Kathleen L. Wieneke, Bar #011139
Christina Retts, Bar #023798
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85281
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: cretts@wienekelawgroup.com

*Attorneys for Defendants City of Phoenix,
Arnold, Rodarme, Palmer, Seaquist, Haynes,
Yamane, Long and Funston*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Lei Ann Stickney, individually and on behalf of all statutory beneficiaries of Casey Wells, and in her capacity as the personal representative of the Estate of Casey Wells;<br><br>Plaintiff,<br><br>v.<br><br>City of Phoenix, a municipality; James Arnold, an individual; Robert Rodarme, an individual; Kenneth Palmer, an individual; Joseph Seaquist, an individual; Dustin Haynes, an individual; Sean Yamane, an individual; Frank Long, an individual; and Travis Funston, an individual;<br><br>Defendants. | NO. 2:20-cv-1401-SMB-CDB<br><br>**DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Defendants City of Phoenix, Arnold, Rodarme, Palmer, Seaquist, Haynes, Yamane, Long and Funston ("Defendants") respectfully submit the following Statement of Facts to support their Motion for Summary Judgment.

**A.** **The Incident**

　　**a.** **The Initial Portions of the Struggle with Officers Arnold, Sgt. Rodarme, and Officer Seaquist.**

1. At 1403 hours on February 4, 2019, a call was placed to 911 to report that a man was naked in the street, had earlier been on his hands and knees screaming, and was a

danger to himself. (Ex. 1, 1403 911 call). The caller reported that the man had already been in the street for approximately 30 minutes. (*Id*.).

2. This 911 call information was input into a Computer Aided Dispatch (CAD) system, which is available to officers to review within their vehicles. (Ex. 2, CAD). At the time, no units were available to respond to the call. (*Id*.).

3. At 1408, a second call was placed to 911 from a different citizen, Jen, about the nude male in the street. (*Id*.)

4. At 1414, a third call was placed to 911 from another citizen, Holly, and information was entered by the dispatcher advising officers that the subject was nude, staring up at the sky and noted that the subject "appears impaired." (*Id*.)

5. At 1415, a fourth call was placed to 911 by James, a fire operations mechanic, who also reported a male subject nude in the street. (*Id*)

6. At 1415, a fifth call was placed to 911 about the naked man, with the dispatcher entering notes advising that the caller was "concerned about children that live in the area that would be coming home from school." (*Id*.; Ex. 5, 1420 911 call).

7. Ultimately, six calls were placed to 911, with one of the original callers calling twice, and at 1416 complaining that officers had not arrived, and reporting that the nude male was standing in the middle of the road in danger of being hit, and she was standing outside yelling for people to slow down so he was not hit. (Ex. 3, 1416 911 call).

8. In response, the dispatcher entered details that the subject was now standing in the roadway. (Ex. 2, CAD).

9. In addition to the CAD electronic information, the dispatcher also put out information over the radio and after receiving these multiple 911 calls, the dispatcher broadcast that: "A bunch of neighbors are calling in. Again, it's 3821 West Salter Drive, 21-300 North, nude male, going up and down the street, been yelling at himself for 30 minutes. He only recently took his clothes off. White male, 40, 6-foot, 280. Last time they said that he's doing yoga poses out in the street at 1415, units to follow." (Ex. 5, audio of radio at 0:00-1:08).

10.     At 14:15:33, Sgt. Rodarme (call sign 93B) advised that he was enroute to the scene. (Ex. 2, CAD).

11.     At 14:18:02, Officer Arnold (call sign 934B) advised that he was enroute to the scene, arriving at 14:19:18 (Ex. 2; Ex. 6, Arnold Deposition at 65:17-67:11).

12.     When Officer Arnold arrived, he parked his patrol car, pulled 10-15 feet from Wells—keeping his distance and "trying to engage in conversation with him"—and seeing his clothes in a pile north of him "telling him that we needed to get him dressed and figure out what's going on here."  (Ex. 6 at 67:15-68:6).

13.     Officer Arnold did not believe that Wells was in any medical distress, but thought it was likely that he was on drugs, particularly given the call details that Wells was likely impaired. (Ex. 6 at 68:7-22, 147:18-148:1).

14.     A citizen video captured Officer Arnold's initial attempts to speak with Wells, who can be seen naked, with a large full beard, and shaking his head vigorously in response to Officer Arnold as Officer Arnold tried verbal persuasion to deescalate the situation. (Ex. 7, civilian video; Ex. 6 at 148:2-149:10).

15.     Although unknown to Officer Arnold at the time—within Wells clothing and providing him a motive to resist arrest—was a glass pipe with methamphetamine residue, a baggie containing methamphetamine, and $3,000. (Ex. 8, photographs, COP-STICKNEY000201, 217, 258, 260, 283, Ex. 9, photograph, COP-STICKNEY00195; Ex. 18, Palmer Deposition at 30:3-16).

16.     Wells did not live in the area and had driven there in a silver Ford Fusion. (Ex. 9, COP-STICKNEY00195).

17.     When Officer Arnold tried to verbally engage Wells—asking him "Sir, what are you doing out here with no clothes on?"—Wells stated something to the effect that "I was born naked, or I came into this world naked and I'm going to leave this world naked; or God meant for me to leave this world naked." (Ex. 6 at 69:9-20; 72:7-73:9).

18.     When Officer Arnold told Wells that he needed to get dressed and would be handcuffed for his safety, Wells stated "You're not going to cuff me." (Ex. 6 at 72:14-73:9).

3

Officer Arnold asked "Why, are you going to fight me? Are we going to have issues?", with Wells stating in response: "You're just not going to cuff me." (*Id*.)

19.    Based upon what he observed, Officer Arnold made the decision to wait for backup before touching Wells. (*Id*.)

20.    While waiting for backup, Officer Arnold continued to try to keep Wells calm because he did not want to wrestle around with someone who was naked and verbally expressed that he would not be put in cuffs; more officers arriving would create a deterrent to Wells fighting. (Ex. 6 at 74:9-75:10).

21.    Sgt. Rodarme arrived several minutes after Officer Arnold, at approximately 14:22:14. (Ex. 2, CAD).

22.    Based upon the initial 911 call, by the time that Sgt. Rodarme arrived, Wells had been at the scene for at least 45 minutes. (*Id.*).

23.    When Sgt. Rodarme arrived, he observed Officer Arnold trying to talk to Wells and "deescalate him," assuring Wells that the officers could get him help as he was naked and they needed to get him out of the street. (Ex. 10, Rodarme Deposition at 28:12-29:3).

24.    Because the area was known for methamphetamine calls and based upon what he observed, Sgt. Rodarme believed that Wells was under the influence of drugs and his belief was solidified once Wells began to fight with superhuman strength. (*Id.* at 135:14-136:3; 140:21-141:10).

25.    Wells was standing in a position with his arms off to the side in an airplane position and with clenched fists. (*Id*. at 30:18-31:10).

26.    Wells was completely naked, grunting, non-compliant, and responded to officers with "fuck you." (*Id*. at 31:7-24).

