# EXHIBIT 1

## (Non-Electronic)

# EXHIBIT 2

```
(s0p10.0h10.0v0T
Page 1                    PHOENIX POLICE DEPARTMENT
FOR: EGGERSS         JURISDICTION - PHOENIX POLICE            Tue, Feb-26-2019

CALL: PH19-203420 CLEARED (R)

                Desk/
Time    Date Unit  ID
14:03:37 02 04 911        Position:131                         Phone: 419 757-2602 VERIZON
                          WRLS 800-451-5242
                          20633 N 35TH AVE N
14:04:01 02 04 W31   A5860 Priority: 2 Received by: 9 911 SYSTEM
                          Initial: 311
                           Final: 311
                          Reporting: 07211
                          Telephone:419 757-2602
                          3821 W SALTER DR[HSE
                          Community: PHX County:  District: 9 Zone: 934
                          Contact: NO CONTACT  G1: PETER G2:  Sex: M DOB:              AZ 419
                          757-2602 623 238-5157
14:06:28 02 04 W31   A5860 NUDE MALE GOING UP AND DOWN THE ST // HAS BEEN YELLING TO HIMSELF FOR 30
                          MIN // ONLY RECENTLY TOOK CLOTHES OFF / WM, 40S, 6'0/280#, NKW
14:07:49 02 04 ED9A  A3944 NO UNIT(S) AVAILABLE FOR CALL
14:08:40 02 04 E53   A3417 (M) DUPLICATE: PH19-203437: CALLER:JEN CATE T-MOBILE USA, SECTOR-3701 W
                          BEARDSLEY RD N, (H) (602)918-7768, NO CONTACT
14:08:40 02 04 E53   A3417 (M) DUPLICATE: PH19-203437: TO THE WEST XST  .. W/M, 60S, GRY HR, NO
                          CLOTHING
14:08:40 02 04 E53   A3417 Related Call:ADDED DUPLICATE:PH19-203437
14:14:55 02 04 E48   A6103 (M) DUPLICATE: PH19-203474: CALLER:HOLLY BOSTON, (H) (602)920-7849, NO
                          CONTACT
14:14:55 02 04 E48   A6103 (M) DUPLICATE: PH19-203474: WM,40'S, STANDING IN THE MIDDLE OF THE STREET
                          YELLING, CURRENTLY DOING YOGA POSES.
14:14:55 02 04 E48   A6103 Related Call:ADDED DUPLICATE:PH19-203474
14:15:15 02 04 E40   A1842 (M) DUPLICATE: PH19-203476: CALLER:JAMES FIRE OPS MECHANIC MAIN, (H)
                          (623)628-5209, CONTACT
14:15:15 02 04 E40   A1842 (M) DUPLICATE: PH19-203476: W/M,60'S,NO CLTHS,GRY HR & BEARD, STARING UP
                          AT SKY, APPEARS IMPAIRED , DUP #3420
14:15:15 02 04 E40   A1842 Related Call:ADDED DUPLICATE:PH19-203476
14:15:17 02 04 E48   A6103 MY CMP CONCERNED ABOUT CHILDREN THAT LIVE IN THE AREA THAT WOULD BE COMING
                          HOME FROM SCHOOL
14:15:17 02 04 ED9A  A3944 NO UNIT(S) AVAILABLE FOR CALL
14:15:33 02 04 ED9A  A3944 EN:93B PS 06999  3821 W SALTER DR[HSE
14:16:31 02 04 W32   A5842 (M) DUPLICATE: PH19-203487: CALLER: T-MOBILE USA, (H) (602)918-7768
14:16:31 02 04 W32   A5842 (M) DUPLICATE: PH19-203487: CMP CLBK TO ADV SUBJ NOW STANDING IN THE RD WAY
14:16:31 02 04 W32   A5842 Related Call:ADDED DUPLICATE:PH19-203487
14:18:02 02 04 ED9A  A3944 EN:934B PT 09243  3821 W SALTER DR[HSE
14:18:50 02 04 ED9A  A3944 I :93B PS 06999  PREEMPT
14:19:18 02 04 934B  09243 A :934B PT 09243
14:19:29 02 04 ED9A  A3944 EN:93B PS 06999  3821 W SALTER DR[HSE
14:19:36 02 04 W28   A6027 (M) DUPLICATE: PH19-203506: CALLER:ANON, (H) (623)256-2961, NO CONTACT
14:19:36 02 04 W28   A6027 (M) DUPLICATE: PH19-203506: WM 50-60YO NOT WEARING ANY CLOTHES -- COMP
                          CONCERNED BECAUSE SCHOOL IS ABOUT TO GET OUT SOON
14:19:36 02 04 W28   A6027 Related Call:ADDED DUPLICATE:PH19-203506
14:20:19 02 04 ED9A  A3944 A :934B PT 09243  3804 W SALTER DR OW MALE
14:20:27 02 04 ED9A  A3944 EN:93B PS 06999  SUBJECT: FW:LREM MVD.18-01
                          RR.00723D34.AZ0072300.TXT LIC/BGZ2448.LIY/ ######## ORIGINAL TEXT ########
                          # COMMENT: LREM MVD.18-01 RR.00723D34.AZ0072300.TXT LIC/BGZ2448.LIY/2019.
                          LIC:BGZ2448  001  TAB:BGZ2448 EXPIRE: 03/31/2019 VIN:1ZVBP8AM2D5279882
```

COP-STICKNEY000450

```
                        PHOENIX POLICE DEPARTMENT
                   JURISDICTION - PHOENIX POLICE            Tue, Feb-26-2019

CALL: PH19-203420 CLEARED (R)

               Desk/
Time      Date Unit  ID
                           VYR:2013  VMA:FORD  VMO:MUSTA VST:CP
14:21:18 02 04 ED9A   A3944  EN:93B PS 06999   DELETED STACK TO PH19-203477
14:22:14 02 04 93B     06999  A :93B PS 06999
14:24:58 02 04 ED9A   A3944  93B ANOTHER UNIT
14:24:58 02 04 ED9A   A3944  A :93B PS 06999   ANOTHER UNIT
14:25:14 02 04 92D     07970  EN:92D PS 07970   ASSIST:93B       /3821 W SALTER DR[HSE
14:25:15 02 04 ED9A   A3944  EN:934D PT 07211   3821 W SALTER DR[HSE
14:25:22 02 04 933D   05980  EN:933D PT 05980   ASSIST:934B       /3804 W SALTER DR OW MALE
14:25:26 02 04 931D   06448  EN:931D PT 06448   ASSIST:934B       /3804 W SALTER DR OW MALE
14:25:29 02 04 ED9A   A3944  93B POSS 239 W/PD
14:25:29 02 04 ED9A   A3944  A :93B PS 06999   POSS 239 W/PD
14:25:46 02 04 ED9A   A3944  EN:932D PT 10157   3821 W SALTER DR[HSE
14:25:53 02 04 ED9A   A3944  EN:P92 PS 09360   3821 W SALTER DR[HSE
14:26:04 02 04 ED9A   A3944  P92 HOLD THE AIR
14:26:04 02 04 ED9A   A3944  EN:P92 PS 09360   HOLD THE AIR
14:26:30 02 04 EHM     A3176  AIR MONT
14:27:41 02 04 ED9A   A3944  A :934D PT 07211
14:27:41 02 04 ED9A   A3944  A :934D PT 07211   Sent to MDT: 934D,Status changed to A  by ED9A
14:27:52 02 04 ED9A   A3944  934D ROLL FIRE
14:27:52 02 04 ED9A   A3944  A :934D PT 07211   ROLL FIRE
14:28:11 02 04 ED9A   A3944  A :932D PT 10157
14:28:11 02 04 ED9A   A3944  A :932D PT 10157   Sent to MDT: 932D,Status changed to A  by ED9A
14:28:14 02 04 EHM     A3176  (AM) AMBULANCE: AM,
14:28:15 02 04 ED9A   A3944  EN:933B PT 08904   3821 W SALTER DR[HSE
14:29:09 02 04 ED9A   A3944  EN:212X PT 05395   3821 W SALTER DR[HSE
14:29:09 02 04 ED9A   A3944  EN:212X PT 05653   3821 W SALTER DR[HSE
14:29:09 02 04 ED9A   A3944  EN:212X PT 05395   CONTROL FOR UNIT CHANGED 9
14:29:09 02 04 ED9A   A3944  EN:212X PT 05653   CONTROL FOR UNIT CHANGED 9
14:29:56 02 04 212X   05395  A :212X PT 05395
14:29:56 02 04 212X   05395  A :212X PT 05653
14:30:37 02 04 ED9A   A3944  933D DETAINED SLOW IT DOWN
14:30:37 02 04 ED9A   A3944  EN:933D PT 05980   DETAINED SLOW IT DOWN
14:30:42 02 04 ED9A   A3944  933D FIRE FOR TAZING
14:30:42 02 04 ED9A   A3944  EN:933D PT 05980   FIRE FOR TAZING
14:31:01 02 04 ED9A   A3944  933D FIRE CAN ROLL IN
14:31:01 02 04 ED9A   A3944  EN:933D PT 05980   FIRE CAN ROLL IN
14:31:01 02 04 EHM     A4493  (FD) FIRE DEPARTMENT: FD,
14:31:32 02 04 ED9A   A3944  933D MINOR INJ TO 93B STEP IT UP NOT BREATHING
14:31:32 02 04 ED9A   A3944  EN:933D PT 05980   MINOR INJ TO 93B STEP IT UP NOT BREATHING
14:32:03 02 04 ED9A   A3944  P92 DOING CPR
14:32:03 02 04 ED9A   A3944  EN:P92 PS 09360   DOING CPR
14:32:07 02 04 ED9A   A3944  93B DOING CPR
14:32:07 02 04 ED9A   A3944  A :93B PS 06999   DOING CPR
14:34:08 02 04 ED9A   A3944  P92 10 OFFICERS ON THIS ALL
14:34:08 02 04 ED9A   A3944  EN:P92 PS 09360   10 OFFICERS ON THIS ALL
14:34:34 02 04 ED9A   A3944  A :931D PT 06448
14:34:34 02 04 ED9A   A3944  A :931D PT 06448   Sent to MDT: 931D,Status changed to A  by ED9A
14:35:18 02 04 ED9A   A3944  P92 MAKE SURE ANOTHER SGT
14:35:18 02 04 ED9A   A3944  EN:P92 PS 09360   MAKE SURE ANOTHER SGT
14:36:00 02 04 ED9A   A3944  EN:93G PS 06358   3821 W SALTER DR[HSE
```

COP-STICKNEY000451

CALL: PH19-203420 CLEARED (R)

```
              Desk/
Time     Date  Unit  ID
14:36:15 02 04 ED9A  A3944  934D 3 UNITS
14:36:15 02 04 ED9A  A3944  A :934D PT 07211  3 UNITS
14:36:31 02 04 ED9A  A3944  EN:923I PT 10481  3821 W SALTER DR[HSE
14:36:31 02 04 ED9A  A3944  EN:923I PT 09605  3821 W SALTER DR[HSE
14:36:50 02 04 P93   06812  EN:P93 PS 06812  ASSIST:P92    /3821 W SALTER DR[HSE
14:37:05 02 04 ED9A  A3944  P92 WHO EVER NOT DOING LIFE SAVING LOCK DOWN AREA AND GETG AHOLD OF
                            WITNESSES
14:37:05 02 04 ED9A  A3944  EN:P92 PS 09360  WHO EVER NOT DOING LIFE SAVING LOCK DOWN AREA
                            AND GETG AHOLD OF WITNESSES
14:37:10 02 04 ED9A  A3944  92D FIRE 23
14:37:10 02 04 ED9A  A3944  EN:92D PS 07970  FIRE 23
14:37:17 02 04 ED9A  A3944  A :P92 PS 09360
14:37:17 02 04 ED9A  A3944  A :P92 PS 09360  Sent to MDT: P92,Status changed to A  by ED9A
14:37:27 02 04 ED9A  A3944  EN:923T PT 09818  3821 W SALTER DR[HSE
14:37:27 02 04 ED9A  A3944  EN:923T PT 10545  3821 W SALTER DR[HSE
14:38:05 02 04 ED9A  A3944  P92 37AV SALTER CLOSE DOWN
14:38:05 02 04 ED9A  A3944  A :P92 PS 09360  37AV SALTER CLOSE DOWN
14:38:58 02 04 933D  05980  EN:933D PT 05980  EXT Q VEH-LIC:WCHBN70  STATE:AZ  TYPE:PC
                            YR:2019  CAD:Y  EXTN:Y  EXTE:Y  EXT1:N  PKI:N  TONC:Y  UNIT:933D
14:39:21 02 04 ED9A  A3944  931D 39AV SALTER
14:39:21 02 04 ED9A  A3944  A :931D PT 06448  39AV SALTER
14:39:41 02 04 ED9A  A3944  EN:903Z PT 08795  3821 W SALTER DR[HSE
14:39:41 02 04 ED9A  A3944  EN:903Z PT 08454  3821 W SALTER DR[HSE
14:39:52 02 04 ED9A  A3944  A :931D PT 06448  37AV SALTER 508
14:41:51 02 04 ED9A  A3944  EN:P9 PT       3821 W SALTER DR[HSE
14:42:02 02 04 ED9A  A3944  EN:P9 PT 05617
14:42:15 02 04 ED9A  A3944  P92 TRANS 1 LIVE 236ING NO VITALS NOW
14:42:15 02 04 ED9A  A3944  A :P92 PS 09360  TRANS 1 LIVE 236ING NO VITALS NOW
14:42:58 02 04 ED9A  A3944  P93 HOLD OVER ALL DAY SHIFT AND 1031 COME OUT AND TAKE CALLS
14:42:58 02 04 ED9A  A3944  EN:P93 PS 06812  HOLD OVER ALL DAY SHIFT AND 1031 COME OUT AND
                            TAKE CALLS
14:44:21 02 04 ED9A  A3944  EN:934H PT 10234  3821 W SALTER DR[HSE
14:44:44 02 04 ED9A  A3944  P92 ENCRY CHANNEL
14:44:44 02 04 ED9A  A3944  A :P92 PS 09360  ENCRY CHANNEL
14:44:49 02 04 212X  05395  I :212X PT 05395
14:44:49 02 04 212X  05395  I :212X PT 05653
14:44:49 02 04 212X  05395  I :212X PT 05395  CONTROL FOR UNIT CLEARED
14:44:49 02 04 212X  05395  I :212X PT 05653  CONTROL FOR UNIT CLEARED
14:44:51 02 04 ED9A  A3944  TR:933B PT 08904  RESC 36
14:44:51 02 04 ED9A  A3944  TR:933B PT 08904  Sent to MDT: 933B,Status changed to TR by ED9A
14:45:28 02 04 ED9A  A3944  EN:934G PT 10308  3821 W SALTER DR[HSE
14:45:48 02 04 933H  10243  EN:933H PT 10243  ASSIST:923T    /3821 W SALTER DR[HSE
14:46:59 02 04 934G  10308  A :934G PT 10308
14:47:54 02 04 93G   06358  A :93G PS 06358
14:48:25 02 04 ED9A  A3944  TR:933B PT 08904  JCL DV RESC 36
14:48:57 02 04 ETAC13 A5391 EN:931H PT 04975  3821 W SALTER DR[HSE
14:49:33 02 04 ED9A  A3944  A :93G PS 06358
14:50:03 02 04 933H  10243  A :933H PT 10243
14:50:14 02 04 ED9A  A3944  92D 3740 W SALTER E/S
14:50:14 02 04 ED9A  A3944  EN:92D PS 07970  3740 W SALTER E/S
```

COP-STICKNEY000452

```
                    PHOENIX POLICE DEPARTMENT
               JURISDICTION - PHOENIX POLICE              Tue, Feb-26-2019

CALL: PH19-203420 CLEARED (R)

                Desk/
Time      Date  Unit  ID
14:50:21 02 04 ED9A   A3944  A :934G PT 10308  3740 W SALTER E/S
14:50:32 02 04 ED9A   A3944  A :92D PS 07970
14:50:32 02 04 ED9A   A3944  A :92D PS 07970  Sent to MDT: 92D,Status changed to A  by ED9A
14:50:36 02 04 ED9A   A3944  Call re-directed:
14:50:46 02 04 ETAC13 A4583  EN:91B PS 08125  3821 W SALTER DR[HSE
14:51:20 02 04 ED9A   A3944  92D 923T DO INTERVIEWS
14:51:20 02 04 ED9A   A3944  A :92D PS 07970  923T DO INTERVIEWS
14:51:36 02 04 ED9A   A3944  A :934G PT 10308
14:51:38 02 04 ED9A   A3944  A :93G PS 06358
14:51:40 02 04 ED9A   A3944  A :933H PT 10243
14:51:42 02 04 ED9A   A3944  A :934H PT 10234
14:51:42 02 04 ED9A   A3944  A :934H PT 10234  Sent to MDT: 934H,Status changed to A  by ED9A
14:51:44 02 04 ED9A   A3944  A :903Z PT 08454
14:51:44 02 04 ED9A   A3944  A :903Z PT 08795
14:51:44 02 04 ED9A   A3944  A :903Z PT 08795  Sent to MDT: 903Z,Status changed to A  by ED9A
14:51:48 02 04 ED9A   A3944  A :933D PT 05980
14:51:48 02 04 ED9A   A3944  A :933D PT 05980  Sent to MDT: 933D,Status changed to A  by ED9A
14:52:00 02 04 ED9A   A3944  A :933B PT 08904
14:52:00 02 04 ED9A   A3944  A :933B PT 08904  Sent to MDT: 933B,Status changed to A  by ED9A
14:52:12 02 04 ED9A   A3944  Call re-directed:9
14:52:31 02 04 923I   10481  A :923I PT 10481
14:52:31 02 04 923I   10481  A :923I PT 09605
14:53:02 02 04 931H   04975  A :931H PT 04975
14:53:17 02 04 ED9A   A3944  NA:923T PT 09818
14:53:17 02 04 ED9A   A3944  EN:923T PT 09819
14:54:46 02 04 ED9A   A3944  A :923I PT 10481
14:54:46 02 04 ED9A   A3944  A :923I PT 09605
14:56:10 02 04 ED9A   A3944  A :923T PT 10545
14:56:10 02 04 ED9A   A3944  A :923T PT 09819
14:56:10 02 04 ED9A   A3944  A :923T PT 10545  Sent to MDT: 923T,Status changed to A  by ED9A
14:57:22 02 04 ED9A   A3944  93B NOT AT THIS TIME
14:57:22 02 04 ED9A   A3944  A :93B PS 06999  NOT AT THIS TIME
14:59:33 02 04 91A    06015  EN:91A PS 06015  ASSIST:923I     /3821 W SALTER DR[HSE
15:01:18 02 04 N2     04492  EN:N2 PS 04492  ASSIST:91A      /3821 W SALTER DR[HSE
15:01:18 02 04 N2     04492  EN:N2 PS 04492  CONTROL FOR UNIT CHANGED 934
15:02:31 02 04 ED9A   A3944  P92 4 MORE SGT
15:02:31 02 04 ED9A   A3944  A :P92 PS 09360  4 MORE SGT
15:03:22 02 04 931H   04975  A :931H PT 04975  EXT Q PERS-NAME:TATE  G1:JENEVETTE
                             DOB:03251968  SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                             UNIT:931H
15:03:26 02 04 ED9A   A3944  EN:91G PS 08532  3821 W SALTER DR[HSE
15:04:10 02 04 ED2A   A5965  EN:21G PS 08629  3821 W SALTER DR[HSE
15:04:24 02 04 ED9A   A3944  Call re-directed:9
15:05:31 02 04 931H   04975  A :931H PT 04975  EXT Q PERS-NAME:JOHNSON  G1:ELISABETH
                             DOB:07311960  SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                             UNIT:931H
15:05:31 02 04 ETACS  A3789  Call re-directed:
15:05:52 02 04 ED6A   A4484  EN:61G PS 07169  3821 W SALTER DR[HSE
15:06:22 02 04 ED9A   A3944  A :P93 PS 06812
15:06:22 02 04 ED9A   A3944  A :P93 PS 06812  Sent to MDT: P93,Status changed to A  by ED9A
```

COP-STICKNEY000453

```
(s0p10.0h10.0v0T
```
PHOENIX POLICE DEPARTMENT
JURISDICTION - PHOENIX POLICE          Tue, Feb-26-2019

CALL: PH19-203420 CLEARED (R)

```
                   Desk/
Time     Date Unit    ID
15:06:47 02 04 ED9A    A3944  Call re-directed:9
15:07:37 02 04 ED9A    A3944  A :91B PS 08125
15:07:37 02 04 ED9A    A3944  A :91B PS 08125   Sent to MDT: 91B,Status changed to A  by ED9A
15:08:51 02 04 21G     08629  I :21G PS 08629
15:08:51 02 04 21G     08629  I :21G PS 08629   CONTROL FOR UNIT CLEARED
15:13:21 02 04 903Z    08795  I :903Z PT 08795
15:13:21 02 04 903Z    08795  I :903Z PT 08454
15:13:21 02 04 903Z    08795  I :903Z PT 08795   CONTROL FOR UNIT CLEARED
15:13:21 02 04 903Z    08795  I :903Z PT 08454   CONTROL FOR UNIT CLEARED
15:14:22 02 04 92D     07970  A :92D PS 07970   EXT Q PERS-NAME:WELLS  G1:CASEY  DOB:10111978
                              SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  SUP:Y  PKI:N  TONC:Y  UNIT:92D
15:14:31 02 04 92D     07970  A :92D PS 07970   EXT Q VEH-LIC:WCHBN70  STATE:AZ  TYPE:PC
                              YR:2019  CAD:Y  EXTN:Y  EXTE:Y  EXT1:N  SUP:Y  PKI:N  TONC:Y  UNIT:92D
15:14:49 02 04 ED9A    A3944  933B SUPV 21 REF
15:14:49 02 04 ED9A    A3944  A :933B PT 08904   SUPV 21 REF
15:15:23 02 04 ED9A    A3944  92D HIT C4
15:15:23 02 04 ED9A    A3944  A :92D PS 07970   HIT C4
15:17:49 02 04 ED9A    A3944  A :MEDIA PT         3821 W SALTER DR[HSE
15:17:55 02 04 ED9A    A3944  A :MEDIA PT          37DR SALTER
15:18:55 02 04 933B    08904  A :933B PT 08904   EXT Q PERS-NAME:WELLS  G1:CASEY  DOB:10111978
                              SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933B
15:19:23 02 04 ED9A    A3944  Subject:Query hit for unit: 933B
                              From:   VTM System Account
                              To:     Elwood TAC 13 PPD9307; Elw Dispatch ED9A PPD9303; Court's Laptop
                              Subject: Query hit for unit: 933B
                              Date:   Mon. Feb. 04, 2019 @ 15:18:56


                              NCIC.1L01TW00723U7U
                              AZ0072300

                              ***MESSAGE KEY QWA SEARCHES ALL NCIC PERSONS FILES WITHOUT LIMITATIONS.
                              MKE/WANTED PERSON
                              ADO/N
                              EXL/1 - FULL EXTRADITION
                              ORI/TN0400000 NAM/WILLIS,KRIST0PHER D SEX/M RAC/B POB/TN
                              DOB/19781011 HGT/601 WGT/170 EYE/BR0 HAI/BR0 FBI/435459MB9
                              SMT/TAT UR ARM
                              SOC/412370569
                              OLN/085318462 OLS/TN OLY/2025
                              OFF/FAILURE TO APPEAR - SEE MIS
                              OOC/CRIMES AGAINST PERSON SEE MIS
                              DOW/20180518 OCA/18CR1124 SID/TN1008453
                              WNO/18CR1124 CTI/TN040023J
                              VLD/20180810
                              MIS/EXTRADITI0N C0NTINENTAL UNITED STATES FAILURE T0 APPEAR AS T0 CHILD
                              ABUSE
                              DNA/N
                              ORI IS HENRY CO SO PARIS 731 642-1672
                              DOB/19780111
```

COP-STICKNEY000454

CALL: PH19-203420 CLEARED (R)

```
                 Desk/
Time      Date Unit  ID
                          AKA/KRIST0PHER,WILLIS I
                          AKA/WILLIS,CHRIST0PHER DURANCE
                          AKA/WILLIS,KRIST0PHER
                          SOC/412370509
                          SID/IA00805520
                          SID/IL52065570
                          SID/M084137490
                          IMN/I744434360 IMT/M
                          NIC/W613922753 DTE/20180529 1014 EDT DLU/20181119 1357 EDT
                          IMMED CONFIRM WARRANT AND EXTRADITION WITH ORI

                          MKE/WANTED PERSON - CAUTION
                          CMC/00 - ARMED AND DANGEROUS
                          EXL/1 - FULL EXTRADITION
                          ORI/IL01600H6 NAM/J0HNS0N,SEAN SEX/M RAC/B POB/IL
                          DOB/19781110 HGT/506 WGT/230 EYE/BR0 HAI/BLK FBI/928797AB2
                          SKN/BLK SMT/TAT L ARM
                          FPC/PMPI05C0091206091313 MNU/0A-IR1149582 SOC/333686662
                          OFF/DANGEROUS DRUGS
                          DOW/20181108 OCA/W18Q7275
                          MIS/ARMED DANGER0US     PREV RESIST/0BSTR PC 0F,UUW,BATTERY P0SS AMT C0N
                          SUB
                          MIS/EXCEPT A/D TAT R ARM
                          DNA/N
                          ORI IS COOK CO SHERIFF'S POLICE COMM CTR 847 635-1188
                          DOB/19781011
                          DOB/19810604
                          AKA/BRADLEY,C0URTNEY
                          AKA/J0HNS0N,SEAN D
                          AKA/J0HNS0N,SHAWN
                          AKA/J0HNS0N,SHAWN D
                          AKA/J0NES,DEANDRE
                          AKA/MAY,N0RMAN
                          AKA/WELLS,MALACHI
                          AKA/WELLS,N0RMAN
                          NIC/W785317599 DTE/20181109 1059 EST DLU/20181109 1450 EST
                          IMMED CONFIRM WARRANT AND EXTRADITION WITH ORI
15:21:01 02 04 ED9A  A3944 Call re-directed:
15:21:04 02 04 ED9A  A3944 Call re-directed:9
15:22:36 02 04 923I  10481 A :923I PT 10481  EXT Q PERS-NAME:MCNEIL  G1:RYAN  DOB:06251973
                          SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:923I
15:24:05 02 04 933H  10243 A :933H PT 10243  EXT Q PERS-NAME:LEONTE  G1:MICHAEL
                          DOB:09262000  SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                          UNIT:933H
15:24:44 02 04 934H  10234 A :934H PT 10234  EXT Q PERS-NAME:BOSTON  G1:HOLLY  DOB:12041983
                          SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:934H
15:25:37 02 04 923I  10481 A :923I PT 10481  EXT Q PERS-NAME:BEFIELD  G1:LORI  DOB:03061971
                          SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:923I
15:25:58 02 04 934H  10234 A :934H PT 10234  EXT Q PERS-NAME:BUFFINGTON  G1:RICHARD
                          DOB:12311984  SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
```

COP-STICKNEY000455

CALL: PH19-203420 CLEARED (R)

```
                Desk/
Time      Date  Unit   ID
                                 UNIT:934H
15:26:20 02 04 923I   10481  A :923I PT 10481  EXT Q PERS-NAME:BENFIELD  G1:LORI
                                 DOB:03061971  SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                                 UNIT:923I
15:26:32 02 04 91G    08532  A :91G PS 08532
15:28:23 02 04 923I   10481  A :923I PT 10481  EXT Q PERS-NAME:TATE  G1:JENEVETTE
                                 DOB:03251968  SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                                 UNIT:923I
15:29:20 02 04 931D   06448  I :931D PT 06448
15:29:20 02 04 931D   06448  I :931D PT 06448  CONTROL FOR UNIT CLEARED
15:29:38 02 04 N2     04492  A :N2 PS 04492
15:31:18 02 04 923T   10545  A :923T PT 10545  EXT Q PERS-NAME:TEXEL  G1:DOUGLAS
                                 DOB:12011954  SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                                 UNIT:923T
15:31:54 02 04 ED9A   A3944  931H SUBJ 37DR SALTER 3743 W SALTER CAN HE COME IN AND CAMERAS
15:31:54 02 04 ED9A   A3944  A :931H PT 04975  SUBJ 37DR SALTER 3743 W SALTER CAN HE COME IN
                                 AND CAMERAS
15:32:03 02 04 ETAC13 A4583  EN:C13 PT 06487  3821 W SALTER DR[HSE
15:32:17 02 04 923T   10545  A :923T PT 10545  EXT Q PERS-NAME:BOLDUC  G1:JEFFREY
                                 DOB:11101959  SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                                 UNIT:923T
15:32:29 02 04 ETAC7  A6176  I :MEDIA PT          CONTROL FOR UNIT CLEARED
15:32:29 02 04 ETAC7  A6176  I :MEDIA PT          PREEMPT
15:33:39 02 04 ED9A   A3944  A :934H PT 10234  3743 W SALTER W/OWNER-CAMERAS
15:33:42 02 04 ED9A   A3944  A :MEDIA PT          3821 W SALTER DR[HSE
15:33:43 02 04 61G    07169  A :61G PS 07169
15:34:49 02 04 ED9A   A3944  A :MEDIA PT          37DR SALTER
15:34:55 02 04 ETAC7  A6176  I :MEDIA PT
15:35:16 02 04 ED9A   A3944  Call re-directed:9
15:36:41 02 04 ED9A   A3944  A :61G PS 07169
15:37:20 02 04 ED9A   A3944  A :91A PS 06015
15:37:20 02 04 ED9A   A3944  A :91A PS 06015  Sent to MDT: 91A,Status changed to A  by ED9A
15:37:38 02 04 ED9A   A3944  A :P9 PT 05617
15:38:33 02 04 ED9A   A3944  EN:C34 PT          3821 W SALTER DR[HSE
15:39:00 02 04 ETAC13 A4583  P93 932H
15:39:00 02 04 ETAC13 A4583  A :P93 PS 06812  932H
15:39:24 02 04 ED9A   A3944  EN:C34 PT 05097
15:39:33 02 04 933H   10243  A :933H PT 10243  EXT Q PERS-NAME:BLANCHARD  G1:DONNA
                                 DOB:07131963  SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                                 UNIT:933H
15:39:43 02 04 ED9A   A3944  A :MEDIA PT          3821 W SALTER DR[HSE
15:39:51 02 04 ED9A   A3944  A :MEDIA PT          37DR SALTER
15:39:57 02 04 ED9A   A3944  Call re-directed:9
15:40:02 02 04 ETAC13 A4583  P93 DAY SHIFT CAN SECURE ONCE ALL CALLS HOLDING LONGER THAN AN HOUR HAVE
                                 BEEN HANDLED
15:40:02 02 04 ETAC13 A4583  A :P93 PS 06812  DAY SHIFT CAN SECURE ONCE ALL CALLS HOLDING
                                 LONGER THAN AN HOUR HAVE BEEN HANDLED
15:40:54 02 04 ED9A   A3944  931H 3734 W SALTER WALKING TO HOUSE
15:40:54 02 04 ED9A   A3944  A :931H PT 04975  3734 W SALTER WALKING TO HOUSE
15:53:02 02 04 91G    08532  I :91G PS 08532
```

COP-STICKNEY000456

CALL: PH19-203420 CLEARED (R)

```
                    Desk/
Time      Date Unit    ID
15:53:02 02 04 91G    08532  I :91G PS 08532  CONTROL FOR UNIT CLEARED
15:55:55 02 04 923T   09818  Subject:MVD.40-01 DR.00723U29.AZ007230
                             MVD.40-01 DR.00723U29.AZ0072300.
                             TXT NAM/BOLDUC,JEFFREY                    .DOB/19591110
                             NAME:JEFFREY,THOMAS,BOLDUC          DOB:11/10/1959
                             RCPT#:SA063520
                             ADDR:3828 W SALTER DR                GLENDALE              AZ
                             85308
                             ISSUE DT:10/06/2018 EXP:11/10/2024      SEX:M HGT:600 WGT:225 HAIR:BRN
                             EYE:BLU
                             OLN:B10074482    SSN:526497175    OLT:OPERATOR CLASS D
                             PREV LIC: B10074482               PREV ST: AZ
                                       B10074482                     AZ
                                       B10074482                     AZ
                             STATUS    CDL MEDICALLY CERTIFIED - MEETS STD.
                             HTTP://162.59.200.85/HOME/INDEX/B1007448200607667
                                              CLICK ON THE WEB ADDR ABOVE
15:56:06 02 04 923T   09818  Subject:DOUGLAS TEXEL
                             TXT NA
                             MVD.40-01 DR.00723U29.AZ0072300.
                             TXT NAM/TEXEL,DOUGLAS              .DOB/19541201
                             NAME:DOUGLAS,J,TEXEL                DOB:12/01/1954
                             RCPT#:NS111547
                             ADDR:3818 W SALTER DR                GLENDALE              AZ
                             85308
                             ISSUE DT:03/11/2009 EXP:12/01/2019      SEX:M HGT:601 WGT:210 HAIR:GRY
                             EYE:BLU
                             OLN:D06652446    SSN:505786298    OLT:OPERATOR CLASS D
                             PREV LIC: D02689659               PREV ST: AZ
                                       D02689659                     AZ
                                       505786298                     AZ
                             HTTP://162.59.200.85/HOME/INDEX/D0665244603855693
                                              CLICK ON THE WEB ADDR ABOVE
15:57:03 02 04 ETAC13 A4583  P93 DAY SHIFT UNITS CAN START SECURING
15:57:03 02 04 ETAC13 A4583  A :P93 PS 06812  DAY SHIFT UNITS CAN START SECURING
16:05:32 02 04 923T   10545  I :923T PT 10545
16:05:32 02 04 923T   10545  I :923T PT 09819
16:05:32 02 04 923T   10545  I :923T PT 10545   CONTROL FOR UNIT CLEARED
16:05:32 02 04 923T   10545  I :923T PT 09819   CONTROL FOR UNIT CLEARED
16:08:12 02 04 934H   10234  I :934H PT 10234
16:08:12 02 04 934H   10234  I :934H PT 10234   CONTROL FOR UNIT CLEARED
16:08:22 02 04 ESUP9  A5027  MAC VAN 17
16:09:43 02 04 51G    09095  EN:51G PS 09095  ASSIST:P93        /3821 W SALTER DR[HSE
16:09:43 02 04 51G    09095  EN:51G PS 09095  CONTROL FOR UNIT CHANGED 934
16:16:39 02 04 ETAC13 A4583  P93 DAY SHFT STILL UNITS STILL ON HOLD OVER TILL 1800 HELP WITH CALLS IN
                             93 **911B
16:16:39 02 04 ETAC13 A4583  A :P93 PS 06812  DAY SHFT STILL UNITS STILL ON HOLD OVER TILL
                             1800 HELP WITH CALLS IN 93 **911B
16:17:38 02 04 ED9A   A3944  P92 MAC VAN
16:17:38 02 04 ED9A   A3944  A :P92 PS 09360  MAC VAN
```

COP-STICKNEY000457

CALL: PH19-203420 CLEARED (R)

```
                Desk/
Time    Date  Unit   ID
16:17:52 02 04 933H   10243  A :933H PT 10243  EXT Q PERS-NAME:DOWTY  G1:MICHEL  DOB:06231978
                             SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933H
16:18:40 02 04 931H   04975  I :931H PT 04975
16:18:40 02 04 931H   04975  I :931H PT 04975   CONTROL FOR UNIT CLEARED
16:18:42 02 04 933H   10243  A :933H PT 10243  EXT Q PERS-NAME:DOWTY  G1:MICHELE
                             DOB:06061966  SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                             UNIT:933H
16:19:00 02 04 ED9A   A3944  92D COME IN FROM THE EAST
16:19:00 02 04 ED9A   A3944  A :92D PS 07970   COME IN FROM THE EAST
16:20:01 02 04 933H   10243  A :933H PT 10243  EXT Q PERS-NAME:WHITE  G1:JASON  DOB:06231978
                             SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933H
16:20:08 02 04 ED9A   A3944  A :C34 PT 05097
16:20:27 02 04 933H   10243  A :933H PT 10243  EXT Q PERS-NAME:WHITE  G1:JASON  DOB:06231978
                             SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933H
16:23:43 02 04 933H   10243  A :933H PT 10243  EXT Q PERS-NAME:DOSS  G1:ANDREW  DOB:01171995
                             SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933H
16:24:34 02 04 934D   07211  A :934D PT 07211  EXT Q PERS-NAME:TWYMAN  G1:RYAN  DOB:03021982
                             SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:934D
16:24:43 02 04 ED9A   A3944  934D C4 INFO ONLY
16:24:43 02 04 ED9A   A3944  A :934D PT 07211   C4 INFO ONLY
16:25:04 02 04 933H   10243  A :933H PT 10243  EXT Q PERS-NAME:KOROLEVA  G1:POLINA
                             DOB:07161982  SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                             UNIT:933H
16:28:00 02 04 ED9A   A3944  A :N21 PS 08075   3821 W SALTER DR[HSE
16:28:00 02 04 ED9A   A3944  A :N21 PS 08075   CONTROL FOR UNIT CHANGED 9
16:28:14 02 04 934D   07211  A :934D PT 07211  EXT Q PERS-NAME:TWYMAN  G1:TODD  DOB:09251947
                             SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:934D
16:41:39 02 04 P92    09360  I :P92 PS 09360
16:41:39 02 04 P92    09360  I :P92 PS 09360   CONTROL FOR UNIT CLEARED
16:50:21 02 04 51G    09095  A :51G PS 09095
16:51:34 02 04 E17    A4592  (M) DUPLICATE: PH19-204459: CALLER:SUSAN MARBLE, (H) (623)258-7355, CONTACT
16:51:34 02 04 E17    A4592  (M) DUPLICATE: PH19-204459: 40MINS AGO OLDER GRY MITS TRUCK DROVE THRU
                             YARD OF HOUSE. CMP HAS PICTURES. CMP IS IN TRAILER IN BACKYARD FOR CONTACT.
16:51:34 02 04 E17    A4592  Related Call:ADDED DUPLICATE:PH19-204459
16:52:18 02 04 N2     04492  I :N2 PS 04492
16:52:18 02 04 N2     04492  I :N2 PS 04492   CONTROL FOR UNIT CLEARED
16:52:36 02 04 E17    A4592  Related Call:DELETED DUPLICATE:PH19-204459
16:53:30 02 04 E17    A4592  UNK IF INC# 204459 IS RELATED
17:10:03 02 04 933D   05980  A :933D PT 05980  EXT Q PERS-DL:D10419512  STATE:AZ  CAD:Y
                             EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933D
17:11:41 02 04 ED9A   A3944  Call re-directed:
17:12:19 02 04 ED9A   A3944  I :P9 PT 05617   CONTROL FOR UNIT CLEARED
17:12:19 02 04 ED9A   A3944  I :P9 PT 05617
17:12:24 02 04 ED9A   A3944  I :MEDIA PT            CONTROL FOR UNIT CLEARED
17:12:24 02 04 ED9A   A3944  I :MEDIA PT
17:15:19 02 04 ED9A   A3944  A :C13 PT 06487
17:21:32 02 04 91A    06015  I :91A PS 06015
17:21:32 02 04 91A    06015  I :91A PS 06015   CONTROL FOR UNIT CLEARED
17:27:14 02 04 933B   08904  A :933B PT 08904  EXT Q PERS-NAME:TWYMAN  G1:RYAN  DOB:03021982
                             SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933B
```

COP-STICKNEY000458

PHOENIX POLICE DEPARTMENT
JURISDICTION - PHOENIX POLICE          Tue, Feb-26-2019

CALL: PH19-203420 CLEARED (R)

```
                Desk/
Time      Date  Unit  ID
17:31:08 02 04 933B   08904  A :933B PT 08904  EXT Q PERS-NAME:SCRANTON  G1:JARRETT
                             DOB:06031981  SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                             UNIT:933B
17:31:41 02 04 933B   08904  A :933B PT 08904  EXT Q PERS-NAME:CARTY  G1:ROBIN  DOB:07171955
                             SEX:F  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933B
17:32:14 02 04 933B   08904  A :933B PT 08904  EXT Q PERS-DL:D02672214  STATE:AZ  CAD:Y
                             EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933B
17:33:22 02 04 933B   08904  A :933B PT 08904  EXT Q PERS-NAME:ALLEN  G1:ROBERT  DOB:02281989
                             SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933B
17:33:43 02 04 933B   08904  A :933B PT 08904  EXT Q PERS-NAME:ALLEN  G1:MICHAEL
                             DOB:11121986  SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                             UNIT:933B
17:34:06 02 04 933B   08904  A :933B PT 08904  EXT Q PERS-NAME:PADFIELD  G1:CHRISTOPHER
                             DOB:06111995  SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                             UNIT:933B
17:35:19 02 04 ED9A   A3944  I :C13 PT 06487  CONTROL FOR UNIT CLEARED
17:35:19 02 04 ED9A   A3944  I :C13 PT 06487
17:35:21 02 04 ED9A   A3944  I :C34 PT 05097  CONTROL FOR UNIT CLEARED
17:35:21 02 04 ED9A   A3944  I :C34 PT 05097
17:45:52 02 04 ED9A   A3944  92D BC TO ALL UNITS DO SUPV IN WORD DOCC ERIC LUMLEY
17:45:52 02 04 ED9A   A3944  A :92D PS 07970  BC TO ALL UNITS DO SUPV IN WORD DOCC ERIC LUMLEY
17:52:32 02 04 934D   07211  I :934D PT 07211
17:52:32 02 04 934D   07211  I :934D PT 07211  CONTROL FOR UNIT CLEARED
17:52:32 02 04 934D   07211  I :934D PT 07211  UPDATED CASE PH203420 FOUNDED-N REPORT-N
                             CLEARED BY-N FINAL-311 BOLO-N STUDY FLAG- REM-
17:52:32 02 04 934D   07211  PRIME FOR PH19-203420 TO 934D
18:07:32 02 04 933H   10243  A :933H PT 10243  EXT Q PERS-NAME:KENNISON  G1:STEVE
                             DOB:05201970  SEX:M  STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y
                             UNIT:933H
18:07:51 02 04 933H   10243  A :933H PT 10243  EXT Q PERS-DL:D01686874  STATE:AZ  CAD:Y
                             EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933H
18:08:00 02 04 933H   10243  A :933H PT 10243  EXT Q PERS-DL:D05844741  STATE:AZ  CAD:Y
                             EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933H
18:11:30 02 04 92D    07970  I :92D PS 07970
18:11:30 02 04 92D    07970  I :92D PS 07970  CONTROL FOR UNIT CLEARED
18:13:16 02 04 ED9A   A3944  A :934D PT 07211  3821 W SALTER DR[HSE
19:09:48 02 04 ED9A   A6133  933D UNIT TO JCL AND RELIEVE 933B DETS NEED HIM BACK HER - NEED 2ND UNIT
                             TO TRAN
19:09:48 02 04 ED9A   A6133  A :933D PT 05980  UNIT TO JCL AND RELIEVE 933B DETS NEED HIM
                             BACK HER - NEED 2ND UNIT TO TRAN
19:10:07 02 04 ED9A   A6133  EN:921H PT 10004  3821 W SALTER DR[HSE
19:10:19 02 04 ED9A   A6133  EN:925F PT 09878  3821 W SALTER DR[HSE
19:10:24 02 04 N21    08075  I :N21 PS 08075
19:10:24 02 04 N21    08075  I :N21 PS 08075  CONTROL FOR UNIT CLEARED
19:11:30 02 04 ED9A   A6133  C34 933B 21 ME #602-349-4464
19:11:38 02 04 921H   10004  EN:921H PT 10004  DV HOSP ER
19:15:01 02 04 ED9A   A6133  EN:925F PT 09878  DV HOSP
19:15:06 02 04 ED9A   A6133  EN:925F PT 09878  17 TO DV HOSP
19:18:19 02 04 ED9A   A6133  93G 91B LEFT SCENE,FAR AWAY?
19:18:19 02 04 ED9A   A6133  A :93G PS 06358  91B LEFT SCENE,FAR AWAY?
```

COP-STICKNEY000459

CALL: PH19-203420 CLEARED (R)

```
                   Desk/
Time      Date  Unit   ID
19:18:24 02 04 ED9A    A6133  91B YEAH I CAN SWING BACK
19:18:24 02 04 ED9A    A6133  A :91B PS 08125   YEAH I CAN SWING BACK
19:18:28 02 04 ED9A    A6133  93G COPY THANK YOU
19:18:28 02 04 ED9A    A6133  A :93G PS 06358   COPY THANK YOU
19:21:05 02 04 925F    09878  A :925F PT 09878
19:21:09 02 04 921H    10004  A :921H PT 10004
19:23:01 02 04 933H    10243  A :933H PT 10243   EXT Q PERS-NAME:CHESNEY  G1:DENNIS   SEX:M
                              STATE:AZ  CAD:Y  EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933H
19:24:43 02 04 933H    10243  A :933H PT 10243   EXT Q PERS-DL:D07569005  STATE:AZ   CAD:Y
                              EXTN:Y  EXTD:Y  PKI:N  TONC:Y  UNIT:933H
19:27:04 02 04 P93     06812  I :P93 PS 06812
19:27:04 02 04 P93     06812  I :P93 PS 06812   CONTROL FOR UNIT CLEARED
19:38:24 02 04 ED9A    A6133  I :925F PT 09878   PREEMPT
19:49:36 02 04 ED9A    A4565  I :91B PS 08125   CONTROL FOR UNIT CLEARED
19:49:36 02 04 ED9A    A4565  I :91B PS 08125   PREEMPT
19:55:12 02 04 921H    10004  A :921H PT 10004   DV HOSP ICU 2-204
20:31:42 02 04 921H    10004  I :921H PT 10004
20:58:13 02 04 ED9A    A6133  C34 - MAKE A 245 R DISPO,C34
20:58:19 02 04 ED9A    A6133  Report flag:N TO:Y
20:58:19 02 04 ED9A    A6133  Cleared by:N TO:R
20:58:20 02 04 ED9A    A6133  Call transferred to Records:203420
21:12:17 02 04 51G     09095  I :51G PS 09095
21:12:17 02 04 51G     09095  I :51G PS 09095   CONTROL FOR UNIT CLEARED
21:12:54 02 04 923I    10481  I :923I PT 10481
21:12:54 02 04 923I    10481  I :923I PT 09605
21:12:54 02 04 923I    10481  I :923I PT 10481   CONTROL FOR UNIT CLEARED
21:12:54 02 04 923I    10481  I :923I PT 09605   CONTROL FOR UNIT CLEARED
21:24:50 02 04 ED9A    A6133  934D 932D COME DOWN TO MAC VAN
21:24:50 02 04 ED9A    A6133  A :934D PT 07211   932D COME DOWN TO MAC VAN
21:29:44 02 04 933B    08904  A :933B PT 08904   VEH:611441 ID:611441
21:40:59 02 04 ED9A    A6133  A :934D PT 07211   17 TO BEUF
21:41:21 02 04 932J    09653  EN:932J PT 09653   ASSIST:933D       /3804 W SALTER DR OW MALE
21:43:33 02 04 934B    09243  I :934B PT 09243
21:43:33 02 04 934B    09243  I :934B PT 09243   CONTROL FOR UNIT CLEARED
21:44:15 02 04 932J    09653  A :932J PT 09653
21:44:42 02 04 ED9A    A6133  933H REF MY CALL TRYING TO PICK VEHS - SUPV ON W/S
21:44:42 02 04 ED9A    A6133  A :933H PT 10243   REF MY CALL TRYING TO PICK VEHS - SUPV ON W/S
21:45:23 02 04 934J    06211  EN:934J PT 06211   ASSIST:61G       /3821 W SALTER DR[HSE
21:48:32 02 04 934J    06211  A :934J PT 06211
21:53:18 02 04 934J    06211  A :934J PT 06211   (INVESTIGATING) 508-SALTER/39AV
21:56:02 02 04 61G     07169  A :61G PS 07169   (AT HEADQUARTERS) 17 SSS
21:59:01 02 04 932D    10157  NA:932D PT 10157  BYE,NUDE MALE GOING UP AND DOWN THE ST // HAS
                              BEEN
22:02:10 02 04 933H    10243  I :933H PT 10243
22:02:10 02 04 933H    10243  I :933H PT 10243   CONTROL FOR UNIT CLEARED
22:10:24 02 04 934G    10308  I :934G PT 10308
22:10:24 02 04 934G    10308  I :934G PT 10308   CONTROL FOR UNIT CLEARED
22:21:49 02 04 93G     06358  I :93G PS 06358
22:21:49 02 04 93G     06358  I :93G PS 06358   CONTROL FOR UNIT CLEARED
22:27:59 02 04 933D    05980  I :933D PT 05980
```

COP-STICKNEY000460

CALL: PH19-203420 CLEARED (R)

```
                Desk/
Time      Date  Unit   ID
22:27:59 02 04 933D   05980  I :933D PT 05980   CONTROL FOR UNIT CLEARED
22:38:55 02 04 934J   06211  A :934J PT 06211
22:39:14 02 04 ED9A   A6133  I :934J PT 06211   PREEMPT
22:40:04 02 04 932J   09653  I :932J PT 09653
22:48:02 02 04 61G    07169  A :61G PS 07169
22:48:25 02 04 61G    07169  NA:61G PS 07169   BYE,17 SSS
22:52:16 02 04 ED6A   A4484  I :61G PS 07169   CONTROL FOR UNIT CLEARED
22:52:16 02 04 ED6A   A4484  I :61G PS 07169
22:52:31 02 04 933B   08904  I :933B PT 08904
22:52:31 02 04 933B   08904  I :933B PT 08904   CONTROL FOR UNIT CLEARED
22:52:51 02 04 EINFON A6078  I :934D PT 07211
23:14:17 02 04 ED9A   A6133  I :932D PT 10157   CONTROL FOR UNIT CLEARED
23:14:17 02 04 ED9A   A6133  I :932D PT 10157
23:56:47 02 04 ED9A   A6133  Report: Y Founded: N How cleared: R
23:56:47 02 04 ED9A   A6133  I :93B PS 06999   CONTROL FOR UNIT CLEARED
23:56:47 02 04 ED9A   A6133  I :93B PS 06999
23:56:47 02 04 ED9A   A6133  Call was CLEARED
10:40:02 02 26 ENICE4 A4823  Related Call:ADDED RELATED:PH19-203666
10:43:50 02 26 ENICE4 A4823  Related Call:ADDED RELATED:PH19-203427
                             END OF REPORT
```

COP-STICKNEY000461



## City Of Phoenix

The accompanying records and recordings and explanatory material are from the

Phoenix Police Department public safety answering point communications

facility. This form authenticates 20 pages. This form authenticates

18 recording(s). These documents and tapes pertain to: Department

Report number DR 2019-00203420; call receipt; date and time 02/04/2019

at 14:04 hours; caller name multiple callers; call origination location address

3900 W Salter Dr; originating telephone number

various numbers; dispatch time 14:15 hours; arrival time 14:19 hours;

Signed: _____

KAREN LOVE
Custodian of records
Communications Bureau
Phoenix Police Department

authentication: PPSB\SnowC
Updated: Monday, August 19, 2019

COP-STICKNEY000462

PHOENIX POLICE DEPARTMENT
JURISDICTION - PHOENIX POLICE          Tue, Feb-26-2019

CALL: PH19-203427 CLEARED (R)

```
                 Desk/
Time     Date  Unit  ID
14:03:59 02 04 911          Position:131                      Phone: 419 757-2602 VERIZON
                            WRLS 800-451-5242
                            VERIZON WRLS 80 20633 N 35TH AV
14:06:50 02 04 W31    A5860 Priority: 3 Received by: 9 911 SYSTEM
                            Initial: 911C
                              Final: 911C
                            Telephone:419 757-2602
                            20633 N 35TH AV
                            Community: PHX County:  District: 9 Zone: 934
                            Contact: VERIZON WRLS 80 G1: 0-451-5242 G2:  Sex:   DOB:              20633
                            N 35TH AVE N  AZ 419 757-2602
14:07:07 02 04 W31    A5860 Report: N Founded: Y How cleared: F
14:07:07 02 04 W31    A5860 HU // ON CLBK VM
10:43:32 02 26 ENICE4 A4823 Related Call:ADDED TO PRIME:PH19-3
10:43:42 02 26 ENICE4 A4823 Related Call:DELETED PRIME:PH19-3
10:43:50 02 26 ENICE4 A4823 Related Call:ADDED TO PRIME:PH19-203420
                            END OF REPORT
```

COP-STICKNEY000463

```
                        PHOENIX POLICE DEPARTMENT
                 JURISDICTION - PHOENIX POLICE          Tue, Feb-26-2019


CALL: PH19-203437 CLEARED (R)


            Desk/
Time    Date Unit  ID
14:06:54 02 04 911              Position:053                        Phone: 602 918-7768 T-MOBILE
                                USA
                                T-MOBILE USA 3729 W SALTER DR
14:07:14 02 04 E53     A3417    Priority: 2 Received by: 9 911 SYSTEM
                                Initial: 311
                                  Final: 311
                                Telephone:602 918-7768
                                3729 W SALTER DR
                                Community: PHX County:  District: 9 Zone: 934
                                Contact: NO CONTACT T-MOBILE USA G1: JEN G2: CATE Sex:   DOB:
                                SECTOR-3701 W BEARDSLEY RD N  AZ 602 918-7768
14:08:40 02 04 E53     A3417    Report: Y Founded: Y How cleared: F
14:08:40 02 04 E53     A3417    TO THE WEST XST  .. W/M, 60S, GRY HR, NO CLOTHING
14:08:40 02 04 E53     A3417    (M) PH203420:DUPLICATE: PH19-203437: TO THE WEST XST  .. W/M, 60S, GRY HR,
                                NO CLOTHING
14:08:40 02 04 E53     A3417    Related Call:ADDED TO PRIME:PH19-203420
14:14:55 02 04 E48     A6103    (M) PH203420:DUPLICATE: PH19-203474: WM,40'S, STANDING IN THE MIDDLE OF
                                THE STREET YELLING, CURRENTLY DOING YOGA POSES.
14:15:15 02 04 E40     A1842    (M) PH203420:DUPLICATE: PH19-203476: W/M,60'S,NO CLTHS,GRY HR & BEARD,
                                STARING UP AT SKY, APPEARS IMPAIRED , DUP #3420
14:16:31 02 04 W32     A5842    (M) (93B) DUPLICATE: PH19-203487: CMP CLBK TO ADV SUBJ NOW STANDING IN THE
                                RD WAY
14:19:36 02 04 W28     A6027    (M) (934B 93B) DUPLICATE: PH19-203506: WM 50-60YO NOT WEARING ANY CLOTHES
                                -- COMP CONCERNED BECAUSE SCHOOL IS ABOUT TO GET OUT SOON
16:51:34 02 04 E17     A4592    (M) (934B 93B) DUPLICATE: PH19-204459: 40MINS AGO OLDER GRY MITS TRUCK
                                DROVE THRU YARD OF HOUSE. CMP HAS PICTURES. CMP IS IN TRAILER IN BACKYARD
                                FOR CONTACT.
                                END OF REPORT
```

COP-STICKNEY000464

CALL: PH19-203474 CLEARED (R)

```
                Desk/
Time      Date  Unit  ID
14:13:59 02 04 E48    A6103   Priority: 2 Received by: P CRIMESTOP
                              Initial: 311
                               Final: 311
                              3734 W SALTER DR
                              Community: PHX County:  District: 9 Zone: 934
                              Contact: NO CONTACT BOSTON G1: HOLLY G2:  Sex:   DOB:          AZ 602
                              920-7849
14:14:55 02 04 E48    A6103   Report: Y Founded: Y How cleared: F
14:14:55 02 04 E48    A6103   WM,40'S, STANDING IN THE MIDDLE OF THE STREET YELLING, CURRENTLY DOING
                              YOGA POSES.
14:14:55 02 04 E48    A6103   (M) PH203420:DUPLICATE: PH19-203474: WM,40'S, STANDING IN THE MIDDLE OF
                              THE STREET YELLING, CURRENTLY DOING YOGA POSES.
14:14:55 02 04 E48    A6103   Related Call:ADDED TO PRIME:PH19-203420
14:15:15 02 04 E40    A1842   (M) PH203420:DUPLICATE: PH19-203476: W/M,60'S,NO CLTHS,GRY HR & BEARD,
                              STARING UP AT SKY, APPEARS IMPAIRED , DUP #3420
14:16:31 02 04 W32    A5842   (M) (93B) DUPLICATE: PH19-203487: CMP CLBK TO ADV SUBJ NOW STANDING IN THE
                              RD WAY
14:19:36 02 04 W28    A6027   (M) (934B 93B) DUPLICATE: PH19-203506: WM 50-60YO NOT WEARING ANY CLOTHES
                              -- COMP CONCERNED BECAUSE SCHOOL IS ABOUT TO GET OUT SOON
16:51:34 02 04 E17    A4592   (M) (934B 93B) DUPLICATE: PH19-204459: 40MINS AGO OLDER GRY MITS TRUCK
                              DROVE THRU YARD OF HOUSE. CMP HAS PICTURES. CMP IS IN TRAILER IN BACKYARD
                              FOR CONTACT.
                              END OF REPORT
```

COP-STICKNEY000465

PHOENIX POLICE DEPARTMENT
JURISDICTION - PHOENIX POLICE             Tue, Feb-26-2019

CALL: PH19-203476 CLEARED (R)

```
                Desk/
Time    Date Unit  ID
14:13:37 02 04 911            Position:040                                    Phone: 623 628-5209 AT&T
                             MOBILITY 800-635-6840
                             MAIN N 39TH AV / W SALTER DR
14:13:49 02 04 E40    A1842  Priority: 2 Received by: 9 911 SYSTEM
                             Initial: 311
                             Final: 311
                             Telephone:623 628-5209
                             N 39TH AV / W SALTER DR
                             Community: PHX County:  District: 9 Zone: 934
                             Contact: CONTACT MAIN G1: JAMES G2: FIRE OPS MECHANIC Sex:   DOB:
                             AZ 623 628-5209
14:15:15 02 04 E40    A1842  Report: N Founded: Y How cleared: F
14:15:15 02 04 E40    A1842  W/M,60'S,NO CLTHS,GRY HR & BEARD, STARING UP AT SKY, APPEARS IMPAIRED ,
                             DUP #3420
14:15:15 02 04 E40    A1842  (M) PH203420:DUPLICATE: PH19-203476: W/M,60'S,NO CLTHS,GRY HR & BEARD,
                             STARING UP AT SKY, APPEARS IMPAIRED , DUP #3420
14:15:15 02 04 E40    A1842  Related Call:ADDED TO PRIME:PH19-203420
14:16:31 02 04 W32    A5842  (M) (93B) DUPLICATE: PH19-203487: CMP CLBK TO ADV SUBJ NOW STANDING IN THE
                             RD WAY
14:19:36 02 04 W28    A6027  (M) (934B 93B) DUPLICATE: PH19-203506: WM 50-60YO NOT WEARING ANY CLOTHES
                             -- COMP CONCERNED BECAUSE SCHOOL IS ABOUT TO GET OUT SOON
16:51:34 02 04 E17    A4592  (M) (934B 93B) DUPLICATE: PH19-204459: 40MINS AGO OLDER GRY MITS TRUCK
                             DROVE THRU YARD OF HOUSE. CMP HAS PICTURES. CMP IS IN TRAILER IN BACKYARD
                             FOR CONTACT.
                             END OF REPORT
```

COP-STICKNEY000466

```
                     PHOENIX POLICE DEPARTMENT
                JURISDICTION - PHOENIX POLICE          Tue, Feb-26-2019
```

CALL: PH19-203487 CLEARED (R)

```
                  Desk/
Time      Date Unit  ID
14:14:16 02 04 911              Position:132                        Phone: 602 918-7768 T-MOBILE
                                USA
                                T-MOBILE USA 3729 W SALTER DR
14:14:21 02 04 W32     A5842    Priority: 2 Received by: 9 911 SYSTEM
                                Initial: INFO
                                  Final: INFO
                                Telephone:602 918-7768
                                3729 W SALTER DR
                                Community: PHX County:  District: 9 Zone: 934
                                Contact: T-MOBILE USA G1:  G2:  Sex:   DOB:          AZ 602 918-7768
14:16:31 02 04 W32     A5842    Report: N Founded: Y How cleared: F
14:16:31 02 04 W32     A5842    CMP CLBK TO ADV SUBJ NOW STANDING IN THE RD WAY
14:16:31 02 04 W32     A5842    (M) (93B) DUPLICATE: PH19-203487: CMP CLBK TO ADV SUBJ NOW STANDING IN THE
                                RD WAY
14:16:31 02 04 W32     A5842    Related Call:ADDED TO PRIME:PH19-203420
14:19:36 02 04 W28     A6027    (M) (934B 93B) DUPLICATE: PH19-203506: WM 50-60YO NOT WEARING ANY CLOTHES
                                -- COMP CONCERNED BECAUSE SCHOOL IS ABOUT TO GET OUT SOON
16:51:34 02 04 E17     A4592    (M) (934B 93B) DUPLICATE: PH19-204459: 40MINS AGO OLDER GRY MITS TRUCK
                                DROVE THRU YARD OF HOUSE. CMP HAS PICTURES. CMP IS IN TRAILER IN BACKYARD
                                FOR CONTACT.
                                END OF REPORT
```

COP-STICKNEY000467

CALL: PH19-203506 CLEARED (R)

```
              Desk/
Time    Date  Unit  ID
14:18:30 02 04 911        Position:128                            Phone: 623 256-2961 VERIZON
                          20033 N 39TH AVE NE
14:18:45 02 04 W28  A6027 Priority: 2 Received by: 9 911 SYSTEM
                          Initial: 311
                           Final: 311
                          Telephone:623 256-2961
                          3800 W SALTER DR
                          Community: PHX County:  District: 9 Zone: 934
                          Contact: NO CONTACT  G1: ANON G2:  Sex: F DOB:              AZ 623 256-2961
14:19:36 02 04 W28  A6027 Report: Y Founded: Y How cleared: F
14:19:36 02 04 W28  A6027 WM 50-60YO NOT WEARING ANY CLOTHES -- COMP CONCERNED BECAUSE SCHOOL IS
                          ABOUT TO GET OUT SOON
14:19:36 02 04 W28  A6027 (M) (934B 93B) DUPLICATE: PH19-203506: WM 50-60YO NOT WEARING ANY CLOTHES
                          -- COMP CONCERNED BECAUSE SCHOOL IS ABOUT TO GET OUT SOON
14:19:36 02 04 W28  A6027 Related Call:ADDED TO PRIME:PH19-203420
14:19:41 02 04 W28  A6027 Report flag:N TO:Y
14:19:41 02 04 W28  A6027 CALL TYPE
14:19:41 02 04 W28  A6027 Final Call type:900 TO:311
16:51:34 02 04 E17  A4592 (M) (934B 93B) DUPLICATE: PH19-204459: 40MINS AGO OLDER GRY MITS TRUCK
                          DROVE THRU YARD OF HOUSE. CMP HAS PICTURES. CMP IS IN TRAILER IN BACKYARD
                          FOR CONTACT.
                          END OF REPORT
```

COP-STICKNEY000468

```
(s0p10.0h10.0v0T
```

CALL: PH19-203666 CLEARED (R)

```
                 Desk/
Time     Date  Unit   ID
14:45:44 02 04 E17     A3949   Priority: 3 Received by: P CRIMESTOP
                               Initial: INFO
                                Final: INFO
                               Telephone:C623 640-4772
                               3743 W SALTER DR
                               Community: PHX County:  District: 9 Zone: 934
                               Contact: NO CONTACT  G1: KAYLA G2:  Sex:   DOB:           AZ C623
                               640-4772
14:47:27 02 04 E17     A3949   Report: N Founded: Y How cleared: F
14:47:27 02 04 E17     A3949   WANTED TO KNOW WHAT IS GOING ON THE IN THE NEIGH  REF INC   203420
10:40:02 02 26 ENICE4 A4823   Related Call:ADDED TO PRIME:PH19-203420
                               END OF REPORT
```

COP-STICKNEY000469

```
(s0p10.0h10.0v0T
```

CALL: PH19-221119 CLEARED (R)

```
                Desk/
Time      Date Unit  ID
13:37:30 02 07 EINFON A4051  Priority: 2 Received by: S SELF-INITIATE
                              Initial: 901H
                               Final: 901H
                              3800 W SALTER DR
                              Community: PHX County:  District: 9 Zone: 934
                              Contact:  G1: G2: Sex:  DOB:                    AZ
13:37:30 02 07 EINFON A4051
13:37:31 02 07 EINFON A4051  A :C34 PT        3800 W SALTER DR
13:37:50 02 07 EINFON A4051  Cleared by:CHANGED TO:R
13:38:05 02 07 EINFON A4051  Report: N Founded: Y How cleared: R
13:38:05 02 07 EINFON A4051  I :C34 PT
13:38:05 02 07 EINFON A4051  Call was CLEARED
                              END OF REPORT
```

COP-STICKNEY000470

# EXHIBIT 3
## (Non-Electronic)

# EXHIBIT 4

## (Non-Electronic)

# EXHIBIT 5
## (Non-Electronic)

# EXHIBIT 6

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)

VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

JAMES ARNOLD

Phoenix, Arizona
April 6, 2021
9:00 a.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
PREPARED BY:                P (602) 230-5454
                            F (480) 546-3721
Donna DeLaVina, RPR         www.dlvreporting.com
Certified Reporter
Certificate No. 50468

1        Do you see where I read that?

2     A.  I do.

3     Q.  And perimortem means around the time of death,

4  I guess.  At the time on February 4th, 2019, did you

5  see abrasions or contusions to Casey Wells' face, torso

6  and extremities?

7           MS. RETTS:  Form; foundation.

8           THE WITNESS:  Are you asking before

9  contact or initial contact or?

10     Q.  BY MR. SHOWALTER:  So prior to -- at the time

11  when you first approached Casey Wells, on February 4th,

12  2019, and he's naked in the road and you're responding

13  to the initial call, did you see any abrasions to him?

14     A.  I don't recall seeing anything, of this source,

15  no.

16     Q.  And he was not -- at that time, you didn't see

17  any bleeding, correct?

18     A.  Correct.

19     Q.  And when you approached him, did he appear to

20  be injured or under physical distress?

21           MS. RETTS:  Form; foundation.

22           THE WITNESS:  Physical, no.

23     Q.  BY MR. SHOWALTER:  Mental and emotional

24  distress?

25           MS. RETTS:  Form; foundation.

1        THE WITNESS:  There was definitely

2   something off with -- I mean, it goes without saying,

3   he's standing in the middle of the road naked at, you

4   know, I believe it was 2 o'clock in the afternoon

5   where -- you know -- like we go back to what you were

6   describing as normal, what we would describe as normal

7   to one another, that's just not normal.

8        So my assumptions were there had to have

9   been something on board in his system that is causing

10  him to be out here or the reason why he's out here,

11  yes.

12  Q.  BY MR. SHOWALTER:  And --

13  A.  Go ahead.

14  Q.  So you can tell when you see a naked man in the

15  street that he has some kind or mental or emotional

16  disturbance that's possibly related to drugs, fair?

17        MS. RETTS:  Form.

18        THE WITNESS:  I can't necessarily tell

19  until I've contacted him.  But I can assume that

20  there's got to be something wrong with this individual,

21  not physically, but mentally, apparently.  You know,

22  until I approach and get -- speak with him or attempt

23  to speak with him or -- and how their responses are, I

24  don't know for sure.  I mean, it's assuming that that's

25  not a normal act for a human being.

1    A.  Okay.

2    Q.  So according to this time line, there are three

3 911 calls received.  The first at 14:04:01, the second

4 at 14:08:40, and the third at 14:14:55.  Do you see

5 where I read that?

6    A.  I do.

7    Q.  And those 911 calls aren't something that you

8 listened to.  They go to dispatch.  You're not part of

9 that.  You receive a call that they need an officer at

10 the scene on Salter, correct?

11         MS. RETTS:  Form.

12         THE WITNESS:  Correct.

13    Q.  BY MR. SHOWALTER:  And at approximately

14 14:15:33, it says Sergeant Rodarme is dispatched.  Do

15 you see where I read that?

16    A.  I do.

17    Q.  And then it says at 14:18:02, Officer Arnold is

18 dispatched.  Do you see where I read that?

19    A.  I do.

20    Q.  And I'm going to show you Exhibit 50.

21    (Whereupon, Deposition Exhibit 50 was marked

22 for identification.)

23    Q.  BY MR. SHOWALTER:  Let's see, Exhibit 50, do

24 you now see a CAD report in front of you?

25    A.  I do.

1    Q.  Okay.  Now, the CAD report -- Exhibit 50 is

2  COP-STICKNEY000450 through 470.  And I'm going to take

3  you to that time.  I can kind of toggle between this,

4  14:18:02 and I'm going to highlight it on the CAD

5  report.

6           Does this entry that I've highlighted

7  relate to you?

8    A.  It does.

9    Q.  Is 9243 your badge number?

10    A.  It is.

11    Q.  And was 934B your call sign on that date?

12    A.  It was.

13    Q.  Okay.  And so when the investigators put that

14  together, they got that time entry correct for when you

15  were dispatched to the scene, correct?

16           MS. RETTS:  Form; foundation.

17           THE WITNESS:  Correct.

18    Q.  BY MR. SHOWALTER:  And do you have any reason

19  to disagree with that time entry?

20           MS. RETTS:  Form.

21           THE WITNESS:  I don't.

22    Q.  BY MR. SHOWALTER:  At 14:19:18, which is a

23  minute and 16 seconds after you were noted as being

24  dispatched, this has you arriving on the scene.  Do you

25  see where I read that here?

1     A.  I do.

2     Q.  And I'm going to go over to the CAD and is --

3  let's see, if I can operate a mouse.

4          Does this entry at 14:19:18 log your

5  arrival at the scene on Salter?

6     A.  It does.

7     Q.  Okay.  And do you have any reason to disagree

8  with the time of your arrival, given in that time line

9  and in the CAD report?

10          MS. RETTS:  Form.

11          THE WITNESS:  I don't.

12     Q.  BY MR. SHOWALTER:  Okay.  So you arrive on the

13  scene at 14:19:18 seconds.  What do you do when you

14  arrive there?

15     A.  I park my patrol vehicle in the middle of the

16  street.  I turn on my overhead lights.  I didn't turn

17  on the siren.  I did turn on my lights.  I pulled

18  probably about 10, 15 feet from Mr. Wells.  I got out

19  of my patrol vehicle.  I approached him, still keeping,

20  you know, my distance from him, just trying to engage

21  in conversation with him.  Asking him why he was out in

22  the middle of the street, not clothed, telling him --

23  or, you know, viewing his clothes and property in the

24  driveway just to the right of him or actually to the

25  north of him, the way he was standing.  And telling him

1  that we needed to get him dressed and figure out what's

2  going on here.

3      Q.  So you were able to see a pile of clothing and

4  a driveway at a nearby house that you were able to

5  relate to Casey, fair?

6      A.  Correct.

7      Q.  Did the fact that he had stripped naked, was

8  that fact that suggested to you that he was under the

9  influence of drugs?

10      A.  Potentially.  You never know what -- I mean, he

11  could not be on drugs, but just be -- have a mental

12  condition, you know, to cause that as well.

13      Q.  And that's -- the fact that somebody is naked,

14  does that make it more likely that they're on drugs

15  than if --

16      A.  No.  It just makes it odd, like we discussed

17  earlier.  It's not normal for a human being to be naked

18  in the middle of the street, you know.

19      Q.  Yeah.

20      A.  It's odd.  But that's why we respond and that's

21  what I was trying to figure out is why he's in the

22  middle of the street with no clothes on.

23      Q.  Now, what was he doing in the middle street?

24  Was he gesturing?  Was he posing?  How would you

25  describe what he was doing?

1      MS. RETTS:  Form.

2      THE WITNESS:  He was standing erect with

3  his arms and hands pointed to the sky, yelling with

4  them up in the air.

5  Q.  BY MR. SHOWALTER:  And was he holding them up

6  in the air or was he moving them to the sides or

7  anything like that?

8  A.  He was holding them straight up in the air.

9  Q.  And so you arrive.  You see you this.  You

10 approach Mr. Wells and you also note the clothing and

11 you tell him, hey, let's get your clothing back on and

12 figure out what's going on here?

13 A.  Right.  I had mentioned also, I said I needed

14 to put him in cuffs, that would be for his safety and

15 mine.  He had mentioned to me one of the only -- one of

16 the three things he said to me, he said to me, I was

17 born naked or I came into this world naked and I'm

18 going to leave this world naked; or God meant for me to

19 leave this world naked.  I'm just paraphrasing.  I

20 don't remember his exact words.

21 Q.  He said words to the effect of, something like

22 I came into this world naked and I'm going to leave

23 this world naked?

24 A.  Right, to those effects, yes.

25 Q.  And --

JAMES ARNOLD  APRIL 06, 2021

1    A.  Yes.  He was answering a question that I was

2  asking him.

3    Q.  Do you have a -- did some time elapse between

4  you telling him that he needed to get his clothes on

5  and the handcuffing comment?  Or were those pretty

6  close together?

7    A.  All relatively pretty close together.  You

8  know, one question followed the other.  Like I had

9  stated, I initially asked, you know, "Sir, what are you

10  doing out here with no clothes on?"  Once I recognized

11  that the clothes were over there, I said, "Hey, let's

12  get your clothes on."  I said, "I'm going to need to

13  put you in cuffs."

14          All along, right before, that's when he

15  said, you know, "I was born naked.  I'm going to leave

16  this world naked," comment.  I'm like, "Let's get your

17  clothes on."  I said, "Let's figure this out.  I'm

18  going to have to cuff you."  That's when he

19  acknowledged me over his shoulder saying, I'm not going

20  to cuff him.

21          I made the statement, I said, "Why, are

22  you going to fight me?  Are we going to have issues?"

23  And he said, "You're just not going to cuff me."  And

24  those were the only words I spoke to him or he -- I

25  don't recall him saying anything else to me or anybody

1  else on the scene.

2    Q.  Okay.  And at the time he made those three

3  statements, was Sergeant Rodarme there yet?  Or was

4  that before Sergeant Rodarme arrived?

5    A.  He wasn't there.  Once he answered the last

6  question and saying, "You're just not going to cuff

7  me."  I made that decision not to go hands-on with him

8  right then.  To wait until my backup showed up, which

9  was Sergeant Rodarme.

10   Q.  At this time -- what is your height?

11   A.  I like to believe I'm 6'2", a full 6'2".  But I

12  might be about 6'1" and three-quarters, depending on --

13  because of my age, I'm getting older.

14   Q.  And it might depend on what shoes you're

15  wearing and things like that?

16   A.  Correct.

17   Q.  And what was your approximate weight on

18  February 4th, 2019?

19   A.  I would have to say it's probably 250-ish.

20   Q.  At the time, did you have an estimate for how

21  tall Casey was and what his approximate weight was?

22   A.  I thought he ranged right in about 5'10",

23  probably about 210 pound range.

24   Q.  Okay.

25   A.  From just looking at him.  I'm not a -- what do

1  you want to call it, those carnival people that guess

2  weights or anything.

3     Q.  Yeah.  But you, as a police officer, you're

4  trained to try to get an accurate description of

5  people.  And that may be much easier, but, you know,

6  you're generally used to giving descriptions of people

7  who are clothed?

8     A.  That's fair to say.

9     Q.  So you made a decision to wait to attempt to

10  cuff Mr. Wells until additional officers arrived on the

11  scene?

12     A.  Yeah.  To even go hands-on with him.  I still

13  tried to chat with him.  I don't recall what I was

14  saying to him.  But I tried to keep him, you know,

15  continuing to be calm.  Because at this point, he was

16  still being calm.  Although, he made those statements

17  to me, he wasn't -- he went right back to looking up in

18  the air and holding his hands up and he wasn't making

19  any, you know, motions towards me.  Or, you know, he

20  wasn't threatening me at that point.

21           So I chose to say, you know what, mainly

22  because he was naked, that I'm not going to go hands-on

23  with him because I didn't want to have to wrestle

24  around somebody if they didn't want me to put them in

25  cuffs when they didn't have any clothes on.

1    Q.  And given that he didn't have any clothes on,

2  you were able to recognize that he was unarmed,

3  correct?

4    A.  Correct.  And I also knew that the more

5  officers that showed up, the more of a deterrent

6  fighting us would be.  So that's another reason why I

7  chose to say, you know what, I'll just wait.  There's

8  no rush for me to go hands-on with him, especially when

9  I knew my backup was coming.  And then that might help

10  deter him from wanting to fight us.

11    Q.  So once you make that decision, you're

12  continuing to attempt to engage Casey, waiting for the

13  arrival of additional officers, correct?

14    A.  Correct.

15    Q.  And the first officer who shows up, would be

16  Sergeant Rodarme?

17    A.  Correct.

18    Q.  And I'm going to take you back to Exhibit 1a.

19  And this is page 81.  And this has Sergeant Rodarme

20  arriving on scene at approximately 14:22:14.  Do you

21  see where I read that?

22    A.  I do.

23    Q.  And do you have any reason to disagree with

24  that?

25    A.  I don't.

1  him to be able to go hands-on.

2      Q.  And Casey also did not change his position,

3  correct?

4      A.  Correct.

5      Q.  And after Sergeant Rodarme arrived, you've

6  already testified you never heard Casey verbalize

7  another word?

8      A.  Correct.

9      Q.  Now, what happened -- picking it up there, what

10  happens next?

11      A.  After we go hands-on with him?

12      Q.  Yes.

13      A.  We had been pleading with him to get him into

14  cuffs.  I had mentioned to Casey, again, with no

15  response from him, I had mentioned, after we had

16  pleaded with him, I said, "Sir," I said, "We've asked

17  you nicely.  We've told you that we're going to get you

18  in cuffs and you're still resisting.  Our next step is

19  we're going to make you go in cuffs."

20          Again, he didn't respond.  Again, he

21  continued to resist us when we attempted.  So at that

22  point, another verbal cue that I gave to my boss, like

23  I was going to try to take him down to be able to get

24  him under control to cuff him.  Well, that attempt

25  failed.  When trying to take him down, he ended up

1  breaking free from both of us, I think more so from me

2  because of the fact my boss in ways just let him go, so

3  I'm not taking down two people and, you know, possibly

4  taking my sergeant out of the mix.

5        But he broke free.  He got into a fighting

6  stance, balled up his fists and he took a swing at me.

7  He hit me right here in the bottom lip and then backed

8  off and smiled on his face and started bouncing up and

9  down again.  So, at that point, that's when I

10  approached him getting him into a high bear hug.  And

11  when doing so we're wrestling around, still standing

12  up.  I don't have the leverage, even though I'm taller

13  than him, he's a stocky man and I didn't have the

14  leverage to bend him over, so he would lose footing and

15  fall to his back.

16        So that's when Sergeant Rodarme initially

17  deployed his TASER.  But I believe and this I don't

18  know, he would have to tell you, I believe, and I don't

19  know.  He would have to tell you, I believe he did not

20  use his TASER because I'm so close to Mr. Wells at the

21  time, being hands-on with him.

22        So he holstered his TASER and then he

23  helped me by grabbing Mr. Wells from behind and forcing

24  him down to his back.  That's where I end up in what I

25  believe is like a full mount.  I don't know if you know

1  that term or whatever.  But I'm top of Mr. Wells.  He's

2  still resisting, I'm trying to get control of just him

3  in general.

4          Well, then my boss comes to his -- because

5  he's laying on his back, trying to get control of his

6  right arm again, which I'm now trying to focus on his

7  left arm and trying to pin him down to where he's now

8  on his back laying like this.  But that whole time,

9  he's still fighting us.  He was able to break free from

10  my grasp and that's when he took a swing at Sergeant

11  Rodarme.  When he did so, that's when I elbowed him

12  right here in the nose and he started bleeding

13  immediately.

14          When he did that, all he did was -- I

15  regained his wrist and I pinned him back down that way.

16  But all he did was shook his head and it seemed to make

17  him madder.  If madder is a word.  Even more mad.  And

18  that's when he started to spit and growl and, you know,

19  make noises and stuff like, you know, he's willing to

20  fight and that didn't affect him.

21          So at that point, I am trying my best to

22  kind of -- I kind of sprawl out.  So I lengthen my

23  body, hoping that my weight would help keep him, you

24  know, down, as well as keeping control of his legs,

25  because he was trying to kick and everything else.  So

1  now I'm laying on top of him lengthwise.  My boss is
2  still trying to hold his arm down, all along after
3  being spit on, you know, with blood and spit into the
4  eye and his mouth trying to hold him down.

5         At that point, other officers were showing
6  up at that point.  I'm not sure exactly sure who was
7  the first.  I believe it was Officer Seaquist was the
8  first one to respond after that.  And we were able to
9  get him -- get him, being Mr. Wells, over onto his
10  stomach to attempt to try to get his arms controlled
11  and behind his back.

12         And at point, that's when Mr. Wells -- I
13  had to give up my arm, because he's turning over to his
14  stomach now, so he pins his left arm, which was the
15  other arm that Sergeant Rodarme had, now under his
16  belly.  And wasn't giving us his right arm at that
17  time.

18     Q.  Let me unpack that.

19         Initially, with -- well, when you first
20  have Casey on the ground and he's on his back, Sergeant
21  Rodarme is working to control the left arm and you're
22  working to control the right?

23     A.  No.  He's controlling the right arm.  I'm
24  controlling the left.

25     Q.  Okay.  So when he's flipped onto his stomach,

1  at that point you're working to --

2      A.  He rolls over.  He gives up the right arm.

3  Sergeant Rodarme has to give up the right arm to roll

4  him over, which Casey, Mr. Wells, pins it up, he lays

5  on it or keeps it under his stomach and won't let us

6  get it out.

7              Well, I transferred over -- I think

8  they're -- by that time, Officer Long and Funston, they

9  were there to help assist with keeping control of his

10 left arm, which I initially had pinned down when he was

11 on his back.  But we still couldn't get his right arm

12 from out -- from underneath him.

13             Officer Seaquist was concentrating on his

14 legs, crossing them, pinning them up back there, so

15 they potentially weren't going to be an issue to us as

16 we're trying to get him under control.

17             So after that, that's when we still

18 couldn't get it, his arm out from under him.  That's

19 when Officer Seaquist, I believe, deployed his TASER

20 after announcing that he was going to deploy it.  So we

21 got out of the way.  But each TASER deployment or -- I

22 don't know how you want to describe it, because there's

23 no deployment after, two cartridges.  So I mean, each

24 one it only affected Mr. Wells for a short second.

25 Like he would tighten up and then as soon as the

1  deployment or whatever was gone, he was right back to

2  resisting us again.

3      Q.  So the -- I mean, the information we have is

4  that the two cartridges were deployed, but once the

5  second cartridge was deployed, Officer Seaquist could

6  still pull the trigger and it would actuate the TASER

7  for five seconds at a time.  Do you disagree with that?

8      A.  I don't disagree with it.  As long as you have

9  a good connection, that's where it's going to localize

10 within that -- whatever the spread is on the probes

11 that hit.  I don't know if the first deployment of the

12 cartridge, both connected, both probes connected.  I

13 think the second one did, but being the close

14 proximity, there wasn't a large enough spread in

15 between the probes to lodge -- to lock up a much larger

16 muscle group or grouping.

17          So I think accompanied with Mr. Wells'

18 size and stuff, I believe that's probably why it wasn't

19 as effective as it is on other people.

20     Q.  Is your recollection that each time you heard

21 the TASER deployed, you would see Casey stiffen in

22 reaction to that?

23     A.  Yes.  I could say that.

24     Q.  And when you're talking about the spread, I

25 just want to make sure that we're talking about the

1  same thing, when the TASER is fired, for lack of better

2  word or deployed is probably the -- the term you use at

3  the City of Phoenix for actually pulling the trigger on

4  a TASER and launching the probe is deployed, correct?

5      A.  Correct.

6      Q.  When that occurs, there are two probes, the

7  idea is those two probes will make contact with the

8  skin of a person and will create an electrical circuit,

9  correct?

10     A.  Correct.

11     Q.  And the circuit they will create will be in

12  between those two probes, correct?

13     A.  Correct.

14     Q.  And so the larger the spread of the two probes,

15  the larger the circuit and the more muscle will be

16  affected by the TASER, correct?

17     A.  Correct.

18     Q.  And the goal in using the TASER is -- the ideal

19  area, again, which to deploy it, is the back and the

20  large muscles of the back, correct?

21             MS. RETTS:  Form; foundation.

22             THE WITNESS:  Correct.

23     Q.  BY MR. SHOWALTER:  And so, in this instance,

24  were you able to view approximately how far away

25  Officer Seaquist was when he deployed the TASER?

1    A.  I could only -- I don't know if you want me to

2  speculate or -- from my recollection, he had to have

3  been about three foot away.

4    Q.  I mean, I think his own estimate ranged from

5  one and a half to two feet.

6    A.  Okay.

7    Q.  So you don't need to weigh in on that.

8         But you would agree with me, that the

9  ideal or the recommended range for TASER use is further

10  away from that, correct?

11         MS. RETTS:  Form.

12         THE WITNESS:  Solely because of what you

13  were just discussing, wanting the optimal spread on the

14  probe to make sure that we're able to lock up as much

15  of a muscle group as possible, yes.

16    Q.  BY MR. SHOWALTER:  And so the farther away you

17  are, the more the probes will spread, fair?

18    A.  Correct.

19    Q.  And if you get too far away, they'll spread too

20  far apart and it won't work at all, right?

21    A.  Correct.

22    Q.  And if you're really close, you have a really

23  small spread, correct?

24    A.  Correct.

25    Q.  And that's not ideal either.

1  getting -- I wasn't able to get him to lose his balance

2  or get that -- you know, he had a lower center of

3  gravity, I guess you could say?

4      Q.  Yeah.  Yeah.  And I think you explained that

5  well when you said you weren't able to get a leverage

6  on him or something like that, right?

7      A.  Correct.

8      Q.  And so Sergeant Rodarme assists in bringing

9  Casey to the ground.  And at that point, you said you

10  were in what you described as a full mount position?

11     A.  Correct.  Where I was sitting on him.  My knees

12  to his side, on each side, where I'm sitting on top of

13  his stomach at the time, trying to control his left arm

14  while he's laying on his back, all along, that's when

15  my sergeant grabbed his right arm and was trying to

16  control that as well.

17          But when I was attempting to do that,

18  that's when he broke free of my grasp and he took a

19  swing at my sergeant, which was trying to gain control

20  of the other arm.

21     Q.  And then is it at that point that you deliver

22  the strike to his nose?

23     A.  Right.  Which gave me that split second to

24  regain control of his left arm and pin that back down.

25  But, like I had stated earlier, that the only effect

1  that he showed us, that he shook his head and it

2  appeared to make him more angry.  It didn't -- it

3  didn't -- I guess, it wasn't effective, in my eyes.

4      Q.  Okay.  And going back to the bear hug, you have

5  your arms around Casey at the armpit level.  What is he

6  doing with his arm, at that point, to the extent that

7  you can remember?

8      A.  I don't remember.  But I can only imagine they

9  were flailing around.  I don't remember him trying to

10  strike me anymore, which could have been.  And then

11  being in that moment with him, I just don't recall it.

12  I didn't feel him striking me anymore.  I was just

13  attempting to control him and get him to the ground.

14      Q.  Was there ever a point where he lifted you off

15  the ground?

16          MS. RETTS:  We've got some weird freezing.

17          Can you ask that again, Jesse?

18      Q.  BY MR. SHOWALTER:  Was there ever a point where

19  he lifted you off the ground?

20      A.  Lifted me off the ground?

21      Q.  Yes.

22      A.  I don't know if you could call it lifted me off

23  the ground.  I mean, he was pushing himself off the

24  ground, which if I was somewhat on top of him, at that

25  time, was lifting myself off the ground as well.  But

 1  keeping it straight.

 2      A.  Right.

 3      Q.  You're on top of him in this full mount.

 4  You're trying to control his right arm?

 5      A.  Left arm.

 6      Q.  His left arm.  Sergeant Rodarme is trying to

 7  control his right arm?

 8      A.  Correct.

 9      Q.  And is it the left arm -- it's Casey's left arm

10  that broke free and strikes Sergeant Rodarme?

11      A.  Yes.

12      Q.  Okay.  And in response to that, is when you do

13  the strike to Casey's nose and using your right arm?

14      A.  No.  Using my left arm, my left, my left.

15  Because I'm on top of him looking down at him.  So I'm

16  using my left.  I'm trying to hold his arm down with my

17  right.  His left arm with his -- because he's going to

18  be like this, so I'm trying to hold it down with my

19  right arm.  And like I said, he bucked me, so I braced

20  myself over top of him with my left arm.  Before I

21  could come back, that's when he got free with his left

22  arm, which was pinned back here.

23              He takes a swing at my boss.  I'm able to,

24  once he takes a swing, get his arm here.  I elbow him

25  with my left arm in the nose.  And then I'm able to

1  regain control of his left arm again with my right arm
2  and pin it back down.  And then that's also, right
3  there all at the same time, I believe is when I tried
4  to sprawl out lengthen my body to hopefully take his
5  legs out of play.  Because now he's starting to spit
6  and everything else, the blood and stuff that was
7  coming from his nose, at my boss and I.

8      Q.  And so maybe my confusion in that is if you're
9  on top -- you're on top of him.  You're working to keep
10  his left arm down.  Sergeant Rodarme is working on the
11  right arm?

12      A.  Correct.

13      Q.  How -- what I don't understand is how he's able
14  to swing and actually strike Sergeant Rodarme through
15  that, at that point?

16      A.  I just said he broke out of my grasp.  After he
17  had bucked me forward and I braced myself, I didn't
18  have the control of his arm at that time.  So when I
19  pushed myself back up, I was at disadvantage.  Him
20  fighting through, was able to get through -- get me to
21  let go of him.  So now I'm just in mount with no arm
22  and he flails it straight -- or swings at my boss.  And
23  then I'm able to get him back to where it's here and
24  then I elbow him in the face and then I'm able to get
25  control of that left arm.

```
 1              MS. RETTS:  Form.
 2              THE WITNESS:  I believe that he was
 3  attempting to swing, to hit him.  Because he still had
 4  his left arm.  He had his right -- or I mean, he had
 5  his right arm -- he had his left arm free.  He was
 6  trying to get my boss to let him go.  Since he had me
 7  off balance and I was trying to, you know, get my
 8  balance back on top of him, he was trying to figure a
 9  way of getting out of our grasp.  So I believe he took
10  a swing at him.
11      Q.  BY MR. SHOWALTER:  Okay.
12      A.  Not flailing his arms.
13      Q.  So that's when you strike him.  Then your
14  testimony is pretty immediately after you strike him
15  he's bleeding?
16      A.  Yes.
17      Q.  And then he's spitting blood, correct?
18      A.  Correct.
19      Q.  Did it look to you like he was intentionally
20  spitting blood at you or Sergeant Rodarme?  Or did it
21  just appear that he was spitting out blood that was in
22  mouth?
23              MS. RETTS:  Form; foundation.
24              THE WITNESS:  He was spitting at.
25      Q.  BY MR. SHOWALTER:  Spitting at?
```

1      A.  We are close.

2      Q.  Is it your recollection, that he was the third

3  Phoenix police officer to arrive at the scene?

4      A.  Yes.

5      Q.  And do you recall him -- at the time when he

6  arrives, you're focused on Casey, correct?

7      A.  Correct.

8      Q.  Do you remember him verbalizing, let's get him

9  onto his stomach?

10     A.  I do.  And that's when I knew he was here.  You

11  know, he was there.

12     Q.  Okay.  And so when that occurs, I want to make

13  sure I get this correct.  Well, can you just explain

14  the process that you guys -- or how you guys went about

15  getting Casey from being on his back to getting him

16  onto his stomach?

17     A.  Like I said -- like I had mentioned earlier, I

18  had to let go of the arm that I was controlling or

19  attempting to control.  Because at that point I'm not

20  sure how or who took over.  I don't know if Sergeant

21  Rodarme let go of the arm he was controlling to get

22  focus of the arm that I was just like passing off to

23  him because we were trying to roll him over so we could

24  control his legs and that being onto his stomach.  And

25  where somebody had his right arm, or control of his

1  right arm.  And then he kept it pinned under his

2  stomach once we were able to roll him over.

3      Q.  And, at that point, what are you doing at that

4  point?

5      A.  Attempting to get his arm that he has now got

6  hiding or, you know, resisting by keeping under his

7  stomach.  I'm trying to get that from being underneath

8  him.

9      Q.  Now, are you in that full mount position on his

10  back at this point?

11      A.  No.  I'm off to the side of him trying to pull

12  the arm from underneath him and then just control

13  his -- that arm.  Because although he's got it pinned

14  under, he's not able to flail that arm.  That arm's not

15  moving.  It's underneath him.

16          So with Sergeant Rodarme, I believe was

17  controlling the arm that I had, which was his left arm

18  now and Officer Seaquist was attempting to get his legs

19  under control and stuff, all he was doing is trying to

20  resist me from getting his arm.

21      Q.  His right arm?

22      A.  Yes, his right arm.  Which, I believe helped in

23  the matter, because then he's focusing on not giving

24  that arm up to me and he can't focus on, you know,

25  resisting Officer Seaquist or resisting Officer -- or

1  Sergeant Rodarme because he's focused on trying to keep

2  his arm underneath his body at that point and not give

3  it up to me.

4      Q.  And Seaquist is at the legs?

5      A.  Yes.

6      Q.  So nobody -- does any -- what is Sergeant

7  Rodarme doing to control Casey's left arm at this

8  point?

9      A.  I'm not sure.  I don't know.  I was focused on

10  trying to get his arm out from underneath him.  And

11  when that wasn't going well, that's when I am hearing

12  Officer Seaquist say that he's deploying the TASER to

13  watch out, for us to stand clear.

14      Q.  Now, you testified earlier about when Casey was

15  on his back, that you were in this full mount posture

16  and that's a MMA term.  Have you ever trained in MMA?

17      A.  I have not.

18      Q.  I want to make sure when I say, have you ever

19  practiced MMA or done any MMA activities?

20      A.  I haven't.

21      Q.  And just so I'm clear, you understand that so

22  you've never like -- that includes like karate, jiu

23  jitsu, Brazilian jiu jitsu, Krav Maga, you've never

24  participated in any of those things?

25      A.  I did some kung fu back probably, if I had to

1  guess, probably back in '97-ish.  But, I mean, that's a

2  perishable skill, if you're not practicing.  So it's

3  not something that I'm proficient in or have been

4  proficient in 20 years.

5      Q.  What about boxing?

6      A.  No.

7      Q.  And a question I forgot to ask you earlier is

8  since you've been a Phoenix police officer, have you

9  had any kind of off-duty employment?

10      A.  I have.

11      Q.  What has that been?

12      A.  I've worked at -- I don't know what you call

13  it, an alternative high school, Maya High School off

14  of -- as security there.  I wouldn't call myself a

15  resource officer, because I didn't work there

16  consistently.  I was just, you know, one day a week on

17  certain -- on my normal off days.  I'm currently doing

18  off-duty at a methadone clinic, off of Cactus and 28th

19  Drive.  And I also worked an off-duty at an auction

20  yard, off of Grand just south of Camelback.

21          And I've done a paving job here and there,

22  but that's been years since I've attempted that.  It's

23  just too hot for me to be out there doing -- I ran some

24  traffic lights and stuff, but nothing, you know --

25      Q.  Circa 2019, were you doing off-duty work at

1 that?

2      A.   2019?

3           Probably just the methadone clinic.  I had

4 probably just started that.  Because I think it's --

5 it's just -- it's been over two years now.  So, yeah, I

6 think I had just started.

7      Q.   And so the methadone clinic, that is people who

8 are addicted to opiates, like heroin, fentanyl, things

9 of that nature and then they can participate in a

10 program where they are -- if they meet certain

11 parameters, they're given a legal opiate that is meant

12 to be like a maintenance type of drug; is that

13 accurate?

14           MS. RETTS:   Foundation.

15           THE WITNESS:   That sounds pretty accurate,

16 you know, something to wean them off of it and to help

17 them get clean, yes.

18      Q.   BY MR. SHOWALTER:   I mean, I don't think

19 anybody gets weaned off by methadone.  I think they

20 just get addicted to methadone, but they have a nice

21 place they can go to get it.  Is that your

22 understanding?

23           MS. RETTS:   Form.

24           THE WITNESS:   I don't know enough about

25 the -- if you can or can't get off of it.  It's harder

1  the wrong -- I'm looking at a different Jamie Arnold.

2           Let me show the right one.

3     A.  I haven't been 160 since about, I don't know,

4  ninth grade, eighth grade.

5     Q.  Okay.  Is this the right Jamie, the correct

6  Jamie Arnold?

7     A.  That's me.

8     Q.  Okay.  And this has you as 6'2" and 190 pounds?

9     A.  Correct.

10    Q.  And that --

11    A.  That's me with the Dodgers, so they're saying

12 that.  I had to have been, I'm assuming that was '99.

13 So six years, so I was probably 24, 25 at that stage.

14    Q.  Okay.  Let me start sharing.

15           So with Casey on his stomach, Officer

16 Seaquist is there.  Sergeant Rodarme is there.  You

17 were there.  Did you or any of those other officers,

18 once Casey was on his stomach, place your weight on

19 Casey, on his abdomen, I should say?

20           MS. RETTS:  Form; foundation.

21           THE WITNESS:  On his abdomen?

22    Q.  BY MR. SHOWALTER:  Yes.

23    A.  That would have been hard to do because he was

24 on his abdomen.  He was on his stomach, right?

25    Q.  Okay.  I guess I just mean the abdomen as just

JAMES ARNOLD   APRIL 06, 2021

1   any portion of his torso.  So any portion of his torso?

2                MS. RETTS:  Form; foundation.

3                THE WITNESS:  I mean, we were holding him

4   down.  I was -- I had placed my knee on his shoulder

5   blade, just to control him or help control him.  But my

6   weight wasn't on him or wasn't in a -- which I didn't

7   think was a compromising spot or position for

8   Mr. Wells.

9        Q.  BY MR. SHOWALTER:  So your knee was on his

10   shoulder blade?

11       A.  Yes.  It would have been his right shoulder

12   blade.

13       Q.  When did you put your knee on his shoulder

14   blade?

15       A.  I don't know.  Are you saying at what point of

16   the -- when we were trying to get him into custody.  At

17   this time, when I had my knee on him, I would say

18   everybody was there, but all the officers had responded

19   that were involved were there at that point.  So myself

20   and Officer -- or Sergeant Rodarme stood up off of him,

21   off of Mr. Wells for a quick second to -- you know,

22   because we're out of breath.  We were the ones that

23   were fighting with him the longest.

24                So we gained our composure and stuff and

25   then when we -- they were still having issues getting

1  him under control, that's when I was up by his head and

2  I knelt down on his shoulder blade.  His -- I'm trying

3  to think, his right shoulder blade.

4       Q.  So at the point at which you put your knee on

5  his right shoulder blade, had Casey been handcuffed?

6       A.  I don't recall.  I know he was being --

7  trying -- we were attempting to still detain him, get

8  him fully in cuffs, fully in the RIPP restraint, the

9  whole nine yards at that point.  So it was still -- he

10  was still resisting at that point, when we were all

11  there trying to get him under control.

12       Q.  Okay.  But you don't know if he had already

13  been handcuffed when you put your knee on his right

14  shoulder blade?

15       A.  I don't know that.  I don't recall that because

16  if he's still struggling around.  And like I had said,

17  I never gained control of his arm until other people

18  got there and then they were able to get control of

19  him.  I had stepped away for that brief second or so to

20  take a couple of breaths.

21            Then when they were still struggling with

22  him, that's when I attempted to help hold him down by

23  kneeling on his shoulder blade.

24            When I say kneel on his shoulder blade, I

25  just placed my knee on the back of his shoulder blade.

1  I was doing more of the leaning on my left leg.

2      Q.  So what you're saying is that you weren't

3  actually placing weight on him with your knee?

4      A.  I had to have been placing some sort of weight

5  on him, just not all my weight, nor I wouldn't even say

6  50 percent of my weight on him at that time.

7          I placed the majority of my weight on my

8  left leg that I was in, like a -- say if I knelt down

9  and I had my arm on my left leg leaning over on it I

10  just placed my right knee in his right shoulder blade.

11      Q.  Did you ever see any other officers place their

12  weight on Casey?

13      A.  No.  I don't recall.

14      Q.  Did you ever see any of the other officers

15  place a knee on Casey?

16      A.  No.

17      Q.  Have you ever experienced phenomenon where you

18  remembered an event better, long after it occurred than

19  you did at the time when it occurred?

20          MS. RETTS:  Form; foundation.

21          THE WITNESS:  Nothing that I can recall.

22  Usually you remember everything right then.

23      Q.  BY MR. SHOWALTER:  And so you would agree with

24  me, that the statements that you gave closer in time to

25  this event would tend to be more accurate than if you

1  restraints, at that point.

2      Q.  BY MR. SHOWALTER:  And do you have a memory

3  independent of what's shown on the video, as to whether

4  he was handcuffed at the point where Officer Palmer

5  says, "He's restrained"?

6              MS. RETTS:  Form; foundation.

7              THE WITNESS:  No, I don't know exactly

8  when he was handcuffed.  I know he was handcuffed and

9  then put in a RIPP restraint to secure his feet as well

10  or his legs as well.  So whether he was handcuffed

11  shortly or, you know, right before applying the RIPP

12  restraint, we still apparently had movement, if

13  somebody is stating stop resisting as Palmer is walking

14  up.

15             So even if he's handcuffed, they're trying

16  to get the RIPP restraint on him and he's still

17  resisting that.

18             So I didn't, to answer your question, I

19  did not see, based off of that video, him moving or any

20  of movement from that section of the video, no.

21             MR. SHOWALTER:  Okay.  I want to take a

22  seven-minute break to go back through my notes and ask

23  any final questions.  And why don't we go off the

24  record and come back at 1:00.

25             MS. RETTS:  Okay.

JAMES ARNOLD  APRIL 06, 2021

```
 1  you're pushing up off Mr. Wells when the other officers
 2  are there, correct?
 3      A.  Correct.
 4      Q.  Now, I want to go back to generally speaking,
 5  if you are called to respond to the scene of an
 6  incident, how you get that information.
 7          Do you have a device in your vehicle
 8  that's referred to either as MDT or a CAD, C-A-D?
 9      A.  Yes.
10      Q.  And although you might not hear the 911 calls
11  yourself, do you have an understanding that the
12  dispatcher actually types in details into that record
13  for you about the call?
14      A.  Yes.
15      Q.  And then you also hear that information
16  broadcast over your radio, correct?
17      A.  Correct.
18      Q.  And the details for the calls involving
19  Mr. Wells, do you recall hearing or seeing on the
20  MDT/CAD reference to there being a concern that
21  Mr. Wells was naked and children might be coming home
22  from school?
23      A.  Yes.
24      Q.  Do you recall seeing information that the 911
25  caller said that Mr. Wells appeared to be impaired?
```

1   A.  I did.

2   Q.  Now, when you first responded and got out of

3   the vehicle and made verbal contact with Mr. Wells,

4   would you agree that you were attempting to verbally

5   de-escalate him?

6   A.  I do.

7   Q.  And were you using verbal persuasion to attempt

8   to get him to comply?

9   A.  I did.

10  Q.  Did he appear to respond to any of the verbal

11  persuasion?

12  A.  He responded three times, like I had mentioned,

13  and that was it.  After that, he just kept looking up

14  and not responding.

15  Q.  Did you feel, based on what he said, that there

16  was a concern to you that he might physically resist

17  any effort to try to get him to comply?

18  A.  Yes.  Hence, the reason why I waited until my

19  boss showed up.

20  Q.  And one of the response options that you have

21  as an officer is command presence, would you agree?

22  A.  Yes.

23  Q.  And you invoke that by just being in uniform

24  and being present that the person will be, I think you

25  said, deterred from fighting?

1    A.   Yes.

2    Q.   And is one of the --

3    A.   I believe some sort of deterrent.  You know,

4  the more that show up officerwise, you would figure it

5  would be even more of a deterrent.

6    Q.   Was that one of the reasons that you waited for

7  the sergeant is that you were hoping with two of you

8  present, that with that command presence, that

9  Mr. Wells would voluntarily comply?

10   A.   Yes.

11   Q.   Did he appear to respond positively to the

12  command presence?

13   A.   No.

14   Q.   Did you ever target any force directed towards

15  Mr. Wells' neck?

16   A.   No.

17   Q.   Did you ever apply a carotid hold?

18   A.   No.

19   Q.   Did you ever apply a half carotid hold?

20   A.   No.

21   Q.   Did you ever intentionally put any pressure on

22  Mr. Wells' neck?

23   A.   No.

24   Q.   You were describing in your testimony earlier

25  that you used the leading edge of your forearm.  And I

JAMES ARNOLD  APRIL 06, 2021

1  just want to make sure we're on the same page on what

2  that means.

3           Can you describe what you meant by when

4  you used the leading edge of your forearm.  And it's

5  being videorecorded, if you could kind of show with

6  your arm?

7     A.  Okay.  Well, I'm over top of him.  I'm over top

8  of him here.  So I just bring my forearm down.

9     Q.  So placing your forearm parallel to the ground.

10  Are you talking about the fleshy part of your arm?

11     A.  I probably struck him right about here on my

12  arm, right here, coming down.

13     Q.  And you only did that after you were struck in

14  the face with a closed fist from Mr. Wells, correct?

15     A.  Correct.

16     Q.  And even after that, you didn't strike him

17  until you saw him moving to strike your sergeant?

18     A.  Correct.

19     Q.  And based upon what you perceived, you believed

20  that he was intentionally attempting to strike your

21  sergeant?

22     A.  I did.

23     Q.  I want to talk about your experience with the

24  fire department.  Unless you have a subject who's fully

25  handcuffed and restrained, is it your experience that

JAMES ARNOLD  APRIL 06, 2021

 1  the fire department will stage, meaning they will not

 2  come into a scene?

 3      A.  Yes, that's very true.

 4      Q.  When you were interacting with Mr. Wells, do

 5  you have an understanding that before he could have

 6  gotten any medical attention, he would need to be fully

 7  restrained because that's what would be required for

 8  the fire department to come in?

 9      A.  Of course.

10      Q.  Now, I want to talk about your placement of

11  your knee in the shoulder blade of Mr. Wells.  On that

12  leg, I think we saw in the video, your foot, was it

13  also -- were you on the ball of your foot?

14      A.  I was.

15      Q.  Did you have any weight on the ball of your

16  foot?

17      A.  It appears so.

18          MS. RETTS:  I don't have any further

19  questions.

20          MR. SHOWALTER:  Give me one second.

21          Just one quick follow-up -- actually, a

22  couple quick follow-ups.

23

24

25                  (Next page, please.)

# EXHIBIT 7
## (Non-Electronic)

# EXHIBIT 8



COP-STICKNEY000201



COP-STICKNEY000217



COP-STICKNEY000258





COP-STICKNEY000283

# EXHIBIT 9



COP-STICKNEY000195

# EXHIBIT 10

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)



VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

ROBERT RODARME

Phoenix, Arizona
March 23, 2021
9:03 a.m.




DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
PREPARED BY:                    Gilbert, Arizona 85234
                                P (602) 230-5454
Donna DeLaVina, RPR             F (480) 546-3721
Certified Reporter              www.dlvreporting.com
Certificate No. 50468

1  don't know how.

2      Q.  BY MR. SHOWALTER:  And I'm not asking you

3  whether or not you're a doctor.  You would agree with

4  me that you were present with Officer Arnold -- well,

5  you arrived at the scene on Salter on February 4th

6  after Officer Jamie Arnold, correct?

7      A.  Yes.

8      Q.  At the time that you arrived on the scene, had

9  there been any physical contact between Officer Arnold

10  and Mr. Wells, to your knowledge?

11      A.  No.

12      Q.  And so when you arrived on the scene, what was

13  Officer Arnold doing?

14      A.  Standing off to the side, talking to him,

15  trying to talk to him.

16      Q.  And did you hear what sorts of things Officer

17  Arnold was saying to him?

18      A.  As I arrived, no.

19      Q.  After you arrived, did you hear Officer Arnold

20  talking to Mr. Wells?

21      A.  Yes.

22      Q.  What did you hear him say to Mr. Wells?

23      A.  He was just trying to de-escalate the

24  situation, trying to get him off the street and

25  trying -- and assuring him that we could get him help,

ROBERT RODARME  MARCH 23, 2021

1  you know.  And to get him off the street, he was naked

2  in the street, so we're just trying to get him out of

3  that situation and trying to help him.

4       Q.  And so you arrive at the scene, Casey's there,

5  Officer Arnold is there.  Let me back it up a little.

6            Before you arrive on the scene, you

7  receive a call over from dispatch, correct?

8       A.  Yes.

9       Q.  And the call says words to the effect that

10  there's a naked man doing yoga on Salter; is that

11  correct?

12            MS. RETTS:  Form.

13            THE WITNESS:  Yes.

14       Q.  BY MR. SHOWALTER:  And Officer Arnold goes

15  there, correct?

16       A.  Yes.

17       Q.  In police terms, Officer Arnold responds to the

18  scene and is the first responding officer, correct?

19       A.  Yes.

20       Q.  When he arrives at the scene, he says words to

21  the effect of there is indeed a naked man doing yoga?

22       A.  Yes.

23       Q.  And that kind of -- those words kind of stood

24  out to you, didn't they?

25            MS. RETTS:  Form.

1    THE WITNESS:  Yes.

2    Q.  BY MR. SHOWALTER:  And you are the next Phoenix

3   police officer to respond to that scene, correct?

4    A.  Yes.

5    Q.  And when you arrive, Casey Wells is still doing

6   some form of yoga or he's engaged in something unusual

7   naked in the middle of the street, correct?

8    MS. RETTS:  Form.

9    THE WITNESS:  Yes.  It wasn't yoga, but it

10   was definitely unusual.

11    Q.  BY MR. SHOWALTER:  And I don't -- you know,

12   I -- does it -- is he facing the sun?

13    A.  Yes.

14    Q.  Does it look like he's praying to the sun?

15    MS. RETTS:  Foundation.

16    THE WITNESS:  I don't know what he was

17   doing.

18    Q.  BY MR. SHOWALTER:  I didn't ask you if you knew

19   what he was doing.  Did it look like he was praying to

20   the sun?  Did he have like a -- was he collapsing his

21   hands together or was he raising his hands in the air?

22   What was he doing?

23    MS. RETTS:  Form.

24    THE WITNESS:  Both of his hands were off

25   to the side, with clenched fists.

ROBERT RODARME  MARCH 23, 2021

1    Q.   BY MR. SHOWALTER:  So his hands are out to his

2    side as in they're extended out so that his arms are

3    parallel to the ground?

4    A.   Yes, like an airplane.

5    Q.   Like an airplane, but with clenched fists?

6    A.   Yes.

7    Q.   What else at that time on your arrival did you

8    observe about Casey?

9    A.   He was completely naked and he was grunting and

10   was not complying with us.

11   Q.   Did you ever hear him say any words?

12   A.   I believe "fuck you" was involved.

13   Q.   What was the context in which you claim Casey

14   said "fuck you"?

15   A.   We were trying to -- Officer Arnold had ahold

16   of his left arm, I had ahold of his right arm, and

17   we're just trying to give him every opportunity to

18   place his hands behind his back.  We told him, he is

19   not detained -- or he's not under arrest, he's just

20   being detained for his safety and we want to help him.

21         But he was not complying.  He was

22   grunting.  He was not acknowledging, you know, wanting

23   to seek help and then he would say "fuck you" and

24   grunt.

25   Q.   Did he ever say the word "no" to you?

1    A.   I would have to -- I don't recall that.

2    Q.   So did you and Officer Arnold have a discussion

3  about how to approach Casey or how to take him into

4  custody before you attempted to take him into custody?

5             MS. RETTS:  Form.

6             THE WITNESS:  No.

7    Q.   BY MR. SHOWALTER:  How did it come to pass that

8  you were attempting to -- was Officer Arnold on the

9  left arm or were you on the left arm?

10   A.   Officer Arnold was on the left arm.

11   Q.   Okay.  And so you were on the right arm?

12   A.   Yes.

13   Q.   And so when -- how did you make the decision to

14 attempt to take his arms?

15   A.   Well, we first tried to, you know, talk to him

16 to try to get off the street.  He was naked, indecent

17 exposure.  We have to do something, tried to get him

18 off the street and he wouldn't comply.  At this point,

19 we decided to take each a grip of his wrists and talk

20 to him, explain to him he's not under arrest he's just

21 being detained.  Because when we say he's just being

22 detained, it's just a form of de-escalation.  When you

23 say arrest, then they seem to think they're going to

24 jail for sure.

25             So we say "detained," and just for our

ROBERT RODARME  MARCH 23, 2021

1  safety, we tried to place his hands behind his back.

2  We just gave him every opportunity.  He would not place

3  his hands behind his back.  He was using his strength

4  to not put his hands behind his back.  But we were

5  giving him every opportunity about 45 seconds to a

6  minute at least, telling him, hey, we're trying to help

7  you.  We're trying to help you, help you, help you and

8  get you help.  But he would not comply, just grunt and

9  yell.

10      Q.  When you arrived at the scene, did Casey have

11  any blood on him?

12      A.  I don't recall that.

13      Q.  Did anybody report there's a naked man with

14  blood on him prior to the arrival?

15      A.  I don't recall hearing that.

16      Q.  And you didn't see any blood on him at the time

17  when you and Officer Arnold approached, began the

18  process of beginning to detain him, correct?

19      A.  I don't recall seeing blood on him.

20      Q.  That's something you would remember, isn't it?

21          MS. RETTS:  Form.

22          THE WITNESS:  Could have.

23      Q.  BY MR. SHOWALTER:  If you had seen it, it was

24  something that you would have talked about on the day

25  of?

1  correct?

2       A.   Yes.

3       Q.   And do you communicate that to Officer Arnold

4  or does he communicate something about that to you?

5       A.   I believe I said we're going to go ahead and

6  put his hands -- let's make the motion to put his hands

7  behind his back to forcibly do it.

8       Q.   And what happened when you and Officer Arnold

9  attempted to do that?

10      A.   He immediately started being aggressive and was

11 trying to get out of our hold, in which he did and

12 started to run away and then he came back and started

13 punching at Officer Arnold.

14      Q.   I have to kind of -- "aggressive" is an

15 adjective.  What I would like to know is what were his

16 physical movements in response to that.  So you and

17 Officer Arnold are each attempting to bring his hands

18 behind his back.  What does Casey do in response to

19 that, in terms of his movements?

20      A.   He resists us and he tries to get out of our

21 grip by pulling away and he was able to pull away from

22 each of us and starts being active, showing signs of

23 active aggression by punching and kicking at us.

24      Q.   So is he still standing -- does he -- is he

25 still standing in that same position or is he moving

ROBERT RODARME  MARCH 23, 2021

1 his legs?

2     A.  He was moving his legs, trying to -- briefly

3 runs southbound for about a couple of feet and then he

4 turns towards Officer Arnold again and was actively

5 punching and kicking.  I saw flailing, but it's

6 actually punching and kicking towards the officer,

7 being in an act of aggression.  And then I did see him

8 punch Officer Arnold in the face on purpose.

9     Q.  Well, the term you used in your interviews was

10 that he's "flailing his arms," correct?

11     A.  Yes.

12     Q.  And you distinguished between the time when you

13 saw him flailing his arms and the time -- and one time

14 where he punched Officer Arnold in the face, correct?

15     A.  That's what's on the transcript.

16     Q.  Is that your recollection of what happened?

17     A.  Yeah, I saw him actively punching Officer

18 Arnold in the face.

19     Q.  How many times did you see him punch Officer

20 Arnold in the face?

21     A.  He connected one time that I saw.

22     Q.  And what did Officer Arnold do in response?

23     A.  He turned and said, "He punched me in the

24 face."  And I said, "Yes, I know.  I saw that."

25           And when he tried to -- and then Officer

1 Arnold got him in a bear hug, you know, a face-to-face

2 bear hug, and at that point, I said, "Hey, let him go."

3 I said, "Jamie, let him go.  I'm going to tase him."

4 And he didn't hear me or what, so I had to reholster my

5 TASER and then we were trying to get him on the ground

6 at this point.  We can't let him go into any other

7 house, get away from us and try to go into any other

8 houses, it would be a dangerous situation.  We're

9 trying to get him on the ground.

10         At that point, he couldn't get him on the

11 ground.  So he still had him in the bear hug and then

12 I -- Jamie was going forward with him a little bit and

13 I got behind him, up to Casey Wells' shoulders and I

14 grabbed onto his shoulders and pulled him down and they

15 went down on him.

16         And at that point, we have Casey Wells on

17 his back.  I went to his right -- or it's a -- I got

18 ahold of his right arm and leg.  He was trying to punch

19 us.  And Officer Jamie Arnold got on his right -- it

20 was a left hand and leg.  Because he was trying to

21 punch us, kick us.  And he actually did punch me in the

22 face.  He got away from a grip, my grip, and he punched

23 me in the face.  And Officer Arnold saw that and

24 Officer Arnold -- I gave a -- like a forearm strike to

25 the head, to try to stop him from doing that.

ROBERT RODARME  MARCH 23, 2021

1    Q.  Officer Arnold gave a forearm strike to Casey's

2  head in response to the point where Casey struck you?

3    A.  Yes.

4    Q.  Where did Officer Arnold connect to Casey's

5  head?

6    A.  I don't know, exactly know -- recall exactly

7  where on the head.  I just saw a forearm strike motion

8  to the head area.

9    Q.  A single forearm strike motion?

10   A.  Yes.

11   Q.  Okay.  So I want to take you -- I want to go

12  back into the response you just gave.

13           How tall -- at the time, you estimated

14  that Casey was approximately 5'8" and 200 pounds or

15  heavier.  Do you agree with that, as a rough estimate?

16   A.  As a rough estimate, yes.

17   Q.  And I think he was actually a good deal heavier

18  than that.  But I'm not trying to -- you know, he

19  weighed how much he weighed.  That was your estimate.

20           You're fairly tall, correct?

21   A.  Yes.

22   Q.  How tall are you?

23   A.  6'5".

24   Q.  And how tall is, approximately, Officer Arnold?

25   A.  5'11", 5'10" maybe.

ROBERT RODARME  MARCH 23, 2021

1       A.   The under forearm, the -- under your -- under

2   your. . .

3       Q.   So that was like the belly of the forearm?

4       A.   Yeah, right, somewhere in that area.

5       Q.   So it wasn't actually the leading -- so it was

6   like -- can you give the motion you saw Officer Arnold

7   do?

8       A.   Like a downward, like that (Witness

9   indicating).

10      Q.   So he went down like that on Casey's head a

11  single time?

12      A.   Yeah.  He was trying to either head butt us and

13  then -- and or get out and strike us with his fists in

14  which he was able to successfully do that on me.  And

15  that's when Jamie Arnold did the strike down.

16      Q.   And other than that strike down -- did you --

17  I'm getting.  I just heard feedback.  But it sounds

18  like it's gone.

19           Other than that single strike down, did

20  you witness any other strikes to Casey Wells?

21      A.   No.

22      Q.   Other that single strike down, did you witness

23  any other uses of force against Casey Wells head, neck

24  or throat?

25           MS. RETTS:  Form.

1   Officer Arnold having Casey in a bear hug.  You go

2   behind Casey, pull Casey down by his shoulders using

3   Officer Arnold's momentum to bring him down, correct?

4       A.  Yes.

5       Q.  Once he's on the ground, you witness Officer

6   Arnold's forearm strike to what you say is the head

7   area or face area?

8               MS. RETTS:  Form.

9               THE WITNESS:  Yes.

10      Q.  BY MR. SHOWALTER:  And what happened after

11  that?

12      A.  At that point, I regained -- no, he either spit

13  blood in my face and so I've got blood in my eyes and

14  my mouth, so I'm very concerned with that.  However,

15  it's in my training, it's going to take more of us to

16  safely take this guy instead into custody.  And so I

17  just, "Jamie, let's keep him held down here."

18              And I got on the radio and said, "We need

19  more units."  And then that triggered more officers to

20  arrive.  And I said, "We're going to wait here.  We're

21  going to hold him down so we can safely get him into

22  custody and get fire here to treat him."  But that's

23  what happened next.

24      Q.  When you did that radio call, did you ask for

25  fire?

ROBERT RODARME  MARCH 23, 2021

1    A.  At that point, no.

2    Q.  At that point, you made the radio call after

3  Casey Wells was bleeding, right?

4    A.  I don't recall who actually made -- I didn't

5  see the transcripts on who actually called the fire

6  department.

7    Q.  But the call you're talking about where you ask

8  for more units was after Casey was bleeding, correct?

9    A.  Correct.

10   Q.  And did you indicate in that call that there

11 was -- that there had been any kind of -- did you use

12 any code, police code?

13   A.  I don't recall.

14       If I would have, it would have been 245 it

15 would be.  I don't recall.  I would have to hear the

16 transcript of that.

17   Q.  What is 245?

18   A.  Aggravated assault on a police officer.

19   Q.  At this point, you make this call, you have

20 Casey by the right arm?

21   A.  Yes.

22   Q.  Officer Arnold has him by the left arm?

23   A.  Yes.

24   Q.  And you make this call.  You're still doing

25 your best to keep control, to maintain control of

ROBERT RODARME  MARCH 23, 2021

1  Casey's right arm.  He's resisting and being

2  noncompliant, correct?

3      A.  Yes.

4      Q.  The decision you communicate to Officer Arnold

5  is we're just going to try to hold him here until more

6  units get here; is that correct?

7      A.  Yes.

8      Q.  And the reason is that you're concerned that

9  any further -- let me see if I can phrase this right.

10  It sounds like your belief is that he's really strong.

11  He's resisting, and it feels to you, in your judgment,

12  like you have him in as much control as you can be sure

13  of getting him into at that point; is that fair?

14          MS. RETTS:  Form.

15          THE WITNESS:  Yes.

16      Q.  BY MR. SHOWALTER:  How long are you holding him

17  like that, just with him on his back -- and I don't

18  think I made this clear.  At this point, Casey is on

19  his back?

20      A.  Yes.

21      Q.  How long are you and Officer Arnold holding

22  Casey on his back, by his arms like this, before

23  another officer arrives, in your best estimate?

24      A.  Approximately a minute.

25      Q.  Okay.  And who is the first officer to arrive?

ROBERT RODARME  MARCH 23, 2021

1  screen.

2          MR. SHOWALTER:  That's fine.

3          THE WITNESS:  Yes.

4    Q.  BY MR. SHOWALTER:  And this has at 2:22:14, 93B

5  is the unit, 006999 is your badge number.

6          What does this mean?

7    A.  It looks like I arrived there at 14:22.

8    Q.  So turning back to Exhibit 1, page 81, that's

9  consistent with what's there, correct?

10          MS. RETTS:  Form.

11          THE WITNESS:  Yean.

12          MS. RETTS:  I'm going to put -- I'm going

13  to give him 50 in front of him, so he can look at both.

14          81?

15          MR. SHOWALTER:  Page 81.

16          THE WITNESS:  Okay.

17          Okay.  I have them both in my hand now.

18    Q.  BY MR. SHOWALTER:  And so do you agree that you

19  arrived at the scene at approximately 2:22 and 14

20  seconds?

21    A.  That's what it says.

22    Q.  Do you have any reason to disagree with that?

23    A.  I don't.

24    Q.  And then it says about two and a half minutes

25  later, at 2:20 -- and so now I'm looking at Exhibit 1,

 1  was standing, correct?

 2      A.   No.

 3      Q.   Okay.  When he struck you, he was on the

 4  ground?

 5      A.   Yes.

 6      Q.   Okay.  And where did he make contact with you?

 7      A.   In my mouth.

 8      Q.   Lower lip mouth?

 9      A.   Lower lip mouth, yes.

10      Q.   Did you receive treatment for that?

11      A.   No.  I mean, there was nothing really you could

12  do for that.  There was some little laceration, but

13  there was really nothing you could do for that one.

14      Q.   And I think Officer Seaquist or one of the

15  other officers noted that you kind of had a fat lip; is

16  that accurate?

17      A.   Yeah.  Yes.

18      Q.   Okay.  After that, after Casey strikes your

19  mouth, what did you do?

20      A.   At that point, I gained grip of his arm again

21  and I told Jamie, "We're going to hold him here until

22  we can get another unit or two to get him safely into

23  custody."  Obviously, he was using superhuman strength

24  and it was my experience before, he's just going to

25  continue to fight and so we're going to hold him there

 1  until we can safely get other officers to take him into

 2  custody.

 3      Q.  Did Casey say anything to you at that point?

 4      A.  No.  He was just yelling, grunting, stuff, you

 5  know, inaudible things.  I couldn't recall what he was

 6  saying, but he wasn't saying anything.

 7      Q.  Officer Seaquist repeatedly said that Casey

 8  sounded like -- was making kind of growl or a howl,

 9  like a bear caught in a trap.

10          Do you agree with that?

11          MS. RETTS:  Form.

12          THE WITNESS:  Yeah, I do remember him

13  grunting, growling.

14      Q.  BY MR. SHOWALTER:  It sounded like a bear

15  caught in a trap?

16          MS. RETTS:  Form.

17          THE WITNESS:  It should be.

18      Q.  BY MR. SHOWALTER:  Did Casey ever -- so other

19  than those two blows that we've talked about, did Casey

20  ever strike you or Officer Arnold at any other point

21  that you recall?

22          MS. RETTS:  Form; foundation.

23          THE WITNESS:  I don't believe so.

24      Q.  BY MR. SHOWALTER:  And he did spit blood in

25  your face.  But other than that, did he ever -- that

1    A.  I don't recall specifically on that.

2    Q.  And was Officer Seaquist at this point, the

3 person working to control Casey's legs?

4         MS. RETTS:  Form.

5         THE WITNESS:  Yes.  He was at his lower

6 legs.

7    Q.  BY MR. SHOWALTER:  And do you recall what

8 technique Officer Seaquist was using to attempt to

9 control Casey's lower legs?

10         MS. RETTS:  Form.

11         THE WITNESS:  I don't recall that.

12    Q.  BY MR. SHOWALTER:  When you testified about

13 Officer Arnold, that he was holding his arm, was he

14 holding Casey's arm outstretched or was he placing

15 Casey's arm behind Casey's back?

16    A.  I just remember him trying to -- he had control

17 of his right arm.  I don't remember if it was behind

18 his back or straight out.  He was holding onto it in

19 order to (audio distortion) behind his body.

20    Q.  And so what happens -- so at this point, what

21 happens next?

22    A.  At this point, give the direction to tase him,

23 use his back area to gain compliance.  Usually the

24 TASER will take a compliance and --

25    Q.  You gave that direction to Officer Seaquist?

1    A.  Yes.

2    Q.  So does Officer Seaquist then do that?

3    A.  Yes.

4    Q.  And what happened -- and so Officer Seaquist

5  unholsters his TASER, aims it at Casey -- did you

6  direct Officer Seaquist as to where to deploy the

7  TASER?

8    A.  No.

9    Q.  Did you see where Officer Seaquist deployed the

10  TASER?

11    A.  It was in the back area.  I don't recall

12  exactly where in the back.  But it was in the back.

13    Q.  Okay.  So Officer Seaquist deploys the taser,

14  what happens when he does that?

15    A.  He's still fighting us.  He's still trying to

16  struggle, not giving his arm up.  So it's still -- it's

17  not working.  So I believe he tased him again.  And

18  then we were able to gain control of that left arm from

19  his stomach area and then we were able to place him

20  into custody, place the handcuffs on him.

21    Q.  So you do -- so there's one TASER deployment

22  and Casey -- did you see the TASER probes make contact

23  with Casey from the first taser deployment?

24    A.  I don't believe I was concentrating on that at

25  that point.

1    Q.  Did you see Casey's body tense up in response

2  to that?

3    A.  I don't recall that.  He was still was not

4  getting compliance.  He was still holding it strongly

5  under his stomach area.

6    Q.  And then Officer Seaquist deploys the second

7  TASER cartridge?

8    A.  I believe so.  At that point, the TASER part.

9  I'm still trying to concentrate on getting compliance

10  with his left arm while still trying to -- you know,

11  being concerned with the blood in my mouth and the

12  blood in my eye and everything, that's what I'm focused

13  on.

14    Q.  And so the second --

15    A.  And there was some point after, maybe it's the

16  second tasing, that he -- I was able to get that arm

17  from underneath him and then we were able to place

18  handcuffs on him.

19    Q.  So after the second -- could it have been the

20  third -- a third use of TASER?

21          MS. RETTS:  Form and foundation.

22          THE WITNESS:  I actually don't recall a

23  third TASER deployment.

24    Q.  BY MR. SHOWALTER:  So sometime after the second

25  TASER deployment -- and the TASER makes a sound when

ROBERT RODARME  MARCH 23, 2021

1  it's activated, correct?

2              MS. RETTS:  Form.

3              THE WITNESS:  Yes.

4     Q.  BY MR. SHOWALTER:  And when this is occurring,

5  you have to also be careful of the TASER wires, because

6  if you come into contact with TASER wires, you're going

7  to get charged, right?

8     A.  Yes.

9     Q.  And you hear that sound.  And so after the

10  second TASER deployment, you're able to get the left

11  arm up and get it handcuffed, correct?

12              MS. RETTS:  Form; foundation.

13              THE WITNESS:  And I honestly can't recall

14  if it was the second or if there was even a third one.

15  I just remember either a second or third one, we were

16  able to get it.

17     Q.  BY MR. SHOWALTER:  Okay.  So after the second

18  or third TASER deployment, you were able to get the arm

19  out and get Casey handcuffed?

20     A.  Yes.

21     Q.  Now, once Casey is handcuffed what happens

22  next?

23     A.  Well, I remember several officers around him

24  and then I got up because I'm concerned for my mouth

25  and my eye because I have blood in it.  And then I

ROBERT RODARME  MARCH 23, 2021

1  recall hearing one of my officers saying, "He's not

2  breathing."  And so I said, you know, "Unhandcuff him

3  and turn him over," and then they performed CPR on him.

4      Q.  Okay.  How long was -- how long was -- well,

5  what about RIPP restraints?

6      A.  Yeah, I believe that's right, there was a RIPP

7  restraint.  We had him in a RIPP restraint.  I recall

8  that a minute after or like 30 seconds after, we had

9  him in handcuffs.  He was still kind of kicking his

10  legs.

11      Q.  So 30 seconds after you have Casey in

12  handcuffs, he's still kicking his legs?

13              MS. RETTS:  Form.

14              THE WITNESS:  Yes.

15      Q.  BY MR. SHOWALTER:  And so in response to that,

16  the RIPP restraints are placed on him?

17              MS. RETTS:  Form; foundation.

18              THE WITNESS:  Yes.

19      Q.  BY MR. SHOWALTER:  And then about how long did

20  it take to put the RIPP restraints on?

21              MS. RETTS:  Form; foundation.

22              THE WITNESS:  Oh, approximately 20

23  seconds, 25, 30 seconds in that area.

24      Q.  BY MR. SHOWALTER:  Okay.  So Casey is

25  handcuffed.  He's still kicking his legs for about 30

1 understanding of that?

2             MS. RETTS:  Form.

3             THE WITNESS:  My understanding, I believe

4 if you have a written reprimand, then you can be purged

5 after five years, and a supervisor counseling, I think,

6 after two years, that's my understanding.

7     Q.  BY MR. SHOWALTER:  And do you have a

8 recollection of ever having your file purged?

9     A.  No, I don't have a recollection of that.  I

10 don't believe that it has.  I never -- I think you have

11 to request it being -- I've never requested it being

12 purged.

13     Q.  I have information that it may happen

14 automatically.  But you don't have any recollection of

15 actually requesting that your file be purged?

16             MS. RETTS:  Form; foundation.

17             THE WITNESS:  No, definitely not.

18             MR. SHOWALTER:  All right.  Let me take a

19 five-minute break and review my notes.

20             THE WITNESS:  Okay.

21             THE COURT REPORTER:  The time is

22 12:36 p.m.  We are off the record.

23         (Whereupon, Lea Shapiro exited the deposition

24 at 12:36 p.m.)

25         (Whereupon, a brief recess ensued from

ROBERT RODARME  MARCH 23, 2021

1  12:36 p.m. to 12:42 p.m.)

2             THE COURT REPORTER:  The time is

3  12:42 p.m.  We are back on the record.

4             MR. SHOWALTER:  And I do not have --

5  subject to the right to ask follow-ups if your attorney

6  asks you any questions, I don't have any further

7  questions for you today, Sergeant.

8             THE WITNESS:  Okay.

9             MS. RETTS:  I have a few questions.

10            THE WITNESS:  Yes.

11

12                    EXAMINATION

13  BY MS. RETTS:

14     Q.  Sergeant, the area where the incident with

15  Mr. Wells occurred, is it -- what is like in terms of

16  the calls for service that you receive?

17     A.  Well, it's known as a drug area.  In fact, we

18  call it Little Town of Methlehem.  It's been known by

19  that.  So there's a lot of meth usage, drug usage, in

20  that specific area.  The call volume suggests drug

21  usage in that area.

22     Q.  As you hear the call and are responding to the

23  scene, is your history responding to calls in that area

24  playing into your mind?

25     A.  Absolutely, that's all I'm thinking is a naked

ROBERT RODARME  MARCH 23, 2021

1  male in the middle of the street, I'm thinking drugs.

2  I'm thinking methamphetamine all the way, based on my

3  experience of 22 years of law enforcement.

4      Q.  Now, when you first arrive on scene, you

5  approach Mr. Wells and Officer Arnold is there.  Are

6  you using your command presence in any way?

7      A.  Yeah, that's a Level 1, officer presence,

8  command presence.  That's the number one, you know

9  force we use, start with.

10     Q.  Is it, you know, a way that you hope that, just

11  by you're in uniform that someone will comply?

12     A.  Absolutely.

13     Q.  Did you --

14     A.  I'm sorry, most people do, in that situation.

15     Q.  Did you then engage in verbal persuasion to

16  attempt to get Mr. Wells to voluntarily comply?

17     A.  Yes, verbal persuasion is the next level of

18  force.  We're absolutely just trying to get him out of

19  the street.  You know, there's kids coming.  I want to

20  get him help.  We want to get him help, help, help.  We

21  just gave him ample opportunity.

22     Q.  And verbal persuasion, with that, you're hoping

23  too that somebody just by you speaking to them will

24  comply?

25     A.  Right.  In fact, I guess, I alluded to earlier

1           Would you agree that the RIPP restraint

2   has two parts to it?

3       A.  Yes.

4       Q.  And one part is used to kind tie around, for

5   lack of a better word, secure the ankles, correct?

6       A.  Yes.

7       Q.  And then the second part connects from the

8   ankles up to handcuffs, correct?

9       A.  Yes.

10      Q.  Now, when a person has just the ankle portion

11  on, can they still kick and move their legs around?

12      A.  Absolutely.

13      Q.  And it takes until the leash and clip are on

14  that a RIPP restraint is finally applied, would you

15  agree?

16      A.  Yes.

17      Q.  Did you have any personal participation at all

18  in that act of taking the leash and the hook and

19  clipping it to the handcuffs?

20      A.  No.

21      Q.  Do you remember seeing that happen?

22      A.  I know that it happened, but I don't recall

23  seeing it.

24      Q.  In your mind, as you sit here today, based on

25  recalling your recollection, are you able to

ROBERT RODARME  MARCH 23, 2021

1  what their roles, explain who had hands on him at that

2  point.

3      Q.  Now, you did a walk-through interview on the

4  scene, correct?

5      A.  Yes.

6      Q.  And you also did a second interview with

7  professional standards, correct?

8      A.  Yes.

9      Q.  And with professional standards, did you do

10  your best to give truthful and accurate testimony?

11      A.  Yes.

12      Q.  Did you do your best to give truthful and

13  accurate statements in your walk-through interview?

14      A.  Yes.

15      Q.  And, in fact, in your walk-through interview,

16  do you remember volunteering a lot of information?

17      A.  Yes, I was pretty excited at the time.  Yeah.

18      Q.  Did you feel exhausted following the struggle

19  with Mr. Wells?

20      A.  Absolutely.

21      Q.  Was it your feeling after personally

22  participating in this struggle, that he had more

23  strength than you had, than you had experienced before

24  with someone resisting?

25      A.  Absolutely.  I mean, like I say, I think I

1  alluded to earlier when a person's on methamphetamine,

2  when they're naked in the street, in my experience

3  before in 22 years, they exhibit a superhuman strength,

4  even if they're -- they weigh 100 pounds, it's -- they

5  exhibit -- it's so hard to get these people into

6  custody.  They don't feel anything.

7         I've had an experience when -- they also

8  tell me that they don't feel pain.  I had one person

9  that cut his penis off on meth and still came at the

10  officers.  It's horrible.  It's a horrible drug.

11         MS. RETTS:  I don't have anything further.

12         MR. SHOWALTER:  Just a few follow-ups.

13

14         FURTHER EXAMINATION

15  BY MR. SHOWALTER:

16  Q.  You testified earlier that once Casey was

17  placed face down on his stomach, that you were

18  controlling his left hand or his left arm?

19  A.  On his stomach, his -- he had his left arm

20  underneath him still.  We were trying to get it out.

21  Q.  Yes, you're correct.  I don't mean to make the

22  issue about whether he was resisting and keeping it

23  under him.  I simply mean when it's you, Arnold and

24  Seaquist, you are working on the left arm and once --

25  so once Seaquist is there and you guys get him onto his

# EXHIBIT 11

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

JOSEPH B. SEAQUIST

Phoenix, Arizona
March 22, 2021
9:02 a.m.

                              DONNA DELAVINA REPORTING, LLC
                               Arizona RRF No. R1010
                               313 North Gilbert Road
                                      Suite 300
                               Gilbert, Arizona 85234
PREPARED BY:                       P (602) 230-5454

Donna DeLaVina, RPR                F (480) 546-3721
Certified Reporter                www.dlvreporting.com
Certificate No. 50468

1    Q.  Now is that correct?  You know, so you would

2  answer a call at 31st Avenue and Deer Valley and you're

3  coming back to the station to do your paperwork and

4  you're at about 31st Avenue and Rose Garden; is that

5  true?

6    A.  Yes.

7    Q.  And, at that point you hear Sergeant

8  Rodarme, you say -- or is it Rodarme or Rodarme?

9    A.  Rodarme.

10    Q.  "Sergeant Rodarme, Bob, he cleared over the

11       radio to send another unit.  And I've been working

12       with him long enough to know that his voice was

13       jacked up, and I knew it was serious."

14            Did I read that accurately -- or is

15  that -- strike that.

16            Is that true?

17    A.  Yes.

18    Q.  And so when you say he cleared over the radio

19  to send another unit, what does that mean?

20    A.  Well, if you work in patrol long enough and

21  you're with a squad long enough and, basically, if

22  you've been an officer long enough, when you have your

23  radio chatter in your ear all day long and especially

24  with officers that you're working with on a squad, you

25  tend -- they're like your brothers and sisters and when

1    Q.  And so what you say in the interview is that

2    you "came up Deer Valley Code 3, drove around, and came

3    in eastbound on Salter."  And then you came to a stop.

4              Is that true, that that's what happened?

5    A.  Yes.

6    Q.  And what is Code 3?

7    A.  Lights and sirens are in operation on the

8    patrol car.

9    Q.  Okay.  And so you next say that your vehicle,

10   that you parked it on the south side of Salter,

11   correct?

12   A.  Correct.

13   Q.  And there's -- I'm going to show you the video

14   in a little bit and when I get to that, I'll actually

15   ask you to identify the car, so I'm not going to try to

16   work out from this stuff about the car location.

17   A.  Okay.

18   Q.  And when I get to page 4 at line 7 through 12,

19   the transcript states, in your words:

20              "When I turned down Salter, I could see

21        two officers and a suspect were in a fight in the

22        middle of the street.  I didn't know who -- which

23        officer was when until I got closer.

24              "I bailed out of my truck and came over.

25        The suspect was laying on his back."

1  his knees, correct?

2         MS. RETTS:  Form.

3         You cut out a little bit at the end.

4  Q.  BY MR. SHOWALTER:  When you say there weren't

5  any knee strikes or nothing, anything like that, you're

6  also saying you didn't witness Casey striking either

7  officer with his knees?

8  A.  Not that I recall seeing anything, no.

9  Q.  Okay.  And then Detective Teusink says:

10         "And this guy is face up?"

11         And at lines 9 through 11 you say:

12         "Yeah.  Yeah.  I mean, this guy was -- he

13     was -- he was in it for the long haul."

14         And Detective Teusink says:

15         "Okay."

16         And then at lines 13 through -- 13 of

17  page 6 through line 17 of page 8, there's a -- you give

18  a fairly lengthy narrative.  Do you see that?

19  A.  Yes.

20  Q.  I'm going to try to break it -- well, let's

21  take it piece by piece.

22         So on page 6, line 13, you say:

23         "After I grabbed his legs, and I had some

24     type of control of his legs -- because he was

25     still -- he was kicking -- I told -- yelled out to

1    Rod and Jamie, turn him on his back.  And they were

2    able to get him on his stomach."

3         Do you see where I read that?

4    A.  Yes.

5    Q.  And is that true?

6    A.  Yes.

7    Q.  That's what I just read -- sorry, I spoke over

8 you?

9    A.  To the best of my knowledge that, yeah, from

10 the events in the interview, yes.

11   Q.  Okay.  So he was kicking and -- but you had

12 some type of control of his legs?

13   A.  Some, I would say is an accurate term.

14   Q.  You didn't have complete control, he still

15 resisted, correct?

16   A.  Yes, correct.

17   Q.  Did you ever see him punch Rodarme -- or

18 Sergeant Rodarme or Officer Armstrong?

19   A.  Arnold.

20   Q.  Arnold, good grief.

21   A.  No.

22   Q.  Okay.  You never saw him elbow either of them

23 either, correct?

24   A.  No.

25   Q.  When you -- okay.  And then you say:

1          "Once they got him on his stomach, I

2     grabbed his ankles and put them together.  And then

3     just with all my weight, I pushed down on them to get

4     his heels touching his butt.  That way I had some type

5     of control on him."

6          A.  Correct.

7          Q.  And so --

8          A.  That would be --

9          Q.  Oh, go ahead.

10         A.  That would be a training technique that we were

11    taught, so it was well within policy.

12         Q.  So at the start of it, his legs are more or

13    less extended.  You get his ankles crossed, so one leg

14    on top of the other, and then bend them back so that

15    his heels touch his butt or get as close to it as

16    possible, correct?

17         A.  Correct.

18         Q.  And the purpose of doing that is to prevent him

19    from kicking and struggling and to try to take control

20    of him, correct?

21         A.  Correct.

22         Q.  And then you say -- and so at this point, he's

23    face down.  And later on I think you said his head was

24    around where his butt was when you're doing this?

25         A.  Correct.

1  Q.  Which direction are you facing in terms -- are

2  you looking towards his feet or are you looking towards

3  his head?

4  A.  Towards his head.

5  Q.  Okay.  And you're putting your weight on his

6  legs.  So you can see what Officer Arnold and Sergeant

7  Rodarme are doing while this happened?

8         MS. RETTS:  Form.

9         THE WITNESS:  I was in a position to see

10 what they were doing.  But I was concentrating more on

11 my position in trying to get Mr. Wells in control.

12 Q.  BY MR. SHOWALTER:  So at page 6, line 23, you

13 say:

14        "Somehow or another, he was able to push

15        on my vest, basically, you know, push me back or

16        push himself forward, because what had happened,

17        his feet," now I'm page 7, line 1, "dropped, and he

18        kicked me right here in the thighs."

19 A.  Correct.

20 Q.  You use the -- when you talk about "he was able

21 to push on my vest," that's not something he did with

22 his arms, this is talking about things that he did with

23 his legs?

24 A.  Correct.

25 Q.  Okay.  And so when you say "his feet dropped,

1  and he kicked me right here in the thighs," what I'm --

2  I want to know what you mean what exactly happened, if

3  you could explain that further?

4      A.  After I gained some control when I crossed his

5  ankles and then pushed his feet and his ankles up to

6  where his heels were touching his butt, I had -- I was

7  laying my upper body on his legs to keep them from

8  kicking around more and somehow, I don't know what

9  transpired on Mr. Wells, but he was able to take his

10  legs, still crossed at the ankles, and the way that I

11  was laying on him with my vest and my upper body on his

12  lower leg areas, he was able to push me or use me or

13  use my vest or my upper body as a brace and pushed,

14  either he pushed himself forward or he was able to push

15  me off his legs, so that I was able to -- I had lost

16  basically control of his legs.

17      Q.  Okay.  And when you say, "he kicked me right

18  here in the thighs," where is it that he kicked you on

19  the thighs, the front of the thighs, the back?

20      A.  The front of the thighs.

21      Q.  And when he hits the front of your thighs, is

22  he doing that with his lower leg or his upper leg?

23      A.  He's doing it basically with his lower leg and

24  his feet.

25      Q.  Okay.  And so what portion of Casey makes

1 contact with you, is it the front of his leg or the

2 heel, rear of his leg?

3     A.  It would have been the front of his legs and

4 the top of his feet, such as a kicking motion.

5     Q.  So were you kneeling when that happened?

6     A.  Yes.

7     Q.  So your knees are -- so before he does that, if

8 I understand correctly, your knees are on the ground

9 and you have your upper body on top of his legs holding

10 him in that crossed ankle, ankles to butt position that

11 we've already talked about, right?

12     A.  Correct.

13     Q.  Okay.  And he kind of -- as you say, he kind of

14 pushes you out of that position and his feet come down

15 and kick your thighs?

16     A.  Correct.

17     Q.  Now at line 2 of page 7 you say:

18           "And I was able to regain.  I went back

19 and I was grabbing his legs, and I had -- it dawned on

20 me that I had to deploy -- and deployed my TASER."

21           Did I read that correctly?

22     A.  Yes, you did.

23     Q.  And is that true?

24     A.  Yes.

25     Q.  And then at lines 5 through 8, you say:

1            "I have been TASER certified ever since

2      the day we had to go down to the academy and get

3      zapped by them.  And this is the first time in 16

4      years I've ever had to use a TASER."

5            Did I read that correctly?

6      A.  Yes, you did.

7      Q.  And is that true?

8      A.  Yes.

9      Q.  At lines 9 through 13 you say:

10           "I yelled to Rod, and I told Jamie, 'I'm

11     deploying TASER.'  I yelled to the guy, 'Stop

12     resisting.'  And he kept fighting.  I let go of my

13     first cartridge on him.  He tensed up.  And then he

14     relaxed and he still kept into the fight."

15           Did I read that correctly?

16     A.  Yes, you did.

17     Q.  And is that true?

18     A.  Yes.

19     Q.  When you say "I let go of my first cartridge on

20  him," does that mean you deployed the first cartridge

21  on him?

22     A.  Yes.

23     Q.  And in response to that first cartridge

24  deployment, you said "He tensed up"?

25     A.  Yes.

1    Q.  Where did he tense up?

2    A.  His whole body would have tensed up.

3    Q.  So his whole body tensed up when you deployed

4  the cartridge, the first cartridge.  And you say, "And

5  then he" -- and so how long was that deployment?

6    A.  You would have to refer to the TASER record.  I

7  couldn't begin to tell you, sir.  I wasn't keeping

8  track of time during the incident.  All I could tell

9  you is what you read.  That it was a first time that I

10  had ever deployed the TASER in the 16 years I was

11  carrying it.

12    Q.  Okay.  So after he tensed up, you say:

13            "And then he relaxed and he still kept

14  into the fight."

15            Did I read that correctly?

16    A.  Yes, you did.

17    Q.  And at point, where were Officer Arnold and

18  Sergeant Rodarme?

19    A.  They were still in the position that was

20  described in the transcript earlier.

21    Q.  So earlier when they're -- I think earlier when

22  their location is described, that's at the point when

23  Casey is face up?

24    A.  Yeah.  Yes, I would say, yes.

25    Q.  And so before you deployed the TASER, you told

1 them, let's flip him over, right?

2     A.  Correct.  Because we would be able to have a

3 better positioning, to gain control.  Plus with him

4 turned over onto his stomach, that reduces the chance

5 of injury to Mr. Wells or to the officers with him

6 throwing punches or flailing his arms around.

7     Q.  So at this point when you first deployed the

8 TASER, what are -- what's Officer Arnold doing?

9     A.  He's still on the right side in basically the

10 same position that I had described earlier, still

11 attempting to get an arm for control.  And the same

12 thing with Sergeant Rodarme, he would be on the left

13 side, the same position I had earlier described, trying

14 to get Mr. Wells' left arm for control.

15     Q.  And so look at lines 14 through 16, you say:

16          "I know that Rob," or Sergeant Rodarme,

17 "was trying to get his arm pulled out from underneath

18 him."

19     A.  Correct.

20     Q.  And "Jamie," or Officer Arnold, "was trying to

21 control his right arm."

22     A.  Correct.

23     Q.  What was Officer Arnold doing to control his

24 right -- Casey's right arm?

25     A.  Sir, I couldn't give you exact details.  The

1  situation was very, very fluid.  And as I explained to

2  8you before, my concentration was more on trying to get

3  Mr. Wells into control or custody or detained.  And I

4  couldn't tell you exactly what Officer Arnold or

5  Sergeant Rodarme were doing.  I was just doing what my

6  position is to try to get him into custody or detained.

7      Q.  But to be clear, you said, "I know that Rod

8  was" -- that Sergeant Rodarme "was trying to get his

9  arm pulled out from underneath him," correct?

10      A.  Correct.

11      Q.  And so while this is happening, Casey Wells'

12  left arm is underneath his body while he's on his

13  stomach, correct?

14      A.  I would say that's accurate.

15      Q.  And Officer Arnold is trying to control his

16  right -- Casey's right arm which is not under his

17  stomach, correct?

18      A.  I would have to say that's accurate, yes.  I

19  know that they were trying to control his arm in order

20  to be able to place handcuffs on him.

21      Q.  Okay.  And you said at line 16:

22          "I kept yelling at him, 'Stop resisting.'

23      I hit him again with the second cartridge.  And it

24      had -- it basically had no effect on him."

25          Did I read that correctly?

1    A.  Yes, you did.

2    Q.  And is that true?

3    A.  True, yes.

4    Q.  At line 19, you say:

5         "He started to get -- I mean, it was

6    just getting to the point now where I could -- the

7    three of us were getting tired with this guy.  He

8    was just wearing us out.  And I kept yelling at him  to

9    stop resisting.  And I know I hit the trigger a  third

10   time.  His body stiffened up.  And once he

11   relaxed, he -- he was just -- he just kept going."

12         Did I read that correctly?

13   A.  Yes.

14   Q.  So on the third TASER deployment, at the point

15   at which you do it, you fired two TASER cartridges; is

16   that correct?

17   A.  Correct.

18   Q.  And both of those deployments were effective in

19   that both prongs of each cartridge made contact with

20   Casey's back, correct?

21         MS. RETTS:  Foundation.

22         THE WITNESS:  I would say, correct.

23   Q.  BY MR. SHOWALTER:  You didn't like when I used

24   the word "effective"?

25   A.  You've got me confused on that.  You mean when

1  I deployed the TASER the first time and the second time

2  with the cartridges, that it wasn't considered to be

3  effective, based on my training and experience, it was

4  not being effective.

5      Q.  And I think I misspoke.  Let's go back to

6  initial -- the very -- the deployment of the first

7  TASER cartridge.  You were how many feet away from

8  Casey's back when you deployed that cartridge?

9      A.  At one foot.

10     Q.  And when you did that, Casey was naked,

11 correct?

12     A.  Yes.

13     Q.  So there's no intervening clothing, you can see

14 whether the cartridge strikes him, correct?

15         Or whether the TASER hits him?

16     A.  Again, I could only assume that when I deployed

17 the TASER that the cartridges did what they were

18 supposed to do.

19     Q.  And I'm not asking you about whether the TASER

20 worked in a certain way.  I'm simply asking you were

21 you able to see that the prongs and the wires, after

22 exiting the TASER, they entered Casey?

23     A.  Yes.

24     Q.  And that was with the first TASER deployment,

25 you could see that the prongs were in his back and you

1 questions about, you know, the neck as a target for

2 police force.

3         As you sit here today, you never saw any -- or

4 your testimony is you never saw anything that could

5 have caused harm to Casey's neck on February 4th of

6 2019?

7     A.  No, sir.

8     Q.  Has anybody ever told you what the Maricopa

9 County Medical Examiner determined was the cause of

10 death in this matter?

11             MS. RETTS:  Form.

12             THE WITNESS:  No.  It would have been

13 basically put into the final report.  But I never read

14 the final report and I never read the autopsy report on

15 it.

16     Q.  BY MR. SHOWALTER:  Okay.  Turning to page 9,

17 line 13 -- I'm sorry, we already did that.  Line 19

18 through 24:

19             "And I previously had been DR -- at DRE

20      with the department.  Through training and

21      everything I had with DRE, I actually thought

22      possibly this guy was on bath salts, the way he was

23      acting, because nothing we were doing was having

24      any effect on him whatsoever, any effect."

25             Did I read that correctly?

1    A.  Yes, you did.

2    Q.  And is that true?

3    A.  Yes.  One of the parts of the DRE training is

4 recognizing symptomolgy and how drugs, whether they be

5 legal or illegal have an effect on the human anatomy.

6 Each person is different, each drug is going to act

7 differently to each person.  And part of what my DRE

8 training was and part of me taking it upon myself to

9 research it, to see what side effects drugs have on the

10 human body.

11          It was -- I wasn't saying for sure, being

12 a doctor, but I had seen people and made contact with

13 people that had been on bath salts.  The -- I can't

14 remember what the name of it is.  But --

15    Q.  Ice?

16    A.  -- synthetic drugs, synthetic marijuana.

17    Q.  Spice?

18    A.  Spice, yes, thank you.  And different drugs,

19 PCP as well.  So I was familiar with somebody being

20 under the influence of a drug that would basically be

21 in -- cause what Mr. Wells was doing.

22    Q.  When you say causing what Mr. Wells was doing,

23 what is the specific thing that you claim he was doing

24 that relates to a drug?

25    A.  His lack of compliance for the commands that

1  were given to him to display or put his hand -- give

2  us -- give his hand so we could take him into custody.

3  Lack of pain to where -- when, as an example, when I

4  was laying on his legs and he pushed me off, he would

5  have had some type of contact with the asphalt to do

6  that.  The fact that he had no reaction to the TASERs

7  or the TASER deployment, to me, that would signify that

8  he is under some type of drug.

9      Q.  To be clear, you don't know whether he was

10  experiencing pain or not?

11      A.  Well, sir, I can tell you from being the

12  initial TASER holder or TASER user when the City of

13  Phoenix decided to use the TASERs and part of the

14  required education for that was to be shot with the

15  TASER.  I can tell you that either somebody is under

16  the influence of a drug or they are very, very used to

17  having high electricity or high voltage electricity put

18  through them.  Because it was a very, very painful and

19  uncomfortable experience.

20          And if Mr. Wells, when I deployed the

21  first and the second cartridge along with the other two

22  times that I initiated the TASER, if he hadn't been

23  under control for that, that would be definitely a

24  reason for me to believe that he was under some type of

25  drug.

1 getting, right?

2     A.  Correct.

3     Q.  And so when you say you thought this guy was

4 possibly on bath salts or PCP, what you mean -- what I

5 understand you to mean is that he was acting

6 irrationally and uncontrollably and he seemed to have a

7 great deal of strength; is that fair?

8                 MS. RETTS:  Form.

9                 THE WITNESS:  Yes.

10     Q.  BY MR. SHOWALTER:  Beyond acting irrationally

11 and uncontrollably and strong, is there anything you

12 mean by he was using you thought bath salts or PCP, are

13 there any other things that you claim appear to be --

14 that you saw that made you think of drugs?

15     A.  The basic fact that he was naked in the middle

16 of the street in a housing area, that, to me, is

17 indications of either somebody being on -- well, let me

18 rephrase that.

19            That to me is a symptom of being under the

20 influence of PCP or bath salts or spice, just because,

21 as I explained to you before, drugs act differently to

22 different people.  But through my training and

23 experience and looking things up, that bath salts and

24 PCP and spice cause people to strip down naked.  Mainly

25 because the drug interacts somewhere in the brain or

1  the body that either gives the person the impression or

2  that their body temperature is very high and they need

3  to cool off, so they will start taking their clothes

4  off.

5      Q.  Is that something that can happen with other

6  illicit stimulants as well, like cocaine, crack cocaine

7  or methamphetamine or other amphetamines?

8          MS. RETTS:  Foundation.

9          THE WITNESS:  It could happen, sir.

10  There's always -- well, through my training and

11  experience doing the drug recognition expert, I would

12  say 95 percent of the cases that I did my evaluations

13  on were what was called polydrug use where they had not

14  only meth but they would also have cocaine in their

15  systems.  They would also have ecstasy, ketamine, all

16  kinds of different drugs into their system.

17          So the drugs are in the system, they could

18  be combating each other.  For different symptomologies,

19  they could be enhancing one drug or another.  So it all

20  depends on the type of drug they took, the quality of

21  the drug they took, the quantity of the drug they took,

22  how they took it.  And if there was any other drugs

23  that were put into the other drugs to -- either as

24  fillers or whatever the case is -- to cut the drug.  So

25  when people are putting these drugs into their system,

1 officers, that the naked man in question is emotionally

2 distressed or emotionally disturbed and it could be

3 mental health or it could be drugs, right?

4             MS. RETTS:  Form; foundation.

5             THE WITNESS:  Yeah.  It's not an everyday

6 occasion that you drive down the street and see naked

7 people walking up and down your street.

8      Q.  BY MR. SHOWALTER:  And, yeah, that's an unusual

9 occurrence?

10      A.  Highly unusual, yes.

11      Q.  So I'm going to scroll -- I'm scrolling down to

12 lines 8 through 10 -- well, actually let's just --

13 let's finish that out.

14             "The way he was acting," okay, so we're at

15 the bottom of page 8 [sic], 20 through 24 you talk

16 about you believe that he was on bath salts and that

17 nothing that he was doing was having any -- or nothing

18 that you guys were doing was having any effect on him;

19 is that accurate?

20      A.  Yes.

21      Q.  With that said, you never witnessed Casey,

22 other than when he struggled and kicked your thighs,

23 you never saw him strike anybody, correct?

24      A.  No.  I never saw him strike anyone.

25      Q.  You never saw him -- you knew he didn't have a

1  weapon because he was naked, true?

2      A.  True.

3      Q.  And other than the point at which he was on his

4  back, the entire time, from the point on which he got

5  flipped over onto his stomach, he remained on his

6  stomach, correct?

7      A.  Correct.

8      Q.  And you did recognize that when the TASER --

9  when you activated the TASER, at multiple times you

10  recognized that his body tensed up during the TASER

11  activation, correct?

12      A.  Correct.  But the report shows that it wasn't

13  multiple times, it was the two times for the cartridges

14  and then two additional times.  So I guess if you want

15  to say multiple, but it was just the four times that I

16  could remember.

17      Q.  So you're not aware of there being a fifth

18  time?

19      A.  No.

20      Q.  So continuing on to page 10, lines 1 through 4,

21  page 9, line 25:

22          "You know, and I -- the training too, with

23      him having his clothes off, being naked -- those

24      are the classic signs of either bath salts or

25      PCP, a person who will start taking their clothes

1    off."

2              Did I read that correctly?

3    A.  Yes, you did.

4    Q.  And then you say:

5              "So, but, yeah, this guy was in it for

6         long haul.  He was in it.  And there was nothing

7         that was going to stop him."

8    A.  Correct.

9    Q.  Again, you never actually saw him injure any

10   officer, correct?

11   A.  Correct.

12   Q.  He never threatened to injure -- you never

13   heard him threaten any officer, correct?

14   A.  All I heard was his growling and grunting.

15   Q.  Did either of the officers at the scene ever

16   tell you that he had harmed them?

17   A.  I recall Officer Arnold mentioning something

18   about Mr. Wells striking him.  But I -- in a situation

19   like this, we were -- officer -- well, all of the

20   officers that were on scene were all separated, so we

21   didn't discuss any -- our testimonies with any of the

22   other officers that were there.

23              So I believe Officer Arnold at some point

24   in the initial contact might have struck him.  But

25   other than that, no, I don't know.

1    A.  Yes.

2    Q.  And is that true?

3    A.  Yes.

4    Q.  And so all four times that you remembered

5  deploying the TASER, you saw him stiffen up and then

6  relax once the deployment or the activation ended?

7    A.  Correct.

8    Q.  At line 12 you say:

9         "So at -- at least after the fourth time,

10   I knew that he was still -- and he was still in it

11   for the fight.  Because I actually saw him tense

12   up, and then he relaxed."

13   A.  That's correct.

14   Q.  And that's true?

15   A.  Yes.

16   Q.  And then you're asked:

17        "You mentioned the first -- the first two

18   deployments were -- they were still struggling to

19   get his arms."

20        And you say:

21        "Yes."

22        Correct?

23   A.  Correct.

24   Q.  And Detective Teusink says:

25        "The third one, where -- where was his --

1    where was his arms at that time?  And where was --

2    and where was his legs:

3            And you say:

4            "From what I can -- well, I was on his

5    legs, and I was trying to -- I grabbed around his

6    legs and I was holding his legs like this.  I

7    remember his -- the suspect's left arm was under

8    his body.  And I could remember making his fist out

9    because Rod was trying to get in and trying to

10   break -- to get his arm out."

11           Did I read all that accurately?

12   A.  Yes, you did.

13   Q.  There's a point in there, and this always

14   happens with transcripts, where you're having a

15   conversation with people, you're able to act things out

16   and make gestures, but it doesn't come through on the

17   transcript.

18           At the transition between 12 -- pages 12

19   and 13, it says:

20           "I grabbed around his legs, and I was

21   holding his legs like this."

22           How were you holding his legs?

23   A.  His ankles were crossed and I would have had my

24   arms in a cross position along with my body laying on

25   top of the arm or on top of his legs.

1  Q.  So you're holding Casey's legs and you see that

2  Officer Arnold -- I'm sorry, that Sergeant Rodarme is

3  having difficulty gaining control of Casey's left arm

4  and that's when you make the decision to deploy the

5  TASER?

6  A.  Yes, sir.

7  Q.  And so you use your right hand to grab the

8  TASER?

9  A.  Correct.  It would have been in a cross draw

10  position.

11  Q.  Did you let go of Casey's legs to do that?

12  A.  I would have to say, yes.  But then, again, you

13  know, you're asking me for doing extremely fine details

14  in a very fluid situation.  In order for me to get my

15  TASER, I would have to reach across my body.  I would

16  have to unsnap -- I had a parachute type of clip that I

17  used on a strap that was used to holster my TASER so I

18  would have had to undo that clip and then draw the

19  TASER with my right hand, because I can't -- I wouldn't

20  be able to do any of those actions with my left hand.

21  Q.  But you don't remember the extent to which you

22  left go of Casey's legs to --

23  A.  Yeah, you're right, I don't remember.  Again,

24  that was one of those type of things where it's a very

25  fluid situation and trying to remember exact fine

1  details such as that, no, I couldn't -- no, I'm not

2  going to answer to anything on that, other than --

3      Q.  So at lines 5 through -- well, at line 5 on

4  page 13, you say:

5           "I remember seeing Jamie," that's Officer

6      Arnold, "grabbing the guy's right arm and trying to

7      bring it back.  And it was just like Jamie was

8      trying to pull concrete out of the ground.  He

9      just -- it -- it was just -- he was not having any

10     effect on trying to get him to get that hand back.

11     And then I -- like I said, after I deployed it the

12     second time, when they were laying on the -- when

13     he was laying on his stomach, I couldn't tell you

14     exactly when it was that Rod was able to get his

15     arm out.  But I could tell you the whole time that

16     he was -- he was in it for the fight."

17           Did I read that correctly?

18     A.  Yes, you did.

19     Q.  And is that true?

20     A.  Yes.

21     Q.  And then Detective Teusink asks you at line 16

22  through 18:

23           "Third and fourth time, do you -- do you

24     recall if his hands were cuffed yet?"

25           Do you see where I read that?

1    A.   Yes.

2    Q.   And you responded:

3              "No, they weren't cuffed."

4              Do you see that?

5    A.   Yes.

6    Q.   And is that true?

7    A.   Yes.

8    Q.   And at lines 21 through 22, Detective Teusink

9  says:

10             "Or if his legs were -- were cuffed yet?"

11             And at lines 23 and onward, you respond:

12             "About the best time I could tell you that

13    he was getting cuffed was probably after the

14    fourth -- the fourth TASER or the fourth trigger

15    pull."

16             Do you see where I read that?

17   A.   Yep.  Yes, sir.

18   Q.   And is that true?

19   A.   Yes.

20   Q.   And then Detective Teusink says:

21             "Okay.  And -- but you don't -- you don't

22    recall pulling that back?"

23             Do you understand that what that means?

24   A.   No.

25   Q.   In response you say:

1              "But -- I don't recall exactly --

2     exactly --"

3              Detective Teusink says:

4              "Okay."

5              And then you say:

6              "-- which one it is, but it had to be

7        some -- the fourth or sometime after the fourth

8        one."

9              So it sounds like what you're saying is

10    that, but correct me if I'm wrong, is that -- your

11    testimony -- or your recollection was that Casey was

12    not cuffed until after the fourth TASER pull; is that

13    what you understand that to mean?

14    A.   Yes.

15    Q.   Okay.  Then Detective Teusink says:

16              "Okay.  And during any of those trigger

17        pulls, he would stiffen up, but that you guys

18        weren't able to get him cuffed?"

19              And you say:

20              "Right.  Once -- once --"

21              "Cuffed" --

22              And then Detective Teusink interjects:

23              "Cuffed -- cuffed or restrained during

24        that time?"

25              And then you say:

1      "Once -- once the shock wore off, he -- it

2    was just -- and you could tell, because with him

3    being naked, his whole body would stiffen up.  And

4    then when he relaxed, he was just back in it.  And

5    each time I deployed it, I told him -- yelled at

6    him, 'Stop resisting, stop resisting,' and he

7    continued.  And I just let go of the trigger."

8          Do you see where I read that?

9    A.  Yes, sir.

10   Q.  And is that true?

11   A.  Yes.

12   Q.  At line 25 of page 14, Detective Teusink says:

13         "And other than," and then it continues

14   onto page 15, "grunting, he wasn't saying?"

15         And you say:

16         "Well, he was -- he was just doing that

17   yowling, I guess for lack of a better term, you

18   could say."

19   A.  That's accurate, yes.

20   Q.  Are you able to -- I mean, when you say

21 grunting, he was also "yowling," what did the yowl

22 sound like?

23   A.  I would -- I don't know if that's a typo.

24 Maybe I was referring -- it was difficult for me to be

25 able to explain exactly what he was doing.  And the

1        THE WITNESS:  If it's not in my report

2   that I wrote it, if I wrote a report or a supplement,

3   if it's not in the interview testimony that I gave to

4   the detectives, then it's, as far as I'm concerned, it

5   never happened.

6        So what you're reading through the

7   interview has been accurate so far.  And what my

8   responses to the interview were accurate at the time

9   when I gave the interview.  So, you know, this incident

10  has affected me in more ways than one.  The loss of Mr.

11  Wells is devastating.  All human life is precious.  And

12  I'm just testifying to what your questions are.

13        So, you know, everything that transpired

14  that day was for the safety of Mr. Wells, the safety of

15  that community or the residents in that community and

16  for the safety of the officers.  So as far as me coming

17  back in two years saying something completely

18  different, I can't say to that, because I don't know

19  what's going to happen in the future.  So I'm --

20      Q.  BY MR. SHOWALTER:  You would agree with me --

21      A.  Go ahead.

22      Q.  Have you ever had a situation where, as time

23  progressed, your memory of an event improved?

24      A.  No.

25      Q.  Generally, your experience -- or generally, has

1  it been your experience that the longer -- the further

2  in time we get from an event, the more difficult it is

3  to remember the event?

4      A.  Well, sir, I can tell you that this event, and

5  the fact that Mr. Wells died in custody, and that I was

6  involved in the situation, will never go away.  The

7  only time it will ever go away is when I pass away.

8  These are the kind of events, as you put it, that you

9  just don't go home, eat dinner, go to sleep and wake up

10  and it's gone.  As I explained to you before, I don't

11  know what your extent or knowledge is about police

12  work, but police work and what we see, what we have to

13  do, things that we have to prepare ourselves for, if

14  you find an officer that tells you that he's not

15  suffering from some type of PTSD, I will tell you he is

16  a liar.  And there are certain incidents, such as this

17  one, that will haunt me until the day I die.

18          So all I'm telling you is that what you

19  read here and what you read here and what I testified

20  to at the time of the interviews is my clear and

21  accurate details and depiction at the time of the

22  incident.

23      Q.  Can you tell me what it is about this incident

24  that will haunt you until the day you die?

25      A.  There are several.  I can tell you one of the

1 images that I have and that have been recurring have

2 been when Mr. Wells was turned onto his back after he

3 was handcuffed and seeing his face, it's imprinted into

4 my mind that it will be there forever.

5          The fact giving him CPR and there was no

6 response to the CPR.  Going up and feeling for a pulse

7 in his carotid and not feeling the pulse.  Doing CPR on

8 him to the point where I had to be physically relieved

9 from giving him CPR because I was doing it for so long

10 and for so many times.

11          The fact that the time between the request

12 for the fire department to respond and the fire

13 department responding, seemed like it was forever.  The

14 fact that Mr. Wells, his demeanor at the time, was

15 beyond anything that I had ever encountered with

16 somebody on drugs before and I've encountered pretty

17 much, you name the drug, illegal street drug, and I've

18 encountered people with it.

19          The fact that with me being 250 pounds at

20 the time, Officer Arnold being about 6'3", 260 pounds

21 and Officer -- Sergeant Rodarme being 6'3", maybe 240,

22 250 pounds and me being 6'1", 250, the fact that he was

23 flicking us off and struggling with us like watching --

24 like trying to flip flies off sugar cane, then, yeah,

25 those are incidents that are and will haunt me.

1          So, you know, I'm not going to say that
2    this one is going to be in specific, because there are
3    several others.  But the fact that, yes, these -- this
4    will stay with me.

5      Q.  You used the term "flies off sugar cane" --

6      A.  It's just an analogy that I kind of come up
7    with.  You know, there's probably other analogies that
8    I could come up with.  But that's about the closest one
9    I thought of, you know, that I can think of.

10     Q.  In your statement, you don't ever say that -- I
11   mean you say you arrived on the scene, Casey's on his
12   back.  You tell Rodarme and Arnold to flip him over
13   onto his stomach.  They do.  At no point is there
14   anything in the records I've seen to say that he
15   knocked one of them over or pushed one of them up into
16   the air.

17         And so are you saying at some point he
18   knocked somebody off of him?

19     A.  No, sir.  I'm using that as an analogy that he
20   was fighting us to the point where he just wasn't
21   rational enough to be able to comply with our commands
22   or our orders.  When we're telling him repeatedly to
23   stop resisting and he continues to resist and when
24   we're trying to get control of him and he is able to go
25   and fight that control, that's the analogy I came up

1      MS. RETTS:  Form; foundation.

2      THE WITNESS:  Only in the cases of active

3  resistance.

4      Q.  BY MR. SHOWALTER:  And that includes people

5  who -- well, strike that.

6      What were you taught about the number and

7  duration of TASER deployments or exposures?

8      MS. RETTS:  Form.

9      THE WITNESS:  Through the training I

10  received with the TASER, I was told that, upon

11  deploying the first cartridge, that the electrical

12  charge would automatically be shut off by the TASER

13  after five seconds.  Then the second cartridge, after

14  five seconds, the TASER would shut itself off.  And I

15  was also trained and under the idea that when you

16  deploy a TASER, if the cartridges didn't have any

17  effect that once you pull the trigger, it would

18  automatically shut off at five seconds.  So that no

19  matter how long you pulled the trigger or how long you

20  kept the trigger depressed, it would automatically shut

21  off at five seconds.

22      Q.  BY MR. SHOWALTER:  What training did you

23  receive about positional asphyxia at the City of

24  Phoenix?

25      MS. RETTS:  Form.

1    THE WITNESS:  Just the training that the

2  City provided.

3    Q.  BY MR. SHOWALTER:  Were you trained that

4  placing weight on a hog-tied individual created a risk

5  of death?

6    MS. RETTS:  Form; foundation.

7    THE WITNESS:  Well, I wouldn't use the

8  term "hog-tied," sir.  That's not -- I'm not going to

9  use that term.

10    However, with somebody that's restrained,

11  if the situation is necessary to keep that person from

12  either injuring themselves or causing injury to someone

13  else and to be able to keep that person from doing

14  those things, then, yes, the physical restraint may be

15  needed, such as laying on somebody's back.  Something

16  along those lines, yeah.

17    Q.  BY MR. SHOWALTER:  And that wasn't quite my

18  question.  My question is:  Were you trained about

19  risks of positional asphyxia when a person is

20  restrained with their arms behind their back and placed

21  on their stomach --

22    A.  Yes.

23    Q.  -- and their legs are elevated?

24    A.  Yes.

25    Q.  And what were you trained about that?

1    A.  That when the subject is handcuffed from the

2  back, it compresses or I want to say, I guess

3  compresses the shoulder areas, which by doing with the

4  shoulder areas, it also stretches the chest out which

5  makes it more difficult to breathe.

6    Q.  And you saw in the video that as you had at

7  least admitted, it was clear that Officer Armstrong --

8  I'm sorry, Officer Arnold had his knee on Casey Wells'

9  shoulder, correct?

10    MS. RETTS:  Form; foundation.

11    THE WITNESS:  From what it appeared on the

12  video, to me, yes.

13    Q.  BY MR. SHOWALTER:  And you have no memory of

14  seeing that at the time, though, right?

15    A.  No, sir.  As I explained, my area of concern

16  was where you saw me at.

17    Q.  If you had seen that at the time, you testified

18  earlier, that you would have told him to stop it and

19  would have notified a supervisor, correct?

20    MS. RETTS:  Form; foundation.

21    THE WITNESS:  I didn't see Officer Arnold

22  doing that, so I wouldn't have had no reason to say

23  anything to either Officer Arnold or Sergeant Rodarme.

24    Q.  BY MR. SHOWALTER:  Now, I asked you about a

25  person -- I asked you if you saw an officer placing

1  could be wrong.  I'm wrong all the time.  A 50/50

2  chance that tomorrow I won't agree with anything I said

3  today.

4           But we have an understanding based on a

5  news report that at some point the City of Phoenix

6  purged certain parts of its IA or personnel files.

7           And I just want to know, if this -- if to

8  the best of -- well, do you have any information on

9  whether or not the City of Phoenix purged files in

10  general?

11     A.  No.

12           MS. RETTS:  Foundation.

13           THE WITNESS:  No.

14     Q.  BY MR. SHOWALTER:  And I want to show you some

15  things in this document.

16           So it says that there are five

17  administrative inquiries that it lists and then it

18  lists one as a firearm discharge.  And those can be the

19  same thing.  So there could be five administrative

20  inquiries and that would be the total number of

21  inquiries and then there could also be a firearm

22  discharge, which is listed separately but happens to be

23  one of the five administrative inquiries.

24           And then going down farther, it says

25  there's one phone log, which I don't understand what

1    THE WITNESS:  No.

2    Q.  BY MR. SHOWALTER:  And so with all of them,

3  you've never observed them using force in the course of

4  police actions?

5    A.  No.  No.  We were all of the mindset of using

6  verbal judo whenever we could.  And, in fact, Officer

7  Funston was one of my trainees and that's one of the

8  things I emphasized upon him was stay away from

9  physical force unless it's absolutely positively

10  necessary.  So we do and we did very well with verbal

11  judo.

12    Q.  Okay.  What would have happened if once Casey

13  Wells was handcuffed, you guys just all stood up and

14  backed away from him once he was handcuffed with his

15  hands behind his back?

16    MS. RETTS:  Form; foundation.

17    THE WITNESS:  I don't understand where

18  you're going with that one.  If he was handcuffed

19  behind his back and still laying on the asphalt and he

20  was not in any kind of physical distress, we would have

21  basically all stood up, but we would have stayed around

22  him to make sure that he didn't injure himself by

23  trying to get away or something along those lines or

24  scratching himself on the pavement.  But if there was

25  no other reason for an officer to be in a physical

1  anything further at this time.  I think I'm done.

2         MS. RETTS:  I have few questions.

3         There's a -- okay.  It went off.

4         MR. SHOWALTER:  What went off?

5         MS. RETTS:  There was a weird noise.  I

6  don't know if you heard it.  But something was going

7  off.

8

9                   EXAMINATION

10  BY MS. RETTS:

11    Q.  Sir, did you form an impression, based upon

12  your training and your experience and your observation

13  of Mr. Wells, that he was on drugs versus mentally ill?

14         MR. SHOWALTER:  Form and foundation.

15         THE WITNESS:  Based on my training and

16  experience, I would have said that he was on drugs.

17    Q.  BY MS. RETTS:  Based upon your experience as a

18  Phoenix police officer, when you have encountered

19  people who you have later learned are mentally ill, do

20  they normally take their clothes off?

21    A.  No.

22    Q.  In your experience, encountering people on

23  drugs, have you encountered people to take their

24  clothes off when on drugs?

25    A.  Yes.

1    Q.  Do you have any recollection of ever deploying

2  the TASER while Mr. Wells had both hands secured

3  securely in handcuffs behind his back?

4    A.  No, I do not.

5    Q.  Did you recognize the TASER as a tool that

6  could be used to get Mr. Wells safely into custody and

7  quickly into custody?

8    A.  Yes.

9    Q.  Would that have facilitated the fire department

10 in responding quickly to the scene?

11   A.  Yes.

12         MS. RETTS:  I don't have anything further.

13         MR. SHOWALTER:  Just so I'm -- I want to

14 be clear on something.

15

16              FURTHER EXAMINATION

17 BY MR. SHOWALTER:

18   Q.  Are you saying there's a bright line rule that

19 if there's a naked person acting weird, that's drugs

20 not mental illness?

21         MS. RETTS:  Form.

22         THE WITNESS:  Well, sir, based on my

23 training and experience, I have had several contacts

24 with individuals that were on illegal drugs like PCP,

25 ketamine, stimulants and those type of drugs have a

1  tendency to cause the individual to feel as if they're

2  overheating and a common reaction to overheating would

3  be to take your clothes off.

4      Where my experience and training involved

5  with somebody that's mentally ill, in cases where I've

6  had it or had contact with them, to the extent they

7  flash me.  They were never stripped down naked or

8  anything along those lines.  They flashed me.

9      So with the training and experience I

10  received, I would have to say that based -- that if

11  somebody is naked and running down the street, that

12  they were on some type of illicit or illegal drug.

13  Q.  BY MR. SHOWALTER:  I mean, you can't rule out

14  mental illness, can you?

15      MS. RETTS:  Form.

16      THE WITNESS:  You can never rule out

17  mental illness.

18  Q.  BY MR. SHOWALTER:  And you're trained that, A,

19  you're not a medical or psychiatric professional and

20  it's not your job to determine if somebody is mentally

21  ill, fair?

22  A.  Fair.

23  Q.  Your job is when you encounter somebody who

24  appears to be mentally disturbed, emotionally disturbed

25  or under the influence of drugs, you recognize that all

1  of those things are potentially medical emergencies,

2  correct?

3         MS. RETTS:  Form; foundation.

4         THE WITNESS:  I don't know if I would

5  classify it as a medical emergency.  I would take each

6  situation for the totality of the circumstances.

7         Part of what I would do for an

8  investigation would be to talk to somebody that knows

9  the individual and find out if there is, in fact, some

10  type of mental health issues.  And if there are, to see

11  if that individual is current taking their medications.

12         But if I'm in a patrol car driving down

13  the street and with nobody calling in and I happen to

14  see an individual that is naked walking down the

15  sidewalk, then my indications are going to be that that

16  person is on some type of drugs because a rational,

17  reasonable person would not walk down the street bare

18  naked.

19     Q.  BY MR. SHOWALTER:  And so when you see somebody

20  who's bare naked, you know not --  I mean, you see --

21  you've encountered -- how many people would you say

22  over the course of your career at Cactus that you've

23  encountered were on meth, a thousand?

24     A.  At least.  Like I said before, there's a lot of

25  cases where the individual was doing polydrug use.  So

1  they could have been a combination of meth and coke,

2  cocaine and heroine, ketamine, PCP, anything.

3          But the contacts that I did have with

4  people that were naked, were generally because of an

5  illegal drug, such as PCP, ketamine, which is the

6  family of PCP, methamphetamine, even to some extent

7  ecstasy.

8      Q.  And when you talk about those drugs as inducing

9  overheating, I'm -- I mean, I feel -- I live Arizona,

10  so I feel uncomfortably hot all the time, even right

11  now in my office.  For some reason, the thermostat

12  resets every day.  So right now it's like 80 degrees

13  and I'm wearing a stupid looking sports coat.  I have

14  zero urge to strip down naked, zero inclination.

15      A.  Okay.

16      Q.  And so one of the things you pointed out is

17  that when you see somebody who's naked, you know that

18  they are irrational and out of their minds, correct?

19      A.  I never said out of their mind.  I said what a

20  reasonable person would believe or what a reasonable

21  person would do.  A reasonable person would not strip

22  down naked and walk up and down the street or stand in

23  the middle of the street yelling or walking into stores

24  or whatever.  A reasonable person would not do that.

25  And as I explained to you before, my contacts with

1  people being mentally ill, usually I was flashed.

2      Q.  When you say flashed, do you mean they exposed

3  themselves to you?

4      A.  A woman would lift her top up and expose her

5  breasts.  Or a gentleman would drop his pants and

6  expose his genitals, something along those lines, where

7  as soon as they would do it, they would cover

8  themselves back up.

9          Those, I was assuming and I would think

10  that they were mental illness.  But I'm just explaining

11  to you that through my training, through my experience,

12  through my contacts with people that have been on drugs

13  that have a tendency to raise the body temperature,

14  whether it raises the physical body temperature or it

15  gives the subject a feeling that their body temperature

16  is raising, then it's all been because of illegal

17  drugs.

18      Q.  Okay.  But one other -- were you also trained

19  on dual diagnosis, people who are both mentally ill and

20  both drug abusers?

21          MS. RETTS:  Form.

22          THE WITNESS:  No.  In the times that --

23  when we have to make contact with somebody, generally

24  our decision on demeanor is what their actions are at

25  the time.  And I'm not in any way, shape or form to be

# EXHIBIT 12

| Seq # | Local Time [DD:MM:YYYY hh:mm:ss] | Event [Event Type] | Cartridge Info [Bay: length in feet/status] | Duration [Seconds] | Temp [Degrees Celsius] | Batt Remaining [%] |
|---|---|---|---|---|---|---|
| 320 | 03 Feb 2019 15:41:20 | Arc | C1: 25' Standard C2: Deployed | 1 | | 55 |
| 321 | 03 Feb 2019 15:41:21 | Safe | C1: 25' Standard C2: Deployed | 2 | 25 | 55 |
| 322 | 04 Feb 2019 06:22:54 | Armed | C1: 25' Standard C2: Deployed | | 25 | 55 |
| 323 | 04 Feb 2019 06:22:55 | Arc | C1: 25' Standard C2: Deployed | 2 | | 55 |
| 324 | 04 Feb 2019 06:22:59 | Safe | C1: 25' Standard C2: Deployed | 5 | 25 | 55 |
| 325 | 04 Feb 2019 14:29:05 | Armed | C1: 25' Standard C2: 25' Standard | | 27 | 55 |
| 326 | 04 Feb 2019 14:29:11 | Trigger | C1: Deployed | 5 | | 55 |
| 327 | 04 Feb 2019 14:29:26 | Trigger | C2: Deployed | 5 | | 55 |
| 328 | 04 Feb 2019 14:29:56 | Trigger | C2: Deployed | 5 | | 55 |
| 329 | 04 Feb 2019 14:30:19 | Trigger | C2: Deployed | 6 | | 54 |
| 330 | 04 Feb 2019 14:30:46 | Trigger | C2: Deployed | 5 | | 54 |
| 331 | 04 Feb 2019 14:33:15 | Safe | C1: Deployed C2: Deployed | 250 | 35 | 53 |
| 332 | 05 Feb 2019 07:56:43 | USB Connected | | | | |
| 333 | 05 Feb 2019 07:56:37 | Time Sync | 05 Feb 2019 07:56:57 to 05 Feb 2019 07:56:37 | | | |
| 334 | 05 Feb 2019 08:09:36 | Time Sync | 05 Feb 2019 08:09:36 to 05 Feb 2019 08:09:36 | | | |

# EXHIBIT 13

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)



VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

TRAVIS FUNSTON

Phoenix, Arizona
April 15, 2021
8:58 a.m.




DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
P (602) 230-5454
F (480) 546-3721
www.dlvreporting.com

PREPARED BY:

Donna DeLaVina, RPR
Certified Reporter
Certificate No. 50468

TRAVIS FUNSTON  APRIL 15, 2021

1  And if that happens, the attorneys will probably remind

2  you and it will be fine.  Make sense?

3      A.  Yeah, it does.

4      Q.  And then if for any reason you need a break

5  during the deposition, just let us know.  And, you

6  know, the only thing I do ask is that if there's a

7  pending question you answer it before taking the break,

8  fair?

9      A.  Yeah, fair.

10     Q.  How long have you been with the City of Phoenix

11  Police Department?

12     A.  It will be coming up on four years in, I

13  believe, June.

14     Q.  What's the date of your graduation from the

15  academy?

16     A.  I don't remember exactly off the top of my

17  head, but I think it was -- I want to say it was June

18  or July of 2017.

19     Q.  And after graduating from the academy, what was

20  your first assignment?

21     A.  Patrol with 91 Frank field training squad.

22     Q.  And after completing that assignment, where did

23  you go?

24     A.  93 Bravo patrol squad.

25     Q.  Do you remember the approximate date that you

1    A.   Corporal.

2    Q.   And to be clear, just so -- this is the Army

3  National Guard?

4    A.   Correct.

5    Q.   So was that an E-3?

6    A.   It's an E-4, an NCO.  It's a noncommissioned

7  officer.

8    Q.   And what was your MOS?

9    A.   11 Bravo.

10   Q.   What is 11 Bravo?

11   A.   Infantry.

12   Q.   Did you serve any -- were you ever deployed?

13   A.   No, I was not.

14   Q.   What's your educational background?  What year

15 did you graduate high school?

16   A.   2012.

17   Q.   What high school did you attend?

18   A.   Pinnacle High School.

19   Q.   And after Pinnacle High School, did you

20 continue your education?

21   A.   I attended an EMT course at PVCC.

22   Q.   So EMT course at Paradise Valley Community

23 College?

24   A.   That's correct.

25   Q.   Did you receive an EMT certificate as a result

1  of that?

2      A.  I did.  I took the state exam but not the

3  national.

4      Q.  Are you current on your EMT certificate?

5      A.  No, I am not.

6      Q.  And what year did you obtain that?

7      A.  2000 -- I want to say it was 2015, but I am not

8  100 percent sure on that.

9      Q.  As part of your EMT training, did you receive

10 any training on positional asphyxia?

11     A.  Yeah.  I would assume, yes.

12     Q.  And don't assume.  As you sit here right now,

13 do you remember any particular training?

14     A.  It's been a while, so I don't recall all the

15 training I did in the EMT course.

16     Q.  As you sit here today, do you recall that there

17 was any training in the EMT course about something

18 called excited delirium?

19     A.  Like I said, not that I can recall.  It's been

20 a while.  I haven't really used those EMT functions as

21 much as I would, based off what I learned specifically

22 for that type of certificate.

23     Q.  In getting the EMT certificate, were you

24 thinking about becoming a firefighter at some point?

25     A.  Something to do where I could help people, but

1      Q.  Yes.

2      A.  That one, that one is a law enforcement

3   specialist.

4      Q.  And so then the other ones would be just kind

5   of specific like -- or like almost like seasonal work

6   or something like that?

7      A.  Correct.  So, like I said, there's a multitude

8   of jobs.  I might have even missed some.  But, yeah,

9   it's just basically if they need someone and I know the

10   person who is coordinating, I'll go and work the job

11   with them.

12      Q.  I want to ask you some questions about your

13   training with the City of Phoenix as a police officer.

14          Do you recall receiving training at the

15   City of Phoenix about something called excited

16   delirium?

17      A.  Yes, I do.

18      Q.  When do you recall receiving that training?

19      A.  During the academy.

20      Q.  And were you trained that excited delirium is a

21   medical emergency?

22      A.  Yes.

23      Q.  Were you trained that excited delirium is

24   something -- well, what were you trained are the

25   indications of excited delirium?

1    A.   There's a multitude of indications when it
2  comes to excited delirium.  But, basically, someone who
3  is not making -- an inaudible sense.  They can believe
4  that they're going to die and they'll say that
5  repeatedly.  They get extreme body heat, temperature,
6  and they will most likely strip down.  And it can come
7  across as someone who may be mentally ill or drug
8  impaired, but there's more key factors I just explained
9  that would indicate to that.

10    Q.  Is it something that generally seems to occur
11 in the presence of police restraint?

12            MS. RETTS:  Form; foundation.

13            THE WITNESS:  I mean, I'm not a doctor.  I
14 would say that it's more something that has to do with
15 the own person's actions.

16    Q.  BY MR. SHOWALTER:  Have you ever heard of a
17 person who died of excited delirium absent an encounter
18 with police?

19            MS. RETTS:  Form.

20            THE WITNESS:  I don't know all of the time
21 someone has died or not died from that.  I don't study
22 that on a regular basis, so I don't know.

23    Q.  BY MR. SHOWALTER:  Were you trained that if
24 somebody is experiencing excited delirium, their heart
25 could explode?

1           MS. RETTS:  Form.

2           THE WITNESS:  Again, I'm not a doctor, but

3    I believe that that is a thing that could happen

4    depending on the situation itself.

5        Q.  BY MR. SHOWALTER:  That's what you were -- and

6    I'm not asking you to be a doctor, I'm just asking

7    about what you were trained.

8           Were you trained that if people are

9    suffering from excited delirium their heart may

10   explode?

11          MS. RETTS:  Form.

12          THE WITNESS:  Yes.  If someone has excited

13   delirium, their heart could explode.

14       Q.  BY MR. SHOWALTER:  And that was training that

15   you received at the City of Phoenix Police Academy,

16   correct?

17          MS. RETTS:  Form.

18          THE WITNESS:  Correct.

19       Q.  BY MR. SHOWALTER:  Were you trained that

20   somebody experiencing excited delirium -- well, that if

21   you were dealing with someone -- strike that.  Were you

22   trained that if you're dealing with someone with

23   excited delirium, hog-tying them can increase their

24   risk of death?

25          MS. RETTS:  Form.

1    THE WITNESS:  We don't hog-tie, so we

2  would never do that to begin with.

3    Q.  BY MR. SHOWALTER:  What is your understanding

4  of the meaning of the word hog-tie?

5    A.  Well, seeing as my family is actually in the

6  rodeo, I understand what a hog-tie is and it completely

7  immobilizes something and it puts a lot of pressure on

8  certain parts of the body.  That's what my definition

9  of a hog-tie would be.

10    Q.  See, I've got family who are in the rodeo too

11  and, I mean, there's not a lot of hog roping going on,

12  right?

13    A.  It's more calves.

14    Q.  More calves.  But you would agree with me that

15  hog-tying can be used just to refer to tying

16  somebody -- binding somebody by the hands and feet and

17  then tying those two and then linking the bound feet to

18  the bound hands.  You've heard that action referred to

19  as hog-tying, correct?

20    MS. RETTS:  Form; foundation.

21    THE WITNESS:  Well, me personally, I mean,

22  I've heard that, but that is not what I consider

23  hog-tying.  I think hog-tying is something that

24  completely immobilizes someone.

25    Q.  BY MR. SHOWALTER:  And I understand that.  I

1  want to know, you would agree with me that hog-tying is

2  a word that people use in common speech outside of law

3  enforcement, correct?

4              MS. RETTS:  Form; foundation.

5              THE WITNESS:  Outside of law enforcement,

6  yes.

7     Q.  BY MR. SHOWALTER:  And you've heard people use

8  the term "hog-tie" to refer to binding somebody up by

9  the hands and feet and then linking the hands and feet

10 together, fair?

11             MS. RETTS:  Form; foundation.

12             THE WITNESS:  I've heard it.

13    Q.  BY MR. SHOWALTER:  And you said that you

14 don't -- that police -- I'm sorry, Phoenix police don't

15 hog-tie people, but Phoenix police do practice a

16 technique of handcuffing people and then using RIPP

17 restraints to bind their feet and then linking the RIPP

18 restraint to the handcuffs, correct?

19             MS. RETTS:  Form.

20             THE WITNESS:  Correct.  But that's not a

21 hog-tie.

22    Q.  BY MR. SHOWALTER:  And where would I find it

23 written that that's not a hog-tie?

24    A.  In our policy.

25    Q.  So what would be a hog-tie?

TRAVIS FUNSTON   APRIL 15, 2021

1    A.   Like I said before, in my opinion, and what my

2 understanding is is that a hog-tie is something that

3 completely immobilizes somebody.  A RIPP restraint does

4 not completely immobilize somebody.

5    Q.   So if you tightened a RIPP restraint

6 sufficiently that a person was completely immobilized,

7 would that be a hog-tie?

8         MS. RETTS:  Form; foundation.

9         THE WITNESS:  That's not how we apply RIPP

10 restraints, so that would never happen.

11    Q.   BY MR. SHOWALTER:  My question was if you

12 tightened RIPP restraints sufficiently that a person

13 was completely immobilized, would that amount to

14 hog-tying?

15         MS. RETTS:  Form; foundation.

16         THE WITNESS:  I believe -- I believe I

17 understand your question.  But if a RIPP restraint is

18 sufficiently applied properly, it will not be that

19 tight.

20    Q.   BY MR. SHOWALTER:  And I understand your

21 qualification to my question so let's say that a RIPP

22 restraint is improperly applied such that it is too

23 tight, would that amount to a hog-tie?

24         MS. RETTS:  Form; foundation.

25         THE WITNESS:  Depending on how it was

TRAVIS FUNSTON  APRIL 15, 2021

1  applied, yes.  But if it was applied that way, that

2  would be incorrect and out of policy.

3      Q.  BY MR. SHOWALTER:  So what is the correct way

4  to apply a RIPP restraint?

5      A.  So there's -- a RIPP restraint has a clasp, the

6  actual restraint itself band and where you loop it

7  around the feet.  And what you want to do is you want

8  to cross those feet so that they can be stopped from

9  kicking or moving and then you tighten it around the

10  feet.  It's going to make it more comfortable on the

11  individual and protect them as well as us at the same

12  time.  Them using the clasp at the other end, you're

13  going to clip onto the back of the handcuffs, which

14  will be behind his lower back.

15          The length of that RIPP restraint gives

16  them plenty of room to be able to sit up, bend their

17  knees, and even we can loosen the lower end of the RIPP

18  restraint so they can walk or hop, if needed.

19      Q.  And when you talk about -- let me see if I can

20  pull something up.

21          When you talk about clasps, are you

22  referring to a hook on the RIPP restraint?

23      A.  It's -- think of like a D link.  It's kind of

24  like that.  It just clips right on.

25      Q.  And so that's the part you refer to as the

TRAVIS FUNSTON  APRIL 15, 2021

1   clasp?

2       A.  Correct.

3       Q.  Bear with me a moment.

4           Okay.  I'm going to show you an exhibit

5   that's been marked as Exhibit 2a.

6           (Whereupon, Deposition Exhibit Number 2a was

7   marked for identification.)

8       Q.  BY MR. SHOWALTER:  And it is Bates stamped

9   COP-STICKNEY000291 and it is a photograph.

10          Are you able the view that?

11      A.  Yes.

12          MS. RETTS:  We've got a close-up paper

13  version too.

14          MR. SHOWALTER:  And I can actually. . .

15          MS. RETTS:  It's kind of hard to see.

16          But, yeah, that's a little better.

17          THE WITNESS:  Is it this right here?

18          MS. RETTS:  Yeah.

19          THE WITNESS:  Yes, I do see it.

20      Q.  BY MR. SHOWALTER:  And so this brass, this

21  brass piece here, that's what you refer to as the clasp

22  or the D link, fair?

23      A.  Correct.

24      Q.  And then these are the handcuffs, which are not

25  part of the RIPP restraint, correct?

1      A.   Correct.

2      Q.   And what is this over here?

3      A.   That would be the part where you can loosen it

4  up to wrap around the feet.  I can't remember the

5  proper terminology for what it's called.

6      Q.   It's like a buckle, right?

7      A.   It's a buckle.  But I swear there's a different

8  name and I just can't remember it.

9      Q.   And let me see if I understand, is there a way

10  of tightening that bucket?

11      A.   Yeah.  So it basically just slides out like a

12  loop.  So you're able to push down on one end of it and

13  bring more through, like through the end to create a

14  spot for the feet to slip through and then you're able

15  to tighten it back down.

16      Q.   Okay.  And so if I understand you correctly, to

17  properly apply the RIPP restraint, the RIPP restraint

18  is looped around the ankles, the ankles are crossed,

19  and then the RIPP restraint is drawn tight, so the loop

20  around the ankles is tight and then that brass clasp or

21  D ring is connected to the handcuff chain; is that

22  correct?

23           MS. RETTS:  Form.

24           THE WITNESS:  Just to clarify, you're

25  saying that the only part that's being tightened is

1  around the feet, correct?

2      Q.  BY MR. SHOWALTER:  So I said that the loop

3  around the feet is tightened and then the clasp is

4  connected to the handcuff chain.  I didn't say anything

5  else was tightened.

6      A.  I just wanted to make sure.

7          Yes, that's correct.

8      Q.  Is there a way -- so once you loop it around

9  the feet, is it a fixed length between what remains

10  on -- is there any way to tighten it further onto the

11  handcuff clasp?

12      A.  Not if it is applied properly, no.

13      Q.  Well, what if it's -- I just want to know if

14  there's any way to do it if it's not applied properly?

15          MS. RETTS:  Foundation.

16          THE WITNESS:  I don't see why that matters

17  because it wasn't improperly applied in this situation,

18  as far as the clasp goes and that length.  So, I mean,

19  if somebody were to completely mess that up, yes.

20      Q.  BY MR. SHOWALTER:  You're not answering my

21  question.  Let me reask the question.

22          There's a loop that goes around the

23  ankles, right?

24      A.  Correct.

25      Q.  There's that buckle that we looked at that's

1  got a -- it's got a spring and you can use that

2  buckle -- is that buckle for tightening at the ankles

3  or is that for something else?

4      A.  Only at the ankles, that's it.

5      Q.  Is there any other portion of the RIPP

6  restraint that allows you to add or remove tension

7  other than that buckle?

8      A.  No, there's not.

9      Q.  Okay.  But it would be possible by exerting

10  force to pull the RIPP restraint tight, correct?

11          MS. RETTS:  Form.

12          THE WITNESS:  What do you mean by

13  "exerting force"?

14      Q.  BY MR. SHOWALTER:  You can physically pull on

15  the RIPP restraint to cause the person's legs to go

16  backward when you're pulling it to connect the clasp to

17  the handcuffs, correct?

18          MS. RETTS:  Form.

19          THE WITNESS:  That's correct.

20      Q.  BY MR. SHOWALTER:  All right.  Let me stop the

21  share.

22          Were you trained -- what were you trained

23  about the reason that Phoenix doesn't hog-tie?

24      A.  The reason we don't hog-tie is positional

25  asphyxiation, of course.  And, I mean, if we hog-tie

1  people, we're going to have to completely carry them

2  when we can just have them walk or hop.  So having the

3  RIPP restraint allows us to allow that to happen.

4      Q.  So it's your testimony that when somebody has

5  the RIPP restraints applied and the RIPP restraint is

6  connected to the handcuff that they can walk?

7      A.  Yes.  I've had it done multiple times.

8      Q.  With the ankle crossed, the loop tightened

9  around their ankles --

10     A.  Either I have -- sorry, I didn't mean to

11 interrupt you.  Either I have them up or I loosen it up

12 enough to where it stays tight around the ankles and

13 they can make little baby step walks.

14     Q.  With it connected --

15     A.  With it connected.

16     Q.  Now, in this instance you were involved in

17 applying the RIPP restraint to Casey Wells, right?

18     A.  Correct.

19     Q.  Is it your testimony that, in the fashion you

20 applied the RIPP restraint, he could have walked or

21 hopped with it applied?

22     A.  He could have hopped, yes.

23     Q.  With his ankles crossed?

24     A.  You only need one foot to hop, sir.

25     Q.  Are you actually trained to have people with

TRAVIS FUNSTON  APRIL 15, 2021

1  their hands cuffed behind their backs, and RIPP

2  restraint around their ankles, you're actually trained

3  to have them hop?

4     A.  During field training, we have had to do that

5  on multiple times for somebody who is too aggressive

6  and violent to allow them out of a RIPP restraint.  So

7  to not risk them being able to run, you make them hop.

8     Q.  So if a person is in that position and they're

9  trying to hop and they fall face forward, they're going

10 to suffer a head injury, right?

11            MS. RETTS:  Form; foundation.

12            THE WITNESS:  We always have an officer on

13 either side of them hold their arms.  We do not let

14 them hop without an officer next to them.

15    Q.  BY MR. SHOWALTER:  But you didn't answer my

16 question again.  So if you have a person hopping and

17 they do fall, they are going to suffer a head injury,

18 correct?

19            MS. RETTS:  Form; foundation.

20            THE WITNESS:  In general, if a person is

21 hopping and they fall, they could suffer a head injury,

22 yes.

23    Q.  BY MR. SHOWALTER:  But, in general, if a person

24 is hopping, they won't have a RIPP restraint around

25 their ankles and they don't have their hands cuffed

TRAVIS FUNSTON  APRIL 15, 2021

1  behind their back, correct?

2          MS. RETTS:  Form.

3          THE WITNESS:  That would be correct.

4      Q.  BY MR. SHOWALTER:  Okay.  So you were trained

5  not to hog-tie individuals because of the dangers of

6  positional asphyxia, correct?

7          MS. RETTS:  Form.

8          THE WITNESS:  A portion of it, yes.

9      Q.  BY MR. SHOWALTER:  What was the other portion?

10     A.  For us to allow them to move, to prevent them

11 from having absolutely no movement possible.  And,

12 obviously, the most important part of the training was

13 to allow us to protect them as well as ourselves.

14     Q.  So what else -- what were you trained about the

15 dangers of positional asphyxia?

16         MS. RETTS:  Form.

17         THE WITNESS:  It's been a minute since

18 I've taken that class, but my understanding is that

19 positional asphyxiation, I mean, if you're in a certain

20 position for an extended period of time, then your body

21 can basically not be able not to get the proper intake

22 of oxygen.

23     Q.  BY MR. SHOWALTER:  What were you trained about

24 the period of time under which a person could

25 potentially suffer positional asphyxia?

1        MS. RETTS:  Form.

2        THE WITNESS:  I don't recall the exact

3  amount of time, but I know it was quite a bit of time.

4  I just don't recall the exact amount.

5    Q.  BY MR. SHOWALTER:  I mean, isn't the training

6  that once somebody is in RIPP restraint, they're

7  supposed to be put on their side?

8    A.  Yes.

9    Q.  Were you trained that if a person is handcuffed

10  and face down, it's against policy to apply any kind of

11  force to their back because of the dangers of

12  positional asphyxia?

13        MS. RETTS:  Form; foundation.

14        THE WITNESS:  Correct.

15    Q.  BY MR. SHOWALTER:  Were you trained that once

16  somebody is handcuffed and face down, that tasing them

17  could result in death?

18        MS. RETTS:  Form; foundation.

19        THE WITNESS:  I don't believe I was

20  trained in that specifically.  But depending on

21  someone's health, a TASER could affect them negatively

22  in any way.

23    Q.  BY MR. SHOWALTER:  I mean, that's one of the --

24  were you given the warnings -- as part of your training

25  at the City of Phoenix, were you provided with warnings

1  about the use of TASERs?

2            MS. RETTS:  Form; foundation.

3            THE WITNESS:  Yes, as part of the

4  training.

5      Q.  BY MR. SHOWALTER:  That using TASERs on

6  handcuffed suspects could result in death?

7            MS. RETTS:  Form; foundation.

8            THE WITNESS:  It could result in death, to

9  take the totality of circumstances in that situation.

10      Q.  BY MR. SHOWALTER:  But you understand that the

11  use of TASERs on a handcuffed suspect can result in

12  death, right?

13            MS. RETTS:  Form; foundation.

14            THE WITNESS:  It can, yes.

15      Q.  BY MR. SHOWALTER:  And you were also trained

16  that using TASERs on healthy or stressful subjects or

17  subjects who may be under the influence of drugs, can

18  cause additional stress that can cause death, correct?

19            MS. RETTS:  Form; foundation.

20            THE WITNESS:  It can, yes.

21      Q.  BY MR. SHOWALTER:  And that's training you

22  received in the academy, correct?

23            MS. RETTS:  Form.

24            THE WITNESS:  Correct.

25      Q.  BY MR. SHOWALTER:  I mean, once somebody is

1  handcuffed, there's no legitimate police interest in
2  tasing them, correct?
3            MS. RETTS:  Form; foundation.
4            THE WITNESS:  That is incorrect.
5       Q.  BY MR. SHOWALTER:  Why is it incorrect?
6       A.  Well, I have a personal experience as to why
7  that's incorrect.  I have an individual who was easily
8  two times, if not three times my size, who was
9  handcuffed and RIPP restrained to the back of my
10 vehicle.  And prior to that happening, he was able to
11 bend the Impala door in the backseat of a police
12 vehicle with just his feet while he was handcuffed to
13 the back.
14           When we were able to get him out and calm
15 down, because he was acting like he was having
16 convulsions or things like that, is when we decided to
17 place him in a RIPP restraining, loose enough that he
18 could sit with it and he had two handcuffs to the rear
19 because of his size.  When I was approaching I-17 and
20 Camelback, he began to convulse again and act like he
21 was going to throw up.  I pulled off to an I-17 and
22 Camelback QT and I asked for another unit due to this
23 person's aggressive behavior and we considered starting
24 fire.  I don't know if he's faking it yet or what's
25 going on with him.

TRAVIS FUNSTON APRIL 15, 2021

1    As soon as I open the door, he was able to
2  remove that RIPP restraint, get his handcuffs in front
3  of him and he was able to give me two black eyes,
4  bruise both sides of my arms.  I tried to go for my
5  TASER, he was able to fight me from that.  He tried to
6  choke me with his handcuffs and he also cut me with
7  this scar right here.  I don't know if you can see
8  that, but it's approximately six inches long from his
9  handcuffs.  And if I was able to get my TASER out, I
10  would have tased him.  And if I wasn't able to, I was
11  not going to win that fight if I did not ask for
12  another officer.
13    So, yes, someone who's in handcuffs, given
14  the circumstances, I would tase them myself, yes.
15    Q.  What was the name of that subject?
16    A.  I -- honestly, it was four years ago, I don't
17  recall.  I was only a transport with that subject, so I
18  never really knew his name to begin with.
19    Q.  So four years ago from today would be April
20  15th of 2017, which is before you were a police
21  officer, correct?
22    A.  So it wasn't four years ago, but it was within
23  my first year on duty when I was pretty new on the
24  93 Bravo squad.
25    Q.  And you don't remember the name of that subject

1  says:

2          "Can you just kind of take us through what

3      was going on this afternoon from the time you heard

4      the radio saying something about the -- about this

5      incident?"

6          Do you see where I read that?

7   A.  Yes, I do.

8   Q.  And so that was the question and then lines 7

9  through 22 are your answers to that, fair?

10  A.  Fair.

11  Q.  And so you're at Beuf Substation on 35th and

12  Pinnacle Peak eating lunch when you hear a call from

13  dispatch of a male in the street naked doing yoga,

14  fair?

15  A.  Fair.

16  Q.  And at lines 13 through 22, you say that you

17  listened to the call, correct?

18  A.  Correct.

19  Q.  And it says:

20          "We hear boss, Jamie, answer up for it."

21          Does that refer to Sergeant Rodarme and

22  Officer Arnold?

23  A.  Yes, it does.

24  Q.  So you're sitting at lunch, do you hear that

25  Sergeant Rodarme and Officer Arnold are responding to

1  that call?

2      A.  Yes.

3      Q.  It says at line 14:

4          "They come over here and we hear what

5      sounds like boss ask for more units.  He's out of

6      breath, I could tell.  He's stressed out.  And then

7      LT said, I believe, said that it sounds like he's

8      in physical two."

9          That may be a transcript error, the word

10 "two," correct?

11     A.  Correct.

12     Q.  So you hear Sergeant Rodarme ask for more

13 units, right?

14     A.  Yes.

15     Q.  And from what you could tell, it sounded like

16 he was out of breath and stressed out, right?

17     A.  Yes.

18     Q.  And then you think that the lieutenant said

19 that it also sounds like he's in the middle of a

20 physical fight; is that accurate?

21     A.  That's correct.

22     Q.  So in response to that, you and Frank, who is

23 Officer Long, stop eating, throw on your vests and jump

24 in the car, correct?

25     A.  Correct.

TRAVIS FUNSTON  APRIL 15, 2021

1    Q.  Now, Officer Long had his own vehicle but you

2    told him to just jump in yours, right?

3    A.  Correct.

4    Q.  And where you're going is right around the

5    corner, correct?

6    A.  Correct.

7    Q.  So you drive over towards Salter, you pass

8    Salter, you make a U-turn and come back, right?

9    A.  Correct.

10   Q.  And you come on to Salter off of 35th Avenue?

11   A.  Correct.

12   Q.  When you get there, you can see that there's a

13   male on the ground, who's naked and he's face down,

14   correct?

15   A.  Correct.

16   Q.  And your words in this interview were with

17   Officer Seaquist, Sergeant Rodarme, and Officer Arnold,

18   quote, "all on top of him," period, end quote, correct?

19           MS. RETTS:  Form.

20           THE WITNESS:  Correct.  But that was

21   clarified later on.

22   Q.  BY MR. SHOWALTER:  I just want to establish

23   your words were that when you arrived you see this guy

24   down, face down on the ground with Officer Seaquist,

25   Officer Arnold and Sergeant Rodarme, quote, "all on top

1  of him," correct?

2           MS. RETTS:  Form.

3           THE WITNESS:  So with that statement, I

4  would say that is a figure of speech as you were saying

5  as to hog-tie would be.  When I say "on top of him," I

6  don't literally mean on the top of him.  They were on

7  the sides of him.

8     Q.  BY MR. SHOWALTER:  But, at the time, in

9  response to the question of what you saw, you said, I

10 saw these three officers all on top of him, correct?

11          MS. RETTS:  Form.

12          THE WITNESS:  I said that, but the literal

13 sense of that is not what I meant.  I meant that they

14 were on the sides of him, which was clarified later on.

15    Q.  BY MR. SHOWALTER:  And you are approaching from

16 the east -- well, I'm sorry, strike that.

17          You're coming from the west, right?

18    A.  Correct.

19    Q.  And you can look at the transcript.  You can

20 look at the transcript as well.

21    A.  I was coming from the east, sir.

22    Q.  Okay.  you were coming from the east.  And then

23 at lines 30 through 34, you say:

24          "They're in the middle of the road and

25      they're trying to restrain him.  He's yelling,

1  screaming.  I can't make out what he's saying.

2  He's not really saying anything.  And they're all

3  saying, 'Stop resisting.'  He's flailing his arms,

4  kicking his legs.  Joe's on his legs and it looked

5  like boss was on his left and Jamie was on his

6  right."

7  Did I read that correctly?

8  A.  You did.

9  Q.  And those are your words, correct?

10  A.  Those are my words.

11  Q.  And that's your description at the time of what

12  you saw when you arrived at the scene, correct?

13  A.  Correct.

14  Q.  And turning to the next page, which is

15  WELLS002396, the interviewer asks you:

16  "He's face up at this time?"

17  And you answer:

18  "He's face down."

19  Correct?

20  A.  Correct.

21  Q.  Until Casey Wells was turned over so that CPR

22  could be performed, from the time you arrived, he was

23  always face down, correct?

24  A.  From the time I arrived, correct.

25  Q.  Now, I'm moving down to lines 12 through 33.

1  And you say that:

2         "He's face down when we arrived."

3         And then you say:

4         "We run over right away and I -- I help

5  out with the legs because I see Joe already has his

6  TASER out and I see that one cartridge has already

7  been deployed."

8         Did I read that correctly?

9  A.  You did.

10  Q.  And that's your statement, correct?

11  A.  Correct.

12  Q.  And that's true?

13  A.  That's true.

14  Q.  So you arrive, you can see the TASER prongs in

15  Casey's back and the wires?

16  A.  Yes.

17  Q.  And then it says -- and I want to go back to

18  something.  Going back up to page 3 of your transcript

19  WELLS002395, you say:

20         "He's yelling, screaming.  I can't make

21  out what he's saying.  He's not really saying

22  anything."

23         Did you ever hear, on February 4th of 2017

24  [sic], did you ever hear Casey say any words that you

25  could recognize as words?

1    A.  No.

2    Q.  One officer described Casey as making sounds

3  like a bear caught in a trap.  Would you agree that

4  that's what Casey -- would that characterization be

5  fair?

6         MS. RETTS:  Form.

7         THE WITNESS:  I would agree with that.

8    Q.  BY MR. SHOWALTER:  Okay.  So I'm sorry for

9  skipping around on you.  So back to WELLS002396.  At

10  line 14, the transcript says:

11         "So we're trying to tell him to stop

12      resisting.  I don't know if the cuffs were on yet

13      or not.  I'm assuming they weren't because I was

14      focused on the legs."

15         Did I read that correctly?

16    A.  You did.

17    Q.  And that's all your statement and it's all

18  true, correct?

19    A.  Correct.

20    Q.  And then it says at lines 16 through 18:

21         "Joe tells him -- we all tell him multiple

22      times to stop resisting.  And Joe tells him, 'Hey,

23      I'm going to tase you again, stop resisting.  I'm

24      going to tase you again, stop resisting.'"

25         Did I read that correctly?

1    A.  Yes.

2    Q.  And those are all your words and that's a true

3  and accurate account of what you saw and heard,

4  correct?

5    A.  Yes.

6    Q.  And when I say those are all your words, that

7  includes you quoting Officer Seaquist, correct?

8    A.  Correct.

9    Q.  And that's your recollection of what Officer

10  Seaquist said is, "Hey, I'm going to tase you again,

11  stop resisting.  I'm going to tase you again, stop

12  resisting," correct?

13    A.  Correct.

14    Q.  So you never heard Casey threaten anybody on

15  February 4th of 2017 [sic], correct?

16    A.  I did not, no.

17    Q.  And you saw that he was naked and you knew that

18  he was unarmed, correct?

19    A.  I did not know that as a fact.

20    Q.  Okay.

21    A.  Individuals have weapons on them that are

22  naked.  That's what I meant with that.

23    Q.  Okay.  Did you have any reason to believe that

24  Casey was armed at any time on February 4th of 2017

25  [sic]?

TRAVIS FUNSTON  APRIL 15, 2021

1   A.  I did not have any reason to, no.

2   Q.  And then you say at line 18:

3       "And he doesn't stop."

4       What was -- that's your words, correct?

5   A.  Correct.

6   Q.  What was the resistance he was -- you know,

7   what I keep saying 2017 instead of 2019, good heavens.

8   In a bunch of my questions I've misstated the date as

9   February 4th of 2017.  You would agree with me that the

10  events we're talking about all occurred on February 4th

11  of 2019?

12  A.  I agree with you.

13  Q.  And so for all the answers that you've given,

14  you would agree with me that it's correct to note that

15  those events took place on February 4th of 2019.  And

16  not February 4th of 2017, correct?

17  A.  Correct.

18  Q.  And my apologies to everybody involved for

19  doing that.

20      Now, at lines 18 through 19, you say:

21      "We light him up again."

22      What does that mean?

23  A.  It's police jargon.  But it basically means we

24  activate the TASER again.

25  Q.  And so would that have been the deployment of

1  the second cartridge?

2      A.  Correct.

3      Q.  So the second cartridge is deployed and then

4  you say at lines 19 through 20:

5              "At that time, I think that's when they

6          got the cuffs on, as far as I know."

7              Did that I read that correctly?

8      A.  Correct.

9      Q.  And is that true?

10     A.  Yes.  Yes.

11     Q.  So after the second TASER cartridge is fired,

12 the officers are able to get Casey handcuffed and

13 that's when you start working on the RIPP restraint,

14 correct?

15             MS. RETTS:  Form.

16             THE WITNESS:  As far as I can recall, yes.

17     Q.  BY MR. SHOWALTER:  And you saw the RIPP

18 restraint on Officer Seaquist's belt, correct?

19     A.  Correct.

20     Q.  Did you -- at this time, did you not carry a

21 RIPP restraint?

22     A.  I did, but it was in my patrol car.

23     Q.  Okay.  And so you see that Officer Seaquist has

24 one on his belt.  You've known him for a while, you

25 know where he keeps it, so you rip it off his belt,

1  handcuff chain, but you can't because he's "still

2  kicking and fighting with us," correct?

3     A.  I'm tracking you now.  Yes, that's correct.

4     Q.  So I just want to make sure I understand.  When

5  you say that Casey is kicking and fighting, at this

6  point, his ankles are crossed and the RIPP restraint is

7  around his ankle, correct?

8              MS. RETTS:  Form.

9              THE WITNESS:  It was not applied.

10  Throughout the time of me trying to apply the

11  tourniquet -- or I'm sorry, the tourniquet, I meant the

12  RIPP restraint, he was actively kicking.  And he kicked

13  me several times during that time.  And then once I was

14  able to get it wrapped around his ankles he was still

15  trying to kick out of it and kick us.  It made it

16  difficult.

17     Q.  BY MR. SHOWALTER:  And I understand.  I want to

18  just focus on what it says in these lines I've

19  highlighted.  You say:

20              "I apply it to his ankles.  And then I'm

21       trying to get it to the cuffs, but I can't because

22       he's still kicking and fighting with us."

23              Right?

24     A.  Correct.

25     Q.  At that point, Casey's ankles are crossed and

TRAVIS FUNSTON  APRIL 15, 2021

1  the noose or lasso of the RIPP restraint is around his

2  crossed ankles and you're working to connect the

3  D ring, correct?

4           MS. RETTS:  Form; foundation.

5           THE WITNESS:  Correct, to a point.  When

6  I'm saying he's fighting with us, it's because he keeps

7  trying to uncross his feet.  So it's been while trying

8  to kick.  So, yes, I am struggling to clasp it, but I'm

9  struggling to keep his feet properly crossed at the

10  same time.

11     Q.  BY MR. SHOWALTER:  What was Officer Seaquist

12  doing at that point?

13     A.  He was trying to assist me, as far as I can

14  recall.  But he was more focused on just kind of being

15  like control of the situation.  We always have one

16  person in something like that that tries to keep an eye

17  of everything that's going on.  And that, in my

18  opinion, is what appeared like he was doing.

19     Q.  But he was also tasing, correct?

20     A.  Correct.

21     Q.  And, generally, the duty of keeping an eye on

22  everything that's going on, would be a sergeant's duty,

23  correct?

24           MS. RETTS:  Form; foundation.

25           THE WITNESS:  I would say that's correct,

1  deployment, correct?

2                  MS. RETTS:  Form; foundation.

3                  THE WITNESS:  Like I said in my statement,

4  that's what it appeared to be by me.

5      Q.  BY MR. SHOWALTER:  That was your observation at

6  the time?

7      A.  What it appeared to be, yeah.  What I appeared

8  to observe and, like I said in my statement, I was more

9  focused on the legs.

10     Q.  So after he's handcuffed, you're working at the

11 RIPP restraints, you're not able to secure it, and then

12 at line 23, you say:

13                 "So Joe," which is Officer Seaquist,

14         "tells him he's going to tase him again, gives him

15         multiple warnings, doesn't stop resisting, still

16         yelling and screaming, tases him a third time, to

17         my knowledge.  And then, at that time, I was able

18         to finally get it clipped on.  And then from there,

19         like almost seconds afterwards, he stops screaming

20         and yelling and kind of went just like of limp."

21                 Did I read that correctly?

22     A.  You read that correctly.

23     Q.  And there's a lot in there to unpack.

24                 So you're not -- you're working to get the

25 RIPP restraint connected to the handcuffs.  Casey, you

1  perceive, is resisting, correct?

2      A.  Correct.

3      Q.  Officer Seaquist you say tells Casey he's going

4  to tase him again, gives him multiple warnings.  And

5  when it says at line 24, "doesn't stop resisting,"

6  that's -- you're referring to Casey there?

7      A.  Yes, I'm referring to Casey.

8      Q.  Okay.  And when you say "still yelling and

9  screaming," that also refers to Casey?

10      A.  Yes, it does.

11      Q.  Then it says "Tases him a third time, to my

12  knowledge," that refers to Officer Seaquist, correct?

13      A.  Correct.

14      Q.  And then after the third time that Casey is

15  tased you were able to get the RIPP restraint clipped,

16  correct?

17      A.  Correct.

18      Q.  So once you got that RIPP restraint clipped and

19  Casey is face down, would there be any reason to tase

20  Casey?

21          MS. RETTS:  Form; foundation.

22          THE WITNESS:  Once he -- no, there's no

23  reason.

24      Q.  BY MR. SHOWALTER:  So if you've got Casey down,

25  he's screaming, he sounds like a bear in a trap, he's

1          MS. RETTS:  Form; foundation.

2          THE WITNESS:  Given the totality of

3    circumstances, yes.

4    Q.  BY MR. SHOWALTER:  Okay.  And so at some point

5    after the RIPP restraint is clipped in, you say:

6          "Almost seconds afterwards, Casey stopped

7       screaming and yelling and kind of went just, like,

8       limp."

9          Is that was that what you claim happened?

10         MS. RETTS:  Form.

11         THE WITNESS:  I'm sorry, can you ask it

12   one more time.

13   Q.  BY MR. SHOWALTER:  At lines 25 through 27 --

14   A.  Yes.

15   Q.  -- it says:

16         "And then at that time, I was able to

17      finally get it clipped on.  And then from there,

18      like almost seconds afterwards, he stopped

19      screaming and yelling and kind of went just, like,

20      limp."

21         Did I read that correctly?

22   A.  After I applied the clip, correct.

23   Q.  And at lines 27 through 28 it says:

24         "Joe immediately checked for his carotid

25      artery and noticed that he had no pulse.  So at

1    that time we flipped him over, started giving him

2    CPR.  Joe's already out of breath, so I told him to

3    back off, let me take it."

4            Did I read that accurately?

5    A.  You did.

6    Q.  And is that what you remember happening?

7    A.  That is.

8    Q.  And then after that, you start performing CPR,

9    correct?

10   A.  Correct.

11   Q.  And you were doing compressions until fire

12   arrived.  And then you flip him over to get the RIPP

13   restraint off and cuffs off so fire could take him,

14   correct?

15   A.  Correct.

16   Q.  And so when you guys are doing the chest

17   compressions, Casey is still cuffed, correct?

18   A.  Correct.

19   Q.  And it is your testimony that that didn't

20   affect the compressions, right, at lines -- on the next

21   page WELLS002397, lines 8 through 12, your testimony is

22   that the fact that he was cuffed and RIPP restrained

23   did not affect the chest compressions, correct?

24   A.  Correct.

25   Q.  I'm going to -- I'm going to take you down to

1   page 5, lines 23 through 26.  You're asked at line 21:

2           "Frank Long.  What was -- what was Frank

3      doing while you were doing this?"

4           And you say at lines 23 through 26:

5           "I'm assuming he was helping get the cuffs

6      on.  He was on the upper half of the subject.  I

7      was on the lower half with Joe.  I was on the lower

8      half with Joe.  And I was kind of just focused on

9      the legs, as he was kicking us the whole entire

10     time.  So I wasn't really focused on that.  So I --

11     I don't know.  I know he was on the top half.

12     That's all I know."

13          Did I read that accurately?

14  A.  You did.

15  Q.  And that was your statement to -- that was your

16  statement on February 4th of 2019, correct?

17          MS. RETTS:  Form.

18          THE WITNESS:  Correct.

19  Q.  BY MR. SHOWALTER:  And then at page 5, there's

20  this interviewer asks you a bunch of questions.  He's

21  almost as bad at asking questions as I am.  But your

22  answer is, at line -- I'm sorry, at WELLS 2398, at

23  line 1, it says:

24          "When I first got there, there were

25     already probes deployed."

1        THE WITNESS:  I don't recall.

2        Q.  BY MR. SHOWALTER:  I think that's what you

3   testified earlier.

4        A.  But, yeah, if it was in my testimony then, yes.

5   Like I said, I just can't recall without looking at it.

6        Q.  The sequence that you've given is that you

7   arrive on scene, you did not witness the deployment of

8   the first cartridge, correct?

9        A.  Correct.

10       Q.  You arrive on scene, you hear the second

11  cartridge pop, be deployed and then that's when you

12  talk about at line 12 through 16 over here, that's when

13  you started being able to control his legs getting

14  close enough to where I could get a RIPP restraint on,

15  right?

16       A.  Correct.

17       Q.  And then you're working to, once you get the

18  RIPP restraint on, you're working to link it to the

19  handcuffs, but you can't do it or you're having trouble

20  doing it and that's when you hear -- that's when you

21  already testified about the third TASER deployment,

22  correct?

23       A.  Activation, correct.

24       Q.  Activation, okay.

25       Q.  And so that third one is an activation,

1  correct?

2      A.   Correct.  Because they're already deployed.

3      Q.   Now, other than those two -- or other than the

4  second deployment and the third activation, did you

5  witness any other TASER activations or deployments on

6  February 4th of 2019?

7      A.   Not that I can recall.

8      Q.   Now, going to the bottom of page 6, which is

9  WELLS002398, there is a question that sounds like from

10 Bob Kavanagh and he says:

11          "You said when you first showed up three

12     guys were on top of him.  Were they on top of him

13     or to the sides, where were they?"

14          And you answer at line 31:

15          "They were on the sides.  Yeah, nobody was

16     actually on top of him."

17          Did I read that correctly?

18     A.   You did.

19     Q.   And so the follow up question is:

20          "So when you say on top, they just -- you

21     just mean controlling him from the top?"

22          And you say:

23          "Yeah.  I mean, like controlling him,

24     yeah, from the top.  So, like, boss was on his left

25     side, on his -- like, controlling his arms.  Jamie

1  was on his right side controlling his arms and Joe

2  was on the back side and he had one leg on one of

3  his legs.  He couldn't get the other one when --

4  because he was holding his TASER.  So that's when I

5  jumped on the legs."

6          So at that point, it sounds like -- did I

7  read that accurately?

8      A.  You read that accurately, yes.

9      Q.  And when you say "boss," we're talking about

10 Sergeant Rodarme, correct?

11     A.  Correct.

12     Q.  It sounds like when you say that "Joe," who was

13 Officer Seaquist, "was on the back side and he had one

14 leg on one of his legs," you mean that Officer Seaquist

15 was using his legs and his body weight to control

16 Casey's legs; is that correct?

17              MS. RETTS:  Form.

18              THE WITNESS:  He had one leg on one of his

19 legs, so, yes, he was using one of his legs.  But I

20 don't know how much weight he had on that leg.  You

21 would have to ask him.

22     Q.  BY MR. SHOWALTER:  But you were able to see

23 that that was, in fact, happening, correct?

24     A.  Yes.  But, like I said, I don't know if he had

25 his whole body weight on his leg at the time.  I think

TRAVIS FUNSTON  APRIL 15, 2021

1  it was just more or enough to keep it from moving from

2  what --

3      Q.  Did you ever see Officer Seaquist get kicked

4  off of Casey?

5      A.  Not that I can recall.

6      Q.  And so you say, "So that's when I jumped on the

7  legs."

8              Were you ever physically placing your

9  weight on Casey's legs?

10             MS. RETTS:  Form.

11             THE WITNESS:  Never -- not with my full

12 body weight, no, just my hands.

13     Q.  BY MR. SHOWALTER:  Did you ever put your knees

14 or your legs or your thighs on Casey's body?

15     A.  Not that I can recall, no.

16     Q.  And at line 8, the questioner says:

17             "And these are -- are three relatively big

18 guys. . ."

19             And you say:

20             "Yeah."

21             Correct?

22             Did I read that correctly?

23     A.  Correct, you did.

24     Q.  And at lines 18 through 19 you say:

25             "They -- they're not small individuals.

TRAVIS FUNSTON  APRIL 15, 2021

1    and Joe Seaquist were already on the ground with

2    the guy restraining him," period.

3         Did I read that correctly?

4    A.  You did.

5    Q.  And that's true, correct?

6    A.  Correct.

7    Q.  And at this point, as you've already testified,

8    Casey's face down, correct?

9    A.  Correct.

10   Q.  And you say:

11        "Joe was on his legs and had a TASER out,

12   off to the side, holding on to one leg."

13        Did I read that correctly?

14   A.  You did.

15   Q.  And is that true?

16   A.  It's true.

17   Q.  And then it says:

18        "Sergeant Rodarme appeared to be on the

19   left side of him and the guy was face down -- the

20   subject.  And he was holding his left arm and then

21   looked like Officer Arnold was on his right side

22   holding down his right arm."

23        Is that correct?

24   A.  Correct.

25   Q.  And your testimony is that Officer Arnold never

1  placed a knee on Casey?

2      A.  Not that I could see, no.

3      Q.  And your testimony is that you never saw

4  Sergeant Rodarme place a knee on Casey, correct?

5      A.  Correct, not that I could see.

6      Q.  I think you -- let's see, at the line 33

7  through 34, you say:

8          "I -- me and Frank jumped out.  I took the

9      legs and Frank went to the upper half.  I helped

10     Joe restrain the legs and I could see that Joe had

11     his TASER out.  We already had one probe deployed.

12     I was trying to control his legs but he was

13     fighting off both me and Joe at the same time so he

14     was pretty strong.  And Sergeant Rodarme and Jamie

15     are not small guys either.  He was able to take

16     them by themself also, so I was trying to retain

17     the legs."

18          Did I read that all correctly?

19     A.  Yes, you did.

20     Q.  You say:

21          "I didn't realize that he wasn't in cuffs

22     at the time later on that Sergeant Rodarme, Jamie

23     and Frank had to get him into cuffs.  I don't know

24     how they did that but -- I know Joe gave him

25     multiple commands to stop resisting -- he was gonna

1  activation, which is not a deployment, but is an

2  activation is to effect the RIPP restraint, correct?

3            MS. RETTS:  Form.

4            THE WITNESS:  I would say that is correct.

5  Q.  BY MR. SHOWALTER:  At page 9 of the PSB

6  interview, Exhibit 195 at WELLS002409, you were asked

7  at line 7 through 9:

8            "Okay.  And then you said when you

9       arrived, Sergeant Rodarme, Officer Arnold, and

10      Officer Seaquist were all restraining the subject.

11      Kind of describe how they were restraining him and

12      tell me where and how the suspect was."

13            And lines 11 through 19 are your answer,

14  correct?

15  A.  Correct.

16  Q.  And in response to that question, you say:

17            "Okay.  So when I got there, they were all

18      giving commands.  They were all yelling."

19            Did I read that accurately?

20  A.  You did.

21  Q.  Did you ever see any sign that Casey could

22  understand the commands that you guys were yelling at

23  him?

24            MS. RETT:  Foundation.

25            THE WITNESS:  If he could, I couldn't tell

1    A.  Yes, it's Officer Arnold.

2    Q.  When you arrived on the scene, about two

3  minutes before this, is this what officer Rodarme and

4  Arnold were doing?

5            MS. RETTS:  Form.

6            THE WITNESS:  I don't know exactly what

7  they were doing when I arrived.  I just knew that

8  that's their location.

9    Q.  BY MR. SHOWALTER:  They were in that same

10  location?

11            MS. RETTS:  Form.

12            THE WITNESS:  Yeah.  When I say location,

13  I mean they were in that area.  I don't know what they

14  were doing in that area, other than trying to restrain

15  him.

16    Q.  BY MR. SHOWALTER:  Did you ever see, at any

17  point, Officer Arnold change his position while you

18  were there?

19            MS. RETTS:  Form.

20            THE WITNESS:  No.  I was focused on the

21  legs.

22    Q.  BY MR. SHOWALTER:  And with respect to Sergeant

23  Rodarme, at some point you did see him get up, correct?

24    A.  I did see that, yes.

25    Q.  Are you able to tell what Officer Arnold is

1        MS. RETTS:  Yes, I have a few questions.

2

3                    EXAMINATION

4   BY MS. RETTS:

5        Q.  When you arrived on scene, did you learn

6   anything from Sergeant Rodarme about what had happened

7   before you showed up?

8        A.  Yes.  He said that he was spit on, specifically

9   in the eye and that he was also struck.

10       Q.  Now, if the sergeant had been spit on, is that

11  an aggravated assault?

12       A.  Yes.

13       Q.  Being struck, a police officer being struck, is

14  that an aggravated assault?

15       A.  Yes, it is.

16       Q.  Now, regardless of whether someone is mentally

17  ill or whether they are under the influence of drugs,

18  or both, is what you're doing when you're on a scene

19  responding to the behavior that they present?

20       A.  Yes, I'm responding to the behavior.

21       Q.  Did you have any concern about school kids

22  coming home when Mr. Wells was in the street naked?

23       A.  Yes, I did.

24       Q.  What concern did you have?

25       A.  Being the time of day, obviously, kids would be

1  coming home from school soon.  It's just common

2  knowledge.  And we had a call from another citizen that

3  stated that they were concerned about kids coming home

4  as well.  And I didn't want to have to have young

5  children come home and see a naked man in the middle of

6  the street acting erratically.  So when I was on scene,

7  I especially wanted to get that handled as quickly and

8  sufficiently as possible for the safety of him, myself

9  and for the kids if they have to come by.

10       Q.  When you were on scene, you only recall hearing

11  two TASER -- strike that.

12            When you were on scene, you heard a TASER

13  deployment and a TASER activation, correct?

14       A.  Correct, that's what recall.

15       Q.  So two total, correct?

16       A.  Correct.

17       Q.  And when you heard the last TASER activation,

18  did you ever hear a TASER activation after the clip of

19  the RIPP restraint was secured to the handcuffs?

20       A.  No, I did not.

21       Q.  The area that you responded to where Mr. Wells

22  was located, is that area known as Jade Park?

23       A.  Yes, it is.

24       Q.  Is the area known for many drugs?

25       A.  Yes.

1    Q.  I want to take you back to the statement you

2  gave on February 4th, Exhibit 194.

3              If you'll turn to page 4 of that

4  transcript.  This is WELLS 002396.

5    A.  (Witness complies.)

6    Q.  And starting at the end of line 29, you say:

7              "Joe's already out of breath, so I told

8         him to back off, let me take it.  So I jumped on

9         him and I started giving him CPR, just doing

10        compressions," and then go on for a little bit; is

11  that correct?

12    A.  That is correct.

13    Q.  So in that section you say, "I jumped on him,"

14  do you see that?

15    A.  I do see that.

16    Q.  Did you literally mean that you jumped on top

17  of Mr. Wells?

18    A.  No, I do not.

19    Q.  And then you saw the video of yourself doing

20  CPR.  Do you recall being asked questions about that

21  video?

22    A.  I do.

23    Q.  And did you see yourself in that video with

24  your left knee on the ground and your right leg out to

25  the side?

# EXHIBIT 14

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

FRANK LONG

Phoenix, Arizona
April 20, 2021
8:57 a.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
P (602) 230-5454
F (480) 546-3721
www.dlvreporting.com

PREPARED BY:

Donna DeLaVina, RPR
Certified Reporter
Certificate No. 50468

FRANK LONG  APRIL 20, 2021

1  like the job, so. . .

2      Q.  BY MR. SHOWALTER:  People weren't the best?

3          MS. RETTS:  Form.

4          THE WITNESS:  No.  I mean, they were good

5  people.  I mean, both sides, I guess.

6      Q.  BY MR. SHOWALTER:  And so did you ever -- do

7  you have any kind of like certifications of any kind

8  outside of being a police officer?

9      A.  In what way?

10     Q.  You know, I'm thinking of things like EMT

11  certifications, you know, pilot licenses, truck driver,

12  you know, CGLs, anything like that?

13     A.  No.

14     Q.  Now, at the academy, at the Phoenix Police

15  Academy, you were trained about prone restraint,

16  correct?

17         MS. RETTS:  Form.

18         THE WITNESS:  What do you mean "prone

19  restraint"?

20     Q.  BY MR. SHOWALTER:  You were trained about how

21  to safely restrain prisoners in general, first of all,

22  correct?

23     A.  Yes.

24     Q.  And one of the things that you were trained at

25  the academy was in the dangers and concerns around

1  positional asphyxia, correct?

2            MS. RETTS:  Form.

3            THE WITNESS:  I mean, you're given a class

4  about it, sure.

5      Q.  BY MR. SHOWALTER:  And one of the things that

6  you were trained at the academy with regard to prone

7  restraint, is that when a prisoner is handcuffed, face

8  down and with their legs up, or with weight on their

9  back, that that can create a danger of positional

10 asphyxia, correct?

11           MS. RETTS:  Form; foundation.

12           THE WITNESS:  I think it kind of depended,

13 if that was my understanding.

14     Q.  BY MR. SHOWALTER:  What did it depend on, to

15 your understanding?

16     A.  Like you had to take some considerations

17 into -- or some things into consideration.  I mean,

18 obviously, if they were an older person or maybe

19 overweight there could always be an issue.  But for the

20 most part, I mean, it was something that, you know, be

21 aware of, be mindful of.

22     Q.  And, certainly, if somebody is not handcuffed

23 and is resisting officers and the safest way for

24 officers to prevent that person from harming officers

25 is to stay on top of them, holding them down while

1  they're trying to get them handcuffed, then that would

2  be a situation where it makes sense to keep them prone

3  and face down, fair?

4          MS. RETTS:  Form; foundation.

5          THE WITNESS:  Say that again.  I'm sorry.

6      Q.  BY MR. SHOWALTER:  If officers are dealing with

7  a subject who's -- that they're attempting to arrest

8  and he's fighting with the officers and resisting and

9  he's not handcuffed and they're able to get him face

10  down, there's -- it's reasonable to keep him face down

11  until the officers can get him handcuffed, fair?

12          MS. RETTS:  Form; foundation.

13          THE WITNESS:  I guess it -- I mean, it can

14  be, if that's what's working.  If that makes sense.

15      Q.  BY MR. SHOWALTER:  I think that makes sense.

16          I mean, you were trained that your

17  actions, in terms of using force and restraint needed

18  to be reasonable under the totality of the

19  circumstances; is that fair?

20      A.  I'm sorry, say it again.

21      Q.  At the academy and throughout your experience

22  at the City of Phoenix, you've been trained that your

23  uses of force, including restraints need to be

24  reasonable under the totality of the circumstances?

25      A.  Yeah.  I guess that would be pretty fair, yeah.

1    A.  Is this with -- well, this is not the PSB?

2    Q.  Correct.

3    A.  Okay.  Then, yes.  Yeah.  So it was not -- so,

4  yes, it was at the scene.

5    Q.  And so the PSB interview would have been at

6  police headquarters at the PSB offices in an interview

7  room, fair?

8    A.  Yes.  Yes.

9    Q.  And there's a list of all the other people who

10  were present.  Did you know Detective Teusink before

11  this interview?

12    A.  No.

13    Q.  Is he somebody you've known since this

14  interview?

15    A.  No.

16    Q.  The same with all the other --

17    A.  I mean, I can see his face, but I don't know

18  that last name.  And then as far as the rest of the

19  them go, no.

20    Q.  Okay.

21    A.  I'm more of a face guy, you know.

22    Q.  Sure.  Okay.

23        Now we get to page 3 and it says:

24        "We've been doing a walk-through of this

25    incident from your perspective.  Tell me -- just

FRANK LONG   APRIL 20, 2021

```
 1      start from beginning when you heard the call --"
 2              At the time point when they're recording
 3  it, had you already kind of walked it through with
 4  them?
 5      A.  I don't believe so, no.  So I was at the
 6  hospital before I came here.
 7      Q.  So did you accompany Casey to the hospital?
 8      A.  I did.
 9      Q.  Did anybody go with you on that?
10      A.  Well, it was just me in the ambulance and the
11  firefighters.  As far as other officers go, no.  I
12  believe somebody eventually came over to relieve me so
13  I could go and do this interview.
14      Q.  Did you drive your vehicle or did ride in
15  either an ambulance or a fire truck?
16      A.  No, I think I rode in the ambulance from the
17  scene to the hospital.
18      Q.  During course of that, did you ever hear Casey
19  say anything?
20      A.  In the ambulance?
21      Q.  Yeah.
22      A.  No.
23      Q.  When you were there, did he appear to be
24  unconscious and incapacitated the entire time?
25      A.  Yeah.
```

1    Sergeant Rodarme and Officer Arnold."

2              Correct?

3    A.  I mean, I see "Officer," a question mark and

4    then it's, "It's Arnold."

5    Q.  Yeah.  Yeah.

6    A.  Okay.

7    Q.  I was kind of doing two different things.  I

8    think I was kind of summarizing it and -- but, yeah.

9    So you guys pull up to the east of where Casey is?

10   A.  Yes.

11   Q.  You get out and you see Casey, Sergeant

12   Rodarme, Sergeant Arnold and Officer -- I'm sorry,

13   Officer Arnold and Officer Seaquist, correct?

14   A.  Yes.

15   Q.  And then at line 25 the questioner says:

16             "Okay.  And on the ground there's a naked

17        male?"

18             And you say:

19             "There's a man, yeah, definitely fighting.

20        I can hear the yelling.  I see some blood on

21        Sergeant Rodarme.  And as I start to approach, he

22        says that he got spit on by the guy, that he spit

23        blood in his mouth and I notice that. . ."

24             Did I read all that accurately?

25   A.  Yeah.

1    Q.  And is that all true?

2    A.  That's what I saw, yeah.

3    Q.  So as you're walking up, Sergeant Rodarme is

4  telling you that this guy spit blood in his mouth?

5    A.  Yes.  He kind of, in a funny manner, because it

6  sounded like he was holding something in his mouth, you

7  know, if you had liquid in your mouth and you're trying

8  to, I don't know, maybe brushing your teeth and your

9  wife asks you a question and you're answering, maybe

10  kind of that.

11    Q.  And you didn't see the blood spitting incident,

12  fair?

13    A.  Yeah, I did not.

14    Q.  Did Sergeant Rodarme or anybody else there tell

15  you how Casey came to have blood in his mouth?

16    A.  I didn't know Casey had blood in his mouth.  I

17  knew Sergeant Rodarme had blood in his mouth.  I don't

18  know how the blood ended up in Sergeant Rodarme's

19  mouth.  I just know that he said, "He spit blood in my

20  mouth."

21    Q.  Okay.  So you kind of illustrated that by

22  talking about like brushing teeth and I'm thinking of

23  like getting my own kids to brush their teeth and to

24  spit out the toothpaste.  And I'm trying to understand

25  what the reference point you were making was?

1      A.  In what context?  Oh, why I was explaining it

2  in the way I was?

3      Q.  Yeah?

4      A.  Oh, because when we were approaching.  And so I

5  see he's pretty tired, you know, he's -- clearly

6  something was going on.  And he says to me -- he looks

7  at me and he says, "He spit blood in my mouth."  But

8  the way he was saying it, it was just like he had

9  something in his mouth.  So that led me to believe

10  like, oh, yeah, he must have spit blood in this guy's

11  mouth.

12      Q.  Okay.

13      A.  Gross.

14      Q.  Also it sounds like it's like how could that

15  happen, was that part of it?  Like it's like how

16  does -- what's the lead up to that?  Was that part of

17  why it sounded so strange?

18      A.  Yeah.  It's like how do you get blood in your

19  mouth?  Yeah.

20      Q.  And so -- okay.

21          Then the questioner says:

22          "And did it sound like he just had that --

23      that it just happened?"

24          And you said:

25          "Yeah."

1  you said, "I notice that there's a officer on top of

2  the subject on the ground," that that does not mean

3  there was an officer on top of the subject on the

4  ground?

5          MS. RETTS:  Form.

6          THE WITNESS:  That kind of sounds like the

7  same thing.  I guess what I'm saying is what I think

8  you're trying to say is that somebody was physically on

9  top of him, I don't know, maybe standing or lying or

10  however it is, that that's not what I meant by -- in

11  that context.

12      Q.  BY MR. SHOWALTER:  Is it your testimony that

13  nobody at the scene ever put -- was ever in your --

14  while you were there, that nobody at the scene was ever

15  physically on top of Casey?

16      A.  Well, when you say on top, like are we talking

17  under this manner like, I don't know, laying on him?

18  Like what are we looking at here?

19      Q.  While you were there, did you ever see anybody

20  laying on him?

21      A.  No.

22      Q.  While you were there, did you ever see anybody

23  place their knee on Casey?

24      A.  No.  Where?

25      Q.  Anywhere on his body?

1    A.  No.

2    Q.  So if you had seen Officer Arnold place his

3  knee on Casey, what would you have done?

4              MS. RETTS:  Form; foundation.

5              THE WITNESS:  Well, I don't know.  I mean,

6  at the time when I'm initially getting there, if that's

7  what we're going off of right now.  So I initially show

8  up.  Sergeant Rodarme, you know, there's three

9  officers.  They're not small in stature, when you

10  compare them to me, right?

11   Q.  BY MR. SHOWALTER:  Yeah.

12   A.  They're clearly having a -- they're having a

13  struggle.  And one of them has to let go because he's

14  got spit in his mouth.  And so now that leaves --

15  whatever was going on, whatever Sergeant Rodarme was

16  doing, holding an arm, trying to help control this guy,

17  clearly, somebody has got to jump in there and try and,

18  excuse me, control that arm now.

19              And, you know, I'm sorry, I can't even

20  remember where I was going.  What was your question

21  again?  I apologize.

22   Q.  BY MR. SHOWALTER:  So if you ever seen Sergeant

23  Arnold -- or I'm sorry, Officer Arnold place a knee on

24  Casey Wells' back, shoulder or neck, what would you

25  have done in response to that?

1   I have to go to the bathroom.

2            THE WITNESS:  I appreciate it.

3            MR. SHOWALTER:  Let's do a ten-minute

4   break and come back on at 10:40.

5            MS. RETTS:  Okay.

6            THE COURT REPORTER:  The time is

7   10:30 a.m.  We are now off the record.

8        (Whereupon, a brief recess ensued from

9   10:30 a.m. to 10:41 a.m.)

10            THE COURT REPORTER:  The time is

11   10:41 a.m.  We are back on the record.

12     Q.  BY MR. SHOWALTER:  Okay.  I'm going to go back

13   to the interview and I want to take you through the

14   bottom of page 5.

15            You say -- at line 26 you say:

16            "So he's laying on his stomach, and then

17      Officer Seaquist is kind of behind, like on his

18      left side but more kind of by the left part of his

19      waist behind him.  It looks like he has his TASER

20      out."

21            Do you see where I read that?

22     A.  Yes, I do.

23     Q.  And is that true?

24     A.  Yeah.

25     Q.  And then at line 32 through 34, it says:

1          "And I help Sergeant Rodarme secure the

2     right hand, because I can tell he's kind of tired,

3     and I tell him, you know, 'Just get out of the

4     way.'  Officer Arnold was able to bring his right

5     hand behind the subject's back, and I take his left

6     hand and bring it around to his back, and we start

7     putting handcuffs on him."

8          Do you see where I read that?

9     A.  I do.

10    Q.  I want to make sure -- at line 32, you say,

11 "And I help Sergeant Rodarme secure the right hand"?

12    A.  Uh-huh.

13    Q.  Should that be left hand?

14    A.  Yeah.  That's what I'm thinking, because I was

15 on his left side.  Yeah, that doesn't make sense to me

16 either.

17    Q.  Okay.  So you help Sergeant Rodarme secure the

18 left hand.  Officer Arnold was able to bring Casey's

19 right hand behind the subject's back and you take his

20 left hand and bring it around to his back and you and

21 Officer Arnold start putting handcuffs on him; is that

22 fair?

23    A.  Yeah.  It sounds about right.

24    Q.  But you say on page 6, lines 1 through 2:

25          "He's -- the suspect is still like pulling

1    away from us."

2            So he's still trying to pull back when you

3    guys are trying to get him handcuffed, correct?

4    A.  Yeah.  He was, yeah, pulling, tensing up, it

5    was pretty difficult to do.

6    Q.  And it says:

7            "Sergeant Rodarme comes back in, helps me

8        with the right arm, and we're eventually able to

9        get handcuffs on him.  He's still screaming,

10       yelling, not saying much."

11           And there you use the words "screaming"

12   and "yelling," correct?

13   A.  Uh-huh.  Yeah.

14   Q.  "At that time I see, or I hear a TASER pop.

15       The TASER pop goes off.  That would be from Officer

16       Seaquist.  He's telling the suspect to stop

17       resisting.  And after this, it was about five

18       seconds rolls by, the subject is still kind of

19       resisting.  Handcuffs are on, and now we're trying

20       to put a RIPP restraint on him.  And that would be

21       Officer Funston on his legs.  And starts off with

22       his right leg and the suspect ends up kicking out

23       his right leg towards Officer Funston, where he's

24       able to get part of the RIPP restraint around him,

25       eventually getting both around his ankles."

FRANK LONG  APRIL 20, 2021

1        At this point, Casey's been handcuffed.
2    You hear the TASER cartridge pop and you guys are
3    working -- or not you guys, but Officer Funston and
4    potentially other officers are working to secure Casey
5    in RIPP restraints, correct?
6            MS. RETTS:  Form; foundation.
7            THE WITNESS:  I mean that's what I'm
8    assuming, right.  I mean, that's what I said.  I
9    couldn't tell you exactly what Officer Funston and the
10   other officers, if there were, helping him.
11       Q.  BY MR. SHOWALTER:  Now, are you kneeling down
12   on the ground or are you -- what is your position at
13   this point?
14       A.  I mean, I'm still on his left side.  Like, I'm
15   on the ground.  Like I'm still trying to hold him down
16   because he's still trying to -- like his chest and he's
17   trying like arch his back, like trying to arch his back
18   and get up.
19       Q.  So you're working to control his arms after
20   he's been handcuffed and hold his arms down?
21       A.  To try and -- yeah, to prevent him from
22   rolling, anything like that.  Because I know Officer
23   Funston was having some problems with the RIPP
24   restraint.  So, yeah, just trying to maintain
25   everything, keep everything as calm as we possibly can.

FRANK LONG  APRIL 20, 2021

1    Q    And then what direction are you facing?

2    A.   So -- okay, so if I'm on his left side, I would

3    generally be facing in the east direction, yeah.

4    Q.   And so you're on Casey's left side.  Are you

5    kneeling on the ground at that point?

6    A.   Yeah.

7    Q.   And is Officer Arnold directly across from you?

8    A.   That's what I recall, yeah.

9    Q.   And you could see Officer Arnold?  You

10   recognize him, correct?

11            MS. RETTS:  Form.

12            THE WITNESS:  Like I saw Officer Arnold,

13   but, you know, I mean, you're in the mix of it all and

14   you're not really focused on where he is and what he's

15   really doing.  I can just say that, yes, he is on his

16   right -- or on the right side in front of me.  I didn't

17   mean to say that.

18   Q.   BY MR. SHOWALTER:  And he was -- my

19   understanding is this was his first day on this squad,

20   but he was somebody you knew already, correct?

21   A.   Yeah.  So he was on the second shift squad.  So

22   when I would be coming in to end my day, he would be

23   coming out to begin his, so, yes.

24            And, yes, it was his first day, yeah.

25   Q.   So at line 13 -- well, yeah, at line 13 the

1    Q.  Was that video taken from your perspective?

2    A.  From my perspective, no.

3    Q.  In that video, when you watched through, could

4  you even see Mr. Wells and what he was doing on the

5  ground?

6    A.  Not really.  I mean, there's clearly something

7  there.  I mean, I think it's safe for us to all say

8  it's Mr. Wells.  But could I clearly see him, no.

9    Q.  I want to ask you generally about restraining

10 folks who are naked.

11   A.  Okay.

12   Q.  Is it more difficult to get them into

13 restraints than someone who is clothed?

14   A.  Absolutely.

15   Q.  Why?

16   A.  Well, for one, you don't want to touch them.

17 It's just the name of the game.  Like you know you have

18 to, but there's no clothing to grab on.  Just being,

19 the sense being naked out in the public, which is kind

20 of naked in general and my experience already means

21 that there's just a heightened level of -- like

22 something is just not there, right.

23          You already know that -- you hope that

24 you're not going to get in a fight with them, but the

25 odds are pretty high.  I don't know why it is, but

1   every person that I've come into contact with that has

2   been naked, that is what it has boiled down to.

3        Q.  I'll have you go back to your transcript that

4   I'm going to walk through.

5        A.  Okay.

6        Q.  And let's see here.  This is Exhibit 196.

7             So I want you to go to page 8.

8        A.  (Witness complies.)

9             Okay.

10       Q.  And you were asked a question about your

11  response from line 20 to 23.

12            The question was:

13            "Okay.  And from the time you were here,

14       he remained face down, and he wasn't able to get

15       back up or turn around or twist anything like

16       that?"

17            And your answer was:

18            "No."

19            Do you see that?

20       A.  I do.

21       Q.  And you go on in that to further state, on

22  line 31:

23            "I mean he was trying, but it wasn't

24       really working."

25            Do you see that?

1    A.   Uh-huh.

2    Q.   Was that a yes?

3    A.   Oh, yes.  Sorry, sorry, yes.

4    Q.   So Mr. Wells, while he was face down on the

5  ground, was trying to move around and struggled.  He

6  just wasn't able --

7    A.   Right --

8    Q.   -- to get back up?

9    A.   -- he just wasn't able to, yeah.  So he was --

10  you know, he was fighting, he was tensing up, arching

11  his back, kicking.

12    Q.   And then on line 33 is:

13         "Actively trying to get away or --"

14         And your answer is:

15         "Oh, yes.  Oh, yes."

16    A.   9-1?

17    Q.   Yes.

18    A.   Okay, yes.

19    Q.   Is that correct?

20    A.   Yes.

21    Q.   I want to go through the TASER and just clarify

22  and make sure we're precise on the language here.

23         Now, a TASER, in the new TASER model there

24  are two cartridges that can be deployed, correct?

25    A.   Yes.  Yes.

1    Q.  I'm sorry, I'm going to have you pause for a

2   because we're talking over one another.

3    A.  I'm sorry.

4    Q.  During the RIPP restraint process, did you see

5   Mr. Wells actively kicking his legs?

6    A.  Yes.

7    Q.  Did it appear that he was intentionally trying

8   to kick?

9    A.  Yes.

10   Q.  When you heard the yell that came out of

11  Mr. Wells, was that after the RIPP restraint had been

12  applied and then clipped, hooked to the handcuffs?

13   A.  That was before.  Because I think, in my mind,

14  I feel like that's why we were able to finally do that.

15   Q.  Now, you were asked some questions about the

16  transcripts and whether they were accurate.

17         Did you have the opportunity to compare

18  the transcript to the audio?

19   A.  No.

20   Q.  Now, assuming the transcript was typed up

21  correctly from the audio, you would agree that that's a

22  truthful and accurate representation of what you said?

23   A.  Under that assumption, yes.

24   Q.  And if we had any disagreements between the

25  transcript and the audio, we would go back to the

1    Q.  Do you know whether or not the dispatcher was

2 able to see your general location on her screen at the

3 time she was dispatching?

4    A.  I know the capability exits.  I don't know if

5 she specifically was able to see.

6    Q.  So you don't know one way or another when she

7 put you as arrived on scene, she was looking at a

8 screen showing your location generally or in fact what

9 led her to do that at all, correct?

10    A.  Correct.

11    Q.  Sometimes that information can be gleaned

12 because over the radio you say you're arrived at a

13 scene, correct?

14    A.  Correct.  And I guess when I say that, dispatch

15 would input it then, that's what I mean.  Like you

16 would voice it over the radio, input it yourself or

17 dispatch would put it in.

18    Q.  Did Mr. Wells appear to be in any form of

19 medical stress at any time before you noticed that

20 blotchiness in his skin?

21    A.  Not that I could tell.  Based on the way he --

22 I mean, he put up a great fight and that's the best way

23 I could put it.

24    MS. RETTS:  I don't have anything further.

25    THE WITNESS:  Okay.

# EXHIBIT 15

UNITED STATES DISTRICT OF ARIZONA

DISTRICT OF ARIZONA

Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE DEPOSITION
OF

SEAN YAMANE

Phoenix, Arizona
March 26, 2021
9:02 a.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
PREPARED BY:                  P (602) 230-5454
                              F (480) 546-3721
Donna DeLaVina, RPR           www.dlvreporting.com
Certified Reporter
Certificate No. 50468

1          I'm not sure that answer came through.

2     A.  No.

3     Q.  Prior to 2013, were you ever involved in any

4  police shootings?

5     A.  No.

6     Q.  Prior to 2013, did you ever receive any

7  reprimands for something like missing a court date or

8  anything like that?

9     A.  Not that I recall.

10    Q.  Prior to 2013, were you ever the subject of a

11 proactive patrol inspection?

12    A.  Not that I'm aware of.

13    Q.  Do you have any understanding of why it is that

14 the PSB investigation involving that pursuit you

15 discussed does not appear in your Concise Officer

16 History?

17          MS. RETTS:  Form; foundation.

18          THE WITNESS:  I do not know.

19    Q.  BY MR. SHOWALTER:  Are you aware that Phoenix

20 has a policy of purging police PSB files?

21          MS. RETTS:  Form; foundation.

22          THE WITNESS:  I'm not aware of that

23 policy.

24    Q.  BY MR. SHOWALTER:  Okay.  All right.  I'm --

25 now where did it go?  Give me a second here.

1    Jamie were on his shoulders.  Frank was around his

2    waist."

3          Who's Frank?

4    A.  Long.

5    Q.  "Travis was at his feet.  Or, I'm sorry,

6    Funston."

7          Is that Travis Funston?

8    A.  Correct.

9    Q.  "Officer Long and Officer Funston.  Funston was

10   struggling with the RIPP restraint.  I got down

11   there.  The guys had his feet apart.  He had the

12   RIPP restraint around his legs, but his ankles were

13   crossed.  It seemed like he was trying to leverage

14   himself to turn over by pressing into the ground

15   and spreading his feet apart."

16          Do you see where I read that?

17   A.  Yes.

18   Q.  And is that true, to the best of your

19   recollection?

20   A.  Yes.

21   Q.  And then there's:

22        "Unintelligible, get them crossed, tighten the

23   RIPP restraint and I think Officer Haynes aided

24   Funston in applying the clip to the handcuffs."

25          Did I read that correctly?

1    A.   Yes.

2    Q.   Do you have any -- that last sentence says:

3              "Unintelligible, get them crossed, tighten

4         the RIPP restraint and I think Officer Haynes aided

5         Funston in applying the clip to the handcuffs."

6              It's not a real sentence, I guess.  It's

7    the unintelligible.

8              Are you able in looking at that -- and

9    you're free to look anywhere else in this that you

10   want, but are you able to just kind of fill in what

11   that means, given the unintelligible?

12             MS. RETTS:  Form.

13             THE WITNESS:  Well, at the time I'm pretty

14   sure he was kicking around, I was able to get his legs

15   crossed and apply the RIPP restraint properly.

16   Q.   BY MR. SHOWALTER:  And then at lines 27 through

17   28 you say:

18             "While I was struggling with his legs, I

19        do remember if the TASER had gone off, and I could

20        feel the suspect tense as I was trying to cross his

21        ankles."

22             Do you see where I read that?

23   A.   Yes.

24   Q.   I want to make sure I understand something.  In

25   what it sounds like in looking, in reading over this

1  and discussing it with you is that when you arrive on

2  scene, Officer Long and Officer Funston are attempting

3  to secure the RIPP restraint to Casey's legs and to

4  clip the RIPP restraint to the handcuffs; is that

5  accurate?

6          MS. RETTS:  Form.

7          THE WITNESS:  Yes.

8      Q.  BY MR. SHOWALTER:  And when they were doing

9  that, is it their goal that Casey's ankles should be

10  crossed or is their goal that they should not be

11  crossed?

12     A.  The goal is to have them secured.  And to

13  properly secure them, you have to cross their ankles.

14     Q.  Okay.  So Officers Long and Funston are trying

15  to get his ankles crossed so he will be secured in the

16  RIPP restraints and they need to do that before they

17  can clip him; is that fair?

18     A.  Yes.

19     Q.  And he's struggling and it appeared to you that

20  he was attempting to -- "he was trying to leverage

21  himself to turn over by pressing into the ground and

22  spreading his feet apart"?

23     A.  Right.

24     Q.  And did you ever see Casey actually get his

25  feet apart?

1    A.  Yes.

2    Q.  Okay.  And so there's this line at 18, 19,

3 where it t says, "The guys had his feet apart."

4         Do you see where I read that?

5    A.  Yeah.  I think it's meant to be "the guy," as

6 in Casey Wells.

7    Q.  Okay.  So he had his feet apart and the RIPP

8 restraints around his legs, but his legs aren't

9 crossed; is that what it means?

10   A.  Correct.

11   Q.  And so the goal in -- can you just explain to

12 me how you were trained to apply the RIPP restraints

13 once the subject was handcuffed?

14   A.  Yeah, to get their ankles crossed, get the RIPP

15 restraint around their ankles as tightly as possible

16 and then clip the lead to the handcuffs.

17   Q.  And what is the effect of doing that?

18   A.  To help secure his legs so he's unable to kick,

19 the subject is unable to kick.  It's for officer

20 safety.

21   Q.  And do you have experience where you've used

22 them in the past on subjects prior to the Casey Wells

23 incident?

24   A.  Yes.

25   Q.  Do subjects still sometimes struggle against

1  the RIPP restraints and the handcuffs, even though

2  they're secured?

3      A.  Yes.

4      Q.  Have you ever had a subject who was handcuffed

5  and had the RIPP restraints properly applied who was

6  able to escape from the RIPP restraint and handcuffed

7  position?

8              MS. RETTS:  Form.

9              THE WITNESS:  Yes.

10     Q.  BY MR. SHOWALTER:  You have had that happen to

11  you?

12     A.  Yes.

13     Q.  Tell me about the circumstances where that

14  happened.

15     A.  The RIPP restraint is secured around their

16  ankles.  I believe he was in the back of the patrol

17  car.  He was able to get it loose enough to where he

18  could get a leg free and began kicking in the back of

19  the patrol car.

20     Q.  So he was able to struggle -- he's in the back

21  of a police car, he's handcuffed behind his back?

22     A.  Yes.

23     Q.  Is he placed on his stomach or on his side?

24     A.  We're just talking about a prior incident of

25  Casey Wells.  The subject was in the back, seated,

1  handcuffs on.  It's no longer clipped to the handcuffs.

2  The lead is brought over to the front area and secured

3  in a way to where his feet are secured to where he

4  can't move his feet up.  But somehow he's able to get

5  out of them and began kicking the back of the patrol

6  car.

7      Q.  So in the incident you're referring to, a

8  subject was handcuffed and then RIPP restrained and

9  then the -- and in the process of arresting the suspect

10  and taking him into custody, he was handcuffed behind

11  his back and the RIPP restraint was clipped to the

12  handcuff.  And then when you had to transport him, you

13  had to change that arrangement; is that correct?

14      A.  Correct.

15      Q.  So in order to transport somebody who is RIPP

16  restrained, is it appropriate to just lift them up and

17  place them face down in the back seat of a police

18  vehicle?

19             MS. RETTS:  Form; foundation.

20             THE WITNESS:  No.  It's best to have them

21  seated.

22      Q.  BY MR. SHOWALTER:  And is there a reason why

23  suspects who are in RIPP restraints and handcuffs

24  aren't placed face down in the back seat of police

25  vehicles?

1          MS. RETTS:  Form; foundation.

2          THE WITNESS:  No.  It's a bad position to

3  be in if you're in an accident.

4      Q.  BY MR. SHOWALTER:  So they can't be restrained

5  with a seat belt if they're in an accident, correct?

6      A.  Correct.

7      Q.  If they're in that position?

8      A.  Correct.

9      Q.  Is there also a concern about positional

10  asphyxia if they're left in that position?

11          MS. RETTS:  Form; foundation.

12          THE WITNESS:  Correct.

13      Q.  BY MR. SHOWALTER:  And so you understand that

14  to mean that they're -- Phoenix police are trained if

15  they leave a hog tied -- or I'm sorry, strike that.

16          If they leave a handcuffed RIPP restrained

17  subject face down, there is a danger that that subject

18  could asphyxiate, correct?

19          MS. RETTS:  Form; foundation.

20          THE WITNESS:  Correct.

21      Q.  BY MR. SHOWALTER:  And that's something you

22  knew about at the time of Casey Wells' incident,

23  correct?

24          MS. RETTS:  Form; foundation.

25          THE WITNESS:  Correct.  And that's for a

SEAN YAMANE   MARCH 26, 2021

1   transport, which would be quite a while to put them in

2   that position.

3       Q.  BY MR. SHOWALTER:  But it's also something

4   where you are trained not to leave a handcuffed RIPP

5   restrained subject face down on their stomach in any

6   location for a long period of time, not just for

7   transport, correct?

8              MS. RETTS:  Form; foundation.

9              THE WITNESS:  That's, again, totality of

10   the circumstances.  In Casey Wells' case, he was still

11   actively resisting and a danger to officers.

12      Q.  BY MR. SHOWALTER:  But what you're trained is

13   that there is a concern generally about having

14   handcuffed restrained subjects face down in RIPP

15   restraints because doing that for any length of time

16   could result in positional asphyxia, correct?

17             MS. RETTS:  Form; foundation.

18             THE WITNESS:  In general.

19      Q.  BY MR. SHOWALTER:  In general, yes?

20      A.  Yes.

21      Q.  And you're also trained that when you have a

22   handcuffed or RIPP restrained subject, not to put

23   pressure on their back, neck or shoulders because that

24   could impair their ability to breathe and also cause

25   positional asphyxia, correct?

1         MS. RETTS:  Form; foundation.

2         THE WITNESS:  During a struggle, you can

3   secure the person by putting weight on their shoulders

4   and back, yes.

5    Q.  BY MR. SHOWALTER:  But you're also trained

6   that once a subject is handcuffed and face down, there

7   is a risk of positional asphyxia if weight is placed on

8   their shoulders or back, correct?

9         MS. RETTS:  Form; foundation.

10        THE WITNESS:  No.

11   Q.  BY MR. SHOWALTER:  You guys don't receive that

12  training that there's a risk of positional asphyxia if

13  you put your weight on a handcuffed subject?

14        MS. RETTS:  Form.

15        THE WITNESS:  Again, it's a totality of

16  circumstances.  Casey Wells was struggling and officers

17  needed to secure him.

18   Q.  BY MR. SHOWALTER:  And I'm not disputing that.

19  I'm not disputing that he needed to be secured for his

20  own safety.  I'm just asking you about the City of

21  Phoenix's training and the training you've received?

22   A.  Okay.

23   Q.  And so in the training you've received, you've

24  been trained that placing your weight on the back of a

25  suspect who has his hands cuffed behind his back, has

1  the risk of interfering with the suspect's ability to

2  breathe, correct?

3            MS. RETTS:  Form; foundation.

4            THE WITNESS:  Correct.

5     Q.  BY MR. SHOWALTER:  So at line 27 through 28 of

6  Exhibit 198, you state:

7            While I was struggling with his legs, I do

8       remember" -- it says, "I do remember if the TASER

9       had gone off and I could feel the suspect tense as

10      I was trying to cross his ankles."

11            Do you see where I read that?

12     A.  Yes.

13     Q.  Well, is it your memory that while you were

14  attempting to get Casey Wells' RIPP -- the RIPP

15  restraints in place, you remember hearing the TASER go

16  off?

17     A.  Yes.

18     Q.  Okay.  At line 32 through 34, the transcript

19  states:

20            "After he got all contained, I think it

21      was Officer Long -- someone noticed that he wasn't

22      responsive.  So we immediately rolled him over.

23      Officer Seaquist began compressions."

24            Do you see where I read that?

25     A.  Yes.

1          MS. RETTS:  Thanks.  You might hear it

2    today, it's just very busy in the sky.

3          MR. SHOWALTER:  I get it.

4     Q.  BY MR. SHOWALTER:  Okay.  So we're still on

5    Exhibit 198 and at line 12 the interviewer says:

6               "Okay.  I'm just going to go back over

7          what you asked" -- I'm sorry, "I'm just going to go

8          back over that and ask you some follow-up

9          questions."

10              And you say, "Okay."

11              And then at line 17 through 20, there's

12   the follow-up question or the first.  Do you see that?

13    A.  Yes.

14    Q.  This question is about what Sergeant Rodarme's

15   voice sounded like over the radio, right?

16    A.  Yes.

17    Q.  And you said, "He sounded like he was in need

18   of help.  Like he was breathing heavily," right?

19    A.  Yes.

20    Q.  And normally, according to your response at

21   line 26, Sergeant Rodarme sounds calm and collected,

22   right?

23    A.  Right.

24    Q.  And at line 34 you note that it sounded urgent,

25   correct?

1    A.  Correct.

2    Q.  Did Sergeant Rodarme use a code, a radio code

3  at that time to indicate what he was actually

4  experiencing?

5    A.  I don't recall.

6    Q.  Did he communicate that he was fighting?

7    A.  I don't recall.

8    Q.  So turning to the next page, which is page 10

9  and Bates numbered WELLS 002463, the interviewer asks:

10        "About how long did it take you guys to

11     respond from the station to the location where this

12     occurred at?"

13        And you answered:

14        "I would say maybe three minutes."

15        Is that accurate?

16    A.  Yes.

17    Q.  And then you're asked:

18        "So when you got there three minutes

19     later, the way you described it made it sound like

20     officers were still holding the suspect down?"

21        And you answered:

22        "Yes."

23    A.  Correct.

24    Q.  Did you ever see Casey Wells on his back?

25    A.  No.

1    A.   Yes.

2    Q.   And then after that it appears that the

3 dispatcher assigned your unit to being present?

4    A.   Correct.

5    Q.   Now, when you were at Mr. Wells' feet, is it

6 fair to say that the only weight that you were placing

7 on him was through your hands?

8    A.   Correct.

9    Q.   And I think in the video we saw you at the

10 bottom of his feet.  Would it be fair to describe the

11 positioning of your legs in a spread eagle position

12 where your knees were in the air?

13    A.   Yes.

14    Q.   Did you ever place any weight through your legs

15 on Mr. Wells?

16    A.   No.

17    Q.   When you were down attempting to control

18 Mr. Wells' legs, did you ever attempt to put them in a

19 leg weave?

20    A.   No.

21    Q.   Did you ever attempt to take his legs and put

22 them up to his butt?

23    A.   No.

24    Q.   Is it fair to say that after you heard the

25 TASER, that was what would have allowed you to get the

1  legs secured to put RIPP restraint in a secure

2  position?

3      A.  Yes.

4          MR. SHOWALTER:  Form and -- just to form

5  and foundation.

6      Q.  BY MS. RETTS:  And before that point, the RIPP

7  restraint portion that goes around the ankles had just

8  been looped around the ankles, correct?

9      A.  Correct.

10     Q.  And to secure it, you need to cross the ankles,

11  true?

12     A.  True.

13     Q.  And before the TASER was cycled, you were not

14  able to cross the ankles, correct?

15     A.  Correct.

16     Q.  Is it fair that Mr. Wells was still resisting

17  with his legs at that point?

18     A.  Yes.

19     Q.  Did you ever see any other of the officers on

20  scene put their body weight through their legs on

21  Mr. Wells?

22     A.  No.

23          MS. RETTS:  I don't have anything further.

24          MR. SHOWALTER:  I have no follow-up.

25          Thank you, Officer.

# EXHIBIT 16

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

DUSTIN HAYNES

Phoenix, Arizona
March 29, 2021
9:03 a.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
PREPARED BY:                   P (602) 230-5454
                               F (480) 546-3721
Donna DeLaVina, RPR            www.dlvreporting.com
Certified Reporter
Certificate No. 50468

1    Q.  You continue at line 28 and say:

2         "Officer Funston had applied the RIPP

3    restraint to the chain link of the handcuffs;

4    however, it doesn't go all the way around the

5    chain.  I reached in and assisted by pulling the

6    RIPP restraint clip over the chain link."

7         Did I read that correctly?

8    A.  Yes.

9    Q.  And is that true?

10   A.  Yes.

11   Q.  So let me see if I understand.  I just want to

12   understand lines 28 through 30, in the context of lines

13   22 through 24 and kind of the time relation of what's

14   happening.

15        And let me fill it out a little bit more.

16   So lines 22 through 24 talks about what you saw when

17   you arrived at the scene, correct?

18              MS. RETTS:  Form.

19              THE WITNESS:  Yes.

20   Q.  BY MR. SHOWALTER:  When you get there, it's you

21   and Officer Sean Yamane, who are arriving together; is

22   that correct?

23   A.  Yes.

24   Q.  And when you arrive, do you see other officers

25   already at the scene?

1    A.  Yes.

2    Q.  Who were the other officers you recall seeing

3 when you arrived?

4    A.  Upon my arrival, I recall I was focused in on

5 Officer Funston, he was at the feet, Officer Long,

6 Officer Arnold and Sergeant Rodarme.

7    Q.  And what about Officer Seaquist, was he there

8 too?

9    A.  Officer Seaquist was there as well.

10    Q.  So when you and Sergeant -- I'm sorry.

11        When you and Officer Yamane arrive, there

12 are five police personnel already present with Casey

13 Wells; is that accurate?

14    A.  Yes.

15    Q.  And they are Long, Funston, Sergeant Rodarme,

16 Officer Seaquist and Officer Arnold?

17    A.  Yes.

18    Q.  And Casey Wells is on his stomach and his hands

19 are cuffed behind his back; is that correct?

20    A.  Yes.

21    Q.  Do you have a recollection of what -- okay.

22        When you arrive, you see that Officer

23 Funston is working with the RIPP restraint on Casey; is

24 that accurate?

25    A.  Yes.

1  Q.  And are the RIPP restraints already around

2  Casey's legs at that point?

3  A.  I believe he had the actual loop around his

4  ankles, but he was trying to get the ankles crossed and

5  Casey was still kicking and straightening his legs out

6  so he couldn't get the ankles crossed to tie it down.

7  So it wasn't fully on, I guess.  It wasn't tightened

8  and positioned properly at that moment.

9  Q.  So if I understand you correctly, the RIPP

10 restraints are on but the RIPP restraint procedure that

11 the City of Phoenix trained you guys in hadn't been

12 completed in terms of tightening and securing the RIPP

13 restraints; is that accurate?

14           MS. RETTS:  Form.

15           THE WITNESS:  Correct.

16 Q.  BY MR. SHOWALTER:  And when you arrive on the

17 scene, are you able to see what Officer Long is doing?

18 A.  I don't recall what he was doing.  Like I said,

19 I was focused on Officer Funston, because he was

20 struggling with the feet.  So Officer Yamane and I went

21 to that location and helped at that task.

22 Q.  And were you able to see what Officer Seaquist

23 was doing when you arrived on scene?

24 A.  I don't recall where he was.

25 Q.  Were you able to see what Sergeant Rodarme was

DUSTIN HAYNES  MARCH 29, 2021

1  doing when you arrived at the scene?

2      A.  I'm not sure where he was initially when I

3  arrived, but I know that he had blood in his eyes and

4  he had kind of -- he was trying to flush his eyes out

5  he was doing something in that regard.  I'm not sure if

6  that was directly after or if that was when we there.

7  But that's -- the first time I recall seeing him, is

8  when he was trying to get his -- he had stuff in his

9  eyes.

10      Q.  And what about Officer Arnold, were you able to

11  see what he was doing when you arrived at the scene?

12      A.  I don't recall where he was positioned.

13      Q.  When you arrived on the scene, you're on this

14  road Salter, correct?

15      A.  Yes.

16      Q.  And Salter runs east/west; is that accurate?

17      A.  Yes.

18      Q.  When you arrive, do you recall did you park to

19  east or to the -- you know what, let me know if seeing

20  the video would help you, but if you recall, did you

21  park to the east of where Casey and the officers were

22  or to the west?

23      A.  We were to the east.

24      Q.  Okay.  So you parked to the east and you're

25  approaching from the east and walking westward towards

1  where Casey and the officers are when you arrive,

2  correct?

3      A.  Yes.

4      Q.  What was the orientation of Casey's body when

5  you arrived at the scene, was he pointed north/south or

6  some other direction?

7      A.  I believe he was pointed with his head towards

8  the north and his feet towards the south.

9      Q.  Do you remember any of the officers saying

10  anything as you and Officer Yamane arrive on the scene?

11      A.  Not that I recall.

12      Q.  Do you remember saying anything to Officer

13  Funston when you arrived on the scene?

14      A.  Not that I remember.

15      Q.  At lines 28 through 30 you talk about:

16          "Officer Funston had applied the RIPP

17      restraint to the chain link of the handcuffs;

18      however, it didn't go all the way around the

19      chain.  I reached in and assisted by pulling

20      the RIPP restraint clip over the chain link."

21          We already talked a little bit about that.

22          Can you -- is there a way you can go into

23  more detail to describe what the problem with that was

24  that required you to assist by pulling the RIPP

25  restraint clip over the chain link?

1    A.  I think it was --

2            MS. RETTS:  Form.

3            Go ahead.

4            THE WITNESS:  It was a combination of

5    Officer Funston was struggling to bend the legs to get

6    them into a position where he had enough slack to be

7    able to go over the handcuffs with the clip.  So

8    Officer Yamane was helping him control the feet and I

9    was able to put the clip onto the handcuffs after there

10   was enough slack in the RIPP restraint.

11   Q.  BY MR. SHOWALTER:  Is the clip on a RIPP

12   restraint a metal clip?

13   A.  Yes.

14   Q.  Is it similar to the types of -- similar, maybe

15   not the same, but similar to the types of clips that

16   are used on things like key chains or dog leashes?

17           MS. RETTS:  Form.

18           THE WITNESS:  It's similar to a dog leash.

19   Q.  BY MR. SHOWALTER:  So is it -- I mean, in a way

20   it's similar -- well, I was going to say it's similar

21   to a carabiner in that it has a spring loaded arm; is

22   that accurate?

23   A.  That's more accurate that it has a spring

24   loaded arm.  Because on a dog clip, you actually have

25   to use the thumb to depress it down to fit it.  This

1    one has like a spring arm on it.

2        Q.  But you could use this type of clip on a dog

3    restraint, correct?

4                MS. RETTS:  Form.

5                THE WITNESS:  You could.

6        Q.  BY MR. SHOWALTER:  Okay.  And it sounds like --

7    is the -- when Funston has the clip over part of the

8    handcuff chain, is it kind of sticking in between the

9    arm and the fixed portion of the clip and those two

10   pieces are kind of pinching the chain between them?

11       A.  I'm not sure exactly what it was.  I kind of --

12   he wasn't able to get it.  I grabbed it and just

13   assisted in clipping it.  So I just saw that he wasn't

14   getting it clipped on there.  He was struggling with

15   that part of it.  So once we --

16       Q.  I'm going to stop sharing and now I'm going to

17   share with you -- I just did a Google search for a RIPP

18   restraint clip under images.

19       A.  Yeah.

20       Q.  I'm going to see if I can pull something up.

21               I was hoping this would be a larger image.

22   Let's see what I can do.

23               Is this -- do you recognize this image

24   as -- good Lord -- do you recognize this image as

25   showing a RIPP restraint?

1    A.   Yes.

2    Q.   And when we're talking about the clip, we're

3 talking about this brass piece at the end; is that

4 fair?

5    A.   Yes.

6    Q.   And it sounded like from your earlier testimony

7 that what you were saying is there's a little spring

8 loaded arm right here and that your goal is to get this

9 entire clip around the chain link of the handcuffs; is

10 that accurate?

11   A.   Yes.

12   Q.   And when you arrived on scene, it just didn't

13 look to you like that had been achieved, like this clip

14 did not actually go around the chain link of the

15 handcuffs; is that accurate?

16   A.   Yes.

17   Q.   Okay.  Now, I'm going to return to Exhibit 199.

18 You know, the other rule, when I was talking about all

19 this stuff that attorneys say when attorneys do these

20 things, the other rule is that if at any point you need

21 a break for any reason, just let us know and we'll be

22 happy to take a break and we'll probably have one

23 anyway in about 15 minutes, whether you ask for it or

24 not.

25        MS. RETTS:  Maybe five.  I just have to

1   use the restroom.  I don't know if I can wait 15, but I

2   can wait five.

3               MR. SHOWALTER:  Why don't we just do it

4   right now.

5               MS. RETTS:  Okay.

6               MR. SHOWALTER:  And so let's go back on at

7   10:10.

8               MS. RETTS:  Okay.

9               THE COURT REPORTER:  The time is

10  10:01 a.m.  We are going off the record.

11          (Whereupon, a brief recess ensued from 10:01

12  a.m. to 10:11 a.m.)

13              THE COURT REPORTER:  The time is

14  10:11 a.m.  We are back on the record.

15      Q.  BY MR. SHOWALTER:  I was just going to ask, we

16  talked about that July 2009, July 14th, 2009 excited

17  delirium incident.  Do you recognize the name of the

18  individual involved in that as Robert Betzold?

19      A.  I don't recall.

20      Q.  All right.  I am going to go back to the

21  interview transcript and share the screen, so that I

22  know that we're all looking at approximately the same

23  thing.  When we left off, we were on page 7 of

24  Exhibit 199 talking about RIPP restraints.  And the

25  RIPP restraint clip and at line 34 of page 7 you say:

1        "At which time the suspect was stiffening

2    and moving his legs. . ."

3            And then continue at line 4 of page 8

4    saying:

5            ". . .while my partner, Officer Yamane,

6        was attempting to cross his feet.  And at that

7        time, I heard Officer Seaquist say, 'Stop

8        resisting.'  And I heard his TASER go off."

9            Do you see where I read that?

10   A.  Yes.

11   Q.  And did I read that accurately?

12   A.  Yes.

13   Q.  Is that a true account of what you remember

14   happening on February 4th of 2019?

15   A.  Yes.

16   Q.  And then you say at lines 10 through 12:

17        "At that time the clasp was applied -- the

18       clip was applied to chain link.  I stepped back and

19       I heard Officer Long advise that the subject was

20       not responsive.  I then leaned in and removed the

21       clasp to the handcuffs."

22           Do you see where I read that?

23   A.  Yes.

24   Q.  And you continued that at line 16 and say:

25        ". . .from the RIPP restraint."

1          Do you see where I read that?

2     A.  Yes.

3     Q.  And so does that mean that at that point, when

4  you learned that the subject was nonresponsive, you

5  leaned in and detached the RIPP restraint from the

6  handcuffs?

7     A.  Yes.

8     Q.  Is it possible that that's something that

9  happened later?

10          MS. RETTS:  Form.

11     Q.  BY MR. SHOWALTER:  Like after Mr. Wells was

12  turned over?

13     A.  Not that I recall.

14     Q.  Okay.  At lines 20 through 29, you talk about

15  assisting and rolling subject over onto his back and

16  that Officer Seaquist began CPR, was relieved by

17  Officer Funston who then continued CPR.  And then you

18  assisted in removing RIPP restraint from the subject's

19  feet and fire arrived shortly after.

20          I didn't read that, I just kind of

21  summarized it.

22          Is it your recollection that after Casey

23  was rolled onto his back, Officer Seaquist began CPR

24  and was relieved by Officer Funston?

25     A.  Yes.

1    Q.  And then after that, you assisted in removing

2  the RIPP restraint from the subject's feet and then

3  fire arrived shortly after; is that accurate?

4    A.  Yes.

5    Q.  And then you went to the east side of the scene

6  to place crime scene tape and were relieved from that

7  by Officer Rodriguez; is that accurate?

8    A.  Yes.

9    Q.  Let me make sure.

10       Do you know the first name of Officer

11  Rodriguez?

12    A.  Emilio.

13    Q.  Okay.  At that point, you and Officer Yamane

14  went to west side of the scene to place crime scene

15  tape and were relieved by another officer, whose name

16  you didn't recall at the time of this interview, right?

17    A.  I don't recall.  I thought Officer Rodriguez

18  relieved us.

19    Q.  Oh, I think he -- so I think when you're on the

20  east side, it's Officer Rodriguez who relieved you.

21  And then you go to the west side and are relieved by an

22  officer from the second shift, whose name you don't

23  remember.

24    A.  Okay.  Yeah, I see that now, yep.

25    Q.  And it was that officer who informed you that

1 | per the lieutenant on scene he wanted the two-man unit

2 | to go handle radios calls; is that correct?

3 |     A.  Correct.

4 |     Q.  And that completed your involvement; is that

5 | accurate?

6 |     A.  Yes.  Yes.

7 |     Q.  I'm going to -- let's see.

8 |             Turning to the next page, page 9, you're

9 | asked where you guys were when you responded.  And it

10 | says, at line 7:

11 |             "We were at Beuf Substation, 35th Avenue

12 |     and Pinnacle Peak."

13 |             Do you see where I read that?

14 |     A.  Yes.

15 |     Q.  Is that an accurate spelling of Beuf?

16 |     A.  Yeah.

17 |     Q.  And then at line 12 -- I'm sorry at line 9, the

18 | interviewer asks about how long it took you to get from

19 | that location from the Beuf Substation to the location

20 | of the incident on Salter and you responded,

21 | "Approximately two to three minutes"; is that correct?

22 |     A.  Correct.

23 |     Q.  So is that two to three minutes approximate

24 | from hearing Sergeant Rodarme state over the radio that

25 | he needs additional units?

1    A.   That's drive time from that location to there.

2  I think we were inside at the time.  I don't recall

3  exactly.  But drive time from 35th Avenue and Pinnacle

4  Peak was about two to three minutes.

5    Q.   Okay.  And he didn't ask you about drive time,

6  though.  The question is:

7            "How long did it take you to get from

8         there to the location that this occurred at?"

9            And you said:

10            "Approximately two to three minutes."

11            Right?

12            MS. RETTS:  Form.

13    Q.   BY MR. SHOWALTER:  Is that correct?

14    A.   That is correct.

15    Q.   And you were asked at line 25 about any

16  commands or warnings about the TASER and you stated at

17  line 29 that you didn't recall; is that correct?

18    A.   Yes.

19    Q.   Other than Officer Seaquist yelling "Stop

20  resisting," do you recall any other commands or

21  warnings that were given to Casey Wells while you were

22  at the scene before he became nonresponsive?

23    A.   Nothing that I recall.

24    Q.   And let's see, at the bottom of page 9 at

25  line 34, you say:

1           "On scene prior to our arrival there was

2      Officer Arnold, Officer Seaquist, Sergeant Rodarme,

3      Officer Funston and Officer Long."

4                And we've already talked about that.

5                But then you say at lines 5 and 6:

6                "And there -- there was one other officer

7      that I'm not sure of his name, he was there right

8      as we got there, about the same time."

9                Do you know who that would have been?

10     A.   It could have been Palmer.  I'm not sure.

11     Q.   It could have been somebody else as well?

12     A.   It could have been.  I'm not sure.  But I was

13     focused on there.

14     Q.   Okay.  And then at lines 11 through 14, you're

15     asked about where these officers were -- I'm sorry,

16     strike that.

17                At line 8 through 9, the interviewer says:

18                "Where were all of they -- were they the

19     ones who were all surrounding the suspect?"

20                And at lines 11 through 14, you say:

21                "Yeah, they were all surrounding the

22     suspect, Officer Funston and Officer Long were kind

23     of towards his feet and waist area, and Officer

24     Arnold and Officer -- or Sergeant Rodarme were

25     towards the suspect's head holding him down from

1    the upper torso area, and Officer Seaquist was

2    standing with his TASER in his hands."

3         Do you see that?

4    A.  Yes.

5    Q.  Was Officer Seaquist standing with his TASER in

6    his hands or was he kneeling?

7         MS. RETTS:  Form.

8         THE WITNESS:  I believe he was standing

9    but. . .

10   Q.  BY MR. SHOWALTER:  Okay.  And then at line 16,

11   you're asked:

12        "And you said that the -- that the suspect

13        was stiffening and moving his legs kind of -- kind

14        of describe what you mean by that."

15        And at lines 19 through 21 -- sorry, about

16   that -- at lines 19 through 21, you say:

17        "I could just see -- where I was focused

18        was the chain link so I could just see his upper

19        thighs kind of moving back and forth as the officer

20        tried to apply the RIPP restraint.  So he was just

21        kind of moving his hips I guess you could say."

22        Did I read that correctly?

23   A.  Yes.

24   Q.  Is that an accurate account of what you saw on

25   February 4th of 2019?

1    A.   Yes.

2    Q.   When you got there or during the time you were

3  there, did you ever see Casey Wells kicking?

4    A.   No, just stiffening his legs outwards towards

5  the officers.

6    Q.   And did you ever see Casey Wells do anything

7  consistent with attempting to strike somebody?

8    A.   No, not from the time that I got there.

9    Q.   Did you ever see Casey Wells doing anything

10  consistent or suggesting that he was attempting to

11  cause people harm?

12    A.   I use -- putting officers in risk by moving his

13  feet back and forth while they were trying to apply the

14  RIPP restraint.

15    Q.   And what is the risk that that creates for

16  officers?

17    A.   Getting kicked in the face or getting kicked

18  anywhere, I guess.

19    Q.   And so with him handcuffed on the ground and

20  Officer Arnold and Sergeant Rodarme restraining his

21  upper body, the risk would be that while he was doing

22  that, if an officer put their head in the -- in front

23  of his feet or in back of his feet, they could

24  potentially be struck by his feet?

25    A.   Yeah.  While trying to apply the RIPP

DUSTIN HAYNES  MARCH 29, 2021

1 restraint, they have to get into close proximity and he

2 was moving his feet back and forth.  Could have created

3 a dangerous situation.

4      Q.  Did you ever see anybody placed in immediate

5 danger from that?

6            MS. RETTS:  Foundation.

7            THE WITNESS:  I was focused in on the RIPP

8 restraint and the clasp.  That is where I was trying to

9 make sure that I knew that I was aware that they were

10 at the feet and he was still moving them.

11     Q.  BY MR. SHOWALTER:  And any time you handcuff a

12 suspect, that also is a dangerous situation because you

13 have to move into close proximity with the subject,

14 correct?

15     A.  Right.

16     Q.  So any time you're putting restraints on a

17 subject of any kind, because you have to place yourself

18 really close to the subject to do it, the danger to --

19 potential dangers to officers increases, correct?

20     A.  Yes.  And it all multiplies when they start

21 tensing up and flailing about and moving.

22     Q.  But you never saw anything that Casey that

23 appeared to you to be an intentional action designed to

24 harm or target an officer, correct?

25            MS. RETTS:  Form.

1    THE WITNESS:  I don't know want the intent

2  was.  I just noticed that the legs were moving back and

3  forth and they were trying to control him.

4    Q.  BY MR. SHOWALTER:  Well, let me give you an

5  example.

6    If you see somebody sort of place their

7  arm back and strike that arm forward towards somebody,

8  you can interpret that as an intentional attempt to

9  strike a person, correct?

10   A.  Yes.

11   Q.  Did you ever see anything that Casey did that

12  appeared to be an intentional attempt to cause anyone

13  harm?

14   MS. RETTS:  Form; foundation.

15   THE WITNESS:  No.  Just stiffening up and

16  moving.

17   Q.  BY MR. SHOWALTER:  When a subject stiffens up

18  while officers are attempting to apply restraints, is

19  that considered to be passive resistance or active

20  resistance according to your training?

21   MS. RETTS:  Form.

22   THE WITNESS:  Stiffening up and not being

23  actively aggressive towards the officer or trying to

24  create danger would be more of a passive situation.

25  Because the sole nature of it was just stiffening up.

DUSTIN HAYNES  MARCH 29, 2021

```
 1      Q.  BY MR. SHOWALTER:  Okay.  I'm going to continue
 2   through Exhibit 199.
 3            And you're asked -- the interviewer says
 4   with respect to the movements Casey was making with his
 5   hips:
 6            "And was that making it difficult or look
 7       like it was preventing. . ."
 8            And you said:
 9            "Yeah."
10            The interviewer continues:
11            ". . .you guys from gaining control of
12       them?"
13            You said:
14            "Yeah."
15            You would agree with that, that when
16   you're attempting to apply RIPP restraints to a subject
17   and they're stiffening or moving their hips, it makes
18   it harder for you to apply the RIPP restraints and gain
19   control?
20      A.  Yes.
21      Q.  At line 31, the interviewer asked:
22            "Did the subject have any injuries?"
23            And line 33 you answer:
24            "I saw that he did have some injuries to
25       his face, but like I said, he was face down
```

1    when I initially got there.  I didn't look at it

2    too much after he rolled over, but I did know that

3    he had some bleeding from the face."

4            Did I read that correctly?

5    A.  Yes.

6    Q.  And is that an accurate account of what you saw

7  at the scene?

8    A.  Yes.

9    Q.  Do you have any information from any source

10  about what caused the injuries to Casey's face?

11            MS. RETTS:  Form.

12            THE WITNESS:  At this point or at that

13  time when I responded there.

14    Q.  BY MR. SHOWALTER:  Well, let's start with when

15  you responded there.

16            When you responded there, did you have any

17  information on how Casey's face was injured?

18    A.  No.

19    Q.  Did you have any understanding at that time of

20  what the injuries to Casey's face were?

21    A.  No.

22    Q.  Now, as of today and excluding information that

23  you obtained solely from your attorney, do you have any

24  information about what caused the injuries to Casey's

25  face?

1          MS. RETTS:  Form; foundation.

2          You can answer.

3          THE WITNESS:  Okay.

4          I heard Officer Arnold's testimony at the

5    civil review board.

6      Q.  BY MR. SHOWALTER:  And what did he testify to

7    at the review board?

8      A.  I don't recall the exact testimony.  But I

9    believe he indicated that he punched him.

10     Q.  When you say "he punched him," does that mean

11   Officer Arnold punched Casey or vice versa?

12         MS. RETTS:  Foundation.

13         THE WITNESS:  I believe Officer Arnold

14   punched Casey.

15     Q.  BY MR. SHOWALTER:  Do you recall anything else

16   about that testimony that Officer Arnold gave at that

17   review board?

18     A.  I believe he said he lifted him up and then

19   slammed him on the ground to get him on the ground.

20     Q.  Your recollection is that Officer Arnold said

21   that he had lifted Casey up and slammed him onto the

22   ground?

23     A.  Yeah.

24     Q.  Did you give any testimony at that PSB review

25   hearing?

DUSTIN HAYNES  MARCH 29, 2021

1    A.  I'm sorry, the air conditioning kicked on right

2  in the middle of that question.  Can you repeat that?

3    Q.  Did you give any testimony at that hearing?

4    A.  Yes, I did.

5    Q.  Did you testify about anything that we haven't

6  discussed today at this deposition or that isn't in

7  your interview?

8    A.  No, not that I recall.

9    Q.  Do you recall who asked you questions at that

10 hearing?  Who was the questioner?

11            MS. RETTS:  Foundation.

12            THE WITNESS:  I don't recall.

13    Q.  BY MR. SHOWALTER:  Other than yourself and

14 Officer Arnold, do you recall who else was present at

15 that hearing?

16    A.  Sergeant Rodarme, Officer Seaquist, Officer

17 Palmer, Officer Long, Officer Funston.  I'm not sure if

18 anybody else was present.  That's what I can remember.

19    Q.  Have you had a chance to review any video or

20 audio recordings of your testimony or the testimony of

21 other officers at that hearing?

22    A.  No.

23    Q.  Was that hearing recorded by audio means only

24 or by video?

25            MS. RETTS:  Foundation.

DUSTIN HAYNES  MARCH 29, 2021

1        THE WITNESS:  I think audio, video and

2   there was media there too.

3      Q.  BY MR. SHOWALTER:  Okay.  When you say there

4   was media at that, do you recall who was present at

5   that by the media?

6      A.  I don't.

7      Q.  Now going back to Exhibit 199.

8        Were you aware -- are you aware as you sit

9   here today, that Casey had fractured cartilage in his

10  throat?

11       MS. RETTS:  Foundation.

12       THE WITNESS:  No.

13     Q.  BY MR. SHOWALTER:  Have you looked -- have you

14  had a chance to look at the medical examiner's report

15  in this matter about the cause of death?

16     A.  No.

17     Q.  Do you have any information on how Casey Wells

18  could have received injuries to his throat during the

19  February 4th, 2019 incident?

20       MS. RETTS:  Foundation.

21       THE WITNESS:  No.

22     Q.  BY MR. SHOWALTER:  Now, back to Exhibit 199.

23       You were asked at line 11:

24       "Did any -- any of the officers have any

25   injuries?"

1            And at lines 13 through 14, you say:

2            "When I initially got there, I saw that

3      Sergeant Rodarme had blood on him and I didn't know

4      if it was his blood or the suspect's blood."

5            Do you see where I read that?

6      A.  Yes.

7      Q.  Is that is something you saw when you arrived

8  at the scene?

9      A.  Yes.

10     Q.  And then you're asked if you know how that was

11 sustained and at line 18 you say:

12            "I don't."

13            Is that accurate?

14     A.  Yes.

15     Q.  But later on, it came to be your understanding

16 that somehow Sergeant Rodarme got Casey's blood on him?

17     A.  Yes.

18     Q.  And then at line 20 you're asked:

19            "Did any of the other officers have any

20      injuries that you saw?"

21            And you said:

22            "Nothing that I observed."

23            Is that accurate?

24     A.  Yes.

25     Q.  And at the scene, you did not see any of the

DUSTIN HAYNES  MARCH 29, 2021

1   other officers use any strikes on the suspect, correct?

2       A.  Correct.

3       Q.  And you did not use any strikes on the suspect,

4   correct?

5       A.  Correct.

6       Q.  And you're asked:

7               "Did the suspect strike at any officers?"

8               And you answered:

9               "Not that I saw, no."

10              Correct?

11      A.  Yes.

12      Q.  At the scene, did any of the other officers

13  talk about being struck by the suspect, if you recall?

14      A.  Not that I remember.

15      Q.  And turning to the next page, which is page 12,

16  one of the questioners asks you, at lines 6 through 8:

17              "When you first got there, you said that

18      Officer Funston was attempting to apply a RIPP

19      restraint and the suspect was still moving, did you

20      think the suspect was still trying to fight with

21      officers and still resist?"

22              And in response to that question you

23  stated:

24              "I thought he was still resisting.  We

25      were having problems trying to actually pull the

1    restraint up because he was stiffening his legs as

2    we were trying to bend it up to get the clip onto

3    the handcuff clasp.  So I thought he was tensing up

4    in doing that."

5         Did I read that correctly?

6    A.  Yes.

7    Q.  And is that a true and accurate account of what

8    you perceived at the time?

9    A.  Yes.

10   Q.  And at line 15, the questioner says:

11        "Do you think he -- I mean, how would you

12   characterize his strength?  Was he trying to kick

13   or was he --"

14        And then it's continued at line 20:

15        "-- was stiffening?"

16        And at lines 22 through 24, you say:

17        ". . .both Officer Funston and I were both

18   pulling on the -- because he trying to get it

19   clipped and he couldn't get it all the way around,

20   and I grabbed it and then he grabbed a little lower

21   and it took both of us to actually pull it up. . .

22        Continuing at line 28:

23        ". . .because he kind of had his legs

24   locked out."

25        Did I read that accurately?

1    A.  Yes.

2    Q.  Is that a true account of your recollection of

3  February 4th, 2019 and Casey's actions?

4    A.  Yes.

5    Q.  And then you're asked at line 30:

6         "What was the purpose behind the RIPP

7      restraint, in your opinion?"

8         And you said:

9         "Just the manner of the fight, I believe,

10     just because he -- he had already been fighting

11     with officers, so it was kind of control him

12     further to where he wouldn't -- risk of injury."

13        Did I read that accurately?

14   A.  Yes.

15   Q.  You didn't actually witness any fighting,

16  correct?

17   A.  Yes.

18   Q.  And so this just reflects your understanding --

19  and, in fact, you didn't make the decision to apply the

20  RIPP restraints, correct?

21   A.  No.  That's correct.

22   Q.  And so this is you stating your understanding

23  of what the reason for the RIPP restraint is, fair?

24   A.  Yes.

25   Q.  Okay.  I'm going to stop sharing that.

1          I wanted to ask, you said you had a chance

2    to review the CAD report and the other document you

3    said you had chance to review would have been, I

4    believe, the incident report and time line in that

5    report?

6          A.   Yes.

7          Q.   Okay.  I'm going to share Exhibit 1a with you.

8               THE WITNESS:  Is that in this book?

9          (Whereupon, Deposition Exhibit 1a was marked

10   for identification.)

11         Q.   BY MR. SHOWALTER:  And this is the incident

12   report and I'm going to take you to COP-STICKNEY, page

13   81.

14              Are you able to see on the screen in front

15   of you in bottom right corner COP-STICKNEY 81?

16         A.   Yes.

17         Q.   And is this the time line you reviewed?

18         A.   Yes.

19         Q.   And on this time line it says at 2:24:58 -- or

20   14:22:58, "Sergeant Rodarme requests another unit," per

21   the "CAD report."

22              Do you see that?

23         A.   Yes.

24         Q.   And you would have responded in response to

25   that and it would have taken you two to three minutes

1  to arrive at the scene; is that accurate?

2          MS. RETTS:  Form.

3          THE WITNESS:  I'm not sure if we initially

4  responded when he requested another unit.  I think it

5  was when it sounded like he was in a fight might have

6  been when we responded.

7      Q.  BY MR. SHOWALTER:  Do you know which of these

8  two entries it would be?

9      A.  I'm trying to see where the -- I saw earlier

10  where he said he was in a physical.

11      Q.  Was earlier, would that be on the CAD report?

12      A.  It might have been on the CAD report.

13      Q.  Okay.  I'm going to share the CAD report with

14  you.  So we're talking about the time line of roughly

15  2:24.

16          And in fact, there's -- well, I'm going to

17  go back to Exhibit 1a.

18          So it says at 2:28:54 -- blah, blah, blah,

19  strike that.

20          It says at 2:24:58 "Sergeant Rodarme

21  requests another unit," that's what it says on

22  Exhibit 1a on that time line?

23      A.  Right.

24      Q.  So I'm going to go to that time stamp 2:24:58

25  on the CAD which is Exhibit 50.

DUSTIN HAYNES  MARCH 29, 2021

1      (Whereupon, Deposition Exhibit Number 50 was

2  marked for identification.)

3      Q.  BY MR. SHOWALTER:  And do you recognize these

4  two entries --

5      A.  Yes.

6      Q.  -- at that time?

7          Is there an entry in here that you saw

8  that indicates that there's something physical

9  happening?

10     A.  Yeah.  The 93 Bravo, "Possible 239 with PD."

11  239 is code for fight, at 14:25 hours and 29 seconds.

12     Q.  So that's right here?

13     A.  Yes.

14     Q.  And so that would be approximately 33 seconds

15  after the initial unit -- or after Rodarme's initial

16  call requesting additional units, correct?

17     A.  Yes.

18     Q.  And so it could be two to three minutes after

19  this; is that fair?

20     A.  Correct, yes.

21     Q.  And then going back to the CAD report, and I'm

22  not going to hold you to just the page I'm showing.

23  But are you able to see an entry indicating -- well,

24  let me strike that.

25          In looking at Exhibit 50, which is the CAD

DUSTIN HAYNES  MARCH 29, 2021

1   report, does the CAD report accurately state when you

2   and Officer Yamane arrived at the scene?

3              MS. RETTS:  Foundation.

4              THE WITNESS:  No.  I don't think it has an

5   on scene time for us.

6      Q.  BY MR. SHOWALTER:  And that's not unusual,

7   fair?

8      A.  No, that's not unusual.  Especially on

9   incidents with lots of units responding, we tend to

10  stay off the radio and just get there.

11     Q.  Other than that -- other than -- in trying to

12  figure -- so strike that.

13             If I'm trying to figure out when you and

14  Officer Yamane arrived on scene, is the best point of

15  reference those two calls from Sergeant Rodarme or is

16  there any other information in the CAD report that you

17  believe would provide a better point of reference?

18     A.  Yeah, I would say that for -- my best point of

19  reference would be when 93 Bravo, Sergeant Rodarme

20  indicated that -- it's a possible fight.  I would say

21  we were anywhere from two to three minutes out from

22  that entry.

23     Q.  And it's also possible that it was two to three

24  minutes out from the 2:24:58 call for another unit

25  where you could see Officer -- I'm sorry, Sergeant

1 Rodarme's voice and you could hearing the breathing and

2 actually sounding like he was in fight, right?

3          MS. RETTS:  Form.

4          THE WITNESS:  He could have been.  I don't

5 recall.  That's just looking at it on paper.  I can't

6 tell the inflection in the voice or anything like that

7 to jog my memory.  But I know that that was my thought

8 process, is that he sounds like he's in a high stress

9 situation because working with him, I kind

10 of -- you get to know the tone of everybody's voice and

11 when they're stressed or under stress or they're in the

12 middle of a situation or fighting, you get to know that

13 inflection in their voice.  But my thought process was

14 as soon as I heard he was in a fight, we were going.

15     Q.  BY MR. SHOWALTER:  Okay.  And then I want to

16 make sure I understand this right.  Is there a point

17 later on -- were you and Officer Yamane 9030?

18     A.  Yes, we were that day.

19     Q.  And so scrolling down to page COP-STICKNEY

20 000452, at 2:39:41, is this the first reference to you

21 and Officer Yamane contained in this?

22     A.  I believe so.

23     Q.  Okay.  And then, let's see, the easiest thing I

24 can do, is I'm just going to search for 9030 and that

25 those are -- and just so -- so these ones at 2:39,

DUSTIN HAYNES  MARCH 29, 2021

1    Q.  BY MR. SHOWALTER:  If you had noticed that an

2   officer at the scene had placed their knee on a

3   handcuffed subject's upper shoulder or neck or right

4   shoulder while the subject was handcuffed, face down on

5   the ground, would you have redirected that officer to

6   do something different?

7              MS. RETTS:  Form foundation.

8              THE WITNESS:  Yes.

9    Q.  BY MR. SHOWALTER:  Why is that?

10   A.  Just in light of current conditions and media

11  and everything like that, in regards to our training,

12  we're no longer able to restrain people due to

13  positional asphyxiation.  When you put weight on the

14  neck or throat area, it creates a dangerous situation

15  when you're trying to detain somebody.

16   Q.  And if somebody is handcuffed behind the back

17  and face down, putting weight anywhere on their back

18  can also cause compression of the lungs and chest, it

19  can make it difficult to breathe, right?

20              MS. RETTS:  Form; foundation.

21              THE WITNESS:  Yes.

22   Q.  BY MR. SHOWALTER:  And that danger of

23  positional asphyxia was something that you were trained

24  on well before any of the current climate or conditions

25  took place, correct?

1          MS. RETTS:  Form.

2          THE WITNESS:  Yes.

3      Q.  BY MR. SHOWALTER:  The difference is that, at

4  some point after the Casey Wells incident, the City of

5  Phoenix changed its policies on what restraint

6  techniques that officers could use, correct?

7          MS. RETTS:  Form; foundation.

8          THE WITNESS:  I'm not exactly sure exactly

9  the dates that policies were changed.  But if it --

10     Q.  BY MR. SHOWALTER:  Sometime in the last two

11 years, was there a change in policies regarding

12 restraint?

13     A.  Yes.

14         MS. RETTS:  Form; foundation.

15     Q.  BY MR. SHOWALTER:  But you were trained in the

16 academy about positional asphyxia as a danger, correct?

17         MS. RETTS:  Form.

18         THE WITNESS:  Yes.

19     Q.  BY MR. SHOWALTER:  And you were trained in the

20 academy that placing weight on the back of a handcuffed

21 suspect who was face down on the ground created a risk

22 or a danger of positional asphyxia, correct?

23         MS. RETTS:  Form.

24         THE WITNESS:  Yes.

25     Q.  BY MR. SHOWALTER:  And you were also trained

1    A.   Yes.

2    Q.   Was it your impression, based upon their

3  communication with you, that they wanted them taken to

4  the county jail?

5    A.   County Hospital or just a different hospital

6  because they didn't want to deal with the, I guess,

7  outburst that he was having, that they observed in the

8  parking lot.

9    Q.   On the scene with Mr. Wells, did you ever see

10  his legs lifted off the ground?

11    A.   No.

12    Q.   Did you ever see his thighs come off the

13  ground?

14    A.   No.

15    Q.   As you were working on securing the RIPP

16  restraint, did you have any of your body weight on

17  Mr. Wells?

18    A.   No.

19        MS. RETTS:  I don't have anything further.

20  We will read and sign, if there are no more questions.

21        MR. SHOWALTER:  I have no more questions.

22  Thank you, Officer Haynes.

23        THE WITNESS:  Thank you.

24        THE COURT REPORTER:  The time is

25  11:32 a.m.  This concludes the Zoom recorded deposition

# EXHIBIT 17



COP-STICKNEY000292

# EXHIBIT 18

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

KENNETH PALMER

Phoenix, Arizona
May 3, 2021
9:56 a.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
PREPARED BY:                    P (602) 230-5454
                                F (480) 546-3721
Donna DeLaVina, RPR             www.dlvreporting.com
Certified Reporter
Certificate No. 50468

1  you observed on February 4th, 2019?

2      A.  Yes.

3      Q.  So when you arrive on the scene, and I'm

4  looking at the second paragraph, you could see blood on

5  the back of the person you later found out was Casey

6  Wells' head, correct?

7      A.  Yes, it is.  It was in his hair.

8      Q.  And you could also see blood on the ground

9  underneath his face?

10     A.  Yes.

11     Q.  Now, you say that officers were giving commands

12 for him to stop resisting as they were also trying to

13 apply a RIPP restraint to his feet.  Did you observe

14 whether he was handcuffed when you arrived at the

15 scene?

16     A.  He was not handcuffed at that time.

17     Q.  So it's your testimony that when you arrived,

18 he was not handcuffed?

19     A.  That is correct.

20     Q.  Well, wouldn't it be improper to apply RIPP

21 restraints to somebody who's not yet handcuffed?

22     A.  No.

23     Q.  Would you be surprised that other officers have

24 testified that at the time you arrived Casey Wells was

25 handcuffed?

1  used to smoke methamphetamine, correct?

2      A.  Yes, sir.

3      Q.  And you also observed that there's soot marks

4  and residue suggesting that the pipe had been used,

5  correct?

6      A.  Correct.

7      Q.  You find more money and an Arizona driver's

8  license for Casey Wells with a Mesa address.  You give

9  the fire captain the driver's license and you look at a

10 baggie you found and it contains several clear crystals

11 that you recognize as methamphetamine, correct?

12     A.  Yes.

13     Q.  And then you give that information to the

14 firefighters and you secure the wallet, drugs and

15 money, correct?

16     A.  Correct.

17     Q.  And then you go back -- so then you go back and

18 speak to Mr. Antoniades, correct?

19     A.  Yes.

20     Q.  And he tells you that he's at his brother's

21 residence at 3812 West Salter.  He's taking care of the

22 house because his brother is out of town.  He sees

23 Casey get out of the car and look at the sky and

24 yelling to God.  That's what he told you, correct?

25     A.  Yes, sir.

1    Q.  This is information that you learned after the

2  Casey Wells incident had occurred and Casey is being

3  given life-saving measures, correct?

4    A.  Correct.

5    Q.  And so Mr. Antoniades, turning to the next

6  page, which is COP-STICKNEY000023, Mr. Antoniades says

7  "The guy had been there for about an hour, so he walked

8  across the street to a friend's to warn him about

9  Casey."

10         Did I read that correctly?  Or is that

11  accurate rather?

12    A.  Yeah, you read that correctly.

13    Q.  And did that guy -- did Mr. Antoniades know

14  that the individual's name was Casey?

15         MS. RETTS:  Foundation.

16         THE WITNESS:  I don't believe he did.

17    Q.  BY MR. SHOWALTER:  And Mr. Antoniades told you

18  he went to get something to eat and when he came back

19  the individual we know was Casey was still yelling and

20  praying, correct?

21    A.  Yes.

22    Q.  And Mr. Antoniades told you that Casey then

23  started to take his clothes off and was now completely

24  naked; is that correct?

25    A.  Yes.

KENNETH PALMER  MAY 03, 2021

1    Q.  And then the first officer arrived and John --

2  and Mr. Antoniades immediately thought that officer

3  would need backup.  He said the officer was trying to

4  talk to Casey when the second officer arrived.  They

5  both tried to talk to him and detain him and Casey

6  began to struggle with them.  He described Casey as

7  flailing his arms around, but not in an attacking way

8  towards the officers.

9         Do you see where I read that?

10   A.  I do.

11   Q.  And Mr. Antoniades told you that he saw one of

12  the officers get hit in the head.  And then he saw one

13  of the officers, Officer Arnold, grabbed Casey in a

14  bear hug?

15   A.  Yes.

16   Q.  And Mr. Antoniades said that Officer Arnold

17  was -- and in taking Casey in a bear hug, he was

18  holding Casey from the front, correct?

19   A.  Yes.

20   Q.  And at that point, the other officer helped to

21  take Casey's legs out from under him and they fell to

22  the ground?

23   A.  Correct.

24   Q.  While on the ground Mr. Antoniades told you

25  Casey continued to resist and struggle and that it

1  sounds like Mr. Antoniades was going to go over to try

2  to help out when another officer arrived?

3      A.  Yes.

4      Q.  And then Mr. Antoniades told you he heard a

5  TASER go off and that more and more officers then began

6  to arrive; is that accurate?

7      A.  Yes.

8      Q.  Subsequently you counted the money in the

9  presence of S.I.T. Justus and there were 32 $100 bills

10  and some miscellaneous bills; is that accurate?

11      A.  Yes.

12      Q.  And then you remained at the scene until you

13  were released and the property you had, along with your

14  body camera, was turned over to Detective Duran; is

15  that correct?

16      A.  Yes.

17      Q.  Okay.  Is Detective Duran somebody you had

18  worked with before?

19      A.  He's a homicide detective.

20      Q.  But had you worked with him in the past?  Did

21  you know him?

22      A.  Yeah.  We used to be on the same squad years

23  ago.

24      Q.  Oh, what squad?

25      A.  93 Bravo, I believe.

1        A.  I do.

2        Q.  And you say:

3             "Arnold was there.  Joe Seaquist was

4        there, Frank Long, my boss, and I saw Dustin

5        Haynes."

6             When you say "my boss," that's referring

7   to Sergeant Rodarme?

8        A.  Correct.

9        Q.  And then you say:

10            "Dustin was working with the  RIPP on the

11       feet.  Joe was kind of sitting on -- basically had

12       his weight on the guy's butt.  Frank had, I

13       believe, his arm and I believe Arnold had his right

14       arm."

15            Do you see where I read that?

16       A.  I do.

17       Q.  "My boss had gotten up.  Frank took over, I

18       believe from where my boss originally was."

19            And then you're asked:

20            "And where did you say your boss

21       originally was?"

22            And you say:

23            "I believe he was on the left arm."

24       A.  Correct.

25       Q.  Now, going down to page 11, you're asked what

1  Seaquist was doing.  And you said:

2              "Basically sitting on his butt.  Joe had a

3      TASER on hand.  He did give a command 'Stop or I'm

4      going to tase you.'  I don't know if he said I'm

5      going to Tase you again or I'm going to Tase you.

6      But I had noticed the probes were already in him

7      when I heard that."

8              Do you see where I read that?

9      A.  Yes, sir.

10     Q.  And is that accurate?

11     A.  Yes, sir.

12     Q.  And then at line 14, you're asked:

13             "And then you said you heard a TASER

14     deployment."

15             And you say:

16             "I heard the spark."

17             Do you see where I read that?

18     A.  I do.

19     Q.  What does that mean in terms of a TASER

20 deployment, that you heard the spark?

21     A.  I heard it cycle.  When you pull the trigger

22 for a TASER, it will automatically cycle for five

23 seconds.  So I heard a five-second cycle.

24     Q.  And that's after it's already been deployed in

25 terms of the cartridge being deployed from the TASER

1     Q.  But you didn't see the actual deployment and

2   you didn't see any of the other cycles of the TASER,

3   correct?

4     A.  Correct.  I only witnessed that one.

5         (Whereupon, Mr. Joel Robbins exited the

6   deposition at 11:35 a.m.)

7     Q.  BY MR. SHOWALTER:  And you only saw evidence of

8   a single deployment in terms of TASER prongs or probes

9   and wires, correct?

10           MS. RETTS:  Form.

11           THE WITNESS:  Yeah.  At that time, I only

12   saw the two in his back.

13     Q.  BY MR. SHOWALTER:  Okay.  Okay.  And then here

14   at page 12 you're asked:

15           "Okay.  Was he handcuffed at that point?"

16           And you say:

17           "When the TASER went off, I believe they

18       had one on and they were still trying to get the

19       other arm around to get the second hand secure."

20           Do you see where I read that?

21     A.  Yes.

22     Q.  What is that based on?

23           MS. RETTS:  Form.

24           THE WITNESS:  My observation.

25     Q.  BY MR. SHOWALTER:  What I'm asking you, so what

1  is it specifically -- I mean, if you could put yourself

2  back in that situation, what is it that you saw

3  specifically in terms of his hands and the handcuffs?

4      A.  So they would have had one handcuff on one

5  wrist towards the small of his back.  And they were

6  working on getting the other hand around towards the

7  small of his back, to get the other handcuff on his

8  wrist.

9      Q.  Are you able to remember which hand was

10  behind -- had the handcuff on it already?

11      A.  I don't remember, no.

12      Q.  And at line 6, you're asked:

13          "Could you tell if he was still actively

14      resisting or actively fighting?"

15          And you answered:

16          "I -- I couldn't tell."

17          Is that accurate?

18      A.  Yes.

19      Q.  So, in other words, from the moment you arrived

20  on the scene, you were not ever able to see Casey

21  Wells' actively resisting, correct?

22              MS. RETTS:  Form.

23              THE WITNESS:  He was not actively

24  fighting.  That doesn't mean he wasn't resisting.

25      Q.  BY MR. SHOWALTER:  I'm just going back to the

1  question you were asked back on February 8th.  You were

2  asked:

3          "Could you tell if he was still actively

4     resisting or actively fighting?"

5          And you said:

6          "I couldn't tell."

7          Correct?

8     A.  Correct.  But if he is still -- if you're

9  trying to pull his arm and he is actively resisting

10  you, you're not necessarily going to see that.

11     Q.  And that's fine.  He could have been doing all

12  kinds of things, right?

13     A.  Right.

14     Q.  I'm just asking about what you could perceive

15  and you didn't perceive that he was actively resisting

16  at that time, correct?

17              MS. RETTS:  Form.

18              THE WITNESS:  I could not tell if he was

19  or he was not.

20     Q.  BY MR. SHOWALTER:  And so you never saw Casey

21  Wells -- you never saw Casey Wells do anything that you

22  perceived as active resistance from the moment you

23  arrived, correct?

24              MS. RETTS:  Form.

25              THE WITNESS:  I really can't answer that

1  Officer Arnold has his knee on Casey's body?

2           MS. RETTS:  Form; foundation.

3           THE WITNESS:  I cannot.

4      Q.  BY MR. SHOWALTER:  Does it appear to you that

5  Sergeant Rodarme is trying to control or that either

6  Arnold or Rodarme are working to control or handcuff

7  Casey's hands?

8           MS. RETTS:  Form; foundation.

9           THE WITNESS:  I'm sorry, would you repeat

10  that?

11     Q.  BY MR. SHOWALTER:  At this point, does it

12  appear to you that either Rodarme or Arnold are

13  attempting to handcuff Casey?

14          MS. RETTS:  Form; foundation.

15     Q.  BY MR. SHOWALTER:  They are looking like they

16  are trying to control him.

17     Q.  And I understand that.  But do they appear to

18  be trying to handcuff him from where they are and your

19  experience as a police officer?

20          MS. RETTS:  Form; foundation.

21          THE WITNESS:  In this video, I can't tell.

22     Q.  BY MR. SHOWALTER:  Okay.  I'm going to push

23  play again.

24          (Video played.)

25     Q.  BY MR. SHOWALTER:  Now, you just said, "He is

 1  detained right now," and Sergeant Rodarme starts

 2  standing up, correct?

 3      A.  Correct.

 4      Q.  What did you see that led you to communicate

 5  over the radio that Casey was detained?

 6      A.  Officers had ahold of every limb of him.  So in

 7  my definition, in my mind, we were in the situation of

 8  where he's not going anywhere.  He is detained.  He is

 9  not in custody, but he is not -- he does not have

10  ability to go anywhere.

11      Q.  And you didn't see him actively resisting or

12  fighting?

13              MS. RETTS:  Foundation.

14              THE WITNESS:  Not that I can see.

15      Q.  BY MR. SHOWALTER:  Okay.  I'm pushing play.

16          (Video played.)

17      Q.  BY MR. SHOWALTER:  Were you able to hear the

18  TASER at that point?

19      A.  In that little segment you just played, no, if

20  it went off, I missed it.

21      Q.  Okay.  I'm going to start it over again.  And

22  sometimes I swear it's there, but sometimes on the

23  audio, in the fashion we're communicating, it can be

24  hard to hear.  So I'm going to push play again and I

25  just want you to tell me if you hear the TASER.

1  or extremities?

2          MS. RETTS:  Form; foundation.

3          THE WITNESS:  The extremities, again,

4  while they're trying to pull his hands while they're on

5  the blacktop, if his legs are included with trying to

6  get a RIPP restraint on, I mean, I guess abrasions

7  could have occurred at those times.

8      Q.  BY MR. SHOWALTER:  And then at B, it gives "Two

9  superficial puncture wounds of upper paramidline right

10  back, consistent with conducted electrical weapon

11  application and related dart injury."

12          You saw the TASER probes, correct?

13      A.  Yes.

14      Q.  And then at C it says, "Subcutaneous

15  hemorrhage, central back, between shoulder blades."

16          When you were at the scene, did you see

17  anything that could have cause hemorrhaging to Casey's

18  central back between his shoulder blades?

19          MS. RETTS:  Form; foundation.

20          THE WITNESS:  No.

21      Q.  BY MR. SHOWALTER:  So you don't ever remember

22  seeing Officer Arnold place any knees on Casey?

23      A.  Not that I remember, no.

24      Q.  What was Officer Arnold, in your recollection,

25  doing with his knees when you arrived at the scene?

1  cam video that you were wearing on your person,

2  correct?

3      A.  Yes.

4      Q.  And that is mounted chest height, true?

5      A.  Yes.  Upper chest, yeah.

6      Q.  So it's not the same vision that you see

7  through your eyes, correct?

8      A.  It is not.

9      Q.  So, for example, if you turn your body, one

10 direction, if your head is turned, for example, to the

11 right you might still be able see something that your

12 body camera doesn't?

13     A.  Correct.

14     Q.  From the body camera that we did see, were you

15 able to see Mr. Wells through much of the interaction?

16     A.  Not in his full entirety.  You can see bits and

17 pieces of him.

18     Q.  Is it fair to say that he was obscured by

19 officers?

20     A.  Yes.

21     Q.  Now, you were never in a position on February

22 4th, 2019, to actually get down and feel whether or not

23 Mr. Wells was physically resisting, true?

24     A.  True.

25     Q.  Did you ever physically touch Mr. Wells?

1    A.  I did not.

2    Q.  Now based upon the fact that you never

3  physically touched Mr. Wells, would you agree that you

4  would not be in the position to tell if he was

5  physically clenching his body?

6              MR. SHOWALTER:  Form and foundation.

7              THE WITNESS:  Correct.

8    Q.  BY MS. RETTS:  Would you agree you could not

9  physically tell if he was clenching or tensing his

10  arms?

11    A.  No.  I could not tell something.  That is felt.

12    Q.  Would you be able to tell whether he was trying

13  to lift any part of his body off the ground?

14              MR. SHOWALTER:  Form and foundation.

15              THE WITNESS:  I could not.

16    Q.  BY MS. RETTS:  Do you believe that you were in

17  a position to comment on the appropriateness of any use

18  of force used by any of the officers on the scene that

19  day?

20              MR. SHOWALTER:  Form and foundation.

21              THE WITNESS:  I can only comment about

22  what I physically saw and I did not see anything that

23  was unusual or like out of bounds, I guess.

24    Q.  BY MS. RETTS:  And because you couldn't feel

25  what Mr. Wells was doing, it's difficult for you to

 1  comment about what other people were feeling, correct?

 2      A.  Correct.

 3              MR. SHOWALTER:  Object to form and

 4  foundation.

 5      Q.  BY MS. RETTS:  Would you agree you can't tell

 6  us what other people physically felt through their

 7  hands?

 8      A.  I cannot.

 9      Q.  In your experience as an officer, if someone is

10  resisting, is that what gives difficulty in trying to

11  get their hands in handcuffs behind their back?

12      A.  Yes.

13              MS. RETTS:  I don't have anything further.

14              MR. SHOWALTER:  A couple of quick

15  follow-ups.

16

17                  FURTHER EXAMINATION

18  BY MR. SHOWALTER:

19      Q.  So I want to make sure I understand something.

20  Police officers are trained to communicate with each

21  other, correct?

22      A.  Yes.

23      Q.  That's one of the most important -- it's a team

24  job, correct?

25      A.  It is.

# EXHIBIT 19
## (Non-Electronic)

# EXHIBIT 20



**NMS Labs**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900   Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

# Toxicology Report

**Report Issued**   02/20/2019 13:05

| | |
|---|---|
| **Patient Name** | WELLS, CASEY |
| **Patient ID** | 19-01162 |
| **Chain** | NMSCP8803 |
| **Age** Not Given | **DOB** Not Given |
| **Gender** | Not Given |
| **Workorder** | 19040535 |

To:   **10106**
Maricopa County Office of the Medical Examiner
Attn: Toxicology Lab
701 W. Jefferson Street
Phoenix, AZ   85007

**Page 1 of 3**

## Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| D-Amphetamine | 68 | ng/mL | 001 - Hospital Blood |
| % of D-Amphetamine | 100 | % | 001 - Hospital Blood |
| % of L-Amphetamine | 0.0 | % | 001 - Hospital Blood |
| D-Methamphetamine | 580 | ng/mL | 001 - Hospital Blood |
| % of D-Methamphetamine | 100 | % | 001 - Hospital Blood |
| % of L-Methamphetamine | 0.0 | % | 001 - Hospital Blood |
| Caffeine | Positive | mcg/mL | 001 - Hospital Blood |

See Detailed Findings section for additional information

## Testing Requested:

| Analysis Code | Description |
|---|---|
| 0329B | Amphetamines (D/L Differentiation), Blood |
| 8042B | Postmortem, Expanded w/Vitreous Alcohol Confirmation, Blood (Forensic) |

## Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Pink Vial | 5.75 mL | 02/04/2019 15:16 | Hospital Blood | |
| 002 | Pink Vial | 1.25 mL | 02/04/2019 15:18 | Hospital Blood | |
| 003 | Green Vial | 1 mL | 02/04/2019 | Hospital Serum | |
| 004 | Gray Top Tube | 9 mL | 02/07/2019 09:00 | Iliac Blood | |
| 005 | Gray Top Tube | 8.75 mL | 02/07/2019 09:00 | Iliac Blood | |
| 006 | Red Top Tube | 1.75 mL | 02/07/2019 09:00 | Vitreous Fluid | |
| 007 | Gray Top Tube | 2.25 mL | 02/07/2019 09:00 | Urine | |

All sample volumes/weights are approximations.

Specimens received on 02/12/2019.

NMS v.18.0

COP-STICKNEY000564



## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| D-Amphetamine | 68 | ng/mL | 10 | 001 - Hospital Blood | LC-MS/MS |
| % of D-Amphetamine | 100 | % | | 001 - Hospital Blood | LC-MS/MS |
| % of L-Amphetamine | 0.0 | % | | 001 - Hospital Blood | LC-MS/MS |
| D-Methamphetamine | 580 | ng/mL | 10 | 001 - Hospital Blood | LC-MS/MS |
| % of D-Methamphetamine | 100 | % | | 001 - Hospital Blood | LC-MS/MS |
| % of L-Methamphetamine | 0.0 | % | | 001 - Hospital Blood | LC-MS/MS |
| Caffeine | Positive | mcg/mL | 0.20 | 001 - Hospital Blood | LC/TOF-MS |

**Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.**

## Reference Comments:

1. % of D-Methamphetamine - Hospital Blood:

   If D-methamphetamine is greater than 20% of the total methamphetamine, the methamphetamine found is probably the result of the use of the DEA schedule II CNS stimulant (D-methamphetamine)

2. Caffeine (No-Doz) - Hospital Blood:

   Caffeine is a xanthine-derived central nervous system stimulant. It also produces diuresis and cardiac and respiratory stimulation. It can be readily found in such items as coffee, tea, soft drinks and chocolate. As a reference, a typical cup of coffee or tea contains between 40 to 100 mg caffeine.

   The reported qualitative result for this substance was based upon a single analysis only. If confirmation testing is required please contact the laboratory.

3. D-Amphetamine - Hospital Blood:

   Amphetamine is a DEA schedule II stimulant drug. It is used therapeutically in the treatment of narcolepsy and in the treatment of hyperactivity in children and adults. Amphetamine has a high potential for abuse. D-amphetamine is a metabolite of D-methamphetamine and benzphetamine. L-amphetamine is a metabolite of L-methamphetamine. Adderall, a brand name of a mixture of D-amphetamine and racemic (D,L-amphetamine) salts, is used in the treatment of hyperactivity disorders. Vyvanase is the brand name for lisdexamfetamine which can be analyzed and reported as D-amphetamine.

4. D-Methamphetamine - Hospital Blood:

   D-methamphetamine is a DEA schedule II CNS stimulant drug. Chemically there are two forms (isomers) of methamphetamine: L-methamphetamine and D-methamphetamine. The L-isomer (more commonly known by its generic name: L-desoxyephedrine) is found as an active ingredient in certain inhalers and used as a nasal decongestant. It has weak CNS stimulatory activity. The D-isomer has been used therapeutically as an anoretic agent in the treatment of obesity and it elicits potent CNS-,cardiac- and circulatory-stimulant effects. Due to its high abuse potential, D-methamphetamine is rarely prescribed therapeutically today. D-amphetamine (dextroamphetamine) is a metabolite of D-methamphetamine and L-amphetamine is a metabolite of L-methamphetamine. These L-isomers are also metabolites of the antiparkinson drug, selegiline.

## Sample Comments:

001    Physician/Pathologist Name: DR. K. HORN

001    Select testing may have been performed at: 200 Welsh Road, Horsham, PA 19044-2208

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

COP-STICKNEY000565



Workorder 19040535 was electronically signed on 02/20/2019 12:30 by:

Michael E. Lamb, M.S.F.S., D-ABFT-FT
Forensic Toxicologist

## Analysis Summary and Reporting Limits:

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Acode 0329B - Amphetamines (D/L Differentiation), Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| % of D-Amphetamine | N/A | D-Amphetamine | 10 ng/mL |
| % of D-Methamphetamine | N/A | D-Methamphetamine | 10 ng/mL |
| % of L-Amphetamine | N/A | L-Amphetamine | 10 ng/mL |
| % of L-Methamphetamine | N/A | L-Methamphetamine | 10 ng/mL |

Acode 52485B - Amphetamines Confirmation, Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamine | 5.0 ng/mL | Norpseudoephedrine | 5.0 ng/mL |
| Ephedrine | 5.0 ng/mL | Phentermine | 5.0 ng/mL |
| MDA | 5.0 ng/mL | Phenylpropanolamine | 5.0 ng/mL |
| MDEA | 5.0 ng/mL | Pseudoephedrine | 5.0 ng/mL |
| Methamphetamine | 5.0 ng/mL | | |

Acode 8042B - Postmortem, Expanded w/Vitreous Alcohol Confirmation, Blood (Forensic) - Hospital Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0.040 mcg/mL | Salicylates | 120 mcg/mL |
| Cannabinoids | 10 ng/mL | | |

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

-Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) for: The following is a general list of compound classes included in this screen. The detection of any specific analyte is concentration-dependent. Note, not all known analytes in each specified compound class are included. Some specific analytes outside these classes are also included. For a detailed list of all analytes and reporting limits, please contact NMS Labs.

Amphetamines, Anticonvulsants, Antidepressants, Antihistamines, Antipsychotic Agents, Benzodiazepines, CNS Stimulants, Cocaine and Metabolites, Hallucinogens, Hypnosedatives, Hypoglycemics, Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents, Opiates and Opioids.