# EXHIBIT 21

| | DVMC Deer Valley Medical Center | Wells, Casey J |
| HONORHEALTH™ | 19829 N. 27th Avenue | MRN: 3040078, DOB: ▓▓▓▓▓, Sex: M |
| | PHOENIX AZ 85027-4001 | Acct #: 20190350580 |
| | Hospital Encounter | Adm: 2/4/2019, D/C: 2/6/2019 |

**ED Notes (continued)**

ED Provider Notes by Jonathan Avelino Maitem, DO at 02/04/19 1635 (continued)                                    Version 1 of 1

3.  Bilateral lower lobe and bilateral upper lobe atelectasis or consolidations.
4.  The stomach is significantly distended with air and there is air within a
loop of mildly distended small bowel. Correlation for iatrogenic air
introduction from the patient's respiratory code is advised.
5.  Fatty hepatic changes.
6.  Small fat-containing umbilical hernia and bilateral inguinal hernias.
7.  Limited assessment of the urinary bladder as it is empty from the Foley
catheter.

Dictated on:  2/4/2019 4:48 PM
Interpreted by:  Barry Sadegi, M.D.
Signed by:  Barry Sadegi, M.D.
Signed Date/Time:  2/4/2019 4:48 PM

The Medical Diagnostic Imaging Group
If you need assistance, please call 602-246-2584.

XR Chest Portable
**Final Result**
IMPRESSION:
1.  Nasogastric tube tip projects over the superior mediastinum, repositioning
is necessary.
2.  Right central venous catheter tip in satisfactory position.
3.  Cardiomegaly and elevated pulmonary vascularity.

Dictated on: 2/4/2019 4:07 PM
Interpreted by:  Barry Sadegi, M.D.
Signed by:  Barry Sadegi, M.D.
Signed Date/Time:  2/4/2019 4:07 PM

The Medical Diagnostic Imaging Group
If you need assistance, please call 602-246-2584.

XR Chest 1 View Post Procedure
**Final Result**
IMPRESSION:
1. No radiographic evidence of acute pulmonary disease.
2. Endotracheal tube in place with distal tip approximately 2.3 cm above the

WELLS 001031

**ED Notes (continued)**

ED Provider Notes by Jonathan Avelino Maitem, DO at 02/04/19 1635 (continued)                                   Version 1 of 1

carina

Dictated on: 2/4/2019 3:22 PM
Interpreted by: Aaron Wittenberg, M.D.
Signed by: Aaron Wittenberg, M.D.
Signed Date/Time: 2/4/2019 3:22 PM

The Medical Diagnostic Imaging Group
If you need assistance, please call 602-246-2584.

Radiology reports interpreted by radiologist, reviewed by me.

**Laboratory Studies:**
**Results for orders placed or performed during the hospital encounter of 02/04/19**
**CBC with Differential**

| Result | Value | Ref Range |
| --- | --- | --- |
| WBC | 8.5 | 4.0 - 10.5 10³/uL |
| RBC | 5.14 | 3.90 - 5.40 10^6/uL |
| Hemoglobin | 16.6 (H) | 10.5 - 14.0 g/dL |
| Hematocrit | 52.2 (H) | 32.0 - 42.0 % |
| MCV | 101.6 (H) | 80.0 - 95.0 fL |
| MCH | 32.3 | 27.0 - 34.0 PG |
| MCHC | 31.8 | 31.0 - 37.0 g/dL |
| RDW-CV | 12.9 | 11.0 - 14.5 CV% |
| RDW-SD | 48.5 (H) | 36.4 - 43.9 SD FL |
| Platelets | 305 | 130 - 450 K/uL |
| MPV | 12.1 | 7.4 - 12.4 fL |
| Neutrophils | 50 | % |
| Lymphs | 34 | % |
| Monocytes | 10 | % |
| Basophils | 0 | % |
| Eosinophils | 2 | % |
| Immature Grans | 5 | % |
| nRBC | <1.0 | /100 WBCs |
| Neutrophils Absolute | 4.23 | 2.88 - 6.00 10³/uL |
| Lymphocytes Absolute | 2.84 | 2.40 - 5.20 10³/uL |
| Monocytes Absolute | 0.81 | 0.27 - 1.25 10³/uL |
| Eosinophils Absolute | 0.13 | <=0.62 10³/uL |
| Basophils Absolute | 0.03 | 10³/uL |
| Immature Grans Absolute | 0.41 (H) | 0.00 - 0.10 10³/uL |
| Nucleated RBC Absolute | 0.000 | <=0.020 10³/uL |

**Comprehensive Metabolic Panel**

| Result | Value | Ref Range |
| --- | --- | --- |
| Glucose | 225 (H) | 74 - 106 mg/dL |
| BUN | 23 (H) | 8 - 21 mg/dL |
| Creatinine | 0.6 | mg/dL |
| eGFR (Non-African American) | | >60 mL/min/1.73m2 |
| eGFR (African American) | | >60 mL/min/1.73m2 |

WELLS 001032



| DVMC Deer Valley Medical Center | Wells, Casey J |
|---|---|
| 19829 N. 27th Avenue | MRN: 3040078, DOB: ▮▮▮▮ Sex: M |
| PHOENIX AZ 85027-4001 | Acct #: 20190350580 |
| Hospital Encounter | Adm: 2/4/2019, D/C: 2/6/2019 |

**H&P - Additional Provider Notes (continued)**

**H&P by Amira Habib Attya, MD at 02/04/19 2017 (continued)**

8:30 PM

Electronically signed by Amira Habib Attya, MD at 02/04/19 2038

**Consults - Additional Provider Notes**

**Consults by Hoang Lim, DO at 02/04/19 1910**

| | | |
|---|---|---|
| Author: **Hoang Lim, DO** | Service: **Trauma** | Author Type: **Physician** |
| Date of Service: **02/04/19 1910** | Creation Time: **02/04/19 1910** | Filed: **02/04/19 1924** |
| Status: **Signed** | Editor: **Hoang Lim, DO (Physician)** | |

Consult Orders
1. Trauma Surgery Consult [183200937] ordered by Jonathan Avelino Maitem, DO at 02/04/19 1718



| **Trauma Consult Note** |
|---|
| **ACUTE CARE SURGICAL SPECIALISTS** |

| **Name:** | Casey Wells | **Date of Exam:** | 2/4/2019 |
|---|---|---|---|
| **MRN:** | 5432291 | **Primary Provider:** | No primary care provider on file. |
| **DOB:** | ▮▮▮▮ | **Age:** | 40 y.o. |
| | | **Gender:** | male |

| **Presentation** |
|---|

**Mechanism of Injury:**
  code arrest

**HPI:**
40M presented to ED by EMS after code arrest. Pt was reported to be doing yoga naked in the park and was approached by police officers. Got into an altercation with police. He was reported to have been tased 3-4 times and then went into cardiac arrest. CPR was initiated. Pt presented to ED with lucas device. Pt was intubated in ED by ER physician. Trauma is being consulted for sternal fractures and b/l rib fractures.

| **History** |
|---|

**Past Medical History:**

WELLS 001230

# EXHIBIT 22

*Gary M. Vilke, M.D., FACEP, FAAEM*
*11582 Normanton Way*
*San Diego, California 92131*
*(619) 666-8643*

November 19, 2021

Christina Retts
Wienke Law Group
1095 W. Rio Salado Pkwy, Suite 209
Tempe, AZ 85281

**RE: *Lei Ann Stickney v. City of Phoenix, et al.***
***Case No.: 2:20-cv-SMB-CDB***

## Introduction

I am a board-certified emergency department physician with substantial experience in cardiac arrest and sudden death. I am also an independent researcher on the physiologic effects of restraint, neck holds, and body position as well as TASER conductive energy weapons. My specific qualifications will be outlined in more detail at the end of this report.

I have been retained as an expert to review relevant materials and provide expert opinion on this matter on whether the actions of the City of Phoenix police officers caused or contributed to the cardiac arrest and death of Mr. Casey Wells when the officers encountered him on February 4, 2019. After careful review, it is my opinion to a reasonable degree of medical certainty that Mr. Wells' cardiac arrest and death was not caused by the actions of the officers including the use of the TASER or restraint. This opinion and related opinions are set forth in the expert report.

## Materials Reviewed

I have reviewed extensive materials pertaining to the above referenced case. This includes, but is not limited to:

COP-STICKNEY007227

## A.     Medical and Scientific Literature

Chan TC, Vilke GM, Neuman T, Clausen JL:  Restraint position and positional asphyxia.  Ann Emerg Med 1997;30(5):578-586.

Chan TC, Vilke GM, Neuman T:  Reexamination of custody restraint position and positional asphyxia.  Am J Forensic Med Pathol 1998;19(3):201-205.

Vilke GM, Chan TC, Neuman T, Clausen JL:  Spirometry in normal subjects in sitting, prone, and supine positions.  Respir Care 2000;45(4):407-410.

Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM:  Weight force during prone restraint and respiratory function.  Am J Forensic Med Pathol 2004;25(3):185-189.

Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW.  Ventilatory and metabolic demands during aggressive physical restraint in healthy adults.  J Forensic Sci 2007;52(1):171-175.

Reay DT, Howard JD, Fligner CL, Ward RJ.  Effects of positional restraint on oxygen saturation and heart rate following exercise. Am J Forensic Med Pathol. 1988 Mar;9(1):16-8.

Schmidt P, Snowden T. The effects of positional restraint on heart rate and oxygen saturation. J Emerg Med 1999;17:777-782.

Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC.  The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures.  J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM.  Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

Ho JD, Dawes DM, Moore JC, Caroon LV, Miner JR: Effect of position and weight force on inferior vena cava diameter--implications for arrest-related death. Forensic Sci Int. 2011 Oct 10;212(1-3):256-9.

Kroll MW, Still GK, Neuman TS, Graham MA, Griffin LV.  Acute forces required for fatal compression asphyxia: A biomechanical model and historical comparisons.  Med Sci and the Law. 2017 Jan 1:25802417695711. [Epub ahead of print]

Kroll MW, Brave MA, Kleist SR, Ritter MB, Ross DL, Karch SB.  Applied Force During Prone Restraint: Is Officer Weight a Factor? Am J Forensic Med Pathol. 2018 [Epub ahead of print]

Rossen R, Kabat H, Anderson JP.  Acute arrest of cerebral circulation in man. Arch NeurPsych1943;50(5):510-28.

COP-STICKNEY007228

Ho JD, Dawes DM, Bultman LL, et al. Respiratory Effect of Prolonged Electrical Weapon Application on Human Volunteers. Acad Emerg Med.2007; 14:197–201

Vilke GM, Sloane CM, Suffecool A, Kolkhorst FW, Neuman TS, Castillo EM, Chan TC. Physiologic effects of the TASER after exercise. Acad Emerg Med. 2009 Aug;16(8):704-10.

Vilke GM, Sloane CM, Bouton KD, Kolkhorst FW, Levine SD, Neuman TS, Castillo EM, Chan TC. Physiological effects of a conducted electrical weapon on human subjects. Ann Emerg Med. 2007 Nov;50(5):569-75. Epub 2007 Aug 24.

Ho J, Dawes D, Nelson RS, et al. Acidosis and catecholamine evaluation following simulated law enforcement "use of force" encounters. Acad Emerg Med 2010 Jul;17(7):e60-8.

Vilke GM, Bozeman WP, Chan TC. Emergency Department Evaluation after Conducted Energy Weapon Use: Review of the Literature for the Clinician. J Emerg Med 2011;40(5):598-604. Epub 2011 Jan 4.

Swerdlow CD, Fishbein MC, Chaman L, Lakkireddy DR, Tchou P.. Presenting Rhythm in Sudden Deaths Temporally Proximate to Discharge of TASER Conducted Electrical Weapons. Acad. Emerg. Med. 2009;16:726-739.

Kroll MW, Lakkireddy D, Rahko PS, Panescu D. Ventricular Fibrillation Risk Estimation for Conducted Electrical Weapons: Critical Convolutions. Conf Proc IEEE Eng Med Biol Soc 2011:271-7.

Panescu D, Kroll M, Brave M. Cardiac Fibrillation Risks with TASER Conducted Electrical Weapons. Conf Proc IEEE Eng Med Biol Soc. 2015:323-9.

Kroll MW, Brave MA, Pratt HMO, Witte KK, Kunz SN, Luceri RM. Benefits, Risks, and Myths of TASER Handheld Electrical Weapons. https://doi.org/10.1007/s41314-019-0021-9.

### B. Case-Specific Materials

01. Plaintiff's Second Amended Complaint dated June 24, 2020;

02. Defendants' Answer to Plaintiff's Second Amended Complaint dated September 4, 2020.

03. Plaintiff's Second Amended Complaint dated June 24, 2020

04. Defendants' Answer to Plaintiff's Second Amended Complaint dated September 4, 2020

05. Defendants' Initial Disclosure Statement dated October 30, 2020 with exhibits:

06. Phoenix Police Department Investigative Report

07. Color photos associated with Phoenix Police Department Investigative Report

COP-STICKNEY007229

08.    Phoenix Police Department Investigative Report re: Wells Autopsy (Redacted)

09.    Phoenix Police Department Body Cam Video

10.    Phoenix Police Department CAD Log

11.    Phoenix Police Department radio dispatch call

12.    Phoenix Police Department 911 Call

13.    Phoenix Police Department Taser Report prepared by Mark Veres

14.    Phoenix Police Department Audio Interview of Shelly Aldridge

15.    Phoenix Police Department Audio Interview of John Antoniades

16.    Phoenix Police Department Audio Interview of Jeffrey Bolduc

17.    Phoenix Police Department Audio Interview of Holly Boston

18.    Phoenix Police Department Audio Interview of Constance Brenton

19.    Phoenix Police Department Audio Interview of Richard Buffington

20.    Phoenix Police Department Audio Interview of Peter Chambers

21.    Phoenix Police Department Audio Interview of Wanda Cleveland and Brittany Walls

22.    Phoenix Police Department Audio Interview of Elisabeth Johnson

23.    Phoenix Police Department Audio Interview of Kyle O'Hare

24.    Phoenix Police Department Audio Interview of Jenevette Tate

25.    Phoenix Police Department Audio Interview of Naida Tedquist

26.    Phoenix Police Department Audio Interview of Douglas Texel

27.    Phoenix Police Department Audio Interview of Vickki Zachariah

28.    Phoenix Police Department Audio Interview of Officer James Arnold

29.    Phoenix Police Department Audio Interview of Officer Travis Funston

30.    Phoenix Police Department Audio Interview of Officer Frank Long

31.    Phoenix Police Department Audio Interview of Sergeant Rodarme

32.    Phoenix Police Department Audio Interview of Officer Joseph Seaquist

33.    Phoenix Police Department Audio Interview of John Antoniades

34.    Phoenix Police Department Dash Cam Video

35.    Phoenix Police Department Use of Force Report

36.    Maricopa County Office of the Medical Examiner Final Report

37.    Maricopa County Office of the Medical Examiner Neuropathology Final Report

38.    Maricopa County Office of the Medical Examiner Anthropology Final Report

39.    Maricopa County Office of the Medical Examiner Toxicology Final Report

40.    Phoenix Police Department Professional Standards Bureau ("PSB") Report

COP-STICKNEY007230

41. Phoenix Police Department PSB Report (Internal Investigation)

42. Phoenix Police Department PSB (Administrative Paperwork)

43. Phoenix Police Department PSB (Involved Employees)

44. Phoenix Police Department PSB (Civilian/Suspect) (Redacted)

45. Phoenix Police Department (Attachments) (Redacted)

46. Phoenix Police Department Review Board Use of Force Incident Review Memo

47. Phoenix Police Department PSB Investigation Summary

48. John Antoniades Audio File

49. James Arnold Audio File

50. Jeffrey Bolduc Audio File

51. Holly Boston Audio File

52. Richard Buffington Audio File

53. Peter Chambers Audio File

54. Travis Funston Audio File

55. Dustin Haynes Audio File

56. Frank Long Audio File

57. Kenneth Palmer Audio File

58. Robert Rodarme Audio File

59. Joseph Seaquist Audio File

60. Jenevette Tate Audio File

61. Douglas Texel Audio File

62. Sean Yamane Audio File

63. Vickki Zachariah Audio File

64. AZ Central.com article re: Casey Wells

65. Defendants' First Supplemental Disclosure Statement dated February 3, 2021 with exhibits:

66. Taser Pulse Chart 1 (Seaquist)

67. Taser Pulse Chart 2 (Seaquist)

68. Phoenix Fire Department EMS Incident Report

69. Phoenix Fire Department Treatment Refusal form and release

70. Phoenix Fire Department Incident History Report (RMS Live System)

71. Defendants' Second Supplemental Disclosure Statement dated March 3, 2021 with exhibits:

72. Officer James Arnold's Division file as maintained by the City of Phoenix (Redacted)

73. Declaration of Custodian of Records from Phoenix Police Department re: Officer James

COP-STICKNEY007231

Arnold's Division file

74.     Officer James Arnold's FMB file as maintained by the City of Phoenix (Redacted)

75.     Declaration of Custodian of Records from Phoenix Police Department re: Officer James Arnold's FMB file

76.     Officer James Arnold's Human Resources ("HR") file as maintained by the City of Phoenix (Redacted)

77.     Declaration of Custodian of Records from Phoenix Police Department re: Officer James Arnold's HR file

78.     Officer James Arnold's Professional Standard's Bureau ("PSB") file as maintained by the City of Phoenix (Redacted)

79.     Declaration of Custodian of Records from Phoenix Police Department re: Officer James Arnold's PSB file

80.     Officer James Arnold's Supervisor Notes file as maintained by the City of Phoenix (Redacted)

81.     Declaration of Custodian of Records from Phoenix Police Department re: Officer James Arnold's Supervisor Notes file

82.     Officer James Arnold's Training file as maintained by the City of Phoenix (Redacted)

83.     Declaration of Custodian of Records from Phoenix Police Department re: Officer James Arnold's Training file

84.     Declaration of Custodian of Records from Phoenix Police Department re: no SID file exists for Officer James Arnold

85.     Officer Travis Funston's Division file as maintained by the City of Phoenix (Redacted)

86.     Declaration of Custodian of Records from Phoenix Police Department re: Officer Travis Funston's Division file

87.     Officer Travis Funston's FMB file as maintained by the City of Phoenix (Redacted)

88.     Declaration of Custodian of Records from Phoenix Police Department re: Officer Travis Funston's FMB file

89.     Officer Travis Funston's Human Resources ("HR") file as maintained by the City of Phoenix (Redacted)

90.     Declaration of Custodian of Records from Phoenix Police Department re: Officer Travis Funston's HR file

91.     Officer Travis Funston's Professional Standard's Bureau ("PSB") file as maintained by the City of Phoenix (Redacted)

92.     Declaration of Custodian of Records from Phoenix Police Department re: Officer Travis

COP-STICKNEY007232

Funston's PSB file

93. Officer Travis Funston's Supervisor Notes file as maintained by the City of Phoenix (Redacted)

94. Declaration of Custodian of Records from Phoenix Police Department re: Officer Travis Funston's Supervisor Notes file

95. Officer Travis Funston's Training file as maintained by the City of Phoenix (Redacted)

96. Declaration of Custodian of Records from Phoenix Police Department re: Officer Travis Funston's Training file

97. Declaration of Custodian of Records from Phoenix Police Department re: no SID file exists for Officer Travis Funston

98. Officer Dustin Haynes' Division file as maintained by the City of Phoenix (Redacted)

99. Declaration of Custodian of Records from Phoenix Police Department re: Officer Dustin Haynes' Division file

100. Officer Dustin Haynes' FMB file as maintained by the City of Phoenix (Redacted)

101. Declaration of Custodian of Records from Phoenix Police Department re: Officer Dustin Haynes' FMB file

102. Officer Dustin Haynes' Human Resources ("HR") file as maintained by the City of Phoenix (Redacted)

103. Declaration of Custodian of Records from Phoenix Police Department re: Officer Dustin Haynes' HR file

104. Officer Dustin Haynes' Professional Standard's Bureau ("PSB") file as maintained by the City of Phoenix (Redacted)

105. Declaration of Custodian of Records from Phoenix Police Department re: Officer Dustin Haynes' PSB file

106. Officer Dustin Haynes' Supervisor Notes file as maintained by the City of Phoenix (Redacted)

107. Declaration of Custodian of Records from Phoenix Police Department re: Officer Dustin Haynes' Supervisor Notes file

108. Officer Dustin Haynes' Training file as maintained by the City of Phoenix (Redacted)

109. Declaration of Custodian of Records from Phoenix Police Department re: Officer Dustin Haynes' Training file

110. Declaration of Custodian of Records from Phoenix Police Department re: no SID file exists for Officer Dustin Haynes

111. Officer Frank Long's Division file as maintained by the City of Phoenix (Redacted)

COP-STICKNEY007233

112. Declaration of Custodian of Records from Phoenix Police Department re: Officer Frank Long's Division file

113. Officer Frank Long's FMB file as maintained by the City of Phoenix (Redacted)

114. Declaration of Custodian of Records from Phoenix Police Department re: Officer Frank Long's FMB file

115. Officer Frank Long's Human Resources ("HR") file as maintained by the City of Phoenix (Redacted)

116. Declaration of Custodian of Records from Phoenix Police Department re: Officer Frank Long's HR file

117. Officer Frank Long's Professional Standard's Bureau ("PSB") file as maintained by the City of Phoenix (Redacted)

118. Declaration of Custodian of Records from Phoenix Police Department re: Officer Frank Long's PSB file

119. Declaration of Custodian of Records from Phoenix Police Department re: Officer Frank Long's PSB file

120. Declaration of Custodian of Records from Phoenix Police Department re: Officer Frank Long's Supervisor Notes file

121. Officer Frank Long's Training file as maintained by the City of Phoenix (Redacted)

122. Declaration of Custodian of Records from Phoenix Police Department re: Officer Frank Long's Training file

123. Declaration of Custodian of Records from Phoenix Police Department re: no SID file exists for Officer Frank Long

124. Officer Kenneth Palmer's Division File as maintained by the City of Phoenix (Redacted)

125. Declaration of Custodian of Records from Phoenix Police Department re: Officer Kenneth Palmer's Division file

126. Officer Kenneth Palmer's FMB File as maintained by the City of Phoenix (Redacted)

127. Declaration of Custodian of Records from Phoenix Police Department re: Officer Kenneth Palmer's FMB file

128. Officer Kenneth Palmer's Human Resources ("HR") file as maintained by the City of Phoenix (Redacted)

129. Declaration of Custodian of Records from Phoenix Police Department re: Officer Kenneth Palmer's HR file

130. Officer Kenneth Palmer's Professional Standard's Bureau ("PSB") file as maintained by the

COP-STICKNEY007234

City of Phoenix (Redacted)

131. Declaration of Custodian of Records from Phoenix Police Department re: Officer Kenneth Palmer's PSB file

132. Officer Kenneth Palmer's Supervisor Notes file as maintained by the City of Phoenix (Redacted)

133. Declaration of Custodian of Records from Phoenix Police Department re: Officer Kenneth Palmer's Supervisor Notes file

134. Officer Kenneth Palmer's Training file as maintained by the City of Phoenix (Redacted)

135. Declaration of Custodian of Records from Phoenix Police Department re: Officer Kenneth Palmer's Training file

136. Declaration of Custodian of Records from Phoenix Police Department re: no SID file exists for Officer Kenneth Palmer

137. Sgt. Robert Rodarme's Division file as maintained by the City of Phoenix

138. Declaration of Custodian of Records from Phoenix Police Department re: Sgt. Robert Rodarme's Division file

139. Sgt. Robert Rodarme's FMB file as maintained by the City of Phoenix (Redacted)

140. Declaration of Custodian of Records from Phoenix Police Department re: Sgt. Robert Rodarme's FMB file

141. Sgt. Robert Rodarme's Human Resources file as maintained by the City of Phoenix (Redacted)

142. Declaration of Custodian of Records from Phoenix Police Department re: Sgt Robert Rodarme's HR file

143. Sgt. Robert Rodarme's Professional Standard's Bureau ("PSB") file as maintained by the City of Phoenix

144. Declaration of Custodian of Records from Phoenix Police Department re: Sgt. Robert Rodarme's PSB file

145. Sgt. Robert Rodarme's Training file as maintained by the City of Phoenix (Redacted)

146. Declaration of Custodian of Records from Phoenix Police Department re: Sgt. Robert Rodarme's Training file

147. Declaration of Custodian of Records from Phoenix Police Department re: no SID file exists for Sgt. Robert Rodarme

148. Officer Joseph Seaquist's FMB file as maintained by the City of Phoenix (Redacted)

149. Declaration of Custodian of Records from Phoenix Police Department re: Officer Joseph

COP-STICKNEY007235

Sequist's FMB file

150. Officer Joseph Seaquist's Human Resources file as maintained by the City of Phoenix (Redacted)

151. Declaration of Custodian of Records from Phoenix Police Department re: Officer Joseph Sequist's HR file

152. Officer Joseph Seaquist's Professional Standard's Bureau ("PSB") file as maintained by the City of Phoenix

153. Declaration of Custodian of Records from Phoenix Police Department re: Officer Joseph Seaquist's PSB file

154. Officer Joseph Seaquist's Training file as maintained by the City of Phoenix (Redacted)

155. Declaration of Custodian of Records from Phoenix Police Department re: Officer Joseph Seaquist's Training file

156. Officer Sean Yamane's Division file as maintained by the City of Phoenix (Redacted)

157. Declaration of Custodian of Records from Phoenix Police Department re: Officer Sean Yamane's Division file

158. Officer Sean Yamane's FMB file as maintained by the City of Phoenix

159. Declaration of Custodian of Records from Phoenix Police Department re: Officer Sean Yamane's FMB file

160. Officer Sean Yamane's Human Resources ("HR") file as maintained by the City of Phoenix (Redacted)

161. Declaration of Custodian of Records from Phoenix Police Department re: Officer Sean Yamane's HR file

162. Officer Sean Yamane's Professional Standard's Bureau ("PSB") file as maintained by the City of Phoenix (Redacted)

163. Declaration of Custodian of Records from Phoenix Police Department re: Officer Sean Yamane's PSB file

164. Officer Sean Yamane's Supervisor Notes file as maintained by the City of Phoenix (Redacted)

165. Declaration of Custodian of Records from Phoenix Police Department re: Officer Sean Yamane's Division file

166. Officer Sean Yamane's FMB file as maintained by the City of Phoenix

167. Declaration of Custodian of Records from Phoenix Police Department re: Officer Sean Yamane's FMB file

168. Officer Sean Yamane's Human Resources ("HR") file as maintained by the City of Phoenix

COP-STICKNEY007236

(Redacted)

169. Declaration of Custodian of Records from Phoenix Police Department re: Officer Sean Yamane's HR file

170. Officer Sean Yamane's Professional Standard's Bureau ("PSB") file as maintained by the City of Phoenix (Redacted)

171. Declaration of Custodian of Records from Phoenix Police Department re: Officer Sean Yamane's PSB file

172. Officer Sean Yamane's Supervisor Notes file as maintained by the City of Phoenix (Redacted) Declaration of Custodian of Records from Phoenix Police Department re: Officer Sean Yamane's Supervisor Notes file

173. Officer Sean Yamane's Training File as maintained by the City of Phoenix

174. Declaration of Custodian of Records from Phoenix Police Department re: Officer Sean Yamane's Training file

175. Declaration of Custodian of Records from Phoenix Police Department re: no SID file exists for Officer Sean Yamane

176. Phoenix Police Department Training materials re: Non-credit video training Restraint/Refusal

177. Phoenix Police Department Training re: Taser Operations

178. Phoenix Police Department Training re: Ground Fighting

179. Phoenix Police Department Training re: Excited Delirium

180. Phoenix Police Department Training re: Taser X26 Recertification

181. Phoenix Police Department Training re: Urban and Open Area Engagements

182. Phoenix Police Department Training re: Use of Force Review

183. Phoenix Police Department Training re: Crisis Communications for First Responders

184. Phoenix Police Department Training re: Taser X26 Recertification

185. Phoenix Police Department Training re: Taser X2 Operator

186. Phoenix Police Department Training re: Advanced Officer Training

187. Phoenix Police Department Training materials re: Use of Force Review

188. Phoenix Police Department Training materials re: Arrest Team Tactics

189. Phoenix Police Department Training materials re: Lesson Plan - Dealing with the Mentally Ill

190. Phoenix Police Department Training materials re: Lesson Plan - Module Mental Illness

191. Phoenix Police Department Training materials re: Lesson Plan - Module Use of Force Review

192. Phoenix Police Department Training materials re: Lesson Plan - Taser Certification Power Point Presentation

COP-STICKNEY007237

193. Phoenix Police Department Training re: Lesson Plan - Taser M26/X26 Advanced Taser

194. Phoenix Police Department Training re: Lesson Plan - Taser X26 Recertification

195. Phoenix Police Department Training materials re: CALEA Video - Mental Illness

196. Article re: Compression Asphyxia Biomechanical Model by Kroll, et al. 2017

197. Westlaw Case Copy re: Marquez v. City of Phoenix (Appeal 2012)

198. Westlaw Case Copy re: Marquez v. City of Phoenix

199. Phoenix Police Department Use of Force Report for IR

200. Phoenix Police Department Ops Order 1-05 Use of Force (Eff. 2018)

201. Transcript re: Audio Interview of Officer Arnold

202. Transcript re: Audio Interview of Officer Funston

203. Transcript re: Audio Interview of Officer Long

204. Transcript re: Audio Interview of Sergeant Rodarme

205. Transcript re: Audio Interview of Officer Seaquist

206. Transcript re: John Antoniadis Audio Interview

207. Transcript re: Shelly Aldridge Audio Interview

208. Transcript re: Connie Brenton Audio Interview

209. Transcript re: Richard Buffington Audio Interview

210. Transcript re: Jeffrey Bolduc Audio Interview labeled --Jeffrey Bolduc

211. Transcript re: Peter Chambers Audio Interview

212. Transcript re: Elizabeth Johnson Audio Interview labeled --Elisabeth Johnson (Redacted)

213. Transcript re: Douglas Texel Audio Interview labeled --Douglas Texel (Redacted)

214. Transcript re: Jenevette Tate Audio Interview labeled --Jenevette Tate (Redacted)

215. Transcript re: Lei Stickney Audio Interview

216. Transcript re: Naida Tedquist Audio Interview

217. Transcript re: Vicki Zachariah Audio Interview

218. Transcript re: Body Worn Camera (Palmer)

219. Transcript re: Dispatch Radio Call

220. Transcript re: Holly Boston 911 Call

221. Transcript re: James Main 911

222. Transcript re: Peter Chambers 911

223. Transcript re: Message System Call

224. Transcript re: Jenvette Tate 911

225. Transcript re: 911 Call

COP-STICKNEY007238

226. Transcript re: Kayla 911 Call

227. Transcript re: Detective John Teusink Dispatch Call

228. Officer Dustin Haynes' E-Learning Training Log (Redacted)

229. Officer Frank Long's E-Learning Training Report (Redacted)

230. Officer James Arnold's E-Learning Training Report (Redacted)

231. Officer Joseph Seaquist's E-Learning Training Report (Redacted)

232. Officer Kenneth Palmer's E-Learning Training Report (Redacted)

233. Sergeant Robert Rodarme's E-Learning Training Report (Redacted)

234. Officer Sean Yamane's E-Learning Training Report (Redacted)

235. Officer Travis Funston's E-Learning Training Report (Redacted)

236. Phoenix Police Department Alert History for Officer James Arnold

237. Phoenix Police Department Alert History for Officer Travis Funston

238. Phoenix Police Department Alert History for Officer Dustin Haynes

239. Phoenix Police Department Alert History for Officer Frank Long

240. Phoenix Police Department Alert History for Sergeant Robert Rodarme

241. Phoenix Police Department Alert History for Officer Joseph Seaquist

242. Phoenix Police Department Alert History for Officer Sean Yamane

243. Phoenix Police Department Concise Officer History Report for Officer James Arnold (Redacted)

244. Phoenix Police Department Concise Officer History Report for Officer Travis Funston (Redacted)

245. Phoenix Police Department Concise Officer History Report for Officer Dustin Haynes (Redacted)

246. Phoenix Police Department Concise Officer History Report for Officer Frank Long

247. Phoenix Police Department Concise Officer History Report for Officer Kenneth Palmer (Redacted)

248. Phoenix Police Department Concise Officer History Report for Sergeant Robert Rodarme (Redacted)

249. Phoenix Police Department Concise Officer History Report for Officer Joseph Seaquist (Redacted)

250. Phoenix Police Department Concise Officer History Report for Officer Sean Yamane (Redacted)

251. Transcript re: PSB 19-0022 Audio file of Holly Boston Interview

COP-STICKNEY007239

252. Transcript re: PSB 19-0022 Audio file of Officer Dustin Haynes Interview

253. Transcript re: PSB 19-0022 Audio file of Officer Frank Long Interview

254. Transcript re: PSB 19-0022 Audio file of Officer Joseph Seaquist Interview

255. Transcript re: PSB 19-0022 Audio file of Officer Sean Yamane Interview

256. Plaintiff's Initial Disclosure Statement dated October 13, 2020 with disclosed exhibits

257. Plaintiff's First Supplemental Disclosure Statement dated December 2, 2020 with disclosed exhibits

258. Plaintiff's Second Supplemental Disclosure Statement dated January 18, 2021 with disclosed exhibits

259. Plaintiff's Third Supplemental Disclosure Statement dated February 27, 2021 with disclosed exhibits

260. Plaintiff's Fourth Supplemental Disclosure Statement dated March 6, 2021 with disclosed exhibits

261. Plaintiff's Fifth Supplemental Disclosure Statement dated March 17, 2021 with

262. disclosed exhibits

263. Plaintiff's Sixth Supplemental Disclosure Statement dated March 20, 2021 with

264. disclosed exhibits

265. Plaintiff's Seventh Supplemental Disclosure Statement dated March 22, 2021 with disclosed exhibits

266. Plaintiff's Twelfth Supplemental Disclosure Statement dated October 15, 2021 with disclosed exhibits;

267. Medical Records from Honor Health Deer Valley Medical Center

268. Deposition with exhibits of Officer James Arnold

269. Deposition with exhibits of Officer Travis Funston

270. Deposition with exhibits of Officer Dustin Haynes

271. Deposition with exhibits of Officer Frank Long

272. Deposition with exhibits of Officer Kenneth Palmer

273. Deposition with exhibits of Sgt. Robert Rodarme

274. Deposition with exhibits of Officer Joseph Seaquist

275. Deposition of Sean Yamane

276. Depositoin of Krystal Goodwin

277. Expert Report of Dr. Michael Freeman

278. Expert Report of Dr. Daniel Wohlgelernter

COP-STICKNEY007240

279.   Expert Report of Dr. Daniel Spitz

280.   Expert Report of Scott DeFoe

281.   Medical Records from St. Joseph's Hospital and Medical Center

**Overview of Opinions**

**(all opinions within this report are to a reasonable
degree of medical or scientific probability)**

An overview of my opinions is as follows with more description of each below:

1. *The actions of the officers to control and restrain Mr. Wells did not cause or contribute to his cardiac arrest and death.*

2. *The use of the TASER on Mr. Wells did not cause or contribute to his cardiac arrest or death.*

3. *There was no clinical evidence of a prolonged neck hold on Mr. Wells and the thyroid cartilage injury noted on autopsy did not cause his sudden cardiac arrest and death.*

4. *Mr. Wells was exhibiting clinical signs of methamphetamine intoxication during his encounter with the officers, which is consistent with the toxicology screen.*

**General Overview**

After reviewing the above listed materials, it appears that on February 4, 2019 at approximately 1406, the Phoenix Police Department received a call reporting a naked male in the street yelling. This individual, later identified as Mr. Casey Wells, was 40 years old, weighed approximately 227 lbs. and was 5'9" at the time. This translates to a body mass index of 33.5, which falls into the "obese" category. Phoenix Police Officer James Arnold arrived on the scene first and attempted to converse with Mr. Wells. Sgt. Robert Rodarme arrived on the scene while Officer Arnold was trying to de-escalate the situation and get Mr. Wells off the street and clothed. This de-escalation was not successful.

COP-STICKNEY007241

Then Officer Arnold and Sgt. Rodarme tried to work together to get Mr. Wells in handcuffs but he refused and resisted. Officer Arnold then placed Mr. Wells in a face-to-face bear-hug with the officer's arms under Mr. Wells' arms. With the assistance of Sgt. Rodarme pulling Mr. Wells' shoulders, the two officers were able to get Mr. Wells to the ground on his back.

With Mr. Wells on his back, Officer Arnold was straddling Mr. Wells' abdomen. Mr. Wells swung his arms at Sgt. Rodarme, to which Officer Arnold used his forearm to strike Mr. Wells in the nose. Officer Arnold was controlling Mr. Wells' left arm while Sgt. Rodarme was trying to control the right arm. When Officer Joseph Seaquist arrived on scene, he assisted by controlling Mr. Wells' feet and legs to prevent him from kicking. Once Officer Seaquist had some control of Mr. Wells' legs the officers turned Mr. Wells onto his stomach. Once over, Officers Arnold and Sgt. Rodarme stayed in the same relative positions on either side of Mr. Wells, with Sgt. Rodarme now trying to control Mr. Wells' left arm and Officer Arnold attempting to control Mr. Wells' right arm.

Mr. Wells continued to resist being handcuffed so Officer Seaquist deployed his TASER from about one foot away into Mr. Wells' back. Mr. Wells tensed up, relaxed and then continued to fight. Sgt. Rodarme was trying to gain control of Mr. Wells' left arm which was positioned under Mr. Wells' stomach while Officer Arnold was trying to control Mr. Wells' right arm. Officer Sequist deployed his TASER several other times. The officers were able to handcuff Mr. Wells and Officer Travis Funston arrived on scene and took Officer Seaquist's RIPP Restraint and put it on Mr. Wells' legs as a hobble, but did not connect the clip.

Shortly after being restrained, Mr. Wells was noted to not be breathing and did not have a pulse. CPR was initiated and paramedics, who had been previously requested because of the TASER use, arrived shortly thereafter. The paramedics found Mr. Wells in a PEA (pulseless electrical activity) cardiac rhythm and initiated resuscitative measures but could not get a pulse

COP-STICKNEY007242

back prior to transporting Mr. Wells to the hospital.

Mr. Wells was transported to Deer Valley Medical Center emergency department. During resuscitation, Mr. Wells regained a pulse, but never did regain consciousness. He was admitted to the ICU, but brain imaging studies and EEG showed no realistic expectation of recovery. Life sustaining therapies were withdrawn and Mr. Wells died on February 6, 2019 at 1746.

A brief timeline of selected events from the EMS record is below:

1428    Call received
1433    On scene
1434    PEA rhythm, CPR
1435    18 g IV placed; epinephrine given-no changes
1438    Epinephrine given- no changes
1440    LMA placed
1442    Epinephrine given
1446    Departed scene
1452    Arrived at hospital

The Medical Examiner, Dr. Kevin Horn, performed an autopsy and reported that the cause of death was due to complications of cardiac dysrhythmia and arrest in setting of drug (methamphetamine) intoxication, acute psychosis, arteriosclerotic cardiovascular disease, and physical restraint with prone positioning and possible extrinsic chest compression.

Given this history, there are several issues that need to be addressed in more detail below. All opinions given are to a reasonable, or higher, degree of medical probability based on the information currently available.

### Detailed discussion and basis of opinions

1. ***The actions of the officers to control and restrain Mr. Wells did not cause or contribute to his cardiac arrest and death.***

COP-STICKNEY007243

During the period that officers were trying to get Mr. Wells under control and restrained, he was maintained at times on his back (supine) or on his stomach (prone) position with officers repositioning and distributing some weight in response to Mr. Wells' physical resistance. During this time, based on the reports and depositions by officers and my review of the videos, Mr. Wells was continuing to physically resist and grunt throughout.

Once Mr. Wells was rolled onto his back, Officer Arnold and Sgt. Rodarme reported they were on either side of Mr. Wells trying to control his arms and get him handcuffed. Officer Seaquist was controlling Mr. Wells legs. Officer Arnold, who weighed about 250 lbs., reported on page 113 of his deposition that he did later place his knee onto the shoulder blade of Mr. Wells. "And like I had said, I never gained control of his arm until other people got there and then they were able to get control of him. I had stepped away for that brief second or so to take a couple of breaths. Then when they were still struggling with him, that's when I attempted to help hold him down by kneeling on his shoulder blade. When I say kneel on his shoulder blade, I just placed my knee on the back of his shoulder blade. I was doing more of the leaning on my left leg. Q. So what you're saying is that you weren't actually placing weight on him with your knee? A. I had to have been placing some sort of weight on him, just not all my weight, nor I wouldn't even say 50 percent of my weight on him at that time. I placed the majority of my weight on my left leg that I was in, like a -- say if I knelt down and I had my arm on my left leg leaning over on it I just placed my right knee in his right shoulder blade." Below is an image from the body cam showing the position of Officer Arnold on the shoulder.

COP-STICKNEY007244



The majority of the weight force was not on Mr. Wells in such a position that would have created the potential to limit ventilation. The weight placed on the shoulder would not significantly limit ventilations enough to cause asphyxiation. Nor would pulling out and holding the arm and hand in position. Weight on the legs would have no limiting effect on ventilation or breathing. Research using up to 220 lbs. of weight on a subject's back has not shown to cause physiologic changes that would imply asphyxiation is even possible with that amount of weight.

If the officers' application of weight had impacted Mr. Wells' ability to ventilate to the point of causing a cardiac arrest and sudden death by asphyxiation, the ventilations would have had to be restricted long enough to where blood oxygen levels would drop because there was not enough oxygen getting into Mr. Wells' lungs. When this occurs, the low blood oxygen levels will cause the heart to become irritable and eventually slow and then stop causing the subject to go into cardiac arrest. This takes time and essentially a complete blockage of air movement in and out of the lungs. There was no evidence that the short period during which some weight applied to Mr. Wells to get him restrained caused the cascade of physiologic changes resulting in a cardiac arrest due to asphyxia. In summary, the evidence supports that neither position, restraint or body weight caused asphyxia or contributed to Mr. Wells' cardiac arrest and death.

COP-STICKNEY007245

**2.** *The use of the TASER on Mr. Wells did not cause or contribute to his cardiac arrest or death.*

There are no peer-reviewed published scientific or medical literature that concludes that TASER Conducted Electrical Weapons, cause cardiac dysrhythmias or cardiac arrest in humans utilized in the probe mode or away from the chest transcardiac axis; there is no peer-reviewed literature that supports that in the case of Mr. Wells a TASER could possibly have electrically-induced his cardiac arrest or death; and there is a wealth of literature that supports that the TASER could not have induced cardiac arrest or death in Mr. Wells. This means there has never been a reported case of sudden death, cardiac arrest, or dysrhythmia from a TASER probe deployment to the back of a human subject. There is theoretical modeling that describes how a TASER could possibly cause cardiac arrest over the transcardiac (over the chest) axis with an embedded TASER dart with a very close dart-to-heart distance (DTH), but these circumstances are not present with Mr. Wells. In the case of an anterior chest deployment of a TASER probe, the modeled risks of going into ventricular fibrillation (VF) are estimated to be 1 in 2.5 million to 1 in 2.87 million for anterior chest probe deployments.

More than 2.5 million volunteer subjects have undergone TASER activations, and none have ever been reported to develop sudden cardiac arrest or die. Just because a TASER was used in some temporal proximity to his death, does not imply contribution or causation to his death.

According to the autopsy report Mr. Wells was 69" in length and weighed 227 pounds; this gives Mr. Wells a body mass index (BMI) of 33.5 kilograms per meter squared (kg/m$^2$) which is considered obese.

The TASER download reflects that Officer Seaquist used his TASER X2 during the incident with Mr. Wells with a total of five trigger pulls recorded over approximately a one and a half-

COP-STICKNEY007246

minute time period.  Officer Seaquist reported using the TASER in the probe mode with the probe having been fired about 12 inches away from Mr. Wells, minimizing the probe spread.  Officer Seaquist reported in his deposition that he did not believe the first two activations were effective. For the third and subsequent activations, Officer Seaquist reported that he activated the second cartridge in probe mode as well.  The time duration of the six trigger pulls was 5 seconds except for the fourth trigger pull that was for 6 seconds, totaling 26 seconds of activation time. However, it should be noted that activation or discharge does not equate to electrical charge being delivered to the subject.  The download data are noted below:

| 326 | 04 Feb 2019 14:29:11 | Trigger | C1: Deployed | 5 |
| 327 | 04 Feb 2019 14:29:26 | Trigger | C2: Deployed | 5 |
| 328 | 04 Feb 2019 14:29:56 | Trigger | C2: Deployed | 5 |
| 329 | 04 Feb 2019 14:30:19 | Trigger | C2: Deployed | 6 |
| 330 | 04 Feb 2019 14:30:46 | Trigger | C2: Deployed | 5 |

For a TASER to deliver a charge to the person, the electrical circuit must be completed and maintained. Thus, as a point of clarification, just because the TASER downloads recorded 26 seconds of activation/discharge time from the TASER, does not mean that the TASER were indeed in sufficiently close contact with the subject and delivering the electrical stimulus for that amount of time.  Nor does the 26 seconds of activation/discharge time indicate in what mode the TASER was used, or what degree of NMI, if any, was induced.  In this case, the TASER was reported to be used in probe mode from close range.

If the TASER had "electrocuted" Mr. Wells, his heart would have gone into ventricular fibrillation (VF) at the time the electricity was being delivered and he would have immediately lost consciousness at the time that the TASER was discharging or within 1-2 seconds after stopping. Subjects in VF cannot fight or struggle, let alone remain conscious as the blood flow to the brain ceases immediately.

COP-STICKNEY007247

For one to possibly conclude that a TASER could even be considered to cause cardiac arrest, all the following facts would need to be present:

1) The device probes would need to be penetrating deep into the chest directly over the heart with a very close DTH. Even for cardiac capture, which is not synonymous with VF, in a human a TASER dart would have to be within 16.7 millimeters (mm) to the heart;

2) The subject would need to have a thin chest wall. In the case of Mr. Wells, even a TASER dart directly over his heart would likely not have been sufficiently close enough to induce capture;

3) The subject would need to be standing at the time of the TASER activation and leaning forward so that the heart is closer to the anterior chest wall and the TASER dart closest to the heart;

4) The subject would need to lose consciousness immediately during the TASER activation or within 1-2 seconds after; and

5) The first cardiac rhythm would need to be VF.

All of these would be needed to even consider the TASER as the cause of death, but in this case with Mr. Wells, these facts are not present. So again, the published scientific data as well as the objective evidence available conclusively confirms that the use of the TASER was non-contributory or causal to the cardiac arrest and death of Mr. Wells.

**3.** ***There was no clinical evidence of a prolonged neck hold on Mr. Wells and the thyroid cartilage injury noted on autopsy did not cause his sudden cardiac arrest and death.***

There was no evidence based on the review of the videos, reports and deposition testimony that a neck hold was ever attempted on Mr. Wells. Officer Arnold was asked the following line of

COP-STICKNEY007248

questioning on page 149 of his deposition, "Q.   Did you ever apply a carotid hold?  A.   No.

Q.  Did you ever apply a half carotid hold?  A.  No.   Q.  Did you ever intentionally put any

pressure on. Mr. Wells' neck?  A.  No."  Sgt. Rodarme was asked the following questions on page

44 of his deposition, "Q: Other that single strike down, did you witness any other uses of force

against Casey Wells head, neck or throat?  A: No.  Q: Did anybody ever use a neck hold on Casey?

A.  No."  Additionally, in my review of materials, I did not see any other officers or bystanders

report that a neck hold was applied to Mr. Wells by the officers.

The autopsy performed by the medical examiner noted the following:  Anterior and

posterior layered dissections of the neck reveal a focally dense hemorrhage in association with the

placement site of a venous catheter in the right lateral aspect of the neck. There are no other

apparent traumatic injuries of the soft tissues of the neck, the strap muscles, or the cervical spine, or

spinal cord. The neck organs are removed and evaluated at autopsy. In addition to previously

described submucosal contusions of the tongue there is a focal 1/2-inch submucosal contusion of

the anterior upper right aspect of the esophagus adjacent to the thyroid cartilage. The remainder of

the airway structures are not opened at the time of autopsy and are referred for anthropology

consultation. There are the following evidences of therapeutic intervention: There is a triple-lumen

intravascular catheter inserted into the right aspect of the neck associated with a moderate amount

of surrounding subcutaneous and strap muscle hemorrhage in this area.

The cervical spine is structurally intact. The atlanto-occipital articulation is grossly normal.

The hyoid bone and thyroid cartilage are intact. Apart from focal therapeutic hemorrhage as

previously described there are no other hemorrhages in the strap muscles or soft tissues of the neck.

The upper airway appears patent. The tongue, tonsils, salivary glands, and remainder of the pharynx

display changes as previously described without other significant pathology.

On the anthropology report of the neck organs removed at autopsy, there was documentation

COP-STICKNEY007249

of fractures to the right superior horn and right lamina of the thyroid cartilage and fractures of the right and left inferior horns of the thyroid cartilage.

There were no other significant injuries to other structures of the neck, including the larynx, arytenoid or tracheal cartilages nor of the muscles of the neck beyond what was caused by the placement of the neck IV catheter.

Neck holds can cause injury and possible death by blocking the airway and asphyxiating an individual by a bar hold or by blocking off blood flow to the brain for so long, that brain damage occurs from a hypoxic (low oxygen level) injury which then leads to a cardiac arrest by a carotid restraint. In the case of Mr. Wells, there was no history of a bar hold. A bar hold is when the arm is pulled across the airway hard enough to cause asphyxiation. When this occurs, there can be crushing of the anterior neck structures, leading to significant damage and airway blockage.

Additionally, there was no report of a carotid restraint, also known as the lateral vascular neck restraint (LVNR), being placed on Mr. Wells. The pathophysiology and safety of the LVNR are relatively straightforward and well delineated in many texts. The purpose is to place the arm around the neck of the subject to be controlled. The crook of the elbow is placed at the anterior (front) region of the neck and the forearm and upper arm come around the sides and are used to place pressure on the lateral aspects of the neck where the carotid arteries are located. Pressure placed on the arteries diminishes blood flow to the brain, quickly rendering the subject unconscious. This takes time to occur. And if released once unconsciousness occurs, it has been deemed safe for many years of use in martial arts. If the hold is left on for a prolonged period, restricting blood flow to the brain, there is a theoretical risk of stroke or death. Research by Rossen et al. applying pressure across the carotid arteries with complete obstruction of flow for up to 100 seconds did cause loss of consciousness in human subjects but did not demonstrate any adverse outcomes including notable brain damage, cardiac arrest or sudden death. Based on the review of the

- 24 -

COP-STICKNEY007250

materials, there is no evidence to support that a prolonged neck hold was placed on Mr. Wells.

Other evidence that there was not a neck hold placed that caused significant damage or crushed the airway and blocked airflow into the lungs is that there was no reported difficulty in establishing the airway by the paramedics or using it to ventilate. Below is an image of a Laryngeal Mask Airway (LMA), which is the airway placed into Mr. Wells by the paramedics. Had the airway been crushed enough to block airflow and asphyxiate Mr. Wells, the tube would have been very difficult to place because the distorted anatomy would have made advancing the tube difficult if not impossible. And more importantly, if the airway had been crushed, the bagging of air into the larynx would have been impeded. Neither of these issues were reported.



When Mr. Wells arrived to the emergency department, the LMA was removed by the emergency physician and replaced with an endotracheal tube (ETT), a breathing tube that is placed into the airway. Similarly, had the airway been crushed enough to block airflow and asphyxiate

COP-STICKNEY007251

Mr. Wells, the ETT would have been very difficult to place because the distorted anatomy would have made advancing the tube difficult if not impossible.  And again, if the airway had been crushed, the bagging of air into the larynx would have been impeded.  Neither of these issues were reported by the emergency physician.

Thus, even though there are injuries noted to the thyroid cartilage on autopsy, these are not specific to a neck hold.  They are indicative of neck trauma having occurred, but does not define exactly when or how the trauma occurred.   In summary, there is no evidence confirming that this injury was caused by a neck hold nor that it caused Mr. Wells' sudden cardiac arrest and death.


   4.  *Mr. Wells was exhibiting clinical signs of methamphetamine intoxication during his encounter with the officers, which is consistent with the toxicology screen.*


Mr. Wells had methamphetamine and amphetamine reported in his blood toxicology evaluation on autopsy.   Methamphetamine is a sympathomimetic illicit drug that acts as a stimulant.  Methamphetamine has a number of physiologic effects, including increasing heart rate and blood pressure.  It can cause delusions, paranoia, erratic or violent behavior and increased agitation, as well as sweatiness, elevated temperatures, and jitteriness. Mr. Wells was exhibiting many of these signs of methamphetamine intoxication including lack of following commands from the officers, erratic behavior, and impulsiveness as well as aggressiveness.  In the emergency department record documented by Dr. Jonathan Maitem, the temperature of Mr. Wells at 1520 was noted to be 100.2°F.  This is obviously an elevated body temperature. It should also be noted that patients who go into cardiac arrest and undergo CPR resuscitation tend to have body temperatures that are even cooler because of the lack of blood flow and the ambient exposure from performing the CPR.  In this case, Mr. Wells had an elevated temperature despite the cardiac arrest with CPR

COP-STICKNEY007252

and the exposure. His core body temperature was more likely even higher initially.

Mr. Wells' behavior on the video and as described by witnesses and officers was consistent with an individual who is under the influence of methamphetamine.

## Background

My background is that I am a full-time faculty member in the department of emergency medicine at the University of California, San Diego Medical Center. I am residency trained and board certified in Emergency Medicine. I work full time as a practicing clinician in the Emergency Department of a busy urban hospital and serve as the clinical operations chief for our two emergency departments with a combined annual census of approximately 75,000 visits. I currently serve as the Medical Director for Risk Management for UC San Diego Health. I also serve as the UCSD Medical Center's Medical Risk Management Committee Chair and Allocation Committee Co-Chair, as well as previously having served as the Chair of the Patient Care and Peer Review Committee, each of which are charged with the task of reviewing medical records and making determinations of standard of care. I am also the former Chief of Staff for UC San Diego Health.

As a physician working at an urban based emergency department at a Level 1 trauma center, I have evaluated hundreds of patients over the last 25 years who have been in cardiac arrest and thousands who have been restrained and used methamphetamine.

I am knowledgeable of peer-reviewed medical and scientific research on the physiological effects of positional restraint and positional asphyxia conducted by others. I have also performed extensive clinical research on human subjects who have been restrained in various positions and with various amounts of weight being placed (articles included in my curriculum vitae) which includes having directly been involved with hundreds of subjects being restrained and studied,

COP-STICKNEY007253

hundreds of patients restrained during my work in the emergency department and have personally

been restrained with weights placed on me as well. I have been invited to lecture nationally and

internationally on this subject. Given my own interests in this area, I regularly perform a complete

review of the literature regarding restraints and in custody death.

I am knowledgeable of peer-reviewed medical and scientific research on TASER electronic

control devices conducted by others. In fact, I was twice the lead author on work requested by the

American Academy of Emergency Medicine (AAEM) to review the totality of the peer reviewed

published medical literature on humans and come to conclusions regarding the necessary

emergency department evaluation of patients being seen after receiving a TASER activation. I have

received federal grant funding and performed extensive clinical research on human subjects who

have received TASER applications (articles included in my curriculum vitae) which includes

having been involved with over 200 TASER activations and have personally received multiple

applications of the device. I have written several book chapters on this topic and have lectured

internationally about the physiologic effects of TASERs.

I am knowledgeable of peer-reviewed medical and scientific research on neck holds. I have

written several peer reviewed papers and textbook chapters on this topic and have been invited to

lecture on this topic. I am trained as a second-degree black belt in tae kwon do and have been

trained in neck holds and have even been personally had a lateral vascular neck restraint (LVNR)

placed on me to the point of unconsciousness. Given my own interests in this area, I regularly

perform a complete review of the literature regarding neck restraint use.

I am knowledgeable of peer-reviewed medical and scientific research for cardiac arrest and

CPR practices. I was the Principal Investigator for San Diego's Resuscitative Outcomes

Consortium (ROC) site, a National Institute of Health (NIH) funded study for ten years that

involved over 200,000 cardiac arrest patients to evaluate treatment options for out of-hospital

COP-STICKNEY007254

cardiac arrest and severe traumatic injury. I have published many peer-reviewed papers on the topic of cardiac arrest and cardiac resuscitation, including publications in the New England Journal of Medicine, JAMA, and Circulation. I also served as the Medical Director of the American Heart Association Training Center at the University of California, San Diego Center for Resuscitation Science almost ten years, teaching Advanced Cardiac Life Support (ACLS) both locally and being asked to give lectures on cardiac arrest internationally. I had been an ACLS instructor for over 20 years. I also work at a busy urban comprehensive emergency department where I care for patients in cardiac arrest on a regular basis.

My Emergency Medical Services (EMS)/prehospital background and experience includes having been a flight physician with Lifeflight of San Diego and with Mercy Air, taking care of acutely injured patients at the scene. My EMS administrative roles include having been the Base Station Medical Director for UCSD, the Medical Director for the Palomar and Southwestern Paramedic College Training Programs, and the former Medical Director for the County of San Diego Emergency Medical Services (EMS) one of the largest EMS systems in the nation. In this role, I was responsible for protocols and quality assurance of over 1000 paramedics and 4000 EMT's. I started the UCSD EMS/Disaster Medicine Fellowship Training Program and was the first Fellowship Director and currently serve as the associate Director of the EMS/Disaster Medicine Division in the UCSD Department of Emergency Medicine and as the Medical Director for the North County Fire Protection District. I have been a paramedic base hospital physician in San Diego County for over 25 years. Other previous EMS roles include having been the Medical Director for the Chula Vista Fire Department, the Carlsbad Fire Department, and the Aeromedevac, Aviamedix and AirLink USA Air Ambulance Services. I was also the Medical Director for the San Diego County Metropolitan Medical Strike Team (MMST) and the UCSD Base Hospital Medical Director, and I also served as EMS medical back up for many SWAT operations. I have written

COP-STICKNEY007255

numerous peer reviewed papers on prehospital medicine and operations as well as many book chapters and have lectured nationally and internationally on prehospital care. I was also the Principal Investigator for San Diego's Resuscitative Outcomes Consortium (ROC) site, a National Institute of Health (NIH) funded study consortium that evaluated treatment options for out of-hospital cardiac arrest and severe traumatic injury for over a decade.

As per Rule 26 formatting, Appendix A is a copy of my current Curriculum Vitae, which includes a list of all publications authored by me. Appendix B is a list of all cases in which I have testified as an expert in trial or deposition within the preceding four years. Appendix C is my fee schedule. The knowledge base that I utilize has been developed over time from my years of clinical practice and experience, reading and training as well as research. Under penalty of perjury, I hereby swear that the opinions stated above are true and correct within a reasonable degree of medical probability based on the information currently available to me. The opinions may be updated as additional information is provided for review.


Respectfully submitted,

Gary M. Vilke, M.D., FACEP, FAAEM
Professor of Clinical Emergency Medicine
Vice-Chair, Clinical Operations Emergency Medicine
Medical Director, Risk Management, UC San Diego Health System
Medical Director, North County Dispatch JPA

COP-STICKNEY007256

# CURRICULUM VITAE

## GARY MICHAEL VILKE, M.D., FACEP, FAAEM

HOME ADDRESS:

11582 Normanton Way
San Diego, CA  92131
Phone: (619) 666-8643
Pager: (619) 290-9149

OFFICE ADDRESS:

Department of Emergency Medicine
UCSD Medical Center
200 W. Arbor Drive
San Diego, CA  92103-8676
Phone:  (619) 543-6210
Fax:      (619) 543-3115
E-mail:  gmvilke@ucsd.edu

PERSONAL:    Born September 12, 1966 in Cleveland, Ohio

EDUCATION:

| | |
|---|---|
| Academic:<br>  1983-88 | B.S. in Zoology, University of California, Berkeley<br>Berkeley, California |
| Medical School:<br>  1988-92 | M.D., University of California, San Diego School of Medicine<br>La Jolla, California |
| Internship:<br>  1992-93 | Department of Surgery<br>University of California, San Diego Medical Center<br>San Diego, California |
| Residency:<br>  1993-96 | Department of Emergency Medicine<br>University of California, San Diego Medical Center<br>San Diego, California    (Chief Resident: 1995-96) |
| Physician Leadership<br>Academy:<br>  2007-09 | University of California, San Diego Medical Center<br>San Diego, California |

LICENSURE:   California Medical License Number G-78057

BOARD CERTIFICATIONS:

National Board of Medical Examiners, 1993

American Board of Emergency Medicine, 1997, renewed 2007 and 2017

COP-STICKNEY007257

| | |
|---|---|
| 9/11 - Present | Professor of Clinical Emergency Medicine and Medicine, University of California, San Diego (UCSD) School of Medicine |
| 4/21-Present | Interim Medical Director, California State Department of Parks and Recreation |
| 12/20–Present | Emergency Medicine Medical Staff Service Chief |
| 7/19-Present | Medical Director, North County Dispatch Joint Powers Authority |
| 1/17-Present | Vice-Chair of Clinical Operations, UC San Diego Department of Emergency Medicine |
| 2/14- Present | Assistant Director, Division of Emergency Medical Services (EMS)/Disaster Medicine, UCSD Medical Center, Department of Emergency Medicine |
| 7/12 – Present | Medical Director, Risk Management, UC San Diego Health System |
| 7/94 - Present | Base Hospital Physician, University of California Medical Center |

COP-STICKNEY007258

PREVIOUS EXPERIENCE/APPOINTMENTS:

| | |
|---|---|
| 1/13 – 6/19 | Medical Director, Carlsbad Fire Department |
| 10/09 – 6/19 | UCSD Department of Emergency Medicine Clinical Research Scholar Fellowship Director |
| 10/15 – 5/19 | Medical Director, AirLinkUSA Air Ambulance Service |
| 1/18-7/18 | Medical Director, Chula Vista Fire Department |
| 2/06 – 6/18 | Director, Division of Clinical Research, UCSD Medical Center, Department of Emergency Medicine |
| 1/16 – 6/18 | Co-Medical Director, Department of Emergency Medicine, UCSD Medical Center |
| 9/15- 9/17 | Staff Physician, El Centro Regional Medical Center Department of Emergency Medicine |
| 6/12 – 6/17 | Associate Director, Department of Emergency Medicine Behavioral Emergencies Research (DEMBER) Lab |
| 1/16 – 1/17 | Emergency Medicine Clinical Service Chief, UC San Diego Health System |
| 4/07 – 12/16 | Medical Director of the American Heart Association Training Center at the UCSD Center for Resuscitation Science |
| 7/96 – 12/15 | Assistant Director, Department of Emergency Medicine, UCSD Medical Center |
| 7/13 – 9/15 | Chief, Division of Custody Medicine, UCSD Medical Center, Department of Emergency Medicine |
| 4/99 – 9/15 | Director, Custody Services, UCSD Medical Center (Co-Director 1999-2013) |
| 3/13 – 9/15 | Medical Director, AviaMedix Air Ambulance Service |
| 10/11- 2/14 | Chief, Division of Emergency Medical Services (EMS)/Disaster Medicine, UCSD Medical Center, Department of Emergency Medicine |
| 4/12 – 3/13 | Medical Director, Aeromedevac Air Ambulance Service |
| 7/09 – 6/12 | Chief of Staff, UCSD Medical Center |
| 7/07 - 6/09 | Vice Chief of Staff UCSD Medical Center |
| 7/04 – 6/09 | EMS/Disaster Medicine Fellowship Director, Department of Emergency Medicine. |

COP-STICKNEY007259

| | |
|---|---|
| 3/02 - 2/06 | Medical Director, San Diego County Emergency Medical Services |
| 3/03 - 12/05 | Medical Consultant, San Diego Chapter Red Cross Disaster Health Services |
| 6/04 - 2/05 | Interim Chief, San Diego County Emergency Medical Services |
| 1/01 - 2/04 | Medical Director, Southwestern College Paramedic Training Program |
| 7/00 - 2/04 | Medical Director, Palomar College Paramedic Training Program |
| 7/97 - 1/03 | Director, Prehospital Services, UCSD Medical Center |
| 6/97 - 1/03 | Medical Director, Paramedic Base Hospital, UCSD Medical Center |
| 7/96 - 1/03 | Medical Director, Mercy Air Medical Transport Service, San Diego, California |
| 4/99 - 3/01 | Medical Co-Director, San Diego Central Jail Medical Services |
| 1/96 - 7/96 | Flight Physician, Mercy Air Medical Transport Service, San Diego, California |
| 7/95 - 7/96 | Associated Emergency Physicians Medical Group, San Diego, California |
| 12/94 - 7/96 | Kaiser Permanente Emergency Department, San Diego, California |
| 10/94 - 7/96 | Med America Health Resource Company, San Diego, California |
| 4/94 - 7/95 | Sharp-Rees-Stealy Urgent Care, San Diego, California |
| 7/93 - 12/95 | Flight Physician, Life Flight Air Medical Transport Service |

PREVIOUS ACADEMIC APPOINTMENTS

| | |
|---|---|
| 7/05 – 9/11 | Professor of Clinical Medicine, UCSD School of Medicine |
| 7/01 - 6/05 | Associate Professor of Clinical Medicine, UCSD School of Medicine |
| 7/96 - 6/01 | Assistant Clinical Professor of Medicine, UCSD School of Medicine |

COP-STICKNEY007260

HONORS AND AWARDS:

| | |
|---|---|
| 1990 | Random House Medical Student Award |
| 1996 | American College of Emergency Physicians, California Chapter Challenge Bowl Winner |
| 1996 | Council of Residency Directors (CORD) Resident Academic Achievement Award |
| 1996 | Outstanding Emergency Medicine Resident |
| 1996 | UCSD Emergency Department Staff Support Award |
| 1996 | *Journal of Emergency Medicine* Outstanding Contribution Award |
| 1999 | "Golden Apple" Teaching Award, UCSD Emergency Medicine Residency Graduating Class of 1999 |
| 2000 | Faculty of the Year, UCSD Emergency Medicine Residency Graduating Class of 2000 |
| 2000 | Best Research Poster Presentation, California Chapter of the American College of Emergency Physicians (CAL/ACEP) Scientific Assembly, Dana Point, California |
| 2000 Emergency | Outstanding Scientific Abstract, State of California EMS Authority Annual Medical Services for Children Conference, San Diego, California, November 2000 |
| 2001 | Best Oral Presentation, CAL/ACEP Scientific Assembly, Santa Clara, California |
| 2004 | Academy of Clinician Scholars, University of California San Diego |
| 2004 | Top Doctor in San Diego County, San Diego Magazine |
| 2004 | Top Peer Reviewer, *Annals of Emergency Medicine* |
| 2005 | Top Doctor in San Diego County, San Diego Magazine |
| 2005 | Clinical Investigation Institute, University of California San Diego |
| 2006 | Top Doctor in San Diego County, San Diego Magazine |
| 2007 | Finalist San Diego Business Journal Health Care Champion Award |
| 2007 | Top Doctor in San Diego County, San Diego Magazine |
| 2007 | Top Peer Reviewer, *Annals of Emergency Medicine* |
| 2008 | Top Doctor in San Diego County, San Diego Magazine |
| 2008 | UCSD Undergraduate Campus Outstanding Faculty Mentor of the Year |
| 2009 | Clinical and Translational Research Institute, Charter member |
| 2009 | Top Doctor in San Diego County, San Diego Magazine |
| 2010 | Top Doctor in San Diego County, San Diego Magazine |
| 2011 | Top Doctor in San Diego County, San Diego Magazine |

COP-STICKNEY007261

HONORS AND AWARDS, continued:

    2012 Top Doctor in San Diego County, San Diego Magazine

    2013 Top Doctor in San Diego County, San Diego Magazine

    2014 Top Doctor in San Diego County, San Diego Magazine

    2015 "25 Emergency Medicine & EMS Professors You Should Know" From Medical Technology Schools at: http://www.medicaltechnologyschools.com/emt/emergency-medicine-ems-professors-to-know

    2018 Top Doctor in San Diego County, San Diego Magazine

    2019 Top Doctor in San Diego County, San Diego Magazine


PROFESSIONAL SOCIETY MEMBERSHIPS:

    American Medical Association, 1988-97

    California Alumni Association, 1988

    American College of Emergency Physicians, 1991

    Fellow, American College of Emergency Physicians, 2000

    California Chapter of the American College of Emergency Physicians, 1991

    Society for Academic Emergency Medicine, 1995

    Society for Academic Emergency Medicine, EMS Interest Group, 2019

    National Association of EMS Physicians, 1998

    Fellow, American Academy of Emergency Medicine, 2000

    California Chapter of the American Academy of Emergency Medicine, 2000

    American Association of University Professors, 2002

    California Conference of the American Association of University Professors, 2002

    San Diego Faculty Association, 2002

    San Diego County Medical Society, 2003

    American Association of Emergency Psychiatry, 2014-2017

COP-STICKNEY007262

PATENTS:

# WO 2010/011976 A2: Medication Delivery Devices Having Penetrable Sterility Barriers and Alignment Features (January 28, 2010)

# WO 2010/011976 A2: Medication Delivery Devices Having Penetrable Sterility Barriers and Alignment Features (January 28, 2010)

# US 2010/011966 A2: Medication Delivery System (January 28, 2010)

# US 2010/0022987 A1: Medication Delivery System (January 28, 2010)

# US 61476836 Medication Delivery Apparatus (April 19, 2011)

Content Expert

Reviewer, Practical Summaries in Acute Care, Thomson American Health Consultants, 2006

Expert Editorial Advisor, *Managing the Ankylosing Spondylitis Patient in an Emergency Setting for the* Spondylitis Association of America (SAA).  2008

Content Expert for Cable News Network (CNN), 2009

Content Expert for ABC News, 2011

Journals

Editor-in-Chief, *Advances in Legal Medicine*, Longdom Publishing, 2014-2015.

Senior Associate Editor/Editorial Board, *Journal of Emergency Medicine*, Elsevier Science, Inc., 2013 (Associate Editor since 2007, Editorial board since 2000; reviewer since 1994)

Editorial Board, *Prehospital Emergency Care,* Taylor & Francis Group, 2006 (Reviewer since 2004)

Editorial Board, *Journal of Forensic and Legal Medicine*, Elsevier Science, Inc. 2012 (Reviewer since 2011)

Editorial Board, *Emergency Medicine and Healthcare*, Herbert Publications, 2013

Editorial Board, *Saudi Journal of Emergency Medicine*, 2019

Senior Reviewer, *Annals of Emergency Medicine*, Mosby, 2007 (Reviewer since 1998)

COP-STICKNEY007263

Journals (cont.)

Reviewer, *European Journal of Epidemiology*, Kluwer Academic Publishers, 1996-97

Reviewer, *Western Journal of Emergency Medicine*, 2001

Reviewer, *American Journal of Emergency Medicine*, Elsevier Science, Inc., 2005

Reviewer, *Emergency Medicine Journal*, BMA House, 2006

Reviewer, *Forensic Science International*, 2007

Reviewer, *California Journal of Emergency Medicine*, 2007

Reviewer, *Journal of the American Medical Association (JAMA)*, 2009

Reviewer, *BioMedical Engineering OnLine*, 2009

Reviewer, *Bioelectromagnetics*, 2010

Reviewer, *Forensic Science, Medicine and Pathology*, 2010

Reviewer, *Psychology Research and Behavior Management*, 2010

Reviewer, *Academic Emergency Medicine*, 2010

Reviewer, *Medicina*, 2012

Reviewer, *Injury Prevention*, 2013

Reviewer, *Therapeutics and Clinical Risk Management*, 2013

Reviewer, *Pediatrics,* 2013

Reviewer, *Journal of Forensic Toxicology and Pharmacology*, 2014

Reviewer, *Journal of Injury and Violence Research*, 2014

Reviewer, *International Journal of Molecular Sciences*, 2015

Reviewer, *Emergency Medicine International,* 2015

Reviewer, *Policing: A Journal of Policy and Practice,* 2016

Reviewer, *International Journal of Law and Psychiatry,* 2017

Reviewer, *Journal of Correctional Health Care*, 2019

Reviewer, *Clinical Toxicology,* 2019

Reviewer, *Medicine, Science and the Law*, 2019

Reviewer, *Medicine, Science and the Law*, 2019

Reviewer, *International Journal of Legal Medicine,* 2019

COP-STICKNEY007264

<u>CURRENT UCSD COMMITTEE MEMBERSHIPS</u>:

Research Committee, Department of Emergency Medicine, 1997

UCSD Faculty Association, 2002

Quality Improvement/Peer Review Committee, Department of Emergency Medicine, 1999

UCSD Academy of Clinician Scholars Executive Committee, 2005

UCSD Medical Staff Executive Committee, 2007

Chair, UCSD Medical Risk Management Committee, 2012

Chair, UCSD Allocation Committee, 2012

UCSD Significant Events Committee, 2012

Co-Chair, UCSD/Rady Children's Joint Risk Management Committee (JRMC), 2013

UCSD Patient Experience Executive Committee, 2013

UCSD Faculty Leadership Group, 2014

Patient Advocacy Reporting System (PARS) Oversight Team, 2014

UCSD Leadership Council, 2015

UCSD Department of Emergency Medicine Clinical Operations Committee, 2016

UCSD Department of Emergency Medicine Executive Committee, 2016

UCSD Department of Emergency Medicine Management Committee, 2016

UCSD Department of Emergency Medicine/Psychiatric Committee, 2016

UCSD Hillcrest Emergency Department Patient Flow Task Force, 2016

UCSD Health System Patient Grievance Review Committee, 2016

UCSD Threat Assessment Management Committee, 2016

UCSD Medical Staff Bylaws Committee, 2018

UCSD Department of Emergency Faculty Search Committee 2018

UCSD Medical Staff Professionalism Committee, 2019

UCSD Academic Assembly alternative representative, 2019

UCSD Ligature Prevention Task Force, 2019

UCSD Emergency Medicine Workplace Violence Initiative Committee, 2019

UCSD Urgent Care Leadership Committee, 2019

UCSD Department of Emergency Medicine Staff Research Associate Interview Committee, 2019

UCSD Department of Emergency Medicine Residency Interview Committee, 2019

UCSD Flu Capacity Task Force, 2019

UCSD Urgent Care Pharmacy Committee, 2020

UCSD Health Novel Coronavirus Planning and Response Workgroup, 2020

COP-STICKNEY007265

<u>CURRENT COMMITTEE MEMBERSHIPS</u>:

American Academy of Emergency Physicians, Clinical Practice Committee, 2011

San Diego County Base Station Physicians' Committee, 2013

San Diego County Prehospital Audit Committee, 2013

EMS Directors Association of California, 2019

San Diego County North Zone EMS Committee, 2019

San Diego County Health Services Capacity Task Force, 2019

San Diego County EMS Protocol Task Force, 2019

Oceanside Fire Department CQI Committee, 2019

San Diego North Zone Dispatch Protocol Task Force, 2019

San Diego County Fire Chief Association, EMS Section, 2019

San Diego Health Connect, EMS Workgroup, 2019

COP-STICKNEY007266

<u>PREVIOUS UCSD COMMITTEE MEMBERSHIPS</u>:

UCSD Department of Emergency Medicine Academic Affairs Committee, 2013-15

President, UCSD Academy of Clinician Scholars, 2013-15

UCSD Board of Governor's Committee, 2013-15

UCSD Academic Senate Representative Assembly, Alternate, 2011-13

UCSD Sheriff Managed Care Oversight Committee

Ladder Rank Recruitment Committee, UCSD Department of Emergency Medicine, 2013

UCSD Medical Staff Bylaws Work Group, 2014

Chair, Emergency Department Staffing Committee of Process Action Team, 1994-95

Hospital Infection Control Committee, 1994-95

Emergency Medicine Housestaff Association Representative, 1994-96

Emergency Department Clinical Practices Committee, 1994-96

Emergency Department Peer Review/Quality Assurance Committee, 1995-96

Emergency Department Critical Care Room Process Action Team, 1996

Paramedic/Emergency Department Interface Task Force, 1998-99

Emergency Department Staffing Committee, Department of Emergency Medicine, 1999

Credentials Committee, 1997-2000

Faculty Search Committee, Department of Emergency Medicine, 1999, 2000, 2002

Medical Director's Group, 1997-2002

Patient Care Review Committee, 2003

Medical Risk Management Committee, 2002-07

Patient Improvement and Outcome Committee, 2003-05

Medical Staff Executive Committee Reorganization Ad Hoc Committee, 2005-2006

UCSD Phasing Strategy Ad Hoc Committee, 2005-06

Clinical Representative, Trauma Quality Assurance Program, 1998-2006

Vice Chief of Staff, UCSD Medical Center, 2007-2009

UCSD/San Diego Sheriff Security Working Group, 2003-10

Chief of Staff, UCSD Medical Center, 2009-2012

Vice-Chair, Quality Council Committee, 2009-2012 (member since 2003)

Chair, Medical Staff Executive Committee, 2009-2012

UCSD Governance Advisory Committee, 2009-2012

COP-STICKNEY007267

UCSD Department of Medicine Clinical Operations Redesign Enterprise (CORE) Initiative Team, 2009-2012

Director of Risk Management Selection Committee, 2007

Chair, Medical Risk Management Committee, 2003-07 (member since 2002)

Medical Risk Management Executive Committee, 2003-07

UCSD Medical Center Allocation Committee 2005-07

Patient Safety Committee, 2003-07

Vice Chair, Medical Staff Executive Committee, 2007-09

Chair, Patient Care and Peer Review Committee, 2007-09 (member since 2005)

Trauma Multidisciplinary Committee, 2000-09

Department of Medicine Committee on Advancement and Promotions (DOMCAP), 2007-09

Vice Chair, Quality Council Committee, 2009-2012

UCSD Medical Center Syncope Task Force, 2010-11

LIFESHARING, A Donate Life Organization Advisory Board, 2010-2014

UCSD Director of Risk Management Selection Committee, 2012

Secretary-Treasurer, UCSD Academy of Clinician Scholars, 2005-12

UCSD Root Cause Analysis Committee, 2013

UCSD Department of Emergency Medicine Chair Selection Committee, 2012-13

UCSD Department of Emergency Medicine Faculty Coverage Committee, 2012-13

UCSD Integrated Delivery Network Design Team, 2012-13

UCSD Department of Emergency Medicine Patient Satisfaction Committee, 2012-13

UCSD Department of Emergency Medicine Faculty Search Committee, 2013

Rady Children's Root Cause Analysis Committee, Ad hoc, 2012-2015

Rady Children's Emergency Department Faculty Search Committee, 2015

COP-STICKNEY007268

<u>PREVIOUS MEMBERSHIPS/ACTIVITIES</u>:

Vice-President, California Chapter of Emergency Medicine Residents Association, 1994-95

Editor-in-Chief, California Chapter of Emergency Medicine Residents Association Newsletter, 1994-95

Co-Director, School of Medicine 225: Introduction to Emergency Medicine, UCSD School of Medicine, 1994-95

Strike Team Leader, DMAT Olympics 1996 Biological & Chemical Antiterrorist Medical Support

Director, Mercy Air Medical Transport Services Continuing Clinical Education, 1996-2003

Member, San Diego County 911 Dispatch Quality Review Board, 1997-98

Co-Director, University of California, San Diego School of Medicine, Course SOM 224I, 1997-2002

Pediatric Advanced Life Support Course Director, 1997-2002

Editor-in-Chief, UCSD Medical Center EMS Run Review, 1997-2003

Sponsor, Palomar College Emergency Medical Education Department Paramedic Training,

1997-2003

Medical Support Physician, Super Bowl XXXII, San Diego, California, January 25, 1998

Medical Support Physician, Suzuki Rock-n-Roll Marathon, San Diego, California, June 21, 1998

Marketing Director, California Chapter of the American College of Emergency Physicians (CAL/ACEP) Scientific Assembly, 1998-99

Member, Program Committee, CAL/ACEP Scientific Assembly, 1998-99

Howard Hughes Foundation Undergraduate Preceptor, 1998, 1999

Co-editor, Pearls from PAC Newsletter, 1998-2000

Preceptor, Introduction to Clinical Medicine 201-B, UCSD School of Medicine, 1999

EMS Team Leader, San Diego County Metropolitan Medical Strike Team, 1999

Co-Chair, Program Committee, CAL/ACEP Scientific Assembly, 1999-2000 and 2000-01

Member, San Diego County Bio-Terrorism Planning Group, 1999-2003

Moderator, EMS Poster Section, Western Regional Society for Academic Emergency Medicine Conference, Portland, Oregon, April 2000

Preceptor, California State University Dominguez Hills Statewide Nursing Program, 2000

Affiliate Faculty, Southwestern College Paramedic Training Program, 2000-03

COP-STICKNEY007269

Medical Director, EPIC "Eliminate Preventable Injuries of Children" Medics, San Diego County, 2000-03

San Diego Port District AED (Automated External Defibrillator) Program RPF Panel, 2001

Peer Reviewer, *Pediatric Emergency Medicine Reports*, 2001

Reviewer, Scientific Abstract Presentations, CAL/ACEP Scientific Assembly, 2001-02

Member, Board of Directors, CAL/ACEP, 2001-03

Moderator, Western Regional SAEM Research Presentations, San Diego, California, April 2002

Clinical Coordinator, Southwestern College Emergency Medical Technician Program, 2001-03

Santa Clara County/Regional Medical Center Trauma Designation Review Committee, 2004

San Diego County Health Services Capacity Issues Task Force, 2002-06

San Diego Regional Safety Consortium Inter-facility Transfer Protocol Task Force, 2004-06

San Diego Regional Fire Prevention Emergency Preparedness Task Force, 2004-2006

San Diego County Task Force on Fire Prevention, 2004-06

President-Elect, EMS Medical Director's Association of California, 2005-06

Medical Director, San Diego County Metropolitan Medical Strike Team, 1998-2008

American College of Emergency Physicians (ACEP) Task Force on Excited Delirium Syndrome 2009-10

Objective Structured Clinical Examiner, UCSD School of Medicine, 1997-10

Evaluator, UCSD Physician Assessment and Clinical Evaluation (PACE) Program, 2000-06

Tactical EMS Care Provider for San Diego Sheriff's Special Enforcement Detail (SED), 2007-10

San Diego State Pre-Med Preceptor, SDSU, 2008-13

Phi Delta Epsilon Faculty Mentor, UCSD, 2008-12

National Institute of Justice Task Force on Excited Delirium, 2011

Member, Disaster Medical Assistance Team (CA-4), 1994-2011

Operations Committee, San Diego County Metropolitan Medical Strike Team, 1998-2010

Physician Member, San Diego County Metropolitan Medical Strike Team, 1998-07

COP-STICKNEY007270

<u>PREVIOUS COMMITTEE MEMBERSHIPS</u>:

Practice Management Committee, CAL/ACEP, 1994-95

Committee on Prehospital Stroke Triage, San Diego County Medical Society, 1998

Research Subcommittee, San Diego County Prehospital Audit Committee, 1997-99

Prehospital RSI Task Force, San Diego County Prehospital Audit Committee, 1997-99

Chair, San Diego County Prehospital Audit Committee, 1998-2000

San Diego County Pediatric CPR Task Force, 1999-2000

San Diego Sheriff's Source Selection Committee, 2000

Steering Committee, San Diego County Metropolitan Medical Strike Team, 1998-2001

Program Committee, CAL/ACEP Scientific Assembly, 1998-2001 (Co-Chair for 1999-2001)

Awards Committee, CAL/ACEP Scientific Assembly, 1999-2001

EMS Committee, San Diego County Metropolitan Medical Strike Team, 1999-2001

San Diego Metropolitan Medical Response System Bio-Terrorism Planning Group, 1999-2001

San Diego County EMS QA Net Prehospital Design Steering Committee, 2000-01

Chair, CPR Subcommittee, San Diego County Prehospital Audit Committee, 1998-2002

San Diego County SIPs (Serial Inebriate Program) Task Force, 2000-02

Task Force Leader, CAL/ACEP Scientific Assembly, 2001-02

Chair, Training Committee, San Diego County Metropolitan Medical Strike Team, 2001-02

Co-Chair, EMS Committee, CAL/ACEP, 2001-02

Policy Committee, CAL/ACEP, 2001-02

Chair, Research Subcommittee, San Diego County Prehospital Audit Committee, 2000-02

Governmental Affairs Committee, CAL/ACEP, 2001-02

Didactic Subcommittee, SAEM Program Committee, 2001-02

Program Mgmt Committee, San Diego County Metropolitan Medical Strike Team, 2001-03

Air Medical Transport Section, American College of Emergency Physicians, 2001-03

San Diego County Sheriff's Mortality Review Committee, 2001-03

San Diego County Sheriff's Pharmacy and Therapeutics Committee, 2001-03

City of San Diego EMS Physicians' Advisory Committee, 1998-2006

City of San Diego Prehospital Cardiac Advisory Committee, 1998-2006

Education Committee, CAL/ACEP, 2000-03

SAEM EMS Interest Group, 2001-2006 (Co-chair 2003-04)

COP-STICKNEY007271

San Diego County EMS for Children (EMSC) Advisory Committee, 2002-05

Scientific Subcommittee, SAEM Program Committee, 2002-05

Police Executive Research Forum Task Force on Conductive Energy Weapons Use, 2005

San Diego County EMS for Children (EMSC) Advisory Committee, 2002-05

Scientific Subcommittee, SAEM Program Committee, 2002-05

Member-at-large, EMDAC Officer Board, 2004-05

San Diego County Fire Chief's Association, 2004-06

San Diego County Sheriff's Helicopter Program Ad Hoc Advisory Committee, 2004-06

Chair, San Diego County HRSA Work Group, 2004-06

San Diego County Regional Helicopter Advisory Committee, 2004-06

San Diego County HRSA Executive Steering Committee, 2004-06

San Diego County Critical Care Transport Working Group, 2005-06

San Diego County Prehospital Patient Record IT Steering Committee, 2005-06

San Diego County Cardiac Advisory Committee, 2005-06

San Diego County Stroke Advisory Committee, 2005-06

San Diego County Emergency Medical Care Committee, 2006

Co-Chair, San Diego County Medical Society EMS Medical Oversight Committee, 2002-2006

Chair, EMS Committee, American Academy of Emergency Medicine California Chapter, 2000-06

EMS Medical Director's Association of California, 2002-06

San Diego County Trauma Administrators Committee, 2002-06

Chair, San Diego County EMS Research Committee, 2002-06

Chair, San Diego County Paramedic Protocol Revision Committee, 2002-06

San Diego County Public Health Services Physicians Group, 2003-06

SAEM EMS Interest Group, 2001-2006 (Co-chair 2003-04)

San Diego County Healthcare Advisory Committee on Terrorism, 2003-06

San Diego County Paramedic Training Joint Advisory Committee, 2000-06

San Diego County Public Health Preparedness Team, 2001-06

EMS Section, American College of Emergency Physicians, 2001-06

Chair, San Diego County Aeromedical Protocol Committee, 1998-2006

San Diego County Committee on Pediatric Emergency Medicine, 1998-2006

COP-STICKNEY007272

San Diego County Base Hospital Physicians Committee, 1997-2006

San Diego County Trauma Audit Committee, 1997-2006

San Diego County Prehospital Audit Committee, 1997-2006

EMS Medical Director's Association of California, 2002-06

SAEM Program Committee, 2001-2007

Chair, Photography Subcommittee, SAEM Program Committee, 2002-2007

Training Committee, San Diego County Metropolitan Medical Strike Team, 2001-09

San Diego BEACON/EMS Hub Technical Committee, 2012-13

San Diego Central Jail Quality Assurance Committee, 1999-2013

San Diego Central Jail Medical Oversight Committee, 1999-2013

Resuscitative Outcomes Consortium (ROC) Executive Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) EMS Operations Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) Management Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) Hospital Practices Cardiac Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) Publications Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) Cardiac Committee, 2014-15

Resuscitative Outcomes Consortium (ROC) Trauma Committee, 2014-15

Carlsbad Fire Department EMS Oversight Committee, 2013-17

COP-STICKNEY007273

<u>CURRENT FUNDED RESEARCH</u>:

1. Co-Investigator with Chris Coyne (Co-PI) for study entitled, "A blinded non-randomized comparison of inhaled loxapine (ADASUVE®) versus IM haloperidol/lorazepam". Funded by Teva Pharmaceuticals, 2015-present. Amount: $28,300.

2. Co-Principal Investigator with Susan Little for study entitled, "FOCUS program (On the Frontlines of Communities in the United States): Routine Screening for HIV Infection at the UCSD Hillcrest and Thornton Emergency Departments". Funded by Gilead, 2016-present. Amount: $490,937.41.

3. Co-Investigator with Chris Coyne for study entitled, "FOCUS program (On the Frontlines of Communities in the United States): Routine Screening for HCV Infection at the UCSD Hillcrest and Thornton Emergency Departments". Funded by Gilead, 2018-present. Amount:  $306,770.

COP-STICKNEY007274

PREVIOUS FUNDED RESEARCH:

1. Co-Investigator with Tom Neuman (PI) for evaluation of positional asphyxia in the hobble restraint position, funded by the County of San Diego, 1995--$33,900

2. Co-Investigator, with Theodore Chan (PI), for evaluation of the Melker percutaneous cricothyrotomy kit in human cadavers, funded by Cook Medical Products, 1997--$10,000

3. Co-Investigator with John Eisele (PI) for the evaluation of positional asphyxia in the hobble restraint position with weight on subjects' backs, funded by the American Academy of Forensic Sciences, 1998--$2,500

4. Co-Investigator, with Theodore Chan (PI), for study entitled, "The Impact of Oleoresin Capsicum Spray on Respiratory Function in Human Subjects in the Sitting and Prone Maximal Restraint Positions." Study funded by the National Institute of Justice, U.S. Department of Justice, 1998-99. UCSD No. 98-7107; USDOJ Federal Award #98-IJ-CX-0079. Amount: $128,176

5. Principle Investigator (PI) for study entitled "Evaluation of Hurricaine anesthetic in patients with dyspepsia" funded by Beutlich Pharmaceuticals for, 2001. Amount: $1,500

6. Co-Investigator, with Theodore Chan (PI), for evaluation of the Melker percutaneous cricothyrotomy kit in human cadavers, funded by Cook Medical Products, 2003. Amount: $12,000

7. Co-Investigator, with David Hoyt (PI) for the Resuscitation Outcomes Consortium: UCSD / San Diego Resuscitation Research Center, funded by the NIH, 9/1/04 to 6/30/09. UO1 HL077908. Amount: $2,250,522

8. Co-Principal Investigator (Co-PI), with Theodore Chan, for study entitled, "The effect of Taser on Cardiac, Respiratory and Metabolic Physiology in Human Subjects." Study funded by the National Institute of Justice, U.S. Department of Justice, 10/1/2005 to 9/30/2007. UCSD No. 2006-0846; USDOJ Federal Award #98-IJ-CX-0079. Amount: $213,941.4

9. Co-Investigator, with Daniel Davis (PI) for the study entitled, "ROC Interventional Trials: Hypertonic Resuscitation for Traumatic Injury, Trauma Epistry, PRIMED", funded by the NIH, 7/1/06 to 6/30/08. UO1 HL077863. Amount: $331,320

10. Co-Investigator, with Daniel Davis (PI) for the, "ROC Cardiac Epistry", funded by the AHA, 7/1/06 to 6/30/08. Amount: $133,427

11. Co-Investigator, with Theodore Chan (PI) for study entitled, "Multi-Center Study of the Impact of Nurse-Patient Ratios on Emergency Department Overcrowding." funded by the Emergency Medicine Foundation, 7/1/07 to 6/30/08. Amount: $50,000

12. Principal Investigator (PI) for study entitled, "Evaluation of the Ventilatory and Respiratory Effects of a Restraint Chair on Human Subjects." Funded by the Institute for the Prevention of In-Custody Deaths, Inc, 1/1/07 to 12/31/07. Amount: $11,658

COP-STICKNEY007275

13. Co-Investigator, with Edward Castillo (PI) for study entitled, "California ED Diversion Project Evaluation." funded by the California Healthcare Foundation, 5/15/08 to 10/15/08. Amount: $50,990

14. Principal Investigator (PI) for study entitled, "Ventilatory Effects of Prone Restraint on Obese Human Subjects." Funded by the Institute for the Prevention of In-Custody Deaths, Inc, 1/1/09 to 12/31/09. Amount: $13,423

15. Principal Investigator (PI) for study entitled, "FAST TRAC: Finding ACS with Serial Troponin Testing for Rapid Assessment." Funded by the Nanosphere, Inc. 2/1/09 to 2/1/11. Amount: $85,000

16. Principal Investigator (PI) for study entitled, "CHOPIN: Copentin Helps in the Early Detection of Patients with Acute Myocardial Infarction." Funded by Brahms AG, 8/1/09 to 8/1/12. Amount: $103,950

17. Co-Investigator, with Christine Hall for the study titled, "RESTRAINT - Risk of dEath in Subjects That Resisted: Assessment of Incidence and Nature of faTal events", funded by the Vancouver Island Health Authority. 7/1/09 to 6/30/11. Amount $50,000

18. Co-Investigator for study titled "STAT MERCURY: Studying the Treatment of Acute HyperTension: A Multicenter EmeRgency Department Clevidipine Utilization RestrY" funded by the Medicines Company, 7/27/10 to 11/1/11. Amount $1400

19. Co-Investigator for study titled "A Phase II, Randomized, Double-blind, Placebo-controlled Study to Evaluate the Safety and Efficacy of MN-221 when Administered Intravenously as an Adjunct to Standard Therapy to Adults with an Acute Exacerbation of Asthma." Study funded by MediciNova, Inc. 1/1/11 to 1/31/12. Amount $50,000

20. Principle Investigator for study titled "AKINESIS: Acute Kidney Injury N-gal Evaluation of Symptomatic heart failure." Study funded by Alere and Abbott, 4/1/11 to 6/30/12. Amount $32,000

21. Principle Investigator for study titled "Evaluation of Ecallantide (DX-88) for the Acute Treatment of Angiotensin Converting Enzyme Inhibitor Induced Angioedema, a Phase II, double-blind study. Study funded by Dyax Corporation. 4/1/11 to 6/30/12. Amount $20,000

22. Principle Investigator for study titled "REAL: Rapid Evaluation of Acute Kidney Injury with NGAL in Acutely Ill Patients in the ICU." Study funded by Alere, 5/1/11 to 6/30/12. Amount $74,435

23. Principle Investigator for study titled "A Mulit-Center, Open-Label, Surveillance Trial to Evaluate the Safety and Efficacy of a Shortened Infusion Time of Intravenous Ibuprofen Protocol CPI-CL-015." Study funded by Cumberland Pharmaceuticals, Inc., 6/1/11 to 6/30/12. Amount $50,000

COP-STICKNEY007276

24. Co-Investigator, with Edward Castillo (PI) for the study titled, "Restraint Chair Literature Review and Policy Gap Analysis", funded by the Ontario Ministry of Community Safety and Correctional Services, 7/1/13 to 9/30/13. COS-0010. Amount: $15,000

25. Co-Investigator, with Daniel Davis (PI) for the study titled, "Resuscitation Outcomes Consortium (ROC) Regional Clinical Center, San Diego", funded by the NIH, 3/1/10 to 6/30/14. U01 HL077908-09. Amount: $1,389,389

26. Co-Investigator with Edward Castillo (PI) for study entitled, "Diagnostic Evaluation using ClearView in Decision Making in the Emergency Room". Funded by EPIC Research and Diagnostics, Inc, 2012-2014. Amount: $650,840.10 (based on 570 total participants).

27. Co-Investigator with Edward Castillo (PI) for study entitled, "Point-of-Care Testing for Illicit Drugs and Alcohol Intoxication in an Emergency Room". Funded by the National Institute on Drug Abuse through Seacoast Science, Inc., 2013-2015. Amount: $50,163.

28. Co-Investigator with Edward Castillo (PI) for study entitled, "Evaluation of downward force placed onto prone subjects." Funded by the Institute for the Prevention of In-Custody Deaths, Inc., 2014-2015. Awarded, contract in process. Amount: $7,500.

29. Co-Investigator with Edward Castillo (PI) for study entitled, "Acute Bacterial Skin and Skin Structure Infection (abSSSI) Practice Pattern Assessment." Funded by Durata Therapeutics International B.V., 2014-2015. Amount: $15,000.

30. Co-Investigator with Edward Castillo (PI) for study entitled, "Exploring emergency room physician's knowledge and attitudes concerning the use of appropriate and safe home care as an alternative to hospital admission." Funded by the Gary and Mary West Health Institute, 2014-2015. Amount: $118,021.

31. Co-Investigator with Allyson Kreshak (PI) for study entitled, "Telephone, Text or Type? Comparing Tools for Improving Physician-Patient Communication Beyond the Walls of the Emergency Department after Discharge." Funded by the UCSD Academy of Clinician Scholars, 2014-2015. Amount: $10,000.

32. Principal Investigator (PI) for the study titled, "Resuscitation Outcomes Consortium (ROC) Regional Clinical Center, San Diego", funded by the NIH, 7/1/14 to 12/31/15. U01 HL077908-09. Amount: NCE

33. Principal Investigator (PI) for study entitled, "EXCITATION Study: Unexplained In-Custody Deaths: Evaluating Biomarkers of Stress and Agitation." Study funded by the National Institute of Justice, U.S. Department of Justice, 11/1/2012 to 6/30/2016. USDOJ Federal Award # 2012-R2-CX-K006. Amount: $431,943

34. Principal Investigator (PI) for the study titled, "Resuscitation Outcomes Consortium (ROC) Protocol -ALPS", funded by the NIH, 7/1/13 to 12/31/15. 5U01HL077863-11 subaward 758500. Amount: $289,003

COP-STICKNEY007277

35.  Co-Investigator with Edward Castillo (PI) for study entitled, "Acute Home Care as an Alternative to Inpatient Admission from the Emergency Department". Funded by the Gary and Mary West Health Institute, 2015 – 2016. Amount: $499,125.

36.  Co-Investigator with Theodore Chan (PI) for study entitled, "The Gary and Mary West Geriatric Center of Excellence (West COE): Phase 1 Research Development". Funded by the Gary and Mary West Health Institute, 2015-2016. Amount: $243,610.

COP-STICKNEY007278

<u>PUBLICATIONS</u>:

<u>Texts/Books</u>

1.   <u>Atlas of Emergency Procedures</u>.  Rosen P, Chan TC, Vilke GM, Sternbach G (Eds.);
     St. Louis: Mosby, Inc., 2001.

2.   <u>Atlas of Emergency Procedures</u>. (Edition translated into Spanish) Rosen P, Chan TC, Vilke
     GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2005.

3.   <u>Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths and Deaths in
     Custody.</u>  Ross DL, Vilke GM (Eds.); New York and London: Routledge. 2017.

<u>Book Chapters</u>

1.   Vilke GM:  Head Trauma, Blunt.  In: <u>The 5 Minute Emergency Medicine Consult</u>.
     Rosen P, Barkin RM, Hayden SR, Schaider JJ, Wolfe R (Eds.); Philadelphia: Lippincott
     Williams & Wilkins, 1999, pp 472-473.

2.   Vilke GM:  Head Trauma, Penetrating.  In: <u>The 5 Minute Emergency Medicine Consult</u>.
     Rosen P, Barkin RM, Hayden SR, Schaider JJ, Wolfe R (Eds.); Philadelphia: Lippincott
     Williams & Wilkins, 1999, 474-475.

3.   Vilke GM:  Urethral Catheterization.  In: <u>Atlas of Emergency Procedures</u>.  Rosen P,
     Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 124-127.

4.   Vilke GM:  Cystostomy.  In: <u>Atlas of Emergency Procedures</u>.  Rosen P, Chan TC,
     Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 128-129.

5.   Vilke GM:  Bladder Aspiration.  In: <u>Atlas of Emergency Procedures</u>.  Rosen P, Chan TC,
     Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 130-131.

6.   Vilke GM:  Dorsal Slit in Phimosis.  In: <u>Atlas of Emergency Procedures</u>.  Rosen P, Chan TC,
     Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 132-133.

7.   Vilke GM:  Manual Paraphimosis Reduction.  In: <u>Atlas of Emergency Procedures</u>.  Rosen P,
     Chan TC, Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 134-135.

8.   Vilke GM:  Zipper Removal.  In: <u>Atlas of Emergency Procedures</u>.  Rosen P, Chan TC,
     Vilke GM, Sternbach G (Eds.); St. Louis: Mosby, Inc., 2001, pp 136-137.

9.   Hayden SR, Silfvast T, Deakin CD, Vilke GM:  Surgical Procedures.  In: <u>Prehospital Trauma
     Care</u>.  Soreide E, Grande CM (Eds.); New York: Marcel Dekker, Inc., 2001, pp 323-354.

10.  Hayden SR, Thierbach A, Vilke GM, Sugrue M:  Patient Turnover: Arriving and Interacting
     in the Emergency Department.  In: <u>Prehospital Trauma Care</u>.  Soreide E, Grande CM (Eds.);
     New York: Marcel Dekker, Inc., 2001, pp 737-751.

COP-STICKNEY007279

Book Chapters

11.  Vilke GM:  Cervical Spine Injury, Adult.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 1048-1049.

12.  Vilke GM:  Extremity Trauma, Penetrating.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 394-395.

13.  Vilke GM:  Head Trauma, Blunt.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 476-477.

14.  Vilke GM:  Head Trauma, Penetrating.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 478-479.

15.  Vilke GM:  Ring/Constricting Band Removal.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 980-981.

16.  Vilke GM:  Warts.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 1222-1223.

17.  Vilke GM:  Fournier's Gangrene.  In: <u>Rosen and Barkin's 5-Minute Emergency Medicine Consult</u> (second edition).  Schaider J, Hayden SR, Wolfe R, Barkin RM, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2003, pp 430-431.

18.  Vilke GM:  Variants of Normal.  In: <u>ECG in Emergency Medicine and Acute Care.</u> Chan TC, Brady WJ, Harrigan RA, Ornato JP, Rosen P (Eds.); Philadelphia: Elsevier Mosby, 2005, pp 12-15.

19.  Vilke GM:  Keloid Formation. In: <u>Greenberg's Text-Atlas of Emergency Medicine</u>. Greenberg MI, Hendrickson RG, Silverberg M (Eds.); Philadelphia: Lippincott Williams and Wilkins, 2005, p 684.

20.  Vilke GM:  Distal Digital Amputation. In: <u>Greenberg's Text-Atlas of Emergency Medicine</u>. Greenberg MI, Hendrickson RG, Silverberg M (Eds.); Philadelphia: Lippincott Williams and Wilkins, 2005, p 685.

21.  Vilke GM:  Painful Syndromes of the Hand and Wrist.  In: <u>Harwood-Nuss' Clinical Practice of Emergency Medicine</u> fourth edition.  Editor-in-chief: AB Wolfson. Philadelphia: Lippincott Williams and Wilkins, 2005, pp 536-540.

COP-STICKNEY007280

Book Chapters

22.  Vilke GM:  Neck Holds.  In: Sudden Deaths in Custody.  Ross DL, Chan TC (Eds.);
New Jersey: Humana Press, 2006, pp 15-38.

23.  Sloane C, Vilke GM:  Riot Control Agents, Tasers and Other Less Lethal Weapons.
In: Sudden Deaths in Custody.  Ross DL, Chan TC (Eds.); New Jersey: Humana Press, 2006,
pp 113-138.

25.  Vilke GM:  *Clostridium botulinum* Toxin (Botulism) Attack.  In: Disaster Medicine.
Ciottone GR (Ed.); Boston: Elsevier Mosby, 2006, pp 701-704.

26.  Vilke GM:  Viral Agents (Section 10, Part 2).  Section Editor.  In: Disaster Medicine.
Ciottone GR (Ed.); Boston: Elsevier Mosby, 2006, pp 661-697.

27.  Patel R, Reynoso J, Vilke GM:  Genitourinary Trauma. In:  Emergency Medicine Handbook.
Clinical Concepts for Clinical Practice.  Roppolo LP, Davis D, Kelly SP, Rosen P (Eds.);
Philadelphia: Elsevier Mosby, 2007, pp 164-173.

28.  Vilke GM:  Extremity Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency
Medicine Consult (third edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P
(Eds.); Philadelphia: Lippincott Williams & Wilkins, 2007, pp 392-393.

29.  Vilke GM:  Fournier's Gangrene. In: Rosen & Barkin's 5-Minute Emergency Medicine
Consult (third edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P (Eds.);
Philadelphia: Lippincott Williams & Wilkins, 2007, pp 428-429.

30.  Vilke GM:  Head Trauma, Blunt. In: Rosen & Barkin's 5-Minute Emergency Medicine
Consult (third edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P (Eds.);
Philadelphia: Lippincott Williams & Wilkins, 2007, pp 474-475.

31.  Vilke GM:  Head Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency
Consult (third edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P (Eds.);
Philadelphia: Lippincott Williams & Wilkins, 2007, pp 476-477.

32.  Vilke GM:  Spine Injury: Cervical, Adult. In: Rosen & Barkin's 5-Minute Emergency
Medicine Consult (third edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P
(Eds.); Philadelphia: Lippincott Williams & Wilkins, 2007, pp 1040-1041.

33.  Vilke GM:  Warts. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (third
edition).  Schaider JJ, Hayden SR, Wolfe RE, Barkin RM, Rosen P (Eds.); Philadelphia:
Lippincott Williams & Wilkins, 2007, pp 1224-1225.

COP-STICKNEY007281

Book Chapters

37. Vilke GM, Sloane CM, Chan TC. Accelerated Triage for Medical Evaluations Following CED Activations. In: Critical Issues in Policing Series: Strategies for Resolving Conflict and Minimizing Use of Force. Ederheimer JA (Ed); Washington DC, Police Executive Research Forum, 2007, pp 108-109.

38. Christensen EF, Deakin C, Vilke GM: Prehospital Care and Trauma Systems. In: Trauma: Emergency Resuscitation, Perioperative Anesthesia, Surgical Management, Volume I. Wilson WC, Grande CM, Hoyt DB (Eds.); New York: Informa Healthcare USA, Inc, 2007, pp 43-58.

36 Chan TC, Vilke GM. In: TASER® Conducted Electrical Weapons: Physiology, Pathology, and Law. Kroll MW, Ho JD (Eds.); New York: Springer, 2009, pp 109-118.

37. Vilke GM: Hand and Wrist Pain. In: Harwood-Nuss' Clinical Practice of Emergency Medicine fifth edition. Editor-in-chief: AB Wolfson. Philadelphia: Lippincott Williams and Wilkins, 2010, pp 711-714.

38. Wilson MP, Vilke GM. Not all ear pain is acute otitis media…and not all require antibiotics! In: Avoiding Common Errors in the Emergency Department. Mattu A, Chanmugam AS, Swadron SP, Tibbles CD, Woolridge DP (Eds) Philadelphia: Lippincott Williams and Wilkins, 2010, pp 520-522.

39. Oyama LC, Vilke GM. In: Emergency Medicine Review Preparing for the Boards. Harrigan RA, Ufberg JW, Tripp ML (Eds) St. Louis: Elsevier Saunders, 2010, pp 303-315.

40. Vilke GM: Extremity Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition). Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 392-393.

41. Vilke GM: Fournier's Gangrene. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition). Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 428-429.

42. Vilke GM: Head Trauma, Blunt. In: In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition). Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 476-477.

43. Vilke GM: Head Trauma, Penetrating. In: In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fourth edition). Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 478-479.

COP-STICKNEY007282

Book Chapters

44.  Vilke GM:  Spine Injury: Cervical, Adult. In: In: <u>Rosen & Barkin's 5-Minute Emergency Medicine Consult</u> (fourth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 1044-1045.

45.  Vilke GM:  Warts. In: In: <u>Rosen & Barkin's 5-Minute Emergency Medicine Consult</u> (fourth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2011, pp 1226-1227.

46.  Heegaard WG, Vilke GM: Factitious Conducted Electrical Weapons Wounds: Injuries and Considerations. In: <u>Atlas of Conducted Electrical Weapon Wounds and Forensic Analysis.</u> Ho JD, Dawes DM, Kroll MW (Eds.)  New York: Springer, 2012, pp 131-142.

47.  Wilson MP, Vilke GM. The patient with excited delirium in the emergency department. In Zun LS, Chepenik LG, Mallory MNS editors. <u>Behavioral Emergencies: A handbook for emergency physicians</u>. Cambridge: Cambridge University Press; 2013.

48.  Vilke GM:  Extremity Trauma, Penetrating. In: <u>Rosen & Barkin's 5-Minute Emergency Medicine Consult</u> (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 398-399.

49.  Vilke GM:  Fournier Gangrene. In: <u>Rosen & Barkin's 5-Minute Emergency Medicine Consult</u> (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 434-435.

50.  Vilke GM:  Head Trauma, Blunt. In: <u>Rosen & Barkin's 5-Minute Emergency Medicine Consult</u> (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 486-487.

51.  Vilke GM:  Head Trauma, Penetrating. In: <u>Rosen & Barkin's 5-Minute Emergency Medicine Consult</u> (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 488-489.

52.  Vilke GM:  Spine Injury: Cervical, Adult. In: <u>Rosen & Barkin's 5-Minute Emergency Medicine Consult </u>(fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 1054-1055.

53.  Vilke GM:  Warts. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (fifth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P, Rosen P (Eds.); Philadelphia: Lippincott Williams & Wilkins, 2015, pp 1240-1241.

COP-STICKNEY007283

Book Chapters

54.   Vilke GM:  Hand and Wrist Pain.  In: Harwood-Nuss' Clinical Practice of Emergency Medicine sixth edition.  Editor-in-chief: AB Wolfson. Philadelphia: Lippincott Williams and Wilkins, 2015, pp 707-710.

55.   Vilke GM: The Question of Positional and Compression Asphyxia. In:  The Thin Blue Line. Amdur E and Hutchings J (eds.) Edgework, 2015, pp 287-290.

56.   Vilke GM: The Question of Positional and Compression Asphyxia. In:  Safe Behind Bars. Amdur E, Blake M, De Villeneuve C (eds.) Edgework, 2015, pp 321-324.

57.   Vilke GM: The Question of Positional and Compression Asphyxia. In:  Cooling the Flames Amdur E, Murphy JK (eds.) Edgework, 2015, pp 247-250.

58.   Castillo EM, Vilke GM. Road Traffic Accidents: Air Bag-Related Injuries and Deaths. Encyclopedia of Forensic and Legal Medicine (Second Edition), 2016, pp 162-174.

59.   Vilke GM, Castillo EM. Restraint Techniques, Injuries, and Death: Use of Force Techniques. Encyclopedia of Forensic and Legal Medicine (Second Edition), 2016, pp 142-147.

60.   Roberts EE, Vilke GM. Restraint Techniques, Injuries, and Death: Conducted Energy Devices.  Encyclopedia of Forensic and Legal Medicine (Second Edition), 2016, pp 118-126.

61.   Castillo EM, Vilke GM. How to design a study that everyone will believe. In: Doing Research in Emergency and Acute Care: Making Order Out of Chaos. Wilson MP, Guluma KZ, Hayden SR (Eds.); Hoboken: Wiley-Blackwell, 2015 pp 79-84.

62.   Vilke GM, Castillo EM. Privacy in research: How to collect data safely and confidentially. In: Doing Research in Emergency and Acute Care: Making Order Out of Chaos. Wilson MP, Guluma KZ, Hayden SR (Eds.); Hoboken: Wiley-Blackwell, 2015, pp 155-160.

63.   Wilson MP, Vilke GM. Mental Illness and Substance Abuse. In: Cooney D. EMS Medicine. New York: McGraw-Hill, 2015, pp 362-366.

64.   DeMers G, Vilke GM. International Deployment. In: Cooney D. EMS Medicine. New York: McGraw-Hill, 2015, pp 531-538.

65.   Vilke GM. Payne-James JJ. Excited Delirium Syndrome: aetiology, identification and treatment.  In: Current Practice in Forensic Medicine Volume 2. Gall JAM, Payne-James JJ (Eds.) West Sussex: Wiley, 2016, pp 97-117.

66.   Villano J, Vilke GM:  Clostridium botulinum Toxin (Botulism) Attack.  In: Disaster Medicine. (second edition) Ciottone GR (Ed.); Philadelphia: Elsevier Mosby, 2016, pp 790-793.

COP-STICKNEY007284

Book Chapters

67. Nakajima Y, Vilke GM, Use of Force in the Prehospital Environment. In: The Diagnosis and Management of Agitation. Zeller SL, Nordstrom KD and Wilson MP (Eds.) Cambridge: Cambridge University Press, 2017. pp 173-188.

68. Holman M, Vilke GM. Neck Holds. In: Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths and Deaths in Custody. Ross DL, Vilke GM (Eds.); New York and London: Routledge. 2017.

69. Coyne CJ, Ly BT, Vilke GM. Excited Delirium Syndrome (ExDS). In: Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths and Deaths in Custody. Ross DL, Vilke GM (Eds.); New York and London: Routledge. 2017.

70. Sloane C, Vilke GM. Less Lethal Weapons, Not Including TASER. In: Guidelines for Investigating Officer-Involved Shootings, Arrest-Related Deaths and Deaths in Custody. Ross DL, Vilke GM (Eds.); New York and London: Routledge. 2017.

71. Childers R, Chan TC, Vilke GM. TASER Conducted Electrical Weapons. In: Clinical Forensic Medicine. (Fourth Edition). Stark (Ed.); Springer Nature Switzerland AG. 2020. pp 279-312.

72. Vilke GM, Solomon PHD: Extremity Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition). Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 396-397.

73. Vilke GM, Solomon, PHD: Fournier Gangrene. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition). Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 432-433.

74. Vilke GM, Boynton HE: Head Trauma, Blunt. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition). Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 484-485.

75. Vilke GM, Shastry S: Head Trauma, Penetrating. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition). Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 486-487.

76. Vilke GM, Shastry S: Spine Injury: Cervical, Adult. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition). Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1056-1057.

77. Vilke GM: Spine Injury: Thoracic, Adult. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition). Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1065-1066.

COP-STICKNEY007285

Book Chapters

78.     Alfaraj DN, Vilke GM:  Spine Injury: Lumbar, Adult. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1062-1063.

79.     Alfaraj DN, Vilke GM:  Spine Injury: Coccyx, Adult. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1060-1061.

80.     Childers R, Vilke GM:  Spine Cord Syndromes. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1054-1055.

81.     Childers R, Vilke GM:  Colon Trauma. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 248-249.

82.     Allehyani MF, Vilke GM:  Bladder Injury. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 146-147.

83.     Vilke GM, Nene RV:  Warts. In: Rosen & Barkin's 5-Minute Emergency Medicine Consult (sixth edition).  Schaider JJ, Barkin RM, Hayden SR, Wolfe RE, Barkin RE, Shayne P (Eds.); Philadelphia: Wolters Kluwer, 2019. pp 1246-1247.

84.     Vilke GM:  Hand and Wrist Pain.  In: Harwood-Nuss' Clinical Practice of Emergency Medicine seventh edition.  Editor-in-chief: AB Wolfson. Philadelphia: Wolters Kluwer, 2019.

85.     Wilson M.P., Vilke G.M. (2021) Excited Delirium Syndrome: Diagnosis and Treatment. In: Zun L.S., Nordstrom K., Wilson M.P. (eds) Behavioral Emergencies for Healthcare Providers. Springer, Cham. https://doi.org/10.1007/978-3-030-52520-0_16

COP-STICKNEY007286

VIDEOS:

1.  Vilke GM, Davis DP, Robinson A: "Glasgow Coma Scale and the Field Neurological Exam" Instructional Video, San Diego County Emergency Medical Services, Copyright 1997.

2.  Vilke GM, Chan TC: "Excited Delirium" Instructional Video, San Diego County Sheriff's Department, 2007.

3.  Morris B, Vilke GM: "Ankylosing Spondylitis" Educational Video. Bill Morris Production Group for the Ankyslosing Spondylitis Association of America, 2009.

COP-STICKNEY007287

PUBLICATIONS, continued:

Articles

1. Vilke GM, Hoyt DB, Epperson M, Fortlage D, Hutton KC, Rosen P:  Intubation techniques in the helicopter.  J Emerg Med 1994;12(2):217-224.

2. Rockwell E, Jackson E, Vilke G, Jeste DV:  A study of delusions in a large cohort of Alzheimer's disease patients.  Am J Geriatric Psychiatry 1994;2(2):157-164.

3. Chan T, Vilke GM, Williams S:  Bi-directional ventricular tachycardia in a patient with digoxin toxicity.  J Emerg Med 1995;13(1):89.

4. Vilke GM:  Misplaced intravascular catheters in a patient with acute renal failure.  J Emerg Med 1995;13(3):379.

5. Vilke GM, Vilke TS, Rosen P:  The completeness of MEDLINE for papers published in the *Journal of Emergency Medicine*.  J Emerg Med 1995;13(4):457-460.

6. Bauman BH, Vilke G, Chan T:  Dexamethasone use in croup.  West J Med 1996;164(1):66.

7. Vilke GM, Hayden SR:  Intraorbital air in a patient status post-facial trauma.  J Emerg Med 1996;14(1):77.

8. Vilke GM, Jacoby I, Manoguerra AS, Clark R:  Disaster preparedness of poison control centers.  Clin Toxicol 1996;34(1):53-58.

9. Vilke GM:  "No worries."  J Emerg Med 1996;14(5):641-642.

10. Vilke GM, Honingford EA:  Cervical spine epidural abscess in a patient with no predisposing risk factors.  Ann Emerg Med 1996;27(6):777-780.

11. Vilke GM, Honingford EA:  Diabetes and neck pain (Letter to the editor).  Ann Emerg Med 1996;28(6):731.

12. Vilke GM, Wulfert EA:  Case reports of two patients presenting with pneumothorax following acupuncture.  J Emerg Med 1997;15(2):155-157.

13. Vilke GM:  Chest pain in an elderly patient.  J Emerg Med 1997;15(4):523.

14. Chan TC, Vilke GM, Neuman T, Clausen JL:  Restraint position and positional asphyxia.  Ann Emerg Med 1997;30(5):578-586.

15. Moss ST, Chan TC, Buchanan J, Dunford JV, Vilke GM:  Outcome study of prehospital patients signed out against medical advice by field paramedics.  Ann Emerg Med 1998; 31(2):247-250.

COP-STICKNEY007288

Articles

16.  Chan TC, Vilke GM, Neuman T:  Reexamination of custody restraint position and positional asphyxia.  Am J Forensic Med Pathol 1998;19(3):201-205.

17.  Howard JD, Reay DT [32(1):116-117] / Chan TC, Vilke GM, Neuman T, Clausen J:  Positional asphyxia (Reply to letter to the editor).  Ann Emerg Med 1998;32(1):117-118.

18.  Vilke GM, Mahoney G, Chan TC:  Postpartum coronary artery dissection.  Ann Emerg Med 1998;32(2):260-262.

19.  Rosa CM, Schwartz BL, Vilke GM:  The prehospital electrocardiogram: Future standard of care?  Top Emerg Med 1998;20(3):23-29.

20.  Davis DP, Bramwell KJ, Vilke GM, Cardall TY, Yoshida E, Rosen P:  Cricothyrotomy technique: Standard versus the rapid four-step technique.  J Emerg Med 1999;17(1):17-21.

21.  Davis DP, Stephen KAC, Vilke GM:  Inaccuracy in endotracheal tube verification using a Toomey syringe.  J Emerg Med 1999;17(1):35-38.

22.  Friedman L, Vilke GM, Chan TC, Hayden SR, Guss DA, Krishel SJ, Rosen P:  Emergency department airway management before and after an emergency medicine residency.  J Emerg Med 1999;17(3):427-431.

23.  Bramwell KJ, Davis DP, Cardall TY, Yoshida E, Vilke GM, Rosen P:  Use of the Trousseau dilator in cricothyrotomy.  J Emerg Med 1999;17(3):433-436.

24.  Cardall TY, Chan TC, Brady WJ, Perry JC, Vilke GM, Rosen P:  Permanent cardiac pacemakers: Issues relevant to the emergency physician, Part I.  J Emerg Med 1999;17(3): 479-489.

25.  Cardall TY, Brady WJ, Chan TC, Perry JC, Vilke GM, Rosen P:  Permanent cardiac pacemakers: Issues relevant to the emergency physician, Part II.  J Emerg Med 1999;17(4): 697-709.

26.  Vilke GM, Buchanan J, Dunford JV, Chan TC:  Are heroin overdose deaths related to patient release after prehospital treatment with naloxone?  Prehosp Emerg Care 1999;3(3):183-186.

27.  Roppolo LP, Vilke GM, Chan TC, Krishel S, Hayden SR, Rosen P:  Nasotracheal intubation in the emergency department, revisited.  J Emerg Med 1999;17(5):791-799.

28.  Vilke GM:  FOOSH injury with snuff box tenderness.  J Emerg Med 1999;17(5):899-900.

29.  Chan TC, Neuman T, Vilke GM, Clausen J, Clark RF:  Metabolic acidosis in restraint-associated cardiac arrest (Letter to the editor).  Acad Emerg Med 1999;6(10):1075-1076.

COP-STICKNEY007289

Articles

30. Chan TC, Vilke GM, Bramwell KJ, Davis DP, Hamilton RS, Rosen P: Comparison of wire-guided cricothyrotomy versus standard surgical cricothyrotomy technique. J Emerg Med 1999;17(6):957-962.

31. Reay DT, Howard JD [20(3):300-301] / Chan TC, Vilke GM, Neuman T: Restraint position and positional asphyxia (Reply to letter to the editor). Am J Forensic Med Pathol 2000; 21(1):93.

32. Vilke GM, Chan TC, Guss DA: Use of a complete neurological examination to screen for significant intracranial abnormalities in minor head injury. Am J Emerg Med 2000;18(2): 159-163.

33. Sloane CM, Vilke G: The other olive associated with vomiting. J Emerg Med 2000; 18(3):375.

34. Vilke GM, Chan TC, Neuman T, Clausen JL: Spirometry in normal subjects in sitting, prone, and supine positions. Respir Care 2000;45(4):407-410.

35. Ma G, Vilke GM: Amoebic abscess. J Emerg Med 2000;18(4):465-466.

36. Davis DP, Bramwell KJ, Hamilton RS, Chan TC, Vilke GM: Safety and efficacy of the rapid four-step technique for cricothyrotomy using a Bair Claw. J Emerg Med 2000;19(2):125-129.

37. Sloane C, Vilke GM, Chan TC, Hayden SR, Hoyt DB, Rosen P: Rapid sequence intubation in the field versus hospital in trauma patients. J Emerg Med 2000;19(3):259-264.

38. Gerling MC, Davis DP, Hamilton RS, Morris GF, Vilke GM, Garfin SR, Hayden SR: Effects of cervical spine immobilization technique and laryngoscope blade selection on an unstable cervical spine in a cadaver model of intubation. Ann Emerg Med 2000;36(4):293-300.

39. Ochs M, Vilke GM, Chan TC, Moats T, Buchanan J: Successful prehospital airway management by EMT-Ds using the Combitube. Prehosp Emerg Care 2000;4(4):333-337.

40. Vilke GM, Barrera A, Iskander J, Chan TC: Emergency department patient knowledge of medications. J Emerg Med 2000;19(4):327-330.

41. Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T: The impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions, final report. NCJ 182433. Washington, DC: United States Department of Justice, National Institute of Justice, 2000, 68 pages.

42. Gerling MC, Davis DP, Hamilton RS, Morris GF, Vilke GM, Garfin SR, Hayden SR: Effect of surgical cricothyrotomy on the unstable cervical spine in a cadaver model of intubation. J Emerg Med 2001;20(1):1-5.

COP-STICKNEY007290

Articles

43.  Vilke GM, Chan TC:  Physician effect on out of hospital patients signing out against medical advice.  Pre-hospital Immediate Care 2001;5(1):38-40.

44.  Davis DP, Kimbro TA, Vilke GM:  The use of midazolam for prehospital rapid-sequence intubation may be associated with a dose-related increase in hypotension.  Prehosp Emerg Care 2001;5(2):163-168.

45.  Patel RJ, Vilke GM, Chan TC:  The prehospital electrocardiogram.  J Emerg Med 2001; 21(1):35-39.

46.  Davis DP, Videen JS, Marino A, Vilke GM, Dunford JV, Van Camp SP, Maharam LG:  Exercise-induced hyponatremia in marathon runners: A two-year experience.  J Emerg Med 2001;21(1):47-57.

47.  Seltzer AG, Vilke GM, Chan TC, Fisher R, Dunford JV:  Outcome study of minors after parental refusal of paramedic transport.  Prehosp Emerg Care 2001;5(3):278-283.

48.  Vilke GM, Marino A, Fisher R, Chan TC:  Estimation of pediatric patient weight by EMT-Ps.  J Emerg Med 2001;21(2):125-128.

49.  Chan TC, Vilke GM, Pollack M, Brady WJ:  Electrocardiographic manifestations: Pulmonary embolism.  J Emerg Med 2001;21(3):263-270.

50.  Morgan J / Sloane C, Vilke GM:  Rapid sequence intubation in the field versus hospital in trauma patients (Reply to letter to the editor).  J Emerg Med 2001;21(4):443-444.

51.  Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T:  Pepper spray's effects on a suspect's ability to breathe.  Research in Brief (NCJ 188069), December 2001.  Washington, DC: United States Department of Justice, National Institute of Justice.

52.  Vilke GM, Steen PJ, Smith AM, Chan TC:  Out-of-hospital pediatric intubation by paramedics: The San Diego experience.  J Emerg Med 2002;22(1):71-74.

53.  Chan TC, Vilke GM, Clausen J, Clark RF, Schmidt P, Snowden T, Neuman T:  The effect of oleoresin capsicum "pepper" spray inhalation on respiratory function.  J Forensic Sci 2002; 47(2):299-304.

54.  Vilke GM, Sharieff GQ, Marino A, Gerhart AE, Chan TC:  Midazolam for the treatment of out-of-hospital pediatric seizures.  Prehosp Emerg Care 2002;6(2):215-217.

55.  Vilke GM, Chan TC:  Agitated delirium and sudden death (Letter to the editor).  Prehosp Emerg Care 2002;6(2):259-260.

COP-STICKNEY007291

Articles

56.     Vilke GM, Fisher R, Chan TC:  An evaluation of the risk for latex allergy in prehospital EMS providers.  J Emerg Med 2002;22(4):345-348.

57.     Vilke GM:  Food-dependent exercise-induced anaphylaxis.  Prehosp Emerg Care 2002; 6(3):348-350.

58.     Vilke GM, Snyder B:  High pressure paint spray gun injury.  J Emerg Med 2002;23(2): 203-204.

59.     Chew GS, Vilke GM, Davis DP, Chan TC:  Toomey$^{TM}$ syringe aspiration may be inaccurate in detecting esophageal intubation following gastric insufflation.  J Emerg Med 2002;23(4): 337-340.

60.     Vilke GM:  Aeromedical Emergencies:  Intro to the section.  J Emerg Med 2002;23(1):49.

61.     Vilke GM, Sardar W, Fisher R, Dunford JD, Chan TC:  Follow-up of elderly patients who refuse transport after accessing 9-1-1.  Prehosp Emerg Care 2002;6(4):391-395.

62.     Vilke GM:  Great toe pain.  J Emerg Med 2003;24(1):59-60.

63.     Davis JM, Vilke GM:  An elderly patient with intussusception. J Emerg Med 2003;24(2):221.

64.     Austin T, Vilke GM, Nyheim E, Kelly D, Chan TC:  Safety and effectiveness of methohexital for procedural sedation in the emergency department.  J Emerg Med 2003;24(3):315-318.

65.     Chan TC, Vilke GM, Smith S, Sparrow W, Dunford JV:  Impact of an after-hours on-call emergency physician on ambulance transports from a county jail.  Prehosp Emerg Care 2003; 7(3):327-331.

66.     Vilke GM, Chan TC, Neuman T:  Patient Restraint in EMS:  Prehosp Emerg Care 2003; 7(3):417.

67.     Deitch S, Davis DP, Schatteman J, Chan TC, Vilke GM:  The use of etomidate for prehospital rapid-sequence intubation.  Prehosp Emerg Care 2003;7(3):380-383.

68.     Vilke GM, Sloane C, Smith AM, Chan TC:  Assessment for deaths in out-of-hospital heroin overdose patients treated with naloxone who refuse transport.  Acad Emerg Med 2003; 10(8):893-896.

69.     Davis DP, Valentine C, Ochs M, Vilke GM, Hoyt DB:  The Combitube as a salvage airway device for paramedic rapid sequence intubation.  Ann Emerg Med 2003;42(5):697-704.

70.     Calkins T, Chan TC, Clark RF, Stepanski B, Vilke GM:  Review of prehospital sodium bicarbonate use for cyclic antidepressant overdose.  Emerg Med J 2003;20:483-486.

COP-STICKNEY007292

PUBLICATIONS, continued:

Articles

71.   Vilke GM, Brown L, Skogland P, Simmons C, Guss DA:  Approach to decreasing emergency department ambulance diversion hours.  J Emerg Med 2004;26(2):189-192.

72.   Vilke GM, Smith AM, Chan TC:  Leaving against medical advice after out-of-hospital naloxone:  a closer look is needed.  Acad Emerg Med 2004;11(3):323-324.

73.   Vilke GM, Harrigan RA, Ufberg JW, Chan TC:  Emergency evaluation and treatment of priapism.  J Emerg Med 2004;26(3):325-329.

74.   Davis DP, Wold RM, Patel RJ, Tran AJ, Tokhi RN, Chan TC, Vilke GM:  The clinical presentation and impact of diagnostic delays on emergency department patients with spinal epidural abscess.  J Emerg Med 2004;26(3):285-291.

75.   Vilke GM, Harrigan RA, Ufberg JW:  Technical Tips: Intro to the section.  J Emerg Med 2004;26(3):323.

76.   Doney MK, Vilke GM:  Large osteosarcoma not apparent on conventional radiography. J Emerg Med 2004;26(3):351-352.

77.   Chan TC, Ufberg J, Harrigan RA, Vilke GM:  Nasal foreign body removal.  J Emerg Med 2004;26(4):441-445.

78.   Vilke GM, Smith AM, Upledger Ray L, Steen PJ, Murrin PA, Chan TC:  Airway obstruction in children aged less than 5 years: The prehospital experience.  Prehosp Emerg Care 2004; 8(2):196-199.

79.   Vilke GM, Jin A, Davis DP, Chan TC:  Prospective randomized study of viscous lidocaine versus benzocaine in a GI cocktail for dyspepsia.  J Emerg Med 2004;27(1):7-9.

80.   Poste JC, Davis DP, Ochs M, Vilke GM, Castillo EM, Stern J, Hoyt DB:  Air medical transport of severely head-injured patients undergoing paramedic rapid sequence intubation. Air Medical Journal 2004;23(4):36-40.

81.   Chan TC, Neuman T, Clausen J, Eisele J, Vilke GM:  Weight force during prone restraint and respiratory function.  Am J Forensic Med Pathol 2004;25(3):185-189.

82.   Ufberg JW, Vilke GM, Chan TC, Harrigan RA:  Anterior shoulder dislocations: Beyond traction-countertraction.  J Emerg Med 2004;27(3):301-306.

83.   Vilke, GM:  San Diego County wildfires: Perspective of county officials.  Disaster Manag Response 2004 Oct-Dec;2(4):99.

COP-STICKNEY007293

Articles

84. Vilke, GM, Castillo EM, Metz MA, Upledger Ray L, Murrin PA, Lev R, Chan TC: Community trial to decrease ambulance diversion hours: The San Diego County patient destination trial. Ann Emerg Med 2004;44(4):295-303.

85. Vilke GM, Stepanski BM, Ray LU, Lutz MW, Murrin PA, Chan TC: 9-1-1 responses for shopping cart and stroller injuries. Pediatr Emerg Care 2004;20(10):660-663.

86. Vilke GM, Castillo EM, Ray LU, Murrin PA, Chan TC: Evaluation of pediatric glucose monitoring and hypoglycemic therapy in the field. Pediatr Emerg Care 2005;21(1):1-5.

87. Vilke GM, Chan TC, Dunford JV, Metz M, Ochs G, Smith A, Fisher R, Poste JC, McCallum-Brown L, Davis DP: The three-phase model of cardiac arrest as applied to ventricular fibrillation in a large, urban emergency medical services system. Resuscitation 2005;64(3):341-346.

88. Davis DP, Peay J, Sise MJ, Vilke GM, Kennedy F, Eastman AB, Velky T, Hoyt DB: The impact of prehospital endotracheal intubation on outcome in moderate to severe traumatic brain injury. J Trauma 2005;58(5):933-939.

89. Davis DP, Grossman K, Kiggins DC, Vilke GM, Chan TC: The inadvertent administration of anticoagulants to ED patients ultimately diagnosed with thoracic aortic dissection. Am J Emerg Med 2005;23(4):439-442.

90. Davis DP, Pettit K, Rom CD, Poste JC, Sise MJ, Hoyt DB, Vilke GM: The safety and efficacy of prehospital needle and tube thoracostomy by aeromedical personnel. Prehosp Emerg Care 2005;9(2):191-197.

91. Davis DP, Peay J, Serrano JA, Buono C, Vilke GM, Sise MJ, Kennedy F, Eastman AB, Velky T, Hoyt DB: The impact of aeromedical response to patients with moderate to severe traumatic brain injury. Ann Emerg Med 2005;46(2):115-122.

92. Davis DP, Vadeboncoeur TF, Ochs M, Poste JC, Vilke GM, Hoyt DB: The association between field glasgow coma scale score and outcome in patients undergoing paramedic rapid sequence intubation. J Emerg Med 2005;29(4):391-397.

93. Davis DP, Wiesner C, Chan TC, Vilke GM: The efficacy of nebulized albuterol/ipratropium bromide versus albuterol alone in the prehospital treatment of suspected reactive airways disease. Prehosp Emerg Care 2005;9(4):386-390.

94. Davis DP, Douglas DJ, Smith W, Sise MJ, Vilke GM, Holbrook TL, Kennedy F, Eastman AB, Velky T, Hoyt DB: Traumatic brain injury outcomes in pre- and post-menopausal females versus age-matched males. J Neurotrauma 2006;23(2):140-148.

COP-STICKNEY007294

Articles

95. Davis DP, Idris AH, Sise MJ, Kennedy F, Brent Eastman A, Velky T, Vilke GM, Hoyt DB:
Early ventilation and outcome in patients with moderate to severe traumatic brain injury.
Crit Care Med 2006;34(4):1202-1208.

96. Dunford JV, Castillo EM, Chan TC, Vilke GM, Jenson P, Lindsay SP:  Impact of the San
Diego Serial Inebriate Program on use of emergency medical resources.  Ann Emerg Med
2006;47(4):328-336.

97. Vadeboncoeur T,  Davis DP, Ochs M, Poste JC, Hoyt DB, Vilke GM:  The ability of
paramedics to predict aspiration in patients undergoing prehospital rapid sequence intubation.
J Emerg Med 2006;30(2):131-136.

98. Davis DP, Serrano JA, Vilke GM, Sise MJ, Kennedy F, Eastman AB, Velky T, Hoyt DB:
The predictive value of field versus arrival Glasgow Coma Scale Score and TRISS calculations
in moderate-to-severe traumatic brain injury.  J Trauma 2006;60(5):985-990.

99. Ramanujam P, Vilke GM:  Prehospital management of the difficult airway.  Clinical
Foundations 2006;7-11.

100. Vilke GM, Tornabene SV, Stepanski B, Shipp HE, Upledger Ray L, Metz MA, Vroman D,
Anderson M, Murrin PA, Davis DP, Harley J:  Paramedic self-reported medication errors.
Prehosp Emerg Care 2006;10(4):457-462.

101. Goldstein EH, Hradecky G, Vilke GM, Chan TC:  Impact of a standardized protocol to address
methicillin-resistant *staphylococcus aureus* skin infections at a large, urban county jail system.
J Correctional Health Care 2006;12(3):181-188.

102. Chappell S, Vilke GM, Chan TC, Harrigan RA, Ufberg JW:  Peripheral venous cutdown.
J Emerg Med 2006;31(4):411-416.

103. Lev R, Vilke G, Dunford J. San Diego Regional STEMI Summit. San Diego Physician.
2006;4:11-13.

104. Vilke GM, Smith AM, Stepanski B, Shipp HE, Upledger Ray L, Murrin PA, Chan TC.
Impact of the San Diego County firestorm on Emergency Medical Services.  Prehosp Dis Med
2006;21(5):353-358.

105. Soroudi A, Shipp HE, Stepanski BM, Ray LU, Murrin PA, Chan TC, Davis DP, Vilke GM.
Adult foreign body airway obstruction in the prehospital setting.  Prehosp Emerg Care. 2007
Jan-Mar;11(1):25-9.

106. Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW.  Ventilatory
and metabolic demands during aggressive physical restraint in healthy adults.  J Forensic Sci
2007;52(1):171-175.

COP-STICKNEY007295

PUBLICATIONS, continued:

Articles

107. Vilke GM, Tornabene SV, Stepanski B, Shipp HE, Upledger Ray L, Metz MA, Vroman D, Anderson M, Murrin PA, Davis DP, Harley J: Paramedic self-reported medication errors. Prehosp Emerg Care 2007;11(1):80-84.

108. Dolkas L, Stanley C, Smith AM, Vilke GM. Deaths associated with choking in San Diego county. J Forensic Sci. 2007;52(1):176-9.

109. Harrigan RA, Chan TC, Moonblatt S, Vilke GM, Ufberg JW. Temporary transvenous pacemaker placement in the Emergency Department. J Emerg Med 2007;32(1):105-111.

110. Davis DP, Kene M, Vilke GM, Sise MJ, Kennedy F, Eastman AB, Velky T, Hoyt DB. Head-Injured Patients Who "Talk and Die": The San Diego Perspective. J Trauma. 2007 Feb;62(2):277-281.

111. Ma G, Davis DP, Schmitt J, Vilke GM, Chan TC, Hayden SR. The sensitivity and specificity of transcricothyroid ultrasonography to confirm endotracheal tube placement in a cadaver model. J Emerg Med 2007;32(4):405-414.

112. Davis DP, Fisher R, Aguilar S, Metz M, Ochs G, McCallum-Brown L, Ramanujam P, Buono C, Vilke GM, Chan TC, Dunford JV. The feasibility of a regional cardiac arrest receiving system. Resuscitation. 2007;74(1):44-51.

113. Levine SD, Sloane CM, Chan TC, Dunford JV, Vilke GM. Cardiac monitoring of human subjects exposed to the taser. J Emerg Med. 2007;33(2):113-7.

114. Firestone D, Wos A, Killeen JP, Chan TC, Guluma K, Davis DP, Vilke GM. Can urine dipstick be used as a surrogate for serum creatinine in emergency department patients who undergo contrast studies? J Emerg Med. 2007;33(2):119-22.

115. Khaleghi M, Loh A, Vroman D, Chan TC, Vilke GM. The effects of minimizing ambulance diversion hours on emergency departments. J Emerg Med. 2007;33(2):155-9.

116. Davis DP, Graydon C, Stein R, Wilson S, Buesch B, Berthiaume S, Lee D, Rivas J, Vilke GM, Leahy DR. The positive predictive value of paramedic versus emergency physician interpretation of the prehospital 12-lead electrocardiogram. Prehosp Emerg Care 2007;11(4):399-402.

117. Vilke GM, Chan TC. Less lethal technology: medical issues. Policing 2007;30(3):341-357.

118. Vilke GM, Sloane CM, Bouton KD, Kolkhorst FW, Levine SD, Neuman TS, Castillo EM, Chan T Physiological Effects of a Conducted Electrical Weapon on Human Subjects. Ann Emerg Med. 2007;.50(5):569-75.

PUBLICATIONS, continued:

COP-STICKNEY007296

Articles

119. Conroy C, Eastman AB, Stanley C, Vilke GM, Vaughan T, Hoyt DB, Pacyna S. Fatal Positional Asphyxia Associated With Rollover Crashes. Am J Forensic Med Pathol. 2007;28(4):330-332.

120. Vilke GM, Sloane C, Levine S, Neuman T, Castillo E, Chan TC. Twelve-lead electrocardiogram monitoring of subjects before and after voluntary exposure to the Taser X26.Am J Emerg Med. 2008;26(1):1-4.

121. Sloane CM, Chan TC, Vilke GM. Thoracic Spine Compression Fracture after TASER Activation. J Emerg Med. 2008:34(3):283-5.

122. Sloane C, Vilke GM. Death by Tasercution Rare. *Emergency Medicine News*. 2008;30(3):7.

123. Chan TC, Harrigan RA, Ufberg J, Vilke GM. Mandibular Reduction. J Emerg Med. 2008;34(4):435-40.

124. Tornabene SV, Deutsch R, Davis DP, Chan TC, Vilke GM. Evaluating the use and timing of opioids for the treatment of migraine headaches in the emergency department. J Emerg Med. 2009 May;36(4):333-7. Epub 2008 Feb 14.

125. Vilke GM, Ufberg JW, Harrigan RA, Chan TC. Evaluation and Treatment of Acute Urinary Retention. J Emerg Med. 2008;35(2):193-8.

126. Sloane CM, Chan TC, Levine SD, Dunford JV, Neuman T, Vilke GM. Serum Troponin I Measurement of Subjects Exposed to the Taser X-26(R). J Emerg Med. 2008;35(1):29-32

127. Tornabene S, Vilke GM. Gradenigo's Syndrome. J Emerg Med. 2010;38(4):449-51. Epub 2008 Feb 23.

128. Vilke GM, Sloane CM, Neuman T, Castillo EM, Chan TC, Kolkhorst F. In reply to Taser safety remains unclear. Ann Emerg Med. 2008 Jul;52(1):85-86.

129. Sloane CM, Vilke GM. Medical Aspects of Less-Lethal Weapons. Law Enforcement Executive Forum. 2008;8(4):81-94.

130. Conroy C, Stanley C, Eastman AB, Vaughn T, Vilke GM, Hoyt DB, Pacyna S, Smith A. Asphyxia: A Rare Cause of Death for Motor Vehicle Crash Occupants. Am J Forensic Med Pathol. 2008;29:14-18.

131. Ramanujam P, Castillo E, Patel E, Vilke G, Wilson MP, Dunford JV. Prehospital transport time intervals for acute stroke patients. J Emerg Med. 2009 Jul;37(1):40-5. Epub 2008 Aug 23.

COP-STICKNEY007297

Articles

132. Chan TC, Killeen JP, Castillo EM, Vilke GM, Guss DA, Feinberg R, Friedman, L. Impact of an Internet-Based Emergency Department Appointment System to Access Primary Care at Safety Net Community Clinics. Ann Emerg Med 2009;54(2):279-84. Dec. Epub 2008 Dec 13.

133. Vilke GM, Johnson WD 3rd, Castillo EM, Sloane C, Chan TC. Tactical and subject considerations of in-custody deaths proximal to use of conductive energy devices. Am J Forensic Med Pathol. 2009;Mar;30(1):23-5.

134. Firestone DN, Band RA, Hollander JE, Castillo E, Vilke GM. Use of a Urine Dipstick and Brief Clinical Questionnaire to Predict an Abnormal Serum Creatinine in the Emergency Department. Acad Emerg Med. 2009;16(8):699-703.

135. Vilke GM, Sloane CM, Suffecool A, Kolkhorst FW, Neuman TS, Castillo EM, Chan TC. Physiologic Effects of the TASER After Exercise. Acad Emerg Med. 2009;16(8):704-710.

136. Vilke GM, Wilson MP. Agitation: What every emergency physician should know. EM Reports. 2009 30(19):1-8.

137. Doney MK, Vilke GM. Case Report: Aortoenteric Fistula Presenting as Repeated Hematochezia. J Emerg Med. 2012;43(3):431-34. Epub 2010 Jan 23.

138. Vilke GM, Sloane C, Castillo EM, Kolkhorst FW, Neuman TS, Chan TC. Evaluation of the Ventilatory Effects of a Restraint Chair on Human Subjects. J Emerg Med. 2011;40(6):714-8. Epub 2010 Jan 13.

139. Chan TC, Killeen JP, Vilke GM, Marshall JB, Castillo EM. Effect of Mandated Nurse–Patient Ratios on Patient Wait Time and Care Time in the Emergency Department. Acad Emerg Med. 2010; 17:545–552

140. Vilke GM, Chan TC. Evaluation and Management for Carotid Dissection in Patients Presenting after Choking or Strangulation. J Emerg Med. 2011;40(3):355-8. Epub 2010 Apr 2.

141. Wilson, MP, MacDonald KS, Vilke GM, Feifel D. Potential complications of combining intramuscular olanzapines with benzodiazepines in emergency department patients. J Emerg Med. 2012;43(5):889-96 Epub 2010 Jun 12.

142. Castillo EM, Vilke GM, Williams M, Turner P, Boyle J, Chan TC. Collaborative to Decrease Ambulance Diversion: The California Emergency Department Diversion Project. J Emerg Med. 2011;40(3):300-7. Epub 2010 Apr 10.

COP-STICKNEY007298

Articles

143. Hostler D, Thomas EG, Emerson SS, Christenson J, Stiell IG, Rittenberger JC, Gorman KR, Bigham BL, Callaway CW, Vilke GM, Beaudoin T, Cheskes S, Craig A, Davis DP, Reed A, Idris A, Nichol G; The Resuscitation Outcomes Consortium Investigators. Increased survival after EMS witnessed cardiac arrest. Observations from the Resuscitation Outcomes Consortium (ROC) Epistry-Cardiac arrest. Resuscitation. 2010 Jul;81(7):826-30. Epub 2010 Apr 18.

144. Macdonald K, Wilson MP, Minassian A, Vilke GM, Perez R, Cobb P, Tallian K, Becker O, Feifel D. A retrospective analysis of intramuscular haloperidol and intramuscular olanzapine in the treatment of agitation in drug- and alcohol-using patients. Gen Hosp Psychiatry. 2010 July - August;32(4):443-445. Epub 2010 Jun 12.

145. Schranz CI, Castillo EM, Vilke GM. The 2007 San Diego wildfire impact on the emergency department of the University of California, San Diego Hospital system. Prehosp Disaster Med. 2010 Sep-Oct;25(5):472-6.

146. Vilke GM, Bozeman WP, Chan TC. Emergency Department Evaluation after Conducted Energy Weapon Use: Review of the Literature for the Clinician. J Emerg Med 2011;40(5):598-604. Epub 2011 Jan 4.

147. Vilke GM, Douglas DJ, Shipp H, Stepanski B, Smith A, Ray LU, Castillo EM. Pedatric poisonings in children younger than five years responded to by paramedics. J Emerg Med. 2011;41(3):265-9 Epub 2011 Jan 5.

148. Vilke GM, DeBard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozeman WP. Excited Delirium Syndrome (ExDS): Defining Based on a Review of the Literature. J Emerg Med. 2012;43(5):897-905. Epub 2011 Mar 24.

149. Davis DP, Salazar A, Chan TC, Vilke GM. Prospective evaluation of a clinical decision guideline to diagnose spinal epidural abscess in patients who present to the emergency department with spine pain. J Neurosurg Spine. 2011;14(6):765-70. Epub 2011 Mar 18.

150. Vilke GM. Pathophysiologic changes due to TASER devices versus excited delirium: Potential relevance to deaths-in-custody? J Forens and Legal Med. 2011;18(6):291. Epub 2011 May 24.

151. Wilson MP, Macdonald K, Vilke GM, Feifel D. A Comparison of the Safety of Olanzapine and Haloperidol in Combination with Benzodiazepines in Emergency Department Patients with Acute Agitation. J Emerg Med. 2012;43(5):790-7. Epub 2011 May 19.

COP-STICKNEY007299

Articles

152.  Stiell IG, Nichol G, Leroux BG, Rea TD, Ornato JP, Powell J, Christenson J, Callaway CW, Kudenchuk PJ, Aufderheide TP, Idris AH, Daya MR, Wang HE, Morrison LJ, Davis D, Andrusiek D, Stephens S, Cheskes S, Schmicker RH, Fowler R, Vaillancourt C, Hostler D, Zive D, Pirallo RG, Vilke GM, Sopko G, Weisfeldt M.  Early versus Later Rhythm Analysis in Patients with Out-of-Hospital Cardiac Arrest.  N Eng J Med 2011;365(9):787-97.

153.  Wilson MP, Vilke GM, Ramanujam P, Itagaki MW. Emergency physicians research commonly encountered patient-oriented problems in the proportion with which they are encountered in the emergency department. West J Emerg Med. 2012 Sep;13(4):344-50. Epub 2012 Feb 6.

154.  DeMers G, Lynch C, Vilke GM.  Retail store-related traumatic injuries in paediatric and elderly populations.  J of Paramed Pract 2012;3(11):632-636.

155.  Vilke GM, Payne-James J, Karsch SB.  Excited Delirium Syndrome (ExDS):  Redefining an Old Diagnosis.  J Forens Legal Med. 2012;19:7-11. Epub 2011 Nov 2.

156.  Vilke GM, Bozeman WP, Dawes DM, DeMers, G, Wilson MP.  Excited delirium syndrome (ExDS): Treatment options and considerations.  J Forens Legal Med. 2012;19:117-121. Epub 2012 Jan 24.

157.  Kroening-Roche JC, Soroudi A, Castillo EM, Vilke GM. Antibiotic and Bronchodilator Prescribing for Acute Bronchitis in the Emergency Department. J Emerg Med. 2012;43(2):221-7. Epub 2012 Feb 16.

158.  Nordt SP, Vilke GM, Clark RF, Lee Cantrell F, Chan TC, Galinato M, Nguyen V, Castillo EM.  Energy Drink Use and Adverse Effects Among Emergency Department Patients. J Community Health. 2012: Oct;37(5):976-81.  Epub 2012 Feb 25.

159.  Vilke GM, Sloane CM, Chan TC. Funding source and author affiliation in TASER research are strongly associated with a conclusion of device safety.  Am Heart J. 2012 Mar;163(3):e5. Epub 2012 Feb 2.

160.  Vilke GM, Sloane CM, Chan TC. Clarification of Funding Sources in "Electronic Control Device Exposures: A Review of Morbidity and Mortality".  Ann Emerg Med 2012;59(4):336.

161.  Gault TI, Gray SM, Vilke GM, Wilson MP.  Are oral medications effective in the management of acute agitation?  J Emerg Med. 2012;43(5):854-9. Epub 2012 Apr 26.

COP-STICKNEY007300

PUBLICATIONS, continued:

Articles

162. Macdonald KS, Wilson MP, Minassian A, Vilke GM, Becker O, Tallian K, Cobb P, Perez R, Galangue B, Feifel D. A naturalistic study of intramuscular haloperidol versus intramuscular olanzapine for the management of acute agitation. J Clin Psychopharm. 2012;32(3):317-22. Epub 2012 Apr 26.

163. Repanshek ZD, Ufberg JW, Vilke GM, Chan TC, Harrigan RA. Alternative treatments of pneumothorax. J Emerg Med 2013;44(2):457-66. Epub 2012 May 21.

164. Wilson MP, Chen N, Vilke GM, Castillo EM, Macdonald KS, Minassian A. Olanzapine in ED patients: differential effects on oxygenation in patients with alcohol intoxication. Am J Emerg Med 2012;30(7):1196-201. Epub 2012 May 23.

165. Almazroua FY, Vilke GM. The captain morgan technique for the reduction of the dislocated hip. Ann Emerg Med 2012;60(1):135-6.

166. Hall CA, Kader AS, McHale AMD, Stewart L, Fick GH, Vilke GM. Frequency of signs of excited delirium syndrome in subjects undergoing police use of force: Descriptive evaluation of a prospective, consecutive cohort. J Foresn and Leg Med 2013;20:102-7. Epub 2012 June 22.

167. Perkins J, Perkins K, Vilke GM, Almazroua FY. Is culture-positive urinary tract infection in febrile children accurately identified by urine dipstick or microanalysis? J Emerg Med 2012;43(6):1155-9. Epub 2012 July 13.

168. Demers G, Meurer WJ, Shih R, Rosenbaum, S, Vilke GM. Tissue plasminogen activator and stroke: Review of the literature for the clinician. J Emerg Med 2012;43(6):1149-54. Epub 2012 July 18

169. Ronquillo L, Minassian A, Vilke GM, Wilson MP. Literature-based Recommendations for Suicide Assessment in the Emergency Department: A Review. J Emerg Med. 2012;43(5):836-42. Epub 2012 Oct 2.

170. Vilke GM, Chan TC, Karch S. Letter by Vilke et al Regarding Article, "Sudden cardiac arrest and death following application of shocks from a TASER electronic control device". Circulation. 2013 Jan 1;127(1):e258. Epub 2013 Jan 1.

171. Wilson MP, Vilke GM. Why all the yelling and screaming? Dealing with agitation in the ED setting. Cyberounds. 2013 Feb 09.

COP-STICKNEY007301

Articles

172. Ali SS, Wilson MP, Castillo EM, Witucki P, Simmons TT, Vilke GM.  Common hand sanitizer may distort readings of breathalyzer tests in the absence of acute intoxication. Acad Emerg Med 2013; 20(2):212-5.

173. Maisel A, Mueller C, Neath SX, Christenson RH, Morgenthaler NG, Nowak RM, Vilke G, Daniels LB, Hollander JE, Apple FS, Cannon C, Nagurney JT, Schreiber D, Defilippi C, Hogan C, Diercks DB, Stein JC, Headden G, Limkakeng AT Jr, Anand I, Wu AH, Papassotiriou J, Hartmann O, Ebmeyer S, Clopton P, Jaffe AS, Frank Peacock W.  Copeptin Helps "Copeptin Helps in the Early Detection of Patients with Acute Myocardial Infarction": the primary results of the CHOPIN Trial.  J Am Coll Cardiol.2013; 62(2):150-30. Epub 2013 Apr 30.

174. Minassian A, Vilke GM, Wilson MP.  Frequent Emergency Department Visits are More Prevalent in Psychiatric, Alcohol Abuse, and Dual Diagnosis Conditions than in Chronic Viral Illnesses Such as Hepatitis and Human Immunodeficiency Virus.  J Emerg Med. 2013;45(4):520-5. Epub 2013 Jul 8.

175. Darracq MA, Clark RF, Jacoby I, Vilke GM, Demers G, Cantrell FL.  Disaster Preparedness of Poison Control Centers in the USA: A 15-year Follow-up Study.  J Med Toxicol. 2014;10(1):29-25. Epub 2013 Jul 12.

176. Winters ME, Rosenbaum S, Vilke GM, Almazroua FY.  Emergency Department Management of Patients with ACE-Inhibitor Angioedema.  J Emerg Med 2013;45(5):775-80. Epub 2013 Aug 26.

177. Savaser DJ, Campbell C, Castillo EM, Vilke GM, Sloane C, Neuman T, Hansen AV, Shah S, Chan TC.  The effect of the prone maximal restrained position with and without weight force on cardiac output and other hemodynamic measures.  J Forens Leg Med. 2013 Nov;20(8):991-5. Epub 2013 Aug 30.

178. Wilson MP, Macdonald K, Vilke GM, Ronquillo L, Feifel D. Intramuscular Ziprasidone: Influence of alcohol and benzodiazepines on vital signs in the emergency setting.  J Emerg Med 2013;45(6):901-8. Epub 2013 Sep 24.

179. Perkins J, McCurdy MT, Vilke GM, Al-Marshad AA.  Telemetry Bed Usage for Patients with Low-risk Chest Pain: Review of the Literature for the Clinician.  J Emerg Med 2014;46(2):273-7. Epub 2013 Nov 22.

180. Del Portal DA, Horn AE, Vilke GM, Chan TC, Ufberg JW.  Emergency department management of shoulder dystocia. J Emerg Med 2014;46(3):378-82. Epub 2013 Dec 18.

COP-STICKNEY007302

Articles

181. Vilke GM, Bozeman WP, Chan TC. Re: Emergency Department Evaluation of Conducted Energy Weapon (CEW)-Injured Patients. J Emerg Med 2014;46(4):533-4. Epub 2014 Jan 9.

182. Jalali N, Vilke GM, Korenevsky M, Castillo EM, Wilson MP. The Tooth, the Whole Tooth, and Nothing But the Tooth: Can Dental Pain Ever Be the Sole Presenting Symptom of a Myocardial Infarction? A Systematic Review. J Emerg Med. 2014;[Epub 2014 Jan 25].

183. Sloane C, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM. Evaluation of the Ventilatory Effects of the Prone Maximum Restraint Position (PMR) on Obese Human Subjects. Forens Sci Int 2014;237:86-9. Epub 2014;46(6):865-72. Epub 2014 Feb 14.

184. Wilson MP, Minassian A, Bahramzi M, Campillo A, Vilke GM. Despite expert recommendations, second-generation antipsychotics are not often prescribed in the emergency department. J Emerg Med. 2014;46(6):808-83. Epub 2014 Mar 19.

185. Vilke GM, Chan TC, Savaser D, Neuman T. Response to letter by Michaud Regarding Article, "Hemodynamic consequences of restraints in the prone position in excited delirium syndrome" J Forens Legal Med 2014;27:82-4.

186. Davis DP, Aguilar SA, Smith K, Husa RD, Minokadeh A, Vilke G, Sell R, Fisher R, Brainard C, Dunford JV. Preliminary Report of a Mathematical Model of Ventilation and Intrathoracic Pressure Applied to Prehospital Patients with Severe Traumatic Brain Injury. Prehosp Emerg Care. 2015 Apr-Jun;19(2):328-35. Epub 2014 Oct 7.

187. Wilson MP, Minassian A, Ronquillo L, Vilke GM. Wilson reply to Ryan. J Emerg Med. 2015 Mar;48(3):336. Epub 2014 Nov 20.

188. Rowh AD, Ufberg JW, Chan TC, Vilke GM, Harrigan RA. Lateral Canthotomy and Cantholysis: Emergency Management of Orbital Compartment Syndrome. J Emerg Med. 2015 Mar;48(3):325-30. Epub 2014 Dec 15.

189. Hall C, Votova K, Heyd C, Walker M, MacDonald S, Eramian D, Vilke GM, Restraint in police use of force events: Examining sudden in custody death for prone and not-prone positions, J Forens Legal Med. 2015;31:29-35. Epub 2015 Jan 5

190. Wilson MP, Brennan JJ, Modesti L, Deen J, Anderson L, Vilke GM, Castillo EM. Lengths of stay for involuntarily held psychiatric patients in the ED are affected by both patient characteristics and medication use. Am J Emerg Med. 2015 Apr;33(4):527-30. Epub 2015 Jan 20.

191. Warren SA, Prince DK, Huszti E, Rea TD, Fitzpatrick AL, Andrusiek DL, Darling S, Morrison LJ, Vilke GM, Nichol G; the ROC Investigators. Volume versus Outcome: More Emergency Medical Services Personnel On-scene and Increased Survival after Out-of-Hospital Cardiac Arrest. Resuscitation. 2015 Sep;94:40-8. Epub 2015 Feb 24.

COP-STICKNEY007303

Articles

192.     Nakajima Y, Vilke GM. Editorial: Ambulance Diversion: the Con Perspective. Am J Emerg Med. 2015 Jun;33(6):818-9. Epub 2015 Mar 10.

193.     Perkins J, Ho JD, Vilke GM, DeMers G. Safety of Droperidol Use in the Emergency Department. J Emerg Med. 2015 Jul;49(1):91-7.  Epub 2015 Mar 30.

194.     Hopper AB, Vilke GM, Castillo EM, Campillo A, Davie T, Wilson MP. Ketamine Use for Acute Agitation in the Emergency Department. J Emerg Med. 2015 Jun;48(6):712-9. Epub 2015 Apr 2.

195.     Vilke GM, DeMers G, Patel N, Castillo EM. Safety and Efficacy of Milk and Molasses Enemas in the Emergency Department. J Emerg Med. 2015 Jun;48(6):667-70. Epub 2015 Apr 4.

196.     Shah KS, Marston NA, Mueller C, Neath SX, Christenson RH, McCord J, Nowak RM, Vilke GM, Daniels LB, Hollander JE, Apple FS, Cannon CM, Nagurney J, Schreiber D, deFilippi C, Hogan CJ, Diercks DB, Limkakeng A, Anand IS, Wu AH, Clopton P, Jaffe AS, Peacock WF, Maisel AS.  Midregional Proadrenomedullin Predicts Mortality and Major Adverse Cardiac Events in Patients Presenting With Chest Pain: Results From the CHOPIN Trial.  Acad Emerg Med. 2015 May;22(5):554-63.  Epub 2015 Apr 23.

197.     Shi E, Vilke GM, Coyne CJ, Oyama LC, Castillo EM.  Clinical outcomes of ED patients with bandemia. Am J Emerg Med. 2015 Jul;33(7):876-81. Epub 2015 Mar 18.

198.     Castillo EM, Coyne CJ, Chan TC, Hall CA, Vilke GM.  Review of the medical and legal literature on restraint chairs.  J Forens Legal Med. 2015;33:91-97. Epub 2015 May 1.

199.     Vilke GM, Kass P. Retroperitoneal Hematoma After Femoral Arterial Catheterization. J Emerg Med. 2015 Sep;49(3):338-9. Epub 2015 July 4.

200.     Campillo A, Castillo E, Vilke GM, Hopper A, Ryan V, Wilson MP. First-generation Antipsychotics Are Often Prescribed in the Emergency Department but Are Often Not Administered with Adjunctive Medications. J Emerg Med. 2015 Dec;49(6):901-6. Epub 2015 Sep 30.

201.     Wilson MP, Nordstrom K, Vilke GM.  The Agitated Patient in the Emergency Department. Curr Emerg Hosp Med Rep. 2015 Oct 12. [Epub ahead of print]

COP-STICKNEY007304

PUBLICATIONS, continued:

Articles

202.    Lev R, Lee O, Petro S, Lucas J, Castillo EM, Vilke GM, Coyne CJ.  Who is prescribing controlled medications to patients who die of prescription drug abuse? Am J Emerg Med. 2016 Jan;34(1):30-5. Epub 2015 Sep 8.

203.    Wilson MP, Nordstrom K, Shah AA, Vilke GM.  Psychiatric Emergencies in Pregnant Women.  Emerg Med Clin North Am. 2015 Nov;33(4):841-51.

204.    Nordstrom K, Vilke GM, Wilson MP. Psychiatric Emergencies for Clinicians: Emergency Department Management of Serotonin Syndrome. J Emerg Med. 2016 Jan;50(1):89-91. Epub 2015 Oct 7.

205.    Lev R, Petro S, Lee A, Lee O, Lucas J, Castillo EM, Egnatios J, Vilke GM.  Methadone related deaths compared to all prescription related deaths.  Forensic Sci Int. 2015 Oct 22;257:347-352.

206.    Abraham MK, Perkins J, Vilke GM, Coyne CJ.  Influenza in the Emergency Department: Vaccination, Diagnosis, and Treatment: Clinical Practice Paper Approved by American Academy of Emergency Medicine Clinical Guidelines Committee. J Emerg Med. 2016 Mar;50(3):536-42.  Epub 2016 Jan 4.

207.    Lev R, Petro S, Lee O, Lucas J, Stuck A, Vilke GM, Castillo EM.  A description of Medical Examiner prescription-related deaths and prescription drug monitoring program data. Am J Emerg Med. 2015 Dec 14.

208.    Meurer WJ, Walsh B, Vilke GM, Coyne CJ. Clinical Guidelines for the Emergency Department Evaluation of Subarachnoid Hemorrhage.  J Emerg Med. 2017 Feb;52(2):255-261. Epub 2016 Jan 25.

209.    Lam SH, Majlesi N, Vilke GM.  Use of Intravenous Fat Emulsion in the Emergency Department for the Critically Ill Poisoned Patient.  J Emerg Med. 2016 Aug;51(2):203-14. Epub 2016 Mar 10.

210.    Kudenchuk PJ, Brown SP, Daya M, Rea T, Nichol G, Morrison LJ, Leroux B, Vaillancourt C, Wittwer L, Callaway CW, Christenson J, Egan D, Ornato JP, Weisfeldt ML, Stiell IG, Idris AH, Aufderheide TP, Dunford JV, Colella MR, Vilke GM, Brienza AM, Desvigne-Nickens P, Gray PC, Gray R, Seals N, Straight R, Dorian P; Resuscitation Outcomes Consortium Investigators. Amiodarone, Lidocaine, or Placebo in Out-of-Hospital Cardiac Arrest. N Engl J Med. 2016 May 5;374(18):1711-22. Epub 2016 Apr 4

211.    Wilson MP, Vilke GM, Hayden SR, Nordstrom K.  Psychiatric Emergencies for Clinicians: Emergency Department Management of Neuroleptic Malignant Syndrome.  J Emerg Med. 2016 Jul;51(1):66-9. Epub 2016 May 28.

COP-STICKNEY007305

PUBLICATIONS, continued:

Articles

212.	Healy ME, Kozubal DE, Horn AE, Vilke GM, Chan TC, Ufberg JW.   Care of the Critically Ill Pregnant Patient and Perimortem Cesarean Delivery in the Emergency Department.  J Emerg Med. 2016 Aug;51(2):172-7. Epub 2016 Jun 29.

213.	Lasoff D, Vilke G, Nordstrom K, Wilson M.  Psychiatric Emergencies for Clinicians: Detection and Management of Anti-N-Methyl-D-Asparate Receptor Encephalitis.  J Emerg Med. 2016;51(5):561-63. Epub Jul 15.

214.	Corbett B, Vilke GM, Nordstrom K, Wilson M.  Psychiatric Emergencies for Clinicians: Diagnosis and Management of Steroid Psychosis.  J Emerg Med. 2016;51(5):577-60. Epub Aug 15.

215.	Hornbeak K, Castillo EM, Sloane C, Vilke GM.  The Role of Subject Intoxication and Other Characteristics in Law Enforcement Use-of-force Incidents. J For Med Leg Aff. 2016 1(3): 112.

216.	Maisel AS, Wettersten N, van Veldhuisen DJ, Mueller C,  Gerasimos Filippatos C, Nowak R, Hogan C, Kontos MC, Cannon CM, Müller GA, Birkhahn R, Clopton P, Taub P, Vilke GM, McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Murray PT.  Neutrophil Gelatinase-Associated Lipocalin for Acute Kidney Injury During Acute Heart Failure Hospitalizations: The AKINESIS Study.  JACC. 2016;68(13):1420-31.

217.	Coyne CJ, Abraham MK, Perkins J, Vilke GM.  Letter: Influenza in the Emergency Department: Vaccination, Diagnosis, and Treatment.   J Emerg Med. 2016 Dec;51(6):735-736. Epub 2016 Sep 26.

218.	Motov S, Rosenbaum S, Vilke GM, Nakajima Y.  Is There a Role for Intravenous Subdissociative-Dose Ketamine Administered as an Adjunct to Opioids or as a Single Agent for Acute Pain Management in the Emergency Department?  J Emerg Med. 2016 Dec;51(6):752-757. Epub 2016 Sep 29.

219.	Degner NR, Joshua A, Padilla R, Vo HH, Vilke GM.  Comparison of Digital Chest Radiography to Purified Protein Derivative for Screening of Tuberculosis in Newly Admitted Inmates. J Correct Health Care. 2016 Oct;22(4):322-330.

220.	Granata RT, Castillo EM, Vilke GM.  Safety of deferred computed tomographic imaging of intoxicated patients presenting with possible traumatic brain injury.  Am J Emerg Med. 2017 Jan;35(1):51-54. Epub 2016 Sep 30.

COP-STICKNEY007306

Articles

221. Beri N, Marston NA, Daniels LB, Nowak RM, Schreiber D, Mueller C, Jaffe A, Diercks DB, Wettersten N, DeFilippi C, Peacock WF, Limkakeng AT, Anand I, McCord J, Hollander JE, Wu AH, Apple FS, Nagurney JT, Berardi C, Cannon CM, Clopton P, Neath SX, Christenson RH, Hogan C, Vilke G, Maisel A. Necessity of hospitalization and stress testing in low risk chest pain patients. Am J Emer Med 2017 (35): 274–280. Epub 2016 Oct 29.

222. Meurer WJ, Barth BE, Gaddis G, Vilke GM, Lam SH. Rapid Systematic Review: Intra-Arterial Thrombectomy ("Clot Retrieval") for Selected Patients with Acute Ischemic Stroke. J Emerg Med. 2017 Feb;52(2):255-261. Epub 2016 Nov 15.

223. Winters ME, Sherwin R, Vilke GM, Wardi G. Does Early Goal-Directed Therapy Decrease Mortality Compared with Standard Care in Patients with Septic Shock? J Emerg Med. 2017 Mar;52(3):379-384. Epub 2016 Nov 19.

224. Coyne CJ, Le V, Brennan JJ, Castillo EM, Shatsky RA, Ferran K, Brodine S, Vilke GM. Application of the MASCC and CISNE Risk-Stratification Scores to Identify Low-Risk Febrile Neutropenic Patients in the Emergency Department. Ann Emerg Med. 2017 Jun;69(6):755-764. Epub 2016 Dec 29.

225. Blewer AL, Ibrahim SA, Leary M, Dutwin D, McNally B, Anderson ML, Morrison LJ, Aufderheide TP, Daya M, Idris AH, Callaway CW, Kudenchuk PJ, Vilke GM, Abella BS. Cardiopulmonary Resuscitation Training Disparities in the United States. J Am Heart Assoc. 2017 May 17;6(5).

226. Evans CS, Platts-Mills TF, Fernandez AR, Grover JM, Cabanas JG, Patel MD, Vilke GM, Brice JH. Repeated Emergency Medical Services Use by Older Adults: Analysis of a Comprehensive Statewide Database. Ann Emerg Med. 2017 Oct;70(4):506-515.e3. Epub 2017 May 27.

227. Starks MA, Schmicker RH, Peterson ED, May S, Buick JE, Kudenchuk PJ, Drennan IR, Herren H, Jasti J, Sayre M, Stub D, Vilke GM, Stephens SW, Chang AM, Nuttall J, Nichol G; Resuscitation Outcomes Consortium (ROC). Association of Neighborhood Demographics with Out-of-Hospital Cardiac Arrest Treatment and Outcomes: Where You Live May Matter. JAMA Cardiol. 2017;2(10):1110-1118.

228. Kudenchuk PJ, Leroux BG, Daya M, Rea T, Vaillancourt C, Morrison LJ, Callaway CW, Christenson J, Ornato JP, Dunford JV, Wittwer L, Weisfeldt ML, Aufderheide TP, Vilke GM, Idris AH, Stiell IG, Colella MR, Kayea T, Egan DA, Desvigne-Nickens P, Gray P, Gray R, Straight R, Dorian P. Antiarrhythmic Drugs for Non-Shockable-Turned-Shockable Out-of-Hospital Cardiac Arrest: The Amiodarone, Lidocaine or Placebo Study (ALPS). Circulation. 2017 Nov 28;136(22):2119-2131. Epub 2017 Sep 13.

COP-STICKNEY007307

Articles

229.  Sherwin R, Winters ME, Vilke GM, Wardi G. Does Early and Appropriate Antibiotic Administration Improve Mortality in Emergency Department Patients with Severe Sepsis or Septic Shock? J Emerg Med. 2017 Oct;53(4):588-595. Epub 2017 Sep 12.

230.  Wilson MP, Nordstrom K, Hopper A, Porter A, Castillo EM, Vilke GM.  Risperidone in the Emergency Setting is Associated with More Hypotension in Elderly Patients.  J Emerg Med. 2017 Nov;53(5):735-739. Epub 2017 Oct 5.

231.  Alfaraj DN, Vilke GM.  Tripartite Fracture of the Ulnar Sesamoid Bone of the Thumb.  J Emerg Med. J Emerg Med. 2017 Nov;53(5):758-759. Epub 2017 Oct 5.

232.  Lasoff D, Hall CA, Bozeman WP, Chan TC, Castillo EM, Vilke GM: Proning: Outcomes of Use of Force Followed with Prone Restraint. J Forensic Med 2017;2(2):1-3.

233.  Mills L, Morley EJ, Soucy Z, Vilke GM, Lam SHF. Ultrasound for the Diagnosis and Management of Suspected Urolithiasis in the Emergency Department. J Emerg Med. 2018 Feb;54(2):215-220. Epub 2017 Oct 28.

234.  Bruno E, Pillus D, Cheng D, Vilke G, Pokrajac N. During the Emergency Department Evaluation of a Well-Appearing Neonate with Fever, Should Empiric Acyclovir Be Initiated? J Emerg Med. 2018 Feb;54(2):261-265.  Epub 2017 Nov 29.

235.  Winters ME, Sherwin R, Vilke GM, Wardi G.  What is the Preferred Resuscitation Fluid for Patients with Severe Sepsis and Septic Shock?   J Emerg Med. 2017 Dec;53(6):928-939. Epub 2017 Oct 25.

236.  Hayes BD, Winters ME, Rosenbaum SB, Allehyani MF, Vilke GM. What is the Role of Reversal Agents in the Management of Emergency Department Patients with Dabigatran-Associated Hemorrhage? J Emerg Med. Apr;54(4):571-575.Epub 2018 Feb 15.

237.  Winters ME, Sherwin R, Vilke GM, Wardi G. Reply. J Emerg Med. 2018 Feb;54(2):245-246.

238.  Coyne CJ, Dang A-H, Castillo EM, Vilke GM.  Assessment of the Theorized Risks of Conducted Energy Weapons through Literature Review of Runaway Pacemakers.  J For Med Leg Aff 2(1): 113-118.

239.  Motov S, Strayer R, Hayes B, Reiter M, Rosenbaum S, Richman M, Repanshek Z, Taylor S, Friedman B, Vilke G, Lasoff D.  The Treatment of Acute Pain in the Emergency Department: A White Paper Position Statement Prepared for the American Academy of Emergency Medicine.  J Emerg Med. 2018 May;54(5):731-736.Epub 2018 Mar 6.

COP-STICKNEY007308

Articles

240. Mullinax S, Chalmers CE, Brennan J, Vilke GM, Nordstrom K, Wilson MP. Suicide screening scales may not adequately predict disposition of suicidal patients from the emergency department. Am J Emerg Med. 2018 Jan 31. [Epub ahead of print].

241. Meurer WJ, Barth B, Abraham M, Hoffman J, Vilke GM, DeMers G. Intravenous Recombinant Tissue Plasminogen Activator and Ischemic Stroke: Focused Update of 2010 Clinical Practice Advisory From the American Academy of Emergency Medicine. J Emerg Med. 2018 May;54(5):723-730. Epub 2018 Mar 12.

242. Wilson MP, Frenkel S, Brennan J, Simanjuntak J, Deen J, Vilke GM. Patients with Suicidal Ideation and Evidence of Alcohol Use are Discharged at Higher Rates from the Emergency Department. Int J Psychol Psychoanal 2017, 3:019.

243. Kurz MC, Schmicker RH, Leroux B, Nichol G, Aufderheide TP, Cheskes S, Grunau B, Jasti J, Kudenchuk P, Vilke GM, Buick J, Wittwer L, Sahni R, Straight R, Wang HE. Advanced vs. Basic Life Support in the Treatment of Out-of-Hospital Cardiopulmonary Arrest in the Resuscitation Outcomes Consortium. Resuscitation. 2018 Jul;128:132-137. Epub 2018 Apr 30.

244. Beri N, Daniels LB, Jaffe A, Mueller C, Anand I, Peacock WF, Hollander JE, DeFilippi C, Schreiber D, McCord J, Limkakeng AT, Wu AHB, Apple FS, Diercks DB, Nagurney JT, Nowak RM, Cannon CM, Clopton P, Neath SX, Christenson RH, Hogan C, Vilke G, Maisel A. Copeptin to rule out myocardial infarction in Blacks versus Caucasians. Eur Heart J Acute Cardiovasc Care. 2018 May 1. [Epub ahead of print].

245. Lam SHF, Li DR, Hong CE, Vilke GM. Systematic Review: Rectal Administration of Medications for Pediatric Procedural Sedation. J Emerg Med. 2018 Jul;55(1):51-63. Epub 2018 May 24.

246. Zive DM, Schmicker R, Daya M, Kudenchuk P, Nichol G, Rittenberger JC, Aufderheide T, Vilke GM, Christenson J, Buick JE, Kaila K, May S, Rea T, Morrison LJ; ROC Investigators. Survival and variability over time from out of hospital cardiac arrest across large geographically diverse communities participating in the Resuscitation Outcomes Consortium. Resuscitation. 2018 Jul 24;131:74-82. Epub 2018 Jul 24.

247. Shuen JA, Wilson MP, Kreshak A, Mullinax S, Brennan J, Castillo EM, Hinkle C, Vilke GM. Telephoned, Texted, or Typed Out: A Randomized Trial of Physician-Patient Communication After Emergency Department Discharge. J Emerg Med. 2018 Sep 1. [Epub ahead of print].

248. Kreshak AA, Brennan JJ, Vilke GM, Tolia VM, Caccese M, Castillo EM, Chan TC. A Description of a Health System's Emergency Department Patients Who Were Part of a Large Hepatitis A Outbreak. J Emerg Med. 2018 Sep 22. [Epub ahead of print].

COP-STICKNEY007309

Articles

249. Okubo M, Schmicker RH, Wallace DJ, Idris AH, Nichol G, Austin MA, Grunau B, Wittwer LK, Richmond N, Morrison LJ, Kurz MC, Cheskes S, Kudenchuk PJ, Zive DM, Aufderheide TP, Wang HE, Herren H, Vaillancourt C, Davis DP, Vilke GM, Scheuermeyer FX, Weisfeldt ML, Elmer J, Colella R, Callaway CW. Variation in Survival After Out-of-Hospital Cardiac Arrest Between Emergency Medical Services Agencies. JAMA Cardiol. 2018 Oct 1;3(10):989-999.

250. Alfaraj DN, Wilson MP, Akeely Y, Vilke GM, Nordstrom K. Psychiatric Emergencies for Clinicians: Emergency Department Management of Hypercalcemia. J Emerg Med. 2018 Oct 15. [Epub ahead of print].

251. Blewer AL, McGovern SK, Schmicker RH, May S, Morrison LJ, Aufderheide TP, Daya M, Idris AH, Callaway CW, Kudenchuk PJ, Vilke GM, Abella BS. Gender Disparities Among Adult Recipients of Bystander Cardiopulmonary Resuscitation in the Public. Circ Cardiovasc Qual Outcomes. 2018 Aug;11(8). [Epub ahead of print].

252. Lutz M, Sloane CM, Castillo EM, Brennen JJ, Coyne CJ, Swift SL, Vilke GM. Physiological Effects of a Spit Sock. Am J Emerg Med. 2018 Oct 3. [Epub ahead of print].

253. Khera R, Humbert A, Leroux B, Nichol G, Kudenchuk P, Scales D, Baker A, Austin M, Newgard CD, Radecki R, Vilke GM, Sawyer KN, Sopko G, Idris AH, Wang H, Chan PS, Kurz MC. Hospital Variation in the Utilization and Implementation of Targeted Temperature Management in Out-of-Hospital Cardiac Arrest. Circ Cardiovasc Qual Outcomes. 2018 Nov;11(11). [Epub ahead of print].

254. Supat B, Brennan JJ, Vilke GM, Ishimine P, Hsia RY, Castillo EM. Characterizing Pediatric High Frequency Users of California Emergency Departments. Am J Emerg Med. 2018 Dec 12. [Epub ahead of print].

255. Childers R, Vilke GM. Ketamine for Acute Agitation. 2019. Current Emerg and Hosp Med Reports. https://doi.org/10.1007/s40138-019-00177-2.

256. Kroll M, Ho J, Vilke GM. 8 Facts About Excited Delirium Syndrome (ExDS) We Learned in 2018. 2019. PoliceOne.com. https://www.policeone.com/police-training/articles/483189006-8-facts-about-excited-delirium-syndrome-ExDS-we-learned-in-2018/

257. Dyson K, Brown SP, May S, Smith K, Koster RW, Beesems SG, Kuisma M, Salo A, Finn J, Sterz F, Nürnberger A, Morrison LJ, Olasveengen TM, Callaway CW, Do Shin S, Gräsner JT, Daya M, Ma MH, Herlitz J, Strömsöe A, Aufderheide TP, Masterson S, Wang H, Christenson J, Stiell I, Vilke GM, Idris A, Nishiyama C, Iwami T, Nichol G. International variation in survival after out-of-hospital cardiac arrest: a validation study of the Utstein template. Resuscitation. 2019 Mar 18. [Epub ahead of print]

COP-STICKNEY007310

<u>Articles</u>

258. Chalmers CE, Mullinax S, Brennan J, Vilke GM, Oliveto AH, Wilson MP. Screening Tools Validated in the Outpatient Pain Management Setting Poorly Predict Opioid Misuse in the Emergency Department: A Pilot Study. J Emerg Med. 2019 Apr 28. [Epub ahead of print]

259. Sieker JW, Castillo EM, Vilke GM. Timing of fatal BASE-jumping incidents: 1981-2018. J Forensic Leg Med. 2019 May 3;65:39-44.

260. Li DR, Brennan JJ, Kreshak AA, Castillo EM, Vilke GM. Patients Who Leave the Emergency Department Without Being Seen and Their Follow-Up Behavior: A Retrospective Descriptive Analysis. J Emerg Med. 2019 May 8. [Epub ahead of print]

261. Murray PT, Wettersten N, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R, Hogan C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Horiuchi Y, Clopton P, Taub P, Vilke GM, Barnett O, McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Maisel A. Utility of Urine Neutrophil Gelatinase-Associated Lipocalin for Worsening Renal Function during Hospitalization for Acute Heart Failure: Primary findings for urine N-gal Acute Kidney Injury N-gal Evaluation of Symptomatic heart faIlure Study (AKINESIS). J Card Fail. 2019 May 22. [Epub ahead of print]

262. Gleber R, Vilke GM, Castillo EM, Brennan J, Oyama L, Coyne CJ. Trends in emergency physician opioid prescribing practices during the United States opioid crisis. Am J Emerg Med. 2019 Jun 6. [Epub ahead of print]

263. Vilke GM, Mash DC, Pardo M, Bozeman W, Hall C, Sloane C, Wilson MP, Coyne CJ, Xie X, Castillo EM. EXCITATION study: Unexplained in-custody deaths: Evaluating biomarkers of stress and agitation. J Forensic Leg Med. 2019 Jun 21;66:100-106.

264. Mathews BK, Fredrickson M, Sebasky M, Seymann G, Ramamoorthy S, Vilke G, Sloane C, Thorson E, El-Kareh R. Structured case reviews for organizational learning about diagnostic vulnerabilities: initial experiences from two medical centers. Diagnosis (Berl). 2019 Aug 24. [Epub ahead of print]

265. Pillus D, Bruno E, Farcy D, Vilke GM, Childers R. Systematic Review: The Role of Thrombolysis in Intermediate-Risk Pulmonary Embolism. J Emerg Med. 2019 Aug 30. [Epub ahead of print]

266. Vilke G, Chan T, Bozeman WP, Childers R. Emergency Department Evaluation After Conducted Energy Weapon Use: Review of the Literature for the Clinician. J Emerg Med. 2019 Sept 6. [Epub ahead of print]

267. Hoenigl M, Mathur K, Blumenthal J, Brennan J, Zuazo M, McCauley M, Horton LE, Wagner GA, Reed SL, Vilke GM, Coyne CJ, Little SJ. Universal HIV and Birth Cohort HCV Screening in San Diego Emergency Departments. Scientific Reports. 2019 Oct 9. 9:14479 | https://doi.org/10.1038/s41598-019-51128-6.

COP-STICKNEY007311

Articles

268.  Lam SHF, Nakajima Y, Castillo EM, Brennan J, Vilke GM. Willingness to consider alternatives to ambulance use among adult emergency department patients.  Am J Emerg Med. 2019 Nov 18. [Epub ahead of print]

269.  Wettersten N, Horiuchi Y, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R, Hogan C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM, Barnett O, McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Murray PT, Maisel A.  B-type natriuretic peptide trend predicts clinical significance of worsening renal function in acute heart failure. Eur J Heart Fail. 2019 Nov 25. [Epub ahead of print]

270.  Docter TA, Patel BH, Brennan JJ, Castillo EM, Lee RR, Vilke GM.  Utility of Shunt Series in the Evaluation of Ventriculoperitoneal Shunt Dysfunction in Adults. J Emerg Med. 2019 Dec 2. [Epub ahead of print]

271.  Sawyer KN, Humbert A, Leroux BG, Nichol G, Kudenchuk PJ, Daya MR, Grunau B, Wang HE, Ornato JP, Rittenberger JC, Aufderheide TP, Wittwer L, Colella MR, Austin M, Kawano T, Egan D, Richmond N, Vithalani VD, Scales D, Baker AJ, Morrison LJ, Vilke GM, Kurz MC; Relationship Between Duration of Targeted Temperature Management, Ischemic Interval, and Good Functional Outcome From Out-of-Hospital Cardiac Arrest.  Crit Care Med. 2019 Dec 10. [Epub ahead of print]

272.  Soucy Z, Cheng D, Vilke GM, Childers R.  Systematic Review: The Role of Intravenous and Oral Contrast in the Computed Tomography Evaluation of Acute Appendicitis.  J Emerg Med. 2019 Dec 13. [Epub ahead of print]

273.  Wettersten N, Horiuchi Y, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R, Hogan C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM, Barnett O, McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Maisel A, Murray PT.  Short-term prognostic implications of serum and urine neutrophil gelatinase-associated lipocalin in acute heart failure: findings from the AKINESIS study.  Eur J Heart Fail. 2019 Dec 21. [Epub ahead of print]

274.  Blewer AL, Schmicker RH, Morrison LJ, Aufderheide TP, Daya M, Starks MA, May S, Idris AH, Callaway CW, Kudenchuk PJ, Vilke GM, Abella BS; Resuscitation Outcomes Consortium Investigators.  Variation in Bystander Cardiopulmonary Resuscitation Delivery and Subsequent Survival From Out-of-Hospital Cardiac Arrest Based on Neighborhood-Level Ethnic Characteristics. Circulation. 2020 Jan 7;141(1):34-41. Epub 2019 Dec 30.

275.  Daya MR, Leroux BG, Dorian P, Rea TD, Newgard CD, Morrison LJ, Lupton JR, Menegazzi JJ, Ornato JP, Sopko G, Christenson J, Idris A, Mody P, Vilke GM, Herdeman C, Barbic D, Kudenchuk PJ.  Survival After Intravenous Intraosseous Amiodarone, Lidocaine, or Placebo in Out-of Hospital Shock-Refractory Cardiac Arrest. Circulation. 2020 Jan 21;141(3):188-198.

COP-STICKNEY007312

PUBLICATIONS, continued:

Articles

276. Finch NA, Vilke GM. Unknown Tetrahydrocannabinol Edible Ingestion Resulting in Acute Stroke Presentation. J Emerg Med. 2020 Jan 22. [Epub ahead of print]

277. Vilke GM, Akeely Y, Lin LC. Sequential Drug-Induced Severe Hyponatremia in a Minimally Symptomatic, 81-Year-Old Patient. J Emerg Med. 2020 Mar;58(3):e137-e140. doi: 10.1016/j.jemermed.2019.11.048. Epub 2020 Mar 20. PMID: 32205001.

278. Rowland KD, Fuehrer J, Motov SM, Vilke G, Rosenbaum SB, Quenzer F. Should Antiemetics be Given Prophylactically with Intravenous Opioids While Treating Acute Pain in the Emergency Department?: Clinical Practice Paper Approved by American Academy of Emergency Medicine Clinical Guidelines Committee. J Emerg Med. 2020 Apr;58(4):706-709. doi: 10.1016/j.jemermed.2019.12.024. Epub 2020 Mar 23. PMID: 32216978.

279. Marigold O, Castillo EM, Sloane C, Brennan J, Coyne CJ, Swift S, Vilke GM. Further study on the physiological effects of an alternative spit mask. J Forensic Leg Med. 2020 May;72:101945. doi: 10.1016/j.jflm.2020.101945. Epub 2020 Mar 31. PMID: 32275230.

280. Gupta R, Roach C, Hryniewicki AT, Vilke GM, Shatsky RA, Coyne CJ. Management of Chimeric Antigen Receptor (CAR) T-Cell Toxicities: A Review and Guideline for Emergency Providers. J Emerg Med. 2020 Jul;59(1):61-74. doi: 10.1016/j.jemermed.2020.04.021. Epub 2020 May 28. PMID: 32473867.

281. Sloane C, Mash DC, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Lasoff D, Wardi G, Xie X, Vilke GM. Assessment of stress markers in restrained individuals following physical stress with and without sham CED activation. J Forensic Leg Med. 2020 Aug;74:101982. doi: 10.1016/j.jflm.2020.101982. Epub 2020 Jun 26. PMID: 32658765.

282. Horiuchi Y, Wettersten N, Patel MP, Mueller C, Neath SX, Christenson RH, Morgenthaler NG, McCord J, Nowak RM, Vilke GM, Daniels LB, Hollander JE, Apple FS, Cannon CM, Nagurney JT, Schreiber D, deFilippi C, Hogan C, Diercks DB, Headden G, Limkakeng AT Jr, Anand I, Wu AHB, Ebmeyer S, Jaffe AS, Peacock WF, Maisel A. Biomarkers Enhance Discrimination and Prognosis of Type 2 Myocardial Infarction. Circulation. 2020 Oct 20;142(16):1532-1544. doi: 10.1161/CIRCULATIONAHA.120.046682. Epub 2020 Aug 21. PMID: 32820656.

283. Sieker J, Vilke GM, Schongalla M, Mei-Dan O. (2020). Injury Patterns and Wilderness Medical Preparedness in BASE Jumping. Muscle, Ligament, and Tendon Journal. 2020;10 (2):156-164.

284. Meurer WJ, Barth B, Abraham M, Hoffman J, Vilke GM, DeMers G. Reply to Letter to the Editor. J Emerg Med. 2020 Jul;59(1):143. doi: 10.1016/j.jemermed.2020.05.015. PMID: 32900459.

COP-STICKNEY007313

Articles

285.    Vilke GM. Restraint physiology: A review of the literature. J Forensic Leg Med. 2020
        Oct;75:102056. doi: 10.1016/j.jflm.2020.102056. Epub 2020 Sep 15. PMID: 32956928;
        PMCID: PMC7490248.

286.    Vilke GM, Brennan JJ, Cronin AO, Castillo EM. Clinical Features of Patients with COVID-
        19: Is Temperature Screening Useful? J Emerg Med. 2020 Sep 21:S0736-4679(20)30977-
        X. doi: 10.1016/j.jemermed.2020.09.048. Epub ahead of print. PMID: 33139117; PMCID:
        PMC7505592.

287.    Singarajah A, Wang A, Sayegh J, Vilke GM, Quenzer FC. "Botched": A Case Report of
        Silicone Embolism Syndrome After Penile and Scrotal Injection. Clin Pract Cases Emerg
        Med. 2020 Nov;4(4):595-598. doi: 10.5811/cpcem.2020.9.48838. PMID: 33217281;
        PMCID: PMC7676808.

288.    Horiuchi YU, Wettersten N, Veldhuisen DJV, Mueller C, Filippatos G, Nowak R, Hogan C,
        Kontos MC, Cannon CM, MÜeller GA, Birkhahn R, Taub P, Vilke GM, Barnett O,
        McDONALD K, Mahon N, NuÑez J, Briguori C, Passino C, Maisel A, Murray PT.
        Potential Utility of Cardiorenal Biomarkers for Prediction and Prognostication of
        Worsening Renal Function in Acute Heart Failure. J Card Fail. 2020 Dec 6:S1071-
        9164(20)31551-7. doi: 10.1016/j.cardfail.2020.11.025. Epub ahead of print. PMID:
        33296713.

289.    Akeely Y, Vilke GM, Alzahrani H, Alshowaihi I, Alsaadani A, Rabah A, Turkistani A,
        Abosamak MF. Postintubation Tracheal Perforation While on Long-Term Steroid Therapy:
        A Case Report. J Emerg Med. 2020 Dec 8:S0736-4679(20)31169-0. doi:
        10.1016/j.jemermed.2020.11.001. Epub ahead of print. PMID: 33308913.

290.    Mathur K, Blumenthal J, Horton LE, Wagner GA, Martin TC, Lo M, Gianella S, Vilke GM,
        Coyne CJ, Little SJ, Hoenigl M. HIV Screening in Emergency Departments: Linkage
        Works but What About Retention? Acad Emerg Med. 2020 Dec 12. doi:
        10.1111/acem.14194. Epub ahead of print. PMID: 33314418.

291.    Gottlieb M, Farcy DA, Moreno LA, Vilke GM, Guittard JA. Triage Nurse-Ordered Testing
        in the Emergency Department Setting: A Review of the Literature for the Clinician. J
        Emerg Med. 2021 Jan 5:S0736-4679(20)31173-2. doi: 10.1016/j.jemermed.2020.11.004.
        Epub ahead of print. PMID: 33419653.

292.    Horiuchi Y, Wettersten N, van Veldhuisen DJ, Mueller C, Filippatos G, Nowak R, Hogan
        C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM, Barnett O,
        McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Maisel A, Murray PT. Relation of
        Decongestion and Time to Diuretics to Biomarker Changes and Outcomes in Acute Heart
        Failure. Am J Cardiol. 2021 Feb 19:S0002-9149(21)00152-1. doi:
        10.1016/j.amjcard.2021.01.040. Epub ahead of print. PMID: 33617811.

COP-STICKNEY007314

Articles

293.	Wu MYC, Vilke GM. Nonspecific Back Pain: A Manifestation of Choledocholithiasis With Cholecystitis. J Emerg Med. 2021 Feb 19:S0736-4679(21)00027-5. doi: 10.1016/j.jemermed.2021.01.018. Epub ahead of print. PMID: 33618931.

294.	Greene S, Cheng D, Vilke GM, Winkler G. How Should Native Crotalid Envenomation Be Managed in the Emergency Department? J Emerg Med. 2021 Feb 20:S0736-4679(21)00029-9. doi: 10.1016/j.jemermed.2021.01.020. Epub ahead of print. PMID: 33622584.

295.	Meurer WJ, Barth BE, Vilke GM, Guittard JA. Telemetry Bed Usage for Patients with Low-Risk Chest Pain: An Updated Review of the Literature for the Clinician. J Emerg Med. 2021 Mar 8:S0736-4679(21)00028-7. doi: 10.1016/j.jemermed.2021.01.019. Epub ahead of print. PMID: 33707075.

296.	Wettersten N, Horiuchi Y, van Veldhuisen DJ, Ix JH, Mueller C, Filippatos G, Nowak R, Hogan C, Kontos MC, Cannon CM, Müeller GA, Birkhahn R, Taub P, Vilke GM, Duff S, McDonald K, Mahon N, Nuñez J, Briguori C, Passino C, Maisel A, Murray PT. Decongestion discriminates risk for one-year mortality in patients with improving renal function in acute heart failure. Eur J Heart Fail. 2021 Mar 31. doi: 10.1002/ejhf.2179. Epub ahead of print. PMID: 33788989.

297.	Rosenbaum S, Wilkerson RG, Winters ME, Vilke GM, Wu MYC. Clinical Practice Statement: What is the Emergency Department Management of Patients with Angioedema Secondary to an ACE-Inhibitor? J Emerg Med. 2021 May 15:S0736-4679(21)00182-7. doi: 10.1016/j.jemermed.2021.02.038. Epub ahead of print. PMID: 34006418.

298.	Vilke GM, Neuma T, Chan TC. Response to: Prone restraint cardiac arrest - A comprehensive review of the scientific literature and an explanation of the physiology. Med Sci Law. 2021 Jun 22:258024211025224. doi: 10.1177/00258024211025224. Epub ahead of print. PMID: 34156879.

299.	Ha EL, Castillo EM, Vilke GM, Oyama LC, Brennan JJ, Birring P, Shah S, Coyne CJ. Active Cancer Patients Presenting to the Emergency Department with Acute Venous Thromboembolism: A Retrospective Cohort Study on Risks and Outcomes. J Emerg Med. 2021 Jun 29:S0736-4679(21)00470-4. doi: 10.1016/j.jemermed.2021.05.014. Epub ahead of print. PMID: 34215470.

300.	Childers R, Cronin AO, Castillo EM, Neuman T, Chan TC, Coyne CJ, Sloane C, Vilke GM. Evaluation of the ventilatory effects on human subjects in prolonged hip-flexed/head-down restraint position. Am J Emerg Med. 2021 Jul 2;50:1-4. doi: 10.1016/j.ajem.2021.06.068. Epub ahead of print. PMID: 34265730.

COP-STICKNEY007315

PUBLICATIONS, continued:

Articles

301.  Nichol G, Daya MR, Morrison LJ, Aufderheide TP, Vaillancourt C, Vilke GM, Idris A,
      Brown S. Compression depth measured by accelerometer vs. outcome in patients with out-
      of-hospital cardiac arrest. Resuscitation. 2021 Oct;167:95-104. doi:
      10.1016/j.resuscitation.2021.07.013. Epub 2021 Jul 29. PMID: 34331984.

302.  Akeely Y, Alharbi MM, Saulat SR, Mehdar A, Alzhrany NM. Samarkandy FM, Vilke GM,
      Alesa S.  The impacts of working 12-hour shifts in the emergency Department on
      physicians' health, social life, and decision-making: A cross-sectional study. Saudi J Er
      Med. 2021;2(3):244-249. https://doi.org/10.24911/SJEMed/72-1619037175.

303.  Mathur K, Blumenthal J, Horton LE, Wagner GA, Martin TCS, Lo M, Gianella S, Vilke
      GM, Coyne CJ, Little SJ, Hoenigl M. HIV screening in emergency departments: Linkage
      works but what about retention. Acad Emerg Med. 2021;28:913-917. DOI:
      10.1111/acem.14194.

COP-STICKNEY007316

Consortium Publications

1.  Davis DP, Garberson LA, Andrusiek DL, Hostler D, Daya M, Pirrallo R, Craig A, Stephens S, Larsen J, Drum AF, Fowler R, and the Resuscitation Outcomes Consortium Investigators. A Descriptive Analysis of Emergency Medical Service Systems Participating in the Resuscitation Outcomes Consortium (ROC) Prehospital Research Network. Prehospital Emergency Care 11:369-382, 2007. (role: site investigator)

2.  J Christenson, D Andrusiek, S Everson-Stewart, P Kudenchuk, D Hostler, J Powell, CW Callaway, D Bishop, C Vaillancourt, D Davis, TP Aufderheide, A Idris, J Stouffer, I Stiell, R Berg, and the ROC investigators. Chest Compression Fraction Determines Survival in Patients with Out-of-hospital Ventricular Fibrillation. Circulation 120(13):1241-7, 2009. (role: site investigator)

3.  Newgard CD, Koprowicz K, Wang H, Monnig A, Kerby JD, Sears GK, Davis DP, Bulger E, Stephens SW, Daya MR; ROC Investigators. Variation in the type, rate, and selection of patients for out-of-hospital airway procedures among injured children and adults. Acad Emerg Med. 2009 Dec;16(12):1269-76. (role: site investigator)

4.  Bulger EM, May S, Brasel KJ, Schreiber M, Kerby JD, Tisherman SA, Newgard C, Slutsky A, Coimbra R, Emerson S, Minei JP, Bardarson B, Kudenchuk P, Baker A, Christenson J, Idris A, Davis D, Fabian TC, Aufderheide TP, Callaway C, Williams C, Banek J, Vaillancourt C, van Heest R, Sopko G, Hata JS, Hoyt DB; ROC Investigators. Out-of-Hospital Hypertonic Resuscitation Following Severe Traumatic Brain Injury: A randomized Controlled Trial. JAMA 304(13):1455-1464, 2010 (role: site investigator)

5.  Newgard CD, Rudser K, Atkins DL, Berg R, Osmond MH, Bulger EM, Davis DP, Schreiber MA, Warden C, Rea TD, Emerson S; ROC Investigators. The availability and use of out-of hospital physiologic information to identify high-risk injured children in a multisite, population based cohort. Prehosp Emerg Care. 2009 Oct-Dec;13(4):420-31. (role: site investigator)

6.  Rea TD, Cook AJ, Stiell IG, Powell J, Bigham B, Callaway CW, Chugh S, Aufderheide TP, Morrison L, Terndrup TE, Beaudoin T, Wittwer L, Davis D, Idris A, Nichol G; Resuscitation Outcomes Consortium Investigators. Predicting survival after out-of-hospital cardiac arrest: role of the Utstein data elements. Ann Emerg Med. 2010 Mar;55(3):249-57. (role: site investigator)

7.  Newgard CD, Schmicker RH, Hedges JR, Trickett JP, Davis DP, Bulger EM, Aufderheide TP, Minei JP, Hata JS, Gubler KD, Brown TB, Yelle JD, Bardarson B, Nichol G; Resuscitation Outcomes Consortium Investigators. Emergency medical services intervals and survival in trauma: assessment of the "golden hour" in a North American prospective cohort. Ann Emerg Med. 2010 Mar;55(3):235-246.e4. Epub 2009 Sep 23. (role: site investigator)

COP-STICKNEY007317

Consortium Publications (cont.)

8.   Newgard CD, Rudser K, Hedges JR, Kerby JD, Stiell IG, Davis DP, Morrison LJ, Bulger E, Terndrup T, Minei JP, Bardarson B, Emerson S; ROC Investigators. A critical assessment of the out-of-hospital trauma triage guidelines for physiologic abnormality. J Trauma. 2010 Feb;68(2):452-62. (role: site investigator)

9.   Brooks SC, Schmicker RH, Rea TD, Aufderheide TP, Davis DP, Morrison LJ, Sahni R, Sears GK, Griffiths DE, Sopko G, Emerson SS, Dorian P; ROC Investigators. Out-of-hospital cardiac arrest frequency and survival: evidence for temporal variability. Resuscitation. 2010 Feb;81(2):175-81. (role: site investigator)

10.   Weisfeldt ML, Sitlani CM, Ornato JP, Rea T, Aufderheide TP, Davis D, Dreyer J, Hess EP, Jui J, Maloney J, Sopko G, Powell J, Nichol G, Morrison LJ; ROC Investigators. Survival after application of automatic external defibrillators before arrival of the emergency medical system: evaluation in the resuscitation outcomes consortium population of 21 million.  J Am Coll Cardiol. 2010 Apr 20;55(16):1713-20. (role: site investigator)

11.   Hostler D, Everson-Stewart S, Rea TD, Stiell IG, Callaway CW, Kudenchuk PJ, Sears GK, Emerson SS, Nichol G, and the Resuscitation Outcomes Consortium Investigators. A prospective cluster-randomized trial of real-time CPR feedback during out-of-hospital cardiac arrest resuscitation. BMJ 2011;342:d512 (role: site investigator)

12.   Aufderheide TP, Nichol G, Rea TD, Brown SP, Leroux BG, Pepe PE, Kudenchuk PJ, Christenson J, Daya MR, Dorian P, Callaway CW, Idris AH, Andrusiek D, Stephens SW, Hostler D, Davis DP, Dunford JV, Pirrallo RG, Stiell IG, Clement CM, Craig A, Van Ottingham L, Schmidt TA, Wang HE, Weisfeldt ML, Ornato JP, Sopko G, and the Resuscitation Outcomes Consortium (ROC) Investigators. A Trial of an Impedance Threshold Device in Out-of-Hospital Cardiac Arrest. New England Journal of Medicine. 365:798-806, 2011 (role: site investigator)

13.   Reinier K, Thomas E, Andrusiek DL, Aufderheide TP, Brooks SC, Callaway CW, Pepe PE, Rea TD, Schmicker RH, Vaillancourt C, Chugh SS; Resuscitation Outcomes Consortium Investigators. Socioeconomic status and incidence of sudden cardiac arrest. CMAJ. 2011 Oct 18;183(15):1705-12. Epub 2011 Sep 12 (role: site investigator)

14.   Wang HE, Devlin SM, Sears GK, Vaillancourt C, Morrison LJ, Weisfeldt M, Callaway CW; ROC Investigators. Regional variations in early and late survival after out-of-hospital cardiac arrest. Resuscitation. 2012 Nov;83(11):1343-8. (role: site investigator)

COP-STICKNEY007318

Consortium Publications (cont.)

15. Kudenchuk PJ, Brown SP, Daya M, Morrison LJ, Grunau BE, Rea T, Aufderheide T, Powell J, Leroux B, Vaillancourt C, Larsen J, Wittwer L, Colella MR, Stephens SW, Gamber M, Egan D, Dorian P; Resuscitation Outcomes Consortium Investigators. Resuscitation Outcomes Consortium-Amiodarone, Lidocaine or Placebo Study (ROC-ALPS): Rationale and methodology behind an out-of-hospital cardiac arrest antiarrhythmic drug trial. Am Heart J. 2014 May;167(5):653-9. (role: site investigator)

16. Ian G. Stiell, Siobhan P. Brown, Graham Nichol, Sheldon Cheskes, Christian Vaillancourt, Clifton W. Callaway, Laurie J. Morrison, James Christenson, Tom P. Aufderheide, Daniel P. Davis, Cliff Free, Dave Hostler, John A. Stouffer and Ahamed H. Idris and the Resuscitation Outcomes Consortium Investigators What Is the Optimal Chest Compression Depth During Out-of-Hospital Cardiac Arrest Resuscitation of Adult Patients? Circulation 2014;130:1962-1970; epub 2014 Sep 24. (role: site investigator)

17. Idris AH, Guffey D, Pepe PE, Brown SP, Brooks SC, Callaway CW, Christenson J, Davis DP, Daya MR, Gray R, Kudenchuk PJ, Larsen J, Lin S, Menegazzi JJ, Sheehan K, Sopko G, Stiell I, Nichol G, Aufderheide TP; Resuscitation Outcomes Consortium Investigators. Chest Compression Rates and Survival Following Out-of-Hospital Cardiac Arrest. Crit Care Med. 2015 Apr;43(4):840-8. (role: site investigator)

18. Stub D, Schmicker RH, Anderson ML, Callaway CW, Daya MR, Sayre MR, Elmer J, Grunau BE, Aufderheide TP, Lin S, Buick JE, Zive D, Peterson ED, Nichol G; ROC Investigators. Association between hospital post-resuscitative performance and clinical outcomes after out-of-hospital cardiac arrest. Resuscitation. 2015 Jul;92:45-52. Epub 2015 Apr 24. (role: site investigator)

19. Salcido DD, Schmicker RH, Kime N, Buick JE, Cheskes S, Grunau B, Zellner S, Zive D, Aufderheide TP, Koller AC, Herren H, Nuttall J, Sundermann ML, Menegazzi JJ; Resuscitation Outcomes Consortium Investigators. Effects of intra-resuscitation antiarrhythmic administration on rearrest occurrence and intra-resuscitation ECG characteristics in the ROC ALPS trial. Resuscitation. 2018 Aug;129:6-12. (role: site investigator)

20. Hansen M, Schmicker RH, Newgard CD, Grunau B, Scheuermeyer F, Cheskes S, Vithalani V, Alnaji F, Rea T, Idris AH, Herren H, Hutchison J, Austin M, Egan D, Daya M; Resuscitation Outcomes Consortium Investigators. Time to Epinephrine Administration and Survival From Nonshockable Out-of-Hospital Cardiac Arrest Among Children and Adults. Circulation. 2018 May 8;137(19):2032-2040. (role: site investigator)

COP-STICKNEY007319

Abstracts

1.  Chan TC, Vilke GM, Hayden SR:  Structured curriculum in domestic violence and child abuse for emergency medicine residents.  Acad Emerg Med 1996;3(5):511.

2.  Moss ST, Vilke GM, Chan TC, Dunford JD:  Outcomes study of out-of-hospital patients signed out against medical advice by field paramedics.  Acad Emerg Med 1997;4(5):413.

3.  Chan TC, Vilke GM, Neuman TS, Clausen JL:  Does the hobble restraint position result in respiratory compromise?  Acad Emerg Med 1997;4(5):459.

4.  Evans SD, Fisher RP, Vilke GM, Chan TC:  Accuracy of urban field paramedics estimating blood loss.  Acad Emerg Med 1997;4(5):459.

5.  Davis DP, Bramwell KJ, Vilke GM, Rosen P:  Cricothyrotomy technique: Standard technique versus the rapid four-step technique.  Acad Emerg Med 1997;4(5):488.

6.  Bramwell K, Vilke G, Davis D, Rosen P:  Cricothyrotomy technique: Use of the Trousseau dilator for initial widening and subsequent stabilization of the opening during endotracheal tube passage.  Ann Emerg Med 1997;30(3):419.

7.  Neuman TS, Vilke GM, Chan TC, Clausen JL:  Changes in pulmonary function associated with position.  Undersea & Hyperbaric Med 1997;24(Suppl):13.

8.  Moats T, Chan TC, Ochs M, Buchanan J, Vilke GM:  Successful out-of-hospital airway management by emergency medical technician-Is using the Combitube.  Acad Emerg Med 1998;5(5):388.

9.  Hamilton RS, Davis DP, Chan TC, Vilke GM, Hayden SR:  The effect of blade type and cervical spinal immobilization on laryngoscopy in a cadaver model of intubation.  Acad Emerg Med 1998;5(5):397.

10.  Vilke GM, Chan TC, Neuman T, Clausen JL:  The effect of body position on pulmonary function.  Acad Emerg Med 1998;5(5):397.

11.  Friedman L, Vilke GM, Chan TC, Hayden SR, Krishel SJ, Rosen P:  Emergency department airway management before and after the start of an emergency medicine residency training program.  Acad Emerg Med 1998;5(5):444.

12.  Davis DP, Bramwell KJ, Hamilton RS, Chan TC, Vilke GM:  Cricothyrotomy speed and safety: A comparison between standard open technique and rapid four-step technique using a novel device.  Acad Emerg Med 1998;5(5):483.

13.  Davis DP, Fisher RP, Chan TC, Dunford JV, Vilke GM:  Rapid-sequence induction for out-of-hospital intubations: A multimedia course designed for paramedics.  Acad Emerg Med 1998;5(5):502.

COP-STICKNEY007320

Abstracts

14. Chan TC, Vilke GM, Buchanan J, Anderson M:  Patient ethnicity and age in prehospital emergency ambulance use and acuity rates.  Prehospital Emerg Care 1998;2(3):223.

15. Marino AT, Vilke GM, Chan TC, Buchanan J:  Precision of prehospital diazepam dosing for children in status epilepticus.  Prehospital Emerg Care 1998;2(3):232.

16. Marino AT, Vilke GM, Chan TC, Buchanan J:  Comparison of prehospital IV and rectal diazepam for the treatment of pediatric seizures.  Prehospital Emerg Care 1998;2(3):233.

17. Vilke GM, Chan TC, Buchanan J, Dunford JV:  Are opiate overdose deaths related to patient release after prehospital naloxone?  Prehospital Emerg Care 1998;2(3):236.

18. Vilke GM, Dunford JV, Buchanan J, Chan TC:  Are opiate overdose deaths related to patient release after naloxone?  Ann Emerg Med 1998;32(3)Part 2:S6.

19. Gerling MC, Hamilton RS, Davis DP, Morris GF, Vilke GM, Hayden SR, Garfin SR:  Effects of cervical spine immobilization technique and laryngoscope blade selection on an unstable cervical spine injury in a cadaver model of intubation.  Ann Emerg Med 1998;32(3)Part 2:S13.

20. Marino AT, Chan TC, Buchanan J, Vilke GM:  Precision of prehospital diazepam dosing for children in status epilepticus.  Ann Emerg Med 1998;32(3)Part 2:S30.

21. Marino AT, Vilke GM, Buchanan J, Chan TC:  Comparison of prehospital intravenous and rectal diazepam for the treatment of pediatric seizures.  Ann Emerg Med 1998;32(3)Part 2:S30.

22. Davis D, Bramwell K, Hamilton R, Chan T, Vilke G:  The fresh-frozen cadaver free-larynx model for cricothyrotomy training.  Ann Emerg Med 1998;32(3)Part 2:S34-S35.

23. Sloane C, Chan TC, Vilke GM, Hayden SR, Krishel SJ, Rosen P:  Rapid sequence induction intubation of trauma patients in the prehospital versus hospital setting.  Ann Emerg Med 1998; 32(3)Part 2:S50.

24. Chan TC, Bramwell K, Hamilton R, Davis D, Vilke GM:  Comparison of Melcker cricothyrotomy versus standard technique in human cadaver model.  Ann Emerg Med 1998; 32(3)Part 2:S50-S51.

25. Chew GS, Chan TC, Bramwell K, Davis DP, Vilke GM:  Does the syringe esophageal detector device accurately detect an esophageal intubation following gastric distention from air insufflation?  Ann Emerg Med 1998;32(3)Part 2:S51.

26. Chan TC, Vilke GM, Kramer M, Buchanan J, Dunford J:  Does a complete neurologic examination adequately screen for significant intracranial abnormalities in minor head injury? J Emerg Med 1998;16(5):804.

COP-STICKNEY007321

PUBLICATIONS, continued:

Abstracts

27.  Chan TC, Vilke GM, Kramer M, Buchanan J, Dunford J:  Does GCS score affect prehospital intubation success rates in trauma patients?  J Emerg Med 1998;16(5):804-805.

28.  Vilke GM, Chan TC, Guss DA:   Prospective study on the utility of head CT scan in patients with minor head injury and GCS scores of 15.  J Emerg Med 1998;16(6):984.

29.  Chan TC, Vilke GM, Ray LU, Anderson ME:  Use of prehospital crash injury data to assess regional automobile safety restraint use.  Prehospital Emerg Care 1999;3(1):83-84.

30.  Vilke GM, Chan TC:  Effect of a physician speaking directly to prehospital patients who want to sign out against medical advice.  Prehospital Emerg Care 1999;3(1):90.

31.  Marino A, Vilke GM, Chan TC:  Urban paramedics experience, comfort, and accuracy in the estimation of pediatric weights.  Prehospital Emerg Care 1999;3(1):92.

32.  Chan TC, Bramwell KJ, Davis DP, Hamilton RS, Vilke GM:  Comparison of wire-guided percutaneous Melcker cricothyrotomy versus standard cricothyrotomy technique in human cadaver models.  Acad Emerg Med 1999;6(5):514.

33.  Ma G, Hayden SR, Chan TC, Vilke GM, Schmitt J, Chan D:  Using ultrasound to visualize and confirm endotracheal intubation.  Acad Emerg Med 1999;6(5):515.

34.  Hamilton RS, Davis DP, Nordt SP, Vilke GM, Chan TC:  Lidocaine administration through an esophageally placed Combitube in a canine model.  Acad Emerg Med 1999;6(5):519-520.

35.  Chew GS, Chan TC, Bramwell K, Davis DP, Vilke GM:  Does gastric distention from air insufflation affect the accuracy of the syringe esophageal detector device in detecting esophageal intubation?  Acad Emerg Med 1999;6(5):520.

36.  Vilke GM, Marino A, Iskander J, Chan TC:  Knowledge of prescribed medications by emergency department patients.  Acad Emerg Med 1999;6(5):539.

37.  Davis D, Marino A, Vilke G, Dunford J, Videen J:  Hyponatremia in marathon runners: Experience with the inaugural rock 'n' roll marathon.  Ann Emerg Med 1999;34(4)Part 2: S40-S41.

38.  Davis DP, Kimbro T, Vilke GM:  The use of midazolam for prehospital rapid-sequence intubation may be associated with a dose-related increase in hypotension.  Prehosp Emerg Care 2000;4(1):90.

39.  Marino AT, Sharieff G, Gerhart AE, Chan TC, Vilke GM:  The efficacy and complication rate of prehospital midazolam for the treatment of pediatric seizures.  Prehosp Emerg Care 2000; 4(1):92.

COP-STICKNEY007322

Abstracts

40. Eisele JW, Chan T, Vilke G, Neuman T, Clausen J: Comparison of respiratory function in the prone maximal restraint position with and without additional weight force on the back. Proceedings of the American Acadamy of Forensic Sciences 2000;VI:202.

41. Chan TC, Vilke GM, Neuman T, Clark RF, Clausen J: Effect of oleoresin capsicum. Acad Emerg Med 2000;7(5):471.

42. Vilke GM, Marino A, Chan TC: Survey of paramedics for latex allergy risk factors. Acad Emerg Med 2000;7(5):483.

43. Schmitt JM, Ma G, Hayden SR, Vilke G, Chan T: Suprasternal versus cricothyroid ultrasound probe position in the confirmation of endotracheal tube placement by bedside ultrasound. Acad Emerg Med 2000;7(5):526.

44. Schmitt JM, Ma G, Hayden SR, Vilke G, Chan T: Use of new air absorbing ultrasound contrast in the confirmation of endotracheal tube placement by bedside ultrasound. Acad Emerg Med 2000;7(5):526.

45. Wold RM, Davis DP, Patel R, Chan TC, Vilke GM: Original clinical decision guideline to identify patients with spinal epidural abscess. Acad Emerg Med 2000;7(5):574-575.

46. Ma G, Chan TC, Vilke GM, Schmitt J, Hayden SR: Confirming endotracheal intubation using ultrasound. Ann Emerg Med 2000;36(4)Part 2:S20-S21.

47. Deitch S, Vilke GM, Marino A, Vroman D, Chan TC: Effect of prehospital use of nitroglycerine on EKG findings in patients with chest pain. J Emerg Med 2001;20(3):321.

48. Chan TC, Vilke GM, Neuman T, Clausen J, Schmidt P, Snowden T, Clark RF: Does oleoresin capsicum "pepper spray" exposure impact cardiovascular function in human subjects? Acad Emerg Med 2001;8(5):442.

49. Chan TC, Vilke GM, Bender S, Saldamando V, Smith J, Dunford JV: Effect of a multi-disciplinary community homeless outreach team on emergency department visits by homeless alcoholics. Acad Emerg Med 2001;8(5):486.

50. Davis DP, Ochs M, Hoyt DB, Vilke GM, Dunford JV: The use of the Combitube as a salvage airway device for paramedic rapid-sequence intubation. Acad Emerg Med 2001;8(5):500.

51. Vilke GM, Simmons C, Brown L, Skogland P, Guss DA: Approach to decreasing emergency department ambulance diversion hours. Acad Emerg Med 2001;8(5):526.

COP-STICKNEY007323

Abstracts

52. Chan TC, Vilke GM, Clausen J, Clark R, Schmidt P, Snowden T, Neuman T: Impact of oleoresin capsicum spray on respiratory function in human subjects in the sitting and prone maximal restraint positions positions, 1998 (computer file). Inter-university Consortium for Political and Social Research (distributor), 2001.

53. Cardall TY, Glasser JL, Davis D, Vilke GM: Cricothyrotomy training in emergency medicine residencies. Ann Emerg Med 2001;38(4):S9.

54. Chan TC, Dunford JV, Vilke GM, Hix A, Schnell S, Liening J, Edgar J: Effect of a multi-disciplinary serial inebriate program on emergency department visits by chronic alcoholics in two urban area hospitals. Ann Emerg Med 2001;38(4):S33.

55. Valentine C, Davis D, Ochs M, Hoyt D, Bailey D, Vilke G: The use of the Combitube as a salvage airway device for paramedic rapid-sequence intubation. Prehosp Emerg Care 2002;6(1):144.

56. Chan TC, Dunford JV, Smith S, Sparrow W, Vilke GM: Impact of an on-call physician on emergency 911 transports from a county jail. Prehosp Emerg Care 2002;6(1):162.

57. Vilke GM, Sardar W, Fisher R, Dunford JV, Chan TC: Follow-up of elderly patients who refuse transport after accessing 9-1-1. Prehosp Emerg Care 2002;6(1):164.

58. Vilke GM, Steen PJ, Smith AM, Chan TC: Out-of-hospital pediatric intubation by paramedics: The San Diego experience. Prehosp Emerg Care 2002;6(1):165.

59. Jin AS, Chan T, Davis D, Vilke G: Prospective randomized study of viscous lidocaine vs Hurricaine in a GI cocktail for dyspepsia. Acad Emerg Med 2002;9(5):381-382.

60. Jenson P, Chan TC, Vilke GM, Leining J, Schnell R, Chester R, Berthelet J, Marcotte A, Simmons C, Kelly D, Dunford J: Impact of a multi-disciplinary, community serial inebriate program on ED visits by chronic alcoholics to three urban emergency departments. Acad Emerg Med 2002;9(5):389.

61. Austin T, Chan TC, Nyheim E, Kelly D, Vilke GM: Does the addition of parenteral opiate pre-medication increase risk for complications when combined with methohexital for moderate procedural sedation in the ED? Acad Emerg Med 2002;9(5):407.

62. Glasser JL, Cardall TY, Podboy M, Vilke GM: Out-of-hospital pediatric rapid-sequence intubation by an aeromedical provider. Acad Emerg Med 2002;9(5):422-423.

63. Chan TC, Austin T, Nyheim E, Kelly D, Vilke GM: Does parenteral opiate premedication increase risk of complications when combined with methohexital for orthopedic reductions in the emergency department? Ann Emerg Med 2002;40(4):S7-S8.

COP-STICKNEY007324

Abstracts

64.  Davis D, Tokhi R, Wold R, Patel R, Chan T, Vilke G:  The clinical presentation and outcome of emergency department patients with spinal epidural abscess.  Ann Emerg Med 2002;40(4): S103.

65.  Vilke GM, Loh A:  A prospective study of minimizing ambulance diversion and its effects on emergency department census and hospital admissions.  Prehosp Emerg Med 2003;7(1):171.

66.  Buono C, Vilke GM, Schwartz B, Brown L, Swabb C:  Identifying reasons for and outcomes of patients who access 9-1-1, then sign out against medical advice.  Prehosp Emerg Med 2003;7(1):172.

67.  Vilke GM, Sloane C, Smith AM, Chan TC:  Assessment for deaths in prehospital heroin overdose patients treated with Naloxone who refuse transport.  Prehosp Emerg Med 2003;7(1):190.

68.  Vilke GM, Lev R, Castillo EM, Murrin PA, Chan TC:  prospective countywide trial to decrease ambulance diversion hours.  Acad Emerg Med 2003;10(5):465.

69.  Tran A, Davis DP, Wold RM, Patel R, Chan TC, Vilke GM:  The use of risk factor assessment to screen for spinal epidural abcess in emergency department patients with spine pain.  Acad Emerg Med 2003;10(5):569.

70.  Chan TC, Kelso D, Dunford JV, Vilke GM:  Can trained health educators provide screening, brief intervention and referral services in an academic teaching hospital emergency department?  Acad Emerg Med 2003;10(5):515.

71.  Vilke GM, Lev R, Castillo EM, Metz MA, Murrin PA, Chan TC:  The effect of decreasing ambulance diversion hours on emergency department interfacility transfers. Ann Emerg Med 2003;42(4):S6.

72.  Vilke GM, Lev R, Castillo EM, Metz MA, Murrin PA, Chan TC:  San Diego County improved patient destination trial to decrease emergency department diversion hours and diverted patients.  Ann Emerg Med 2003;42(4):S2.

73.  Chan TC, Clausen J, Neuman T, Eisele JW, Vilke GM:  Does weight force during physical restraint cause respiratory compromise?  Ann Emerg Med 2003;42(4):S17.

74.  Davis D, Grossman K, Vilke G, Kiggins D, Chan TC:  Inadvertent anticoagulation of emergency department patients with aortic dissection.  Ann Emerg Med 2003;42(4):S99.

75.  Vilke GM, Wiesner C, Davis DP, Chan TC:  The efficacy of adding ipratropium bromide to albuterol for the prehospital treatment of reactive airways disease. Prehosp Emerg Care 2004; 8(1):112.

COP-STICKNEY007325

PUBLICATIONS, continued:

Abstracts

76. Vilke GM, Vadeboncoeur T, Davis DP, Poste JC, Ochs M, Hoyt DB: The predictive value of paramedic assessment of aspiration in patients undergoing RSI. Prehosp Emerg Care 2004; 8(1):88-89.

77. Vilke G, Castillo E, Metz M, Murrin P, Ray LU, Lev R, Chan T: Community trial to decrease ambulance diversion of patients and hours. Prehosp Emerg Care 2004;8(1):84.

78. Chan TC, Killeen JP, Kelly D, Vilke GM, Guss DA: Impact of a rapid emergency department entry and an accelerated care initiative on patient wait times and length of stay. Acad Emerg Med 2004;11(5):485.

79. Davis DP, Vadeboncoeur TF, Poste JC, Vilke GM, Ochs M, Hoyt DB: The use of field Glasgow coma scale to screen severely head-injured patients to undergo paramedic rapid sequence intubation. Acad Emerg Med 2004;11(5):492.

80. Patel RJ, Davis D, Vilke GM, Chan TC: Comparison of wire-guided cricothyrotomy technique with and without balloon-cuffed endotracheal tubes vs. standard surgical cricothyrotomy. Acad Emerg Med 2004;11(5):522.

80. Vilke GM, Chan TC, Dunford JV, Poste JC, Metz M, Ochs G, Smith A, Fisher R, McCallum-Brown L, Davis DP: The three-phase model of cardiac arrest as applied to ventricular fibrillation in a large, urban emergency medical services system. Acad Emerg Med 2004;11(5):604.

82. Hutton K, Swanson E, Vilke G, Davis D, Jones S, Hoogeveen B: Cricothyrotomies by air medical providers in 2853 patient intubations. Air Med J 2004;23(5):33.

83. Davis D, Buono C, Vilke G, Sise M, Eastman B, Kennedy F, Vilke T, Hoyt D: The efficacy of air medical response to patients with moderate to severe traumatic brain injury. Air Med J 2004;23(5):31.

84. Hutton K, Swanson E, Vilke G, Davis D, Jones S, Hoogeveen B: Laryngoscopic visualization grade predicts difficult intubations by air medical crews in the prehospital setting. Air Med J 2004;23(5):30.

85. Hutton K, Swanson E, Vilke G, Davis D, Jones S, Hoogeveen B: Success and failure rates of RSI versus non-RSI intubations by air medical providers in 2853 patients. Air Med J 2004; 23(5):30.

86. Metz M, Marcotte A, Vilke GM: The effect of decreasing ambulance diversion hours on ed interfacility transfers. J Emerg Nurs 2004;30(5):411.

87. Metz M, Murrin P, Vilke GM: Community trial to decrease ambulance diversion hours: the San Diego county patient destination trial. J Emerg Nurs 2004;30(5):410.

COP-STICKNEY007326

Abstracts

88. Metz M, Murrin P, Vilke GM: The three-phase EMS cardiac arrest model for ventricular fibrillation. J Emerg Nurs 2004;30(5):405.

89. Vilke GM, Murrin P, Gardina L, Upledger Ray L, Stepanski B, Chan TC: Impact of a new booster seat law. Ann Emerg Med 2004;44(4):S39-S40.

90. Vilke GM, Marcotte A, Metz M, Upledger Ray L: Pain management in the out-of-hospital setting. Ann Emerg Med 2004;44(4):S63.

91. Vilke GM, Murrin PA, Marcotte A, Upledger RL: Impact of the San Diego County firestorm on emergency medical services. Ann Emerg Med 2004;44(4):S102-S103.

92. Davis DP, Pettit K, Poste JC, Vilke GM: The efficacy of out-of-hospital needle and tube thoracostomy in major trauma victims. Ann Emerg Med 2004;44(4):S103.

93. Buono CJ, Davis DP, Vilke GM, Stepanski B. Esophageal Intubation in an EMS system: a six-year experience. Prehosp Emerg Care 2005; 9(1):113.

94. Dunford JV, Vilke GM, Chan TC. Utilization of EMS and hospital resources by serial inebriate program (SIP) clients. Prehosp Emerg Care 2005; 9(1):116.

95. Davis DP, Serrano JA, Buono CJ, Vilke GM, Sise MJ, Hoyt DB. The predictive value of field and arrival Glasgow coma score in moderate-to-severe brain injury. Prehosp Emerg Care 2005; 9(1):124.

96. Vilke GM, Castillo EM, Upledger-Ray L, Davis DP, Murrin PA, Kennedy F, Cox S, Coimbra R. Evaluation of paramedic field triage of injured patients to trauma centers and emergency departments. Prehosp Emerg Care 2005; 9(1):125.

97. Vilke GM, Harley J, Metz M, Stepanski B, Vroman D, Anderson M, Shipp H. Paramedic self-reported medication errors in an anonymous survey. Prehosp Emerg Care 2005; 9(1):127.

98. Bush J, Chan TC, Killeen JP, Vilke GM. The effect of changing from a latex agglutination D-Dimer to an ELISA D-Dimer on emergency physicians ordering imaging studies practices to evaluate for pulmonary embolism. Acad Emerg Med 2005;12(5):41.

99. Vilke GM, Michalewicz B, Kolkhorst FW, Neuman T, Chan TC. Does weight force during physical restraint cause respiratory compromise? Acad Emerg Med 2005;12(5):16.

100. Levine SD, Sloane C, Chan TC, Vilke GM, Dunford J. Cardiac monitoring of subjects exposed to the Taser. Acad Emerg Med 2005;12(5):71.

COP-STICKNEY007327

Abstracts

101. Davis DP, Buono C, Serrano J, Vilke GM, Sise MJ, Hoyt DB.  The impact of hyper- and hypoventilation on outcome in traumatic brain injury.  Acad Emerg Med 2005;12(5):138-139.

102. Davis D, Buono C, Ramanujam P, Fisher R, Vilke GM, Chan TC, Metz M, Dunford J:  The potential safety of designated cardiac arrest receiving facilities.  Ann Emerg Med 2005;46(3):S17.

103. Chan TC, Killeen JP, Kelly DL, Vilke GM, Guss DA:  Accelerated care at triage:  Physician-directed ancillary testing at triage for patients waiting in an emergency department.  Ann Emerg Med 2005;46(3):S107-S108.

104. Lev R, Vilke G, Dunford J:  San Diego Regional STEMI Summit.  San Diego Physician. 2005;4:11-13.

105. Davis D, Reynoso J, Harley J, Kanegaye J, Buono C, Vilke G:  The natural history of pediatric patients meeting criteria for paramedic intraosseous catheter insertion.  Prehosp Emerg Care 2006;10(1):110.

106. Davis D, Ramanujam P, Buono C, Vilke G:  The sensitivity of capnometry to detect endotracheal intubation:  Where should we draw the line?  Prehosp Emerg Care 2006; 10(1):118.

107. Levine S, Sloane C, Chan T, Dunford J, Vilke G:  Cardiac monitoring of subjects exposed to the Taser.  Prehosp Emerg Care 2006;10(1):130.

108. Levine SD, Sloane C, Chan TC, Vilke GM, Dunford J:  Cardiac monitoring of human subjects exposed to the taser.  Acad Emerg Med 2006;13(5 Supp 1):S47.

109. Vilke GM, Dolkas L, Stanley C, Smith AM, Chan TC:  Evaluation of deaths associated with choking.  Acad Emerg Med 2006;13(5 Supp 1):S49.

110. Chan TC, Vilke GM, Michalewicz BA, Neuman T, Levy S, Kolkhorst F:  Does physical restraint impact metabolic oxygen consumption during exertion?  Acad Emerg Med 2006; 13(5 Supp 1):S46.

111. Castillo EM, Vilke GM, Sturgis KN, Chan TC, Lindsay SP, Dunford JV:  Decrease of health care service utilization among chronic public inebriates.  Acad Emerg Med 2006;13 (5 Supp 1):S105-106.

112. Vilke G, Johnson W, Castillo EM, Ederheimer JA, Wexler C, Sloane CM, Chan TC: Evaluation of in-custody deaths proximal to use of conductive energy devices.  Ann Emerg Med 2006;48(4 Supp 1):S23-S24.

COP-STICKNEY007328

Abstracts

113.  Tornabene SV, Chan TC, Davis DP, Deutsch R, Vilke GM:  Evaluating the use and timing of opioids for the treatment of migraine headaches in the ED.  Ann Emerg Med 2006;48 (4 Supp 1):S59-S60.

114.  Killeen JP, Chan TC, Vilke GM, Buono C, Griswold W, Rao R, Lenert L:  Wireless computerized rapid triage in the field:  How well does technology perform during mass casualty incidents and disaster events?  Ann Emerg Med 2006;48(4 Supp 1):S69.

115.  Davis D, Salazar A, Vilke G, Chan T:  The utility of a novel decision rule to diagnose spinal epidural abscess in ED patients with back pain.  Ann Emerg Med 2006;48(4 Supp 1):S66.

116.  Vilke GM, Castillo EM, Stepanski BM, Murrin PA, Upledger-Ray L, Metz MA, Chan TC:  San Diego County patient destination trial to decrease ambulance division hours: Three year follow-up.  Ann Emerg Med 2006;48(4 Supp 1):S90.

117.  Graydon C, Wilson S, Leahy D, Berthiaume S, Buesch B, Stein R, Vilke G, Davis D:  The positive predictive value of paramedic versus emergency physician interpretation of the prehospital 12-lead ECG.  Prehosp Emerg Care 2006;10(1):116.

118.  Ramanujam P, Stepanski B, Smith A, Upledger-Ray L, Vilke GM.  Impact of a state booster seat law on compliance in pediatric traffic crash victims.  Ann Emerg Med 2006; 48(4 Supp 1):S56.

119.  Michalewicz BA, Chan TC, Vilke GM, Levy SS, Neuman TS, Kolkhorst FW.  Ventilatory and metabolic demands during aggressive physical restraint in healthy adults.  Med Sci Sports Exerc 2006;38(5) Suppl:S452-S453.

120.  Chan T, Sloane C, Neuman T, Levine S, Castillo E, Vilke G, Bouton K, Kohokorst F.  The impact of the taser weapon on respiratory and ventilatory function in human subjects.  Acad Emerg Med 2007; 14(5 Suppl 1): S191-192.

121.  Buono C, Lyon J, Huang R, Brown S, Liu F, Vilke G, Killeen J, Chan T, Kirsh D, Lenert L.  Does wireless technology improve patient tracking in mass casualty incidents?  Acad Emerg Med 2007; 14(5 Suppl 1): S190.

122.  Vilke G, Sloane C, Levine S, Neuman T, Castillo E, Chan T.  Does the Taser Cause Electrical Changes in Twelve Lead ECG Monitoring of Human Subjects?  Acad Emerg Med 2007; 14(5 Suppl 1): S104.

123.  Vilke G, Sloane C, Bouton K, Levine S, Neuman T, Castillo E, Kolkhorst F, Chan T.  Cardiovascular and metabolic effects of the taser on human subjects.  Acad Emerg Med 2007; 14(5 Suppl 1): S104-105.

124.  Sloane C, Vilke G, Chan T, Levine S, Dunford J.  Serum troponin I measurement of subjects exposed to the taser x-26.  Acad Emerg Med 2007; 14(5 Suppl 1): S103-104.

COP-STICKNEY007329

Abstracts

125. Bouton KD, Vilke GM, Chan TC, Sloane C, Levine S, Neuman TS, Levy SS, Kolkhorst FW. Physiological effects of a five second Taser exposure. Med Sci Sports Exerc 2007;39(5 Suppl):S323.

126. Firestone D, Band RA, Hollander JE, Castillo EM, Vilke GM. Can Urine Dipstick and Brief Questionnaire Predict Abnormal Serum Creatinine in Emergency Department Patients? Ann Emerg Med 2007; 50(3):S24.

127. Vilke GM, Sloane C, Suffecool AC, Neuman TS, Castillo EM, Kolkhorst FW, Chan TC. Physiologic Effects of the TASER on Human Subjects After Exercise. Ann Emerg Med 2007; 50(3):S55.

128. Chan TC, Killeen JP, Castillo EM, Vilke GM, Guss DA. Impact of Electronic Medication Reconciliation on Triage Times for Patients Seen in the Emergency Department. Ann Emerg Med 2007; 50(3):S71.

129. Marsan Jr RJ, Vilke GM, Chan TC, Davis DP, Stepanski BM. Description and Efficacy of Treatment of Hemodynamically Significant Bradycardia in a Large, Urban, Pacing-capable EMS System. Ann Emerg Med 2007; 50(3):S80.

130. Chan TC, Killeen JP, Castillo EM, Vilke GM, Kennedy S, FeinbergR, Guss DA. Impact of an internet based referral appointment system community clinic access and follow-up for ED patients with no primary care. Acad Emerg Med 2008; 15(5 Suppl 1): S104.

131. Vilke GM, Sloane CM, Suffecool A, Neuman T, Castillo EM, Kolkhorst F, Chan TC. Crossover-controlled human study of the physiologic effects of the Taser after vigorous exercise. Acad Emerg Med 2008; 15(5 Suppl 1): S155.

132. Vilke GM, Chan TC, Killeen JP, Castillo EM. Impact of psychiatric patient holds in the emergency department on overcrowding. Acad Emerg Med 2008; 15(5 Suppl 1): S221.

133. Barnard AC, Sloane C, Vilke GM, Chan TC, Neuman TS, Kolkhorst FW. Physiological effects of TASER X-26 after intense exercise. Med and Sci in Sports and Exercise 2008; 40(Suppl 5): S475.

134. Chan TC, Killeen JP, Vilke GM, Guss DA, Jones K, Marshall J, Moore T, Castillo EM. Impact of mandated nurse-patient ratios on emergency department crowding. Ann Emerg Med 2008; 52(4):S44.

135. Davis D, Fong T, Lawrence B, Vilke GM. Psychosocial variables influence the decision to call 9-1-1 in emergency department patients with abdominal pain. Ann Emerg Med 2008; 52(4):S71.

COP-STICKNEY007330

Abstracts

136.    Bizek G, Castillo EM, Vilke GM, Chan TC. Characteristics and rates of rewarming of
        emergency department patients with moderate to severe accidental hypothermia. Ann
        Emerg Med 2008; 52(4):S105-6.

137.    Ramanujam P, Castillo EM, Patel E, Vilke GM, Wilson M, Dunford J.  Pre hospital
        transport time intervals for acute stroke patients. Ann Emerg Med 2008; 52(4):S154.

138.    Vilke GM, Killen J,P, Chan TC, Crumpacker J, Castillo EM.  Risk factors and
        characteristics of falls among emergency department elderly patients.  Ann Emerg Med
        2008; 52(4):S160.

139.    Marsan R, Castillo EM, Chan TC, Stepanski B, Vilke GM: Comparison of prehospital
        retrospective chart review to prospectively obtained data. Acad Emerg Med
        2009;16(4)Suppl 1: S85-S86.

140.    Killeen D, Killeen J, Castillo EM, Chan TC, Vilke GM: Emergency department patient
        evaluation of internet and email access for healthcare information.  Acad Emerg Med
        2009;16(4)Suppl 1: S132-S133.

141.    Sloane CM, Chan TC, Kohlkorst F, Castillo EM, Neuman T, Vilke GM: Can a restraint
        chair cause respiratory or ventilatory compromise? Acad Emerg Med 2009;16(4)Suppl 1:
        S137.

142.    Castillo, EM, Vilke GM, Killeen J, Guss DA, Marshall J, Chan TC: Impact of mandated
        nurse-patient ratios on ED medication delivery. Acad Emerg Med 2009;16(4)Suppl 1:
        S157-S158.

143.    Slattery D, Pierson B, Stanley K, Vilke GM: Bridging the training gap in cardiac arrest:
        identification of cardiac arrest decision-making deficits in lay rescuers. Acad Emerg Med
        2009;16(4)Suppl 1: S182.

144.    Slattery D, Stanley K, Vilke GM, Pierson B: non-medical responders are not accurate at
        identifying agonal respirations? Acad Emerg Med 2009;16(4)Suppl 1: S182.

145.    Castillo EM, Vilke GM, Killeen J, Guss DA, Feinberg R, Friedman L, Chan TC: Factors
        associated with community clinic follow-up from an ED internet-based referral system.
        Acad Emerg Med 2009;16(4)Suppl 1: S247-S248.

146.    Marmon J, Castillo EM, Vilke GM, Killeen J, Chan TC: The effect of admitting team
        resident turnover on emergency department patient flow. Acad Emerg Med
        2009;16(4)Suppl 1: S257-S258.

COP-STICKNEY007331

Abstracts

147.  Castillo EM, Vilke GM, Williams M, Turner P, Boyle J, Chan TC. Collaborative to decrease ambulance diversion: The California ED Diversion Project. Ann Emerg Med 2009; 54(3):S79.

148.  Lev R, Castillo EM, Vilke GM, Chan TC. Multi-center study of left without treatment rates from Emergency Departments serving a large metropolitan region. Ann Emerg Med 2009; 54(3):S86.

149.  Chan TC, Vilke GM, Killeen JP, Gus DA, Marshall J, Castillo EM. Impact of mandated nurse-patient ratios on time to antibiotic administration in the Emergency Department. Ann Emerg Med 2009; 54(3):S97.

150.  Vilke GM, Robertson NB, Castillo EM, Killeen JP, Chan TC. Erythrocyte sedimentation rate compared to C-reactive protein as a screening marker in the Emergency Department. Ann Emerg Med 2009; 54(3):S121.

151.  Stiell IG, Nichol G, Leroux BG, Rea TD, Ornato JP, Powell J, Christenson J, Callaway CW, Kudenchuk PJ, Aufderheide TP, Idris AH, Daya M, Wang HE, Morrison L, Davis D, Andrusiek D, Stephens S, Cheskes S, Schmicker RH, Fowler R, Vaillancourt C, Hostler D, Zive D, Pirrallo RG, Vilke G, Sopko G, Weisfeldt M, the Resuscitation Outcomes Consortium (ROC) Investigators: Resuscitation outcomes consortium ROC PRIMED trial of early rhythm analysis versus later analysis in out-of-hospital cardiac arrest. Resuscitation 2010;81S:S16.

152.  Castillo EM, Chan TC, Luu B, Prabhakar N, Vilke GM. Factors Associated With Injuries Among Subjects and Deputies During Law Enforcement Use of Force Events. Ann Emerg Med 2010; 56(3):S138.

153.  Wilson MP, MacDonald KS, Vilke GM, Feifel D. Potential Complications of Olanzapine and Benzodiazepines Compared to Haloperidol and Benzodiazepines In Emergency Department Patients. Ann Emerg Med 2010; 56(3):S155.

154.  Killeen JP, Castillo EM, Vilke GM, Marshall JB, Chan TC. Impact of Mandated Nurse-Patient Ratios on Emergency Department Discharge Time. Ann Emerg Med 2010; 56(3):S182.

155.  Chan TC, Castillo EM, Humber DM, Killeen JP.  Frequency of Pharmacy Interventions and Emergency Overrides Following Implementation of Electronic Pharmacy Review In the Emergency Department. Ann Emerg Med 2010; 56(3):S343.

156.  Chan TC, Castillo EM, Vilke GM, Killeen JP. Do Computerized Medication Alerts Change Medication Orders In the Emergency Department.  Ann Emerg Med 2010; 56(3):S372.

COP-STICKNEY007332

Abstracts

157. Wilson MP, Vilke GM, Govindarajan P, Itagaki MW. Emergency Physicians Research Commonly Encountered Patient-Oriented Problems in the the Proportion with Which They Are Encountered in the Emergency Department. Acad Emerg Med 2011;18 (5)Suppl:S67.

158. Vilke GM, Anthony E, Castillo EM. Factors Associated with Ambulance Use Among Emergency Department Patients. Acad Emerg Med 2011;18 (5)Suppl:S114.

159. Nordt SP, Castillo EM, Galinato M, Nguyen V, Clark RF, Cantrell FL, Chan TC, Vilke GM: Energy Drink Use and Adverse Effects Among Emergency Department Patients. Clin Toxicol 2011; 49(6):579.

160. Savaser DJ, Campbell CC, Chan TC, Shah V, Sloane CS, Hansen AV, Castillo EM, Vilke GM. The Effect of Prone Maximal Restraint (PMR, aka ''Hog-Tie'') Position on Cardiac Output and Other Hemodynamic Measurements. Acad Emer Med 2012;19(4):S78.

161. Castillo EM, Vilke GM, Killeen JP, Brennan JJ, Chan TC. Visit Urgency Between Frequent Emergency Department Users In A Large Metropolitan Region Network. Acad Emer Med 2012;19(4):S96.

162. Killeen JP, Castillo EM, Chan TC, Vilke GM. Emergency Department Patients on Warfarin - How Often Is the Visit Due to the Medication? Acad Emer Med 2012;19(4):S121.

163. Killeen JP, Chan TC, Vilke GM, Rafie S, Dunlay R, Castillo EM. Does Pharmacist Review of Medication Orders Delay Medication Administration in the Emergency Department? Acad Emer Med 2012;19(4):S166.

164. Killeen JP, Vilke GM, Chan TC, Oyama L, Carey M, Castillo EM. Does the Residency Selection Cycle Impact What Information Is Accessed on the Web? Acad Emer Med 2012;19(4):S202.

165. Vilke GM, Ali S, Simmons T, Witucki P, Wilson MP. Does An Alcohol-based Hand Sanitizer Affect Breathalyzer Levels? Acad Emer Med 2012;19(4):S278.

166. Vilke GM, Patel N, Castillo EM, Demers G. Safety and Efficacy of Milk and Molasses in the ED. Acad Emer Med 2012;19(4):S287.

167. Castillo EM, Chan TC, Brennen JJ, Killeen JP, Vilke GM. Multiple Hospital Emergency Department Visits Among "Frequent Flyer" Patients With a Pain Associated-discharge Diagnosis. Acad Emer Med 2012;19(4):S321.

168. Wilson MP, Chen N, Minassian A, Vilke GM, Castillo EM. In Combination With Benzodiazepines And Alcohol Intoxication, Intramuscular But Not Oral Olanzapine Is Associated With Decreased Oxygen Saturations. Acad Emer Med 2012;19(4):S356.

COP-STICKNEY007333

Abstracts

169. Killeen JP, Vilke GM, Dunford JV, Fisher R, Pringle J, Castillo EM, Chan TC: Impact of 12-lead ECG Wireless Transmission on Hospital STEMI Activations. Ann Emer Med 2012;60(4)S25.

170. Castillo EM, Brennan JJ, Chan TC, Killeen JP, Vilke GM: Factors Associated With Frequent Users of Emergency Department Resources. Ann Emer Med 2012;60(4)S32.

171. DeMers G, Graydon C, Stein M, Wilson S, Buesch B, Berthiaume S, Lee DM, Rivas J, Vilke GM, Davis D: Analysis of Inter-facility Transfer Rates After Initiation of a Regional PCI System. Ann Emer Med 2012;60(4)S44.

172. Vilke GM, Brennan JJ, Castillo EM, Killeen JP, Chan TC: Multiple Hospital Emergency Department Visits Among Frequent Users With a Pain-Associated Discharge Diagnosis. Ann Emer Med 2012;60(4)S54.

173. Benaron D, Castillo EM, Vilke GM, Guluma KZ: Emergency Department Patient Perception of Stroke. Ann Emer Med 2012;60(4)S58.

174. Castillo EM, Chan TC, Killeen JP, Vilke GM: Knowledge of Acute Myocardial Infarction Symptoms: Do Sex Differences Still Exist? Ann Emer Med 2012;60(4)S83.

175. Chan TC, Castillo EM, Dunford JV, Fisher R, Jensen AM, Vilke GM, Killeen JP: Hot Spots and Frequent Fliers: Identifying High Users of Emergency Medical Services. Ann Emer Med 2012;60(4) S83-S84.

176. Brennan JJ, Chan TC, Vilke GM, Killeen JP, Castillo EM: Identification of Frequent Users of Hospital Emergency Department Resources Using a Community-wide Approach. Ann Emer Med 2012;60(4)S102.

177. Chan TC, Killeen JP, Brennan JJ, Vilke GM, Castillo EM: The Forgotten Emergency Department Visit When Assessing Hospital Readmissions. Ann Emer Med 2012;60(4)S105.

178. Brennan JJ, Chan TC, Killeen JP, Castillo EM, Vilke GM: Multiple Hospital Emergency Department Visits Among "Frequent Flyer" Patients With a Psychiatric-Associated Discharge Diagnosis. Ann Emer Med 2012;60(4) S146-S147.

179. Campillo A, MacDonald KS, Vilke GM, Wilson MP: The B52 Combination Is Not Frequently Used in Emergency Departments and Causes A High Proportion of Patients to Fall Asleep. Ann Emer Med 2012;60(4) S147.

180. Lin GK, Vilke GM, Castillo EM, Chen N, Wilson MP: A Comparison of Oral Aripiprazole and Oral Olanzapine Use in the Emergency Department. Ann Emer Med 2012;60(4) S147-S148.

COP-STICKNEY007334

PUBLICATIONS, continued:

Abstracts

181. Sloane C, Chan TC, Vilke GM, Castillo EM, Kolkhorst F, Neuman T: The Ventilatory Effects of the Prone Maximal Restraint Position on Obese Human Subjects. Acad Emer Med 2013;20(5):S105.

182. Hogen R, Brennan JJ, Vilke GM, Chan TC, Castillo EM: Visit Urgency amongst the Chronic Disease Population in a Large Metropolitan Region Emergency Department Network. Acad Emer Med 2013;20(5):S172.

183. Castillo EM, Chan TC, Vilke GM, Killeen JP, Brennan JJ: Factors Associated with Super Users of Emergency Department Resources Admitted to Acute Care. Acad Emer Med 2013;20(5):S183.

184. Brennan JJ, Chan TC, Vilke GM, Castillo EM, Killeen JP: Comorbidity among Frequent Emergency Department Users with Psychiatric Associated Discharge Diagnoses. Acad Emer Med 2013;20(5):S229.

185. Brennan JJ, Castillo EM, Vilke GM, Killeen JP, Chan TC: Factors Associated with Frequent Users of California Emergency Department Resources. Acad Emer Med 2013;20(5):S230.

186. Chan TC, Brennan JJ, Killeen JK, Stevenson ME, Kuntz KE, Vilke GM, Castillo EM: Impact of Social Services Case Management on Homeless, Frequent Users of Emergency Departments. Acad Emer Med 2013;20(5):S231.

187. Castillo EM, Chan TC, Brennan JJ, Roberts EE, Vilke GM. What Contributes to Subject and Officer Injuries During Law Enforcement Use of Force Events? Ann Emerg Med 2013, 62(4), S107.

188. Brennan JJ, Castillo EM, Wilson M, Chan TC, Killeen JP, Vilke GM. Psychiatric-Associated Visits to California Emergency Departments: Presence of Licensed Psychiatric Beds and Admission. Ann Emerg Med 2013, 62(4), S118.

189. Granata RT, Vilke GM. Impact of deferred CT imaging of intoxicated patients presenting with altered mental status. J Invest Med 2014;61(1):214.

190. Nowak RM, Schreiber D, Hollander J, Nagurney J, Hogan C, Wu A, Vilke GM, Apple F, Cannon C, Daniels L, Anand I, deFillippi C, McCord J, Shah K, Marston N, Neath SX, Christenson R, Diercks D, Limkakeng A, Jaffe A, Mueller C, Maisel A, Peacock F: Copeptin Provides Prognostic Value in Emergency Department Patients Presenting with Acute Undifferentiated Chest Pain. Acad Emerg Med 2014;21(5):S89.

COP-STICKNEY007335

PUBLICATIONS, continued:

Abstracts

191.    Peacock W, Nowak R, Neath SX, Hollander J, Cannon C, Nagurney JT, Schreiber D, Hogan C, Diercks D, Stein JC, Headden G, Limkakeng AT, Mueller C, Vilke GM, Maisel A: Can a Second Measurement of Copeptin Improve Acute Myocardial Infarction Rule Out? Acad Emerg Med 2014;21(5):S90.

192.    Vilke GM, Lassoff D, Chan TC, Hall CA, Bozeman WP, Castillo EM. Proning: Outcomes of Use of Force Followed with Prone Restraint. Acad Emerg Med 2014; 21(Supp 1): S161.

193.    Vilke GM, Chan TC, Roberts EE, Moore JD, Parra KM, Castillo EM. Does Law Enforcement Use Different Levels of Force if the Subject Appears to be Mentally Impaired? Acad Emerg Med 2014; 21(Supp 1): S238.

194.    Hopper A, Dee J, Vilke GM, Castillo EM, Chen V, Hall D, Wilson MP. Hypotensive Effects of Risperidone Are Not Increased When Used in Conjunction with Benzodiazepines or in Alcohol Intoxicated Patients but May Increase in Elderly Patients. Acad Emerg Med 2014; 21(Supp 1):S56.

195.    Castillo, EM, Brennan JJ, Hsia RY, Killeen JP, Vilke, GM, Chan TC. Thirty-day Readmissions Through the Emergency Department in a Large, Metropolitan Region. Acad Emerg Med 2014; 21(Supp 1):S108.

196.    Castillo EM, Chan TC, Hsia RY, Killeen JP, Vilke GM, Brennan JJ. Should Rural Hospitals be Concerned about Frequent Users of Emergency Department Resources? Acad Emerg Med 2014; 21(Supp 1):S218.

197.    Brennan JJ, Chan TC, Vilke GM, Hsia RY, Killeen JP, Castillo EM. Traveling Super Users of California Emergency Departments. Acad Emerg Med 2014; 21(Supp 1):S220.

198.    Killeen JP, Castillo EM, Brennan JJ, Vilke GM, Chan TC. Does Emergency Department Interrogation Reduce ED Time for Patients with Pacemakers or ICDs? Acad Emerg Med 2014; 21(Supp 1):S274.

199.    Castillo EM, Brennan JJ, Hsia RY, Killeen JP, Vilke GM, Chan TC. Multiple Emergency Department Use and 30-day ED Visits. Acad Emerg Med 2014; 21(Supp 1):S322.

200.    Marston N, Shah K, Mueller C, Neath SX, Christenson R, McCord J, Nowak R, Vilke G, Daniels L, Hollander J, Apple F, Cannon C, Nagurney J, Schreiber D, DeFilippi C, Hogan C, Diercks D, Limkaken A, Anand I, Jaffe A, Peacock WF, Maisel A, Wu, A: Can a second measurement of copeptin improve acute myocardial infarction rule out?. J Am Coll Cardiol 2014;63(12_S).

COP-STICKNEY007336

PUBLICATIONS, continued:

Abstracts

201. Chan TC, Killeen JP, Vilke GM, Castillo EM. Impact of the Affordable Care Act on the Health Care Coverage of Patients Seen in the Emergency Department: Initial First Quarter Findings. Ann Emerg Med 2014; 64(4s):S84 –S85.Smith C, Hopper AB,

202. Castillo EM, Dang AQ, Chan TC, Vilke GM. Mortality and Timing of Death in Patients With Runaway Pacemakers. Ann Emerg Med 2014; 64(4s):S111.

203. Brennan JJ, Chan TC, Hsia RY, Vilke GM, Killeen JP, Castillo EM. Predicting Frequent Use of Emergency Department Resources. Ann Emerg Med 2014; 64(4s):S118 – S119.

204. Campillo A, Castillo EM, Vilke GM, Wilson MP. Use of Quetiapine in the Emergency Department for Acute Agitation and Associated Physiologic Effects. Ann Emerg Med 2014; 64(4s):S138.

205. Vilke GM, Lev R, Chan TC, Lucas J, Smith J, Painter NA, Castillo EM. Prescription Drug Prescribing Patterns in a Large Regional Area. Ann Emerg Med 2014; 64(4s):S139-S140.

206. Hopper AB, Deen J, Smith C, Campillo A, Vilke GM, Castillo EM, Wilson MP. Hypotensive Effects of Oral Second Generation Antipsychotics in the Emergency Department. Ann Emerg Med 2014; 64(4s):S140-S141.

207. Marston N, Shah K, Mueller C, Neath SX, Christenson R, McCord J, Nowak R, Vilke GM, Daniels L, Hollander J, Apple F, Cannon C, Nagurney J, Schreiber D, deFilippi C, Hogan C, Diercks D, Limkakend A, Anand I, Wu A, Clopton P, Jeffe A, Peacock F, Maisel A. Does Copeptin Provide Additional Risk Stratification in Chest Pain Patients With a Mild Troponin Elevation? Circulation 2014; 130:A12996.

208. Egnatios J, Lev R, Petro S, Castillo E, Vilke G. Long Active Death: Medadone. Ann Emerg Med 2015; 66(4s):S140-S141.

209. Vilke GM, Guss DA. Pilot Study of Telemedicine in a County Jail to Assess and Treat Acutely Ill Inmates. Ann Emerg Med 2015; 66(4s): S14.

210. Brennan JJ, Vilke GM, Hsia RY, Chan TC, Killeen JP, Huang J, Castillo EM. Transient Ischemic Attack "Bouncebacks": Emergency Department Discharges Who Return as Admissions Within Seven Days. Ann Emerg Med 2015; 66(4s):S112.

211. Brennan JJ, Chan TC, Vilke GM, Killeen JP, Hsia RY, Tehaney K, Castillo EM. Admissions Within Seven Days of an Emergency Department Discharge. Ann Emerg Med 2015; 66(4s):S89.

COP-STICKNEY007337

Abstracts

212.  Lev R, Lee O, Petro S, Lucas J, Castillo EM, Vilke GM, Coyne CJ. Specialty-Specific Prescribing Patterns to Patients Who Die From Prescription Drugs: How Do Emergency Physicians Compare? Ann Emerg Med 2015; 66(4s):S119.

213.  Castillo EM, Chan, TC, Vilke GM, Hsia RY, Ishamine P, Shah S, Kapoor K, Brennan JJ. A Description of Pediatric Frequent Users of Emergency Department Resources. Ann Emerg Med 2015; 66(4s):S8.

214.  Rentmeester L, Clark RF, Joshua A, Vilke, GM. (2015). Undetectable Total Phenytoin in a Patient with Elevated Kappa Light Chains. Clinical Toxicology. 2015;53. 658.

215.  Chan TC, Brennan JJ, Vilke GM, Hsia RY, Killeen JP, Castillo EM. The Changing Landscape of Emergency Department Visits in California. Acad Emerg Med 2016; 23:S15

216.  Castillo EM, Vilke GM, Killeen JP, Hsia RY, Wilson MP, Brennan JJ. ED Utilization Prior to a Suicide and Self-Inflicted Injury Related ED Visit. Acad Emerg Med 2016; 23:S17.

217.  Supat B, Brennan JJ, Vilke GM, Ishimine P, Shah S, Hsia RY, Castillo EM. Assessing Factors Associated with Pediatric Frequent Emergency Department Utilization. Acad Emerg Med 2016; 23:S32.

218.  Coyne CJ, Chiu C, Brennan JJ, Castillo EM, Vilke GM. Medication Adherence in the Emergency Department: What are the Barriers? Acad Emerg Med 2016; 23:S41.

219.  Spinosa DL, Brennan JJ, Castillo EM, Hsia RY, Vilke GM. Multivariate Analysis of 30-Day Readmission for Acute Myocardial Infarction. Acad Emerg Med 2016; 23:S118.

220.  Castillo EM, Brennan JJ, Shah S, Vilke GM, Hsia RY, Nguyen M. Asthma and Asthma-Mimicking Pediatric ED Revisit Within Three Days of an ED Discharge. Acad Emerg Med 2016; 23:S120.

221.  Castillo EM, Brennan JJ, Chan TC, Killeen JP, Hsia RY, Vilke GM. ED Utilization 3-Days Prior to a Fall-Related ED Visit Among Elderly Patients. Acad Emerg Med 2016; 23:S139.

222.  Coyne CJ, Le V, Brennan JJ, Castillo EM, Shatsky RA, Vilke GM. Low-Risk febrile Neutropenia: Can These Patients be Safely Discharged from the Emergency Department? Acad Emerg Med 2016; 23:S161.

223.  Brennan JJ, Vilke GM, Chan TC, Killeen JP, Hsia RY, Castillo EM. ED Revisits Within 3 Days of an ED Discharge Among Elderly Patients. Acad Emerg Med 2016; 23:S169.

COP-STICKNEY007338

Abstracts

224. Nakajima Y, Vilke GM, Castillo EM, Brennan JJ, Hsia R. Asthma Bouncebacks Emergency Department Discharges Who Return as Admission Within Three Days. Acad Emerg Med 2016; 23:S202.

225. Benaron D, Castillo E, Vilke G, Guluma K. Emergency Department Patient Perception of Stroke: A Comparison of Elderly and Nonelderly Knowledge of Stroke. Acad Emerg Med 2016; 23:S256.

226. Vilke GM, Castillo EM, Brennan JJ, Killeen JP. What Happens to Emergency Patients Who Leave Without Being Seen by a Physician? Ann Emerg Med 2016;68(4):S33.

227. Castillo EM, Morgan AO, Vilke GM, Killeen JP, Hsia RY, Brennan JJ. Characteristics of Frequent Users of Emergency Departments With Pain-Related Diagnoses. Ann Emerg Med 2016;68(4):S56-57.

228. Brennan JJ, Vilke GM, Killeen JP, Hsia RY, Castillo EM. Trends Among Emergency Department Visits for Suicide-Related Diagnoses, 2008 – 2014. Ann Emerg Med 2016;68(4):S385.

229. Coyne CC, Brennan JJ, Castillo EM, Vilke GM. Cancer-Related Emergency Department Bounce Backs: Describing the Population and Assessing Outcomes. Ann Emerg Med 2016;68(4):S387.

230. Kurz M C, Schmicker R, Leroux B, Nichol G, Aufderheide T, Cheskes S, Gray R, Jasti J, Kudenchuk P, Vilke G, Buick J , Wittwer L , Shani R, Brienza A, Straight R and Wang H E: Abstract 16472: Advanced vs. Basic Life Support in the Treatment of Out-of-Hospital Cardiopulmonary Arrest in the Resuscitation Outcomes Consortium. Circulation. 2016;134:A16472.

231. Cheskes S, Schmicker R, Morrison L, Rea T, Grunau B, Drenna I, Leroux B, Vaillancourt C, Schmidtt A, Kudenchuk P, Aufderheide T, Herren H, Vilke G, Flickinger K, Charleston M, Straight R, Jasti J, Christenson J: Abstract 13871: Does Compliance With a Global Cpr Quality Benchmark Predict Survival From Out-Of-Hospital Cardiac Arrest? Circulation. 2016;134:A13871

232. Castillo EM, Ko K, Howard J, Vilke GM, Hsia R, Killeen JP, Brennan J. The Rate and Patient Characteristics of 7-Day ED Revisits among Senior Patients. Acad Emerg Med 2017; 24 (S1):S37-S38.

233. Hornbeak K, Castillo EM, Sloane C, Vilke GM. Injuries Associated with Law Enforcement Use-of-force Incidents with and without Subject Intoxication. Acad Emerg Med 2017; 24 (S1):S131.

PUBLICATIONS, continued:

COP-STICKNEY007339

Abstracts

234.  Coyne C, Li D, Brennan J, Castillo E, Vilke GM. Evaluating cancer-related pain
      management in the emergency department setting. Acad Emerg Med 2017; 24 (S1):S148-
      S149.

235.  Brennan J, Vilke GM, Hsia R, Killeen JP, Castillo EM. Emergency department visits
      following hospital admissions. Acad Emerg Med 2017; 24 (S1):S159.

236.  Vilke GM, Holman M, Brennan B, Castillo EM. Evaluation of the Risk of Carotid Artery
      Injury in Strangulation. Acad Emerg Med 2017; 24 (S1):S211-S212.

237.  Coyne CJ, Brennan J, Castillo EM, Vilke GM. Conducting Meaningful Population-Based
      Research on Patients with Cancer Who Present To the Emergency Department - A Study on
      The Methodology of Categorization. Acad Emerg Med 2017; 24 (S1):S223.

238.  Miller A, Brennan J, Vilke GM, Castillo EM. Knowledge and Concern over Ingredients in
      Packaged Food and Personal Hygiene Products among Emergency Department Patients.
      Acad Emerg Med 2017; 24 (S1):S248.

239.  Killeen JP, Castillo EM, Vilke GM, Chan TC, Dunford JK, Kahn C, Powell R, Sparks J,
      Pringle J, Chavez DJ, Branning MD. Prehospital to Emergency Department Data Exchange-
      a SAFR Transition of Care. Ann Emerg Med 2017; 70(4): S2.

240.  Sloane C, Mash DC, Chan TC, Kolkhorst F, Neuman T, Castillo EM, Vilke GM.
      Assessment of Stress Markers in Restrained Individuals Following Physical Stress with and
      Without a Sham TASER Activation. Ann Emerg Med 2017; 70(4): S41.

241.  Brennan JJ, Chan TC, Vilke GM, Killeen JK, Hsia RY, Castillo EM. ED Revisits within 3
      Days of an ED Discharge for Urinary Tract Infection among Geriatric Patients. Ann Emerg
      Med 2017; 70(4): S85.

242.  Kreshak, Tolia VT, Chan TC, Killeen JP, Vilke GM, Castillo EM. A Four-Year Descriptive
      Analysis of Geriatric Patients' Visits to the Emergency Department. Ann Emerg Med 2017;
      70(4): S97.

243.  Nakajima Y, Brennan JJ, Castillo EM, Vilke GM. Factors Associated with Ambulance Use
      in Emergency Department Patients. Ann Emerg Med 2017; 70(4): S102.

244.  Tolia VT, Chan TC, Killeen JP, Vilke GM, Kreshak AA, Castillo EM. Evaluation of
      Mobility and Fall Risk among Seniors Presenting to the Emergency Department. Ann
      Emerg Med 2017; 70(4): S102.

245.  Tolia VT, Chan TC, Killeen JP, Vilke GM, Kreshak AA, Castillo EM. Identification of
      Unrecognized Delirium in Senior Emergency Department Patients. Ann Emerg Med 2017;
      70(4): S105.
PUBLICATIONS, continued:

COP-STICKNEY007340

Abstracts

246.    Brennan JJ, Chan TC, Vilke GM, Hsia RY, Killeen JK, Castillo EM. Geriatric visits to
        California Emergency Department from 2008 through 2014. Ann Emerg Med 2017; 70(4):
        S158-S159.

247.    Coyne CJ, Ence T, Smyres C, Brennan J, Castillo E, Vilke GM. The relationship between
        medication knowledge, perceived importance, and medication adherence. Ann Emerg Med
        2017; 70(4): S169.

248.    Vilke GM, Brennan JJ, Chan TC, Hsia RY, Killeen JP, Castillo EM. Emergency
        Department Utilization Three Days Prior to a Septicemia Diagnosis among Geriatric
        Patients. Acad Emerg Med 2018;70(4):S45.

249.    Coyne CJ, Ha E, Brennan JJ, Castillo EM, Birring P, Shah S, Vilke GM. Cancer-Related
        Venous Thromboembolism in the Emergency Department: A Retrospective Cohort
        Study. Acad Emerg Med 2018;70(4):S72.

250.    Castillo EM, Vuong CL, Vilke GM, Brennan JJ, Hsia RY, Killeen JP. 30-Day
        Readmissions among Elderly Patients Discharged with an Acute Myocardial
        Infraction. Acad Emerg Med 2018;70(4):S120.

251.    Coyne CJ, Brennan JJ, Castillo EM, Vilke GM. Cancer-Related Emergency Department
        Visits in the Elderly: Comparing Characteristics and Outcomes. Acad Emerg Med
        2018;70(4):S121.

252.    Vilke GM, Lutz M, Sloane C, Castillo E, Brennan J, Swift S, Coyne C. Physiological
        Effects of a Spit Sock. Ann Emerg Med 2018; 72(4): S56.

253.    Tolia VM, Kreshak AA, Chan TC, Brennan JJ, Vilke GM, Castillo EM. Initial Risk
        Screening and Impact of Evaluation for Geriatric Emergency Department Patients. Ann
        Emerg Med 2018; 72(4): S83.

254.    Castillo EM, Cronin AO, Chan TC, Brennan JJ, Vilke GM, Killeen JP, Hsia RY. Trends in
        Drug and Alcohol Use from 2008 Through 2016. Acad Emerg Med 2019; 26(S1):S41.

255.    Castillo EM, Brennan JJ, Hsia RY, Vilke GM, Killeen JP, Chan TC. Trends in Emergency
        Department Discharges from 2008 Through 2016. Acad Emerg Med 2019; 26(S1):S61.

256.    Castillo EM, Tolia VM, Kreshak AA, Brennan JJ, Chan TC, Vilke GM, Hsia RY. A
        Description of Geriatric Patients Presenting to California Emergency Departments for a
        Fall-Related Complaint. Acad Emerg Med 2019; 26(S1):S90-1.

COP-STICKNEY007341

PUBLICATIONS, continued:

Abstracts

257.  Killeen JP, Docter TA, Brennan JJ, Castillo EM, Vilke GM, Chan TC, Tolia VM. Comparison of Length of Stay for Patients with High Sensitivity Troponin vs Standard Troponin. Acad Emerg Med 2019; 26(S1):S352.

258.  Tolia VM, Chan TC, Brennan JJ, Castillo EM, Vilke GM, Wardi G, Kreshak AA. The Impact of a Short Hospital Worker Strike on Emergency Department Utilization. Acad Emerg Med 2019; 26(S1):S236.

259.  Vilke GM, Mash D, Pardo M, Bozeman W, Hall C, Sloane C, Wilson M, Coyne CJ, Xie C, Castillo EM. Excitation Study — Unexplained In-Custody Deaths: Evaluating Biomarkers of Stress and Agitation. Acad Emerg Med 2019; 26(S1):S260.

260.  Castillo EM, Vuong C, Brennan JJ, Chan TC, Cronin AO, Vilke GM. Electric Scooter-Related Injuries after their Introduction into a Large Metropolitan Area. Academic Emergency Medicine. 2020;27(S1): S183.

COP-STICKNEY007342

<u>ORAL PRESENTATIONS AT NATIONAL MEETINGS</u>:

1.  Chan TC, Buchanan J, Anderson M, Vilke GM:  Patient ethnicity and age in prehospital emergency ambulance use and acuity rates.  NAEMSP Mid-Year Meeting, Lake Tahoe, Nevada; July 1998.

2.  Vilke GM, Dunford JV, Buchanan J, Chan TC:  Are opiate overdose deaths related to patient release after naloxone?  ACEP Research Forum, San Diego, California; October 1998.

3.  Gerling MC, Hamilton RS, Davis DP, Morris GF, Vilke GM, Hayden SR:  The effects of cervical spine immobilization on technique and laryngoscope blade selection on an unstable cervical spine injury in a cadaver model of intubation.  ACEP Research Forum, San Diego, California; October 1998.

4.  Vilke GM, Chan TC, Ray LU, Anderson ME:  Use of prehospital crash injury data to assess regional automobile safety restraint use.  NAEMSP Annual Meeting, Marcos Island, Florida; January 1999.

5.  Chew GS, Chan TC, Bramwell K, Davis DP, Vilke GM:  Does gastric distention from air insufflation affect the accuracy of the syringe esophageal detector device in detecting esophageal intubation?  SAEM Western Regional Research Forum, Redondo Beach, California; March 1999.

6.  Davis DP, Kimbro T, Vilke GM:  The use of midazolam for prehospital rapid-sequence intubation may be associated with a dose-related increase in hypotension.  NAEMSP Annual Meeting, Dana Point, California; January 2000.

7.  Marino AT, Sharieff G, Gerhart AE, Chan TC, Vilke GM:  The efficacy and complication rate of prehospital midazolam for the treatment of pediatric seizures.  NAEMSP Annual Meeting, Dana Point, California; January 2000.

8.  Eisele JW, Chan T, Vilke G, Neuman T, Clausen J:  Effect of weight placed on the back of subjects in the hobble restraint position.  American Academy of Forensic Sciences Annual Meeting, Reno, Nevada; February 2000.

9.  Chan TC, Vilke GM, Neuman TS, Clark RF, Clausen JL:  The effect of oleoresin capsicum spray inhalation on pulmonary and respiratory function.  SAEM Western Regional Research Forum, Portland, Oregon; April 2000.

10. Vilke GM, Chan TC, Seltzer A, Fisher R, Dunford JV:  Outcome of out-of-hospital refusal of paramedic transport by parents of pediatric patients.  State of California EMS Authority EMS for Children Annual Conference, San Diego, California; November 2000.

11. Deitch S, Vilke GM, Marino A, Vroman D, Chan TC:  Effect of prehospital use of nitroglycerine on EKG findings in patients with chest pain.  American Academy of Emergency Medicine Annual Conference, Orlando, Florida; March 2001.

COP-STICKNEY007343

12. Vilke GM, Steen PJ, Smith AM, Chan TC: Pediatric intubation by paramedics: The San Diego County experience. SAEM Western Regional Research Forum, Irvine, California; March 2001.

13. Davis DP, Ochs M, Hoyt DB, Dunford JV, Vilke GM: The use of the Combitube as a salvage airway device for paramedic RSI. SAEM Western Regional Research Forum, Irvine, California; March 2001.

14. Chan TC, Dunford JV, Vilke GM: Impact of a community multidisciplinary homeless outreach team. SAEM Annual Meeting, Atlanta, Georgia; May 2001.

15. Chan TC, Dunford JV, Vilke GM: Impact of a community multidisciplinary homeless outreach team. CAL/ACEP Scientific Assembly, Santa Clara, California; June 2001. (Won Award for Best Oral Presentation)

16. Valentine C, Davis D, Ochs M, Hoyt D, Bailey D, Vilke G: The use of the Combitube as a salvage airway device for paramedic rapid sequence induction. NAEMSP Annual Meeting, Tucson, Arizona; January 2002.

17. Vilke GM, Lev R, Castillo EM, Metz MA, Murrin PA, Chan TC: Prospective countywide trial to decrease ambulance diversion hours. SAEM Western Regional Meeting, Scottsdale, Arizona; April 2003.

18. Vilke GM, Lev R, Castillo EM, Murrin PA, Chan TC: Prospective countywide trial to decrease ambulance diversion hours. SAEM Annual Meeting, Boston, Massachusetts, May 2003.

19. Vilke GM, Lev R, Castillo EM, Metz MA, Murrin PA, Chan TC: San Diego County improved patient destination trial to decrease emergency department diversion hours and diverted patients. American College of Emergency Physicians Research Forum, Boston, Massachusetts; October 2003.

20. Vilke G, Castillo E, Metz M, Murrin P, Ray LU, Lev R, Chan T: Community trial to decrease ambulance diversion of patients and hours. NAEMSP National Conference, Tucson, Arizona; January 2004.

21. Marcelyn Metz, Patricia Murrin, Gary M. Vilke: The three-phase EMS cardiac arrest model for ventricular fibrillation. ENA Annual Meeting; San Diego, California; October 2004.

22. Michalewicz, BA, TC Chan, GM Vilke, SS Levy, TS Neuman, and FW Kolkhorst: Ventilatory and metabolic demands during aggressive physical restraint in healthy adults. American College of Sports Medicine Annual Meeting, Denver, CO; June 2006. [*Medicine and Science in Sports and Exercise* 38(5 Supplement), 2006].

23. Vilke GM, Ali S, Simmons T, Witucki P, Wilson MP. Does an alcohol-based sanitizer impact breathalyzer levels? SAEM Annual Meeting, Chicago, Illinois; May 2012.

COP-STICKNEY007344

<u>SELECTED SPEAKING ENGAGEMENTS</u>:

1.  "Death of a Child: How to Treat the Survivors" -- Grand Rounds, Department of Emergency Medicine, UCSD Medical Center; April 1996.

2.  "Assessing GCS and the Field Neurologic Exam" -- Palomar College Paramedic Training; June 1998.

3.  "Prehospital Shock"; "Management of the Field Trauma Patient" -- Mercy Air, Ventura County Lecture Series; August 1998.

4.  "ER: Not Just a Television Show, But a Field of Research" -- Howard Hughes Foundation Lecture Series, University of California, San Diego; November 1998.

5.  "Multi-Casualty  Incident" -- UCSD Medical Center Trauma Conference; March 1999.

6.  "Managing the Prehospital Multi-Casualty Incident" -- Southwestern College Paramedic Training Institute; May 1999.

7.  "Aeromedical Transport: The Past and Current Environment" -- Trauma Morbidity and Mortality Conference, Children's Hospital, San Diego, California; July 1999.

8.  "Altitude Medicine"; "Carbon Monoxide Poisoning and Treatment Options"; "Aeromedical Transport Options"; "Emergent Airway Management Options" -- Rural Emergency Medicine Conference, Jackson Hole, Wyoming; August 1999.

9.  "Abdominal and Chest Trauma in Sports" -- First Annual San Diego County Athletic Coaches Workshop, San Diego, California; June 2000.

10. "Tabletop Discussion on Chemical Weapon of Mass Destruction" -- Facilitator of Tabletop Training for San Diego County Metropolitan Medical Strike Team; July 2000.

11. "Pediatric IV Access"; "Spinal Immobilization"; "Children with Special Health Care Needs"; "Cardiovascular Emergencies" -- American Academy of Pediatrics Pediatric Education for Prehospital Professionals Conference, San Diego, California; November 2000.

12. "New Frontiers in Field Management of Pediatric Status Epilepticus" -- State of California EMS Authority Annual EMS for Children Conference, San Diego, California; November 2000.

13. "EMS Medical Control: Avoiding your Day in Court" -- ACEP's Emergency Medicine Connection Conference, San Diego, California; March 2001.

14. "Pediatric Intubations by Paramedics" -- San Diego Chapter of the Committee on Pediatric Emergency Medicine; April 2001.

15. "Warfare and Terrorism: A Review of Chemical Agents -- San Diego County Metropolitan Medical Strike Team Training; August 2001.

COP-STICKNEY007345

16. "Bioterrorism and San Diego County" -- Council of Community Clinics Meeting; October 2001.

17. "Bioterrorism and San Diego County Readiness" -- CTN interview with Bill Horn; October 2001.

18. "Future of Prehospital Care" -- Keynote Speaker, Southwestern Paramedic College Graduation; November 2001.

19. "Biological Agents for Terrorism" -- San Diego County Metropolitan Medical Strike Team Training; November 2001.

20. "Clinical Aspects of Bioterrorist Agents" -- Palomar Paramedic College; November 2001.

21. "Clinical Aspects of Bioterrorism" -- Grand Rounds, Fallbrook Hospital; January 2002.

22. "Bioterrorism and San Diego County Readiness" -- Poway Town Hall Meeting; January 2002.

23. "Bioterrorist Preparedness" -- National Medical Association, San Diego County; January 2002.

24. "Chemical Agents of Terrorism: Diagnosis and Treatment" -- Topics and Advances in Internal Medicine, San Diego, California; March 2002.

25. "Bioterrorism: Implications for the Legal and Domestic Community" -- Thomas Jefferson School of Law, San Diego, California; April 2002.

26. "Prehospital Management of Pediatric Seizures" -- EMS-Children Annual Conference; San Diego, California; November 2002.

27. "Paramedicine – Past, Present and Future" -- Keynote Speaker, Southwestern Paramedic College Graduation; San Diego, California; December 2002.

28. "Medical Group Preparedness: How would you Respond to a Possible Victim of Bioterrorism?" -- Bioterrorism Preparedness Training Conference; San Diego California; January 2003.

29. "Update on Bioterrorism" -- The Western States Winter Conference on Emergency Medicine; Park City, Utah; January 2003.

30. "Academic Emergency Medicine and Research Opportunities" -- San Diego Health Information Association, San Diego, California; February 11, 2003.

32. "Blast and Radiological Injuries: Myths and Realities" -- San Diego County Metropolitan Medical Strike Team Training; San Diego, California; August 2003.

COP-STICKNEY007346

33.  "Clinical Aspects of Bioterroism" -- American Correctional Health Services Association, California and Nevada Chapter Annual Conference, San Diego, California; September 2003.

34.  "Bioterrorism" -- UCSD/SDSU General Preventive Medicine Residency Lecture Series, La Jolla, California; October 2003.

35.  "Prehospital Pediatric Airway Obstruction" – Children's Hospital Grand Rounds, San Diego, California; July 2004.

36.  "Future of Healthcare in San Diego: Trends Impacting our Delivery System" -- San Diego Organization of Healthcare Leaders, San Diego, California; August 2004.

36.  "Firestorm 2003" -- Children's Hospital Grand Rounds, San Diego, California; January 2004.

37.  "EMS research: Unique ethical and regulatory issues" -- Applied Research Ethics National Association Annual meeting, San Diego, California; October 2004.

38.  "What happens when you call 911?" -- San Diego Sports Medicine Foundation, San Diego, California; October 2004.

39.  "Making the Metropolitan Medical Response System Work for You" -- Emergency Response 2004 Conference, San Diego, California; November 2004.

40.  "San Diego County Emergency Department Ambulance Bypass - Past, Present, Future" -- Urgent Matters Briefing, San Diego, California; November 2004.

41.  "San Diego County Emergency Department Ambulance Bypass - Past, Present, and Future" -- San Diego Community Emergency Departments, San Diego, California; December 2, 2004.

42.  "Emergency Response Management for Efficiency of Care and Fiscal Consideration" -- American Correctional Health Services Association, Oakland, California; April 2, 2005.

43.  "Conducted Energy Devices – Medical Updates and Issues" -- Police Executive Research Forum, Houston, Texas; October 18, 2005.

44.  "Conducted Energy Devices Proximity Deaths and Medical Response" -- 2005 Critical Issues in Policing Series, Police Executive Research Forum, San Diego, California; December 8, 2005.

45.  "Conductive Electrical Devices (Tasers®) and Patients with Excited Delirium for Law Enforcement and Emergency Medical Personnel" -- The U.S. Metropolitan Municipalities EMS Medical Directors Annual Meeting, Dallas, Texas; February 16, 2006.

46.  "Tasers and Sudden Death" -- Keynote speaker at One Day Symposium on In-Custody Deaths by the Florida Sheriffs Association, Orlando, Florida; June 1, 2006.

COP-STICKNEY007347

47. "Medical Aspects of the Use of Force Continuum" -- Department of Justice Community Oriented Policing Services (COPS) Conference, Washington, DC; July 29, 2006.

48. "Resuscitation Outcomes Consortium" -- 7th Annual University of California Neurotrauma Meeting, Carmel, California; August 3, 2006.

49. "Use of Force:  Sudden Death Myths and Excited Delirium" -- The Commission of Accreditation for Law Enforcement Agencies (CALEA) Less Lethal Technology Working Group Meeting, Washington, DC; September 10, 2006.

50. "Police In-Custody Deaths and the Taser Controversy" -- UCSD/SDSU General Preventive Medicine Residency Lecture Series, La Jolla, California; September 2006.

51. "Conductive Energy Devices:  The medical aspects of Taser Electronic Control Devices (ECDs) and other Energy Devices" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 16-17, 2006.

52. "Cardiac, Respiratory and Metabolic Effects of EMD" – Study of Deaths Following Electro Muscular Disruption, Meeting of the Chief Medical Panel for the National Institute of Justice. Washington D.C.; January 9, 2007.

53. "The Medical Implications of Tasers and the Impact on EMS " – National Association of EMS Physicians National Conference.  Naples, FL; January 12, 2007.

54. "Excited Delirium" - Solutions For Corrections Seminar for the California State Sheriff's Association.  Ontario, CA; February 7, 2007.

55. "Excited delirium, positional asphyxia and restraint" -- EMS Today Conference, Baltimore, Maryland; March 10, 2007.

56. "Medical implications of Tasers and other Conductive Energy Devices" -- EMS Today Conference, Baltimore, Maryland; March 10, 2007.

57. "Excited Delirium" -- American Correctional Health Services Association, Oakland, California; September 19, 2007.

58. "Human Physiologic Effects of Tasers" – Study of Deaths Following Electro Muscular Disruption, Meeting of the Chief Medical Panel for the National Institute of Justice. Washington D.C.; September 27, 2007.

59. "The clinical impacts of TASER and other Conductive Energy Devices on Humans:  A Review of the latest Medical Research" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 28-30, 2007.

COP-STICKNEY007348

60. "Physiological Effects of Tasers" – The City Council of Miami-Dade. Miami, Florida; January 17, 2008.

61. "Excited Delirium: What is it? Why does it kill? What do we need to know about it? Western States Winter Conference on Emergency Medicine. Park City, Utah, February 8, 2008.

62. "Medical Effects of Tasers" – The City Council of Houston. Houston, Texas; March 10, 2008.

63. "Less Lethal Weapons" - Emergency Nurses Association, San Diego Chapter. San Diego, California; April 18, 2008.

64. "The Clinical Impacts of TASER and other Conductive Energy Devices on Humans and Why People Die Afterwards" -- American Correctional Health Services Association, San Diego, California; September 17, 2008.

65. "Police In-Custody Deaths and Excited Delirium" -- UCSD/SDSU General Preventive Medicine Residency Lecture Series, La Jolla, California; October 2008.

66. "The Clinical Impacts of TASER and other Conductive Energy Devices on Humans" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc. Las Vegas, Nevada; October 29, 2008.

67. "Agitated Delirium – Role of Illicit Drug Use in Sudden Restraint Death" Western Medical Toxicology Fellowship Conference. San Diego, California; April 29, 2009.

68. "Conducted Energy Devices: Are They Safe Options?" Excited Delirium Conference by the Canadian Institute for the Prevention of In-Custody Deaths, Inc. Niagara Falls, Canada; May 26, 2009.

69. "The Physiologic Effects of the Taser on Humans" UCSD Biomedical and Clinical Research Seminars. San Diego, California; June 2, 2009.

70. "The Taser-Plastic Surgery Interface" UCSD Department of Plastic Surgery Grand Rounds. San Diego, California; June 17, 2009.

71. "ECD Research Update and Safety Issues" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc. Las Vegas, Nevada; November 12, 2009.

72. "Use of the Restraint Chair and Positional Asphyxia" – Southern California Jail Manager's Association. Temecula, California; January 21, 2010.

COP-STICKNEY007349

73. "Excited Delirium Challenges and Best ER Practices" Excited Delirium Conference by the Canadian Institute for the Prevention of In-Custody Deaths, Inc. Niagara Falls, Canada; April 19, 2010.

74. "Excited Delirium and TASERs:  What Physicians Need to Know" – Grand Rounds Scripps Encinitas Hospital.  Encinitas, California; July 15, 2010.

75. "Excited Delirium and TASERs:  What Physicians Need to Know" – Grand Rounds University Medical Center.  Las Vegas Nevada; August 10, 2010.

76. "Review of ECD Research and Reported Cardiac Capture" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 17, 2010.

76. "The Science Behind the American Heart Association ACLS Guidelines" – Puerto Vallarta ACLS Resuscitation Conference.  Puerto Vallarta, Mexico; February 18, 2011.

77. "The Science Behind the American Heart Association ACLS Guidelines" – Cabo San Lucas ACLS Resuscitation Conference.  Cabo San Lucas, Mexico; March 25, 2011.

78. "ROC Cardiac Arrest Outcomes" – San Diego Resuscitation Conference.  San Diego, California; April 9, 2011.

79. "Do Electronic Control Devices Kill Humans: Review of the Data" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 16, 2011.

80. "Evaluation After Choking or Strangulation" – UCSD Forensic Nursing Conference. San Diego, California; April 28, 2012.

81. "Prehospital Hypothermia for Cardiac Arrest" – Santa Clara County EMS Conference. San Jose, California; May 23, 2012.

82. "The Science Behind the American Heart Association ACLS Guidelines" – Cabo San Lucas ACLS Resuscitation Conference.  Cabo San Lucas, Mexico; August 21, 2012.

83. "Acute Cerebral Accidents" – Hermosillo ACLS Resuscitation Conference.  Hermosillo, Sonora, Mexico; September 11, 2012.

84. "Excited Delirium Syndrome: TASERS, Restraints, and Sudden Death" – Emergency Nurses Association Annual Conference.  San Diego, California; September 15, 2012.

85. "Electronic Control Devices and the not so Shocking Truth about their Lethality" – Sudden Death, Excited Delirium and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; November 14, 2012.

COP-STICKNEY007350

86. "Medical Evaluation and Detection of Dementia and Delirium" – Annual Update on Behavioral Emergencies Conference. Las Vegas, Nevada, December 5, 2012.

87. "Acute Cerebral Accidents" – Puerto Vallarta Resuscitation Conference. Puerto Vallarta Mexico; January 17, 2013.

88. "Excited Delirium Syndrome: TASERS, Restraints, and Sudden Death" – San Diego County Emergency Nurses Association 911 Conference. San Diego, California; April 19, 2013.

89. "Acute Cerebral Accidents" – Cabo San Lucas Resuscitation Conference. Cabo San Lucas Mexico; April 27, 2013.

90. "Acute Myocardial Infarction" – Mazatlan Resuscitation Conference. Mazatlan Mexico; May 7, 2013.

91. "Hypothermia Post Cardiac Arrest" –Acapulco Resuscitation Conference. Acapulco, Mexico; May 28, 2013.

92. "Bath Salts and In-Custody Death"- National Sheriff's Association. Charlotte, NC; June 25, 2013.

93. "Updates in Cardiac Arrest: The ROC Trials" – Mexico Association of Emergency Medicine Emergency Update Conference. Mexico City, Mexico; June 28, 2013.

94. "Management of Head Trauma" – Mexico Association of Emergency Medicine Emergency Update Conference. Mexico City, Mexico; June 28, 2013.

95. "Hypothermia Post Cardiac Arrest" –La Paz Resuscitation Conference. La Paz, Mexico; July 22, 2013.

96. "Management of Head Trauma" – Mexico Association of Emergency Medicine Emergency Update Conference. Monterrey, Mexico; September 26, 2013.

97. "Updates in Cardiac Arrest: The ROC Trials" – Mexico Association of Emergency Medicine Emergency Update Conference. Monterrey, Mexico; September 26, 2013.

98. "Risk Management and Minimizing Malpractice Exposure" – UCSD Department of Orthopedics Grand Rounds, San Diego, CA October 2, 2013.

99. "Decreasing Your Risk in Labor and Delivery" – UCSD 9th Annual Perinatal Symposium, San Diego, CA October 11, 2013.

100. "Excited Delirium Syndrome: TASERS, Restraints, and Sudden Death" – UCSD Department of Emergency Medicine Grand Rounds, San Diego, CA November 11, 2013.

COP-STICKNEY007351

101. "Excited Delirium Syndrome" – Annual Update on Behavioral Emergencies Conference. Orlando, Florida; December 12, 2013.

102. "The importance of CT on the initial evaluation of a trauma patient: ABC or AB-CT ?" – Primero Simposium Internacional BNH con UCSD Celebrado en Los Cabos. Los Cabos, Mexico; December 7, 2013.

103. "Management of Head Trauma" –Emergency Medicine Update Conference. Puerto Vallarta, Mexico; December 18, 2013.

104. "Updates in Cardiac Arrest: The ROC Trials" – Emergency Medicine Update Conference. Puerto Vallarta, Mexico; December 18, 2013.

105. "Pulmonary Embolism: Evaluation and Treatment"- 25th Annual Mexico Emergency Medicine Congress. Acapulco, Mexico; February 20, 2014.

106. "Management of Head Trauma" –Emergency Medicine Update Conference. Puerto Vallarta, Mexico; March 5, 2014.

107. "Updates in Cardiac Arrest: The ROC Trials" – Emergency Medicine Update Conference. Puerto Vallarta, Mexico; March 5, 2015.

108. "Management of Burns" –Trauma Update Conference. Puerto Vallarta, Mexico; April 3, 2014.

109. "Management of Head Trauma" –Trauma Update Conference. Puerto Vallarta, Mexico; April 3, 2014.

110. "Cuffs, Chains and Chairs" – Restraint and In-Custody Death Conference by the Institute for the Prevention of In-Custody Deaths, Inc. Las Vegas, Nevada; April 24, 2014.

111. "Management of Burns" –Trauma Update Conference. Los Cabos, Mexico; June 5, 2014.

112. "Management of Head Trauma" - Primera Feria Annual de la Salud. Guadalajara, Mexico; July 18, 2014

113. "Management of Burns" - Primera Feria Annual de la Salud. Guadalajara, Mexico; July 18, 2014.

114. "Updates in Cardiac Arrest: The ROC Trials" – Primera Feria Annual de la Salud. Guadalajara, Mexico; July 18, 2014.

115. "Pulmonary Embolism: Evaluation and Treatment"- Primera Feria Annual de la Salud. Guadalajara, Mexico; July 18, 2014.

COP-STICKNEY007352

116.  "Risk Management and Minimizing Malpractice Exposure" – UCSD Department of Anesthesia Pain Service Grand Rounds, San Diego, CA September 24, 2014.

117. "The ABCs of CPR" –Huatulco Resuscitation Conference.  Huatulco, Mexico; October 2, 2014.

118. "Risk Management and Minimizing Malpractice Exposure" – UCSD Division of Gastroenterology Grand Rounds, San Diego, CA October 16, 2014.

119. "Identification and Treatment of Excited Delirium Syndrome" - Annual Update on Behavioral Emergencies Conference. Scottsdale, Arizona; December 11, 2014.

120. "Autopsy of an In-Custody Death" – Defense Research Institute Annual Conference, San Diego, CA January 30, 2015.

121. "TASERS:  The shocking truth"- 26th Annual Mexico Emergency Medicine Congress. Mazatlan, Mexico; February 5, 2015.

122. "Resuscitation Update:  CPR, Hypothermia and new devices" - 26th Annual Mexico Emergency Medicine Congress. Mazatlan, Mexico; February 5, 2015.

123. "Management of Head Trauma" - Segundo Feria Annual de la Salud.  Guadalajara, Mexico; May 22, 2015.

124. "Updates in Cardiac Arrest:  The ROC Trials" – Segundo Feria Annual de la Salud. Guadalajara, Mexico; May 22, 2015.

125. "Pulmonary Embolism: Evaluation and Treatment"- Segundo Feria Annual de la Salud. Guadalajara, Mexico; May 22, 2015.

126. "Resuscitation Update:  CPR, Hypothermia and new devices" – Altitude and Travel Medicine Symposium. Cusco, Peru; August 21, 2015.

127. "Approaches to Stabilization, Transfer and Disposition of Tourist with Multiple Trauma – Altitude and Travel Medicine Symposium. Cusco, Peru; August 21, 2015.

128. "Risk Management and Minimizing Malpractice Exposure" – UCSD Department of Orthopedics Grand Rounds, San Diego, CA December 2, 2015.

129. "Ketamine and EMS" – Annual Update on Behavioral Emergencies Conference.  Las Vegas, Nevada; December 3, 2015.

130. "Pulmonary Embolism: Evaluation and Treatment"- 27th Annual Mexico Emergency Medicine Congress. Puerto Vallarta, Mexico; February 4, 2016.

COP-STICKNEY007353

SELECTED SPEAKING ENGAGEMENTS, continued:

131. "The importance of CT on the initial evaluation of a trauma patient: ABC or AB-CT ?" – 27th Annual Mexico Emergency Medicine Congress. Puerto Vallarta, Mexico; February 4, 2016.

132. "Risk Management and Minimizing Malpractice Exposure" – UCSD Department of Dermatology Grand Rounds, San Diego, CA February 11, 2016.

133. "Remembering the Provider" – Southern California Association of Health Risk Managers, Palm Desert, CA May 4, 2016.

134. "The ABCs of CPR" –San Miguel Health Fair.  San Miguel, Mexico; July 15, 2016.

135. "Beware of the Medically Fragile Patient"- Special Needs Conference by the Institute for the Prevention of In-Custody Deaths, Inc.  Las Vegas, Nevada; March 7, 2017.

136. "Avances en Tromboembolia Pulmonar"- 3rd Annual Congreso Binacional de Medicine de urgencias y Trauma, Tijuana, Mexico; May 5, 2017.

137. "Caso Clinico de Trauma"- 3rd Annual Congreso Binacional de Medicine de urgencias y Trauma, Tijuana, Mexico; May 5, 2017.

138. "Avances en Aeromedicina"- 3rd Annual Congreso Binacional de Medicine de urgencias y Trauma, Tijuana, Mexico; May 6, 2017.

139. "Science of Restraint, Position/Compression and Asphyxia, and Science Behind Asphyxial Death" – Police Use of Force in Today's World.  Miami, FL; June 26, 2017.

140. "Excited Delirium Syndrome and the Risk of Litigation" – California Crisis Intervention Team Association Annual Meeting.  Costa Mesa, CA; August 24, 2017.

141. "Medico-legal Issues in the Acutely Agitated Patient" – Coalition on Psychiatric Emergencies Pre-Conference. Scottsdale, Arizona, December 15, 2017.

142. "Updates on Excited Delirium" – Annual Update on Behavioral Emergencies Conference. Scottsdale, Arizona, December 15, 2017.

143. "When Should Ketamine be Used in the Treatment of Agitation?" – International Conference on Emergency Medicine.  Mexico City, Mexico, June 8, 2018.

144. "Avances en Tromboembolia Pulmonar"- 3rd Annual Congreso Binacional de Medicine de urgencias y Trauma, Tijuana, Mexico; June 7, 2019.

145. "Excited Delirium in the ED: Clinical Pearls" – Southern California EM Symposium, Los Angeles, California.  February 1, 2020.

146. "Updates in Treating Excited Delirium Syndrome"- 31st Emergency and Reanimation Congress, Acapulco, Mexico.  February 12, 2020.

COP-STICKNEY007354

<u>SELECTED SPEAKING ENGAGEMENTS, continued</u>:

147. "Management of Acute Agitation in the Emergency Department"- 31st Emergency and Reanimation Congress, Acapulco, Mexico.  February 12, 2020.

148. "Debate on Excited Delirium and Treatment" – Annual Update on Behavioral Emergencies Conference. Zoom, December 2, 2020.

149. "Excited Delirium Syndrome" – San Diego County Methamphetamine Strike Force.  San Diego, California, December 4, 2020.

COP-STICKNEY007355

*APPENDIX B*

**Testimony for last 4 years**

**Deposition Testimony**

November 20, 2017
Elaine Bridges v County of Los Angeles, et al
Superior Court of California, County of Los Angeles South District
Case No.: TC028303
Attorney: Keith Wyatt
Defense: Jail asthmatic death

December 4, 2017
C.R. et al. v. City of Antioch et. al. (Death of Rakeem Rucks)
U.S. District Court Northern District of California
Case Number: 3:16-cv-03742-EDL
Attorney: Noah Blechman
Defense: Restraint death, ExDS

December 6, 2017
Kelli Denise Goode, et al v The City of Southaven, et al.
U.S. District Court Northern District of Mississippi Oxford Division
Case Number: 3:1-cv-060-DMB-RP
Attorney: John Goode
Defense: Restraint death, ExDS

December 11, 2017
Robinson v City of Redding, et al.
U.S. District Court Eastern District of California
Case Number: 2:14-cv-02910-KJM-KJN
Attorney: Gary Brickwood
Defense: Restraint death, spit mask, ExDS

December 17, 2017
Matthew Prunty v State of Louisiana, et al
Office of Worker's Compensation, State of Louisiana
Case Number: 14-00831
Attorney Robert Dunkelman
Defense: TASER work comp injury case

January 19, 2018
Shainie Lindsey, et. al. v. City of Pasadena, et. al.
U.S. District Court, Central District of California
Case Number: CV16-08602 SJO(RAOx)
Attorney: Kevin Osterberg
Defense: In-custody death, restraint, TASER

COP-STICKNEY007356

March 19, 2018
James Neuroth v. Mendocino County, et al.
U.S. District Court, Northern District of California
Case Number: 1:15-cv-03226
Attorney: Kathleen M. Kunkle
Defense: In-custody death, restraint

April 24, 2018
Jean Suarez v. City of Hollywood, et. al.
U.S. District Court, Southern District of Florida
Case Number: 0:16-CV-62215-WPD
Attorney: Adam Hapner
Defense: In-custody death, restraint, TASER, ExDS

June 5, 2018
Alex Aguilar, Jr, et al v. City of Los Angeles, et al
U.S. District Court, Central District of California
Case No.: 2:17-cv-043882-CBM-MRW
Attorney: Calvin House
Defense: In-custody death, ingested bindle, TASER

August 28, 2018
Ramos, et al. v. Town of East Hartford, et al
U.S. District Court, District of Connecticut
Case No. 3:16-CV-00166 (VLB)
Attorney: Sara Murphy
Defense: In-custody death, TASER

September 20, 2018
Magilson vs. Total Access Urgent Care, PC, et al.,
Circuit Court of St. Louis County State of Missouri
Case No. 15SL-CC04289
Attorney: Andrew Eastman
Defense: Urgent care PE death

September 24, 2018
Estate of Tashi Farmer v. Las Vegas Metropolitan Police Department, et. al.
U.S. District Court District of Nevada
Case No. 2:17-cv-01946-JCM-PAL
Attorney: Matt Wolf
Defense: In custody death, TASER, neck hold

September 27, 2018
Albertha Fletcher, et al v City of New London, et al
U.S. District Court District of Connecticut
Case No. 3:16-cv-241 (MPS)
Attorney: Rhonda Rooney
Defense: Agitation evaluation and management in ED

COP-STICKNEY007357

October 19, 2018
Roy Nelson III, Successor-in-Interest to Decedent Roy Nelson, et al. v. City of Hayward, et al.
U.S. District Court Northern District of California
Case No. 3:16-cv-7222
Attorney: Raymond Rollan
Defense: WRAP restraint in-custody death

December 18, 2018
Dennis P. Murphy v. Sandoval County, et al
U.S. District Court District of New Mexico
Case No. 1:17-cv-585-SWS/MLC
Attorney: Nick Autio
Defense: heroin withdrawal, renal failure jail death

February 6, 2019
Saly Martinez et al. v. USA, et al.
U.S. District Court, District of Arizona
Case No: CV-17-01876-PHX-JJT
Attorney: Larry Tinsley
Defense: Strangulated hernia

February 25, 2019
Susan A. Keyes, et. al.  v James Alexander Hunter, MD, et. al.
Circuit Court of Greene County, Missouri
Case No.:1631-CC-00181
Attorney: Catherine Reade
Defense: Cipro toxicity, diverticulitis

March 7, 2019
Vincent Valenzuela, et. al.  v City of Anaheim, et. al.
U.S. District Court of California, Southern Division
Case No. SACV17-02094 CJC
Attorney:  Jill Williams
Defense: In Custody Death, Neck hold, TASER

March 23, 2019
Humberto Martinez, et al v. City of Pittsburg, et al.
U.S. District Court Northern District of California
Case No.: 4:17-cv-04246
Attorney: Noah Blechman
Defense: In Custody Death, Neck hold, Taser

April 15, 2019
Norma M. Walkes, et al. v Jonatan D. Valdez, M.D., et al
Circuit Court of the Fifth Judicial Circuit in and for Lake County, Florida
Case No.: 2016-CA-001752
Attorney: Daryl Parks

COP-STICKNEY007358

Plaintiff: Hospital treatment of agitation

April 18, 2019
Lester Pride, et. al. vs SSM Health Care St. Louis, et. al.
Circuit Court of St. Charles County, Missouri Eleventh Judicial Circuit
Case No.: 1711-CC00080
Attorney: Stephen Woodley
Plaintiff: Delayed CVA care

April 22, 2019
Chandra Turner, et al vs City of Champaign, et al
U.S. District Court for the Central District of Illinois
Case No.: 17 CV 2261
Attorney: Justin Brunner
Defense: In Custody Death

April 23, 2019
Cassidy Yount vs Raymond Ketting, MD, et. al.
Circuit Court of Scott County, Missouri
Case No.:18SO-CV00399
Attorney: Stephen Woodley
Plaintiff: Delayed CVA carela

May 24, 2019
David Collins, et al v County of San Diego, et al
San Diego Superior Court
Case No. 37-2017-00028981-CU-PN-CTL
Attorney:  Chris Welsh
Defense: hyponatremia at jail

June 5, 2019
Mary H. Garcia, et al. vs County of Riverside, et al.
U.S. District Court, Central District of California
Case No. 5:18-cv-839
Attorney: James Packer
Defense: Restraints and restraint chair

July 19, 2019
A.B., etc, et al vs County of San Diego, et al
U.S. District Court, Central District of California
Case No.: 3:18-cv-01541-MMA-LL
Attorney: Christina Vilaseca
Defense: In Custody Death

September 30, 2019
Trinita Farmer v. Las Vegas Metropolitan Police Department, et. al.
U.S. District Court District of Nevada
Case No. 2:18-CV-00860-GMN-VCF

COP-STICKNEY007359

Attorney: Matt Wolf
Defense: In custody death, TASER, neck hold

December 19, 2019
Norma Montano, et al. v. Sean Esparza, et al.
Pima County Superior Court
Case No. C20180653
Attorney: Nathan Metzgar
Defense: GSW to chest death

April 13, 2020
Christopher Lenihan v County of Los Angeles, et al.
Superior Court of Los Angeles County
Case No. BC656759
Attorney: Michele Goldsmith
Defense: EMS transport of heat related illness

June 11, 2020
Charmane Henderson v City of Torrance, et al.
U.S. District Court, Central District of California
Case No. 2:18-cv-03918-MWF-Ex
Attorney: Michael Watts
Defense: In custody death, TASER

August 7, 2020
Nyerges, et al v. Hillstone Restaurant Group, Inc.
U.S. District Court, District of Arizona
Case No.:2:19-cv-2376-DWL
Attorney: Pari Scroggin
Defense: Choking death

August 27, 2020
Shane Cavanaugh v. County of San Diego, et al.
U.S. District Court Southern District of California
Case No.: 18cv2557-BEN-LL
Attorney: Fernando Kish
Defense: Jail hanging

September 1, 2020
McAtee/George v. CoxHealth, et. al.
Circuit Court of Taney County, Missouri at Forsyth
Case No. : 1946-CC00124
Attorney: Catherine Reade
Defense: Urgent care pediatric heart failure

September 28, 2020
Monica Munoz v Bright Futures Academy, et al
Superior Court of the State of California, County of San Bernardino

COP-STICKNEY007360

Case No: CIVDS1721398
Attorney: Elham Rabbani
Defense: Compression asphyxia

October 30, 2020 (Part1)
Mussalina Muhaymin v City of Phoenix, et al
U.S. District Court, District of Arizona
Case No. CV-17-04565-PHX-SMB
Attorney: Karen Stillwell
Defense: In Custody Death

November 9, 2020
Estate of Todero v. City of Greenwood, et al.
U.S. District Court, Southern District of Indiana, Indianapolis Division
Case No. 1:17-cv-1698-JPH-MJD
Attorney: James Stephenson
Defense: In Custody Death

November 13, 2020
Teresa Perkins v. City of Anaheim
U.S. District Court, Central District of California
Case No. 8:19-cv-00315-JLS-JDE
Attorney: Gregg Audet
Defense: In Custody Death

November 19, 2020 (Part 2)
Mussalina Muhaymin v City of Phoenix, et al
U.S. District Court, District of Arizona
Case No. CV-17-04565-PHX-SMB
Attorney: Karen Stillwell
Defense: In Custody Death

December 15, 2020
M.H. and Juan Solano v County of Orange, et al.
U.S. District Court, Central District of California
Case No.: 8:19-cv-00549-JVS-ADS
Attorney: Jeanne Tollison
Defense: In Custody Death

December 16, 2020
Daniel Prude Grand Jury Investigation
Rochester, NY
Case No. N/A
Attorney Jennifer Sommers
Expert: In Custody Death

January 25, 2021
Katrina Eisinger, et al v. City of Anaheim, et al.

COP-STICKNEY007361

Superior Court of the State of California, County of Orange
Case No.:30-2018-010135259 CU-PA-CJC
Attorney: Moses Johnson
Defense: In Custody Death

February 4, 2021
Felicia Thompson v. Narinder Saukhla, MD, et al.
U.S. District Court, Eastern District of California
Case No. 2:18-cv-02422-WBS-KJN
Attorney: Van Longyear
Defense: Prison medical care

February 11, 2021
Ariel Barker v City of Plaquemine
U.S. District Court, Middle District of Louisiana
Case No. 3:17-cv-340
Attorney: Tara Johnson
Defense: In-custody death

May 5, 2021
Dongyuan Li . vs. City of Santa Ana, et al
U.S. District Court, Central District of California
Case No. 8:20-cv-00068-SB (JDEx)
Attorney: Danielle Foster
Defense: Heat Exhaustion

June 16, 2021
Shewanna Phillip v Harris County, et al
U.S. District Court, Southern District of Texas
Case No.: 4:18-cv-01586
Attorney: Jennifer Callan
Defense: Jail cardiac arrest

June 28, 2021
Russell H. Dawson, et al. v South Correctional Entity (SCORE), et al.
U.S. District Court, Western District of Washington at Seattle
Case No.: 2:119-cv-01987-RSM
Attorney: Heidi Mandt
Defense: Jail medical care

June 29, 2021
Shewanna Phillip v Harris County, et al (part 2)
U.S. District Court, Southern District of Texas
Case No.: 4:18-cv-01586
Attorney: Jennifer Callan
Defense: Jail cardiac arrest

July 12, 2021

COP-STICKNEY007362

Michael Moore v. City of Los Angeles
U. S. District Court, Central District of California
Case No.: CV20-3053 AB (AGRx)
Attorney: Christian Bojorguez
Defense: police actions in ER

July 16, 2021
Quinta Sanders v. Cory Hutcheson, et al.
U. S. District Court, Eastern District of Missouri Southeastern District
Case No: 1:18-CV-00269
Attorney: Robert T. Plunkert
Defense: Cell extraction death

August 9, 2021
Anthony Gagliani, vs. Lexington County Sheriff's Department, et. al.
U.S. District Court District of South Carolina Columbia Division
Case No.: 3:20-cv-03737-JMC-SVH
Attorney: David DeMasters
Defense: Arrest related death

August 17, 2021
Hattie Mennecke v Graydon Skeoch, MD
Superior Court for the State of California, County of San Bernadino
Case No.: CIVDS1713937
Attorney:  Thomas Bradford
Defense: Care of stroke patient

August 19, 2021
Ron Ely v County of Santa Barbara, et al
U. S. District Court, Central District of California
Case No: 2:20-cv-06549 DMG (SKx)
Attorney: Mary Pat Barry
Defense: Stabbing death

August 23, 2021
B.P., as a minor, et al. v. County of San Bernardino, et al
U. S. District Court, Central District of California
Case No.: 5:19-cv-01243-JGB-SP
Attorney:  Pete Ferguson
Defense: Arrest related death

August 24, 2021 (Part 1)
Anthony Perez, et al vs. American Ambulance
U. S. District Court, Eastern District of California, Fresno Division
Case No. 1:18-CV-00127-AWI-EPG
Attorney: Rick Ryan
Defense:  EMS restraint death

COP-STICKNEY007363

September 8, 2021 (Part 2)
Anthony Perez, et al vs. American Ambulance
U. S. District Court, Eastern District of California, Fresno Division
Case No. 1:18-CV-00127-AWI-EPG
Attorney: Rick Ryan
Defense: EMS restraint death

September 10, 2021
Brian Dunnigan v York County, et al.
U. S. District Court, Eastern District of Maine
Case 2:19-cv-00450-GZS
Attorney: Peter Marchesi
Defense: TASER burns

September 20, 2021
Estate of Michael Barrera v. City of Woodland, et al.
U. S. District Court, Eastern District of California
Case No: 2:18-cv-00329
Attorney: Derick Konz
Defense: In custody death during restraint

September 21, 2021
Roberto and Michelle Carrillo v. Mercy Health East Communities et al
Circuit Court of Lincoln County, Missouri
Case No. 18L6-CC001119
Attorney: Paul Venker
Defense: Missed diagnosis of multiple myeloma

November 10, 2021
Brejanea Burley, et al. v. County of Los Angeles, et al.
Superior Court of California, County of Los Angeles, South District, Long Beach
Case No. TC 027341
Attorney: Jill Williams
Defense: In custody death during restraint

**Courtroom Testimony**

January 23, 2018
Alexis Yancy, et al, vs. State of California; California Highway Patrol, et al.
U.S. District Court, Southern District of California
Case No.: 15-cv-0580 JM (PCL)
Attorney: Douglas Baxter
Defense: TASER, Restraint

March 12, 2017
Amy Manning, Personal Representative of The Estate of Patricia Cameron v. Presbyterian
County of Santa Fe; First Judicial District
Case No.: D-101-CV-2016-01392

COP-STICKNEY007364

Attorney: Walter Melendres
Defense: Pulmonary embolism

March 22, 2018
Nevada v Kenneth Lopera Grand Jury Investigation
Justice Court, Las Vegas Township
Case No. 1F10146X
Attorney David Rogers
Expert: neck holds

September 25, 2018
Aimee Bevan v. Santa Fe County, et al
State of New Mexico, County of Santa Fe First Judicial Court
Case# D-101-CV-2015-00061
Attorney: Mark Komer
Defense: In custody death, heroin OD

October 8, 2018
Magilson vs. Total Access Urgent Care, PC, et al.,
Circuit Court of St. Louis County State of Missouri
Case No. 15SL-CC04289
Attorney: Andrew Eastman
Defense: Urgent care PE death

December 13, 2018
Bryce Masters v. City of Independence, MO, et al
U.S. District Court, Western District of Missouri
Case No. 4:16-cv-01045-GAF
Attorney: James Tippin
Defense: TASER and cardiac arrest

February 5, 2019
Connie Lambert et al v Dr. Joseph Procreva, et al.
Circuit Court, of Jackson County Mississippi
Case No. 2017-00072(2)
Attorney: John Banahan
Defense: missed SEA

April 16 and 18, 2019
Alan Simmons, Jr. v. Scripps Health, et. al.
Superior Court of California, County of San Diego Central Division
Case No.: 37-2016-00040795-CU-MM-CTL
Attorney: William Low
Defense: Missed meningococcemia

May 1, 2019
Alex Aguilar, Jr, et al v. City of Los Angeles, et al
U.S. District Court, Central District of California

COP-STICKNEY007365

Case No.: 2:17-cv-043882-CBM-MRW
Attorney: Calvin House
Defense: In-custody death, ingested bindle, TASER

June 11, 2019
Christopher Wroth, et al v. City of Rohnert Park, et al.
U.S. District Court, Northern District of California
Case No.: 3:17-cv-05339-JST
Attorney: Raymond Fullerton
Defense: In-custody death, restraint

June 18, 2019
Norma M. Walkes, et al. v Jonatan D. Valdez, M.D., et al Hearing
Circuit Court of the Fifth Judicial Circuit in and for Lake County, Florida
Case No.: 2016-CA-001752
Attorney: Daryl Parks
Plaintiff: Hospital treatment of agitation

July 22, 2019
David Collins, et al v County of San Diego, et al
San Diego Superior Court
Case No. 37-2017-00028981-CU-PN-CTL
Attorney:  Chris Welsh
Defense: hyponatremia at jail

November 15, 2019
Vincent Valenzuela, et. al.  v City of Anaheim, et. al.
U.S. District Court of California, Southern Division
Case No. SACV17-02094 CJC
Attorney:  Jill Williams
Defense: In Custody Death, Neck hold, TASER

January 29, 2020
Juan Frias vs City of Los Angeles, et al
U.S. District Court, Central District of California
Case No. CV16-4626 PSG (SKx)
Attorney: Christian Bojorquez
Defense: GSW death

February 20, 2020
Peralta v the State of Arizona, et al
U.S. District Court of Arizona
Case No. 17-CV-01868
Attorney: Michael Gaughan
Defense: paraplegia post fall at jail

April 8, 2021
Katrina Eisinger, et al v. City of Anaheim, et al.

COP-STICKNEY007366

Superior Court of the State of California, County of Orange
Case No.:30-2018-010135259 CU-PA-CJC
Attorney: Moses Johnson
Defense: In Custody Death

May 17, 2021
McAtee/George v. CoxHealth, et. al.
Circuit Court of Taney County, Missouri at Forsyth
Case No. : 1946-CC00124
Attorney: Catherine Reade
Defense: Urgent care pediatric heart failure

June 15, 2021
Richard Donastorg v. City of Ontario
U.S. District Court, Central District of California
Case No.: 5:18-cv-00992 JGB (SPx)
Attorney: Daniel Roberts
Defense: Agitation with meth intoxication

August 31, 2021
KJP, et. al. v County of San Diego, et. al.
U.S. District Court, Southern District of California
Case No. 3:15-cv-02692-H-MDD
Attorney: Ron Lenert
Defense: In-custody death, restraint

October 19, 2021
State of Georgia vs. Henry Lee Copeland, Michael Howell, and Rhett Scott
Washington Superior Court
Case No: 18CR46A
Attorney Pierce Blitch
Defense: In-custody death

COP-STICKNEY007367

*APPENDIX C*

*Gary Michael Vilke, MD, FACEP, FAAEM*
*11582 Normanton Way*
*San Diego, California 92131*
*(619) 666-8643*

## **Fee Schedule**

FEE SCHEDULE
For case material review, research, report writing, written communication, deposition and trial preparation, and telephonic or in person meetings: $750.00/ hour
A retainer for 3 hours ($2250.00) may be requested in advance.

For deposition and trial testimony: $1000.00/hour with a two (2) hour minimum. Deposition fees are to be paid at the time of deposition or in advance.

TRAVEL
*If travel out of county (more than 50 miles) for deposition or trial is required:*

> Business class airline tickets to and from to be paid for by the requesting firm/agency.

> Hotel accommodations to be paid for by the requesting firm/agency.

> Transportation to and from the airport in the host city to be paid for by the requesting firm/agency.

Time for travel will be billed at the standard review rate up to 4 hours each direction. The time starts at departure from home until arrival in host city, and from departure from host city until arrival home.

*If travel is within the county (less than 50 miles) for deposition or trial is required:*

Time for travel will be billed at the standard review rate up to 4 hours each direction. The time starts at departure from home until arrival at the depo/trial site, and from departure until arrival home.

CANCELLATION:
A cancellation fee of $1000.00 will be charged if a trial or deposition that was to *occur in San Diego County* is cancelled with less than 48 hours notice from the agreed upon scheduled time.

A cancellation fee of $2000.00 will be charged if a trial or deposition that was to *occur outside of San Diego County* is cancelled with less than 72 hours notice from the agreed upon scheduled time outside San Diego County.

COP-STICKNEY007368

# EXHIBIT 23

Examination of the back revealed two apparent shallow puncture wounds likely corresponding to sites of dart implantation from the CEW in the skin of his back, with at least one puncture wound able to be delineated and measured to a depth of approximately 1 cm within the fat and soft tissue of the back, associated with a small amount of surrounding hemorrhage.   As the CEW darts were only superficially penetrating into the skin and subcutaneous tissues, were not placed over or in proximity to the heart, and had no apparent immediate effects upon his consciousness or cardiac function at the time the CEW was deployed (as he had continued to physically struggle after the last CEW deployment), the CEW is not considered a potential cause or contributing cause of death in this case.

There were no acute internal injuries of significance.  Old rib fractures were identified on postmortem radiographs as well as perimortem fractures of the ribs and sternum which were recognized at the hospital as likely inflicted during cardiopulmonary resuscitation with chest compressions.

Internal examination also revealed the presence of significant arteriosclerotic cardiovascular disease with enlargement of the heart and thickening of its walls as well as significant atherosclerotic stenosis of a major coronary vessel.   Microscopic examination of the heart, including the conducting system, revealed myocytic hypertrophy, small vessel disease, and scarring (fibrosis) in many areas of the heart muscle, consistent with chronic cardiovascular disease.

Forensic neuropathologic examination of the brain, dura mater, and spinal cord revealed the presence of hypoxic/ischemic encephalopathy with edema, consistent with perimortem cardiorespiratory arrest and resuscitation.  Despite the provided history, no "brain mass" was identified at autopsy or on detailed neuropathological examination; however, as noted above, the mass described in previous clinical imaging appeared to involve the clivus bone at the skull base, and did not directly involve the brain or its coverings. This mass may have caused headaches in life, but there was no autopsy evidence that it caused or contributed to the death of this man. Please see the accompanying forensic neuropathology report for details.

Forensic anthropologic evaluation of the hyoid bone and cartilaginous structures of the airway revealed focal fractures of right sided airway cartilages. The hyoid bone was reportedly intact. Please see the accompanying forensic anthropology report for details.

Toxicologic analyses performed on antemortem samples of blood from the treating hospital revealed the presence of 580 ng/mL methamphetamine. Chiral analyses revealed the methamphetamine that was detected consisted completely (100%) of the d-isomer. In the setting of a past (2016) prescription for Desoxyn (a prescribed form of d-methamphetamine), there is a slight possibility that this could represent this medication (if still actively taken by the decedent, although there is no documented recent prescription for this medication).

Alternatively, and more likely, with a history of illicit methamphetamine abuse (a street

COP-STICKNEY000547

# EXHIBIT 24

Michael Levine, MD

# EXPERT OPINION REPORT

**Pursuant to Federal Rules of Civil Procedure, Rule 26**

Court:          United States District Court, District of Arizona
Case Number:  2:20-cv-1401-SMB-CBD
Case Name:    Lei Ann Stickney v. City of Phoenix et. al.
Date of report: 30 November 2021


I, Michael David Levine, am an adult over 18 years of age and would be competent to testify if called as a witness in this matter.  I have prepared this report on behalf of the City of Phoenix, Arizona in the matter of Lei Ann Stickney in the United States District Court, District of Arizona.

A.  The University of California employs me as an associate professor of emergency medicine, and I am in charge of the medical toxicology consulting service at UCLA. My duties include, but are not limited to, supervising interns and residents in the emergency department, as an attending physician in the emergency department at Ronal Regan UCLA Medical Center, Olive View UCLA Medical Center, Santa Monica UCLA Medical Center.  In addition, I also am an attending physician in the emergency department at Huntington Memorial Hospital.  I am in charge of the medical toxicology consulting service at Ronald Regan UCLA Medical Center, Olive-View UCLA Medical Center, and Santa Monica UCLA Medical Center.  I teach medical students, residents and fellows toxicology.  In addition, I serve on a committee of the American Association of Poison Control Centers, which helps ascribe causality to overdose deaths reported to US Poison Control Centers.

B.  Past employment:  University of Southern California (associate professor of emergency medicine, and chief of the division of medical toxicology), Banner University Medical Center (attending physician, department of medical toxicology), North Valley Emergency Specialists in Glendale, AZ (attending physician, department of emergency medicine, Banner Thunderbird Medical Center)

C.  I previously have served as vice chair of the pharmacy and therapeutics committee, and was chair of the medication safety committee, both at LA County-USC Medical Center.

I have served on numerous committees as a member of the American College of Medical Toxicology during the past five years, and have helped develop guidelines, participate in research, and advance education of physicians currently in their emergency medicine residency and medical toxicology fellowships.

D.  I have 17 years of emergency medicine experience as an emergency physician, and

COP-STICKNEY007411

13 years of medical toxicology experience as a toxicologist. My area of expertise includes, but is not limited to, emergency medicine and medical toxicology. I am board certified in both Emergency Medicine and Medical Toxicology.

E.   I have provided expert opinions in approximately 40 cases. I have been deposed approximately 15 times and have provided expert testimony one time for a grand jury and four times for trial. I have been recognized as an expert in both emergency medicine and medical toxicology by the United States District Court, Southern District of California.

F.   I was asked to independently review the records and opine on the but for cause of death.

G.   At the time of making this report, I have reviewed a variety of documents, including original research, to reach an opinion in this matter.

H.   The statements made herein are based on my personal knowledge, which is based upon a review of the medical records and police reports, as well as years of training as a medical toxicologist and emergency physician. A copy of my Curriculum Vitae is attached herewith and incorporated hereto as though fully set forth.

I.   I have received numerous documents from the Wieneke Law Group in October 2021 through November 2021.

J.   Based on the materials reviewed, as well as other related opinions, I was requested to provide my opinion as to the but for cause of death, and any possible effect of methamphetamine toxicity

K.   DOCUMENTS REVIEWED
  1. Notice of Claim
  2. Plaintiff's Second Amended complaint, dated 24 June, 2020
  3. Defendant's answer to Plaintiff's Second Amended Complaint, dated 4 September, 2020
  4. Defendants' Ninth Supplemental disclosure statement
  5. Plaintiff's Twelfth supplemental disclosure statement
  6.
  7. Phoenix police incident report 2019-00000203420 dated 4 Feb, 2019 (redacted)
  8. Body cam video 05-5980_0219000203420_02.04.2019_16.52.14_01.05.24
  9. Report from the Office of the Medical Examiner case 19-01162, including final report, anthropology report, neuropathology report, and toxicology report
  10.   Phoenix Fire Department ENS Incident report RE 19-045650
  11.   Phoenix Fire Department Refusal of Treatment and release form 19-045650
  12.   Phoenix Fire Department incident Hx Report 19-045650 02-04-19
  13.   Glendale Police RPR Response Documents
  14.   Cell phone video by Richard Buffington (redacted)

15. Danica Oparnica medical records; redacted
16. Furguson Family Medicine report; redacted
17. Jewish Family and Children's Services medical records; redacted; defense exhibit 285
18. Recovery Innovations medical records; redacted
19. Chicanos Por La Causa medical records; redacted
20. Banner Thunderbird Medical Center records
21. J. Michael Holder medical records; redacted
22. Riverside Community Hospital medical records; redacted
23. Expert report of Daniel Spitz
24. Response to subpoena duces tecum; Daniel Spitz
25. Expert report of Daniel Wohlgelernter
26. Response to subpoena duces tecum; Daniel Wohlgelernter
27. Expert report of Scott DeFoe
28. Response to subpoena duces tecum; Scott DeFoe
29. Expert report of Michael Freeman
30. Response to subpoena duces tecum; Michael Freeman
31. St. Joseph's Hospital Medical records
32. Deposition transcript of Krystal Goodwin; 5 November 2021
33. Deposition transcript of Connie Brenton; 2 November, 2021


**L. OPINION NUMBER 1:   Mr. Casey Joe Wells was under the influence of methamphetamine**

In my opinion, Mr. Wells likely used methamphetamine within a day of his arrest. Methamphetamine is a stimulant.  Amphetamines bind to a specific type of receptor in the brain, called a D2 receptor, which is a type of dopamine receptor.  Stimulation of this receptor, has been associated with acute psychosis.  In fact, many antipsychotics work by blocking this receptor.  Mr. Wells was naked in the street, and by all descriptions, appeared to be acutely psychotic. He was described as talking "incoherently" at times (COP-STICKNEY000084), and as "talking to God and the heavens" at other times (COP-STICKNEY000080).  Mr. Wells quickly becomes agitated and combative.  He is not following commands.

Blood collected at the hospital revealed a methamphetamine level of 580 ng/mL, and an amphetamine level of 68 ng/mL.  On average, methamphetamine has a half-life of approximately 11 hours, although there is some range associated with this. Methamphetamine gets converted to amphetamine via a process of demethylation.  Thus, the fact that most of the drug is found in the methamphetamine form, and not the amphetamine form, suggests recent use.  While there is considerable overlap in drug levels, such that one level may be fatal for one individual and not for others, a methamphetamine level of 580 ng/mL, is clearly in a range where toxicity and death can occur.

**Opinion 2:  Methamphetamine contributed to the events on 4 February, 2019**

Mr. Wells has a history of auditory hallucinations and also attention deficit hyperactivity disorder (ADHD).  There has been discussion about a possible diagnosis of schizophrenia, but in most of the medical records I have reviewed (e.g. WELLS 002872), Mr. Wells does not mention any formal psychiatric history other than attention deficit hyperactivity disorder, which is not associated with psychosis. Furthermore, it has been stated in deposition testimony that Mr. Wells only hallucinated while high on illicit drugs.  Methamphetamines can clearly cause psychosis. They bind the same receptor, but do the exact opposite of many antipsychotics. Thus, they can clearly cause acute psychosis.  Even if there is a history of schizophrenia, the fact that he was not on antipsychotics and spent much of his life not hallucinating while not on drugs, and only hallucinated while on drugs, strongly suggests that the methamphetamine at least contributed, and probably caused the hallucinations encountered on 4 February, 2019, in which Mr. Wells was talking to God and the heavens.


**Opinion 3: I disagree with the opinion of Dr. Wohlgelernter**

Dr. Wohlgelernter states that Mr. Wells had a history of "unspecified psychosis not due to a substance or known physiologic condition" (WELLS 003122).   As previously stated, it has been stated in deposition testimony that Mr. Wells only hallucinated while using methamphetamines.  He was not routinely on antipsychotics and was not routinely hallucinating.  If he had schizophrenia, and was not on antipsychotics, I would expect him to be hallucinating routinely, with or without stimulants. The fact that he only hallucinates with stimulants suggests that stimulants are the but for cause of the hallucinations, not an underlying psychiatric illness.

More importantly, however, Dr. Wohlgelernter correctly describes pulseless electrical activity (PEA).  He then states, however, that "the only plausible and possible cause of PEA cardiac arrest in the case of Casey Wells was hypoxia/hypoxemia," and that "no other cause of PEA is plausible or relevant in explaining Case Wells' Cardiac arrest" (WELLS 003127).  I firmly disagree with this statement.  First, there are multiple causes of pulseless electrical activity, including acidosis, myocardial infarction, hypoxia, hypovolemia, and hyperkalemia, among others.  Furthermore, it is well known that methamphetamine can increase the myocardial work-load.  Like virtually all stimulants, methamphetamine increases the blood pressure and the heart rate, thus making the heart work much harder than it normally would. Methamphetamine has been associated with vasoconstriction and cellular hypoxia. The autopsy of Mr.  Wells revealed coronary atherosclerosis. It is certainly possible that the underlying coronary atherosclerosis, coupled with the increased stress on the heart from the methamphetamine, along with methamphetamine-induced vasoconstriction, and the near certain acidosis that accompanied a multiple minute struggle,  could have created a scenario resulting in a cardiac arrest. Pulseless electrical activity has been described following methamphetamine overdose.

**Opinion 4:  Methamphetamine is dangerous**

Michael Freeman states that in contrast to opiates, methamphetamine has a low hospitalization and death rate.  He states it is "exceedingly small" chance to die from a dose of methamphetamine.  First, any comparison of opiates to methamphetamines is irrelevant

COP-STICKNEY007414

as they are completely different drugs.  Dr. Freeman uses an illogical calculation to determine the risk of death from methamphetamine, and states 1 death occurs per 353,000 doses.  It should be noted that the National Institutes of Drug Abuse site 7.3 deaths due to methamphetamine toxicity per 100,000 population, although the number is greater in some individuals, including non-Hispanic whites, like Mr. Wells (9.4 deaths per 100,000 population).    Regardless, as a practicing toxicologist, I can clearly state that patients definitely die from acute methamphetamine toxicity.  Furthermore, Dr. Freeman states "there is no evidence that supports the implication that the very small amount of methamphetamine in Mr. Wells' blood (0.58 mg/L) was even a plausible cause of his death in the absence of violent restraint" (WELLS 003045).  It should be noted in Logan's work entitled "cause and manner of death in fatalities involving methamphetamine," that Mr. Wells's level of 580 ng/mL is clearly in a range that has been associated with fatal ingestions.

**O.  EXHIBITS:**
> 1. Medical Examiner report with laboratory studies

**P:  QUALIFICATIONS:**
> See attached Curriculum Vitae

**Q.  EXPERT TESTIMONY:**
> See attached

**R:  PUBLICATIONS**
> See attached curriculum vitae

**S:  PERSONAL COMPENSATION**
> Case review          $350/hour
> Deposition fee       $450/hour
> Court testimony      $600/hour

**T:  References:**

Albertson TE, Kenyon NJ, Morrisey B.  Amphetamines and derivatives.  In: Haddad and Winchester's Clinical Management of Poisoning and drug overdose.  Shannon MW, Borron SW, Burns MJ (Eds).  4th Edition.  Elsevier BV. 2007.

Connors NJ, Hoffman RS.  Amphetamines and their derivatives.  In: Critical Care Toxicology: Diagnosis and Management of the Critically Poisoned Patient.  Brent J (Ed).  2nd edition.  Springer.  2017.

Crosby MM, Moore KA.  Amphetamines/sympathomimetic amines.  In: Principles of forensic toxicology.  Levine BS, Kerrigan S (Eds).  5th Edition. Springer. 2020.

Gummin DD, Mowry JB, Beuhler MC, et. al.  2019 Annual report of the American Association of Poison Control Center's National Poison Data System (NPDS): 37th annual report.  Clin Toxicol.  2020; 58:1360-541.

Kevil CG, Goeders NE, Woolard MD, et. al. Methamphetamine use and cardiovascular disease. Arterioscler Thromb Vasc Biol. 2019; 39:1739-46.

Kousik S, Graves S, Napier T, et. al. Methamphetamine-induced vascular changes lead to striatal hypoxia and dopamine reduction. Neuroreport. 2011; 22:923-8.

Logan BK, Fligner CL, Haddix T. Cause and manner of death in fatalities involving methamphetamine. J Forensic Sci. 1998; 43:28-34.

National Institute of Drug Abuse. Methamphetamine overdose deaths rise sharply nationwide. Available at https://www.drugabuse.gov/news-events/news-releases/2021/01/methamphetamine-overdose-deaths-rise-sharply-nationwide. Accessed 30 November, 2021.

Spyres MB, Jang DH. Amphetamines. In: Goldfrank's Toxicologic Emergencies. Nelson LS (Ed). 11th Edition. McGraw Hill, 2019.

Tsai C, Quidgley-Martin M, Laub N, et. al. Methamphetamine-associated pulseless electrical activity in a young child. Am J Emerg Med. 2021; 39:e1-257.e2

I reserve the right to modify or amend my report and/or opinions should additional information become available to me.

Date: 30 November, 2021

Signature, _____
          Michael Levine MD, FACEP, FACMT

# EXHIBIT 25

.CHAEL K. JEANES. CLERK
BY         DEP

A. WASHINGTON. FILED

16 DEC 19   PM 12: 45

WILLIAM G MONTGOMERY
MARICOPA COUNTY ATTORNEY

Lindsey Coates
Deputy County Attorney
Bar ID #: 021710
301 West Jefferson, 8th Floor
Phoenix, AZ 85003
Telephone: (602) 372-7350
mcaoptd@mcao.maricopa.gov
MCAO Firm #: 00032000
Attorney for Plaintiff

12/21

DR 16178361 - Glendale Police Department
Manistee Justice Court

0131635261

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

COUNTY OF MARICOPA, RCC-DOWNTOWN

| | |
|---|---|
| THE STATE OF ARIZONA,<br><br>    Plaintiff,<br><br>vs.<br><br>CASEY WELLS,<br>aka CASEY JOE WELLS<br><br><br>    Defendant. | CR2016-158122-001<br><br><br>DIRECT COMPLAINT<br><br>**COUNT 1:** POSSESSION OR USE OF DANGEROUS DRUGS, A CLASS 4 FELONY  (Casey Wells)<br>**COUNT 2:** POSSESSION OF DRUG PARAPHERNALIA, A CLASS 6 FELONY (Casey Wells)<br>**COUNT 3:** UNLAWFUL FLIGHT FROM LAW ENFORCEMENT VEHICLE, A CLASS 5 FELONY  (Casey Wells)<br>**COUNT 4:** CRIMINAL TRESPASS IN THE FIRST DEGREE, A CLASS 6 FELONY (Casey Wells) |

**IN CUSTODY**

The complainant herein personally appears and, being duly sworn, complains on

information and belief against CASEY WELLS, charging that in Maricopa County, Arizona:

**DCO**

COP-STICKNEY006924

**COUNT 1:**

CASEY WELLS, on or about December 14, 2016, knowingly did possess or use methamphetamine, a dangerous drug, in violation of A.R.S. §§ 13-3401, 13-3407, 13-3418, 13-701, 13-702, and 13-801.

**COUNT 2:**

CASEY WELLS, on or about December 14, 2016, unlawfully did use or possess with intent to use a pipe(s), drug paraphernalia, to inject, ingest, inhale, or otherwise introduce into the human body methamphetamine, a dangerous drug, in violation of A.R.S. §§ 13-3401, 13-3407, 13-3415, 13-3418, 13-701, 13-702, and 13-801.

**COUNT 3:**

CASEY WELLS, on or about December 14, 2016, while driving a vehicle willfully fled or attempted to elude a pursuing official law enforcement vehicle which was being operated with proper emergency equipment, in violation of A.R.S. §§ 28-622.01, 28-624(C), 28-3001, 28-3304, 28-3305, 28-3315, 13-701, 13-702, and 13-801.

**COUNT 4:**

CASEY WELLS, on or about December 14, 2016, knowingly did enter or remain unlawfully in or on the residential structure of Robert Madrid, located at 9002 North 56th Avenue, Glendale, Arizona, in violation of A.R.S. §§ 13-1501, 13-1504(A)(1),(B), 13-701, 13-702, and 13-801.

/s/ Lindsey Coates
Deputy County Attorney

IN CUSTODY

Complainant

Agency: Glendale Police Department

Subscribed and sworn upon information and belief this ___ day of December, 2016.
LC/jm

2

COP-STICKNEY006925

****DRAFT****       RELEASE QUESTIONNAIRE

Notice: Unless a specific Form IV is sealed or ordered redacted by the Court, all Form IVs are public records of the Court or Clerk at the time they are provided to the Court and will be released in their entirety upon request.

DEFENDANT'S NAME CASEY WELLS       DOB 1978-10-11 BOOKING NO.

ALIAS(ES)            CASE NO.

## A. GENERAL INFORMATION

Charges
1 Cts. 13-1504A CRIMINAL TRESPASS 1ST DEG F6
1 Cts. 28-622.01 UNLAW FLIGHT FROM LAW ENF VEH F5

Pursuant to A.R.S. §41-1750 ten-print fingerprints were taken of the arrested person? ☒ Yes ☐ No
If yes, PCN =

Pursuant to A.R.S. §13-610 one or more of the above charges requires the arresting agency to secure a DNA sample from the arrested person? ☐ Yes ☒ No

If yes, does the defendant have a valid DNA sample on file with AZDPS? ☐ Yes ☐ No

If no, Arresting Agency has taken required sample? ☐ Yes ☐ No

Offense Location:
Offense Date: 2016-12-14
Arrest Location: 5670 W PEORIA AV
Date: 2016-12-14 Time: 12:30

## B. PROBABLE CAUSE STATEMENT

1. Please summarize and include the facts which establish probable cause for the arrest:
ON 12/14/2016 I RESPONDED TO THE AREA OF 5500 W TUR-QUOISE WHERE A CIVILIAN TRAFFIC OFFICER OBSERVED A SUSPICIOUS VEHICLE IN THE AREA DRIVEN BY 81, WELLS,CASEY. THE TRAFFIC OFFICER TOLD ME THAT WELLS HOME UNLAWFULLY AT APPROXIMATELY 0300 HOURS EARLIER . IN THE MORNING. I ARRIVED TO THE AREA AND EVENTU-ALLY FOLLOWED WELLS WHILE HE WAS DRIVING HIS WHITE CHEVY TRUCK. I ILLUMINATED MY RED AND BLUE LIGHTS AND MY AUDIBLE SIREN IN AN ATTEMPT TO GET CASE STOPPED AND FURTHER INVESTIGATE THE TRESPASS. HE REFUSED TO STOP AND CONTINUED DRIVING THROUGH THE NEIGHBORHOOD. I SAW CASEY LOOKING AT ME IN HIS DRIVER'S SIDE MIRROR AND I WAS CONFIDENT THAT HE WAS AWARE OF MY PRESENCE AND MY ATTEMPT TO SEIZE HIM. I RAN A RECORDS CHECK ON THE VEHICLE HE WAS DRIVING AND PULLED A PICTURE OF THE REGISTERED OWNER, CASEY WELLS. I IDENTIFIED THE MALE DRIVING THE TRUCK AND REFUSING TO STOP AS CASEY WELLS.

I THEN CONTACTED THE VICTIM OF THE TRESPASS. I SHOWED HIM A PHOTOGRAPHIC LINEUP WHICH I CREATED THAT INCLUDED A PICTURE OF WELLS. HE IMMEDIATELY PICKED OUT WELLS AS THE MAN THAT ENTERED HIS HOME UNLAWFULLY AT APPROXIMATELY 0200 HOURS. OFFICERS ARRESTED WELLS AND THEY LOCATED APPROXIMATELY 10 GRAMS OF METHAMPHETAMINE ON HIS PERSON. THIS WAS TESTED BY TRU NARC AND IT TESTED POSITIVE FOR METHAMPHETAMINE.

POST-MIRANDA WELLS ADMITTED TO SEEING OFFICERS BE-HIND HIM AND MAKING THE DECISION NOT TO STOP. HE STATED THAT HE ISN'T SUBJECT TO MAN'S LAW. HE ALSO ADMITTED TO ENTERING THE HOUSE THAT DIDN'T BELONG TO HIM. HE STATED THAT HE WAS THERE TO "REDEEM."

## C. OTHER INFORMATION (Check if applicable)

1. ☐ Defendant is presently on probation, parole or any other form of release involving other charges or convictions: Explain:

2. List any prior:
Arrests? PODD,

Convictions?

F.T.A.'s?

3. Is there any indication the defendant is:

☐ An Alcoholic?       ☒ An Addict?

☒ Mentally disturbed?       ☐ Physically Ill?

4. ☒ Defendant is currently employed
With whom NONE

How long:
5. Where does the defendant currently reside? HOME-LESS ,

With whom
How long: _____ years _____ months _____ days
6. What facts indicate the defendant will flee if released?
Explain:

7. What facts does the state have to oppose an unsecured release? Explain:VERY UNSTABLE, NO RESIDENCE, NO JOB, NO TIES TO SOCIETY,

## D. CIRCUMSTANCES OF THE OFFENSE(Check if applicable)

1. ☐ Firearm or other weapon was used
Type:

☐ Someone was injured by the defendant

☐ Medical attention was necessary
Nature of injuries: N/A

2. ☐ Someone was threatened by the defendant
Nature and extent of threats:

3. Did the offense involve a child victim? ☐ Yes ☒ No
If yes, was DCS notified? ☐ Yes ☒ No

COP-STICKNEY006926

4.   If property offense, value of property taken or damaged:

☐ Property was recovered

5. Name(s) of co-defendant(s):

****DRAFT****

3. ☒ Evidence of the offense was found in the defendant's possession
Explain: METHAMPHETAMINE WAS FOUND IN POSSESSION WHEN ARRESTED

E. CRIMES OF VIOLENCE
1. Relationship of defendant to victim:

☐ Victim(s) and defendant reside together

2. How was the situation brought to the attention of the police?
☐ Victim    ☐ Third Party    ☐ Officer observed

3. ☐ There are previous incidents involving these same parties
Explain:

4. Was the defendant under the influence of alcohol or drugs at the time of the offense?
☒ Yes    ☐ No    ☐ Unk

H. DRUG OFFENSES
1. If the defendant is considered to be a drug dealer, please state the supporting facts:

4. Is defendant currently the subject of:
☐ An order of protection    ☐ Any other court order

☐ Injunction against harassment

Explain:

2. What quantities and types of illegal drugs are directly involved in the offense? 10GRAMS

F. DOMESTIC VIOLENCE ISSUES (Check if applicable)
Defendant's actions

☐ Threats of homicide/suicide/bodily harm

☒ Drug field test completed

☒ Defendant admission of drug type
Approximate monetary value: $$100

☐ Control/ownership/jealousy issues    ☐ Crime occurs in public

3. Was any money seized?

☐ Prior history of DV    ☐ Kidnapping

☐ Yes    ☒ No

☐ Frequency/intensity of DV increasing    ☐ Depression

Amount: $

☐ Access to or use of weapons    ☐ Stalking behavior

I. ADDITIONAL INFORMATION
1. Military Service:

☐ Violence against children/animals

JUDICIAL OFFICER REVIEW
OF PROBABLE CAUSE
STATEMENT AND COMPLAINT
ON OTHER VERIFICATION

Has the defendant served in the military services of the United States? ☐ Yes    ☒ No    ☐ Unknown

☐ Multiple violations of court orders

If yes, currently on active duty? ☐ Yes    ☐ No

G. CIRCUMSTANCES OF THE ARREST (Check if applicable)
1. Did the defendant attempt to:

☐ Complaint Review

Branches Served In: _____
(AF - Air Force AR - Army CG - Coast Guard MC - Marine Corp MM - Merchant Marines NG - National Guard NV - Navy RS - Reserves)

☒ Avoid arrest    ☐ Resist arrest    ☐ Self Surrender

☐ Witness sworn

☐ Reviewed Form IV

Explain: REFUSED TO STOP FOR A MARKED POLICE VEHICLE DISPLAYING RED AND BLUE LIGHTS AND SIREN N/A

2. Is the defendant homeless?
☒ Yes    ☐ No    ☐ Unknown

☐ other sources

☐ PC determined

3. Do you need the court to provide an interpreter to help communicate and to understand what is being said?
☐ Yes    ☒ No

2. ☐ Defendant was armed when arrested
Type:

Judicial Officer

If so, what language:

Pursuant to AO 2003-046, the oath has been administered pursuant to the law and required procedures. [signature]

**If a fugitive arrest, a Form IVA must also be completed**

I certify that the information presented is true to the best of my knowledge.

| GOITIA/11807 | AZ0071300/623-930-3000 | 2016-12-14 |
|---|---|---|
| ARRESTING OFFICER/SERIAL NUMBER | ARREST AGENCY/DUTY PHONE NUMBER | DATE |
| 16178361/AZ0071300 | | |
| DEPARTMENTAL REPORT NO. | DEPARTMENTAL REPORT NO. | DEPARTMENTAL REPORT NO. |

COP-STICKNEY006928

****DRAFT****    RELEASE QUESTIONNAIRE

Notice: Unless a specific Form IV is sealed or ordered redacted by the Court, all Form IVs are public records of the Court or Clerk at the time they are provided to the Court and will be released in their entirety upon request.

DEFENDANT'S NAME CASEY WELLS         DOB 1978-10-11 BOOKING NO.

ALIAS(ES)         CASE NO.

## A. GENERAL INFORMATION

Charges
1 Cts. 13-3407A1 DANGEROUS DRUG-POSS/USE F4

Pursuant to A.R.S. §41-1750 ten-print fingerprints were taken of the arrested person? ☒ Yes ☐ No
If yes, PCN = _____

Pursuant to A.R.S. §13-610 one or more of the above charges requires the arresting agency to secure a DNA sample from the arrested person? ☐ Yes ☒ No

If yes, does the defendant have a valid DNA sample on file with AZDPS? ☐ Yes ☐ No

If no, Arresting Agency has taken required sample? ☐ Yes ☐ No

Offense Location:
Offense Date: 2016-12-14
Arrest Location: 5670 W PEORIA AV
Date: 2016-12-14 Time: 12:30

## B. PROBABLE CAUSE STATEMENT

1. Please summarize and include the facts which establish probable cause for the arrest:
ON 12/14/2016 I RESPONDED TO THE AREA OF 5500 W TUR-QUOISE WHERE A CIVILIAN TRAFFIC OFFICER OBSERVED A SUSPICIOUS VEHICLE IN THE AREA DRIVEN BY 81, WELLS, CASEY. THE TRAFFIC OFFICER TOLD ME THAT WELLS WAS IDENTIFIED AS A SUSPECT THAT ENTERED A VICTIM'S HOME UNLAWFULLY AT APPROXIMATELY 0200 HOURS EARLIER IN THE MORNING. I ARRIVED TO THE AREA AND EVENTU-ALLY FOLLOWED WELLS WHILE HE WAS DRIVING HIS WHITE CHEVY TRUCK. I ILLUMINATED MY RED AND BLUE LIGHTS AND MY AUDIBLE SIREN IN AN ATTEMPT TO GET CASE STOPPED AND FURTHER INVESTIGATE THE TRESPASS. HE REFUSED TO STOP AND CONTINUED DRIVING THROUGH THE NEIGHBORHOOD. I SAW CASEY LOOKING AT ME IN HIS DRIVER'S SIDE MIRROR AND I WAS CONFIDENT THAT HE WAS AWARE OF MY PRESENCE AND MY ATTEMPT TO SEIZE HIM. I RAN A RECORDS CHECK ON THE VEHICLE HE WAS DRIVING AND PULLED A PICTURE OF THE REGISTERED OWNER, CASEY WELLS. I IDENTIFIED THE MALE DRIVING THE TRUCK AND REFUSING TO STOP AS CASEY WELLS.

I THEN CONTACTED THE VICTIM OF THE TRESPASS. I SHOWED HIM A PHOTOGRAPHIC LINEUP WHICH I CREATED THAT INCLUDED A PICTURE OF WELLS. HE IMMEDIATELY PICKED OUT WELLS AS THE MAN THAT ENTERED HIS HOME UNLAWFULLY AT APPROXIMATELY 0200 HOURS. OFFICERS ARRESTED WELLS AND THEY LOCATED APPROXIMATELY 10 GRAMS OF METHAMPHETAMINE ON HIS PERSON. THIS WAS TESTED BY TRU NARC AND IT TESTED POSITIVE FOR METHAMPHETAMINE. WELLS *[illegible handwriting]* POST-MIRANDA WELLS ADMITTED TO SEEING OFFICERS BE-HIND HIM AND MAKING THE DECISION NOT TO STOP. HE STATED THAT HE ISN'T SUBJECT TO MAN'S LAW. HE ALSO ADMITTED TO ENTERING THE HOUSE THAT DIDN'T BELONG TO HIM. HE STATED THAT HE WAS THERE TO "REDEEM."

## C. OTHER INFORMATION (Check if applicable)

1. ☐ Defendant is presently on probation, parole or any other form of release involving other charges or convictions: Explain:

2. List any prior:
Arrests? PODD,

Convictions?

F.T.A.'s?

3. Is there any indication the defendant is:

☐ An Alcoholic?    ☒ An Addict?

☒ Mentally disturbed?    ☐ Physically Ill?

4. ☒ Defendant is currently employed
With whom NONE

How long:
5. Where does the defendant currently reside? HOME-LESS .

With whom
How long: _____ years _____ months _____ days
6. What facts indicate the defendant will flee if released? Explain:

7. What facts does the state have to oppose an unsecured release? Explain: VERY UNSTABLE, NO RESIDENCE, NO JOB, NO TIES TO SOCIETY,

## D. CIRCUMSTANCES OF THE OFFENSE (Check if applicable)

1. ☐ Firearm or other weapon was used
Type:

☐ Someone was injured by the defendant

☐ Medical attention was necessary
Nature of injuries: N/A

2. ☐ Someone was threatened by the defendant
Nature and extent of threats:

3. Did the offense involve a child victim? ☐ Yes ☒ No
If yes, was DCS notified? ☐ Yes ☒ No

COP-STICKNEY006929

4.  If property offense, value of property taken or damaged:

☐ Property was recovered

5. Name(s) of co-defendant(s):

COP-STICKNEY006930

DEFENDANT'S NAME CASEY WELLS                      DOB 1978-10-11 BOOKING NO.

CASE NO. _____        Page 3 of 3

**E. CRIMES OF VIOLENCE**
1.  Relationship of defendant to victim:

☐ Victim(s) and defendant reside together

2.  How was the situation brought to the attention of the police?
    ☐ Victim   ☐ Third Party   ☐ Officer observed

3.  ☐ There are previous incidents involving these same parties
    Explain:

4.  Is defendant currently the subject of:
    ☐ An order of protection   ☐ Any other court order

    ☐ Injunction against harassment

    Explain:

**F. DOMESTIC VIOLENCE ISSUES (Check if applicable)**
    Defendant's actions

☐ Threats of homicide/suicide/bodily harm

☐ Control/ownership/jealousy issues        ☐ Crime occurs in public

☐ Prior history of DV                      ☐ Kidnapping

☐ Frequency/intensity of DV increasing     ☐ Depression

☐ Access to or use of weapons              ☐ Stalking behavior

☐ Violence against children/animals

☐ Multiple violations of court orders

**G. CIRCUMSTANCES OF THE ARREST (Check if applicable)**
1.  Did the defendant attempt to:

☒ Avoid arrest   ☐ Resist arrest   ☐ Self Surrender

Explain: REFUSED TO STOP FOR A MARKED POLICE VEHICLE
DISPLAYING RED AND BLUE LIGHTS AND SIREN
N/A

2.  ☐ Defendant was armed when arrested
Type:

*Pursuant to AO 2003-046, the oath has been
administered pursuant to the law and
required procedures.* [signature]

3.  ☒ Evidence of the offense was found in the defendant's
    possession
    Explain: METHAMPHETAMINE WAS FOUND IN POSSESSION
    WHEN ARRESTED

4.  Was the defendant under the influence of alcohol or
    drugs at the time of the offense?
    ☒ Yes   ☐ No   ☐ Unk

**H. DRUG OFFENSES**
1.  If the defendant is considered to be a drug dealer, please
    state the supporting facts:

2.  What quantities and types of illegal drugs are directly
    involved in the offense? 1GRAMS

☒ Drug field test completed

☒ Defendant admission of drug type
Approximate monetary value: $$100
3.  Was any money seized?

    ☐ Yes   ☒ No
Amount: $

**I. ADDITIONAL INFORMATION**
1.  Military Service:

    Has the defendant served in the military services of the
    United States? ☐ Yes   ☒ No   ☐ Unknown

    If yes, currently on active duty? ☐ Yes   ☐ No

    Branches Served In: _____
    (AF - Air Force AR - Army CG - Coast Guard MC - Marine Corp
    MM - Merchant Marines NG - National Guard NV - Navy
    RS - Reserves)

2.  Is the defendant homeless?
    ☒ Yes   ☐ No   ☐ Unknown

3.  Do you need the court to provide an interpreter to help
    communicate and to understand what is being said?
    ☐ Yes   ☒ No

    If so, what language:

JUDICIAL OFFICER CHECK LIST
OF PROBABLE CAUSE
STATEMENT AND COMPLAINT
OR COMPLAINT

☐ Complaint Review

☐ Witness statement

☐ Attached Form IV

☐ Other sources

☐ PC determined

Judicial Officer

**If a fugitive arrest, a Form IVA must also be completed**

---

I certify that the information presented is true to the best of my knowledge.

| GOITIA/11807 | AZ0071300/623-930-3000 | 2016-12-14 |
|---|---|---|
| ARRESTING OFFICER/SERIAL NUMBER | ARREST AGENCY/DUTY PHONE NUMBER | DATE |
| 16178361/AZ0071300 | | |
| DEPARTMENTAL REPORT NO. | DEPARTMENTAL REPORT NO. | DEPARTMENTAL REPORT NO. |

COP-STICKNEY006931

# EXHIBIT 26

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
T. Alameda, Deputy
1/20/2017 9:17:00 AM
Filing ID 8033577

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## UNIFORM CONDITIONS OF SUPERVISED PROBATION

State of Arizona
VS.

**MARICOPA COUNTY DIVISION: <u>RCCT3</u>**
<u>CR2016-158122-001 DT</u>

**Casey Wells**

PID # AZ19627691

ARS §13-901.01     N/A

**OFFENSES:**

| | | | |
|---|---|---|---|
| Count 002 | ARS §13-3415A | DRUG PARAPHERNALIA-POSSESS/USE | F6 U |

*The Court is suspending imposition or execution of sentence and, under the supervision of the Adult Probation Department (APD),*

**PLACING** the defendant on probation for a period of **2.00** Years
to begin on **1/20/2017**

*I AGREE TO THE FOLLOWING AS CONDITIONS OF THE SUSPENSION OR THE IMPOSITION OR EXECUTION OF SENTENCE (Conditions Checked Also Apply)*

**LAW ABIDING BEHAVIOR**
1. I will maintain a crime-free lifestyle, by obeying all laws, and not engaging or participating in any criminal activity.
2. I will not possess or control any stun guns, tasers, firearms, ammunition, deadly, or prohibited weapons as defined in A.R.S. §13-3101.
3. I will report any contact I have with law enforcement to the APD within 72 hours.
4. I will submit to search and seizure of person and property by the APD without a search warrant.
5. If deported or processed through voluntary departure, I will not return to the United States without legal authorization during the term of my probation. If I am deported or processed through voluntary departure, all conditions remain in effect.

**REPORTING TO APD**
6. I will report to the APD within 72 hours of sentencing, absolute discharge from prison, release from incarceration, or residential treatment and continue to report as directed. I will also keep APD advised of progress toward case plan goals and comply with any written directive of the APD to enforce compliance with the conditions of probation. I will provide a sample for DNA testing if required by law.

**RESIDENCE**
7. I will provide the APD safe, unrestricted access to my residence and receive prior approval of the APD before changing my residence. I will reside in a residence approved by the APD.
8. I will request and obtain written permission of the APD prior to leaving the state.
10. I may apply for an Inter-County transfer and will not proceed to that County until APD issues written authorization.

**TREATMENT/BEHAVIOR CHANGE/PRO-SOCIAL ACTIVITIES**
11. I will actively participate and cooperate in any program of counseling or assistance as determined by APD, or as required by law, given assessment results and/or my behavior. I will sign any release or consent required by the APD so the APD can exchange information in relation to my treatment, behavior and activities.
12. I will not possess or use illegal drugs or controlled substances and will submit to drug and alcohol testing as directed by the APD.
13. I will obtain written approval of the APD prior to associating with anyone I know who has a criminal record. I will not knowingly associate with any person engaged in criminal behaviors.
14. I will seek, obtain, and maintain employment, if legally permitted to do so, and/or attend school according to my case plan with the APD. I will inform the APD of any changes within 72 hours.
15. I will be financially responsible by paying all restitution, fines, and fees in my case as imposed by the Court. I understand, if I do not pay restitution in full, the Court may extend my probation.

1100-010-A (Rev 6/10)

COP-STICKNEY006941

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## UNIFORM CONDITIONS OF SUPERVISED PROBATION

**State of Arizona**
**VS.**
**Casey Wells**

**MARICOPA COUNTY DIVISION: RCCT3**
**CR2016-158122-001 DT**

PID # AZ19627691

ARS §13-901.01   N/A

21.  I will abide by the attached special conditions of probation:
  •Mental Health
  •Drug Court

22.  Defendant shall complete substance abuse treatment, including relapse prevention and aftercare.

Based upon the defendant's agreement to abide by the Conditions of Supervision set forth, above, as well as my review and approval of such conditions, I hereby impose and order that these conditions are in effect, and the defendant shall comply with said conditions.

_____
**Hon.  Julie AshworthLaFave**
MARICOPA COUNTY SUPERIOR COURT

01/20/2017
Date

**RECEIPT AND ACKNOWLEDGMENT:** *I acknowledge receipt of the conditions of probation and any attachments added. I understand that by not abiding by the conditions of probation my probation could be revoked and the Court may sentence me in accordance with the law. In addition, I waive extradition for any probation revocation proceedings in this matter.*

_____
Defendant

01/20/2017
Date

Transient
Address _____  Apt. _____  City _____  State _____  Zip _____  Phone _____

1100-010-B (Rev 6/10)

COP-STICKNEY006942

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## SPECIAL CONDITIONS OF PROBATION

State of Arizona

VS.   Casey Wells

PID # AZ: 19627691

**MARICOPA COUNTY DIVISION: Maricopa**   **RCCT3**

**CASE: CR2016-158122-001 DT  Cnt 002**

**Pursuant to Uniform Condition 21:**

**Drug Court**

1. I will participate, cooperate in and successfully complete the Drug Court Program to include abiding by all Drug Court program orders or contracts that may be provided in writing at future court hearings.
2. I will abide by and comply with all APD behavior agreements.
3. I will reside within the designated Drug Court supervision area.
4. I will actively participate in substance abuse treatment and follow all treatment program rules, conditions, and requirements which will be provided to me in writing by the treatment program, including drug testing, as directed by the APD.
5. I will submit a weekly co-payment for treatment services based on a sliding fee scale.
6. I understand Uniform Condition #15, fines and surcharges, is deferred pending a future Court hearing.
7. I may serve up to 120 days in the Maricopa County Jail as specified at a future Court hearing.

RECEIPT AND ACKNOWLEDGMENT: I acknowledge receipt of the Special Conditions of Probation. I understand that by not abiding by the Conditions of Probation my probation could be revoked and the Court may sentence me in accordance with the law.

_____
Defendant                              01/20/2017
                                            DATE

_____
**Hon. Julie Ashworth LaFave** 01/20/2017
MARICOPA COUNTY SUPERIOR COURT    DATE

1100-210e (R-10-10)

COP-STICKNEY006943

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## SPECIAL CONDITIONS OF PROBATION

State of Arizona

VS.  **Casey Wells**

PID # AZ: 19627691

**MARICOPA COUNTY DIVISION: Maricopa**     RCCT3

CASE: CR2016-158122-001 DT  Cnt 002

**Pursuant to Uniform Condition 21:**

**Mental Health**

1.  I will be screened for the Mental Health Court and, if accepted, participate, cooperate in and successfully complete the Mental Health Court program to include abiding by all Mental Health Court contract orders provided to me by the Mental Health Court.

2.  I will actively participate and cooperate in any program screenings and treatment as directed by the APD.

3.  I will follow instructions of program and/or treatment staff.

4.  I will take my medications as prescribed and report any changes in medication use to the APD.

5.  I will submit to blood level checks and urinalyses as instructed by treatment staff or the APD.

6.  I will abide by any curfew or restrictions to residence, if imposed by the APD.

7.  I may serve up to 120 days in the Maricopa County Jail as specified at a future Court hearing.

RECEIPT AND ACKNOWLEDGMENT: I acknowledge receipt of the Special Conditions of Probation. I understand that by not abiding by the Conditions of Probation my probation could be revoked and the Court may sentence me in accordance with the law.

_____                 _____
Defendant                                                    **Hon. Julie Ashworth LaFave**
                    01/20/2017                              01/20/2017
                    DATE                                      DATE
                                                      MARICOPA COUNTY SUPERIOR COURT

1100-210e (R-10-10)

COP-STICKNEY006944

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

JUDGMENT AND ORDERS OF RESTITUTION, FINES AND FEES

State of Arizona

VS.   Casey Wells                    **MARICOPA COUNTY DIVISION:** Maricopa          **RCCT3**

PID # AZ: 19627691                   **CASE: CR2016-158122-001 DT  Cnt 002**

Pursuant to Uniform Condition15: I will pay all restitution, fines, and fees in my case as imposed by the Court*

**Financial Sanctions**

| | | | Total Amount | Payment | Begin Date |
|---|---|---|---|---|---|
| b. | Probation Svc Fee/Standard (after 5/1/2009) A.R.S. 13-901(A) | | $65.00 | $65.00 | 3/1/2017 |
| d. | Drug Offense Fine (Paraphernalia) | $750.00 + Surcharge 83.00% = $622.50 | $1,372.50 | $10.00 | 3/1/2017 |

### Fines Monthly Total Payment = $75.00

**Other Assessments (paid in conjunction with monthly payment)**

| | | Total Amount | Payment | Begin Date |
|---|---|---|---|---|
| r. | Probation Assess.(7/1/08 to present) (A.R.S. 12-269) | $20.00 | | 3/1/2017 |
| s. | Time Payment Fee (A.R.S. 12-116) | $20.00 | | 3/1/2017 |
| t. | Victim Rights Enforcement Assessment (A.R.S. 12-116.09) | $2.00 | | 3/1/2017 |
| x. | Criminal Penalty Assessment (A.R.S. 12-116.04) *Glendale PD* | $13.00 | | 3/1/2017 |

## MONTHLY GRAND TOTAL PAYMENT = $75.00

*Pursuant to A.R.S. 13-805, failure to maintain contact with the Probation Department may result in the issuance of a criminal restitution order in favor of both the State for the unpaid balance, if any, of any fines, costs, fees, or surcharges or assessments imposed; and, in favor of each person entitled to restitution for the unpaid balance of any restitution ordered.
**Probation will automatically be extended pursuant to A.R.S. 13-902 C.
***Interstate Compact Process and Application Fee: Only one fee per defendant with entire fee due at time of application.

RECEIPT AND ACKNOWLEDGMENT: I acknowledge receipt of the Judgment and Orders of Restitution, Fines and Fees and understand my financial obligation to the Court and other related parties.

| | | |
|---|---|---|
| _____ | | _____ |
| | | **Hon.  Julie Ashworth LaFave** |
| Defendant          01/20/2017 | | MARICOPA COUNTY SUPERIOR COURT          01/20/2017 |
| DATE | | DATE |

1100-044 (R12-14)

COP-STICKNEY006945

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
I. OSUNA, Deputy
1/20/2017 9:17:00 AM
Filing ID 8033572

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## UNIFORM CONDITIONS OF SUPERVISED PROBATION

State of Arizona
VS.

Casey Wells

**MARICOPA COUNTY DIVISION: RCCT3**
**CR2016-158122-001 DT**

PID # AZ19627691

ARS §13-901.01    N/A

**OFFENSES:**

Count 004    ARS §13-1504A1    CRIM TRESP 1ST DEG-RES STRUCT    F6 U

*The Court is suspending imposition or execution of sentence and, under the supervision of the Adult Probation Department (APD),*

**PLACING** the defendant on probation for a period of **2.00** Years
to begin on **1/20/2017**

*I AGREE TO THE FOLLOWING AS CONDITIONS OF THE SUSPENSION OR THE IMPOSITION OR EXECUTION OF SENTENCE (Conditions Checked Also Apply)*

### LAW ABIDING BEHAVIOR
1. I will maintain a crime-free lifestyle, by obeying all laws, and not engaging or participating in any criminal activity.
2. I will not possess or control any stun guns, tasers, firearms, ammunition, deadly, or prohibited weapons as defined in A.R.S. §13-3101.
3. I will report any contact I have with law enforcement to the APD within 72 hours.
4. I will submit to search and seizure of person and property by the APD without a search warrant.
5. If deported or processed through voluntary departure, I will not return to the United States without legal authorization during the term of my probation. If I am deported or processed through voluntary departure, all conditions remain in effect.

### REPORTING TO APD
6. I will report to the APD within 72 hours of sentencing, absolute discharge from prison, release from incarceration, or residential treatment and continue to report as directed. I will also keep APD advised of progress toward case plan goals and comply with any written directive of the APD to enforce compliance with the conditions of probation. I will provide a sample for DNA testing if required by law.

### RESIDENCE
7. I will provide the APD safe, unrestricted access to my residence and receive prior approval of the APD before changing my residence. I will reside in a residence approved by the APD.
8. I will request and obtain written permission of the APD prior to leaving the state.
10. I may apply for an Inter-County transfer and will not proceed to that County until APD issues written authorization.

### TREATMENT/BEHAVIOR CHANGE/PRO-SOCIAL ACTIVITIES
11. I will actively participate and cooperate in any program of counseling or assistance as determined by APD, or as required by law, given assessment results and/or my behavior. I will sign any release or consent required by the APD so the APD can exchange information in relation to my treatment, behavior and activities.
12. I will not possess or use illegal drugs or controlled substances and will submit to drug and alcohol testing as directed by the APD.
13. I will obtain written approval of the APD prior to associating with anyone I know who has a criminal record. I will not knowingly associate with any person engaged in criminal behaviors.
14. I will seek, obtain, and maintain employment, if legally permitted to do so, and/or attend school according to my case plan with the APD. I will inform the APD of any changes within 72 hours.
15. I will be financially responsible by paying all restitution, fines, and fees in my case as imposed by the Court. I understand, if I do not pay restitution in full, the Court may extend my probation.

1100-010-A  (Rev 6/10)

COP-STICKNEY006946

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
UNIFORM CONDITIONS OF SUPERVISED PROBATION

State of Arizona
VS.

**Casey Wells**

MARICOPA COUNTY DIVISION: <u>RCCT3</u>
<u>CR2016-158122-001 DT</u>

PID # AZ19627691

ARS §13-901.01    N/A

21.    I will abide by the attached special conditions of probation:
•Mental Health
•Drug Court

22.    Defendant shall have no contact with the victim. Defendant shall not return to the scene of the crime. Defendant shall complete substance abuse treatment, including relapse prevention and aftercare.

Based upon the defendant's agreement to abide by the Conditions of Supervision set forth, above, as well as my review and approval of such conditions, I hereby impose and order that these conditions are in effect, and the defendant shall comply with said conditions.

_Hon. Julie AshworthLaFave_
MARICOPA COUNTY SUPERIOR COURT

01/20/2017
Date

**RECEIPT AND ACKNOWLEDGMENT:** *I acknowledge receipt of the conditions of probation and any attachments added. I understand that by not abiding by the conditions of probation my probation could be revoked and the Court may sentence me in accordance with the law. In addition, I waive extradition for any probation revocation proceedings in this matter.*

_Defendant_

01/20/2017
Date

Transient
Address    Apt.    City    State    Zip    Phone

1100-010-B  (Rev 6/10)

COP-STICKNEY006947

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## SPECIAL CONDITIONS OF PROBATION

State of Arizona

VS.   Casey Wells

PID # AZ: 19627691

MARICOPA COUNTY DIVISION: Maricopa          RCCT3

CASE: CR2016-158122-001 DT  Cnt 004

---

**Pursuant to Uniform Condition 21:**

**Drug Court**

1. I will participate, cooperate in and successfully complete the Drug Court Program to include abiding by all Drug Court program orders or contracts that may be provided in writing at future court hearings.
2. I will abide by and comply with all APD behavior agreements.
3. I will reside within the designated Drug Court supervision area.
4. I will actively participate in substance abuse treatment and follow all treatment program rules, conditions, and requirements which will be provided to me in writing by the treatment program, including drug testing, as directed by the APD.
5. I will submit a weekly co-payment for treatment services based on a sliding fee scale.
6. I understand Uniform Condition #15, fines and surcharges, is deferred pending a future Court hearing.
7. I may serve up to 120 days in the Maricopa County Jail as specified at a future Court hearing.

RECEIPT AND ACKNOWLEDGMENT: I acknowledge receipt of the Special Conditions of Probation. I understand that by not abiding by the Conditions of Probation my probation could be revoked and the Court may sentence me in accordance with the law.

Defendant

01/20/2017
DATE

Hon. Julie Ashworth LaFave
MARICOPA COUNTY SUPERIOR COURT

01/20/2017
DATE

1100-210e (R-10-10)

COP-STICKNEY006948

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
SPECIAL CONDITIONS OF PROBATION

State of Arizona

VS.   Casey Wells

PID # AZ: 19627691

MARICOPA COUNTY DIVISION: Maricopa     RCCT3

CASE: CR2016-158122-001 DT  Cnt 004

**Pursuant to Uniform Condition 21:**

**Mental Health**

1.  I will be screened for the Mental Health Court and, if accepted, participate, cooperate in and successfully complete the Mental Health Court program to include abiding by all Mental Health Court contract orders provided to me by the Mental Health Court.

2.  I will actively participate and cooperate in any program screenings and treatment as directed by the APD.

3.  I will follow instructions of program and/or treatment staff.

4.  I will take my medications as prescribed and report any changes in medication use to the APD.

5.  I will submit to blood level checks and urinalyses as instructed by treatment staff or the APD.

6.  I will abide by any curfew or restrictions to residence, if imposed by the APD.

7.  I may serve up to 120 days in the Maricopa County Jail as specified at a future Court hearing.

RECEIPT AND ACKNOWLEDGMENT: I acknowledge receipt of the Special Conditions of Probation. I understand that by not abiding by the Conditions of Probation my probation could be revoked and the Court may sentence me in accordance with the law.

Defendant                          01/20/2017
                                   DATE

Hon. Julie Ashworth LaFave 01/20/2017
                                   DATE
MARICOPA COUNTY SUPERIOR COURT

1100-210c (R-10-10)

COP-STICKNEY006949

Michael K. Jeanes, Clerk of Court
*** Filed ***
01/26/2017 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2016-158122-001 DT                                01/20/2017

                                        CLERK OF THE COURT
COMMISSIONER JULIE A. LAFAVE              M. Delgado/T. Sandoval
                                                Deputy

STATE OF ARIZONA                    MARY KATHLEEN PLOMIN

v.

CASEY WELLS (001)                   ALBERT G FREEMAN JR.
DOB: 10/11/1978

                                    APPEALS-CCC
                                    DISPOSITION CLERK-CSC
                                    RFR


SUSPENSION OF SENTENCE - PROBATION GRANTED

8:51 a.m.

Courtroom SCT 3B

State's Attorney:        Nathan Erickson on behalf of Mary Plomin
Defendant's Attorney:    Albert Freeman Jr.
Defendant:               Present

A record of the proceedings is made digitally in lieu of a court reporter.

The plea is accepted.

Count(s) 2 and 4: WAIVER OF TRIAL: The Defendant knowingly, intelligently and voluntarily waived all pertinent constitutional and appellate rights and entered a plea of guilty.

IT IS THE JUDGMENT of the Court Defendant is guilty of the following:

OFFENSE: Count 2 (as amended) Possession of Drug Paraphernalia

Docket Code 109              Form R109B-10                    Page 1

COP-STICKNEY006950

CR2016-158122-001 DT                                    01/20/2017


Class 6 Undesignated Felony
A.R.S. § 13-3401, 13-3407, 13-3415, 13-3416, 13-3418, 13-901.01 (H)(4), 13-901.01 (I),
13-805, 13-105, 13-3413, 12-269, 12-116.04, 12-116.09, 13-610, 13-604, 13-701, 13-702, 13-
707, 13-801 and 13-802
Date of Offense: 12/14/2016
Non Dangerous - Non Repetitive

OFFENSE: Count 4 (as amended) Criminal Trespass in the First Degree
Class 6 Undesignated Felony
A.R.S. § 13-1501, 13-1504 (A) (1), (B), 13-701, 13-702, 13-801, 13-604, 13-610, 13-707,
13-802, 12-116.04, 12-116.09 and 12-269
Date of Offense: 12/14/2016
Non Dangerous - Non Repetitive

The Court is suspending imposition or execution of sentence and, under the supervision
of the Adult Probation Department (APD), placing the Defendant on probation for:

Count 2 Probation Term: 2 years

To begin 1/20/2017.

IT IS ORDERED that probation in this cause number shall run concurrent with probation
in Count 4 in this cause number.

Count 4 Probation Term: 2 years

To begin 1/20/2017.

IT IS ORDERED that probation in this cause number shall run concurrent with probation
in Count 2 in this cause number.

Condition 6: Report to the APD within 72 hours of sentencing, absolute discharge from
prison, release from incarceration, or residential treatment and continue to report as directed.
Keep APD advised of progress toward case plan goals and comply with any written directive of
the APD to enforce compliance with the conditions of probation. Provide DNA testing if
required by law.

Condition 8: Request and obtain written permission of the APD prior to leaving the
State.

COP-STICKNEY006951

CR2016-158122-001 DT                                          01/20/2017

Condition 15: Restitution, Fines and Fees:

PROBATION SERVICE FEE: Count 2 - $65.00 per month, beginning 3/1/2017.

FINE: Count 2 - Total amount of $1,372.50, which includes surcharges of 83%, payable $10.00 per month beginning 3/1/2017.

PROBATION ASSESSMENT: Count 2 - $20.00 payable on 3/1/2017.

Count 2: Time payment fee pursuant to A.R.S. § 12-116 in the amount of $20.00 payable on 3/1/2017.

VICTIMS' RIGHTS ENFORCEMENT Count 2 - in the amount of $2.00 payable on 3/1/2017.

PENALTY ASSESSMENT - A.R.S. §12-116.04: Count 2 - $13.00 payable on 3/1/2017.

Investigative Agency:

Glendale Police Department

All amounts payable through the Clerk of the Superior Court.

The Court will retain jurisdiction over restitution for 6 months. No hearing is set at this time. In the event a restitution hearing is set, Defendant waives his/her presence.

Condition 21: Abide by the special conditions of probation as noted on the attachment to the Uniform Conditions of Supervised Probation as follows:

Mental Health

Drug Court

Condition 22: Other: Defendant shall complete substance abuse treatment, including relapse prevention and aftercare. Defendant shall have no contact with the victim. Defendant shall not return to the scene of the crime.

IT IS FURTHER ORDERED that Defendant shall submit to fingerprint identification processing by the Maricopa County Sheriff's Office if directed to do so by the Adult Probation Department. The Adult Probation Department shall direct any Defendant placed on probation

COP-STICKNEY006952

who has not already had a State Identification Number (SID) established to submit to fingerprint processing.

Defendant is advised pursuant to A.R.S. § 13-805 that failure to maintain contact with the Probation Department may result in the issuance of:

1. A criminal restitution order in favor of the state for the unpaid balance, if any, of any fines, costs, incarceration costs, fees, surcharges or assessments imposed.

2. A criminal restitution order in favor of each person entitled to restitution for the unpaid balance of any restitution ordered.

IT IS ORDERED granting the Motion to Dismiss the following: Counts 1 and 3.

IT IS ORDERED exonerating any bond previously posted in this matter to the party posting same.

IT IS FURTHER ORDERED that Defendant must submit to DNA testing for law enforcement identification purposes in accordance with A.R.S. §13-610.

Pursuant to the terms set forth in the parties' Plea Agreement,

IT IS ORDERED that the Defendant pay all costs associated with the DNA testing ordered herein.

8:57 a.m. Matter concludes.

IT IS ORDERED that defense counsel shall preserve defendant's file for post-conviction relief purposes. If defense counsel receives notice that defendant is seeking post-conviction relief, counsel shall prepare the file for delivery to PCR counsel and shall make timely arrangements for the exchange thereof when notified. Further, upon exchange of the file, defense counsel shall file with the court a Notice of Compliance that shall, at a minimum, include date of compliance, recipient of the file, and an itemization of contents of the file. A copy of the Notice shall be provided to PCR counsel, the State and the PCR Unit.

COP-STICKNEY006953

CR2016-158122-001 DT                                        01/20/2017

Defendant's right index fingerprint is permanently affixed to this sentencing order in open court.

/s/  COMMISSIONER JULIE A. LAFAVE
JUDICIAL OFFICER OF THE SUPERIOR COURT

(right index fingerprint)

COP-STICKNEY006954

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
05/05/2017 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2016-158122-001 DT                          04/28/2017


                                        CLERK OF THE COURT
COMMISSIONER VIRGINIA L. RICHTER              D. Van Hoorn
                                              Deputy


STATE OF ARIZONA                        PRELIM BUREAU B COUNTY
                                        ATTORNEY

v.

CASEY WELLS (001)                       PAMELA ADWELL



DRUG COURT STATUS HEARING


11:04 a.m.

Courtroom CCB 1004

State's Attorney:        Appearance Waived
Defendant's Attorney:    Amy Melcher
Defendant:               Present

A record of the proceedings is made digitally in lieu of a court reporter.

This is the time set for Drug Court Status Hearing.

Discussion is held.

Defendant is not in compliance with the Drug Court contract.


Docket Code 573              Form R000D                        Page 1

COP-STICKNEY006955

CR2016-158122-001 DT                                    04/28/2017


IT IS ORDERED Defendant shall self-surrender to the custody of the Maricopa County Sheriff's Office for the period of 1 day(s) commencing 05/07/2017, not to be released until 05/08/2017.

The Court reviews a new Path 2 Week 6 contract with Defendant and Defendant signs same.

IT IS FURTHER ORDERED setting Drug Court Status Hearing on 06/09/2017 at 10:00 a.m. before this division.

11:05 a.m. Matter concludes.

COP-STICKNEY006956

FILED 4/28/17 11:30 AM

MICHAEL K. JEANES, Clerk

By D. VanHoorn, Deputy



CLERK OF THE SUPERIOR COURT
MARICOPA COUNTY, AZ

ORDER OF CONFINEMENT

☒ SELF SURRENDER
☐ AMENDED

MARICOPA COUNTY JAIL

DOB 10/11/78

CR 2016-158122-001 Defendant Casey Wells

To the Sheriff of Maricopa County, the above-named individual:

☒ Having been remanded to the custody of the Sheriff
☒ Having been placed/ reinstated on probation with a term of incarceration

☐ Having rejected probation
☐ Having been found incompetent
☐ Having been found in violation of probation
☐ Other

On the charge(s) of: CT 2 (Amd) Possession of Drug Paraphernalia CtelF

☒ IT IS ORDERED that the Defendant be confined in the MARICOPA COUNTY JAIL for a period of 1 day commencing 5/7/17 with credit for O , not to be released until 5/8/17

☐ Defendant having been remanded to the custody of the Sheriff, Defendant shall be transported to the court on _____ at _____ for the purposes of _____

☐ Defendant is held NON-Bondable pursuant to ☐ Rule 7.2(c) ☐ Arizona Constitution Article 2. section 22.

**Check One Only**

☐ Defendant is to be screened for Work Furlough by Adult Probation

☐ Defendant shall participate in Work Furlough (participation is contingent upon Jail Classification/ MCSO approval)

☐ Defendant shall participate in Work Release (participation is contingent upon Jail Classification/ MCSO approval) Shall be released for wk/ school on:
Mon. Tues. Wed. Thurs. Fri. Sat. Sun From: _____ ☐AM ☐PM
(circle all days that apply) (Time)
To: _____ ☐AM ☐PM
(Time)

☐ Other _____

☐ Defendant shall be transferred for treatment at the Arizona State Hospital/ Correctional Health Services.
Status Hearing: _____

☐ Jail term concurrent with _____

☐ Jail term consecutive to _____

☐ IT IS FURTHER ORDERED Defendant be released from custody as to Count(s) _____

☐ IT IS FURTHER ORDERED dismissing _____

Today's date 4/28/17
Order of Confinement to Begin 5/7/17
by 9 pm

JUDGE/ JUDGE PRO TEM OF THE SUPERIOR COURT
Hon. Virginia Richter

1600-118 R08-12

COP-STICKNEY006957

**SUPERIOR COURT OF THE STATE OF ARIZONA**
**MARICOPA COUNTY**

| | |
|---|---|
| Division | **TCJ 01** |
| Pros Atty: | **DCA** |

**Tricia Hall, Luhrs Building**

**THE STATE OF ARIZONA**

vs.

**CASEY WELLS**
**DOB: 10/11/1978**

Case Number: **CR2016-158122-001-DT**

**PETITION TO MODIFY TERMS OR**
**REGULATIONS OF PROBATION & ORDER**

The defendant was formally judged guilty of the crime of **Count 2: 13-3415A DRUG PARAPHERNALIA-POSSESS/USE, A Class 6 Undesignated.**

| | | | |
|---|---|---|---|
| Probation Start | Date: 01/20/2017 | Prob. Length: 2 years | Standard |

The defendant was ordered to comply with the following condition(s) of probation: Condition #21, Drug Court

**CIRCUMSTANCES:**

The defendant was ordered to participate in the Drug Court Program; however, the Drug Court team has found the defendant to be ineligible for the program based on his recent behavior at treatment making him inappropriate to continue participating in Intensive Outpatient Substance Use Disorder Treatment groups.

**RECOMMENDATION:**

Delete Condition #21, Drug Court

**VICTIM STATUS:**

* There is no victim involved in this case.

Date: November 17, 2017

Tricia Hall
Probation Officer    Phone: 602-489-1479

---

**DIRECTION:**

☒ **IT IS ORDERED** modifying the condition(s) of probation as recommended above.

☐ **IT IS ORDERED** denying the petition.

☐ **IT IS ORDERED** _____

Date: _____

Judge of the Superior Court

Susan G. White

---

**CASEY WELLS**          **CR2016-158122-001-DT**

**PTM - PETITION TO MODIFY**                              1 of 1

# EXHIBIT 27

# SUPERIOR COURT OF THE STATE OF ARIZONA
## MARICOPA COUNTY

Division    **RCCT3**

Pros Atty:    **DCA**

**Kimberly McCurtain, Probation Service Center**

**THE STATE OF ARIZONA**                    Case Number:  **CR2016-158122-001-DT**

vs.

**CASEY WELLS**                    **MEMO TO THE COURT**

**DOB:    10/11/1978**

The defendant was formally judged guilty of the crime of **Count 2: 13-3415A  DRUG PARAPHERNALIA-POSSESS/USE,  A Class 6 Undesignated.**

Probation Start    Date: 01/20/2017    Prob. Length: 2 years                    Standard

**CIRCUMSTANCES:**

The defendant was arrested by Mesa Police on March 26th, 2018 for disorderly conduct and indecent exposure. According to Mesa Police report 2018-0850177, the defendant was standing nude shaking his hips side to side and praying with his hands up. These offenses are both misdemeanors and the defendant plead guilty in court on April 2nd, 2018. This officer met with the defendant on April 5th, 2018 and directed him to sign up for the Ladders program at Terros to address both mental health and substance abuse.

It is respectfully recommended he be allowed to address the matter in city court, foregoing a petition to revoke at this time. Please advise this officer if the court wishes to take any other action than described above.

**VICTIM STATUS:**

- There is no victim involved in this case.

Date: April 09, 2018                    Amanda Howe

                    Probation Officer        Phone: 602-525-0953

---

**DIRECTION:**

☐  Prepare and Submit a Petition to Revoke Probation with:  ☐  Summons    ☐  Bench Warrant

☒  Take Whatever Action Deemed Appropriate

☐  Take the Following Action:

Date:  4/20/18

                    Judge of the Superior Court

                    HONORABLE SUSAN WHITE
                    MARICOPA COUNTY SUPERIOR COURT

**CASEY WELLS    CR2016-158122-001-DT**

**MEM - MEMO TO THE COURT**                    1 of 1

COP-STICKNEY006959

# SUPERIOR COURT OF THE STATE OF ARIZONA
## MARICOPA COUNTY

| | | | |
|---|---|---|---|
| Amanda Howe, Probation Service Center | | Cause Number: | CR2016158122-001 |
| ACIC: Yes | NCIC: No | In Custody: No | Booking #: |
| Prop 302 Finding: None | | 13-901.01 Offense: Ineligible | |
| Veteran: No | | Interpreter: No | |

**THE STATE OF ARIZONA**                    **Petition To Revoke Probation– Order for Warrant**

vs.

**WELLS, CASEY**

DOB:    10/11/1978

The defendant was formally adjudged guilty of the crime of:

**COUNT 2: DRUG PARAPHERNALIA-POSSESS/USE, A CLASS 6 UNDESIGNATED COMMITTED ON: 12/14/2016**

**COUNT 4: CRIMINAL TRESPASS 1ST DEGREE , A CLASS 6 UNDESIGNATED COMMITTED ON: 12/14/2016**

Original Conditions Signed:  1/20/2017

**Count #**

| 2 | Probation Start: | 1/20/2017 | 2 years | Standard |
|---|---|---|---|---|
| 4 | Probation Start: | 1/20/2017 | 2 years | Standard |

**This officer has reason to believe that the defendant has failed to comply with the following term(s) of probation:**

#1        - The defendant committed the crime of Disorderly Conduct on or about  March 26, 2018.

            - The defendant committed the crime of Indecent Exposure on or about  March 26, 2018.

#3        The defendant had law enforcement contact on 3/26/2018, 4/17/2018 and did not report law enforcement contact to the Adult Probation Department within  seventy-two (72) hours.

#8        The defendant left the  state, on or about April 17, 2018 without written permission of the Adult Probation Department and traveled to  California.

#12      The defendant possessed or used an illegal drug or controlled substance,  alcohol, on or about 6/6/2017, 6/17/2017, 6/23/2017, 7/5/2017, 8/26/2017, 9/11/2017. The defendant possessed or used an illegal drug or controlled substance, methamphetamine, on or about 5/1/2017. Number of drug tests completed: 93. Number of drug tests missed: 7. Number of positive drug tests:  81. Number of negative drug tests:  12. Number of admissions of illegal drug use:  3. Number of admissions of controlled substance use:  0.

#15b    The defendant did not pay  Probation Service Fee as imposed by the Court: Monthly Payment $65.00. Delinquent $285.00; (COUNT  2).

#15d    The defendant did not pay Drug Fine and Surcharge as imposed by the Court: Total $1,372.50. Monthly payment $10.00. Balance owed $140.00; (COUNT  2).

**VICTIM STATUS:**

    1 Victim(s): The victim has not opted-in for post-conviction notice of probation matters. ( COUNT 4 )

**EVIDENCE FOR ALLEGED CONDITIONS:**

    Testimony of APO/SO Amanda Howe, Phone# (602) 525-0953.

    Testimony of APO/SO Benjamin Beckhart, Phone# (602) 619-2108.

    Copy of most recent conditions of probation, dated: 01/20/2017.

COP-STICKNEY006960

# SUPERIOR COURT OF THE STATE OF ARIZONA
## MARICOPA COUNTY

Copy of Behavior Agreement & Review and Acknowledgment, dated: 02/10/2017, 03/05/2018.

Copy of Uniform Behavior Agreement, per condition #12 dated 01/04/2018, condition #12 dated 02/08/2018, condition #12 dated 03/05/2018, condition #12 dated 04/05/2018.

Signed statement of Behavior Agreement, dated: 07/28/2017, 08/25/2017, 12/01/2017.

Copy of Police Report #2018-0850177, Agency Mesa Police Department.

RFR Printout, dated 04/18/2018.

Copy of APETS case entries, related to condition(s) #12.

I affirm under penalty of perjury that the foregoing is true and correct.

Date: April 24, 2018

Amanda Howe
_____
Adult Probation Officer
Phone: (602) 525-0953

---

The Court finds reasonable cause to believe that the probationer has violated a written condition or regulation of probation.
IT IS ORDERED that a warrant for the arrest of the Defendant shall be issued.
Appearance Bond (Secured) set at $900.00

Date: April 24, 2018

**Christine Mulleneaux**
_____
Judge / Commissioner

COP-STICKNEY006961

# EXHIBIT 28

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## UNIFORM CONDITIONS OF SUPERVISED PROBATION

State of Arizona

VS.

Casey Wells

**MARICOPA COUNTY DIVISION: MQPV3**

**CR2016-158122-001 DT**

PID # AZI9627691

ARS §13-901.01    Ineligible

**OFFENSES:**

| Count 002 | ARS §13-3415A | DRUG PARAPHERNALIA-POSSESS/USE | F6 U |

*The Court is suspending imposition or execution of sentence and, under the supervision of the Adult Probation Department (APD),*

**Reinstating** the defendant on probation for a period of **2.00** Years

to begin on **5/18/2018** with a revised expiration date of **02/13/2019**

*I AGREE TO THE FOLLOWING AS CONDITIONS OF THE SUSPENSION OR THE IMPOSITION OR EXECUTION OF SENTENCE (Conditions Checked Also Apply)*

#### LAW ABIDING BEHAVIOR
1. I will maintain a crime-free lifestyle, by obeying all laws, and not engaging or participating in any criminal activity.
2. I will not possess or control any stun guns, tasers, firearms, ammunition, deadly, or prohibited weapons as defined in A.R.S. §13-3101.
3. I will report any contact I have with law enforcement to the APD within 72 hours.
4. I will submit to search and seizure of person and property by the APD without a search warrant.
5. If deported or processed through voluntary departure, I will not return to the United States without legal authorization during the term of my probation. If I am deported or processed through voluntary departure, all conditions remain in effect.

#### REPORTING TO APD
6. I will report to the APD within 72 hours of sentencing, absolute discharge from prison, release from incarceration, or residential treatment and continue to report as directed. I will also keep APD advised of progress toward case plan goals and comply with any written directive of the APD to enforce compliance with the conditions of probation. I will provide a sample for DNA testing if required by law.

#### RESIDENCE
7. I will provide the APD safe, unrestricted access to my residence and receive prior approval of the APD before changing my residence. I will reside in a residence approved by the APD.
8. I will request and obtain written permission of the APD prior to leaving the state.
10. I may apply for an Inter-County transfer and will not proceed to that County until APD issues written authorization.

#### TREATMENT/BEHAVIOR CHANGE/PRO-SOCIAL ACTIVITIES
11. I will actively participate and cooperate in any program of counseling or assistance as determined by APD, or as required by law, given assessment results and/or my behavior. I will sign any release or consent required by the APD so the APD can exchange information in relation to my treatment, behavior and activities.
12. I will not possess or use illegal drugs or controlled substances and will submit to drug and alcohol testing as directed by the APD.
13. I will obtain written approval of the APD prior to associating with anyone I know who has a criminal record. I will not knowingly associate with any person engaged in criminal behaviors.
14. I will seek, obtain, and maintain employment, if legally permitted to do so, and/or attend school according to my case plan with the APD. I will inform the APD of any changes within 72 hours.
15. I will be financially responsible by paying all restitution, fines, and fees in my case as imposed by the Court. I understand, if I do not pay restitution in full, the Court may extend my probation.
16. I will not consume or possess any substances containing alcohol.

1100-010-A (Rev 6/10)

COP-STICKNEY006963

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## UNIFORM CONDITIONS OF SUPERVISED PROBATION

State of Arizona

VS.

**Casey Wells**

**MARICOPA COUNTY DIVISION:** MQPV3

CR2016-158122-001 DT

**PID #** AZ19627691

ARS §13-901.01    Ineligible

18.  I will serve 90 days, in the county jail beginning 5/18/2018 with credit for 0 days served, not to be released until 8/16/2018. I will comply with all program rules. The jail time is to run as flat time.

19.  I will not have any contact with the victim(s) in any form, unless approved in writing by the APD.

21.  I will abide by the attached special conditions of probation:
     •Mental Health

22.  While in custody, screen Defendant for participation in Reach Out for substance abuse and/or mental health assessment and treatment. If selected for Reach Out, the court authorizes defendant's early release from custody to a treatment facility approved by APD. I will complete a mental health needs screen not later than 40 days after release from custody and participate in any identified treatment services. Thinking For Change: Be screened for "Thinking For Change" (T4C) and if eligible, enroll in and complete the program.

**Based upon the defendant's agreement to abide by the Conditions of Supervision set forth, above, as well as my review and approval of such conditions, I hereby impose and order that these conditions are in effect, and the defendant shall comply with said conditions.**

_____

**Hon.  John R.Doody**
MARICOPA COUNTY SUPERIOR COURT

05/18/2018
**Date**

**RECEIPT AND ACKNOWLEDGMENT:** *I acknowledge receipt of the conditions of probation and any attachments added. I understand that by not abiding by the conditions of probation my probation could be revoked and the Court may sentence me in accordance with the law. In addition, I waive extradition for any probation revocation proceedings in this matter.*

_____
Defendant

05/18/2018
**Date**

_____
Transient
**Address**

Apt.        City        State    Zip    Phone

1100-010-B  (Rev 6/10)

COP-STICKNEY006964

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## SPECIAL CONDITIONS OF PROBATION

State of Arizona

VS.  **Casey Wells**

PID # AZ: 19627691

**MARICOPA COUNTY DIVISION: Maricopa**     MQPV3

**CASE: CR2016-158122-001 DT  Cnt 002**

---

**Pursuant to Uniform Condition 21:**

**Mental Health**

1. I will be screened for the Mental Health Court and, if accepted, participate, cooperate in and successfully complete the Mental Health Court program to include abiding by all Mental Health Court contract orders provided to me by the Mental Health Court.
2. I will actively participate and cooperate in any program screenings and treatment as directed by the APD.
3. I will follow instructions of program and/or treatment staff.
4. I will take my medications as prescribed and report any changes in medication use to the APD.
5. I will submit to blood level checks and urinalyses as instructed by treatment staff or the APD.
6. I will abide by any curfew or restrictions to residence, if imposed by the APD.
7. I may serve up to 120 days in the Maricopa County Jail as specified at a future Court hearing.

RECEIPT AND ACKNOWLEDGMENT: I acknowledge receipt of the Special Conditions of Probation. I understand that by not abiding by the Conditions of Probation my probation could be revoked and the Court may sentence me in accordance with the law.

_____          _____
Defendant                                        05/18/2018
                                                      DATE

**Hon. John R. Doody**          05/18/2018
MARICOPA COUNTY SUPERIOR COURT     DATE

1100-210e (R-10-10)

COP-STICKNEY006965

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## JUDGMENT AND ORDERS OF RESTITUTION, FINES AND FEES

State of Arizona

VS.   **Casey Wells**                          **MARICOPA COUNTY DIVISION: Maricopa**      **MOPV3**

PID # AZ: 19627691                             **CASE: CR2016-158122-001 DT  Cnt 002**

**Pursuant to Uniform Condition15: I will pay all restitution, fines, and fees in my case as imposed by the Court***

---

## Financial Sanctions

|   |   |   | Total Amount | Payment | Begin Date |
|---|---|---|---|---|---|
| b. | Probation Svc Fee/Standard (after 5/1/2009) A.R.S. 13-901(A) | | $65.00 | $65.00 | 11/1/2018 |
| c. | Delinquent Probation Service Fee A.R.S. 13-901 | | $285.00 | $10.00 | 11/1/2018 |
| d. | Drug Offense Fine (Paraphernalia) | $750.00 + Surcharge 83.00% = $622.50 | $1,372.50 | $10.00 | 11/1/2018 |

### Fines Monthly Total Payment =   $85.00

## Other Assessments (paid in conjunction with monthly payment)

|   |   | Total Amount | Payment | Begin Date |
|---|---|---|---|---|
| r. | Probation Assess.(7/1/08 to present) (A.R.S. 12-269) | $20.00 | | 11/1/2018 |
| s. | Time Payment Fee (A.R.S. 12-116) | $20.00 | | 11/1/2018 |
| t. | Victim Rights Enforcement Assessment (A.R.S. 12-116.09) | $2.00 | | 11/1/2018 |
| x. | Criminal Penalty Assessment (A.R.S. 12-116.04) *Glendale PD* | $13.00 | | 11/1/2018 |

## MONTHLY GRAND TOTAL PAYMENT :  $85.00

1100-044 (R12-14)

COP-STICKNEY006966

*Pursuant to A.R.S. 13-805, failure to maintain contact with the Probation Department may result in the issuance of a criminal restitution order in favor of both the State for the unpaid balance, if any, of any fines, costs, fees, or surcharges or assessments imposed; and, in favor of each person entitled to restitution for the unpaid balance of any restitution ordered.
**Probation will automatically be extended pursuant to A.R.S.13-902 C.
***Interstate Compact Process and Application Fee: Only one fee per defendant with entire fee due at time of application.

---

RECEIPT AND ACKNOWLEDGMENT: I acknowledge receipt of the Judgment and Orders of Restitution, Fines and Fees and understand my financial obligation to the Court and other related parties.

| | |
|---|---|
| _(signature)_ | _(signature)_ |
| | Hon. John R. Doody |
| Defendant | MARICOPA COUNTY SUPERIOR COURT |
| 05/18/2018 | 05/18/2018 |
| DATE | DATE |

1100-044 (R12-14)

COP-STICKNEY006967



IN THE SUPERIOR COURT OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

State of Arizona

V.

Casey Wells

**Case: CR2016-158122-001 DT**

**ORDER OF CONFINEMENT**

**MARICOPA COUNTY JAIL**

DOB: 10/11/1978

To the Sheriff of Maricopa County, the above-named individual having been placed on probation with a term of imprisonment on the charge(s) of :

Count 002    ARS §13-3415A    DRUG PARAPHERNALIA-POSSESS/USE   F6 U

**IT IS HEREBY ORDERED:** the above named individual is confined to the MARICOPA County JAIL as a condition of probation and as follows:

> Count 002   I will serve 90 days, in the county jail beginning 5/18/2018 with credit for 0 days served, not to be released until 8/16/2018. I will comply with all program rules. The jail time is to run as flat time.

IT IS FURTHER ORDERED:

> While in custody, screen Defendant for participation in Reach Out for substance abuse and/or mental health assessment and treatment. If selected for Reach Out, the court authorizes defendant's early release from custody to a treatment facility approved by APD. I will complete a mental health needs screen not later than 40 days after release from custody and participate in any identified treatment services. Thinking For Change: Be screened for "Thinking For Change" (T4C) and if eligible, enroll in and complete the program.

> Defendant shall complete substance abuse treatment, including relapse prevention and aftercare. Defendant shall have no contact with the victim. Defendant shall not return to the scene of the crime.

The following count(s) have a sentence or reinstatement of Probation

| | | | |
|---|---|---|---|
| Count 002 | ARS §13-3415A | DRUG PARAPHERNALIA-POSSESS/USE | F6 U |
| Count 004 | ARS §13-1504A1 | CRIM TRESP 1ST DEG-RES STRUCT | F6 U |

Today's Date: 05/18/2018

Order of Confinement to begin: 05/18/2018

Signature:

**Commissioner John R. Doody**
MARICOPA COUNTY SUPERIOR COURT

Docket: OCJ

COP-STICKNEY006968

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2016-158122-001 DT                                    05/18/2018

                                                 CLERK OF THE COURT
COMMISSIONER JOHN R. DOODY                          C. Williamson
                                                        Deputy


STATE OF ARIZONA                        ANN NMN ALEXOV

v.

CASEY WELLS (001)                       JOHN W TARADASH
DOB: 10/11/1978
                                        DISPOSITION CLERK-CSC
                                        RFR


DISPOSITION HEARING - PROBATION REINSTATED WITH REVOCATION
ARRAIGNMENT/VIOLATION HEARING


1:59 p.m.

Courtroom #3 CCB - LL

State's Attorney:          S. Heckathorne
Defendant's Attorney:      J. Taradash
Defendant:                 Present

A record of the proceedings is made digitally in lieu of a court reporter.

Defendant was present for the group advisement given on the record at 10:30 a.m. this date in Courtroom 3.

The Defendant admits violation of probation for condition 12.

The admission is accepted and entered of record.

Docket Code 580                Form R580-10                        Page 1

COP-STICKNEY006969

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2016-158122-001 DT                              05/18/2018

The Defendant is advised of the right to disposition hearing within the statutory time limits and the right to a written probation violation report.

Disposition proceeds at this time.

The Court finds Defendant has violated the conditions of probation previously imposed.

IT IS ORDERED suspending imposition of sentence and, under the supervision of the Adult Probation Department (APD), continuing the defendant on probation beginning 05/18/2018:

Count(s) 2 and 4: With a revised expiration date of 02/13/2019.

Count(s) 2 and 4: Length of Probation: 2 years

Conditions of probation include the following:

Condition 6: Report to the APD within 72 hours of sentencing, absolute discharge from prison, release from incarceration, or residential treatment and continue to report as directed. Keep APD advised of progress toward case plan goals and comply with any written directive of the APD to enforce compliance with the conditions of probation. Provide DNA testing if required by law.

Condition 8: Request and obtain written permission of the APD prior to leaving the State.

Condition 15: Restitution, Fines and Fees:

PROBATION SERVICE FEE: Count 2 - $65.00 per month.

DELINQUENT PROBATION SERVICE FEES: Count 2 - $285.00 payable $10.00 per month.

FINE: Count 2 - Total amount of $1,372.50, which includes surcharges of 83%, payable $10.00 per month.

PROBATION ASSESSMENT: Count 2 - $20.00.

TIME PAYMENT FEE: Count 2 - $20.00.

COP-STICKNEY006970

CR2016-158122-001 DT                                           05/18/2018

VICTIMS' RIGHTS ENFORCEMENT: Count 2 - $2.00.

PENALTY ASSESSMENT: A.R.S. § 12-116.04 - Count 2 - $13.00.

Investigative Agency:

Glendale Police Department

Payment to commence on 11/01/2018 and is due on the same day of each month thereafter until paid in full.

All amounts payable through the Clerk of the Superior Court.

Condition 16: Not consume or possess any substances containing alcohol.

Condition 18: Count 2: Be incarcerated in the county jail for 90 day(s), beginning 05/18/2018 with credit for 0 day(s) served.

Not to be released until 08/16/2018.

Report to the APD within 72 hours of release from jail. Comply with all program rules.

Condition 19: Not have any contact with the victim(s) in any form, unless approved in writing by the APD.

Condition 21: Abide by the special conditions of probation as noted on the attachment to the Uniform Conditions of Supervised Probation as follows:

Mental Health

Condition 22: Other: While in custody, screen Defendant for participation in Reach Out for substance abuse and/or mental health assessment and treatment. If selected for Reach Out, the court authorizes defendant's early release from custody to a treatment facility approved by APD. I will complete a mental health needs screen not later than 40 days after release from custody and participate in any identified treatment services. Thinking For Change: Be screened for "Thinking For Change" (T4C) and if eligible, enroll in and complete the program.

IT IS FURTHER ORDERED Defendant be given credit for any monies paid to date.

COP-STICKNEY006971

CR2016-158122-001 DT                                    05/18/2018

IT IS FURTHER ORDERED that Defendant shall submit to fingerprint identification processing by the Maricopa County Sheriff's Office if directed to do so by the Adult Probation Department. The Adult Probation Department shall direct any Defendant placed on probation who has not already had a State Identification Number (SID) established to submit to fingerprint processing.

Defendant is reminded that failure to maintain contact with the Probation Department as required by your Probation Officer may result in the following orders being issued against you:

1. A criminal restitution order in favor of the state for the unpaid balance, if any, of any fines, costs, incarceration costs, fees, surcharges or assessments imposed.

2. A criminal restitution order in favor of each person entitled to restitution for the unpaid balance of any restitution ordered.

IT IS ORDERED granting the Motion To Dismiss the allegations of violation of the remaining term(s) as set forth in the Petition To Revoke.

Count(s) 2: IT IS ORDERED remanding Defendant to the custody of the Maricopa County Sheriff.

Count(s) 4: IT IS FURTHER ORDERED Defendant be released from custody for this count only.

The written terms and conditions of probation are handed to the Defendant for explanation and signature. The Defendant is advised of the consequences of failure to abide by the terms of probation.

2:16 p.m. Matter concludes.

IT IS ORDERED that defense counsel shall preserve defendant's file for post-conviction relief purposes. If defense counsel receives notice that defendant is seeking post-conviction relief, counsel shall prepare the file for delivery to PCR counsel and shall make timely arrangements for the exchange thereof when notified. Further, upon exchange of the file, defense counsel shall file with the court a Notice of Compliance that shall, at a minimum, include date of compliance, recipient of the file, and an itemization of contents of the file. A copy of the Notice shall be provided to PCR counsel, the State and the PCR Unit.

COP-STICKNEY006972

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CR2016-158122-001 DT                              05/18/2018


        Defendant's right index fingerprint is permanently affixed to this sentencing order in open
court.



                    /s/  COMMISSIONER JOHN R. DOODY
                    JUDICIAL OFFICER OF THE SUPERIOR COURT


(right index fingerprint)

COP-STICKNEY006973

## SUPERIOR COURT OF THE STATE OF ARIZONA
### MARICOPA COUNTY

| | |
|---|---|
| Amanda Howe, Probation Service Center | **Cause Number:** CR2016158122-001 |
| ACIC: Yes　　　NCIC: No | In Custody:　　No　　　Booking #: |
| Prop 302 Finding: None | 13-901.01 Offense: Ineligible |
| Veteran: No | Interpreter:　　No |

**THE STATE OF ARIZONA**　　　　　　　　　**Petition To Revoke Probation – Order for Warrant**

vs.

**WELLS, CASEY**

DOB:　10/11/1978

The defendant was formally adjudged guilty of the crime of:

**COUNT 2: DRUG PARAPHERNALIA-POSSESS/USE, A CLASS 6 UNDESIGNATED COMMITTED ON: 12/14/2016**
**COUNT 4: CRIMINAL TRESPASS 1ST DEGREE , A CLASS 6 UNDESIGNATED COMMITTED ON: 12/14/2016**

Original Conditions Signed: 1/20/2017

Count #

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2 | Probation Start: | 1/20/2017 | 2 years | | | | Standard |
| 2 | Reinstated | 5/18/2018 | 2 years | Ending | 2/13/2019 | | Standard |
| 4 | Probation Start: | 1/20/2017 | 2 years | | | | Standard |
| 4 | Reinstated | 5/18/2018 | 2 years | Ending | 2/13/2019 | | Standard |

**This officer has reason to believe that the defendant has failed to comply with the following term(s) of probation:**

#1　　　- The defendant committed the crime of Indecent Exposure on or about February 4, 2019.

　　　　　- The defendant committed the crime of Aggravated Assault on or about February 4, 2019.

**VICTIM STATUS:**

　　1 Victim(s): The victim has not opted-in for post-conviction notice of probation matters. ( COUNT 4 )

**EVIDENCE FOR ALLEGED CONDITIONS:**

　　Testimony of APO/SO Amanda Howe, Phone# (602) 525-0953.
　　Copy of most recent conditions of probation, dated: 08/09/2018.
　　Copy of Police Report #2019-203420, Agency Phoenix Police.

COP-STICKNEY006974

# EXHIBIT 29

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
              Plaintiff,      )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
              Defendants.     )
_____)


VIDEORECORDED VIDEOCONFERENCE

30(B)(6) DEPOSITION

OF

JOSHUA CALLE

Phoenix, Arizona
September 16, 2021
8:56 a.m.


DONNA DELAVINA REPORTING, LLC
                              Arizona RRF No. R1010
                              313 North Gilbert Road
PREPARED BY:                        Suite 300
                              Gilbert, Arizona 85234
Donna DeLaVina, RPR            P (602) 230-5454
Certified Reporter             F (480) 546-3721
Certificate No. 50468          www.dlvreporting.com

1            THE WITNESS:  The tactical training

2   detail, yes.

3       Q.  BY MR. SHOWALTER:  Okay.  Now, is that -- is

4   that something that's part of the Phoenix -- I think

5   you testified earlier, that's part of the academy?

6       A.   It's part of the Training Bureau, yes.

7       Q.   And so you train officers at the academy?

8            MS. RETTS:  Form.

9            THE WITNESS:  We train officers in

10  general.  Sometimes at the academy, at offsite

11  locations, for instance.

12      Q.  BY MR. SHOWALTER:  So you train officers at the

13  academy and you also are involved in continuing

14  education; is that fair?

15           MS. RETTS:  Form.

16           THE WITNESS:  Correct.

17      Q.  BY MR. SHOWALTER:  What are the courses that

18  you personally teach?

19      A.   Currently the one that I teach, it would be a

20  response to resistance review.

21      Q.   A response to resistance review?

22      A.   Correct.

23      Q.   And so does that mean that that tends to be a

24  continuing education course for officers who have

25  already graduated from the academy?

1    A.  So it's part of our, we'll call it, annual

2 advanced officer training in our module, that's one of

3 the courses in that.

4    Q.  And is that training every Phoenix police

5 officer is required to take every year?

6    A.  Yes and no.  It is mandatory for patrol

7 officers to go through this training.  This year things

8 are a little bit different, so non-patrol officers are

9 also getting portions of the training as well.

10    Q.  And what is taught in the response to

11 resistance review?

12    A.  There are -- a lot of it is policy, where we go

13 over Operations Order 1.5, talking about resistance

14 levels, response options, how policy is written, what

15 it reads, what it says.  We discuss issues related to

16 articulation, when force is used, stuff that we see.

17 And then there is a lot of de-escalation, some small

18 team tactics, team movement, there are pressures on

19 crisis entry, active shooter and a few other things

20 related to that.

21    Q.  Did that used to be called the use of force

22 review?

23    A.  Yes.  This year we changed our verbiage from

24 response -- or from use of force to response to

25 resistance.

1    Q.  Do you know why that change was made?

2              MS. RETTS:  Outside the scope; foundation.

3              THE WITNESS:  You mean from the chain of

4    command?

5    Q.  BY MR. SHOWALTER:  Would you agree with me,

6    that changing the name of that lesson plan from use of

7    force review to response to resistance review, takes

8    the emphasis away from the police use of force and

9    attempts to put it on the resistance of subjects?

10             MS. RETTS:  Outside the scope; foundation.

11             THE WITNESS:  I believe it kind of puts

12   the onus back on the subject that's resisting from the

13   police.  Yeah, I would agree to that.

14   Q.  BY MR. SHOWALTER:  Other than changing the

15   name, was there a substantive change in what was being

16   taught?

17   A.  No.

18             MS. RETTS:  Form.

19   Q.  BY MR. SHOWALTER:  And so that change you

20   understand occurred in the past year?

21   A.  Yeah, within the last year, this year, last

22   year sometime.

23   Q.  I'm going to show you a lesson plan that's been

24   produced in this case that is a --

25             MR. SHOWALTER:  And Tina, Ms. Retts,

1  it's -- I believe it's our Exhibit 179.

2          And this is a document that was produced

3  to us in this case as the City of Phoenix Police

4  Department Lesson Plan 2015 Module Use of Force Review

5  and it is Bates stamped COP-STICKNEY003628 through 38.

6      Q.  BY MR. SHOWALTER:  Is this a document that you

7  reviewed prior to this deposition?

8      A.  I believe so.  I looked at lot of lesson plans

9  and I think this is one that I looked at.

10     Q.  And is this use of force review the lesson plan

11  that is a version of the lesson plan that is now known

12  as the response to resistance review?

13          MS. RETTS:  Form.

14          THE WITNESS:  Yes and no.  It's covering

15  Operations Order 1.5.  I believe we've had some

16  changes, obviously, in the last six years.  So some of

17  this stuff is our policies have changed, it would be

18  different.

19     Q.  BY MR. SHOWALTER:  Okay.  And so when I said

20  "version," would it be fair to say that this is an

21  earlier version of the training that is currently known

22  as the response to resistance review?

23          MS. RETTS:  Form.

24          THE WITNESS:  Yeah, you could say that.

25     Q.  BY MR. SHOWALTER:  And my understanding of

1 reviewing this is that this is a training that

2 references Operations Order 1.5; is that fair?

3      A.  That is correct.

4      Q.  What is Operations Order 1.5?

5      A.  Operations Order 1.5 used to be referenced as

6 our use of force policy.  It's now the response to

7 resistance policy.

8      Q.  Okay.  So as of February 2019, Operations Order

9 1.5 would have been the use of force policy, correct?

10      A.  Yes.

11      Q.  All right.  Now, I'm going to --

12           MR. SHOWALTER:  And, Donna, can we have PP

13 lesson plan that I just looked at marked as Exhibit

14 179?

15           THE COURT REPORTER:  Yes.

16           MS. RETTS:  Marked as 179 or -- do you

17 want to start at 179?

18           MR. SHOWALTER:  I'm just going to mark it

19 as 179 and I'm not going to go consecutive in this

20 deposition.  I'm just going to use our disclosure

21 exhibit numbers.

22           MS. RETTS:  All right.

23      (Whereupon, Deposition Exhibit 179 was marked

24 for identification.)

25      Q.  BY MR. SHOWALTER:  The next document is what

1  before I get into that.

2          When did you graduate from the academy?

3    A.  It would have been I believe October of 2003,

4  2003.

5    Q.  And when you first started as a Phoenix police

6  officer, were you trained that there was a use of force

7  continuum?

8          MS. RETTS:  Form; outside the scope.

9          THE WITNESS:  Numerous years.  I don't

10  remember this particular verbiage.  I know there's been

11  a use of force matrix and a use of force continuum

12  throughout my career.

13    Q.  BY MR. SHOWALTER:  And currently there are use

14  of force options, correct?

15    A.  That's correct.

16    Q.  And that was also the case in February of 2019

17  that there was use of force options, correct?

18    A.  I believe so, yeah.  I don't know when that

19  verbiage specifically changed, but that sounds about

20  right.

21    Q.  So looking at Exhibit 204, the first thing it

22  says, under general information, is "Sanctity of Life,

23  The Department respects the dignity of all persons and

24  recognizes the sanctity of human life, rights, and

25  liberty."

1      Did I read that correctly?

2    A.  Yes.

3    Q.  Is that true even for the lives of people who

4 are alleged to have committed crimes?

5    A.  It's true for everybody.

6    Q.  And so it's also true -- and that's part of the

7 training that even the City of Phoenix Police are

8 trained that even people who are suspected of crimes

9 have dignity and the sanctity of their life, rights and

10 liberty must be respected; is that fair?

11   A.  I would say, no, that's not fair.  When we

12 train this, we don't separate any segment of the

13 population.  It's just everyone, we will respect the

14 dignity and sanctity of life of everybody.  If they

15 happen to be criminals or if they happen to be whatever

16 else, they still fall under the sanctity of life

17 statement.

18   Q.  So it doesn't matter if they're a criminal,

19 officers are expected to have reverence for the

20 sanctity of their lives, correct?

21   A.  That is correct.

22   Q.  And it doesn't matter if they are under the

23 influence of alcohol or marijuana or methamphetamine

24 either, correct?

25   A.  To respect the sanctity of life, correct.

1    Q.  Correct.

2            Is that right?

3    A.  Yes.

4            MS. RETTS:  He answered correct before.

5    Did that not come across?

6            MR. SHOWALTER:  I don't think it did.

7            MS. RETTS:  Okay.

8    Q.  BY MR. SHOWALTER:  And so Operations Order 1.5

9    sets forth the policies of the Phoenix Police

10   Department for physical force, non-deadly force and

11   deadly force, as well as lethal weapons and equipment,

12   correct?

13   A.  Correct.

14   Q.  And it also states "Officers are trained to

15   utilize deadly force only as a last resort when other

16   measures are not practical under the existing

17   circumstances."

18           Did I read that correctly?

19   A.  Yes, you did.

20   Q.  And all officers have to be trained in this

21   before using any kind of force, correct?

22   A.  Officers are trained in defensive tactics,

23   first delivered in the academy and then through regular

24   in-service training, yes.

25   Q.  But is their training consistent with

1  Operations Order 1.5?

2      A.  Yes.

3      Q.  But the training actually includes many things

4  that are not contained within Operations Order 1.5,

5  correct?

6              MS. RETTS:  Form.

7              THE WITNESS:  How do you mean?

8      Q.  BY MR. SHOWALTER:  There are specific tactics,

9  you know, for instance with respect to you restraining

10  subjects that are not detailed in this operations

11  order, correct?

12              MS. RETTS:  Form.

13              THE WITNESS:  I think that would be

14  accurate.

15      Q.  BY MR. SHOWALTER:  And this policy defines --

16  it has a series of definitions, correct?

17      A.  Correct, right here on Point Number 2 under

18  definitions, yes.

19      Q.  And it defines non-deadly force, Definition B

20  as a tactic, "when properly applied, has minimal or no

21  risk of causing death."

22              Did I read that correctly?

23      A.  Yes.

24      Q.  Do you agree with that definition of non-deadly

25  force?

1  and training.

2          MS. RETTS:  Form; foundation; outside the

3  scope.

4          THE WITNESS:  The same reaction or same

5  response would be totality of the circumstances and

6  what the intent of the officer was trying to do.

7      Q.  BY MR. SHOWALTER:  And that's what police are

8  trained is that you can't have a bright-line rule on

9  that, it always depends on the totality of the

10 circumstances to determine whether that constitutes a

11 deadly force use?

12         MS. RETTS:  Form; outside the scope.

13         THE WITNESS:  Outside of a firearm, yeah.

14     Q.  BY MR. SHOWALTER:  What about placing somebody

15 in handcuffs and RIPP restraints and then facing them

16 facedown on the ground, can that be deadly force?

17         MS. RETTS:  Form; foundation; outside the

18 scope.

19         THE WITNESS:  Again, it is the totality of

20 the circumstances; placing someone on their chest would

21 not be considered deadly force.

22     Q.  BY MR. SHOWALTER:  Can it be if a person is

23 placed in restraints with their hands cuffed behind

24 their back and their legs restrained with RIPP

25 restraints and left facedown on the ground, can that

1  constitute deadly force under the City of Phoenix's
2  policy?
3          MS. RETTS:  Form; foundation; outside the
4  scope.
5          THE WITNESS:  Again, it would be dependent
6  on the totality of the circumstances.
7      Q.  BY MR. SHOWALTER:  I'm going to stop the share.
8  I want to show you a different. . .
9          Would you agree with me that City of
10  Phoenix -- well, are City of Phoenix police trained
11  that placing a handcuff restrained subject in the
12  facedown prone position can cause death or serious
13  bodily injury?
14          MS. RETTS:  Form.
15          THE WITNESS:  Again, based on the totality
16  of the circumstances, you could say that.  But merely
17  placing someone in restraints in the facedown position
18  would not constitute deadly force.  There's a lot more
19  that would go into it.
20      Q.  BY MR. SHOWALTER:  And that wasn't my question.
21          My question is:  Are City of Phoenix
22  police officers trained that placing somebody who has
23  been handcuffed and RIPPed restrained facedown in the
24  prone position can be deadly force?
25          MS. RETTS:  Form.

1           THE WITNESS:  Based on your specific

2    question, no.

3        Q.  BY MR. SHOWALTER:  Are Phoenix police officers

4    trained that placing weight on the back of a subject

5    who is facedown in the prone position, who's handcuffed

6    and RIPPed restrained can be deadly force?

7           MS. RETTS:  Form; foundation.

8           THE WITNESS:  Again, it's totality of the

9    circumstances.  Like we do defensive tactics training

10   all the times with recruits and in-service where we

11   restrain them, put them in handcuffs and use RIPP

12   restraint.  Team tactics where we use weight to control

13   subjects with movements.  And, no, we don't train

14   that's deadly force.  There's a lot of other mitigating

15   factors and stuff that go into it.  We don't -- to

16   answer your question a little bit -- to clarify what

17   you're asking -- if we were to leave people for

18   extended amount of time with other mitigating factors,

19   yeah, that could be considered deadly force.

20       Q.  BY MR. SHOWALTER:  And so what are the

21   circumstances under which leaving somebody facedown

22   who's restrained could constitute deadly force pursuant

23   to the City of Phoenix's training?

24           MS. RETTS:  Form; foundation.

25           THE WITNESS:  If they're in a fight.

1  They're exhibiting a lot of different behaviors,

2  mental, physical, health, drugs, all of that would go

3  into it.  As a rule, we don't -- we train that if

4  they're in a position, it's just for a short time to

5  gain control, take them into custody and then bring

6  them into a position of recovery, as we refer to it or

7  on their side or sit them up as soon as practical.

8      Q.  BY MR. SHOWALTER:  So what are the -- so I'm

9  going to go back to what I was talking about earlier.

10             Other than the training that use of a

11  firearm constitutes deadly force, are police officers

12  trained that there's any other use of force -- and we

13  also talked about bean bag shotguns -- are police

14  officers at the City of Phoenix trained that there's

15  any other use of force that can constitute deadly

16  force?

17             MS. RETTS:  Form; outside the scope.

18             THE WITNESS:  The answer would be we train

19  that anything officers do, right, tools, tactics that

20  create substantial risk of injury or death, right, when

21  they start getting into that arena, it could be

22  considered deadly force.

23      Q.  BY MR. SHOWALTER:  But they're not trained

24  about circumstances under which it actually would be

25  deadly force?

1              MS. RETTS:  Form.

2              THE WITNESS:  How do you mean?

3      Q.  BY MR. SHOWALTER:  I mean -- so let's -- with

4  respect to restraint, are Phoenix police officers

5  trained that there are certain specific circumstances

6  under which the use of restraints on prone subjects

7  constitutes deadly force?

8              MS. RETTS:  Form; foundation.

9              THE WITNESS:  There are things that --

10  such as the RIPP restraint, right.  Per our training,

11  lesson plans we explain you can't hogtie individuals,

12  meaning you can't tighten up their restraint where

13  their ankles and hands would be in a really tight

14  position and leave them, that has the potential of

15  creating serious risk of injury or death, so we train

16  not to do that.  We don't necessarily refer to it as

17  it's deadly force.

18      Q.  BY MR. SHOWALTER:  Is there a reason that you

19  don't teach -- or that City of Phoenix police officers

20  are not taught that hogtying a prone subject can

21  constitute deadly force?

22              MS. RETTS:  Form.

23              THE WITNESS:  Yeah.  The reason being,

24  based on a lot of unknown factors that officers have no

25  ability to know, such as physical issues, mental, drug,

1  clear bright-line rules, other than that a firearm is

2  deadly force.

3            Does that make sense?

4            MS. RETTS:  Form.

5            THE WITNESS:  It makes sense that it

6  doesn't specify anything outside of firearm, yes.  But,

7  again, it's the way it articulates any tactic or use of

8  force that creates substantial risk of causing death or

9  serious physical injury, such as the use of a firearm

10  could be considered deadly force.

11    Q.  BY MR. SHOWALTER:  Okay.  And so with respect

12  to TASERs, are police officers trained that under

13  certain circumstances, a TASER can cause serious bodily

14  injury or death?

15            MS. RETTS:  Form.

16            THE WITNESS:  Yes and no.

17    Q.  BY MR. SHOWALTER:  Explain.

18    A.  We're trained -- the officers are trained when

19  and how to use a TASER, if used improperly.  For

20  example, letting it run for an extended amount of time.

21  That could cause serious injury or death.

22    Q.  And are officers also trained that using a

23  TASER on a person who's physical compromised can cause

24  death?

25            MS. RETTS:  Form.

1          THE WITNESS:  No.  They're trained people

2    that are physically compromised would not be the best

3    candidate for the use of that tool or tactic.

4       Q.  BY MR. SHOWALTER:  Are they trained that they

5    should not use TASERs on people who are physically

6    compromised?

7       A.  No.  They're -- such as our current training,

8    people that are, for instance, obese, because of the

9    way the TASER works with muscle mass aren't necessarily

10   the best candidates for the use of TASER, people with

11   low body mass, elderly, children are not the best

12   candidates for the use of that tool.  However, there's

13   nothing that strictly prohibits it, based on the

14   officers' judgment and the totality of the

15   circumstances.

16      Q.  And so on the TASER, there's no bright-line

17   rule about types of people it can be used against?

18          MS. RETTS:  Form.

19          THE WITNESS:  Types of people, no.

20   Situations, yeah.  They don't prohibit using the TASER

21   when people are on an elevated location, on a wall, in

22   a tree -- up in a tree, next to a ledge, something like

23   that.  We try not to tase people that are in or around

24   bodies of water, the potential to fall and create other

25   risk is there, so we train that's not the best tool in

1  that situation.

2      Q.  BY MR. SHOWALTER:  Are officers trained that

3  it's not the best tool or that they should not use it

4  in that situation?

5          MS. RETTS:  Form.

6          THE WITNESS:  It's not the best tool.

7  They shouldn't tase people at elevated locations.  The

8  risk of fall is great.  But, again, the totality of

9  circumstances can factor into the decision making of

10  each officer at the time.

11     Q.  BY MR. SHOWALTER:  What about use of TASER

12  against handcuffed subjects, is that --

13         MS. RETTS:  Form.

14     Q.  BY MR. SHOWALTER:  Is that something that

15  officers are trained that they should not do or that

16  it's not the best option?

17         MS. RETTS:  Form; foundation.

18         THE WITNESS:  So as a rule, generally,

19  officers are trained that they will not use the TASER

20  on handcuffed subjects.  However, again, based on the

21  totality of the circumstances if, as a situation if

22  someone is handcuffed, yet they're still causing

23  issues, biting, kicking, scratching, doing other stuff

24  like that, that would constitute continued active

25  aggression, then use of the TASER would not strictly be

1  prohibited.

2      Q.  BY MR. SHOWALTER:  So what if a subject is

3  handcuffed and they're  facedown, prone on the ground,

4  being held by officers, is it okay to use a TASER on

5  that subject?

6              MS. RETTS:  Form; foundation; outside the

7  scope.

8              THE WITNESS:  What's the subject doing?

9      Q.  BY MR. SHOWALTER:  So they're being held to the

10  ground by police officers.  They're handcuffed.  Is it

11  okay to use a TASER on them?

12              MS. RETTS:  Form; foundation; outside the

13  scope.

14              THE WITNESS:  If they're not doing

15  anything else, they're not continuing fighting,

16  kicking, scratching, trying to bite, anything like

17  that, right, we're talking hypothetically here, it's

18  probably not the best tool.

19      Q.  BY MR. SHOWALTER:  Is it prohibited?

20              MS. RETTS:  Form; foundation; outside the

21  scope.

22              THE WITNESS:  No.  It's not specifically

23  prohibited.  I believe our policy says we will not use

24  a TASER on handcuffed individuals.  But, again, the

25  totality of the circumstances, exactly what's going on,

1  what the subject was doing that led to that decision is

2  all mitigating factors.

3       Q.  BY MR. SHOWALTER:  So officers are trained that

4  they shouldn't use a TASER on a handcuffed subject but

5  that they can, if they can articulate a reason for

6  doing so; is that fair?

7            MS. RETTS:  Form.

8            THE WITNESS:  They're trained that, as a

9  rule, we don't tased handcuffed prisoners.

10      Q.  BY MR. SHOWALTER:  But they can if they can

11 articulate a reason for doing so, correct?

12           MS. RETTS:  Form; foundation; outside the

13 scope.

14           THE WITNESS:  Based on the totality of the

15 circumstances, there are instances where it could be

16 used, correct.

17      Q.  BY MR. SHOWALTER:  All right.  Are police

18 officers at the City of Phoenix trained that they need

19 to be able to articulate the reason for their use of

20 force?

21      A.  Yes.

22      Q.  What are they trained that that means?  That

23 articulate, what are they trained that that means?

24      A.  They're trained to have to be able to explain

25 who, what, where, when, why, how everything that was

1          Does the City of Phoenix have anywhere a

2     list of techniques or tactics that, if used improperly,

3     constitute deadly force?

4               MS. RETTS:  Form.

5               THE WITNESS:  Not to my knowledge, no.

6     Q.  BY MR. SHOWALTER:  Are City of Phoenix police

7     officers -- other than with respect to firearms, are

8     City of Phoenix police officers ever trained on what

9     techniques, if used improperly, can constitute deadly

10    force?

11    A.  How do you mean?

12    Q.  Are City of Phoenix police officers trained or

13    is there any policy that says if you hogtie someone and

14    leave them facedown that is deadly force?

15              MS. RETTS:  Form.

16              THE WITNESS:  That specific incident?

17    Q.  BY MR. SHOWALTER:  Yes.

18    A.  No.  We don't have anything to say that's

19    deadly force, but we have policy that prohibits

20    hogtying.

21    Q.  Are City of Phoenix police officers trained if

22    they use a TASER on somebody who they know to be

23    physically compromised, that that can amount to deadly

24    force?

25              MS. RETTS:  Form; foundation.

1          THE WITNESS:  I don't believe so, no.

2      Q.  BY MR. SHOWALTER:  Are City of Phoenix police

3  officers trained that using a TASER on a subject who

4  may be suffering from excited delirium may be deadly

5  force?

6          MS. RETTS:  Form; foundation; outside the

7  scope.

8          THE WITNESS:  No.  Using a TASER on a

9  subject who is experiencing characteristics of excited

10  delirium would probably be a better tool when used

11  properly because it would help get that person into

12  custody faster, which is what the training is, is we

13  need to detain them as quickly as possible to lessen

14  the likelihood of serious harm or death.

15      Q.  BY MR. SHOWALTER:  Are City of Phoenix police

16  officers trained that placing their weight on a subject

17  who is handcuffed in the prone position can be deadly

18  force?

19          MS. RETTS:  Form; foundation; outside the

20  scope.

21          THE WITNESS:  That specifically, no, it's

22  not trained it could be deadly force.  Again, there is

23  training that when someone is controlled, handcuffed

24  and proned out, we'll roll them into a recovery

25  position as soon as possible, as soon as practical.

1 different.  It's based on what the subject actions are

2 doing.  We don't train that using body weight on the

3 subject that we're trying to take into custody is

4 deadly force, no.

5    Q.  BY MR. SHOWALTER:  And so in the City of

6 Phoenix, officers are not trained that if they have a

7 prone suspect or subject who's been handcuffed and

8 maybe they're still struggling, but they've been

9 handcuffed, that placing weight on them can cause

10 death?

11         MS. RETTS:  Form; foundation.

12         THE WITNESS:  The training is consistent

13 with Graham versus Connor.  It's totality of the

14 circumstances.  It's all based on what is going on,

15 right.  The training would be when the subject is

16 detained and they can safely be rolled over into a

17 recovery position, to do that as soon as practical.

18    Q.  BY MR. SHOWALTER:  And I understand that.  But

19 I just want to know, does the City of Phoenix train

20 police officers that placing weight on the back of a

21 handcuffed prone subject can cause death?

22         MS. RETTS:  Form; foundation.

23         THE WITNESS:  So based solely on what you

24 said, no.

25    Q.  BY MR. SHOWALTER:  Are City of Phoenix police

1    A.   Yeah.  That's one place, yeah.

2    Q.   And you could have a training for City of

3 Phoenix police officers where you have them read Graham

4 v. Connor and you then say, okay, as you can see, it's

5 the totality of the circumstances, and we're done here,

6 go forth and police, right.  And that would be an

7 inadequate training, correct, if that was all it was,

8 is police officers are hired, they read Graham v.

9 Connor, they're told that it's the totality of the

10 circumstances and they go out into the world applying

11 force under the totality of the circumstances, that

12 would be inadequate, correct?

13           MS. RETTS:  Form; foundation; outside the

14 scope.

15           THE WITNESS:  I would consider that

16 inaccurate -- or inadequate, yes.

17    Q.   BY MR. SHOWALTER:  And so simply telling

18 officers that, well, it's the totality of the

19 circumstances, that's not really training, is it?

20           MS. RETTS:  Form; foundation.

21           THE WITNESS:  So officers are trained,

22 right, for -- since we're talking TASER, they can use

23 the TASER during these circumstances, active

24 aggression, danger to self, danger to others, right,

25 and it's a handcuff assist or control assist tool.  If

1  a subject were still displaying those levels of

2  resistance and a TASER could be appropriate, right,

3  even though they're handcuffed, it's based completely

4  on what that subject is displaying at that time, during

5  that incident.

6      Q.  BY MR. SHOWALTER:  Okay.  I'm going to take you

7  back up to the definition of active aggression.  It

8  says, "Physical actions of assault."

9          Do you see where I read that?

10     A.  Yep.

11     Q.  And so if a handcuffed -- let's say you have a

12  subject who's been handcuffed and is in RIPP

13  restraints, what would constitute assault by that

14  person that would justify a use of an electronic

15  control device?

16          MS. RETTS:  Form; foundation; outside the

17  scope.

18          THE WITNESS:  So just because someone

19  would be handcuffed or be in RIPP restraints, would not

20  prevent someone from physical action of assault, they

21  can still kick, bite, scratch, grab onto.  I've seen

22  incidents where a subject was handcuffed to the rear

23  and has caused pretty significant bodily harm just by

24  squeezing and grabbing onto an officer's leg.

25          So that's what we're referring to, right.

1  If they're solely laying down in handcuffs and RIPP

2  restraint, there's no longer physical actions of

3  assault, they're not in active aggression, they're not

4  a danger to self or others and they're able to be

5  rolled over into a prone position, that would be the

6  expectation.

7       Q.  BY MR. SHOWALTER:  I didn't understand the last

8  thing you said about -- it sounded like you said able

9  to be rolled over into the prone position?

10      A.  Correct.

11          I'm sorry, not -- I misspoke, not the

12  prone position, the position of recovery from the prone

13  position.  I apologize.

14      Q.  Spitting on an officer is considered -- is that

15  considered an assault?

16          MS. RETTS:  Form; foundation.

17          THE WITNESS:  I would consider it an

18  assault, yes.

19      Q.  BY MR. SHOWALTER:  And I'm not asking for your

20  personal opinion, I'm asking for as police officers are

21  trained and the policies of the City of Phoenix?

22          MS. RETTS:  Form; foundation; outside the

23  scope.

24          THE WITNESS:  Per Arizona Revised Statutes

25  that could be considered an assault.  But I can't say

1  do, arrest team tactics, you know, positional arrest

2  tactics, there are portions where we train officers to

3  use body weight, arms to control the subject to place

4  them in handcuffs.  But the training does not include

5  extended periods of time in that position.  The

6  training is used to gain control and then move on.

7  Q.  BY MR. SHOWALTER:  And officers are not trained

8  that placing body weight on the back of a prone

9  handcuffed subject can cause death, correct?

10  MS. RETTS:  Form.

11  THE WITNESS:  That one is a difficult --

12  it's not a yes or no.  They're trained that that could

13  be a factor, right.  But depending on the situation,

14  you still have to be able to detain and control the

15  subject.  So if and when there are mitigating factors

16  similar to excited delirium or positional asphyxia, the

17  training is consistent with getting control and getting

18  that subject into a recovery position and requesting

19  fire or EMS.

20  Q.  BY MR. SHOWALTER:  Have you reviewed the case

21  of Casey Wells?

22  A.  I have not.

23  Q.  Have you ever watched the video showing Casey

24  Wells being restrained and tased?

25  MS. RETTS:  Form.

1  force that is excessive or outside of policy with

2  respect to this tactic or technique?

3         MS. RETTS:  Form.

4         THE WITNESS:  I don't believe we use any

5  specific videos to highlight improper use of force or

6  bad tactics for training, no.

7     Q.  BY MR. SHOWALTER:  And stepping away from

8  videos, are officers trained even outside of videos,

9  with demonstrations or explanations of specific tactics

10  that, if used, would constitute excessive force?

11         MS. RETTS:  Form; foundation.

12         THE WITNESS:  It truly would depend on

13  what exactly we're talking about.  Like, when we're

14  doing defensive tactics training, we'll do the RIPP

15  restraint training.  During that training, I would say,

16  yes, we show them exactly what is not authorized.  We

17  explain when a RIPP restraint is placed around

18  someone's ankles, you cannot shorten the length, right,

19  the clasp would need to be, and we use it as a visual

20  example as we're explaining, connected to the chain

21  between your handcuffs or in the case of hinge cuffs,

22  it would be wrapped around one time and the clasp will

23  go back onto the strap.

24         And then we'll show an example, that you

25  can't shorten this because it would create what could

1  be construed as hogtying and would lead to other issues

2  with position asphyxia and stuff like that.

3  Q.  BY MR. SHOWALTER:  So what are officers trained

4  is the problem with hogtying?

5  A.  Just that, that when subjects are forced into

6  that position their legs and hands together, it leads

7  to complications related to positional asphyxia,

8  breathing issues, especially in a prone position.  So

9  we don't train for hogtying.  We use the restraint to

10  restrain people's legs to keep them from kicking as

11  much as possible.

12  Q.  So what are officers trained to do with RIPP

13  restraints?

14  A.  As I just said, the clasp goes around the -- or

15  connects to the chain between the handcuffs, right, and

16  they're not shortening that strap in any way or in the

17  case of hinge cuffs, you wrap around the hinge of the

18  handcuff and then connect back to the strap and not

19  shorten the strap in any way.

20  Q.  So I'm going to show you what we'll mark as

21  Exhibit 300.

22  (Whereupon, Deposition Exhibit Number 300 was

23  marked for identification.)

24  Q.  BY MR. SHOWALTER:  And this is has been

25  provided to us as the City of Phoenix's lesson plan for

 1   RIPP restraint hobble.

 2            Do you recognize this document?

 3   A.  Yes.

 4   Q.  Is this something you've reviewed in advance of

 5   today's deposition?

 6   A.  Yes.

 7   Q.  And is this a course you've ever taught?

 8   A.  I haven't specifically taught it.  This -- I

 9   believe this is the lesson plan that we're still using

10   for teaching RIPP.  I haven't been present when it's

11   been taught.

12   Q.  Okay.  And it states at page 3 of the lesson

13   plan that "The purpose of the RIPP restraint hobble is

14   to temporarily restrain a combative subject."

15            Is that accurate?

16   A.  That is accurate, yes.

17   Q.  And then below that it gives the method of

18   restraining, RIPP restraint hobble, and it defines that

19   as "Restraining device used to secure the legs and

20   ankles of a subject."

21            Did I read that accurately?

22   A.  Yes.

23   Q.  And it also has this term "T.A.R.P."  total

24   appendage restraining procedure.

25            Is that something different than a RIPP

1  restraint hobble?

2     A.  I don't believe so.  It's just that's the term,

3  you're getting both arms and feet restrained.

4     Q.  So, in other words, total appendage restraining

5  procedure, if I understand you correctly, is the

6  position that somebody is in once the RIPP restraint

7  hobble has been appropriately applied; is that

8  accurate?

9     A.  I believe so, yes.

10     Q.  And under total appendage restraining

11  procedure, it says, "A position achieved by snapping

12  the fully extended remaining belt to the handcuff

13  chains to restrict kicking."

14        Did I read that correctly?

15     A.  Yes.

16     Q.  And so once -- is the training that once a

17  subject is put in the RIPP restraints that they are to

18  be sit up -- well, strike that.

19        Once the RIPP restraint hobble is

20  effectively applied and the subject has stopped

21  resisting -- you know, strike that.

22        I'm not sure I understand this Number 2.

23  It says, "After restraining with the Hobble, always

24  seat the subject upright and check for injuries.  If

25  the subject displays signs of a medical issue, request

1  the fire department immediately."

2        What does that mean?

3      A.  It means exactly what it says, it's another

4  restraint tool.  Just like with handcuffing, sit the

5  subject into a recovery position and if they're

6  displaying of signs of any medical issues, you request

7  the fire department immediately.

8      Q.  Okay.  And maybe that's what I don't

9  understand.  It says, "seat the subject upright and

10  check for the injuries," is that the same as putting

11  them in the recovery position?

12      A.  Yes.

13      Q.  I thought the recovery position was putting

14  them on their side?

15      A.  It's either/or, on their side or seated -- sat

16  upright.

17      Q.  Okay.  Now the next portion of the lesson plan

18  is the application of the RIPP restraint hobble,

19  correct?

20      A.  That is correct.

21      Q.  Is this something where there is an

22  accompanying PowerPoint or is it all just done by

23  demonstration?

24      A.  This one is all demonstration done usually in

25  one of our defensive tactics rooms and accompanied with

1   other defensive tactics training.

2        Q.  Does the City of Phoenix have videos that show

3   correct application of the RIPP restraint hobble?

4        A.  Not to my knowledge.  Well, we don't use them,

5   to my knowledge.

6        Q.  Do you know if the City of Phoenix has such

7   videos?

8        A.  I would imagine we have body worn camera where

9   people have used RIPP restraint.

10       Q.  Looking at the body worn camera, without

11  knowing what the training is, would not provide us with

12  information on what the officers are trained to do,

13  correct, it would just provide us with information of

14  what they actually did, fair?

15       A.  So I thought the question was do we use videos

16  for training.  No, to my knowledge, we don't use videos

17  for training.  We physically show them how to put those

18  on.

19            And then I thought you asked if we had

20  videos.  And I would imagine through the course of

21  several years with the body worn cameras, we have

22  recorded someone getting placed in a RIPP restraint,

23  but we don't use it for training, to my knowledge.

24       Q.  And let me put it a different way.  Are you

25  aware of whether the City of Phoenix has videos that

1  show the proper procedure for RIPP restraint?  It could

2  have been either provided by police agencies, AZ POST,

3  or the manufacturer of the RIPP restraint.

4           MS. RETTS:  Form; foundation.

5           THE WITNESS:  Used for training.

6       Q.  BY MR. SHOWALTER:  Not used for training.  I

7  just want to know if you know if the City of Phoenix

8  has such videos?

9           MS. RETTS:  Form; foundation; outside the

10  scope.

11           THE WITNESS:  To my knowledge, no.  I

12  imagine they might.

13       Q.  BY MR. SHOWALTER:  Have you ever seen any video

14  that was used to demonstrate either the proper or

15  improper use of RIPP restraint hobbles?

16           MS. RETTS:  Form.

17           THE WITNESS:  No.  Based on my memory,

18  every time I've attended training, it's been in person

19  and shown physical examples of how to apply the RIPP

20  restraint.

21       Q.  BY MR. SHOWALTER:  Okay.  Going down what is

22  this on right side it say P.O. Number 1, P.O. Number 2,

23  P.O. Number 3.  What does that stand for?

24       A.  Those stand for performance objectives.

25       Q.  Okay.  Now, when it talks about RIPP restraint

1  hobble application it says, "Prone handcuffed subjects.

2  This should be completed by two or three officers."

3           Do you see where I read all that?

4     A.   I do.

5     Q.   And this lesson plan, this Exhibit 300, is this

6  the same way that you were trained to apply RIPP

7  restraints?

8           MS. RETTS:  Form.

9           THE WITNESS:  It looks like it, yes.

10    Q.   BY MR. SHOWALTER:  And is it your understanding

11 that this lesson plan represents the City of Phoenix's

12 training applicable to RIPP restraints as of February

13 2019?

14    A.   I believe so, yes.

15    Q.   Okay.  So it says -- why is it -- is two or

16 three officers the minimum number of officers for

17 applying a RIPP restraint?

18    A.   There's no minimum or maximum, but if you're in

19 a situation that a subject is displaying conditions

20 that are conducive to applying a RIPP restraint,

21 probably you'll need at least two or more to restrain

22 the subject enough to put them into a RIPP restraint.

23    Q.   Okay.  Then it says, "Control the subject's

24 body and legs.  Cross the subject's ankles."

25           Did I read that correctly?

1     A.  Yes.

2     Q.  And so at this point in the application, the

3  subject's prone, facedown, and an officer places -- is

4  physically controlling their ankles and placing one

5  ankle on top of the other, correct?

6     A.  Correct.

7     Q.  And then it says at (a), this thing about

8  "bulky items such as cowboy boots or baggy jeans," that

9  can pose a problem, correct?

10     A.  Correct.

11     Q.  At Number 3, it says, "Open the Hobble wide

12  enough to loop it around the subject's ankles and cinch

13  the strap snugly around the ankles by pulling up on the

14  brass clip with one hand and pushing the jawed

15  alligator clip down against the ankles."

16          Did I read that correctly?

17     A.  Yes.

18     Q.  So if I understand this, I don't want to sound

19  overly -- and I'm not really being critical, but I just

20  want to make sure I understand something.  In Number 3

21  here, "Open the Hobble wide enough to loop it around

22  the subject's ankles and cinch the strap snugly around

23  the ankles by pulling up on the brass clip with one

24  hand and pushing jawed alligator clip down against the

25  ankles."

1            Left out of that, but understood to be
2    there is, you not only have to open the hobble wide
3    enough to loop it around the subject's ankles, you
4    actually have to loop it around the subject's ankles,
5    correct?
6        A.   Correct.
7        Q.   And so this is just talking about one end of
8    the RIPP device; is that fair?
9        A.   That is correct.  Yeah, it's the loop end.  The
10   clasp end is on the other end.
11       Q.   Okay.  And so once that is -- so at this point,
12   when that is applied are the subject's legs still
13   extended?
14       A.   In a perfect world, yes.
15       Q.   Okay.  So they can be, but they don't have to
16   be?
17       A.   Yes.  I mean, that -- for it to be applied
18   efficiently, yeah, that would be the best position.
19       Q.   But if you have a subject who's struggling or
20   the officers have already -- the subject was struggling
21   and the officers already brought his ankles upwards
22   somewhat to stop him from struggling, then it can be
23   applied at that point, correct?
24       A.   Yeah.  It may not be applied as efficiently as
25   if they were straight out.  And it's -- it can be

1  extremely difficult to apply when subjects are

2  constantly kicking and fighting.  That's another reason

3  why it says for two or more -- or two or three

4  officers.

5     Q.  Okay.  And so if we complete Number 3

6  correctly, we will have the loop firm around the

7  subject's ankles, which are crossed over each other,

8  correct?

9     A.  Correct.

10    Q.  And, at this point, it says "Bring the

11 subject's ankles towards the buttocks by pulling the

12 strap towards the handcuffs and attach the brass clip

13 to the middle chain of the handcuffs or to the hinge of

14 the cuffs."

15          Did I read that correctly?

16    A.  Yes.

17    Q.  When it says about attaching the brass clip to

18 the middle chain of the handcuffs or to the hinge of

19 the handcuffs, what is the hinge of the handcuffs?

20    A.  So you have basically two types of handcuffs,

21 chain handcuffs that generally have two to three links

22 between them and then hinge cuffs, where it's a hinge

23 that will be similar to that(Witness indicating),

24 right, that bends.  So with hinge cuffs you can't

25 attach the clip to the hinge, you have to wrap the

1 strap around the hinge and then attach it back to

2 itself.

3     Q.   Okay.  And so at Number 5 it says, "Do not

4 shorten the strap or wrap it around the subject's

5 ankles."

6          Did I read that correctly?

7     A.   Yes.

8     Q.   And then it says, "Be mindful of body positions

9 which impair subject's ability to breathe normally."

10          Did I read that correctly?

11    A.   You did.

12    Q.   What does that mean?

13    A.   That's where we're talking about the taller

14 individuals, where that strap, it's one length, so you

15 can't make it longer or shorter.  It could put them in

16 like a hogtied position and we're trying to avoid that

17 at all costs.  We don't want them -- their ankles up by

18 their hands.  It's just to restrain the feet and keep

19 them from kicking as much as possible.  And then once

20 the RIPP restraint is placed on, then you start getting

21 them out of the prone position as quickly as practical.

22    Q.   How -- I mean, what -- hold on.  Let me just

23 make sure I'm not missing something.

24          How is hogtie defined?

25    A.   Honestly, I don't know.  I've never studied or

1  researched hogtying.

2       Q.  What were you trained was the difference

3  between using the RIPP restraint -- or I'm sorry.  What

4  is the City of Phoenix trained is the difference

5  between hogtying and properly applying the RIPP

6  restraint?

7       A.  Hogtying, you can't move your ankles or hands,

8  you're pretty much stuck in that position and you can't

9  move.  Whereas, with the RIPP restraint and the strap

10  around the ankles, subjects can still move their legs,

11  but just restricts, it doesn't get rid of it, but it

12  restricts the ability to kick.

13       Q.  And as an officer applying RIPP restraints, how

14  do you know whether you're properly applying them or

15  whether you've gone from properly applying them to

16  having a subject in a hogtied position?  What's the

17  training on that?

18            MS. RETTS:  Form.

19            THE WITNESS:  There isn't necessarily any

20  training.  Other than the clasp or clip goes around the

21  hinge cuffs or connected to the handcuff and the strap

22  is not shortened in any way.  When you're doing that,

23  you avoid hogtying.

24       Q.  BY MR. SHOWALTER:  Is part of the training

25  showing officers what hogtying looks like, so they know

1   not to do that?

2       A.  No.  The training does include showing what it

3   looks like to shorten the strap, right.  So the strap

4   would be clipped through the handcuffs and back to

5   itself at the ankles and it does show wrapping around

6   the ankles to shorten the strap as an example of what

7   not to do and then it's shown again how do it correctly

8   without shortening the strap.

9       Q.  Is there a -- RIPP restraints are one size fits

10  all, correct?

11      A.  As far as I know, yes.

12      Q.  Officers don't walk around with tape measures

13  and say, you know, he looks like a 38 or whatever,

14  correct?

15      A.  That is correct.

16      Q.  With a fairly short individual, it's going to

17  be necessary to shorten the strap in order to properly

18  apply the RIPP restraint, correct?

19              MS. RETTS:  Form.

20              THE WITNESS:  No.  I mean, a short

21  individual it will work as well it can.

22      Q.  BY MR. SHOWALTER:  In terms of a subject's body

23  position, what is the difference between body

24  position -- is it your testimony -- or is it your

25  training that if a subject can move their legs, they

1          MS. RETTS:  Form; foundation; outside the

2   scope.

3          THE WITNESS:  I guess effectively if they

4   use it incorrectly, yes.

5     Q.  BY MR. SHOWALTER:  Is it possible to look at a

6   picture of a subject who has been -- well, given that

7   you've never been trained on what actually constitutes

8   hogtying, would you be able to look at a picture of a

9   subject in RIPP restraints and tell whether or not they

10  were properly applied or whether they had, in fact,

11  been hogtied?

12         MS. RETTS:  Form; foundation; outside the

13  scope.

14         THE WITNESS:  I could look at a picture

15  and determine if I believe the RIPP restraint was

16  applied correctly.

17    Q.  BY MR. SHOWALTER:  We looked at that earlier

18  where it says -- good grief.

19         This is Number 6 on page 4.  It says, "Be

20  mindful of body positions which impair subject's

21  ability to breathe normally."  And I asked you what

22  body positions those would be and it sounded like you

23  said very tall people.

24         Was there any other training on that topic

25  on body positions that impair subject's ability to

1 breathe normally?

2         MS. RETTS:  Form.

3         THE WITNESS:  No, just a long exposure in

4 the prone position.  People that are very tall, right,

5 it would restrict the movement of the legs quite a bit.

6    Q.  BY MR. SHOWALTER:  And then it also says that

7 "Facedown exposure should be limited to the time

8 necessary to apply the hobble and custody is

9 maintained."

10        Does that mean that facedown exposure

11 itself is a body position which impairs the subject's

12 ability to breathe normally?

13         MS. RETTS:  Form.

14         THE WITNESS:  It could.  But, again, it's

15 the totality of the circumstances.  During this

16 training, people are in the facedown position with

17 handcuffs and RIPP restraints for minutes on end during

18 the training.

19    Q.  BY MR. SHOWALTER:  And are those -- is part of

20 the training that those people have also been in a

21 fight and are being held down by seven officers and

22 they're also being tased?

23         MS. RETTS:  Form; outside the scope.

24         THE WITNESS:  During the training, no.

25    Q.  BY MR. SHOWALTER:  Is there ever a police

1        A.   Correct.

2        Q.   And what is your -- well, what is your training

3   on how the TASER is supposed to work with respect to

4   the human nervous system?

5              MS. RETTS:   Object to form.

6              THE WITNESS:   What is my specific

7   training --

8        Q.   BY MR. SHOWALTER:   Yes?

9        A.   -- or what is the training?

10             I'm sorry, you're asking for my specific

11  training?

12       Q.   Yes.   I'm asking for your understanding of how

13  the City of Phoenix trained people as of 2019 about

14  what the purpose of the TASER was with respect to the

15  human nervous system?

16       A.   Right.   So the training consists of explaining

17  how the TASER, the electricity of the TASER works by

18  like overriding the subject's ability to fight through

19  it.   It kind of hijacks the nervous system to where

20  they can't control the muscles between the probes.   The

21  training is an arrest assist tool.   And prolonged

22  exposures, numerous exposures are frowned upon, right.

23  The goal is to use it to gain control and place them

24  into custody.

25             (Phone ringing.)

1  the lesson plan in 2019.  Mark Veres would have still

2  have been an officer in charge of the TASER program and

3  Chris Stone would be there.  I imagine Mark's name is

4  there so this could be it.

5      Q.  Okay.  Now this gives a -- this training,

6  that's the 2013 revision, gives guidelines for use.  It

7  says subject operations order 1.5.4E.  And it says "The

8  TASER will not be" -- below this it says, "The TASER

9  will not be used for," and then it gives a series of

10  lists, correct?

11     A.  Correct.

12     Q.  It gives a list, with a series of

13  circumstances, correct?

14     A.  Yes.

15     Q.  And so this says "The TASER will not be used

16  for, One, coercion of any type."

17             Is that accurate?  Is that what the

18  training is?

19     A.  Yes.

20     Q.  But then it gives an exception and it says, "A

21  warning ARC combined with the proper verbal warning may

22  be used as coercion in situations that would likely

23  result in a justified deployment of the ECD," correct?

24     A.  That is correct.

25     Q.  And then it says, "The TASER will not be used

1  for:  Against subjects solely for running from the

2  officer," is that correct?

3     A.  Yes.

4     Q.  And are officers trained that, under no

5  circumstances, will a TASER be used against a subject

6  solely because they're running from an officer?

7     A.  That one is kind of difficult, because the

8  solely for running, right, lack of any probable cause,

9  reasonable suspicion, yeah, we wouldn't tase that

10 person.

11    Q.  And then it also says, "The TASER will not be

12 used," and you referenced before, it says, "TASERs will

13 not be used against a subject who would be in danger of

14 falling from a significant height."

15         Did I read that correctly?

16    A.  Yes.

17    Q.  And is that something that officers are trained

18 is an absolute rule?

19         MS. RETTS:  Form.

20         THE WITNESS:  No.  Go back to how we

21 discussed it earlier for the totality of circumstances,

22 right.  As a general rule, people that are at

23 significant height or have a potential for fall, they

24 could do something else that would heighten that level

25 of force through the need to use force than would be

1 counteractive.

2    Q.  BY MR. SHOWALTER:  Okay.  So the written

3 training says "The TASER will not be used against a

4 subject who would be in danger of falling from a

5 significant height."  But in the actual training,

6 officers are told that this is not a hard and fast

7 rule, there maybe circumstances where they can do this,

8 correct?

9         MS. RETTS:  Form.

10        THE WITNESS:  No.  In the training it's

11 said, exactly what I said, is that people who are at a

12 falling risk should not be tased.  But in most of our

13 training, we explain that, you know, most incidents are

14 not black and white, there are other mitigating

15 factors.  So as we expect our officers to be able to

16 think through problems and identify times when certain

17 levels of force should or shouldn't be used.

18    Q.  BY MR. SHOWALTER:  So then it says TASERs

19 should not be used when subjects are near flammable

20 liquids and gasses.  Did I read that correctly?

21    A.  Yes.

22    Q.  And is it the same thing where officers are

23 basically -- so let me strike that.

24         Are officers basically told that, yeah, we

25 teach you these rules, is the training that we teach

1  you these rules, but if the circumstances are

2  appropriate, you don't have to follow these rules?

3          MS. RETTS:  Form.

4          THE WITNESS:  No.  Our policy allows for

5  deviation at times when the deviation is needed and

6  it's objectively reasonable and a supervisor is

7  notified, right.  So we're talking Number 4 right here,

8  the subject -- it say "The TASER will not be used for

9  subjects near flammable liquids and gases, right.  And

10  then the reason would be with the TASER, the arc of

11  electricity could spark and cause someone who's near or

12  around flammable gases to catch fire.

13          So that would be something you would want

14  to avoid as much as possible, if that person were to do

15  something to rise to the level of deadly force and that

16  was the force option you already had, and you needed to

17  deploy force, that could be an option, not the best

18  option.  There are other stuff, but, again, training

19  officers to think through problems.

20      Q.  BY MR. SHOWALTER:  So are you talking about

21  that portion of Operational Order 1.5, where it talks

22  about deviation when we an officer is faced with deadly

23  force?

24      A.  Yes.

25      Q.  And so when you say that officers -- is

1  there -- when you say that officers are trained and

2  they can deviate from policy if circumstances require

3  it, other than a subject who poses an immediate threat

4  of death or serious bodily injury, are there any other

5  circumstances that permit deviation from the policies?

6      A.  To break it down, right, danger to self,

7  others, if they're exhibiting something that's

8  threatening to themselves, officers or others, then,

9  yes, they can -- but there's a lot of stuff they can

10 do -- but if need be, they could deviate, if needed.

11     Q.  So are officers trained that if a person has

12 doused himself with gasoline and is holding a lighter,

13 threatening to light himself on fire, that they can use

14 a TASER on that person?

15     A.  No, that's not the best tool for that

16 circumstance.

17     Q.  Because you said to danger to self.  I mean,

18 danger to self, under what circumstances does a person

19 presenting a danger to themselves permit an officer to

20 use deadly force?

21          MS. RETTS:  Form; foundation.

22          THE WITNESS:  I wouldn't know danger to

23 themself, right.  But, again, we're talking TASER, so

24 someone flammable, there are other tools, tactics and

25 techniques that could be used and are better for the

1  TASER -- or better than a TASER.

2      Q.  BY MR. SHOWALTER:  Are officers trained that

3  they should not use force to prevent something, that

4  using the force will make happen, does that make sense?

5          MS. RETTS:  Form.

6          THE WITNESS:  I don't understand what you

7  mean.

8      Q.  BY MR. SHOWALTER:  Well, an example we just

9  gave, a subject has doused himself with gasoline and

10 he's sitting in the middle of -- there's nobody near

11 him.  He doesn't pose a danger to anybody else, but

12 he's threatening to light himself on fire.  If you

13 tased him, you have the possibility of actually causing

14 that fire to happen, correct?

15     A.  Correct.

16     Q.  Are officers trained that that doesn't make --

17 not to do things like that?

18     A.  Yes.

19     Q.  How does that training occur?

20     A.  Much like the lesson plan, it breaks down

21 different times when the TASER would not be an optimal

22 tactic and that's something that we talk about, someone

23 that had doused themself in gasoline or flammable

24 liquid, the TASER could ignite that liquid and it's not

25 the best tool for that situation.

1    Q.  And that's kind of the same thing.  You say you

2    have somebody who's on a bridge threatening suicide or

3    threatening to jump and if you tase them, they might

4    fall and you're just causing the thing you claim you're

5    trying to prevent, right?

6    A.  Correct.  For like a suicidal subject, yes.

7    Q.  I'm just wondering if -- I mean, both of those

8    things with the TASER would also apply to other things,

9    I suppose, right?  You also wouldn't want to shoot that

10   person for various reasons.  I guess what I'm wondering

11   is there a general rule for that type of training and

12   kind of just general police common sense?

13                MS. RETTS:  Form.

14                THE WITNESS:  I guess the answer would be,

15   yeah.  We want our officers to be independent thinking.

16   We teach them policy.  We teach them response options,

17   what they can do and the training is to use the least

18   amount of force as necessary to effect the detention or

19   arrest.

20   Q.  BY MR. SHOWALTER:  And so that is part of their

21   training is least amount of force necessary, correct?

22   A.  Correct.

23   Q.  Now, are they trained that if they do not use

24   the least amount of force necessary, that they are

25   being excessive?

JOSHUA CALLE  SEPTEMBER 16, 2021

1           MS. RETTS:  Form; outside the scope.

2           THE WITNESS:  Again, it's situational,

3   dependent on the totality of the circumstances.

4       Q.  BY MR. SHOWALTER:  Okay.  Then Number 5 is

5   "Intimidation by reckless display."

6           Did I read that correctly?

7       A.  Yes.

8       Q.  And just -- we're back at Exhibit 306.

9           Example 6 -- or I'm sorry, Prohibition 6

10  is on "Escorting or prodding individuals," correct?

11      A.  Correct.

12      Q.  Prohibition 7 is "Waking unconscious or

13  intoxicated individuals," correct?

14      A.  Yep.

15          Yes.  I'm sorry.

16          MR. SHOWALTER:  I'm sorry, Donna, did I

17  just give him Prohibition 7?

18          THE COURT REPORTER:  Prohibition 7, yes,

19  "Waking unconscious or intoxicated individuals."

20      Q.  BY MR. SHOWALTER:  Okay.  Prohibition 8 is it

21  should not be used on "individuals operating a motor

22  vehicle," correct?

23      A.  Correct.

24      Q.  And Nine, "Individuals holding a firearm when

25  their finger is on the trigger," correct?

1    A.  That is correct.

2    Q.  Number 10 is "Handcuffed prisoners

3 resisting/refusing to entering a police vehicle,

4 holding room, or hanging onto railing or other item, et

5 cetera."

6         What is the meaning of that 10th

7 prohibition?

8    A.  Basically, someone -- it's kind of going back

9 to the escorting or prodding, "handcuffed prisoners who

10 are resisting or refusing to enter a police vehicle,

11 holding room or hanging onto railing or other item."

12    Q.  And so does that mean it shouldn't be used --

13 is that just a prohibition on using TASERs against

14 handcuffed prisoners?

15         MS. RETTS:  Form.

16         THE WITNESS:  Not necessarily.

17    Q.  BY MR. SHOWALTER:  When does Ten apply?

18    A.  When someone is -- like a handcuffed prisoner

19 refusing to get into a car, but not necessarily being a

20 threat, causing a danger to self or others, like being

21 more of a pain not allowing them to put him in a car, a

22 holding cell or grabbing onto a railing, right.

23 Grabbing onto a railing isn't necessarily a threat,

24 it's just being a pain.  So the TASER would not be a

25 tool to use in that situation.

JOSHUA CALLE   SEPTEMBER 16, 2021

1   Q.   Are City of Phoenix police officers trained

2   that they should not use the TASER against handcuffed

3   prisoners who are held facedown or prone?

4              MS. RETTS:   Form.

5              THE WITNESS:   No.

6   Q.   BY MR. SHOWALTER:   And does the City of

7   Phoenix's policy preclude police officers from using a

8   TASER against a prone, handcuffed subject?

9              MS. RETTS:   Form; foundation.

10              THE WITNESS:   Not necessarily, no.

11   Q.   BY MR. SHOWALTER:   When does it violate City of

12   Phoenix policy to use a TASER against a prone

13   handcuffed subject?

14              MS. RETTS:   Form; foundation; outside the

15   scope.

16              THE WITNESS:   When it's not objectively

17   usable and the totality of the circumstances does not

18   dictate the need of that tool.  If someone is laying

19   still prone and they're not doing anything else, there

20   would be no reason to use the TASER.  So, yeah, it

21   wouldn't be justified then.

22              If they're still displaying active

23   aggression, danger to self, others, fighting, right,

24   again, the totality of the circumstances, then it's up

25   to that officer to articulate and decide what level of

1  force and what force options he uses.

2      Q.  What if they are handcuffed, facedown, their

3  legs are being controlled, their legs are in RIPP

4  restraints and they've got five, six or seven officers

5  holding them down, in that circumstance, is it

6  appropriate to tase a subject?

7          MS. RETTS:  Form; foundation; outside the

8  scope.

9          THE WITNESS:  I would imagine if there's

10  four or five or six officers holding a subject down,

11  that would tell me they're probably still fighting,

12  kicking and making it difficult and they're not

13  restrained.

14      Q.  BY MR. SHOWALTER:  So that would not be

15  prohibited under the City of Phoenix policy, to tase

16  somebody in that circumstance?

17          MS. RETTS:  Form; foundation; outside the

18  scope.

19          THE WITNESS:  It's situational dependent,

20  right.  There's nothing that prohibits the use of the

21  TASER when there's signs of active aggression or higher

22  or they do to self others [sic].  As a general rule, if

23  a subject is handcuffed, we don't use the TASER.  But

24  like we've covered numerous times, in the totality of

25  the circumstances, the mitigating factors will decide

1  whether or not that level is appropriate or not.

2      Q.  BY MR. SHOWALTER:  So as general rule, officers

3  are trained that they can't use a TASER on a handcuffed

4  subject unless they decide under the totality of the

5  circumstances it's reasonable; is that correct?

6              MS. RETTS:  Form.

7              THE WITNESS:  Yes.  That's based on the

8  subject's levels of resistance.

9      Q.  BY MR. SHOWALTER:  Are there any absolute rules

10  about use of force that the City of Phoenix trains its

11  officers?

12              MS. RETTS:  Form.

13              THE WITNESS:  Such as.

14      Q.  BY MR. SHOWALTER:  Are there any absolute

15  rules?

16      A.  Yeah.  I mean, for instance, you can't use the

17  TASER unless the subject is displaying active

18  aggression, a danger to himself or another, right.

19  Outside of those circumstances, you can't use the

20  TASER.

21      Q.  But that's not an absolute rule, because it

22  allows for an exception based on discretion of the

23  officer, correct?

24              MS. RETTS:  Form.

25              THE WITNESS:  Correct.

1    Q.  BY MR. SHOWALTER:  And isn't that the way of

2   all of the City's rules about uses of force work is

3   that they present a rule.  But then officers are

4   trained if need be, they can deviate from that rule,

5   correct?

6            MS. RETTS:  Form.

7            THE WITNESS:  That is correct.  Because

8   the world and people do unexpected things and this job,

9   this profession is incredibly difficult.  It's very

10  difficult to place in it a box and make absolute rules

11  that this will never be done or to never do that

12  because people do unexpected things that require people

13  to think and react.  And more often than not, in very

14  short time frames.

15   Q.  BY MR. SHOWALTER:  So under certain

16  circumstances, it would be within policy for City of

17  Phoenix police officers to hogtie a subject if they

18  reasonably believed that doing so was necessary,

19  correct?

20            MS. RETTS:  Form.

21            THE WITNESS:  Based on our training and

22  lesson plans, hogtying is prohibited, right.  But if

23  hypothetically they're in a deadly force encounter and

24  that person is still a risk to significant serious

25  injury, physical or death to another person, and that's

1    Q.  So what about this one, excited delirium?

2    A.  This is one that I would have reviewed.  It

3  would have pertained to Phoenix police officers.

4    Q.  And this one relates to prone restraint,

5  correct?

6    A.  Correct.

7    Q.  The reason I was closing out of all those

8  windows, because it was kind of like you were trying to

9  kind of keep up with me as I was doing that.  I've just

10 got too many windows open, I'm trying to man -- you

11 know, we've got lot of exhibits.  But I can't even see

12 things at a certain point.

13       (Whereupon, Deposition Exhibit Number 165 was

14 marked for identification.)

15   Q.  BY MR. SHOWALTER:  So this is Exhibit 165.

16 It's Phoenix Police Department Training Materials,

17 Number 09367 Excited Delirium.

18       Are you familiar with this document?

19   A.  I believe this is one that I reviewed.

20   Q.  Okay.  And is this a course that you took as a

21 Phoenix police officer, training you received?

22   A.  I couldn't tell you if this one specifically.

23 Through the years, there's been numerous different

24 lesson plans and training.  I have received training on

25 excited delirium, yes.

1    Q.  Is training on excited delirium mandatory for

2  all patrol officers at the City of Phoenix?

3    A.  At some point, I'm sure all officers have gone

4  through, whether the academy or through advanced

5  officer training.  We don't do it every year.

6    Q.  Okay.  And so I want to go to Number 316, which

7  is this AZ POST training on in-custody death.

8         Is this a training that you have received?

9    A.  This specific one?

10    Q.  Yes.

11    A.  I don't believe so.  This is from 2014 and I

12  was a recruit in 2003.  This is -- if I'm looking at

13  this correctly, this would be a police recruit class.

14    Q.  Okay.  Is excited delirium a term that the City

15  of Phoenix uses in its trainings

16    A.  I believe so, yes.

17    Q.  In looking at this AZ POST lesson plan, there

18  is reference to something called sudden in-custody

19  death syndrome.

20         Do you see that?

21    A.  Yes.

22    Q.  Is that a term that the City of Phoenix uses in

23  its training?

24    A.  Not necessarily.

25    Q.  What do you mean by not necessarily?

1    A.  I've seen it in lesson plans that we've used in

2  the past.  We don't necessarily use it in training

3  right now.

4    Q.  And when you say "in the past," you mean at

5  some point since 2003?

6    A.  Yes.  And in reviewing some of the lesson

7  plans, I've seen it as well.

8    Q.  Just so I can understand it, would this 2014

9  lesson plan, AZ POST lesson plan on managing in-custody

10  death be something that applied to City of Phoenix

11  officers?

12          MS. RETTS:  Form.

13          THE WITNESS:  It would have been

14  instruction that police recruits received.

15    Q.  BY MR. SHOWALTER:  And so if they received this

16  AZ POST training, as a general matter, are they

17  required to comply with their AZ POST training unless

18  they receive some contrary training at the City of

19  Phoenix or there's a contrary policy at the City of

20  Phoenix?

21    A.  It would be expected to comply with the

22  training they received, whether it was POST or Phoenix.

23    Q.  And is AZ POST considered to be the standard

24  for peace officers in Arizona?

25    A.  They set the standard for training in Arizona,

1          THE WITNESS:  Correct.

2     Q.  BY MR. SHOWALTER:  With the proviso that there

3   may be other discussion of excited delirium in

4   reference to other policies, trainings, or tactics,

5   correct?

6     A.  Yes.

7     Q.  And, let's see, reviewing this -- for some

8   reason, it suddenly turned sideways on me.

9          So looking at the third page of excited

10  delirium, you know, it says "Excited Delirium Draft" on

11  that page and on some of the other, but ultimately it's

12  signed, correct?

13    A.  Correct.

14    Q.  So this was a training, even though it says the

15  draft, correct?

16    A.  Yes.

17    Q.  And in the introduction of the outline on the

18  training, it gives an overview of the performance

19  objectives.  And the first is to list some signs and

20  symptoms of excited delirium.  The second is to

21  identify appropriate measures and tactics used to

22  contain and control individuals displaying excited

23  delirium.  And the third is to recognize excited

24  delirium as a medical emergency which requires fire

25  department response.

1          Did I read that correctly?

2     A.  Yes.

3     Q.  And is that how officers at the City of Phoenix

4  are trained regarding excited delirium?

5     A.  Yes.

6     Q.  They are trained that it is a medical emergency

7  that requires a fire department response, correct?

8     A.  Correct.

9     Q.  In the right-hand margin, when you get down a

10 little bit, there's a reference Di Maio & Di Maio 2006.

11 Are you familiar with those authors or their book,

12 which is referenced on the first page?

13    A.  I am not.

14    Q.  The book itself is called "Excited Delirium

15 Syndrome" by Di Maio & Di Maio.  So you're not familiar

16 with that book?

17    A.  I'm not.

18    Q.  Okay.  And that book itself is not a part of

19 the training, correct?

20    A.  Correct.

21    Q.  It's just a source or reference cited in the

22 training?

23    A.  That is correct.

24    Q.  And there is a history of excited delirium

25 given.  Do you have an understanding of why it's

1  it's trained at the City of Phoenix is that it is not a

2  situation where somebody's heart is exploding

3  literally, correct?

4      A.  Correct, not physically literally exploding.

5  no, correct.

6      Q.  And the City of Phoenix police officers are

7  trained that excited delirium is a medical emergency

8  that if fire personnel are called out for death can be

9  prevented, correct?

10     A.  No, that's not correct.  I don't know if death

11 can be prevented.  It's something that we are trained

12 to get medical or fire as quickly as possible, it can

13 help it.

14     Q.  Are City of Phoenix officers trained that if a

15 subject is showing symptoms of excited delirium or is

16 in a state of excited delirium, that death is

17 inevitable?

18             MS. RETTS:  Form.

19             THE WITNESS:  No.

20     Q.  BY MR. SHOWALTER:  Are City of Phoenix officers

21 trained that when a subject is displaying signs or

22 symptoms of excited delirium, that death may happen

23 regardless of what police officers do?

24             MS. RETTS:  Form.

25             THE WITNESS:  Officers are trained that if

1  they're dealing with someone who is showing signs or a

2  lot of symptoms of excited delirium, they need to

3  detain with legal authority, if they have legal

4  authority, to detain as quickly as possible and get

5  medical assistance.

6      Q.  BY MR. SHOWALTER:  And the signs and symptoms

7  of excited delirium, given in this training, are, one,

8  violent or aggressive behavior; two, running or running

9  wildly about; three, shouting or incoherent babbling;

10  four, destructive behavior, attacking glass or shiny

11  objects; five, profuse sweating; six, unusual or

12  seemingly incredible strength; seven, no appreciable

13  response to pain compliance techniques; eight, refusal

14  to comply with commands; nine, may continue to fight

15  even after restrained; ten, naked, wearing only

16  underwear or disrobing; eleven, history of recent or

17  chronic drug and/or alcohol use, abuse, prior psych

18  history."

19          Did I read all of that correctly?

20      A.  You did, yes.

21      Q.  And is that what the City of Phoenix's training

22  on excited delirium or the signs and symptoms of

23  excited delirium are between 2009 and February of 2019?

24      A.  Yes.

25      Q.  And then at B it says, "May be followed by a

1  delirium even if they've already been handcuffed and

2  are already being restrained?

3            MS. RETTS:  Foundation.

4            THE WITNESS:  No.  It's just saying it's a

5  tool to be used to help detain subjects.

6      Q.  BY MR. SHOWALTER:  And so under tactical

7  response, it says the "Primary officer should attempt

8  to safely restrict the individual's movement.  Observe

9  the individual's behavior and physical characteristics

10  to determine if the subject is more likely than not in

11  a state of excited delirium; and request fire to

12  respond, advise radio of possible excited delirium and,

13  if feasible, advise radio of the individual's physical

14  characteristics and actions."

15            Did I read that correctly?

16      A.  Yes.

17      Q.  And so once an officer identifies symptoms or

18  signs of excited delirium, they should notify fire that

19  they are dealing with a subject who may be in a state

20  of excited delirium; is that correct?

21      A.  That is correct.  We attempt to get fire there

22  as soon as possible.

23      Q.  And then there's another discussion of the use

24  of the TASER.  And it says, "The TASER in probe mode is

25  suggested tool in these situations due to its

1  incapacitating effect when combined with adequate back

2  up and lethal coverage."

3          And then it says, below that, "An

4  effective deployment will fully incapacitate the

5  individual for five seconds; officers should move in to

6  control the individual while he/she is incapacitated."

7          Did I read that correctly?

8  A.   Yes.

9  Q.   And so that is for taking the individual into

10  custody, correct?

11  A.   Correct.

12  Q.   Once they're handcuffed or once they're in

13  custody, unless the scene is otherwise secured, request

14  fire respond to the scene, correct?

15  A.   Correct.

16  Q.   And then it says, "To the extent feasible, keep

17  the individual in a safe position, location,

18  handcuffed, sitting upright or lying on their side."

19          What does that mean?

20  A.   If it's feasible, if it's safe, get the person

21  into a recovery position.

22  Q.   Either sitting or lying on their side?

23  A.   Correct.

24  Q.   And then it says, "Talk to the individual and

25  gauge their level of consciousness," correct?

1  to take them into custody.  It's a control hold to keep

2  subjects from rolling into you or further attack while

3  we're trying to take them into custody.

4      Q.  What if the subject has already been

5  handcuffed, is there a training that the City of

6  Phoenix uses about putting knees on the back, shoulders

7  or neck?

8          MS. RETTS:  Form.

9          THE WITNESS:  Not necessarily.  But,

10  again, it's about control.  If there's a subject still

11  fighting, biting, kicking, that kind of stuff, you're

12  trying to stop that act of aggression, then there is a

13  control technique.

14     Q.  BY MR. SHOWALTER:  Other than the carotid hold

15  technique, is there any training at the City of Phoenix

16  that authorizes the use of force against a subject's

17  neck?

18          MS. RETTS:  Form.

19          THE WITNESS:  Yes, the carotid control

20  technique which was allowed in 2019.  It's no longer

21  allowed now.  But there's a lot of pressure points,

22  pain compliance, nerve endings that are in the

23  subject's neck, below the ear, down to the traps,

24  brachial plexus along the side of the neck.

25     Q.  BY MR. SHOWALTER:  Are officers trained that

1  they should not strike individuals in the throat?

2      A.  Yes.

3      Q.  Are officers trained that they should not

4  target the throat?

5      A.  Yes.

6      Q.  Why is that?

7      A.  As discussed earlier, with the use of the

8  carotid, there's bones and nerves and a lot of

9  important bodily parts that could get damaged, if you

10  strike someone in the throat.

11      Q.  Now, if an officer is in extreme circumstances

12  and they find that the only thing they can do to save

13  themselves is to strike a suspect in the throat, that

14  would be authorized under the policy that we talked

15  about earlier, which says if you're facing a deadly

16  threat, you can diverge from these policies, correct?

17          MS. RETTS:  Form; foundation; outside the

18  scope.

19          THE WITNESS:  I guess.  In my opinion, it

20  wouldn't be the best tactic to use.  However, fighting,

21  struggling with people is dynamic and there's a lot of

22  different techniques that could be used where people

23  move.  In a dynamic environment where someone could be

24  potentially trying to put pressure on the brachial

25  plexus and the subject rolls and they end up getting a

 1  thumb to the their throat.  You try to strike them in

 2  the face and their head moves, there's a lot of

 3  mitigating factors to that.

 4      Q.  BY MR. SHOWALTER:  And if an officer did that,

 5  and struck a subject in the throat, you would expect

 6  that would be something that they would report to

 7  medical responders at the scene, hey, I accidentally

 8  struck this guy in the throat and I think he may have

 9  an injury?

10          MS. RETTS:  Form; foundation; outside the

11  scope.

12          THE WITNESS:  Yeah, they would be expected

13  to notify medical and your supervisor.

14      Q.  BY MR. SHOWALTER:  So you were talking about

15  the use of the knee in the back in order to extend a

16  subject's arm for handcuffing.  Do you recall that?

17      A.  Yeah.

18      Q.  Is it unreasonable under a City of Phoenix

19  policy and training, for an officer to continue to

20  place a knee on a subject's back after they've already

21  been handcuffed?

22          MS. RETTS:  Form; foundation; outside the

23  scope.

24          THE WITNESS:  It depends on what's going

25  on.

1    Q.  BY MR. SHOWALTER:  What if the subject is not

2 moving, would it be unreasonable then?

3              MS. RETTS:  Form; foundation; outside the

4 scope.

5              THE WITNESS:  If they're not moving,

6 right, they're no longer fighting, resisting, any of

7 that, and they can safely remove their knee, then,

8 yeah, the expectation that they would move their knee

9 would be there.

10    Q.  BY MR. SHOWALTER:  And so that would be

11 outside -- leaving a knee on the back of a subject

12 who's handcuffed and not moving or resisting would be

13 contrary to City of Phoenix policy and training,

14 correct?

15              MS. RETTS:  Form; foundation; outside the

16 scope.

17              THE WITNESS:  The expectation is they

18 would move the knees, correct.

19    Q.  BY MR. SHOWALTER:  And if you have a subject

20 who's been handcuffed and is being held down by

21 multiple officers and is not resisting or fighting back

22 or moving, it would be contrary to City of Phoenix

23 policies and training to tase that subject, correct?

24              MS. RETTS:  Form and foundation; outside

25 the scope.

1          THE WITNESS:  If there's multiple people

2    holding a subject down, I would find it difficult to

3    say that they were no longer moving.  But they would

4    still have to be able to articulate justified use of

5    that force option and that tool.

6       Q.  BY MR. SHOWALTER:  And so I'm not clear that

7    that's responsive to my question, so let me ask it

8    again slightly different.

9          A subject -- let me just ask you for a

10   scenario.

11         A subject can be resisting and officers

12   can respond to that resistance by holding the subject

13   down, correct?

14      A.  Correct.

15      Q.  And they may continue to hold that subject down

16   even after they've stopped resisting, correct?

17      A.  If the person has stopped resisting and there's

18   no longer a need to do that, the expectation would be

19   that they would no longer put pressure, right.

20      Q.  Sure.  But that's not an instantaneous thing

21   that happens in real life, is it?

22      A.  Correct.

23      Q.  So a subject may be resisting, officers may

24   hold them down, they may continue to resist and then

25   stop resisting, correct?

1    A.  I guess that could happen, yeah.

2    Q.  And officers may in that situation reasonably

3  continue to restrain them for some period of time after

4  they first sensed that the person has stopped

5  resisting, because they want to make sure that that

6  resistance stays stopped, right?

7    A.  Correct.

8        MS. RETTS:  Form.

9    Q.  BY MR. SHOWALTER:  And so there are certainly

10  circumstances in which officers could be holding down a

11  person, who's not resisting at that moment, correct?

12        MS. RETTS:  Form; foundation.

13        THE WITNESS:  Yeah.  I mean, if we're

14  talking minute time periods, yeah.

15    Q.  BY MR. SHOWALTER:  And even if a person is

16  resisting, if they're being held down and effectively

17  controlled by other officers, then it would be

18  unreasonable and unnecessary to tase that person,

19  correct?

20        MS. RETTS:  Form; foundation; outside the

21  scope.

22        THE WITNESS:  It's not necessarily a yes

23  or no answer, right.  If multiple officers are holding

24  someone down, I find it odd -- it would be hard for me

25  to say they're no longer resisting, right.  So if

1  scope.

2         THE WITNESS:  If he is still fighting,

3  struggling, kicking, biting, that could be an

4  appropriate tool to use.  If he's not doing anything

5  whatsoever, it would probably be inappropriate.

6      Q.  BY MR. SHOWALTER:  And my question was whether

7  it was allowed under policy and training or within

8  policy and training.  When you say appropriate or

9  inappropriate, is that what you mean?

10     A.  Yeah.

11     Q.  Okay.

12     A.  Within our training standards, the scope of

13  training, yes.

14     Q.  Okay.  I want to ask -- I'm almost done.  I

15  thought I would be done sooner.

16         I just want to ask you about -- so Item

17  11, "The City of Phoenix Police Department's knowledge,

18  training, policies, customs and practices regarding use

19  of force reporting since 2009."

20         What is the policy about use of force

21  reporting at the City of Phoenix?

22         Or where is it found?

23     A.  How do you mean, reporting?

24     Q.  Yes.

25     A.  It's in a few different places, 1.5 and

1  Section 4 where they talk about notifying supervisors

2  and documenting through use of force reports.

3      Q.  Okay.  Beyond documenting in that fashion, does

4  the City of Phoenix have any policies on collecting and

5  aggregating use of force information or use of force

6  reports?

7             MS. RETTS:  Form; foundation.

8             THE WITNESS:  Are you talking like you see

9  our information to notify FBI for our own internal

10  investigations?  What are you referring to?

11      Q.  BY MR. SHOWALTER:  In any -- for City of

12  Phoenix's own purposes, does the City of Phoenix gather

13  all use of force reports for any kind of review and

14  analysis?

15      A.  Yes.

16      Q.  What is that, that it does with that?

17      A.  Well, when an officer applies force above a

18  certain level, we used to refer to it as Level 30 or

19  anything above, handcuffs or restraint, joint locks,

20  pressure points, it goes to another level, what used to

21  be called use of force report where a supervisor would

22  fill that out and send it through the chain to the

23  lieutenant commander.  And then depending on the level

24  of force, it would also be reviewed and investigated

25  by our professional standards bureau.

1    EXAMINATION

2  BY MS. RETTS:

3    Q.  Sergeant, today you gave testimony about

4  formalized training that's given through the

5  department.  But in terms of an officer who goes

6  through the academy, the City of Phoenix training, is

7  there on-the-job training that also occurs?

8    A.  Yes.  There's training received in the basic

9  curriculum at the academy.  Once graduating the

10  academy, they go through a field training program where

11  they have -- you work from 12, upwards of 18 weeks

12  riding with a field training officer and then they also

13  attend advanced officer training yearly.

14    Q.  And during that period of time, when they have

15  their process of going through the field training, they

16  have someone who is evaluating them and giving them

17  feedback on any force they might have to use?

18    A.  Correct.  They have a field training officer

19  ride with them at all times, until the end of their

20  training, until the last two weeks.  And they're also

21  working around other field training officers and field

22  training sergeants that are kind of keeping an eye out

23  on their training.

24    Q.  Is it a part of the responsibility of those

25  field training officers and sergeants when a recruit --

1  when a new officer encounters situations with the
2  public or encounters a suspect that after those,
3  there's a debrief and there's a discussion about force
4  that could be used, might be used, other situations
5  could be resolved differently?
6      A.  Yes.  After -- usually after every single
7  incident, each incident is broken down and discussed
8  better ways, other ways to handle it, different
9  techniques, tactics that can be used.
10     Q.  And those are situations where you would expect
11  a field training officer to give feedback about
12  specific instances and what were appropriate for and/or
13  inappropriate for?
14     A.  Yes.
15     Q.  In addition to that, as officers get on shift,
16  are there usually briefings before they start?
17     A.  They are.
18     Q.  And what happens during a briefing?
19     A.  During briefings the supervisor should go
20  over -- so we expect our supervisors to train, talk
21  about different expectations, tactics, trainings,
22  everything like that.  And they also go over -- we used
23  to call it the briefing book, but now it's the duty
24  report, incidents that have happened throughout the
25  city, of note.  And as well any crime watches, specific

1 activities to their beat, their area.

2      Q.  And those are situations where a sergeant,

3 commander, lieutenant would talk to the officers coming

4 on shift about incidents that happened and about

5 tactics that were or were not appropriate?

6      A.  Correct.

7      Q.  And those are constant things that are

8 happening on a day-to-day basis, correct?

9      A.  Yes.  And we also do what we refer to as

10 organized briefing training, in addition to our

11 learning platform where we have constant new material

12 going out for officers to keep their training current

13 and updated.

14      Q.  When you were asked a bunch of questions about

15 whether officers are trained about what is, quote,

16 excessive force.  Do you remember those questions?

17      A.  Yes.

18      Q.  Now, the training given from the City of

19 Phoenix, does it focus on what is an appropriate versus

20 inappropriate tactic?

21      A.  The department focuses on what would be

22 appropriate.  I don't necessarily want to highlight bad

23 behavior or wrong behavior.  You want to highlight what

24 is expected and the correct process, the correct force

25 and you get repetitions in that and build repetitions.

1    Q.  So there's a concept in defensive tactics
2   training, any type of use of force that's muscle
3   memory, are you familiar with that?
4    A.  Yes.
5    Q.  What is that concept?
6    A.  So muscle memory, it's not necessarily muscles
7   have memory.  But under stress, human nature will
8   revert to what they normally do.  So we try to get
9   proper repetitions, repeatedly over and over and over,
10  so under stress the reaction will be what is trained
11  rather than what is untrained.  For instance, in our
12  policing world, one of the things that I bring up,
13  officers who keep their phone on their belt and
14  constantly answer their phone.  Under stress, we've
15  incidents nationwide where officers have grabbed there
16  phone instead of a gun or another tool that would be
17  appropriate.  So we really try to focus on the
18  appropriate response and multiple repetitions.
19            So under stress, they refer back to their
20  training.
21   Q.  For example, in a situation of applying a RIPP
22  restraint, you want to teach that and have them
23  demonstrate and do that in the appropriate way, not
24  teach them how to inappropriately apply that, such as
25  actually having them apply a hogtie?

1    A.  Correct.  We don't want to teach them how to

2    apply it inappropriately.

3    Q.  We don't want them, for example, in the heat of

4    a moment not remember what the correct technique was

5    and do the wrong one, correct?

6    A.  Correct.

7    Q.  Now, as you go through that training, such as

8    the RIPP restraint uses an audible description and

9    shows how the RIPP restraint should not be applied.

10   For example, to shorten it, that you cannot shorten it?

11   A.  Correct.  We show wrapping it around the feet,

12   we shorten it.  And we show wrapping around the

13   handcuffs multiple times shortened.  And then we show

14   pulling it all the way back to the feet and explain

15   those are incorrect.  And then we show them the correct

16   way again and then have them demonstrate, acknowledge

17   the correct application.

18   Q.  So that would be another instance where when

19   you're giving that training, you're not saying, this

20   is, quote, excessive force.  You're saying this is

21   inappropriate, you don't do that?

22   A.  Correct.

23   Q.  Now we talked about TASER training, some of the

24   general rules that apply to TASER restrictions.

25   Officers are trained generally not to tase someone from

1  a height, correct?

2      A.  Correct.

3      Q.  Would that be another instance where we're

4  talking about -- we're not using the terminology of

5  excessive force, for the reason that we talk about not

6  tasing someone from a height is because it could be an

7  unreasonable force?

8      A.  Correct.  It's not necessarily excessive.  In

9  this instance, the way that the TASER works, it can

10  incapacitate someone from being able to stop their fall

11  and they could fall on their head, hurt their neck,

12  that sort of thing.  So we don't teach them to do it

13  wrong, we try to explain to do it right and the reasons

14  why to do it right.

15     Q.  Now, we went through some hypothetical

16  scenarios in your testimony about TASERs and one of

17  them was, for example, a person who might be doused in

18  a flammable liquid and he has a lighter, that as a

19  general rule you would not want to tase that person,

20  correct?

21     A.  That is correct.

22     Q.  Now we also went through the policy that talked

23  about in certain circumstances where there may be a

24  deadly force scenario with danger to a third person

25  that there might be, as an exception, a deviation,

1  correct?

2       A.  Correct.

3       Q.  So, for example, let's say that person doused

4  in flammable liquid with a lighter is at a gas station

5  and walks to the gas pumps where there are ten people

6  standing there.  Is that the type of situation where

7  use of the TASER may, depending upon the totality of

8  the circumstances, be appropriate?

9       A.  Yes, that would be a deadly force encounter

10  that could be a deadly force option.

11      Q.  Officers also go through firearms training

12  that's called decision making analysis or it's been

13  called FAAC and it's been called MILO.  Are you

14  familiar with that?

15      A.  Yes.

16      Q.  And those are basically training scenarios

17  where the officer is in a video and a red gun and they

18  have to make the decision on whether the circumstances

19  justify using deadly force or not using deadly force,

20  correct?

21      A.  Correct.  Our department uses two different

22  virtual trainers, the TI system and the Virtual Trainer

23  where they're predominantly used for lethal force,

24  shoot, don't shoot scenarios, decision making.  But

25  we've also encountered other scenarios that did include

1  use force or not, i.e., such as the TASER or OC spray,

2  that kind of stuff.  But it's all decision making.

3      Q.  And that process allows you to do evaluation of

4  officers to make sure that they're, as you talked about

5  earlier, having good decision making using the

6  framework of totality of the circumstances?

7      A.  Exactly.

8      Q.  And if someone doesn't pass that, they have to

9  go through and retake it, correct?

10      A.  They receive remedial training and then they go

11  through another pass/fail scenario or set of scenarios

12  as their assessment.

13      Q.  In addition to Policy 1.5, the response options

14  for force situations, the City also has Policy 7.1 for

15  handcuffing prisoners, correct?

16      A.  Correct.

17      Q.  And in that policy, officers are specifically

18  told that there is a risk of injury or death by

19  position asphyxia when a suspect is kept facedown for a

20  prolonged period of time, correct?

21      A.  That is correct.

22      Q.  And the training, in terms of prone placement,

23  he's not calling it deadly or non-deadly force, but

24  making officers aware that there could be a risk of

25  physical harm by that being facedown?

1    A.  Correct.

2    Q.  And officers are trained.  And it's reiterated

3 in the policy, to minimize the time they're facedown,

4 correct?

5    A.  Yes.

6    Q.  And they trained when feasible, to roll a

7 person over into the recovery position on their side or

8 sit them up, correct?

9    A.  Correct.

10    Q.  Officers are trained that the preferred target

11 for the TASER is the back, correct?

12    A.  That is the primary target area, yes.

13    Q.  And is part of that reason to minimize the

14 potential of exposure to the chest?

15    A.  Yes.  We have a term, we call it dart to heart,

16 where we try to avoid darts near the heart.  The back

17 being the primary target area for that reason and it is

18 a large muscle area that gets the most effect from that

19 tool.

20    Q.  If a TASER is deployed and the probes don't

21 spread a certain distance, what is the potential effect

22 of that?

23         MR. SHOWALTER:  Form; foundation.

24         THE WITNESS:  So the potential of that is

25 when you're in compliance, the TASER, the way the

# EXHIBIT 30

1. <u>**GENERAL INFORMATION**</u>

   A. Sanctity of Life – The Department respects the dignity of all persons and recognizes the sanctity of human life, rights, and liberty.

   B. The policies of the Department are set forth as follows:

   - Physical force
   - Non-deadly force
   - Deadly force

       ∗ Officers are trained to utilize deadly force only as a last resort when other measures are not practical under the existing circumstances.

   - Lethal weapons and equipment

   C. Sworn employees and affected civilian employees will be trained and instructed in these policies before employing any of the weapons, tactics, or techniques.

   D. Only Department-issued or approved weapons, equipment, and chemical agents will be authorized.

2. <u>**DEFINITIONS**</u>

| A. | **Reasonable Belief** | • | When the facts and circumstances cause a reasonable and prudent law enforcement officer to act or think in a similar way under the circumstances |
|---|---|---|---|
| B. | **Non-Deadly Force** | • | Is a tactic when properly applied has minimal or no risk of causing death |
| C. | **Deadly Force** | • | Any tactic or use of force that creates a substantial risk of causing death or serious physical injury, such as the use of a firearm |
| D. | **Serious Physical Injury** | • | A bodily injury that creates a reasonable risk of death, causes serious and permanent disfigurement, or results in long term loss or impairment of the functioning of any bodily member or organ |
| E. | **Excessive Force** | • | The application of an unreasonable amount of force in a given incident based on the totality of the circumstances |
| F. | **Types of Resistance** | • | Psychological Intimidation - Non-verbal cues indicating subject's unwillingness or threats through attitude, appearance, and physical readiness |
| | | • | Verbal Non-Compliance - Verbal responses indicating unwillingness or threats |
| | | • | Passive Resistance - Physical actions that do not prevent an officer's attempt to control |
| | | • | Defensive Resistance - Physical actions that attempt to prevent an officer's control, but does not involve attempts to harm the officer |
| | | ∗ | Based on this definition, solely running from officers does not constitute defensive resistance |
| | | • | Active Aggression - Physical actions of assault |
| | | • | Aggravated Active Aggression - Deadly force encounter |
| G. | **Response Options** | The option used is determined by the totality of the circumstances | |
| | | • | Presence - Identification of authority |
| | | • | Verbal Direction - Commands of direction or arrest |
| | | • | Soft Empty Hand Control and Restraining Devices - Techniques that have a minimal chance of injury |
| | | ∗ | Restraining Devices - Handcuffs, Ripp restraint, ankle cuffs, shackles |
| | | • | Chemical Weapons - Oleoresin capsicum (OC), Chloroacetophenone (C/N) and 2-Chlorobenzaimalononitrile (C/S) |

COP-STICKNEY003722

2. <u>**DEFINITIONS**</u> (Continued)

| | | |
|---|---|---|
| **G. Response Options** (Continued) | • Electronic Control Device (ECD): for example, Taser<br>• Intermediate Control Techniques  -  Techniques that have a probability of injury<br>    ∗ Hard Empty Hand Control<br>    ∗ Impact Weapons<br>    ∗ Stunbag Shotgun<br>    ∗ Canine (K9) Application<br>• Carotid Control Technique<br>• Deadly Force | |
| **H. Use of Force Restrictions** | <u>Handcuffed/Restrained Persons</u><br>• Employees will not use strikes, impact weapons, chemical weapons, ECDs, carotid control techniques, or deadly force unless such force is necessary to prevent imminent serious bodily injury or death, or unless such force is reasonable based on the totality of circumstances. | |

3. <u>**GENERAL POLICY**</u>

A. It is the policy of the Department to use a reasonable amount of force to conduct lawful public safety activities.

B. The response option employed will be reasonable and based on the totality of circumstances.

(1) Employees involved in the use of force have the responsibility of providing the facts and circumstances they believe justified the use of force by completing the necessary reports, memorandums, etc.

(2) Circumstances that may govern the reasonableness of using a particular force option include, but are not limited to:

• The severity of the crime
• Whether the subject poses an immediate threat to the safety of officers or others
• Whether the subject is actively resisting arrest or attempting to evade arrest by flight

(3) <u>Elements of Force</u>  -  Employees need to consider the following:

• <u>Ability</u>  -  Subject  has the reasonable ability to carry out the act
• <u>Opportunity</u>  -  Subject  has the reasonable opportunity to carry out the act
• <u>Jeopardy</u>  -  Subject  creates jeopardy to the officer or others
• <u>Preclusion</u>  -  Other alternatives have been reasonably considered based on the totality of the circumstances

C. <u>Escalation/De-Escalation of Force</u>

• When use of force is needed, employees will assess each incident to determine, based on policy, training, and experience, which use of force option will de-escalate the situation and bring it under control.

D. All sworn employees will intervene, if a reasonable opportunity exists, when they know or should know another employee is using unreasonable force.

• All sworn employees will immediately report excessive force verbally to a supervisor.

E. <u>Medical Treatment</u>  -  Employees are responsible for requesting medical treatment for subjects against whom force was used.

COP-STICKNEY003723

3. E. <u>Medical Treatment</u> (Continued)

- Any time there is an injury, or an alleged injury, as a result of force used by Department personnel, employees will:

  ∗ Examine any person claiming injury and render first aid, if necessary.
  ∗ Request paramedics to respond to the scene, if appropriate.
  ∗ Immediately notify a supervisor.

F. The techniques taught by the Department's proficiency skills instructors will be used when practical.

4. **RESPONSE OPTIONS**

A. <u>Presence</u>

- Presence is established through identification of authority.

  ∗ The presence of a K9 at a scene falls under this parameter.

B. <u>Verbal Persuasion, Negotiation, or Command</u>

- Includes instruction or direction from an officer in the form of verbal statements or commands.

C. <u>Soft Empty Hand Techniques and Restraining Devices</u> - These techniques have a minimal chance of injury.

(1) Control and restraint techniques include, but are not limited to:

- Wrist locks
- Joint locks
- Pressure points
- Handcuffing (metal, plastic, or soft restraint devices)
- Restraining devices such as Ripp restraints, ankle cuffs, and shackles (transport use only)

(2) Employees **will not** restrain subjects with their legs behind their back (hog-tying).

D. <u>Chemical Agents</u> - The use of authorized chemical agents is considered a non-deadly tactic.

| **(1) Oleoresin Capsicum (OC) Spray** | May be used when reasonable and justified in the following situations:<br><br>• To prevent the possibility of injury to an officer or another person<br>• To ward off threatening dogs or other animals<br>• In tactical building entries, such as search warrants<br>• To subdue a person who is:<br><br>   ∗ Threatening or attempting physical harm to himself or another<br>   ∗ Resisting an arrest<br>   ∗ Rioting<br>   ∗ Interfering with an arrest<br><br>Carrying Procedures<br><br>• Uniformed Employees<br><br>   ∗ All uniformed employees will be trained in the use of OC spray.<br>   ∗ Mandatory equipment which will be attached to the gunbelt and carried at all times while on duty.<br>   ∗ It will be carried with the canister in an upright position. |
|---|---|

COP-STICKNEY003724

4.   D.   <u>Chemical Agents</u> (Continued)

| **(1) Oleoresin Capsicum (OC) Spray** (Continued) | • <u>Sworn Plainclothes Employees</u><br><br>  ∗ All plainclothes employees will be trained in the use of OC spray.<br>  ∗ Sworn employees in plainclothes below the rank of commander will carry 3/4-ounce OC spray as readily available as their weapon.<br><br>• Undercover Operations - Carrying OC spray is optional for sworn employees assigned to undercover operations.<br>• Civilian Employees - Because civilian employees do not have arrest powers and the training necessary to restrain aggressive individuals, those civilians authorized to carry OC spray will utilize this as a defensive tool in an effort to gain time and distance from an attacking subject.<br><br>  ∗ Civilian employees will not engage individuals who, by their verbal or non-verbal actions, are engaging in aggressive behavior that may result in a physical attack to the employee.<br><br><u>Directions for Use</u><br><br>• Employees using the 1.6-ounce OC spray will direct a one-second burst into the face of the subject; effective range is normally 12-15 feet.<br>• Employees using the 3/4-ounce spray will direct a one-second burst into the face of the subject; effective range is normally 10-12 feet.<br>• **Do not** use within three (3) feet of a subject as soft tissue damage could occur.<br>• The subject should be immediately handcuffed and moved to a well-ventilated area; medical help will be requested if a subject complains or displays any severe or abnormal reaction to the spray.<br>• Employees will not unnecessarily display or handle any OC spray.<br>• When the circumstances justifying the use of OC spray no longer exist, OC spray will immediately be discontinued.<br><br>  ∗ Employees still may use reasonable force to maintain control and to protect themselves from danger.<br><br><u>Post-Use Care</u><br><br>• Warm water can be used to flush the eyes without rubbing.<br>• If water is not available, the Fire Department will be called to the scene.<br>• Subjects should recover within 45 minutes; however, the intense sensation of skin burning may persist for 30 to 90 minutes after exposure.<br>• Salve or ointments **should not** be used on affected areas.<br>• Subjects sprayed with OC will not be left unattended.<br>• Paramedics will be called to the scene if a subject exposed to OC spray complains or displays any severe or abnormal reaction to the spray at any time.<br>• Employees will continue to provide post-use care to the subject until the subject has recovered from the effect of the spray.<br>• Employees will not lay subjects on their stomach.<br>• Civilian employees will follow the proper directions for use as prescribed for sworn employees and will notify Communications that OC spray has been deployed.<br><br>  ∗ The employee will make efforts to maintain a visual on the subject and direct sworn officers to the location for disposition and post-use care.<br>  ∗ Once sworn employees arrive, post care procedures will be implemented. |
|---|---|
| **(2) Oleoresin Capsicum Spray Mark-9 Canister 18.34 ounce** | <u>Authorized Personnel</u><br><br>• Supervisors<br>• Officers and supervisors of the Special Assignments Unit (SAU), Major Offender Unit (MOU), Downtown Operations Unit (DOU), and Tactical Response Unit (TRU) |

COP-STICKNEY003725

4. D. <u>Chemical Agents</u> (Continued)

| (2) **Oleoresin Capsicum Spray Mark-9 Canister 18.34 ounce** (Continued) | • <u>K9 handler</u><br><br>    ∗ Supervisors may direct an officer to deploy the Mark 9 canister when reasonable to do so.<br><br><u>Directions for Use</u><br><br>• Employees using the Mark-9 canister OC spray will direct a one-second burst into the face of the subjects from a minimum distance of 15 feet.<br>• The effective range is normally 20-25 feet.<br>• Employees using the Mark-9 canister OC spray in a riot control situation should direct the spray face level, from a minimum distance of 15 feet, into the crowd until the desired effect is achieved.<br>• Employees will not unnecessarily display or handle any OC Spray Mark 9 canister 18.34 ounce.<br>• Tactical chemical agents are considered non-lethal weapons.<br>• Detailed training, deployment procedures, and tactical considerations are found in the appropriate bureau manuals. |
|---|---|
| (3) **Tactical Chemical Agents** | <u>Delivery Systems</u><br><br>• Isper Jet<br>• 37mm Gas Delivery System<br><br>    ∗ Ferret rounds will not be directed at individuals due to the possibility of serious injury if the round strikes a person.<br>    ∗ Ferret rounds will not be used against moving vehicles.<br><br><u>Authorization for Use</u><br><br>• The use of tactical chemical agents will be limited to those officers and supervisors specifically authorized and trained in their use.<br>• SAU and DOU are responsible for tactical chemical agent training; grenadier 1 and 2 levels, and will maintain the roster of officers certified to deploy chemical agents.<br>• SAU, DOU, and TRU supervisors may authorize use of tactical chemical agents. |

E. <u>Electronic Control Devices (ECD)</u> - Use is considered a non-deadly tactic.

| (1) **Guidelines For Use** | • ECDs, such as the Taser, use compressed nitrogen gas to propel probes and wires that conduct electrical energy which overrides a subject's central nervous system, attempting to temporarily stop the subject's actions.<br>• ECDs may be used when it is objectively reasonable based on the totality of the circumstances, on subjects who are displaying active aggression, or who are placing an officer or a third party in reasonable apprehension of imminent physical injury, or to prevent a subject from harming him/herself.<br>• The following circumstances should be considered prior to use:<br><br>    ∗ Is the subject posing an imminent threat to the safety of officers, a third party, or him/herself?<br>    ∗ What is the severity and violence level of the crime?<br>    ∗ Does the subject have a history of violent behavior?<br>    ∗ If an arrest team is not available, is it feasible to delay deployment to wait for one?<br><br>• When the circumstances justifying the use of an ECD no longer exist, the ECD will immediately be discontinued.<br><br>    ∗ Employees still may use reasonable force to maintain control and to protect themselves or others from danger when such force can be justified through the totality of the circumstances. |
|---|---|

COP-STICKNEY003726

4.    E.    <u>Electronic Control Devices (ECD)</u>  (Continued)

**(1) Guidelines For Use** (Continued)

- ECDs will not be used for any of the following:

  ∗ Coercion of any type

    **EXCEPTION**:   A warning Arc combined with the proper verbal warning may be used as coercion in situations that would likely result in a justified deployment of the ECD.

  ∗ Against subjects solely for running from the officer
  ∗ Against a subject who would be in danger of falling from a significant height
  ∗ When subjects are near flammable liquids and gases
  ∗ Intimidation by reckless display
  ∗ Escorting or prodding individuals
  ∗ Waking unconscious or intoxicated individuals
  ∗ Individuals operating a motor vehicle
  ∗ Individuals holding a firearm when their finger is on the trigger
  ∗ Handcuffed prisoners resisting/refusing to enter a police vehicle, holding room, or hanging onto a railing or other item, etc.

    **NOTE**:   The Department currently uses a nitrogen propellant OC spray; however, employees need to use caution in incidents involving other jurisdictions which might be using an alcohol based OC spray.

- Employees will avoid using ECDs against the following subjects, unless employees can articulate other reasonable force options have been tried or were unlikely to succeed:

  ∗ Female subjects known to be pregnant or who are visibly pregnant
  ∗ Elderly subjects
  ∗ Young children
  ∗ Handcuffed prisoners

- The following should be considered prior to using the device on subjects in water:

  ∗ Any significant amount of water may cause the subject to drown and will hinder other officers assisting in the apprehension of the subject.
  ∗ Deep water reduces the target area.

- Employees requested to provide ECD demonstrations to groups and organizations will first obtain permission from their bureau/precinct commander.
- Employees shall not carelessly or recklessly display the ECD.

<u>Tactical Considerations</u> - When deploying an ECD, employees:

- Will announce deployment to prevent contagious fire.
- Will communicate with other employees upon arriving at the scene.
- Will, when practical, have an arrest team available.
- Will consider whether other options exist when dealing with mental health or excited delirium subjects.

  ∗ If an exigency exists for ECD use, the circumstances regarding the decision will be explained in the Incident Report (IR).

- Will, when practical, give a verbal warning and consider the brief use of the warning Arc function to give the subject adequate opportunity to comply before force is applied.
- Should, if inside nine (9) feet, deploy in two authorized locations on the body far enough away from each other to create neuromuscular incapacitation (NMI) and then use the Arc button to activate all deployed probes.
- May, if outside of nine (9) feet, deploy the ECD for one 5-second cycle, evaluate the subject's response, and, when feasible, allow the arrest team to control the subject.

  ∗ Subsequent deployment may be administered if control over the subject is not achieved.
  ∗ If the ECD is ineffective or inoperable, consider another force option.

4.  E.  <u>Electronic Control Devices (ECD)</u>  (Continued)

| | |
| :--- | :--- |
| **(1) Guidelines For Use** (Continued) | <u>Tactical Considerations</u>  -  When deploying an ECD, employees:  (Continued)<br><br>• Will, if it is determined an extended cycle is necessary to control a combative suspect, explain the circumstances regarding the decision in the IR.<br>• Should only apply the number of cycles reasonably necessary to safely approach and restrain a subject (a limit to the number of cycles that may be administered to a subject has not been determined).<br><br><u>Primary Target Areas for Probe Deployment</u><br><br>• Center mass of the subject's back<br><br><u>Secondary Target Areas for Probe Deployment</u><br><br>• If unable to fire at the subject's back, employees will fire at either side of the body attempting to aim below the diaphragm.<br>• If unable to fire at the subject's back or sides of his/her body, employees should target the lower front torso just above the belt line allowing the bottom probe to strike the legs.<br>• The groin area **will not** be intentionally targeted.<br><br><u>Target Areas for Drive Stun</u><br><br>• Muscle or nerve points on the front, back, side, legs and arms (radial nerve, brachial plexus tie-in, common peroneal, etc.)<br><br><u>Close Deploy and Redirect</u>  -  This technique may be used when proximity to the subject would not result in a probe spread large enough to achieve NMI.<br><br>• Under exigent circumstances; for example, cartridge malfunction, employees may deploy probes at close range and then redirect a drive stun to an area of the body at a distance great enough to achieve NMI.<br>• ECDs equipped with Rotational Pulse Drive technology incorporate Smart Cartridges which, when working properly, can be deployed in a semi-automatic mode; therefore employees may deploy in two (2) authorized locations on the body far enough away from each other to create NMI and then back away using the Arc button to activate all deployed probes.<br><br><u>Non-Target Areas</u><br><br>• Head, neck, female breast, and groin<br><br><u>Probe Deployment Ranges for Patrol</u><br><br>• Maximum range 25 feet for Smart Cartridge<br>• Preferred range nine (9) to 18 feet for 25 foot Smart Cartridge<br><br><u>Medical Treatment</u><br><br>• Paramedics will be requested for the following:<br><br>    ∗ Probe penetrates the skin, or if the probes penetrate the clothing and the cycle is effective<br>    ∗ If multiple drive stun applications are delivered<br><br>• Prior to paramedic care, ECD operators should remove probes from the subject while wearing latex gloves.<br>• **Do not** remove probes from the subject's eyes, face, throat, or groin.<br>• Any medical complications will be reported to paramedics.<br>• A supervisor will be notified and respond to the scene. |

COP-STICKNEY003728

4.   E.   <u>Electronic Control Devices (ECD)</u>  (Continued)

| | | |
|---|---|---|
| **(1)** | **Guidelines For Use** (Continued) | <u>Authorized Personnel</u><br><br>• Only employees who are trained and certified by Training Bureau staff are authorized to carry and deploy the ECD.<br>• ECD operators will receive training and recertify annually.<br><br><u>Authorized Equipment</u><br><br>• Employees will only carry one (1) authorized ECD device (Taser X2).<br>• First responders who have been certified and issued an ECD will carry the device on their person and a minimum of two (2) cartridges at all times.<br>• ECD holsters will be worn on the support side (opposite side of the primary handgun) in a "cross draw" orientation.<br><br>   ∗   The Safariland 6005-10 in black with a single leg strap is the only optional authorized drop-leg ECD holster (employees wearing this option will wear the holster/platform and ECD attached to the duty belt and wearer's leg in order to be in compliance with this policy).<br><br>• Sworn employees assigned to specialty details will carry an ECD in accordance with approved procedures authorized by the respective bureau commander.<br>• Employees working in a non-uniform capacity that have a Department-issued ECD will have the device available in the passenger compartment of their City vehicle.<br>• Employees who have a Department-issued ECD and are working in an off-duty capacity will carry the device as if they were in an on duty status.<br>• Exceptions may be made by the employee's bureau/precinct commander.<br>• Certified civilian detention officers will carry their ECD in accordance with this policy.<br><br><u>Use on Animals</u><br><br>• Employees may deploy an authorized ECD to incapacitate dangerous animals posing an immediate threat to officers or the public.<br>• Employees should consider containment of the animal and request assistance from the Maricopa County Animal Care & Control (MCACC).<br>• Follow the reporting and impounding procedures as outlined in section 6.A.(3) of this order. |
| **(2)** | **General Information** | <u>Storage and Tracking Data</u><br><br>• New ECDs will be entered into <u>www.evidence.com</u> prior to being placed into service.<br><br>   ∗   The ECD serial number and the officer's name and serial number to whom the device is assigned will be kept current for as long as the program is in use.<br><br>• Each bureau/precinct will maintain a log which will contain the following information:<br><br>   ∗   The serial numbers of the cartridges assigned to each officer<br>   ∗   The reason a new cartridge was issued (training, defective, use of force incident, etc.)<br>   ∗   IR number if the cartridge was fired during a use of force incident<br><br>• Police Supply is responsible for ordering extra cartridges and Power Magazines and keeping an extra supply of ECDs to replace those which are inoperable or taken due to an investigation.<br>• Each bureau/precinct will maintain extra duty cartridges and Power Magazines.<br>• Upon transfer from a first responder assignment, officers will immediately turn in their ECD, holster, battery, and cartridges to administrative staff of the assignment they are leaving so the equipment can be returned to Police Supply.<br>• Employees will inspect their ECD for damage, to insure all parts are present prior to the start of shift.<br>• If the ECD is damaged or parts are found missing, it will be reported to a supervisor in accordance with Operations Order 3.13, Rules and Regulations.<br>• Employees will conduct a functional test of their ECD, in accordance with established training at the beginning of each shift in order to test the operability of the ECD. |

COP-STICKNEY003729

4.    E.    <u>Electronic Control Devices (ECD)</u>  (Continued)

| (2) | **General Information** (Continued) | • The employee's supervisor will conduct an inspection of the ECD, ensure the device has been downloaded each month, and the results will be reflected in their supervisor notes. |
|---|---|---|

<u>Online Firmware Updates</u>

• Taser, Intl. publishes firmware updates online via <u>www.evidence.com</u>.  Tasers must be connected monthly to ensure the most current firmware is installed on the device.

<u>Voluntary Exposures</u>

• It is not the practice of the Department to conduct voluntary exposures as a requirement for user or in-house instructor certification or during Department approved ECD demonstrations.

F.    <u>Intermediate Control Techniques</u>  -  Techniques that may result in injury.

| (1) | **Hard Empty Hand Techniques** | These include but are not limited to: |
|---|---|---|

• Closed fist strikes          • Kicks
• Hammer fist strikes       • Knee strikes
• Palm-heel strikes          • Elbow strikes
• Impact pushes

<u>Guidelines for Use</u>

• Areas to avoid are the neck, back, sternum, kidneys, and groin.
• Hard empty hand techniques may be used when facing the active aggression level of resistance.
• When the circumstances justifying the use of hard empty hand techniques no longer exist, hard empty hand techniques will immediately be discontinued.

    ∗   Employees still may use reasonable force to maintain control and to protect themselves from danger.

• Although these techniques may be used in some situations when facing passive resistance, employees will first attempt verbal persuasion and soft empty hand techniques when practical.
• Closed fist, palm-heel, and elbow strikes are the only techniques that may be used to strike the face and head, and then only when reasonable as a means to overcome a violent attack.

    ∗   A supervisor will be advised and respond to the scene to view and evaluate the subject.
    ∗   Jail personnel will be advised.

| (2) | **Impact Weapons** | Straight, Side-handle, or Expandable Baton |
|---|---|---|

• Impact weapon strikes may be used when facing the active aggression level of resistance.
• Passive resistance or resistance, such as a subject's refusal to enter a police vehicle or holding room or to let go of a railing, is not sufficient in itself to justify the use of impact weapon strikes.
• When the use of the impact weapon is warranted, employees will attempt to strike large muscle group areas and nerve motor points where there is minimal chance of permanent injury.
• Employees will not purposely strike or jab suspects with an impact weapon on the head, neck, sternum, spine, lower abdomen, groin, or kidneys unless faced with a deadly force situation.
• When the circumstances justifying the use of impact weapons no longer exist, the use of impact weapons will immediately be discontinued.

    ∗   Employees still may use reasonable force to maintain control and to protect themselves from danger.

COP-STICKNEY003730

4. F. <u>Intermediate Control Techniques</u> (Continued)

| (2) | **Impact Weapons** (Continued) | <u>Authorization to Carry Impact Weapons</u><br><br>• Employees may carry impact weapons at their discretion unless specifically required otherwise.<br>• The impact weapon will meet the specifications listed in Operations Order 3.15, Uniform Policy.<br>• Employees who elect to carry an impact weapon must satisfactorily complete the appropriate course taught by a Department impact weapons instructor. |
| --- | --- | --- |
| (3) | **Flashlights** | • Flashlights are not designed as impact weapons; however, a flashlight may be used as an impact weapon if a baton is not readily available.<br>• Employees will not purposely strike or jab subjects with a flashlight on the head, neck, sternum, spine, lower abdomen, groin, or kidneys unless faced with a deadly force situation. |
| (4) | **Canines (K9s)** | <u>K9s are considered a non-deadly tactic when properly deployed.</u><br><br>• K9s will not be used for control of crowds or in any circumstances where a strong potential exists for discrediting the Department.<br>• K9s may be used to search for or apprehend felony subjects when public or officer safety is threatened sufficiently to justify this level of force.<br>• K9s may be used to search for misdemeanor subjects; however, the animal will remain on lead unless officer safety is threatened.<br><br><u>Procedures for Deploying K9s</u><br><br>• Whenever time and circumstances permit, a verbal warning will be given to a subject before releasing the K9 to conduct a search.<br>• An announcement identifying police authority and giving directions to the subject should be made in addition to stating the K9 will be released if the subject fails to comply.<br>• Detailed procedures for K9 use are found in Operations Order 5.3, Specialized Investigations and Assistance, and the Tactical Support Bureau (TSB) manual. |
| (5) | **Stunbag Shotguns and 37mm Direct Impact Munitions (SAU)** | • Stunbag shotguns and 37mm direct impact munitions may be used in situations where distance is necessary to maintain officer safety and the use of impact weapons is a reasonable use of force: for example, subduing a person who is threatening or attempting physical harm to himself or another.<br>• Stunbag or 37mm direct impact munition rounds should not be fired through mediums, such as glass or chain link fences, because the bag might tear and lead shot might be released.<br>• Employees should anticipate firing follow-up shots if the prior shot missed or was not effective.<br>• The affected bureau/precinct/duty commander will be immediately notified of all incidents involving the use of a stunbag shotgun or 37mm direct impact munitions.<br>• Optimal ranges for the stunbag shotgun are between five (5) feet and 20 yards.<br>• If possible, officers should consider other force options at less than five (5) feet.<br>• When the circumstances justifying the use of a stunbag shotgun no longer exist, the use of a stunbag shotgun will immediately be discontinued.<br><br>  ∗ Employees still may use reasonable force to maintain control and to protect themselves from danger.<br><br><u>Primary Target Areas</u><br><br>• Arms below the elbow<br>• Lower abdomen<br>• Buttocks<br>• Legs<br><br><u>Secondary Target Areas</u><br><br>• Arms above the elbow<br>• Back, excluding spinal cord area from the base of the skull to the tailbone<br>• Knees |

COP-STICKNEY003731

4.    F.    <u>Intermediate Control Techniques</u>  (Continued)

| (5) **Stunbag Shotguns and 37mm Direct Impact Munitions (SAU)** (Continued) | <u>Non-target Areas</u><br><br>• Head<br>• Spine<br>• Thorax<br>• Neck<br><br>**NOTE:**   Shots to non-target areas can result in fatal or serious injury.<br><br><u>Additional Information</u><br><br>• For specific guidelines reference the stunbag shotgun, refer to Operations Order 4.25, Firearms Regulations.<br>• For specific guidelines reference the 37mm direct impact munitions, refer to the TSB manual. |
|---|---|

G.    <u>Carotid Control Technique</u>

| (1)  **Guidelines** | • The carotid control technique is designed to reduce the flow of oxygenated blood to the brain.<br>• If oxygenated blood flow to the brain is cut off for longer than **four (4) to six (6) minutes**, irreparable brain damage may occur.<br><br><u>When to Use the Carotid Control Technique</u><br><br>• The carotid control technique should only be used on subjects who are using active aggression, aggravated active aggression, or who are a threat to themselves or others.<br><br><u>Improper Applications of the Carotid Control Technique</u><br><br>• This technique will not be used to render a subject unconscious for the following situations:<br><br>   ∗   Administrative reasons, such as obtaining fingerprints or photographs<br>   ∗   If a subject demonstrates passive resistance, such as refusing to enter a police vehicle or holding room<br><br><u>Post-Use Care</u>  -  If a subject is rendered unconscious as a result of the application of this technique, employees will comply with the following:<br><br>• Immediately handcuff the subject<br>• Roll the subject onto their side and check for vital signs (recovery time will vary, but usually takes 20 to 30 seconds)<br>• Paramedics will be **immediately** summoned to the scene in all cases.<br>• If cardiopulmonary resuscitation (CPR) is necessary, officers will **immediately** remove the handcuffs.<br><br><u>Notifications</u><br><br>• A supervisor will be notified immediately and respond to the scene.<br>• Employees will advise receiving officers (including detention personnel who may assume custody of the subject) the subject was rendered unconscious by the use of the carotid control technique.<br>• The use of the carotid control technique will also be reported on relevant reports, booking forms, referrals, etc.<br><br><u>Restrictions</u><br><br>• Employees will not use the technique more than once on the same subject because of the possibility of progressive physical injury.<br>• The subject will remain handcuffed or restrained, as necessary, to avoid subsequent applications of the carotid control technique. |
|---|---|

4.    G.    Carotid Control Technique  (Continued)

| **(1) Guidelines** (Continued) | Restrictions  (Continued) |
|---|---|
| | • Subjects who have had the carotid control technique applied will not be restrained with their legs behind their back (hog-tying). |

H.    Deadly Force

| **(1) Guidelines** | Employees may use deadly force under the following circumstances: |
|---|---|
| | • When such force is reasonable to protect themselves or a third person from another's use, or threatened use, of deadly force. |
| | • To prevent the escape of a subject whom the employee has probable cause to believe has committed an offense involving the infliction or threat of serious physical injury or death, and is likely to endanger human life or cause serious injury to another unless apprehended without delay. |
| | • In situations where the employee must overcome an attack the employee reasonably believes would produce serious physical injury or death to the employee or another person. |
| | ∗ When the use of techniques taught by the Department's proficiency skills instructors is not practical under the circumstances, the employee may resort to any reasonable method to overcome the attack. |
| | • When the circumstances justifying the use of deadly force no longer exist, deadly force will immediately be discontinued. |
| | ∗ Employees still may use reasonable force to maintain control and to protect themselves from danger. |
| | • Deadly force is utilized as a last resort when other measures are not practical under the existing circumstances. |
| | • The intentional use of a police vehicle against a subject on foot will be considered a use of deadly force. |
| | • Employees **will not** attempt to deliberately collide with other vehicles or use a police vehicle to force **any** vehicle off the roadway. |
| | **EXCEPTION**: Employees trained in the precision immobilization technique (PIT) maneuver and assigned to the Airport Bureau on Airport grounds or dignitary protection officers when needed as part of their duties. |
| | Use of Firearms |
| | • In addition to the guidelines listed above, employees will discharge firearms in connection with police activities only, and in accordance with the following policies, whether on or off duty. |
| | • Employees will not unnecessarily draw or display any firearm, or carelessly handle a firearm. |
| | • Warning shots **will not** be fired. |
| | • When the shooting of a subject appears imminent, employees will, if practical, issue a verbal warning. |
| | • Firearms will not be used under circumstances in which a substantial and unjustifiable risk of injury or death to bystanders exists. |
| | • Employees will not discharge a firearm from a moving vehicle. |
| | • Firearms will only be used to kill an animal posing an immediate danger to the employee or the public when other means of protection are impractical. |

COP-STICKNEY003733

4. H. <u>Deadly Force</u> (Continued)

| **(1) Guidelines** (Continued) | <u>Vehicles</u> |
|---|---|
| | • Weapons will not be fired solely to disable a moving vehicle. |
| |     ∗ Weapons may be discharged at the driver or other occupant of a moving vehicle only when the employee has probable cause to believe the subject poses an immediate danger of death or serious physical injury to the employee or others, and the use of deadly force does not create a danger to the public that outweighs the benefits of its use. |
| | • Employees will not deliberately place themselves in the path of a moving vehicle or one capable of immediate movement. |
| |     ∗ This is generally considered tactically unsound unless executed as part of a tactical plan intended to enhance safety. |
| |     ∗ This is not intended to prevent employees from moving in front of or around vehicles during the execution of routine traffic duties, such as directing traffic. |
| | • Employees are reminded of the serious risks involved when reaching in or leaning into a running vehicle occupied. |
| | • Exigent circumstances must exist before an employee may reach or lean into a running vehicle with the driver's seat occupied. |
| | • When it is safe to do so, placing a police vehicle directly in front and rear of the subject vehicle provides an extra margin of safety. |
| | <u>Notifications</u> |
| | • Employees who discharge any firearm will make a verbal report to a supervisor as soon as possible and submit a written report as soon as practical. |
| |     ∗ A command officer can make an exception to this requirement. |
| | • The employee's bureau/precinct commander or the duty commander will be advised of the weapon discharge incident. |
| | • Firearms training, lawful target practice, and lawful hunting are exempt from this paragraph. |

5. **RESPONSE OPTIONS TRAINING**

    A. All sworn employees will receive annual training on use of force options and policy by Department authorized instructors, who are certified through Arizona Peace Officers Standards and Training Board (AzPOST).

    B. <u>Impact Weapons</u>

| **(1) Basic Impact Weapons Training** | • Recruits will receive basic impact weapons training while in the academy. |
|---|---|
| | • Employees not previously certified in basic impact weapons usage may receive impact weapons training on duty or if they are unable to complete the training during their assigned shift, in an authorized off duty training program. |
| | • Overtime will be authorized for any impact weapons certification/re-certification training only when employees are unable to complete the training during their regular on duty shift. |
| **(2) Impact Weapons Proficiency Training** | • Employees carrying impact weapons will successfully demonstrate proficiency in its use annually. |
| | • Department training records will reflect which impact weapon/s an officer has elected to carry and the date basic and proficiency training was completed. |

    C. <u>Stunbag Shotguns and 37mm Direct Impact Munitions (SAU)</u>

      • All sworn employees below the rank of lieutenant will receive stunbag training upon assignment to patrol, and every year thereafter if assigned to patrol.

      • See Operations Order 4.25, Firearms Regulations, and the TSB manual for more information.

COP-STICKNEY003734

5.  D.  <u>Chemical Agents</u>

- All sworn employees below the rank of commander will receive annual training regarding use of OC spray.

E.  <u>Carotid Control Technique</u>

- In order to use the carotid control technique, an employee must satisfactorily complete the basic training course for carotid control.
- Employees will only use the carotid control technique taught by Department defensive tactics instructors.
- Employees must pass a proficiency test administered by a Department certified defensive tactics instructor.
- Certified employees will receive this training while attending post academy.
- Employees not previously trained in the basic carotid control technique must receive carotid control technique training and will demonstrate proficiency prior to utilizing it.
- Employees who are authorized to use the carotid control technique will demonstrate proficiency in its use annually.
- No other type of neck restraint/hold is authorized.

F.  <u>Firearms</u> -  See Operations Order 4.25, Firearms Regulations.

6.  **REPORTING USE OF FORCE INCIDENTS** -  Employees will document the use of each response option.

A.  <u>Reporting Guidelines</u>

| (1) **Officer Presence Verbal Persuasion Negotiation or Command Soft Empty Hand and Restraining Devices** | Document the following as required in IRs:<br><br>- Officer presence<br>- Verbal persuasion, negotiation, or commands used<br>- Soft empty hand and restraining devices<br><br>Reporting requirements when injury or alleged injury occurs:<br><br>- A supervisor will be contacted as soon as possible.<br>- An IR will be completed with the use of force details explained in the Narrative section to include how any injuries were sustained.<br>- If **no** injury is visible, this will also be documented.<br>- Supervisors will complete a Use of Force report. |
|---|---|
| (2) **Chemical Agents** | Reporting requirements for **all** incidents involving the use of chemical agents:<br><br>- A supervisor will be contacted as soon as possible.<br>- An IR will be completed with the use of the chemical agent documented in the Narrative section.<br>- Supervisors will complete a Use of Force report only upon complaint of injury. |
| (3) **ECDs** | Reporting requirements for **all** incidents involving an ECD:<br><br>- A supervisor will be contacted as soon as possible.<br>- The ECD will be downloaded immediately prior to the completion of the Use of Force report.<br>- Supervisors will complete an Event Information Log for ECDs, available online at www.evidence.com for those with appropriate access, which will be saved electronically and attached to the Use of Force report.<br>- An IR will be completed with the use of force details explained in the Narrative section including the reason for the ECD deployment and target and impact areas. |

COP-STICKNEY003735

6.    A.    <u>Reporting Guidelines</u>  (Continued)

| (3) | **ECDs** (Continued) | <u>Reporting requirements for **all** incidents involving an ECD</u>  (Continued): |
|---|---|---|
| | | • Supervisors will complete a Use of Force report which will include the following: |
| | | ∗ Serial number of ECD used |
| | | ∗ Number of times deployed |
| | | ∗ Distance of the subject from the operator/s who deployed the ECD |
| | | ∗ Effectiveness and result of use |
| | | <u>Impounding Procedures</u> |
| | | • Place the probes backward in the spent cartridge and cover with a biohazard sticker. |
| | | • Place the cartridge, probes, and some of the Anti-Felon Identifications (AFIDs) in a plastic container and then into a plastic evidence bag marked with biohazard stickers, and impound as evidence. |
| | | • When completing the IR, list the package/item in the Evidence section ensuring the spent cartridge serial number is included. |
| | | • If there is no evidentiary value to the cartridge and probes, the following procedures will be followed: |
| | | ∗ Place the probes backward in the spent cartridge and cover with a biohazard sticker. |
| | | ∗ Place the cartridge in the sharps/biohazard container in any precinct impound room. |
| (4) | **Intermediate Control Techniques** | <u>Reporting requirements for **all** incidents involving intermediate control techniques:</u> |
| | | • A supervisor will be contacted as soon as possible. |
| | | • An IR will be completed with the use of force details explained in the Narrative section. |
| | | • Supervisors will complete a Use of Force report. |
| | | • K9s |
| | | ∗ All Department K9 injury incidents will be investigated and documented by a K9 Unit supervisor using the standard bite report format. |
| | | ∗ The K9 Unit supervisor will also complete the Use of Force report. |
| | | • <u>Stunbag Shotguns and Sage SL-6 (SAU)</u>  -  The Use of Force report will include the following: |
| | | ∗ Reason for the shooting |
| | | ∗ Weapon/s used |
| | | ∗ Number of shots fired |
| | | ∗ Target and impact locations |
| | | ∗ Distance of the subject from the officer/s that fired |
| | | ∗ Effectiveness and result of use |
| | | • If a subject sustains a serious injury from a stunbag shotgun or Sage SL-6 shooting incident, see section 7.B of this order for detailed procedures. |
| (5) | **Carotid Control Technique** | <u>Reporting requirements for **all** incidents involving the carotid control technique:</u> |
| | | • A supervisor will be contacted as soon as possible. |
| | | • An IR will be completed with the use of force code details explained in the Narrative section. |
| | | • Supervisors will complete a Use of Force report. |
| (6) | **Deadly Force** | • See the section 7 of this order for investigation and documentation procedures. |

B.    <u>Use of Force Report</u>

   (1)   Upon notification of a use of force incident, supervisors will conduct a fact finding investigation which will be documented in a Use of Force report if a Use of Force report is required as outlined above in section 6.A.

COP-STICKNEY003736

6. B. (1) (a) Refer to the Field Based Reporting (FBR) User Manual for data entry procedures.

    (b) A Use of Force report will not be completed on prisoner injuries occurring prior to police arrival or by means other than by police employees.

- Refer to Operations Order 7.1, Prisoners, for required documentation.

    (c) When possible, audio record witness statements which will be attached to the Use of Force report as an "Image."

    (d) Digital photographs will be taken of any injuries which will be processed/stored as outlined in Operations Order 8.1, Evidence, Impounding, and Property.

    (e) No additional paperwork is required unless unusual circumstances exist.

(2) Supervisors will submit the initial Use of Force report within seven (7) days of notification of the incident.

(3) Use of Force reports will be submitted up to commander approval within 30 days of initiation of the report.

7. **SHOOTINGS AND OTHER CRITICAL USE OF FORCE INCIDENTS**

A. Required Reports - Supervisors will complete the following reports:

- Shooting Investigation (if applicable; see section 7.E of this order)
- Use of Force Report

B. Investigation and Reporting Responsibilities

| **(1) Shootings and Other Use of Force Incidents Resulting in Death or Serious injury** | All shootings and other use of force incidents resulting in death or serious injury involving employees of this Department will be investigated concurrently by the following:<br><br>• Professional Standards Bureau (PSB) - Completes the Use of Force report<br>• Involved employee's supervisor<br>• Violent Crimes Bureau (VCB)/Homicide Unit<br>• Incident Review Unit (IRU)<br><br>**EXCEPTION**: Incidents listed in the following sections will be investigated accordingly. |
|---|---|
| **(2) Non-Injury Accidental Discharges and Shootings Involving Animals** | • For non-injury accidental discharges not involving a police action and shootings involving animals, the employee's supervisor will investigate the incident and complete the Use of Force report. |
| **(3) Accidental Discharge Involving Police Action** | • If an accidental discharge occurs while the employee is performing a police function and a citizen or subject is in close proximity such as, attempting to arrest a subject, PSB will conduct the investigation and complete the Use of Force report. |

C. Notifications - The highest ranking officer at the scene will notify the PSB commander, VCB commander, and IRU/Legal Unit lieutenant.

D. Handling of Involved Employee's Firearm

(1) Employees involved in any incident in which their firearm was discharged will release the firearm to the officer or supervisor responsible for the investigation.

7.  D. (2) Employees will be issued another firearm by PSB investigators prior to going off shift or returning to duty.

    E. <u>Shooting Investigation</u>

        (1) The written report will include the following pre-narrative information:

| Investigating Supervisor | Name, serial number, duty assignment, work days and hours |
|---|---|
| Employee Involved | Name, serial number, duty assignment, work days and hours |
| Synopsis | |
| Reason for Shooting | Injured animal, accidental discharge, etc. |
| Occurred | Location, date and time |
| Employee's Prior Use of Force Incidents and Dispositions | |
| Weapon Used | Make, model, caliber, ownership and type of ammunition |
| Number of Shots Fired/ Impact Locations/ Backdrop Description | |
| Injuries or damage | Description of any animals involved and name, address, etc., of owner of damaged property/injured animals |
| Witnesses | |
| Photos/Latent Print Examiner | Name of the employee who took the photographs |
| IR Numbers of Other Related Investigations | |
| Details of Investigation | Narrative |

        (2) As soon as possible (after the scene investigation has been completed), the PSB Investigations Unit lieutenant will be contacted to obtain a PSB shooting incident control number.

           • If the incident occurs during non-business hours, the investigating supervisor will contact PSB at the beginning of the next business day to obtain the control number.
           • The control number will be included in the subject portion of the memorandum in addition to any other title information.

        (3) All pertinent documents, including photographs, will be attached to the investigative report.

        (4) Evidence in the form of bulk items (guns, shell cases, etc.) will not be forwarded.

        (5) Supervisors will make no recommendations other than referring the matter to the Use of Force Review Board.

    F. <u>Routing of Administrative Use of Force Investigation</u>

        (1) <u>Incidents Investigated by PSB</u>  -  The PSB Commander will forward a copy of the PSB report to the employee's assistant chief and Department Use of Force Board chairperson.

        (2) <u>Incidents Investigated by the Employee's Supervisor</u>  -  The completed Use of Force report and shooting investigation will be forwarded to the commander of the involved employee's bureau/precinct.

8.  **TACTICAL REVIEW COMMITTEE**

    A. <u>Purpose</u>

        (1) The Tactical Review Committee (TRC) and TRC sub-committee will review critical use of force incidents and identify any related training needs.

COP-STICKNEY003738

8.  A.  (2)  The TRC will not have the authority to make recommendations on whether or not a particular use of force involved in the incident reviewed complies with Department policy.

   (3)  While the role of the committee is primarily restricted to the identification of training needs for individuals and the Department as a whole, the committee may make suggestions regarding amendments to policy.

   - Use of force incidents generally evolve rapidly, compelling employees to make decisions with limited time and/or information; therefore, the TRC will take into consideration the totality of the circumstances involved in the incident and decide if the training need is sufficient to justify immediate intervention.

   B.  TRC Committee Members

   (1)  The TRC will report to the Police Chief or designee and will consist of the following personnel:

   - Training Bureau commander (chair)
   - Department Legal advisor (or representative)
   - PSB commander or designee
   - SAU lieutenant
   - Arizona Law Enforcement Academy (ALEA) Basic Training lieutenant
   - Training Bureau Advanced Training/Proficiency Skills lieutenant
   - Phoenix Police Sergeants and Lieutenants Association (PPSLA) president (or representative)
   - Phoenix Law Enforcement Association (PLEA) president (or representative)

   C.  TRC Sub-Committee Members

   (1)  The TRC sub-committee, consisting of the following personnel, will attend each VCB debriefing following a critical use of force incident:

   - Officers – Tactical Training Detail officer, SAU officer, and a patrol officer
   - Sergeants – Firearms Detail sergeant, SAU training sergeant, Tactical Training sergeant, and a patrol sergeant
   - Lieutenants – Advanced Training/Proficiency Skills lieutenant, SAU lieutenant, K9 Unit lieutenant, and a patrol lieutenant

   (1)  Based on the information reviewed at the incident debriefing, the sub-committee will discuss the incident and determine the type of training opportunities that can be addressed.

   (a)  This training will address the tactical decision-making and actions of the involved officers, as well as the management of the tactical scene by the responding supervisors.

   (b)  The TRC sub-committee will make their recommendations to the TRC.

   (c)  The TRC will make a final determination on any training needs.

   D.  Post Use of Force Training

   (1)  Upon review of the incident by the TRC, all involved employees (to include supervisors) will be required to attend mandatory training.

   - At the discretion of the TRC sub-committee, personnel indirectly involved in the incident may also be required to attend training.

COP-STICKNEY003739

8. D. (2) A Training Notification Form 80-593D, completed by the TRC, will specify the required training and who will be required to attend the training.

- The commander/administrator of the affected employee/s will ensure the training is completed without delay.

  ∗ With the exception of extenuating circumstances, the mandatory training shall be satisfactorily completed within 14 calendar days from the date notified.

(3) Employees will complete the mandatory training before returning to their regular work assignment.

(4) Once the training is completed, the Training Notification form will be signed by the employee and the Advance Training/Proficiency Skills lieutenant.

- The signed Training Notification form will be returned to the TRC.

E. Training Bureau Responsibilities

(1) The Training Bureau will be responsible for designing and delivering training based on the review and recommendations made by the TRC.

(2) Training may include the use of scenario based instruction when appropriate.

(a) The Training Bureau may develop instruction, based on the TRC review process, to be given at module training, produced as training videos, or created as a written directive for Department-wide dissemination.

(b) Matters deemed to be of an urgent nature will be addressed as soon as possible and will not be set aside for the next module.

(3) The training recommended by the TRC may be different for supervisors and other involved employees.

(4) The Training Bureau will ensure employees involved in the training acknowledge they have received and are responsible for the information presented to them.

F. Use of Force: Semi-Annual Report

(1) The TRC chairperson will provide a semi-annual report of lethal force activity to the executive staff by memorandum.

(2) The TRC semi-annual report will include the following:

- The number and type of lethal force incidents reviewed
- Any training given in relation to each lethal force incident and how the training was distributed
- Any trends identified in lethal force incidents and any policy revisions or improvements made as a result of the TRC review process

(3) The TRC may review incidents of non-lethal force upon referral made by a commander or assistant chief.

**NOTE**: Normally, the TRC will not review non-lethal force incidents.

COP-STICKNEY003740

9. **POST USE OF FORCE TRAUMA**

   A. Purpose

      (1) The physical and emotional well being of Department employees is a primary concern following any use of force incident.

      (2) The following guidelines have been established to ensure the physical and emotional needs of Department personnel are addressed.

   B. Definitions

| (1) **Critical Use of Force Incident** | Any situation where an employee seriously injures or kills a person |
|---|---|
| (2) **Persons Directly Involved** | Employees who seriously injure a person or who are seriously injured and those who participate in the incident |
| (3) **Post Use of Force Trauma** | The emotional and physical effects that may occur to persons who have been involved physically or emotionally in a use of force incident |

   C. Assistance at the Scene of Any Use of Force Incident

      (1) Critical Incident Stress Management (CISM) Team - A CISM team coordinator will be contacted to evaluate the incident and call out CISM team members as needed in all use of force incidents.

      (2) Command Personnel - Appropriate command personnel, at the discretion of the Police Chief, will initiate personal contact with the involved employee and family to provide Department support and assistance as soon as possible.

   D. Post Use of Force Counseling

      (1) Employees Directly Involved in a Critical Use of Force Incident - All employees directly involved in a use of force incident resulting in death or serious injury will attend a psychological debriefing with the contracted psychologist listed in this order.

      (2) The psychological debriefing will be scheduled as soon as possible after the incident by the employees' immediate supervisors.

         (a) Counseling is available on a 24-hour per day basis if needed.

         (b) Five (5) follow-up sessions will be available at no expense to employees.

      (3) Employees will meet with the contracted psychologist a second time before being released to enforcement duties (this session will be completed 30 days following the critical incident).

      (4) Verification of the visits from the psychologist's office (not the contents of the sessions) will be included in the Return to Work Authorization Form 80-595D to be forwarded to the appropriate assistant chief for review and his/her signature.

      (5) Employees Not Directly Involved in a Use of Force Incident

         (a) All employees who feel they are or may be negatively affected as a result of their involvement are strongly encouraged to take advantage of the counseling services available through the Employee Assistant Unit (EAU)

         (b) This may include the employees' spouses or immediate family members.

COP-STICKNEY003741

9. D. (6) <u>Services Contracted to Provide Post Use of Force Counseling</u> - The following service is contracted to provide post use of force counseling:

Jeni McCutcheon, Psy. D., M.S.C.P., ABPP
4501 N 22nd Street, Suite 190
Phoenix, Arizona 85016
602-368-2526
To schedule appointments: www.drjeni.org

(7) <u>Counseling Confidentiality Assurance</u> - Employees who seek consultation or receive counseling through the Department contracted psychologist are assured maximum confidentiality.

(a) No individual, group, organization, department, City employee, or City official shall have access to any information regarding an individual's participation in the program except as noted.

(b) The only exception to the guarantee of confidentiality is an indication by the officer to the psychologist of any **immediate physical danger to self or others**.

(c) In the event of such an occurrence, the Police Chief shall be notified or action taken to ensure protection of those concerned.

E. <u>Post Use of Force Reassignment</u>

(1) <u>Reassignment Guidelines</u>

| **(1) Employees Who Seriously Injure or Kill a Person** | • Any employee who seriously injures or kills a person and is able to work **will be** assigned at home for one (1) week following the incident. |
|---|---|
| | • The employee will ensure availability to investigators. |
| | • The employee may be assigned to a non-enforcement position for at least three (3) additional weeks pending administrative review. |
| | • The Police Chief may return the employee to full duty prior to the Use of Force Review Board upon recommendation of the officer's assistant chief. |
| | • The employee will attend an initial psychological debriefing as soon as possible and a second meeting 30 days following the critical incident. |
| **(2) Any Other Employee Directly Involved in a Use of Force Incident** | • Any other employee directly involved in a use of force incident resulting in death or serious injury to any person may be reassigned to a non-enforcement position pending administrative review of the incident. |
| | • The Police Chief may return the employee to full duty prior to the Use of Force Review Board upon recommendation of the officer's assistant chief. |
| | • The employee will attend a psychological debriefing. |

(2) Any employee involved in a use of force incident resulting in assignment at home will have **PX** time (Use of Force/Administrative Leave) entered in eChris by the Fiscal Management Bureau/Human Resource Unit supervisor.

(3) All employees directly involved in a Class III discharge of a firearm will be referred to the Training Bureau firearms staff for an appointment prior to returning to enforcement duty from administrative leave.

(a) The employee's bureau/precinct commander/administrator or designee will be responsible for contacting the Training Bureau firearms staff to schedule the appointment.

(b) This appointment will provide employees with the opportunity to fire their duty weapon, and if necessary, qualify on a replacement weapon and discuss any weapons related questions they may have as a result of their shooting incident.

COP-STICKNEY003742

9.  E.  (4)  All employees involved in a critical use of force incident will have a Return to Work Authorization form completed by their commander/administrator prior to returning to their regular work assignment.

(5)  The administrative review process will be considered complete upon the findings of the Use of Force Review Board, if the incident is found within policy, or upon completion of the disciplinary review process, if the incident is found to be out of policy.

COP-STICKNEY003743

# EXHIBIT 31

## TASER X2 OPERATOR

| | |
|---|---|
| LESSON PLAN: | Taser X2 Operator |
| LESSON PLAN NUMBER: | **11887** |
| TOTAL COURSE HOURS: | 5 |
| COURSE CONTENT: | This class is designed to provide an operator level certification for the Taser X2. The course provides understanding of the Taser X2 and Smart Cartridges as well as the policy covering the use and deployment of any approved electronic control device. This course must be taught by a certified Taser Instructor |
| PERFORMANCE OBJECTIVES: | Upon completion of this course the student will be able to: |

1. Demonstrate an understanding of all policies rules and regulations concerning the Taser X2 by completing a written exam with a score of 80% or better

2. Identify the components of the Taser X2 and Smart Cartridge

3. Display adherence to all safety rules with regard to handling the Taser X2 and Smart Cartridges

4. Demonstrate a one-second spark test of the device

5. Demonstrate proficiency by successfully loading, unloading and reloading two Smart Cartridges into and out of a Taser X2

6. Demonstrate competency by deploying two Smart Cartridges, live or non-conductive, in a static range or scenario based training setting

# Taser X2 Operator

| | |
|---|---|
| Taser X2 Operator | Rev: 1 |
| 11887   PT0073 | Hrs: 5 |

| | |
|---|---|
| LESSON PREPARED BY: | Off. Vincent Lewis #6935 |
| DATE PREPARED: | August 2, 2011 |
| LESSON REVISED BY: | Off. Mark Veres #7833 |
| | Sgt. Tim Woods #6396 |
| DATE REVISED: | November 14, 2013 |

COP-STICKNEY004986

INSTRUCTOR REFERENCES:          Instructor Certification Lesson Plan Version 19, Taser International, 2013

                                Phoenix Police Department Operations Order 1.5 Use of Force revised June 2013.

TRAINING AIDS:                  PowerPoint presentation related materials, including computer, projector, screen, etc

                                Taser X2 for live demonstration purposes

                                Live X2 25' Smart Cartridges, at least 2 per student, or 4 per student if not using inert training Smart Cartridges

                                Inert X2 Smart Cartridges, blue in color, at least 2 per device

                                Silhouette targets, backed with cardboard

                                Eye protection, required during drills and demonstration for all in attendance.  No exceptions

                                OPTIONAL EQUIPMENT:

                                Conductive Taser, Intl. silhouette targets

                                Taser, Intl. protective suit for scenario based training. To be used only with non-conductive training cartridges

                                Training knife or other simulated dangerous instrument

                                Red training guns

METHOD OF PRESENTATION:         PowerPoint presentation with discussion lead by instructor, hands-on familiarization with the Taser X2, written exam to be administered at the end of the lecture portion with a required passing score of 80% or better, practical drills and live-fire exercises

PREREQUISITE:                   None

CLASS LEVEL:                    Sworn officer or reserve unit

COP-STICKNEY004987

REVIEWED BY:

DATE REVIEWED:

APPROVED BY: (Author's Lieutenant)     Lt. D. Morro 6255   DATE: 12-23-13

APPROVED BY: (Author's Commander)     DATE:

APPROVED BY: (Records Approval Committee)     Sgt M. Huish 6090   DATE: 1-8-14

APPROVED BY: (Training Bureau Commander)     DATE: 1.

COP-STICKNEY004988

I. **INTRODUCTION**

    A.    The goal of this class is to provide an operator level certification for the Taser X2 electronic control device

    B.    The course consists of:

        1.    Lecture and interactive discussion

        2.    Written exam, required score of 80% or better to pass

        3.    Drills

        4.    Scenarios (OPTIONAL)

    C.    Safety rules

        1.    Never point the Taser at anything you do not intend to target

        2.    Keep the device's safety switch in the down (SAFE) position until pointed in a safe direction or on target

        3.    Do not arm the device until told to do so by an instructor

        4.    Never place hands in front of the device, especially when changing the cartridges

        5.    Do not point the laser light in the eyes

            a.    The laser can cause eye damage if directed into the eye for prolonged periods of time

II. **GUIDELINES FOR USE**

    A.    Operations Order 1.5.4E, Electronic Control Devices

        1.    The Taser may be used when it is objectively reasonable based on the totality of the circumstances on subjects displaying active aggression or who are placing an officer in reasonable apprehension of imminent physical injury to him/herself or a third party, as well as preventing a subject from harming him/herself

    B.    The Taser will not be used for:

        1.    Coercion of any type

COP-STICKNEY004989

        a.     Exception: A warning ARC combined with the proper verbal warning may be used as coercion in situations that would likely result in a justified deployment of the ECD

   2.    Against subjects solely for running from the officer

   3.    Against a subject who would be in danger of falling from a significant height

   4.    When subjects are near flammable liquids and gases

   5.    Intimidation by reckless display

   6.    Escorting or prodding individuals

   7.    Waking unconscious or intoxicated individuals

   8.    Individuals operating a motor vehicle

   9.    Individuals holding a firearm when their finger is on the trigger

   10.   Handcuffed prisoners resisting/refusing to enter a police vehicle, holding room, or hanging onto a railing or other item, etc

## III. TASER HISTORY

A. Previous models of Electronic Control Devices (ECD) such as the Air Taser were pain compliance stun guns

B. 1999 – Taser, Intl. introduces the Advanced Taser M26 which was the first model to achieve Neuromuscular Incapacitation (NMI)

   1.    Phoenix Police began testing the device on specialty details

C. March, 2003 – Phoenix Police goes to full deployment with the M26

D. August, 2003 – PPD begins the transition to the current model X26, smaller unit, Shaped Pulse Technology, lithium Digital Power Magazine

E. May, 2012 – PPD purchases the first 100 X2s

F. January 2013 to January 2014 – Transition and Deployment of the X2 ECD department wide

COP-STICKNEY004990

IV.    **TASER TECHNOLOGY AND NEUROMUSCULAR INCAPACITATION (NMI)**

   A.    The Taser X2 "Smart ECD" is a software upgradeable electronic control device

   B.    The Taser X2 does not rely on pain compliance alone

   Unlike OC spray, batons, etc

   C.    Propels wired probes to conduct energy that affects the sensory and motor functions of the central nervous system

   D.    Maximum range of the current standard issue X2 cartridge is 25'

        1.    Keep in mind that an average armed assailant can cover 21' in less time than it takes the average officer to draw and fire their handgun at center mass

   E.    Human Nervous System

        1.    Communicates with simple electrical impulses

        2.    Central nervous system

             a.    Command Center: Brain and spinal cord

             b.    Processes information and makes decisions

        3.    Sensory nervous system

             a.    Nerves that carry information from the body to the brain; touch, temperature, etc

        4.    Motor nervous system

             a.    Nerves that carry commands from the brain to the muscles to control movement

        5.    The Taser affects both the sensory and the motor nervous systems

        6.    The pulse delivered by the Taser simulates the electronic impulses used by human nerves

             a.    The TASER X2, X3 and X26 send out short duration, high voltage electrical waves or TASER-Waves™ or T-Waves that overpower the normal electrical signals within the nerve fibers

             b.    Discuss how the body's communication is analogous to having a conversation on a land line telephone where signals are sent from one phone to another via electrical signals. Should

COP-STICKNEY004991

a third person pick up this phone line and begin to scream (analogous to a TASER-Wave in the body), the other two persons can no longer hear communication. Just as important, when the screaming stops, communications begins again without damage to the phone line

F. Operation modes

    1. Incapacitation mode; probe spread deployment

        a. Causes uncontrollable muscle contraction

        b. What Taser refers to as Neuromuscular Incapacitation or NMI

        c. Directly affects the sensory and motor nervous systems

    2. Stun mode; electrodes driven into the target

        a. Should not be considered for primary use

            1) Should be considered in cases where both cartridges have failed

        b. Pain compliance only

        c. Affects the sensory nerves

        d. May not be effective against focused aggressors or people under the influence of drugs

    3. Close deployment with a drive stun follow up

        a. Used to create appropriate spread for NMI at close range instead of probe deployment

    4. "X-Connect" – can be used when initial probe spread is too close by firing a second set of probes away from the first and using the ARC button

V. **ELECTRICITY 101**

A. Electricity follows the path of least resistance

    1. For electricity to flow, a positive and negative path must be complete to maintain a circuit of electricity

B. The greater the spread between probes, the greater the effectiveness

    1. More muscle groups involved

COP-STICKNEY004992

    C.    Electricity will not pass to others in contact with the subject unless contact is made between the probes

        1.    If two (or more) subjects are in direct physical contact and one probe strikes each subject, the effects may be felt through the chain until contact is broken

    D.    Voltage is the measure of how far an arc of electricity can travel through the air

        1.    50,000 volts is initially necessary to jump gaps and connect the circuit through open air (spark test or up to one inch away from the body)

        2.    Once the circuit is connected, the Taser X2 voltage drops to 1,200

    E.    Electricity can arc through clothing and some bullet resistant materials, up to 1" per probe (2" cumulative)

        1.    If only one probe impacts skin, the second must be within 2" to complete the circuit

    F.    The probes do not have to break the skin to be effective

        1.    If both probes catch clothing only, each probe must be within 1" of skin to complete the circuit

## VI.    ANATOMY OF THE TASER X2

*Use an actual Taser X2 for display or issue Tasers to class at this time*

    A.    The Taser X2 electronic control device

*At this time display the detailed graphic of the Taser X2 with the components labeled and review each item with the class*

        1.    Two-Shot ECD

        2.    Comparable size to X26 ECD

        3.    Environmentally hardened chassis built to survive dust, rain, cold and heat, more so than the X26

        4.    Designed for simple operation

        5.    X2 ECD safety and trigger are similar to the X26 ECD

        6.    One new operational component –the ARC switch

    B.    X2 Safety Switch

        1.    Safety switch down = SAFE

*Turns the X2 ON or OFF*

        2.    Safety switch up = ARMED

        3.    Activates the Central Information Display (CID), laser and illumination

COP-STICKNEY004993

    4.    Begins the event record in the download log

    5.    Ambidextrous and should not move independently on either side

C.    Trigger operation

    1.    5 second automatic timing cycle

        a.    A single trigger pull and release will activate the device for 5 seconds

        b.    It is possible to stop the automatic 5 seconds by engaging the safety

    2.    Holding the trigger back beyond 5 seconds will keep the Taser firing until the trigger is released

D.    ARC switch

    1.    A – ARC Display

        a.    To be used to perform ARC tests or drive stuns without deploying cartridges

    2.    R – Re-energize

        a.    Will re-energize a deployed cartridge without advancing to the next bay

    3.    C – Cartridge advance

        a.    Toggles between both cartridges

    4.    A sustained press of the ARC switch for approximately .5 second will display an arc across the face of the device without deploying any live Smart Cartridges

E.    Re-Energizing Cartridges

    1.    Once both cartridges are fired, the operator can select between fired cartridges by tapping the ARC switch

    2.    Pulling the trigger again will re-energize the selected cartridge for a 5-second cycle or longer if the trigger is held down

    3.    A sustained press of the ARC switch will reenergize both deployed cartridges

VII.    **CENTRAL INFORMATION DISPLAY (CID)**

A.    Single color (yellow on black) display allows the operator to observe system status information, as well as, view option

The term ARC switch and ARC button are used interchangeably

changes

B.   CID Smart Cartridge™ Icons

    1.   There are several different icons seen on the display. Users should refer to the manual for ease of use

> Display the graphic depicting common icons and their meanings

C.   Display Count Up

    1.   Displayed by numbered count-up to 5 with one trigger pull or until released beyond 5

D.   Power Source Status Icon

    1.   Reads the battery consumption and displays the remaining battery life on the CID

    2.   PPM should be changed at 20%

    3.   Bars in battery show 20% increments

E.   System Status Monitoring and Reporting

    1.   The X2 ECD monitors its system and functional status

        a.   No icons – No problems detected during diagnostics

        b.   Major Fault (triangle with exclamation point)

            1)   Likely accompanied by a noticeable nonessential subsystem failure within the X2 ECD

> i.e. the flashlight or laser not working, but the ECD can still be used

        c.   Critical fault (octagon with exclamation point)

            1)   Indicates a system failure – This X2 is NOT to be used for duty

VIII.   **SELECTOR SWITCH**

A.   Used to access the features and options menu

B.   Use only your finger to depress the Selector Switch

    1.   Do not use objects like pens, paper clips or knives as this can result in switch breakage or the switch could get stuck

C.   Menus

    1.   Main Menu

> Lists sub menus

        a.    Sighting menu

            1)    OO – Stealth No LASER no Flashlight

            2)    LO – Laser Only

            3)    OF – Only Flashlight

            4)    LF – LASER Flashlight

*De/Activates laser(s), flashlights, etc*

2. Information Menu - System menu

    a.    Displays the serial number, date and time setting, and current program version installed

3. Information Menu – PPM

    a.    Displays the PPM serial number, battery voltage and the battery percentage remaining

4. Information Menu – Engineering Code

    a.    Displays current faults of the ECD. All zeros indicate there are no faults

5. Options Menu

    a.    Power Save On/Off

*ECD will shut off after 20 minutes if left ARMED*

D. USB Icon

    1.    When the X2 ECD is connected to the computer via a USB port, the USB icon will show in the display, as well as the serial number of the X2

## IX.    STEALTH MODE

A. Pressing the Selector Switch when the Safety is in the UP (ARMED) position will initiate Stealth Mode

    1.    Laser and flashlight turn off

    2.    CID dims

    3.    Press again to cancel Stealth Mode

## X.    PERFORMANCE POWER MAGAZINE (PPM)

*What is referred to as the DPM on the X26*

A. Specifics

    1.    Contains three 3V lithium batteries

2. Stores enough power for approximately 500+ five-second cycles on both bays

3. To remove, depress the PPM release button and pull down on the PPM

B. TPPM – Tactical Performance Power Magazine is equipped with a grip extension

## XI. ROTATIONAL PULSE DRIVE

1. When the ARC Button is depressed, this quickly sequences discharges across both bays at a rate of 19 pulses per second in each bay. It has the ability to incapacitate 2 individuals simultaneously, but was primarily designed to give the operator an immediate back up shot in case of a miss

## XII. CURRENT METERING

A. The X2 ECD constantly measures its output, pulse-by-pulse, to optimize the delivered charge and increase the likelihood of NMI

## XIII. X-CONNECT™

A. During a field deployment, any combination of probes deployed onto a subject may achieve NMI as long as there is at least one top probe (positive) and one bottom probe (negative) from either deployed cartridge on the subject when the ARC button is held

1. Any additional probes that reach the target will produce an added "Cross Connected" or X-Connect™ effect, even when they are from different cartridge bays of the same X2 using the trigger and holding down the ARC button. This will spread the NMI effect across a wider area of the body

## XIV. ARC TEST

A. Officers will ARC test their Department issued or personally owned Tasers at the beginning of each shift to test the operability of the Taser

Operations Order 1.5.4E, Electronic Control Devices

B. Conditions components for use

C. One second is all that is required

D. To perform an ARC test:

COP-STICKNEY004997

1. Hold the device up so that the profile is visible; the same fashion as during a tactical magazine exchange of a firearm

2. Activate the device by shifting the Safety to the up or ARMED position

3. Ensure there are cartridges loaded into both bays. The device is not intended to be activated without any loaded cartridges

4. One momentary sustained press of the ARC Switch, by the off hand thumb, should activate it long enough to hear, and see, the X2 ARC feature. It is not necessary to extend the duration. In most cases, less than one second is adequate

   a. You should see two complete sustained arcs of electricity

5. Shift the safety back down to the SAFE position

6. Holster the X2

## XV.  SMART CARTRIDGES™

A. Taser X2 Smart Cartridges use compressed nitrogen as a propellant

B. The X2 uses a low voltage signal to deploy the cartridge and is therefore unaffected by static electricity

*Static electricity can discharge an X26 air cartridge*

C. To load a Smart Cartridge:

1. Hold it at both ends of the blast doors while keeping all body parts away from the front

2. Ensure the Safety Switch is in the down (SAFE) position

3. Point the X2 in a safe direction

4. Insert the protruding end into the deployment bay until it is seated. You may hear an audible click when it is seated

5. It is recommended that bays be loaded in such a fashion that one does not pass ones hand over a loaded bay

   a. When loading with the right hand, begin with the bay furthest to the user's left

COP-STICKNEY004998

        b.    When loading with the left hand, begin with the bay furthest to the user's right

## XVI. MARKSMANSHIP

A. Optimum distance for effective probe spread is 9 feet to 18 feet from the target

B. Shot Placement

   1. When possible, fire at the subject's back

      a. Surprise factor

      b. Clothing tends to fit tighter

      c. Larger muscle group

   2. Avoid the face, throat, and groin exposure

      a. Greater possibility of organ or tissue damage

      b. Would require transport to a medical facility for probe removal by a specialist

   3. "Split the belt line" to incorporate both core and upper leg muscles for greater effectiveness

   4. Align the Taser with target orientation

      a. Vertically if the target is taller than wide (standing)

      b. Horizontally if the target is wider than tall (laying down, or for animals)

   5. Use the mechanical sights

      a. The lasers are calibrated, but not reliably

C. Probe Trajectory

   1. Approximately 1 foot spread for every 9 feet traveled

   2. The top probe impacts at point of aim. The bottom probe falls at a 6.5° downward angle

   3. Example: 9' to 18' will yield a spread of approximately 12" to 25"

   4. If the device is canted horizontally, the bottom probe will travel 6.5° laterally

a.    Keeping the subject's head above the sights should increase accuracy and ensure the bottom probe connects as intended

## XVII. EFFECTIVE APPLICATION OF THE X2 TASER

A.    When applied correctly, the TASER is a very effective tool

    1.    However, always have a backup plan in case of failure

B.    Use of the Warning ARC with a Verbal Warning

    1.    When safe to do so, provide a verbal warning to the subject in an IF/THEN statement

        a.    When the subject is non-compliant after having been given clear commands

Deorle V Rutherford 263 F. 3d 1106 – Court of Appeals, 9th Circuit 2001

            1)    For example:  an IF/THEN statement; "IF you do not comply with my commands, THEN I will use my Taser"

            2)    Activate the Warning ARC after the verbal warning

        b.    Document your orders/warnings to the subject and their responses

            1)    Documentation is crucial when looking at Use of Force reasonableness

C.    Planning Essentials for Taser Deployment

    1.    Maintenance of the Taser prior to deployment is crucial

        a.    ARC testing prior to the start of shift ensures functionality

        b.    Instills confidence that the officer's tool is a viable option

    2.    Have an Arrest Plan

        a.    Prior to a planned deployment, the arrest team must be ready to fill defined roles

            1)    Lethal Cover

            2)    Two "hands on" officers

                 a)    Officer(s) are dual purpose for either handcuffing or applying soft empty hand techniques or hard empty hand techniques based on:

(1)    Immediate threat to safety of officers/others

(2)    Actively resisting

(3)    Circumstances tense, uncertain, rapidly evolving

(4)    Severity of the crime at issue

(5)    Attempting to evade seizure by flight

b)    The dual purpose allows the Taser Operator and Lethal Cover time to transition to another tool or re-position to a position of advantage

c)    Communication within the arrest team and to the subject is essential

(1)    Give the subject clear direction and provide a reasonable amount of time to comply

d)    Plans rapidly change so be flexible and look to fill a need for the team

3.    Reputation of the Taser - Deterrence

a.    In some situations, a Taser in the hands of an officer is enough for compliance

b.    The Warning ARC is a useful option for stopping the fight before it begins

4.    Marksmanship and distance from the target affect probe placement and device effectiveness

a.    The dual lasers show the spread on the subject

b.    Probe spread, in large part, determines effectiveness

1)    Less than 9' the operator should employ the "X Connect" option with "trigger, relocate aim to maximize spread, trigger, arc"

2)    If deploying "close deployment" attempt to keep an inch or so of buffer space between the Taser and the target area. This allows the probe to penetrate into

COP-STICKNEY005001

the target

    c.    Deploy the Taser for one 5 second cycle, evaluate the subject's response, and when feasible, allow the arrest team to control the subject

    5.    Debrief to get better

D.    Officers should only apply the number of cycles reasonably necessary to allow safe restraint of the subject

E.    If ineffective, avoid repeated cycles and select another appropriate force option

## XVIII. CLOSE DEPLOYMENTS AND RE-DIRECTS USING THE ARC SWITCH

A.    Although this remains a valid tactic, it may be substituted for a double-fire and implementing X-Connect through the use of the ARC button

B.    The Taser X2 Smart Cartridges are equipped with electrodes on the firing end and will deliver the application when applied to the body by driving the device into the target and using the ARC button

    1.    When deploying the device at or near contact with the body, the probes should clear the blast doors or penetrate them

C.    The drive stun will work with a spent cartridge

D.    Target areas for drive stuns are:

    1.    Muscle or nerve points on the front, back, side, legs and arms

E.    Non-target areas include the head, neck, and groin

F.    Repeated drive stun applications are not recommended. However, this should not be necessary since NMI may be achieved by firing again into another part of the body greater than 4" away from the first probe(s) and holding down the ARC button

    1.    This technique can also be considered when only one probe hits, or both cartridges are expended, and one probe from each cartridge is on target. "X Connect" did not affect the subject. The drive stun will complete the circuit with the probes that are on target

NMI cannot be achieved through the application of a drive stun because the spread of contacts is not great enough to incorporate large muscle groups

COP-STICKNEY005002

XIX. **POSSIBLE INJURIES**

    A.    Injuries resulting from unsupported persons falling

    B.    Muscle contractions

    C.    Redness or minor skin irritation at the contact site

    D.    Temporary blisters

    E.    Bleeding if the probes puncture the skin

    F.    Officers will avoid using the Taser against female subjects known to be pregnant or who are visibly pregnant unless officers can articulate other reasonable force options have been tried or were unlikely to succeed

        1.    When dealing with pregnant women, the Taser's electrical output is not harmful to fetuses, however the above injuries to the mother could result

            *Operations Order 1.5.4E Guidelines for use*

XX. **POST DEPLOYMENT**

    A.    Request Fire and a Supervisor

    B.    If probes penetrate the skin, officers may don gloves and remove them prior to medical personnel arrival

        1.    Keep the support hand clear of the probe

        2.    With the thumb and forefinger or pliers, grasp the probe firmly and pull straight out

        3.    Invert probes into spent cartridge and cover with biohazard tape to prevent probes from falling out

    C.    Do not remove probes from the face, throat, groin, bone, or any other sensitive body part that may cause serious injury

    D.    Documentation

        1.    Prepare accurate and detailed reports

            a.    Circumstances leading to deployment

            b.    Commands given

            c.    Subject's response

            d.    Where the probes hit the subject

            e.    Number of cycles delivered

   f.  Was drive stun used

   g.  How the situation was resolved

## XXI. EFFECTS ON ANIMALS

 A. The Taser X2 is an option for dealing with aggressive animals

   1. Generally successful

   2. Usually recovers instantly

   3. Usually runs away breaking the wires

 B. Remember shot placement, animals encountered will typically be longer than they are tall; exceptions include standing bears

 C. If possible, contain the animal prior to deployment and consider having Rabies/Animal Control on standby

## XXII. TASER X2 MAINTENANCE AND CARE

 A. Check PPM regularly and monitor the remaining battery life

 B. Always store the device with the PPM fully inserted; ensure the PPM release button has snapped flush with the handle to prevent moisture damage or corrosion on the contacts

   1. Any inspection of the device should include a visual inspection of the PPM contacts as well as the gold contacts in the PPM well of the device handle for any corrosion or excessive carbon deposits

    a. DO NOT USE a pencil eraser to clean the gold contacts

   2. Contact a certified Taser Armorer for assistance with cleaning contacts as a trouble-shooting measure

 C. Inspect Smart Cartridges for secured blast doors, any damage, etc

 D. Secure the device in a holster when not in use

 E. Do not store the device or cartridges in pockets without a holster

 F. Do not let the X2 get excessively wet

   1. Keep it relatively clean and free of dirt, dust, and debris

       2.     Remove Smart Cartridges and wipe the exterior of the device clean with a dry cloth

       3.     Keep firing bays clear of obstructions, dirt, and/or debris

       4.     Remove PPM and ensure the battery well is clear of dirt or debris

## XXIII. QUESTIONS

A.     Direct any questions regarding the operation, maintenance, training, certification, use or policy reference the Taser X2 to the Tactical Training Detail

## XXIV. WRITTEN EXAM

A.     A written test score of 80% is required to pass

B.     Students who are unable to pass the exam may not be issued a Taser device

## XXV. DRILLS

A.     Safety

       1.     No live weapons or ammunition will be allowed in the training environment and should be properly secured

       2.     The following drills are to be conducted in a safe for training environment using cardboard-backed silhouette or Taser International training targets

       3.     Every participant and observer is required to wear eye protection during the drills. No exceptions

       4.     Review safety rules with students prior to conducting drills

            a.     See above section I. Introduction, C. Safety Rules

B.     ARC Test

       1.     Materials needed:

            a.     Taser X2

       2.     Demonstrate the following:

        a. Review and demonstrate the steps for a spark test as listed in above section XIV ARC Tests, subsection D. To perform an ARC test

    3. Have student/s perform the drill to proficiency

C. Dry Fire Drill

    1. Materials needed:

        a. Taser X2

        b. Two blue inert training Smart Cartridges

        c. Target positioned vertically, and optional second target positioned horizontally, at a distance of approximately 12 feet to demonstrate optimal range for effective deployment

    2. Demonstrate the following:

        a. Verify the cartridges are not live; utilize inert blue training Smart Cartridges

        b. From the holster, draw and activate the Taser while pointing in on a target

            1) Remind students to use the mechanical sights and not the laser(s) for aiming

        c. Loudly announce your intent to deploy

            1) "Taser, Taser, Taser!"

        d. Pull and release the trigger, allowing the 5 second automatic timing cycle to run its course

        e. During the cycle, lower the Taser below eye line

            1) This is done to allow the operator to assess whether the deployment was successful

        f. After the Taser has stopped, assess the need for additional cycles

        g. Switch the Safety into the down or SAFE position

D. Live Fire Drill 1

    1. Materials needed:

       a.    Taser X2

       b.    Two live Smart Cartridges or Training         15', 25', or 35'
            simulation Smart Cartridges of any length

   2.    Demonstrate the following:

       a.    From the holster, draw and activate the Taser
            while pointing in on a target

       b.    Loudly announce your intent to deploy

            1)    "Taser, Taser, Taser!"

       c.    Pull and release the trigger

       d.    It is preferred to stay on target in case of a
            double-trigger pull

       e.    After the 5 second cycle has stopped, press      NOTE: pulling the trigger
            and hold the ARC Switch button to re-energize     will fire a remaining live
            the deployed cartridge. The operator must         cartridge
            watch the counter to verify the duration of the
            deployment since there is no automatic timing
            function using the ARC switch

   3.    To simulate a bad connection or missed probe, pull
       and release the trigger to deploy the second cartridge

            1)    Only one positive and one negative lead
                from any combination of deployed
                cartridges are required to deliver NMI.
                Therefore, a second cartridge may
                incapacitate a subject while holding the
                ARC switch, via X-Connect

       b.    Eject the spent cartridges and holster

E.    Live Fire Drill 2

   1.    Materials needed:

       a.    Taser X2

       b.    Two live Smart Cartridges or Training         Any length: 15', 25', or
            simulation Smart Cartridges                  35'

   2.    Demonstrate the following:

       a.    Stand within arm's reach of the target

       b.    From the holster, draw and activate the device
            while pointing in on the target

COP-STICKNEY005007

        c.      Loudly announce your intent to deploy

            1)    "Taser, Taser, Taser!"

        d.      Place the Taser on a spot on the target such as the left hip then pull and release the trigger

Avoid using the center mass for this drill, or consider using a character target depicting the subject's back

        e.      Immediately relocate the Taser to the other hip and pull the trigger again to deploy the second cartridge and hold down the ARC switch, thus creating the X-Connect effect

The device will automatically advance to select the next cartridge

F.    Optional drills

    1.    Other drills such as live wire manipulation should first be demonstrated or conducted by a certified Taser Instructor

**\*ANY CHANGES TO THIS OUTLINE CONSTITUTES A REVISION AND MUST BE DOCUMENTED AS A NEW LESSON PLAN AND RE-APPROVED.**

# Taser X2 Operator

| Taser X2 Operator | | Rev: 1 |
|---|---|---|
| 11887 | PT0073 | Hrs: 5 |

# EXHIBIT 32

## USE OF FORCE REVIEW

| | |
|---|---|
| LESSON PLAN: | Use of Force Review |
| LESSON PLAN NUMBER: | 10597 |
| TOTAL COURSE HOURS: | 1 |
| COURSE CONTENT: | This course will provide an overview of Operations Order 1.5 Use of Force and satisfy the requirement for annual training in use of force options and policy |
| PERFORMANCE OBJECTIVES: | Upon completion of this course the student will be able to: |

1. Define types of resistance

2. Identify response options to include those considered deadly and non-deadly



**Use of Force R**
Use of Force Review

10597                    Hrs: 1

| | |
|---|---|
| LESSON PREPARED BY: | Vincent Lewis #6935 |
| DATE PREPARED: | May 11, 2010 |
| DATE REVISED: | |
| LESSON REVISED BY: | |
| DATE REVISED: | |
| INSTRUCTOR REFERENCES: | Operations Order 1.5 |
| | AzPOST Defensive Tactics Instructor Manual |
| | Tactical Support Bureau Manual, Rapid Deployment Unit K-9, Rev 02/08 |
| TRAINING AIDS: | PowerPoint Presentation Equipment |
| METHOD OF PRESENTATION: | Lecture / Practical Application |
| CLASS LEVEL: | Sworn Employees |

COP-STICKNEY004945



REVIEWED BY:

DATE REVIEWED:

APPROVED BY: (Author's Lieutenant)          Lf. ⟨signature⟩ 4876      DATE: 6/1/10

APPROVED BY: (Author's Commander)                                    DATE:

APPROVED BY: (Records Approval Committee)   Sgt. M. Huish 6080 DATE: 6-9-10

APPROVED BY: (TRAINING BUREAU CMDR.)        Lt. L. Bugueso 5519 (TBC)   DATE: 6-9-10

I.  **INTRODUCTION**

    A.    All sworn employees will receive annual training on the use of force options and policy by Department authorized instructors, who are certified through Arizona Peace Officers Standards and Training (AzPOST)      Ops 1.5.5A

    B.    The policies of the Department are set forth as follows:

        1.    Physical force

        2.    Deadly force

        3.    Non-deadly force

        4.    Lethal weapons and equipment

II.  **DEFINITONS**

    A.    Reasonable

        1.    The standard by which an officer's actions are evaluated is defined as follows:

            a.    When the facts and circumstances cause a reasonable and prudent law enforcement officer to act or think in a similar way under the circumstances      Ops. Order 1.5.2; Definitions

        2.    The response option employed will be reasonable and based on the totality of the circumstances      Ops. Order 1.5.3B

            a.    Consider the severity of the crime

            b.    Whether the suspect poses an immediate threat to the safety of officers or others

            c.    Whether the suspect is actively resisting arrest or attempting to evade arrest by flight

    B.    Types of Resistance

        1.    Psychological Intimidation

            a.    Non-verbal cues indicating subject's unwillingness or threats through attitude, appearance and physical readiness

        2.    Verbal Non-compliance

            a.    Verbal responses indicating unwillingness or

COP-STICKNEY004947


threats

3.  Passive Resistance

    a.  Physical actions that do not prevent an officer's attempt to control

4.  Defensive Resistance

    a.  Physical actions that attempt to prevent an officer's attempt to control, but does not involve attempts to harm the officer

    b.  Based on this definition, solely running from officers does not constitute defensive resistance

5.  Active Aggression

    a.  Physical actions of assault

6.  Aggravated Active Aggression

    a.  Deadly force encounter

C.  Officers are authorized to use force for the following reasons:                    AzPOST DTI Manual

    1.  Self defense

    2.  In defense of others

    3.  For arrest/detention

    4.  To prevent escape

D.  Justification for Use of Force

    1.  US Supreme Court: Graham v. Connor, 490 U.S. 386 (1989)

        a.  Acknowledged that the "reasonableness" test in analyzing the use of force is "not capable of precise definition or mechanical application          Tactical Support Bureau Manual, RDU K9, D-04.5B

        b.  It is necessary to evaluate the facts and circumstances confronting the officer at the time force was used

        c.  The evaluation of an officer's use of force will be undertaken from the perspective of a reasonable officer on the scene, not through the 20/20 vision of hindsight

    2.  The question is whether the amount of force used was objectively reasonable based on the totality of the

COP-STICKNEY004948



circumstances, using the information available to the officer at the time of the incident

    a.    The severity of the crime at issue

    b.    Whether the suspect poses an immediate threat to the safety of the law enforcement officers or others

    c.    Whether the suspect is actively resisting arrest or attempting to evade arrest by flight

## III.   ELEMENTS OF FORCE

A.   Ability – Suspect has the reasonable ability to carry out the act

B.   Opportunity – Suspect has the reasonable opportunity to carry out the act

C.   Jeopardy – Suspect creates jeopardy to the officer or others

D.   Duties

    1.    All sworn employees will intervene, if a reasonable opportunity exists, when they know or should know another employee is using unreasonable force

    2.    All sworn employees will immediately report excessive force verbally to a supervisor

    3.    Officers are responsible for requesting medical treatment for suspects against whom force was used

## IV.   RESPONSE OPTIONS

A.   Presence

    1.    Identification of authority

B.   Verbal Persuasion, Negotiation, or Command

    1.    Commands of direction or arrest

C.   Soft Empty Hand Techniques and Restraining Devices

    1.    Techniques that have minimal chance of injury

        a.    Wrist locks, joint locks, pressure points, handcuffing, restraining devices such as RIPP

    2.    Employees will not restrain suspects with their legs behind their back (hog-tying)        Ops Order 1.5.4C(2)

COP-STICKNEY004949

D.     Chemical Agents

      1.     Oleoresin Capsicum (OC)

          a.     Punch II, & Mark 9

          b.     May be used to prevent the possibility of injury to an officer or another person

          c.     To ward off dogs or other animals

          d.     To subdue a person who is threatening physical harm to himself or another, resisting an arrest, rioting, or interfering with an arrest

      2.     All uniformed employees will carry the OC attached to the gunbelt at all times while on duty

      3.     Sworn employees in plainclothes below the rank of commander will carry 3/4 – ounce OC spray as readily available as their weapon

      4.     Deploy a one second burst to the face at a distance of 12-15 feet

      5.     Do not use within 3 feet of a suspect as soft tissue damage could occur

      6.     Immediately handcuff and move the suspect to a well ventilated area; effects should wear off in approximately 45 minutes

          a.     Medical help will be requested if a suspect complains or displays any severe or abnormal reaction to the spray

      7.     Officers and Supervisors from SAU, MOU, and TRU are authorized to deploy Mark 9. Supervisors may direct an officer to deploy Mark 9 when reasonable to do so

E.     Electronic Control Devices

      1.     Taser X26

          a.     May be used when it is objectively reasonable based on the totality of the circumstances, on subjects who are displaying active aggression or who are placing an officer in reasonable apprehension of imminent physical injury to him/herself or a third party, as well as preventing a subject from harming him/herself

          b.     Officers will deploy the Taser for one 5 second cycle, assess the need for additional cycles,

COP-STICKNEY004950

and deploy if necessary to safely gain control of the suspect

    c.    Although there is no predetermined number of cycles that can be administered to a subject, officers should only apply the number of cycles reasonably necessary to safely approach and restrain a subject      Ops Order 1.5.4E

F.    Hard Empty Hand Techniques

    1.    Strikes, kicks, etc

    2.    Although these techniques may be used in some situations when facing passive resistance, officers will first attempt verbal persuasion and soft empty hand techniques when practical

G.    Impact Weapons

    1.    Straight, Side-handle, or Expandable Baton

        a.    Impact weapon strikes may be used when facing the active aggression level of resistance      Ops Order 1.5.4F

        b.    Avoid purposely striking or jabbing the head, neck, sternum, spine, lower abdomen, groin or kidneys unless faced with a deadly force situation

        c.    Must recertify annually

        d.    Flashlights may be used as an impact weapon if a baton is not readily available

    2.    Stun-bag Shotguns

        a.    Optimal range between 5 and 20 yards

        b.    Primary target areas include the arms below the elbow, lower abdomen, buttocks and legs

        c.    Secondary target areas include the arms above the elbow, back (excluding spinal chord area from the base of the skull to the tailbone), and knees

        d.    Non-target areas include the head, spine, thorax, and neck

H.    Carotid Control Technique

    1.    Should only be used on subjects who are using active aggression, aggravated active aggression, or who are a threat to themselves or others

*Use of Force R*   Use of Force Review   Hrs: 1   10597

2.   If oxygenated blood flow to the brain is cut off for four          Ops Order 1.5.4G
     to six minutes, irreparable brain damage may occur

3.   Upon successful application, immediately handcuff the
     subject and check vitals. If CPR is necessary,
     **immediately** remove the handcuffs

4.   Fire will be called immediately

5.   A supervisor will be notified immediately and will
     respond to the scene

6.   Advise receiving officers; detention, wagon, etc

7.   Steps for application are outlined in the AZPOST
     Defensive Tactics Instructor manual

I.  Deadly Force

1.   Authorized when such force is reasonable to protect
     yourself or a third person from another's use, or
     threatened use, of deadly force

2.   Utilized as a last resort when other measures are not
     practical under the existing circumstances

*ANY CHANGES TO THIS OUTLINE CONSTITUTES A REVISION AND MUST BE DOCUMENTED AS A NEW
LESSON PLAN AND RE-APPROVED.

# EXHIBIT 33

## USE OF FORCE REFRESHER

| | |
|---|---|
| LESSON PLAN: | Use of Force Refresher |
| LESSON PLAN NUMBER: | 10596 |
| TOTAL COURSE HOURS: | 30 minutes |
| COURSE CONTENT: | Lecture material to be used as briefing training that covers the general policy of the Phoenix Police Department regarding Use of Force to include types of resistance, response options and reporting of incidents |
| PERFORMANCE OBJECTIVES: | Upon completion of this course of instruction, students will be able to: |

Identify the six (6) types of resistance:

    A.    Psychological intimidation

    B.    Verbal non-compliance

    C.    Passive resistance

    D.    Defensive resistance

    E.    Active aggression

    F.    Aggravated active aggression

Identify the eight (8) response options:

    A.    Officer presence

    B.    Verbal direction

    C.    Soft Empty-hand control and restraining devices

    D.    Chemical weapons

    E.    Taser

    F.    Intermediate control techniques

    G.    Carotid control technique

*__Use of Force R__*
Use of Force Refresher

_10596_ _ _ _ _ _ _ **Hrs: 0.5** _ _

COP-STICKNEY004934



H.  Deadly Force

LESSON PREPARED BY:            Lieutenant Tamara Motyka

                              Sergeant Jason Singer

DATE PREPARED:                May 2010

DATE REVISED:

INSTRUCTOR REFERENCES:        Phoenix Police Department Ops Order 1.5

                              AZ POST Defensive Tactics Instructor Manual

TRAINING AIDS:                None needed

METHOD OF PRESENTATION:       Interactive lecture and class discussion

CLASS LEVEL:                  Sworn / In-Service Refresher

REVIEWED BY:

DATE REVIEWED:

APPROVED BY: (Author's Lieutenant)     LT. T.G. *Mm* 4775  DATE: 6-1-10

APPROVED BY: (Author's Commander)      Cmb. Robert Han 5366  DATE: 6-4-10

APPROVED BY: (Records Approval Committee)   Sgt M. Hush 6AP  DATE: 6-16-10

APPROVED BY: (TRAINING BUREAU CMDR.)   LT. J 4816  ABC  DATE: 4/11/10

COP-STICKNEY004935

## I.    INTRODUCTION

    A.    Instructor – (self) introduction

    B.    Preview of performance objectives

    C.    The four (4) reasons officers are authorized to use force:

        1.    For self defense

        2.    In defense of others

        3.    For arrest/detention

        4.    To prevent escape

## II.    DEFINITIONS

    A.    Non-Deadly Force – Is a tactic that when properly applied has minimal or no risk of causing death

    B.    Deadly Force – Any tactic or use of force that creates a substantial risk of causing death or serious physical injury, such as the use of a firearm

> "means force reasonably likely to kill." Vera Cruz v. Escondido, (9th Cir. 1997)

    C.    Excessive Force- The application of an unreasonable amount of force in a given incident based on the totality of the circumstances

        1.    Neither force nor excessive force requires actual physical contact (pointing guns, making commands, threatened K-9 release, confinement, etc.)

        2.    All involve issues of force and reasonableness

## III.    GENERAL POLICY

    A.    It is the policy of the Department to use a reasonable amount of force to conduct lawful public safety activities

    B.    The response option will be reasonable and based on the totality of the circumstances

        1.    Officers involved in a use of force situation have the responsibility of providing the facts


and circumstances they believe justified the use of force

2. Circumstances that may govern the reasonableness of using a particular force option include, but are not limited to:

   a. The severity of the crime

   b. Whether the suspect poses an immediate threat to the safety of officers or others

   c. Whether the suspect is actively resisting or attempting to evade arrest by flight

## IV. TYPES OF RESISTANCE

A. Psychological Intimidation

   1. Nonverbal cues indicating the subject's unwillingness or threats through attitude, appearance, and physical readiness

B. Verbal Non-Compliance

   1. Verbal responses indicating unwillingness or threats

C. Passive Resistance

   1. Physical actions that do not prevent an officer's attempt to control

   A subject going limp before or during contact

D. Defensive Resistance

   1. Physical actions that attempt to prevent an officer's control, but does not involve attempts to harm the officer

   A subject tightens up or attempts to pull away from the officer

E. Active Aggression

   1. Physical actions of assault

   A subject displays menacing behavior, assaults, or attempts to assault

F. Aggravated Active Aggression

   1. Deadly force encounter

COP-STICKNEY004937



V.    **RESPONSE OPTIONS**

    A.    Officer Presence

        1.    Identification of authority        Marked car, police uniform, verbal identification, etc

    B.    Verbal Direction

        1.    Commands of direction or arrest        When using force, give verbal commands when reasonable

    C.    Soft Empty Hand Control and Restraining Devices

        1.    Techniques that have a minimal chance of injury (wrist locks, joint locks, pressure points, handcuffs, restraining devices). Employees will not restrain suspects with their legs behind their backs (hog-tying)

    D.    Chemical Weapons

        1.    OC Spray

            a.    May be used when reasonable and justified in the following situations:

                1)    To prevent the possibility of injury to an officer or another person

                2)    To ward off threatening dogs or other animals

                3)    In tactical building entries, such as search warrants

                4)    To subdue a person who is:

                    a)    Threatening or attempting physical harm to himself or another

                    b)    Resisting arrest

                    c)    Rioting

                    d)    Interfering with an arrest

    E.    Taser

        1.    M26 and X26 Advanced Taser



  a. May be used, when it is objectively reasonable based on the totality of the circumstances, on subjects who are displaying active aggression or who are placing an officer in reasonable apprehension of imminent physical injury to himself or a third party, as well as preventing a subject from harming himself

  b. The following circumstances should be considered prior to use:

   1) Is the suspect posing a current threat to the safety of officers or others?

   2) What is the severity and violence level of the crime?

   3) Do the suspects have a history of violent behavior?

 F. Intermediate Control Techniques

  1. Techniques that have a probability of injury

  a. Hard Empty Hand Control Techniques which include: closed fist strikes, hammer fist strikes, palm heel strikes, impact push, kicks, knee strikes, and elbow strikes

   1) May be used when facing the active aggression level of resistance

   2) Although these techniques may be used in some situations when facing passive resistance, officers will first attempt verbal persuasion and soft empty hand techniques when practical

   3) Closed fist, palm heel, and elbow strikes are the only techniques that may be used to strike the head and face, and then only when reasonable as a means to overcome a violent attack

  2. Impact Weapons

  a. May be used when facing the active level of resistance

  b. Flashlights are not designed as impact weapons; however, a flashlight may be used as an impact weapon if a baton is



not readily available

    3.    Stun Bag Shotgun

        a.    May be used in situations where distance is necessary to maintain officer safety and the use of impact weapons is a reasonable use of force         Subduing a person who is threatening or attempting physical harm to himself or another

  G.    Carotid Control Technique

    1.    Should only be used on subjects who are using active aggression, aggravated active aggression, or who are a threat to themselves or others

  H.    Deadly Force

    1.    May be used to protect themselves or a third person from another's use, or threatened use, of deadly force

    2.    To prevent the escape of a subject whom the officer has probable cause to believe has committed an offense involving the infliction or threat of serious physical injury or death, and is likely to endanger human life or cause serious injury to another unless apprehended without delay

    3.    In situations where the officer must overcome an attack the officer reasonably believes would produce serious physical injury or death to the officer or another person

    4.    When the circumstances justifying the use of deadly force no longer exist, deadly force will immediately be discontinued

## VI.    USE OF FORCE RESTRICTIONS

  A.    Handcuffed/ Restrained Persons

    1.    Employees will not strike persons who are restrained by hand, foot, leg, or use impact weapons, chemical agents, Tasers, carotid control techniques or deadly force, unless such force is necessary to prevent imminent serious bodily injury or death, or unless such force is reasonable based on the totality of the circumstances

COP-STICKNEY004940



## VII.   REPORTING USE OF FORCE INCIDENTS

A.   Officers will:

    1.   Render first aid or request paramedics if appropriate

    2.   Contact a supervisor as soon as possible whenever an officer utilizes the carotid control technique, intermediate control techniques, Taser, chemical agents or whenever an injury occurs or is alleged to have occurred during soft empty hand and restraining device

> Remember, anytime there is an actual injury, or an alleged injury, as a result of **any** force used by Department personnel, employees will immediately notify a supervisor

    3.   Complete a DR with the appropriate use of force code and document thoroughly the details surrounding the use of force

## VIII.   REPORT WRITING

A.   If a defensive tactics technique is used during an arrest, indicate the technique that was used in the offense report and what first aid, if any, was given.

> After we cause any injury, we must provide for first aid

    1.   Be very specific

    2.   Explain the suspect's actions and your reactions

    3.   Include your thoughts and feelings

    4.   You must be able to clearly communicate, through your report, the scenario in which you used force

    5.   You must answer "who, what, why, when, where and how" in each offense report

B.   Remember: Your supervisor, your department, the prosecuting attorney's office, the defendant and his/her family, the defense counsel, the judge and the jury will be reading your report

    1.   They are human beings and will want to know if you acted reasonably under the totality of the circumstances

    2.   There is a good chance that the media will get all, or some, of your report

    3.   Do not embarrass law enforcement



4. They will have only your report to go by.

5. Avoid being too brief

C. Key elements of a use-of-force report:

1. General details – time, date, locations, connect-up reports, etc

2. The purpose of the contact with the subjects involved:

   a. Consensual contact

   b. Investigative detention

   c. Arrest

   d. Self defense or defense of others

   e. To prevent suicide

   f. To prevent escape or recapture

3. Officer arrival:

   a. Marked unit vs. unmarked

   b. Uniform vs. plainclothes

   c. Number of officers

4. Approach:

   a. What you observed

   b. Number of officers/subjects

5. Subject/suspect actions and behavior:

   a. Subject's verbal responses

   b. Subject's body language

   c. Subject's physical actions – cooperative, resistant, physical actions of assault, deadly force, suicidal, etc

6. Any applicable force variable such as drug/alcohol influences, any prior knowledge of the suspect, the officer's perception based on experience, injury or exhaustion to officer, proximity of back up, etc

COP-STICKNEY004942

7.　What level of force was used?

    a.　Was force increased or decreased?

    b.　Was it effective?

    c.　At what point?

    d.　What was the suspect's reaction?

    e.　If not effective, why was it not effective and what else was tried or done?

    f.　Type of control methods used – specifically, what was done and how?

    g.　Duration of resistance

8.　What level of resistance was used?  How?

9.　Injuries to anyone, including the officer

    a.　Who caused the injury?

    b.　Any previous injuries to the suspect and not caused by police?

    c.　How injured, when and where?

10.　Treatment of injuries to all involved

11.　Describe how you applied a particular technique

12.　Explain why you used force and particular methods and techniques

13.　Describe the scene in detail, including available cover or lack of cover

14.　Avoid general terms such as:  Aggressive, threatened, resisted, struggled, etc

    a.　Describe in detail what the suspect did that was threatening or aggressive

    b.　How did the suspect resist and struggle?

    c.　Did the suspect pull away from you, push you, hold your arm down or call for his/her friends to come help?

15.　If the subject was injured by your actions, do not be afraid to say it.  Just tell why he/she was



Use of Force R
Use of Force Refresher

Hrs: 0.5

10596

COP-STICKNEY004943

        injured and how

    16.    Handcuffed and double locked

*ANY CHANGES TO THIS OUTLINE CONSTITUTES A REVISION AND MUST BE DOCUMENTED AS A NEW LESSON PLAN AND RE-APPROVED.

COP-STICKNEY004944

# EXHIBIT 34

**CITY OF PHOENIX**
**PHOENIX POLICE DEPARTMENT**
**Lesson Plan**

## DEALING WITH THE MENTALLY ILL

LESSON PLAN NUMBER:

TOTAL COURSE HOURS: 2 Hours

COURSE CONTENT: An overview of Magellan, the role of Magellan within the mental health system and the new partnership with law enforcement.

PERFORMANCE OBJECTIVES: Upon completion of this course, the student will be able to:

1. Understand the structure of governmental services available to those individuals with a serious mental illness (SMI).

2. Define the role of the Regional Behavioral Health Authority (RBHA) for Maricopa County, Magellan Health Services.

3. Recognize signs and symptoms of a seriously mentally ill individual.

4. Demonstrate effective Crisis Intervention techniques.

5. Complete the petition forms for psychological evaluation.

LESSON PREPARED BY: Officer Vincent Lewis #6935
Officer Michael Bosworth #8036

DATE PREPARED: January 2007

LESSON REVISED BY: Officer Vincent Lewis #6935

DATE REVISED: January 2007

LESSON REVISED BY: Detective Rachel C. Rohkohl #7609

DATE REVISED: January 2008

INSTRUCTOR REFERENCES:

Crisis Intervention Team Training Instructor Manual

Website: www.nimh.nih.qov, National Institute on Mental Heath

Website: www.nami.orq, National Alliance on Mental Illness

Website: www.azdhs.qov, Arizona Department of Health

**Dealing with t**
Dealing with the Mentally Ill

9644 Rev 1       Hrs: 2

COP-STICKNEY003598

Services, Division of Behavioral Health

"Detaining Mentally Ill in Jail a Problem," Leonard, The Arizona Republic, 2005

Magellan Resources

TRAINING AIDS:                     PowerPoint
                                   Computer
                                   White Board
                                   Handouts

METHOD OF PRESENTATION:            Lecture, PowerPoint and handouts

CLASS LEVEL:                       Advanced Officer Training

REVIEWED BY:                       *Det P. Randall* #7409

DATE REVIEWED:                     *1-26-10*                01-26-10

APPROVED BY: (Author's Lieutenant)  LT. *[signature]* 5410    DATE: 1/26/10

APPROVED BY: (Author's Commander)   *Frank Sweeney*   DATE: 1-26-10

APPROVED BY: (Records Approval Committee)              DATE:

APPROVED BY: (TRAINING BUREAU CMDR.)  *[signature]*   DATE: 1-28-10

**HOUR 1**

I.  **INTRODUCTION**

    A.    Instructor – (Self) introduction        Slide 1

    B.    Overview of Performance Objectives    Slide 2

        1.    Understand the structure of governmental services available to those individuals with a serious mental illness (SMI).

        2.    Define the role of the Regional Behavioral Health Authority (RBHA) for Maricopa County, Magellan Health Services.

        3.    Recognize signs and symptoms of a seriously mentally ill individual.

        4.    Demonstrate effective Crisis Intervention techniques.

        5.    Complete the petition forms for psychological evaluation.

    C.    "An estimated 26.2 percent of Americans ages 18 and older, or about one in four, suffer from a diagnosable mental disorder in a given year."    Slide 3

        National Institute on Mental Health
        www.nimh.hih.gov

        Slide 4

II.  **THE ARIZONA DEPARTMENT OF HEALTH SERVICES**

        1.    Division of Behavioral Health

            a.    Contracted Regional Behavioral Health Authority for Maricopa County: Magellan Health Services

            b.    Arizona currently has four Inter-agency agreements with Tribal Regional Behavioral Health Authorities (TRBHAs) to provide services for Native Americans    Slide 5

                1)    Gila River

                2)    Colorado River

                3)    Navajo Nation

                4)    Pasqua Yaqui    Slide 6 Map of AZ **AZ Dept. of BHS**

        2.    The Department of Health Services (AZDHS) is responsible for providing behavioral health programs    Slide 7

COP-STICKNEY003600

and services for children and adults and their families.

    a.    Those served include seriously mentally ill adults.

    b.    Seriously emotionally disturbed children.

    c.    Statewide crisis system including the crisis line, mobile teams, inpatient psychological evaluation and detoxification facilities.

    d.    Substance abuse and/or general mental health assistance for children and adults.

3.    Services are provided by contracted companies.

    a.    Magellan Health Services        Slide 8

        1)    Psychological Evaluations

        2)    Crisis Phones

        3)    Case Management

        4)    Medication

        5)    Peer Support

    b.    Terros and Empact

        1)    Mobile Crisis Response and Suicide Intervention

    c.    Community Bridges (L.A.R.C.)

        1)    Substance Abuse/Alcohol Detox

## III.  MAGELLAN HEALTH SERVICES

A.    Contracted by the State of Arizona to provide behavioral health services to consumers in Maricopa County

B.    $1.5 billion contract for 3 years, with the option to extend for an additional 2 years.

C.    Consumers are assigned a case manager to:

    1.    Assist them with medications

    2.    Schedule counseling and peer counseling meetings

    3.    Monitor their clients

    4.    Assess need for and/or file petitions for psychological



evaluations.

D.  Crisis Line 24 hours a day, 7 days a week, for public and          Slide 10
    Police use.

    1.  (602) 222-9444

    2.  Immediately identify yourself as a police officer.

    3.  Ask to speak to a supervisor.

    4.  Give as much of the subject's information as possible,
        including reason for police response.

        a.  Example: Subject called 911 threatening to
            commit suicide by firearm. Subject does own
            handgun with ammunition. Subject has been
            diagnosed with schizophrenia and refuses to
            take medication. Police have responded several
            times in the past for same incident. No threats
            made to officers or anyone else. Subject is no
            longer armed and requests to speak to mobile
            team.

    5.  Obtain ETA for mobile team and notify supervisor.

        a.  Mobile teams are staffed with two Master's level
            clinicians who complete a field evaluation on
            subject to determine need for full psych eval.

## IV.  THE CRIMINAL JUSTICE SYSTEM AND MENTAL ILLNESS

A.  Statistics                                                          Slide 11

    1.  In 2006, over 7.2 million people were under some form       **U.S. Department of**
        of correctional supervision; i.e. probation, prison, jail or    **Justice Bureau of**
        parole. –U.S. Dept of Justice                                   **Justice Statistics**
                                                                        **(DOJBJS)**

    2.  Between 1995 and 2005, the incarcerated population          **Slide 12 DOJBJS**
        grew an average of 3.3% annually; State prisons up
        1.3%, local jails up 4.7%, federal prison up 5.1%.

    3.  The percentage of jail detainees with mental disorders      **Slide 13 Steadman &**
        is substantially higher than among the general                  **Veysey 1994;Teplin**
        population. "County officials estimate 20% of the jail's         **1994**
        population is seriously mentally ill." - *Detaining Mentally*
        *Ill in Jail a Problem* Leonard, AZRepublic, 2005

    4.  It is estimated that persons with severe mental illness      **Slide 14 Torrey et al.,**
        are admitted to jails at a rate that is eight times the rate    **1992**
        of admissions to public psychiatric hospitals, which
        means that more people with severe mental disorders
        are in jail than are in state psychiatric hospitals.

COP-STICKNEY003602



| | | |
|---|---|---|
| 5. | Over half of all inmates were found to have a mental health problem. Inmates reported symptoms of mania, major depression, or psychotic disorder such as delusions or hallucinations. | Slide 15 **DOJ Press Release, September, 2006** |
| 6. | It is reported that 7% of police contacts involve persons with mental illness in crisis as reported by major police departments. | Slide 16 **Deane, Steadman, Borum, Veysey & Morrisey, 1998** |
| 7. | A survey of 450 police officers in three U.S. cities noted that within the month prior to the survey, each had responded to an average of six calls regarding people with a mental illness in crisis. | Slide 17 **Borum, Deane, Steadman & Morrisey, 1998** |
| 8. | Of the incarcerated population of persons with severe mental illness, nearly 3 out of 4, or approximately 70%, also have a co-occurring alcohol and/or drug abuse problem. | Slide 18 **Abram & Teplin, 1991** |

B. Police Referrals for Psychological Evaluations          Slide 19

   1. 2,907 petitions accepted by Value Options in 2006.          *Source: email from Joe Prawdzik, ValueOptions Training Department*

   2. This averages out to about 8 people a day, or 1 person every 3 hours.

**V.    BREAK (10 MINUTES)**

                                                              Slide 20 **HOUR 2**

**VI.    MENTALLY ILL INDIVIDUALS IN CRISIS**

   A.   Signs and Symptoms of Mental Illness          Slide 21

      1. The National Alliance on Mental Illness defines SMI as "medical conditions that disrupt a person's thinking, feeling, mood, ability to relate to others, and daily functioning."

      2. Schizophrenia

         a. 2.2 Million Americans. Will usually begin to          Slide 22
            appear in late teens, early twenties.

         b. Affects subject's ability to reason, think clearly, distinguish between reality and fantasy, make decisions, manage emotions, or relate to others.

         c. Subject may display confused or inconsistent behavior. May lack expression or emotional

response.

    d.    Highest likelihood for violent or psychotic behavior.

    e.    Treatment should include hospitalization, antipsychotic medications, and psychosocial rehabilitation.

3.    Bipolar Disorder (Manic Depression)           Slide 23

    a.    Over 10 Million Americans.

    b.    Characterized by two phases.

        1)    Mania, or manic phase; subject goes through period of excessive impulsive behavior, insomnia, hyperactivity, anger or agitation.

        2)    Depression; behavior ranges from decreased activity to thoughts of suicide.

    c.    Medications include Symbyax, Seroquel, Lithium, Depakote, Risperdal and Zyprexa – mood stabilizers.

4.    Post Traumatic Stress Disorder (PTSD)        Slide 24

                                      www.nimh.nih.gov

    a.    Affects about 7.7 million American adults.

    b.    Subjects relive the traumatic event initially experienced with possibility of hallucinations, paranoia, or defensive behavior.

    c.    Visual or auditory triggers will cause the brain to react as if the experience is happening in real life.

    d.    Abuse victims, veterans, sex crime victims, hostages, refugees all have potential for PTSD.

    e.    Commonly treated with behavioral therapy.

5.    Other illnesses may be characterized by irrational behavior, rambling, talking to oneself, wild or attention seeking behavior, violent outbursts, withdrawal or antisocial behavior, paranoia, delusions, hallucinations, etc.    Slide 25

6.    Subjects may talk about how the government/police/ FBI/CIA/military is watching them.

7.    May believe they receive messages from the TV or radio. Some believe there are people, cameras or

COP-STICKNEY003604

listening devices in the attic or walls.

B.    How might police come into contact with SMI individuals?    Slide 26

    1.    Police receive an emergency call from the SMI individual about a burglary in progress. I.e. The subject thinks someone is in the attic or walls, but can't prove it.    Slide 27

    2.    Police receive a call from a case manager or crisis team to assist with transport of a combative or dangerous SMI individual for psychological evaluation.    Slide 28

    3.    Police respond to serve a pickup order.

    4.    Police respond to suspicious person displaying SMI behaviors.

    5.    Police contact subject on street who has an ACIC pickup order in system.

C.    Conflict Resolution and Recovery    Slide 29

    1.    Secure the scene. Call for back up due to the potential for violent behavior. Use additional officers to help control family or bystanders while you contact subject.    Slide 30

    2.    Establish some kind of communication. Get a dialogue going and use names to familiarize yourself with the subject.

    3.    Watch your tactics, but try your best to appear less threatening. This will help to gain compliance from the subject.

    4.    Consider how active the subject's symptoms are. Can you reason with him/her logically? Is the subject still living on this plain of reality?

    5.    Slow the situation down and use time to your advantage. The first 0 to 45 minutes are critical, in that most violent encounters will occur within this time.

    6.    Listen intently and completely. Give strong consideration to any threats made by the subject, whether or not they have the ability to carry them out.    Slide 31

    7.    Do not lie, embellish, or fabricate information. Don't tell them you can fix all of their problems or that you can take them wherever they want to go. If you lie, they may never trust the police again.

    8.    Do not create your own methods for fixing their situation, i.e. tin foil hats, waving a laser pointer around the room, "telephoning" the government for them, etc.



**Dealing with t**
Dealing with the Mentally Ill

COP-STICKNEY003605

9.    Include the subject in as much of the decision making as possible. This will help to empower the subject and move toward returning to pre-crisis state.

10.   Use resources such as Magellan Health Services, Crisis Line, mobile teams, and CIT officers, to assist with disposition of the SMI individual.

11.   Booking is still an option for individuals who commit crimes. Include mental illness indicators on the Form IV          Slide 32

12.   Conduct a debriefing with officers/supervisors involved to plan future responses to this or these type of subjects. Consider attaching hazard information to this location in CAD.

Slide 33

## VII.    PETITION FOR PSYCHOLOGICAL EVALUATION

A.    Civil Commitments: A peace officer may take into custody any          Slide 34
individual he has **probable cause** to believe, based on his own observations, is, as a result of mental disorder, a danger to self or others, and that during the time necessary to complete the pre-petition screening procedures set forth in sections 36-520 and 36-521 the person is likely without immediate hospitalization to suffer serious physical harm, or serious illness, or to inflict serious harm on another person. If apprehension takes place on or about the premises of the apprehended person, the officer shall take reasonable precautions to safeguard the premises and the property thereon, unless such property and premises are in the possession of a responsible relative or guardian. A peace officer who makes a good faith effort to follow the requirements of this section is not subject to civil liability. **(ARS 36-525)**

B.    Subjects in custody who meet the state's requirements for evaluation will be held for up to 72 hours to complete the evaluation.

C.    Petitions          Slide 35

1.    Emergent

a.    Voluntary – Walk in or brought in by Police or family for evaluation. Subject signs self in. Subject may leave at any time if they do not meet requirements to be held

b.    Involuntary – Brought in by Police, mobile team, or family. Will need to be petitioned.

2.    Non emergent

a.    Persistently or Acutely Disabled (PAD) or



Gravely Disabled (GD) – without help, the
subject is a danger to self (DTS) or a danger to
others (DTO).

1) Subject is petitioned and attempt is
made to locate and deliver subject for
evaluation.

3. Be clear and concise in your articulation of the facts    Slide 36 and 37
surrounding the incident. Include any statements made
by the subject indicating self harm or harm to others.

4. Differentiate between "unwilling" and "unable" to
receive treatment.

## VIII. CONCLUSION

A. Police will contact SMI subjects. With proper training and    Slide 38
understanding of their conditions, we can improve relations
with their community and reduce the number of injuries
caused by negative encounters with Police.

B. Individuals can improve their conditions with strict adhesion to
medications and therapy.

C. Consider taking the 40 hour Crisis Intervention Team training.    Slide 39
Contact your Training Coordinator at your precinct for
scheduling.

Slide 40

## IX. QUESTIONS

T:\TACTICAL\U-40\Lewis\CIT\Dealing with the        OUTLINE \
Mentally III 2008.doc

*ANY CHANGES TO THIS OUTLINE CONSTITUTES A REVISION AND MUST BE DOCUMENTED AS A NEW
LESSON PLAN AND RE-APPROVED.

COP-STICKNEY003607