Joel B. Robbins, Esq. (011065)
Jesse M. Showalter, Esq. (026628)
**ROBBINS & CURTIN, p.l.l.c.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Tel: (602) 400-4400
joel@robbinsandcurtin.com
jesse@robbinsandcurtin.com

Thomas A. Burnett, Esq. (026509)
Donal E. Burnett, Esq. (028800)
**BURNETT LAW OFFICE, PLC**
1744 South Val Vista Drive, Suite 208
Mesa, Arizona 85204
Tel: (480) 347-9116
tom.burnett@burnettlawaz.com
don.burnett@burnettlawaz.com
*Co-counsel for Plaintiff*

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Lei Ann Stickney, individually and on behalf of all statutory beneficiaries of Casey Wells, and in her capacity as the personal representative of the Estate of Casey Wells,<br><br>Plaintiff,<br><br>v.<br><br>City of Phoenix, *et al.*,<br><br>Defendants. | No. 2:20-cv-01401-SMB-CDB<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (DOC. 91)**<br><br>**-and-**<br><br>**PLAINTIFF'S CONTROVERTING STATEMENT OF FACTS** |

Plaintiff Lei Ann Stickney responds to Defendants' Statement of Facts in Support of Motion for Summary Judgment (Doc. 91) and submits Plaintiff's Controverting Statement of Facts as follows:

## RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

**A.**   **The Incident**

**a.**   **The Initial Portions of the Struggle with Officers Arnold, Sgt. Rodarme, and Officer Seaquist**

1. At 1403 hours on February 4, 2019, a call was placed to 911 to report that a man was naked in the street, had earlier been on his hands and knees screaming, and was a danger to himself. (Ex. 1, 1403 911 call). The caller reported that the man had already been in the street for approximately 30 minutes. (*Id.*).

**RESPONSE**: Admit. The 911 caller also told the dispatcher that he did not see any weapons on the man. 911 Call Audio (COP-STICKNEY000480) at 2:23, *Exhibit 1*.

2. This 911 call information was input into a Computer Aided Dispatch (CAD) system, which is available to officers to review within their vehicles. (Ex. 2, CAD). At the time, no units were available to respond to the call. (*Id.*).

**RESPONSE**: Admit.

3. At 1408, a second call was placed to 911 from a different citizen, Jen, about the nude male in the street. (*Id.*)

**RESPONSE**: Admit. Jen also expressed concern that the man might have dementia or that "there might be something wrong with him, poor thing." 911 Call Audio (COP-STICKNEY000481) at 1:00-1:35, *Exhibit 2*.

4. At 1414, a third call was placed to 911 from another citizen, Holly, and information was entered by the dispatcher advising officers that the subject was nude, staring up at the sky and noted that the subject "appears impaired." (*Id.*)

**RESPONSE**: Dispute. The caller did not use the words "appears impaired." Holly explained that the man was "doing what looks like yoga poses" naked in the middle of the street. 911 Call Audio (COP-STICKNEY000483), *Exhibit 3*.

5. At 1415, a fourth call was placed to 911 by James, a fire operations mechanic, who also reported a male subject nude in the street. (*Id.*)

**RESPONSE**: Admit. James told the dispatcher that the man was just staring up at the sky and did not appear agitated. 911 Call Audio (COP-STICKNEY000484), *Exhibit 4*.

6. At 1415, a fifth call was placed to 911 about the naked man, with the dispatcher entering notes advising that the caller was "concerned about

children that live in the area that would be coming home from school." (*Id.*; Ex. 5, 1420 911 call).

**RESPONSE**: Admit.

7. Ultimately, six calls were placed to 911, with one of the original callers calling twice, and at 1416 complaining that officers had not arrived, and reporting that the nude male was standing in the middle of the road in danger of being hit, and she was standing outside yelling for people to slow down so he was not hit. (Ex. 3, 1416 911 call).

**RESPONSE**: Admit.

8. In response, the dispatcher entered details that the subject was now standing in the roadway. (Ex. 2, CAD).

**RESPONSE**: Admit.

9. In addition to the CAD electronic information, the dispatcher also put out information over the radio and after receiving these multiple 911 calls, the dispatcher broadcast that: "A bunch of neighbors are calling in. Again, it's 3821 West Salter Drive, 21-300 North, nude male, going up and down the street, been yelling at himself for 30 minutes. He only recently took his clothes off. White male, 40, 6-foot, 280. Last time they said that he's doing yoga poses out in the street at 1415, units to follow." (Ex. 5, audio of radio at 0:00-1:08).

**RESPONSE**: Admit.

10. At 14:15:33, Sgt. Rodarme (call sign 93B) advised that he was enroute to the scene. (Ex. 2, CAD).

**RESPONSE**: Admit.

11. At 14:18:02, Officer Arnold (call sign 934B) advised that he was enroute to the scene, arriving at 14:19:18 (Ex. 2; Ex. 6, Arnold Deposition at 65:17-67:11).

**RESPONSE**: Admit.

12. When Officer Arnold arrived, he parked his patrol car, pulled 10-15 feet from Wells—keeping his distance and "trying to engage in conversation with him"—and seeing his clothes in a pile north of him "telling him that we needed to get him dressed and figure out what's going on here." (Ex. 6 at 67:15-68:6).

**RESPONSE**: Admit.

13. Officer Arnold did not believe that Wells was in any medical distress, but thought it was likely that he was on drugs, particularly given the call details that Wells was likely impaired. (Ex. 6 at 68:7-22, 147:18-148:1).

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

**RESPONSE**: Dispute. Officer Arnold testified that the fact Casey Wells had stripped naked suggested to him that Casey was potentially on drugs or experiencing a "mental condition." Arnold Dep. at 68:7-12, ***Exhibit 5***.

14. A citizen video captured Officer Arnold's initial attempts to speak with Wells, who can be seen naked, with a large full beard, and shaking his head vigorously in response to Officer Arnold as Officer Arnold tried verbal persuasion to deescalate the situation. (Ex. 7, civilian video; Ex. 6 at 148:2-149:10).

**RESPONSE**: Dispute. The video does not capture any words spoken by either Officer Arnold or Casey and therefore does not appear to show that Officer Arnold was trying "verbal persuasion to deescalate the situation." *See* Defendants' Exhibit 7. Plaintiff admits that the video shows Casey standing naked and shaking and nodding his head with his arms raised in the air, while Officer Arnold approaches Casey, puts on a pair of black gloves, and takes out a pair of handcuffs. *See id.*

15. Although unknown to Officer Arnold at the time—within Wells clothing and providing him a motive to resist arrest—was a glass pipe with methamphetamine residue, a baggie containing methamphetamine, and $3,000. (Ex. 8, photographs, COP-STICKNEY000201, 217, 258, 260, 283, Ex. 9, photograph, COP-STICKNEY00195; Ex. 18, Palmer Deposition at 30:3-16).

**RESPONSE**: Objection. Information of which the officers were unaware may not be considered in determining whether their use of force was objectively reasonable. *Hayes v. County of San Diego*, 736 F.3d 1223, 1232–33 (9th Cir. 2013) (noting that the court "can only consider the circumstances of which [the defendant officers] were aware when they employed deadly force"); *Glenn v. Washington County*, 673 F.3d 864, 873, n. 8 (9th Cir. 2011) ("We cannot consider evidence of which the officers were unaware—the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways."); Fed. R. Evid. 402, 403.

16. Wells did not live in the area and had driven there in a silver Ford Fusion. (Ex. 9, COP-STICKNEY00195).

**RESPONSE**: Objection. Defendants' Exhibit 9—a photograph of a silver car—does not demonstrate that Casey did not live in the area or that he had driven there in the silver

car. Moreover, this information was not known to the Officer Defendants and is therefore not relevant to determining whether their use of force was objectively reasonable. *See* Response to ¶ 15, *supra*; *Hayes*, 736 F.3d at 1232–33; *Glenn*, 673 F.3d at 873, n. 8.

17. When Officer Arnold tried to verbally engage Wells—asking him "Sir, what are you doing out here with no clothes on?"—Wells stated something to the effect that "I was born naked, or I came into this world naked and I'm going to leave this world naked; or God meant for me to leave this world naked." (Ex. 6 at 69:9-20; 72:7-73:9).

**RESPONSE**: Admit.

18. When Officer Arnold told Wells that he needed to get dressed and would be handcuffed for his safety, Wells stated "You're not going to cuff me." (Ex. 6 at 72:14-73:9). Officer Arnold asked "Why, are you going to fight me? Are we going to have issues?", with Wells stating in response: "You're just not going to cuff me." (*Id.*)

**RESPONSE**: Admit.

19. Based upon what he observed, Officer Arnold made the decision to wait for backup before touching Wells. (*Id.*)

**RESPONSE**: Dispute. Officer Arnold testified that after Casey stated, "you're just not going to cuff me," Arnold made the decision "not to go hands-on with him" and to wait until Sgt. Rodarme showed up before going hands-on. Arnold Dep. at 73:2-9, ***Exhibit 5***.

20. While waiting for backup, Officer Arnold continued to try to keep Wells calm because he did not want to wrestle around with someone who was naked and verbally expressed that he would not be put in cuffs; more officers arriving would create a deterrent to Wells fighting. (Ex. 6 at 74:9-75:10).

**RESPONSE**: Dispute. Officer Arnold testified that Casey was "still being calm," was not making any motions toward Arnold, and was not threatening him while Arnold waited for other officers to arrive. However, Arnold did not want to go "hands on" with someone who was naked. Arnold Dep. at 74:9-25, ***Exhibit 5***.

21. Sgt. Rodarme arrived several minutes after Officer Arnold, at approximately 14:22:14. (Ex. 2, CAD).

**RESPONSE**: Admit.

22. Based upon the initial 911 call, by the time that Sgt. Rodarme arrived, Wells had been at the scene for at least 45 minutes. (*Id.*).

**RESPONSE**: Admit.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

23. When Sgt. Rodarme arrived, he observed Officer Arnold trying to talk to Wells and "deescalate him," assuring Wells that the officers could get him help as he was naked and they needed to get him out of the street. (Ex. 10, Rodarme Deposition at 28:12-29:3).

**RESPONSE**: Plaintiff admits that Sgt. Rodarme testified that the officers told Casey they wanted to help him. Plaintiff disputes Sgt. Rodarme's characterization of this statement as an attempt to "deescalate" Casey, who Officer Arnold described as "still being calm" and non-threatening. *See* Arnold Dep. at 74:9-25, *Exhibit 5*.

24. Because the area was known for methamphetamine calls and based upon what he observed, Sgt. Rodarme believed that Wells was under the influence of drugs and his belief was solidified once Wells began to fight with superhuman strength. (*Id.* at 135:14-136:3; 140:21-141:10).

**RESPONSE**: Plaintiff admits that Sgt. Rodarme believed Casey was under the influence of methamphetamine because the area was known for meth-related calls and because Casey was naked in the street. Rodarme Dep. at 135:14-136:3, *Exhibit 6*. In his deposition, Sgt. Rodarme equated "superhuman strength" with excited delirium. *See id.* at 54:1-55:6. Plaintiff disputes Sgt. Rodarme's characterization that Casey ever "began to fight with superhuman strength" and disputes the inference that Casey was fighting or threatening the officers before they went "hands on" with him.

25. Wells was standing in a position with his arms off to the side in an airplane position and with clenched fists. (*Id.* at 30:18-31:10).

**RESPONSE**: Admit.

26. Wells was completely naked, grunting, non-compliant, and responded to officers with "fuck you." (*Id.* at 31:7-24).

**RESPONSE**: Admit that this statement summarizes Sgt. Rodarme's testimony. However, neither officer gave a command or gave Casey an opportunity to comply with it prior to going "hands on" with him, and Casey never told them "no." The officers did not warn him prior to going "hands on" with him. They did not have a discussion between themselves about how to approach Casey or take him into custody. Sgt. Rodarme testified that "Officer Arnold had ahold of his left arm, I had ahold of his right arm, and we're just trying to give him every opportunity to place his hands behind his back. We told him, he is

not detained -- or he's not under arrest, he's just being detained for his safety and we want to help him." *See* Rodarme Dep. at 31:15-32:6, ***Exhibit 6***. Officer Arnold testified that he did not hear Casey verbalize any words after Sgt. Rodarme arrived. *See* Arnold Dep. at 81:5-8, ***Exhibit 5***.

27. Officer Arnold took hold of Wells' left arm and Sgt. Rodarme took hold of his right arm (while Wells held his arms out in an airplane position), while still verbally engaging with him and giving him every opportunity to voluntarily place his hands behind his back. (*Id.* at 31:7-33:9). The officers did not try to force his arms back, but first tried to negotiate with Wells, telling him that they would take him to get help and were trying to help him. (*Id.*).

**RESPONSE**: *See* Response to ¶ 26, *supra*.

28. To deescalate the situation, Sgt. Rodarme told Wells that he was not under arrest, that he was being detained for his safety, and that the officers wanted to help him, but in response Wells grunted and remained non-compliant. (*Id.*).

**RESPONSE**: *See* Response to ¶ 26, *supra*.

29. Sgt. Rodarme used this deescalation technique of telling Wells that he was being detained because, when individuals are told they are under arrest, they seem to think that it is inevitable that they are going to jail. (*Id.*).

**RESPONSE**: *See* Response to ¶ 26, *supra*.

30. For approximately forty-five seconds to a minute, the officers continued to hold onto Wells arms and tell him that they were trying to help him, but he would not comply and was using his strength to hold his arms stiff as he grunted and yelled. (*Id.*)

**RESPONSE**: *See* Response to ¶ 26, *supra*.

31. Wells would not listen or comply. (*Id.*).

**RESPONSE**: *See* Response to ¶ 26, *supra*.

32. The officers continued to plead with him and try to deescalate the situation—pleading with Wells not to resist, don't make things worse, and explaining to him that just because he was being placed in handcuffs he would not be arrested, yet every time they tried to pull his hands down to place them behind his back he would resist. (Ex. 6, Arnold Deposition at 81:9-84:17).

**RESPONSE**: Admit that this summarizes Officer Arnold's testimony. *See also* Response to ¶ 26, *supra*.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

33. As Officer Arnold explained, "We had been pleading with him to get him into cuffs. I had mentioned to Casey, again, with no response, I had mentioned after we had pleaded with him, I said, 'Sir,' I said, 'We've asked you nicely. We've told you that we're going to get you in cuffs and you're still resisting. Our next step is we're going to make you go in cuffs." (*Id.* at 81:13-84:17).

**RESPONSE**: Admit that this summarizes Officer Arnold's testimony. *See also* Response to ¶ 26, *supra*.

34. Officer Arnold and Sgt. Rodarme then tried to pull Wells arms down to handcuff him and "he immediately started being aggressive and was trying to get out of our hold, in which he did and started to run away and then he came back and started punching at Officer Arnold." (Ex. 10, Rodarme Deposition at 36:3-23; Ex. 6, Arnold Deposition at 81:13-84:17). Wells resisted arrest by pulling away and then began punching and kicking at the officers. (*Id.*).

**RESPONSE**: Dispute. Officer Arnold testified that, after they went hands on with Casey, Officer Arnold made the decision to "try to take him down to be able to get him under control to cuff him." Arnold Dep. at 81:9-82:4, *Exhibit 5*. There is no evidence that Arnold or Rodarme warned Casey before Arnold tried to take him to the ground.

Shortly after the incident, a bystander, Richard Buffington, gave an interview in which he stated that Casey was not aggressive and did not try to hit or punch the officers. He did not try to attack or come toward the officers at all. It appeared to him that Casey simply did not want to be touched. The officers began to "wrestle" Casey to the ground and either pushed Casey or caused him to fall, hitting his head on the pavement. One of the officers then fell on top of Casey. *See* Buffington Interview Transcript (WELLS 002731-33, 002737), *Exhibit 7*; Fed. R. Evid. 803(1), 803(2).

Another bystander, Jeffrey Bolduc, also told police that he did not see Casey punch or strike the officers, and once Casey was taken to the ground, he appeared to be flailing around. *See* Bolduc Interview Transcript (WELLS 002651-52), *Exhibit 8*.

Officer Arnold testified that he never saw Casey kick any of the officers and described Casey as "flailing his legs around." *See* Arnold Dep. at 101:1-12, *Exhibit 5*. Sgt. Rodarme also described Casey as "flailing his arms." *See* Rodarme Dep. at 36:24-37:15, *Exhibit 6*.

35. Officer Arnold recounted that "He got into a fighting stance, balled his fists and he took a swing at me. He hit me right here in the bottom lip and then backed off and smiled on his face and started bouncing up and down again. So, at that point, that's went I approached him getting him into a bear hug. And when doing so we're wrestling around, still standing up. I don't have the leverage, even though I'm taller than him, he's a stocky man and I didn't have the leverage to bend him over. So he would lose footing and fall to his back." (Ex. 6, Arnold Deposition at 81:20-82:15).

**RESPONSE**: Dispute. *See* Response to ¶ 34, *supra*.

36. After Officer Arnold was punched in the face by Wells, he turned to Sgt. Rodarme in surprise and said: "He punched me in the face." (Ex. 10, Rodarme Deposition at 37:19-24).

**RESPONSE**: Dispute. Bystanders told investigators that Casey was not aggressive, did not try to attack or come toward the officers, and did not try to punch or hit them. The officers both described Casey as "flailing." *See* Response to ¶ 34, *supra*.

37. When Officer Arnold had Wells in the bear hug, Sgt. Rodarme pulled out his Taser, but was unable to deploy it, as he was concerned about Wells getting away "[w]e can't let him go into any other house, get away from us and try to go into any other houses, it would be a dangerous situation. We're trying to get him on the ground." (*Id.* at 38:1-9).

**RESPONSE**: Plaintiff disputes that the officers had any genuine concern that Casey would try to flee and go into a house. Mr. Buffington told investigators that Casey "wasn't trying to go anywhere, it seemed like. He was just trying to be by himself." Buffington Interview (WELLS 002737), *Exhibit 7*; *see also* Response to ¶ 34, *supra*.

38. Sgt. Rodarme pulled down on Wells' shoulders and both Officer Arnold and Wells fell to the ground, with Wells on his back facing upwards continuing to kick and punch at officers. (*Id.* at 38:1-25).