27.    Officer Arnold then took hold of Wells' left arm and Sgt. Rodarme took hold of his right arm (while Wells held his arms out in an airplane position), while still verbally engaging with him and giving him every opportunity to voluntarily place his hands behind his back. (*Id*. at 31:7-33:9). The officers did not try to force his arms back, but first tried

4

to negotiate with Wells, telling him that they would take him to get help and were trying to help him. (*Id*.).

28.     To deescalate the situation, Sgt. Rodarme told Wells that he was not under arrest, that he was being detained for his safety, and that the officers wanted to help him, but in response Wells grunted and remained non-compliant. (*Id*.).

29.     Sgt. Rodarme used this deescalation technique of telling Wells that he was being detained because, when individuals are told they are under arrest, they seem to think that it is inevitable that they are going to jail. (*Id*.).

30.     For approximately forty-five seconds to a minute, the officers continued to hold onto Wells arms and tell him that they were trying to help him, but he would not comply and was using his strength to hold his arms stiff as he grunted and yelled.  (*Id*.)

31.     Wells would not listen or comply.  (*Id*.).

32.     The officers continued to plead with him and try to deescalate the situation— pleading with Wells not to resist, don't make things worse, and explaining to him that just because he was being placed in handcuffs he would not be arrested, yet every time they tried to pull his hands down to place them behind his back he would resist.  (Ex. 6, Arnold Deposition at 81:9-84:17).

33.      As Officer Arnold explained, "We had been pleading with him to get him into cuffs. I had mentioned to Casey, again, with no response, I had mentioned after we had pleaded with him, I said, 'Sir,' I said, 'We've asked you nicely.  We've told you that we're going to get you in cuffs and you're still resisting.  Our next step is we're going to make you go in cuffs." (*Id*. at 81:13-84:17).

34.     Officer Arnold and Sgt. Rodarme then tried to pull Wells arms down to handcuff him and "he immediately started being aggressive and was trying to get out of our hold, in which he did and started to run away and then he came back and started punching at Officer Arnold." (Ex. 10, Rodarme Deposition at 36:3-23; Ex. 6, Arnold Deposition at 81:13-84:17).  Wells resisted arrest by pulling away and then began punching and kicking at the officers. (*Id*.).

5

35.     Officer Arnold recounted that "He got into a fighting stance, balled his fists and he took a swing at me. He hit me right here in the bottom lip and then backed off and smiled on his face and started bouncing up and down again. So, at that point, that's went I approached him getting him into a bear hug. And when doing so we're wrestling around, still standing up. I don't have the leverage, even though I'm taller than him, he's a stocky man and I didn't have the leverage to bend him over. So he would lose footing and fall to his back." (Ex. 6, Arnold Deposition at 81:20-82:15).

36.     After Officer Arnold was punched in the face by Wells, he turned to Sgt. Rodarme in surprise and said: "He punched me in the face." (Ex. 10, Rodarme Deposition at 37:19-24).

37.     When Officer Arnold had Wells in the bear hug, Sgt. Rodarme pulled out his Taser, but was unable to deploy it, as he was concerned about Wells getting away "[w]e can't let him go into any other house, get away from us and try to go into any other houses, it would be a dangerous situation. We're trying to get him on the ground." (*Id*. at 38:1-9).

38.     Sgt. Rodarme pulled down on Wells' shoulders and both Officer Arnold and Wells fell to the ground, with Wells on his back facing upwards continuing to kick and punch at officers. (*Id*. at 38:1-25).

39.     Officer Arnold held Wells' arm on his left side, but lost his grip and Wells punched Sgt. Rodarme in the face (ultimately connecting), looked like he might be trying to head-butt the officers, and in response Officer Arnold immediately deployed a single forearm strike to stop the attack and re-gain control of Wells' arm. (Ex. 10, Rodarme Deposition at 38:1-25; 39:1-10; 44:10-21; Ex. 6, Arnold Deposition at 90:21-91:3, 94:9-11, 95:13-18; 150:3-22).

40.     After Officer Arnold re-gained control of the loose arm, Wells appeared to be even more angry and spit blood in Sgt. Rodarme's face and eyes; Sgt. Rodarme realized that it would take more officers to safely take Wells into custody. (Ex. 10, Rodarme Deposition at 59:10-61:24, 71-72; Ex. 6, Arnold Deposition at 90:21-91:3, 97:13-24).

41.     As Wells was faceup on the ground and because he had exhibited superhuman strength and struck Sgt. Rodarme in the mouth, Sgt. Rodarme told Officer Arnold "We're going to wait here. We're going to hold him down so we can safely get him into custody and get fire to treat him." (Ex. 10, Rodarme Deposition at 71:3-72:6)

42.     At approximately 14:24:58, after having been punched in the face, Wells having spit blood on him and Sgt. Rodarme winded from the struggle, Sgt. Rodarme requested another unit to respond to assist (Ex. 5, audio of radio transcript at 9:40-46; Ex. 2, CAD; Ex. 10, Rodarme Deposition at 67:18-22).

43.     Additional units were advised to respond by the Lieutenant, who vocalized over the radio that "it sounds like he is fighting," asked for several officers to respond, and the dispatcher was advised to check for the "air unit please." (Ex. 5, at 10:00-10:12).

44.     At 14:25:29, the CAD reflects that Sgt. Rodarme was in a possible 239 (a fight). (Ex. 2, CAD).

45.     Officer Seaquist heard Sgt. Rodarme's request for additional units and could tell that the situation was serious based upon the tone of Sgt. Rodarme's voice. (Ex. 11, Seaquist Deposition at 45:7-13).

46.     While waiting for another officer to arrive and providing a period of deescalation for Wells, Officer Arnold and Sgt. Rodarme held him face up by his arms on the ground. (Ex. 10, Rodarme Deposition at 61:8-24).

47.      Officer Seaquist (call sign 934D) answered for the call at 14:25:15 and arrived on scene at 14:27:41—nearly three minutes after Sgt. Rodarme radioed for assistance. (Ex. 2, CAD).

48.     As Officer Seaquist arrived, he saw Officer Arnold and Sgt. Rodarme struggling to control Wells, who seemed to be in the fight "for the long haul" and was kicking, but neither officer was using any strikes and were only controlling him with soft empty hand techniques. (Ex. 11, Seaquist Deposition at 51:18-25; 62:9-13; 96:20-97:8).

49.     Officer Seaquist's impression based upon training received related to drug recognition, was that Wells was likely on drugs, not that he was mentally ill, as he had seen

similar states of undress with PCP and bath salts, but not such states of undress with mental illness. (Ex. 11, Seaquist Deposition at 85:16-87:8, 90:3-91:4, 95:11-20, 96:20-97:8, 204:11-25, 205:18-209:17).

50.     When Officer Seaquist, all three officers tried to roll Wells over to get him into custody as quickly and safely as possible because he had been throwing punches and kicking. (Ex. 11, Seaquist Deposition 69:25-70:6).