**RESPONSE**: Dispute. The officers and bystanders described Casey as flailing rather than intentionally trying to strike anyone. *See* Response to ¶ 34, *supra*.

39. Officer Arnold held Wells' arm on his left side, but lost his grip and Wells punched Sgt. Rodarme in the face (ultimately connecting), looked like he might be trying to head-butt the officers, and in response Officer Arnold immediately deployed a single forearm strike to stop the attack and re-gain control of Wells' arm. (Ex. 10, Rodarme Deposition at 38:1-25; 39:1-10; 44:10-21; Ex. 6, Arnold Deposition at 90:21-91:3, 94:9-11, 95:13-18; 150:3-22).

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

**RESPONSE**: Plaintiff disputes that Casey "punched" Sgt. Rodarme in the face. Bystanders told police that Casey did not try to punch or strike the officers. Instead, he appeared to both officers and bystanders to be flailing around. *See* Response to ¶ 34, *supra*. Casey "started bleeding immediately" when Officer Arnold struck him. *See* Arnold Dep. at 83:4-13, *Exhibit 5*.

40. After Officer Arnold re-gained control of the loose arm, Wells appeared to be even more angry and spit blood in Sgt. Rodarme's face and eyes; Sgt. Rodarme realized that it would take more officers to safely take Wells into custody. (Ex. 10, Rodarme Deposition at 59:10-61:24, 71-72; Ex. 6, Arnold Deposition at 90:21-91:3, 97:13-24).

**RESPONSE**: Plaintiff disputes that Casey became "even more angry" or that he intentionally "spit blood" in Sgt. Rodarme's face and eyes. Officer Arnold and a bystander both described Casey as appearing to flail around on the ground. *See* Arnold Dep. at 101:1-12, *Exhibit 5*; Bolduc Interview Transcript (WELLS 002651-52), *Exhibit 8*. Because Casey's autopsy revealed broken cartilage in his throat, a factfinder could conclude that Arnold struck Casey in the throat and that blood bubbled up into his mouth and nose. *See* Rodarme Dep. at 50:10-16, *Exhibit 6*. A factfinder could also conclude that Casey was trying to clear his airway rather than intentionally spitting blood at the officers. *See* Arnold Dep. at 97:17-98:8, *Exhibit 5*.

41. As Wells was faceup on the ground and because he had exhibited superhuman strength and struck Sgt. Rodarme in the mouth, Sgt. Rodarme told Officer Arnold "We're going to wait here. We're going to hold him down so we can safely get him into custody and get fire to treat him." (Ex. 10, Rodarme Deposition at 71:3-72:6)

**RESPONSE**: Plaintiff disputes that Casey exhibited "superhuman" strength or that he intentionally struck Sgt. Rodarme in the mouth. Both Officer Arnold and bystander Jeffrey Bolduc stated that Casey appeared to be flailing around on the ground. *See* Response to ¶ 34, *supra*.

42. At approximately 14:24:58, after having been punched in the face, Wells having spit blood on him and Sgt. Rodarme winded from the struggle, Sgt. Rodarme requested another unit to respond to assist (Ex. 5, audio of radio transcript at 9:40-46; Ex. 2, CAD; Ex. 10, Rodarme Deposition at 67:18-22).

**RESPONSE**: Plaintiff disputes that Casey intentionally punched or spit blood on Sgt. Rodarme. *See* Responses to ¶¶ 34, 39-40, *supra*.

43. Additional units were advised to respond by the Lieutenant, who vocalized over the radio that "it sounds like he is fighting," asked for several officers to respond, and the dispatcher was advised to check for the "air unit please." (Ex. 5, at 10:00-10:12).

**RESPONSE**: Admit.

44. At 14:25:29, the CAD reflects that Sgt. Rodarme was in a possible 239 (a fight). (Ex. 2, CAD).

**RESPONSE**: Admit.

45. Officer Seaquist heard Sgt. Rodarme's request for additional units and could tell that the situation was serious based upon the tone of Sgt. Rodarme's voice. (Ex. 11, Seaquist Deposition at 45:7-13).

**RESPONSE**: Plaintiff admits that Officer Seaquist claimed that he knew Sgt. Rodarme's "voice was jacked up, and [he] knew it was serious." Seaquist Dep. at 45:10-17, ***Exhibit 9***.

46. While waiting for another officer to arrive and providing a period of deescalation for Wells, Officer Arnold and Sgt. Rodarme held him face up by his arms on the ground. (Ex. 10, Rodarme Deposition at 61:8-24).

**RESPONSE**: Admit.

47. Officer Seaquist (call sign 934D) answered for the call at 14:25:15 and arrived on scene at 14:27:41—nearly three minutes after Sgt. Rodarme radioed for assistance. (Ex. 2, CAD).

**RESPONSE**: Admit.

48. As Officer Seaquist arrived, he saw Officer Arnold and Sgt. Rodarme struggling to control Wells, who seemed to be in the fight "for the long haul" and was kicking, but neither officer was using any strikes and were only controlling him with soft empty hand techniques. (Ex. 11, Seaquist Deposition at 51:18-25; 62:9-13; 96:20-97:8).

**RESPONSE**: Dispute. Officer Seaquist testified in his deposition that he perceived Casey to be "flailing his legs" rather than kicking. He interpreted Casey's movement as "the result of him struggling and flailing and resisting" rather than an intentional kick to injure him. *See* Seaquist Dep. at 115:9-19, ***Exhibit 9***. Officer Arnold, Sgt. Rodarme, and bystanders all described Casey as "flailing" on the ground rather than intentionally trying to kick or

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

strike the officers. *See* Response to ¶ 34, *supra*. The fact that Officer Arnold and Sgt. Rodarme were able to control Casey with only "soft empty hands" also weighs against any inference that Casey was kicking or fighting "for the long haul."

49. Officer Seaquist's impression based upon training received related to drug recognition, was that Wells was likely on drugs, not that he was mentally ill, as he had seen similar states of undress with PCP and bath salts, but not such states of undress with mental illness. (Ex. 11, Seaquist Deposition at 85:16-87:8, 90:3-91:4, 95:11-20, 96:20-97:8, 204:11-25, 205:18-209:17).

**RESPONSE**: Admit.

50. When Officer Seaquist, all three officers tried to roll Wells over to get him into custody as quickly and safely as possible because he had been throwing punches and kicking. (Ex. 11, Seaquist Deposition 69:25-70:6).

**RESPONSE**: Dispute. Plaintiff disputes that Casey was intentionally "throwing punches and kicking," as it appeared to Officer Arnold, Sgt. Rodarme, and bystanders that he was flailing. *See* Response to ¶ 34, *supra*. Officer Seaquist also perceived Casey to be flailing rather than intentionally trying to punch or kick. *See* Seaquist Dep. at 115:9-19, ***Exhibit 9***. Officer Seaquist testified that, before he deployed his Taser, he told Arnold and Rodarme "let's flip him over" because "we would be able to have a better positioning, to gain control. Plus with him turned over onto his stomach, that reduces the chance of injury to Mr. Wells or to the officers with him throwing punches or flailing his arms around." *Id.* at 69:25-70:5.

51. Wells was kicking and Officer Seaquist grabbed onto his legs to attempt to control them. (Ex. 11, Seaquist Deposition at 62:20-63:16).

**RESPONSE**: Plaintiff disputes that Casey was kicking at the officers. *See* Response to ¶ 50, *supra*.

52. The offers then rolled Wells over and, in the process, Wells tucked his arm under him and continued resisted Officer Arnold and Sgt. Rodarme's attempt to handcuff him by keeping his right arm pinned under his body. (Ex. 6, Arnold Deposition at 103:12-105:13)

**RESPONSE**: Plaintiff disputes that Casey intentionally placed his arm under his body. A factfinder could draw the inference that Casey's arm became pinned beneath him when the officers rolled him onto his stomach.

53. To keep Wells from kicking, Officer Seaquist wove Wells' legs together and pushed them toward his buttocks as the other two officers continued to struggle to restrain Wells. (Ex. 11, Seaquist Deposition at 63:25-64:21).

**RESPONSE**: Plaintiff disputes that Casey was kicking. *See* Response to ¶ 50, *supra*. Plaintiff admits that Officer Seaquist crossed Casey's legs at the ankles, bent them toward his buttocks, and leaned his upper body against the front of Casey's lower legs. *See* Seaquist Dep. at 65:25-66:16, ***Exhibit 9***.

54. Wells then pushed back on Officer Seaquist's vest and Wells kicked Officer Seaquist in the thighs. (Ex. 11, Seaquist Deposition at 65:12-67:16).

**RESPONSE**: Plaintiff admits that Officer Seaquist claimed that Casey's lower legs pushed against his vest and that Casey's feet came "down and kick[ed]" Seaquist's thighs. *See* Seaquist Dep. at 67:7-16, ***Exhibit 9***. A factfinder could infer that Casey's legs pushed against Seaquist's vest because they were bent in an awkward and uncomfortable position and that his legs slipped and came down on Seaquist's thighs.

55. As Wells kept his right arm pinned underneath him, he continued to resist arrest, refused to give his arm up, and Sgt. Rodarme told Officer Seaquist to Tase him. (Ex. 10, Rodarme Deposition at 78:20-79:8; Ex. 6, Arnold Deposition at 105:6-13).

**RESPONSE**: Plaintiff admits that Sgt. Rodarme gave the direction for Officer Seaquist to Tase Casey. Plaintiff disputes that Casey intentionally kept his right arm underneath him, resisted, or refused to give his arm up. A factfinder could conclude that Casey was physically unable to extract his arm from beneath his body while the three officers restrained him face down on the pavement.

56. Officer Seaquist yelled to Sg. Rodarme and Arnold, "I'm deploying the Taser," and he gave commands to Wells to stop resisting, but he kept fighting and Officer Seaquist deployed the first Taser cartridge. (Ex. 11, Seaquist Deposition at 67:25-69:16; 106:1-107:16).

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

**RESPONSE**: Plaintiff admits that Officer Seaquist deployed a Taser cartridge but disputes that Casey was "fighting" as he lay face down, restrained by three officers, and with his arm trapped beneath him. *See* Responses to ¶¶ 34, 50, *supra*.

57. Officer Seaquist deployed the Taser while Officer Arnold was on Wells' right side attempting to get his arm out from being pinned under his body and Sgt. Rodarme was on the left side attempting to gain the left arm for control, but the Taser had a small spread and little effect. (Ex. 11, Seaquist Deposition at 70:7-20; Ex. 6, Arnold Deposition at 84:25-86:2; 106:1-107:16).

**RESPONSE**: Dispute. Plaintiff disputes any inference that the Taser deployment had little effect on Casey. Officer Seaquist testified that Casey's whole body "tensed up" in response to the first Taser deployment. Seaquist Dep. at 68:23-69:2, ***Exhibit 9***. Officer Arnold testified that he saw Casey's body stiffen in response to each Taser deployment. Arnold Dep. at 86:20-23, ***Exhibit 5***.

There is also a dispute over which officer had control of which arm. Sgt. Rodarme testified that when the officers turned Casey onto his stomach, before the first Taser deployment, Casey's left arm became pinned beneath his body. Officer Arnold was able to get Casey's right arm behind his back and was holding it in anticipation of Rodarme getting Casey's left arm out from under his body so they could put him in handcuffs. Rodarme Dep. at 76:6-77:23, ***Exhibit 6***; *see also* Seaquist Dep. at 106:1-6, ***Exhibit 9***. At the same time, Officer Seaquist was laying his body across Casey's legs, which were crossed at the ankles. Seaquist Dep. at 103:13-25, ***Exhibit 9***.

58. Wells tensed momentarily with only a small probe spread, but then "still kept into the fight." (Ex. 11, Seaquist Deposition at 69:1-16; Ex. 6, Arnold Deposition at 85:17-88:24).

**RESPONSE**: Plaintiff disputes any inference that the Taser deployment had little effect on Casey or that he was fighting. *See* Responses to ¶¶ 34, 50, 57, *supra*.

59. After the first Tasing, Officer Seaquist kept yelling at Wells to "stop resisting" and then deployed the second cartridge, which was not effective in stopping Wells' resistive actions. (Ex. 11, Seaquist Deposition at 71:21-73:3; Ex. 10, Rodarme Deposition at 79:9-81:22).

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

**RESPONSE**: Plaintiff admits that Seaquist deployed his Taser at Casey a second time almost immediately after the first Taser deployment. *See* Seaquist Dep. at 71:21-24, ***Exhibit 9***. Plaintiff disputes that the second Taser deployment "was not effective." *See* Responses to ¶¶ 57, *supra*. Plaintiff objects to the phrase "resistive actions" as ambiguous because it does not describe the allegedly resistive conduct. Plaintiff disputes that Casey was resisting, as Seaquist was laying across his legs, Arnold was restraining his right arm, and his left arm was pinned beneath his body. *See* Rodarme Dep. at 76:6-77:23, ***Exhibit 6***; Seaquist Dep. at 103:13-25, ***Exhibit 9***.

60. With Wells continuing to resist and the officers becoming exhausted, Officer Seaquist kept yelling at Wells to stop resisting and, when he did not, pulled the trigger a third time. (Ex. 11, Seaquist Deposition at 72:4-13).

**RESPONSE**: Plaintiff admits that Seaquist almost immediately deployed his Taser a third time. During the third deployment, he fired two Taser cartridges, and the prongs of both cartridges made contact with Casey's back. Seaquist Dep. at 72:4-22, ***Exhibit 9***. Plaintiff disputes that Casey was resisting and objects to the claim that Casey was "continuing to resist" as ambiguous because it does not describe the allegedly resistive conduct. Casey's arm was still trapped beneath him, and there is no evidence that he had the physical ability to extract his arm while the officers restrained and Tased him.

61. Officer Seaquist recalled making out Wells' hand being in a fist as Sgt. Rodarme was trying to get his arm out. (Ex. 11, Seaquist Deposition at 102:24-103:12).

**RESPONSE**: Plaintiff admits that Seaquist testified that he saw Casey's left hand was in a fist, but Plaintiff disputes any inference that Casey was planning or trying to strike any officer.

62. Officer Seaquist activated the Taser a fourth time, but did not believe it was effective in stopping the resistance in it and that wells "was still in it for the fight." (Ex. 11, Seaquist Deposition at 102:4-12).

**RESPONSE**: Plaintiff admits that Seaquist almost immediately activated his Taser a fourth time but disputes that Casey was resisting. Officers Long and Funston had arrived by this time. Officer Arnold, Officer Long, and Sgt. Rodarme handcuffed Casey behind his

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

back while he remained face down on the pavement. Officer Funston was working on applying a RIPP restraint to Casey's legs. *See* Long Dep. at 72:17-74:24, ***Exhibit 10***.

63. Officer Seaquist did not have any recollection of deploying the Taser a fifth time, but testified that Wells was able to be cuffed after the last Taser activation. (Ex. 11, Seaquist Deposition at 107:21-110:11).

**RESPONSE**: Dispute. Officer Seaquist's recollection is contradicted by Officer Palmer's Axon body camera video, in which the fifth Taser deployment is heard while Casey is handcuffed and restrained face down by the other Officer Defendants. *See* Defendants' Exhibit 19 at 5:20-5:45. Officer Long also testified that he heard the Taser being deployed after Casey was already handcuffed. *See* Long Dep. at 72:17-74:24, ***Exhibit 10***. Officer Funston testified that Officer Seaquist deployed the Taser after Casey was already handcuffed and had his legs crossed and bound with the lasso of the RIPP restraint. *See* Funston Dep. at 49:22-54:13, ***Exhibit 11***.

64. Officer Seaquist's goal was to take Wells into custody safely and to keep the community and officers safe. (Ex. 11, Seaquist Deposition at 119:1-122:4).

**RESPONSE**: Plaintiff admits that this was the post-hoc justification for his actions that Officer Seaquist gave during his deposition. He also stated that this incident, and Casey's unresponsive face, will haunt him until the day he dies. *See* Seaquist Dep. at 120:4-121:18, ***Exhibit 9***.

65. The Taser download (which is not synched to the CAD records), documents five Taser activations, for a total of 26 seconds. (Ex. 12, Taser Download, COP-STICKNEY000500).

**RESPONSE**: Admit. The Taser download shows that the five Taser deployments all occurred within 1 minute 35 seconds. The first, second, third, and fifth deployments lasted five seconds, and the fourth lasted six seconds. *See* Defendants' Exhibit 12, Doc. 91-1 at p. 154.

### b. Officers Long and Funston

66. Officer Funston also heard Sgt. Rodarme over the radio ask for additional units: "He's out of breath, I could tell. He's stressed out," and he also heard the Lieutenant come onto the radio and advise that it sounded like there was a physical fight. (Ex. 13, Funston Deposition at 39:2-40:25).

**RESPONSE**: Admit.

67. Officer Funston knew that the area of the call was known for drugs. (*Id.* at 113:21-25).

**RESPONSE**: Admit.

68. Officer Funston is EMT certified. (*Id.* at 12:22-13:2).

**RESPONSE**: Admit.

69. Officers Funston and Long arrived at approximately 14:28:11 (Ex. 2, CAD).

**RESPONSE**: Admit.

70. When Officer Funston arrived on scene with Officer Long, he observed Wells yelling and screaming, flailing and kicking his legs, with officers giving commands to Wells to stop resisting, and he could tell that one Taser cartridge had already been deployed. (Ex. 13, Funston Deposition at 41:1-3, 42:22-43:8; 43:25-45:15; 63:8-64:21; 81:17-20).

**RESPONSE**: Admit. However, Plaintiff disputes that Casey was intentionally kicking. Officers and bystanders alike consistently described Casey as "flailing." *See* Response to ¶ 34, *supra*.

71. Sgt. Rodarme warned Officers Funston and Long that he had been spit on and that he was also struck by Wells, both of which are aggravated assaults. (Ex. 13, Funston, 112:5-15; Ex. 14, Long Deposition at 59:9-61:11).

**RESPONSE**: Admit only that Sgt. Rodarme allegedly told Officers Funston and Long that he "was spit at and struck." He did not tell Funston and Long that Casey was sweating and overheated, potentially suffering from excited delirium, and bleeding from his nose and mouth. *See* Funston Dep. at 121:15-122:11, ***Exhibit 11***.