51.      Wells was kicking and Officer Seaquist grabbed onto his legs to attempt to control them. (Ex. 11, Seaquist Deposition at 62:20-63:16).

52.     The offers then rolled Wells over and, in the process, Wells tucked his arm under him and continued resisted Officer Arnold and Sgt. Rodarme's attempt to handcuff him by keeping his right arm pinned under his body. (Ex. 6, Arnold Deposition at 103:12-105:13)

53.     To keep Wells from kicking, Officer Seaquist wove Wells' legs together and pushed them toward his buttocks as the other two officers continued to struggle to restrain Wells. (Ex. 11, Seaquist Deposition at 63:25-64:21).

54.     Wells then pushed back on Officer Seaquist's vest and Wells kicked Officer Seaquist in the thighs. (Ex. 11, Seaquist Deposition at 65:12-67:16).

55.      As Wells kept his right arm pinned underneath him, he continued to resist arrest, refused to give his arm up, and Sgt. Rodarme told Officer Seaquist to Tase him. (Ex. 10, Rodarme Deposition at 78:20-79:8; Ex. 6, Arnold Deposition at 105:6-13).

56.     Officer Seaquist yelled to Sg. Rodarme and Arnold, "I'm deploying the Taser," and he gave commands to Wells to stop resisting, but he kept fighting and Officer Seaquist deployed the first Taser cartridge. (Ex. 11, Seaquist Deposition at 67:25-69:16; 106:1-107:16).

57.     Officer Seaquist deployed the Taser while Officer Arnold was on Wells' right side attempting to get his arm out from being pinned under his body and Sgt. Rodarme was on the left side attempting to gain the left arm for control, but the Taser had a small spread

and little effect. (Ex. 11, Seaquist Deposition at 70:7-20; Ex. 6, Arnold Deposition at 84:25-86:2; 106:1-107:16).

58.     Wells tensed momentarily with only a small probe spread, but then "still kept into the fight." (Ex. 11, Seaquist Deposition at 69:1-16; Ex. 6, Arnold Deposition at 85:17-88-24).

59.     After the first Tasing, Officer Seaquist kept yelling at Wells to "stop resisting" and then deployed the second cartridge, which was not effective in stopping Wells' resistive actions. (Ex. 11, Seaquist Deposition at 71:21-73:3; Ex. 10, Rodarme Deposition at 79:9-81:22).

60.     With Wells continuing to resist and the officers becoming exhausted, Officer Seaquist kept yelling at Wells to stop resisting and, when he did not, pulled the trigger a third time. (Ex. 11, Seaquist Deposition at 72:4-13).

61.     Officer Seaquist recalled making out Wells' hand being in a fist as Sgt. Rodarme was trying to get his arm out. (Ex. 11, Seaquist Deposition at 102:24-103:12).

62.     Officer Seaquist activated the Taser a fourth time, but did not believe it was effective in stopping the resistance in it and that wells "was still in it for the fight." (Ex. 11, Seaquist Deposition at 102:4-12).

63.     Officer Seaquist did not have any recollection of deploying the Taser a fifth time, but testified that Wells was able to be cuffed after the last Taser activation. (Ex. 11, Seaquist Deposition at 107:21-110:11).

64.     Officer Seaquist's goal was to take Wells into custody safely and to keep the community and officers safe. (Ex. 11, Seaquist Deposition at 119:1-122:4).

65.     The Taser download (which is not synched to the CAD records), documents five Taser activations, for a total of 26 seconds.   (Ex. 12, Taser Download, COP-STICKNEY000500).

   **b.     <u>Officers Long and Funston</u>**

66.     Officer Funston also heard Sgt. Rodarme over the radio ask for additional units: "He's out of breath, I could tell. He's stressed out," and he also heard the Lieutenant

9

come onto the radio and advise that it sounded like there was a physical fight. (Ex. 13, Funston Deposition at 39:2-40:25).

67.     Officer Funston knew that the area of the call was known for drugs.  (*Id*. at 113:21-25).

68.     Officer Funston is EMT certified. (*Id*. at 12:22-13:2).

69.      Officers Funston and Long arrived at approximately 14:28:11 (Ex. 2, CAD).

70.     When Officer Funston arrived on scene with Officer Long, he observed Wells yelling and screaming, flailing and kicking his legs, with officers giving commands to Wells to stop resisting, and he could tell that one Taser cartridge had already been deployed. (Ex. 13, Funston Deposition at 41:1-3, 42:22-43:8; 43:25-45:15; 63:8-64:21; 81:17-20).

71.     Sgt. Rodarme warned Officers Funston and Long that he had been spit on and that he was also struck by Wells, both of which are aggravated assaults. (Ex. 13, Funston, 112:5-15; Ex. 14, Long Deposition at 59:9-61:11).

72.     Officer Funston knew that a citizen had called with concerns that kids would soon be coming home from school and he wanted to assist with having the situation handled "as quickly and sufficiently as possible for the safety of him, myself, and for the kids if they have to come by." (Ex. 13, Funston Deposition at 112:21-113:9).

73.     Officer Long immediately stepped in to assist Sgt. Rodarme with controlling Wells' left hand as he was still pulling and tensing and it appeared that Sgt. Rodarme was tired. (Ex. 14, Long Deposition at 71:25-73:5).

74.     Wells was being given commands to stop resisting, multiple times, and Officer Seaquist told him "Hey, I'm going to tase you again, stop resisting. I'm going to tase you again, stop resisting," and the second cartridge was deployed.  (Ex. 13, Funston, 45:8-46:13, 47:18-48:2).

75.     Officer Funston began attempting to apply a RIPP restraint, which throughout the time that he was trying to apply it, Wells was: "Actively kicking. He kicked me several times during that. And then once I was able to get it wrapped around his ankles he was still

trying to kick out of it and kick us. It made it difficult." (Ex. 13, Funston Deposition at 50:4-16; 57:25-58:14; Ex. 10, Rodarme Deposition at 82:6-14).

76.     As Officer Funston tried to clip the RIPP restraint to the handcuffs, Wells continued to resist and tried to uncross his feet; in working with the RIPP restraint, Officer Funston only used his hands and did not place any body weight on Wells.  (Ex. 13, Funston Deposition at 50:17-51:10, 65:8-15, 98:16-21).

77.     Officer Long saw Officer Funston struggling with the RIPP restraint while Wells was trying to arch his back like he was trying to get up and appeared to be intentionally kicking his legs, Officer Long was trying to keep things as calm as possible as it is extremely difficult to get someone who is naked in custody because there is nothing to grab onto.  (Ex. 14, Long at 76:11-77:17; 145:12-147:11, 152:4-9).

78.     Because Wells continued to resist and he was not secured, Officer Funston heard Officer Seaquist command Wells multiple times to stop resisting, but Wells did not stop resisting and Officer Seaquist did another Taser activation, which resulted in Officer Funston finally being able to secure the RIPP restraint and seconds afterwards Wells went limp. (Ex. 13, Funston Deposition at 53:10-54:17; 56:15-57:24; 62:10-63:7).