72. Officer Funston knew that a citizen had called with concerns that kids would soon be coming home from school and he wanted to assist with having the situation handled "as quickly and sufficiently as possible for the safety of him, myself, and for the kids if they have to come by." (Ex. 13, Funston Deposition at 112:21-113:9).

**RESPONSE**: Plaintiff admits that this was the post-hoc justification that Officer Funston gave during his deposition but disputes that the Officer Defendants' use of force was objectively reasonable because of the mere possibility that children would see Casey Wells naked in the street.

73. Officer Long immediately stepped in to assist Sgt. Rodarme with controlling Wells' left hand as he was still pulling and tensing and it appeared that Sgt. Rodarme was tired. (Ex. 14, Long Deposition at 71:25-73:5).

**RESPONSE**: Plaintiff admits that Officer Long and Sgt. Rodarme controlled Casey's left arm and that they placed him into handcuffs, along with Officer Arnold who had Casey's right arm. *See* Long Dep. at 72:17-74:24, ***Exhibit 10***. Plaintiff disputes the inference that Casey was intentionally "pulling and tensing." Officers Seaquist and Arnold testified that Casey's whole body tensed up when he was Tased. Seaquist Dep. at 68:23-69:2, ***Exhibit 9***; Arnold Dep. at 86:20-23, ***Exhibit 5***. Plaintiff is entitled to an inference that Casey was unintentionally reacting to being Tased when he was perceived as pulling or tensing.

74. Wells was being given commands to stop resisting, multiple times, and Officer Seaquist told him "Hey, I'm going to tase you again, stop resisting. I'm going to tase you again, stop resisting," and the second cartridge was deployed. (Ex. 13, Funston, 45:8-46:13, 47:18-48:2).

**RESPONSE**: Admit that this was Officer Funston's testimony.

75. Officer Funston began attempting to apply a RIPP restraint, which throughout the time that he was trying to apply it, Wells was: "Actively kicking. He kicked me several times during that. And then once I was able to get it wrapped around his ankles he was still trying to kick out of it and kick us. It made it difficult." (Ex. 13, Funston Deposition at 50:4-16; 57:25-58:14; Ex. 10, Rodarme Deposition at 82:6-14).

**RESPONSE**: Admit that this was Officer Funston's testimony. *See* Response to ¶ 34, *supra*.

76. As Officer Funston tried to clip the RIPP restraint to the handcuffs, Wells continued to resist and tried to uncross his feet; in working with the RIPP restraint, Officer Funston only used his hands and did not place any body weight on Wells. (Ex. 13, Funston Deposition at 50:17-51:10, 65:8-15, 98:16-21).

**RESPONSE**: Admit that this was Officer Funston's testimony. However, Casey was handcuffed, and Funston was able to secure Casey's legs, crossed at the ankles, in the lasso of the RIPP restraint before the next Taser activation. *See* Funston Dep. at 49:22-54:13, ***Exhibit 11***; *see also* Response to ¶ 34, *supra*.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

77. Officer Long saw Officer Funston struggling with the RIPP restraint while Wells was trying to arch like he was trying to get up and appeared to be intentionally kicking his legs, Officer Long was trying to keep things as calm as possible as it is extremely difficult to get someone who is naked in custody because there is nothing to grab onto. (Ex. 14, Long at 76:11-77:17; 145:12-147:11, 152:4-9).

**RESPONSE**: Plaintiff disputes that Officer Funston was struggling with the RIPP restraint or that Casey was intentionally kicking. Casey was already handcuffed, and Officer Funston was able to secure Casey's legs with the lasso of the RIPP restraint before the next Taser activation. *See* Funston Dep. at 49:22-54:13, ***Exhibit 11***; *see also* Response to ¶ 34, *supra*.

78. Because Wells continued to resist and he was not secured, Officer Funston heard Officer Seaquist command Wells multiple times to stop resisting, but Wells did not stop resisting and Officer Seaquist did another Taser activation, which resulted in Officer Funston finally being able to secure the RIPP restraint and seconds afterwards Wells went limp. (Ex. 13, Funston Deposition at 53:10-54:17; 56:15-57:24; 62:10-63:7).

**RESPONSE**: Dispute. Casey was secured in handcuffs, and his legs were crossed and secured in the lasso of the RIPP restraint when Officer Seaquist activated the Taser for the final time. Officer Funston claims that he was able to clip the RIPP restraint into Casey's handcuffs after the last Taser activation. *See* Funston Dep. at 49:22-54:13, ***Exhibit 11***; Long Dep. at 72:17-74:24, ***Exhibit 10***. Officer Palmer's body camera video also shows that Casey was not resisting, was secured, and was being held down by the other Officer Defendants when the Taser was deployed. *See* Defendants' Exhibit 19 at 5:20-5:45.

79. Officer Funston never heard another Taser activation after the clip of the RIPP restraint was finally attached to the handcuffs. (Ex. 13, Funston, at 113:17-114:20).

**RESPONSE**: Admit that this was Officer Funston's testimony.

80. As the officers struggled to handcuff Wells and he was still resisting as the RIPP restraint was applied, Officer Arnold placed less than 50% weight through his knee on Wells' right shoulder blade for purposes of controlling his movement (with the majority of his weight being carried by the opposite leg that was not on Wells and his arm that was leaning on that opposite leg) only until he was fully restrained as the fire department would not respond until he was; Officer Arnold did not believe that the location or limited weight was physically compromising. (Ex. 6, Arnold Deposition at 111:15-

113:11, 114:2-10, 151:4-9). He applied no force to Wells' neck and no carotid control hold was applied. (*Id.* at 138, 149:14-23).

**RESPONSE**: Dispute. Officer Arnold testified that he kneeled on Casey's shoulder when other officers began to arrive and they were attempting to get Casey handcuffed and into the RIPP restraint. *See* Arnold Dep. at 112:9-113:11, **Exhibit 5**. This would have been at approximately 14:28:11 when Officer Funston and Long arrived. *See* Defendants' ¶¶ 69, 73, 75, *supra*. Officer Arnold also stated that he stood up after Casey was handcuffed and then got back down and kneeled on Casey's shoulder again. *See id.* at 140:14-144:17, **Exhibit 5**.

This statement is also contradicted by Officer Palmer's body worn camera video, which shows Officer Arnold kneeling on Casey's upper back or shoulder blade. *See* Defendants' Exhibit 19 at 5:20-6:02. One inference to be drawn from this video is that Officer Arnold appears to be leaning toward Casey to push more weight onto his right knee and onto Casey's back. *See id.*

81. Officer Long never saw a knee placed on Wells' shoulder. (Ex. 14, Long Deposition at 66:16-67:2).

**RESPONSE**: Dispute. Officer Long's recollection is contradicted by Officer Palmer's body worn camera video, which shows Officer Arnold kneeling on Casey's upper back or shoulder. *See* Defendants' Exhibit 19 at 5:26-5:32.

82. While focused on Wells feet and trying to get them secured, Officer Funston did not see Officer Arnold place any weight on Wells. (Ex. 13, Funston Deposition at 78:25-79:5).

**RESPONSE**: Dispute. Officer Funston's recollection is contradicted by Officer Palmer's body worn camera video, which shows Officer Arnold kneeling on Casey's upper back or shoulder. *See* Defendants' Exhibit 19 at 5:26-5:32.

83. A suspect can continue to kick up until the point that the RIPP restraint is secured to the handcuffs. (Ex. 10, Rodarme Deposition at 138:10-16).

**RESPONSE**: Object to relevance. Officer Palmer's body camera video shows that Casey was not kicking and was completely still and silent when he was Tased for the fifth and final time. *See* Defendants' Exhibit 19 at 5:20-5:45.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

84. It was not until shortly after the clip was secured, that Officer Long noticed that Wells was not responsive and he was immediately rolled over and Officer Seaquist began CPR; before that point, Wells did not appear to be in any medical distress and "put up a great fight." (Ex. 14, Long Deposition at 50:13-51:2, 154:18-23)

**RESPONSE**: Plaintiff disputes that Casey did not appear to be in any medical distress before the officers realized he was unresponsive. Throughout the encounter he had been grunting and yelling like a bear caught in a trap. *See* Seaquist Dep. at 84:8-17, 88:7-25, *Exhibit 9*; Rodarme Dep. at 72:3-17, *Exhibit 6*. He appeared overheated and sweaty, and he had hit his head when Officer Arnold and Sgt. Rodarme pushed him or took him to the ground. *See* Rodarme Dep. at 54:1-15, 101:11-102:8, *Exhibit 6*. He was bleeding from his mouth and nose where Officer Arnold had struck him. Arnold Dep. at 83:4-13, *Exhibit 5*.

85. Officer Seaquist immediately began CPR with Funston continuing within seconds of the RIPP restraint being attached and officers discovering that Wells had stopped moving. (Ex. 13, Funston, at 53:10-54:17; 56:15-57:24; 62:10-63:7).

**RESPONSE**: Admit.

### c.  Officers Yamane and Haynes

86. Officer Yamane also heard Sgt. Rodarme—who normally sounded calm and collected—radio for help and "He sounded like he was in need of help. Like he was breathing heavily." (Ex. 15, Yamane Deposition at 55:14-56:1). Officer Haynes heard the same and the officers rode together to the scene. (Ex. 16, Haynes Deposition at 37:23-68:23-69:14).

**RESPONSE**: Dispute. Officer Haynes testified that he recalled Sgt. Rodarme sounding like he was in a "high stress situation." *See* Haynes Dep. at 68:23-69:14, *Exhibit 12*.

87. Officer Haynes immediately went to assist Officer Funston with Well's legs because he saw that Wells resisting with his legs and Officer Funston could not secure the loop around Wells ankles (Ex. 16, Haynes Deposition at 39:1-22; 56:1-20).

**RESPONSE**: Dispute. Officer Haynes testified that Casey was "straightening his legs out" but Officer Funston "had the actual loop" of the RIPP restraint around his ankles. The RIPP restraints were on but the process of tightening and securing the RIPP restraints to Casey's handcuffs had not yet been completed. *See* Haynes Dep. at 39:1-15, *Exhibit 12*.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

88. Officer Yamane also observed that Officer Funston was struggling with Wells legs and it appeared that Wells was "trying to leverage himself to turn over by pressing into the ground and spreading his feet apart." (Ex. 15, Yamane Deposition at 41:9-20).

**RESPONSE**: Admit that this was Officer Yamane's statement; however, Plaintiff disputes that Casey was attempting to leverage himself to turn over or that he had the ability to do so. When Officers Yamane and Haynes arrived, Rodarme and Arnold "were on his shoulders, Frank [Long] was around his waist." Funston was at Casey's feet. And Seaquist had already deployed his Taser at least two times. *See* Yamane Dep. at 66:2-68:5, ***Exhibit 13***.

89. While Officer Yamane was trying to help cross Wells' feet, he was stiffening and moving his legs and Officer Haynes heard Officer Seaquist say "Stop resisting" and heard the Taser go off. (Ex. 16, Haynes Deposition at 45:20-46:23).

**RESPONSE**: Admit. However, Plaintiff is entitled to an inference that Casey's legs were stiffening in response to the Taser deployments, which would cause his whole body to tense and stiffen. *See* Seaquist Dep. at 68:23-69:2, ***Exhibit 9***; Arnold Dep. at 86:20-23, ***Exhibit 5***. Another inference is that Casey was stiffening and moving because he could not breathe due to the prone restraint, multiple Tasings, and crushed cartilage in his throat.

90. Officers had difficulty with attaching the RIPP restraint to the handcuffs because Wells was stiffening his legs, was still resisting, and had his legs "locked out." (*Id.* at 62:15-64:14).

**RESPONSE**: Plaintiff disputes that Casey was intentionally stiffening his legs, resisting, or locking his legs. *See* Response to ¶ 89, *supra*.

91. While Officer Yamane was struggling to cross Wells legs to apply the RIPP restraint—because Wells had been kicking around—he could feel Wells tense from the Taser. (Ex. 15, Yamane Deposition at 42:13-45:13).

**RESPONSE**: Plaintiff disputes that Casey was "kicking around." *See* Response to ¶ 34, *supra*.

92. It was not until after Officer Haynes and Yamane heard the Taser, the last time, that officers were able to clip the RIPP restraint to the handcuffs. (Ex. 16, Haynes Deposition at 45:20-46:23; Ex. 15, Yamane Deposition at 111:24-112:18).

**RESPONSE**: Dispute. A jury may reasonably infer from Officer Palmer's body camera video that the RIPP restraint had been clipped to Casey's handcuffs before the final Taser deployment. *See* Defendants' Exhibit 19 at 5:20-5:45. Alternatively, the jury may infer that nothing Casey did prevented the Officer Defendants from clipping the RIPP restraint because the video shows he was still and restrained face down by the Officer Defendants. The jury may conclude that the use of the RIPP restraint was unreasonable and unnecessary.

93. Officer Haynes never placed his body weight on Wells during the incident. (Ex. 16, Haynes Deposition at 99:15-19).

**RESPONSE**: Dispute. Officer Haynes testified that he and Officer Funston bent Casey's legs to get the RIPP restraint clipped into the handcuff clasp. *See* Haynes Dep. at 62:24-64:1, ***Exhibit 12***.

94. The only weight that Officer Yamane placed was through his hands as his knees were in a spread-eagle position, with his knees in the air, and he never placed any weight on Wells (Ex. 15, Yamane Deposition at 111:5-23).

**RESPONSE**: Plaintiff disputes that Officer Yamane "never placed any weight on Wells." Officer Yamane admitted that he placed weight on Casey's feet or legs with his hands. *See* Yamane Dep. at 111:5-8, ***Exhibit 13***.

95. Officer Yamane did not see any other officer put body weight on Wells through their legs. (*Id.* at 112:19-22).

**RESPONSE**: Dispute. This statement is contradicted by Officer Palmer's body worn camera video, which shows Officer Arnold kneeling on Casey's upper back or shoulder blade. *See* Defendants' Exhibit 19 at 5:26-5:32. Officer Arnold testified that he kneeled on Casey's shoulder when other officers began to arrive, and they were attempting to get Casey handcuffed and into the RIPP restraint. *See* Arnold Dep. at 112:9-113:11, ***Exhibit 5***. This would have been at approximately 14:28:11 when Officer Funston and Long arrived. *See* Defendants' ¶¶ 69, 73, 75, *supra*. Officer Arnold also stated that he stood up after Casey was handcuffed and then got back down and kneeled on Casey's shoulder again. *See id.* at 140:14-144:17, ***Exhibit 5***.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

96. When Wells was on the ground and until the RIPP restraint was clipped, he had still been actively resisting and was a danger to officers. (Ex. 15, Yamane Deposition at 48:3-11).

**RESPONSE**: Dispute. Yamane provided this statement during his deposition as justification for the Officer Defendants' improper and excessive prone restraint. Yamane testified that he was trained that handcuffed and RIPP restrained subjects should not be placed face down for any length of time because doing so could result in positional asphyxia; however, Yamane appeared to claim that the Officer Defendants were reasonable in doing that to Casey because, according to Yamane, Casey was "a danger to officers." *See* Yamane Dep. 48:3-20, *Exhibit 13*.

This statement is contradicted by Officer Palmer's body worn camera video, which shows Casey was silent and immobile, handcuffed and restrained by the other Officer Defendants. *See* Defendants' Exhibit 19 at 5:20-5:45. It is also contradicted by Officer Haynes' testimony, in which he stated that he never saw Casey attempt to strike, kick, or intentionally harm any officer. Rather, it appeared to him that Casey's legs were stiffening and "moving back and forth." *See* Haynes Dep. at 53:2-14, 54:22-55:16, *Exhibit 12*.

97. The RIPP restraint was not shortened and was clipped to the chain of the handcuffs. (Ex. 17, COP-STICKNEY00292).

**RESPONSE**: Dispute. The RIPP restraint was clipped to a ring on the handcuffs, between Casey's wrists. *See* Defendants' Exhibit 17, Doc. 91-1, p. 284.

### d. <u>Officer Palmer</u>

98. Officer Palmer arrived to the scene, near the end of the struggle with Wells, and at approximately 14:30:37 advised over the radio that Wells was detained (but not in custody). (Ex. 2, CAD; Ex.18, Palmer Deposition at 83:25-84:10).

**RESPONSE**: Plaintiff admits that Officer Palmer was the last to arrive at the scene. When he arrived, the other Officer Defendants were restraining Casey face down on the ground. Casey appeared to be still and silent. Casey was already in handcuffs. Officer Palmer stated, "he is detained right now." Officer Seaquist then deployed his Taser for the fifth and final time. Plaintiff disputes that Casey was struggling or that he was not already in custody when Palmer arrived. *See* Defendants' Exhibit 19 at 5:20-5:45.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

99. As he arrived, Officer Palmer observed that Wells was not yet handcuffed and officers were trying to control Wells feet with a RIPP restraint. (Ex. 18, Palmer Deposition at 26:11-19).

**RESPONSE**: Dispute. Other Officer Defendants testified that Casey was handcuffed before the Taser was deployed for the final time. *See* Funston Dep. at 49:22-54:13, ***Exhibit 11***; Long Dep. at 72:17-74:24, ***Exhibit 10***. A jury may also conclude from the body camera video that the RIPP restraint had been clipped to Casey's handcuffs before the last Taser deployment. *See* Defendants' Exhibit 19 at 5:20-5:45.

100. Officer Palmer heard Officer Seaquist give the command to Wells, "stop, or I'm going to Tase you," and then heard a five second Taser cycle. (*Id.* at 61:25-62:23).

**RESPONSE**: Plaintiff admits that on Officer Palmer's body camera video an officer is heard stating, "Stop resisting," prior to the sound of the Taser being deployed. *See* Defendants' Exhibit 19 at 5:20-5:45.

101. When he heard the Taser cycle, Officer Palmer observed that the officers were still trying to secure Wells hands and had one handcuff on his wrist toward the small of his back. (*Id.* at 64:1-66:11).

**RESPONSE**: Dispute. Other Officer Defendants testified that Casey was handcuffed before the Taser was deployed for the final time. *See* Funston Dep. at 49:22-54:13, ***Exhibit 11***; Long Dep. at 72:17-74:24, ***Exhibit 10***.