79.     Officer Funston never heard another Taser activation after the clip of the RIPP restraint was finally attached to the handcuffs. (Ex. 13, Funston, at 113:17-114:20).

80.     As the officers struggled to handcuff Wells and he was still resisting as the RIPP restraint was applied, Officer Arnold placed less than 50% weight through his knee on Wells' right shoulder blade for purposes of controlling his movement (with the majority of his weight being carried by the opposite leg that was not on Wells and his arm that was leaning on that opposite leg) only until he was fully restrained as the fire department would not respond until he was; Officer Arnold did not believe that the location or limited weight was physically compromising. (Ex. 6, Arnold Deposition at 111:15-113:11, 114:2-10, 151:4-9).  He applied no force to Wells' neck and no carotid control hold was applied. (*Id.* at 138, 149:14-23).

81.     Officer Long never saw a knee placed on Wells' shoulder.  (Ex. 14, Long Deposition at 66:16-67:2).

82.     While focused on Wells feet and trying to get them secured, Officer Funston did not see Officer Arnold place any weight on Wells.  (Ex. 13, Funston Deposition at 78:25-79:5).

83.     A suspect can continue to kick up until the point that the RIPP restraint is secured to the handcuffs. (Ex. 10, Rodarme Deposition at 138:10-16).

84.      It was not until shortly after the clip was secured, that Officer Long noticed that Wells was not responsive and he was immediately rolled over and Officer Seaquist began CPR; before that point, Wells did not appear to be in any medical distress and "put up a great fight." (Ex. 14, Long Deposition at 50:13-51:2, 154:18-23)

85.     Officer Seaquist immediately began CPR with Funston continuing within seconds of the RIPP restraint being attached and officers discovering that Wells had stopped moving. (Ex. 13, Funston, at 53:10-54:17; 56:15-57:24; 62:10-63:7).

### c.     <u>Officers Yamane and Haynes</u>

86.     Officer Yamane also heard Sgt. Rodarme—who normally sounded calm and collected—radio for help and "He sounded like he was in need of help. Like he was breathing heavily." (Ex. 15, Yamane Deposition at 55:14-56:1).  Officer Haynes heard the same and the officers rode together to the scene. (Ex. 16, Haynes Deposition at 37:23-68:23-69:14).

87.      Officer Haynes immediately went to assist Officer Funston with Well's legs because he saw that Wells resisting with his legs and Officer Funston could not secure the loop around Wells ankles (Ex. 16, Haynes Deposition at 39:1-22; 56:1-20).

88.     Officer Yamane also observed that Officer Funston was struggling with Wells legs and it appeared that Wells was "trying to leverage himself to turn over by pressing into the ground and spreading his feet apart." (Ex. 15, Yamane Deposition at 41:9-20).

89.    While Officer Yamane was trying to help cross Wells' feet, he was stiffening and moving his legs and Officer Haynes heard Officer Seaquist say "Stop resisting" and heard the Taser go off. (Ex. 16, Haynes Deposition at 45:20-46:23).

90.    Officers had difficulty with attaching the RIPP restraint to the handcuffs because Wells was stiffening his legs, was still resisting, and had his legs "locked out." (*Id*. at 62:15-64:14).

91.    While Officer Yamane was struggling to cross Wells legs to apply the RIPP restraint—because Wells had been kicking around—he could feel Wells tense from the Taser.  (Ex. 15, Yamane Deposition at 42:13-45:13).

92.    It was not until after Officer Haynes and Yamane heard the Taser, the last time, that officers were able to clip the RIPP restraint to the handcuffs. (Ex. 16, Haynes Deposition at 45:20-46:23; Ex. 15, Yamane Deposition at 111:24-112:18).

93.    Officer Haynes never placed his body weight on Wells during the incident. (Ex. 16, Haynes Deposition at 99:15-19).

94.    The only weight that Officer Yamane placed was through his hands as his knees were in a spread-eagle position, with his knees in the air, and he never placed any weight on Wells (Ex. 15, Yamane Deposition at 111:5-23).

95.    Officer Yamane did not see any other officer put body weight on Wells through their legs. (*Id*. at 112:19-22).

96.    When Wells was on the ground and until the RIPP restraint was clipped, he had still been actively resisting and was a danger to officers. (Ex. 15, Yamane Deposition at 48:3-11).

97.    The RIPP restraint was not shortened and was clipped to the chain of the handcuffs. (Ex. 17, COP-STICKNEY00292).

### d.    Officer Palmer

98.    Officer Palmer arrived to the scene, near the end of the struggle with Wells, and at approximately 14:30:37 advised over the radio that Wells was detained (but not in custody). (Ex. 2, CAD; Ex.18, Palmer Deposition at 83:25-84:10).

99.     As he arrived, Officer Palmer observed that Wells was not yet handcuffed and officers were trying to control Wells feet with a RIPP restraint.  (Ex. 18, Palmer Deposition at 26:11-19).

100.     Officer Palmer heard Officer Seaquist give the command to Wells, "stop, or I'm going to Tase you," and then heard a five second Taser cycle.  (*Id*. at 61:25-62:23).

101.     When he heard the Taser cycle, Officer Palmer observed that the officers were still trying to secure Wells hands and had one handcuff on his wrist toward the small of his back. (*Id*. at 64:1-66:11).

102.     Officer Palmer does not recall noticing that Officer Arnold had any weight on Wells' back. (Ex. 18, Palmer Deposition at 96:21-23).

103.     Officer Palmer was wearing a body worn camera, which captured a limited portion of the event, and Officer Arnold is standing by at least 14:30:58 on the video before Wells rolled over and then discovered to not be breathing. (Ex. 19, Body Camera Video (Redacted)).

104.     From the time that Officer Palmer exited his car at 14:30:14 to the time that Wells was rolled over at 14:31:07, less than a minute elapsed. (Ex. 19, 5:16-6:10).

105.      Officer Palmer did not have any physical contact with Wells. (*Id*.).

106.     Officer Palmer was never in a position to get down to feel if Wells was physically resisting, he never touched wells, could not tell if he was clenching his body or tensing, and could not tell if he was trying to lift his body off of the ground. (Ex. 18, Palmer Deposition at 101:14-103:12).

107.     Officer Palmer interviewed on camera a nearby citizen, who had earlier seen Wells yelling at the sky, reported that when Officer Arnold arrived he immediately though that he would need backup to take Wells into custody. (Ex. 18, Palmer Deposition at 30:20-33:16; Ex. 19, Body Camera at 14:41-21:15). Before police arrived, the citizen warned his neighbor to keep an eye on Wells because he could be a "mass murderer" and that to be careful with someone is not in his right mind who might start shooting people.  (Ex. 19 at 17:10-17:40). Wells was non-compliant, struggling, "refused to get arrested," and he

observed one of the Officers get hit in the head. (*Id*. at 17:58-19:39). The citizen saw Officer Arnold grab Wells in a bear-hug from the front and then saw them both fall to the ground, with Wells continuing to struggle and resist. (*Id*. at 18:00-18:52) Seeing the great danger faced by the two officers struggling to control Wells, Mr. Antoines was going to help and "tie his ankles" because he was kicking. (*Id*. at 18:22-18:30). He "thought he [Wells] was going to reach for his gun" when Officer Arnold put him in a bear hug. (*Id*. at 18:50-19:26).