102. Officer Palmer does not recall noticing that Officer Arnold had any weight on Wells' back. (Ex. 18, Palmer Deposition at 96:21-23).

**RESPONSE**: Dispute. Officer Palmer's recollection is contradicted by his body camera video, which distinctly shows Officer Arnold kneeling with his right knee placed on Casey's upper back or shoulder blade. *See* Defendants' Exhibit 19 at 5:30.

103. Officer Palmer was wearing a body worn camera, which captured a limited portion of the event, and Officer Arnold is standing by at least 14:30:58 on the video before Wells rolled over and then discovered to not be breathing. (Ex. 19, Body Camera Video (Redacted)).

**RESPONSE**: Dispute. The video shows Officer Arnold kneeling on Casey's back from the time Officer Palmer arrives at 14:30:17 until Officer Arnold is seen standing at 14:30:59. *See* Defendants' Exhibit 19 at 5:20-6:02. Officer Arnold testified that he kneeled

on Casey's shoulder when other officers began to arrive and they were attempting to get Casey handcuffed and into the RIPP restraint. *See* Arnold Dep. at 112:9-113:11, **Exhibit 5**. This would have been at approximately 14:28:11 when Officer Funston and Long arrived and would mean that Officer Arnold was kneeling on Casey for nearly three minutes. *See* Defendants' ¶¶ 69, 73, 75, *supra*. Officer Arnold also stated that he stood up after Casey was handcuffed and then got back down and kneeled on Casey's shoulder again. *See id.* at 140:14-144:17, **Exhibit 5**. Therefore, a jury could conclude that Officer Arnold kneeled on Casey's back for nearly three minutes—much longer than the 42 seconds captured on Officer Palmer's body camera video.

104. From the time that Officer Palmer exited his car at 14:30:14 to the time that Wells was rolled over at 14:31:07, less than a minute elapsed. (Ex. 19, 5:16-6:10).

**RESPONSE**: Admit, but object to relevance.

105. Officer Palmer did not have any physical contact with Wells. (*Id.*).

**RESPONSE**: Admit, but object to relevance.

106. Officer Palmer was never in a position to get down to feel if Wells was physically resisting, he never touched wells, could not tell if he was clenching his body or tensing, and could not tell if he was trying to lift his body off of the ground. (Ex. 18, Palmer Deposition at 101:14-103:12).

**RESPONSE**: Dispute. Upon seeing Casey, Officer Palmer stated, "he is detained right now." His body camera video shows that Casey appeared to be still and silent. After the final Taser deployment, Officer Palmer is heard requesting the fire department for a Tasing. *See* Defendants' Exhibit 19 at 5:20-5:45.

107. Officer Palmer interviewed on camera a nearby citizen, who had earlier seen Wells yelling at the sky, reported that when Officer Arnold arrived he immediately though that he would need backup to take Wells into custody. (Ex. 18, Palmer Deposition at 30:20-33:16; Ex. 19, Body Camera at 14:41-21:15). Before police arrived, the citizen warned his neighbor to keep an eye on Wells because he could be a "mass murderer" and that to be careful with someone is not in his right mind who might start shooting people. (Ex. 19 at 17:10-17:40). Wells was non-compliant, struggling, "refused to get arrested," and he observed one of the Officers get hit in the head. (*Id.* at 17:58-19:39). The citizen saw Officer Arnold grab Wells in a bear-hug from the front and then saw them both fall to the ground, with Wells continuing to

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

struggle and resist. (*Id.* at 18:00-18:52) Seeing the great danger faced by the two officers struggling to control Wells, Mr. Antoines was going to help and "tie his ankles" because he was kicking. (*Id.* at 18:22-18:30). He "thought he [Wells] was going to reach for his gun" when Officer Arnold put him in a bear hug. (*Id.* at 18:50-19:26).

**RESPONSE**: Object to relevance. Other bystanders provided interviews in which they stated that Casey did not appear aggressive and did not attempt to strike any officer. Rather it appeared to those bystanders as well as to other Officer Defendants that Casey was flailing around. *See* Response to ¶ 34, *supra*. In addition, Officer Arnold had no concerns that Casey was potentially a "mass murderer" who might "start shooting people." Officer Arnold could see that Casey was naked and unarmed. *See* Arnold Dep. at 75:1-10, ***Exhibit 5***. Officer Arnold testified that Casey never reached for any officer's gun, Taser, or other equipment. *See id.* at 101:13-18, ***Exhibit 5***.

Moreover, information of which the officers were unaware may not be considered in determining whether their use of force was objectively reasonable. *Hayes v. County of San Diego*, 736 F.3d 1223, 1232–33 (9th Cir. 2013) (noting that the court "can only consider the circumstances of which [the defendant officers] were aware when they employed deadly force"); *Glenn v. Washington County*, 673 F.3d 864, 873, n. 8 (9th Cir. 2011) ("We cannot consider evidence of which the officers were unaware—the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways."); Fed. R. Evid. 402, 403, 404(b).

### e. Requests for Medical/Fire Response

108. At 14:27:52, the fire department was requested to be sent to the scene. (Ex. 2, CAD).

**RESPONSE**: Admit.

109. At 14:30:42, the fire department was again requested, by Officer Palmer, due to a tasing. (*Id.*)

**RESPONSE**: Admit.

110. At 14:31:01, Officer Palmer advised that the fire department could come into the scene. (*Id.*)

**RESPONSE**: Admit.

111. At 14:31:32, Officer Palmer requested that fire hurry up their response because Wells was not breathing (*Id.*)

**RESPONSE**: Admit.

112. From the time that Sgt. Rodarme arrived on scene, until the time that Wells was secured in handcuffs and RIPP restraints and discovered not to be breathing, less than ten minutes had passed (Ex. 2, CAD).

**RESPONSE**: Admit.

113. From the time that Officer Seaquist arrived on scene, until the time that Wells was secured in handcuffs and RIPP restraints and discovered not to be breathing, less than four minutes had passed. (Ex. 2, CAD).

**RESPONSE**: Admit.

## B.    Medical Evidence.

114. The toxicological report for Wells was positive for methamphetamine. (Ex. 20, Toxicological Report).

**RESPONSE**: Admit.

115. Wells was transported to HonorHealth Deer Valley for medical treatment, a Lucas device was used for CPR during transport, he was intubated, and a CT scan revealed "no acute bony abnormality of the cervical spine." (Ex. 21, WELLS001030-1031, 1230).

**RESPONSE**: Admit.

116. Emergency Physician, Dr. Vilke, opined that there was no medical evidence of a crushed airway or damage to the neck that could cause death and that "even though there are injuries noted to the thyroid cartilage on autopsy, these are not specific to a neck hold. They are indicative of neck trauma having occurred, but does not define exactly when or how the trauma occurred." (Ex. 22, Dr. Vilke Report at 22-26).

**RESPONSE**: Admit. However, Dr. Vilke's expert opinions are contradicted by the opinions of Plaintiff's expert, Dr. Daniel Spitz, a forensic pathologist. Dr. Spitz has opined that the fractured cartilage in Casey's neck supports the conclusion that Casey was subjected to applied force to his neck consistent with neck restraint such as a chokehold. During the autopsy, Casey's eyes showed petechial hemorrhages involving the left sclera and left palpebral conjunctiva, which are commonly observed with neck compression. Such a compressive force would affect Casey's ability to breathe and limit blood flow to and from the brain. *See* Spitz Report at pp. 7-9, ***Exhibit 14***.

117. Dr. Vilke further opined that transitory weight force on the shoulder of Wells did not cause or contribute to his death, nor did hands-on only force used to place Wells in handcuffs and a RIPP restraint. (*Id.* at 19-17)

**RESPONSE**: Plaintiff admits this is Dr. Vilke's opinion. Dr. Spitz has opined that Casey's death was due to a multifactorial process with the most significant factor being prone restraint with extrinsic compression of his torso and likely his neck, and that Taser use was a contributory condition. *See* Spitz Report at p. 10, ***Exhibit 14***.

118. Dr. Vilke further opined that the Taser use did not cause or contribute to the death of Mr. Wells. (*Id.* at 20-21).

**RESPONSE**: Plaintiff admits this is Dr. Vilke's opinion. Dr. Spitz has opined that Casey's death was due to a multifactorial process with the most significant factor being prone restraint with extrinsic compression of his torso and likely his neck, and that Taser use was a contributory condition. *See* Spitz Report at p. 10, ***Exhibit 14***.

119. The Medical Examiner, Dr. Horn, did not include the Taser as a cause or contributor to death, specifically stating: "Examination of the back revealed two apparent shallow puncture wounds likely corresponding to sites of dart implantation from the CEW in the skin of his back, with at least one puncture wound able to be delineated and measured to a depth of approximately 1 cm with the fat and soft tissue of the back, associated with a small amount of surrounding hemorrhage. As the CEW darts were only superficially penetrating into the skin and subcutaneous tissues, were not placed over or in proximity to the heart, and had no apparent immediate effects on his consciousness or cardiac function at the time the CEW was deployed (as he had continued to physically struggle after the last CEW deployment), the CEW is not considered a potential cause or contributing cause of death in this case." (Ex. 23, COP-STICKNEY00547).

**RESPONSE**: Plaintiff admits this quote appears in the Medical Examiner's report. However, the Medical Examiner appeared to rely on the Officers' reports that Casey physically struggled and was not showing signs of medical distress, which are contradicted by the physical evidence and testimony, as discussed above. Dr. Spitz has opined that Casey's death was due to a multifactorial process with the most significant factor being prone restraint with extrinsic compression of his torso and likely his neck, and that Taser use was a contributory condition. *See* Spitz Report at p. 10, ***Exhibit 14***.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

120. Dr. Levine opined that Wells was under the influence of methamphetamine at the time of the officers' encounter with him, and that the drugs contributed to his presentation on that date. (Ex. 24, Dr. Levine Report).

**RESPONSE**: Admit.

## C.    <u>Prior Contact with Police</u>

121. On December 14, 2016, while under the influence of methamphetamine and after unlawfully entering a home that was not his, Wells refused to stop for police and engaged instead engaged in felony flight. (Ex. 25; Affidavit of Arrest and Direct Criminal Complaint, COP-STICKNEY006924-6931).

**RESPONSE**: Objection. Information of which the officers were unaware may not be considered in determining whether their use of force was objectively reasonable. *Hayes v. County of San Diego*, 736 F.3d 1223, 1232–33 (9th Cir. 2013) (noting that the court "can only consider the circumstances of which [the defendant officers] were aware when they employed deadly force"); *Glenn v. Washington County*, 673 F.3d 864, 873, n. 8 (9th Cir. 2011) ("We cannot consider evidence of which the officers were unaware—the prohibition against evaluating officers' actions 'with the 20/20 vision of hindsight' cuts both ways."); Fed. R. Evid. 402, 403, 404(b).

122. When confronted about why he did not stop for police, he admitted that he was aware of the officer trying to stop him but that he "isn't subject to man's law." (*Id.* at COP-STICKNEY006929).

**RESPONSE**: *See* Response to ¶ 121, *supra*.

123. After entering a guilty plea for drug paraphernalia-possession/use (A.R.S. § 13-3415(A) and Criminal Trespass-1st Degree-Residential Structure (A.R.S. § 13-1504(A)(1)), Wells was placed on probation for a period of 2 years, to begin on January 20, 2017, and he was required to maintain a crime-free lifestyle, obey all laws, and that he would possess or use illegal drugs or controlled substances. (Ex. 26, Uniform Conditions of Supervised Probation, COP-STICKNEY006941-6958).

**RESPONSE**: *See* Response to ¶ 121, *supra*.

124. While on probation, on March 26, 2018, Wells was arrested by Mesa Police Department for disorderly conduct and indecent exposure—after being found nude in public—in addition to a guilty plea for this crime he also had multiple prior instances of use of illegal substances. (Ex. 27, Memo to the Court and Petition to Revoke Probation, COP-STICKNEY006959-61).

**RESPONSE**: *See* Response to ¶ 121, *supra*.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

125. Based upon his continued drug use and criminal conduct, Wells probation was extended to February 13, 2019, and he served 90 days in jail beginning 5/18/2018. (Ex. 28, Extension of Probation, at COP-STICKNEY006963-006974).

**RESPONSE**: *See* Response to ¶ 121, *supra*.

D. **Phoenix Police Department Operations Orders and Training Related to Force, Positional Asphyxia, and Excited Delirium.**

126. The Phoenix Police Department's use of force guidelines are reflected in Operations Order 1.5, which explicitly recognizes the City's respect for the dignity of all life. (Ex. 29, Sgt. Calle Deposition at 30:21-31:25; Exhibit 30, Operations Order 1.5, COP_STICKNEY 003723-3743)

**RESPONSE**: Admit.

127. Generally, Operations Order 1.5(3)(B) provides that the Department's policy is to "use a reasonable amount of force to conduct lawful public safety activities" and that the proper use of a particular level of force depends on totality of circumstances, taking into consideration: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. (Ex. 30 at COP-STICKNEY003723)

**RESPONSE**: Admit.

128. The policy defines "reasonable belief," "excessive force," "types of resistance," and gives force "options" which are to be determined based upon the "totality of the circumstances." (*Id.* at COP-STICKNEY003722-3733).

**RESPONSE**: Admit.

129. The policy further defines "Elements of Force" that the officers "need" to consider, including whether the suspect: (1) has a reasonable ability to carry out the act; (2) has a reasonable opportunity to carry out the act; and (2) creates a jeopardy to the officer or others. (*Id.*)

**RESPONSE**: Admit. The policy also provides that officers "need" to consider whether "other alternatives have been reasonably considered based on the totality of the circumstances." *See* Defendants' Exhibit 30, Doc. 91-2, p. 288.

130. Under the heading "Escalation/De-Escalation of Force", Operations Order 1.5(3)(C), states that "[w]hen use of force is needed, employees will assess each incident to determine, based on policy, training, and experience, which use of force option will deescalate the situation and bring it under control." (*Id.*)

**RESPONSE**: Admit.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

131. Employees are directed that they "will intervene, if a reasonable opportunity exists, when they know or should know another employee is using unreasonably use of force," and must immediately report "excessive force" verbally to a supervisor). (*Id.*)

**RESPONSE**: Admit.

132. Operations Order 1.5(4) sets forth the various use of force options that may be used depending on the totality of those circumstances, which includes not only force, but options aimed at obtaining compliance without force such as presence, verbal persuasion, negotiation, or command. (*Id.* at COP-STICKNEY003724).

**RESPONSE**: Admit.

133. Operations Order 1.5(C) identifies RIPP restraints as a permitted device, but specifically states that "employees will not restrain subjects with their legs behind their back (hog-tying)." (*Id.*)

**RESPONSE**: Admit.

134. Operations Order 1.5(4)(E) provides guidelines for use of an Electronic Control Device, including an explanation of how the Taser functions, its effect in temporarily incapacitating a suspect, and factors that determine when it should and should not be used:

> ECDs, such as the Taser, use compressed nitrogen gas to propel probes and wires that conduct electrical energy which overrides a subject's central nervous system, attempting to temporarily stop the subject's actions.

> ECDs may be used when it is objectively reasonable based on the totality of the circumstances, on subjects who are displaying active aggression, or who are placing an officer or a third party in reasonable apprehension of imminent physical injury, or to prevent a subject from harming him/herself.

> The following circumstances should be considered prior to use:

> *Is the suspect posing an imminent threat to the safety of officers, a third party, or him/herself?

> *What is the severity and violence level of the crime?

> *Do the suspects have a history of violent behavior?

> *If a arrest team is not available, is it feasible to delay deployment to wait for one?

> When the circumstances justifying the use of an ECD no longer exist, the ECD will immediately be discontinued.

\* Employees may still use reasonable force to maintain control and to protect themselves or others from danger when such force can be justified through the totality of the circumstances.

ECDs will not be used for any of the following:

> • Coercion of any type
>
> • Against subjects solely for running from the officer
>
> • Against a subject who would be in danger of falling from a significant height
>
> • When subjects are near flammable liquids and gases
>
> • Intimidation by reckless display
>
> • Escorting or prodding individuals
>
> • Waking unconscious or intoxicated individuals
>
> • Individuals operating a motor vehicle
>
> • Individuals holding a firearm when their finger is on the trigger
>
> • Handcuffed prisoner's resisting/refusing to enter a police vehicle, holing room, or hanging onto a railing or other item, etc.

(*Id.* at COP-STICKNEY003726-3727.)

**RESPONSE**: Admit.

135. Operations Order 1.5(4)(E) further advises officers should avoid using the Taser against certain persons (known or visibly pregnant women, elderly persons, young children, and handcuffed prisoners) unless the officers can articulate that other reasonable force options have been tried or were unlikely to succeed. (*Id.* at COP-STICKNEY003727).

**RESPONSE**: Admit.

136. Operations Order 1.5(E) provides tactical considerations for Taser deployment:

> • Will announce deployment to prevent contagious fire.
>
> • Will communicate with other employees upon arriving at the scene.
>
> • Will, when practical, have an arrest team available.
>
> • Will consider whether other options exist when dealing with mental health or excited delirium subjects.
>
>   \*If an exigency exists for ECD use, the circumstances regarding the decision will be explained in the Incident Report.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

Tactical Considerations:

> • Will, if it is determined an extended cycle is necessary to control a combative subject, explain the circumstances regarding the decision in the IR.

> • Should only apply the number of cycles reasonably necessary to safely approach and restrain a subject (a limit to the number of cycles that may be administered to a subject has not yet been determined).

> • Should Deploy the Taser for one 5-second cycle, evaluate the subject's response, and when feasible, allow the arrest team to control the subject.

>> • Subsequent application can be made if control over the subject is not achieved.

>> • If the Taser is ineffective or inoperable, consider another force option.

>> • If an arrest team is not available is it feasible to delay deployment to wait for one?

> …

> • Employees will avoid using ECDs against the following subjects, unless employees can articulate other reasonable force options have been tried or were unlikely to succeed:

> …

>> • Handcuffed prisoners

(*Id.* at COP_STICKNEY003) (emphasis added).