### e. **Requests for Medical/Fire Response**

108.    At 14:27:52, the fire department was requested to be sent to the scene. (Ex. 2, CAD).

109.    At 14:30:42, the fire department was again requested, by Officer Palmer, due to a tasing.  (*Id*.)

110.    At 14:31:01, Officer Palmer advised that the fire department could come into the scene. (*Id*.)

111.    At 14:31:32, Officer Palmer requested that fire hurry up their response because Wells was not breathing (*Id*.)

112.    From the time that Sgt. Rodarme arrived on scene, until the time that Wells was secured in handcuffs and RIPP restraints and discovered not to be breathing, less than ten minutes had passed (Ex. 2, CAD).

113.    From the time that Officer Seaquist arrived on scene, until the time that Wells was secured in handcuffs and RIPP restraints and discovered not to be breathing, less than four minutes had passed. (Ex. 2, CAD).

### B. **Medical Evidence.**

114.    The toxicological report for Wells was positive for methamphetamine. (Ex. 20, Toxicological Report).

115.    Wells was transported to HonorHealth Deer Valley for medical treatment, a Lucas device was used for CPR during transport, he was intubated, and a CT scan revealed "no acute bony abnormality of the cervical spine." (Ex. 21, WELLS001030-1031, 1230).

116. Emergency Physician, Dr. Vilke, opined that there was no medical evidence of a crushed airway or damage to the neck that could cause death and that "even though there are injuries noted to the thyroid cartilage on autopsy, these are not specific to a neck hold. They are indicative of neck trauma having occurred, but does not define exactly when or how the trauma occurred." (Ex. 22, Dr. Vilke Report at 22-26).

117. Dr. Vilke further opined that transitory weight force on the shoulder of Wells did not cause or contribute to his death, nor did hands-on only force used to place Wells in handcuffs and a RIPP restraint. (*Id*. at 19-17)

118. Dr. Vilke further opined that the Taser use did not cause or contribute to the death of Mr. Wells. (*Id*. at 20-21).

119. The Medical Examiner, Dr. Horn, did not include the Taser as a cause or contributor to death, specifically stating: "Examination of the back revealed two apparent shallow puncture wounds likely corresponding to sites of dart implantation from the CEW in the skin of his back, with at least one puncture wound able to be delineated and measured to a depth of approximately 1 cm with the fat and soft tissue of the back, associated with a small amount of surrounding hemorrhage. As the CEW darts were only superficially penetrating into the skin and subcutaneous tissues, were not placed over or in proximity to the heart, and had no apparent immediate effects on his consciousness or cardiac function at the time the CEW was deployed (as he had continued to physically struggle after the last CEW deployment), the CEW is not considered a potential cause or contributing cause of death in this case." (Ex. 23, COP-STICKNEY00547).

120. Dr. Levine opined that Wells was under the influence of methamphetamine at the time of the officers' encounter with him, and that the drugs contributed to his presentation on that date. (Ex. 24, Dr. Levine Report).

C. **Prior Contact with Police**

121. On December 14, 2016, while under the influence of methamphetamine and after unlawfully entering a home that was not his, Wells refused to stop for police and

16

engaged instead engaged in felony flight. (Ex. 25; Affidavit of Arrest and Direct Criminal Complaint, COP-STICKNEY006924-6931).

122.    When confronted about why he did not stop for police, he admitted that he was aware of the officer trying to stop him but that he "isn't subject to man's law." (*Id*. at COP-STICKNEY006929).

123.    After entering a guilty plea for drug paraphernalia-possession/use (A.R.S. § 13-3415(A) and Criminal Trespass-1st Degree-Residential Structure (A.R.S. § 13-1504(A)(1)), Wells was placed on probation for a period of 2 years, to begin on January 20, 2017, and he was required to maintain a crime-free lifestyle, obey all laws, and that he would possess or use illegal drugs or controlled substances. (Ex. 26, Uniform Conditions of Supervised Probation, COP-STICKNEY006941-6958).

124.    While on probation, on March 26, 2018, Wells was arrested by Mesa Police Department for disorderly conduct and indecent exposure—after being found nude in public—in addition to a guilty plea for this crime he also had multiple prior instances of use of illegal substances. (Ex. 27, Memo to the Court and Petition to Revoke Probation, COP-STICKNEY006959-61).

125.    Based upon his continued drug use and criminal conduct, Wells probation was extended to February 13, 2019, and he served 90 days in jail beginning 5/18/2018. (Ex. 28, Extension of Probation, at COP-STICKNEY006963-006974).

**D.    Phoenix Police Department Operations Orders and Training Related to Force, Positional Asphyxia, and Excited Delirium.**

126.    The Phoenix Police Department's use of force guidelines are reflected in Operations Order 1.5, which explicitly recognizes the City's respect for the dignity of all life. (Ex. 29, Sgt. Calle Deposition at 30:21-31:25; Exhibit 30, Operations Order 1.5, COP_STICKNEY 003723-3743)

127.    Generally, Operations Order 1.5(3)(B) provides that the Department's policy is to "use a reasonable amount of force to conduct lawful public safety activities" and that the proper use of a particular level of force depends on totality of circumstances, taking into

consideration: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. (Ex. 30 at COP-STICKNEY003723)

128.    The policy defines "reasonable belief," "excessive force," "types of resistance," and gives force "options" which are to be determined based upon the "totality of the circumstances." (*Id*. at COP-STICKNEY003722-3733).

129.    The policy further defines "Elements of Force" that the officers "need" to consider, including whether the suspect: (1) has a reasonable ability to carry out the act; (2) has a reasonable opportunity to carry out the act; and (2) creates a jeopardy to the officer or others. (*Id*.)

130.    Under the heading "Escalation/De-Escalation of Force", Operations Order 1.5(3)(C), states that "[w]hen use of force is needed, employees will assess each incident to determine, based on policy, training, and experience, which use of force option will de-escalate the situation and bring it under control." (*Id*.)

131.     Employees are directed that they "will intervene, if a reasonable opportunity exists, when they know or should know another employee is using unreasonably use of force," and must immediately report "excessive force" verbally to a supervisor). (*Id*.)

132.    Operations Order 1.5(4) sets forth the various use of force options that may be used depending on the totality of those circumstances, which includes not only force, but options aimed at obtaining compliance without force such as presence, verbal persuasion, negotiation, or command. (*Id*. at COP_STICKNEY003724).

133.    Operations Order 1.5(C) identifies RIPP restraints as a permitted device, but specifically states that "employees **will not** restrain subjects with their legs behind their back (hog-tying)." (*Id*.)