**RESPONSE**: Admit.

137. Officers receive training based upon this policy, including the expectation that if a person were Tased, in handcuffs, and RIPP restrained that the expectation is that they would be rolled into the recovery position as soon as possible. (Ex. 29, Calle Deposition at 77:17-79:13).

**RESPONSE**: Dispute. The City of Phoenix, through its Rule 30(b)(6) representative, testified that officers are trained that it is appropriate and within policy to use an electronic control device (ECD) on a handcuffed person who is prone, face down on the ground if the person is displaying "active aggression" or is a danger to himself or others." *See* Calle Dep. at 75:8-19, 76:12-21, 77:17-78:5, *Exhibit 15*. Mr. Calle did not testify that officers were trained to roll the subject into recovery position as soon as possible or within a specific unit of time. His testimony was that the "expectation" would be that officers would roll the

subject to the position of recovery "[i]f they're solely laying down in handcuffs and RIPP restraint, there's no longer physical actions of assault, they're not in active aggression, they're not a danger to self or others and they're able to be rolled over . . . that would be the expectation." *Id.* at 79:1-6.

138. Operations Order 1.5(4)(E) provides that the primary target for Taser probes should be "Center mass of the subject's back." (Ex. 30, at COP-STICKNEY003728).

**RESPONSE**: Admit.

139. Officers are trained to use the back as a preferred target, to minimize the potential of exposure to the chest to avoid darts near the heart. (Ex. 29, Calle Deposition at 191:10-19; Ex. 31, Taser X2 Operator Lesson Plan).

**RESPONSE**: Admit.

140. Officers are also trained that Tasers may not be effective against focused aggressors or people under the influence of drugs; that they should "only apply the number of cycles reasonably necessary to allow safe restraint of the subject;" and "if ineffective, avoid repeated cycles and select another appropriate force option." (Ex. 31, Taser X2 Operator Lesson Plan, at 7 & 17).

**RESPONSE**: Plaintiff disputes the statement that officers are trained that "Tasers may not be effective against focused aggressors or people under the influence of drugs" because this phrase refers only to a Taser used in "stun mode" where electrodes are driven into a target in situations where both cartridges have failed. *See* Defendants' Exhibit 31, Doc. 91-2, p. 316. Plaintiff admits the remainder of this statement.

141. Officers receive training on the Taser, including that using the Taser improperly, such as letting it run for an extended period of time, could cause serious injury or death, and that there are certain people who are not good candidates for use of that tool/tactic, and that the officer must look at the totality of the circumstances to justify each deployment. (Ex. 29, Sgt. Calle Deposition at 51:11-54:1).

**RESPONSE**: Admit. In addition, officers are not trained that the Taser can cause serious injury or death to people who are physically compromised, nor are they trained to refrain from using a Taser on physically compromised individuals. *See* Calle Dep. at 51:11-52:19, *Exhibit 15*.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

142. Officers are trained about how the Taser works, circumstances when it should not be used, that numerous exposures and prolonged exposures are "frowned upon," and that officers are "expected to be able to think through problems and identify times when certain levels of force should or shouldn't be used." (*Id.* at 108:12-25; 111:5-123:14).

**RESPONSE**: Admit. *See also* Response to ¶ 141, *supra*.

143. Consistent with Operations order 1.5(E), Officers are trained, as a general rule, not to use a TASER on a handcuffed subject, but that based upon the totality of the circumstances there may be instances where it could be used. (*Id.* at 55:3-16).

**RESPONSE**: Dispute. The City of Phoenix, through its Rule 30(b)(6) representative, testified that officers are trained that it is appropriate and within policy to use an electronic control device (ECD) on a handcuffed person who is prone, face down on the ground if the person is displaying "active aggression" or is a danger to himself or others. *See* Calle Dep. at 75:8-19, 76:12-21, 77:17-78:5, ***Exhibit 15***.

144. Operations Order 1.5(F) provides guidelines for intermediate control techniques, including strikes, advising as follows:

> • Areas to avoid are the neck, back, sternum, kidneys and groin.

> • Hard empty hand techniques may be used when facing the active aggression level of resistance.

> • Although these techniques may be used in some situations when facing passive resistance, officers will first attempt verbal persuasion and soft empty hand techniques when practical.

> • Closed fist, palm-heel, and elbow strikes are the only techniques that may be used to strike the face and head, and then only when reasonable as a means to overcome a violent attack.

(Ex. 30, Operations Order 1.5 at COP-STICKNEY003730).

**RESPONSE**: Admit. "Hard empty hand techniques" include strikes with an officer's fist, elbow, knee, or palm-heel, as well as kicks and impact pushes. The policy defines active aggression as "physical actions of assault." Defendants' Exhibit 30, Doc. 91-2, p. 287.

145. Officers are trained not to strike individuals in the throat, or to target the throat. (Ex. 29, Calle Deposition at 165:25-166:10).

**RESPONSE**: Admit.

146. Although deadly force (e.g., firearm or vehicle) was not used in this case, Operations Order 1.5(4)(H) specifically limits the use of deadly force

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

"as a last resort when other measures are not practical under the existing circumstances" and requires that force to be discontinued [w]hen the circumstances justifying the use of deadly force no longer exist." (Ex. 30, Operations Order 1.5 at COP-STICKNEY003733).

**RESPONSE**: Plaintiff admits that Operations Order 1.5(4)(H) contains the quoted material. However, Plaintiff disputes that "deadly force was not used" in this case. City of Phoenix Operations Order 7.1(1)(A)(3), which pertains to restraining subjects, provides that certain conditions may increase the risk of injury or death by positional asphyxia when a suspect is kept face down for a prolonged period of time, including being under the influence of drugs or alcohol, obesity, and cardiovascular disorders. When these conditions are present, officers may refrain from handcuffing the subject behind his or her back and may consider alternative restraint methods. *See* Operations Order 7.1 at pp. 1-2, ***Exhibit 16***. Thus, officers are trained, and know, that prone restraint carries a risk of serious injury or death and may therefore constitute deadly force.

147. Officers are trained that any tool or technique that it used in a way that creates a substantial risk of causing death or serious physical injury, could be considered deadly force. (Ex. 29, Calle Deposition at 44:8-22).

**RESPONSE**: Admit. *See also* Response to ¶ 146, *supra*.

148. Operations Order 1.5(5) requires all employees to "receive annual training on the use of force options and policy by Department authorized instructors, who are certified through Arizona Peace Officers Standards and Training Board (AZPOST)." (Ex. 30, Operations Order 1.5 at COP-STICKNEY003734).

**RESPONSE**: Admit.

149. The City provides annual training on the use of force and Operations Order 1.5, RIPP restraint, sudden in custody death/positional asphyxia, excited delirium, mental illness, effective and crisis communication that includes deescalation, which the involved officers received. (Ex. 29, Calle Deposition at 23:17-24:25; 26:2-27:10; 32:8-33:2, Ex. 32, Use of Force Refresher Lesson Plan 10597; Ex. 33, Use of Force Review, Lesson Plan 10596; Ex. 34, Dealing with the Mentally Ill; Ex. 35, 2015 Module Mental Illness; Ex. 36, Excited Delirium; Ex. 37, Sudden In-Custody Death; Ex. 38, Funston Training; Ex. 39, Palmer training; Ex. 40, Rodarme Training; Ex. 41, Seaquist Training; Ex. 42, Haynes Training; Ex. 43, Yamane Training; Ex. 44, Long Training; Ex. 45, Arnold Training)

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

**RESPONSE**: Plaintiff admits that the Officer Defendants had received training but disputes that the training was constitutionally adequate. Plaintiff's police practices expert, Scott DeFoe, has opined that the Phoenix Police Department failed to properly train its officers in (a) crisis intervention techniques, (b) the risks associated with positional asphyxia and excited delirium, and (c) the risks associated with the use of maximally prone restraint techniques on subjects who may be mentally ill, experiencing a mental health crisis, or under the influence of a controlled substance. *See* DeFoe Report at pp. 33-35, 38, 44-45, 53, ***Exhibit 17***.

150. Officer Long, in addition to attending multiple training modules on mental illness and crisis communications that the other officers also attended, attended a 35 hour block of Crisis Intervention Training ("CIT"). (Ex. 44, Long Training, at COP-STICKNEY001625).

**RESPONSE**: Admit, but object to relevance.

151. Officer Seaquist had training as a drug recognition officer. (Ex. 41, Seaquist Training, COP-STICKNEY—003143, 3139, 3138).

**RESPONSE**: Admit. Officer Seaquist testified that because of his training as a "drug recognition evaluation or expert" (DRE) he recognized that Casey was under the influence of drugs. Specifically, he believed at the time that Casey was likely under the influence of bath salts. *See* Seaquist Dep. at 85:16-87:8, ***Exhibit 9***.

152. Operations Order 1.5(6) further outlines the reporting requirements for every use of force and subjects it to review by the Use of Force Review Board. (Ex. 30, at COP-STICKNEY003735-38)

**RESPONSE**: Plaintiff admits that Operations Order 1.5(6) contains reporting requirements. However, not every use of force is reviewed by the Use of Force Review Board, only critical incidents such as officer involved shootings or in-custody deaths. *See* Junas Dep. at 20:23-21:9, ***Exhibit 18***.

153. Critical incidents, per policy, are also reviewed by the Tactical Review Committee and TRC sub-committee to "identify any related training needs" and the committee "may make suggestions regarding amendments to policy." (*Id.* at COP-STICKNEY03739).

**RESPONSE**: Admit.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

154. Operations Order 1.5(7)(B) requires that all use of force incidents that result in death or serious injuries to be investigated concurrently by the Professional Standards Bureau (PSB); the officer's supervisor; the Violent Crimes Bureau/Homicide Unit; and the Incident Review Unit. (*Id.* at COP-STICKNEY003737; Ex. 29, Calle Deposition at 173:17-174:5).

**RESPONSE**: Admit.

155. Operations Order 1.5(7)(F) also directs how the PSB and Supervisor investigations shall be routed. (Ex. 30, Operations Order 1.5, at COP-STICKNEY003738).

**RESPONSE**: Admit.

156. Operations Order 1.5(8)(A)-(C) sets up a Tactical Review Committee to review incidents and identify whether there are any related training needs; (8)(D) requires post-training if a training need is identified; (8)(E) establishes the Training Bureau's responsibilities in designing and implementing appropriate training if any need is identified; and (8)(F) establishes reporting criteria. (*Id.* at COP-STICKNEY003740).

**RESPONSE**: Admit.

157. Operations Order 1.5(9) provides that that the physical and emotional wellbeing of the officer is a primary concern following any use of force incident and sets forth guidelines for counseling and other assistance, and even allows for reassignment if necessary. (*Id.* at COP-STICKNEY-3741).

**RESPONSE**: Admit, but object to relevance.

158. Operations Order 7.1 applies to the handcuffing of suspects, and section (3)(d) provides that an officer may consider alternative methods of restraint for "subjects apparently under the influence of drugs, subjects who are obese, subjects known to have cardiovascular disorders, subjects who have injuries preventing handcuffing to the rear," and that "these conditions may increase the risk of injury or death by positional asphyxiation when a suspect is kept face down for a prolonged period of time." (Ex. 46, Operations Order 7.1, at COP-STICKNEY4902-4903).

**RESPONSE**: Admit.

159. Operations Order 7.1 (1)(B)(2), further instructs that the only leg restraints that are authorized are the RIPP strap and modified leg irons, and under guidelines for use provides:

> a. Leg-restraint straps may be used to secure combative or violent subjects to prevent injury to the subject, officers, and others and to minimize the opportunity for escape.

> b. If either of the restraints is applied, officers will minimize the facedown exposure of the prisoner.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

c. If the opportunity presents itself, officers should place prisoners in an upright position on their side or back.

(*Id.* at COP-STICKNEY04903).

**RESPONSE**: Admit.

160. Operations Order 7.1(1)(B)(4), states that "subjects displaying difficulty breathing or loss of consciousness will be removed from restraints at the earliest opportunity" and "first-aid and/or live saving measures will be initiated, including a request for the Fire Department." (*Id.*).

**RESPONSE**: Admit.

161. Operations Order 7.1 specifically advises of the potential risk of injury of death by positional asphyxia if a suspect is kept facedown for a prolonged period of time. (Ex. 29, Calle Deposition at 190:13-191:9).

**RESPONSE**: Admit.

162. Officers are trained to determine the totality of the circumstances based upon the Graham factors in assessing whether a particular force as deployed might be deadly or non-deadly force, including assessing when it is appropriate to sit a detainee up and put them in the recovery position, and to move them into that recovery position as soon as possible. (*Id.* at 41:7-44:22; 60:15-25; 62:5-17).

**RESPONSE**: Dispute. The City of Phoenix, through its Rule 30(b)(6) representative, testified that officers are trained that it is appropriate and within policy to use an electronic control device (ECD) on a handcuffed person who is prone, face down on the ground if the person is displaying "active aggression" or is a danger to himself or others." *See* Calle Dep. at 75:8-19, 76:12-21, 77:17-78:5, *Exhibit 15*. Mr. Calle did not testify that officers were trained to roll the subject into recovery position as soon as possible or within a specific unit of time. His testimony was that the "expectation" would be that officers would roll the subject to the position of recovery "[i]f they're solely laying down in handcuffs and RIPP restraint, there's no longer physical actions of assault, they're not in active aggression, they're not a danger to self or others and they're able to be rolled over . . . that would be the expectation." *Id.* at 79:1-6.

Plaintiff admits that Mr. Calle testified that it was generally left up to the officer to determine whether a use of force tactic rose to the level of deadly force under the "totality of the circumstances." Mr. Calle admitted that officers are trained that certain tactics, if used

incorrectly, could rise to the level of deadly force, like if an officer lets a Taser run for an extended amount of time or the carotid control technique is performed incorrectly. *See id.* at 47:3-24, 51:11-21.

163. Officers are trained that subjects cannot be hog-tied—meaning that the restraint cannot be tightened wow [sic] where their ankles are in a tight position—as leaving them in such a position has the potential of creating a serious risk of injury or death. (*Id.* at 45:2-17).

**RESPONSE**: Admit.

164. Phoenix Police Department policy prohibits hog-tying. (*Id.* at 59:12-20).

**RESPONSE**: Admit.

165. Officers are trained to consider the totality of the circumstances in whether to place any weight while trying to arrest a situation, while considering any issues such as excited delirium and positional asphyxia, gaining control over the person, and getting them into a recovery position and asking for the fire department. (*Id.* at 81:7-19).

**RESPONSE**: Dispute. When asked if officers are not trained that placing body weight on the back of a prone handcuffed subject can cause death, the City of Phoenix, through its Rule 30(b)(6) representative, testified, "it's not a yes or no." Mr. Calle stated that officers are trained that they still have to be able to detain and control the subject, and if issues like positional asphyxia or excited delirium are present, "the training is consistent with getting control and getting that subject into a recovery position and requesting fire or EMS." Calle Dep. at 81:7-19, ***Exhibit 15***.

Mr. Calle further testified that officers are trained that it is appropriate and within policy to use an electronic control device (ECD) on a handcuffed person who is prone, face down on the ground if the person is displaying "active aggression" or is a danger to himself or others." *See id.* at 75:8-19, 76:12-21, 77:17-78:5, ***Exhibit 15***. Mr. Calle did not testify that officers were trained to roll the subject into recovery position as soon as possible or within a specific unit of time. His testimony was that the "expectation" would be that officers would roll the subject to the position of recovery "[i]f they're solely laying down in handcuffs and RIPP restraint, there's no longer physical actions of assault, they're not in active aggression,

they're not a danger to self or others and they're able to be rolled over . . . that would be the expectation." *Id.* at 79:1-6.

Mr. Calle's testimony is inconsistent with the PPD's RIPP Restraint Lesson Plan, which provides that officers should be mindful of body positions that impair the subject's ability to breathe, limit face down exposure, and immediately roll the subject into a seated position. *See* Doc. 91-4, p. 87. The Lesson Plan also states the RIPP strap should not be shortened or wrapped around the subject's ankles. *See id.*

166. Officers are trained on how to appropriately apply the RIPP restraint and instructed on how it cannot be applied, such as by shortening the strap, because that might cause hog-tying and result in positional asphyxia, and instructed that once it is placed "you start getting them out of the prone position as quickly as practical." (*Id.* at 83:7-96:8, 98:19-99:18; Ex. 47, RIPP Restraint Hobble Lesson Plan; Ex. 37, Sudden In Custody Death).

**RESPONSE**: Dispute. Officer Long testified that there are several ways to attach a RIPP restraint, including by wrapping the RIPP restraint around the subject's ankles then attaching the clip by bringing the subject's "heels towards the butt." He was not aware of any training by the City of Phoenix that officers should not bring a subject's heels towards the butt while attaching the RIPP restraint. *See* Long Dep. at 96:4-24, ***Exhibit 10***.

167. Officers receive AZPOST recruit training (before they become officers) and City of Phoenix training related to positional asphyxia and excited delirium, including that excited delirium is a medical emergency. (Ex. 29, Calle Deposition at 135:15-137:22. 145:9-146:8; 150:20-151:24; 158:6-159:7; Ex. 47, RIPP Restraint Hobble Lesson Plan; Ex. 37, Sudden In Custody Death; Ex. 36, Excited Delirium).

**RESPONSE**: Admit.

168. The expectation, provided through training and policy, is that an officer would not use a knee as force on a person who was not resisting, fighting, and if it is safe to remove the pressure, then the expectation would be to remove the pressure. (Ex. 29, Calle Deposition at 167:18-168:18, 169:11-170:14).

**RESPONSE**: Admit.

169. In addition to classroom training, officers also receive: (1) field training for several months to obtain hands-on training regarding all aspects of police work, including a debrief as to all incidents and how they could be effectively resolved; and (2) daily briefings on incidents that have occurred and the

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

tactics that may or may not be appropriate under the given factual circumstances. (*Id.* at 183:3-185:25).

**RESPONSE**: Admit.

170. In terms of physical training on hands-on techniques, the City trains officers on how to apply the technique appropriately verses how to apply it in the wrong way, to avoid an officer, in the heat of the moment, remembering the incorrect technique. (*Id.* at 185:18-190:12).