134.    Operations Order 1.5(4)(E) provides guidelines for use of an Electronic Control Device, including an explanation of how the Taser functions, its effect in temporarily incapacitating a suspect, and factors that determine when it should and should not be used:

18

ECDs, such as the Taser, use compressed nitrogen gas to propel probes and wires that conduct electrical energy which overrides a subject's central nervous system, attempting to temporarily stop the subject's actions.

ECDs may be used when it is objectively reasonable based on the totality of the circumstances, on subjects who are displaying active aggression, or who are placing an officer or a third party in reasonable apprehension of imminent physical injury, or to prevent a subject from harming him/herself.

The following circumstances should be considered prior to use:

*Is the suspect posing an imminent threat to the safety of officers, a third party, or him/herself?

*What is the severity and violence level of the crime?

*Do the suspects have a history of violent behavior?

*If a arrest team is not available, is it feasible to delay deployment to wait for one?

When the circumstances justifying the use of an ECD no longer exist, the ECD will immediately be discontinued.

* Employees may still use reasonable force to maintain control and to protect themselves or others from danger when such force can be justified through the totality of the circumstances.

ECDs will not be used for any of the following:

• Coercion of any type

• Against subjects solely for running from the officer

• Against a subject who would be in danger of falling from a significant height

• When subjects are near flammable liquids and gases

• Intimidation by reckless display

• Escorting or prodding individuals

• Waking unconscious or intoxicated individuals

• Individuals operating a motor vehicle

• Individuals holding a firearm when their finger is on the trigger

• Handcuffed prisoner's resisting/refusing to enter a police vehicle, holing room, or hanging onto a railing or other item, etc.

(*Id*. at COP-STICKNEY003726-3727.)

135. Operations Order 1.5(4)(E) further advises officers should avoid using the Taser against certain persons (known or visibly pregnant women, elderly persons, young children, and handcuffed prisoners) unless the officers can articulate that other reasonable force options have been tried or were unlikely to succeed. (*Id*. at COP-STICKNEY003727).

136. Operations Order 1.5(E) provides tactical considerations for Taser deployment:

> • Will announce deployment to prevent contagious fire.
>
> • Will communicate with other employees upon arriving at the scene.
>
> • Will, when practical, have an arrest team available.
>
> **• Will consider whether other options exist when dealing with mental health or excited delirium subjects.**
>
> **\*If an exigency exists for ECD use, the circumstances regarding the decision will be explained in the Incident Report.**
>
> <u>Tactical Considerations:</u>
>
> • Will, if it is determined an extended cycle is necessary to control a combative subject, explain the circumstances regarding the decision in the IR.
>
> • Should only apply the number of cycles reasonably necessary to safely approach and restrain a subject (a limit to the number of cycles that may be administered to a subject has not yet been determined).
>
> Should Deploy the Taser for one 5-second cycle, evaluate the subject's response, and when feasible, allow the arrest team to control the subject.
>
> > • Subsequent application can be made if control over the subject is not achieved.
> >
> > • If the Taser is ineffective or inoperable, consider another force option.
> >
> > • If an arrest team is not available is it feasible to delay deployment to wait for one?
> >
> > …
>
> • Employees will avoid using ECDs against the following

subjects, unless employees can articulate other reasonable force options have been tried or were unlikely to succeed:

…

• Handcuffed prisoners

(*Id*. at COP_STICKNEY003) (emphasis added).

137. Officers receive training based upon this policy, including the expectation that if a person were Tased, in handcuffs, and RIPP restrained that the expectation is that they would be rolled into the recovery position as soon as possible. (Ex. 29, Calle Deposition at 77:17-79:13).

138. Operations Order 1.5(4)(E) provides that the primary target for Taser probes should be "Center mass of the subject's back." (Ex. 30, at COP-STICKNEY003728).

139. Officers are trained to use the back as a preferred target, to minimize the potential of exposure to the chest to avoid darts near the heart. (Ex. 29, Calle Deposition at 191:10-19; Ex. 31, Taser X2 Operator Lesson Plan).

140. Officers are also trained that Tasers may not be effective against focused aggressors or people under the influence of drugs; that they should "only apply the number of cycles reasonably necessary to allow safe restraint of the subject;" and "if ineffective, avoid repeated cycles and select another appropriate force option." (Ex. 31, Taser X2 Operator Lesson Plan, at 7 & 17).

141. Officers receive training on the Taser, including that using the Taser improperly, such as letting it run for an extended period of time, could cause serious injury or death, and that there are certain people who are not good candidates for use of that tool/tactic, and that the officer must look at the totality of the circumstances to justify each deployment. (Ex. 29, Sgt. Calle Deposition at 51:11-54:1).

142. Officers are trained about how the Taser works, circumstances when it should not be used, that numerous exposures and prolonged exposures are "frowned upon," and that officers are "expected to be able to think through problems and identify times when certain levels of force should or shouldn't be used." (*Id*. at 108:12-25; 111:5-123:14).

143.    Consistent with Operations order 1.5(E), Officers are trained, as a general rule, not to use a TASER on a handcuffed subject, but that based upon the totality of the circumstances there may be instances where it could be used. (*Id*. at 55:3-16).

144.    Operations Order 1.5(F) provides guidelines for intermediate control techniques, including strikes, advising as follows:

> • Areas to avoid are the neck, back, sternum, kidneys and groin.
>
> • Hard empty hand techniques may be used when facing the active aggression level of resistance.
>
> • Although these techniques may be used in some situations when facing passive resistance, officers will first attempt verbal persuasion and soft empty hand techniques when practical.
>
> • Closed fist, palm-heel, and elbow strikes are the only techniques that may be used to strike the face and head, and then only when reasonable as a means to overcome a violent attack.

(Ex. 30, Operations Order 1.5 at COP-STICKNEY003730).

145.    Officers are trained not to strike individuals in the throat, or to target the throat. (Ex. 29, Calle Deposition at 165:25-166:10).

146.    Although deadly force (e.g., firearm or vehicle) was not used in this case, Operations Order 1.5(4)(H) specifically limits the use of deadly force "as a last resort when other measures are not practical under the existing circumstances" and requires that force to be discontinued [w]hen the circumstances justifying the use of deadly force no longer exist."  (Ex. 30, Operations Order 1.5 at COP-STICKNEY003733).

147.    Officers are trained that any tool or technique that it used in a way that creates a substantial risk of causing death or serious physical injury, could be considered deadly force. (Ex. 29, Calle Deposition at 44:8-22).

148.    Operations Order 1.5(5) requires all employees to "receive annual training on the use of force options and policy by Department authorized instructors, who are certified through Arizona Peace Officers Standards and Training Board (AZPOST)." (Ex. 30, Operations Order 1.5 at COP-STICKNEY003734).