**RESPONSE**: Admit.

171. When questioned about training on positional asphyxia:

> a. Officer Haynes testified that he received training that placing weight on the back of a handcuffed suspect could create a risk of positional asphyxia. (Ex. 16, Haynes Deposition at 83-84);
>
> b. Officer Yamane testified that he was trained that individuals should not be left face down for any length of time because there was a risk of positional asphyxia and that the placement of weight while in this position could potentially interfere with breathing, but that at all times with Wells, he was still resisting and a danger to officers until the RIPP restraint was applied; (Ex. 15, Yamane Deposition at 45:4-50:4).
>
> c. Officer Long testified that he was trained on how to safely handcuff and on the potential risks of positional asphyxia; (Ex. 14, Long Deposition at 21:14-23:14)
>
> d. Officer Seaquist testified that he was provided training on positional asphyxia, including that there can be a risk of interfering with breathing if weight was placed. (Ex. 11, Seaquist Deposition at 184:22-186:5).
>
> e. Officer Funston testified that hog-tying is prohibited, that the RIPP properly applied does not result in a hog-tie, that he was trained on the potential dangers of positional asphyxia, to roll someone in the recovery position as soon as possible, and that pressure on the back could create a risk. (Ex. 13, Funston Deposition at 15:12-32:14).

**RESPONSE**: Plaintiff admits that this statement summarizes the testimony of Officers Haynes, Yamane, Long, Seaquist, and Funston. With respect to training on positional asphyxia, Officer Arnold—the officer who knelt on Casey's upper back—testified that he had not received training on positional asphyxia. *See* Arnold Dep. at 49:7-13, ***Exhibit 5***. Sgt. Rodarme had heard of the term "positional asphyxia" but was unable to say what it

meant and did not recall receiving any training about it. *See* Rodarme Dep. at 53:15-24, ***Exhibit 6***.

Plaintiff also disputes Officer Yamane's characterization of Casey as resisting or posing a danger to the officers. This statement is contradicted by Officer Palmer's body worn camera video, which shows Casey was silent and immobile, handcuffed and restrained by the other Officer Defendants. *See* Defendants' Exhibit 19 at 5:20-5:45. It is also contradicted by Officer Haynes' testimony, in which he stated that he never saw Casey attempt to strike, kick, or intentionally harm any officer. Rather, it appeared to him that Casey's legs were stiffening and "moving back and forth." *See* Haynes Dep. at 53:2-14, 54:22-55:16, ***Exhibit 12***.

172. The City also provides officers training on deescalation and "verbal judo", which emphasizes that the overall goal is preservation of life and that the training is "designed to help officers stay focused and calm during crisis situations and bring chaotic moments to as peaceful a resolution as the suspect(s) will afford." (Ex. 48, Decision Making De-Escalation Techniques, COP_STICKNEY0005078-5086, at 3-4).

**RESPONSE**: Plaintiff admits that the Officer Defendants had received training but disputes that the training was constitutionally adequate. Plaintiff's police practices expert, Scott DeFoe, has opined that the Phoenix Police Department failed to properly train its officers in crisis intervention techniques and failed to establish a Crisis Intervention Team consisting of officers and mental health professionals to respond to incidents involving mentally ill individuals. *See* DeFoe Report at pp. 33-35, ***Exhibit 17***. The City's lesson plan titled, "Dealing with the Mentally Ill" directed that "Police will contact SMI subjects." *Id.* at p. 34. Consequently, in Mr. DeFoe's opinion, the Officer Defendants failed to recognize that Casey was mentally ill or under the influence and Sgt. Rodarme failed to formulate a tactical plan and escalated the situation by quickly initiating force against Casey when there was no rush to do so. *See id.* at p. 31, 33-35.

173. The training includes the concept of "ask, tell, make": (1) first, "ask— be courteous, be professional"; (2) second, "tell—be courteous, be professional;" (3) third, "resources—if I give the subject the order and they don't follow it, do I have the resources to make them. If not start the resources

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

your way, or if feasible wait for the resources become available;" (4) fourth, "make—affect the arrest or detention using the least amount of force and the reasonable objectiveness standard." (*Id.* at COP_STICKNEY005080-81).

**RESPONSE**: *See* Response to ¶ 172, *supra*.

174. The City's training on deescalation reviews the Graham factors and encourages officers to continuously evaluate the approach to taking someone into custody, to include their potential mental state and objectives. (*Id.*).

**RESPONSE**: *See* Response to ¶ 172, *supra*.

175. Officer Seaquist testified that officers were all of the mindset of using "verbal judo," whenever they could. (Ex. 11, Seaquist deposition at 202:2-11). Officer Funston was one of Officer Seaquist's trainees and he emphasized to him to stay away from physical force unless it was absolutely positively necessary and to focus on verbal judo. (*Id.*).

**RESPONSE**: Plaintiff objects on the basis that Officer Seaquist lacks foundation to testify about the mindset of other officers. Plaintiff otherwise admits that this summarizes statements made by Officer Seaquist in his deposition.

176. Officers were also trained on how to interact with the mentally ill, including using scenarios to apply listening skills and demonstrating effective crisis intervention techniques. (Ex. 35, 2015 Module Mental Illness, at COP-STICKNEY003608, 3621-003627; Ex. 34, Dealing with the Mentally Ill, at COP-STICKNEY003598, 3605, 3607).

**RESPONSE**: *See* Response to ¶ 172, *supra*.

## E.    Employee Investigations

177. The Police Department has a Professional Standards Bureau (PSB), that investigates in-custody deaths, and includes multiple levels of review, including a review board with three civilian members, an assistant chief, a commander, and a peer officer. (Ex. 49, Lt. Junas Deposition at 20:11-23:7; 26:3-28:4; 63:3-64:14).

**RESPONSE**: Admit.

178. The PSB investigators provide facts, which the use of force board and then, the Chief, makes the final determination. (*Id.* at 88:8-16).

**RESPONSE**: Admit.

179. The length of time that it takes for a PSB investigation to be finished is very dependent upon the length of time that the Maricopa County Attorney's Office conducts their independent review to determine if there will or will not be charges—as the City "can't close or move forward with an

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

administrative investigation until the criminal is completed." (*Id.* at 120:23-122:2; 132:19-13).

**RESPONSE**: Admit.

### F.    Purging Files

180. Officer Funston graduated from the Police Academy in 2017 and thereafter started working as an officer. (Ex. 13, Funston Deposition at 7:10-20).

**RESPONSE**: Admit.

181. Officer Seaquist testified that he had no knowledge of any purging of files. (Ex. 11, Seaquist Deposition at 190:7-13).

**RESPONSE**: Admit.

182. Sgt. Rodarme testified that he had no prior discipline and that he had never requested to have anything purged from his file. (Ex. 10, Rodarme Deposition at 134:3-17).

**RESPONSE**: Admit. However, Sgt. Rodarme was aware of the City's policy of purging files. His understanding was that officers could request to purge written reprimands after five years and supervisor counseling after two years. *See* Rodarme Dep. at 133:19-134:12, *Exhibit 6*.

183. Officer Yamane similarly had no knowledge regarding purging and no prior shootings, or discipline. (Ex. 15, Yamane Deposition at 38:19-23).

**RESPONSE**: Admit.

### G.    Dr. Beckson Opinions

184. Psychiatrist Dr. Beckson opined that Wells was under the influence of methamphetamine, reflecting a relatively high blood concentration of methamphetamine compared with the median methamphetamine concentrations in published studies of methamphetamine-related deaths. (Ex. 50, Beckson Report, at COP-STICKNEY00705-7082).

**RESPONSE**: Admit that this is Dr. Beckson's opinion.

185. Although Wells had a long-history of methamphetamine use, his abuse and behavior spiraled out of control after his uncle (with a similar drug problem, history of mental illness, and similar religious preoccupation) murdered his grandmother and two people staying with her at the time. (*Id.* at COP-STICKNEY007091-7097).

**RESPONSE**: Object to relevance. There is no evidence that the Officer Defendants had any knowledge of Casey's personal or family history at the time of the incident. Only

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

information known to the Officer Defendants at the time of the incident is relevant and admissible for the purpose of determining whether their force was objectively reasonable under the *Graham* factors. *See Hayes*, 736 F.3d at 1232–33; *Glenn*, 673 F.3d at 873. Information acquired after a deadly force incident may generally only be used to corroborate an officers' use of force in a situation where a suicide by cop theory is asserted or a suspect's intent to engage with police is clearly at issue. *See Boyd v. City & Cnty. of San Francisco*, 576 F.3d 938, 944 (9th Cir. 2009); *Estate of Tindle v. Mateu*, 2020 WL 5760287, at *11 (N.D. Cal. Sept. 28, 2020) (discussing the Ninth Circuit's retreat from the holding in *Boyd*). Those circumstances are not present here. Accordingly, any later acquired information that the Officer Defendants—or their counsel—learned about Casey should not be factored into the analysis of whether their actions were objectively reasonable.

186. Dr. Beckson further opined that as a result of Wells' psychosis and illicit drug use, there was a substantial probability (if not likelihood) that even the best efforts of mental health professionals or CIT trained officers would not have gained his cooperation. (*Id.* at COP-STICKNEY00797-7105).

**RESPONSE**: Object to relevance. This statement is purely speculative. *See* Response to ¶ 185, *supra*.

187. "Acutely psychotic individuals may or may not respond to efforts by mental health professionals to obtain cooperation because of their irrational thinking (which can make logical discussion and persuasion challenging or impossible); delusions (the nature of which may be difficult to discern, and which may involve a drastically different belief system that is divorced from the reality of the situation, such as grandiose beliefs that one has special powers or standing, such as being above the laws of man or being on a special mission from God; or paranoid beliefs that pit the psychotic individual and the professional in an adversarial position); auditory hallucinations (which may include voices that interpret professional efforts as irrelevant or contrary to the psychotic individual's interests or even part of a plot to harm the individual; and such voices may command the individual to resist or attack and harm others)." (*Id.* at COP-STICKNEY007101).

**RESPONSE**: Object to relevance. *See* Response to ¶ 185, *supra*.

188. Dr. Beckson opined that Wells' failure to comply and react to Officer Arnold's attempts at deescalation "likely reflected grandiose delusional beliefs about Mr. Wells' own standing in relation to man and God. Grandiose and delusional beliefs with religious themes are common in acute psychosis;

and noted by Mr. Wells' aunt, similar to his uncle, he would become religiously preoccupied when psychotic. Mr. Wells' statements and behavior are reminiscent of Casey Wells' failure to follow police commands in December 2016. After that arrest, while 'ranting about religious issues,' Mr. Wells told police that he doesn't bow to man's law and man will bow to him, which also likely reflected grandiose delusional beliefs about himself in relation to man and God." (*Id.* at COP-STICKNEY007102).

**RESPONSE**: Object to relevance. There is no evidence that the Officer Defendants had any knowledge of Casey's personal or family history, or his prior arrest, at the time of the incident. *See* Response to ¶ 185, *supra*.

## PLAINTIFF'S CONTROVERTING STATEMENT OF FACTS

**A.** **Within minutes of contacting Casey Wells, Officer Arnold and Sgt. Rodarme go "hands on," even though Casey is unarmed, not threatening, and is standing stationary in the street.**

189. On the afternoon of February 4, 2019, several residents of Salter Drive in Phoenix, Arizona called 911 to report a naked man in the street. That man was Casey Wells. *See* Second Amended Complaint, Doc. 1-3, p. 5.

190. It was clear to the callers that Casey was mentally disturbed but was not armed and did not appear aggressive, violent, or dangerous. At 14:03 (2:03 p.m.), the first caller stated that the man had been in the street for about half an hour, had been screaming earlier, and did not have any weapons on him. *See* 911 Call Audio (COP-STICKNEY000480) at 2:23, *Exhibit 1*.

191. At 14:08 (2:08 p.m.), another resident called and expressed concern that the man might have dementia or "something wrong with him." 911 Call Audio (COP-STICKNEY000481) at 1:00-1:35, *Exhibit 2*.

192. At 14:13 (2:13 p.m.), a third caller reported, while chuckling, that there was a naked man "just standing" in her street. She stated he had been screaming and was now "doing what looks like yoga poses" naked in the middle of the street. 911 Call Audio (COP-STICKNEY000483), *Exhibit 3*.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

193.    Also at 14:13 (2:13 p.m.), another caller noted that the man was staring up at the sky but did not appear agitated and looked like he was "communing with nature." 911 Call Audio (COP-STICKNEY000484), ***Exhibit 4***.

194.    At 1416 (2:16 p.m.), one of the callers called back a second time because no officer had arrived yet and she was worried the man would be hit by a car. Defendants' Exhibit 3.

195.    City of Phoenix Police Officer James Arnold was the first to arrive on the scene at 14:19:18 (2:19 p.m.). *See* Arnold Dep. at 125:18-20, ***Exhibit 5***; CAD History, Defendants' Exhibit 2, Doc. 91-1 at p. 3.

196.    As Officer Arnold approached, Casey stood with his arms raised "straight up in the air," yelling, and vigorously nodding and shaking his head. *See* Arnold Dep. at 68:23-69:8, ***Exhibit 5***; Defendants' Exhibit 7.



197.    When he arrived and saw Casey nude, Officer Arnold had probable cause to arrest Casey for indecent exposure. Arnold Dep. at 152:5-8, ***Exhibit 5***.

198.    Indecent exposure is a class 1 misdemeanor. A.R.S. § 13-1402(C).

199.    Officer Arnold put on a pair of black gloves and took out a pair of handcuffs. *See* Defendants' Exhibit 7.

200.    Officer Arnold could see that Casey was naked and unarmed. *See* Arnold Dep. at 75:1-10, ***Exhibit 5***.

201. Officer Arnold believed that Casey was potentially on drugs or experiencing a "mental condition." *See* Arnold Dep. at 68:7-12, ***Exhibit 5***.

202. He also knew that Casey's odd behavior—standing naked and doing yoga on a public street—could be a sign of excited delirium, and he knew that excited delirium was a medical emergency. *See* Arnold Dep. at 44:23-45:1, 46:2-15, 47:21-48:8, ***Exhibit 5***.

203. Officer Arnold told Casey, "Hey, let's get your clothes back on," to which Casey commented, while still looking up at the sky, that he came into the world naked and would leave the world naked. *See* Arnold Dep. at 69:9-24, 71:1-13, ***Exhibit 5***.

204. Officer Arnold then told Casey he needed to put Casey in handcuffs "for his safety and mine." Casey allegedly told Officer Arnold, "You're not going to cuff me." *See* Arnold Dep. at 70:1-12, 71:14-22, ***Exhibit 5***.

205. Officer Arnold told Casey: "And why would that be? Are you going to fight me? I'm just trying to keep us both safe. We need to get your clothes on. I'm not telling you you're being arrested. We just need to get this figured out." Arnold Dep. at 70:1-12, ***Exhibit 5***. Casey repeated "You're just not going to cuff me." *Id.*

206. These were the only three statements Casey made during the entire encounter. He did not speak any other words to Officer Arnold or to any other officer. Arnold Dep. at 70:13-16, 70:20-22, 72:21-73:1, ***Exhibit 5***.

207. Officer Arnold knew that backup was coming and that there was "no rush" for him to go "hands on" with Casey. He also did not want to "wrestle" and go "hands on" with someone who was naked, so he waited for the next officer to arrive. *See* Arnold Dep. at 74:9-75:14, ***Exhibit 5***.

208. Casey did not threaten Officer Arnold or make any motions towards him. Casey was "still being calm," and he continued to hold his hands up and look at the sky. *See* Arnold Dep. at 74:9-25, ***Exhibit 5***.

209. At 14:22:14 (2:22 p.m.)—three minutes after Officer Arnold's arrival—Sergeant Robert Rodarme arrived on the scene. Arnold Dep. at 75:15-25, 125:21-23, ***Exhibit 5***; Rodarme Dep. at 67:4-7, ***Exhibit 6***.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

210.    Sgt. Rodarme assumed, based on Casey's behavior of being naked in the street, that Casey was under the influence of methamphetamine. Rodarme Dep. at 135:22-136:3, *Exhibit 6*.

211.    Sgt. Rodarme also understood that Casey could be experiencing excited delirium because he had had a prior interaction with a subject who was experiencing excited delirium in 2000 or 2001 who, like Casey, was naked and sweating. *See* Rodarme Dep. at 54:1-15, *Exhibit 6*.

212.    Officer Arnold told Sgt. Rodarme that Casey "was not going to allow [the Officers] to cuff him and get him dressed." Arnold Dep. at 76:1-9, *Exhibit 5*.

213.    Sgt. Rodarme said, "okay," and positioned himself on the west side of Casey, on the opposite side from Officer Arnold. Arnold Dep. at 76:10-13, *Exhibit 5*.

214.    Casey was holding his arms out to the side with his fists clenched, "like an airplane." *See* Rodarme Dep. at 30:2-31:6, *Exhibit 6*.

215.    Casey was grunting but was not moving or speaking. *See* Arnold Dep. at 76:14-77:1, *Exhibit 5*; Rodarme Dep. at 31:7-10, *Exhibit 6*.

216.    Sgt. Rodarme told Casey, "Let's get your clothes on, let's figure this out. Just because we're going to get you in cuffs, doesn't mean that you're being arrested. We're just doing this for everybody's safety here." Arnold Dep. at 76:14-77:1, *Exhibit 5*. Casey did not respond to Sgt. Rodarme. *Id.*

217.    Sgt. Rodarme and Officer Arnold did not tell Casey he was under arrest. In fact, they specifically told him he was *not* under arrest but was going to be handcuffed for safety. *See* Arnold Dep. at 76:14-77:1, *Exhibit 5*; Rodarme Dep. at 32:13-33:9, *Exhibit 6*.

218.    Casey was not suspected of a felony or violent crime. *See* Arnold Dep. at 152:5-8, *Exhibit 5*.

219.    Casey had not attempted to strike or assault anyone. *See* Arnold Dep. at 63:22-25, 76:1-77:21, *Exhibit 5*; Rodarme Dep. at 30:2-33:9, *Exhibit 6*; Buffington Interview Transcript (WELLS 002731-33, 002737), *Exhibit 7*; Bolduc Interview Transcript (WELLS 002651-52), *Exhibit 8*.

220.    Casey had not threatened anyone. *See* Arnold Dep. at 76:1-77:21, ***Exhibit 5***; Rodarme Dep. at 30:2-33:9, ***Exhibit 6***.