149. The City provides annual training on the use of force and Operations Order 1.5, RIPP restraint, sudden in custody death/positional asphyxia, excited delirium, mental illness, effective and crisis communication that includes deescalation, which the involved officers received. (Ex. 29, Calle Deposition at 23:17-24:25; 26:2-27:10; 32:8-33:2, Ex. 32, Use of Force Refresher Lesson Plan 10597; Ex. 33, Use of Force Review, Lesson Plan 10596; Ex. 34, Dealing with the Mentally Ill; Ex. 35, 2015 Module Mental Illness; Ex. 36, Excited Delirium; Ex. 37, Sudden In-Custody Death; Ex. 38, Funston Training; Ex. 39, Palmer training; Ex. 40, Rodarme Training; Ex. 41, Seaquist Training; Ex. 42, Haynes Training; Ex. 43, Yamane Training; Ex. 44, Long Training; Ex. 45, Arnold Training)

150. Officer Long, in addition to attending multiple training modules on mental illness and crisis communications that the other officers also attended, attended a 35 hour block of Crisis Intervention Training ("CIT"). (Ex. 44, Long Training, at COP-STICKNEY 001625).

151. Officer Seaquist had training as a drug recognition officer. (Ex. 41, Seaquist Training, COP-STICKNEY—003143, 3139, 3138).

152. Operations Order 1.5(6) further outlines the reporting requirements for every use of force and subjects it to review by the Use of Force Review Board. (Ex. 30, at COP-STICKNEY003735-38)

153. Critical incidents, per policy, are also reviewed by the Tactical Review Committee and TRC sub-committee to "identify any related training needs" and the committee "may make suggestions regarding amendments to policy." (*Id*. at COP-STICKNEY03739).

154. Operations Order 1.5(7)(B) requires that all use of force incidents that result in death or serious injuries to be investigated ***concurrently*** by the Professional Standards Bureau (PSB); the officer's supervisor; the Violent Crimes Bureau/Homicide Unit; and the Incident Review Unit. (*Id.* at COP-STICKNEY003737; Ex. 29, Calle Deposition at 173:17-174:5).

155.   Operations Order 1.5(7)(F) also directs how the PSB and Supervisor investigations shall be routed. (Ex. 30, Operations Order 1.5, at COP-STICKNEY003738).

156.   Operations Order 1.5(8)(A)-(C) sets up a Tactical Review Committee to review incidents and identify whether there are any related training needs; (8)(D) requires post-training *if* a training need is identified; (8)(E) establishes the Training Bureau's responsibilities in designing and implementing appropriate training if any need is identified; and (8)(F) establishes reporting criteria. (*Id*. at COP-STICKNEY003740).

157.   Operations Order 1.5(9) provides that that the physical and emotional well-being of the officer is a primary concern following any use of force incident and sets forth guidelines for counseling and other assistance, and even allows for reassignment if necessary. (*Id*. at COP-STICKNEY-3741)

158.   Operations Order 7.1 applies to the handcuffing of suspects, and section (3)(d) provides that an officer may consider alternative methods of restraint for "subjects apparently under the influence of drugs, subjects who are obese, subjects known to have cardiovascular disorders, subjects who have injuries preventing handcuffing to the rear," and that "these conditions may increase the risk of injury or death by positional asphyxiation when a suspect is kept face down for a prolonged period of time." (Ex. 46, Operations Order 7.1, at COP-STICKNEY4902-4903).

159.   Operations Order 7.1 (1)(B)(2), further instructs that the only leg restraints that are authorized are the RIPP strap and modified leg irons, and under guidelines for use provides:

    a.   Leg-restraint straps may be used to secure combative or violent subjects to prevent injury to the subject, officers, and others and to minimize the opportunity for escape.

    b.   If either of the restraints is applied, officers will minimize the facedown exposure of the prisoner.

    c.   If the opportunity presents itself, officers should place prisoners in an upright position on their side or back.

(*Id*. at COP-STICKNEY04903).

160.   Operations Order 7.1(1)(B)(4), states that "subjects displaying difficulty breathing or loss of consciousness will be removed from restraints at the earliest opportunity" and "first-aid and/or live saving measures will be initiated, including a request for the Fire Department." (*Id*.).

161.   Operations Order 7.1 specifically advises of the potential risk of injury of death by positional asphyxia if a suspect is kept facedown for a prolonged period of time. (Ex. 29, Calle Deposition at 190:13-191:9).

162.   Officers are trained to determine the totality of the circumstances based upon the *Graham* factors in assessing whether a particular force as deployed might be deadly or non-deadly force, including assessing when it is appropriate to sit a detainee up and put them in the recovery position, and to move them into that recovery position as soon as possible. (*Id*. at 41:7-44:22; 60:15-25; 62:5-17).

163.   Officers are trained that subjects cannot be hog-tied—meaning that the restraint cannot be tightened wow where their ankles are in a tight position—as leaving them in such a position has the potential of creating a serious risk of injury or death. (*Id*. at 45:2-17).

164.   Phoenix Police Department policy prohibits hog-tying. (*Id*. at 59:12-20).

165.   Officers are trained to consider the totality of the circumstances in whether to place any weight while trying to arrest a situation, while considering any issues such as excited delirium and positional asphyxia, gaining control over the person, and getting them into a recovery position and asking for the fire department. (*Id*. at 81:7-19).

166.   Officers are trained on how to appropriately apply the RIPP restraint and instructed on how it cannot be applied, such as by shortening the strap, because that might cause hog-tying and result in positional asphyxia, and instructed that once it is placed "you start getting them out of the prone position as quickly as practical." (*Id*. at 83:7-96:8, 98:19-99:18; Ex. 47, RIPP Restraint Hobble Lesson Plan; Ex. 37, Sudden In Custody Death).

167.     Officers receive AZPOST recruit training (before they become officers) and City of Phoenix training related to positional asphyxia and excited delirium, including that excited delirium is a medical emergency.  (Ex. 29, Calle Deposition at 135:15-137:22. 145:9-146:8; 150:20-151:24; 158:6-159:7; Ex. 47, RIPP Restraint Hobble Lesson Plan; Ex. 37, Sudden In Custody Death; Ex. 36, Excited Delirium).

168.     The expectation, provided through training and policy, is that an officer would not use a knee as force on a person who was not resisting, fighting, and if it is safe to remove the pressure, then the expectation would be to remove the pressure. (Ex. 29, Calle Deposition at 167:18-168:18, 169:11-170:14).

169.     In addition to classroom training, officers also receive: (1) field training for several months to obtain hands-on training regarding all aspects of police work, including a debrief as to all incidents and how they could be effectively resolved; and (2) daily briefings on incidents that have occurred and the tactics that may or may not be appropriate under the given factual circumstances.  (*Id*. at 183:3-185:25).

170.     In terms of physical training on hands-on techniques, the City trains officers on how to apply the technique appropriately verses how to apply it in the wrong way, to avoid an officer, in the heat of the moment, remembering the incorrect technique. (*Id*. at 185:18-190:12).