221.    Casey was not attempting to flee from the Officers. *See* Arnold Dep. at 76:1-77:21, ***Exhibit 5***; Rodarme Dep. at 30:2-33:9, ***Exhibit 6***.

222.    Sgt. Rodarme and Officer Arnold did not warn Casey that they were going to go "hands on" with him. *See* Arnold Dep. at 76:1-77:21, ***Exhibit 5***; Rodarme Dep. at 30:2-33:9, ***Exhibit 6***.

223.    Sgt. Rodarme and Officer Arnold did not have a discussion about how to approach Casey or how to take him into custody. Rodarme Dep. at 32:2-6, ***Exhibit 6***.

224.    Rather than discuss a plan to keep the situation calm or call for backup, Sgt. Rodarme and Officer Arnold signaled to each other with a "head nod" that they were going to initiate a physical confrontation with Casey, who remained standing still with his arms out at his sides and was not responding to the Officers. *See* Arnold Dep. at 76:1-77:21, ***Exhibit 5***.

225.    Officer Arnold described how each of them grabbed one of Casey's arms:

> And then both my boss and I, we kind of gave our -- just, I don't know, like a head nod to each other that we're going to go hands-on at the same time, which we bother grabbed him at the wrist and in triceps of each of his arms and we tried to bring him down to try to be able to cuff him or get him into a position where we could get him restrained or in restraints.

*Id.* at 77:2-8.

226.    Casey continued to hold his arms straight out to the side, but he was not fighting or trying to break away. He appeared to not be paying attention and would not respond to the Officers. *Id.* at 77:9-21.

227.    Sgt. Rodarme and Officer Arnold gripped Casey's arms for approximately 45 seconds to one minute, while Casey kept his arms outstretched like an airplane. Rodarme Dep. at 35:11-20, ***Exhibit 6***.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

228.    At that point, Sgt. Rodarme and Officer Arnold escalated their use of force by attempting to forcibly bring Casey's arms behind his back. Rodarme Dep. at 35:21-36:7, *Exhibit 6*.

229.    Casey began flailing his arms and legs, and he allegedly made contact with Officer Arnold's lower lip. *See* Rodarme Dep. at 36:24-37:11, *Exhibit 6*; Arnold Dep. at 82:5-9, *Exhibit 5*; Bolduc Interview Transcript (WELLS 002651), *Exhibit 8*.

230.    Officer Arnold grabbed Casey in a "bear hug" to take him to the ground. *See* Arnold Dep. at 82:5-15, 89:17-90:3, *Exhibit 5*; Rodarme Dep. at 37:22-38:25, *Exhibit 6*.

231.    Sgt. Rodarme, who was behind Casey, grabbed Casey's shoulders and slammed him to the ground, causing Casey's head to strike the pavement and causing Officer Arnold to fall on top of him. *See* Arnold Dep. at 82:5-15, 89:17-90:3, *Exhibit 5*; Rodarme Dep. at 37:22-38:25, 41:6-9, 100:12-102:8 *Exhibit 6*.

232.    Casey was laying on his back on the ground, and Officer Arnold got into a "full mount" position, where he was sitting on Casey's stomach with his legs on either side, and was trying to control Casey's left arm. Sgt. Rodarme grabbed Casey's right arm. *See* Arnold Dep. at 90:8-20, 94:3-5, *Exhibit 5*.

233.    Casey continued flailing, and his left arm broke free and made contact with Sgt. Rodarme. *See* Arnold Dep. at 90:8-20, 94:9-11, 95:13-25, 96:23-97:10, *Exhibit 5*.

234.    In response, Officer Arnold used his forearm to strike Casey's face, head, or throat. *See* Arnold Dep. at 62:9-64:8, 90:21-23, 94:12-95:7, *Exhibit 5*; Rodarme Dep. at 43:24-45:1, 49:18-50:19, *Exhibit 6*.

235.    Casey immediately began bleeding from his mouth and nose. *See* Arnold Dep. at 83:4-13, 97:13-15, *Exhibit 5*; Rodarme Dep. at 49:18-50:19, *Exhibit 6*.

236.    There was a large amount of blood in Casey's mouth. Rodarme Dep. at 72:24-73:22, *Exhibit 6*.

237.    As Casey expelled the blood from his mouth and nose, some of the blood got on Sgt. Rodarme. *See* Arnold Dep. at 97:19-98:8, *Exhibit 5*.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

238. At 14:24:58 (2:24 p.m.)—only two and a half minutes after arriving at the scene—Rodarme called for additional units. *See* CAD, Defendants' Exhibit 2, Doc. 91-1, p. 4.

239. Sgt. Rodarme did not request the fire department, even though Casey was injured and bleeding. *See* Rodarme Dep. at 59:24-60:9, ***Exhibit 6***.

240. When Sgt. Rodarme placed the call for additional units, Casey was on his back on the ground, and Sgt. Rodarme and Officer Arnold were holding him down by his arms. *See* Rodarme Dep. at 60:19-23, 61:4-24 ***Exhibit 6***.

241. Officer Arnold then began using the weight of his body to control Casey. He sprawled the entire length of his body over Casey "to take his legs out of play." *See* Arnold Dep. at 93:14-21, 94:12-95:7, 98:9-19, ***Exhibit 5***.

242. They remained this way until Officer Seaquist arrived almost three minutes later at 14:27:41 (2:27 p.m.). *See* Arnold Dep. at 98:20-99:4, ***Exhibit 5***; Rodarme Dep. at 61:4-24, ***Exhibit 6***; CAD, Defendants' Exhibit 2, Doc. 91-1, p. 4.

**B. Officer Seaquist deploys his Taser into Casey five times in 1 minute 35 seconds while Casey is restrained by the Officer Defendants in a prone position.**

243. When Officer Seaquist arrived, he saw that Casey's "face was pretty much all blood." Casey "had blood coming out of his nose, his mouth", and he had a cut across his head. Seaquist Dep. at 81:13-20, ***Exhibit 9***.

244. Officer Seaquist could see that Casey was naked and did not have a weapon. Seaquist Dep. at 95:25-96:2, ***Exhibit 9***.

245. Casey was face up, laying on his back. Officer Arnold and Sgt. Rodarme were on their knees on either side of Casey trying to control his arms. Seaquist Dep. at 60:22-61:5, 61:19-23, 69:21-24, ***Exhibit 9***.

246. Officer Seaquist never heard Casey speak any words, but he was grunting and growling like a bear caught in a trap. Seaquist Dep. at 84:1-17, ***Exhibit 9***.

247.    Officer Seaquist suggested to Officer Arnold and Sgt. Rodarme that they flip Casey over onto his stomach to have better positioning, gain control, and prevent Casey from "throwing punches or failing his arms around." Seaquist Dep. at 69:25-70:6, ***Exhibit 9***.

248.    Officer Seaquist took Casey's legs, and the three Officers rolled Casey onto his stomach. Seaquist Dep. at 62:2-13, ***Exhibit 9***.

249.    When the Officers rolled Casey over, his left arm became pinned beneath his stomach. Rodarme Dep. at 141:16-142:4, ***Exhibit 6***.

250.    Sgt. Rodarme was working on getting Casey's left arm out from under his body. Officer Arnold was at Casey's right arm, and Officer Seaquist was trying to control Casey's legs. Rodarme Dep. at 141:16-142:4, ***Exhibit 6***.

251.    Officer Arnold was able to get Casey's right arm behind his back and was holding it in anticipation of Rodarme getting Casey's left arm out from under his body so they could put him in handcuffs. Rodarme Dep. at 76:6-77:23, ***Exhibit 6***.

252.    At the same time, Officer Seaquist crossed Casey's legs at the ankles, bent Casey's knees to press Casey's heels against his butt, and applied the weight of his entire body to Casey's lower legs. Officer Seaquist "took [his] whole 250 pounds and laid" on Casey's legs. Seaquist Dep. at 63:25-64:6, 103:13-104:19, 114:12-22, ***Exhibit 9***.

253.    Casey's lower legs were pushing against Officer Seaquist's vest, and his legs slipped or "dropped" and came down onto Officer's Seaquist's thighs. *See* Seaquist Dep. at 65:12-67:16, ***Exhibit 9***.

254.    Officer Seaquist perceived this as Casey flailing around rather than intentionally kicking him. *See* Seaquist Dep. at 115:9-18, ***Exhibit 9***.

255.    Aside from this instance where Casey's legs came down onto Officer Seaquist, Officer Seaquist never saw Casey attempt to strike any officer. *See* Seaquist Dep. at 95:21-24, ***Exhibit 9***.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

256.     Officer Seaquist saw that Sgt. Rodarme was having trouble getting control of Casey's left arm, which was still under his body, and Officer Seaquist made the decision to deploy his Taser. *See* Seaquist Dep. at 106:1-6, ***Exhibit 9***.

257.     Officer Seaquist believed that Casey could be mentally disturbed or under the influence of drugs. *See* Seaquist Dep. at 85:16-86:3, 86:18-21, 94:24-95:7, ***Exhibit 9***.

258.     Officer Seaquist also knew that signs of excited delirium included yelling, removing one's clothing, talking irrationally, not responding to commands, and physically resisting, and he knew that excited delirium could lead to loss of consciousness and death. *See* Seaquist Dep. at 178:17-179:19, ***Exhibit 9***.

259.     The City of Phoenix had trained its officers, including Officer Seaquist, that they could use a Taser against subjects who were engaged in "active resistance and failure to comply with officer commands" without regard for whether a subject was under the influence of drugs, mentally ill or disturbed, or experiencing excited delirium. *See* Seaquist Dep. at 179:20-180:9, 181:1-20, 182:18-184:3, ***Exhibit 9***.

260.     The City of Phoenix had trained its officers, including Officer Seaquist, that there is a risk of positional asphyxia when a person is restrained on their stomach with their arms behind their back and their legs are elevated because it becomes more difficult for them to breathe. *See* Seaquist Dep. at 185:17-186:5, ***Exhibit 9***.

261.     Just over one minute[1] after arriving on the scene, Officer Seaquist deployed his Taser. The Taser was deployed for five seconds. *See* Defendants' Exhibit 12, Doc. 91-1 at p. 154.

262.     The Taser deployment was successful, and Casey's whole body tensed up and stiffened in response. *See* Seaquist Dep. at 68:9-69:2, ***Exhibit 9***; Arnold Dep. at 86:20-23, ***Exhibit 5***.

---

[1]     Times listed in the Taser Download were determined to be 15 seconds fast. *See* Seaquist Dep. at 140:20-141:23, ***Exhibit 9***.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

263.   Officers Funston and Long arrived on the scene at 14:28:11 (2:28 p.m.), just thirty seconds after Officer Seaquist's arrival. *See* CAD, Defendants' Exhibit 2, Doc. 91-1, p. 4.

264.   When Officers Funston and Long approached the other Officers and Casey, they saw Casey naked and face down on the pavement with Officers Arnold and Seaquist and Sgt. Rodarme "all on top of him" holding him down." Funston Dep. at 41:12-21, ***Exhibit 11***; *see also* Long Dep. at 56:4-58:3, ***Exhibit 10***.

265.   Officer Funston could see that Casey was naked and had no reason to believe he was armed. *See* Funston Dep. at 46:17-47:1, ***Exhibit 11***.

266.   Casey was not threatening anyone, and he did not try to strike anyone. *See* Funston Dep. at 46:14-16, 66:10-15, ***Exhibit 11***.

267.   Casey was flailing his arms and legs and yelling but was not using any words. Funston Dep. at 42:22-43:8, 44;17-45:7, ***Exhibit 11***; Long Dep. at 57:25-58:3, ***Exhibit 10***.

268.   Officer Funston believed Casey was impaired and was either mentally ill or on some type of drugs. Funston Dep. at 75:10-19, ***Exhibit 11***.

269.   Officer Funston could see Taser prongs in Casey's back and could tell Officer Seaquist had already deployed his Taser. Funston Dep. at 44:4-16, ***Exhibit 11***.

270.   Officer Long also saw that Officer Seaquist had his Taser out. Long Dep. at 71:16-24, ***Exhibit 10***.

271.   Officer Seaquist was kneeling with his right knee on Casey's left leg. He was holding Casey's leg with his left hand and was holding his Taser in his right hand. Funston Dep. at 82:13-83:2, ***Exhibit 11***.

272.   Officer Arnold was kneeling on top of Casey, with his right knee on Casey's upper back or right shoulder blade. Arnold Dep. at 112:9-113:11, ***Exhibit 5***.

273.   Officer Arnold still had Casey's right hand behind his back. Long Dep. at 71:25-72:23, ***Exhibit 10***.

274.   Officer Long went to Casey's left side to help Sgt. Rodarme secure Casey's left arm. Long Dep. at 71:25-72:23, ***Exhibit 10***.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

275.     Officer Funston removed the RIPP restraint from Officer Seaquist's belt, but because Officer Seaquist kept his RIPP restraint "rolled up," Officer Funston had difficulty figuring out how to get it undone. *See* Seaquist Dep. at 77:11-22, ***Exhibit 9***; Funston Dep. at 48:23-49:5, ***Exhibit 11***.

276.     Fifteen seconds after the first Taser deployment, Officer Seaquist deployed his Taser a second time. The Taser was deployed for a period of five seconds. *See* Defendants' Exhibit 12, Doc. 91-1 at p. 154.

277.     Thirty seconds later, Officer Seaquist deployed his Taser a third time, again for a period of five seconds. *See* Defendants' Exhibit 12, Doc. 91-1 at p. 154.

278.     Twenty-three seconds after that, Officer Seaquist deployed his Taser a fourth time, for a period of six seconds. *See* Defendants' Exhibit 12, Doc. 91-1 at p. 154.

279.     Casey's body stiffened in response to each Taser deployment. *See* Arnold Dep. at 86:20-23, ***Exhibit 5***.

280.     Officer Long and Sergeant Rodarme were able to get Casey's left arm out from underneath him and behind his back, and along with Officer Arnold, they got Casey into handcuffs. *See* Long Dep. at 71:25-73:13, ***Exhibit 10***; Rodarme Dep. at 80:6-23, ***Exhibit 6***.

281.     After the second or third use of the Taser, Officers Arnold and Long and Sgt. Rodarme had placed Casey in handcuffs, and Officer Funston began to work on getting the RIPP restraint around Casey's ankles. *See* Rodarme Dep. at 80:6-23, ***Exhibit 6***; Funston Dep. at 48:11-49:5, 52:24-52:4, ***Exhibit 11***; Seaquist Dep. at 77:11-22, ***Exhibit 9***.

282.     Officers Haynes and Yamane arrived on the scene and saw Casey lying face down and handcuffed behind his back. Haynes Dep. at 75:22-76:3, ***Exhibit 12***; Yamane Dep. at 40:14-23, ***Exhibit 13***.

283.     Officers Haynes and Yamane could see that Casey was naked and unarmed, he was not trying to kick or strike any officers, and he was not reaching for any officer's weapon. Yamane Dep. at 63:1-64:18, ***Exhibit 13***.

284.     Sgt. Rodarme and Officer Arnold "were on [Casey's] shoulders." *See* Yamane Dep. at 40:24-41:8, ***Exhibit 13***.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

285.    Officer Long "was around [Casey's] waist." *See* Yamane Dep. at 40:24-41:8, ***Exhibit 13***. Officer Long was kneeling next to Casey's left side and was continuing to hold Casey down, even though he was handcuffed, while Officer Funston worked to secure the RIPP restraint. *See* Long Dep. at 76:1-25, ***Exhibit 10***.

286.    Officer Funston was at Casey's feet, "struggling" with the RIPP restraint, so Officers Haynes and Yamane went to assist him. Yamane Dep. at 40:24-41:8, ***Exhibit 13***; Haynes Dep. at 39:16-21, ***Exhibit 12***.

287.    Casey's legs were "tensing up and moving" as Officer Funston applied the RIPP restraint. Haynes Dep. at 36:14-25, ***Exhibit 12***.

288.    Casey's legs were tensing up, likely unintentionally due to the involuntary muscle contractions caused by the Taser or because of the pain of the restraint and the Officers' weight being applied to his back and limbs. *See* Palmer Dep. at 108:1-110:21, ***Exhibit 19***.

289.    The loop of the RIPP restraint was around Casey's ankles, but Casey's legs were not crossed, and the RIPP restraint was not fully tightened and positioned properly. Haynes Dep. at 39:1-15, ***Exhibit 12***; Yamane Dep. at 58:13-23, ***Exhibit 13***.

290.    Officer Funston had applied the RIPP restraint to the chain link of the handcuffs, but it did not go all the way around the chain. Officer Funston was struggling to bend Casey's legs to get them into a position where he had enough slack to go over the handcuffs with the clip of the RIPP restraint. Haynes Dep. at 41:15-42:10, ***Exhibit 12***.

291.    Officer Yamane grabbed Casey's ankles and put his weight down on Casey's legs, pushing Casey's feet towards his buttocks to create enough slack so the restraint could be clipped to the handcuffs. *See* Yamane Dep. at 59:13-22, 61:13-22, ***Exhibit 13***; Haynes Dep. at 41:15-42:10, ***Exhibit 12***.

292.    Officers Yamane, Haynes, Funston, and Long all knew that there was a concern about having handcuffed subjects face down with their legs elevated and weight on their back for any length of time because it could result in positional asphyxia. *See* Yamane

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

Dep. at 48:12-20, ***Exhibit 13***; Haynes Dep. at 83:1-21, ***Exhibit 12***; Funston Dep. at 28:4-29:14, ***Exhibit 11***; Long Dep. at 21:24-22:21, ***Exhibit 10***.

293.   Officer Palmer arrived on the scene at 14:30:14 (2:30 p.m.) wearing a body worn camera. *See* Palmer Dep. at 12:1-5, ***Exhibit 19***; Defendants' Exhibit 19 at 5:17.

294.   As Officer Palmer approached the scene, Casey was face down and handcuffed. He was not moving or making any noise. *See* Defendants' Exhibit 19 at 5:20.

295.   Officer Palmer did not observe Casey making any volitional movement, and he did not document anything to show that Casey was resisting the other Officers. *See* Palmer Dep. at 27:23-28:25, 107:20-25, ***Exhibit 19***.