171.     When questioned about training on positional asphyxia:

a.     Officer Haynes testified that he received training that placing weight on the back of a handcuffed suspect could create a risk of positional asphyxia. (Ex. 16, Haynes Deposition at 83-84);

b.     Officer Yamane testified that he was trained that individuals should not be left face down for any length of time because there was a risk of positional asphyxia and that the placement of weight while in this position could potentially interfere with breathing, but that all times with Wells, he was still resisting and a danger to officers until the RIPP restraint was applied; (Ex. 15, Yamane Deposition at 45:4-50:4).

c. Officer Long testified that he was trained on how to safely handcuff and on the potential risks of positional asphyxia; (Ex. 14, Long Deposition at 21:14-23:14)

d. Officer Seaquist testified that he was provided training on positional asphyxia, including that there can be a risk of interfering with breathing if weight was placed. (Ex. 11, Seaquist Deposition at 184:22-186:5).

e. Officer Funston testified that hog-tying is prohibited, that the RIPP properly applied does not result in a hog-tie, that he was trained on the potential dangers of positional asphyxia, to roll someone in the recovery position as soon as possible, and that pressure on the back could create a risk. (Ex. 13, Funston Deposition at 15:12-32:14).

172. The City also provides officers training on deescalation and "verbal judo", which emphasizes that the overall goal is preservation of life and that the training is "designed to help officers stay focused and calm during crisis situations and bring chaotic moments to as peaceful a resolution as the suspect(s) will afford." (Ex. 48, Decision Making De-Escalation Techniques, COP_STICKNEY0005078-5086, at 3-4).

173. The training includes the concept of "ask, tell, make": (1) first, "ask—be courteous, be professional"; (2) second, "tell—be courteous, be professional;" (3) third, "resources—if I give the subject the order and they don't follow it, do I have the resources to make them. If not start the resources your way, or if feasible wait for the resources become available;" (4) fourth, "make—affect the arrest or detention using the least amount of force and the reasonable objectiveness standard." (*Id.* at COP_STICKNEY005080-81).

174. The City's training on deescalation reviews the *Graham* factors and encourages officers to continuously evaluate the approach to taking someone into custody, to include their potential mental state and objectives. (*Id.*).

175. Officer Seaquist testified that officers were all of the mindset of using "verbal judo," whenever they could. (Ex. 11, Seaquist deposition at 202:2-11). Officer Funston was

one of Officer Seaquist's trainees and he emphasized to him to stay away from physical force unless it was absolutely positively necessary and to focus on verbal judo. (*Id*.).

176.    Officers were also trained on how to interact with the mentally ill, including using scenarios to apply listening skills and demonstrating effective crisis intervention techniques. (Ex. 35, 2015 Module Mental Illness, at COP-STICKNEY003608, 3621-003627; Ex. 34, Dealing with the Mentally Ill, at COP-STICKNEY003598, 3605, 3607).

**E.    Employee Investigations**

177.    The Police Department has a Professional Standards Bureau (PSB), that investigates in-custody deaths, and includes multiple levels of review, including a review board with three civilian members, an assistant chief, a commander, and a peer officer.  (Ex. 49, Lt. Junas Deposition at 20:11-23:7; 26:3-28:4; 63:3-64:14).

178.    The PSB investigators provide facts, which the use of force board and then, the Chief, makes the final determination. (*Id*. at 88:8-16).

179.    The length of time that it takes for a PSB investigation to be finished is very dependent upon the length of time that the Maricopa County Attorney's Office conducts their independent review to determine if there will or will not be charges—as the City "can't close or move forward with an administrative investigation until the criminal is completed." (*Id*. at 120:23-122:2; 132:19-13).

**F.    Purging Files**

180.    Officer Funston graduated from the Police Academy in 2017 and thereafter started working as an officer.  (Ex. 13, Funston Deposition at 7:10-20).

181.    Officer Seaquist testified that he had no knowledge of any purging of files. (Ex. 11, Seaquist Deposition at 190:7-13).

182.    Sgt. Rodarme testified that he had no prior discipline and that he had never requested to have anything purged from his file. (Ex. 10, Rodarme Deposition at 134:3-17).

183.    Officer Yamane similarly had no knowledge regarding purging and no prior shootings, or discipline. (Ex. 15, Yamane Deposition at 38:19-23).

### G.    Dr. Beckson Opinions

184.    Psychiatrist Dr. Beckson opined that Wells was under the influence of methamphetamine, reflecting a relatively high blood concentration of methamphetamine compared with the median methamphetamine concentrations in published studies of methamphetamine-related deaths.  (Ex. 50, Beckson Report, at COP-STICKNEY00705-7082).

185.    Although Wells had a long-history of methamphetamine use, his abuse and behavior spiraled out of control after his uncle (with a similar drug problem, history of mental illness, and similar religious preoccupation) murdered his grandmother and two people staying with her at the time.  (*Id*. at COP-STICKNEY007091-7097).

186.    Dr. Beckson further opined that as a result of Wells' psychosis and illicit drug use, there was a substantial probability (if not likelihood) that even the best efforts of mental health professionals or CIT trained officers would not have gained his cooperation. (*Id*. at COP-STICKNEY00797-7105).

187.    "Acutely psychotic individuals may or may not respond to efforts by mental health professionals to obtain cooperation because of their irrational thinking (which can make logical discussion and persuasion challenging or impossible); delusions (the nature of which may be difficult to discern, and which may involve a drastically different belief system that is divorced from the reality of the situation, such as grandiose beliefs that one has special powers or standing, such as being above the laws of man or being on a special mission from God; or paranoid beliefs that pit the psychotic individual and the professional in an adversarial position); auditory hallucinations (which may include voices that interpret professional efforts as irrelevant or contrary to the psychotic individual's interests or even part of a plot to harm the individual; and such voices may command the individual to resist or attack and harm others)." (*Id*. at COP-STICKNEY007101).

188.    Dr. Beckson opined that Wells' failure to comply and react to Officer Arnold's attempts at deescalation "likely reflected grandiose delusional beliefs about Mr.

Wells' own standing in relation to man and God. Grandiose and delusional beliefs with religious themes are common in acute psychosis; and noted by Mr. Wells' aunt, similar to his uncle, he would become religiously preoccupied when psychotic. Mr. Wells' statements and behavior are reminiscent of Casey Wells' failure to follow police commands in December 2016. After that arrest, while 'ranting about religious issues,' Mr. Wells told police that he doesn't bow to man's law and man will bow to him, which also likely reflected grandiose delusional beliefs about himself in relation to man and God." (*Id*. at COP-STICKNEY007102).

DATED this 18th day of March 2022.

WIENEKE LAW GROUP, PLC

By:    <u>*/s/ Christina Retts*</u>
Kathleen L. Wieneke
Christina Retts
1225 West Washington Street, Suite 313
Tempe, AZ 85281
*Attorneys for Defendants City of Phoenix, Arnold, Rodarme, Palmer, Seaquist, Haynes, Yamane, Long and Funston*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Thomas A. Burnett
Donal E. Burnett
Burnett Law Office, PLC
1744 South Val Vista Drive, Suite 208
Mesa, AZ 85204

Joel B. Robbins
Jesse M. Showalter,
ROBBINS & CURTIN, p.l.l.c.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012

*Attorneys for Plaintiff*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is a registered participant of the CM/ECF System:

N/A

By:     */s/ Mica Mahler*