296.   Seven Officer Defendants—Sgt. Rodarme and Officers Arnold, Seaquist, Long, Funston, Haynes, and Yamane were restraining Casey face down on the ground while he was handcuffed by applying pressure to his shoulders, upper back, lower back, and legs. *See* Defendants' Exhibit 19 at 5:20.



297.   Officer Arnold was still kneeling on Casey with his right knee applying weight to Casey's upper back, shoulder, or neck, as he had been doing since at least the time that Officers Funston and Long arrived at 14:28:11 (2:28 p.m.). *See* Defendants' Exhibit 19 at 5:20-6:03; Arnold Dep. at 112:9-113:11, ***Exhibit 5***.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267



298.     One of the Officers yelled, "Stop resisting!" *See* Defendants' Exhibit 19 at 5:23.

299.     Officer Palmer radioed to the dispatcher, "He is detained right now; anybody else can slow it down." *See* Defendants' Exhibit 19 at 5:30.

300.     Despite his acknowledgement that Casey was detained, Officer Palmer did not instruct the other Officers to remove their weight from Casey or move him into a recovery position. *See* Defendants' Exhibit 19 at 5:30-6:30.

301.     Twenty-seven seconds after the fourth Taser deployment, Officer Seaquist deployed his Taser for a fifth time. *See* Defendants' Exhibit 12, Doc. 91-1 at p. 154; Defendants' Exhibit 19 at 5:33.

302.     As Officer Seaquist deployed his Taser for the fifth time, Casey was handcuffed, not moving, and was being restrained face down by Sgt. Rodarme and Officers Arnold, Long, Funston, Haynes, and Yamane. *See* Defendants' Exhibit 19 at 5:33; Long Dep. at 76:1-25, ***Exhibit 10***; Palmer Dep. at 27:11-28:25, ***Exhibit 19***.

303.     Officer Palmer radioed to request the fire department for a Tasing. *See* Defendants' Exhibit 19 at 5:41.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

304.     As Officer Yamane was restraining Casey's legs, he heard Officer Seaquist deploy his Taser. The Taser deployment was "effective" in that Officer Yamane was able to cross Casey's ankles and tighten the RIPP restraint. *See* Yamane Dep. at 65:8-67:8, ***Exhibit 13***.

305.     Officer Haynes also heard the Taser being deployed as he assisted by pulling the RIPP restraint clip over the chain link of the handcuffs and fastening the clip to the chain link. Haynes Dep. at 37:1-10, 41:15-42:10, ***Exhibit 12***.

306.     Officer Arnold finally removed his knee from Casey's back and stood up at 14:30:58. *See* Defendants' Exhibit 19 at 6:02.

307.     At approximately 14:31:00 (2:31 p.m.), one of the Officers announced that Casey was not breathing. The Officers rolled Casey to his back and began cardiopulmonary resuscitation (CPR). *See* Defendants' Exhibit 19 at 6:03.

308.     Officer Seaquist Tased Casey five times, for a total of twenty-six seconds, in a period of one minute and thirty-five seconds. *See* Defendants' Exhibit 12, Doc. 91-1 at p. 154.

**C.     The Officer Defendants' prone restraint, extrinsic compression, and Taser use caused or contributed to Casey's death.**

309.     The Phoenix Fire Department arrived on the scene at 14:33 (2:33 p.m.). Casey was without vital signs, and his initial cardiac rhythm was recorded as pulseless electrical activity (PEA). Spitz Report at p. 7, ***Exhibit 14***.

310.     Casey was transported to Deer Valley Medical Center, where he regained a pulse within a few minutes. *See id.*

311.     An examination revealed abrasions to Casey's face and lower extremities, and Taser darts were noted in his left scapular region. A CT scan of the head showed a parietal scalp hematoma and left facial contusion. *See id.*

312.     Casey never regained consciousness and was pronounced dead on February 6, 2019. *See id.*; Wohlgelernter Report at p. 14, ***Exhibit 20***.

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

313.     During an autopsy on February 7, 2019, the Medical Examiner found multiple blunt force injuries to Casey's head, torso, and extremities, puncture wounds consistent with Taser use, and traumatic injuries to the cartilage in Casey's neck. *See* Spitz Report at pp. 7-8, ***Exhibit 14***; Wohlgelernter Report at p. 14, ***Exhibit 20***; Autopsy Report (WELLS 000604-613, 000624), ***Exhibit 21***.

314.     The Medical Examiner's findings related to Casey's traumatic injuries included:

  a) Abrasions and contusions of Casey's head, scalp, face, torso, and extremities;

  b) Intrascalpular and subgaleal hemorrhages over the posterior right aspect of the vertex, the upper right scalp, and the posterior left scalp;

  c) Superficial puncture wounds consistent with Taser use and related dart injury;

  d) Subcutaneous hemorrhage of the central back (between the shoulder blades) which extended to involve the paraspinal muscles and measured six inches in greatest vertical dimension;

  e) Cerebral edema consistent with perimortem anoxic encephalopathy;

  f) Conjunctival edema with focal sparse petechial hemorrhages involving the left eye sclera and left upper eyelid conjunctiva; and

  g) Focal half-inch submucosal contusion of the anterior upper right aspect of the esophagus adjacent to the thyroid cartilage.

Autopsy Report (WELLS 000604-613, 000624), ***Exhibit 21***.

315.     Examination of Casey's hyoid bone and the cartilage in his neck revealed:

  a) The right superior horn of the thyroid cartilage was fractured into two segments;

  b) The right superior lamina of the thyroid cartilage was fractured obliquely;

  c) The right and left inferior horns were fractured; and

d) There was reddish discoloration in the fractures of the thyroid cartilage and in the lamina of the cricoid cartilage.

Autopsy Report (WELLS 000623-624), ***Exhibit 21***.

316. The Medical Examiner determined Casey's cause of death to be "complications of cardiac dysrhythmia and arrest in setting of drug (methamphetamine) intoxication, acute psychosis, arteriosclerotic cardiovascular disease, and physical restraint with prone positioning and possible extrinsic chest compression. The manner of death was classified as "undetermined." Autopsy Report (WELLS 000603), ***Exhibit 21***.

317. Dr. Daniel Spitz, a forensic pathologist, is largely in agreement with the Medical Examiner's determination of the cause of death, but, in his opinion, the manner of death is most appropriately classified as a homicide because the evidence shows the Phoenix police officers played a significant role in Casey's death. Spitz Report at p. 9, ***Exhibit 14***.

318. According to Dr. Spitz, the full thickness soft tissue hemorrhage between Casey's shoulder blades, subcutaneous hemorrhages of his back and posterior neck, petechial hemorrhages, and cartilage fractures are evidence that Casey was subjected to forced prone restraint with weight applied to his back and neck. *See id.* Such a compressive force would affect Casey's ability to breathe and limit blood flow to and from the brain. *Id.*

319. Based on his forensic analysis, Dr. Spitz has concluded that Casey's death was "due to a multifactorial process with the most significant factor being restraint asphyxiation due to forced prone restraint with extrinsic compression of his torso likely in combination with neck compression. Methamphetamine intoxication, arteriosclerotic and hypertensive heart disease and use of a conducted electrical weapon (TASER) can be considered contributory conditions." *Id.* at p. 10.

320. Dr. Daniel Wohlgelernter, a cardiologist, has opined that Casey's respiratory compromise resulting in hypoxia and PEA cardiac arrest was the result of: (a) compressive/restraint asphyxia due to Casey being restrained in the prone position on a hard surface; (b) five Taser deployments to Casey's back; and (c) multiple fractures of the thyroid

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

cartilage, which can result in airway compromise and are indicative of trauma to the neck. Wohlgelernter Report at pp. 15-16, **Exhibit 20**.

321.    According to Dr. Wohlgelernter, the type of sustained muscle contraction produced in response to a Taser deployment can contribute to respiratory compromise in a subject, like Casey, who is being actively and forcefully restrained in a prone position. *Id.* at p. 16.

322.    Dr. Wohlgelernter rejects the contention that methamphetamine intoxication was a major contributing factor to Casey's sudden cardiac arrest because the cardiac arrest was confirmed as PEA and methamphetamine, even at levels of intoxication, does not cause PEA. If methamphetamine had caused Casey's cardiac arrest, Dr. Wohlgelernter would expect a cardiac monitor to have shown ventricular tachycardia or ventricular fibrillation. *Id.* at p. 16.

323.    Dr. Wohlgelernter also rejects the notion that Casey's cardiac pathology was a major contributing factor to his cardiac arrest. There was no autopsy evidence of prior or acute myocardial infarction, and although the autopsy showed cardiomegaly with moderate concentric left ventricular hypertrophy, the abnormalities were not of sufficient severity to cause cardiac arrest. According to Dr. Wohlgelernter, if Casey's cardiac findings were causative, an EKG would have shown ventricular tachycardia or ventricular fibrillation, not PEA. *Id.*

324.    Dr. Michael Freeman, a forensic epidemiologist, provided an analysis of the various potential causes of Casey's cardiopulmonary arrest and which potential causes were the most probable cause or causes of his death. Freeman Report at p. 1, **Exhibit 22**.

325.    According to Dr. Freeman, when Casey was restrained in a prone position, a combination of factors presented an "exceedingly high risk for positional asphyxia, including his heightened oxygen needs due to obvious delirium, activity, and struggle immediately preceding the take down, pain secondary to injury and multiple TASER shocks (further increasing his oxygen requirements), and most critically, the use of a chokehold. All of these factors combined to result in Mr. Wells cardiopulmonary arrest." *Id.* at p. 12.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

326. Dr. Freeman opined that there is highly reliable physical evidence that a chokehold was applied to Casey during the restraint. The fractured thyroid cartilage and petechial hemorrhages are strongly associated with direct intentional neck trauma, such as from manual strangulation and chokeholds. *Id.* at pp. 12-13.

327. In Dr. Freeman's opinion, Officer Seaquist's Taser use was a plausible contributing cause of Casey's cardiopulmonary arrest and death, combined with the factors for positional asphyxia. When the Taser was deployed, Casey was delirious, highly excited, screaming, hyperventilating, and confused. The Taser caused excruciating pain in addition to the potential for cardiac dysrhythmia (when deployed on the torso near the heart), which in turn increased Casey's need for oxygen. *Id.* at pp. 14-15.

328. For these reasons, Dr. Freeman concluded that Casey's death was caused by the Phoenix Police Officers' use of force, which resulted in cardiopulmonary arrest triggered by asphyxia. *Id.* at p. 18.

### D. The City of Phoenix's unconstitutional training, policies, and practices were moving forces behind Casey's death and the violation of his rights.

329. Plaintiff's police practices expert, Scott DeFoe, has opined that the use of force, including lethal force, by Sgt. Rodarme and Officers Arnold, Seaquist, Long, Funston, Haynes, and Yamane did not comport with standard police practices and was unnecessary and inappropriate. In Mr. DeFoe's opinion, this was not an immediate defense of life situation, and the Officers overreacted based on their subjective fear without exhausting other reasonable and available measures. *See* DeFoe Report at p. 53, ***Exhibit 17***.

330. Specifically, according to Mr. DeFoe, the Officers acted unreasonably in failing to immediately remove the pressure and weight from Casey's back and move him into a recovery position and were unreasonable in essentially hogtying him by forcing his feet and ankles toward his buttocks because they knew or should have known of the risks of positional asphyxia. *See* DeFoe Report at pp. 49-51, ***Exhibit 17***.

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

331. Mr. DeFoe has also opined that Officer Seaquist's use of the Taser was unreasonable, unnecessary, and violated the City's policy that prohibited Taser usage against a handcuffed prisoner. *See* DeFoe Report at pp. 38-40, ***Exhibit 17***.

332. In Mr. DeFoe's opinion, the Phoenix Police Department failed to properly train its Officers on the risks associated with maximally prone restraint techniques, including the danger of positional asphyxia and sudden death, and the Department failed to implement a policy to avoid the use of maximally prone restraint techniques. *See* DeFoe Report at pp. 44-46, 53-54, ***Exhibit 17***.

333. The City of Phoenix, through its Rule 30(b)(6) representative, testified that Officers are trained that it is appropriate and within policy to use an electronic control device (ECD) on a handcuffed person who is prone, face down on the ground if the person is displaying "active aggression" or is a danger to himself or others." *See* Calle Dep. at 75:8-19, 76:12-21, 77:17-78:5, ***Exhibit 15***. Mr. Calle further testified that the "expectation" would be that officers would roll the subject to the position of recovery "[i]f they're solely laying down in handcuffs and RIPP restraint, there's no longer physical actions of assault, they're not in active aggression, they're not a danger to self or others and they're able to be rolled over . . . that would be the expectation." *Id.* at 79:1-6.

334. Phoenix Police Officers are trained that it is appropriate and within policy to use an electronic control device (ECD) on a handcuffed person who is prone, face down on the ground if the person is displaying "active aggression" or is a danger to himself or others. *See* Calle Dep. at 75:8-19, 76:12-21, 77:17-78:5, ***Exhibit 15***.

335. Phoenix Police Officers are not trained that the Taser can cause serious injury or death to people who are physically compromised, nor are they trained to refrain from using a Taser on physically compromised individuals. *See* Calle Dep. at 51:11-52:19, ***Exhibit 15***.

336. When asked if Officers were trained that placing body weight on the back of a prone handcuffed subject can cause death, Mr. Calle testified, "it's not a yes or no." Mr. Calle stated that Officers are trained that they still have to be able to detain and control the

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ♦ Fax: (602) 265-0267

subject, and if issues like positional asphyxia or excited delirium are present, "the training is consistent with getting control and getting that subject into a recovery position and requesting fire or EMS." Calle Dep. at 81:7-19, *Exhibit 15*.

337.　In Mr. DeFoe's opinion, the Department also failed to train the Officers on crisis intervention techniques and failed to establish a Crisis Intervention Team involving mental health professionals who could have assisted the Officers in their encounter with Casey. *See* DeFoe Report at pp. 33-35, 53-54, *Exhibit 17*.

338.　In Mr. DeFoe's opinion, the Department failed to determine that there was a failure to de-escalate the subject incident and that the use of force was unnecessary and inappropriate. *See* DeFoe Report at pp. 53-54, *Exhibit 17*.

339.　In fact, since 2009, the Phoenix Police Department Professional Standards Bureau (PSB) has never found an in-custody death out of policy. *See* DeFoe Report at pp. 53-54, *Exhibit 17*; Junas Dep. at 60:11-15, *Exhibit 18*.

340.　PSB Lieutenant Ryan Junas, the City's Rule 30(b)(6) representative, testified that the Department does not track in-custody deaths in which prone restraint occurred. *See* Junas Dep. at 58:5-16, *Exhibit 18*.

341.　PSB investigations and Use of Force Review Boards are not provided with any information on an Officer's past use of force history and have no way of determining whether an Officer has a history of using force more frequently than others. *See* Junas Dep. at 117:5-15, *Exhibit 18*.

342.　The Phoenix Police Department also maintains a practice of allowing Officers to purge use of force records from their files. If a use of force was found to be within policy— as all in-custody deaths were since 2009—then records pertaining to an Officer's use of force or aggregate uses of force would be purged on a yearly basis. *See* Junas Dep. at 85:2-13, *Exhibit 18*.

343.　In addition, prior to 2015, Officer uses of force were documented in the PACE database, which was purged much more extensively than recent records. Thus, for Officers

ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 400-4400 ◆ Fax: (602) 265-0267

employed before 2015, there would be much less data available on their uses of force. *See* Junas Dep. at 115:17-117:4, ***Exhibit 18***.

344. According to Mr. DeFoe, these types of decisions have a ripple effect because they lead other officers within the Department to believe they can engage in similar conduct without consequences. *See* DeFoe Report at pp. 53-54, ***Exhibit 17***.

345. As a result of the Phoenix Police Department's inadequate training, policies, and practices, the Officers failed in their duty to intervene and failed to recognize that Casey was experiencing a mental illness or was under the influence and that he was exhibiting signs of medical distress throughout their encounter. In addition, Sgt. Rodarme, as the sergeant in charge, failed to formulate a tactical plan and escalated the situation by initiating physical force when there was no rush to do so. Sgt. Rodarme also failed to intercede and failed to ensure that the other Officers did not hogtie or deploy the Taser against Casey. *See* DeFoe Report at pp. 31-35, 46-48, 51-52, ***Exhibit 17***.

346. Dr. Wohlgelernter determined that three factors led to Casey's death: (1) compressive restraint asphyxia; (2) five taser deployments; and (3) multiple fractures of the hyoid cartilage in Casey's neck. *See* Wohlgelernter Report at pp. 14-16, ***Exhibit 20.***

347. Dr. Spitz determined that the most significant factor in Casey's death was "restraint asphyxiation due to forced prone restraint with extrinsic compression of his torso likely in combination with neck compression." *See* Spitz Report at p. 10, ***Exhibit 14***.

348. Dr. Spitz concluded that the use of the taser was also a contributing factor in Casey's death. *Id.*

349. Dr. Spitz and Dr. Freeman both concluded that Casey's death would not have occurred but for the police use of force. *Id.; see also* Freeman Report at pp. 18-19, ***Exhibit 22***.

///
///

RESPECTFULLY SUBMITTED: May 2, 2022

**Robbins & Curtin, p.l.l.c.**

By:     /s/ Jesse M. Showalter
        Joel B. Robbins
        Jesse M. Showalter
        301 E. Bethany Home Road
        Suite B-100
        Phoenix, Arizona 85012
        *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 2, 2022, I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF system for filing and transmittal of a

Notice of Electronic Filing to the following CM/ECF registrants:

Kathleen L. Wieneke
Christina Retts
Wieneke Law Group, PLC
1225 W. Washington Street, Suite 313
Tempe, Arizona 85281
kwieneke@wienekelawgroup.com
cretts@wienekelawgroup.com
*Attorneys for Defendant*

Thomas A. Burnett
Donal E. Burnett
Burnett Law Office, PLC
1744 S. Val Vista Drive, Suite 208
Mesa, Arizona 85204
tom.burnett@burnettlawaz.com
don.burnett@burnettlawaz.com
*Co-counsel for Plaintiff*

/s/ Julie W. Molera