***Stickney v. City of Phoenix, et al.***
**Case No. 2:20-cv-01401-SMB-CDB**

**Exhibits to Plaintiff's Response to Defendants'**
**Statement of Facts in Support of Motion for Summary Judgment (Doc. 91)**
**-and-**
**Plaintiff's Controverting Statement of Facts**

| Description | Exh. No. |
|---|---|
| 911 Call Audio (COP-STICKNEY000480) (Non-Electronic) | 1. |
| 911 Call Audio (COP-STICKNEY000481) (Non-Electronic) | 2. |
| 911 Call Audio (COP-STICKNEY000483) (Non-Electronic) | 3. |
| 911 Call Audio (COP-STICKNEY000484) (Non-Electronic) | 4. |
| James Arnold Deposition Transcript | 5. |
| Robert Rodarme Deposition Transcript | 6. |
| Richard Buffington Interview Transcript | 7. |
| Jeffrey Bolduc Interview Transcript | 8. |
| Joseph Seaquist Deposition Transcript | 9. |
| Frank Long Deposition Transcript | 10. |
| Travis Funston Deposition Transcript | 11. |
| Dustin Haynes Deposition Transcript | 12. |
| Sean Yamane Deposition Transcript | 13. |
| Daniel Spitz Expert Report | 14. |
| Joshua Calle Deposition Transcript | 15. |
| PPD Operations Order 7.1 | 16. |
| Scott DeFoe Expert Report | 17. |
| Ryan Junas Deposition Transcript | 18. |
| Kenneth Palmer Deposition Transcript | 19. |
| Daniel Wohlgelernter Expert Report | 20. |
| Autopsy Report | 21. |
| Michael Freeman Expert Report | 22. |

# EXHIBIT 1

## (Non-Electronic)

# EXHIBIT 2

## (Non-Electronic)

# EXHIBIT 3

**(Non-Electronic)**

# EXHIBIT 4

## (Non-Electronic)

# EXHIBIT 5

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)

VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

JAMES ARNOLD

Phoenix, Arizona
April 6, 2021
9:00 a.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
P (602) 230-5454
F (480) 546-3721
www.dlvreporting.com

PREPARED BY:

Donna DeLaVina, RPR
Certified Reporter
Certificate No. 50468

1  that I was trained on it in any way.

2      Q.  BY MR. SHOWALTER:  But you received information

3  about it sufficient --

4      A.  In further training on how to, when to

5  administer it while on scene.

6      Q.  And you've also received training on something

7  called excited delirium, correct?

8      A.  Correct.

9      Q.  And you received training on how to recognize

10  the signs of excited delirium, correct?

11              MS. RETTS:  Form.

12              THE WITNESS:  I don't know how -- I'm

13  trying to think.  We've, I'm sure, have gotten training

14  on it.  But to recognize it.  I mean, how am I supposed

15  to know who's going to have excited delirium and who's

16  not going to have excited delirium.  I go based on the

17  individual and how they're responding and what's going

18  on and in the situation.

19      Q.  BY MR. SHOWALTER:  You received training on

20  excited delirium as a part of your academy training,

21  correct?

22      A.  Correct.  And I believe that's right.

23      Q.  And you were trained that excited delirium is a

24  medical emergency, correct?

25              MS. RETTS:  Form.

1  delirium or going to have excited delirium.

2      Q.  What were you trained at the academy were the

3  signs of excited delirium?

4      A.  Sweating, you know, the -- just rapid

5  breathing.  I mean, that was a long time ago.  I -- you

6  know. . .

7      Q.  Odd behavior, would that be a potential sign of

8  excited delirium?

9          MS. RETTS:  Form; foundation.

10         THE WITNESS:  I don't know.  There's --

11  you would be pointing out half of the society if you

12  say odd behavior or what I believe is odd behavior.  I

13  mean, some people would think I have excited delirium

14  too because they think something I'm doing is odd or

15  acting up.

16     Q.  BY MR. SHOWALTER:  Well, I have it as odd

17  behavior in the -- along with sweating, rapid breathing

18  and usage of a stimulant or suspected usage of a

19  stimulant?

20         MS. RETTS:  Form; foundation.

21         THE WITNESS:  I mean, I can draw, you

22  know, all kinds of conclusions, you know.  I just feel

23  that how I approach the situation, there wasn't a

24  thought of me thinking that this gentleman was under

25  distress in terms of he wasn't sweating.  He wasn't --

1    he wasn't rapid hard breathing or breathing issues and

2    stuff initially.  I guess, a naked gentleman standing

3    in the middle of the street, yelling to the sky.

4        Q.  BY MR. SHOWALTER:  And, you know, I recently

5    bought a home in Arizona in October, and now the summer

6    is starting where it's too hot to live and I'm told

7    that Arizona is essentially dependent on the Colorado

8    River for its water.  And there's bunch of other

9    states, like more powerful states, like California that

10   are also dependent on that.  And, you know, the water

11   is running out.

12             They're still building homes.  And so I

13   would classify anybody buying a home in Arizona under

14   those circumstances and people are lining up to buy

15   homes, that to me is like odd behavior that's

16   consistent with psychosis, but I did it anyway.

17             And so that's my own idiosyncratic view of

18   what odd behavior is.  That's something I define as odd

19   behavior that society says is normal behavior, right?

20       A.  I got you.

21       Q.  And you were saying earlier that there are

22   things that you might consider odd that maybe everybody

23   does.  And so that's -- you know, when I use the word

24   idiosyncratic, that's kind of what I mean, is it's my

25   own peculiar definition.  But you would agree with me

1  that standing naked on a public road during the daytime

2  and doing sun salutations or yoga, would be odd

3  behavior under pretty much anybody's definition, fair?

4          MS. RETTS:  Form.

5          THE WITNESS:  Very fair.  Of course.

6     Q.  BY MR. SHOWALTER:  And you recognize that what

7  Casey Wells was doing was odd behavior, correct?

8     A.  Correct.

9          MR. SHOWALTER:  Why don't we go ahead and

10  take a five-minute break right now.

11          MS. RETTS:  Thank you.  I appreciate it.

12  I was about to ask, but I didn't want to interrupt

13  your --

14          MR. SHOWALTER:  It's 10:11 right now.  Why

15  don't we come back at 10:20.

16          MS. RETTS:  Perfect.

17          THE COURT REPORTER:  The time is 10:11

18  a.m.  We are off the record.

19       (Whereupon, a brief recess ensued from

20  10:11 a.m. to 10:20 a.m.)

21          THE COURT REPORTER:  The time is

22  10:20 a.m.  We are back on the record.

23     Q.  BY MR. SHOWALTER:  I want to make sure I

24  understand.  I was asking you -- Officer Arnold, I was

25  asking you some questions about your training on

1  excited delirium.  And we sort of went from there to

2  talking about the specifics of this case.  And we're

3  going to get into that.  But before we do, I just

4  wanted to ask you, since the academy, have you received

5  training on excited delirium?

6      A.  None that I recall.

7      Q.  Okay.  Were you also trained at the academy

8  about positional asphyxia?

9      A.  I don't remember.

10     Q.  Since the academy, did you receive any training

11  on positional asphyxia?

12          MS. RETTS:  Form.

13          THE WITNESS:  No, I haven't.

14     Q.  BY MR. SHOWALTER:  Are you familiar with the

15  City of Phoenix's operation orders regarding the use of

16  force?

17     A.  Yes.

18     Q.  And in terms of use of force, operations orders

19  on that issue can change over time, correct?

20     A.  Correct, I believe so.

21     Q.  As of February 4th of 2019, were you trained in

22  using the carotid hold technique?

23          MS. RETTS:  Form.

24          THE WITNESS:  We were -- yes.

25     Q.  BY MR. SHOWALTER:  And at that time, that was a

1    Q.  K is "anthropologic assessment of hyoid bone

2  and airway cartilages revealing focal airway cartilage

3  fractures."  Do you see where I read that?

4    A.  I do.

5    Q.  And then it says, "see anthropology report"?

6    A.  Uh-huh.

7    Q.  Do you see where it says that?

8    A.  Yes.

9    Q.  Do you have any information on how Casey

10  Wells -- how the cartilage in Casey's throat was

11  fractured?

12          MS. RETTS:  Form; foundation.

13          THE WITNESS:  I don't recall.

14    Q.  BY MR. SHOWALTER:  Did you or any other officer

15  ever make contact with Casey's throat in any way that

16  you observed or did?

17          MS. RETTS:  Form.

18          THE WITNESS:  I can answer for myself and

19  I did not.

20    Q.  BY MR. SHOWALTER:  And during this event, you

21  were -- were you generally around Casey's head where

22  you would have a view if another officer struck Casey

23  in the throat?

24          MS. RETTS:  Form; foundation.

25          THE WITNESS:  Around his head, I mean,

1    if -- just whoever was in the -- that was dealing with

2    Mr. Wells.  But then in view of -- if any of us struck

3    him in the throat, so it didn't -- it just would have

4    to be by his neck, we would have all seen that.

5        Q.  BY MR. SHOWALTER:  And what I mean is that if

6    an officer was working to control Casey's legs, he

7    might not necessarily observe what other officers who

8    were located up by Casey's head are doing, fair?

9              MS. RETTS:  Foundation.

10             THE WITNESS:  I mean, you could be right

11   next to somebody.  If you're concentrating like you're

12   stating that he's concentrating on, focusing on the

13   legs.  Somebody could be focused on an arm or a

14   shoulder or something and not recall being -- somebody

15   getting struck in the, you know, in the throat, like

16   you're saying.

17             So I don't understand why saying holding

18   the legs, he might not see what somebody that's up

19   towards the head would definitely see.  The chances may

20   be a little bit greater because you're closer to the

21   possible assault or whatever you want to call it.

22             But I didn't.  Like I said, I can't answer

23   for anybody else, but I did not see anybody strike him.

24   I'm the only one that struck him and that happened

25   before any other officer arrived on scene.  And I only

 1  struck him because of the fact that he broke free.  On

 2  his back, he broke free from my grasp and started

 3  swinging at Sergeant Rodarme.

 4       Q.  BY MR. SHOWALTER:  Okay.  And I was just going

 5  to --

 6       A.  So in order to gain control of him and his arm

 7  again, that's why I struck him in the nose with my

 8  forearm.

 9       Q.  And so to be clear, you said a second ago

10  before any other officer arrived at the scene, you mean

11  any other officer other than Sergeant Rodarme?

12       A.  Correct.

13       Q.  So I'm going to take you to what's been marked

14  as Exhibit 1a and this is the Phoenix police report.

15       (Whereupon, Deposition Exhibit Number 1a was

16  marked for identification.)

17       Q.  BY MR. SHOWALTER:  And I'm not going to try to

18  ask you anything about first page.  But Exhibit 1a is

19  Bates stamped COP-STICKNEY000001 through 000128.

20            And I'm going to take you to page 81,

21  COP-STICKNEY 81, which is also the 81st page and

22  there's a time line.  And I want to take you through

23  the time line and ask you some questions about it.  And

24  ask you what -- you know, the things that you saw on

25  February 4th and what happened, okay?

1  that we needed to get him dressed and figure out what's

2  going on here.

3     Q.  So you were able to see a pile of clothing and

4  a driveway at a nearby house that you were able to

5  relate to Casey, fair?

6     A.  Correct.

7     Q.  Did the fact that he had stripped naked, was

8  that fact that suggested to you that he was under the

9  influence of drugs?

10     A.  Potentially.  You never know what -- I mean, he

11  could not be on drugs, but just be -- have a mental

12  condition, you know, to cause that as well.

13     Q.  And that's -- the fact that somebody is naked,

14  does that make it more likely that they're on drugs

15  than if --

16     A.  No.  It just makes it odd, like we discussed

17  earlier.  It's not normal for a human being to be naked

18  in the middle of the street, you know.

19     Q.  Yeah.

20     A.  It's odd.  But that's why we respond and that's

21  what I was trying to figure out is why he's in the

22  middle of the street with no clothes on.

23     Q.  Now, what was he doing in the middle street?

24  Was he gesturing?  Was he posing?  How would you

25  describe what he was doing?

1        MS. RETTS:  Form.

2        THE WITNESS:  He was standing erect with

3   his arms and hands pointed to the sky, yelling with

4   them up in the air.

5     Q.  BY MR. SHOWALTER:  And was he holding them up

6   in the air or was he moving them to the sides or

7   anything like that?

8     A.  He was holding them straight up in the air.

9     Q.  And so you arrive.  You see you this.  You

10  approach Mr. Wells and you also note the clothing and

11  you tell him, hey, let's get your clothing back on and

12  figure out what's going on here?

13    A.  Right.  I had mentioned also, I said I needed

14  to put him in cuffs, that would be for his safety and

15  mine.  He had mentioned to me one of the only -- one of

16  the three things he said to me, he said to me, I was

17  born naked or I came into this world naked and I'm

18  going to leave this world naked; or God meant for me to

19  leave this world naked.  I'm just paraphrasing.  I

20  don't remember his exact words.

21    Q.  He said words to the effect of, something like

22  I came into this world naked and I'm going to leave

23  this world naked?

24    A.  Right, to those effects, yes.

25    Q.  And --

1    A.  When I mentioned that I was going to be placing

2  him in cuffs, he had looked over, still hands up in the

3  air, looked over his left shoulder at me and addressed

4  me saying, "You're not going to cuff me."

5    Q.  Okay.

6    A.  Which I said, "And why would that be?  Are you

7  going to fight me?  I'm just trying to keep us both

8  safe.  We need to get your clothes on.  I'm not telling

9  you you're being arrested.  We just need to get this

10  figured out."

11           And he stated one more time to me, he

12  said, "You're just not going to cuff me."

13    Q.  So you said he only ever said three things to

14  you, were those the three things you heard him say?

15    A.  Those were the three things that I recall him

16  saying.

17    Q.  And that was before you had gone hands-on,

18  fair?

19    A.  Correct.

20    Q.  After you went hands-on, you never heard him

21  say another word, fair?

22    A.  Correct.

23    Q.  I want to make sure I kind of have a sense of

24  the chronology of those three statements.

25    A.  Uh-huh.

1    Q.  Based on what you've testified about, it sounds
2  like the first thing you said to him was, hey, let's
3  get your clothes back on; is that fair?

4    A.  Correct.

5    Q.  And in response to that he made the comment
6  about being born naked or coming into this world naked
7  and leaving this world naked, correct?

8    A.  Correct.  I don't know if it was response to me
9  or he was just talking.  Because he didn't engage.  He
10  didn't look at me when he was saying that.  He was
11  still looking up into the sky with his hands and he
12  was, you know, yelling stuff in the air prior to me
13  showing up.

14         So I don't know if that was something that
15  he was saying, you know, after I had asked him to get
16  his clothes, you know.  But he did not verbally contact
17  me until I told him that I was going to put him in
18  cuffs for his safety and mine.

19    Q.  And that was when he sort of looked over his
20  shoulder and said, "No, you're not"?

21    A.  Correct.  He said, "You're not going to cuff
22  me."

23    Q.  Okay.  And was that comment or were the two
24  comments about the handcuffs, when he made those, was
25  it clear to him that he was actually addressing you?

JAMES ARNOLD   APRIL 06, 2021

1    A.   Yes.   He was answering a question that I was

2    asking him.

3    Q.   Do you have a -- did some time elapse between

4    you telling him that he needed to get his clothes on

5    and the handcuffing comment?   Or were those pretty

6    close together?

7    A.   All relatively pretty close together.   You

8    know, one question followed the other.   Like I had

9    stated, I initially asked, you know, "Sir, what are you

10   doing out here with no clothes on?"   Once I recognized

11   that the clothes were over there, I said, "Hey, let's

12   get your clothes on."   I said, "I'm going to need to

13   put you in cuffs."

14        All along, right before, that's when he

15   said, you know, "I was born naked.   I'm going to leave

16   this world naked," comment.   I'm like, "Let's get your

17   clothes on."   I said, "Let's figure this out.   I'm

18   going to have to cuff you."   That's when he

19   acknowledged me over his shoulder saying, I'm not going

20   to cuff him.

21        I made the statement, I said, "Why, are

22   you going to fight me?   Are we going to have issues?"

23   And he said, "You're just not going to cuff me."   And

24   those were the only words I spoke to him or he -- I

25   don't recall him saying anything else to me or anybody

1  else on the scene.

2      Q.  Okay.  And at the time he made those three

3  statements, was Sergeant Rodarme there yet?  Or was

4  that before Sergeant Rodarme arrived?

5      A.  He wasn't there.  Once he answered the last

6  question and saying, "You're just not going to cuff

7  me."  I made that decision not to go hands-on with him

8  right then.  To wait until my backup showed up, which

9  was Sergeant Rodarme.

10     Q.  At this time -- what is your height?

11     A.  I like to believe I'm 6'2", a full 6'2".  But I

12  might be about 6'1" and three-quarters, depending on --

13  because of my age, I'm getting older.

14     Q.  And it might depend on what shoes you're

15  wearing and things like that?

16     A.  Correct.

17     Q.  And what was your approximate weight on

18  February 4th, 2019?

19     A.  I would have to say it's probably 250-ish.

20     Q.  At the time, did you have an estimate for how

21  tall Casey was and what his approximate weight was?

22     A.  I thought he ranged right in about 5'10",

23  probably about 210 pound range.

24     Q.  Okay.

25     A.  From just looking at him.  I'm not a -- what do

1  you want to call it, those carnival people that guess

2  weights or anything.

3     Q.  Yeah.  But you, as a police officer, you're

4  trained to try to get an accurate description of

5  people.  And that may be much easier, but, you know,

6  you're generally used to giving descriptions of people

7  who are clothed?

8     A.  That's fair to say.

9     Q.  So you made a decision to wait to attempt to

10 cuff Mr. Wells until additional officers arrived on the

11 scene?

12    A.  Yeah.  To even go hands-on with him.  I still

13 tried to chat with him.  I don't recall what I was

14 saying to him.  But I tried to keep him, you know,

15 continuing to be calm.  Because at this point, he was

16 still being calm.  Although, he made those statements

17 to me, he wasn't -- he went right back to looking up in

18 the air and holding his hands up and he wasn't making

19 any, you know, motions towards me.  Or, you know, he

20 wasn't threatening me at that point.

21          So I chose to say, you know what, mainly

22 because he was naked, that I'm not going to go hands-on

23 with him because I didn't want to have to wrestle

24 around somebody if they didn't want me to put them in

25 cuffs when they didn't have any clothes on.

JAMES ARNOLD  APRIL 06, 2021

1    Q.  And given that he didn't have any clothes on,
2  you were able to recognize that he was unarmed,
3  correct?

4    A.  Correct.  And I also knew that the more
5  officers that showed up, the more of a deterrent
6  fighting us would be.  So that's another reason why I
7  chose to say, you know what, I'll just wait.  There's
8  no rush for me to go hands-on with him, especially when
9  I knew my backup was coming.  And then that might help
10  deter him from wanting to fight us.

11    Q.  So once you make that decision, you're
12  continuing to attempt to engage Casey, waiting for the
13  arrival of additional officers, correct?

14    A.  Correct.

15    Q.  And the first officer who shows up, would be
16  Sergeant Rodarme?

17    A.  Correct.

18    Q.  And I'm going to take you back to Exhibit 1a.
19  And this is page 81.  And this has Sergeant Rodarme
20  arriving on scene at approximately 14:22:14.  Do you
21  see where I read that?

22    A.  I do.

23    Q.  And do you have any reason to disagree with
24  that?

25    A.  I don't.

1    Q.   Okay.  And when -- so I'm going to stop the

2  share.

3              When Sergeant Rodarme arrives, what

4  happens at that point?

5    A.   He approached both Mr. Wells and I, as I was

6  standing there.  I advised Sergeant Rodarme that

7  Mr. Wells was not -- had stated the me that he was not

8  going to allow me or us to cuff him and get him

9  dressed.

10   Q.   And my sergeant, Sergeant Rodarme at the time,

11 stated, "Okay."  As he positioned himself on the west

12 side of Casey, which was the opposite side I was

13 standing on.

14              Still Casey or Mr. Wells wasn't moving.  I

15 believe, I don't recall what he was saying, meaning my

16 supervisor, my boss, but he engaged in conversation

17 with -- when I say conversation, he started talking to

18 Casey.  I don't remember Casey saying anything to him

19 as well, trying to, you know, de-escalate the

20 situation, saying, kind of reiterating what I had

21 already mentioned to Mr. Wells on, let's get your

22 clothes on, let's figure this out.  Just because we're

23 going to get you in cuffs, doesn't mean that you're

24 being arrested.  We're just doing this for everybody's

25 safety here.  And he was, to my knowledge or what I

1  remember, not responding to my boss.

2          And then both my boss and I, we kind of

3  gave our -- just, I don't know, like a head nod to each

4  other that we're going to go hands-on at the same time,

5  which we bother grabbed him at the wrist and in triceps

6  of each of his arms and we tried to bring him down to

7  try to be able to cuff him or get him into a position

8  where we could get him restrained or in restraints.

9          At that point, he wasn't letting us move

10  his arms.  He wasn't fighting us like waving his arms

11  around or trying to break free at that point.  He was

12  just attempting to resist us and not let us get him

13  into cuffs.  So we both attempted to plead with them,

14  please don't resist, please just let us, you know, get

15  you in cuffs so we can figure this out.  Don't make it

16  any worse than what it is or possibly could be.  We

17  just kept pleading with him.  And, again, he continues

18  to not pay attention to us or not respond to us.  But

19  just every time we would attempt to get his arms behind

20  his back, he would resist us, like trying to keep them

21  up in the air.

22     Q.  Okay.  I want to -- I'm going to share with you

23  a video that I do not believe it's been marked for this

24  deposition.  It is Exhibit 26.  It's a cell phone video

25  that was taken by a neighbor.

1 | him to be able to go hands-on.

2 |    Q.  And Casey also did not change his position,

3 | correct?

4 |    A.  Correct.

5 |    Q.  And after Sergeant Rodarme arrived, you've

6 | already testified you never heard Casey verbalize

7 | another word?

8 |    A.  Correct.

9 |    Q.  Now, what happened -- picking it up there, what

10 | happens next?

11 |    A.  After we go hands-on with him?

12 |    Q.  Yes.

13 |    A.  We had been pleading with him to get him into

14 | cuffs.  I had mentioned to Casey, again, with no

15 | response from him, I had mentioned, after we had

16 | pleaded with him, I said, "Sir," I said, "We've asked

17 | you nicely.  We've told you that we're going to get you

18 | in cuffs and you're still resisting.  Our next step is

19 | we're going to make you go in cuffs."

20 |          Again, he didn't respond.  Again, he

21 | continued to resist us when we attempted.  So at that

22 | point, another verbal cue that I gave to my boss, like

23 | I was going to try to take him down to be able to get

24 | him under control to cuff him.  Well, that attempt

25 | failed.  When trying to take him down, he ended up

1  breaking free from both of us, I think more so from me

2  because of the fact my boss in ways just let him go, so

3  I'm not taking down two people and, you know, possibly

4  taking my sergeant out of the mix.

5          But he broke free.  He got into a fighting

6  stance, balled up his fists and he took a swing at me.

7  He hit me right here in the bottom lip and then backed

8  off and smiled on his face and started bouncing up and

9  down again.  So, at that point, that's when I

10  approached him getting him into a high bear hug.  And

11  when doing so we're wrestling around, still standing

12  up.  I don't have the leverage, even though I'm taller

13  than him, he's a stocky man and I didn't have the

14  leverage to bend him over, so he would lose footing and

15  fall to his back.

16          So that's when Sergeant Rodarme initially

17  deployed his TASER.  But I believe and this I don't

18  know, he would have to tell you, I believe, and I don't

19  know.  He would have to tell you, I believe he did not

20  use his TASER because I'm so close to Mr. Wells at the

21  time, being hands-on with him.

22          So he holstered his TASER and then he

23  helped me by grabbing Mr. Wells from behind and forcing

24  him down to his back.  That's where I end up in what I

25  believe is like a full mount.  I don't know if you know

1  that term or whatever.  But I'm top of Mr. Wells.  He's
2  still resisting, I'm trying to get control of just him
3  in general.

4          Well, then my boss comes to his -- because
5  he's laying on his back, trying to get control of his
6  right arm again, which I'm now trying to focus on his
7  left arm and trying to pin him down to where he's now
8  on his back laying like this.  But that whole time,
9  he's still fighting us.  He was able to break free from
10  my grasp and that's when he took a swing at Sergeant
11  Rodarme.  When he did so, that's when I elbowed him
12  right here in the nose and he started bleeding
13  immediately.

14          When he did that, all he did was -- I
15  regained his wrist and I pinned him back down that way.
16  But all he did was shook his head and it seemed to make
17  him madder.  If madder is a word.  Even more mad.  And
18  that's when he started to spit and growl and, you know,
19  make noises and stuff like, you know, he's willing to
20  fight and that didn't affect him.

21          So at that point, I am trying my best to
22  kind of -- I kind of sprawl out.  So I lengthen my
23  body, hoping that my weight would help keep him, you
24  know, down, as well as keeping control of his legs,
25  because he was trying to kick and everything else.  So

1  deployment or whatever was gone, he was right back to

2  resisting us again.

3      Q.  So the -- I mean, the information we have is

4  that the two cartridges were deployed, but once the

5  second cartridge was deployed, Officer Seaquist could

6  still pull the trigger and it would actuate the TASER

7  for five seconds at a time.  Do you disagree with that?

8      A.  I don't disagree with it.  As long as you have

9  a good connection, that's where it's going to localize

10 within that -- whatever the spread is on the probes

11 that hit.  I don't know if the first deployment of the

12 cartridge, both connected, both probes connected.  I

13 think the second one did, but being the close

14 proximity, there wasn't a large enough spread in

15 between the probes to lodge -- to lock up a much larger

16 muscle group or grouping.

17          So I think accompanied with Mr. Wells'

18 size and stuff, I believe that's probably why it wasn't

19 as effective as it is on other people.

20     Q.  Is your recollection that each time you heard

21 the TASER deployed, you would see Casey stiffen in

22 reaction to that?

23     A.  Yes.  I could say that.

24     Q.  And when you're talking about the spread, I

25 just want to make sure that we're talking about the

1            Now, I want to take you back to what you

2   were talking earlier about when Casey was brought to

3   the ground.  Do you remember hearing Casey's head

4   strike the asphalt?

5            MS. RETTS:  Form.

6            THE WITNESS:  I do not.

7       Q.  BY MR. SHOWALTER:  Do you know if Sergeant

8   Rodarme did anything to cushion Casey's head from

9   striking the asphalt?

10      A.  I don't recall.

11      Q.  And you also -- before we get to that point,

12  you have him in, what you described as a high bear hug?

13      A.  Correct.

14      Q.  When you say a bear hug, you mean -- and this

15  is -- you're face to face with him, correct?

16      A.  Correct.

17      Q.  And you are putting your arms around him and

18  pulling him tight, correct?

19      A.  Correct.  Well, actually, my arm for underneath

20  his.  So I'm about armpit high, I guess if you want to

21  consider that a high bear hug, instead of, you know,

22  the smaller, closer to the small of his back, being a

23  lower bear hug and being able to maybe, you know, knock

24  his center of gravity over.  Well, with him being a

25  little bit shorter than me and a stocky man, I wasn't

1  getting -- I wasn't able to get him to lose his balance

2  or get that -- you know, he had a lower center of

3  gravity, I guess you could say?

4       Q.  Yeah.  Yeah.  And I think you explained that

5  well when you said you weren't able to get a leverage

6  on him or something like that, right?

7       A.  Correct.

8       Q.  And so Sergeant Rodarme assists in bringing

9  Casey to the ground.  And at that point, you said you

10  were in what you described as a full mount position?

11       A.  Correct.  Where I was sitting on him.  My knees

12  to his side, on each side, where I'm sitting on top of

13  his stomach at the time, trying to control his left arm

14  while he's laying on his back, all along, that's when

15  my sergeant grabbed his right arm and was trying to

16  control that as well.

17            But when I was attempting to do that,

18  that's when he broke free of my grasp and he took a

19  swing at my sergeant, which was trying to gain control

20  of the other arm.

21       Q.  And then is it at that point that you deliver

22  the strike to his nose?

23       A.  Right.  Which gave me that split second to

24  regain control of his left arm and pin that back down.

25  But, like I had stated earlier, that the only effect

1 still has access, especially because of Sergeant

2 Rodarme trying to control the other arm.  We didn't

3 have his legs.  So he's got, you know, his feet on the

4 ground and he's pushing off the ground to try to, you

5 know, to buck me off, I guess, if that's a right

6 analogy.

7         So that's why -- that was another

8 contributing factor of why he was able to break from my

9 grasp and stuff, because now I'm having to catch myself

10 and concentrate with my other arm over his head when he

11 bucks me up forward and I have to, you know, position

12 myself and then come back down.  And that's when I had

13 lost his arm.

14     Q.  Okay.  And so he --

15     A.  And so that's why after that, after I struck

16 him and stuff like that, that's when I tried to sprawl

17 out on him to hopefully take his legs out play a little

18 bit more until somebody else got there to help us out

19 to control his legs.  And that's why Officer Seaquist,

20 I believe, was the first one there again.  He

21 immediately went right to his legs to control those.

22     Q.  And so make sure I'm -- when I refer to left

23 and right arms, make sure I'm getting it right.

24     A.  Okay.

25     Q.  Because I'll confess to having difficulty

1  keeping it straight.

2      A.  Right.

3      Q.  You're on top of him in this full mount.

4  You're trying to control his right arm?

5      A.  Left arm.

6      Q.  His left arm.  Sergeant Rodarme is trying to

7  control his right arm?

8      A.  Correct.

9      Q.  And is it the left arm -- it's Casey's left arm

10  that broke free and strikes Sergeant Rodarme?

11      A.  Yes.

12      Q.  Okay.  And in response to that, is when you do

13  the strike to Casey's nose and using your right arm?

14      A.  No.  Using my left arm, my left, my left.

15  Because I'm on top of him looking down at him.  So I'm

16  using my left.  I'm trying to hold his arm down with my

17  right.  His left arm with his -- because he's going to

18  be like this, so I'm trying to hold it down with my

19  right arm.  And like I said, he bucked me, so I braced

20  myself over top of him with my left arm.  Before I

21  could come back, that's when he got free with his left

22  arm, which was pinned back here.

23          He takes a swing at my boss.  I'm able to,

24  once he takes a swing, get his arm here.  I elbow him

25  with my left arm in the nose.  And then I'm able to

1  regain control of his left arm again with my right arm

2  and pin it back down.  And then that's also, right

3  there all at the same time, I believe is when I tried

4  to sprawl out lengthen my body to hopefully take his

5  legs out of play.  Because now he's starting to spit

6  and everything else, the blood and stuff that was

7  coming from his nose, at my boss and I.

8    Q.  And so maybe my confusion in that is if you're

9  on top -- you're on top of him.  You're working to keep

10  his left arm down.  Sergeant Rodarme is working on the

11  right arm?

12    A.  Correct.

13    Q.  How -- what I don't understand is how he's able

14  to swing and actually strike Sergeant Rodarme through

15  that, at that point?

16    A.  I just said he broke out of my grasp.  After he

17  had bucked me forward and I braced myself, I didn't

18  have the control of his arm at that time.  So when I

19  pushed myself back up, I was at disadvantage.  Him

20  fighting through, was able to get through -- get me to

21  let go of him.  So now I'm just in mount with no arm

22  and he flails it straight -- or swings at my boss.  And

23  then I'm able to get him back to where it's here and

24  then I elbow him in the face and then I'm able to get

25  control of that left arm.

1  Q.  So I think I understand.  You're working to

2  control his left arm.  He breaks free.  At that point,

3  you have to kind of come back up?

4  A.  Right.

5  Q.  And that's how he's able to swing and strike

6  Sergeant Rodarme?

7  A.  Right.  He breaks free as I'm coming back up.

8  As I pushed myself back up to get back into, you know,

9  in control, I guess, of my body and be back into full

10  mount instead of me, you know, having to -- and I don't

11  -- I don't know if it was -- yeah, it was -- I went

12  with one arm and that's what it was is when I pushed

13  back up, he had broke free of my grasp with my right

14  arm.  When I went down with my left arm to brace myself

15  from going over forward on him.

16  Q.  Okay.

17  A.  Because if he bucked me, there's a chance of

18  me -- him bucking me straight off and I roll or do

19  whatever forward.  But I was able to brace myself and

20  stay on him.  But when I was coming back up, that's

21  when he had got out my grasp and he took the swing at

22  Sergeant Rodarme.

23  Q.  Okay.  I mean, did it appear to you that he was

24  intentionally swinging in order to strike Sergeant

25  Rodarme?  Or was it flailing or which?

1          MS. RETTS:  Form.

2          THE WITNESS:  I believe that he was

3  attempting to swing, to hit him.  Because he still had

4  his left arm.  He had his right -- or I mean, he had

5  his right arm -- he had his left arm free.  He was

6  trying to get my boss to let him go.  Since he had me

7  off balance and I was trying to, you know, get my

8  balance back on top of him, he was trying to figure a

9  way of getting out of our grasp.  So I believe he took

10  a swing at him.

11     Q.  BY MR. SHOWALTER:  Okay.

12     A.  Not flailing his arms.

13     Q.  So that's when you strike him.  Then your

14  testimony is pretty immediately after you strike him

15  he's bleeding?

16     A.  Yes.

17     Q.  And then he's spitting blood, correct?

18     A.  Correct.

19     Q.  Did it look to you like he was intentionally

20  spitting blood at you or Sergeant Rodarme?  Or did it

21  just appear that he was spitting out blood that was in

22  mouth?

23          MS. RETTS:  Form; foundation.

24          THE WITNESS:  He was spitting at.

25     Q.  BY MR. SHOWALTER:  Spitting at?

1    A.   At, yes.   Not just spitting off to the side or

2  just chaachh chaachh, you know, trying to get it out of

3  his mouth because he was, you know, potentially choking

4  on it or anything of the sort.   He was direct and he

5  was spitting on it.   Once it started dripping in his

6  mouth, like I said, he shook and it just made him even

7  more mad at the situation of what happened and it made

8  him fight.

9    Q.   And when you spread out, it sounds like that's

10  about the point where you start spreading out to use

11  your weight to control him?

12    A.   Right.

13    Q.   And Sergeant Rodarme is still on the right arm.

14  What are you doing with your arms when you spread out?

15    A.   Now I'm trying to keep my balance on top of

16  him, as well as holding his arm up.   As well as I'm now

17  spread out.   I'm not kneeling over top of him anymore.

18  I'm the length of his body on top of him now, just

19  trying to control his arm.

20           But that portion, it seemed like it wasn't

21  very long, because of the fact I believe that's when

22  Officer Seaquist was able to get there.   So I didn't

23  feel like I had to keep him -- or attempt to keep him

24  controlled that much longer before Officer Seaquist

25  showed up and was able to assist with controlling his

1  legs and us turning him over onto his stomach.  But

2  where we lost his, you know, his right arm which

3  Sergeant Rodarme had.  He kept it under his belly or

4  waistline or however you want to say it.

5      Q.  I mean, is it -- so you remember, I took

6  through you through the Maricopa County Medical

7  Examiner report?

8      A.  Right.

9      Q.  And showed you parts of it, right?

10     A.  Sure.

11     Q.  And one of the things that it mentioned is this

12  cartilage in Casey's neck that was broken.  Do you

13  remember that?

14     A.  Right.

15     Q.  It is possible that at this point, when you're

16  spreading out and you're working to gain control of

17  Casey's left arm, that your left elbow or your left

18  forearm could have been on Casey's neck?

19          MS. RETTS:  Form.

20          THE WITNESS:  No.  I mean, I know it

21  wasn't.  I mean, there's all kinds of possibilities

22  that could be going on or could have happened.  But I

23  know it wasn't.

24     Q.  BY MR. SHOWALTER:  Where was it on Casey?

25  Where was your, like your left forearm and elbow at

JAMES ARNOLD  APRIL 06, 2021

1    Q.  Did you ever see Casey kick anybody?

2    A.  I don't recall him kicking anybody in

3  particular.  I do remember him flailing his legs around

4  and that's the main reason why we're all trying to

5  control his legs.  And it wasn't something, it was

6  just, oh, we crossed them and we were able to get them.

7  He was resisting that too.  So he might have kicked

8  Officer Seaquist.  I don't know.  You would have to ask

9  him.

10    Q.  No, I understand.  I'm just curious about what

11  you saw.  You never saw him kick anybody, correct?

12    A.  I didn't see him kick anybody.

13    Q.  Was there ever a time where it appeared to you

14  that Casey was trying to reach for any officer's gun,

15  TASER or other equipment items?

16         MS. RETTS:  Form; foundation.

17         THE WITNESS:  No.  I don't recall that

18  happening.

19         MR. SHOWALTER:  All right.  Why don't we

20  take -- so just -- I want to take another break right

21  now.  I envision being done with this by 2:00 p.m. and

22  hopefully earlier than that.

23         MS. RETTS:  Okay.

24         MR. SHOWALTER:  So I'm just warning you

25  guys.  You know, if you guys want to -- let me know if

1  any portion of his torso.  So any portion of his torso?

2            MS. RETTS:  Form; foundation.

3            THE WITNESS:  I mean, we were holding him

4  down.  I was -- I had placed my knee on his shoulder

5  blade, just to control him or help control him.  But my

6  weight wasn't on him or wasn't in a -- which I didn't

7  think was a compromising spot or position for

8  Mr. Wells.

9     Q.  BY MR. SHOWALTER:  So your knee was on his

10  shoulder blade?

11    A.  Yes.  It would have been his right shoulder

12  blade.

13    Q.  When did you put your knee on his shoulder

14  blade?

15    A.  I don't know.  Are you saying at what point of

16  the -- when we were trying to get him into custody.  At

17  this time, when I had my knee on him, I would say

18  everybody was there, but all the officers had responded

19  that were involved were there at that point.  So myself

20  and Officer -- or Sergeant Rodarme stood up off of him,

21  off of Mr. Wells for a quick second to -- you know,

22  because we're out of breath.  We were the ones that

23  were fighting with him the longest.

24            So we gained our composure and stuff and

25  then when we -- they were still having issues getting

1 him under control, that's when I was up by his head and

2 I knelt down on his shoulder blade.  His -- I'm trying

3 to think, his right shoulder blade.

4     Q.  So at the point at which you put your knee on

5 his right shoulder blade, had Casey been handcuffed?

6     A.  I don't recall.  I know he was being --

7 trying -- we were attempting to still detain him, get

8 him fully in cuffs, fully in the RIPP restraint, the

9 whole nine yards at that point.  So it was still -- he

10 was still resisting at that point, when we were all

11 there trying to get him under control.

12     Q.  Okay.  But you don't know if he had already

13 been handcuffed when you put your knee on his right

14 shoulder blade?

15     A.  I don't know that.  I don't recall that because

16 if he's still struggling around.  And like I had said,

17 I never gained control of his arm until other people

18 got there and then they were able to get control of

19 him.  I had stepped away for that brief second or so to

20 take a couple of breaths.

21          Then when they were still struggling with

22 him, that's when I attempted to help hold him down by

23 kneeling on his shoulder blade.

24          When I say kneel on his shoulder blade, I

25 just placed my knee on the back of his shoulder blade.

1       A.  You mean my knee?

2       Q.  I'm sorry, I mean your knee -- so strike that.

3           Can I just have you review this and tell

4   me if there's anywhere in here where you talk about

5   placing your knee on Casey's back?

6           MS. RETTS:  Form.

7           THE WITNESS:  Okay, no.

8       Q.  BY MR. SHOWALTER:  And so you've had a chance

9   to review it and there's no reference in the PSB

10  transcript to your knee being on his back, correct?

11          MS. RETTS:  Form.

12          THE WITNESS:  Correct.

13      Q.  BY MR. SHOWALTER:  I'm going to take you back

14  to an exhibit we've already looked at, which is

15  Exhibit 1a.  And it is page 81, Bates page 81 and it's

16  that time line that we looked at before.

17      A.  Okay.

18      Q.  So between -- so you arrived on the scene at

19  2:19:18, correct, approximately?

20      A.  Correct.

21      Q.  Sergeant Rodarme arrived on scene at

22  approximately 14:22:14, correct?

23      A.  Correct.

24      Q.  So it's about three minutes after you get there

25  and we looked at that bystander video, right?  Before

 1  me see if I can find it.

 2           Good grief, let me just share the screen.

 3           Are you able to see that paused video

 4  image, paused at 14:30 and 40 seconds?

 5     A.  I am.

 6     Q.  And this is imperfect.  Let me actually just

 7  take it back.

 8           So now I'm paused at 14:30 and 23 seconds.

 9  And here it looks like you're leaning towards Casey

10  with your left leg out to the side.

11           Do you see that?

12           MS. RETTS:  Form.

13           THE WITNESS:  Can you get closer?

14     Q.  BY MR. SHOWALTER:  Yeah.

15           So right there, it looks like you're -- to

16  me, viewing it, it looks like most of your body is

17  leaning more towards your right leg than to your left;

18  is that fair?

19     A.  No.  I disagree on that.  You said that my left

20  leg is out to the left.

21     Q.  Yes.

22     A.  And you said then I'm leaning on Casey.  But

23  this view shows my arm on my -- on my left leg, which

24  indicates that I'm putting the majority of my weight on

25  that leg.

JAMES ARNOLD  APRIL 06, 2021

1    Q.  Okay.  And I think what I tried to say and

2  maybe I did it imperfectly, was that you were leaning

3  towards Casey, like your center mass appeared to me to

4  be leaning towards Casey, but you disagree?

5              MS. RETTS:  Form.

6              THE WITNESS:  Correct.

7    Q.  BY MR. SHOWALTER:  Okay.  So I'm going to push

8  play.

9        (Video played.)

10    Q.  BY MR. SHOWALTER:  And let me just try to back

11  it up.

12              I mean, I'll just make a -- the

13  observation that I have is that at some points it looks

14  like you could actually be bracing, kind of using your

15  left leg to kind of push, to push your right knee onto

16  Casey and apply more force.

17              Are you saying that's not happening?

18              MS. RETTS:  Form.

19              THE WITNESS:  I'm saying that's your

20  perception.  How I'm doing it and how I described it,

21  of course, my perception and I feel I -- you know, I

22  was there.

23    Q.  BY MR. SHOWALTER:  Okay.  And I'm going to push

24  play.

25        (Video played.)

JAMES ARNOLD  APRIL 06, 2021

1    Q.  BY MR. SHOWALTER:  Now, here we can't -- where

2   I've paused it at 14:30 and 35, we can't see your legs

3   at all, correct?

4    A.  Correct.

5    Q.  But it does look like you are facing south and

6   looking down at Casey; is that accurate?

7    A.  I am facing south and I am looking down,

8   correct.

9    Q.  Okay.

10       (Video played.)

11    Q.  BY MR. SHOWALTER:  Now, I'm pausing it here at

12   14:30 and 41.  And do you see how you're -- are you

13   able to tell that your left leg is sort of pointed away

14   from your body, does that make sense?

15       MS. RETTS:  Form.

16       THE WITNESS:  I can't tell if I'm still

17   even on him, at this point.  I mean, we can assume.

18    Q.  BY MR. SHOWALTER:  And would it be fair to

19   assume that at this point you were still on Casey?

20       MS. RETTS:  Form.

21       THE WITNESS:  I can't see it.  So assuming

22   that I am just because that's where the last position

23   you saw me in, before he turned and pointed a different

24   way.  And we're assuming, you know, a few segments

25   after this where it shows me standing up, this doesn't

1 mean that we can't see it, if I'm on his shoulders

2 still or if I've come off and I'm just kneeling down

3 right from there, near him.

4     Q.  BY MR. SHOWALTER:  Now, you said or you

5 testified earlier that your memory was that about the

6 time that Casey -- that other officers arrived and were

7 handcuffing Casey, that's when you got up.  And then at

8 some point after that, you went back down on your --

9 and put your knee on his shoulder, correct?

10     A.  Correct.

11     Q.  That's not shown in this video, fair?

12          MS. RETTS:  Form.

13          THE WITNESS:  The actual getting up and

14 moving positions to being where I am currently?

15     Q.  BY MR. SHOWALTER:  Yes.

16     A.  In this video, correct.  I don't know if that

17 happened like -- at this point, it appears they're

18 still trying to get him into the RIPP restraint.  I

19 can't even see Casey right now or Mr. Wells.  I can

20 barely see him in any of the footage, just because of

21 all of the officers there.

22          But when we got up, it could have been in

23 the end of the picture when I finally got up off of

24 this and my recollection was, you know, a little bit

25 off.

1      Q.  So then --

2      A.  When exactly I got up off of him or switched;

3  or was he totally restrained or largely restrained?

4      Q.  And that's what I was getting at, is it

5  possible that your memory has the order reversed, that

6  you moved to having your knee on Casey's back and then

7  you got up?

8      A.  I can almost -- yeah, there's a good

9  possibility.  I mean, trying to, you know, remember

10  everything verbatim in an incident like that, where I

11  feel, you know, I'm -- you know -- I don't know.  You

12  know, in a fight with a subject and stuff like that,

13  it's going to be hard to recall everything and document

14  it according to a time line and stuff like that,

15  exactly how it happened.  I mean, that's why we have

16  videos or little tidbits of the videos.  Of course,

17  they're not going to lie.

18      Q.  Sergeant Rodarme testified that when he arrived

19  at the scene, Casey was very sweaty.  But you don't

20  have a recollection of that?

21      A.  I don't.

22      Q.  And do you have an explanation of why in the

23  two interviews, the initial one by the homicide

24  investigators and the second one by PSB, that you

25  didn't tell them about having your knee on Casey's

1                  FURTHER EXAMINATION

2  BY MR. SHOWALTER:

3     Q.  One of the weird things about this incident

4  was -- I don't know, if weird things.

5                  When you arrived on the scene and saw

6  Casey Wells nude, you had probable cause to arrest him

7  for indecent exposure, correct?

8     A.  Correct.

9     Q.  You never saw anything to indicate that he was

10 involved in any kind of a sex crime or anything like

11 that or posing a danger to kids, fair?

12                 MS. RETTS:  Form; foundation.

13                 THE WITNESS:  I did not see anything.  But

14 knowing the time of day that kids would be, you know,

15 coming home from school was a definite factor.

16    Q.  BY MR. SHOWALTER:  It was a concern to you,

17 correct?

18    A.  Correct.

19    Q.  Did you have any communications with the fire

20 department?

21    A.  I didn't myself, no.

22    Q.  Okay.  And do you know who was the first

23 officer at the scene to contact or to request fire?

24    A.  I don't know.

25                 MR. SHOWALTER:  All right.  Nothing

1  STATE OF ARIZONA      ) SS.
                         )
2  COUNTY OF MARICOPA     )

3

4      BE IT KNOWN that the foregoing proceedings
   were taken before me, DONNA DELAVINA, Certified
5  Reporter No. 50468; that the witness before testifying
   was duly sworn by me to testify to the whole truth;
6  that the foregoing 154 pages are a full, true and
   accurate record of the proceedings, all done to the
7  best of my skill and ability; that the proceedings were
   taken down by me in shorthand and thereafter reduced to
8  print under my direction.

9      [X]  Review and signature was requested.

10     [ ]  Review and signature was waived.

11     [ ]  Review and signature not required.

12     I CERTIFY that I am in no way related to any
   of the parties thereto nor am I in any way interested
13 in the outcome hereof.

14     I FURTHER CERTIFY that I have complied with
   the ethical obligations set forth in ACJA 7-206.  DATED
15 at Phoenix, Arizona, this 21st day of April, 2021.

16

17          Donna DeLaVina, RPR
            Certified Reporter
18          Certificate No. 50468

19          *     *     *     *     *     *

20

21     I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
   complied with the ethical obligations set forth in ACJA
22 7-206.

23

24          Donna DeLaVina, RPR, Owner
            Donna DeLaVina Reporting, LLC
25          Arizona RRF No. R1010

# EXHIBIT 6

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

ROBERT RODARME

Phoenix, Arizona
March 23, 2021
9:03 a.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
PREPARED BY:                    P (602) 230-5454
                                F (480) 546-3721
Donna DeLaVina, RPR             www.dlvreporting.com
Certified Reporter
Certificate No. 50468

ROBERT RODARME  MARCH 23, 2021

1        THE WITNESS:  Yes.

2    Q.  BY MR. SHOWALTER:  And you are the next Phoenix

3 police officer to respond to that scene, correct?

4    A.  Yes.

5    Q.  And when you arrive, Casey Wells is still doing

6 some form of yoga or he's engaged in something unusual

7 naked in the middle of the street, correct?

8        MS. RETTS:  Form.

9        THE WITNESS:  Yes.  It wasn't yoga, but it

10 was definitely unusual.

11   Q.  BY MR. SHOWALTER:  And I don't -- you know,

12 I -- does it -- is he facing the sun?

13   A.  Yes.

14   Q.  Does it look like he's praying to the sun?

15       MS. RETTS:  Foundation.

16       THE WITNESS:  I don't know what he was

17 doing.

18   Q.  BY MR. SHOWALTER:  I didn't ask you if you knew

19 what he was doing.  Did it look like he was praying to

20 the sun?  Did he have like a -- was he collapsing his

21 hands together or was he raising his hands in the air?

22 What was he doing?

23       MS. RETTS:  Form.

24       THE WITNESS:  Both of his hands were off

25 to the side, with clenched fists.

ROBERT RODARME  MARCH 23, 2021

1    Q.  BY MR. SHOWALTER:  So his hands are out to his
2  side as in they're extended out so that his arms are
3  parallel to the ground?
4    A.  Yes, like an airplane.
5    Q.  Like an airplane, but with clenched fists?
6    A.  Yes.
7    Q.  What else at that time on your arrival did you
8  observe about Casey?
9    A.  He was completely naked and he was grunting and
10  was not complying with us.
11    Q.  Did you ever hear him say any words?
12    A.  I believe "fuck you" was involved.
13    Q.  What was the context in which you claim Casey
14  said "fuck you"?
15    A.  We were trying to -- Officer Arnold had ahold
16  of his left arm, I had ahold of his right arm, and
17  we're just trying to give him every opportunity to
18  place his hands behind his back.  We told him, he is
19  not detained -- or he's not under arrest, he's just
20  being detained for his safety and we want to help him.
21          But he was not complying.  He was
22  grunting.  He was not acknowledging, you know, wanting
23  to seek help and then he would say "fuck you" and
24  grunt.
25    Q.  Did he ever say the word "no" to you?

1    A.  I would have to -- I don't recall that.

2    Q.  So did you and Officer Arnold have a discussion

3  about how to approach Casey or how to take him into

4  custody before you attempted to take him into custody?

5         MS. RETTS:  Form.

6         THE WITNESS:  No.

7    Q.  BY MR. SHOWALTER:  How did it come to pass that

8  you were attempting to -- was Officer Arnold on the

9  left arm or were you on the left arm?

10   A.  Officer Arnold was on the left arm.

11   Q.  Okay.  And so you were on the right arm?

12   A.  Yes.

13   Q.  And so when -- how did you make the decision to

14  attempt to take his arms?

15   A.  Well, we first tried to, you know, talk to him

16  to try to get off the street.  He was naked, indecent

17  exposure.  We have to do something, tried to get him

18  off the street and he wouldn't comply.  At this point,

19  we decided to take each a grip of his wrists and talk

20  to him, explain to him he's not under arrest he's just

21  being detained.  Because when we say he's just being

22  detained, it's just a form of de-escalation.  When you

23  say arrest, then they seem to think they're going to

24  jail for sure.

25         So we say "detained," and just for our

ROBERT RODARME  MARCH 23, 2021

1  safety, we tried to place his hands behind his back.

2  We just gave him every opportunity.  He would not place

3  his hands behind his back.  He was using his strength

4  to not put his hands behind his back.  But we were

5  giving him every opportunity about 45 seconds to a

6  minute at least, telling him, hey, we're trying to help

7  you.  We're trying to help you, help you, help you and

8  get you help.  But he would not comply, just grunt and

9  yell.

10      Q.  When you arrived at the scene, did Casey have

11  any blood on him?

12      A.  I don't recall that.

13      Q.  Did anybody report there's a naked man with

14  blood on him prior to the arrival?

15      A.  I don't recall hearing that.

16      Q.  And you didn't see any blood on him at the time

17  when you and Officer Arnold approached, began the

18  process of beginning to detain him, correct?

19      A.  I don't recall seeing blood on him.

20      Q.  That's something you would remember, isn't it?

21          MS. RETTS:  Form.

22          THE WITNESS:  Could have.

23      Q.  BY MR. SHOWALTER:  If you had seen it, it was

24  something that you would have talked about on the day

25  of?

ROBERT RODARME  MARCH 23, 2021

1  We don't want to arrest him.  We want to get him off

2  the street and get him help.

3          He would not listen to us.  And we can't

4  sit there all day as kids are coming home from school

5  in that neighborhood, that was even recorded on there.

6  And indecent exposure, we can't just sit here all day

7  with him, so we had to do something at that point.  So

8  we gave him 45 to a minute.  And then we decided, well,

9  we have to get him off the street.  So then we tried to

10  put his hands behind his back.

11      Q.  And so for the duration of that -- so, let me

12  make sure I have this correctly.  You each take hold of

13  one wrist.  Does he keep his wrists -- his arms held up

14  in that airplane position?

15      A.  Yes.  They're pretty locked down in that

16  position.  He's locked them out.

17      Q.  And so for 35 to 45 seconds you're holding onto

18  his wrist -- I'm sorry, 45 seconds to a minute, I think

19  you said?

20      A.  You're right.

21      Q.  You're holding onto his wrists and you're

22  asking him to put his hands behind his back.  And

23  Officer Arnold is doing the same thing.  He doesn't

24  comply at that point, you make the decision to attempt

25  to force his hands behind his back to cuff him; is that

ROBERT RODARME  MARCH 23, 2021

1  correct?

2      A.  Yes.

3      Q.  And do you communicate that to Officer Arnold

4  or does he communicate something about that to you?

5      A.  I believe I said we're going to go ahead and

6  put his hands -- let's make the motion to put his hands

7  behind his back to forcibly do it.

8      Q.  And what happened when you and Officer Arnold

9  attempted to do that?

10      A.  He immediately started being aggressive and was

11  trying to get out of our hold, in which he did and

12  started to run away and then he came back and started

13  punching at Officer Arnold.

14      Q.  I have to kind of -- "aggressive" is an

15  adjective.  What I would like to know is what were his

16  physical movements in response to that.  So you and

17  Officer Arnold are each attempting to bring his hands

18  behind his back.  What does Casey do in response to

19  that, in terms of his movements?

20      A.  He resists us and he tries to get out of our

21  grip by pulling away and he was able to pull away from

22  each of us and starts being active, showing signs of

23  active aggression by punching and kicking at us.

24      Q.  So is he still standing -- does he -- is he

25  still standing in that same position or is he moving

1  his legs?

2     A.  He was moving his legs, trying to -- briefly

3  runs southbound for about a couple of feet and then he

4  turns towards Officer Arnold again and was actively

5  punching and kicking.  I saw flailing, but it's

6  actually punching and kicking towards the officer,

7  being in an act of aggression.  And then I did see him

8  punch Officer Arnold in the face on purpose.

9     Q.  Well, the term you used in your interviews was

10 that he's "flailing his arms," correct?

11    A.  Yes.

12    Q.  And you distinguished between the time when you

13 saw him flailing his arms and the time -- and one time

14 where he punched Officer Arnold in the face, correct?

15    A.  That's what's on the transcript.

16    Q.  Is that your recollection of what happened?

17    A.  Yeah, I saw him actively punching Officer

18 Arnold in the face.

19    Q.  How many times did you see him punch Officer

20 Arnold in the face?

21    A.  He connected one time that I saw.

22    Q.  And what did Officer Arnold do in response?

23    A.  He turned and said, "He punched me in the

24 face."  And I said, "Yes, I know.  I saw that."

25              And when he tried to -- and then Officer

1  Arnold got him in a bear hug, you know, a face-to-face

2  bear hug, and at that point, I said, "Hey, let him go."

3  I said, "Jamie, let him go.  I'm going to tase him."

4  And he didn't hear me or what, so I had to reholster my

5  TASER and then we were trying to get him on the ground

6  at this point.  We can't let him go into any other

7  house, get away from us and try to go into any other

8  houses, it would be a dangerous situation.  We're

9  trying to get him on the ground.

10          At that point, he couldn't get him on the

11  ground.  So he still had him in the bear hug and then

12  I -- Jamie was going forward with him a little bit and

13  I got behind him, up to Casey Wells' shoulders and I

14  grabbed onto his shoulders and pulled him down and they

15  went down on him.

16          And at that point, we have Casey Wells on

17  his back.  I went to his right -- or it's a -- I got

18  ahold of his right arm and leg.  He was trying to punch

19  us.  And Officer Jamie Arnold got on his right -- it

20  was a left hand and leg.  Because he was trying to

21  punch us, kick us.  And he actually did punch me in the

22  face.  He got away from a grip, my grip, and he punched

23  me in the face.  And Officer Arnold saw that and

24  Officer Arnold -- I gave a -- like a forearm strike to

25  the head, to try to stop him from doing that.

ROBERT RODARME  MARCH 23, 2021

1  bear hug and you talked about going up and grabbing him

2  by the shoulders, were you behind Officer Arnold when

3  you did that maneuver to bring Casey to the ground or

4  were you behind Casey?

5      A.  He was behind Casey.

6      Q.  Okay.  And so kind of pull Casey down by

7  shoulders so that Officer Arnold comes down on top of

8  him and Casey goes to the ground?

9      A.  Yes.

10          (Whereupon, Joel Robbins exited the deposition

11  at 9:57 a.m.)

12      Q.  BY MR. SHOWALTER:  When that happened, Casey's

13  head strikes the concrete -- or the asphalt, correct?

14              MS. RETTS:  Form; foundation.

15              THE WITNESS:  I don't recall his head

16  hitting the ground.  I don't recall that part.

17      Q.  BY MR. SHOWALTER:  I'm going to ask you to look

18  at Exhibit 29, page, where did it go, 8 of 15, and it's

19  Bates stamped WELLS 000sa610.

20      A.  Okay.  I'm on that page.

21      Q.  About halfway down it says "Evidence of

22  Trauma"?

23      A.  Yes.

24      Q.  It talks about there being a contusion,

25  abrasion, and ecchymosis of the nasal bridge and the

 1  those injuries?

 2                   MS. RETTS:  Form; foundation.

 3                   THE WITNESS:  I don't know how that

 4  happened.

 5      Q.  BY MR. SHOWALTER:  You testified earlier that

 6  you saw Officer Arnold strike Casey's head with a

 7  forearm strike?

 8      A.  Yes.

 9      Q.  When you say a "forearm strike," what's the

10  purpose of a forearm strike in police hard hands uses

11  of force?

12      A.  You're trying to stop acts of aggression.

13      Q.  And why use a forearm strike rather than a

14  closed fist strike?

15      A.  I couldn't tell you that.

16      Q.  I mean, one of the reasons be that there's just

17  more mass.  You're more likely to make contact?

18                   MS. RETTS:  Form; foundation.

19                   THE WITNESS:  It could be.

20      Q.  BY MR. SHOWALTER:  And it could also, that's

21  also the same motion as an elbow strike, correct?

22                   MS. RETTS:  Form; foundation.

23                   THE WITNESS:  No.

24      Q.  BY MR. SHOWALTER:  What part of Officer

25  Arnold's forearm made contact with Casey?

ROBERT RODARME  MARCH 23, 2021

1    A.  The under forearm, the -- under your -- under

2  your. . .

3    Q.  So that was like the belly of the forearm?

4    A.  Yeah, right, somewhere in that area.

5    Q.  So it wasn't actually the leading -- so it was

6  like -- can you give the motion you saw Officer Arnold

7  do?

8    A.  Like a downward, like that (Witness

9  indicating).

10    Q.  So he went down like that on Casey's head a

11  single time?

12    A.  Yeah.  He was trying to either head butt us and

13  then -- and or get out and strike us with his fists in

14  which he was able to successfully do that on me.  And

15  that's when Jamie Arnold did the strike down.

16    Q.  And other than that strike down -- did you --

17  I'm getting.  I just heard feedback.  But it sounds

18  like it's gone.

19         Other than that single strike down, did

20  you witness any other strikes to Casey Wells?

21    A.  No.

22    Q.  Other that single strike down, did you witness

23  any other uses of force against Casey Wells head, neck

24  or throat?

25         MS. RETTS:  Form.

1    THE WITNESS:  No.

2    And, Mr. Showalter.

3    MR. SHOWALTER:  Yes.

4    THE WITNESS:  Is it okay if I took a

5  break?

6    MR. SHOWALTER:  It would be.  And that was

7  one of the rules I forgot to tell you, is if you need a

8  break, just let us know and we'll take a break.

9    How long do you need?

10    MS. RETTS:  I need to use the bathroom

11  too, so --

12    THE WITNESS:  Five, ten minutes.

13    MR. SHOWALTER:  Ten minutes is fine.

14    MS. RETTS:  Okay.

15    THE WITNESS:  Okay.  Thank you.

16    THE COURT REPORTER:  The time is

17  10:02 a.m.  We are now going off the record.

18    (Whereupon, a brief recess ensued from

19  10:02 a.m. to 10:13 a.m.)

20    THE COURT REPORTER:  The time is

21  10:13 a.m.  We're back on the record.

22    Q.  BY MR. SHOWALTER:  When we left, when we were

23  talking about the injuries and some of the early parts

24  of the interaction with Casey Wells and the physical

25  portion.  I want to take you back to Exhibit 29 and

ROBERT RODARME  MARCH 23, 2021

1  Q.  You would agree with me if that anybody struck

2  Casey in the neck or throat, that that would be

3  contrary to City of Phoenix policy?

4           MS. RETTS:  Form; foundation.

5           THE WITNESS:  I couldn't tell you that.

6  It's based on the situation.

7  Q.  BY MR. SHOWALTER:  Well, doesn't the City of

8  Phoenix policy on use of force say that the throat is

9  off limits for strikes?

10           MS. RETTS:  Form.

11           THE WITNESS:  In general.  I would have to

12  see the actual policy.  But it doesn't mean you can't

13  do it, if need be.  But in this case, it didn't happen.

14  Q.  BY MR. SHOWALTER:  Your testimony is in this

15  case, it didn't happen, nobody struck Casey in the

16  throat?

17  A.  That I saw, no.

18  Q.  Are you able to testify absolutely that when

19  Officer Arnold did that forearm strike to Casey that it

20  didn't strike his throat?

21  A.  I saw -- it struck him in the head area.  I

22  don't know where exactly on the head, but it wasn't in

23  the actual throat.  Because why I say that, is because

24  immediately after the forearm strike he had blood on

25  his nose and mouth, up in that area and that he spit

1  the blood in my nose -- in my eyes and my mouth,

2  immediately following.

3      Q.  Let me be clear.  You testified earlier that

4  you did not see where on Casey Officer Arnold's forearm

5  landed; is that true or false?

6              MS. RETTS:  Form.

7              THE WITNESS:  That's true.  I can't tell

8  you if it was exactly the nose or the mouth or the

9  middle of the mouth.  It wasn't on the neck.

10     Q.  BY MR. SHOWALTER:  Well, it's also possible

11 that the forearm strike broke -- struck his throat,

12 broke cartilage in there and that blood came bubbling

13 up into his mouth and nose, true?

14             MS. RETTS:  Form and foundation.

15             THE WITNESS:  I don't know.  I didn't see

16 the actual strike.

17     Q.  BY MR. SHOWALTER:  So you didn't actually see

18 it and you can't say where --

19     A.  I saw it was on the head area.

20     Q.  And so I'm going to share with you from the

21 same Exhibit 29 at page WELLS 000623.

22     A.  Yes.

23     Q.  There's an anthropology report on the neck

24 organs that the medical examiner removed and it notes,

25 fractures to the right superior horn, the right lamina,

ROBERT RODARME  MARCH 23, 2021

1      THE WITNESS:  No.

2      Q.  BY MR. SHOWALTER:  If you had witnessed one of

3  the officers placing their knee on Casey's back,

4  shoulders or neck, would you have told them not to do

5  that when he was restrained face down?

6          MS. RETTS:  Form foundation.

7          THE WITNESS:  It all depends on the

8  situation.

9      Q.  BY MR. SHOWALTER:  Well, you understand that if

10  somebody is restrained face down, that putting weight

11  on their back can interfere with their respiratory

12  ability by compressing their lungs?

13          MS. RETTS:  Form; foundation.

14          THE WITNESS:  I don't know that.

15      Q.  BY MR. SHOWALTER:  You weren't trained on

16  positional asphyxia?

17          MS. RETTS:  Form.

18          THE WITNESS:  I don't recall if I was

19  trained in a class or not, on that.  But I've heard of

20  it.

21      Q.  BY MR. SHOWALTER:  You've heard of positional

22  asphyxia?

23      A.  Yeah.  But I can't tell you right now in this

24  forum what it is.

25      Q.  Let's see.  I'm off the scene share.

1            So back to -- earlier when you mentioned

2   that you had a previous incident that you were involved

3   in circa 2000, 2001, and that you volunteered that that

4   was an excited delirium incident.  What is your

5   understanding of excited delirium?

6        A.  When a person is high on methamphetamines and

7   they start an act of aggression and fighting.  This is

8   a similar case where the guy was naked and we were

9   fighting for -- it took me and my partner a good ten

10  minute fight to get this guy in custody and he was

11  naked, sweating.  And when we finally placed his hands

12  behind his back, I remember him grabbing my watch so

13  hard that my watch broke.  And then he just -- like the

14  heart, like exploded or stopped because of too much

15  meth in his system, so I recall that.

16       Q.  Is what you recall from your training or is

17  that what you recall from -- where did you obtain that

18  information from?

19            MS. RETTS:  Form.

20            THE WITNESS:  After that incident and the

21  incidences of hearing this common incidents occurring

22  throughout the city and in the country, in fact, it

23  started becoming more known.  I think this is becoming

24  excited delirium.  And I remember seeing videos

25  entitled "excited delirium," just that, when officers

ROBERT RODARME  MARCH 23, 2021

1  are fighting naked men, you know, and they have this,

2  what I describe as superhuman strength and it's hard to

3  get -- you know, two or three officers to get this guy

4  in custody.  That also he's fighting -- he goes from

5  fighting like crazy to all the sudden just his heart

6  stops or explodes or something and he passes away.

7      Q.  BY MR. SHOWALTER:  So is this -- where did you

8  learn about -- where did you first learn about -- where

9  did you first learn the term "excited delirium"?

10      A.  I can't recall.

11      Q.  You can't recall where or when you first

12  learned that term?

13      A.  It might have been in one of modules we have

14  which is form training, you know, like during the week

15  of in a year, that we call it a module.  And I think

16  one of the classes was excited delirium and they showed

17  videos of what I just mentioned.

18      Q.  Is that a term that came up in that case back

19  in 2000 or 2001, excited delirium?

20      A.  Yes.

21      Q.  Do you recall the outcome of that case, whether

22  there was a lawsuit brought in that?

23              MS. RETTS:  Form.

24              THE WITNESS:  As I explained, yeah,

25  they -- I was being sued during that case, but it never

ROBERT RODARME  MARCH 23, 2021

1  Officer Arnold having Casey in a bear hug.  You go

2  behind Casey, pull Casey down by his shoulders using

3  Officer Arnold's momentum to bring him down, correct?

4      A.  Yes.

5      Q.  Once he's on the ground, you witness Officer

6  Arnold's forearm strike to what you say is the head

7  area or face area?

8              MS. RETTS:  Form.

9              THE WITNESS:  Yes.

10     Q.  BY MR. SHOWALTER:  And what happened after

11  that?

12     A.  At that point, I regained -- no, he either spit

13  blood in my face and so I've got blood in my eyes and

14  my mouth, so I'm very concerned with that.  However,

15  it's in my training, it's going to take more of us to

16  safely take this guy instead into custody.  And so I

17  just, "Jamie, let's keep him held down here."

18              And I got on the radio and said, "We need

19  more units."  And then that triggered more officers to

20  arrive.  And I said, "We're going to wait here.  We're

21  going to hold him down so we can safely get him into

22  custody and get fire here to treat him."  But that's

23  what happened next.

24     Q.  When you did that radio call, did you ask for

25  fire?

ROBERT RODARME  MARCH 23, 2021

1   A.  At that point, no.

2   Q.  At that point, you made the radio call after

3   Casey Wells was bleeding, right?

4   A.  I don't recall who actually made -- I didn't

5   see the transcripts on who actually called the fire

6   department.

7   Q.  But the call you're talking about where you ask

8   for more units was after Casey was bleeding, correct?

9   A.  Correct.

10   Q.  And did you indicate in that call that there

11   was -- that there had been any kind of -- did you use

12   any code, police code?

13   A.  I don't recall.

14       If I would have, it would have been 245 it

15   would be.  I don't recall.  I would have to hear the

16   transcript of that.

17   Q.  What is 245?

18   A.  Aggravated assault on a police officer.

19   Q.  At this point, you make this call, you have

20   Casey by the right arm?

21   A.  Yes.

22   Q.  Officer Arnold has him by the left arm?

23   A.  Yes.

24   Q.  And you make this call.  You're still doing

25   your best to keep control, to maintain control of

1  Casey's right arm.  He's resisting and being

2  noncompliant, correct?

3      A.  Yes.

4      Q.  The decision you communicate to Officer Arnold

5  is we're just going to try to hold him here until more

6  units get here; is that correct?

7      A.  Yes.

8      Q.  And the reason is that you're concerned that

9  any further -- let me see if I can phrase this right.

10  It sounds like your belief is that he's really strong.

11  He's resisting, and it feels to you, in your judgment,

12  like you have him in as much control as you can be sure

13  of getting him into at that point; is that fair?

14          MS. RETTS:  Form.

15          THE WITNESS:  Yes.

16      Q.  BY MR. SHOWALTER:  How long are you holding him

17  like that, just with him on his back -- and I don't

18  think I made this clear.  At this point, Casey is on

19  his back?

20      A.  Yes.

21      Q.  How long are you and Officer Arnold holding

22  Casey on his back, by his arms like this, before

23  another officer arrives, in your best estimate?

24      A.  Approximately a minute.

25      Q.  Okay.  And who is the first officer to arrive?

ROBERT RODARME  MARCH 23, 2021

1 | screen.

2 | MR. SHOWALTER:  That's fine.

3 | THE WITNESS:  Yes.

4 | Q.  BY MR. SHOWALTER:  And this has at 2:22:14, 93B

5 | is the unit, 006999 is your badge number.

6 | What does this mean?

7 | A.  It looks like I arrived there at 14:22.

8 | Q.  So turning back to Exhibit 1, page 81, that's

9 | consistent with what's there, correct?

10 | MS. RETTS:  Form.

11 | THE WITNESS:  Yean.

12 | MS. RETTS:  I'm going to put -- I'm going

13 | to give him 50 in front of him, so he can look at both.

14 | 81?

15 | MR. SHOWALTER:  Page 81.

16 | THE WITNESS:  Okay.

17 | Okay.  I have them both in my hand now.

18 | Q.  BY MR. SHOWALTER:  And so do you agree that you

19 | arrived at the scene at approximately 2:22 and 14

20 | seconds?

21 | A.  That's what it says.

22 | Q.  Do you have any reason to disagree with that?

23 | A.  I don't.

24 | Q.  And then it says about two and a half minutes

25 | later, at 2:20 -- and so now I'm looking at Exhibit 1,

1  until we can safely get other officers to take him into

2  custody.

3     Q.  Did Casey say anything to you at that point?

4     A.  No.  He was just yelling, grunting, stuff, you

5  know, inaudible things.  I couldn't recall what he was

6  saying, but he wasn't saying anything.

7     Q.  Officer Seaquist repeatedly said that Casey

8  sounded like -- was making kind of growl or a howl,

9  like a bear caught in a trap.

10          Do you agree with that?

11          MS. RETTS:  Form.

12          THE WITNESS:  Yeah, I do remember him

13  grunting, growling.

14     Q.  BY MR. SHOWALTER:  It sounded like a bear

15  caught in a trap?

16          MS. RETTS:  Form.

17          THE WITNESS:  It should be.

18     Q.  BY MR. SHOWALTER:  Did Casey ever -- so other

19  than those two blows that we've talked about, did Casey

20  ever strike you or Officer Arnold at any other point

21  that you recall?

22          MS. RETTS:  Form; foundation.

23          THE WITNESS:  I don't believe so.

24     Q.  BY MR. SHOWALTER:  And he did spit blood in

25  your face.  But other than that, did he ever -- that

1  was one time.  Did he spit on you ever again?

2      A.  No.  That was a large amount of blood, though,

3  initially.

4      Q.  What does it indicate to you that he was able

5  to spit a large amount of blood?

6              MS. RETTS:  Form.

7              THE WITNESS:  Because I remember there was

8  a lot of blood in my eye and my mouth.

9      Q.  BY MR. SHOWALTER:  But that means for him to do

10  that, there had to be a lot of blood in his mouth,

11  correct?

12              MS. RETTS:  Form.

13              THE WITNESS:  Not necessarily.

14      Q.  BY MR. SHOWALTER:  Well, he can't spit blood --

15  for there to be blood in his mouth, it has to be his

16  blood and he can't spit more blood than he has in his

17  mouth, correct?

18              MS. RETTS:  Form.

19              THE WITNESS:  I just remember that to me

20  because any amount of blood in my face, I'm going to

21  maybe say it's a large amount.  But there was blood in

22  my mouth from Mr. Wells.

23      Q.  BY MR. SHOWALTER:  And Seaquist described when

24  he arrived on the scene, that Casey Wells' face

25  appeared to be covered in blood?

ROBERT RODARME  MARCH 23, 2021

1  his arms underneath himself?

2      A.  Yes.

3      Q.  So in order to turn him over onto his stomach,

4  you had to release control of at least one arm?

5      A.  Yes.

6      Q.  When he was turned onto his stomach, did -- you

7  were initially controlling his right arm with Officer

8  Arnold on his left, did you -- once he was turned onto

9  his stomach, did you and Arnold switch places or did

10  you switch arms?

11      A.  Switched arms, I believe.  We did not stitch

12  places.

13      Q.  So once Casey is on his stomach, you're at --

14  you're attempting to control Casey's left arm and

15  Officer Arnold is attempting to control Casey's right

16  arm?

17      A.  Yeah.  Now, we're able to get his right arm

18  behind his back, but I'm still trying to get his left

19  arm now underneath his stomach, trying to place him in

20  custody.

21      Q.  And what had he done with his left arm?

22      A.  He still had it underneath him.  He would not

23  release it from underneath.

24      Q.  So is he clenching his fists?

25      A.  His arm is underneath him, I can't see it at

1  the time.

2      Q.  Can you see where approximately his arm and

3  hand are in relation to his own body?  Are they at his

4  chest, his stomach, his head, his neck?

5              MS. RETTS:  Form.

6              THE WITNESS:  Under his body, stomach

7  area.

8      Q.  BY MR. SHOWALTER:  Okay.  So his left hand is

9  at his -- approximately his stomach area or his mid

10 abdomen?

11             MS. RETTS:  Form.

12             THE WITNESS:  Yes.

13     Q.  BY MR. SHOWALTER:  Okay.  And so now at this

14 point, Officer Arnold has been able to gain some

15 control of Casey's right arm.  What does Officer Arnold

16 do with that right arm?

17     A.  He's waiting for -- he's holding it in

18 anticipation of me trying to get the other arm out so

19 we can put him in handcuffs.  In the meantime, he's

20 still trying to kick his legs, you know, behind him,

21 trying to hit -- strike myself and Officer Seaquist.

22 So we're trying to gain access, you know, control of

23 his legs as well.

24     Q.  Did Casey Wells at any point strike you with

25 his legs?

1    Q.  Did you see Casey's body tense up in response

2  to that?

3    A.  I don't recall that.  He was still was not

4  getting compliance.  He was still holding it strongly

5  under his stomach area.

6    Q.  And then Officer Seaquist deploys the second

7  TASER cartridge?

8    A.  I believe so.  At that point, the TASER part.

9  I'm still trying to concentrate on getting compliance

10  with his left arm while still trying to -- you know,

11  being concerned with the blood in my mouth and the

12  blood in my eye and everything, that's what I'm focused

13  on.

14    Q.  And so the second --

15    A.  And there was some point after, maybe it's the

16  second tasing, that he -- I was able to get that arm

17  from underneath him and then we were able to place

18  handcuffs on him.

19    Q.  So after the second -- could it have been the

20  third -- a third use of TASER?

21         MS. RETTS:  Form and foundation.

22         THE WITNESS:  I actually don't recall a

23  third TASER deployment.

24    Q.  BY MR. SHOWALTER:  So sometime after the second

25  TASER deployment -- and the TASER makes a sound when

1  City of Phoenix detectives.

2          You don't know them, do you?

3  A.  No.

4  Q.  And I just wanted to -- earlier we were talking

5  about when Casey Wells was taken down, when Officer

6  Arnold has him in a bear hug and then you do the

7  maneuver to bring him to the ground, by grabbing his

8  shoulders.  And I wanted to see if we could refresh

9  your recollection with this.  So I'm going to have you

10  turn to page WELLS 002355, which is page 7.

11  A.  Okay, I'm there.

12  Q.  And at lines 11 through 13, you say:

13          "Jamie's got him" -- I'm sorry, page 7,

14  line 12, you say:

15          "Jamie's got him in a bear hug and now

16      he's going this way.  He's going towards the east."

17          And then you continue at line 21 and say:

18          "Yeah, he's going towards the east and I

19      get behind him because he's having a hard time

20      getting him down.  Okay, he's not going down and

21      that's our intention just to get him to the

22      ground."

23          And then at line 27 through 28, you say:

24          "So I used momentum, Jamie's momentum and

25      I was behind him and I grabbed the -- the -- the

ROBERT RODARME  MARCH 23, 2021

1   male's shoulder area."

2              And then at lines 32 through 33, you

3   continue and say:

4              "And I made a motion downward and was able

5       to successfully take him to the ground, where he

6       fell to the ground."

7              Do you see where I read all that?

8   A.  Yes.

9   Q.  And is all of that accurate and true?

10  A.  Yes.

11  Q.  And then continuing on to the next page at

12  lines 3 through 6, you say:

13             "Okay.  He hit his head.  Okay.  Not our

14      intention.  We're just trying to get him to the

15      ground.  And then I -- Jamie either immediately --

16      either he fell on him with momentum or he

17      immediately just got on top of him, like with

18      his -- his wrist."

19             Do you see where I read that?

20  A.  Yes.

21  Q.  Earlier when I was asking you about this, you

22  had no memory of Casey's head striking the ground.

23  Does this refresh your recollection on that issue?

24  A.  Yes.  Reports and transcripts have a great

25  recollection of this.  So I appreciate seeing this on

ROBERT RODARME  MARCH 23, 2021

1  today's date.

2      Q.  And so at trial you will testify consistent

3  with this report, that Casey's head did strike the

4  ground at that point?

5            MS. RETTS:  Form.

6            THE WITNESS:  Yes.  These transcripts

7  right here, I have no reason to believe they're not

8  true.

9      Q.  BY MR. SHOWALTER:  Okay.  Now I'm going to ask

10  you to take a look at a video and the video is going to

11  be Exhibit 24.

12           (Whereupon, Deposition Exhibit Number 24 was

13  marked for identification.)

14      Q.  BY MR. SHOWALTER:  And before I do that, I'm

15  going to take you back to Exhibit 1.

16           If I can find it and that page 81 of

17  Exhibit 1, where it has the time line.

18           MS. MOLERA:  For clarification, it's 1a.

19           MR. SHOWALTER:  Yes, it's Exhibit 1a.

20           THE WITNESS:  Okay.

21      Q.  BY MR. SHOWALTER:  And I want you to note at

22  the bottom of page 81 at 14:30:12 hours, it indicates

23  "Officer Palmer exited patrol vehicle with Vievu body

24  camera activated."

25           Do you see where I read that?

ROBERT RODARME  MARCH 23, 2021

1  was there ever -- I mean, in theory this document

2  should record every complaint any citizen ever made

3  about you even no matter how unfounded.  And if there

4  was a police vehicle crash, that would be there.  If

5  there was, you know, an administrative investigation,

6  no matter how unfounded and unfair, that would be in

7  there.

8          But it seems like, in yours, it just

9  starts and it's not just yours, it's everybody's, like

10  Officer Seaquist, Officer Arnold.  It's like this thing

11  just came into being in 2013 or 2014.

12          Do you have any recollection of just, you

13  know, some kind of administrative investigation or IA

14  or anything prior to 2014 that should have been

15  recorded on a document like this?

16          MS. RETTS:  Form; foundation.

17          THE WITNESS:  I have no recollection of

18  that, no.  I've had a clean record, a decorated record.

19     Q.  BY MR. SHOWALTER:  Are you aware of the City of

20  Phoenix having a policy purging records involving

21  officer discipline or misconduct or administrative

22  investigations?

23          MS. RETTS:  Form; foundation.

24          THE WITNESS:  Yes.

25     Q.  BY MR. SHOWALTER:  And what's your

ROBERT RODARME  MARCH 23, 2021

1 | understanding of that?

2 |         MS. RETTS:  Form.

3 |         THE WITNESS:  My understanding, I believe

4 | if you have a written reprimand, then you can be purged

5 | after five years, and a supervisor counseling, I think,

6 | after two years, that's my understanding.

7 |    Q.  BY MR. SHOWALTER:  And do you have a

8 | recollection of ever having your file purged?

9 |    A.  No, I don't have a recollection of that.  I

10 | don't believe that it has.  I never -- I think you have

11 | to request it being -- I've never requested it being

12 | purged.

13 |    Q.  I have information that it may happen

14 | automatically.  But you don't have any recollection of

15 | actually requesting that your file be purged?

16 |         MS. RETTS:  Form; foundation.

17 |         THE WITNESS:  No, definitely not.

18 |         MR. SHOWALTER:  All right.  Let me take a

19 | five-minute break and review my notes.

20 |         THE WITNESS:  Okay.

21 |         THE COURT REPORTER:  The time is

22 | 12:36 p.m.  We are off the record.

23 |    (Whereupon, Lea Shapiro exited the deposition

24 | at 12:36 p.m.)

25 |    (Whereupon, a brief recess ensued from

1  12:36 p.m. to 12:42 p.m.)

2              THE COURT REPORTER:  The time is

3  12:42 p.m.  We are back on the record.

4              MR. SHOWALTER:  And I do not have --

5  subject to the right to ask follow-ups if your attorney

6  asks you any questions, I don't have any further

7  questions for you today, Sergeant.

8              THE WITNESS:  Okay.

9              MS. RETTS:  I have a few questions.

10             THE WITNESS:  Yes.

11

12             EXAMINATION

13  BY MS. RETTS:

14    Q.  Sergeant, the area where the incident with

15  Mr. Wells occurred, is it -- what is like in terms of

16  the calls for service that you receive?

17    A.  Well, it's known as a drug area.  In fact, we

18  call it Little Town of Methlehem.  It's been known by

19  that.  So there's a lot of meth usage, drug usage, in

20  that specific area.  The call volume suggests drug

21  usage in that area.

22    Q.  As you hear the call and are responding to the

23  scene, is your history responding to calls in that area

24  playing into your mind?

25    A.  Absolutely, that's all I'm thinking is a naked

ROBERT RODARME  MARCH 23, 2021

1  male in the middle of the street, I'm thinking drugs.

2  I'm thinking methamphetamine all the way, based on my

3  experience of 22 years of law enforcement.

4      Q.  Now, when you first arrive on scene, you

5  approach Mr. Wells and Officer Arnold is there.  Are

6  you using your command presence in any way?

7      A.  Yeah, that's a Level 1, officer presence,

8  command presence.  That's the number one, you know

9  force we use, start with.

10      Q.  Is it, you know, a way that you hope that, just

11  by you're in uniform that someone will comply?

12      A.  Absolutely.

13      Q.  Did you --

14      A.  I'm sorry, most people do, in that situation.

15      Q.  Did you then engage in verbal persuasion to

16  attempt to get Mr. Wells to voluntarily comply?

17      A.  Yes, verbal persuasion is the next level of

18  force.  We're absolutely just trying to get him out of

19  the street.  You know, there's kids coming.  I want to

20  get him help.  We want to get him help, help, help.  We

21  just gave him ample opportunity.

22      Q.  And verbal persuasion, with that, you're hoping

23  too that somebody just by you speaking to them will

24  comply?

25      A.  Right.  In fact, I guess, I alluded to earlier

ROBERT RODARME  MARCH 23, 2021

1  alluded to earlier when a person's on methamphetamine,

2  when they're naked in the street, in my experience

3  before in 22 years, they exhibit a superhuman strength,

4  even if they're -- they weigh 100 pounds, it's -- they

5  exhibit -- it's so hard to get these people into

6  custody.  They don't feel anything.

7           I've had an experience when -- they also

8  tell me that they don't feel pain.  I had one person

9  that cut his penis off on meth and still came at the

10 officers.  It's horrible.  It's a horrible drug.

11          MS. RETTS:  I don't have anything further.

12          MR. SHOWALTER:  Just a few follow-ups.

13

14              FURTHER EXAMINATION

15 BY MR. SHOWALTER:

16    Q.  You testified earlier that once Casey was

17 placed face down on his stomach, that you were

18 controlling his left hand or his left arm?

19    A.  On his stomach, his -- he had his left arm

20 underneath him still.  We were trying to get it out.

21    Q.  Yes, you're correct.  I don't mean to make the

22 issue about whether he was resisting and keeping it

23 under him.  I simply mean when it's you, Arnold and

24 Seaquist, you are working on the left arm and once --

25 so once Seaquist is there and you guys get him onto his

1  stomach, you're at the left arm, Arnold is at the right

2  arm and Seaquist is trying to control the legs,

3  correct?

4      A.  Yes.

5      Q.  And in working to get him, Casey handcuffed,

6  did you ever hand over responsibility or to attempt to

7  control Casey's left arm to anybody else?

8              MS. RETTS:  Form.

9              THE WITNESS:  No.  I don't recall.  I

10  ended up getting his hand, left hand from above or from

11  under his stomach.

12      Q.  BY MR. SHOWALTER:  And you did not release his

13  left arm from your control until he was handcuffed,

14  correct?

15      A.  Right.  Right.

16      Q.  And so you knew -- so when you got up, you knew

17  that he was handcuffed and you've already testified

18  about duration of time and all that, correct?

19              MS. RETTS:  Form.

20              THE WITNESS:  Yes.  I knew he was

21  handcuffed at that time.

22      Q.  BY MR. SHOWALTER:  Now, I wanted to ask you

23  some questions about meth and you testified that you --

24  you know, I'm not -- they could have a contest in

25  Arizona between police departments about which part of

```
 1  STATE OF ARIZONA        ) SS.
                            )
 2  COUNTY OF MARICOPA      )

 3

 4          BE IT KNOWN that the foregoing proceedings
    were taken before me, DONNA DELAVINA, Certified
 5  Reporter No. 50468; that the witness before testifying
    was duly sworn by me to testify to the whole truth;
 6  that the foregoing 149 pages are a full, true and
    accurate record of the proceedings, all done to the
 7  best of my skill and ability; that the proceedings were
    taken down by me in shorthand and thereafter reduced to
 8  print under my direction.

 9          [X]  Review and signature was requested.

10          [ ]  Review and signature was waived.

11          [ ]  Review and signature not required.

12          I CERTIFY that I am in no way related to any
    of the parties thereto nor am I in any way interested
13  in the outcome hereof.

14          I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in ACJA 7-206.  DATED
15  at Phoenix, Arizona, this 16th day of April, 2021.

16

17          Donna DeLaVina, RPR
            Certified Reporter
18          Certificate No. 50468

19          *     *     *     *     *     *

20

21          I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
    complied with the ethical obligations set forth in ACJA
22  7-206.

23

24          Donna DeLaVina, RPR, Owner
            Donna DeLaVina Reporting, LLC
25          Arizona RRF No. R1010
```

**EXHIBIT 7**



## CERTIFICATE OF ACCURACY

Net Transcripts, Inc. certifies that the document produced from the audio file named 019

- Richard Buffington Interview (redacted) (WELLS 000441).mp3 submitted by the Law

Offices of Robbins & Curtin on the 8th day of March, 2021 is a true and accurate

transcription. The transcript was produced by Net Transcripts' employees and

contractors to the best of their abilities and no intentional changes or redactions have

been made.

Dated: April 13, 2021

_____

Shane Mirkovich, General Manager
For Net Transcripts, Inc.

WELLS 002727

**INTERVIEW WITH RICHARD BUFFINGTON**
**Q=Det. Michael Rudd**
**A=Richard Buffington**

Q:    All right. This is Detective Rudd, 8085, reference incident 2019-0203420 on February 4, 2018 (sic) at 1804 hours. And I'm here with, if you could introduce yourself for my tape.

A:    Richard Buffington.

Q:    Okay. So Richard, obviously here to talk to you about what happened in the street by your house on Salter Lane.

A:    All right.

Q:    Holly tells me that you actually saw what was going on first and alerted her to what was happening?

A:    Yeah. When I came home from work, I'd say 12:30, 1:00 - 12:30 to 1:00. So, I forgot my phone today. So I was just fricking messed up all day but around - around 1 o'clock, I see this guy sitting - not sitting, but he's like kneeling on his knees, hands in the air and just, like, yelling.

Q:    Where's he kneeling?

A:    Just in the driveway.

WELLS 002728

1    Q:         The next house west of you?
2
3    A:         Two houses w- two houses west.
4
5    Q:         What was he yelling?
6
7    A:         I don't know. I - I had my windows up and music, but I could see his mouth
8               moving. I could see his arms going. I mean, he had a big beard, so you could tell
9               when he's, like, talking. It's just, you know, bouncing.
10
11   Q:         Is that somebody you've seen before?
12
13   A:         I've never seen him.
14
15   Q:         Okay. So just figured...
16
17   A:         This neighborhood is weird. I mean, there's a lot of weird people, so I just
18               thought he was someone from down the street, just wondering around. Because
19               that happens all the time.
20
21   Q:         Okay.
22
23   A:         A lot of weird sh-.
24
25   Q:         So didn't - didn't seem like a big deal to you at first?
26
27   A:         No, I told her about it and you know, I was going to see what she thought about
28               it. And he disappeared when we looked, it was like five minutes when I was
29               inside and he wasn't there, but we could still hear him somewhere.
30
31   Q:         Okay.
32
33   A:         So we were just like, okay, whatever.
34
35
36

WELLS 002729

1    Q:          All right.

2

3    A:          And then a little bit later she tells me there's a naked guy on the street.

4

5    Q:          Okay.

6

7    A:          So then we went and looked and, yeah a naked guy and she called in on 911

8               and...

9

10   Q:          That's, did you recognize him then?

11

12   A:          Mm-mm.

13

14   Q:          When you saw him naked?

15

16   A:          No - nope, never saw him.

17

18   Q:          I mean, was it the same person you saw earlier?

19

20   A:          Yeah, same person, big beard a short - shorter buzzed hair. Kind of big guy.

21

22   Q:          Right. Was he alone?

23

24   Q:          Alone, yeah.

25

26   Q:          All right. What was he doing then?

27

28   A:          He was just literally, he was standing facing like toward the mountain west, I

29               guess. And just hands up, just yelling. Couldn't really understand what he was

30               saying. We could hear him.

31

32   Q:          Okay.

33

34   A:          And then he's, you know, he's just starts - he didn't really, like, I do have video

35

36

WELLS 002730

1      of that. If you want to see that, it's just...

2

3    Q:    I'd like to, but I want you to tell me what you remember first.

4

5    A:    Yeah, so he's just standing there and that's basically it. And then the police

6      officer showed up.

7

8    Q:    One police officer?

9

10    A:    One police officer, and then he kind of walked within, I'd say eight to 10 feet of

11      them. And then know you could - you could - I couldn't hear what they're

12      saying. Because we were inside the house watching it. But, you know, he's just -

13      you could hear him talking and you know, his hands were up. His hands were up

14      before pretty much, before he's even got there, so - and then the officer pulled

15      out his handcuffs moved a little closer and then - and then you can tell the guy

16      got like kind of agitated right there. Like he started yelling even more and getting

17      all, you know, and then another police officer showed up and then they tried to,

18      you know, take him down to the ground and they just could not do it. Like, he

19      was - he's super strong.

20

21    Q:    When you say he got agitated, do you mean he was just animated or was he

22      aggressive towards the officer in any way?

23

24    A:    Yeah. Yeah. No - no, not - he wasn't really aggressive. He was just, got, he did

25      not want to be, you know, I don't know if it was touched or, you know, he didn't

26      want to be, you know, like subdued, I'm guessing. So he - he was like, you

27      know, he saw the handcuffs and he's just like, they're going to try to, he's gonna

28      try to handcuff me. And - but his hands were still up the whole time, but he's -

29      until the other officer came and they tried to grab him.

30

31    Q:    How'd they try to grab him?

32

33    A:    Just by the arms. They both went and tried to push his arms down and he's like

34      literally holding them up, like, and they couldn't get his arms down and then

35

36

WELLS 002731

1        they're trying to wrestle. And then at one point he fell to the ground, like on his

2        back and then another officer fell on top of him kind of pretty awkward. So yeah,

3        he fell. I'm not sure if he hit his head or you know, what, but, and then an officer

4        landed on him and then both of them held them like that on his back until two

5        more officers showed up like pretty much, right at the same time.

6

7     Q:       Did you see anybody throw any punches or kicks or anything like that?

8

9     A:       I couldn't really see that. I was also at the same time, there was a neighbor in

10        front of my house, and we were kind of talking. He's not a neighbor, I just - I

11        don't - I forgot his name, but he lives at the far house on the corner. He drives a

12        red, a red SUV. And we were kinda talking and kind of, you know, we weren't

13        really staring, but we were talking about the neighborhood. And so I, you know,

14        I didn't watch like literally the whole thing, just bits and pieces.

15

16    Q:       So it looked like the first two officers were having difficulty controlling the

17        guy...

18

19    A:       Oh, yeah.

20

21    Q:       ...but you couldn't see...

22

23    A:       Oh yeah, he - they - they - they could not control him at all.

24

25    Q:       No kicks or punches from either direction that you saw it?

26

27    A:       Mm-mm. Just trying to get them on the ground.

28

29    Q:       Okay.

30

31    A:       Like...

32

33    Q:       And once I did, it was back first because I didn't see how he fell. You know,

34        someone, you know, pushed him or you know what, but they fell.

35

36

WELLS 002732

1

2    Q:          And…

3

4    A:          And one officer landed on him. And then when the two officers showed up, then

5                they really tried to, you know, get him on his stomach and put his hands behind

6                his back. And then you could hear some Taser going off, you know, I heard at

7                least two. Because you could hear that pop of that Taser. And then - because

8                when he was on his back, I thought he gave up. But then he started fighting again

9                and then they, you know, the two other officers came up, they Tased him...

10

11   A:          What did his fighting look like?

12

13   Q:          Pulling his arms away. And he was kicking them, you know, trying to kick them

14               away from him. The police officer.

15

16   Q:          He's kicking the officers?

17

18   A:          Mm-hm. Trying to kick them away from him while he's on his back. Once the

19               other two showed up.

20

21   Q:          How long was that fight going on?

22

23   A:          Five minutes. Maybe five minutes.

24

25   Q:          All right. Then what happened?

26

27   A:          And then that was pretty much it. The other two, I heard some Tasers. And then

28               they were resuscitating him.

29

30   Q:          Okay. Did you notice him stop moving or anything leading up to him stop?

31

32   A:          No.

33

34   Q:          Where they started resuscitating?

35

36

WELLS 002733

1

2    A:           Mm-hm. Like nothing really. I mean they Tased him once or twice and then that

3                     was it. And then they started with rescus-- pretty much right away, they started

4                     trying to...

5

6    Q:           So one second he's fighting in the next second.

7

8    A:           He's just...

9

10   Q:           You didn't notice any gap or anything in particular happen?

11

12   A:           Mn-hm. The, uh, the lady next door came out and we started talking too, so, you

13                 know. I felt like I should have recorded the whole thing, but I didn't want to be

14                 one of those guys. I don't know.

15

16   Q:           Well…

17

18   A:           It's sad.

19

20   Q:           …you get used to it - yeah. So you do have a video?

21

22   A:           Yeah.

23

24   Q:           And it's on your cell phone?

25

26   A:           Mm-hm.

27

28   Q:           How long is the video?

29

30   A:           I think a minute and a half. And that was right when the cops - the first police

31                 officer arrived.

32

33   Q:           This is filmed from your driveway, looking out (unintelligible).

34

35

36

WELLS 002734

1    A:      No, right, right - right in the window, kind of through the car. And I can zoom in,

2           if you want. See it's like 10 feet, I'd say. It was just, you know, they're kind of

3           talking to each other.

4

5    Q:      While you're out here talking to your neighbors did anyone mention if they know

6           who this guy is or seen him before or anything like that?

7

8    A:      Mm-mm, she - she - she hasn't seen him before. She knows it's a female that

9           lives at the house kind of where he was at.

10

11   Q:      And you didn't know if he arrived in any car or anything like that? He didn't

12           show, see him show up?

13

14   A:      He, he like, he pulls out his handcuffs, steps up a little bit and then you could see

15           him. He starts jawing a lot. And I mean, that guy's built on, you know, he's no -

16           and the police officer wasn't that bad either, but starts moving more and I don't

17           know what they're saying.

18

19   Q:      Is the sound on this turned up right now?

20

21   A:      Yeah.

22

23   Q:      The - do you know, if you captured any of what they're saying.

24

25   A:      No, we're - we're in the house. It was just our dogs, I think making noise. And...

26

27   Q:      I would really like to get a copy of this video.

28

29   A:      Okay.

30

31   Q:      Would it - I think that's going to be too big of a file for...

32

33   ((Crosstalk))

34

35

36

WELLS 002735

1    A:        To email. Is that stored on a disc on there or how is that on?

2

3    Q:        I think I have a stored to the phone, but I can store it to the hard drive or the

4                memory card.

5

6    A:        If there's a way that you can do that or I - if you can lend me your phone, I

7                know, but I don't need anything else from your phone. I don't want to look at

8                your private stuff or anything, I'd just liked that one video. If there's a way that

9                you can get it.

10

11   A:        I'm pretty sure Holly is - she's a tech person.

12

13   Q:        Okay.

14

15   A:        And she can put it on - on a hard drive or something.

16

17   Q:        Okay. And I know that as soon as I mentioned, there's a video, my boss is going

18                to want to see it right away.

19

20   A:        Oh - oh, yeah.

21

22   Q:        So...

23

24   A:        I wish it was more, I mean, I wish I got the whole thing, but...

25

26   Q:        No, that's fine. I understand both - both drives to want to film it and then want to

27                not film it.

28

29   A:        Yeah.

30

31   Q:        Somebody is having a very bad day right there.

32

33   A:        Yeah.

34

35

36

WELLS 002736

| | | |
|---|---|---|
| 1 | Q: | Anything else you remember? |
| 3 | A: | That's pretty much it and, resuscitating and then… |
| 5 | Q: | You mentioned it didn't look like he was attacking or coming towards the |
| 6 | | officers at all? |
| 8 | Q: | No, he wasn't. It didn't seem like he was punching him. It was more like trying |
| 9 | | to get away, kick them away or just - but not trying to run? He like, he wasn't |
| 10 | | trying to go anywhere, it seemed like. He was just trying to be by himself. Like, I |
| 11 | | don't know. It's they didn't want them to touch them or, you know, I don't |
| 12 | | know. |
| 14 | Q: | Okay. |
| 16 | A: | Yeah, I'm not sure if that car is his, 'cause it's kinda parked in that, you know, |
| 17 | | blocking that driveway. So I don't know… |
| 19 | Q: | You don't think that car belongs there? |
| 21 | A: | Mm-mm. |
| 23 | Q: | Okay. All right. Well, we'll go off tape now. |

The transcript has been reviewed with the audio recording submitted and it is an accurate
transcription.
Signed ___*JoTaylor Callaway*_____

WELLS 002737

# EXHIBIT 8



# CERTIFICATE OF ACCURACY

Net Transcripts, Inc. certifies that the document produced from the audio file named 008

- Jeffrey Bolduc Interview (redacted) (WELLS 000430).mp3 submitted by the Law

Offices of Robbins & Curtin on the 8th day of March, 2021 is a true and accurate

transcription.  The transcript was produced by Net Transcripts' employees and

contractors to the best of their abilities and no intentional changes or redactions have

been made.


Dated:  April 13, 2021

_____
Shane Mirkovich, General Manager
For Net Transcripts, Inc.

WELLS 002649

1
2
3
4
5
6
7      **INTERVIEW WITH JEFFERY BOLDUC**
8         **Q=Det. Michael Smojver**
9            **A=Jeffery Bolduc**
10
11
12    Q:        I'm Detective Smojver 9236, report number 2019-203420. (Redacted).
13
14    A:        Yes.
15
16    Q:        And Jeffrey what's your last name?
17
18    A:        Bolduc. Yeah.
19
20    Q:        B-O-L-D-U-C right?
21
22    A:        Right.
23
24    Q:        Okay. All right. You live here?
25
26    A:        Yes.
27
28    Q:        Okay. And what - can you tell me what you saw this afternoon?
29
30    A:        I kind of - I was taking a nap, woke up, looked out the window, saw the
31              neighbors, all looking that way, east.
32
33    Q:        Okay. Right.
34
35
36

WELLS 002650

1   A:      I walked across the street, where Doug, the neighbor right next to me to the east
2            and the woman that lives across.
3

4   Q:      Okay.
5

6   A:      ...were there. I saw two Phoenix Police Officers struggling with a naked man. He
7            was on his feet, but they were trying to get him under control.
8

9   Q:      Okay.
10

11  A:      They eventually got him on the ground. He was - the whole time he was flailing.
12           These two police officers were having a difficult time restraining him. And they
13           kind of had his upper body held down, but his legs and the lower portion of his
14           body were...
15

16  Q:      Okay.
17

18  A:      ...swinging back and forth.
19

20  Q:      Got you.
21

22  A:      And they eventually got him pretty much under control. But I guess he was still
23           fighting them violently. Then other police officers showed up.
24

25  Q:      So how many are there now?
26

27  A:      I'm going to say there's four.
28

29  Q:      Okay.
30

31  A:      ...around him. And that's when we saw the yellow Taser, by a police officer who
32           was kind of at his feet. And then we heard two pops and someone in the group
33           that I was with said, you know, that's what a Taser sounds like.
34

35

36

WELLS 002651

1   Q:        Yeah it makes a popping noise.

2

3   A:        Yeah. And then shortly after that we saw a police officer giving chest

4             compressions.

5

6   Q:        Okay.

7

8   A:        And then another police officer took over, but, this guy was just out of control.

9

10  Q:        Did you - did you see anything before a struggle, or did you just see them

11            struggling?

12

13  A:        I just saw them struggling with - with him.

14

15  Q:        So you didn't see what led up to that?

16

17  A:        No. I have no idea.

18

19  Q:        Were there any punches or strikes or anything like that? Did you see any?

20

21  A:        I didn't see any of that, but like I said, I kinda got to the situation...

22

23  Q:        Right.

24

25  A:        ...late.

26

27  Q:        We're you in your - the neighbor's yard then, is that where you were standing?

28

29  A:        We were standing across the street behind the Buick that's parked in front of

30            their house.

31

32  Q:        So you were on the other side of the street?

33

34  A:        Right.

35

36

WELLS 002652

1

2  Q:     Okay.

3

4  A:     Yeah, I walked over. That's where Doug and the woman I don't know. I've only

5         lived here since October. So I don't really know the neighbors very well.

6

7  Q:     Well, now you've all got a story to tell, huh?

8

9  A:     Yeah. I moved from Sunnyslope trying to get away from bad things.

10

11 Q:     Oh, it's...

12

13 A:     But...

14

15 Q:     This is nothing. This - Sunnyslope is...

16

17 A:     Yeah.

18

19 Q:     Whole another animal.

20

21 A:     Right. Yeah.

22

23 Q:     It's just - you just never know. Did you know the guy that was fighting with the

24        officers?

25

26 A:     No.

27

28 Q:     Have you ever seen him before?

29

30 A:     Not that I'm aware.

31

32 Q:     Was he saying anything as they were struggling?

33

34 A:     I don't think so. It was a fair distance away...

35

36

WELLS 002653

1

2    Q:           Right.

3

4    A:           But I do remember the officers giving an, you know...

5

6    Q:           Like what were they saying?

7

8    A:           Well, I - you couldn't hear because, I don't know. Just couldn't hear, I guess I

9                 wasn't...

10

11   Q:           So just a - so we'll just - it was like a fight basically.

12

13   A:           Yeah.

14

15   Q:           And inaudible comments from everybody more or less or...

16

17   A:           I would say. So. Yes.

18

19   Q:           That's fair to say?

20

21   A:           Yeah.

22

23   Q:           Okay. Paramedics show up.

24

25   A:           Yeah. A lot.

26

27   Q:           Okay.

28

29   A:           Fire and paramedics.

30

31   Q:           A lot of us came. Flying...

32

33   A:           A lot of police officers.

34

35

36

WELLS 002654

1  Q:      Yeah. Anybody in any of your neighbors recognize the guy?
2
3  A:      No one said that they did.
4
5  Q:      Okay.
6
7  A:      Someone did mention - oh, I think I asked someone, does he live there? And they
8          s- someone said, no, he pulled up in a car. Got out and then was putting his arms
9          in the air and talking to God.
10
11 Q:      Did you - did you see any of that?
12
13 A:      I didn't, no.
14
15 Q:      Okay. So you were napping when it...
16
17 A:      Yeah.
18
19 Q:      So what woke you up? Did you hear the - here - so what woke you up? 'Cause I
20         know you said were taking a nap.
21
22 A:      I don't know.
23
24 Q:      Just - time to get up...
25
26 A:      Yeah. I get up at 4:00 in the morning. And by, you know, noon, 1 o'clock I'm
27         tired.
28
29 Q:      Yeah. I hear you. I'm up at 4 o'clock in the morning too.
30
31 A:      Yeah.
32
33 Q:      Whether I like to or not, the dog's got to go out...
34
35
36

WELLS 002655

1   A:          Right.

2

3   Q:          ...so then it's off to work I go, so - okay Anything else that you can think of?

4

5   A:          No. Can I - is he from this area that you know of?

6

7   Q:          It doesn't appear that way. No.

8

9   A:          Okay. That's good.

10

11  Q:          I'm trying to figure out why he was here.

12

13  A:          Yeah.

14

15  Q:          So, but no one knows him.

16

17  A:          Yeah. He was...

18

19  Q:          Wouldn't know why he would be here.

20

21  A:          He was obviously crazy or on drugs or something.

22

23  Q:          Most likely there's some chemicals on board. I'm sure. So...

24

25  Q:          Yeah. So, yeah, it's unfortunate.

26

27  A:          Yep.

28

29  Q:          Alright, anything else?

30

31  A:          Nothing I can add.

32

33  Q:          Okay.

34

35

36

WELLS 002656

1  A:          That I can think of.

2

3  Q:          All right, end the report 1846.

4

5

6  The transcript has been reviewed with the audio recording submitted and it is an accurate

7  transcription.

8  Signed_____ Jo Taylor Callaway_____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

33

34

35

36

WELLS 002657

# EXHIBIT 9

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
             Plaintiff,       )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
             Defendants.      )
_____)

VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

JOSEPH B. SEAQUIST

Phoenix, Arizona
March 22, 2021
9:02 a.m.

DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
PREPARED BY:                    P (602) 230-5454
                                F (480) 546-3721
Donna DeLaVina, RPR             www.dlvreporting.com
Certified Reporter
Certificate No. 50468

1    Q.  Now is that correct?  You know, so you would

2  answer a call at 31st Avenue and Deer Valley and you're

3  coming back to the station to do your paperwork and

4  you're at about 31st Avenue and Rose Garden; is that

5  true?

6    A.  Yes.

7    Q.  And, at that point you hear Sergeant

8  Rodarme, you say -- or is it Rodarme or Rodarme?

9    A.  Rodarme.

10    Q.  "Sergeant Rodarme, Bob, he cleared over the

11       radio to send another unit.  And I've been working

12       with him long enough to know that his voice was

13       jacked up, and I knew it was serious."

14            Did I read that accurately -- or is

15  that -- strike that.

16            Is that true?

17    A.  Yes.

18    Q.  And so when you say he cleared over the radio

19  to send another unit, what does that mean?

20    A.  Well, if you work in patrol long enough and

21  you're with a squad long enough and, basically, if

22  you've been an officer long enough, when you have your

23  radio chatter in your ear all day long and especially

24  with officers that you're working with on a squad, you

25  tend -- they're like your brothers and sisters and when

1    Q.  BY MR. SHOWALTER:  Other than the carotid hold,

2  is there any other force technique authorized by the

3  City of Phoenix in which the neck is -- the neck or

4  throat are appropriate targets?

5          MS. RETTS:  Form.

6          THE WITNESS:  No.

7    Q.  BY MR. SHOWALTER:  Did you witness anybody

8  using a carotid hold on Casey Wells on February 4th of

9  2019?

10   A.  No, I did not.

11   Q.  Did you witness anybody striking Casey Wells on

12  February 4th, 2019?

13   A.  No, I did not.

14   Q.  And so when you say -- when you say that -- and

15  let me make sure I'm clear on who the officers are.

16          So when you arrive at the scene at Salter,

17  Sergeant Rodarme is there and then Officer Arnold is

18  also present?

19   A.  Yes.  I believe Officer Arnold made the initial

20  contact on the radio call and Sergeant Rodarme backed

21  him up.

22   Q.  And as you describe it at the bottom of page 5,

23  Casey is laying on his back, his feet facing south, and

24  his head facing kind of north.  Rod at his head, knee

25  towards his head, but it wasn't on the head.

1              And as we get onto page 6, you say:

2              "And this -- his right knee was back.  And

3     he was fighting this guy, trying to get an arm to

4     be able to cuff him."

5     A.   That would be accurate, yes.

6     Q.   When you say "his right knee is back," are you

7  talking about Sergeant Rodarme or Casey?

8     A.   Sergeant Rodarme.

9     Q.   And when say "he was fighting this guy, trying

10  to get an arm to be able to cuff him," the "he" is

11  Sergeant Rodarme and this guy is Casey Wells in that

12  sentence, correct?

13    A.   Yes.

14    Q.   Sergeant Rodarme was "fighting this guy, trying

15  to get an arm to be able to cuff him," correct?

16    A.   Yes, correct.

17    Q.   And then does Jamie refer to Officer Arnold?

18    A.   Yes.

19    Q.   So Officer Arnold is on Casey's right side,

20  basically positioned the same way.  So both officers

21  are on their knees trying to get ahold of Casey's arms

22  when you arrive at the scene?

23    A.   That would be accurate, yes.

24    Q.   And when you say there wasn't any knee strikes,

25  that also means Casey didn't strike either officer with

1  his knees, correct?

2           MS. RETTS:  Form.

3           You cut out a little bit at the end.

4      Q.  BY MR. SHOWALTER:  When you say there weren't

5  any knee strikes or nothing, anything like that, you're

6  also saying you didn't witness Casey striking either

7  officer with his knees?

8      A.  Not that I recall seeing anything, no.

9      Q.  Okay.  And then Detective Teusink says:

10          "And this guy is face up?"

11          And at lines 9 through 11 you say:

12          "Yeah.  Yeah.  I mean, this guy was -- he

13      was -- he was in it for the long haul."

14          And Detective Teusink says:

15          "Okay."

16          And then at lines 13 through -- 13 of

17  page 6 through line 17 of page 8, there's a -- you give

18  a fairly lengthy narrative.  Do you see that?

19      A.  Yes.

20      Q.  I'm going to try to break it -- well, let's

21  take it piece by piece.

22          So on page 6, line 13, you say:

23          "After I grabbed his legs, and I had some

24      type of control of his legs -- because he was

25      still -- he was kicking -- I told -- yelled out to

1    Rod and Jamie, turn him on his back.  And they were

2    able to get him on his stomach."

3         Do you see where I read that?

4    A.  Yes.

5    Q.  And is that true?

6    A.  Yes.

7    Q.  That's what I just read -- sorry, I spoke over

8  you?

9    A.  To the best of my knowledge that, yeah, from

10  the events in the interview, yes.

11   Q.  Okay.  So he was kicking and -- but you had

12  some type of control of his legs?

13   A.  Some, I would say is an accurate term.

14   Q.  You didn't have complete control, he still

15  resisted, correct?

16   A.  Yes, correct.

17   Q.  Did you ever see him punch Rodarme -- or

18  Sergeant Rodarme or Officer Armstrong?

19   A.  Arnold.

20   Q.  Arnold, good grief.

21   A.  No.

22   Q.  Okay.  You never saw him elbow either of them

23  either, correct?

24   A.  No.

25   Q.  When you -- okay.  And then you say:

1        "Once they got him on his stomach, I

2  grabbed his ankles and put them together.  And then

3  just with all my weight, I pushed down on them to get

4  his heels touching his butt.  That way I had some type

5  of control on him."

6        A.  Correct.

7        Q.  And so --

8        A.  That would be --

9        Q.  Oh, go ahead.

10       A.  That would be a training technique that we were

11  taught, so it was well within policy.

12       Q.  So at the start of it, his legs are more or

13  less extended.  You get his ankles crossed, so one leg

14  on top of the other, and then bend them back so that

15  his heels touch his butt or get as close to it as

16  possible, correct?

17       A.  Correct.

18       Q.  And the purpose of doing that is to prevent him

19  from kicking and struggling and to try to take control

20  of him, correct?

21       A.  Correct.

22       Q.  And then you say -- and so at this point, he's

23  face down.  And later on I think you said his head was

24  around where his butt was when you're doing this?

25       A.  Correct.

1    Q.  Which direction are you facing in terms -- are

2  you looking towards his feet or are you looking towards

3  his head?

4    A.  Towards his head.

5    Q.  Okay.  And you're putting your weight on his

6  legs.  So you can see what Officer Arnold and Sergeant

7  Rodarme are doing while this happened?

8          MS. RETTS:  Form.

9          THE WITNESS:  I was in a position to see

10  what they were doing.  But I was concentrating more on

11  my position in trying to get Mr. Wells in control.

12    Q.  BY MR. SHOWALTER:  So at page 6, line 23, you

13  say:

14          "Somehow or another, he was able to push

15      on my vest, basically, you know, push me back or

16      push himself forward, because what had happened,

17      his feet," now I'm page 7, line 1, "dropped, and he

18      kicked me right here in the thighs."

19    A.  Correct.

20    Q.  You use the -- when you talk about "he was able

21  to push on my vest," that's not something he did with

22  his arms, this is talking about things that he did with

23  his legs?

24    A.  Correct.

25    Q.  Okay.  And so when you say "his feet dropped,

1   and he kicked me right here in the thighs," what I'm --

2   I want to know what you mean what exactly happened, if

3   you could explain that further?

4       A.   After I gained some control when I crossed his

5   ankles and then pushed his feet and his ankles up to

6   where his heels were touching his butt, I had -- I was

7   laying my upper body on his legs to keep them from

8   kicking around more and somehow, I don't know what

9   transpired on Mr. Wells, but he was able to take his

10  legs, still crossed at the ankles, and the way that I

11  was laying on him with my vest and my upper body on his

12  lower leg areas, he was able to push me or use me or

13  use my vest or my upper body as a brace and pushed,

14  either he pushed himself forward or he was able to push

15  me off his legs, so that I was able to -- I had lost

16  basically control of his legs.

17      Q.   Okay.  And when you say, "he kicked me right

18  here in the thighs," where is it that he kicked you on

19  the thighs, the front of the thighs, the back?

20      A.   The front of the thighs.

21      Q.   And when he hits the front of your thighs, is

22  he doing that with his lower leg or his upper leg?

23      A.   He's doing it basically with his lower leg and

24  his feet.

25      Q.   Okay.  And so what portion of Casey makes

1  contact with you, is it the front of his leg or the

2  heel, rear of his leg?

3       A.  It would have been the front of his legs and

4  the top of his feet, such as a kicking motion.

5       Q.  So were you kneeling when that happened?

6       A.  Yes.

7       Q.  So your knees are -- so before he does that, if

8  I understand correctly, your knees are on the ground

9  and you have your upper body on top of his legs holding

10 him in that crossed ankle, ankles to butt position that

11 we've already talked about, right?

12      A.  Correct.

13      Q.  Okay.  And he kind of -- as you say, he kind of

14 pushes you out of that position and his feet come down

15 and kick your thighs?

16      A.  Correct.

17      Q.  Now at line 2 of page 7 you say:

18           "And I was able to regain.  I went back

19 and I was grabbing his legs, and I had -- it dawned on

20 me that I had to deploy -- and deployed my TASER."

21           Did I read that correctly?

22      A.  Yes, you did.

23      Q.  And is that true?

24      A.  Yes.

25      Q.  And then at lines 5 through 8, you say:

1        "I have been TASER certified ever since
2    the day we had to go down to the academy and get
3    zapped by them.  And this is the first time in 16
4    years I've ever had to use a TASER."
5        Did I read that correctly?
6    A.  Yes, you did.
7    Q.  And is that true?
8    A.  Yes.
9    Q.  At lines 9 through 13 you say:
10        "I yelled to Rod, and I told Jamie, 'I'm
11    deploying TASER.'  I yelled to the guy, 'Stop
12    resisting.'  And he kept fighting.  I let go of my
13    first cartridge on him.  He tensed up.  And then he
14    relaxed and he still kept into the fight."
15        Did I read that correctly?
16    A.  Yes, you did.
17    Q.  And is that true?
18    A.  Yes.
19    Q.  When you say "I let go of my first cartridge on
20  him," does that mean you deployed the first cartridge
21  on him?
22    A.  Yes.
23    Q.  And in response to that first cartridge
24  deployment, you said "He tensed up"?
25    A.  Yes.

1    Q.  Where did he tense up?

2    A.  His whole body would have tensed up.

3    Q.  So his whole body tensed up when you deployed

4  the cartridge, the first cartridge.  And you say, "And

5  then he" -- and so how long was that deployment?

6    A.  You would have to refer to the TASER record.  I

7  couldn't begin to tell you, sir.  I wasn't keeping

8  track of time during the incident.  All I could tell

9  you is what you read.  That it was a first time that I

10  had ever deployed the TASER in the 16 years I was

11  carrying it.

12    Q.  Okay.  So after he tensed up, you say:

13            "And then he relaxed and he still kept

14  into the fight."

15            Did I read that correctly?

16    A.  Yes, you did.

17    Q.  And at point, where were Officer Arnold and

18  Sergeant Rodarme?

19    A.  They were still in the position that was

20  described in the transcript earlier.

21    Q.  So earlier when they're -- I think earlier when

22  their location is described, that's at the point when

23  Casey is face up?

24    A.  Yeah.  Yes, I would say, yes.

25    Q.  And so before you deployed the TASER, you told

JOSEPH B. SEAQUIST  MARCH 22, 2021

1  them, let's flip him over, right?

2      A.  Correct.  Because we would be able to have a

3  better positioning, to gain control.  Plus with him

4  turned over onto his stomach, that reduces the chance

5  of injury to Mr. Wells or to the officers with him

6  throwing punches or flailing his arms around.

7      Q.  So at this point when you first deployed the

8  TASER, what are -- what's Officer Arnold doing?

9      A.  He's still on the right side in basically the

10  same position that I had described earlier, still

11  attempting to get an arm for control.  And the same

12  thing with Sergeant Rodarme, he would be on the left

13  side, the same position I had earlier described, trying

14  to get Mr. Wells' left arm for control.

15      Q.  And so look at lines 14 through 16, you say:

16          "I know that Rob," or Sergeant Rodarme,

17  "was trying to get his arm pulled out from underneath

18  him."

19      A.  Correct.

20      Q.  And "Jamie," or Officer Arnold, "was trying to

21  control his right arm."

22      A.  Correct.

23      Q.  What was Officer Arnold doing to control his

24  right -- Casey's right arm?

25      A.  Sir, I couldn't give you exact details.  The

1   situation was very, very fluid.  And as I explained to

2   8you before, my concentration was more on trying to get

3   Mr. Wells into control or custody or detained.  And I

4   couldn't tell you exactly what Officer Arnold or

5   Sergeant Rodarme were doing.  I was just doing what my

6   position is to try to get him into custody or detained.

7       Q.  But to be clear, you said, "I know that Rod

8   was" -- that Sergeant Rodarme "was trying to get his

9   arm pulled out from underneath him," correct?

10      A.  Correct.

11      Q.  And so while this is happening, Casey Wells'

12  left arm is underneath his body while he's on his

13  stomach, correct?

14      A.  I would say that's accurate.

15      Q.  And Officer Arnold is trying to control his

16  right -- Casey's right arm which is not under his

17  stomach, correct?

18      A.  I would have to say that's accurate, yes.  I

19  know that they were trying to control his arm in order

20  to be able to place handcuffs on him.

21      Q.  Okay.  And you said at line 16:

22              "I kept yelling at him, 'Stop resisting.'

23      I hit him again with the second cartridge.  And it

24      had -- it basically had no effect on him."

25              Did I read that correctly?

1  could see the wires?

2      A.  Yes.

3      Q.  And you have to be careful not to touch those

4  wires because if you touch them, you could get shocked,

5  right?

6      A.  Correct.

7      Q.  And the same goes for the other officers, they

8  want to avoid those as well, correct?

9      A.  Correct.

10     Q.  And so you then fire -- or you didn't fire --

11 you then deploy the second TASER cartridge.  The same

12 question, are you able to see both prongs enter Casey?

13     A.  I was able to see the wires, just as you

14 described on the first deployment, yes.

15     Q.  And so just as on the first deployment, you

16 could also see the prongs and the wires on the second

17 deployment?

18     A.  Yes.

19     Q.  While you were there between those deployments

20 and the time when you later were involved turning Casey

21 over to perform CPR, did you at any point notice that

22 the TASER prongs or wires became disconnected?

23     A.  No.

24     Q.  And at the bottom of page 7, at lines 23

25 through 25, you say:

1     Q.  And your memory is that you deployed the first

2 two cartridges and then you made two trigger pulls but

3 it's possible there were more and you would defer to

4 whatever the TASER readings indicate?

5     A.  Correct.

6     Q.  So then at line 8, on page 8, you say:

7         "But we were finally able to get him where

8     he was handcuffed to the back.  And then I was on

9     his -- on his legs, because he was still fighting."

10     A.  That's accurate.

11     Q.  And at this point you say:

12         "Officer Funston came running up.  And I

13     remember him, he was -- I thought he was trying to

14     grab -- and I usually carry my RIPP Restraint on my

15     belt here.  He took my RIPP Restraint off.  And he

16     looked at me -- and because I keep it like rolled

17     up, he just looked at me, like, how in the fuck do

18     you get this thing undone?"

19         Did I read that correctly?

20     A.  Yes, you did.

21     Q.  And is that true and accurate?

22     A.  Yes.

23     Q.  So at this point, had you stopped deploying the

24 TASER?

25     A.  Yes.

1          Did I read that correctly?

2     A.  Yes, you did.

3     Q.  And is that true?

4     A.  Yes.

5     Q.  And then at lines 5 through 7, you say:

6          "So it probably wasn't 30 seconds between

7     the time he was fully in custody and I started CPR.

8     How long I did CPR, I have no idea."

9          Did I read that correctly?

10    A.  Yes.

11    Q.  And is that true?

12    A.  To the best of my knowledge, yes.

13    Q.  At lines 8 through 12, you stated:

14         "So, you know, when I first saw him, when

15    Rod and Jamie were fighting with him, he had -- his

16    face was pretty much all blood.  I saw he had blood

17    coming out of his nose, his mouth.  I think he had

18    a cut across his head."

19         Did I read that accurately?

20    A.  Yes.

21    Q.  So I want to break that down.  When you arrived

22    at the scene, you saw that Casey's face was pretty much

23    covered in blood?

24         MS. RETTS:  Form.

25         THE WITNESS:  No.  Because at the time

1    Q.  "It was just like he was like a bear stuck in a

2  trap.  All he would -- all he would do is just -- you

3  would hear like 'grunting sound' -- and that's all I

4  was doing."

5              Or I think it maybe means that's all he

6  was doing?

7    A.  Correct.

8    Q.  Now, do you know if one of the reasons he

9  wasn't yelling and never said any words was that his

10  mouth and respiratory cavities were filling up with

11  blood?

12              MS. RETTS:  Form; foundation.

13              THE WITNESS:  I'm not a doctor or a

14  paramedic, sir, so I couldn't tell you what was leading

15  to him grunting.  All I could tell you is what my

16  observations and what I heard and he was pretty much

17  grunting and growling like a bear.

18    Q.  BY MR. SHOWALTER:  Did you ever -- have you

19  ever since this incident learned that Casey had

20  fractured cartilage in his neck?

21              MS. RETTS:  Form.

22              THE WITNESS:  No.  I was never briefed on

23  the autopsy report or anything along that.  No, I was

24  not aware of anything like that at all.

25    Q.  BY MR. SHOWALTER:  And earlier I asked you

1  questions about, you know, the neck as a target for

2  police force.

3         As you sit here today, you never saw any -- or

4  your testimony is you never saw anything that could

5  have caused harm to Casey's neck on February 4th of

6  2019?

7      A.  No, sir.

8      Q.  Has anybody ever told you what the Maricopa

9  County Medical Examiner determined was the cause of

10  death in this matter?

11             MS. RETTS:  Form.

12             THE WITNESS:  No.  It would have been

13  basically put into the final report.  But I never read

14  the final report and I never read the autopsy report on

15  it.

16      Q.  BY MR. SHOWALTER:  Okay.  Turning to page 9,

17  line 13 -- I'm sorry, we already did that.  Line 19

18  through 24:

19             "And I previously had been DR -- at DRE

20      with the department.  Through training and

21      everything I had with DRE, I actually thought

22      possibly this guy was on bath salts, the way he was

23      acting, because nothing we were doing was having

24      any effect on him whatsoever, any effect."

25             Did I read that correctly?

1    A.  Yes, you did.

2    Q.  And is that true?

3    A.  Yes.  One of the parts of the DRE training is

4  recognizing symptomolgy and how drugs, whether they be

5  legal or illegal have an effect on the human anatomy.

6  Each person is different, each drug is going to act

7  differently to each person.  And part of what my DRE

8  training was and part of me taking it upon myself to

9  research it, to see what side effects drugs have on the

10 human body.

11          It was -- I wasn't saying for sure, being

12 a doctor, but I had seen people and made contact with

13 people that had been on bath salts.  The -- I can't

14 remember what the name of it is.  But --

15   Q.  Ice?

16   A.  -- synthetic drugs, synthetic marijuana.

17   Q.  Spice?

18   A.  Spice, yes, thank you.  And different drugs,

19 PCP as well.  So I was familiar with somebody being

20 under the influence of a drug that would basically be

21 in -- cause what Mr. Wells was doing.

22   Q.  When you say causing what Mr. Wells was doing,

23 what is the specific thing that you claim he was doing

24 that relates to a drug?

25   A.  His lack of compliance for the commands that

1  were given to him to display or put his hand -- give

2  us -- give his hand so we could take him into custody.

3  Lack of pain to where -- when, as an example, when I

4  was laying on his legs and he pushed me off, he would

5  have had some type of contact with the asphalt to do

6  that.  The fact that he had no reaction to the TASERs

7  or the TASER deployment, to me, that would signify that

8  he is under some type of drug.

9      Q.  To be clear, you don't know whether he was

10  experiencing pain or not?

11      A.  Well, sir, I can tell you from being the

12  initial TASER holder or TASER user when the City of

13  Phoenix decided to use the TASERs and part of the

14  required education for that was to be shot with the

15  TASER.  I can tell you that either somebody is under

16  the influence of a drug or they are very, very used to

17  having high electricity or high voltage electricity put

18  through them.  Because it was a very, very painful and

19  uncomfortable experience.

20          And if Mr. Wells, when I deployed the

21  first and the second cartridge along with the other two

22  times that I initiated the TASER, if he hadn't been

23  under control for that, that would be definitely a

24  reason for me to believe that he was under some type of

25  drug.

1    Q.  And to be clear, though, what I'm asking you is

2  this:  You don't know what Casey Wells' subjected

3  experience of pain was at any given time on

4  February 4th of 2019, correct?

5    A.  No.  I've never had contact with Mr. Wells

6  previous to this incident.

7    Q.  But, in other words, he never said that hurts,

8  he never said ouch, correct?

9    A.  No.  All he did was either growl, as I

10  described earlier, growl like a bear caught in a trap.

11  There was never any kind of vocalization or verbal,

12  verbal just talking from him either in any way, shape

13  or form.  It was just all basically the grunting and

14  the growling sounds.

15    Q.  And you keep saying that he was growling or

16  grunting like a bear caught in a trap, right?

17    A.  That was about the best description that I

18  could give.  I didn't have anything on audio to

19  describe it, so that was the closest description that I

20  could give.

21    Q.  And you would agree with me that a bear trap is

22  a painful thing to be caught in?

23    A.  I haven't experienced it, but I would assume

24  that bears that have been caught in it aren't very

25  happy.

1 naked, right?

2    A.  Yes.

3    Q.  And when you see the man's face, you see that

4 he's got a beard, a big beard and you also see that

5 he's got blood all over his face, right?

6    A.  I couldn't tell you, sir, if he had a beard.  I

7 would like to explain to you that what happens in these

8 types of situations is that your -- as I explained to

9 you before how everybody's body operates differently.

10 When you see two officers in a struggle in a street

11 with a naked man, what my decisions were, from the time

12 I heard Officer Rodarme -- or Sergeant Rodarme clear

13 for additional units until when I got on scene, my

14 reactions are going to be to assist the two officers to

15 try to gain control of Mr. Wells.

16          I can't get into telling you exact details

17 on whether Mr. Wells had a beard or not, I don't know.

18 If I did see blood on his face, I couldn't tell you

19 exactly where it was coming from.  It just -- there's

20 just certain things that happen that you just don't

21 look at or just try to pinpoint fine details on such as

22 does he have a beard or not.

23    Q.  That's fine.

24          But you recognize that when you see a

25 naked man with blood on his face fighting with police

JOSEPH B. SEAQUIST  MARCH 22, 2021

1 officers, that the naked man in question is emotionally

2 distressed or emotionally disturbed and it could be

3 mental health or it could be drugs, right?

4             MS. RETTS:  Form; foundation.

5             THE WITNESS:  Yeah.  It's not an everyday

6 occasion that you drive down the street and see naked

7 people walking up and down your street.

8       Q.  BY MR. SHOWALTER:  And, yeah, that's an unusual

9 occurrence?

10      A.  Highly unusual, yes.

11      Q.  So I'm going to scroll -- I'm scrolling down to

12 lines 8 through 10 -- well, actually let's just --

13 let's finish that out.

14            "The way he was acting," okay, so we're at

15 the bottom of page 8 [sic], 20 through 24 you talk

16 about you believe that he was on bath salts and that

17 nothing that he was doing was having any -- or nothing

18 that you guys were doing was having any effect on him;

19 is that accurate?

20      A.  Yes.

21      Q.  With that said, you never witnessed Casey,

22 other than when he struggled and kicked your thighs,

23 you never saw him strike anybody, correct?

24      A.  No.  I never saw him strike anyone.

25      Q.  You never saw him -- you knew he didn't have a

1  weapon because he was naked, true?

2      A.  True.

3      Q.  And other than the point at which he was on his

4  back, the entire time, from the point on which he got

5  flipped over onto his stomach, he remained on his

6  stomach, correct?

7      A.  Correct.

8      Q.  And you did recognize that when the TASER --

9  when you activated the TASER, at multiple times you

10 recognized that his body tensed up during the TASER

11 activation, correct?

12     A.  Correct.  But the report shows that it wasn't

13 multiple times, it was the two times for the cartridges

14 and then two additional times.  So I guess if you want

15 to say multiple, but it was just the four times that I

16 could remember.

17     Q.  So you're not aware of there being a fifth

18 time?

19     A.  No.

20     Q.  So continuing on to page 10, lines 1 through 4,

21 page 9, line 25:

22             "You know, and I -- the training too, with

23         him having his clothes off, being naked -- those

24         are the classic signs of either bath salts or

25         PCP, a person who will start taking their clothes

1    where was his arms at that time?  And where was --

2    and where was his legs:

3           And you say:

4           "From what I can -- well, I was on his

5    legs, and I was trying to -- I grabbed around his

6    legs and I was holding his legs like this.  I

7    remember his -- the suspect's left arm was under

8    his body.  And I could remember making his fist out

9    because Rod was trying to get in and trying to

10   break -- to get his arm out."

11          Did I read all that accurately?

12   A.  Yes, you did.

13   Q.  There's a point in there, and this always

14   happens with transcripts, where you're having a

15   conversation with people, you're able to act things out

16   and make gestures, but it doesn't come through on the

17   transcript.

18          At the transition between 12 -- pages 12

19   and 13, it says:

20          "I grabbed around his legs, and I was

21   holding his legs like this."

22          How were you holding his legs?

23   A.  His ankles were crossed and I would have had my

24   arms in a cross position along with my body laying on

25   top of the arm or on top of his legs.

1  Q.  So he's on his stomach.  When you have your

2  arms around his legs, do you -- you're not

3  encompassing -- you're only encompassing -- well,

4  strike that.

5          Are you encompassing both of his ankles

6  which are crossed over?

7  A.  Yes.  It would encompass both of his ankles

8  when they were crossed over and lower legs in the calf

9  area, in the calf and the shin area.

10  Q.  But you're not grasping his thighs as well?

11  A.  No.

12  Q.  So you have him around -- kind of -- and it's

13  almost like a bear hug is how I would describe it.

14  Would that be fair?

15  A.  Very fair, very accurate.

16  Q.  And so you're -- you've got him -- you're

17  holding his calves, legs are crossed, and you're doing

18  your best to press his heels against his butt, right?

19  A.  Correct.

20  Q.  And at this point, are you -- you're still

21  facing towards Casey's head?

22  A.  Correct.

23  Q.  Okay.  And at the top of page 13, lines 1

24  through 4, you remember that at this point his left arm

25  was under his body.

1    Q.  So you're holding Casey's legs and you see that

2  Officer Arnold -- I'm sorry, that Sergeant Rodarme is

3  having difficulty gaining control of Casey's left arm

4  and that's when you make the decision to deploy the

5  TASER?

6    A.  Yes, sir.

7    Q.  And so you use your right hand to grab the

8  TASER?

9    A.  Correct.  It would have been in a cross draw

10  position.

11    Q.  Did you let go of Casey's legs to do that?

12    A.  I would have to say, yes.  But then, again, you

13  know, you're asking me for doing extremely fine details

14  in a very fluid situation.  In order for me to get my

15  TASER, I would have to reach across my body.  I would

16  have to unsnap -- I had a parachute type of clip that I

17  used on a strap that was used to holster my TASER so I

18  would have had to undo that clip and then draw the

19  TASER with my right hand, because I can't -- I wouldn't

20  be able to do any of those actions with my left hand.

21    Q.  But you don't remember the extent to which you

22  left go of Casey's legs to --

23    A.  Yeah, you're right, I don't remember.  Again,

24  that was one of those type of things where it's a very

25  fluid situation and trying to remember exact fine

1  continues:

2          "And -- and I think you used the word

3      'kick.'  Was it -- was it a -- an intentional kick?

4      Or was it just -- he was just forcing and it -- and

5      it --"

6          And you say:

7          "Well -- "

8          And Detective Teusink continues:

9          "-- and it pushed down and kicked your

10      body?"

11          And then you say at line 16 through 22:

12          "I'm not going to spec -- I can't

13      speculate to what his feelings were, but I know I

14      had his ankles crossed, just like what they teach

15      us in the academy -- ankles were crossed.  And as

16      soon as I got his ankles crossed, I just took my

17      whole 250 pounds and laid on it.  And I was laying

18      on -- basically I had his ass in my face."

19          Did I read that correctly?

20  A.  Yes, sir, it's accurate.

21  Q.  And it's all true?

22  A.  Yes.

23  Q.  And then at lines 23 through 25, you say:

24          "And I was laying like this.  And he

25      pushed -- he either pushed -- well, he pushed,

1  because even it -- I mean, his -- his legs still

2  had strength," and continuing onto page 16, line 1,

3  "in them.  He either pushed -- and I don't remember

4  him pushing me back, but I remember him going

5  forward.  And when he went forward, that's when

6  the gap came between his legs.  And that's when he

7  came down on me."

8  A.  That's accurate.

9  Q.  "It wasn't -- I wouldn't say it was an

10  intentional kick.  He was just flailing his legs,

11  and that's when," and then, "indiscernible."

12      Did I read all that correctly?

13  A.  Yes.

14  Q.  And so is it accurate to say that you did not

15  interpret the -- what you called the kick, as being an

16  intentional kick to injure you, it was the result of

17  him struggling and flailing and resisting?

18  A.  That's accurate, yes.

19  Q.  And then Detective John Teusink says:

20      "He was just -- he was just using force to

21  get you off."

22      And you agree, correct?

23  A.  Correct.

24  Q.  And then Detective Teusink turns it over to

25  Detective Duran and Detective Duran says:

1   it been your experience that the longer -- the further

2   in time we get from an event, the more difficult it is

3   to remember the event?

4       A.  Well, sir, I can tell you that this event, and

5   the fact that Mr. Wells died in custody, and that I was

6   involved in the situation, will never go away.  The

7   only time it will ever go away is when I pass away.

8   These are the kind of events, as you put it, that you

9   just don't go home, eat dinner, go to sleep and wake up

10  and it's gone.  As I explained to you before, I don't

11  know what your extent or knowledge is about police

12  work, but police work and what we see, what we have to

13  do, things that we have to prepare ourselves for, if

14  you find an officer that tells you that he's not

15  suffering from some type of PTSD, I will tell you he is

16  a liar.  And there are certain incidents, such as this

17  one, that will haunt me until the day I die.

18          So all I'm telling you is that what you

19  read here and what you read here and what I testified

20  to at the time of the interviews is my clear and

21  accurate details and depiction at the time of the

22  incident.

23      Q.  Can you tell me what it is about this incident

24  that will haunt you until the day you die?

25      A.  There are several.  I can tell you one of the

1  images that I have and that have been recurring have

2  been when Mr. Wells was turned onto his back after he

3  was handcuffed and seeing his face, it's imprinted into

4  my mind that it will be there forever.

5          The fact giving him CPR and there was no

6  response to the CPR.  Going up and feeling for a pulse

7  in his carotid and not feeling the pulse.  Doing CPR on

8  him to the point where I had to be physically relieved

9  from giving him CPR because I was doing it for so long

10  and for so many times.

11          The fact that the time between the request

12  for the fire department to respond and the fire

13  department responding, seemed like it was forever.  The

14  fact that Mr. Wells, his demeanor at the time, was

15  beyond anything that I had ever encountered with

16  somebody on drugs before and I've encountered pretty

17  much, you name the drug, illegal street drug, and I've

18  encountered people with it.

19          The fact that with me being 250 pounds at

20  the time, Officer Arnold being about 6'3", 260 pounds

21  and Officer -- Sergeant Rodarme being 6'3", maybe 240,

22  250 pounds and me being 6'1", 250, the fact that he was

23  flicking us off and struggling with us like watching --

24  like trying to flip flies off sugar cane, then, yeah,

25  those are incidents that are and will haunt me.

1    Q.  I want to have you look at a different exhibit.

2  This is Exhibit 1a.  Let me see if I can get the page

3  right, so I can help Ms. Retts out and get the right

4  one in front of you.

5              THE WITNESS:  This?

6              MS. RETTS:  I think so.

7    Q.  BY MR. SHOWALTER:  What I'm looking for

8  COP-STICKNEY 81.

9              MS. RETTS:  Okay, hold on.

10             THE COURT REPORTER:  Are we marking that

11  and are you going to share it?

12             MR. SHOWALTER:  We can do all of the

13  above.  So we're going to mark this a Exhibit 1a.

14             (Whereupon, Deposition Exhibit Number 1a was

15  marked for identification.)

16             THE WITNESS:  This report is a supplement.

17             MS. RETTS:  It's 81.

18             THE WITNESS:  If I'm looking at the right

19  page.

20    Q.  BY MR. SHOWALTER:  And so, as I said, I don't

21  believe you wrote a supplement.  But I wanted to ask

22  you about this time line that's in this investigation

23  report at page 81.

24             You didn't prepare this time line, it's a

25  time line that the investigators created.  But I wanted

1  to see if you could review that and tell me if you have

2  any reason to disagree with this time line?

3         MS. RETTS:  Foundation.

4         THE WITNESS:  No, because the CAD system

5  or computer aided dispatch --

6     Q.  BY MR. SHOWALTER:  Yes.

7     A.  -- has everything, as you can see, it is time

8  stamped and everything is recorded.  And it's all meant

9  to be chronologically accurate so there wouldn't be any

10  reason why I would dispute any of that time line.

11    Q.  Okay.  Now, one thing that I wanted to note

12  here is at -- if you look at the entry for 2:29:11

13  seconds.  It's actually the second entry with that

14  time.

15    A.  Yeah, I see it.

16    Q.  It says -- it references your TASER download

17  report and it says that the time from the TASER

18  download report is 15 seconds fast?

19    A.  Whatever that means, I don't know.

20    Q.  Do you have any reason to disagree with that?

21  I just think that's in the report.  Do you have any

22  knowledge of that?

23    A.  No.

24         MS. RETTS:  Foundation.

25         THE WITNESS:  No.

1  delirium, there's pretty much not a whole lot that the

2  medical team can do.

3        But as far as going through excited

4  delirium, just what the City afforded me in training.

5    Q.  Who told you that, that if a person is on a

6  gurney and in the best trauma ward in the world?

7    A.  One of the instructors who were training

8  that -- I couldn't even begin to tell you who the

9  instructor was because we have so many different

10 instructors come in from different agencies or

11 different organizations to do the training.  So I don't

12 know who it was.

13       But the training that we went through,

14 basically pointed out some issues with excited

15 delirium.  And that's to the extent of what I could

16 tell you about the training.

17   Q.  What were you trained as far as recognizing

18 excited delirium?

19       MS. RETTS:  Form.

20       THE WITNESS:  Excited -- for issues of

21 failure to comply with orders of stopping to resist or

22 commands to stop resisting.  Being aggressive or

23 fighting.  Not responding to verbal commands.  Acting

24 to the point of -- I don't know what words I want to

25 use.  But by -- let's see, how can I put this?  By

1  resisting with all kind of -- with all of the strength

2  that you can muster, irrational talking or things along

3  that line.

4     Q.  Were you -- what are the dangers of excited

5  delirium?

6           MS. RETTS:  Form; foundation.

7           THE WITNESS:  Well, I'm not a physician

8  and I'm not an EMT or a paramedic, but I can tell you

9  from my training that some of them are yelling out loud

10 with no reason to be yelling, taking your clothes off,

11 fighting, resisting, and then at that point, for

12 whatever reason physically, something happens inside

13 the body where the subject becomes unconscious.  What

14 that happened or what affects that, I don't know.

15    Q.  BY MR. SHOWALTER:  Well, one of the risks of

16 dealing with a subject who exhibits signs of excited

17 delirium is sudden death, correct?

18           MS. RETTS:  Form.

19           THE WITNESS:  Correct.

20    Q.  BY MR. SHOWALTER:  And the City of Phoenix

21 trains its officers to be conscious of those signs and

22 to avoid taking steps that could aggravate that risk,

23 correct?

24           MS. RETTS:  Form.

25           THE WITNESS:  Correct.

1    Q.  BY MR. SHOWALTER:  And that includes avoiding

2  the use of TASERs on a subject who may be experiencing

3  excited delirium, correct?

4            MS. RETTS:  Form; foundation.

5            THE WITNESS:  As far as using the TASER,

6  sir, what we're trained at and what's in the City of

7  Phoenix's ops orders is that a TASER is supposed to be

8  used in a case of active resistance and failure to

9  comply with officer commands.

10            So unless recent events have changed that,

11  when there's active resistance going on, then a TASER

12  can be deployed.  And I'm not -- as I explained, I'm

13  not a doctor.  I'm not a physician.  I'm not qualified

14  in any way, shape or form to make a medical diagnosis

15  or coming in contact with somebody that I might think

16  is excited delirium.  My reaction is going to be

17  strictly to what they show physically and if I'm

18  standing there talking to them and all the sudden they

19  collapse, then I'm am going to do what I need to do or

20  what I've been trained to do, to ensure the safety and

21  well-being of that person, along with contacting the

22  fire department and doing what is needed to be done.

23            So if you're trying to infer that

24  Mr. Wells was going through excited delirium, I'm not

25  going to make that kind of statement or diagnosis.

1    Q.  BY MR. SHOWALTER:  I was just asking you about

2   your training, okay.

3           So I want to know, yes or no, were you

4   trained by the City of Phoenix that you should consider

5   whether the person is -- or that the possibility of

6   excited delirium is something you should consider

7   before deploying a TASER?

8           MS. RETTS:  Form.

9           THE WITNESS:  No.

10   Q.  BY MR. SHOWALTER:  Did the City of Phoenix

11  train you that the possibility that a subject is on

12  drugs is something you should consider before deploying

13  a TASER?

14   A.  No.

15   Q.  Did the City of Phoenix train you that the

16  possibility that somebody is emotionally distressed,

17  emotionally disturbed or mentally ill is something you

18  should consider before deploying a TASER?

19           MS. RETTS:  Form.

20           THE WITNESS:  No.

21   Q.  BY MR. SHOWALTER:  Did the City of Phoenix

22  provide you with the Axon -- TASER company's

23  manufacturer's warnings for the TASER itself?

24           MS. RETTS:  Form.

25           THE WITNESS:  No.  The only issue -- or

JOSEPH B. SEAQUIST  MARCH 22, 2021

1   not issue.  But the warning that we would get would be

2   through training, through continued training and if

3   there was any type of new developments with the TASER,

4   then we would be trained on that.

5       Q.  BY MR. SHOWALTER:  So nobody ever trained you

6   that some individuals could be particularly susceptible

7   to the effects of TASERs?

8           MS. RETTS:  Form.

9           THE WITNESS:  Well, sir, I will tell you

10  that part of my training for the TASER was that you

11  were not to deploy the TASER on pregnant women, you

12  were not to deploy the TASER in a situation where the

13  suspect would end up -- excuse me -- end up being

14  seriously injured or dead or killed.  That you were not

15  to use the TASER on small children, but as far as any

16  specifics on a mentally ill patient or something like

17  that, no.

18      Q.  BY MR. SHOWALTER:  And you were never trained

19  that using a TASER on somebody who was intoxicated or

20  under the influence of drugs could cause or contribute

21  to sudden death?

22          MS. RETTS:  Form; foundation.

23          THE WITNESS:  If anything, it was the

24  direct opposite of your statement.

25      Q.  BY MR. SHOWALTER:  What's that?

JOSEPH B. SEAQUIST  MARCH 22, 2021

1    A.  If -- we were never trained that, if somebody

2 was under the influence of drugs or alcohol, that you

3 couldn't use the TASER on it.

4    Q.  BY MR. SHOWALTER:  What about using the TASER

5 on people who were exhausted from physical struggle,

6 were you trained that that could cause death?

7         MS. RETTS:  Form; foundation.

8         THE WITNESS:  No.

9    Q.  BY MR. SHOWALTER:  What about that using it on

10 somebody who was profoundly agitated could cause death?

11         MS. RETTS:  Form; foundation.

12         THE WITNESS:  Using a TASER on someone

13 that's profoundly agitated?

14    Q.  BY MR. SHOWALTER:  Yes.

15    A.  Yes.

16    Q.  You were taught that that could cause death?

17    A.  No.  We were taught that using a TASER on

18 somebody that's extremely agitated would be able to go

19 ahead and allow us to either detain or put that subject

20 in custody.

21    Q.  Okay.  And so you were actually taught that

22 when you encounter somebody who's agitated or

23 potentially suffering from excited delirium or

24 intoxicated on drugs, including stimulants, that it was

25 appropriate to use the TASER?

1          MS. RETTS:  Form; foundation.

2          THE WITNESS:  Only in the cases of active

3    resistance.

4      Q.  BY MR. SHOWALTER:  And that includes people

5    who -- well, strike that.

6          What were you taught about the number and

7    duration of TASER deployments or exposures?

8          MS. RETTS:  Form.

9          THE WITNESS:  Through the training I

10   received with the TASER, I was told that, upon

11   deploying the first cartridge, that the electrical

12   charge would automatically be shut off by the TASER

13   after five seconds.  Then the second cartridge, after

14   five seconds, the TASER would shut itself off.  And I

15   was also trained and under the idea that when you

16   deploy a TASER, if the cartridges didn't have any

17   effect that once you pull the trigger, it would

18   automatically shut off at five seconds.  So that no

19   matter how long you pulled the trigger or how long you

20   kept the trigger depressed, it would automatically shut

21   off at five seconds.

22     Q.  BY MR. SHOWALTER:  What training did you

23   receive about positional asphyxia at the City of

24   Phoenix?

25          MS. RETTS:  Form.

1    THE WITNESS:  Just the training that the
2  City provided.
3    Q.  BY MR. SHOWALTER:  Were you trained that
4  placing weight on a hog-tied individual created a risk
5  of death?
6    MS. RETTS:  Form; foundation.
7    THE WITNESS:  Well, I wouldn't use the
8  term "hog-tied," sir.  That's not -- I'm not going to
9  use that term.
10    However, with somebody that's restrained,
11  if the situation is necessary to keep that person from
12  either injuring themselves or causing injury to someone
13  else and to be able to keep that person from doing
14  those things, then, yes, the physical restraint may be
15  needed, such as laying on somebody's back.  Something
16  along those lines, yeah.
17    Q.  BY MR. SHOWALTER:  And that wasn't quite my
18  question.  My question is:  Were you trained about
19  risks of positional asphyxia when a person is
20  restrained with their arms behind their back and placed
21  on their stomach --
22    A.  Yes.
23    Q.  -- and their legs are elevated?
24    A.  Yes.
25    Q.  And what were you trained about that?

1    A.   That when the subject is handcuffed from the

2    back, it compresses or I want to say, I guess

3    compresses the shoulder areas, which by doing with the

4    shoulder areas, it also stretches the chest out which

5    makes it more difficult to breathe.

6    Q.   And you saw in the video that as you had at

7    least admitted, it was clear that Officer Armstrong --

8    I'm sorry, Officer Arnold had his knee on Casey Wells'

9    shoulder, correct?

10             MS. RETTS:   Form; foundation.

11             THE WITNESS:   From what it appeared on the

12   video, to me, yes.

13   Q.   BY MR. SHOWALTER:   And you have no memory of

14   seeing that at the time, though, right?

15   A.   No, sir.   As I explained, my area of concern

16   was where you saw me at.

17   Q.   If you had seen that at the time, you testified

18   earlier, that you would have told him to stop it and

19   would have notified a supervisor, correct?

20             MS. RETTS:   Form; foundation.

21             THE WITNESS:   I didn't see Officer Arnold

22   doing that, so I wouldn't have had no reason to say

23   anything to either Officer Arnold or Sergeant Rodarme.

24   Q.   BY MR. SHOWALTER:   Now, I asked you about a

25   person -- I asked you if you saw an officer placing

```
 1   STATE OF ARIZONA        ) SS.
                             )
 2   COUNTY OF MARICOPA      )

 3

 4        BE IT KNOWN that the foregoing proceedings
     were taken before me, DONNA DELAVINA, Certified
 5   Reporter No. 50468; that the witness before testifying
     was duly sworn by me to testify to the whole truth;
 6   that the foregoing 211 pages are a full, true and
     accurate record of the proceedings, all done to the
 7   best of my skill and ability; that the proceedings were
     taken down by me in shorthand and thereafter reduced to
 8   print under my direction.

 9             [X]  Review and signature was requested.

10             [ ]  Review and signature was waived.

11             [ ]  Review and signature not required.

12        I CERTIFY that I am in no way related to any
     of the parties thereto nor am I in any way interested
13   in the outcome hereof.

14        I FURTHER CERTIFY that I have complied with
     the ethical obligations set forth in ACJA 7-206.  DATED
15   at Phoenix, Arizona, this 12th day of April, 2021.

16

17             Donna DeLaVina, RPR
               Certified Reporter
18             Certificate No. 50468

19                  *    *    *    *    *    *

20

21        I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
     complied with the ethical obligations set forth in ACJA
22   7-206.

23

24             Donna DeLaVina, RPR, Owner
               Donna DeLaVina Reporting, LLC
25             Arizona RRF No. R1010
```

# EXHIBIT 10

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

FRANK LONG

Phoenix, Arizona
April 20, 2021
8:57 a.m.

                              DONNA DELAVINA REPORTING, LLC
                               Arizona RRF No. R1010
                               313 North Gilbert Road
                                    Suite 300
                              Gilbert, Arizona 85234
PREPARED BY:                    P (602) 230-5454
                                F (480) 546-3721
Donna DeLaVina, RPR             www.dlvreporting.com
Certified Reporter
Certificate No. 50468

1  like the job, so. . .

2      Q.  BY MR. SHOWALTER:  People weren't the best?

3          MS. RETTS:  Form.

4          THE WITNESS:  No.  I mean, they were good

5  people.  I mean, both sides, I guess.

6      Q.  BY MR. SHOWALTER:  And so did you ever -- do

7  you have any kind of like certifications of any kind

8  outside of being a police officer?

9      A.  In what way?

10      Q.  You know, I'm thinking of things like EMT

11  certifications, you know, pilot licenses, truck driver,

12  you know, CGLs, anything like that?

13      A.  No.

14      Q.  Now, at the academy, at the Phoenix Police

15  Academy, you were trained about prone restraint,

16  correct?

17          MS. RETTS:  Form.

18          THE WITNESS:  What do you mean "prone

19  restraint"?

20      Q.  BY MR. SHOWALTER:  You were trained about how

21  to safely restrain prisoners in general, first of all,

22  correct?

23      A.  Yes.

24      Q.  And one of the things that you were trained at

25  the academy was in the dangers and concerns around

1  positional asphyxia, correct?

2         MS. RETTS:  Form.

3         THE WITNESS:  I mean, you're given a class

4  about it, sure.

5     Q.  BY MR. SHOWALTER:  And one of the things that

6  you were trained at the academy with regard to prone

7  restraint, is that when a prisoner is handcuffed, face

8  down and with their legs up, or with weight on their

9  back, that that can create a danger of positional

10 asphyxia, correct?

11        MS. RETTS:  Form; foundation.

12        THE WITNESS:  I think it kind of depended,

13 if that was my understanding.

14    Q.  BY MR. SHOWALTER:  What did it depend on, to

15 your understanding?

16    A.  Like you had to take some considerations

17 into -- or some things into consideration.  I mean,

18 obviously, if they were an older person or maybe

19 overweight there could always be an issue.  But for the

20 most part, I mean, it was something that, you know, be

21 aware of, be mindful of.

22    Q.  And, certainly, if somebody is not handcuffed

23 and is resisting officers and the safest way for

24 officers to prevent that person from harming officers

25 is to stay on top of them, holding them down while

1   Q.  And at line -- and that's kind of clarified

2   there.  At line 7 of page 4, you continue explaining

3   and you say:

4            "So we arrive, I exit the vehicle.  I

5        notice that there's an officer on top of the

6        subject on the ground.  He's laying on his stomach,

7        I can hear some yelling.  I see Officer -- or

8        Sergeant Rodarme on, I guess, it would be his left

9        side."

10           Do you see where I read that?

11   A.  Yeah.

12   Q.  And that's true and accurate, correct?  That's

13   what you saw when you arrived?

14           MS. RETTS:  Form.

15           THE WITNESS:  Yeah.

16   Q.  BY MR. SHOWALTER:  I mean, so you arrive, you

17   can see the naked suspect face down on the ground,

18   correct?

19   A.  I see somebody on the ground, yeah.

20   Q.  And you can see that the stomach -- I'm sorry,

21   you can see that the naked person is face down and

22   there's an officer on top of him, right?

23           MS. RETTS:  Form.

24           THE WITNESS:  Yeah.  There are like people

25   around him.

1    Q.  BY MR. SHOWALTER:  Well, you said:

2             "I notice that there's an officer on top

3    of the subject on the ground."

4             That's what you saw, correct?

5             MS. RETTS:  Form.

6             THE WITNESS:  Right.  So there -- like,

7    he's on the ground and there's people around the guy,

8    yeah.

9    Q.  BY MR. SHOWALTER:  Well, that's not what you

10   seed, though.  You said:

11            "I notice that there's an officer on top

12   of the subject on the ground."

13            That's what you said to the interviewer on

14   February 4th of 2019, correct?

15            MS. RETTS:  Form.

16            THE WITNESS:  Yeah, that's what I said.

17   Q.  BY MR. SHOWALTER:  And you were able to see

18   that the subject was on the ground laying face down on

19   his stomach, correct?

20   A.  Yeah, from what I could see.

21   Q.  And you could hear some yelling?

22   A.  Uh-huh.

23   Q.  Is that yes?

24   A.  Yes.  Sorry.

25   Q.  Do you remember what you could hear people

FRANK LONG  APRIL 20, 2021

1  yelling?

2      A.  No.  No.  It was just yelling.  I couldn't tell

3  you what it was.

4      Q.  And then you see Officer or Sergeant Rodarme on

5  the subject's left side, correct?

6      A.  Yeah.  So when I say "left," like his -- like

7  the subject's physical left side.  So I just want to

8  clarify, because even that was kind of confusing me.

9      Q.  I understand.  And so Salter runs east/west at

10  this point, correct?

11      A.  Yes.

12      Q.  And when you arrive, the person you later find

13  out is Casey is face down with his head pointing

14  approximately north and his feet pointing approximately

15  south, correct?

16      A.  Correct.

17      Q.  So when you say that Sergeant Rodarme is on his

18  left side, Sergeant Rodarme would be directly to the

19  west of Casey, correct?

20      A.  Yeah.  Yeah.

21      Q.  So then at lines 11 through 12 -- I'm sorry, 11

22  through 13, the questioner says:

23          "Let's go, let's go over here.  So you

24      pull out of the -- you're parked kind of where the

25      MAC van is right now, just east of where you see

FRANK LONG  APRIL 20, 2021

1   I have to go to the bathroom.

2           THE WITNESS:  I appreciate it.

3           MR. SHOWALTER:  Let's do a ten-minute

4   break and come back on at 10:40.

5           MS. RETTS:  Okay.

6           THE COURT REPORTER:  The time is

7   10:30 a.m.  We are now off the record.

8        (Whereupon, a brief recess ensued from

9   10:30 a.m. to 10:41 a.m.)

10          THE COURT REPORTER:  The time is

11  10:41 a.m.  We are back on the record.

12     Q.  BY MR. SHOWALTER:  Okay.  I'm going to go back

13  to the interview and I want to take you through the

14  bottom of page 5.

15          You say -- at line 26 you say:

16          "So he's laying on his stomach, and then

17      Officer Seaquist is kind of behind, like on his

18      left side but more kind of by the left part of his

19      waist behind him.  It looks like he has his TASER

20      out."

21          Do you see where I read that?

22     A.  Yes, I do.

23     Q.  And is that true?

24     A.  Yeah.

25     Q.  And then at line 32 through 34, it says:

1          "And I help Sergeant Rodarme secure the

2      right hand, because I can tell he's kind of tired,

3      and I tell him, you know, 'Just get out of the

4      way.'  Officer Arnold was able to bring his right

5      hand behind the subject's back, and I take his left

6      hand and bring it around to his back, and we start

7      putting handcuffs on him."

8          Do you see where I read that?

9      A.  I do.

10     Q.  I want to make sure -- at line 32, you say,

11 "And I help Sergeant Rodarme secure the right hand"?

12     A.  Uh-huh.

13     Q.  Should that be left hand?

14     A.  Yeah.  That's what I'm thinking, because I was

15 on his left side.  Yeah, that doesn't make sense to me

16 either.

17     Q.  Okay.  So you help Sergeant Rodarme secure the

18 left hand.  Officer Arnold was able to bring Casey's

19 right hand behind the subject's back and you take his

20 left hand and bring it around to his back and you and

21 Officer Arnold start putting handcuffs on him; is that

22 fair?

23     A.  Yeah.  It sounds about right.

24     Q.  But you say on page 6, lines 1 through 2:

25          "He's -- the suspect is still like pulling

1    away from us."

2            So he's still trying to pull back when you

3    guys are trying to get him handcuffed, correct?

4    A.  Yeah.  He was, yeah, pulling, tensing up, it

5    was pretty difficult to do.

6    Q.  And it says:

7            "Sergeant Rodarme comes back in, helps me

8        with the right arm, and we're eventually able to

9        get handcuffs on him.  He's still screaming,

10       yelling, not saying much."

11           And there you use the words "screaming"

12   and "yelling," correct?

13   A.  Uh-huh.  Yeah.

14   Q.  "At that time I see, or I hear a TASER pop.

15       The TASER pop goes off.  That would be from Officer

16       Seaquist.  He's telling the suspect to stop

17       resisting.  And after this, it was about five

18       seconds rolls by, the subject is still kind of

19       resisting.  Handcuffs are on, and now we're trying

20       to put a RIPP restraint on him.  And that would be

21       Officer Funston on his legs.  And starts off with

22       his right leg and the suspect ends up kicking out

23       his right leg towards Officer Funston, where he's

24       able to get part of the RIPP restraint around him,

25       eventually getting both around his ankles."

1              Did I read that correctly?

2      A.  Yeah.  You did a good job.

3      Q.  And is that all true, to the best of your

4  recollection?

5              MS. RETTS:  Form.

6              THE WITNESS:  Yeah, to the best of my

7  recollection.

8      Q.  BY MR. SHOWALTER:  I mean, you've had a chance

9  to review this transcript prior to today and other than

10  that thing about the right hand versus the left hand,

11  will you testify that everything contained in this

12  transcript is true?

13      A.  I mean, it's true, yeah.

14      Q.  Okay.  And so I want to make sure I understand

15  the sequence that's captured at lines 2 through 7 of

16  page 6.

17              So you're trying to -- you and Officer

18  Arnold are working to get the subject -- to get Casey

19  handcuffed.  Sergeant Rodarme comes back in to help you

20  with the right arm and you get handcuffs on him and

21  then after that, you hear a TASER pop, correct?

22              MS. RETTS:  Form.

23              THE WITNESS:  Yeah.  I mean, based on what

24  I said, yeah, that sounds about right.

25      Q.  BY MR. SHOWALTER:  And when you say you hear

1            At this point, Casey's been handcuffed.

2   You hear the TASER cartridge pop and you guys are

3   working -- or not you guys, but Officer Funston and

4   potentially other officers are working to secure Casey

5   in RIPP restraints, correct?

6            MS. RETTS:  Form; foundation.

7            THE WITNESS:  I mean that's what I'm

8   assuming, right.  I mean, that's what I said.  I

9   couldn't tell you exactly what Officer Funston and the

10  other officers, if there were, helping him.

11      Q.  BY MR. SHOWALTER:  Now, are you kneeling down

12  on the ground or are you -- what is your position at

13  this point?

14      A.  I mean, I'm still on his left side.  Like, I'm

15  on the ground.  Like I'm still trying to hold him down

16  because he's still trying to -- like his chest and he's

17  trying like arch his back, like trying to arch his back

18  and get up.

19      Q.  So you're working to control his arms after

20  he's been handcuffed and hold his arms down?

21      A.  To try and -- yeah, to prevent him from

22  rolling, anything like that.  Because I know Officer

23  Funston was having some problems with the RIPP

24  restraint.  So, yeah, just trying to maintain

25  everything, keep everything as calm as we possibly can.

1  some trouble.  So we'll just kind of wait until he's --

2  well, I don't know, got a RIPP restraint attached and

3  everything is good.

4      Q.  BY MR. SHOWALTER:  All right.  So in attaching

5  the RIPP restraint, one of the things you're trying to

6  do is bring the heels towards the butt, correct?

7          MS. RETTS:  Form; foundation.

8          THE WITNESS:  No, not always.  I mean

9  there's, obviously, a multitude of ways to do it.  But,

10  generally, it's just the loop going around the ankle,

11  calf, knee area, right around there.  Sometimes it goes

12  above the knee.  It just really kind of depends,

13  especially if you're walking, you might want them to go

14  above the knee.  It would make a little more sense so

15  you have that bend.  So it's not always bringing the

16  heels to the butt, wrapped around the ankles, no.

17      Q.  BY MR. SHOWALTER:  But it can be, correct?

18      A.  Yeah, it can be.

19      Q.  Is there training that says you don't try to do

20  that?

21          MS. RETTS:  Form; foundation.

22          THE WITNESS:  Heels to the butt?

23      Q.  BY MR. SHOWALTER:  Yes.

24      A.  Not that I am aware of.

25      Q.  And is there -- did you receive any training

1   STATE OF ARIZONA        ) SS.
                            )
2   COUNTY OF MARICOPA      )

3

4          BE IT KNOWN that the foregoing proceedings
    were taken before me, DONNA DELAVINA, Certified
5   Reporter No. 50468; that the witness before testifying
    was duly sworn by me to testify to the whole truth;
6   that the foregoing 156 pages are a full, true and
    accurate record of the proceedings, all done to the
7   best of my skill and ability; that the proceedings were
    taken down by me in shorthand and thereafter reduced to
8   print under my direction.

9          [X]  Review and signature was requested.

10         [ ]  Review and signature was waived.

11         [ ]  Review and signature not required.

12         I CERTIFY that I am in no way related to any
    of the parties thereto nor am I in any way interested
13  in the outcome hereof.

14         I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in ACJA 7-206.  DATED
15  at Phoenix, Arizona, this 10th day of May, 2021.

16

17              Donna DeLaVina, RPR
                Certified Reporter
18              Certificate No. 50468

19              *     *     *     *     *     *

20

21         I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
    complied with the ethical obligations set forth in ACJA
22  7-206.

23

24              Donna DeLaVina, RPR, Owner
                Donna DeLaVina Reporting, LLC
25              Arizona RRF No. R1010

# EXHIBIT 11

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

TRAVIS FUNSTON

Phoenix, Arizona
April 15, 2021
8:58 a.m.

                              DONNA DELAVINA REPORTING, LLC
                               Arizona RRF No. R1010
                               313 North Gilbert Road
                                     Suite 300
                               Gilbert, Arizona 85234
PREPARED BY:                     P (602) 230-5454

Donna DeLaVina, RPR              F (480) 546-3721
Certified Reporter              www.dlvreporting.com
Certificate No. 50468

1  behind their back, correct?

2          MS. RETTS:  Form.

3          THE WITNESS:  That would be correct.

4     Q.  BY MR. SHOWALTER:  Okay.  So you were trained

5  not to hog-tie individuals because of the dangers of

6  positional asphyxia, correct?

7          MS. RETTS:  Form.

8          THE WITNESS:  A portion of it, yes.

9     Q.  BY MR. SHOWALTER:  What was the other portion?

10    A.  For us to allow them to move, to prevent them

11 from having absolutely no movement possible.  And,

12 obviously, the most important part of the training was

13 to allow us to protect them as well as ourselves.

14    Q.  So what else -- what were you trained about the

15 dangers of positional asphyxia?

16         MS. RETTS:  Form.

17         THE WITNESS:  It's been a minute since

18 I've taken that class, but my understanding is that

19 positional asphyxiation, I mean, if you're in a certain

20 position for an extended period of time, then your body

21 can basically not be able not to get the proper intake

22 of oxygen.

23    Q.  BY MR. SHOWALTER:  What were you trained about

24 the period of time under which a person could

25 potentially suffer positional asphyxia?

1          MS. RETTS:  Form.

2          THE WITNESS:  I don't recall the exact

3  amount of time, but I know it was quite a bit of time.

4  I just don't recall the exact amount.

5     Q.  BY MR. SHOWALTER:  I mean, isn't the training

6  that once somebody is in RIPP restraint, they're

7  supposed to be put on their side?

8     A.  Yes.

9     Q.  Were you trained that if a person is handcuffed

10  and face down, it's against policy to apply any kind of

11  force to their back because of the dangers of

12  positional asphyxia?

13          MS. RETTS:  Form; foundation.

14          THE WITNESS:  Correct.

15     Q.  BY MR. SHOWALTER:  Were you trained that once

16  somebody is handcuffed and face down, that tasing them

17  could result in death?

18          MS. RETTS:  Form; foundation.

19          THE WITNESS:  I don't believe I was

20  trained in that specifically.  But depending on

21  someone's health, a TASER could affect them negatively

22  in any way.

23     Q.  BY MR. SHOWALTER:  I mean, that's one of the --

24  were you given the warnings -- as part of your training

25  at the City of Phoenix, were you provided with warnings

TRAVIS FUNSTON  APRIL 15, 2021

1    Q.  Now, Officer Long had his own vehicle but you

2  told him to just jump in yours, right?

3    A.  Correct.

4    Q.  And where you're going is right around the

5  corner, correct?

6    A.  Correct.

7    Q.  So you drive over towards Salter, you pass

8  Salter, you make a U-turn and come back, right?

9    A.  Correct.

10    Q.  And you come on to Salter off of 35th Avenue?

11    A.  Correct.

12    Q.  When you get there, you can see that there's a

13  male on the ground, who's naked and he's face down,

14  correct?

15    A.  Correct.

16    Q.  And your words in this interview were with

17  Officer Seaquist, Sergeant Rodarme, and Officer Arnold,

18  quote, "all on top of him," period, end quote, correct?

19           MS. RETTS:  Form.

20           THE WITNESS:  Correct.  But that was

21  clarified later on.

22    Q.  BY MR. SHOWALTER:  I just want to establish

23  your words were that when you arrived you see this guy

24  down, face down on the ground with Officer Seaquist,

25  Officer Arnold and Sergeant Rodarme, quote, "all on top

1  of him," correct?

2            MS. RETTS:  Form.

3            THE WITNESS:  So with that statement, I

4  would say that is a figure of speech as you were saying

5  as to hog-tie would be.  When I say "on top of him," I

6  don't literally mean on the top of him.  They were on

7  the sides of him.

8     Q.  BY MR. SHOWALTER:  But, at the time, in

9  response to the question of what you saw, you said, I

10  saw these three officers all on top of him, correct?

11            MS. RETTS:  Form.

12            THE WITNESS:  I said that, but the literal

13  sense of that is not what I meant.  I meant that they

14  were on the sides of him, which was clarified later on.

15     Q.  BY MR. SHOWALTER:  And you are approaching from

16  the east -- well, I'm sorry, strike that.

17            You're coming from the west, right?

18     A.  Correct.

19     Q.  And you can look at the transcript.  You can

20  look at the transcript as well.

21     A.  I was coming from the east, sir.

22     Q.  Okay.  you were coming from the east.  And then

23  at lines 30 through 34, you say:

24            "They're in the middle of the road and

25      they're trying to restrain him.  He's yelling,

1    screaming.  I can't make out what he's saying.

2    He's not really saying anything.  And they're all

3    saying, 'Stop resisting.'  He's flailing his arms,

4    kicking his legs.  Joe's on his legs and it looked

5    like boss was on his left and Jamie was on his

6    right."

7              Did I read that correctly?

8    A.   You did.

9    Q.   And those are your words, correct?

10   A.   Those are my words.

11   Q.   And that's your description at the time of what

12   you saw when you arrived at the scene, correct?

13   A.   Correct.

14   Q.   And turning to the next page, which is

15   WELLS002396, the interviewer asks you:

16              "He's face up at this time?"

17              And you answer:

18              "He's face down."

19              Correct?

20   A.   Correct.

21   Q.   Until Casey Wells was turned over so that CPR

22   could be performed, from the time you arrived, he was

23   always face down, correct?

24   A.   From the time I arrived, correct.

25   Q.   Now, I'm moving down to lines 12 through 33.

1 | And you say that:

2 | "He's face down when we arrived."

3 | And then you say:

4 | "We run over right away and I -- I help

5 | out with the legs because I see Joe already has his

6 | TASER out and I see that one cartridge has already

7 | been deployed."

8 | Did I read that correctly?

9 | A.  You did.

10 | Q.  And that's your statement, correct?

11 | A.  Correct.

12 | Q.  And that's true?

13 | A.  That's true.

14 | Q.  So you arrive, you can see the TASER prongs in

15 | Casey's back and the wires?

16 | A.  Yes.

17 | Q.  And then it says -- and I want to go back to

18 | something.  Going back up to page 3 of your transcript

19 | WELLS002395, you say:

20 | "He's yelling, screaming.  I can't make

21 | out what he's saying.  He's not really saying

22 | anything."

23 | Did you ever hear, on February 4th of 2017

24 | [sic], did you ever hear Casey say any words that you

25 | could recognize as words?

TRAVIS FUNSTON  APRIL 15, 2021

1    A.  No.

2    Q.  One officer described Casey as making sounds

3  like a bear caught in a trap.  Would you agree that

4  that's what Casey -- would that characterization be

5  fair?

6         MS. RETTS:  Form.

7         THE WITNESS:  I would agree with that.

8    Q.  BY MR. SHOWALTER:  Okay.  So I'm sorry for

9  skipping around on you.  So back to WELLS002396.  At

10  line 14, the transcript says:

11         "So we're trying to tell him to stop

12      resisting.  I don't know if the cuffs were on yet

13      or not.  I'm assuming they weren't because I was

14      focused on the legs."

15         Did I read that correctly?

16    A.  You did.

17    Q.  And that's all your statement and it's all

18  true, correct?

19    A.  Correct.

20    Q.  And then it says at lines 16 through 18:

21         "Joe tells him -- we all tell him multiple

22      times to stop resisting.  And Joe tells him, 'Hey,

23      I'm going to tase you again, stop resisting.  I'm

24      going to tase you again, stop resisting.'"

25         Did I read that correctly?

1    A.  Yes.

2    Q.  And those are all your words and that's a true

3 and accurate account of what you saw and heard,

4 correct?

5    A.  Yes.

6    Q.  And when I say those are all your words, that

7 includes you quoting Officer Seaquist, correct?

8    A.  Correct.

9    Q.  And that's your recollection of what Officer

10 Seaquist said is, "Hey, I'm going to tase you again,

11 stop resisting.  I'm going to tase you again, stop

12 resisting," correct?

13    A.  Correct.

14    Q.  So you never heard Casey threaten anybody on

15 February 4th of 2017 [sic], correct?

16    A.  I did not, no.

17    Q.  And you saw that he was naked and you knew that

18 he was unarmed, correct?

19    A.  I did not know that as a fact.

20    Q.  Okay.

21    A.  Individuals have weapons on them that are

22 naked.  That's what I meant with that.

23    Q.  Okay.  Did you have any reason to believe that

24 Casey was armed at any time on February 4th of 2017

25 [sic]?

1    A.   I did not have any reason to, no.

2    Q.   And then you say at line 18:

3         "And he doesn't stop."

4         What was -- that's your words, correct?

5    A.   Correct.

6    Q.   What was the resistance he was -- you know,

7  what I keep saying 2017 instead of 2019, good heavens.

8  In a bunch of my questions I've misstated the date as

9  February 4th of 2017.  You would agree with me that the

10 events we're talking about all occurred on February 4th

11 of 2019?

12   A.   I agree with you.

13   Q.   And so for all the answers that you've given,

14 you would agree with me that it's correct to note that

15 those events took place on February 4th of 2019.  And

16 not February 4th of 2017, correct?

17   A.   Correct.

18   Q.   And my apologies to everybody involved for

19 doing that.

20        Now, at lines 18 through 19, you say:

21        "We light him up again."

22        What does that mean?

23   A.   It's police jargon.  But it basically means we

24 activate the TASER again.

25   Q.   And so would that have been the deployment of

1  the second cartridge?

2  A.  Correct.

3  Q.  So the second cartridge is deployed and then

4  you say at lines 19 through 20:

5  "At that time, I think that's when they

6  got the cuffs on, as far as I know."

7  Did that I read that correctly?

8  A.  Correct.

9  Q.  And is that true?

10  A.  Yes.  Yes.

11  Q.  So after the second TASER cartridge is fired,

12  the officers are able to get Casey handcuffed and

13  that's when you start working on the RIPP restraint,

14  correct?

15  MS. RETTS:  Form.

16  THE WITNESS:  As far as I can recall, yes.

17  Q.  BY MR. SHOWALTER:  And you saw the RIPP

18  restraint on Officer Seaquist's belt, correct?

19  A.  Correct.

20  Q.  Did you -- at this time, did you not carry a

21  RIPP restraint?

22  A.  I did, but it was in my patrol car.

23  Q.  Okay.  And so you see that Officer Seaquist has

24  one on his belt.  You've known him for a while, you

25  know where he keeps it, so you rip it off his belt,

TRAVIS FUNSTON   APRIL 15, 2021

1  correct?

2       A.   Correct.

3       Q.   And you apply the RIPP restraint to Casey's

4  ankles, correct?

5       A.   Correct.

6       Q.   And so at this point, you're trying to get it

7  to the cuffs, but you can't because Casey -- you say

8  Casey's "still kicking and fighting with us"; is that

9  correct?

10      A.   Correct.

11      Q.   So at this point, when you say he's still

12  kicking and fighting, he's cuffed, correct?

13            MS. RETTS:   Form.

14            THE WITNESS:   I'm sorry, can you ask the

15  question again?

16      Q.   BY MR. SHOWALTER:   At this point, when you say

17  that he's kicking and fighting, Casey is in handcuffs,

18  correct?

19            MS. RETTS:   Form.

20            THE WITNESS:   Correct.   At that time,

21  during this part of the incident, yes.

22      Q.   BY MR. SHOWALTER:   All right.   I'm at lines 21

23  through 23, you're talking about the RIPP restraint,

24  you apply it to Casey's ankles and then you're trying

25  to get that D clasp up to the cuffs to link it to the

TRAVIS FUNSTON  APRIL 15, 2021

1  handcuff chain, but you can't because he's "still

2  kicking and fighting with us," correct?

3      A.  I'm tracking you now.  Yes, that's correct.

4      Q.  So I just want to make sure I understand.  When

5  you say that Casey is kicking and fighting, at this

6  point, his ankles are crossed and the RIPP restraint is

7  around his ankle, correct?

8              MS. RETTS:  Form.

9              THE WITNESS:  It was not applied.

10 Throughout the time of me trying to apply the

11 tourniquet -- or I'm sorry, the tourniquet, I meant the

12 RIPP restraint, he was actively kicking.  And he kicked

13 me several times during that time.  And then once I was

14 able to get it wrapped around his ankles he was still

15 trying to kick out of it and kick us.  It made it

16 difficult.

17     Q.  BY MR. SHOWALTER:  And I understand.  I want to

18 just focus on what it says in these lines I've

19 highlighted.  You say:

20              "I apply it to his ankles.  And then I'm

21     trying to get it to the cuffs, but I can't because

22     he's still kicking and fighting with us."

23              Right?

24     A.  Correct.

25     Q.  At that point, Casey's ankles are crossed and

TRAVIS FUNSTON  APRIL 15, 2021

1   the noose or lasso of the RIPP restraint is around his

2   crossed ankles and you're working to connect the

3   D ring, correct?

4              MS. RETTS:  Form; foundation.

5              THE WITNESS:  Correct, to a point.  When

6   I'm saying he's fighting with us, it's because he keeps

7   trying to uncross his feet.  So it's been while trying

8   to kick.  So, yes, I am struggling to clasp it, but I'm

9   struggling to keep his feet properly crossed at the

10  same time.

11     Q.  BY MR. SHOWALTER:  What was Officer Seaquist

12  doing at that point?

13     A.  He was trying to assist me, as far as I can

14  recall.  But he was more focused on just kind of being

15  like control of the situation.  We always have one

16  person in something like that that tries to keep an eye

17  of everything that's going on.  And that, in my

18  opinion, is what appeared like he was doing.

19     Q.  But he was also tasing, correct?

20     A.  Correct.

21     Q.  And, generally, the duty of keeping an eye on

22  everything that's going on, would be a sergeant's duty,

23  correct?

24              MS. RETTS:  Form; foundation.

25              THE WITNESS:  I would say that's correct,

1  depending on the situation.

2     Q.  BY MR. SHOWALTER:  And in this case, Sergeant

3  Rodarme was also -- I mean, once Casey is handcuffed,

4  Sergeant Rodarme and Sergeant Seaquist -- I'm sorry,

5  Sergeant Arnold [sic], who had his arms, would be

6  available to keep an eye on what's going on, correct?

7           MS. RETTS:  Form; foundation.

8           THE WITNESS:  It's Officer Arnold, not

9  Sergeant Arnold.

10     Q.  BY MR. SHOWALTER:  Thank you for correcting me.

11           But Officer Arnold and Sergeant Rodarme,

12  once they have the handcuffs on, they can kind look

13  around and see what's -- and assess the situation as a

14  whole, correct?

15           MS. RETTS:  Form; foundation.

16           THE WITNESS:  Correct.  However, in the

17  video you'll see Officer Long take Sergeant Rodarme's

18  position because he had blood in his eye, removing him

19  from being able to effectively control the situation.

20     Q.  BY MR. SHOWALTER:  At what point did that

21  happen?

22     A.  I can't recall the exact point.  I'm sure if we

23  watched the video, you could see.

24     Q.  Okay.  And so just to be clear, you guys are

25  able to get Casey handcuffed after the second TASER

1  deployment, correct?

2           MS. RETTS:  Form; foundation.

3           THE WITNESS:  Like I said in my statement,

4  that's what it appeared to be by me.

5      Q.  BY MR. SHOWALTER:  That was your observation at

6  the time?

7      A.  What it appeared to be, yeah.  What I appeared

8  to observe and, like I said in my statement, I was more

9  focused on the legs.

10     Q.  So after he's handcuffed, you're working at the

11 RIPP restraints, you're not able to secure it, and then

12 at line 23, you say:

13          "So Joe," which is Officer Seaquist,

14      "tells him he's going to tase him again, gives him

15      multiple warnings, doesn't stop resisting, still

16      yelling and screaming, tases him a third time, to

17      my knowledge.  And then, at that time, I was able

18      to finally get it clipped on.  And then from there,

19      like almost seconds afterwards, he stops screaming

20      and yelling and kind of went just like of limp."

21          Did I read that correctly?

22     A.  You read that correctly.

23     Q.  And there's a lot in there to unpack.

24          So you're not -- you're working to get the

25 RIPP restraint connected to the handcuffs.  Casey, you

TRAVIS FUNSTON  APRIL 15, 2021

1  perceive, is resisting, correct?

2      A.  Correct.

3      Q.  Officer Seaquist you say tells Casey he's going

4  to tase him again, gives him multiple warnings.  And

5  when it says at line 24, "doesn't stop resisting,"

6  that's -- you're referring to Casey there?

7      A.  Yes, I'm referring to Casey.

8      Q.  Okay.  And when you say "still yelling and

9  screaming," that also refers to Casey?

10      A.  Yes, it does.

11      Q.  Then it says "Tases him a third time, to my

12  knowledge," that refers to Officer Seaquist, correct?

13      A.  Correct.

14      Q.  And then after the third time that Casey is

15  tased you were able to get the RIPP restraint clipped,

16  correct?

17      A.  Correct.

18      Q.  So once you got that RIPP restraint clipped and

19  Casey is face down, would there be any reason to tase

20  Casey?

21          MS. RETTS:  Form; foundation.

22          THE WITNESS:  Once he -- no, there's no

23  reason.

24      Q.  BY MR. SHOWALTER:  So if you've got Casey down,

25  he's screaming, he sounds like a bear in a trap, he's

1   They could handle some by themselves.  This guy had

2   to fight off all three."

3        Did I read that correctly?

4   A.  You did.

5   Q.  Did you ever see -- I mean, you never saw him

6   in any other position other than face down on the

7   ground, though, correct?

8   A.  Correct.  Not until we, obviously, flipped him

9   over to do CPR.

10  Q.  And you never saw him strike anyone, correct?

11  A.  Other than him kicking myself, no.

12  Q.  And I should have been more clear.  We've

13  already talked about the kicks.  But did you ever see

14  him strike anyone with his hands?

15  A.  I did not, no.

16  Q.  And at the time when you say that he kicked

17  you, Officer Seaquist was controlling Casey's legs to

18  some degree, correct?

19        MS. RETTS:  Form.

20        THE WITNESS:  Just the left leg, yes, from

21  my knowledge.

22  Q.  BY MR. SHOWALTER:  And you were working to

23  control -- what part of the left leg was Officer

24  Seaquist controlling?

25  A.  I don't really remember exactly where he was on

1     "Was the suspect armed?"

2     And you say:

3     "No."

4     And then you're asked:

5     "Did he appear to be armed?

6     And you say:

7     "No."

8     Correct?

9  A.  Correct.

10  Q.  And then at line 33 of page 6, you're asked:

11     "Any signs of impairment that you

12  noticed?"

13     And you answered:

14     "Yeah.  I would say he was either mentally

15  ill or on some type of drugs."

16     Did I read that correctly?

17  A.  Yes.

18  Q.  And is that accurate?

19  A.  Yes.

20  Q.  And then you're asked:

21     "What led you to believe he might be

22  mentally ill or on drugs?"

23     And you say:

24     "Well, when the call came out and said

25  there was a naked male in the street yelling and

1  if he could or could not, no.

2      Q.  BY MR. SHOWALTER:  And you never heard Casey

3  utter a word, correct?

4      A.  No.

5      Q.  So he never said, you know, FU or anything like

6  that, correct?

7      A.  Not that I could make out, no.

8      Q.  And you say he "was just screaming, making

9  noises and inaudible noises."  And when you use that

10  term, you're using inaudible to mean noises that you

11  can't make sense of his words, correct?

12      A.  Correct.

13      Q.  And then at lines 12 through 13, you say,

14  "Joe," Officer Seaquist, "is on the left leg," correct?

15      A.  Correct.

16      Q.  And then you continue:

17          "He's got his right knee down on the leg,

18      it looks like, and he's holding -- holding it with

19      his left hand because he has his right hand up

20      holding his TASER."

21          Did I read that correctly?

22      A.  You did.

23      Q.  And is that what you remember?

24      A.  Yes, it is.

25      Q.  So Officer Seaquist has his right knee down on

1  what would be Casey's left leg, correct?

2      A.   Correct.

3      Q.   And Officer Seaquist's knee is above the bend

4  of Casey's knee, correct?

5                  MS. RETTS:  Form.

6                  THE WITNESS:  I don't really recall

7  exactly where it was.

8      Q.   BY MR. SHOWALTER:  Well, if it's not above

9  that, wouldn't it interfere with the ability to get

10  Casey's legs -- ankles crossed for the RIPP restraint?

11                 MS. RETTS:  Form; foundation.

12                 THE WITNESS:  Not with one leg, no.

13     Q.   BY MR. SHOWALTER:  Now going back to

14  Exhibit 194, which was the February 4th interview --

15  oh, there were two things I just want to make clear and

16  we've talked a little bit about these already.

17                 And so at page 2, it says -- this is the

18  questioner -- it says:

19                 "Justin Fyfe, with DPS.  And then Travis'

20      attorney, Bob Kavanagh."

21                 Do you see where I read that?

22                 I'm sorry, I can screen share.  I thought

23  I was screen sharing.

24     A.   Oh, no, I see where he wrote that -- or where

25  that is written, I mean.

TRAVIS FUNSTON  APRIL 15, 2021

1          MS. RETTS:  Form.

2          THE WITNESS:  It's not like we were just

3   standing around talking.  It was a matter of in the

4   moment.  You communicate when you're in situations like

5   that, to give other officers an understanding of what's

6   going on.

7      Q.  BY MR. SHOWALTER:  Well, how does telling --

8   how does him telling you that Casey had spit on him and

9   struck him help you to understand what's going?

10     A.  That we have an individual who is willing to

11  fight a uniformed police officer who has presence and

12  giving him commands and striking him in the face,

13  making it an aggravated assault on a police officer and

14  a felony.

15     Q.  So what else did he tell you?  Because that's

16  more information than you told -- than you gave when

17  your attorney was asking you questions.  What is it

18  that Sergeant Rodarme specifically told you when you

19  arrived at the scene?

20         MS. RETTS:  Form.

21         THE WITNESS:  I can't recall exactly what

22  he said.  But I think the gist of it was I was spit on

23  and struck.  It's pretty quick statements when you're

24  in a situation like that.

25     Q.  BY MR. SHOWALTER:  And so he just said, I was

1  spit at and struck?

2     A.  Correct.

3     Q.  Did he say anything else?

4     A.  Not that I can recall.

5     Q.  Did he tell you that Casey Wells appeared to

6  him to be sweating and overheated and that he thought

7  he was undergoing excited delirium?

8     A.  Not that I can recall.

9     Q.  Did he tell you that Casey Wells was bleeding

10 from the nose and mouth?

11    A.  Not that I can recall.

12    Q.  As you sit here today, are you aware that there

13 were actually five TASER activations or deployments

14 over the course of this event?

15    A.  I am aware of this today, yes.

16    Q.  As you sit here today -- strike that.

17         You're not claiming that Casey was

18 attempting to expose himself to children and that he

19 intended to do that, are you?

20         MS. RETTS:  Form; foundation.

21         THE WITNESS:  I can't speak for what was

22 going on through his mind.

23    Q.  BY MR. SHOWALTER:  He didn't go to a park or a

24 school, did he?

25    A.  No.

1   STATE OF ARIZONA        ) SS.
                            )
2   COUNTY OF MARICOPA      )

3

4          BE IT KNOWN that the foregoing proceedings
    were taken before me, DONNA DELAVINA, Certified
5   Reporter No. 50468; that the witness before testifying
    was duly sworn by me to testify to the whole truth;
6   that the foregoing 125 pages are a full, true and
    accurate record of the proceedings, all done to the
7   best of my skill and ability; that the proceedings were
    taken down by me in shorthand and thereafter reduced to
8   print under my direction.

9          [X]  Review and signature was requested.

10         [ ]  Review and signature was waived.

11         [ ]  Review and signature not required.

12         I CERTIFY that I am in no way related to any
    of the parties thereto nor am I in any way interested
13  in the outcome hereof.

14         I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in ACJA 7-206.  DATED
15  at Phoenix, Arizona, this 4th day of May, 2021.

16

17              Donna DeLaVina, RPR
                Certified Reporter
18              Certificate No. 50468

19                  *    *    *    *    *    *

20

21         I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
    complied with the ethical obligations set forth in ACJA
22  7-206.

23

24              Donna DeLaVina, RPR, Owner
                Donna DeLaVina Reporting, LLC
25              Arizona RRF No. R1010

# EXHIBIT 12

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

DUSTIN HAYNES

Phoenix, Arizona
March 29, 2021
9:03 a.m.


DONNA DELAVINA REPORTING, LLC
Arizona RRF No. R1010
313 North Gilbert Road
Suite 300
Gilbert, Arizona 85234
PREPARED BY:                    P (602) 230-5454
                                F (480) 546-3721
Donna DeLaVina, RPR             www.dlvreporting.com
Certified Reporter
Certificate No. 50468

1   Q.  Now at line 14 the interviewer says:

2           "All right.  Just go ahead and tell me in

3   your own words what happened."

4           And at line 16 through 18 you say:

5           "On February 4th, 2019 -- I don't recall

6   the exact time -- I responded to a backup from 93

7   Bravo -- Sergeant Rodarme who requested additional

8   units and it sounded like he was in a physical."

9           Did I read that accurately?

10  A.  Yes.

11  Q.  And is that an accurate and true account of

12  your response on February 4th, 2019?

13  A.  Yes.

14  Q.  And then you continue at lines 22 through 24,

15  and you say:

16          "Upon my arrival on scene the subject was

17  already in handcuffs and was face down on the

18  ground, and I approached and Officer Funston was

19  applying a RIPP restraint to his legs as he was

20  still tensing up and moving."

21          Did I read that correctly?

22  A.  Yes.

23  Q.  And is that a true account of what you saw when

24  you arrived at the scene?

25  A.  Yes.

DUSTIN HAYNES  MARCH 29, 2021

1    Q.  You continue at line 28 and say:

2         "Officer Funston had applied the RIPP

3    restraint to the chain link of the handcuffs;

4    however, it doesn't go all the way around the

5    chain.  I reached in and assisted by pulling the

6    RIPP restraint clip over the chain link."

7         Did I read that correctly?

8    A.  Yes.

9    Q.  And is that true?

10   A.  Yes.

11   Q.  So let me see if I understand.  I just want to

12   understand lines 28 through 30, in the context of lines

13   22 through 24 and kind of the time relation of what's

14   happening.

15        And let me fill it out a little bit more.

16   So lines 22 through 24 talks about what you saw when

17   you arrived at the scene, correct?

18        MS. RETTS:  Form.

19        THE WITNESS:  Yes.

20   Q.  BY MR. SHOWALTER:  When you get there, it's you

21   and Officer Sean Yamane, who are arriving together; is

22   that correct?

23   A.  Yes.

24   Q.  And when you arrive, do you see other officers

25   already at the scene?

DUSTIN HAYNES  MARCH 29, 2021

1    Q.  And are the RIPP restraints already around

2  Casey's legs at that point?

3    A.  I believe he had the actual loop around his

4  ankles, but he was trying to get the ankles crossed and

5  Casey was still kicking and straightening his legs out

6  so he couldn't get the ankles crossed to tie it down.

7  So it wasn't fully on, I guess.  It wasn't tightened

8  and positioned properly at that moment.

9    Q.  So if I understand you correctly, the RIPP

10 restraints are on but the RIPP restraint procedure that

11 the City of Phoenix trained you guys in hadn't been

12 completed in terms of tightening and securing the RIPP

13 restraints; is that accurate?

14            MS. RETTS:  Form.

15            THE WITNESS:  Correct.

16    Q.  BY MR. SHOWALTER:  And when you arrive on the

17 scene, are you able to see what Officer Long is doing?

18    A.  I don't recall what he was doing.  Like I said,

19 I was focused on Officer Funston, because he was

20 struggling with the feet.  So Officer Yamane and I went

21 to that location and helped at that task.

22    Q.  And were you able to see what Officer Seaquist

23 was doing when you arrived on scene?

24    A.  I don't recall where he was.

25    Q.  Were you able to see what Sergeant Rodarme was

DUSTIN HAYNES  MARCH 29, 2021

1  where Casey and the officers are when you arrive,

2  correct?

3      A.  Yes.

4      Q.  What was the orientation of Casey's body when

5  you arrived at the scene, was he pointed north/south or

6  some other direction?

7      A.  I believe he was pointed with his head towards

8  the north and his feet towards the south.

9      Q.  Do you remember any of the officers saying

10  anything as you and Officer Yamane arrive on the scene?

11      A.  Not that I recall.

12      Q.  Do you remember saying anything to Officer

13  Funston when you arrived on the scene?

14      A.  Not that I remember.

15      Q.  At lines 28 through 30 you talk about:

16          "Officer Funston had applied the RIPP

17      restraint to the chain link of the handcuffs;

18      however, it didn't go all the way around the

19      chain.  I reached in and assisted by pulling

20      the RIPP restraint clip over the chain link."

21          We already talked a little bit about that.

22          Can you -- is there a way you can go into

23  more detail to describe what the problem with that was

24  that required you to assist by pulling the RIPP

25  restraint clip over the chain link?

DUSTIN HAYNES  MARCH 29, 2021

1      A.  I think it was --

2              MS. RETTS:  Form.

3              Go ahead.

4              THE WITNESS:  It was a combination of

5    Officer Funston was struggling to bend the legs to get

6    them into a position where he had enough slack to be

7    able to go over the handcuffs with the clip.  So

8    Officer Yamane was helping him control the feet and I

9    was able to put the clip onto the handcuffs after there

10   was enough slack in the RIPP restraint.

11      Q.  BY MR. SHOWALTER:  Is the clip on a RIPP

12   restraint a metal clip?

13      A.  Yes.

14      Q.  Is it similar to the types of -- similar, maybe

15   not the same, but similar to the types of clips that

16   are used on things like key chains or dog leashes?

17              MS. RETTS:  Form.

18              THE WITNESS:  It's similar to a dog leash.

19      Q.  BY MR. SHOWALTER:  So is it -- I mean, in a way

20   it's similar -- well, I was going to say it's similar

21   to a carabiner in that it has a spring loaded arm; is

22   that accurate?

23      A.  That's more accurate that it has a spring

24   loaded arm.  Because on a dog clip, you actually have

25   to use the thumb to depress it down to fit it.  This

1    A.  Yes.

2    Q.  When you got there or during the time you were

3  there, did you ever see Casey Wells kicking?

4    A.  No, just stiffening his legs outwards towards

5  the officers.

6    Q.  And did you ever see Casey Wells do anything

7  consistent with attempting to strike somebody?

8    A.  No, not from the time that I got there.

9    Q.  Did you ever see Casey Wells doing anything

10  consistent or suggesting that he was attempting to

11  cause people harm?

12    A.  I use -- putting officers in risk by moving his

13  feet back and forth while they were trying to apply the

14  RIPP restraint.

15    Q.  And what is the risk that that creates for

16  officers?

17    A.  Getting kicked in the face or getting kicked

18  anywhere, I guess.

19    Q.  And so with him handcuffed on the ground and

20  Officer Arnold and Sergeant Rodarme restraining his

21  upper body, the risk would be that while he was doing

22  that, if an officer put their head in the -- in front

23  of his feet or in back of his feet, they could

24  potentially be struck by his feet?

25    A.  Yeah.  While trying to apply the RIPP

DUSTIN HAYNES  MARCH 29, 2021

1  restraint, they have to get into close proximity and he

2  was moving his feet back and forth.  Could have created

3  a dangerous situation.

4      Q.  Did you ever see anybody placed in immediate

5  danger from that?

6              MS. RETTS:  Foundation.

7              THE WITNESS:  I was focused in on the RIPP

8  restraint and the clasp.  That is where I was trying to

9  make sure that I knew that I was aware that they were

10  at the feet and he was still moving them.

11     Q.  BY MR. SHOWALTER:  And any time you handcuff a

12  suspect, that also is a dangerous situation because you

13  have to move into close proximity with the subject,

14  correct?

15     A.  Right.

16     Q.  So any time you're putting restraints on a

17  subject of any kind, because you have to place yourself

18  really close to the subject to do it, the danger to --

19  potential dangers to officers increases, correct?

20     A.  Yes.  And it all multiplies when they start

21  tensing up and flailing about and moving.

22     Q.  But you never saw anything that Casey that

23  appeared to you to be an intentional action designed to

24  harm or target an officer, correct?

25              MS. RETTS:  Form.

1          THE WITNESS:  I don't know want the intent

2     was.  I just noticed that the legs were moving back and

3     forth and they were trying to control him.

4          Q.  BY MR. SHOWALTER:  Well, let me give you an

5     example.

6               If you see somebody sort of place their

7     arm back and strike that arm forward towards somebody,

8     you can interpret that as an intentional attempt to

9     strike a person, correct?

10         A.  Yes.

11         Q.  Did you ever see anything that Casey did that

12    appeared to be an intentional attempt to cause anyone

13    harm?

14              MS. RETTS:  Form; foundation.

15              THE WITNESS:  No.  Just stiffening up and

16    moving.

17         Q.  BY MR. SHOWALTER:  When a subject stiffens up

18    while officers are attempting to apply restraints, is

19    that considered to be passive resistance or active

20    resistance according to your training?

21              MS. RETTS:  Form.

22              THE WITNESS:  Stiffening up and not being

23    actively aggressive towards the officer or trying to

24    create danger would be more of a passive situation.

25    Because the sole nature of it was just stiffening up.

1  other officers use any strikes on the suspect, correct?

2      A.  Correct.

3      Q.  And you did not use any strikes on the suspect,

4  correct?

5      A.  Correct.

6      Q.  And you're asked:

7           "Did the suspect strike at any officers?"

8           And you answered:

9           "Not that I saw, no."

10          Correct?

11     A.  Yes.

12     Q.  At the scene, did any of the other officers

13  talk about being struck by the suspect, if you recall?

14     A.  Not that I remember.

15     Q.  And turning to the next page, which is page 12,

16  one of the questioners asks you, at lines 6 through 8:

17          "When you first got there, you said that

18      Officer Funston was attempting to apply a RIPP

19      restraint and the suspect was still moving, did you

20      think the suspect was still trying to fight with

21      officers and still resist?"

22          And in response to that question you

23  stated:

24          "I thought he was still resisting.  We

25      were having problems trying to actually pull the

1    restraint up because he was stiffening his legs as

2    we were trying to bend it up to get the clip onto

3    the handcuff clasp.  So I thought he was tensing up

4    in doing that."

5           Did I read that correctly?

6    A.  Yes.

7    Q.  And is that a true and accurate account of what

8    you perceived at the time?

9    A.  Yes.

10   Q.  And at line 15, the questioner says:

11          "Do you think he -- I mean, how would you

12   characterize his strength?  Was he trying to kick

13   or was he --"

14          And then it's continued at line 20:

15          "-- was stiffening?"

16          And at lines 22 through 24, you say:

17          ". . .both Officer Funston and I were both

18   pulling on the -- because he trying to get it

19   clipped and he couldn't get it all the way around,

20   and I grabbed it and then he grabbed a little lower

21   and it took both of us to actually pull it up. . .

22          Continuing at line 28:

23          ". . .because he kind of had his legs

24   locked out."

25          Did I read that accurately?

1    A.  Yes.

2    Q.  Is that a true account of your recollection of

3  February 4th, 2019 and Casey's actions?

4    A.  Yes.

5    Q.  And then you're asked at line 30:

6          "What was the purpose behind the RIPP

7       restraint, in your opinion?"

8          And you said:

9          "Just the manner of the fight, I believe,

10      just because he -- he had already been fighting

11      with officers, so it was kind of control him

12      further to where he wouldn't -- risk of injury."

13          Did I read that accurately?

14    A.  Yes.

15    Q.  You didn't actually witness any fighting,

16  correct?

17    A.  Yes.

18    Q.  And so this just reflects your understanding --

19  and, in fact, you didn't make the decision to apply the

20  RIPP restraints, correct?

21    A.  No.  That's correct.

22    Q.  And so this is you stating your understanding

23  of what the reason for the RIPP restraint is, fair?

24    A.  Yes.

25    Q.  Okay.  I'm going to stop sharing that.

1  report, does the CAD report accurately state when you

2  and Officer Yamane arrived at the scene?

3         MS. RETTS:  Foundation.

4         THE WITNESS:  No.  I don't think it has an

5  on scene time for us.

6     Q.  BY MR. SHOWALTER:  And that's not unusual,

7  fair?

8     A.  No, that's not unusual.  Especially on

9  incidents with lots of units responding, we tend to

10 stay off the radio and just get there.

11    Q.  Other than that -- other than -- in trying to

12 figure -- so strike that.

13         If I'm trying to figure out when you and

14 Officer Yamane arrived on scene, is the best point of

15 reference those two calls from Sergeant Rodarme or is

16 there any other information in the CAD report that you

17 believe would provide a better point of reference?

18    A.  Yeah, I would say that for -- my best point of

19 reference would be when 93 Bravo, Sergeant Rodarme

20 indicated that -- it's a possible fight.  I would say

21 we were anywhere from two to three minutes out from

22 that entry.

23    Q.  And it's also possible that it was two to three

24 minutes out from the 2:24:58 call for another unit

25 where you could see Officer -- I'm sorry, Sergeant

1  Rodarme's voice and you could hearing the breathing and

2  actually sounding like he was in fight, right?

3          MS. RETTS:  Form.

4          THE WITNESS:  He could have been.  I don't

5  recall.  That's just looking at it on paper.  I can't

6  tell the inflection in the voice or anything like that

7  to jog my memory.  But I know that that was my thought

8  process, is that he sounds like he's in a high stress

9  situation because working with him, I kind

10 of -- you get to know the tone of everybody's voice and

11 when they're stressed or under stress or they're in the

12 middle of a situation or fighting, you get to know that

13 inflection in their voice.  But my thought process was

14 as soon as I heard he was in a fight, we were going.

15     Q.  BY MR. SHOWALTER:  Okay.  And then I want to

16 make sure I understand this right.  Is there a point

17 later on -- were you and Officer Yamane 9030?

18     A.  Yes, we were that day.

19     Q.  And so scrolling down to page COP-STICKNEY

20 000452, at 2:39:41, is this the first reference to you

21 and Officer Yamane contained in this?

22     A.  I believe so.

23     Q.  Okay.  And then, let's see, the easiest thing I

24 can do, is I'm just going to search for 9030 and that

25 those are -- and just so -- so these ones at 2:39,

DUSTIN HAYNES  MARCH 29, 2021

1  stopped your vehicle when you arrived on scene?

2      A.  I don't recall.

3      Q.  Do you recall who was driving that day?

4      A.  I don't recall.

5      Q.  Okay.  I'm going to push play again.

6          (Video played.)

7      Q.  BY MR. SHOWALTER:  You recognize -- so at this

8  point, we're facing west on the video, correct?

9      A.  Yes.

10     Q.  And do you recognize this individual as Officer

11 Rodriguez?

12     A.  Yes.

13     Q.  And over here, you can see a group of police

14 officers, correct?

15     A.  Yes.

16     Q.  And you're one of the officers in that group,

17 right?

18     A.  Yeah.

19     Q.  Okay.  I'm going to push play again and I'll

20 pause it shortly as the video gets closer to the scene.

21         (Video played.)

22     Q.  BY MR. SHOWALTER:  Okay.  I paused it right

23 there.  So once -- so you already testified that when

24 you arrived at the scene, there were five officers

25 around Casey and Casey was handcuffed behind his back;

1    is that right?

2                MS. RETTS:  Form.

3                THE WITNESS:  Yes.

4        Q.  BY MR. SHOWALTER:  When you and Officer Yamane

5    joined, then there were seven officers working to take

6    Casey into custody; is that correct?

7        A.  Yes.

8        Q.  And the point at which I paused it, are you

9    able to recognize Sergeant Rodarme?

10       A.  Yes.

11       Q.  Is that him right there to the north of the --

12       A.  I believe that's him.

13       Q.  And are you able to recognize who this officer

14   is to the left, on the camera screen left, of Sergeant

15   Rodarme?

16       A.  I think it's Officer Arnold, but I'm not

17   100 percent.

18       Q.  And whoever that is, are you able to tell that

19   that person is kneeling?

20               MS. RETTS:  Form; foundation.

21               THE WITNESS:  They both appear to be

22   kneeling.

23       Q.  BY MR. SHOWALTER:  And with respect to --

24       A.  Or squatting.

25       Q.  So both Sergeant Rodarme and this individual

1    Q.  BY MR. SHOWALTER:  If you had noticed that an

2    officer at the scene had placed their knee on a

3    handcuffed subject's upper shoulder or neck or right

4    shoulder while the subject was handcuffed, face down on

5    the ground, would you have redirected that officer to

6    do something different?

7           MS. RETTS:  Form foundation.

8           THE WITNESS:  Yes.

9    Q.  BY MR. SHOWALTER:  Why is that?

10    A.  Just in light of current conditions and media

11    and everything like that, in regards to our training,

12    we're no longer able to restrain people due to

13    positional asphyxiation.  When you put weight on the

14    neck or throat area, it creates a dangerous situation

15    when you're trying to detain somebody.

16    Q.  And if somebody is handcuffed behind the back

17    and face down, putting weight anywhere on their back

18    can also cause compression of the lungs and chest, it

19    can make it difficult to breathe, right?

20           MS. RETTS:  Form; foundation.

21           THE WITNESS:  Yes.

22    Q.  BY MR. SHOWALTER:  And that danger of

23    positional asphyxia was something that you were trained

24    on well before any of the current climate or conditions

25    took place, correct?

1 | STATE OF ARIZONA        ) SS.
  |                         )
2 | COUNTY OF MARICOPA      )

3

4          BE IT KNOWN that the foregoing proceedings
were taken before me, DONNA DELAVINA, Certified
5 Reporter No. 50468; that the witness before testifying
was duly sworn by me to testify to the whole truth;
6 that the foregoing 101 pages are a full, true and
accurate record of the proceedings, all done to the
7 best of my skill and ability; that the proceedings were
taken down by me in shorthand and thereafter reduced to
8 print under my direction.

9          [X]  Review and signature was requested.

10          [ ]  Review and signature was waived.

11          [ ]  Review and signature not required.

12          I CERTIFY that I am in no way related to any
of the parties thereto nor am I in any way interested
13 in the outcome hereof.

14          I FURTHER CERTIFY that I have complied with
the ethical obligations set forth in ACJA 7-206.  DATED
15 at Phoenix, Arizona, this 24th day of April, 2021.

16

17          Donna DeLaVina, RPR
             Certified Reporter
18           Certificate No. 50468

19                    *    *    *    *    *    *

20

21          I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
complied with the ethical obligations set forth in ACJA
22 7-206.

23

24          Donna DeLaVina, RPR, Owner
             Donna DeLaVina Reporting, LLC
25           Arizona RRF No. R1010

# EXHIBIT 13

UNITED STATES DISTRICT OF ARIZONA

DISTRICT OF ARIZONA

Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE DEPOSITION
OF

SEAN YAMANE

Phoenix, Arizona
March 26, 2021
9:02 a.m.

                              DONNA DELAVINA REPORTING, LLC
                               Arizona RRF No. R1010
                               313 North Gilbert Road
PREPARED BY:                         Suite 300
                               Gilbert, Arizona 85234
Donna DeLaVina, RPR              P (602) 230-5454
Certified Reporter               F (480) 546-3721
Certificate No. 50468           www.dlvreporting.com

1    Q.  And at line 11 you give your response and you

2  say:

3              "I was at the substation using the

4        facilities and officer -- or Sergeant Rodarme got

5        on the radio saying they needed another unit.  And

6        I think Lieutenant Bennett got on air and said, 'He

7        sounded like he was fighting.  Units get there

8        quickly.'"

9              Do you see where I read that?

10   A.  Yes.

11   Q.  And that is all true, to the best of your

12  recollection?

13   A.  Yes.

14   Q.  And then at the end of line 13 and continuing,

15  you say:

16              "I responded.  Got down there.  When I got

17        down there, he was already face down.  The suspect

18        was already faced down in handcuffs."

19              Do you see where I read that?

20   A.  Yes.

21   Q.  So when you arrived on the scene, Casey Wells

22  was already face down in handcuffs, correct?

23   A.  Yes, based on that statement.

24   Q.  And then you say:

25              "It looked like Rodarme and Arnold --

1   Jamie were on his shoulders.  Frank was around his

2   waist."

3           Who's Frank?

4   A.  Long.

5   Q.  "Travis was at his feet.  Or, I'm sorry,

6   Funston."

7           Is that Travis Funston?

8   A.  Correct.

9   Q.  "Officer Long and Officer Funston.  Funston was

10  struggling with the RIPP restraint.  I got down

11  there.  The guys had his feet apart.  He had the

12  RIPP restraint around his legs, but his ankles were

13  crossed.  It seemed like he was trying to leverage

14  himself to turn over by pressing into the ground

15  and spreading his feet apart."

16          Do you see where I read that?

17  A.  Yes.

18  Q.  And is that true, to the best of your

19  recollection?

20  A.  Yes.

21  Q.  And then there's:

22      "Unintelligible, get them crossed, tighten the

23  RIPP restraint and I think Officer Haynes aided

24  Funston in applying the clip to the handcuffs."

25          Did I read that correctly?

1 transport, which would be quite a while to put them in

2 that position.

3     Q.  BY MR. SHOWALTER:  But it's also something

4 where you are trained not to leave a handcuffed RIPP

5 restrained subject face down on their stomach in any

6 location for a long period of time, not just for

7 transport, correct?

8            MS. RETTS:  Form; foundation.

9            THE WITNESS:  That's, again, totality of

10 the circumstances.  In Casey Wells' case, he was still

11 actively resisting and a danger to officers.

12     Q.  BY MR. SHOWALTER:  But what you're trained is

13 that there is a concern generally about having

14 handcuffed restrained subjects face down in RIPP

15 restraints because doing that for any length of time

16 could result in positional asphyxia, correct?

17            MS. RETTS:  Form; foundation.

18            THE WITNESS:  In general.

19     Q.  BY MR. SHOWALTER:  In general, yes?

20     A.  Yes.

21     Q.  And you're also trained that when you have a

22 handcuffed or RIPP restrained subject, not to put

23 pressure on their back, neck or shoulders because that

24 could impair their ability to breathe and also cause

25 positional asphyxia, correct?

SEAN YAMANE   MARCH 26, 2021

1      A.   Yes.

2      Q.   So at the time you arrived, Casey Wells is face

3  down, his hands are handcuffed behind his back and his

4  head is pointed north, correct?

5      A.   Correct.

6      Q.   And then you're asked at line 8:

7           "The officers were trying to apply the

8      RIPP restraint?"

9           And you answered:

10          "Yes."

11          Correct?

12     A.   Correct.

13     Q.   And at line 12 you're asked:

14          "Do they have it on him at all or are they

15     still trying to get it?"

16          And you respond at line 14:

17          "Yeah.  It was just looped around his

18     legs, but his legs weren't crossed -- his ankles

19     weren't crossed."

20          Do you see where I read that?

21     A.   Yes.

22     Q.   And that's accurate?

23     A.   Yes.

24     Q.   And then I always think it's funny in these

25  transcripts that they'll say -- anytime the interviewer

1  says anything, they say it's a question.  So the word

2  "okay" is given as a question, but it's really

3  something -- it's sort of a conversational element.

4            But at line 19 you say -- so here's my

5  question.  At line 19 you say:

6            "Because he was tensing up and resisting."

7            Do you see where I read that?

8  A.  Yes.

9  Q.  When you say that you're explaining why the

10  RIPP restraints were looped around his legs and his

11  ankles weren't crossed, correct?

12  A.  Correct.

13  Q.  Now at line 21 the interviewer asks:

14            "And then you said you started to assist

15      with controlling his legs.  How did you do that?"

16            And you answer at line 24:

17            "By grabbing him by his ankles and putting

18      my weight down."

19            Do you see where I read that?

20  A.  Yes.

21  Q.  Is that accurate?

22  A.  Yes.

23  Q.  And then you're asked:

24            "What was his reaction when you did that?"

25            And you said:

1    Q.  BY MR. SHOWALTER:  Your goal at this point is

2  to get Casey's legs crossed or his ankles crossed and

3  to press his heels towards his butt so that the RIPP

4  restraints can be tightened and clipped into the

5  handcuffs; is that accurate?

6            MS. RETTS:  Form.

7            THE WITNESS:  His heels didn't need to go

8  back towards his butt to be tightened.

9    Q.  BY MR. SHOWALTER:  Okay.

10    A.  My goal is just to cross his ankles and tighten

11  the RIPP restraint, which can be done without pushing

12  his heels towards his butt.

13    Q.  And I -- maybe I want to be clear about

14  something.  It's not necessary that his heels touch his

15  butt, correct?

16    A.  Correct.

17    Q.  But, generally, you were directing -- your goal

18  is to get his legs pushed towards his butt; is that

19  fair?

20            MS. RETTS:  Form.

21            THE WITNESS:  Enough to clip to the

22  handcuffs.

23    Q.  BY MR. SHOWALTER:  Okay.  And this is -- I

24  guess this is what I want to make sure I understand.

25  You say, he's spreading his legs apart and he's

1    Q.  And then at line 4 you're asked:

2            "When he was trying to kick, did he kick

3    you at all?"

4            And you responded:

5            "No."

6            Do you see that?

7    A.  Yes.

8    Q.  And that's true, right?

9    A.  Correct.

10   Q.  Did you ever see Casey Wells kick any officers?

11   A.  No.

12   Q.  I'm sorry, I didn't hear the answer.

13   A.  No.

14   Q.  Did you ever see Casey Wells strike any

15   officers?

16   A.  No.

17   Q.  Did you ever see Casey Wells bite any officers?

18   A.  No.

19   Q.  Did you ever see him spit on any officers?

20   A.  No.

21   Q.  Did you have any concern that Casey Wells had a

22   weapon?

23   A.  No.

24   Q.  Why not?

25   A.  He was naked.

1  Q.  Now, there is a -- you know, there may be a

2  concern when you're dealing with a mentally ill suspect

3  or a suspect who's emotionally disturbed or a suspect

4  who's under the influence of drugs or just an

5  aggressive resistant suspect that they could grab one

6  of the officers' weapons, correct?

7  A.  Correct.

8  Q.  But while you were on top of Casey and Casey

9  was handcuffed and the other officers were on top of

10 Casey, did you ever see him reach for any of the

11 officers' weapons?

12          MS. RETTS:  Form; foundation.

13          THE WITNESS:  No.  My focus was on his

14 legs.

15 Q.  BY MR. SHOWALTER:  You never saw him do

16 anything that was consistent with him trying to grab

17 one of the officers' weapons, correct?

18 A.  Correct, my focus was on his legs.

19 Q.  And so at line 14 through 15, you write:

20          "He was attempting to kick" -- or I'm

21 sorry, you write.  Strike that.  Strike the question.

22 You didn't write anything.

23          At officer -- at line 14 through 15, the

24 transcript has your statement as:

25          "He was attempting to kick, but I had all

SEAN YAMANE  MARCH 26, 2021

1    my weight on his ankles.  I could feel him trying

2    to lift upwards."

3            Do you see where I read that?

4    A.  Yes.

5    Q.  Is that accurate as to what you experienced on

6  February 4th of 2019?

7    A.  Yes.

8    Q.  That Casey Wells, while you were trying to get

9  him into the RIPP restraint, you could feel him

10  actively resisting you at that point, correct?

11    A.  Correct.

12    Q.  And then the interviewer says:

13            "Okay.  If you hadn't been preventing him

14    from doing that, would he have been able to kick

15    you?"

16            And your answer was:

17            "Yes."

18            Right?

19    A.  Right.

20    Q.  And then at line 22 it says:

21            "Okay.  And then you said you heard a

22    TASER deployed?"

23            And you answer:

24            "Yes."

25            Is that accurate?

SEAN YAMANE  MARCH 26, 2021

1      A.  Yes.

2      Q.  And it says -- the next question is:

3          "Who deployed the TASER?"

4          And you answered:

5          "Officer Seaquist."

6          Correct?

7      A.  Correct.

8      Q.  He was the only person there who deployed a

9  TASER, so far as you know, correct?

10     A.  Correct.

11     Q.  Did you hear how many times he deployed the

12 TASER?

13     A.  I believe once.

14     Q.  You recall one instance where he deployed the

15 TASER?

16     A.  Yes.

17     Q.  Okay.  And at line 34, you're asked:

18          "Was that effective?"

19          Did you understand that question to mean

20 was the TASER effective?

21     A.  Correct.

22     Q.  And at line 2 of page 13, you answered, "Yes,"

23 correct?

24     A.  Correct.

25     Q.  And so the only TASER used that you witnessed

1  was effective; is that accurate?

2      A.  Yes.

3      Q.  And when you say it was effective, what do you

4  mean?

5      A.  I was able to cross his ankles at the time and

6  tighten the RIPP restraint.

7      Q.  So it allowed you to gain control, correct?

8      A.  Correct.

9      Q.  And at line 13, you're asked:

10              "Had there been any -- had there been any

11  TASER deployments prior to you getting there to assist

12  that you know of?"

13              And do you see where I read that?

14      A.  Yes.

15      Q.  And at line 16 through 17, you said:

16              "I would assume so because before that

17      there was actual two probes stuck in his back."

18              Do you see where I read that?

19      A.  Yes.

20      Q.  And so -- and then the follow-up -- is that

21  true?

22      A.  Yes.

23      Q.  When you say "two probes," do you mean two

24  individual darts?  Or do you mean that there was

25  evidence that two TASER cartridges had been deployed?

SEAN YAMANE  MARCH 26, 2021

```
 1              MS. RETTS:  Form.
 2              THE WITNESS:  It was that there two
 3  visible darts in his back prior to me getting -- or
 4  upon my arrival, before the TASER went off, there were
 5  already two.
 6       Q.  BY MR. SHOWALTER:  Okay.  And then at line 19
 7  through 21 -- oh, strike that.  We already covered
 8  that.
 9              And then you say -- and then at line 23
10  the question is:
11              "Okay.  And then he became unresponsive.
12       Officer Seaquist and Officer Funston began giving
13       him compressions and then fire eventually came on
14       scene?"
15              And you answered:
16              "Yes."
17              Is that accurate?
18       A.  Yes.
19       Q.  Having watched the video, would you agree
20  that -- well, let me strike that.
21              In watching the video, were you able to
22  hear a TASER used?
23       A.  Yes.
24       Q.  I want to ask a question to make sure I'm not
25  making a fool of myself.
```

1    A.  Yes.

2    Q.  And then after that it appears that the

3 dispatcher assigned your unit to being present?

4    A.  Correct.

5    Q.  Now, when you were at Mr. Wells' feet, is it

6 fair to say that the only weight that you were placing

7 on him was through your hands?

8    A.  Correct.

9    Q.  And I think in the video we saw you at the

10 bottom of his feet.  Would it be fair to describe the

11 positioning of your legs in a spread eagle position

12 where your knees were in the air?

13    A.  Yes.

14    Q.  Did you ever place any weight through your legs

15 on Mr. Wells?

16    A.  No.

17    Q.  When you were down attempting to control

18 Mr. Wells' legs, did you ever attempt to put them in a

19 leg weave?

20    A.  No.

21    Q.  Did you ever attempt to take his legs and put

22 them up to his butt?

23    A.  No.

24    Q.  Is it fair to say that after you heard the

25 TASER, that was what would have allowed you to get the

```
 1  STATE OF ARIZONA        ) SS.
                            )
 2  COUNTY OF MARICOPA      )

 3

 4          BE IT KNOWN that the foregoing proceedings
    were taken before me, DONNA DELAVINA, Certified
 5  Reporter No. 50468; that the witness before testifying
    was duly sworn by me to testify to the whole truth;
 6  that the foregoing 114 pages are a full, true and
    accurate record of the proceedings, all done to the
 7  best of my skill and ability; that the proceedings were
    taken down by me in shorthand and thereafter reduced to
 8  print under my direction.

 9          [X]  Review and signature was requested.

10          [ ]  Review and signature was waived.

11          [ ]  Review and signature not required.

12          I CERTIFY that I am in no way related to any
    of the parties thereto nor am I in any way interested
13  in the outcome hereof.

14          I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in ACJA 7-206.  DATED
15  at Phoenix, Arizona, this 18th day of April, 2021.

16

17               Donna DeLaVina, RPR
                 Certified Reporter
18               Certificate No. 50468

19               *     *     *     *     *     *

20

21          I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
    complied with the ethical obligations set forth in ACJA
22  7-206.

23

24               Donna DeLaVina, RPR, Owner
                 Donna DeLaVina Reporting, LLC
25               Arizona RRF No. R1010
```

# EXHIBIT 14

# DANIEL J. SPITZ, M.D.
## FORENSIC PATHOLOGY AND TOXICOLOGY

**34051 South Gratiot Avenue, Suite 202**
**Clinton Township, Michigan 48035**

****************************

Telephone: (586) 791-6700
Facsimile: (586) 791-6701
Direct: (313) 806-2002

Email: danspitz@aol.com

October 12, 2021

Mr. Jesse Showalter
Attorney at Law
Robbins and Curtin

*Re: Lei Ann Stickney, et al. v. City of Phoenix, et al.*
   *United States District Court Case No. 2:20-cv-01401-SMB-CDB*

Dear Mr. Showalter,

My review of this case involved evaluation of the following materials:

- Autopsy Report, Maricopa County Medical Examiner (Casey Wells)
- Neuropathology Report (Casey Wells)
- Anthropology Report (Casey Wells)
- Toxicology Report, NMS Labs (Casey Wells)
- Imaging Studies (Casey Wells)
- Preliminary Investigation Report, Maricopa Co. Medical Examiner
- Case Notes, Maricopa County Medical Examiner
- Body Diagrams and Autopsy Worksheets, Maricopa Co. Medical Examiner
- Misc. File Documents, Maricopa Co. Medical Examiner
- Autopsy and Hospital Photographs
- Scene Photographs
- Plaintiff's First Amended Complaint
- Plaintiff's Second Amended Complaint
- Plaintiff's Eighth Supplemental Disclosure Statement
- Plaintiff's Eleventh Supplemental Disclosure Statement
- Axon Video Footage of Incident (Officer Kenneth Palmer)
- EMS Report, Phoenix Fire Department

WELLS 003147

- Incident Report, Phoenix Police Department
- Written Report – Forensic Research and Analysis (Dr. Michael Freeman)
- Written Report – Daniel Wohlgelernter, MD
- Medical Records (Casey Wells)
  - Deer Valley Medical Center
- Articles Provided by Defense
  - Sudden Death During Physical Restraint by the Dutch Police
  - Ormrod Lecture October 2019: Police Restraint Cause of Death
  - Law Enforcement Use of Force "Standards," Degrees of Certainties and Scientific Reliabilities
  - Investigation of Deaths Temporally Associated with Law Enforcement Apprehension
  - Electrical Weapons, Hematocytes and Ischemic Cardiovascular Accidents
  - The Relationship between Positional Asphyxia and Increasing Body Mass
- Deposition Transcripts
  - Officer James Arnold
  - Sergeant Robert Rodarme
  - Officer Joseph Seaquist
  - Officer Travis Funston
  - Officer Frank Long
  - Officer Dustin Haynes
  - Officer Sean Yamane
  - Officer Kenneth Palmer

Subsequent to my review of these materials, it is my opinion that Casey Wells suffered anoxic encephalopathy due to cardiorespiratory arrest as a result of forced prone restraint with extrinsic chest compression and evidence of neck compression resulting in restraint asphyxia.

Contributory conditions included methamphetamine toxicity, arteriosclerotic and hypertensive heart disease and use of a conducted electrical weapon (TASER).

The cardiorespiratory arrest occurred while Casey Wells was being actively restrained in a prone position with his hands cuffed behind his back by multiple City of Phoenix police officers.

Casey Wells was a 40 year-old man with a history of drug abuse and mental illness. According to the autopsy report, Mr. Wells was 69 inches tall and weighed 227 pounds (BMI: 33.5).

On February 4, 2019 at approximately 1404 hours, Phoenix Police received a 911 call from a citizen regarding a man who standing in the roadway and acting strangely. Over the next few minutes additional 911 calls were received indicating there was a naked man standing in the road, staring at the sky, doing yoga poses and talking to god. The man was later determined to be Casey Wells.

WELLS 003148

Sergeant Robert Rodarme and Officer James Arnold were dispatched to the scene with Officer Arnold arriving at approximately 1419 hours and Sergeant Rodarme arriving at approximately 1422 hours.

Casey Wells was not compliant with Officer Arnold's commands and resisted attempts at being detained. This prompted Officer Arnold and Sergeant Rodarme to physically engage Mr. Wells which resulted in Mr. Wells being forcibly taken to the ground in a supine position. During the take down, it was reported that Mr. Wells struck the back of his head on the pavement. Additional officers were dispatched to the scene with Officer Joseph Seaquist being the next to arrive at approximately 1427 hours. With Officer Seaquist on scene, the three officers were able to force Casey Wells into a prone position.

Officer Travis Funston and Officer Frank Long arrived on scene at approximately 1428 hours and engaged in the struggle and restraint of Mr. Wells.

With respect to the type of force that was used to subdue and restrain Casey Wells, the following was gained from deposition testimony of several of the involved police officers.

**Officer James Arnold gave deposition testimony on April 6, 2021.**

During his deposition Officer Arnold stated that while Casey Wells was supine on the ground, he struck Mr. Wells in the face with his forearm.

**Question:** Do you have a belief as to how there came to be – what caused there to be blood in Casey's mouth and nose?

**Answer:** Yes, I struck Casey with my forearm in the nose.

Officer Arnold indicated that he had control of Mr. Wells' left arm and Sergeant Rodarme had control of Mr. Wells' right arm. During the process of forcing Mr. Wells to a prone position, both officers had to release their control of his upper extremities.

Once in a prone position, Officers Arnold, Rodarme and Long restrained Mr. Wells' upper extremities and torso and Officers Seaquist and Funston restrained Mr. Wells' lower extremities.

During his deposition, Officer Arnold was asked if he placed his weight on Mr. Wells' torso. Officer Arnold replied the following:

**Answer:** I mean we were holding him down. I was – I had placed my knee on his shoulder blade, just to control him or help control him.

**Question:** So your knee was on his shoulder blade?

**Answer:** Yes, it would have been his right shoulder blade.

WELLS 003149

### Officer Joseph Seaquist gave deposition testimony on March 22, 2021.

During his deposition the following question / answer exchanges occurred:

**Question:** And then you say: "Once they got him on his stomach, I grabbed his ankles and put them together. And then just with all my weight, I pushed down on them to get his heels touching his butt. That way I had some type of control on him."

**Answer:** Correct.

**Question:** How were you holding his legs?

**Answer:** His ankles were crossed and I would have had my arms in a cross position along with my body laying on top of the arm or on top of his legs.

**Question:** And so you're – you've got him – you're holding his calves, legs are crossed, and you're doing your best to press his heels against his butt, right?

**Answer:** Correct.

**Question:** "I can't speculate to what his feeling were, but I know I had his ankles crossed, just like what they teach us in the academy – ankles were crossed, I just took my whole 250 pounds and laid on it. And I was laying on – basically I had his ass in my face". Did I read that correctly?

**Answer:** Yes, sir, it's accurate.

### Officer Frank Long gave deposition testimony on April 20, 2021.

**Question:** At line 7 of page 4, you continue explaining and you say: "So we arrive, I exit the vehicle. I notice that there's an officer on top of the subject on the ground. He's laying on his stomach. I can hear some yelling. I see Sergeant Rodarme on, I guess, it would be his left side." Do you see where I read that?

**Answer:** Yeah.

**Question:** And that's true and accurate, correct? That's what you saw when you arrived?

**Answer:** Yeah.

With Casey Wells on the ground in a prone position, Officer Seaquist utilized his TASER using both cartridges plus several trigger pull deployments. The TASER probes struck Mr. Wells in the back.

Review of the TASER download report (report times are 15 seconds fast) indicated that Officer Seaquist deployed the first TASER cartridge at 1429:11 hours and the second

WELLS 003150

cartridge at 1429:26 hours. Additional trigger deployments occurred at 1429:56 hours, 1430:19 hours and 1430:46 hours. The final trigger pull is recorded on Officer Kenneth Palmer's body worn camera at 1430:31 hours.

After four TASER deployments, Casey Wells was able to be handcuffed behind his back.

Shortly after the arrival of Officers Funston and Long, Officers Dustin Haynes and Sean Yamane arrived on scene and engaged in the restraint of Mr. Wells.

According to Officer Haynes, Casey Wells was face down on the ground and already restrained with handcuffs when he arrived. He observed Officer Funston applying the RIPP restraint and assisted by attaching the RIPP restraint clip to the handcuffs. After he applied the clip he stepped back and shortly thereafter someone stated that Mr. Wells was not responsive.

Officer Yamane stated that when he arrived, Casey Wells was already face down and restrained in handcuffs. Officer Yamane indicated that he was able to get Mr. Wells' legs crossed and secure the RIPP restraint around his legs. Officer Yamane stated that the TASER was deployed while he was struggling with Mr. Wells' legs.

After being handcuffed and secured with the RIPP restraint, Casey Wells was found to be pale and pulseless. Mr. Wells was moved to a supine position while his hands remained cuffed behind his back. Officer Seaquist began chest compressions while waiting for Phoenix Fire Department personnel to arrive.

**Summary of Body Worn Camera Video (Officer Kenneth Palmer)**

The incident is partially captured on Officer Kenneth Palmer's body camera video.

Officer Palmer arrived on scene and exited his police vehicle at 1430:12 hours with an activated body camera.

A few seconds after Officer Palmer exited his vehicle, the video shows multiple police officers (seven) on and around Casey Wells who was restrained in a prone position on the pavement.

At 1430:26 hours, Officer Arnold can be seen using his right knee to restrain the right upper back of Mr. Wells.

At 1430:28 hours, an officer is heard stating "he is detained".

At 1430:31 hours, a TASER deployment can be heard. A few seconds later, an officer is heard saying that Fire is requested due to use of a TASER.

Phoenix Fire Department personnel are told to enter the scene at 1430:59 hours.

WELLS 003151

At 1431:07 hours, Casey Wells is rolled from a prone position to a supine position while still handcuffed behind his back.

The video footage is lost (apparently due to the camera being covered) at 1431:09 hours and returns at 1431:22 hours.

At 1431:25 hours, an officer can be heard stating that Mr. Wells has no pulse and is not breathing.

At 1431:30 hours, an officer can be seen performing chest compressions on Mr. Wells.

At 1433:26 hours, several officers roll Mr. Wells in order to remove the handcuffs. Phoenix Fire Department personnel take over resuscitative efforts at approximately 1433 hours.

At no time during the video can Casey Wells be seen making any purposeful movements and at no time can Mr. Wells be heard making any sounds.

**Timeline of Events (Per Phoenix Police Department Incident Report):**

Citizen makes first 911 call at 1404 hours. A few minutes later additional 911 calls are received indicating that a naked man is in the roadway and acting strangely.

Sergeant Rodarme and Officer Arnold were dispatched to the scene with Officer Arnold arriving at approximately 1419 hours and Sergeant Rodarme arriving at approximately 1422 hours. Officer Seaquist arrived on scene at approximately 1427 hours and Officer Funston and Officer Long arrived on scene at approximately 1428 hours.

Officer Seaquist deployed the first cartridge from his TASER at 1429:11 hours and he deployed the second cartridge at 1429:26 hours. After the cartridges were fired, the TASER trigger was engaged three times at 1429:56 hours, 1430:19 hours and 1430:46 hours. (TASER time was determined to be 15 seconds ahead of real time).

At 1430:12 hours, Officer Kenneth Palmer exited his vehicle with an activated body camera.

At 1430:31 hours, TASER deployment can be heard on the audio of Officer Palmer's body camera.

At 1431:10, Officers can be seen rolling Mr. Wells onto his back and at 1431:20 hours, an officer can be heard saying that Mr. Wells is purple and without a pulse.

At 1431:32 hours, Officer Palmer radioed that Mr. Wells was not breathing and requested an accelerated fire response.

6

WELLS 003152

Phoenix Fire Department personnel arrived on scene and conducted an initial evaluation of Casey Wells at approximately 1433 hours. The assessment showed that Mr. Wells had a Glascow coma score of 3 and was without vital signs. The initial cardiac rhythm was recorded as pulseless electrical activity (PEA). Resuscitative efforts were continued and Mr. Wells was transported to the emergency department at Deer Valley Medical Center.

Upon arrival at the emergency department, Mr. Wells was unresponsive and in cardiac arrest. His pupils were fixed and dilated. Resuscitative efforts were continued and within a few minutes, Mr. Wells regained a pulse. Mr. Wells was transferred to the intensive care unit for further evaluation and treatment.

Upon initial medical evaluation, abrasions were noted to Mr. Wells' face and upper and lower extremities. TASER darts were noted to the left scapular region.

A CT scan of the head showed a parietal scalp hematoma and left facial contusion.

Casey Wells' condition did not improve and following discussions with his family the decision was made to withdraw care.

Casey Wells was pronounced dead on February 6, 2019 at 1746 hours.

Casey Wells' body was transported to the Maricopa County Medical Examiner's Office for further investigation and autopsy. The autopsy was conducted on February 7, 2019 at 0800 hours.

The autopsy examination found multiple blunt force injuries and injuries related to use of a conducted electrical weapon (TASER).

Examination of the head demonstrated multiple abrasions and contusions involving the nose, superior left orbital region, left temporal scalp and the right side of the forehead. A ¾ inch abraded contusion was on the left side of the face (cheek) and a 1 inch abrasion was on the right side of the face (cheek). A small abrasion was on the left ear and a small abrasion was on the right temporal scalp. Two abrasions measuring up to 2 inches in greatest dimension were on the posterior scalp.

Examination of the lips demonstrated mucosal abrasions and the tongue showed bite-related injuries involving the tip and left bite line.

The eyes showed petechial hemorrhages involving the left sclera and left palpebral conjunctiva.

Reflection of the scalp showed subscalp hemorrhages over the posterior right vertex, upper right scalp and posterior left scalp.

Examination of the neck organs revealed a ½ inch submucosal contusion involving the proximal anterior esophagus adjacent to the thyroid cartilage.

WELLS 003153

Forensic anthropology examination of the hyoid bone and airway cartilages demonstrated fractures of the right superior horn and right lamina of the thyroid cartilage and fractures of the right and left inferior horns of the thyroid cartilage.

Examination of the torso showed abrasions on the posterior aspects of the right and left shoulders. Several variably sized abrasions were on the right and left sides of the back, right hip region and left buttock. A 2 inch linear abrasion was on the left side of the chest above nipple and a blue-purple contusion (~1½ inches) was on the left lower abdominal quadrant.

Dissection of the back soft tissues demonstrated a 4 x 1 inch area of subcutaneous hemorrhage involving the central region of the mid back (between the shoulder blades). The hemorrhage extended deep to involve the paraspinal muscles. The right side of the mid-back had a small hemorrhage involving the subcutaneous soft tissues and several small hemorrhages were noted in the subcutaneous tissues of the posterior neck.

Evidence of historical trauma consisted of callouses (consistent with remote fractures) involving the right 10th rib and the left 7th rib.

Examination of the upper extremities demonstrated multiple abrasions involving the right and left elbows, posterior surfaces of the right and left hands, dorsal surfaces of the right and left wrists and dorsal surface of the left forearm. Dissection of the subcutaneous tissues and musculature showed hemorrhages in association with externally visible abrasions.

Examination of the lower extremities showed multiple variably sized abrasions on the left thigh, right and left knees and right and left feet.

TASER-related injuries consisted of a pair of shallow puncture wounds on the paramidline upper right back. A small amount of subcutaneous hemorrhage involved the underlying tissues.

Natural disease consisted of arteriosclerotic and hypertensive heart disease and obesity.

Postmortem toxicology testing (NMS Laboratories) using hospital blood showed the following:

- D-Amphetamine: 68 ng/mL (100% D-Amphetamine)
- D-Methamphetamine: 580 ng/mL (100% D-Methamphetamine)
- Caffeine

Following the autopsy examination and death investigation, the Maricopa County Medical Examiner issued a Medical Examiner Report which indicated the following cause and manner of death opinions:

WELLS 003154

**Cause of Death:**

*Complications of Cardiac Dysrhythmia and Arrest in Setting of Drug (Methamphetamine) Intoxication, Acute Psychosis, Arteriosclerotic Cardiovascular Disease and Physical Restraint with Prone Positioning and Possible Extrinsic Chest Compression.*

**Manner of Death:**

*Undetermined.*

While I am largely in agreement with the cause of death as listed by the Maricopa County Medical Examiner, it is my opinion that the evidence yields additional significant findings that are critical with respect to Casey Wells' cause of death.

In light of the evidence associated with this death investigation, it is clear that the actions of the Phoenix police officers played a significant role relative to the death of Casey Wells. Since the death resulted from the actions of others, the manner of death is most appropriately classified as a homicide.

## OPINIONS:

The autopsy demonstrated subcutaneous soft tissue hemorrhages involving the central region of the mid back (between the shoulder blades) which extended deep to involve the paraspinal muscles. Essentially this is full thickness hemorrhage extending from the skin down to the spine. Additionally, subcutaneous hemorrhages involved other areas of Casey Wells' back and posterior neck.

These findings are clear and convincing evidence that Casey Wells was subjected to forced prone restraint with weight force being applied to the central region of his back and posterior neck while he was actively being restrained in a prone position.

None of the involved police officers acknowledged putting weight on the central region of Mr. Wells' back or posterior neck. However, the presence of such trauma indicates that at some point during the physical restraint, one or more of the involved police officers compressed Mr. Wells against the pavement by applying weight force to these areas.

Additionally, examination of Mr. Wells' anterior neck structures demonstrated several fractures of the thyroid cartilage; specifically the right superior horn, right lamina and the right and left inferior horns.

Multiple fractures involving the thyroid cartilage supports the conclusion that Casey Wells was subjected to applied force to his neck consistent with a neck restraint such as a choke hold. The finding of petechial hemorrhages involving the left sclera and left palpebral conjunctiva, while non-specific, are commonly observed in association with neck compression. Such a compressive force would affect Mr. Wells' ability to breathe and limit blood flow to and from the brain.

9

WELLS 003155

Officer Arnold acknowledged that he utilized his knee to put his body weight on the right side of Mr. Wells' upper back and Officer Seaquist indicated that he crossed Mr. Wells' feet and used his strength and body weight to forcibly flex Mr. Wells' feet back to level of his buttocks.

Both of these actions are particularly dangerous with respect to restraint asphyxiation. The action of forcing a person's legs back to the buttocks and using full body weight to maintain this position creates significant compressive force on the chest and abdomen such that normal respiratory movements are impaired. Additionally, such a force may result in compression of the abdomen which would impair venous blood flow back to the heart.

Forensic analysis of the evidence in this case indicates that Casey Wells' death was due to a multifactorial process with the most significant factor being restraint asphyxiation due to forced prone restraint with extrinsic compression of his torso likely in combination with neck compression. Methamphetamine intoxication, arteriosclerotic and hypertensive heart disease and use of a conducted electrical weapon (TASER) can be considered contributory conditions.

Additionally, physical exertion associated with the active struggle and forced prone restraint would increase the oxygen demands of Casey Wells and further exacerbate his respiratory compromise.

Furthermore, it is my opinion that but for this type of restraint, there is no evidence to support the conclusion that Casey Wells would have died when he did.

The above opinions are made to a reasonable degree of medical and scientific certainty and are based on the materials that I have reviewed. I reserve the right to amend my opinions should new or additional information become available.

Very truly yours,

Daniel J. Spitz, M.D.

WELLS 003156

# EXHIBIT 15

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
             Plaintiff,       )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
             Defendants.      )
_____)


VIDEORECORDED VIDEOCONFERENCE

30(B)(6) DEPOSITION

OF

JOSHUA CALLE

Phoenix, Arizona
September 16, 2021
8:56 a.m.

                          DONNA DELAVINA REPORTING, LLC
                           Arizona RRF No. R1010
                           313 North Gilbert Road
PREPARED BY:                     Suite 300
                           Gilbert, Arizona 85234
Donna DeLaVina, RPR            P (602) 230-5454
Certified Reporter            F (480) 546-3721
Certificate No. 50468        www.dlvreporting.com

1  see that, correct?

2      A.  Correct.

3      Q.  There is a -- well, if I look at the non-deadly

4  force definition, where it says "a tactic when properly

5  applied has a minimal or no risk of causing death," I'm

6  left wondering are there tactics that when not properly

7  applied have a risk of causing death?

8              MS. RETTS:  Form; asked and answered.

9              THE WITNESS:  Tactics such as, and at this

10  time, the carotid control technique, right.

11      Q.  BY MR. SHOWALTER:  Yes.

12      A.  The technique itself isn't a deadly force

13  technique per se.  If that was the case, they wouldn't

14  use it in professional sports and Octagon.  But based

15  on a lot mitigating factors, physical, mental, drugs,

16  alcohol, a lot of that kind of stuff, it could start

17  getting into the deadly force arena, right, based on

18  the actions of the subject and the totality of the

19  circumstances.  That one specifically, if applied

20  incorrectly, could be considered deadly force.

21      Q.  And so if applied incorrectly, what would --

22  incorrect applications of the carotid hold technique

23  would include, one, doing it for too long, correct?

24      A.  Correct.

25      Q.  It would also include doing it with the wrong

1  clear bright-line rules, other than that a firearm is

2  deadly force.

3           Does that make sense?

4           MS. RETTS:  Form.

5           THE WITNESS:  It makes sense that it

6  doesn't specify anything outside of firearm, yes.  But,

7  again, it's the way it articulates any tactic or use of

8  force that creates substantial risk of causing death or

9  serious physical injury, such as the use of a firearm

10  could be considered deadly force.

11     Q.  BY MR. SHOWALTER:  Okay.  And so with respect

12  to TASERs, are police officers trained that under

13  certain circumstances, a TASER can cause serious bodily

14  injury or death?

15           MS. RETTS:  Form.

16           THE WITNESS:  Yes and no.

17     Q.  BY MR. SHOWALTER:  Explain.

18     A.  We're trained -- the officers are trained when

19  and how to use a TASER, if used improperly.  For

20  example, letting it run for an extended amount of time.

21  That could cause serious injury or death.

22     Q.  And are officers also trained that using a

23  TASER on a person who's physical compromised can cause

24  death?

25           MS. RETTS:  Form.

1            THE WITNESS:  No.  They're trained people

2    that are physically compromised would not be the best

3    candidate for the use of that tool or tactic.

4        Q.  BY MR. SHOWALTER:  Are they trained that they

5    should not use TASERs on people who are physically

6    compromised?

7        A.  No.  They're -- such as our current training,

8    people that are, for instance, obese, because of the

9    way the TASER works with muscle mass aren't necessarily

10   the best candidates for the use of TASER, people with

11   low body mass, elderly, children are not the best

12   candidates for the use of that tool.  However, there's

13   nothing that strictly prohibits it, based on the

14   officers' judgment and the totality of the

15   circumstances.

16       Q.  And so on the TASER, there's no bright-line

17   rule about types of people it can be used against?

18            MS. RETTS:  Form.

19            THE WITNESS:  Types of people, no.

20   Situations, yeah.  They don't prohibit using the TASER

21   when people are on an elevated location, on a wall, in

22   a tree -- up in a tree, next to a ledge, something like

23   that.  We try not to tase people that are in or around

24   bodies of water, the potential to fall and create other

25   risk is there, so we train that's not the best tool in

1    Q.  BY MR. SHOWALTER:  Is that something that

2    officers are explicitly told in their training?

3              MS. RETTS:  Form.

4              THE WITNESS:  What I just told you?

5    Q.  BY MR. SHOWALTER:  Yes.

6    A.  No.  It's not specifically told in training,

7    no, that's my opinion.

8    Q.  Okay.  So going back to this list of use of

9    force restrictions.

10             When is it appropriate to use electronic

11   control devices on a handcuffed person who is prone,

12   facedown on the ground pursuant to the City of

13   Phoenix's use of force policies and training?

14             MS. RETTS:  Form; foundation; outside the

15   scope?

16             THE WITNESS:  Whether the person is

17   handcuffed or restrained, if they're still displaying

18   actions of active aggression or dangers to self or

19   others, it can be justified, yeah, or articulated.

20   Q.  BY MR. SHOWALTER:  Is that what police officers

21   are trained at the City of Phoenix?

22             MS. RETTS:  Form.

23             THE WITNESS:  Are they trained they can

24   use the TASER on a handcuffed prisoner or on a

25   handcuffed subject?

1   Q.  BY MR. SHOWALTER:  On a handcuffed prone

2   subject?

3   A.  No.  Our training is specific to the totality

4   of the circumstances.  Everything that's going on is

5   going to determine response options, right.  We don't

6   train -- a lot officers like the TASER and use the

7   TASER a lot.  We don't necessarily train that the TASER

8   is the best tool in any incidents or times that

9   officers use them.  However, it is a tool that officers

10  decide to use.  We don't train specifically that you

11  can or can't use it in this specific incident.

12  Q.  So even though there's a policy that gives a

13  use of force restriction against using electronic

14  control devices on handcuffed restrained persons, you

15  don't -- the City of Phoenix police officers are not

16  specifically trained as to when they can or cannot use

17  an electronic control device on a prone handcuffed

18  subject?

19          MS. RETTS:  Form.

20          THE WITNESS:  It's totality of the

21  circumstances.

22  Q.  BY MR. SHOWALTER:  Okay.  But here's what I'm

23  not understanding.  So the totality of the

24  circumstances, that's a legal test that comes from

25  Graham v. Connor, correct?

1    A.   Yeah.  That's one place, yeah.

2    Q.   And you could have a training for City of

3    Phoenix police officers where you have them read Graham

4    v. Connor and you then say, okay, as you can see, it's

5    the totality of the circumstances, and we're done here,

6    go forth and police, right.  And that would be an

7    inadequate training, correct, if that was all it was,

8    is police officers are hired, they read Graham v.

9    Connor, they're told that it's the totality of the

10   circumstances and they go out into the world applying

11   force under the totality of the circumstances, that

12   would be inadequate, correct?

13          MS. RETTS:  Form; foundation; outside the

14   scope.

15          THE WITNESS:  I would consider that

16   inaccurate -- or inadequate, yes.

17   Q.   BY MR. SHOWALTER:  And so simply telling

18   officers that, well, it's the totality of the

19   circumstances, that's not really training, is it?

20          MS. RETTS:  Form; foundation.

21          THE WITNESS:  So officers are trained,

22   right, for -- since we're talking TASER, they can use

23   the TASER during these circumstances, active

24   aggression, danger to self, danger to others, right,

25   and it's a handcuff assist or control assist tool.  If

1    a subject were still displaying those levels of

2    resistance and a TASER could be appropriate, right,

3    even though they're handcuffed, it's based completely

4    on what that subject is displaying at that time, during

5    that incident.

6        Q.  BY MR. SHOWALTER:  Okay.  I'm going to take you

7    back up to the definition of active aggression.  It

8    says, "Physical actions of assault."

9            Do you see where I read that?

10       A.  Yep.

11       Q.  And so if a handcuffed -- let's say you have a

12   subject who's been handcuffed and is in RIPP

13   restraints, what would constitute assault by that

14   person that would justify a use of an electronic

15   control device?

16           MS. RETTS:  Form; foundation; outside the

17   scope.

18           THE WITNESS:  So just because someone

19   would be handcuffed or be in RIPP restraints, would not

20   prevent someone from physical action of assault, they

21   can still kick, bite, scratch, grab onto.  I've seen

22   incidents where a subject was handcuffed to the rear

23   and has caused pretty significant bodily harm just by

24   squeezing and grabbing onto an officer's leg.

25           So that's what we're referring to, right.

 1  If they're solely laying down in handcuffs and RIPP

 2  restraint, there's no longer physical actions of

 3  assault, they're not in active aggression, they're not

 4  a danger to self or others and they're able to be

 5  rolled over into a prone position, that would be the

 6  expectation.

 7      Q.  BY MR. SHOWALTER:  I didn't understand the last

 8  thing you said about -- it sounded like you said able

 9  to be rolled over into the prone position?

10      A.  Correct.

11          I'm sorry, not -- I misspoke, not the

12  prone position, the position of recovery from the prone

13  position.  I apologize.

14      Q.  Spitting on an officer is considered -- is that

15  considered an assault?

16          MS. RETTS:  Form; foundation.

17          THE WITNESS:  I would consider it an

18  assault, yes.

19      Q.  BY MR. SHOWALTER:  And I'm not asking for your

20  personal opinion, I'm asking for as police officers are

21  trained and the policies of the City of Phoenix?

22          MS. RETTS:  Form; foundation; outside the

23  scope.

24          THE WITNESS:  Per Arizona Revised Statutes

25  that could be considered an assault.  But I can't say

1  do, arrest team tactics, you know, positional arrest

2  tactics, there are portions where we train officers to

3  use body weight, arms to control the subject to place

4  them in handcuffs.  But the training does not include

5  extended periods of time in that position.  The

6  training is used to gain control and then move on.

7      Q.  BY MR. SHOWALTER:  And officers are not trained

8  that placing body weight on the back of a prone

9  handcuffed subject can cause death, correct?

10             MS. RETTS:  Form.

11             THE WITNESS:  That one is a difficult --

12  it's not a yes or no.  They're trained that that could

13  be a factor, right.  But depending on the situation,

14  you still have to be able to detain and control the

15  subject.  So if and when there are mitigating factors

16  similar to excited delirium or positional asphyxia, the

17  training is consistent with getting control and getting

18  that subject into a recovery position and requesting

19  fire or EMS.

20      Q.  BY MR. SHOWALTER:  Have you reviewed the case

21  of Casey Wells?

22      A.  I have not.

23      Q.  Have you ever watched the video showing Casey

24  Wells being restrained and tased?

25             MS. RETTS:  Form.

```
 1  STATE OF ARIZONA        ) SS.
                            )
 2  COUNTY OF MARICOPA      )

 3

 4         BE IT KNOWN that the foregoing proceedings
    were taken before me, DONNA DELAVINA, Certified
 5  Reporter No. 50468; that the witness before testifying
    was duly sworn by me to testify to the whole truth;
 6  that the foregoing 198 pages are a full, true and
    accurate record of the proceedings, all done to the
 7  best of my skill and ability; that the proceedings were
    taken down by me in shorthand and thereafter reduced to
 8  print under my direction.

 9         [X]  Review and signature was requested.

10         [ ]  Review and signature was waived.

11         [ ]  Review and signature not required.

12         I CERTIFY that I am in no way related to any
    of the parties thereto nor am I in any way interested
13  in the outcome hereof.

14         I FURTHER CERTIFY that I have complied with
    the ethical obligations set forth in ACJA 7-206.  DATED
15  at Phoenix, Arizona, this 30th day of September, 2021.

16

17              Donna DeLaVina, RPR
                Certified Reporter
18              Certificate No. 50468

19              *     *     *     *     *     *

20

21      I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
    complied with the ethical obligations set forth in ACJA
22  7-206.

23

24              Donna DeLaVina, RPR, Owner
                Donna DeLaVina Reporting, LLC
25              Arizona RRF No. R1010

26
```

# EXHIBIT 16

1. **RESTRAINING PRISONERS**

    A. Handcuffs

    (1) General Guidelines

    (a) Prisoners will be handcuffed with their hands behind their backs except when doing so would aggravate an injury.

    (b) All arrested persons in the following categories will be handcuffed **at the time of arrest** and remain handcuffed **until** confined in jail.

    - Felony prisoners
    - Belligerent or combative prisoners
    - Verbally abusive prisoners who are likely to become combative
    - Prisoners who are likely to cause injury to themselves or others
    - Any other prisoners the officer feels necessary to restrain

    (c) The tightness of the handcuffs should always be checked before placing a suspect in a vehicle.

    - As a general rule, handcuffs should easily move up and down the wrist while tight enough to avoid sliding over the hands.
    - Handcuffs will always be double-locked before placing a subject in a vehicle.
    - When suspects complain of handcuff tightness, officers will check them immediately.

    (2) Prisoners Handcuffed for More Than One Hour

    (a) If a prisoner is handcuffed for more than one (1) hour, consideration will be given to bringing the handcuffs from behind the suspect's back to the front.

    - Discretion of the officer and common sense should be the deciding factors.

    (b) Officers may use one of the following options:

    - Utilize the RIPP™ restraining device or leg irons.
    - Secure one of the prisoner's wrists to the fixed restraining device (detention ring) within the holding cells.

    (3) Physically Compromised Prisoners

    (a) A physically compromised prisoner is a prisoner who is apparently physically disabled, physically ill, or physically injured.

    (b) Physically compromised prisoners will be restrained in accordance with the section 1.A.(1) above with consideration given to the prisoner's physical condition.

    (c) Officers may refrain from using handcuffs on physically compromised prisoners as long as officer safety is not jeopardized.

    - This **does not** apply to mentally ill prisoners.

    (d) Officers may consider alternative methods of restraint, such as those listed in section 1.B.(2) of this order, for:

    - Subjects apparently under the influence of alcohol/drugs.
    - Subjects who are obese.
    - Subjects known to have cardiovascular disorders.
    - Subjects who have injuries preventing handcuffing to the rear.

COP-STICKNEY004902

1. A. (3) (e) These conditions may increase the risk of injury or death by positional asphyxiation when a suspect is kept face down for a prolonged period of time.

    (4) <u>Prisoners Appearing Before a Judge</u>

       (a) In-custody defendants may appear before judges without handcuffs or restraints whenever, in the opinion of the officer or police assistant, there is little likelihood of the prisoner attempting to escape.

       (b) The officer may request the judge keep the prisoner restrained for the safety of the court; however, the **final decision** in these matters rests with **the judge**.

    (5) <u>Fixed Restraint Devices</u>

       (a) Prisoners may be handcuffed to a fixed restraint device in the holding room processing area when being questioned outside the holding room.

       (b) Prisoners will not be secured to an immovable object not designed and intended for such purposes.

  B. <u>Leg Restraints</u>

    (1) <u>Authorized Equipment</u>

       (a) The only leg restraints authorized are the Department issued RIPP™ strap and modified leg irons.

          • The RIPP™ strap may be used to temporarily secure a prisoner who is handcuffed to the rear and to secure the legs during transportation.
          • Leg irons may also be used to secure a prisoner who is handcuffed to the rear or in the front.
          • The Wolfstrap (nylon with caribiner) may only be used in conjunction with the leg irons to secure the prisoner's legs during transportation.

       (b) Leg irons may be obtained from patrol supervisors.

    (2) <u>Guidelines for Use</u>

       (a) Leg-restraint straps may be used to secure combative or violent subjects to prevent injury to the subject, officers, and others and to minimize the opportunity for escape.

       (b) If either of the restraints is applied, officers will minimize the facedown exposure of the prisoner.

       (c) If the opportunity presents itself, officers should place prisoners in an upright position, on their side or back.

    (3) <u>Prisoner Welfare During Transportation by Officers</u> - See Operations Order 7.2, Prisoner Transportation.

    (4) <u>Medical Aid</u>

       (a) Suspects displaying difficulty breathing or loss of consciousness will be removed from restraints at the earliest opportunity.

       (b) First-aid and/or lifesaving measures will be initiated, including a request for the Fire Department.

COP-STICKNEY004903

1. B. (4) (c) Officers should use caution to ensure the individual is not feigning the condition to affect an escape.

2. **SEARCHING PRISONERS**

   A. General Guidelines

      (1) Officers will control and secure all persons in their custody for the protection of officers and others.

         (a) Prisoners will be considered potentially dangerous regardless of the charges against them.

         (b) Prisoners will be searched before being transported, placed in a holding room, or booked into jail.

      (2) A search must be thorough and should not be discontinued when one weapon is found as the subject may have more than one.

         • The same is true for narcotic drugs, dangerous drugs, etc. and other contraband.

      (3) All property, including smoking materials, will be removed from prisoners before placing them in a police vehicle.

   B. Types of Searches

   | (1) Standing Search | • Used subsequent to the standing speed cuffing<br>• Considered the safest and most versatile search<br>• Should be used in most non-high-risk arrest situations |
   | --- | --- |
   | (2) Kneeling or Prone Search | • Should be used in most high-risk situations<br>• May be used for group searches |
   | (3) Strip Search | • Most thorough search<br>• In most instances is conducted when a prisoner is in jail or in a police holding facility<br>• See section 2.D. of this order for more information. |

   C. Searches by Officers of the Opposite Sex

      (1) When practical, officers will request an officer of the same sex as the prisoner to be dispatched to conduct the search.

      (2) Prisoners of the opposite sex who have not been thoroughly searched will be handcuffed until a thorough search has been performed.

      (3) When an officer of the same sex as the prisoner is not available, a limited but thorough search will be made for weapons only before transporting the prisoner.

         (a) Officers will consider requesting another officer to respond and act as a witness to this search to minimize allegations of misconduct.

         (b) If exigent and articulable circumstances exist, officers may proceed with the search without a witness.

         (c) Items such as coats, jackets, hats, footwear, and handbags will be removed from the suspect and thoroughly searched.

         (d) A more thorough search for contraband or evidence will be delayed until it can be accomplished by an officer or jail personnel of the same sex as the prisoner.

COP-STICKNEY004904

2.  D.  <u>Strip Searches</u>

    (1)  Permission of a commander or higher will be obtained before conducting a strip search.

    (2)  The strip search must be reasonable, and justification will be documented in an Incident Report (IR).

    (3)  Only an officer who is of the same sex as the suspect will conduct a strip search.

       •  Officers will limit searches of the vaginal or rectal areas to a visual one only.

    (4)  Strip searches will be conducted in private rooms with due regard for the subject's dignity.

  E.  <u>Body Cavity Searches</u>

    (1)  A body cavity search is any physical intrusion into the body (anal or vaginal) regardless of the how the intrusion occurs.

    (2)  Permission of a commander or higher will be obtained before having a body cavity search conducted.

    (3)  A body cavity search <u>will only be conducted by a medical doctor after</u> obtaining one of the below:

       •  Search warrant
       •  Consent by the suspect (the consent will be captured on video (body-worn camera (BWC) or other means).

    (4)  An officer of the same sex as the suspect will be present during the body cavity search for evidentiary purposes.

3.  <u>**MEDICAL TREATMENT OF PHYSICALLY COMPROMISED PRISONERS**</u>

  A.  <u>General Guidelines</u>

    (1)  Any time a prisoner is sick or injured, claims to have been injured while being arrested or while in custody, inflicts injury to himself/herself while in custody, or has a pre-existing medical injury/illness that requires medical attention, these procedures will be followed:

| (a) **Employee's Responsibilities** | • If the physical condition requires emergency medical attention, officers will take appropriate action and notify their supervisor as soon as practical. |
|---|---|
| | • When necessary, summon the Fire Department to the scene. |
| | • Inform the Fire Department of general observations concerning the subject's condition, such as loss of consciousness, combativeness, unusual strength, or vomiting. |
| | • Inform the Fire Department of police activity the person has been involved in, such as being hobbled or a struggle with an officer. |
| | • Officers will obtain a supervisor's approval before booking a physically compromised prisoner. |
| | • Officers will verbally advise jail personnel when a prisoner has any handicap, injury, illness, and/or violence potential. |
| | • Officers who arrest persons with a pre-existing medical injury or illness that requires a medical review or medical release while in police custody will document the injury/illness in the same IR which documents the arrest (a separate IR will not be generated for the pre-existing medical injury or illness). |
| | **NOTE:** If the arrest is for an offense not requiring an IR, such as a Failure to Appear (FTA) warrant, the pre-existing medical injury or illness will be documented in a Field Interview (FI). |

COP-STICKNEY004905

3.   A.   (1)   (Continued)

| (a) **Employee's Responsibilities (Continued)** | • When prisoners inflict injury to themselves while in custody, officers will complete a Report of Property Damage/Loss/Injury Form 80-511D, which will be forwarded to the Incident Review Unit (IRU). |
| --- | --- |
| | **EXCEPTION:** If the self-inflicted injury is a result of an attempted suicide, results in a completed suicide, or requires hospitalization, an FI will be completed. |
| (b) **Supervisor's Responsibilities** | • Upon notification of a response to resistance incident, a Response to Resistance report will be completed as outlined in Operations Order 1.5, Response to Resistance. |
| | • The supervisor will review the circumstances of the arrest to evaluate the need for booking the prisoner. |
| | • If medical care is deemed necessary, a supervisor will authorize transportation of the prisoner to a hospital. |
| | • Consideration should be given to issuing an Arizona Traffic Ticket and Complaint (ATTC) as a citation in lieu of detention (CLD) or releasing the subject pending issuance of a complaint. |

(2)   Physically compromised prisoners who require medical treatment will normally be seen at the Maricopa County Medical Center (MCMC).

  • Officers will have a physician examine the arrested person to verify the need for medical treatment.
  • Unconscious prisoners will not be transported to jail but will be taken to the nearest hospital either by ambulance or by the Fire Department.
  • An intoxicated prisoner who cannot be awakened will be treated as an unconscious prisoner.

(3)   If it is believed arrested persons do not require hospitalization for an extended period and they have adequate insurance, they may be treated and released from another medical facility.

(4)   The City will not accept financial responsibility for any prisoner injuries that occurred before the arrest.

(5)   Unless required by law, officers **will not** use or disclose any medical information they see or hear during transportation to or while at the medical facility.

B.   Transport of Physically Compromised Prisoners

(1)   When a prisoner is restrained with handcuffs or other police restraint devices, an officer will remain with the prisoner at all times, including transport to the hospital in the ambulance.

(2)   If a prisoner is transported by ambulance, officers will either follow or ride in the ambulance to the hospital, at the request of Fire Department personnel, after notifying their supervisor.

(3)   When a prisoner is refused at the Maricopa County Sheriff's Office (MCSO) 4th Avenue Jail by medical staff and needs a medical release, officers should request an ambulance to transport the prisoner to the nearest medical facility.

(4)   The officer standing by the prisoner at the hospital will contact the nurses' station upon arrival.

  • The officer will have PRISONER IN CUSTODY written in large blocks on the admission form.
  • If a physician does not see the prisoner within a reasonable time (one (1) to two (2) hours), officers should contact either an emergency room nurse or the nursing supervisor and request the initial examination be expedited.
  • If a satisfactory arrangement is not reached, the officer will advise a police supervisor of the situation.

COP-STICKNEY004906

3.   C.   Security of Physically Compromised Prisoners at the Medical Facility

(1)   Officers will be responsible for the prisoner starting at the hospital and ending when the MCSO 4th Avenue Jail nurse accepts the prisoner.

(2)   In most circumstances, officers may be present in the hospital treatment areas as necessary for the security and safety of hospital personnel and others, and to prevent the escape of the patient/prisoner.

(a)   The prisoner should be kept in sight, whenever possible, being careful not to interfere with necessary medical care.

(b)   If consistent with security needs, an officer may wait outside of a treatment or patient care area when requested to do so by hospital personnel.

(3)   Prisoners Receiving Surgery - Officers will be responsible for the prisoner until all surgery, recovery, etc., is completed, and the prisoner is ready for release to a special care unit (ICU, coronary care, etc).

(4)   Visitation Guidelines for Hospitalized Prisoners:

| (a) General Guidelines | • Prisoners confined to hospitals will be allowed visitors with approval of hospital personnel.<br>• Individual doctors will have ultimate control as to whether a prisoner will be allowed visitors for health reasons.<br>• The officer assigned to guard the prisoner will use discretion in matters of officer safety and prisoner security.<br>• **All** visitors will be logged in on the Hospitalized Prisoner Visitor Log Form PPD #11 located on PolicePoint.<br>• At the time of booking, the booking officer will be responsible for finalizing the Hospitalized Prisoner Visitor Log form which will send an email notification to the assigned case agent. |
|---|---|
| (b) Number of Visits Allowed | • Prisoners will be limited to two regular visits per day and unlimited privilege visits; a visit consists of <u>one</u> person.<br>　• Privilege Visits - Includes visits with attorneys, clergy, etc.<br>　• Regular Visits - Visits by immediate family including mother, father, spouse, son, daughter, stepchild, brother, sister or relative who has been a parent substitute.<br>• Additional visits may be provided at the request of the treating physician. |
| (c) Time of Visits | • Visits will only be allowed during established hospital visiting hours.<br>• Visits will be limited to a maximum of 30 minutes by any one individual.<br>• Attorneys may stay longer to conduct conferences with their client.<br>• Hospital personnel can conclude a visit at any time.<br>• A visit also may be concluded in the interest of officer safety and prisoner security. |
| (d) Searches of Visitors | • With consent, all visitors, including attorneys, will be subject to an electronic search by a handheld metal detector; however, officers may refuse to allow entry and/or contact with a hospitalized prisoner if an electronic search is refused.<br>• With consent, the officer guarding the prisoner may stop and frisk a visitor for the purpose of officer safety and prisoner security; a consent refusal may result in refusal to allow entry and/or contact with a hospitalized prisoner. |
| (e) Visitor Requirements | • All visitors will present picture identification, which will be documented on the Hospitalized Prisoner Visitor Log form.<br>• Visitors will not be permitted to have physical contact with the prisoner. |

COP-STICKNEY004907

3. C. (4) Visitation Guidelines for Hospitalized Prisoners: (Continued)

| (e) | Visitor Requirements (Continued) | • No more than one visitor will be allowed in the prisoner's hospital room at one time.<br>• All items carried by visitors (purses, packages, etc.) will be left outside the room during the visit. |
|---|---|---|
| (f) | Officer Responsibilities | • The officer will remain in the room with the prisoner during the entire visit, except for visits by the prisoner's attorney.<br>• Officers should record all voluntary statements made by a prisoner concerning the commission of a crime on an Incident Supplement. |
| (g) | Attorney Visits | If attorneys request to speak to their client privately, they will be allowed to do so with following stipulations:<br><br>• The prisoner will be handcuffed to the bed before the officer steps outside the room.<br>• The entrance door to the hospital room will remain open during all visits.<br>• The officer will remain just outside the entrance door at all times so any unusual noises can be monitored.<br>• Officers should make every effort to position themselves so they do not overhear the conversation between the attorney and the prisoner.<br>• The officer should make periodic visual checks of the activities in the room but limit interruption of the attorney's conference. |

(5) Hospitalized Felony Prisoners

- When an injured violent felony prisoner requires treatment at a hospital, the prisoner's security will remain the responsibility of the arresting officer's precinct/bureau.

  - The arresting officer will be responsible for completing the original IR and a Booking form template listing the appropriate charges.
  - Upon release of the prisoner from the medical facility, the booking officer will complete the associated Booking form template and an Incident Supplement.

(6) Use of Guards - The use of guards for a prisoner requiring admission to a hospital for an extended period of time will be left to the discretion of a precinct/bureau/duty commander.

D. Additional Documentation

(1) Photographs of Prisoner Injuries - Whether or not the suspect is booked or released, photographs will be taken and impounded in accordance with Operations Order 8.1, Evidence, Impounding, and Property.

- Photographs will be taken of the prisoner's injury or alleged injury, even if no obvious injury is visible.
- Photographs will be taken in all instances of those individuals whose injuries were self-inflicted or were the result of fighting, etc., before the police arrived.
- All photographs should be taken with a color chart adjacent to the injured area.
- Photographs should include the following:

  - Subject's face (for identification purposes)
  - All four sides of the subject (front/back/both sides)
  - Injuries

(2) Audio Recordings - Any audio recordings of interviews with the injured prisoner, involved officers, witnesses, parents (if juvenile involved), etc., will be documented in the IR and impounded as outlined in Operations Order 8.1, Evidence, Impounding, and Property.

COP-STICKNEY004908

3. D. (3) Medical Clearance

    (a) Medical clearance documentation will be completed by both the treating physician and the officer, listing the injury and treatment.

    (b) Before the prisoner is booked, the medical clearance documentation must indicate jail custody will not endanger the prisoner's health.

    (c) The medical clearance documentation will be left at the jail.

  E. Illness or Injury After Booking (Felony Arrest)

    (1) Once the MCSO 4th Avenue Jail has accepted a prisoner (booking number obtained and officer has left the jail), any required medical treatment becomes the responsibility of the jail.

    (2) Department assistance in obtaining a medical release for a prisoner accepted by the jail will be in an emergency situation only and will require approval of a lieutenant.

4. **PRISONER ESCAPES, ARIZONA REVISED STATUTES (ARS) 13-2502 – 13-2504**

  A. If a prisoner escapes from a police facility or while being transported, officers will:

- Provide radio with a complete description of the escaped prisoner to be broadcasted immediately.
- Establish a perimeter.

  B. A supervisor will respond to the area and mobilize the necessary resources, such as canine or air support.

  C. If the suspect is apprehended, an additional charge of escape will be added, an appropriate report completed, and the suspect booked.

  D. If the suspect is not apprehended, an IR will be completed and all offenses (to include an escape charge) submitted for complaint.

5. **RELEASE OF PRISONERS** - When releasing a prisoner for any reason, officers will ensure:

  A. Positive identification of the prisoner is made before release.

  B. The sign-out time is logged in the records management system (RMS) "Jail Management/Inmate Tracking" module, "Detained Persons Log" tab, if the prisoner is released from a police facility.

  C. All personal property is returned to the prisoner.

COP-STICKNEY004909

1. **OFFICERS RESPONSIBILITIES**

   A. Officers will transport prisoners with consideration given to the following:

      - Officers' safety
      - Prisoners' health and welfare
      - Prevention of any escape attempts by the prisoner

   B. Officers will bear full responsibility for the safety of their prisoners and for the safekeeping of prisoners' property.

2. **SECURITY**

   A. Searches

   | (1) **Search of Prisoners** | • All prisoners will be searched prior to being placed in the transport vehicle. |
   |---|---|
   | (2) **Search of Transport Vehicles** | • Vehicles used to transport prisoners will be searched for contraband, weapons, etc., at the following times: <br><br> • At the start of the shift <br> • At the end of the shift <br> • As soon as practical after a prisoner has been transported <br><br> • At no time will a prisoner be transported in a vehicle which has not been thoroughly searched. |

   B. Restraint of Prisoners

      - Prisoners will be restrained during transport in accordance with Operations Order 7.1, Prisoners.

   C Contact with Prisoners

      (1) Officers will keep their prisoners in sight at all times.

      (2) Passenger officers will not sit with prisoners in shield cars or wagons but will monitor prisoners from the front seat compartment.

      (3) Prisoners will not be allowed to communicate with anyone other than Department personnel during the time they are being transported.

   D. Prisoner Transport Guidelines

      (1) Transport Documentation

         (a) Officers transporting prisoners will utilize the "Change Status" function on the Mobile Data Computer (MDC) to access the "Transport" and "Transport Complete" status option masks.

         (b) Officers will enter their intended location and vehicle mileage in the "Transport" status option mask before transporting a prisoner.

            **EXAMPLE:** 400 W. Madison St/75000

         (c) Officers will enter their ending location and vehicle mileage in the "Transport Complete" status option mask upon arrival at the intended location.

            **EXAMPLE:** 400 W. Madison St/75009

COP-STICKNEY004910

# EXHIBIT 17

# On-Scene Consulting

October 14, 2021

Mr. Joel B. Robbins, Esq
Mr. Jesse M. Showalter, Esq.
Robbins & Curtin, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012

## <u>Federal Rules of Civil Procedure 26 (a) (2) (B) Report</u>

**Lei Ann Stickney, individually and on behalf of all statutory beneficiaries of Casey Wells, and in her capacity as the personal representative of the Estate of Casey Wells, Plaintiff,**
**vs.**
**City of Phoenix, et. al,**
**(<u>Case No. 2:20-cv-01401-SMB-CDB</u>).**

Dear Mr. Robbins and Mr. Showalter,

Thank you for retaining me to analyze and render opinions regarding the February 4, 2019, use of force incident involving Phoenix Police Department Sergeant Robert Rodarme #<u>6999</u>, Police Officer Kenneth Palmer #<u>5980</u>, Police Officer Joseph Seaquist #<u>7211</u>, Police Officer Dustin Haynes #<u>8454</u>, Police Officer Sean Yamane #<u>8795</u>, Police Officer Frank Long #<u>8904</u>, Police Officer James Arnold #<u>9243</u>, Police Officer Travis Funston #<u>10157</u>, and Mr. Casey Joe Wells at 3821 W. Salter Drive, Phoenix Arizona 85308.  I have studied reports, photographs, videos, Phoenix Police Department documents, Transcriptions of Digitally Recorded Interviews and Depositions, and other material (<u>as listed under Materials Reviewed</u>) provided to me thus far regarding this case.

Please be advised that if any additional documents related to this matter, are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions. It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

WELLS 003188

**Materials Reviewed:**

- Plaintiff's Second Amended Complaint (prior to removal to district court).
- Plaintiff's Response to Defendant Arnold's First Requests for Production of Documents
- Plaintiff's Response to Defendant Arnold's First Non-Uniform Interrogatories
- Responses to Plaintiff's First Set of Discovery to City of Phoenix and Officer Defendants
- Plaintiff's Tenth Supplemental Disclosure Statement and the following disclosure exhibits:
    1. PPD Report Nos. 201900000221119 and 201900000203420 (WELLS 000001-000004).

        a. PPD Report No. 201900000203420 (COP-STICKNEY000001-000128).

        b. PPD Report No. 201900000221119 (COP-STICKNEY000443-000447).

    2. PPD investigative photographs (WELLS 000122-000424).

        a. PPD investigative photographs (COP-STICKNEY000129-000442).

    3. 9-1-1 audio recordings (WELLS 000425).

        a. PPD radio dispatch call labeled 201900203420_02042019_1415_1447 dated 2-4-2019 (COP-STICKNEY000471).

        b. PPD radio dispatch call labeled 201900203420_02042019_1447_1540 dated 2-4-2019 (COP-STICKNEY000472).

        c. PPD radio dispatch call labeled 201900203420_02042019_1556_1629 dated 2-4-2019 (COP-STICKNEY000473).

        d. PPD radio dispatch call labeled 201900203420_02042019_1617_1708 dated 2-4-2019 (COP-STICKNEY000474).

        e. PPD radio dispatch call labeled 201900203420_02042019_1744_1745 dated 2-4-2019 (COP-STICKNEY000475).

        f. PPD radio dispatch call labeled 201900203420_02042019_1812_1813 dated 2-4-2019 (COP-STICKNEY000476).

        g. PPD radio dispatch call labeled 201900203420_02042019_1909_1918 dated 2-4-2019 (COP-STICKNEY000477).

        h. PPD radio dispatch call labeled 201900203420_02042019_2057_2058 dated 2-4-2019 (COP-STICKNEY000478).

WELLS 003189

      i.      PPD radio dispatch call labeled 201900203420_02042019_2124_2145 dated 2-4-2019 (<u>COP-STICKNEY000479</u>)

      j.      PPD 911 call labeled 201900203420_02042019_1403 (<u>COP-STICKNEY000480</u>).

      k.      PPD 911 call labeled 201900203427_02042019_1406 (<u>COP-STICKNEY000481</u>).

      l.      PPD 911 call labeled 201900203437_02042019_1406 (<u>COP-STICKNEY000482</u>).

      m.      PPD 911 call labeled 201900203474_02042019_1413 (<u>COP-STICKNEY000482</u>)

      n.      PPD 911 call labeled 201900203476_02042019_1413 (<u>COP-STICKNEY000484</u>).

      o.      PPD 911 call labeled 201900203487_02042019_1416 (<u>COP-STICKNEY000485</u>).

      p.      PPD 911 call labeled 201900203506_02042019_1420 (<u>COP-STICKNEY000486</u>).

      q.      PPD 911 call labeled 201900203666_02042019_1445 (<u>COP-STICKNEY000487</u>).

      r.      PPD 911 call labeled 201900221119_02072019_1336 (<u>COP-STICKNEY000488</u>).

4.    Audio interview of Connie Brenton (<u>WELLS 000426</u>).

5.    Audio interview of Douglas Texel (<u>WELLS 000427</u>).

6.    Audio interview of Elisabeth Johnson (<u>WELLS 000428</u>).

7.    Audio interview of Holly Boston (<u>WELLS 000429</u>).

8.    Audio interview of Jeffrey Bolduc (<u>WELLS 000430</u>).

9.    Audio interview of Jenevette Tate (<u>WELLS 000431</u>).

10.    Audio interview of John Antoniades (<u>WELLS 000432</u>).

11.    Audio interview of Kyle O'Hare (<u>WELLS 000433</u>).

12.      Audio interview of Lei Ann Stickney (<u>WELLS 000434</u>).

13.      Audio interview of Naida Tedquist (<u>WELLS 000435</u>).

14.      Audio interview of Frank Long (<u>WELLS 000436</u>).

15.      Audio interview of James Arnold (<u>WELLS 000437</u>).

16.      Audio interview of Joseph Seaquist (<u>WELLS 000438</u>).

17.      Audio interview of Travis Funston (<u>WELLS 000439</u>).

18.      Audio interview of Peter Chambers (<u>WELLS 000440</u>).

19.      Audio interview of Richard Buffington (<u>WELLS 000441</u>).

20.      Audio interview of Robert Rodarme (<u>WELLS 000442</u>).

21.      Audio interview of Shelly Aldridge (<u>WELLS 000443</u>).

22.      Audio interview of Vickki Zachariah (<u>WELLS 000444</u>).

23.      Audio interview of Wanda Cleveland and Brittany Walls (<u>WELLS 000445</u>).

24.      Axon video footage of incident (<u>WELLS 000446</u>).

25.      Axon video footage following incident (<u>WELLS 000447</u>).

26.      Cellphone video footage by Richard Buffington (<u>WELLS 000448</u>).

27.      Photographs taken by Jeffrey Bolduc (<u>WELLS 000449-000452</u>).

28.      PPD PSB19-0022 investigation (<u>WELLS 000453-000601</u>).

       a.      PPD PSB19-002 Report re: 19-022 (<u>Cover Pages</u>) (<u>COP-STICKNEY000567-000569</u>).

       b.      PPD PSB19-002 Report dated 11-8-2019 (<u>Internal Investigation</u>) (COP-STICKNEY000570-579)

       c.      PPD PSB re: 19-0022 (<u>Administrative Paperwork</u>) (<u>COP-STICKNEY000580-000619</u>).

       d.      PPD PSB re: 19-0022 (<u>Involved Employees</u>) (<u>COP-STICKNEY000620-000628</u>).

       e.      PPD PSB re: 19-0022 (<u>Civilian Suspect</u>) (COP-STICKNEY000629-000640).

       f.      PPD PSB re: 19-0022 (<u>Attachments</u>) (<u>COP-STICKNEY000641-000666</u>).

WELLS 003191

g.  PPD Review Board UOF Incident Review Memo re: PSB 19-0022 dated 2-18-2020 (COP-STICKNEY000667).

h.  PPD PSB Investigation Summary re: PSB 19-0022 (COP-STICKNEY000668-000676).

i.  Audio interview of John Antoniades dated 2-4-2019 re: PPD PSB 19-0022 (COP-STICKNEY000677).

j.  Audio interview of James Arnold dated 2-15-2019 re: PPD PSB 19-0022 (COP-STICKNEY000678).

k.  Audio interview of Jeffrey Bolduc dated 2-4-2019 re: PPD PSB 19-0022 (COP-STICKNEY 000679).

l.  Audio interview of Holly Boston dated 2-4-2019 re: PPD PSB 19-0022 (COP-STICKNEY000680).

m.  Audio interview of Richard Buffington dated 2-4-2019 re: PPD PSB 19-0022 (COP-STICKNEY000681).

n.  Audio interview of Peter Chambers dated 2-4-2019 re: PPD PSB 19-0022 (COP-STICKNEY000682).

o.  Audio interview of Travis Funston dated 2-11-2019 re: PPD PSB 19-0022(COP-STICKNEY000683).

p.  Audio interview of Dustin Haynes dated 2-11-2019 re: PPD PSB 19-0022 (COP-STICKNEY000684).

q.  Audio interview of Frank Long dated 2-22-2019 re: PPD PSB 19-0022 (COP-STICKNEY000685).

r.  Audio interview of Kenneth Palmer dated 2-8-2019 re: PPD PSB 19-0022 (COP-STICKNEY000686).

s.  Audio interview of Robert Rodarme dated 2-8-2019 re: PPD PSB 19-0022 (COP-STICKNEY000687).

t.  Audio interview of Joseph Seaquist dated 2-15-2019 re: PPD PSB 19-0022 (COP-STICKNEY000688).

u.  Audio interview of Jenevette Tate dated 2-5-2019 re: PPD PSB 19-0022 (COP-STICKNEY000689).

v.  Audio interview of Douglas Texel dated 2-6-2019 re: PPD PSB 19-0022 (COP-STICKNEY000690).

w.  Audio interview of Sean Yamane dated 2-22-2019 re: PPD PSB 19-0022 (COP-STICKNEY000691).

x.  Audio interview of Vickki Zachariah (undated) re: PPD PSB 19-0022 (COP-STICKNEY000692).

29.  Maricopa County Medical Examiner's file re Casey Wells (WELLS 000602-000686).

30.  Maricopa County Medical Examiner's photographs re Casey Wells (WELLS 000687-000867).

31.  Maricopa County Medical Examiner's imaging studies re Casey Wells (WELLS 000868).

WELLS 003192

32. Phoenix Fire Department EMS and billing records (WELLS 000869-000871).

33. Chief Jeri Williams' comments regarding George Floyd (WELLS 000932).

34. PPD EIIP/IAPro notifications and alerts since 2010 (WELLS 000933-001012).

35. PPD CAD Log (COP-STICKNEY000450-000470).

36. PPD Taser Report prepared by Mark Veres (COP-STICKNEY000489-000500).

37. PPD UOF Report re Incident 201900000203420 (COP-STICKNEY000522-000541)

38. Video of Casey Wells naked at bus stop (WELLS 001908)

39. Taser Pulse Chart labeled 142911 cartridge 1 (Seaquist) (COP-STICKNEY000696)

40. Taser Pulse Chart labeled 142926 cartridge 2 (Seaquist) (COP-STICKNEY000697)

41. Taser Pulse Chart labeled 142956 cartridge 2 (Seaquist) (COP-STICKNEY000698)

42. Taser Pulse Chart labeled 143019 cartridge 2 (Seaquist) (COP-STICKNEY000699)

43. Taser Pulse Chart labeled 143046 cartridge 2 (Seaquist) (COP-STICKNEY000700)

44. Phoenix Fire Department EMS Incident Report re: 19-045650 dated 2-4-2019 (COP-STICKNEY000701)

45. Phoenix Fire Department Incident History Report (RMS Live System) re: Incident 19-045650 dated 2-4-2019 (COP-STICKNEY000703-000704).

46. Arnold's Division file (COP-STICKNEY000705-767).

47. Arnold's FMB file (COP-STICKNEY000769-844)

48. Arnold's HR file (COP-STICKNEY000846-893).

49. Arnold's PSB file (COP-STICKNEY000895-905).

50. Arnold's Supervisor Notes file (COP-STICKNEY000907-916).

51. Arnold's Training file (COP-STICKNEY000918-928).

52. Funston's Division file (COP-STICKNEY000931-939).

53. Funston's FMB file (COP-STICKNEY000941-980).

54. Funston's HR file (COP-STICKNEY000982-1012).

WELLS 003193

55.  Funston's PSB file (<u>COP-STICKNEY001014-1020</u>).

56.  Funston's Supervisor Notes file (<u>COP-STICKNEY001022-1051</u>).

57.  Funston's Training file (<u>COP-STICKNEY001053-1060</u>).

58.  Haynes' Division file (<u>COP-STICKNEY001063-1168</u>).

59.  Haynes' FMB file (<u>COP-STICKNEY001170-1241</u>).

60.  Haynes' HR file (<u>COP-STICKNEY001243-1287</u>).

61.  Haynes' PSB file (<u>COP-STICKNEY001289-1309</u>).

62.  Haynes' Supervisor Notes file (<u>COP-STICKNEY001311-1319</u>).

63.  Haynes' Training file (<u>COP-STICKNEY001321-1332</u>).

64.  Long's Division file (<u>COP-STICKNEY001335-1386</u>).

65.  Long's FMB file (<u>COP-STICKNEY001388-1457</u>).

66.  Long's HR file (<u>COP-STICKNEY001459-1514</u>).

67.  Long's PSB file (<u>COP-STICKNEY001516-1538</u>).

68.  Long's Supervisor Notes file (<u>COP-STICKNEY001540-1615</u>).

69.  Long's Training file (<u>COP-STICKNEY001617-1627</u>).

70.  Palmer's Division File (<u>COP-STICKNEY001630-1862</u>).

71.  Palmer's FMB File (<u>COP-STICKNEY001864-1989</u>).

72.  Palmer's HR file (<u>COP-STICKNEY001991-2031</u>).

73.  Palmer's PSB file (<u>COP-STICKNEY002033-2381</u>).

74.  Palmer's Supervisor Notes file (<u>COP-STICKNEY002383-2396</u>).

75.  Palmer's Training file (<u>COP-STICKNEY002398-2416</u>).

76.  Rodarme's Division file (<u>COP-STICKNEY002419-2561</u>).

77.  Rodarme's FMB file (<u>COP-STICKNEY002563-2676</u>).

78.  Rodarme's HR file (COP-STICKNEY002678-2721).

WELLS 003194

79. Rodarme's PSB file (COP-STICKNEY002723-2739).

80. Rodarme's Training file (COP-STICKNEY002741-2756).

81. Seaquist's FMB file (COP-STICKNEY002758-2977).

82. Seaquist's HR file (COP-STICKNEY002979-3018).

83. Seaquist's PSB file (COP-STICKNEY003020-3128).

84. Seaquist's Training file (COP-STICKNEY003130-3146).

85. Yamane's Division file (COP-STICKNEY003149-3207).

86. Yamane's FMB file (COP-STICKNEY003209-3275).

87. Yamane's HR file (COP-STICKNEY003277-3317).

88. Yamane's PSB file (COP-STICKNEY003319-3350).

89. Yamane's Supervisor Notes file (COP-STICKNEY003352-3375).

90. Yamane's Training File (COP-STICKNEY003377-3387).

91. PPD Training materials re: Course #1453 Non- credit video training Restraint/Refusal, (COP-STICKNEY003390-3393).

92. PPD Training materials re: Course #08159 Taser Operations M26 X26 (COP-STICKNEY003394-3418).

93. PPD Training re: Course #08487 Ground Fighting (COP-STICKNEY003419-3429).

94. PPD Training re: Course #09367 Excited Delirium (COP-STICKNEY003430-3438).

95. PPD Training re: Course #10186 Taser X26 Recertification (COP-STICKNEY003439-3450).

96. PPD Training re: Course #1378 Urban and Open Area Engagements (COP-STICKNEY003451-3466).

97. PPD Training re: Course #10597 UOF Review (COP-STICKNEY003467-3474).

98. PPD Training re: Course #10597 UOF Review (COP-STICKNEY003475-3485).

99.     PPD Training re: Course #9783 Crisis Communications for First Responders (<u>COP-STICKNEY003486-3500</u>).

100.    PPD Training re: Course #10610 Taser X26 Recertification (<u>Revised 9/2009</u>) (<u>COP-STICKNEY003501-3512</u>).

101.    PPD Training re: Course #11132 Taser X2 Operator (<u>COP-STICKNEY003513-3532</u>).

102.    PPD Training re: Course #10868 Advanced Officer Training 2011 (<u>COP-STICKNEY003533-3549</u>).

103.    PPD Training re: Course #11362 UOF review (<u>Revised 6/2012</u>) (<u>COP-STICKNEY003550-3560</u>).

104.    PPD Training re: Course #11630 Advanced Officer Training 2013 (<u>COP-STICKNEY003561-3589</u>).

105.    PPD Training re: Course #11364 Arrest Team Tactics (<u>COP-STICKNEY003590-3597</u>).

106.    PPD Training re: Lesson Plan - Dealing with the Mentally Ill (<u>Revised 1/2008</u>) (<u>COP-STICKNEY003598-3607</u>).

107.    PPD Training re: Lesson Plan #12199 - 2015 Module Mental Illness (<u>11/2014</u>) (<u>COP-STICKNEY003608-3627</u>).

108.    PPD Training re: Lesson Plan #12267 - 2015 Module UOF Review (<u>03/2015</u>) (<u>COP-STICKNEY003628-3638</u>).

109.    PPD Training re: Lesson Plan #10610 Taser Recertification 2010 Power Point Presentation (<u>COP-STICKNEY003639-3663</u>).

110.    PPD Training re: Lesson Plan #08159 Taser M26/X26 Advanced Taser (<u>COP-STICKNEY003664</u>).

111.    PPD Training re: Lesson Plan #10186 Taser X26 Recertification (<u>COP-STICKNEY003665</u>).

112.    PPD Training re: CALEA Video – Mental Illness (<u>COP-STICKNEY003666</u>).

113.    PPD UOF Report for IR 201900000203420 (<u>COP-STICKNEY003702-3721</u>).

114.    Transcript of audio interview of Joseph Seaquist dated 2-4-2019 (<u>WELLS 002268-002284</u>).

WELLS 003196

115. Transcript of audio PSB interview of Joseph Seaquist dated 2-15-2019 (<u>WELLS 002285-002304</u>).

116. Transcript of audio interview of James Arnold dated 2-4-2019 (<u>WELLS 002305-002327</u>).

117. Transcript of audio PSB interview of James Arnold dated 2-15-2019 (<u>WELLS 002328-002348</u>).

118. Transcript of audio interview of Robert Rodarme dated 2-4-2019 (<u>WELLS 002349-002360</u>).

119. Transcript of audio PSB interview of Robert Rodarme dated 2-8-2019 (<u>WELLS 002361-002392</u>).

120. Transcript of audio interview of Travis Funston dated 2-4-2019 (<u>WELLS 002393-002400</u>).

121. Transcript of audio PSB interview of Travis Funston dated 2-11-2019 (<u>WELLS 002401-002416</u>).

122. Transcript of audio interview of Frank Long dated 2-4-2019 (<u>WELLS 002417-002430</u>).

123. Transcript of audio PSB interview of Frank Long dated 2-22-2019 (<u>WELLS 002431-002453</u>).

124. Transcript of audio PSB interview of Sean Yamane dated 2-22-2019 (<u>WELLS 002454-002468</u>).

125. Transcript of audio PSB interview of Dustin Haynes dated 2-11-2019 (<u>WELLS 002469-002481</u>).

126. Transcript of audio PSB interview of Kenneth Palmer dated 2-8-2019 (<u>WELLS 002482-002498</u>).

127. Transcript of audio interview of Connie Brenton dated 2-4-2019 (<u>WELLS 002499-002538</u>).

128. Transcript of audio interview of Douglas Texel dated 2-6-2019 (<u>WELLS 002539-002546</u>).

129. Transcript of audio interview of John Antoniades dated 2-4-2019 (<u>WELLS 002547-002586</u>).

WELLS 003197

130. Phoenix Police Department Ops Order 1-05 Use of Force (Eff. 2018) (COP-STICKNEY003722-3743).

131. Transcript re: Audio Interview of Officer Arnold dated 2-4-2019 (COP-STICKNEY003744-3786).

132. Transcript re: Audio Interview of Officer Funston dated 2-4-2019 (COP-STICKNEY003787-3802).

133. Transcript re: Audio Interview of Officer Long dated 2-4-2019 (COP-STICKNEY003803-3826).

134. Transcript re: Audio Interview of Sergeant Rodarme dated 2-4-2019 (COP-STICKNEY003827-3848).

135. Transcript re: Audio Interview of Officer Seaquist dated 2-4-2019 (COP-STICKNEY003849-3879).

136. Transcript re: John Antoniadis Audio Interview dated 2-4-2019 (redacted) (COP-STICKNEY003880-3935).

137. Transcript re: John Antoniadis Audio Interview dated 7-2-2019 (COP-STICKNEY004513-004548).

138. Transcript re: Shelly Aldridge Audio Interview dated 2-4-2019 (COP-STICKNEY003992-4010).

139. Transcript re: Connie Brenton Audio Interview dated 2-4-2019 (redacted) (COP-STICKNEY004011-4063).

140. Transcript re: Richard Buffington Audio Interview dated 2-4-2019 (COP-STICKNEY004064-4083).

141. Transcript re: Jeffrey Bolduc Audio Interview (COP-STICKNEY004084-4095).

142. Transcript re: Peter Chambers Audio Interview dated 2-4-2019 (redacted) (COP-STICKNEY004096-4115).

143. Transcript re: Elisabeth Johnson Audio Interview (redacted) (COP-STICKNEY004116-4133)

144. Transcript re: Douglas Texel Audio Interview dated 2-6-2019 (COP-STICKNEY004134-4142).

145. Transcript re: Jenevette Tate Audio (redacted) (COP-STICKNEY004143-4166).

WELLS 003198

146. Transcript re: Lei Stickney Audio Interview dated 2-4-2019 (redacted) (COP-STICKNEY004167-4188).

147. Transcript re: Naida Tedquist Audio Interview dated 2-4-2019 (redacted) (COP-STICKNEY004189-4203)

148. Transcript re: Vickki Zachariah Audio Interview dated 2-4-2019 (redacted) (COP-STICKNEY004204-4232).

149. Transcript re: Body Worn Camera (Palmer) labeled 5980_2019000203420_02.04.2019_14.25.26_02.27.17 dated 2-4-2019 (COP-STICKNEY004233-4310).

150. Transcript re: Body Worn Camera (Palmer) labeled 5980_2019000203420_02.04.2019_16.52.14_01.05.24 dated 2-4-2019 (COP-STICKNEY004311-4330).

151. Transcript re: Dispatch Radio Call labeled 201900203420_02042019_1415_1447 dated 2-4-2019 (COP-STICKNEY004331-4351).

152. Transcript re: Dispatch Radio Call labeled 201900203420_02042019_1447_1540 dated 2-4-2019 (COP-STICKNEY004352-4364).

153. Transcript re: Dispatch Radio Call labeled 201900203420_02042019_1556_1629 dated 2-4-2019 (COP-STICKNEY004365-4378).

154. Transcript re: Dispatch Radio Call labeled 201900203420_02042019_1617_1708 dated 2-4-2019 (COP-STICKNEY004379-4383).

155. Transcript re: Dispatch Radio Call labeled 201900203420_02042019_1744_1745 dated 2-4-2019 (COP-STICKNEY004384-4386).

156. Transcript re: Dispatch Radio Call labeled 201900203420_02042019_1812_1813 dated 2-4-2019 (COP-STICKNEY004387-4389).

157. Transcript re: Dispatch Radio Call labeled 201900203420_02042019_1909_1918 dated 2-4-2019 (COP-STICKNEY004390-4394).

158. Transcript re: Dispatch Radio Call labeled 201900203420_02042019_2057_2058 dated 2-4-2019 (COP-STICKNEY004395-4397).

159. Transcript re: Dispatch Radio Call labeled 01900203420_02042019_2124_2145 dated 2-4-2019 (COP-STICKNEY004398-4408).

WELLS 003199

160. Transcript re: Holly Boston 911 Call labeled 01900203474_02042019_1413 dated 2-4-2019 (redacted) (COP-STICKNEY004409-4413).

161. Transcript re: James Main 911 Call labeled 201900203476_02042019_1413 dated 2-4-2019 (COP-STICKNEY004414-4418).

162. Transcript re: Peter Chambers 911 Call labeled 201900203420_02042019_1403 dated 2-4-2019 (COP-STICKNEY004419-4424).

163. Transcript re: Message System Call labeled 201900203427_02042019_1406 dated 2-4-2019 (COP-STICKNEY004425-4427).

164. Transcript re: Jenevette Tate 911 Call labeled 201900203437_02042019_1406 dated 2-4-2019 (COP-STICKNEY004428-4432).

165. Transcript re: 911 Call labeled 201900203487_02042019_1416 dated 2-4-2019 (COP-STICKNEY004433-4436).

166. Transcript re: 911 Call labeled 201900203506_02042019_1420 dated 2-4-2019 (COP-STICKNEY004437-4440).

167. Transcript re: Kayla 911 Call labeled 201900203666_02042019_1445 dated 2-4-2019 (COP-STICKNEY004441-4445).

168. Transcript re: Detective John Teusink Dispatch Call labeled 201900221119_02072019_1336 dated 2-4-2019 (COP-STICKNEY004446-4451).

169. Officer Dustin Haynes' E-Learning Training Log (redacted) (COP-STICKNEY004452-4454).

170. Officer Frank Long's E-Learning Training Log (redacted) (COP-STICKNEY004455-4457).

171. Officer James Arnold's E-Learning Training Log (redacted) (COP-STICKNEY004458-4460).

172. Officer Joseph Seaquist's E-Learning Training Log (redacted) (COP-STICKNEY004461-4462).

173. Officer Kenneth Palmer's E-Learning Training Log (redacted) (COP-STICKNEY004463-4465).

174. Sergeant Robert Rodarme's E-Learning Training Log (redacted) (COP-STICKNEY004466-4469).

WELLS 003200

175. Officer Sean Yamane's E-Learning Training Log (redacted) (COP-STICKNEY004470-4472).

176. Officer Travis Funston's E-Learning Training Log (redacted) (COP-STICKNEY004473-4475).

177. Phoenix Police Department Alert History for Officer James Arnold (COP-STICKNEY004476).

178. Phoenix Police Department Alert History for Officer Travis Funston (COP-STICKNEY004477).

179. Phoenix Police Department Alert History for Officer Dustin Haynes (COP-STICKNEY004478).

180. Phoenix Police Department Alert History for Officer Frank Long (COP-STICKNEY004479).

181. Phoenix Police Department Alert History for Officer Kenneth Palmer (COP-STICKNEY004480).

182. Phoenix Police Department Alert History for Sergeant Robert Rodarme (COP-STICKNEY004481-4483).

183. Phoenix Police Department Alert History for Officer Joseph Seaquist (COP-STICKNEY004484).

184. Phoenix Police Department Alert History for Officer Sean Yamane (COP-STICKNEY004485).

185. Phoenix Police Department Concise Officer History for Officer James Arnold (redacted and unredacted) (COP-STICKNEY4486-4488).

186. Phoenix Police Department Concise Officer History for Officer Travis Funston (redacted and unredacted) (COP-STICKNEY4489-4490).

187. Phoenix Police Department Concise Officer History for Officer Dustin Haynes (redacted and unredacted) (COP-STICKNEY4491-4493).

188. Phoenix Police Department Concise Officer History for Officer Frank Long (COP-STICKNEY4494-4496).

189. Phoenix Police Department Concise Officer History for Officer Kenneth Palmer (redacted and unredacted) (COP-STICKNEY4497-4503).

WELLS 003201

190. Phoenix Police Department Concise Officer History for Sergeant Robert Rodarme (redacted and unredacted) (COP-STICKNEY4504-4506).

191. Phoenix Police Department Concise Officer History for Officer Joseph Seaquist (redacted and unredacted) (COP-STICKNEY4507-4509).

192. Phoenix Police Department Concise Officer History for Officer Sean Yamane (redacted and unredacted) (COP-STICKNEY4510-4512).

193. Transcript re: PSB 19-0022 Audio file of Holly Boston Interview dated 2-4-2019 (COP-STICKNEY004549-4568).

194. Transcript re: PSB 19-0022 Audio file of Officer Dustin Haynes Interview dated 2-11-2019 (COP-STICKNEY004569-4584).

195. Transcript re: PSB 19-0022 Audio file of Officer Frank Long Interview dated 2-22-2019 (COP-STICKNEY004585-4614).

196. Transcript re: PSB 19-0022 Audio file of Officer Joseph Seaquist Interview dated 2-15-2019 (COP-STICKNEY004615-4643).

197. Transcript re: PSB 19-0022 Audio file of Officer Sean Yamane Interview dated 2-22-2019 (COP-STICKNEY004644-4662).

198. "Phoenix police routinely 'purge' officer discipline records, keep misconduct secret," Aug. 27, 2019, The Republic (WELLS 002587-002597).

199. "A Mass Purge of Misconduct Records by Phoenix, Arizona Police," May 15, 2020, Criminal Legal News (WELLS 002598-002602).

200. City of Phoenix Police Department – Police Record Purging Review, March 19, 2020 (WELLS 002603-002615).

201. TASER Handheld CEW Warnings, Instructions, and Information: Law Enforcement, dated 10-30-2018 (WELLS 002616-002623).

202. Transcript re: PSB19-0022 Audio File of Officer James Arnold Interview dated 2-15-19 (COP-STICKNEY004663-004694).

203. Transcript re: PSB19-0022 Audio File of Officer Travis Funston Interview dated 2-11-19 (COP-STICKNEY004695-004716).

204. Transcript re: PSB19-0022 Audio File of Officer Kenneth Palmer Interview dated 2-8-19 (COP-STICKNEY004717-004738).

WELLS 003202

205. Transcript re: PSB19-0022 Audio File of Sgt Robert Rodarme Interview dated 2-11-19 (COP-STICKNEY004739-004772).

206. Transcript re: Kyle Walls Audio Interview dated 2-4-2019 (COP-STICKNEY004773-004785).

207. Transcript re: Wanda Cleveland and Brittany Walls Audio Interview dated 2-4-2019 (COP-STICKNEY004786-004809).

208. Officer Robert Rodarme's Supervisor Notes (redacted) (COP-STICKNEY004810-004833).

209. Documents received from Glendale Police Department in response to public record request (redacted) (COP-STICKNEY004834-004857).

210. Elisabeth Johnson Interview Transcript dated 2-4-2019 (WELLS 002624-002634).

211. Holly Boston Interview Transcript dated 2-4-2019 (WELLS 002635-002648).

212. Jeffery Bolduc Interview Transcript dated 2-4-2019 (WELLS 002649-002657).

213. Jenevette Tate Interview Transcript dated 2-5-2019 (WELLS 002658-002676).

214. Kyle O'Hare Interview Transcript dated 2-6-2019 (WELLS 002677-002687).

215. Lei Ann Stickney Interview Transcript dated 2-4-2019 (WELLS 002688-002704).

216. Naida Tedquist Interview Transcript dated 2-16-2019 (WELLS 002705-002714).

217. Peter Chambers Interview Transcript dated 2-4-2019 (WELLS 002715-002726).

218. Richard Buffington Interview Transcript dated 2-4-2019 (WELLS 002727-002737).

219. Shelly Aldridge Interview Transcript dated 2-4-2019 (WELLS 002738-002750).

220. Vickki Zachariah Interview Transcript dated 2-4-2019 (WELLS 002751-002771).

221. Wanda Cleveland Interview Transcript dated 2-4-2019 (WELLS 002772-002790).

222. PPD Operations Order 7.1 – Prisoners (COP-STICKNEY004902-4910).

223. PPD Lesson Plan re: Course #8422 – Emotional Survival for the New Officer (COP-STICKNEY004911-4913).

224. PPD Lesson Plan re: Course #8440 – Enlightened Leadership (Post Academy) (COP-STICKNEY004914-4917).

WELLS 003203

225. PPD Lesson Plan re: Course #8903 – Career Survival (COP-STICKNEY004918-4926).

226. PPD Lesson Plan re: Course #10511 – RIPP Restraint (COP-STICKNEY004927-4933).

227. PPD Lesson Plan re: Course #10596 – Use of Force Refresher (COP-STICKNEY004934-4944).

228. PPD Lesson Plan re: Course #10597 – Use of Force Review (COP-STICKNEY004945-4952).

229. PPD Lesson Plan re: Course #11233 – Interpersonal Communication (COP-STICKNEY004953-4965).

230. PPD Lesson Plan re: Course #11247 – Ethics in Law Enforcement (COP-STICKNEY004966-4977).

231. PPD Lesson Plan re: Course #11364 – Arrest Team Tactics (COP-STICKNEY004978-4985).

232. PPD Lesson Plan re: Course #11887 –Taser X2 Operator (COP-STICKNEY004986-5008).

233. PPD Lesson Plan re: Course #12416 – Module re: PTSD Dealing with Trauma, 2015 (COP-STICKNEY005009-5013).

234. PPD Lesson Plan re: Course #12474 – Emotional Survival for New Officers (COP-STICKNEY005014-5022).

235. PPD Lesson Plan re: Course #1785 – Officer Survival Skills (COP-STICKNEY005023-5040).

236. PPD Lesson Plan re: Course #12929 – Post Academy PSB Presentation (COP-STICKNEY005041-5045).

237. PPD Lesson Plan re: Course #13329 –Controlling & Handcuffing Suspects (COP-STICKNEY005046-5052).

238. PPD Lesson Plan re: Course #13445 – Tactical Negotiations (COP-STICKNEY005053-5057).

239. PPD Lesson Plan re: Course #12266 – Module Crisis Communications for First Responders, 2015 (COP-STICKNEY005058-5077).

WELLS 003204

240. PPD Lesson Plan re: Course #12530 – Decision Making Matrix De-Escalation Techniques (COP-STICKNEY005078-5086).

241. AZPOST PPD Training Academy Course "Sudden in Custody Death Syndrome (Positional Asphyxia) (COP-STICKNEY005087-5100).

242. AZPOST Model Lesson Plan Course "Managing In-Custody Death 8.5.5, June 2014 (Positional Asphyxia) (COP-STICKNEY005101-5110).

243. AZPOST Protocol re: Excited Delirium Response (COP-STICKNEY005111).

244. AZPOST Curriculum Lesson Plan 3.4 – Mental Illness, July 2006 (COP-STICKNEY005112-5125).

245. AZPOST Curriculum Lesson Plan 5.10 – Narcotics and Dangerous Drugs, July 2006 (COP-STICKNEY005126-5175).

246. AZPOST Curriculum Lesson Plan 8.5 – Techniques and Procedure Selection, August 2006 (COP-STICKNEY005176-5180).

247. AZPOST Curriculum Lesson Plan 8.5.3 and 8.5.4 – Use of Force, August 2006 (COP-STICKNEY005181-5212).

248. AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics Handout (COP-STICKNEY005213-5214).

249. AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics, August 2006 (COP-STICKNEY005215-5228).

250. AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques, August 2006 (COP-STICKNEY005229-5246).

251. AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques Handout, 2004 (COP-STICKNEY005247-5248).

252. AZPOST Curriculum Lesson Plan 8.5.9, 8.8.10 and 8.5.11 – Personal Defense Techniques, August 2006 (COP-STICKNEY005249-5268).

253. AZPOST Curriculum Lesson Plan 8.5.9 - 8.5.11 – Personal Defense Techniques Handout, 2004 (COP-STICKNEY005269-5270).

254. AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques (PPCT) Handout (COP-STICKNEY005271-5279).

WELLS 003205

255. AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques, August 2006 (COP-STICKNEY005280-5295).

256. AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 – Handcuffing Handout (COP-STICKNEY005296-5313).

257. AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 – Handcuffing August 2006 (COP-STICKNEY005314-5330).

258. AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival Handout (COP-STICKNEY005331-5333).

259. AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival, Revised: April 2007 (COP-STICKNEY005334-5348).

260. AZPOST Curriculum Lesson Plan 3.4 – Mental Illness, March 2010 (COP-STICKNEY005349-5363).

261. AZPOST Curriculum Lesson Plan 5.10 – Narcotics and Dangerous Drugs, November 2009 (COP-STICKNEY005364-5413).

262. AZPOST Curriculum Lesson Plan 8.5 – Techniques and Procedure Selection, January 2010 (COP-STICKNEY005414-5418).

263. AZPOST Curriculum Lesson Plan 8.5.3 and 8.5.4 – Use of Force, January 2010 (COP-STICKNEY005419-5448).

264. AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics Handout, 2010 (COP-STICKNEY005449-5450).

265. AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques, April 2010 (COP-STICKNEY005451-5467).

266. AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques Handout, 2010 (COP-STICKNEY005468-5469).

267. AZPOST Curriculum Lesson Plan 8.5.9 - 8.5.11 – Personal Defense Techniques Handout, 2010 (COP-STICKNEY005470-5471).

268. AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques (OCCS) Handout, 2010 (COP-STICKNEY005472-5485).

269. AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques (PPCT) Handout, 2010 (COP-STICKNEY005486-5494).

WELLS 003206

270. AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 - Handcuffing Handout, 2010 (COP-STICKNEY005495-5512).

271. AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival Handout, 2010 (COP-STICKNEY005513-5515).

272. AZPOST Curriculum Lesson Plan 3.4 – Mental Illness, November 2012 (COP-STICKNEY005516-5530).

273. AZPOST Curriculum Lesson Plan 8.5 – Techniques and Procedure Selection, June 2014 (COP-STICKNEY005531-5535).

274. AZPOST Curriculum Lesson Plan 8.5.3 and 8.5.4 – Use of Force, June 2014 (COP-STICKNEY005536-5565).

275. AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics Handout, revised June 2014 (COP-STICKNEY005566-5567).

276. AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics, June 2014 (COP-STICKNEY005568-5581).

277. AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques, June 2014 (COP-STICKNEY005582-5598).

278. AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques Handout, Re-Reviewed 2014 (COP-STICKNEY005599-5600).

279. AZPOST Curriculum Lesson Plan 8.5.9 - 8.5.11 – Personal Defense Techniques Handout, Reviewed June 2014 (COP-STICKNEY005601-5602).

280. AZPOST Curriculum Lesson Plan 8.5.9, 8.8.10 and 8.5.11 – Personal Defense Techniques, August 2017 (COP-STICKNEY005603-5625).

281. AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques, Instructor/Basic, April 2017 (COP-STICKNEY005626-5639).

282. AZPOST OCCS Handout, June 2014 (COP-STICKNEY005640-5653).

283. AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 – Handcuffing, June 2016 (COP-STICKNEY005654-5664).

284. AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival, June 2017 (COP-STICKNEY005665-5679).

WELLS 003207

285. AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival Handout, Reviewed June 2014 (COP-STICKNEY005680-5682).

286. AZPOST Curriculum Lesson Plan 8.5.25 – Choke Defense Technique, June 2017 (COP-STICKNEY005683-5689).

287. Office of Community Oriented Policing Services ("COPS") Publication "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice" (COP-STICKNEY005744-5823).

288. PPD Uniform Crime Reporting ("UCR") Annual Comparison, 2010 - 2020 (COP-STICKNEY005824).

289. Presentation - "Estimation of TASER Current Flow and Effects on Human Body," D. Panescu, 2008 (COP-STICKNEY005825-5859).

290. Presentation - TASER Risk Management Stats Public Summary presented June 10, 2014 (COP-STICKNEY005860-5935).

291. Presentation - TASER Risk Management Stats Public Summary presented October 15, 2013 (COP-STICKNEY005936-5993).

292. TASER Email re: Training Bulletin, September 18, 2014 (COP_003058).

293. PPD PSB investigation materials re: CI20-0075 – Officer Arnold (COP-STICKNEY006207-6212).

294. PPD PSB investigation materials re: INQ16-0401– Officer Arnold (COP-STICKNEY006213-6217).

295. Audio – Recorded Interview #1 with Complainant (labeled 801_0333) PPD PSB investigation materials re: INQ16-0401– Officer Arnold (COP-STICKNEY006218)

296. Audio – Recorded Interview #2 with Complainant (labeled B--S) PPD PSB investigation materials re: INQ16-0401– Officer Arnold (Redacted) (COP-STICKNEY006219).

297. PPD PSB investigation materials re: INQ17-0264– Officer Arnold (COP-STICKNEY006220-6224).

298. PPD PSB investigation materials re: INQ18-0955 – Officer Arnold (Redacted) (COP-STICKNEY006225-6229).

WELLS 003208

299. PPD PSB investigation materials re: PHN16-0058 – Officer Arnold (<u>Redacted</u>) (<u>COP-STICKNEY006230-6235</u>).

300. Audio – Recorded Interview (<u>labeled Ms. Jeffries Call</u>) PPD PSB investigation materials re: PHN16-0058– Officer Arnold (<u>COP-STICKNEY006236</u>).

301. PPD PSB investigation materials re: CI18-0113 – Officer Funston (<u>Redacted</u>) (<u>COP-STICKNEY006237-6241</u>).

302. PPD PSB investigation materials re: INQ19- 0631 – Officer Funston (<u>Redacted</u>) (<u>COP-STICKNEY006242-6266</u>).

303. PPD PSB investigation materials re: PPI19- 0101 - Officer Funston (<u>Redacted</u>) (<u>COP-STICKNEY006267-6271</u>).

304. PPD PSB investigation materials re: INQ17-0915 - Officer Haynes (<u>Redacted</u>) (<u>COP-STICKNEY006272-6280</u>).

305. PPD PSB investigation materials re: PPI14-0373 - Officer Haynes (<u>Redacted</u>) (<u>COP-STICKNEY006281-6285</u>).

306. PPD PSB investigation materials re: CI16-0073 - Officer Long (<u>Redacted</u>) (<u>COP-STICKNEY006286-6292</u>).

307. PPD PSB investigation materials re: CI16-0188 - Officer Long (<u>Redacted</u>) (<u>COP-STICKNEY006293-6299</u>).

308. PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (<u>Redacted</u>) (<u>COP-STICKNEY006300-6376</u>).

309. Audio – Recorded Interview (<u>labeled DCS K Miller</u>) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (<u>COP-STICKNEY006377</u>).

310. Audio – Recorded Interview (<u>labeled Det. Gonzalez</u> (<u>2</u>) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (<u>COP-STICKNEY006378</u>).

311. Audio – Recorded Interview (<u>labeled Det Gonzalez Intro</u>) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (<u>COP-STICKNEY006379</u>)

312. Audio – Recorded Interview (<u>labeled Det Nichols</u>) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (<u>COP-STICKNEY006380</u>).

313. Audio – Recorded Interview (<u>labeled Palmer Interview</u>) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (<u>COP-STICKNEY006381</u>).

WELLS 003209

314. PPD PSB investigation materials re: TRF10-0625 - Officer Palmer (<u>Redacted</u>) (<u>COP-STICKNEY006382-6383</u>).

315. PPD PSB investigation materials re: TRF10-0702 - Officer Palmer (<u>Redacted</u>) (<u>COP-STICKNEY006384-6385</u>).

316. PPD PSB investigation materials re: TRF10-1100 - Officer Palmer (<u>Redacted</u>) (<u>COP-STICKNEY006386-6387</u>).

317. PPD PSB investigation materials re: TRF10-1101 - Officer Palmer (<u>COP-STICKNEY006388-6389</u>).

318. PPD PSB investigation materials re: TRF10-1340 - Officer Palmer (<u>COP-STICKNEY006390-6397</u>).

319. PPD PSB investigation materials re: TRF10-1341 - Officer Palmer (<u>COP-STICKNEY006398-6406</u>).

320. PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (<u>Redacted</u>) (<u>COP-STICKNEY006407-6414</u>).

321. Audio – recorded Interview (<u>labeled message left 111219</u>) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (<u>COP-STICKNEY006415</u>)

322. Audio – recorded Interview (<u>labeled Ms. Dileo Msg for PSB</u>) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (<u>COP-STICKNEY006416</u>).

323. Audio – recorded Interview (<u>labeled Ms. Dileo PSB Interview</u>) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (<u>COP-STICKNEY006417</u>).

324. Audio – recorded Interview (<u>labeled Phone Conversation 111219</u>) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (<u>COP-STICKNEY006418</u>).

325. Audio – recorded Interview (<u>labeled Phone Discussion 111019</u>) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (<u>COP-STICKNEY006419</u>).

326. Audio – recorded Interview (<u>labeled Phone Conversation 112519</u>) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (<u>COP-STICKNEY006420</u>).

WELLS 003210

327.    PPD PSB investigation materials re: PIC14-0023 - Officer Rodarme (<u>COP-STICKNEY006421-6432</u>).

328.    PPD PSB investigation materials re: SI19-0077 - Officer Rodarme (<u>Redacted</u>) (<u>COP-STICKNEY006433-6437</u>).

329.    PPD PSB investigation materials re: INQ14-0011- Officer Seaquist (<u>Redacted</u>) (<u>COP-STICKNEY006438-6441</u>).

330.    PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (<u>COP-STICKNEY006442-6447</u>).

331.    Audio – recorded Interview (<u>labeled Dawson msg</u>) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (<u>Redacted</u>) (<u>COP-STICKNEY006448</u>)

332.    Audio – recorded Interview (<u>labeled Dawson, Marisa</u>) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (<u>Redacted</u>) (<u>COP-STICKNEY006449</u>).

333.    Audio – recorded Interview (<u>labeled Marisa Dawson</u>) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (<u>Redacted</u>) (<u>COP-STICKNEY006450</u>).

334.    Audio – recorded Interview (<u>labeled Ms. Marisa Dawson</u>) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (<u>Redacted</u>) (<u>COP-STICKNEY006451</u>).

335.    Audio – recorded Interview (<u>labeled Recorded Interview w Marisa Dawson</u>) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (<u>Redacted</u>) (<u>COP-STICKNEY006452</u>).

336.    PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (<u>Redacted</u>) (<u>COP-STICKNEY006453-6459</u>).

337.    Audio – recorded Interview (<u>labeled Ofc audio recording at 918T part 1</u>) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (<u>COP-STICKNEY006460</u>).

338.    Audio – recorded Interview (<u>labeled Ofc audio recording at 918T part 2</u>) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (<u>COP-STICKNEY006461</u>).

WELLS 003211

339. Audio – recorded Interview (labeled PSB call to Ms. Craig) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006462)

340. Audio – recorded Interview (labeled PSB Interview with Officer) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006463).

341. Audio – recorded Interview (labeled PSB Interview with Officer Seaquist) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006464).

342. PPD PSB investigation materials re: INQ19-0581 - Officer Seaquist (Redacted) (COP-STICKNEY006465-6466).

343. Audio – recorded Interview (labeled Terry 8-7-19) PPD PSB investigation materials re: INQ19-0581 - Officer Seaquist (COP-STICKNEY006467).

344. Audio – recorded Interview (labeled Terry 8-19-19) PPD PSB investigation materials re: INQ19-0581 - Officer Seaquist (COP-STICKNEY006468).

345. PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (Redacted) (COP-STICKNEY006469-6471).

346. Audio – recorded Interview (labeled Voice Mail for Ms. Cindy Franks) PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (COP-STICKNEY006472).

347. Audio – recorded Interview (labeled PSB Interview Ms. Cindy Franks) PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (COP-STICKNEY006473).

348. Audio – recorded Interview (labeled PSB Interview Cindy Franks 2) PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (COP-STICKNEY006474).

349. PPD In-Custody Deaths, 2014-2019 (COP-STICKNEY006592).

350. U.S. Department of Justice, National Law Enforcement Technology Center, Positional Asphyxia - Sudden Death June 1995 (WELLS 002791-002794).

351. Memorandum re Positional Asphyxia, Chris Krall, CIRSA Assistant Director, June 10, 1996 (WELLS 002795-002798).

Depositions:

- Arnold, James ,2021-04-06.
- Funston, Travis, 2021-04-15.
- Haynes, Dustin, 2021-03-29.
- Long, Frank, 2021-03-30.
- Palmer, Kenneth,2021-05-03.
- Rodarme, Robert, 2021-03-23.
- Seaquist, Joseph, 2021-03-22.
- Yamane, Sean, 2021-03-26.
- Calle, Joshua,2021-09-16 (30(b)(6) designee).
- Junas, Ryan, 2021-09-21.

**Summary:**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

**The below listed information is derived from City of Phoenix, In-Custody Death Investigation-PSB19-0022, (COP-STICKNEY000570-000578):**

**DETAILS OF INVESTIGATION:**

*"On February 4, 2019, at 2:15:33 p.m., Sergeant Rodarme #6999 and Officer Arnold #9243 responded to 3821 West Salter Drive on a radio call of indecent exposure. Numerous witnesses contacted the Phoenix Police Department to report a nude male was walking in the street and yelling near this address. Officer Arnold arrived on scene at 2:19:18. Officer Arnold told PSB investigators when he arrived on scene, he observed Mr. Wells, naked in the street. Officer Arnold told PSB investigators Mr. Wells had "his hands up in the air, pointed towards the sky, and appears to be yelling. Officer Arnold told PSB investigators it did appear Mr. Wells was aware of Officer Arnold's presence at this time."*

*"Officer Arnold told PSB investigators he approached Mr. Wells and attempted to engage Mr. Wells in conversation while standing behind Mr. Wells. Officer Arnold stated Mr. Wells did not respond or acknowledge him. Officer Arnold stated, "He starts what I believe is talking to God." Officer Arnold told PSB investigators he made*

WELLS 003213

*repeated attempts to engage Mr. Wells in conversation and convince him to put his clothes on, but Officer Arnold stated Mr. Wells would not respond to him. Officer Arnold told PSB investigators Mr. Wells continued to hold his hands in the air. Officer Arnold told PSB investigators Mr. Wells then said, "I came into this world naked, and this is how God intends me to leave it."*

*"Officer Arnold told Mr. Wells he was going to handcuff him. Officer Arnold told PSB investigators Mr. Wells left his hands in the air, looked over his shoulder at Officer Arnold, and stated. "You're not cuffing me." Officer Arnold told PSB investigators he began trying to talk to Mr. Wells while he waited for additional police officers to arrive on scene, but Mr. Wells was not responsive to Officer Arnold's attempts to engage him in conversation."*

*"At 2:22:14 p.m., Sergeant Rodarme arrived on scene. Sergeant Rodarme and Officer Arnold told PSB investigators they each grabbed one of Mr. Wells' arms and attempted to pull Wells' arms behind him to handcuff him. Sergeant Rodarme and Officer Arnold stated Mr. Wells immediately started to physically resist their attempts to handcuff him and began making grunting noises. Officer Arnold stated he and Sergeant Rodarme were telling Mr. Wells to not resist, but Mr. Wells continued resisting their efforts to arrest him."*

*"Sergeant Rodarme and Officer Arnold stated Officer Arnold then attempted to take Mr. Wells to the ground, but as Officer Arnold was doing this, Mr. Wells was able to escape from their grasp. Officer Arnold stated Mr. Wells intentionally "swung at him." Officer Arnold told PSB investigator's Mr. Wells fist grazed his lip. Sergeant Rodarme told PSB investigators he witnessed Mr. Wells strike Officer Arnold told PSB investigators Officer Arnold wrapped his arms around Mr. Wells as they were facing each other while Sergeant Rodarme grabbed Mr. Wells from behind. Sergeant Rodarme pulled them to the ground to assist Officer Arnold with gaining control of Mr. Wells. Sergeant Rodarme told PSB investigators Mr. Wells inadvertently hit the back of his head against the asphalt road as he was falling to the ground."*

*"Sergeant Rodarme and Officer Arnold stated Officer Arnold was on top of Mr. Wells as Mr. Wells was laying on his back. Officer Arnold told PSB investigators he was attempting to pin Mr. Wells on the ground by pressing his elbow against the top of Mr. Wells' chest. Officer Arnold stated he was holding onto Mr. Wells' left arm while Sergeant Rodarme was holding onto Mr. Wells' right arm. Sergeant Rodarme and Officer Arnold both stated Mr. Wells continued to fight and attempt to escape from their*

WELLS 003214

grasp while attempting to bite them as well. Sergeant Rodarme and Officer Arnold told PSB investigators Mr. Wells was able to free his arms from their grasp. Sergeant Rodarme told PSB investigators Mr. Wells intentionally punched him in the mouth once Mr. Wells broke free from Sergeant Rodarme's grasp. Sergeant Rodarme stated he received a cut to the inside of his lip when he was punched. Officer Arnold stated he believed Mr. Wells was going to attempt to strike him again when he broke free from Officer Arnold's grasp. Officer Arnold told PSB investigators he then delivered one elbow strike to Mr. Wells' nose, which caused Mr. Wells' nose to bleed. Officer Arnold stated Mr. Wells then began spitting towards them once his noise was bleeding., which Officer Arnold believed was intentional based on how Mr. Wells was shaking his head while spitting. Sergeant Rodarme and Officer Arnold told investigators Mr. Wells spit blood on them, which went into Sergeant Rodarme's mouth and eye."

"Sergeant Rodarme requested additional units to respond to the call at 2:24:58 p.m. because "We couldn't get this guy under control; ourselves, and it's better to, you know, to get more of us than not." Sergeant Rodarme told PSB investigators he and Officer Arnold continued to restrain Mr. Wells on the ground until additional units arrived. Officer Seaquist told PSB investigators he responded because he "knew this was not a good thing," based on how Sergeant Rodarme sounded when he requested more units. Officer Seaquist stated he never heard Sergeant Rodarme sound like this while speaking on the radio before."

"At 2:27:41 p.m., Officer Seaquist arrived on scene. Officer Seaquist told PSB investigators he saw Sergeant Rodarme and Officer Arnold "struggling with the suspect in the middle of the street." Sergeant Rodarme and Officer Arnold told PSB investigators Mr. Wells was still laying on his back at this time, and they attempted to roll Mr. Wells onto his stomach. As they rolled Mr. Wells onto his stomach, Mr. Wells was able to pin his left arm underneath him, which prevented the police officers from controlling his left arm."

"Officer Seaquist told PSB investigators Mr. Wells was "flailing his legs." Officer Seaquist stated he attempted to gain control of Mr. Wells' legs by attempting to bend them towards his buttocks. Officer Seaquist told PSB investigators Mr. Wells was able to kick his legs back towards Officer Seaquist and kicked him on the thighs. Officer Seaquist told PSB investigators he was telling Mr. Wells to not resist."

"At 2:28:11 p.m., Officers Long and Funston arrived on scene. Officers Long and Funston told PSB investigators Sergeant Rodarme, Officer Seaquist and Officer Arnold

WELLS 003215

*were holding Mr. Wells on the ground face down and attempting to restrain him. Officer Funston stated he assisted with controlling Mr. Wells' legs, but Mr. Wells was "fighting off both me and [Officer Seaquist] at the same time, so he was pretty strong, and Sergeant Rodarme and [Officer Arnold] are not small guys either and he was able to take them by himself also. Officer Funston told PSB investigators Officer Seaquist gave Mr. Wells multiple commands to not resist, which Mr. Wells ignored. Officer Funston stated Mr. Wells was moving his body, arms, and legs around to prevent officers from controlling him. Officer Long told PSB investigators he assisted with controlling Mr. Wells' arms. Officer Long stated Mr. Wells attempted to push himself off the ground and was tensing his arms as police officers were attempting to control his arms."*

*"At 2:29:11 p.m., Officer Seaquist provided an announcement he was going to deploy his Taser and then deployed his Taser into Mr. Wells' back, as Mr. Wells was continuing to resist the officers' attempts to detain him. Officer Arnold told PSB investigators the Taser deployment "locked [Mr. Wells] up, but following the Taser deployment, Mr. Wells continued to keep his left arm underneath his body, preventing the police officers from controlling his arm. Sergeant Rodarme and Officer Seaquist both described the Taser deployment as ineffective. Officer Arnold stated the police officers continued to tell Mr. Wells not to resist, but Mr. Wells continued to resist their attempts to detain him."*

*"At 2:29:26 p.m., Officer Seaquist deployed the second cartridge from his Taser. Officer Arnold told PSB investigators the Taser deployment prevented Mr. Wells from resisting while it was being deployed, but following the deployment, Mr. Wells continued to resist. Officer Seaquist described this Taser deployment as ineffective."*

*"At 2:29:56 p.m., Officer Seaquist deployed the Taser a third time. Officer Seaquist described to PSB investigators how Mr. Wells was lying face down and police officers were still unable to successfully gain control of Mr. Wells' arms to handcuff him. Officer Seaquist said Officer Arnold struggled to gain control of Mr. Wells' right arm while Sergeant Rodarme tried securing the left arm, which was underneath Mr. Wells' chest. Officer Seaquist stated he gave repeated commands to Mr. Wells to stop resisting."*

*"At 2:30:19., Officer Seaquist deployed the Taser a fourth time. Officer Seaquist told PSB investigators the fourth Taser deployment allowed Officer Arnold to gain control of Mr. Wells' right arm. Officer Seaquist stated Sergeant Rodarme appeared to be gaining control of Mr. Wells' left arm; however, Mr. Wells continued resisting Sergeant Rodarme's attempt to control the left arm. Officer Seaquist said a short time after the*

WELLS 003216

*fourth Taser deployment the police officers were eventually able to get Mr. Wells handcuffed behind his back."*

*"At 2:30:46 p.m., Officer Seaquist deployed the Taser a fifth time. Officer Funston told PSB investigators he attempted to apply a RIPP restraint to Mr. Wells. Officers Palmer, Haynes, and Yamane advised PSB investigators they arrived as Officer Funston attempted to apply the RIPP restraint (strap used to immobilize the legs). Officer Haynes told PSB investigators Mr. Wells was still "tensing and moving," which was preventing the other police officers on scene from controlling him. Officer Haynes stated he assisted Officer Funston with attaching the RIPP restraint clip to the handcuff chain, and Officer Yamane stated he assisted with controlling Mr. Wells' legs as the RIPP restraint was applied. Officer Haynes told PSB investigators Mr. Wells stiffened his legs as they were doing this in an attempt to prevent the police officers from controlling him. Officers Yamane, Long, Funston told PSB investigators Mr. Wells was kicking his legs to prevent the officers from controlling him. Officer Funston told PSB investigators he was kicked "a few times" by Mr. Wells."*

*"Sergeant Rodarme told PSB investigators once Mr. Wells was in handcuffs, he heard Officer Seaquist say, "He's coding boss. He's not breathing boss." Officer Seaquist told PSB investigators the police officers removed the handcuffs and RIPP restraint, and he began Cardiopulmonary Resuscitation (CPR). Officers Long and Funston assisted Officer Seaquist with doing CPR until paramedics from the Phoenix Fire Department arrived on scene."*

*"Officer Palmer told PSB investigators he did not assist the other police officers with controlling Mr. Wells but requested the Phoenix Fire Department respond for a Taser deployment."*

*"Officer Arnold told PSB investigators he believed his elbow strike and Officer Seaquist's Taser deployments were necessary to detain Mr. Wells. Officer Seaquist told PSB investigators the Taser deployments were necessary to gain compliance of Mr. Wells. Officer Seaquist stated the only way they would have been able to gain compliance of Mr. Wells without the Taser deployments is if more police officers responded to the scene. Officer Seaquist told PSB investigators there were other police officers responding to the call, but he did not know how long it would take them to arrive."*

WELLS 003217

*"Officer Palmer was wearing a body-worn camera during the incident. Officer Palmer responded at the 00:29 time stamp on the video and did not arrive until the 5:15 time stamp on the video. The dispatcher was heard providing the location of this incident and other police officers were heard responding to this incident. The video from Officer Palmer's body-worn camera showed Sergeant Rodarme and Officers Seaquist, Haynes, Yamane, Long, Arnold, and Funston restraining Mr. Wells on the ground. One police officer was heard telling Mr. Wells to not resist. Approximately ten seconds after this command was given, a Taser deployment was heard. Mr. Wells cannot be clearly seen in the video due to the numerous police officers assisting with controlling him."*

## Opinions:

<u>Note</u>: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. Rather, my opinions involve the consistency of the officers' actions with standard police practices.

### <u>Opinion Number 1</u>

It is my opinion that a reasonable Police Officer acting consistent with standard police practices would have initially determined Mr. Casey Joe Wells was mentally ill, experiencing a mental crisis, and or under the influence of a controlled substance. It is my opinion that the Defendants in this matter failed to initially determine that based on Mr. Casey Joe Wells' actions he was mentally ill, experiencing a mental crisis and or under the influence of a controlled substance. Throughout the United States and in Arizona, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Casey Joe Wells who are suffering from a mental illness, experiencing a mental crisis and or under the influence of a controlled substance. The objective is to avoid unnecessary injury and or death. The underlying principle is reverence for human life. These correct and reasonable methods are recognizing cues and other indicators in order to make appropriate decisions regarding intervention strategies; time to assess the situation; calm the situation; request additional and equipment; provide reassurance that the officers are there to help; give the person time to calm down; move slowly; eliminate emergency lights and reduce environmental distractions. These correct and reasonable methods are well known and proven effective for the safety and welfare of both Peace Officers and the public. It is my opinion the Defendants in this matter to include Phoenix Police Department Sergeant Robert Rodarme #<u>6999</u>, Police Officer Joseph Seaquist #<u>7211</u>, Police Officer Dustin Haynes #<u>8454</u>, Police Officer Sean Yamane #<u>8795</u>, Police Officer Frank Long #<u>8904</u>, Police Officer James Arnold #<u>9243</u>, and Police Officer Travis Funston #<u>10157</u>, failed to initially determine that Mr. Casey Joe Wells was mentally ill or experiencing a mental crisis.

WELLS 003218

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident. Defusing is a process of reducing the potential for violence and bringing emotional level to a manageable level to restore order. The primary objective is to calm the person so that a conversation can take place and the use of force can be avoided.

In addition, <u>law enforcement officers should be taught the below listed De-escalation Techniques</u>:

- Recognize the person may be overwhelmed by thoughts, beliefs, sounds (<u>voices</u>).
- Remember, a person's delusions or hallucinations are real to them.
- Understand that a rational discussion may not take place.
- Speak simply, move slowly.
- Announce actions before taking them.
- Attempt to gain voluntary compliance.
- Remove distractions and disruptive people.
- Be friendly, patient and encouraging but remain professional.
- Be aware that a uniform and a gun may frighten a person with mental illness.
- Reassure the person that no harm is intended.
- Get immediate emergency aid when needed.

Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. <u>Effective communication</u>:

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessens personal and professional stress.

It is not the role of or within the capacity of peace officers to attempt to diagnose a person's disability, officers need to recognize cues and other indicators in order to make appropriate decisions regarding intervention strategies.

WELLS 003219

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level by recognizing that an individual may be mentally ill and or experiencing a mental crisis.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 2

It is my opinion the Phoenix Police Department failed to properly train Phoenix Police Department Sergeant Robert Rodarme #6999, Police Officer Joseph Seaquist #7211, Police Officer Dustin Haynes #8454, Police Officer Sean Yamane #8795, Police Officer Frank Long #8904, Police Officer James Arnold #9243, and Police Officer Travis Funston #10157, in Crisis Intervention Techniques.  In addition, it is my opinion that the Phoenix Police Department failed to establish a Crisis Intervention Team(s) comprised of mental health professionals and sworn Phoenix Police Department Police Officers trained in Crisis Intervention Techniques, that could have responded to assist with the providing Mr. Casey Joe Wells with the proper mental health treatment.  Crisis Intervention Team (CIT) Officers are specially trained to respond to incidents involving individuals who are mentally ill and pose a danger to themselves or others.

Many law enforcement agencies throughout the United States that have provided Crisis Intervention Training (CIT) to their police officers and or have formed a Crisis Intervention Team(s) that typically follow the below listed recommended guidelines:

- Whenever possible, a uniformed CIT Officer(s) should respond to any call involving a mentally ill individual that pose a danger to self or others.
- Upon receiving a call involving a mentally ill person, who poses a danger to themselves or others, Communications (Dispatch) will follow the standard dispatch protocol and request a CIT Officer(s) to respond.

Crisis Intervention curriculum teaches officers skills such as de-escalation, (e.g., talking slowly, having more patience, asking subject questions, recognizing the signs and symptoms of mental illness), how to provide mental health referrals/resources, and about the voluntary treatment options.  By increasing understanding by officers of mental illness and improving the response to mental health calls will reduce the need for the use of force, decrease injuries and deaths to officers and people in a mental health crisis,

WELLS 003220

reduce the stigma of mental illness and increase access and engagement in services for people with mental illness.

In addition, I base my opinion on my law enforcement experience with the Los Angeles Police Department (LAPD) while assigned to: Patrol, Vice, Special Problems Unit, Detectives, and Special Weapons and Tactics (SWAT) to include being the Supervisor-in-Charge of LAPD SWAT's Crisis Negotiation Team.  In addition, the utilization of a mental health professional at the onset of an incident such as this incident can be an invaluable tool.  The Los Angeles Police Department Mental Evaluation Unit (MEU) responds to thousands of similar incidents on an annual basis and supports uniformed personnel by providing valuable insight and information.  In addition, I base my opinion on my twenty-eight-year law enforcement career where I have utilized the services of LAPD's Mental Evaluation Unit on hundreds of incidents to effectively resolve situations involving mentally ill subjects.

In addition, I base my opinion on City of Phoenix, Phoenix Police Department, Lesson Plan, Dealing With the Mentally Ill, (COP-STICKNEY 003598-3607):

10.  Use resources such as Magellan Health Services, Crisis Line, mobile teams, and CIT Officers, to assist with disposition of the Seriously Mentally Ill (SMI) individual.

VIII.  CONCLUSION:

A.  Police will contact SMI subjects.  With proper training and understanding of their conditions, we can improve relations with their community and reduce the number of injuries caused by negative encounters with the police.

In addition, it is my opinion Phoenix Police Department Sergeant Robert Rodarme #6999, failed to formulate a tactical plan prior to escalating the situation by initiating force. There was no rush.  Mr. Casey Joe Wells was not actively committing a crime that necessitated a physical intervention. He was standing stationary and not running around or committing another act that would necessitate an immediate physical intervention. There were numerous Phoenix Police Department Police Officers that were responding to the incident.  In addition, Mr. Casey Joe Wells was naked and unarmed standing in the street at the time that the force was initiated.

In addition, I base my opinion on Arizona Peace Officer Standards and Training Board, 585-Hour Basic Curriculum, Model Lesson Plan, Lesson Title: MENTAL ILLNESS 3.4, March 2010, (COP-STICKNEY 005349-5361):

WELLS 003221

D.  Time:

1.  When possible slow the situation down.

a.  Give the person time to process the information.

b.  Give the person time for emotions to decrease and rationality to increase.

c.  Take time to develop a plan.

d.  Do not urge or agree with delusions or hallucinations.

e.  Discuss topics that are reality based.

f.  If the person is hallucinating, try to get him/her to focus on your voice.

g.  Ask what the voices are saying to help assess whether the person's fears are increasing or decreasing as a means of assessing violence potential.

In addition, I base my opinion on the following facts and testimony:

- According to Police Officer James Arnold, being that Mr. Casey Joe Wells was naked he could see that he was unarmed, (Deposition Transcript of James Arnold, Page 49).
- According to Police Officer Dustin Hayes he recalls that Police Officer James Arnold said that he had lifted up Mr. Casey Joe Wells and slammed him to the ground, (Deposition Transcript of Dustin Hayes, Page 58).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 3

It is my opinion the Defendants in this matter to include Phoenix Police Department Sergeant Robert Rodarme #6999, Police Officer Joseph Seaquist #7211, Police Officer Dustin Haynes #8454, Police Officer Sean Yamane #8795, Police Officer Frank Long #8904, Police Officer James Arnold #9243, and Police Officer Travis Funston #10157, failed to immediately take the pressure and weight off of Mr. Casey Joe Wells' back once he was on the ground and in a prone position.  This can be accomplished by simply immediately rolling him on to his side in a recumbent position or place him in a seated or standing position.

WELLS 003222

In addition, I base my opinion on <u>U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995</u>, (<u>WELLS 002791-002793</u>):

It is important to understand how preexisting risk factors, combined with the subject's body position when subdued or in transit, can compound the risk of sudden death.

<u>The Defendants knew or should have known that when an individual is restrained in a face-down position, and breathing may become labored</u>:

- Weight is applied to the person's back-the more weight, the more severe the degree of compression.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs-the person struggles more violently.
- The officer applies more compression to subdue the individual.

It is my opinion that the <u>Basic Physiology of a Struggle</u> is applicable in this matter. A person lying on his stomach has trouble breathing when pressure is applied to the back. <u>The remedy seems relatively simple</u>: get the pressure off his back. In addition, it is my opinion that Defendants should have recognized that there are certain factors that may render some individuals more susceptible to positional asphyxia following a violent struggle, particularly when prone in a face-down position.

The risk of positional asphyxia is compounded when an individual with predisposing factors become involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind the back handcuffing combined with placing the subject in a stomach-down position.

Every day, police officers encounter situations that require them to restrain persons. Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as "positional, or restraint, asphyxia." Proper training also covers multiple effective options available such as avoiding compression of the chest, rolling the subjects over on his side, and sitting or standing the subject up.

Sudden in-custody death is not a new phenomenon-it can occur at any time, for a variety of reasons. Any law enforcement agency may experience a sudden in-custody death, and while rare, such deaths appear to be associated most often with the following variables:

WELLS 003223

<u>Drugs and/or alcohol intoxication</u>:  Drug and acute alcohol intoxication is a major risk factor because respiratory drive is reduced, and subjects may not realize they are suffocating.

<u>Violent struggle extreme enough to require the officers to employ some type of restraint technique</u>:  Subjects who have engaged in extreme violent activities may be more vulnerable to subsequent respiratory muscle failure.

<u>Unresponsive of a subject during or immediately after a struggle:</u> Such unresponsive behavior may indicate cardiopulmonary arrest and the need for immediate medical attention.

In addition, I base my opinion on <u>The Americans for Effective Law Enforcement</u> <u>AELE Monthly Law Journal, Restraint and Asphyxia, Part Two-Compressional Asphyxia, January 2009,</u>

<u>Conclusions</u>: Police trainers must be aware of potential deaths from compressional asphyxia.  Officers must be taught to avoid putting their body with on a confined person as soon as active resistance has ended of the person has been adequately trained from causing harm to himself or others.  Dr. Reay's article in the May 1996, FBI Law Enforcement Bulletin emphasized:

"Instructors must stress vigilance in monitoring the subject's condition.  The process of hypoxia is insidious, and subjects might not exhibit any clear symptoms before they simply stop breathing.  Generally, it takes several minutes significant hypoxia to occur, but it can happen more quickly if the subject had been violently active and is already out of breath.  If the subject experiences extreme difficulty breathing or stops breathing altogether, officers must take steps to resuscitate the subject and obtain medical care immediately."

In addition, I base my opinion on <u>Memorandum</u>, <u>Re</u>:  Positional Asphyxia, Chris Krall, CIRSA Assistant Director, June 10, 1996 (<u>WELLS 002795-002798</u>):

<u>Risk Factors</u>: Positional asphyxia is a death that results from a body position that interferes with the ability to breathe.  Some of the risk factors for positional asphyxia that can exist in a police officer-suspect confrontation include:

- An aggressively or violently resistive subject.
- A subject who is under the influence of alcohol or drugs, or who has a predisposing medical condition such as obesity.
- Placement of a subject in a prone, face-down position.
- The use of maximal restraints such as "hogtying."

WELLS 003224

- The application of weight to the subject's back.

In a worst-case scenario, efforts to forcibly restrain a resisting subject can cause the subject to experience difficulty in breathing, and the subject's increasing struggles to breathe, if met with escalating force, can ultimately lead to asphyxia.

In addition, I base my opinion on Arizona Peace Officer Standards and Training Board, 585-Hour Basic Curriculum, Model Lesson Plan, Managing In-Custody Death 8.5.5, June 2014, (COP-STICKNEY005101-005110):

e. Restrain the Person:

ii. As a general rule, do not permit the person to remain in the prone position.

a. Place the subject on their side or in a seated upright position.

g. Avoid hog tying the subject.

In addition, it is my opinion the Phoenix Police Department failed to properly train Police Officer James Arnold on the risks associated with positional asphyxia and Excited Delirium.

In addition, I base my opinion on the following facts and testimony:

- According to Police Officer James Arnold, since the academy, he has not received any additional training on Excited Delirium, (Deposition Transcript of James Arnold, Page 49).
- According to Police Officer James Arnold, he does not remember if he was trained at the academy about positional asphyxia and stated that since the academy, he has not received any on positional asphyxia, (Deposition Transcript of James Arnold, Page 49).
- According to Police Officer Joseph Seaquist, it appears to him by viewing the video at his deposition, Officer Arnold had his knee on Mr. Casey Joe Wells shoulder, (Deposition Transcript of Joseph Seaquist, Page 186).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 4**

It is my opinion that a reasonable Police Officer acting consistent with standard police practices would not have deployed his Taser X2, Conducted Electrical Weapon (CEW) at any time in this incident on Mr. Casey Joe Wells. It is my opinion Phoenix Police

WELLS 003225

Department Police Officer Joseph Seaquist #7211, used inappropriate and unnecessary force when he deployed his Taser X2, Conducted Electrical Weapon (CEW) to Mr. Casey Joe Wells' back (5) times while he was lying in a prone position on the ground with Phoenix Police Department Sergeant Robert Rodarme #6999, Police Officer Joseph Police Officer Dustin Haynes #8454, Police Officer Sean Yamane #8795, Police Officer Frank Long #8904, Police Officer James Arnold #9243, and Police Officer Travis Funston #10157, restraining him with pressure and bodyweight. In addition, based on my review of the facts in this matter, Mr. Casey Joe Wells appeared to be handcuffed and lying in a prone position when Police Officer Joseph Seaquist deployed his Taser X2, Conducted Electrical Weapon (CEW), the fifth time.

The Taser is a X2, Conducted Electrical Weapon (CEW) as defined by the manufacturer, Axon. It is a handheld, battery operated tool which uses controlled electrical current designed to disrupt a person's sensory and motor nervous system by means of deploying electrical energy sufficient to cause temporary uncontrolled muscle contractions, or Neuro Muscular Incapacitation, ("NMI"). As a result, the electrical energy can override the person's voluntary motor responses for a brief duration. The use of Taser X2 (CEW) deployment resulting in NMI may provide a brief opportunity during which physical restraint procedures can be initiated whenever practical.

It is my opinion Police Officer Joseph Seaquist's use of the Taser X2 (CEW) in this matter caused Mr. Casey Joe Wells to respond to the pain associated with being "Tased" for (26) seconds by moving his torso and legs which detracted from the ultimate objective of handcuffing and controlling Mr. Casey Wells by immediately rolling him on to his side in a recumbent position or place him in a seated or standing position. In addition, it is my opinion based on my review of the facts in this matter, Police Officer Joseph Seaquist failed to give Mr. Casey Wells a warning that he was going to deploy his Taser X2 and a reasonable opportunity and ability to comply prior to initiating additional deployments. I base my decision on Taser Evidence Sync, Phoenix Police Department, Serial No. X300069F0, Taser X2, (WELLS 000547/000558):

1. Sequence 326: 04 Feb 2019: 14:29:11(5 Seconds).
2. Sequence 327: 04 Feb 2019: 14:29:26 (5 Seconds).
3. Sequence 328: 04 Feb 2019: 14:29:56 (5 Seconds).
4. Sequence 329: 04 Feb 2019: 14:30:19 (6 Seconds).
5. Sequence 330: 04 Feb 2019: 14:30:46 (5 Seconds).

WELLS 003226

In addition, as outlined in <u>Opinion Number 3</u> of this Report, Police Officer Joseph Seaquist should have known that Mr. Casey Joe Wells may have been having difficulty breathing while in a prone position and while being restrained with body weight and pressure by the Defendants and may have been resisting in his attempt to create space between his chest and the ground in an attempt to breathe and that being restrained in a face-down position, and breathing may become labored:

- Weight is applied to the person's back-the more weight, the more severe the degree of compression.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs-the person struggles more violently.
- The officer applies more compression to subdue the individual.

In addition, I base my opinion on <u>PPD Training materials re</u>: <u>Course #11132 X2 Taser Operator,</u> (<u>COP-STICKNEY003513-003526</u>):

II.  <u>Guidelines for Use</u>:

B.  <u>The Taser will not be used for</u>:

10.  <u>Handcuffed prisoners</u> resisting/refusing to enter police vehicles, holding room, or hanging onto a railing or other item, etc.

XV.   <u>Duration of Applications</u>:

B.  Officers should only apply the number of cycles reasonably necessary to allow safe restraint of the suspect.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 5**

It is my opinion the Defendants in this matter to include Phoenix Police Department Sergeant Robert Rodarme #<u>6999</u>, Police Officer Joseph Seaquist #<u>7211</u>, Police Officer Dustin Haynes #<u>8454</u>, Police Officer Sean Yamane #<u>8795</u>, Police Officer Frank Long #<u>8904</u>, Police Officer James Arnold #<u>9243</u>, and Police Officer Travis Funston #<u>10157</u>, Defendants in this matter used unnecessary and inappropriate force when they hogtied Mr. Casey Joe Wells with the Ripp Hobble Restraint Device while he was restrained (<u>handcuffed</u>) on the ground in a prone position.

WELLS 003227

In addition, <u>I base my opinion on the Ripp Hobble Restraints International Inc. instructions that states in bold and italicized</u>: ***NEVER Hog-Tie a Prisoner.***

In addition, it is my opinion it was inappropriate force and unnecessary force when the Defendants to include Phoenix Police Department Sergeant Robert Rodarme <u>#6999</u>, Police Officer Joseph Seaquist #<u>7211</u>, Police Officer Dustin Haynes <u>#8454</u>, Police Officer Sean Yamane <u>#8795</u>, Police Officer Frank Long <u>#8904</u>, Police Officer James Arnold #<u>9243</u>, and Police Officer Travis Funston #<u>10157</u>, hogtied Mr. Casey Joe Wells by forcibly pushing his legs up to his buttocks to connect the Ripp Hobble Restraint to the handcuffs while he was restrained (<u>handcuffed</u>) and in a prone position. It is my opinion that if the Defendants were concerned that Mr. Casey Joe Wells may kick or move his legs, they simply could have properly utilized the Ripp Hobble Restraint Device to secure the ankles or knees of Mr. Casey Joe Wells and immediately roll him on to his side in a recumbent position or place him in a seated or standing position.

In addition, it is my opinion that if Mr. Casey Joe Wells knees and or ankles were secured by the Ripp Hobble Restraint device, it would have prevented him from kicking his legs until he was secured on the stretcher/gurney's multi-point restraint system and then transported to the hospital by ambulance by licensed medical professionals.

In addition, <u>I base my opinion on the Ripp Hobble Restraints International Inc. instructions that states</u>: "*The RIPP HOBBLE is made of 700 polypropylene webbed belt featuring a brass snap at one end with the other end of the belt permanently inserted through a jawed alligator clip. This unique design allows for use on ankles, knees, and elbows <u>(for de-cuffing potentially violent subjects)</u>. Transport your prisoner seated in the vehicle in an upright position-unable to kick-out doors and windows.*"

<u>In addition, it is my opinion, the Defendants knew or should have known that when an individual is restrained in a face-down position, breathing may become labored</u>:
- By forcibly pushing his legs up to his buttocks to connect the Ripp Hobble Restraint Device to the handcuffs while he is restrained and in a prone position.
- The individual experiences increased difficulty breathing.
- The natural reaction to oxygen deficiency occurs-the person struggles more violently.
- The officer applies more compression to subdue the individual.

WELLS 003228

In addition, it is my opinion that Defendants should have recognized that there are certain factors that may render some individuals more susceptible to positional asphyxia following a struggle, particularly when prone in a face-down position.

The risk of positional asphyxia is compounded when an individual with predisposing factors become involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind the back handcuffing combined with placing the subject in a stomach-down (prone) position.

Every day, police officers encounter situations that require them to restrain persons. Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as "positional, or restraint, asphyxia." Proper training also covers multiple effective options available such as avoiding compression of the chest, rolling the subject over on his side, and sitting or standing the subject up.

In addition, I base my opinion on U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995, Advisory Guidelines for Care of Subdued Subjects: To help ensure subject safety and minimize the risk of sudden in-custody death, officers should learn to recognize factors, contributing to positional asphyxia. Where possible, avoid the use of maximally prone restraint techniques (e.g., hogtying). To help minimize the potential for in-custody injury death officers should:

- Follow existing training and policy guidelines for situations involving physical restraint of subjects.
- As soon as the suspect is handcuffed, get him off his stomach.
- Ask the subject if he has used drugs recently or suffers from any cardiac or respiratory diseases or conditions such as asthma, bronchitis, or emphysema.
- Monitor subject carefully and obtain medical treatment if needed.
- Be trained to recognize breathing difficulties or loss of consciousness and immediately transport the individual to the emergency room or call for an Emergency Medical Team (EMT) unit if such signs are observed.

In addition, I base my opinion on AELE Monthly Law Journal, Restraint and Asphyxia, Part One-Restraint Ties, December 2008, (FPD 000844-852):

Hogtying: Involves placing the suspect into a prone position with his or her hands secured by the handcuffs, and legs together with restraints. The hands and leg restraints

WELLS 003229

are then connected, resulting in the slight elevation of the suspect's upper and lower body.

In addition, I base my opinion on AZ POST PPD Training Academy Course "Sudden in Custody Death Syndrome (Positional Asphyxia) (COP-STICKNEY005087-5100):

## VII.  POSITIONAL ASPHYXIA:

A.  Hog-tying is almost always listed as a contributing factor due to the positional restraint position's ability to aid in inducing positional asphyxia.

## VIII.  FIRST RULE TO REMOVING THE PERCEPTION OF BLAME:

A.  Never hog-tie anyone.

B.  Positional restraint asphyxia is not new to the law enforcement community.

## XII.  METHOD OF RESTRAINING:

A.  T.A.R.P.

1.  Total Appendage Restraining Procedure.

2.  After restraining with R.I.P.P. device, always seat subject upright and request medical attention immediately.

6.  Avoid allowing the subject to lie on their side and NEVER ALLOW THEM TO REMAIN ON THEIR CHEST OR STOMACH.

In addition, I base my opinion on the following facts and testimony:

- According to Police Officer Travis Funston, he agrees that once somebody is in a RIPP restraint, they are supposed to be put on their side, (Deposition Transcript of Travis Funston, Page 29).
- According to Police Officer Sean Yamane, he agrees that if you leave a handcuffed RIPP restrained subject face down for any length of time could result in positional asphyxia, (Deposition Transcript of Sean Yamane, Page 48).
- According to Police Officer Sean Yamane, he never saw Mr. Casey Joe Wells strike, bite, spit on, kick and officers and he never saw him with a weapon because he was naked, (Deposition Transcript of Sean Yamane, Page 63).
- According to Police Officer Joseph Seaquist, he agrees that he initially provided a statement to investigators, "Once they got him on his stomach, I grabbed his ankles and put them together and then just with all my weight, I pushed down on

WELLS 003230

them to get his heels touching his butt," (<u>Deposition Transcript of Joseph Seaquist, Page 64</u>).

- According to Police Officer Joseph Seaquist, he agrees that he initially provided a statement to investigators, "I know I had his ankles crossed, just like they teach us in the academy—ankles were crossed, I just took my whole 250 pounds and laid on it. And I was laying on—basically, I had his ass in my face," (<u>Deposition Transcript of Joseph Seaquist, Page 114</u>).
- According to Police Officer Joseph Seaquist, he did not interpret what he called a kick as an intentional kick to injure him, it was the result of him struggling and flailing and resisting, (<u>Deposition Transcript of Joseph Seaquist, Page 115</u>).
- According to Police Officer Joseph Seaquist, he did not ever see Mr. Casey Joe Wells use any control hold or Mixed Martial Arts (<u>MMA</u>) holds on the involved officers, (<u>Deposition Transcript of Joseph Seaquist, Page 64</u>).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

<u>**Opinion Number 6**</u>

It is my opinion the Phoenix Police Department failed to properly train Sergeant Robert Rodarme #<u>6999</u>, Police Officer Joseph Seaquist #<u>7211</u>, Police Officer Dustin Haynes #<u>8454</u>, Police Officer Sean Yamane #<u>8795</u>, Police Officer Frank Long #<u>8904</u>, Police Officer James Arnold #<u>9243</u>, and Police Officer Travis Funston #<u>10157</u>, on the danger/risks associated with the of maximally prone restraint techniques, (<u>e.g., hog-tying</u>), subjects who may be mentally ill, experiencing a mental crisis and or under the influence of a controlled substance <u>prior to</u> the February 4, 2019, Use of Force incident involving Mr. Casey Joe Wells.

In addition, I base my opinion on <u>U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995</u>: Sudden in-custody death is not a new phenomenon-it can occur at any time, for a variety of reasons. Any law enforcement agency may experience a sudden in-custody death, and while rare, such deaths appear to be associated most often with the following variables:


I. <u>Cocaine-induced bizarre or frenzied behavior</u>**:** When occurring while confined by restraints, cocaine-induced excited delirium (<u>an acute mental disorder characterized by impaired thinking, disorientation, visual hallucinations, and illusions</u>) may increase a

WELLS 003231

subject's susceptibility to sudden death by effecting an increase of the heart rate to a critical level.

II. <u>Drugs and/or alcohol intoxication</u>:  Drug and acute alcohol intoxication is a major risk factor because respiratory drive is reduced, and *subjects may not realize they are suffocating.*

III. <u>Violent struggle extreme enough to require the officers to employ some type of restraint technique</u>:  Subjects who have engaged in extreme violent activities may be more vulnerable to subsequent respiratory muscle failure.

IV. <u>Unresponsive of a subject during or immediately after a struggle:</u> Such unresponsive behavior may indicate cardiopulmonary arrest and the need for immediate medical attention.

In addition, it is important that Police Officers are properly trained to how preexisting risk factors, combined with the subject's body position when subdued or in transit, can compound the risk of sudden death.

In addition, it is important that Police Officers are properly trained that there are certain factors that may render some individuals more susceptible to positional asphyxia following a struggle, particularly when prone in a face-down position.

In addition, it is important that Police Officers are properly trained that the risk of positional asphyxia is compounded when an individual with predisposing factors become involved in a violent struggle with an officer or officers, particularly when physical restraint includes use of behind the back handcuffing combined with placing the subject in a stomach-down (<u>prone</u>) position.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 7**

It is my opinion the Phoenix Police Department failed to implement a policy to avoid the use of maximally prone restraint techniques, (<u>e.g., hog-tying</u>), <u>prior to</u> the February 4, 2019, Use of Force incident involving Mr. Casey Joe Wells.   Law enforcement agencies have recognized for decades that the use of maximally prone restraint techniques, (<u>e.g., hog-tying</u>), can result in unnecessary positional/restraint asphyxia deaths and sudden cardiac arrests of subjects being taken into custody.

WELLS 003232

In addition, I base my opinion on <u>U.S. Department of Justice, Office of Justice Programs, National Law Enforcement Technology Center, Positional Asphyxia-Sudden Death, June 1995, Advisory Guidelines for Care of Subdued Subjects</u>: To help ensure subject safety and minimize the risk of sudden in-custody death, officers should learn to recognize factors, contributing to positional asphyxia.  Where possible, avoid the use of maximally prone restraint techniques (e<u>.g., hogtying</u>).  <u>To help minimize the potential for in-custody injury death officers should</u>:

- Following existing training and policy guidelines for situations involving physical restraint of subjects.
- As soon as the suspect is handcuffed, get him off his stomach.
- Ask the subject if he has used drugs recently or suffers for any cardiac or respiratory diseases or conditions such as asthma, bronchitis, or emphysema.
- Monitor subject carefully and obtain medical treatment if needed.
- Be trained to recognize breathing difficulties or loss of consciousness and immediately transport the individual to the emergency room or call for an Emergency Medical Team (<u>EMT</u>) unit if such signs are observed.


Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **<u>Opinion Number 8</u>**

It is my opinion Phoenix Police Department Sergeant Robert Rodarme #<u>6999</u>, failed to take <u>Command and Control</u> of the scene and immediately intervene/intercede and ensure that Mr. Casey Joe Wells did not remain in a prone position was not hogtied and was immediately placed in a recumbent position or standing position or seated position without delay. In addition, it is my opinion that Sergeant Robert Rodarme should have advised Police Officer Joseph Seaquist #<u>7211</u> not to deploy his Taser X2, Conducted Electrical Weapon (<u>CEW</u>) to Mr. Casey Joe Wells' back while he was lying in a prone position on the ground during this incident.


The community expects that its peace officers will use reasonable force, and peace officers will intervene if reasonable force is exceeded.  For the community and officer's protection, the officer must know the laws pertaining to intervention.  <u>This intervention may take the form of one or more of the following actions</u>:

- Strongly caution the other officer.
- Physically restrain the other officer.

WELLS 003233

- Immediately report the incident.

**Intervention:** is the act of attempting to prevent or attempting to stop the inappropriate or unlawful behavior of another.

An officer may face both criminal or civil liability and disciplinary action if they fail to intervene and prevent other officers from violating anyone's constitutional rights if they had reason to know and an opportunity to act.

### Necessity for Intervention:

Intervention is necessary because:

- It is required by law.
- It is morally and ethically correct.
- Personal integrity demands it.
- It enhances officer safety.
- It preserves professionalism and supports the law enforcement mission.
- It strengthens public confidence in the law enforcement profession and the individual agency involved.

It reduces personal and agency liability because it results in fewer:

- Physical injuries arising from unreasonable force.
- Disciplinary actions and personal complaints.
- Criminal complaints filed against officers.
- Civil liability suits, including fewer punitive financial judgments against individual officers.

The United States Constitution protects individuals from unlawful actions of peace officers.

Note:  The officer who fails to intervene, for whatever reason, is also held accountable by the United States Code.

### Factors Affecting Intervention:

Although peace officers are legally and ethically required to intervene when they observe inappropriate behavior by a fellow officer, personal and psychological reasons may prevent them from intervening.

WELLS 003234

Peace Officers may fail to take action when a fellow officer is behaving inappropriate because of several factors.

**Peace Officers may not intervene because of:**

I.  <u>Transfer of Responsibility</u>: "Somebody else will step in any minute now."

II.  <u>Rationalization</u>: "Nobody else is doing anything so maybe I am just misunderstanding the situation, and nothing is really wrong."

III.  <u>Self-Doubt</u>: "What if I'm wrong?  What will everyone think of me if I step in and do something."

**Personal and Psychological Factors:**

**Personal Factors:**

- Unfamiliar with fellow officer.
- Inexperience with proper action to remedy the situation.
- Feeling the intervention is someone else's responsibility.
- Peer pressure.
- Personal problems.
- Fearing consequences, such as being ostracized.
- Fear of reaction from senior officers, field training officers, or supervisors.

**Psychological Factors:**

- Erroneous notion of how peace officers should behave.
- Fear may play a significant part in the behavior of the observing officer.

Any officer present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force.  An officer who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

WELLS 003235

## **Opinion Number 9**

It is my opinion the Defendants in this matter to include Phoenix Police Department Police Officer Joseph Seaquist #7211, Police Officer Dustin Haynes #8454, Police Officer Sean Yamane #8795, Police Officer Frank Long #8904, Police Officer James Arnold #9243, and Police Officer Travis Funston #10157, had a <u>Duty to Intervene</u>.  In addition, it is my opinion that the aforementioned Police Officers should have immediately take the pressure and weight off of Mr. Casey Joe Wells' back, and immediately place him in a recumbent position (<u>side</u>), seated position or standing position without delay.

The community expects that its peace officers will use reasonable force, and peace officers will intervene if reasonable force is exceeded.  For the community and officer's protection, the officer must know the laws pertaining to intervention.

<u>This intervention may take the form of one or more of the following actions</u>:
- Strongly caution the other officer.
- Physically restrain the other officer.
- Immediately report the incident.

**Intervention:** is the act of attempting to prevent or attempting to stop the inappropriate or unlawful behavior of another.

An officer may face both criminal or civil liability and disciplinary action if they fail to intervene and prevent other officers from violating anyone's constitutional rights if they had reason to know and an opportunity to act.

**Necessity for Intervention:**

<u>Intervention is necessary because</u>:

- It is required by law.
- It is morally and ethically correct.
- Personal integrity demands it.
- It enhances officer safety.
- It preserves professionalism and supports the law enforcement mission.
- It strengthens public confidence in the law enforcement profession and the individual agency involved.

WELLS 003236

It reduces personal and agency liability because it results in fewer:

- Physical injuries arising from unreasonable force.
- Disciplinary actions and personal complaints.
- Criminal complaints filed against officers.
- Civil liability suits, including fewer punitive financial judgments against individual officers.

The United States Constitution protects individuals from unlawful actions of peace officers.

Note:  The officer who fails to intervene, for whatever reason, is also held accountable by the United States Code.

**Factors Affecting Intervention:**

Although peace officers are legally and ethically required to intervene when they observe inappropriate behavior by a fellow officer, personal and psychological reasons may prevent them from intervening.

Peace Officers may fail to take action when a fellow officer is behaving inappropriate because of several factors.

**Peace Officers may not intervene because of:**

I.  Transfer of Responsibility: "Somebody else will step in any minute now."

II.  Rationalization: "Nobody else is doing anything so maybe I am just misunderstanding the situation, and nothing is really wrong."

III.  Self-Doubt: "What if I'm wrong?  What will everyone think of me if I step in and do something."

**Personal and Psychological Factors:**

**Personal Factors:**

- Unfamiliar with fellow officer.
- Inexperience with proper action to remedy the situation.
- Feeling the intervention is someone else's responsibility.
- Peer pressure.
- Personal problems.
- Fearing consequences, such as being ostracized.

WELLS 003237

- Fear of reaction from senior officers, field training officers, or supervisors.

**Psychological Factors:**

- Erroneous notion of how peace officers should behave.
- Fear may play a significant part in the behavior of the observing officer.

Any officer present and observing another officer using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force. An officer who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

In addition, I base my opinion on the following video, facts, and testimony in this matter:

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**Opinion Number 10**

It is my opinion the Defendants in this matter to include Sergeant Robert Rodarme #6999, Police Officer Joseph Seaquist #7211, Police Officer Dustin Haynes #8454, Police Officer Sean Yamane #8795, Police Officer Frank Long #8904, Police Officer James Arnold #9243, and Police Officer Travis Funston #10157, failed to recognize that Mr. Casey Joe Wells was in medical distress and having a difficulty breathing and take appropriate action.

It is my opinion based on my training and experience that Agonal Respirations or what is commonly referred to as Agonal Breathing looks or sounds like: snoring, heavy breathing; labored or exaggerated breathing; gurgling; guttural sounds; groaning; snorting; and or gasping. Agonal Respirations are often heard by those people who are near a person prior to death.

In addition, Police Officers are trained or should be trained that if a person subjectively says, "I can't breathe" or uses similar words, do not dismiss the person's claim. In addition, talking does not equal breathing. An individual who speaks in one-word sentences is in medical trouble and needs medical treatment. Police Officers must demonstrate concern and remain professional at all times.

WELLS 003238

Based on this initial assessment, peace officers may need to provide basic care for victim(s).  Such care may include providing basic emergency medical care until relieved by other personnel with equal or higher levels of training.

If the victim is unable to speak or is not responsive, then appropriate steps should be taken to assess the victim's:

- Airway
- Breathing
- Circulation

I.  The responding peace officer should determine if the victim is breathing:

If the victim is not breathing with a pulse:

- Begin rescue breathing.

If the victim is not breathing with no pulse:

- Begin CPR.

If the victim is breathing:

- Complete primary assessment.

If the victim has a pulse, is breathing, but unconscious:

- Check for indications of life-threatening conditions, (e.g., major bleeding, shock, etc.).
- Place the victim in a recovery position (on the side with the head supported by the lower forearm), if appropriate to aid breathing and allow fluids or vomit to drain from the mouth.

In addition, I base my opinion on the following video, facts, and testimony:

- According to Police Officer Frank Long, he only heard Mr. Casey Joe Wells grunt, growl, or yell but no spoken words, (Deposition Transcript of Frank Long, Page 69).

Lastly, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

WELLS 003239

## **Opinion Number 11**

It is my opinion that the Phoenix Police Department Sergeant Robert Rodarme #6999, Police Officer Joseph Seaquist #7211, Police Officer Dustin Haynes #8454, Police Officer Sean Yamane #8795, Police Officer Frank Long #8904, Police Officer James Arnold #9243, and Police Officer Travis Funston #10157,use of force/lethal force in this matter did not comport with standard police practices and violated their training or the training that they should have received that contributed to the death of Mr. Casey Joe Wells including but not limited to for the following reasons:

- Highest level of force a Police Officer can use.
- This was not an immediate Defense of Life situation.
- Must be a last resort before using lethal force.
- Must be the direst of circumstances.
- Deadly force is likely to cause great bodily injury or death.
- Must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- Subjective Fear is insufficient.
- Over reaction is excessive force.

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## **Opinion Number 12**

It is my opinion the Phoenix Police Department failed to determine through their investigation and review process that there was a failure to effectively de-escalate the situation and that the force used in this matter was inappropriate and unnecessary. It is my opinion that there was a gross lack of situational awareness and fundamental tactical errors in this incident. It is also my opinion that there was a failure by the Phoenix Police Department failed to properly train the Defendant Officers on following subject matters: Proper Response and Interaction with the Mentally Ill, Working as a Team, Verbal Strategies, Active Listening Skills, Crisis Intervention Training, Taser (CEW), Defusing and De-Escalation Techniques, Compressional/Positional/Restraint Asphyxia, Agonal Breathing and the proper use of the RIPP Hobble Restraint Device. In addition, the Phoenix Police Department endorsed the conduct of the involved Officers by determining that their conduct was within policy. These types of decisions tend to have a ripple effect

WELLS 003240

in the Department because other Officers believe that they can engage in similar conduct without consequences.

<u>In addition, I base my opinion on the following facts and testimony</u>:

- According to Phoenix Police Department Professional Standards Bureau Lieutenant Ryan Junas, since 2009, the Phoenix Police Department has never found an In-Custody Death out of policy, (<u>Deposition Transcript of Ryan Junas, Page 60</u>).
- According to Phoenix Police Department Professional Standards Bureau Lieutenant Ryan Junas, he is not aware if the Use of Force Board ever recommended that the City of Phoenix review its policies for prone restraint, (<u>Deposition Transcript of Ryan Junas, Page 103</u>).

Lastly, I base my opinion on my twenty-eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## My Qualifications for Reviewing this Case:

My opinions are based on my education, training, and experience.  Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent GS-1811.  Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC)-6-month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale narcotic smuggling and money laundering operations.

I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader.  Upon my graduation from the LAPD Academy, I was assigned to 77th Division.  In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail).  I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I worked a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

WELLS 003241

I applied and was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. I received the Purple Heart in 2010. Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer at Wilshire Division. I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident, while working with a Probationary Police Officer who had recently graduated from the Los Angeles Police Academy.

I was promoted to the rank of Detective and attended Basic Detective School. Upon completion of Basic Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.

I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to my assignment, I attended mandated Basic Supervisor School. In conjunction with Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training. The training focused on team building, leadership, and decision making. While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training. I directly supervised a Watch of Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents. I conducted audits, personnel investigations, Standard Based Assessments (Ratings), Use of Force Investigations, Administrative Projects, and prepared commendations for officer's field performance. While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group. I directly supervised (14) Police Officers and Detectives assigned to the Unit. Our unit worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in the Division. I provided ongoing mandated Department Training as well tactical, firearms, less than lethal and search warrant tactics training to the Officers and Detectives. As a Unit, we prepared and served numerous search warrants. I provided search warrant tactical briefing and de-briefing of each warrant at

WELLS 003242

the conclusion of the service. I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was selected to be loaned to Internal Affairs, Headquarters Section. I investigated personnel complaints that were too large in scope for a geographical Division. At the conclusion of my loan, I was selected to Management Services Division, Special Projects, and Office of the Chief of Police. I completed numerous in-depth staff projects for review by the Chief of Police. In addition, I was assigned with conducting research and editing the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I applied and was selected as a Sergeant II at 77th Division Vice. I directly supervised ten undercover officers and four uniformed officers. I provided all facets of training to the officers assigned to Vice at that time to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations training, Surveillance training, and any other training deemed necessary by my Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits on Specialized Units in Central and South Bureaus. I reported directly to the Office of the Chief of Police.

In 2000, I applied and was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (18) K9 Handlers. Metro K9 conducted K9 Operations for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include: K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at in-service training, Watch Commander School, Field Training Officer (FTO) School, and Basic Detective School. While at K9, I investigated and completed K9 contacts, personnel complaints, Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

WELLS 003243

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised sixty SWAT Officers. I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, SAGE, MX-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team. I provided on-going crisis negotiation training, mental health training, de-briefs, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunctional with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and the Didi Hirsch Suicide Prevention Training. In addition, I was assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the sole LAPD SWAT representative to respond to Mumbai India with Counterterrorism following the terrorist attack in November 2008. I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of multiple venue/multiple attacker tactics.

In June 2010, I retired from the Los Angeles Police Department with 20 years in service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations to include: The Medal of Valor, Purple Heart, and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included: Identified and conducted Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. Utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. Ensured a coordinated ability to identify and monitor potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. Mitigated expected threats. Utilized preplanned, coordinated actions in response to

WELLS 003244

infrastructure warnings or incidents. Responded to hostilities. Identified and eliminated the cause, or source, of an infrastructure event by the utilization of emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies. Conducted all facets of security training for the company and employees. Formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. Conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). Processed and monitored inmate population from initial intake, housing, court, transportation, and release. Conducted searches of inmate population as well as the facility on an ongoing basis. Utilized experience as a gang officer, Detective and Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. Provided information to gang detail. Functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. Attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. Attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents, and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. Conducted and or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. Conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events. Conducted internal

WELLS 003245

investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 5, 2017, I was the Director of Security at L&R Group of Companies. Identified and conducted Risk and Vulnerability Assessments for all L&R Group of Companies developments and projected developments throughout the United States. Conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. Ensured all Security Professionals were compliant with BSIS security training and licensing. Conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. Conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. Developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. Coordinated all security efforts to ensure safety at Special Events. Conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

In 2020, I earned my Master of Legal Studies Degree from Pepperdine Caruso School of Law.

        Attached are my curriculum vitae, listing of testimony and fee schedule.

_____

Scott A. DeFoe

WELLS 003246



**EXHIBIT 18**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)


VIDEORECORDED VIDEOCONFERENCE

30(B)(6) DEPOSITION

OF

RYAN JUNAS

Phoenix, Arizona
September 29, 2021
9:01 a.m.

                              DONNA DELAVINA REPORTING, LLC
                               Arizona RRF No. R1010
                               313 North Gilbert Road
                                     Suite 300
                               Gilbert, Arizona 85234
PREPARED BY:                      P (602) 230-5454

Donna DeLaVina, RPR               F (480) 546-3721
Certified Reporter              www.dlvreporting.com
Certificate No. 50468

1      THE WITNESS:  We do not use that same

2  terminology per se.  This is not a City of Phoenix

3  document.  But there are similarities between the two,

4  yes.

5      Q.  BY MR. SHOWALTER:  What would be the City of

6  Phoenix terminology, what -- let me -- does the City of

7  Phoenix require that PSB investigations be impartial,

8  fair and lacking in bias?

9      A.  Yes.

10      MS. RETTS:  Form; outside the scope.

11      Q.  BY MR. SHOWALTER:  And how does the City of

12  Phoenix ensure that its PSB investigations are

13  impartial and fair and lacking in bias?

14      MS. RETTS:  Form; outside the scope.

15      THE WITNESS:  There are multiple levels of

16  review involved in it, from sergeants that investigate

17  an investigation and to a lieutenant, to a commander,

18  to -- I mean, it depends on the investigation.  But we

19  have civilian review boards that review things, as well

20  as the executive or also the police chief as well.  So

21  it's all of our responsibility to ensure that we are

22  maintaining those ideas and best practices.

23      Q.  BY MR. SHOWALTER:  Okay.  Tell me how the City

24  of Phoenix's Use of Force Board -- or I'm sorry, Use of

25  Force Review Board works?

1    A.  So for your information, it's now called a

2 Critical Incident Review Board.  They recently changed

3 the name but it reviews critical incidents such as

4 officer involved shootings and in-custody deaths and it

5 consists of three civilian board members, an assistant

6 chief, a commander, and a peer officer that hear and --

7 so do you want the whole setup and exactly how it

8 functions?  I don't know how in depth you want me to

9 go.

10    Q.  So did you say there were civilian members of

11 the --

12    A.  Correct.  There are three civilian board

13 members that are not employed or part of the Phoenix

14 Police Department or the City of Phoenix.

15    Q.  Has that always been the case?

16    A.  I can't speak to always prior to 2009, but,

17 yes, from the beginning of -- that I am knowledgeable

18 about until now, yes, we've always included civilian

19 members on the board.

20    Q.  Are there any requirements of those civilian

21 members, in terms of their qualifications, to be on

22 that board?

23         MS. RETTS:  Form.

24         THE WITNESS:  I am unsure about how they

25 select those specific civilian board members.

1          MS. RETTS:  Form; foundation; outside the

2    scope.

3          THE WITNESS:  No.  It does not

4    specifically state in any of them the prone restraint.

5      Q.  BY MR. SHOWALTER:  How do you go about

6    determining -- does the City of Phoenix track

7    in-custody deaths in which prone restraint occurred?

8          MS. RETTS:  Form; foundation outside the

9    scope.

10          THE WITNESS:  I don't believe we track

11   down to that small of data points.  We track the Use of

12   Force Board recommendations and we track use of force

13   that is reportable.  So it would be like an elbow, fist

14   strikes, things of that nature, which would require a

15   response to resistance form.  But I don't believe we

16   drill down that far for the prone stuff.

17      Q.  BY MR. SHOWALTER:  And with respect to the Use

18   of Force Board's recommendations that you track, would

19   that be the second-to-the-last column, Use of Force

20   Board outcome?

21          MS. RETTS:  Form.

22          THE WITNESS:  Yes, the outcome is the same

23   as recommendation.

24      Q.  BY MR. SHOWALTER:  And then when it says "CHF

25   concur," what is CHF?

1 | witness, in discussing this, it sounded to me like the

2 | City of Phoenix categorizes as two categories that are

3 | separate.  One is in-custody deaths and one is

4 | shootings; is that accurate?

5 |    A.  That is.

6 |    Q.  Okay.  So when I say in-custody deaths, you

7 | understand and the City of Phoenix understands, that

8 | I'm not talking about shootings, correct?

9 |    A.  Yes.  In my answer, I did not answer assuming

10 | officer involved shootings, no.

11 |    Q.  And so since 2009, the City of Phoenix Use of

12 | Force Review Board has never found that an in-custody

13 | death was out of policy, correct?

14 |        MS. RETTS:  Form.

15 |        THE WITNESS:  From my knowledge, correct.

16 |    Q.  BY MR. SHOWALTER:  Are you familiar with the

17 | case of Edguardo Figueroa, which is Number 13 on

18 | Exhibit 430?

19 |    A.  No, I did not review that case in its entirety.

20 |    Q.  Are you aware of --

21 |    A.  Outside of --

22 |    Q.  Go ahead?

23 |    A.  No.  Outside of this summary here.

24 |    Q.  So you're not aware that Mr. Figueroa was

25 | handcuffed while he was severely intoxicated, that he

1           THE WITNESS:  Yes.

2    Q.  BY MR. SHOWALTER:  Where would the

3 documentation of those officer uses of force and

4 aggregate uses of force be kept?

5           MS. RETTS:  Form; foundation; outside the

6 scope.

7           THE WITNESS:  So if they were within

8 policy, and a supervisor addressed it with the

9 employee, it may be the employee's notes as saying it

10 was reviewed which are purged on a yearly basis, as far

11 as employees go.  But outside of that, it would be in

12 any kind of -- it depends on the purging process at the

13 time of what was kept and what was not.

14    Q.  BY MR. SHOWALTER:  Okay.  So if an officer used

15 force in 2009 and the supervisor determined that use of

16 force was within policy, that would -- that information

17 would subsequently be purged?

18           MS. RETTS:  Form; outside the scope.

19           THE WITNESS:  I don't have all of the

20 information on our purging criteria, or documents from

21 the time of 2009, so I couldn't speak to that without

22 further research.

23    Q.  BY MR. SHOWALTER:  Have you ever seen data that

24 lists City of Phoenix police officers by the number of

25 use of force reports that have been generated in which

1    Q.  BY MR. SHOWALTER:  So PAS would be the

2  interface and PACE would be the database?

3    A.  Exactly.  Thank you for using that terminology

4  for me.

5    Q.  And is the PACE database of officers uses of

6  force still in existence today?

7         MS. RETTS:  Form; foundation; outside the

8  scope.

9         THE WITNESS:  Much of it had been moved

10  over into RMS, but without conferring with our RMS task

11  force and team and the city clerk purging guidelines

12  and stuff, I couldn't speak to all of what has been

13  preserved.

14    Q.  BY MR. SHOWALTER:  And so when was the RMS

15  system adopted?

16    A.  2015.

17    Q.  And so prior to 2015, officer uses of force

18  would be documented in the PACE database for each

19  individual Phoenix police officer for whom there is a

20  record of use of force, correct?

21    A.  That is correct.

22    Q.  Was that system subject to purging?

23    A.  Yes.

24    Q.  So do you know, as you sit here today, whether

25  those records have been purged for any particular years

1  or ranges of years?

2          MS. RETTS:  Form; foundation; outside the

3  scope.

4          THE WITNESS:  I do not know what all has

5  been purged.

6     Q.  BY MR. SHOWALTER:  Is there any way to

7  determine for a current City of Phoenix police officer,

8  their use of force history since they've been at the

9  City of Phoenix?

10          MS. RETTS:  Form; foundation; outside the

11  scope.

12          THE WITNESS:  It depends on when they were

13  first employed.  Since the RMS system has been in

14  place, they have not been purging, as they did in the

15  past.  I know in past years in PACE years, prior to

16  2015, they purged lot more items than they currently do

17  today.

18          So for an officer who has been employed

19  since 1990s, it would be speculation, but I would

20  imagine there would be much less data available for

21  those early years than they are today.

22     Q.  BY MR. SHOWALTER:  Is there any -- if I look at

23  PACE data for officer -- in the event that I were able

24  to look PACE data for officers, would there be any way

25  to tell if data for certain years had been purged?

1          MS. RETTS:  Form; foundation; outside the

2  scope.

3          THE WITNESS:  I'm not familiar with our

4  records department and how they deal with that.

5      Q.  BY MR. SHOWALTER:  In the context of PSB

6  investigations and Use of Force Review Boards, are Use

7  of Force Boards provided with officer histories

8  relating to their past uses of force?

9      A.  They are not.

10      Q.  And so the Use of Force Board has no way of

11  determining whether a particular officer uses -- has a

12  history of using force much more frequently than other

13  officers, correct?

14          MS. RETTS:  Form.

15          THE WITNESS:  Correct.

16      Q.  BY MR. SHOWALTER:  But to some degree, at any

17  given time, the City of Phoenix actually has that

18  information that it could provide to the Use of Force

19  Board, correct?

20          MS. RETTS:  Form; foundation; outside the

21  scope.

22          THE WITNESS:  The City of Phoenix would

23  have that information, yes.

24          MR. SHOWALTER:  All right.  I do not have

25  any further questions for you at this time.

1  STATE OF ARIZONA       ) SS.
                          )
2  COUNTY OF MARICOPA     )

3

4       BE IT KNOWN that the foregoing proceedings
   were taken before me, DONNA DELAVINA, Certified
5  Reporter No. 50468; that the witness before testifying
   was duly sworn by me to testify to the whole truth;
6  that the foregoing 134 pages are a full, true and
   accurate record of the proceedings, all done to the
7  best of my skill and ability; that the proceedings were
   taken down by me in shorthand and thereafter reduced to
8  print under my direction.

9            [X]  Review and signature was requested.

10           [ ]  Review and signature was waived.

11           [ ]  Review and signature not required.

12           I CERTIFY that I am in no way related to any
   of the parties thereto nor am I in any way interested
13 in the outcome hereof.

14           I FURTHER CERTIFY that I have complied with
   the ethical obligations set forth in ACJA 7-206.  DATED
15 at Phoenix, Arizona, this 7th day of October, 2021.

16

17           Donna DeLaVina, RPR
             Certified Reporter
18           Certificate No. 50468

19            *    *    *    *    *    *

20

21       I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
   complied with the ethical obligations set forth in ACJA
22 7-206.

23

24           Donna DeLaVina, RPR, Owner
             Donna DeLaVina Reporting, LLC
25           Arizona RRF No. R1010

# EXHIBIT 19

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Lei Ann Stickney, individually) No. 2:20-cv-01401-SMB-CDB
and on behalf of all statutory)
beneficiaries of Casey Wells, )
and in her capacity as the    )
personal representative of the)
Estate of Casey Wells,        )
                              )
            Plaintiff,        )
                              )
v.                            )
                              )
City of Phoenix, et al.,      )
                              )
            Defendants.       )
_____)



VIDEORECORDED VIDEOCONFERENCE DEPOSITION

OF

KENNETH PALMER

Phoenix, Arizona
May 3, 2021
9:56 a.m.

                    DONNA DELAVINA REPORTING, LLC
                     Arizona RRF No. R1010
                     313 North Gilbert Road
                           Suite 300
                     Gilbert, Arizona 85234
PREPARED BY:               P (602) 230-5454

Donna DeLaVina, RPR         F (480) 546-3721
Certified Reporter         www.dlvreporting.com
Certificate No. 50468

1    Q.  Have you -- prior to today, have you had an

2  opportunity to review the body camera footage that you

3  took on February 4th of 2019?

4    A.  Just some pieces of it, not in its entirety,

5  no.

6    Q.  When did you last review that body camera

7  footage?

8    A.  That would have been last Friday with my

9  attorney.

10    Q.  And then prior to that, did you -- prior to

11  that, do you remember being interviewed by PSB?

12    A.  Yes.

13    Q.  Did you have an opportunity, if you remember,

14  did you have an opportunity to review that footage

15  before that interview?

16    A.  To review my body cam video before the PSB

17  interview?

18    Q.  Yes.

19    A.  No.  Well, I wasn't -- I didn't.  I guess I

20  would have had opportunity to, if I wanted to.  I can

21  pull up my own body cam video, but, no, I did not.

22    Q.  Okay.  I think the only -- was that the only --

23  that PSB interview after the incident the only

24  interview you gave in regard to this matter?

25    A.  Yes.

1          MS. RETTS:  Form.

2          THE WITNESS:  I have no idea what other

3 officers had testified to.  I know when I arrived they

4 were still in the process of trying to get handcuffs on

5 both of his wrists.

6     Q.  BY MR. SHOWALTER:  But you didn't say that in

7 your report, correct?

8          MS. RETTS:  Form.

9          THE WITNESS:  I did not specifically state

10 he was not in handcuffs, if that's what you're asking.

11     Q.  BY MR. SHOWALTER:  And you don't say

12 anything -- you don't record anything in your report

13 that he was physically resisting or that you observed

14 him physically resisting, but you do say that you could

15 hear commands from other officers to stop resisting,

16 correct?

17          MS. RETTS:  Form.

18          THE WITNESS:  When I got there, they were

19 trying to control his feet with the RIPP restraint.  An

20 officer was on each arm trying to get his arms behind

21 his back.  So I'm not sure -- how else do you want me

22 to answer that question?

23     Q.  BY MR. SHOWALTER:  I'm just asking, in your

24 report you do not recount observing anything that Casey

25 Wells did that was resisting, you just say that you

1  could hear officers giving commands for him to stop

2  resisting, correct?

3          MS. RETTS:  Form.

4          THE WITNESS:  I did not document anything

5  of him resisting as in getting up and swinging, things

6  of that nature, trying to run away.  That doesn't mean

7  he is still not being, I guess, passive resistant as to

8  not complying with giving up his hands, things of that

9  nature.

10  Q.  BY MR. SHOWALTER:  And right now, I'm just

11  talking about what's in your report.  There's nothing

12  in your report that says anything about conduct that

13  Casey Wells supposedly was doing that indicates that he

14  was resisting, is there?  If there is, can you show me

15  where it is?

16  A.  No.  I did not document anything to show how he

17  was resisting.

18  Q.  Okay.  And you were trained that your

19  supplements needed to be full and complete and

20  accurate, correct?

21          MS. RETTS:  Form.

22          THE WITNESS:  Our reports are done to

23  refresh our memory of what happened.  So I put what I

24  felt was necessary at the time or like what I was

25  seeing at the time.

1 their arm, you are not necessarily going to see that.

2          You need to see some movement to know if

3 there is a resistance or not.

4     Q.  But you never saw any movement, right?

5     A.  I never saw him --- no, I didn't see movement,

6 that doesn't mean he -- again, he wasn't clenched and

7 he's not helping us, I guess.

8     Q.  For all you know, he could have been

9 unconscious and dying at the moment you arrived on

10 scene, correct?

11          MS. RETTS:  Form; foundation.

12          THE WITNESS:  I don't believe so.  If he

13 did not have the ability to resist, then they would not

14 have any trouble taking him into custody.

15     Q.  BY MR. SHOWALTER:  I want to go back to what my

16 question was, which was:  You never saw him move and

17 you never heard him make any sound that you can say

18 definitively came from him, correct?

19     A.  Correct.

20     Q.  Did you ever see Casey do anything that you can

21 describe under oath as something that Casey

22 volitionally did?

23          MS. RETTS:  Form; foundation.

24          THE WITNESS:  Nothing that I physically

25 saw that I could describe, no.

1    Q.  BY MR. SHOWALTER:  And for all you know, if he

2   was tensing, it could have been in reaction to pain

3   that he was experiencing from the restraint and the

4   knee being placed in his back, which, according to the

5   medical examiner, may have caused his heart to stop,

6   correct?

7          MS. RETTS:  Form; foundation.

8          THE WITNESS:  I'm not quite sure I

9   understand your question.

10    Q.  BY MR. SHOWALTER:  You don't, as you silt here

11   today, you don't know if his muscles were tense at all,

12   correct?

13    A.  I do not, no.

14    Q.  And if they were tense, that could be in --

15   that itself is not necessarily a sign that somebody is

16   intentionally resisting, that they have tense muscles,

17   is it?

18          MS. RETTS:  Foundation.

19          THE WITNESS:  It would -- I don't know why

20   they would be tense muscles if they -- I don't know of

21   any other reason they would be tense other than to try

22   to prevent being taken into custody.

23    Q.  BY MR. SHOWALTER:  Well, the purpose of a TASER

24   is to cause muscles to contract involuntarily, correct?

25    A.  Yes.

1    Q.  So that could cause tense muscles, correct?

2    A.  Not unless the TASER goes off.

3    Q.  Which you heard it do, correct?

4         MS. RETTS:  Form.

5         THE WITNESS:  Let me clarify what I said,

6    not when the TASER turns off.  While you are being

7    Tased, your muscles are clenched.  The second it turns

8    off, your muscles are free to move.  That's why during

9    our training when you Tase somebody, we are to grab

10   them while they are being Tased.  Because the second it

11   turns off, the fight can be back on, but his muscles

12   are loose and you can now manipulate.

13   Q.  Do you know how many times Officer Seaquist

14   cycled the TASER on Casey?

15   A.  I do not.

16   Q.  But you would agree that any time the TASER was

17   being cycled, Casey's muscles would be tensed if the

18   TASER was working as it's supposed to?

19        MS. RETTS:  Form; foundation.

20        THE WITNESS:  If it was working properly,

21   then, yes, his muscles would be tensed at the time it

22   was actually cycled.

23   Q.  BY MR. SHOWALTER:  And the other thing that

24   could be happening is that another officer could be

25   administering pain compliance techniques that could

1  cause a person to involuntarily tense their muscles,

2  correct?

3           MS. RETTS:  Form; foundation.

4      Q.  BY MR. SHOWALTER:  Or reflexively tense their

5  muscle?

6           MS. RETTS:  Form; foundation.

7           THE WITNESS:  I don't know.

8      Q.  BY MR. SHOWALTER:  And the other thing that

9  could be happening is somebody could be having a

10 seizure.  That's a possibility always, right?

11          MS. RETTS:  Form.

12     Q.  BY MR. SHOWALTER:  That could cause tensing of

13 muscles in your experience, couldn't it?

14          MS. RETTS:  Form; foundation.

15          THE WITNESS:  Yeah.  I would agree with

16 that.

17     Q.  BY MR. SHOWALTER:  Did anybody ever tell you

18 after the fact what exactly Casey was doing once he was

19 on the ground that resulted in that Tasing you heard?

20     A.  No, I don't believe I discussed it with

21 anybody.

22          MR. SHOWALTER:  Okay.  I've got nothing

23 further.

24          MS. RETTS:  We will read and sign.

25          MR. SHOWALTER:  Thank you, Officer Palmer.

1  STATE OF ARIZONA       ) SS.
                          )
2  COUNTY OF MARICOPA     )

3

4        BE IT KNOWN that the foregoing proceedings
   were taken before me, DONNA DELAVINA, Certified
5  Reporter No. 50468; that the witness before testifying
   was duly sworn by me to testify to the whole truth;
6  that the foregoing 112 pages are a full, true and
   accurate record of the proceedings, all done to the
7  best of my skill and ability; that the proceedings were
   taken down by me in shorthand and thereafter reduced to
8  print under my direction.

9            [X]  Review and signature was requested.

10           [ ]  Review and signature was waived.

11           [ ]  Review and signature not required.

12           I CERTIFY that I am in no way related to any
   of the parties thereto nor am I in any way interested
13  in the outcome hereof.

14           I FURTHER CERTIFY that I have complied with
   the ethical obligations set forth in ACJA 7-206.  DATED
15  at Phoenix, Arizona, this 18th day of May, 2021.

16
                _____
17              Donna DeLaVina, RPR
                Certified Reporter
18              Certificate No. 50468

19           *     *     *     *     *     *

20

21       I CERTIFY that DONNA DELAVINA REPORTING, LLC, has
   complied with the ethical obligations set forth in ACJA
22  7-206.

23
                _____
24              Donna DeLaVina, RPR, Owner
                Donna DeLaVina Reporting, LLC
25              Arizona RRF No. R1010



# EXHIBIT 20

DANIEL WOHLGELERNTER, M.D

2299 Century Hill
Los Angeles, CA.  90067

_____

phone (310) 729-2202
Fax (310) 492-9793
Email: drdan@iheartdrdan.com

October 9, 2021

Joel Robbins
Jesse M. Showalter
ROBBINS & CURTIN
301 East Bethany Home Road
Suite B-100
Phoenix, Arizona 85012

RE:  Stickney (Wells) v. City of Phoenix, et al.
U.S.D.C. Case No. 2:20-cv-0140I-SMB-CDB
CASEY WELLS, decedent
DOB: ████████
Date of Incident- 2/04/19-- Date of Death: 2/06/2019 (40 years old)

Dear Mr. Robbins and Mr. Showalter:

I am a board-certified cardiologist with substantial experience in sudden cardiac arrest and sudden cardiac death, including my service as the director of the ICU and CCU at Providence- St. John's Hospital in Santa Monica, CA, and in my current position as Section Chief of Cardiology at Providence-St. John's.

I am knowledgeable about peer-reviewed medical and scientific research on the topics of pathophysiology of cardiac arrest and the specific type of cardiac arrest known as PEA (pulseless electrical activity).  The knowledge base that I utilize has been formed by my 35 years of clinical practice and experience, and my previous and ongoing review of and experimental literature.

In January 2021, I was retained as an expert to review relevant materials and provide expert opinion on this matter, date of incident, February 4, 2019, and to consider and to render expert opinion on whether the restraining process was contributory to Mr. Casey Wells' death, and to address alternative opinions and theories regarding the cause of death.

I have reviewed the following materials:

Plaintiff's Second Amended Complaint (prior to removal to district court)
Plaintiff's Response to Defendant Arnold's First Requests for Production of Documents
Plaintiff's Response to Defendant Arnold's First Non-Uniform Interrogatories
Responses to Plaintiff's First Set of Discovery to City of Phoenix and Officer Defendants
Plaintiff's Tenth Supplemental Disclosure Statement and the following disclosure exhibits:
PPD Report Nos. 201900000221119 and 201900000203420 (redacted) (WELLS 000001-000004)
PPD Report No. 201900000203420 (redacted) (COP-STICKNEY000001-000128)

1

WELLS 003113

PPD Report No. 201900000221119 (redacted) (COP-STICKNEY000443-000447)
PPD investigative photographs (redacted) (WELLS 000122-000424)
PPD investigative photographs (COP-STICKNEY000129-000442)
CD containing 9-1-1 audio recordings (redacted) (WELLS 000425)
PPD radio dispatch call labeled 201900203420_02042019_1415_1447 dated 2-4-2019 (COP-STICKNEY000471)
PPD radio dispatch call labeled 201900203420_02042019_1447_1540 dated 2-4-2019 (COP-STICKNEY000472)
PPD radio dispatch call labeled 201900203420_02042019_1556_1629 dated 2-4-2019 (COP-STICKNEY000473)
PPD radio dispatch call labeled 201900203420_02042019_1617_1708 dated 2-4-2019 (COP-STICKNEY000474)
PPD radio dispatch call labeled 201900203420_02042019_1744_1745 dated 2-4-2019 (COP-STICKNEY000475)
PPD radio dispatch call labeled 201900203420_02042019_1812_1813 dated 2-4-2019 (COP-STICKNEY000476)
PPD radio dispatch call labeled 201900203420_02042019_1909_1918 dated 2-4-2019 (COP-STICKNEY000477)
PPD radio dispatch call labeled 201900203420_02042019_2057_2058 dated 2-4-2019 (COP-STICKNEY000478)
PPD radio dispatch call labeled 201900203420_02042019_2124_2145 dated 2-4-2019 (COP-STICKNEY000479)
PPD 911 call labeled 201900203420_02042019_1403 (COP-STICKNEY000480)
PPD 911 call labeled 201900203427_02042019_1406 (COP-STICKNEY000481)
PPD 911 call labeled 201900203437_02042019_1406 (COP-STICKNEY000482)
PPD 911 call labeled 201900203474_02042019_1413 (COP-STICKNEY000482)
PPD 911 call labeled 201900203476_02042019_1413 (COP-STICKNEY000484)
PPD 911 call labeled 201900203487_02042019_1416 (COP-STICKNEY000485)
PPD 911 call labeled 201900203506_02042019_1420 (COP-STICKNEY000486)
PPD 911 call labeled 201900203666_02042019_1445 (COP-STICKNEY000487)
PPD 911 call labeled 201900221119_02072019_1336 (COP-STICKNEY000488)
Audio interview of Connie Brenton (redacted) (WELLS 000426)
Audio interview of Douglas Texel (redacted) (WELLS 000427)
Audio interview of Elisabeth Johnson (redacted) (WELLS 000428)
Audio interview of Holly Boston (redacted) (WELLS 000429)
Audio interview of Jeffrey Bolduc (redacted) (WELLS 000430)
Audio interview of Jenevette Tate (redacted) (WELLS 000431)
Audio interview of John Antoniades (redacted) (WELLS 000432)
Audio interview of Kyle O'Hare (redacted) (WELLS 000433)
Audio interview of Lei Ann Stickney (redacted) (WELLS 000434)
Audio interview of Naida Tedquist (redacted) (WELLS 000435)
Audio interview of Frank Long (redacted) (WELLS 000436)
Audio interview of James Arnold (redacted) (WELLS 000437)
Audio interview of Joseph Seaquist (redacted) (WELLS 000438)
Audio interview of Travis Funston (redacted) (WELLS 000439)
Audio interview of Peter Chambers (redacted) (WELLS 000440)
Audio interview of Richard Buffington (redacted) (WELLS 000441)
Audio interview of Robert Rodarme (redacted) (WELLS 000442)
Audio interview of Shelly Aldridge (redacted) (WELLS 000443)
Audio interview of Vickki Zachariah (redacted) (WELLS 000444)
Audio interview of Wanda Cleveland and Brittany Walls (redacted) (WELLS 000445)
Axon video footage of incident (WELLS 000446)
Axon video footage following incident (WELLS 000447)
Cellphone video footage by Richard Buffington (redacted) (WELLS 000448)
Photographs taken by Jeffrey Bolduc (WELLS 000449-000452)
PPD PSB19-0022 investigation (redacted) (WELLS 000453-000601)

WELLS 003114

PPD PSB19-002 Report re 19-022 (Cover Pages) (COP-STICKNEY000567-000569)
PPD PSB19-002 Report dated 11-8-2019 (Internal Investigation) (COP-STICKNEY000570-579)
PPD PSB re 19-0022 (Administrative Paperwork) (COP-STICKNEY000580-000619)
PPD PSB re 19-0022 (Involved Employees) (COP-STICKNEY000620-000628)
PPD PSB re 19-0022 (Civilian Suspect) (redacted) (COP-STICKNEY000629-000640)
PPD PSB re 19-0022 (Attachments) (redacted) (COP-STICKNEY000641-000666)
PPD Review Board UOF Incident Review Memo re PSB 19-0022 dated 2-18-2020 (COP-STICKNEY000667)
PPD PSB Investigation Summary re PSB 19-0022 (redacted) (COP-STICKNEY000668-000676)
Audio Interview of John Antoniades dated 2-4-2019 re PPD PSB 19-0022 (COP-STICKNEY000677)
Audio Interview of James Arnold dated 2-15-2019 re PPD PSB 19-0022 (COP-STICKNEY000678)
Audio Interview of Jeffrey Bolduc dated 2-4-2019 re PPD PSB 19-0022 (COP-STICKNEY 000679)
Audio Interview of Holly Boston dated 2-4-2019 re PPD PSB 19-0022 (COP-STICKNEY000680)
Audio Interview of Richard Buffington dated 2-4-2019 re PPD PSB 19-0022 (COP-STICKNEY000681)
Audio Interview of Peter Chambers dated 2-4-2019 re PPD PSB 19-0022 (COP-STICKNEY000682)
Audio Interview of Travis Funston dated 2-11-2019 re PPD PSB 19-0022 (COP-STICKNEY000683)
Audio Interview of Dustin Haynes dated 2-11-2019 re PPD PSB 19-0022 (COP-STICKNEY000684)
Audio Interview of Frank Long dated 2-22-2019 re PPD PSB 19-0022 (COP-STICKNEY000685)
Audio Interview of Kenneth Palmer dated 2-8-2019 re PPD PSB 19-0022 (COP-STICKNEY000686)
Audio Interview of Robert Rodarme dated 2-8-2019 re PPD PSB 19-0022 (COP-STICKNEY000687)
Audio Interview of Joseph Seaquist dated 2-15-2019 re PPD PSB 19-0022 (COP-STICKNEY000688)
Audio Interview of Jenevette Tate dated 2-5-2019 re PPD PSB 19-0022 (COP-STICKNEY000689)
Audio Interview of Douglas Texel dated 2-6-2019 re PPD PSB 19-0022 (COP-STICKNEY000690)
Audio Interview of Sean Yamane dated 2-22-2019 re PPD PSB 19-0022 (COP-STICKNEY000691)
Audio Interview of Vickki Zachariah (undated) re PPD PSB 19-0022 (COP-STICKNEY000692)
Maricopa County Medical Examiner's file re Casey Wells (redacted) (WELLS 000602-000686)
Maricopa County Medical Examiner's photographs re Casey Wells (WELLS 000687-000867)
Maricopa County Medical Examiner's imaging studies re Casey Wells (WELLS 000868)
Phoenix Fire Department EMS and billing records (redacted) (WELLS 000869-000871)
Photographs of Casey Wells in hospital (WELLS 000875-000888)
Chief Jeri Williams' comments regarding George Floyd (WELLS 000932)
PPD EIIP/IAPro notifications and alerts since 2010 (WELLS 000933-001012)
HonorHealth Deer Valley Medical Center medical records (redacted) (WELLS 001021-001886)
PPD CAD Log (COP-STICKNEY000450-000470)
PPD Taser Report prepared by Mark Veres (COP-STICKNEY000489-000500)
PPD Use of Force Report re Incident 201900000203420 (COP-STICKNEY000522-000541)
Video of Casey Wells naked at bus stop (WELLS 001908)
Taser Pulse Chart labeled 142911 cartridge 1 (Seaquist) (COP-STICKNEY000696)
Taser Pulse Chart labeled 142926 cartridge 2 (Seaquist) (COP-STICKNEY000697)
Taser Pulse Chart labeled 142956 cartridge 2 (Seaquist) (COP-STICKNEY000698)
Taser Pulse Chart labeled 143019 cartridge 2 (Seaquist) (COP-STICKNEY000699)
Taser Pulse Chart labeled 143046 cartridge 2 (Seaquist) (COP-STICKNEY000700)
Phoenix Fire Department EMS Incident Report re: 19-045650 (COP-STICKNEY000701)
Phoenix Fire Department Incident History Report (RMS Live System) re: Incident 19-045650 (COP-STICKNEY000703-000704)
Jewish Family & Children's Services medical records (redacted) (WELLS 001911-001917)
Recovery Innovations medical records (redacted) (WELLS 001918-002170)

WELLS 003115

PPD Training materials re: Course #1453 Non- credit video training Restraint/Refusal, (COP-STICKNEY003390-3393)

PPD Training materials re: Course #08159 Taser Operations M26 X26 (COP-STICKNEY003394-3418)

PPD Training re: Course #08487 Ground Fighting (COP-STICKNEY003419-3429)

PPD Training re: Course #09367 Excited Delirium (COP-STICKNEY003430-3438)

PPD Training re: Course #10186 Taser X26 Recertification (COP-STICKNEY003439-3450)

PPD Training re: Course #10378 Urban and Open Area Engagements (COP-STICKNEY003451-3466)

PPD Training re: Course #10597 UOF Review (COP-STICKNEY003467-3474)

PPD Training re: Course #10597 UOF Review (COP-STICKNEY003475-3485)

PPD Training re: Course #9783 Crisis Communications for First Responders (COP-STICKNEY003486-3500)

PPD Training re: Course #10610 Taser X26 Recertification (Revised 9/2009) (COP-STICKNEY003501-3512)

PPD Training re: Course #11132 Taser X2 Operator (COP-STICKNEY003513-3532)

PPD Training re: Course #10868 Advanced Officer Training 2011 (COP-STICKNEY003533-3549)

PPD Training re: Course #11362 UOF review (Revised 6/2012) (COP-STICKNEY003550-3560)

PPD Training re: Course #11630 Advanced Officer Training 2013 (COP-STICKNEY003561-3589)

PPD Training re: Course #11364 Arrest Team Tactics (COP-STICKNEY003590-3597)

PPD Training re: Lesson Plan - Dealing with the Mentally Ill (Revised 1/2008) (COP-STICKNEY003598-3607)

PPD Training re: Lesson Plan #12199 - 2015 Module Mental Illness (11/2014) (COP-STICKNEY003608-3627)

PPD Training re: Lesson Plan #12267 - 2015 Module UOF Review (03/2015) (COP-STICKNEY003628-3638)

PPD Training re: Lesson Plan #10610 Taser Recertification 2010 Power Point Presentation (COP-STICKNEY003639-3663)

PPD Training re: Lesson Plan #08159 Taser M26/X26 Advanced Taser (COP-STICKNEY003664)

PPD Training re: Lesson Plan #10186 Taser X26 Recertification (COP-STICKNEY003665)

PPD Training re: CALEA Video – Mental Illness (COP-STICKNEY003666)

PPD UOF Report for IR 201900000203420 (COP-STICKNEY003702-3721)

Chicanos Por La Causa, Corazon Residential Treatment Center medical records (redacted) (WELLS 002172-002243)

Danica Oparnica, ANP medical records (redacted) (WELLS 002244-002261)

Ferguson Family Medicine medical records (redacted) (WELLS 002262-002267)

Transcript of audio interview of Joseph Seaquist dated 2-4-2019 (WELLS 002268-002284)

Transcript of audio PSB interview of Joseph Seaquist dated 2-15-2019 (WELLS 002285-002304)

Transcript of audio interview of James Arnold dated 2-4-2019 (WELLS 002305-002327)

Transcript of audio PSB interview of James Arnold dated 2-15-2019 (WELLS 002328-002348)

Transcript of audio interview of Robert Rodarme dated 2-4-2019 (WELLS 002349-002360)

Transcript of audio PSB interview of Robert Rodarme dated 2-8-2019 (WELLS 002361-002392)

Transcript of audio interview of Travis Funston dated 2-4-2019 (WELLS 002393-002400)

Transcript of audio PSB interview of Travis Funston dated 2-11-2019 (WELLS 002401-002416)

Transcript of audio interview of Frank Long dated 2-4-2019 (WELLS 002417-002430)

Transcript of audio PSB interview of Frank Long dated 2-22-2019 (WELLS 002431-002453)

Transcript of audio PSB interview of Sean Yamane dated 2-22-2019 (WELLS 002454-002468)

Transcript of audio PSB interview of Dustin Haynes dated 2-11-2019 (WELLS 002469-002481)

Transcript of audio PSB interview of Kenneth Palmer dated 2-8-2019 (WELLS 002482-002498)

Phoenix Police Department Ops Order 1-05 Use of Force (Eff. 2018) (COP-STICKNEY003722-3743)

Officer Dustin Haynes' E-Learning Training Log (redacted) (COP-STICKNEY004452-4454)

Officer Frank Long's E-Learning Training Log (redacted) (COP-STICKNEY004455-4457)

Officer James Arnold's E-Learning Training Log (redacted) (COP-STICKNEY004458-4460)

Officer Joseph Seaquist's E-Learning Training Log (redacted) (COP-STICKNEY004461-4462)

Officer Kenneth Palmer's E-Learning Training Log (redacted) (COP-STICKNEY004463-4465)

WELLS 003116

Sergeant Robert Rodarme's E-Learning Training Log (redacted) (COP-STICKNEY004466-4469)

Officer Sean Yamane's E-Learning Training Log (redacted) (COP-STICKNEY004470-4472)

Officer Travis Funston's E-Learning Training Log (redacted) (COP-STICKNEY004473-4475)

TASER Handheld CEW Warnings, Instructions, and Information: Law Enforcement, dated 10-30-2018 (WELLS 002616-002623)

Transcript re: PSB19-0022 Audio File of Officer James Arnold Interview dated 2-15-19 (COP-STICKNEY004663-004694)

Transcript re: PSB19-0022 Audio File of Officer Travis Funston Interview dated 2-11-19 (COP-STICKNEY004695-004716)

Transcript re: PSB19-0022 Audio File of Officer Kenneth Palmer Interview dated 2-8-19 (COP-STICKNEY004717-004738)

Transcript re: PSB19-0022 Audio File of Sgt Robert Rodarme Interview dated 2-11-19 (COP-STICKNEY004739-004772)

Transcript re: Kyle Walls Audio Interview dated 2-4-2019 (COP-STICKNEY004773-004785)

Transcript re: Wanda Cleveland and Brittany Walls Audio Interview dated 2-4-2019 (COP-STICKNEY004786-004809)

Officer Robert Rodarme's Supervisor Notes (redacted) (COP-STICKNEY004810-004833)

Documents received from Glendale Police Department in response to public record request (redacted) (COP-STICKNEY004834-004857)

Elisabeth Johnson Interview Transcript dated 2-4-2019 (WELLS 002624-002634)

Holly Boston Interview Transcript dated 2-4-2019 (WELLS 002635-002648)

Jeffery Bolduc Interview Transcript dated 2-4-2019 (WELLS 002649-002657)

Jenevette Tate Interview Transcript dated 2-5-2019 (WELLS 002658-002676)

Kyle O'Hare Interview Transcript dated 2-6-2019 (WELLS 002677-002687)

Lei Ann Stickney Interview Transcript dated 2-4-2019 (WELLS 002688-002704)

Naida Tedquist Interview Transcript dated 2-16-2019 (WELLS 002705-002714)

Peter Chambers Interview Transcript dated 2-4-2019 (WELLS 002715-002726)

Richard Buffington Interview Transcript dated 2-4-2019 (WELLS 002727-002737)

Shelly Aldridge Interview Transcript dated 2-4-2019 (WELLS 002738-002750)

Vickki Zachariah Interview Transcript dated 2-4-2019 (WELLS 002751-002771)

Wanda Cleveland Interview Transcript dated 2-4-2019 (WELLS 002772-002790)

PPD Operations Order 7.1 – Prisoners (COP-STICKNEY004902-4910)

PPD Lesson Plan re: Course #8422 – Emotional Survival for the New Officer (COP-STICKNEY004911-4913)

PPD Lesson Plan re: Course #8440 – Enlightened Leadership (Post Academy) (COP-STICKNEY004914-4917)

PPD Lesson Plan re: Course #8903 – Career Survival (COP-STICKNEY004918-4926)

PPD Lesson Plan re: Course #10511 – RIPP Restraint ((COP-STICKNEY004927-4933)

PPD Lesson Plan re: Course #10596 – Use of Force Refresher (COP-STICKNEY004934-4944)

PPD Lesson Plan re: Course #10597 – Use of Force Review (COP-STICKNEY004945-4952)

PPD Lesson Plan re: Course #11233 – Interpersonal Communication (COP-STICKNEY004953-4965)

PPD Lesson Plan re: Course #11247 – Ethics in Law Enforcement (COP-STICKNEY004966-4977)

PPD Lesson Plan re: Course #11364 – Arrest Team Tactics (COP-STICKNEY004978-4985)

PPD Lesson Plan re: Course #11887 –Taser X2 Operator (COP-STICKNEY004986-5008)

PPD Lesson Plan re: Course #12416 – Module re: PTSD Dealing with Trauma, 2015 (COP-STICKNEY005009-5013)

PPD Lesson Plan re: Course #12474 – Emotional Survival for New Officers (COP-STICKNEY005014-5022)

PPD Lesson Plan re: Course #1785 – Officer Survival Skills (COP-STICKNEY005023-5040)

PPD Lesson Plan re: Course #12929 – Post Academy PSB Presentation (COP-STICKNEY005041-5045)

PPD Lesson Plan re: Course #13329 –Controlling & Handcuffing Suspects (COP-STICKNEY005046-5052)

WELLS 003117

PPD Lesson Plan re: Course #13445 – Tactical Negotiations (COP-STICKNEY005053-5057)

PPD Lesson Plan re: Course #12266 – Module Crisis Communications for First Responders, 2015 (COP-STICKNEY005058-5077)

PPD Lesson Plan re: Course #12530 – Decision Making Matrix De-Escalation Techniques (COP-STICKNEY005078-5086)

AZPOST PPD Training Academy Course "Sudden in Custody Death Syndrome (Positional Asphyxia) (COP-STICKNEY005087-5100)

AZPOST Model Lesson Plan Course "Managing In-Custody Death 8.5.5, June 2014 (Positional Asphyxia) (COP-STICKNEY005101-5110)

AZPOST Protocol re: Excited Delirium Response (COP-STICKNEY005111)

AZPOST Curriculum Lesson Plan 3.4 – Mental Illness, July 2006 (COP-STICKNEY005112-5125)

AZPOST Curriculum Lesson Plan 5.10 – Narcotics and Dangerous Drugs, July 2006 (COP-STICKNEY005126-5175)

AZPOST Curriculum Lesson Plan 8.5 – Techniques and Procedure Selection, August 2006 (COP-STICKNEY005176-5180)

AZPOST Curriculum Lesson Plan 8.5.3 and 8.5.4 – Use of Force, August 2006 (COP-STICKNEY005181-5212)

AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics Handout (COP-STICKNEY005213-5214)

AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics, August 2006 (COP-STICKNEY005215-5228)

AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques, August 2006 (COP-STICKNEY005229-5246)

AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques Handout, 2004 (COP-STICKNEY005247-5248)

AZPOST Curriculum Lesson Plan 8.5.9, 8.8.10 and 8.5.11 – Personal Defense Techniques, August 2006 (COP-STICKNEY005249-5268)

AZPOST Curriculum Lesson Plan 8.5.9 - 8.5.11 – Personal Defense Techniques Handout, 2004 (COP-STICKNEY005269-5270)

AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques (PPCT) Handout (COP-STICKNEY005271-5279)

AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques, August 2006 (COP-STICKNEY005280-5295)

AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 – Handcuffing Handout (COP-STICKNEY005296-5313)

AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 – Handcuffing August 2006 (COP-STICKNEY005314-5330)

AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival Handout (COP-STICKNEY005331-5333)

AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival, Revised: April, 2007 (COP-STICKNEY005334-5348)

AZPOST Curriculum Lesson Plan 3.4 – Mental Illness, March 2010 (COP-STICKNEY005349-5363)

AZPOST Curriculum Lesson Plan 5.10 – Narcotics and Dangerous Drugs, November 2009 (COP-STICKNEY005364-5413)

AZPOST Curriculum Lesson Plan 8.5 – Techniques and Procedure Selection, January 2010 (COP-STICKNEY005414-5418)

AZPOST Curriculum Lesson Plan 8.5.3 and 8.5.4 – Use of Force, January 2010 (COP-STICKNEY005419-5448)

AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics Handout, 2010 (COP-STICKNEY005449-5450)

AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques, April 2010 (COP-STICKNEY005451-5467)

AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques Handout, 2010 (COP-STICKNEY005468-5469)

AZPOST Curriculum Lesson Plan 8.5.9 - 8.5.11 – Personal Defense Techniques Handout, 2010 (COP-STICKNEY005470-5471)

AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques (OCCS) Handout, 2010 (COP-STICKNEY005472-5485)

AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques (PPCT) Handout, 2010 (COP-STICKNEY005486-5494)

WELLS 003118

AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 - Handcuffing Handout, 2010 (COP-STICKNEY005495-5512)

AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival Handout, 2010 (COP-STICKNEY005513-5515)

AZPOST Curriculum Lesson Plan 3.4 – Mental Illness, November 2012 (COP-STICKNEY005516-5530)

AZPOST Curriculum Lesson Plan 8.5 – Techniques and Procedure Selection, June 2014 (COP-STICKNEY005531-5535)

AZPOST Curriculum Lesson Plan 8.5.3 and 8.5.4 – Use of Force, June 2014 (COP-STICKNEY005536-5565)

AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics Handout, revised June 2014 (COP-STICKNEY005566-5567)

AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics, June 2014 (COP-STICKNEY005568-5581)

AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques, June 2014 (COP-STICKNEY005582-5598)

AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques Handout, Re-Reviewed 2014 (COP-STICKNEY005599-5600)

AZPOST Curriculum Lesson Plan 8.5.9 - 8.5.11 – Personal Defense Techniques Handout, Reviewed June 2014 (COP-STICKNEY005601-5602)

AZPOST Curriculum Lesson Plan 8.5.9, 8.8.10 and 8.5.11 – Personal Defense Techniques, August 2017 (COP-STICKNEY005603-5625)

AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques, Instructor/Basic, April 2017 (COP-STICKNEY005626-5639)

AZPOST OCCS Handout, June 2014 (COP-STICKNEY005640-5653)

AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 – Handcuffing, June 2016 (COP-STICKNEY005654-5664)

AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival, June 2017 (COP-STICKNEY005665-5679)

AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival Handout, Reviewed June 2014 (COP-STICKNEY005680-5682)

AZPOST Curriculum Lesson Plan 8.5.25 – Choke Defense Technique, June 2017 (COP-STICKNEY005683-5689)

Office of Community Oriented Policing Services ("COPS") Publication "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice" (COP-STICKNEY005744-5823)

PPD Uniform Crime Reporting ("UCR") Annual Comparison, 2010 - 2020 (COP-STICKNEY005824)

Presentation - "Estimation of TASER Current Flow and Effects on Human Body", D. Panescu, 2008 (COP-STICKNEY005825-5859)

Presentation - TASER Risk Management Stats Public Summary presented June 10, 2014 (COP-STICKNEY005860-5935)

Presentation - TASER Risk Management Stats Public Summary presented October 15, 2013 (COP-STICKNEY005936-5993)

TASER Email re: Training Bulletin, September 18, 2014 (COP_003058)

PPD PSB investigation materials re: CI20-0075 – Officer Arnold (COP-STICKNEY006207-6212)

PPD PSB investigation materials re: INQ16-0401– Officer Arnold (COP-STICKNEY006213-6217)

Audio – Recorded Interview #1 with Complainant (labeled 801_0333) PPD PSB investigation materials re: INQ16-0401– Officer Arnold (COP-STICKNEY006218)

Audio – Recorded Interview #2 with Complainant (labeled B--S) PPD PSB investigation materials re: INQ16-0401– Officer Arnold (Redacted) (COP-STICKNEY006219)

PPD PSB investigation materials re: INQ17-0264– Officer Arnold (COP-STICKNEY006220-6224)

PPD PSB investigation materials re: INQ18-0955 – Officer Arnold (Redacted) (COP-STICKNEY006225-6229)

PPD PSB investigation materials re: PHN16-0058 – Officer Arnold (Redacted) (COP-STICKNEY006230-6235)

Audio – Recorded Interview (labeled Ms Jeffries Call) PPD PSB investigation materials re: PHN16-0058– Officer Arnold (COP-STICKNEY006236)

WELLS 003119

PPD PSB investigation materials re: CI18-0113 – Officer Funston (Redacted) (COP-STICKNEY006237-6241)
PPD PSB investigation materials re: INQ19- 0631 – Officer Funston (Redacted) (COP-STICKNEY006242-6266)
PPD PSB investigation materials re: PPI19- 0101 - Officer Funston (Redacted) (COP-STICKNEY006267-6271)
PPD PSB investigation materials re: INQ17-0915 - Officer Haynes (Redacted) (COP-STICKNEY006272-6280)
PPD PSB investigation materials re: PPI14-0373 - Officer Haynes (Redacted) (COP-STICKNEY006281-6285)
PPD PSB investigation materials re: CI16-0073 - Officer Long (Redacted) (COP-STICKNEY006286-6292)
PPD PSB investigation materials re: CI16-0188 - Officer Long (Redacted) (COP-STICKNEY006293-6299)
PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (Redacted) (COP-STICKNEY006300-6376)
Audio – Recorded Interview (labeled DCS K Miller) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (COP-STICKNEY006377)
Audio – Recorded Interview (labeled Det. Gonzalez (2)) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (COP-STICKNEY006378)
Audio – Recorded Interview (labeled Det Gonzalez Intro) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (COP-STICKNEY006379)
Audio – Recorded Interview (labeled Det Nichols) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (COP-STICKNEY006380)
Audio – Recorded Interview (labeled Palmer Interview) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (COP-STICKNEY006381)
PPD PSB investigation materials re: TRF10-0625 - Officer Palmer (Redacted) (COP-STICKNEY006382-6383)
PPD PSB investigation materials re: TRF10-0702 - Officer Palmer (Redacted) (COP-STICKNEY006384-6385)
PPD PSB investigation materials re: TRF10-1100 - Officer Palmer (Redacted) (COP-STICKNEY006386-6387)
PPD PSB investigation materials re: TRF10-1101 - Officer Palmer (COP-STICKNEY006388-6389)
PPD PSB investigation materials re: TRF10-1340 - Officer Palmer (COP-STICKNEY006390-6397)
PPD PSB investigation materials re: TRF10-1341 - Officer Palmer (COP-STICKNEY006398-6406)
PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (Redacted) (COP-STICKNEY006407-6414)
Audio – recorded Interview (labeled message left 111219) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006415)
Audio – recorded Interview (labeled Ms Dileo Msg for PSB) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006416)
Audio – recorded Interview (labeled Ms Dileo PSB Interview) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006417)
Audio – recorded Interview (labeled Phone Conversation 111219) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006418)
Audio – recorded Interview (labeled Phone Discussion 111019) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006419)
Audio – recorded Interview (labeled Phone Conversation 112519) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006420)
PPD PSB investigation materials re: PIC14-0023 - Officer Rodarme (COP-STICKNEY006421-6432)
PPD PSB investigation materials re: SI19-0077 - Officer Rodarme (Redacted) (COP-STICKNEY006433-6437)
PPD PSB investigation materials re: INQ14-0011- Officer Seaquist (Redacted) (COP-STICKNEY006438-6441)
PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006442-6447)
Audio – recorded Interview (labeled Dawson msg) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006448)
Audio – recorded Interview (labeled Dawson, Marisa) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006449)
Audio – recorded Interview (labeled Marisa Dawson) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006450)

WELLS 003120

Audio – recorded Interview (labeled Ms Marisa Dawson) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006451)

Audio – recorded Interview (labeled Recorded Interview w Marisa Dawson) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006452)

PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (Redacted) (COP-STICKNEY006453-6459)

Audio – recorded Interview (labeled Ofc audio recording at 918T part 1) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006460)

Audio – recorded Interview (labeled Ofc audio recording at 918T part 2) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006461)

Audio – recorded Interview (labeled PSB call to Ms Craig) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006462)

Audio – recorded Interview (labeled PSB Interview with Officer) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006463)

Audio – recorded Interview (labeled PSB Interview with Officer Seaquist) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006464)

PPD PSB investigation materials re: INQ19-0581 - Officer Seaquist (Redacted) (COP-STICKNEY006465-6466)

Audio – recorded Interview (labeled Terry 8-7-19) PPD PSB investigation materials re: INQ19-0581 - Officer Seaquist (COP-STICKNEY006467)

Audio – recorded Interview (labeled Terry 8-19-19) PPD PSB investigation materials re: INQ19-0581 - Officer Seaquist (COP-STICKNEY006468)

PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (Redacted) (COP-STICKNEY006469-6471)

Audio – recorded Interview (labeled Voice Mail for Ms Cindy Franks) PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (COP-STICKNEY006472)

Audio – recorded Interview (labeled PSB Interview Ms Cindy Franks) PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (COP-STICKNEY006473)

Audio – recorded Interview (labeled PSB Interview Cindy Franks2) PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (COP-STICKNEY006474)

PPD In-Custody Deaths, 2014-2019 (COP-STICKNEY006592)

U.S. Department of Justice, National Law Enforcement Technology Center, Positional Asphyxia - Sudden Death June 1995 (WELLS 002791-002794)

Memorandum re Positional Asphyxia, Chris Krall, CIRSA Assistant Director, June 10, 1996 (WELLS 002795-002798)

Community Health Services records (redacted) (WELLS 002799-002871)

Banner Thunderbird Medical Center medical records (redacted) (6-24-2007) (WELLS 002872-002901)

Banner Thunderbird Medical Center medical records (redacted) (11-24-2016) (WELLS 002902-002996)

Banner Estrella Medical Center medical records (12-8-2016) (redacted) (WELLS 002997-003030)

Article re: Compression Asphyxia Biomechanical Model by Kroll, et al. 2017 (COP-STICKNEY003667-3674)

Research Article "The Speed of a Prone Subject" by William J. Lewinski, Ph.D., et al., Force Science Institute (COP-STICKNEY004858-4871)

Research Article "Prone Positioning in Awake, Nonintubated Patients with COVID-19 Hypoxemic Respiratory Failure," JAMA Internal Medicine, November 2020 (COP-STICKNEY004873-4876)

Research Abstract "Prone Positioning Improves Oxygenation in Spontaneously Breathing Nonintubated Patients with Hypoxemic Acute Respiratory Failure: A Retrospective Study," Journal of Critical Care, December 2015 (COP-STICKNEY004877-4878)

Research Article "Assessment of Stress Markers in Restrained Individuals Following Physical Stress with and without Sham CED Activation", Journal of Forensic and Legal Medicine, Volume 74, 2020 (COP-STICKNEY004879-4884)

WELLS 003121

Research Article: "Police Restraint – Causes of Death", Medicine Science and the Law, Meng Aw-Yong, 2020 (COP-STICKNEY005690-5696)

Research Article: "LAW Enforcement Use of Force "Standards" Degrees of Certainties, and Scientific Reliabilities", For the Defense, Michael Brave, June 2020 (COP-STICKNEY005697-5703)

Research Article "The Relationship Between Positional Asphyxia and Increasing Body Mass Index", Legal Medicine, Roger W. Byard, January 2020 (COP-STICKNEY005704-5706)

Research Article "Sudden Death During Physical Restraint by the Dutch Police", Journal of Forensic and Legal Medicine, L.G.M. Dijkhuizen, April 2020 (COP-STICKNEY005707-5715)

Research Article "Investigation of Deaths Temporally Associated with Law Enforcement Apprehension", AFP, M. Graham, M.D., Vol 4, issue 3 (COP-STICKNEY005716-5738)

Research Article "Electrical Weapons, Hematocytes, and Ischemic Cardiovascular Accidents", Journal of Forensic and Legal Medicine, M. Kroll, et al., May 2020 (COP-STICKNEY005739-5743)

Deposition Transcripts:
Arnold, James 2021-04-06
Funston, Travis 2021-04-15
Haynes, Dustin 2021-03-29
Long, Frank 2021-03-30
Palmer, Kenneth 2021-05-03
Rodarme, Robert 2021-03-23
Seaquist, Joseph 2021-03-22
Yamane, Sean 2021-03-26

PERTINENT MEDICAL HISTORY:

Casey Wells had a prior history of intermittent use of methamphetamine, attention deficit hyperactivity disorder, unspecified psychosis not due to a substance or known physiological condition vs. schizoaffective disorder, and intermittent hypertension. He had no history of heart disease.

On August 12, 2018, a treatment summary at the Corazon residential treatment program stated the following: "Casey appeared stable emotionally and mentally at the time of discharge; he denied any depression or suicidal ideation at time of his completion of treatment. At this time it appears that Casey is at the action stage of change as it appears that he wants to maintain sobriety as evidenced by his completion of treatment and progress. In addition, Casey will need to continue following up with a sponsor and staying In a sober environment. Casey appeared willing to end his relationships with active drug use, so as to decrease his potential for relapse. Casey states that he will be going back home to his wife. Based on Casey's behavior and participation it appears that his potential for relapse is low, providing that he continues to use his support systems, strengths, and especially a sponsor to help him maintain his sobriety."

This incident occurred in the afternoon on February 4, 2019, on a residential street in Phoenix, Arizona. City of Phoenix police officers responded to calls reporting a man (Casey Wells) standing naked in the street, praying and/or doing yoga poses. He was not threatening anyone and he was not armed. He appeared psychologically disturbed. Officer James Arnold arrived first at the scene at 2:19 PM, and Officer Robert Rodarme arrived on scene at 2:22 PM. Officers Arnold and Rodarme attempted to handcuff Mr. Wells, and grabbed his arms and attempted to pull his arms behind his back. Casey did not wish to be handcuffed, and began flailing his arms and legs. Officers Arnold and Rodarme forced Casey

WELLS 003122

to the ground, on the street, and this caused Mr. Wells to hit the back of his head on the asphalt. Officer Joseph Seaquist then arrived on the scene. Officers Arnold, Rodarme, and Seaquist pushed Casey into a prone position (lying face down on his stomach) on the hard surface of the street, and Casey's left arm became pinned beneath his body. Casey flailed his legs, and Officer Seaquist grabbed Casey's legs and pushed them toward his buttocks. At this point, Officers Arnold, Rodarme, and Seaquist were applying force to Casey's back and extremities, thereby holding Casey face down on the asphalt. Officers Funston and Long then arrived on scene, and they joined in the force being applied to Mr. Wells. Officer Funston restrained Casey's legs, and Officer Long restrained his arms. As Casey lay face down on the asphalt with five officers restraining him in the prone position, and with his left arm trapped under his body, Officer Seaquist deployed his Taser electrical control device into Casey's back. In response to the Taser deployment, Casey "locked up", which is the term for sustained muscle contractions in response to the electrical stimulation. Officer Seaquist used his Taser on Casey 3 more times, as Casey continued to be restrained in a prone position with the officers applying compressive force to his torso and extremities. After a 4th Taser deployment, Casey was handcuffed, with his handcuffed arms behind his back. Officers Haynes, Yamane, and Palmer then arrived on the scene. Officers Haynes and Funston applied a RIPP restraint to immobilized Casey's legs and attached the RIPP clip to the handcuff chain. Officer Yamane restrained Casey's legs as the RIPP restraint was applied. With Mr. Wells handcuffed, with his hands behind his back, and with RIPP restraint on his legs, and with him face down on the hard asphalt surface with 6 officers applying compressive force to his neck, back, and legs, Officer Seaquist deployed his Taser into Casey for the 5th time. The Axon body camera demonstrates that one of the Officers was using his knee and body weight to apply pressure to Casey's upper back and neck and shows that Casey was subdued and handcuffed and restrained in the prone position by a total of 6 Officers.

At approximately 2:31 PM, Officer Long noticed that Mr. Wells was purple and was not breathing and was pulseless. CPR was initiated. When Phoenix Fire Dept. EMS arrived, the on-scene EKG demonstrated that Casey was in PEA (pulseless electrical activity) cardiac arrest. He was given epinephrine and cardiopulmonary resuscitation with successful restoration of pulse and rhythm.

Mr. Wells was then transported to Deer Valley Medical Center. Evaluation demonstrated that there was no evidence of acute myocardial infarction. Laboratory studies showed severe metabolic acidosis, consistent with his having had cardiac arrest. He was noted to have severe brain injury due to anoxic encephalopathy as a result of the cardiac arrest. The brain imaging studies and EEG showed that there was no realistic prospect of recovery. Casey's mom, Lei Ann Stickney, agreed to withdrawal of life-sustaining therapies in light of the futility of additional care. Casey was declared dead on February 6, 2019.

The Maricopa County Office of the Medical Examiner performed an autopsy on Casey Wells on February 7, 2019. PERSONS PRESENT AT EXAMINATION: Phoenix Police Department: Detective Michael Smojver. The Medical Examiner was Kevin Horn, MD.

The following are findings from the Coroner's report:

WELLS 003123

FINDINGS:

I. Complications of cardiac dysrhythmia and arrest in setting of drug (methamphetamine) intoxication, acute psychosis, arteriosclerotic cardiovascular disease, and physical restraint with prone positioning and possible extrinsic chest compression.

A. Multifocal abrasions and contusions of face, torso, and extremities, consistent with perimortem physical struggle.

B. Two (2) superficial puncture wounds of upper paramidline right back, consistent with conducted electrical weapon (CEW) application and related dart injury.

C. Subcutaneous hemorrhage, central back (between shoulder blades).

D. Cardiomegaly (450 grams) with moderate concentric left ventricular hypertrophy.

E. Atherosclerotic stenosis of proximal left anterior descending coronary artery, focal, moderate to severe (up to approximately 70 percent luminal narrowing).

F. Microscopic examination of ventricular myocardium and cardiac conducting system tissues with multifocal myocytic hypertrophy, multifocal moderate interstitial and perivascular fibrosis, and multifocal arteriosclerotic small vessel disease.

G. Pulmonary edema, bilateral.

H. Arteriolonephrosclerosis, bilateral, mild.

I. Diffuse marked cerebral edema with changes consistent with perimortem anoxic encephalopathY.

J. Neuropathologic evaluation of brain, dura mater, and spinal cord revealing changes consistent with perimortem hypoxic/ischemic encephalopathy consistent with cardiopulmonary arrest and resuscitation (see neuropathology report).

   1. Hemorrhagic gastritis, mild (incidental), consistent with perimortem hypoxic/ischemic encephalopathy with resuscitation and intubation.

K. Anthropologic assessment of hyoid bone and airway cartilages revealing focal airway cartilage fractures (see anthropology report)'

L. Toxicologic analyses of antemortem samples of blood from treating hospital with presence of 100% d-methamphetamine enantiomer via chiral analysis (580 ng/mL) and related metabolite (d-amphetamine).

M. Reported urine drug screens (antemortem in hospital) revealing presumptive presence of amphetamines and ecstasy.

N. Reported perimortem bizarre behavior (yelling, physical aggression, and public nudity), consistent with unspecified psychiatric disorder in context of acute/chronic drug use.

O. Reported history of drug use including reported past use of methamphetamine, both prescribed and illicit.

P. Reported history of sudden unresponsiveness during perimortem physical struggle with prone positioning and possible extrinsic torso compression in context of law enforcement subdual.

II. Benign prostatic hypertrophy, mild.

III. Pleuropulmonary fibrous adhesions, right.

IV. Remote rib fractures, with callus, left seventh and tenth right ribs, incidental.

V. Reported history of clival ecchordosis physaliphora (skull base congenital hamartoma, benign) by magnetic resonance imaging, antemortem, incidental.

   A. No skull or central nervous system mass lesions identified at autopsy or during neuropathological evaluation of brain, dura mater, or spinal cord.

VI. Reported history of hypothyroidism and gastroesophageal reflux disease.

VII Therapy-related changes.

   A. hemorrhagic, mildly displaced fractures of bilateral anterior ribs and of sternum, consistent with perimortem cardiopulmonary resuscitative efforts with chest compressions.

WELLS 003124

B. Focal mucosal erosion of urinary bladder in context of perimortem Foley catheterization.

Dr. Horn, the medical examiner, provided the following summary and opinions:

SUMMARY AND OPINION of DR. KEVIN HORN- MEDICAL EXAMINER:
Based on the postmortem examination findings and investigative history as available to me, it is my opinion that Casey Joe Wells, 40-year-old Caucasian male, died as a result of complications of cardiac dysrhythmia and arrest in setting of drug (methamphetamine) intoxication, acute psychosis, arteriosclerotic cardiovascular disease, and physical restraint with prone positioning and possible extrinsic chest compression.

According to reports, this man's death was pronounced in a local hospital intensive care unit. According to initial reports, he was in the process of being arrested by the Phoenix Police Department involving the use of a conducted electrical weapon (CEW). During the process of restraint and arrest he apparently experienced cardiac arrest and could not be revived. Brain death was ultimately diagnosed in the hospital and he expired after family opted to withdraw care.

According to subsequently received reports, the decedent was in a local city park , nude,  and performing what appeared to be yoga exercises. The Phoenix police Department responded to the scene after receiving notifications of this activity, and approached the decedent.

According to the detective attending autopsy and police reports, following approach and verbal engagement and instruction by police officers, the decedent rapidly became belligerent and verbally and physically aggressive, punching at least two of the officers in the face and also spitting blood and saliva in the face of one of the officers. According to this source, a conducted electrical weapon (CEW) was deployed with 2 cartridges discharged and darts apparently striking the decedent's body.

Per reports (and subsequent review of the device log), the CEW unit was energized a total of 5 times. The darts were reportedly deployed only into the back of the decedent. Following deployment of the CEW, this man remained awake, noncompliant and combative, without apparent physiologic effects from the CEW. Officers then physically engaged the subject and, after a struggle, were able to pin this man to the ground in a prone position and restrained his arms behind his back.

Reportedly, per medical records from HonorHealth and also police records, probable drug paraphernalia in the form of a glass pipe was found in the subject's clothing. A handwritten scene report from the EMS fire/rescue team that provided initial medical care, as well as the police investigative summary, also described a "baggie of methamphetamines" found in the decedent's clothes that were near the subject.

According to the police report, a body camera was activated by an officer arriving on scene after commencement of the event and struggle with the other officers already on scene. The CEW had already been deployed or was being deployed around the time this officer arrives (around 14:30:20 hours). Per the narrative timeline accompanying the video, as of 14:30,:20 hours, the decedent was still struggling with an officer and not complying with verbal instructions to stop resisting. As of 14:30:31, he was still actively struggiing with the officer, and no CEW deployments occurred per video after this time. As of 14:31:20, he was rolled to his back after restraint to check welfare, and as of 14:31:20, an officer is heard to state that the subject was "purple, no pulse."

WELLS 003125

It became apparent that the subject was not breathing, appeared cyanotic, and was not responsive. Emergency medical services personnel then transported him to an emergency room. He was resuscitated but remained intubated, unconscious, and unresponsive. A qualitative urine drug screen performed at the hospital reportedly revealed the presumptive presence of amphetamines and ecstasy.

Various abrasions and contusions of this man's body were observed at the hospital. Imaging studies of the head revealed scalp and left facial contusions without apparent additional trauma of the skull, facial skeleton, or the neck/cervical spine.

Imaging of the thorax revealed non-displaced fractures of the left anterior 3rd-5th ribs and right anterior 3rd-6th ribs, as well as an inferior fracture of the sternum in the setting of perimortem cardiopulmonary resuscitation with chest compressions.

He expired the following day, without regaining consciousness, following declaration of brain death.

In summary, the cause of death in this case is attributed to an apparent sudden cardiac dysrhythmia occurring in the setting of multiple co-existing and likely contributory factors, including acute methamphetamine intoxication, pre-existing significant cardiovascular disease, a physical struggle with others, prone positioning and chest compression (both by the prone position of the subject and also with possible additional compression by the body weight of the subduing officers applied to the decedent's torso). Individuals with acute psychosis/agitation and/or manic behavior have also been known to die suddenly due to unclear mechanisms in the setting of emotional and physical stresses arising from police confrontation and physical subdual. Such deaths may not be reliably separated from a sudden cardiac dysrhythmia due to extreme epinephrine effect (adrenaline secretion), particularly in individuals with pre-existing cardiovascular disease and acute sympathomimetic drug use (drugs such as methamphetamine or cocaine). As this man has autopsy and toxicology evidence of both chronic heart disease and perimortem methamphetamine use, these factors must all be considered as contributory to death and the relative importance of each cannot be reliably determined. Given the postmortem examination findings and the reported circumstances of death, the manner of death is most appropriately designated undetermined.

Laura Fulginiti, PhD, forensic anthropologist, was asked by Kevin Horn, MD, Office of the Medical Examiner, Maricopa County, Phoenix, Arizona to examine the neck organs of this decedent. The purpose of the examination was to assess osseous traumata. ( traumatic injuries to the bones of the neck).
RESULTS OF THE EXAMINATION
OSSEOUS TRAUMATA: There are perimortem fractures on the submitted specimens as follows:
1) The right superior horn of the thyroid cartilage is fractured into two segments
2) The right superior lamina of the thyroid cartilage is fractured obliquely
3) The right and left inferior horns are fractured
4) There is reddish discoloration in the fractures described in #1 and #2 and in the lamina of the cricoid cartilage.

**ANALYSIS & OPINIONS- DANIEL WOHLGELERNTER, MD**

It is my opinion, with a reasonable degree of medical certainty, that Casey Wells' death was due to restraint/compressive asphyxia with mechanical obstruction of respiration, secondary to compressive

WELLS 003126

force applied to his torso by the police officers, as well as application of 5 TASER shocks to Mr. Wells' back, with resultant respiratory compromise and subsequent development of hypoxia/hypoxemia causing PEA cardiac arrest.

Pulseless electrical activity (PEA), also known as electromechanical dissociation, refers to cardiac arrest in which the electrocardiogram shows a heart rhythm that should produce a pulse, but does not. The EKG obtained by EMS at the time of the cardiac arrest demonstrated PEA.

The following medical literature is informative regarding PEA cardiac arrest: 2005 American Heart Association Guidelines for Cardiopulmonary Resuscitation and Emergency Cardiovascular Care (December 2005). "Part 7.2: Management of Cardiac Arrest". Circulation. 112 (24 Suppl): IV 58–66. doi:10.1161/CIRCULATIONAHA.105.166557.

As is documented in the cardiology literature, PEA may be caused by many conditions, but its most frequent causes are hypovolemia and hypoxemia. "Hypoxia secondary to respiratory failure is probably the most common cause of PEA, with respiratory insufficiency accompanying 40-50% of PEA cases." emedicine.medscape.com/article/161080-overview#a6-updated 11/20/17.

In reviewing the literature and as confirmed by my extensive experience as a cardiologist, the only plausible and possible cause of PEA cardiac arrest in the case of Casey Wells was hypoxia/hypoxemia, secondary to restraint/compressive asphyxia.   No other cause of PEA is plausible or relevant in explaining Casey Wells' cardiac arrest .

Mr. Wells' was subjected to full-bodied restraint, including force at the head into the pavement sufficient to cause significant contusions and abrasions to both sides of his face and his neck. Examination of the neck organs demonstrated the following:

1) The right superior horn of the thyroid cartilage is fractured into two segments
2) The right superior lamina of the thyroid cartilage is fractured obliquely
3) The right and left inferior horns are fractured
4) There is reddish discoloration in the fractures described in #1 and #2 and in the lamina of the cricoid cartilage.
   A thyroid cartilage fracture is a type of laryngeal fracture. Most blunt force laryngeal fractures are associated with multiple trauma.  Such insults to the anterior neck can cause posterior compression of the larynx and can result in airway compromise.

Casey Wells had respiratory compromise resulting in hypoxia and ultimately leading to PEA cardiac arrest.  There were several factors contributing to this respiratory compromise:

1) compressive/restraint asphyxia due to Casey being in the prone position on a hard surface (asphalt on street), with five officers restraining him in the prone position, and with his left arm trapped under his body. In cases of compression asphyxia, the physical act of ventilation is impaired or prevented by compression due to an external force on the chest and/or abdomen. Casey had external force applied to his chest by multiple officers and had external force applied to his chest and abdomen by the unyielding hard asphalt surface of the city street;

15

WELLS 003127

2) 5 Taser deployments to Casey's back.  A Taser is an electroshock weapon used to incapacitate targets via shocks that temporarily impair the target's physical function.  The records and testimony document that, in response to the Taser deployment, Casey "locked up", which is the term for sustained muscle contractions in response to the electrical stimulation.   This type of sustained muscle contraction can contribute to respiratory compromise in a subject, such as Casey Wells, who is being actively and forcefully restrained in a prone position;

3) multiple fractures of the thyroid cartilages, indicative of major trauma to the neck, which can result in airway compromise.

I reject the contention that a major contributing factor to the sudden cardiac arrest in this matter was methamphetamine intoxication. The undeniable fact that the cardiac rhythm at the time the EMS confirmed cardiac arrest was PEA is incompatible with the theory that methamphetamine was the culprit.  The hypothesis that methamphetamine caused the cardiac arrest would only be plausible if the cardiac monitor that confirmed this cardiac arrest showed ventricular tachycardia or ventricular fibrillation.  Methamphetamine, even at lethal levels of intoxication, does NOT cause PEA.  The only acceptable pathophysiologic explanation of the PEA in this case is hypoxia/hypoxemia due to asphyxia.

Methamphetamine does create a physiologic derangement in which the individual who has consumed the methamphetamine now has higher oxygen demand, because of the drug-induced hyperactivity, agitation, and circulatory stimulation with higher blood pressure and heart rate.  Casey Wells suffered cardiac arrest during prone restraint because his breathing was impaired at a time of elevated need for oxygen, and at a time when he needed maximal ventilatory effort to maintain oxygen supply-demand balance and to provide for respiratory compensation for metabolic acidosis.  Methamphetamine and Taser applications, combined with physical exertion and struggle, contributed to Casey's need for higher levels of oxygen, and possible development of some element of metabolic acidosis.  Prone restraint with compressive force to his thorax resulted in the inability of his cardiorespiratory system to maintain oxygen and acid-base balance.  The resultant development of hypoxia +/- metabolic acidosis caused his PEA cardiac arrest.

In addition, I reject the contention that the cardiac pathology noted by the Medical Examiner was a major contributing factor to Casey Wells' cardiac arrest.   There was no autopsy evidence of acute or prior myocardial infarction, and evaluation at Deer Valley Medical Center, after Casey's cardiac arrest, demonstrated that there was no evidence of acute myocardial infarction. Autopsy did show Cardiomegaly (450 grams) with moderate concentric left ventricular hypertrophy; however, these abnormalities are not of sufficient severity to cause sudden cardiac arrest.   Moreover,   if these findings were causative,  the EKG rhythm at the time of the cardiac arrest would have been ventricular fibrillation or ventricular tachycardia,  and not PEA, which was documented by the EMS at the time of Casey's cardiac arrest.

REVIEW OF DEFENSE EXHIBITS- MEDICAL LITERATURE

1) Compression Asphyxia Biomechanical Model by Kroll, et al. 2017 –

   Results and conclusion: The modeling results suggest that an adult male requires 2550 +/- 250 N of chest-applied distributed static force (260 26 kg with earth gravity) or 4050 +/- 320 N of

16

WELLS 003128

dynamic force to cause flail chest from short term chest compression.

My Response:   this article is irrelevant.   My opinions regarding the mechanism of Casey Wells' PEA cardiac arrest are not based on a claim of "flail chest".  It is my opinion that the PEA cardiac arrest was due to compressive/restraint asphyxia;  however, there is no need to invoke the mechanism of "flail chest" to support the claim of restraint asphyxia.

Of note,  on the first page of this article by Kroll et al., one finds the following statement:
"It is incontrovertible that compression asphyxia is a welldocumented cause of death in many circumstances"

2) "The Speed of a Prone Subject" by William J. Lewinski, Ph.D., et al., Force Science Institute-2016

Abstract of this article:  "A within-in subjects research design was used to examine the dangerousness of an assailant in the prone position in relation to the speed at which the individual with "hidden hands" can fire a weapon. Forty participants were recruited to fire a handgun in five directions from a prone position. Each participant's initial area of body movement and time to weapon discharge was recorded. Results suggest that participants can fire a weapon from the initial movement of any body part to discharge in a little over half a second (M = 0.61 s), and the time from first object sighting (noting something was in the hands) to discharge was approximately one-third of a second (M = 0.36 s). Repeated measures analysis indicated that the fastest shooting times occurred in the chest up position. The head and upper body most commonly moved first when participants shot from the chest up position, while participants first moved their feet and lower body in all other positions. Lack of previous research points to the novel nature of this article. The speed with which a prone subject can turn and fire a weapon can be applied to officer training and policy."

My response:   this article has no relevance to my opinions.   I am not offering any opinions regarding police practices or training.

3) "Prone Positioning in Awake, Nonintubated Patients with COVID-19 Hypoxemic Respiratory Failure," JAMA Internal Medicine, November 2020

My response:   this article provides valuable insights for treatment of COVID patients with respiratory failure, in whom there is no issue of restraint asphyxia.  It has no bearing on the issues pertaining to this case.

4) "Prone Positioning Improves Oxygenation in Spontaneously Breathing Nonintubated Patients with Hypoxemic Acute Respiratory Failure: A Retrospective Study," Journal of Critical Care, December 2015

My response:   this article provides valuable insights for treatment of hospitalized patients with acute respiratory failure, in whom there is no issue of restraint asphyxia.  It has no bearing on the issues pertaining to this case.

17

WELLS 003129

5) "Assessment of Stress Markers in Restrained Individuals Following Physical Stress with and without Sham CED Activation", Journal of Forensic and Legal Medicine, Volume 74, 2020

Abstract of this article:
"Introduction: Law enforcement and pre-hospital care personnel often confront individuals who must be physically restrained. Many are under the influence of illicit substances, and law enforcement officers may need to use a controlled electrical device (CED) to gain control of the individual and they are often placed into the prone maximum restraint (PMR) position. These techniques have previously been evaluated for their physiologic effects. The purpose of this study was to investigate the psychological effects of anticipating and experiencing a sham CED activation in healthy human subjects who were exercised and restrained compared with no sham activation by assessing the differences in a panel of several known biomarkers of stress.

Methods: We performed a randomized, crossover controlled human subject trial to study the stress associated with exercise, physical exhaustion, and restraint with and without an added psychological stress simulating the field use of a CED. Twenty-five total subjects; each subject performed two different trials each consisting of a brief period of intense exercise on a treadmill to exhaustion followed by placement in the PMR with and without induced psychological stress. Blood samples were collected for analysis pre and post exercise, as well as 10 min after completion of the exercise. A panel of hormones and stress markers were measured.

Results: We found no significant differences in any of the stress biomarkers measured between the two study groups. A trend towards higher levels of copeptin was measured in the sham CED activation arm.

Conclusion: During a brief period of intense exercise followed by the psychological stress of anticipated CED application, there did not appear to be statistically significant changes in the stress panel of biomarkers measured, only a trend towards significance for higher copeptin levels in the patients exposed to the psychological stress."

My response: "The purpose of this study was to investigate the psychological effects of anticipating and experiencing a sham CED activation in healthy human subjects who were exercised and restrained".  Casey Wells was not a "healthy, human subject" participating in a controlled trial, administered by physiologists.   The participants in this study were provided with informed consent details prior to their participation in this study. Casey Wells was not provided with information about the nature of the experience that he was about to undergo with the police officers, and he did not provide "informed consent" before undergoing 5 Taser deployments.  This study has no relevance to the issues in this case.

6) "Police Restraint - Causes of Death", Medicine Science and the Law, Meng Aw-Yong, 2020

This is an article based on a lecture that was given by Dr. Meng Aw-Yong, Department of Emergency Medicine, Hillingdon Hospital, London on the topic of "Death in police custody and acute behavioral disturbance (ABD)". Dr. Yong describes ABD: "ABD presents with the signs and symptoms of a hyper-adrenergic autonomic dysfunction (i.e. an overdose of adrenaline) as follows: extremely aggressive/violent behavior, excessive strength/continued struggle despite restraint, insensitivity to pain, acute psychosis with fear of impending doom, hot to touch,

18

profusely sweating, inappropriate state of undress, tachypnea/fast breathing, tachycardia/fast pulse and dilated pupil size."

Dr. Yong offers the following theory: "What causes death in ABD – acidosis? So, let's see what we think causes people to die during ABD. Whenever you exert yourself, you use up energy and oxygen. A simple by-product of this is carbon dioxide and hydrogen ions. This forms carbonic acid, increases lactic acid and decreases the pH (becoming more acid, i.e. acidosis). The more you exert, the greater the production of carbon dioxide and lactic acid. The excess of carbon dioxide is removed in quick time (minutes) by breathing faster and in slower time(hours/days) by the kidneys. You may notice after exercising that you breathe more quickly to get rid of this excess carbon dioxide. If insufficient, this can lead to increased acidosis, called metabolic acidosis."

My response: Dr. Yong in his lecture/article does not address the issue of compressive/restraint asphyxia and the potential for lethal hypoxia. He focuses on metabolic acidosis as a complication of ABD. With reference to the case of Casey Wells, as we have discussed, he had a PEA cardiac arrest. PEA is caused most frequently by hypoxia secondary to respiratory failure, with respiratory insufficiency accompanying 40–50% of PEA cases. Metabolic acidosis may have been a secondary contributing cause to the PEA cardiac arrest. Methamphetamine and Taser applications, combined with physical exertion and struggle, contributed to Casey's need for higher levels of oxygen, and possible development of some element of metabolic acidosis. Prone restraint with compressive force to his thorax resulted in the inability of his cardiorespiratory system to maintain oxygen and acid-base balance. The resultant development of hypoxia +/- metabolic acidosis caused his PEA cardiac arrest. Regardless of the mechanism responsible for triggering the PEA cardiac arrest in this case, or in any other given restraint case, the restriction on breathing is fundamental to each of them, so in that sense these are all properly classified as asphyxiation.

7) "The Relationship Between Positional Asphyxia and Increasing Body Mass Index", Legal Medicine, Roger W, Byard, January 2020

Abstract of this article: "Review of the files of the Pathology section of Forensic Science SA over 17 yrs (January 2003-December 2019) revealed 32 adult cases of positional asphyxia (age range 18–87 years; average 49 years – m:f ratio 3:1).Predisposing/causative conditions were accidents, N = 8, alcohol intoxication N = 7, neurological disease N = 7, drug intoxication N = 5, morbid obesity N = 2, combinations of factors N = 2, and a single homicide N = 1. There was one case with below normal weight (BMI 17.9), with 6 cases having normal weights (BMI range 18.9–24.6, average 22.3), 9 being overweight (BMI range 25.3–29.5, average 27.9), and 16 being obese (BMI range 30–66.2, average 40.9). Only 7 cases (22%) had either under/normal weight compared to 25 (78%) who were overweight/obese (p < 0.05). Increasing body mass appears to be a risk factor to be considered in all forms of positional asphyxia; BMI should, therefore, be routinely taken into account in the forensic evaluation of such cases."

My response: I agree with the findings and conclusions of Dr. Byard, et al., in this article. Casey Wells did have increased BMI, though he did not have morbid obesity. I agree with the recommendation that caution should be utilized in applying compressive restraint in the prone position with individuals with increased BMI.

WELLS 003131

8) "Sudden Death During Physical Restraint by the Dutch Police", Journal of Forensic and Legal Medicine, L.G.M. Dijkhuizen, April 2020

Abstract of this article:   "Background: and goal: The Police is sometimes confronted with the death of a subject during physical restraint. In most of these cases a clear Cause of Death (COD) cannot be determined by the Pathologist. The goal of this research is to find and clarify a pattern and pinpoint a clearer COD.

Method: The research group is compiled of 38 closed police case files from the NPIID (National Police Internal Investigation Department) between 2005 and 2016.  The control group is compiled of cases involving excitation and restraint, without leading to death. 148 cases were included from the NPIID between 2005 and 2016 and the Violence Registration Database of the Dutch National Police between 2014 and 2015. Case files of both the research and the control group were systematically analyzed and compared.

Results and conclusion: The observed pattern shows that subjects dying during Physical Restraint are mostly males between 30 and 40 years old with a BMI above 30 kg/m2.Both BMI and age are remarkably lower in the control group. Subjects were encountered in a state of excitation mostly attributed to (multiple) drugs (cocaine, MDMA or cannabis). The physical restraint portrayed a pattern of escalation with restraint being mostly face-down, hands cuffed to the back, receiving thoracic pressure, resulting in a high total amount of force used. In the research group 44.7% (17/38) of subjects were encountered (partially) unclothed versus 4.1% (6/148)  in the control group. Cause of death in these cases seems to be multifactorial and is comprised of both personal factors and factors during and after the struggle. The different factors are comingled and augment each other. The end effect is that the subjects end up in a fatal spiral."

My response:   The author acknowledges that "The subject ends up in a prone position and several police officers apply pressure to the thorax, leading to relative hypoventilation" which can lead to hypoxia and death. He focuses on the mechanism of hyperthermia (increased body temperature) as a potential COD. There was no evidence of hyperthermia in the case of Casey Wells.

The article includes this section on positional asphyxia:
"Positional asphyxia is the situation in which the respiration is limited by the position of the body and the fact that the person cannot change this position. Positional asphyxia is a diagnosis per exclusion. Although there are several case reports on positional asphyxia there is no scientific evidence for the relationship between pressure on the thorax and asphyxia. Three studies concluded that prone positioning is a common form of restraint not associated with death and that prone positioning has no clinically significant effects in subject physiology. The research of Sloane et al. showed no evidence of hypoxia or hypoventilation during the placement of 10 intensely exercising volunteers in prone maximum restraint position. In 2013 Savaser et al. studied the effects of hogtie restraint in different positions, combined with 3 min of thoracic weight of 50 lbs. (22,7 kg) and 100 lbs. (45,4 kg). to the back. The study showed no significant difference in heart rate, mean arterial pressure or oxygen saturation in any of these

WELLS 003132

positions. This study does not represent the amount of pressure that is caused when several police officers lay on the back of a person."

My response to this portion of the article: The studies that Dr. Dijkhuizen cites do not replicate real-world conditions, in that these studies used healthy volunteers with a known testing endpoint; not a real-life struggle involving a person already in a compromised physiological state with an elevated need for oxygen. The experimental settings in the studies cited by Dr. Dijkhuizen have attempted to reproduce the impact of prone restraint; however, these experiments were performed on healthy volunteers. By contrast, agitated individuals, like Casey Wells, are in a state of heightened oxygen demand and may have some element of preexisting metabolic acidosis. Restraint in the prone position may exacerbate these conditions via inadequate ventilation and a decrease in cardiac output. These physiologic derangements can lead to pulseless electrical activity (PEA) cardiac arrest.

Several studies mentioned by Dr. Dijkhuizen have focused on attempts to replicate prone restraint situations to assess an individual's capacity for ventilation under these conditions. These experimental, controlled models are limited by their inability to replicate real-world conditions and the uncontrolled situations in which prone restraint would ordinarily be applied. Most subjects in these experiments were healthy and not in a "fight-or-flight" state that would most likely occur during a confrontation with law enforcement officers. Data from trials involving healthy subjects in a controlled situation cannot be applied to an uncontrolled situation such as with Casey Wells who was high on methamphetamine, was multiply TASED, and involved in intense physical activity and, consequently, had an elevated need for oxygen, as a result of increased oxygen demand, and had need for unrestricted ventilatory function so as to have proper respiratory compensation for metabolic acidosis .

In addition, published trials from other groups identified significant decreases in lung capacity among participants held in a prone position. Parkes reported an average 24% drop in FVC (forced vital capacity) and a 27% drop in FEV1 (forced expired volume in one second) in a cohort of 14 healthy volunteers positioned in prone restraint. These findings were described as "significant." One participant in this study experienced a 57% drop in FEV1. The summary of this article states the following: "Small but significant numbers of people die during restraint following violent incidents. We used a repeated measures design to compare lung function in four restraint positions with a standing control position. Participants restrained flat on the floor, prone or supine, showed non-significant reductions in forced vital capacity (FVC) and forced expiratory volume FEV1 compared with the standing control position. Participants restrained face down with the body weight of the restraining persons pressed on their upper torso and/or in a flexed restraint position showed a significant reduction in lung function (mean reductions in FVC of 23.8% and 27.4% respectively). Some, but not all, prone restraint positions show significant restriction of lung function." ( Parkes J. Sudden death during restraint: do some positions affect lung function? Med Sci Law 2008; 48:137–141)

9) "Investigation of Deaths Temporally Associated with Law Enforcement Apprehension", AFP, M. Graham, M.D., Vol 4, issue 3

21

WELLS 003133

My response:   this is a lengthy (24 page) review of various underlying disease states of subjects apprehended by law enforcement and the different techniques used by law enforcement to subdue the subjects.

The following statements are made in this article:  "Forcible Restraint Death temporally associated with forcibly subduing a suspect can occur during apprehension.  A variety of techniques along the continuum of force may be used to attempt to subdue a suspect.  In addition to stress-related exacerbation of a natural disease causing death, techniques utilized during forcible restraint can result in injury and, rarely, in death of the subject."

My response:   I agree with this statement; i.e.,  forcible restraint can result in injury or death.

Another section in this article:  It is clear that sufficient weight applied to the  chest of a person for a long enough period of time is capable of causing death – the generally  accepted entity of compression ("traumatic") asphyxia. Classical cases of compression asphyxia generally are associated with large amounts of weight being applied to the chest, such as a car  falling off a jack . Death in such situations can result from ventilatory impairment and/or increased intrathoracic pressure, the latter affecting venous return and cardiovascular function. Deaths associated with decreased central venous return characteristically exhibit facial congestion and petechiae. Studies of subjects in the prone restraint position with up to approximately 225 pounds of pressure exerted on the back have failed to demonstrate evidence of respiratory impairment, hypoxia or hypoventilation that would indicate a significant risk for asphyxia."

My response:   Please refer to my comments on the previous article, numbered as "8"- "Sudden Death During Physical Restraint by the Dutch Police", Journal of Forensic and Legal Medicine, L.G.M. Dijkhuizen, April 2020,  in which I responded in this manner to a similarly stated opinion:

The studies that are cited in this article do not replicate real-world conditions, in that these studies used healthy volunteers with a known testing endpoint; not a real-life struggle involving a person already in a compromised physiological state with an elevated need for oxygen.  The experimental settings in these studies have attempted to reproduce the impact of prone restraint; however, these experiments were performed on healthy volunteers. By contrast, agitated individuals, like Casey Wells, are in a state of heightened oxygen demand and may have some element of preexisting metabolic acidosis. Restraint in the prone position may exacerbate these conditions via inadequate ventilation and a decrease in cardiac output. These physiologic derangements can lead to pulseless electrical activity (PEA) cardiac arrest.

10) Article "Electrical Weapons, Hematocytes, and Ischemic Cardiovascular Accidents", Journal of Forensic and Legal Medicine, M. Kroll, et ai, May 2020

Conclusions of this article:  "A review of clinical cases, of ischemic or thrombotic events revealed no direct association with the CEW discharge. A full-trunk electrical weapon exposure did not lead to hematocyte changes beyond normal clinically expected variations in similar acute response scenarios. The case report and biomarker data do not support the hypothesis that a CEW discharge is associated with changes likely to promote coagulation or thrombus formation."

WELLS 003134

My response: this article is not relevant to this case and has no bearing on the opinions that I have offered. I am not offering any opinion related to CEW/Taser deployments and promotion of coagulation or thrombus formation.

I hereby affirm that the opinions stated above are true and correct within a reasonable degree of medical probability. I also reserve the right to review the reports of other expert witnesses retained in this case by all parties, and review other materials as they become available in the case, and provide additional opinions as appropriate.

Sincerely yours,

DANIEL WOHLGELERNTER, MD, FACC

23

WELLS 003135

# EXHIBIT 21



**MARICOPA COUNTY**
**OFFICE OF THE MEDICAL EXAMINER**
**701 W. Jefferson Street**
**Phoenix, AZ 85007**

### MEDICAL EXAMINER REPORT

**DECEDENT:** Casey Joe Wells                    **CASE:** 19-01162

**DATE OF EXAMINATION:** 02/07/2019              **TIME:** 0800 Hours

**PERSONS PRESENT AT EXAMINATION:**
**Phoenix Police Department**: Detective Michael Smojver, #9236

---

### CAUSE OF DEATH:
COMPLICATIONS OF CARDIAC DYSRHYTHMIA AND ARREST IN SETTING OF
DRUG (METHAMPHETAMINE) INTOXICATION, ACUTE PSYCHOSIS,
ARTERIOSCLEROTIC CARDIOVASCULAR DISEASE, AND PHYSICAL RESTRAINT
WITH PRONE POSITIONING AND POSSIBLE EXTRINSIC CHEST COMPRESSION

### MANNER OF DEATH:
UNDETERMINED

---

05/23/2019
**Date Signed**

KEVIN D. HORN, MD
**MEDICAL EXAMINER**

WELLS 000603

**FINDINGS**

I.  Complications of cardiac dysrhythmia and arrest in setting of drug (meth-amphetamine) intoxication, acute psychosis, arteriosclerotic cardiovascular disease, and physical restraint with prone positioning and possible extrinsic chest compression.

A.  Multifocal abrasions and contusions of face, torso, and extremities, consistent with perimortem physical struggle.

B.  Two (2) superficial puncture wounds of upper paramidline right back, consistent with conducted electrical weapon (CEW) application and related dart injury.

C.  Subcutaneous hemorrhage, central back (between shoulder blades).

D.  Cardiomegaly (450 grams) with moderate concentric left ventricular hypertrophy.

E.  Atherosclerotic stenosis of proximal left anterior descending coronary artery, focal, moderate to severe (up to approximately 70 percent luminal narrowing).

F.  Microscopic examination of ventricular myocardium and cardiac conducting system tissues with multifocal myocytic hypertrophy, multifocal moderate interstitial and perivascular fibrosis, and multifocal arteriosclerotic small vessel disease.

G.  Pulmonary edema, bilateral.

H.  Arteriolonephrosclerosis, bilateral, mild.

I.  Diffuse marked cerebral edema with changes consistent with perimortem anoxic encephalopathy.

J.  Neuropathologic evaluation of brain, dura mater, and spinal cord revealing changes consistent with perimortem hypoxic/ischemic encephalopathy consistent with cardiopulmonary arrest and resuscitation (see neuropathology report).

   1.  Hemorrhagic gastritis, mild (incidental), consistent with perimortem hypoxic/ischemic encephalopathy with resuscitation and intubation.

K.  Anthropologic assessment of hyoid bone and airway cartilages revealing focal airway cartilage fractures (see anthropology report).

L.  Toxicologic analyses of antemortem samples of blood from treating hospital with presence of 100% d-methamphetamine enantiomer via chiral analysis (580 ng/mL) and related metabolite (d-amphetamine).

M.  Reported urine drug screens (antemortem in hospital) revealing presumptive presence of amphetamines and ecstasy.

N.  Reported perimortem bizarre behavior (yelling, physical aggression, and public nudity), consistent with unspecified psychiatric disorder in context of acute/chronic drug use.

O.  Reported history of drug use including reported past use of methamphetamine, both prescribed and illicit.

P.  Reported history of sudden unresponsiveness during perimortem physical struggle with prone positioning and possible extrinsic torso compression in context of law enforcement subdual.

WELLS 000604

II.     Benign prostatic hypertrophy, mild.

III.    Pleuropulmonary fibrous adhesions, right.

IV.    Remote rib fractures, with callus, left seventh and tenth right ribs, incidental.

V.     Reported history of clival ecchordosis physaliphora (skull base congenital
        hamartoma, benign) by magnetic resonance imaging, antemortem, incidental.
        A.     No skull or central nervous system mass lesions identified at autopsy or
               during neuropathological evaluation of brain, dura mater, or spinal cord.

VI.    Reported history of hypothyroidism and gastroesophageal reflux disease.

VII.   Therapy-related changes.
        A.     Mildly hemorrhagic, mildly displaced fractures of bilateral anterior ribs and
               of sternum, consistent with perimortem cardiopulmonary resuscitative
               efforts with chest compressions.
        B.     Focal mucosal erosion of urinary bladder in context of perimortem Foley
               catheterization.

## SUMMARY AND OPINION

Based on the postmortem examination findings and investigative history as available to
me, it is my opinion that Casey Joe Wells, 40-year-old Caucasian male, died as a result
of complications of cardiac dysrhythmia and arrest in setting of drug
(methamphetamine) intoxication, acute psychosis, arteriosclerotic cardiovascular
disease, and physical restraint with prone positioning and possible extrinsic chest
compression.

According to reports, this man's death was pronounced in a local hospital intensive care
unit. According to initial reports, he was in the process of being arrested by the Phoenix
Police Department involving the use of a conducted electrical weapon (CEW) during the
process of restraint and arrest he apparently experienced cardiac arrest and could not
be revived. Brain death was ultimately diagnosed in the hospital and he expired after
family opted to withdraw care.

According to subsequently received reports on 02/04/2018, the decedent was in a local
city park nude and performing what appeared to be yoga exercises. The Phoenix
Police Department responded to the scene after receiving notifications of this activity,
and approached the decedent.

According to the detective attending autopsy and police reports, following approach and
verbal engagement and instruction by police officers, the decedent rapidly became
belligerent and verbally and physically aggressive, punching at least two of the officers
in the face and also spitting blood and saliva in the face of one of the officers.
According to this source, a conducted electrical weapon (CEW) was deployed with 2

WELLS 000605

cartridges discharged and darts apparently striking the decedent's body.

Per reports (and subsequent review of the device log), the CEW unit was energized a total of 5 times. The darts were reportedly deployed only into the back of the decedent. Following deployment of the CEW, this man remained awake, noncompliant and combative, without apparent physiologic effects from the CEW. Officers then physically engaged the subject and, after a struggle, were able to pin this man to the ground in a prone position and restrained his arms behind his back.

Reportedly, per medical records from HonorHealth and also police records, probable drug paraphernalia in the form of a glass pipe was found in the subject's clothing. A handwritten scene report from the EMS fire/rescue team that provided initial medical care, as well as the police investigative summary, also described a "baggie of methamphetamines" found in the decedent's clothes that were near the subject.

According to the police report, a body camera was activated by an officer arriving on scene after commencement of the event and struggle with the other officers already on scene. The CEW had already been deployed or was being deployed around the time this officer arrives (around 14:30:20 hours). Per the narrative timeline accompanying the video, as of 14:30:20 hours, the decedent was still struggling with an officer and not complying with verbal instructions to stop resisting. As of 14:30:31, he was still actively struggling with the officer, and no CEW deployments occurred per video after this time. As of 14:31:10, he was rolled to his back after restraint to check welfare, and as of 14:31:20, an officer is heard to state that the subject was "purple, no pulse."

It became apparent that the subject was not breathing, appeared cyanotic, and was not responsive. Emergency medical services personnel then transported him to an emergency room. He was resuscitated but remained intubated, unconscious, and unresponsive. A qualitative urine drug screen performed at the hospital reportedly revealed the presumptive presence of amphetamines and ecstasy.

Various abrasions and contusions of this man's body were observed at the hospital. Imaging studies of the head revealed scalp and left facial contusions without apparent additional trauma of the skull, facial skeleton, or the neck/cervical spine.

Imaging of the thorax revealed non-displaced fractures of the left anterior 3rd-5th ribs and right anterior 3rd-6th ribs, as well as an inferior fracture of the sternum in the setting of perimortem cardiopulmonary resuscitation with chest compressions.

He expired the following day, without regaining consciousness, following declaration of brain death.

According to the family of the decedent, this man has a multiyear history of chronic drug use including reported illicit methamphetamine, but review of pharmacy records indicates that he was also prescribed Adderall (amphetamine) and Desoxyn (d-methamphetamine) at least as recently as 2016 for an unknown indication. Desoxyn is

WELLS 000606

rarely prescribed, but its most common indication is for attention-deficit hyperactivity disorder (ADHD). More recent prescriptions of Desoxyn after 2016 are not reflected in available pharmacy records, but he continued to receive prescription amphetamine (not methamphetamine) after this (into 2018, per pharmacy records).

Medical records from December 2016 indicate at least one evaluation in a local emergency department for hypertension (146/100) following admitted smoking of illicit methamphetamine. At that time, he also stated he had a prescription for methamphetamine. He was briefly evaluated but left the department ("eloped") without formal discharge.

Psychiatric records from March 2017, later made available for review, indicate a history of ADHD with prior treatment with both Adderall (amphetamine) and Desoxyn. The notes from this time frame indicate he remained on 20 mg Adderall each morning, but that he was no longer prescribed Desoxyn. These reports also indicate a past history of auditory hallucinations during childhood and also when receiving or using methamphetamine; however, as of the date of these reports (in March 2017), he denied active hallucinations. There are no reports of a past formal diagnosis of chronic psychosis or schizophrenia based on these and other medical records available to me as of the time of this report.

Per the police report, this man had previously been encountered by police in a different part of the city, apparently intoxicated and "dancing" with no clothes on near a bus stop on 9/22/2017. On that occasion, he was transported to a HonorHealth Deer Valley hospital for evaluation.

Medical records from a clinic visit in 12/6/2018, document treatment for an upper respiratory infection. These records document a history of smoking and hypothyroidism. Listed medications at this most recent visit do not include either Adderall nor Desoxyn. Past various clinic records also document past treatment for migraine headaches and gastroesophageal reflux disease.

Also, according to family members, this man had a "brain mass" which was not otherwise specified that caused headaches. No known seizures were described from this source. Available clinic records document "occipital neuralgia" and a past magnetic resonance imaging (MRI) study documented the presence of "clival ecchordosis physaliphora," a congenital benign hamartomatous lesion derived from notochord remnants, usually located in the retroclival prepontine region of the skull (not directly involving the brain).

He also had a past medical history of hypothyroidism and smoking. He had no other significant reported past medical history.

Postmortem examination revealed an adult male with numerous primarily body surface area abrasions and contusions without apparent internal injuries of significance.

WELLS 000607

Examination of the back revealed two apparent shallow puncture wounds likely corresponding to sites of dart implantation from the CEW in the skin of his back, with at least one puncture wound able to be delineated and measured to a depth of approximately 1 cm within the fat and soft tissue of the back, associated with a small amount of surrounding hemorrhage. As the CEW darts were only superficially penetrating into the skin and subcutaneous tissues, were not placed over or in proximity to the heart, and had no apparent immediate effects upon his consciousness or cardiac function at the time the CEW was deployed (as he had continued to physically struggle after the last CEW deployment), the CEW is not considered a potential cause or contributing cause of death in this case.

There were no acute internal injuries of significance. Old rib fractures were identified on postmortem radiographs as well as perimortem fractures of the ribs and sternum which were recognized at the hospital as likely inflicted during cardiopulmonary resuscitation with chest compressions.

Internal examination also revealed the presence of significant arteriosclerotic cardiovascular disease with enlargement of the heart and thickening of its walls as well as significant atherosclerotic stenosis of a major coronary vessel. Microscopic examination of the heart, including the conducting system, revealed myocytic hypertrophy, small vessel disease, and scarring (fibrosis) in many areas of the heart muscle, consistent with chronic cardiovascular disease.

Forensic neuropathologic examination of the brain, dura mater, and spinal cord revealed the presence of hypoxic/ischemic encephalopathy with edema, consistent with perimortem cardiorespiratory arrest and resuscitation. Despite the provided history, no "brain mass" was identified at autopsy or on detailed neuropathological examination; however, as noted above, the mass described in previous clinical imaging appeared to involve the clivus bone at the skull base, and did not directly involve the brain or its coverings. This mass may have caused headaches in life, but there was no autopsy evidence that it caused or contributed to the death of this man. Please see the accompanying forensic neuropathology report for details.

Forensic anthropologic evaluation of the hyoid bone and cartilaginous structures of the airway revealed focal fractures of right sided airway cartilages. The hyoid bone was reportedly intact. Please see the accompanying forensic anthropology report for details.

Toxicologic analyses performed on antemortem samples of blood from the treating hospital revealed the presence of 580 ng/mL methamphetamine. Chiral analyses revealed the methamphetamine that was detected consisted completely (100%) of the d-isomer. In the setting of a past (2016) prescription for Desoxyn (a prescribed form of d-methamphetamine), there is a slight possibility that this could represent this medication (if still actively taken by the decedent, although there is no documented recent prescription for this medication).

Alternatively, and more likely, with a history of illicit methamphetamine abuse (a street

WELLS 000608

formulation rather than the prescribed form), and reports of a pipe and bag found with the decedent at the scene, this toxicologic finding represents active perimortem use of illicitly sourced methamphetamine. This drug's principal metabolite is also detected in this blood sample (d-amphetamine), along with caffeine. No L-isomer of methamphetamine or amphetamine was detected. No alcohol, other common drugs of abuse, or other significant medications were detected in these analyses.

In summary, the cause of death in this case is attributed to an apparent sudden cardiac dysrhythmia occurring in the setting of multiple co-existing and likely contributory factors, including acute methamphetamine intoxication, pre-existing significant cardiovascular disease, a physical struggle with others, prone positioning and chest compression (both by the prone position of the subject and also with possible additional compression by the body weight of the subduing officers applied to the decedent's torso). Individuals with acute psychosis/agitation and/or manic behavior have also been known to die suddenly due to unclear mechanisms in the setting of emotional and physical stresses arising from police confrontation and physical subdual.

Such deaths may not be reliably separated from a sudden cardiac dysrhythmia due to extreme epinephrine effect (adrenaline secretion), particularly in individuals with pre-existing cardiovascular disease and acute sympathomimetic drug use (drugs such as methamphetamine or cocaine). As this man has autopsy and toxicology evidence of both chronic heart disease and perimortem methamphetamine use, these factors must all be considered as contributory to death and the relative importance of each cannot be reliably determined.

Given the postmortem examination findings and the reported circumstances of death, the manner of death is most appropriately designated undetermined.

*As with all death investigations, opinions expressed herein are amenable to change should new, reliable, and pertinent information come to light.*

*The Maricopa County Medical Examiner's Office is required by statute (A.R.S. § 11-594(A) (2) and (4)) to certify the cause and manner of death following completion of the death investigation of each case over which it assumes jurisdiction, and to promptly execute a death certificate, on a form provided by the state registrar of vital statistics, indicating the cause and manner of death. The form provided by the state registrar of vital statistics includes five manners of death: homicide, suicide, accident, natural, and undetermined. The determination of manner of death is a forensic determination by the pathologist predicated upon the totality of all then-known forensic evidence and other circumstances surrounding the cause of death; it is not a legal determination of criminal or civil responsibility of any person(s) for the death.*

## POSTMORTEM EXAMINATION

### EXTERNAL EXAMINATION

The body is received in a zippered body pouch secured by evidence seal number 5607366.

WELLS 000609

## CLOTHING AND PERSONAL EFFECTS

None.

## EVIDENCE OF MEDICAL INTERVENTION

There are the following evidences of therapeutic intervention: There is a triple-lumen intravascular catheter inserted into the right aspect of the neck associated with a moderate amount of surrounding subcutaneous and strap muscle hemorrhage in this area. There are intravascular catheters inserted into both antecubital fossae and the volar right wrist. A triple-lumen intravascular catheter is found inserted into the right inguinal fossa. There is a pulse oximeter on the right index finger. There are sequential compression garments over the bilateral lower extremities (shins and calves), multiple electrocardiographic patches on the body, and a Foley catheter in situ with an attached urine reservoir containing a very small amount of clear yellow urine (which is collected as a toxicologic specimen).

Reflection of the skin from the thorax and abdomen reveals the presence of mildly hemorrhagic, mildly displaced fractures of multiple anteromedial ribs and a transverse fracture of the sternum. These fractures were recognized clinically at the hospital and are consistent with those commonly seen in incidentally inflicted chest compression resuscitation efforts. These fractures did not cause or contribute to death.

## EVIDENCE OF TRAUMA

### BLUNT FORCE TRAUMA OF HEAD

There is diffuse contusion, abrasion, and ecchymosis of the nasal bridge and the tip of the nose, a 4 inch striate abrasion extending across the upper left brow ridge and the left temple, a faint area of blue-purple contusion of the right forehead near the hairline, small irregular abrasions measuring up to 1/4 inch on the anterior upper midline forehead near the hairline, a 3/4 inch abraded contusion of the left cheek, a 1/4 inch abrasion anterior to the tragus of the left ear, a 1/4 inch abrasion of the right temple, a 1 inch abrasion of the right cheek, and two striate abrasions of the posterior aspect of the scalp measuring up to 2 inches.

Reflection of the lips reveals the presence of mucosal abrasion of the inner surface of the midline and paramidline mucosa of the lower lip along the vermillion border, measuring up to 1/4 inch. There are extensive apparent bite injuries of the tip and left aspect of the tongue with marked submucosal contusion measuring up to 2 inches.

Examination of the eyes reveals conjunctival edema with focal sparse petechial hemorrhages involving the left eye sclera and left upper eyelid conjunctiva.

Reflection of the scalp reveals intrascalpular and subgaleal hemorrhages over the posterior right aspect of the vertex measuring 4 inches, the upper right scalp measuring

WELLS 000610

2 inches, and the posterior left scalp measuring 1 inch.

Anterior and posterior layered dissections of the neck reveal a focally dense hemorrhage in association with the placement site of a venous catheter in the right lateral aspect of the neck. There are no other apparent traumatic injuries of the soft tissues of the neck, the strap muscles, or the cervical spine, or spinal cord.

The neck organs are removed and evaluated at autopsy. In addition to previously described submucosal contusions of the tongue there is a focal 1/2 inch submucosal contusion of the anterior upper right aspect of the esophagus adjacent to the thyroid cartilage. The remainder of the airway structures are not opened at the time of autopsy and are referred for anthropology consultation.

Anterior and lateral radiographs of the specimen are obtained. Anterior and posterior photographs of the specimen are obtained.

Forensic anthropologic evaluation of the hyoid bone and airway cartilages reveal perimortem traumata including fractures of the right aspect of the horns and lamina of the thyroid cartilage. Please see the accompanying anthropology report for details.

Inspection of the calvarium does not reveal the presence of fractures. Opening of the calvarium reveals a markedly edematous brain without intracranial hemorrhages. The dura mater and brain are otherwise unremarkable at the time of initial inspection. The brain, dura mater, and the entirety of the spinal cord to the level of the cauda equina are removed, photographed, and retained in formalin fixative for further neuropathologic evaluation.

Subsequent neuropathologic evaluation of the brain, dura mater, and spinal cord following a period of formalin fixation reveal generalized edema with gross and microscopic changes consistent with perimortem hypoxic-ischemic encephalopathy in the setting of cardiorespiratory arrest and resuscitation. Please see the accompanying neuropathology report for details.

BLUNT FORCE TRAUMA OF TORSO

There is a faint striate area of abrasion measuring 4 x 4 inches on the posterior left shoulder, a faint 1-1/2 inch striate abrasion of the posterior right shoulder, a 5 x 2 inch area of striate abrasion of the posterior lower right torso and hip, a 1/4 inch roughly circular abrasion of the paramidline lower left torso, a 1-1/4 inch linear abrasion of the posterior lower left torso, a 3 x 2 inch area of striate abrasion on the upper outer aspect of the left buttock, a 2 inch linear abrasion of the anterolateral left chest above the nipple, and a blue-purple contusion measuring up to approximately 1-1/2 inch at the left lower quadrant of the abdomen.

Inspection of the genitalia and of the anus does not reveal the presence of traumatic injuries, evidence of past or perimortem sexual assault, or other significant pathology.

WELLS 000611

Examination of the posterior paramidline upper right aspect of the back reveals a pair of apparent shallow puncture wounds which measure 3/16 inch in average diameter and are morphologically most consistent with CEW dart strike injuries. The darts are not retained in the skin or available for examination at the time of autopsy. The upper most wound is 16 inches inferior to the crown of the head and 3/4 inch to the right of the posterior midline of the torso. The lower most wound is 19 inches inferior to the crown of the head and also 3/4 inch to the right of the posterior midline of the torso. Incision of the skin in this location reveals the presence of a maximal dart penetration depth of approximately 1.5 cm, associated with a small amount of subcutaneous hemorrhage within adipose tissue deep to the skin of the back. The dart does not penetrate the spine, chest cavity, or major organs or vessels. Subcutaneous evaluation of the lower most puncture wound reveals a larger area of subcutaneous hemorrhage, rendering a distinct wound path less certain for this second dart puncture.

The skin is dissected away from the entirety of the back revealing a 4 x 1 inch elongated area of subcutaneous ecchymosis between the shoulder blades. There is an adjacent smaller 3/4 inch area of subcutaneous hemorrhage inferior and lateral to this larger area of hemorrhage on the right side. Dissection of the soft tissue and musculature of the upper back reveals a larger area of hemorrhage extending to involve the paraspinal muscles measuring up to 6 inches in greatest vertical dimension.

This extended layered dissection of the structures of the back does not reveal additional injuries of the spine, rib cage, or internal organs.

Survey of the rib cage from an anterior vantage (following removal of viscera and overlying parietal pleura) reveals the presence of acute therapeutic fractures of the ribs and sternum as previously described. Review of postmortem radiographs also reveal remote healing fractures of the tenth right rib and the seventh left rib with prominent fracture calluses. These rib fractures were not caused during the present incident and therefore played no role in the death of this man.

Internal examination of the remainder of the organs of the thorax, abdomen, and pelvis does not reveal the presence of additional traumatic injuries.

BLUNT FORCE TRAUMA OF UPPER AND LOWER EXTREMITIES

There are multifocal striate abrasions measuring up to 1-1/4 inch on the left elbow and up to 1-1/2 inch on the right elbow, multiple irregular abrasions measuring up 2 inches on the dorsum of the right hand and wrist, a 1-1/4 inch striate abrasion of the dorsal left wrist, a cluster of abrasion measuring up to 1-1/4 inch on the dorsum of the left forearm, a 1/4 inch abrasion of the dorsal left thumb, irregular abrasions measuring up to 3/8 inch on the dorsum of the left hand, and a subungual contusion measuring 1/4 inch involving the left index finger.

Layered dissection and exposure of the subcutaneous tissues and musculature of the posterior aspects of both arms reveals the presence of hemorrhage in association with

WELLS 000612

the previously described abrasions of the elbows. No other injuries are identified.

Postmortem radiographs of the upper extremities do not reveal the presence of skeletal trauma.

Examination of the lower extremities reveals irregular red-brown abrasions measuring up to 1-1/4 inch on the anterior left thigh, a horizontal abrasion measuring up to 1 inch on the anteromedial lower left thigh, a 1/8 inch abrasion of the anterolateral aspect of the left knee, a 2 inch irregular striate abrasion of the anterior right knee, a 3/4 inch abrasion of the medial aspect of the proximal left foot, a 1 inch abrasion on the dorsum of the left foot near the base of the great toe, a 1/8 inch abrasion on the dorsum of the second toe of the left foot, irregular abrasions measuring up to 1/2 inch on the lateral malleolus of the left foot, and a 1/2 inch abrasion of the lateral malleolus of the right foot. Inspection of the bottoms of the feet does not reveal injuries.

Posterior layered dissections of both legs and the buttocks do not reveal the presence of additional traumatic injuries.

Postmortem radiographs of the lower extremities do not reveal the presence of additional traumatic injuries of the bones of the legs.

### SCARS, TATTOOS AND OTHER IDENTIFYING BODY FEATURES

There are linear scars of the anterolateral upper left hip and the lateral left abdomen measuring up to 3 inches.

### GENERAL EXTERNAL EXAMINATION

The unembalmed body is that of a heavy set adult Caucasian male 69 inches in length and weighing 227 pounds. Rigor mortis is fixed and livor mortis is red-purple and fixed over the posterior surfaces of the body. The scalp hair is brown-gray. The irides are blue. There are no lesions of the sclerae or conjunctivae. Facial hair consists of a long bushy brown-gray beard and mustache. Dentition is natural and in good condition. The trachea is in the midline. The thorax is well developed and symmetrical. The abdomen is protuberant with no palpable intra-abdominal masses. The external genitalia are those of a normal male. The anus is atraumatic and unremarkable. The extremities are well developed and symmetrical with no significant cyanosis, clubbing, edema or deformity. The posterior aspects of the torso are symmetrical. General appearance is compatible with the reported age of 40 years.

### INTERNAL EXAMINATION

The body is opened by a standard Y-shaped thoracoabdominal incision. All viscera occupy their appropriate anatomic relationships. Subcutaneous adipose tissue ranges up to 4 cm in thickness over the abdominal wall. Serous surfaces are smooth and glistening throughout with focal fibrous adhesions between the right lung and the

WELLS 000613

overlying chest wall. There is no significant free fluid accumulation in the body cavities.

**CARDIOVASCULAR SYSTEM**

The 450-gram heart occupies its usual mediastinal site. The external configuration is globular. The epicardial surfaces are smooth and glistening. All major vessels arise in their appropriate anatomic relationships. The coronary arteries arise normally and are distributed in a right dominant pattern with atherosclerotic narrowing ranging up to 70 percent in the proximal left anterior descending coronary artery. The myocardium is firm, red-brown without areas of softening, hemorrhage or gross scarring. No abnormal communications exist between the cardiac chambers. There is moderate concentric left ventricular hypertrophy. Ventricular thicknesses are: left 1.7 cm, right 0.3 cm, and 1.8 cm in the interventricular septum. The cardiac valves have thin, pliable leaflets. The valve circumferences are appropriate to the caliber of the cardiac chambers. The valve cusps and surfaces are free of fusion or vegetations.

The aorta is of normal caliber with all major arterial branches arising in their appropriate anatomic relationship. Elasticity is normal. The intimal surfaces are smooth, without aneurysm formation or dissection. No systemic venous abnormalities or thrombi are present.

**RESPIRATORY SYSTEM**

The lungs weigh 625 grams left and 750 grams right. The upper and lower airways are patent and of normal caliber. The pleural surfaces are smooth and glistening apart from previously described right lung adhesions. The parenchyma is congested and edematous, dark red-purple, and exuding marked amounts of blood and frothy fluid from cut parenchymal sections. There are no areas of induration, consolidation, hemorrhage or gross scarring. The pulmonary vessels are patent and of normal caliber.

**DIGESTIVE/HEPATOBILIARY SYSTEM**

The oropharynx is grossly normal and unobstructed. The esophagus is of normal caliber with a smooth, white mucosal lining. The gastroesophageal junction is well defined. The stomach lumen contains approximately 100 mL of dark brown liquid. There are multifocal non-erosive areas of mild hemorrhagic gastritis within the upper stomach. No other areas of mucosal ulceration, erosion, or hemorrhage or scarring of the stomach are present. The small and large intestines are unremarkable. The appendix is present. The lobular tan pancreas is firm, without areas of fat necrosis, gross hemorrhage or space-occupying lesions. The pancreatic ducts are patent and of normal caliber.

The 3025 gram liver has a smooth intact capsule, covering red-brown parenchyma. No localizing masses, lesions or areas of hemorrhage are evident on external or cut surfaces. The intrahepatic and extrahepatic ducts are patent and of normal caliber. The gallbladder contains viscid bile. The gallbladder mucosa and wall are grossly

WELLS 000614

normal.

## GENITOURINARY SYSTEM

The symmetric kidneys each weigh 250 grams. They are similar. The capsules strip with mild difficulty from diffusely granular red-brown cortical surfaces. The cortices are sharply delineated from the medullary pyramids. The calyces, pelves and ureters are unremarkable. The renal vessels are patent and of normal caliber.

The urinary bladder contains scant clear urine (approximately 3 mL), with a Foley catheter in situ. There is a 0.5 cm focal area of mucosal erosion of the posterior aspect of the bladder, also consistent with the therapeutic presence of a Foley catheter. The mucosal surfaces are otherwise flat and pink-tan. The prostate is mildly symmetrically enlarged and nodular without gross evidence of malignancy. The seminal vesicles are unremarkable.

## HEMATOPOIETIC SYSTEM

The 550 gram spleen occupies its usual anatomic site, with an intact, smooth and glistening capsule covering dark purple, moderately firm parenchyma. Regional lymph nodes have their usual distribution and appearance. Rib bone marrow is beefy, red, and unremarkable without grossly apparent sclerosis or space-occupying lesions. The thymus has undergone age-appropriate physiologic involution and is no longer grossly observable.

## ENDOCRINE SYSTEM

The pituitary, thyroid, and adrenal glands are grossly not remarkable.

## NECK

The cervical spine is structurally intact. The atlanto-occipital articulation is grossly normal. The hyoid bone and thyroid cartilage are intact. Apart from focal therapeutic hemorrhage as previously described there are no other hemorrhages in the strap muscles or soft tissues of the neck. The upper airway appears patent. The tongue, tonsils, salivary glands, and remainder of the pharynx display changes as previously described without other significant pathology.

## MUSCULOSKELETAL SYSTEM

The bony framework, supporting musculature and soft tissues are unremarkable, except as previously described.

## NERVOUS SYSTEM

The scalp is reflected in the usual fashion revealing previously described focal injuries.

WELLS 000615

There is no skull fracture. The 1500 gram brain is covered by thin, clear, delicate leptomeninges. The dura mater is intact. There is good preservation of cerebral symmetry with marked diffuse flattening of gyri consistent with cerebral edema. Convolutional patterns otherwise remain intact. External landmarks are readily identified. There is evidence of perimortem herniation with bilateral uncal notching and prominence of the bilateral cerebellar tonsils. The cerebral vessels are intact with no evidence of aneurysm or thrombosis. Atherosclerotic changes are absent. Multiple sections of cerebrum, cerebellum, and brain stem following formalin fixation reveal changes as previously described.

The remainder of the spinal cord below the level of the atlanto-occipital articulation is removed using a posterior approach and is retained in formalin fixative for further neuropathologic evaluation. Neuropathologic examination of the spinal cord reveals changes as described in the accompanying report.

**EVIDENCE**

The following items of evidence are collected, inventoried, and released to Detective Michael Smojver, badge #9236 of the Phoenix Police Department: Wet and dry swabs from hands (with control), buccal swab, fingernail clippings (right and left, with fingernail clippers), and blood specimen (blot).

**TOXICOLOGY SPECIMENS**

Samples of the following are collected and submitted for toxicological testing: Cardiac blood, gastric contents, iliac venous blood, urine, vitreous fluid, and antemortem samples of blood and serum from treating hospital (date of collection 02/04/2019).

**MICROSCOPIC DESCRIPTIONS**

**Cardiac conducting system (sinoatrial and atrioventricular node with proximal bundle of His):** Multiple sequential sections taken through upper right cardiac atrium at junction of superior vena cava and right cardiac auricle, encompassing the anatomic region of the sinoatrial node show unremarkable fibromuscular cardiac tissues and apparent normal nodal tissue with ganglia, without inflammation, fibrosis, or necrosis. There are very small limited foci of nonspecific interstitial extravasation of erythrocytes within atrial myocardium near SA node region.

Similarly, multiple sequential sections taken through upper ventricular septum along the junction between the muscular and membranous septum and mitral valve annulus, encompassing the anatomic region of the atrioventricular node and proximal bundle of His, show unremarkable fibromuscular cardiac tissues, without inflammation, necrosis, or other apparent pathology. No definitive bypass tracts (ectopic conducting tissue) are seen extending from or directly connecting the atrial and ventricular tissues in the examined planes of section. Vessels supplying these tissues appear histologically normal.

WELLS 000616

However, adjacent myocardium within the upper ventricular septum shows pathology similar to other sections, with myocytic hypertrophy, arteriosclerotic small vessel disease, and multifocal moderate perivascular and interstitial fibrosis.

**Left anterior descending coronary artery:** Cross section of muscular artery with significant luminal stenosis by non-calcified and non-inflamed atheromatous plaque.

**Ventricular myocardium (left and septal):** Diffuse myocytic hypertrophy with multifocal moderate interstitial and perivascular fibrosis, particularly in subendocardial zones. Multiple small arterial branch vessels show chronic arteriosclerotic disease changes with myointimal hyperplasia and stenotic vessel lumina.

**Liver:** Multifocal centrilobular macrovesicular steatosis without significant active inflammation or fibrosis.

**Thyroid gland:** Multifocal mild to moderate patchy chronic inflammation at periphery of unremarkable follicular parenchyma.

**Ventricular myocardium (right), pituitary gland, pancreas, spleen, adrenal gland, kidney, and lungs:** Multiple microscopic sections are reviewed. The findings are consistent with the gross autopsy impressions and contribute no further significant pathologic diagnoses.

KDH/Diskriter
D: 02/07/2019
T: 02/08/2019

WELLS 000617



**MARICOPA COUNTY**
**OFFICE OF THE MEDICAL EXAMINER**
**701 W. Jefferson Street**
**Phoenix, AZ 85007**

**NEUROPATHOLOGY REPORT**

**DECEDENT:** Casey Joe Wells　　　　　　　　　　　**CASE:** 19-01162

## NEUROPATHOLOGIC DIAGNOSES

I.　Marked generalized brain edema status post cardiopulmonary arrest with resuscitation
　　a. Early cerebellar tonsil herniation, bilateral
　　b. Acute neuronal degeneration, neocortex, hippocampus, basal ganglia, cerebellum
　　c. Acute infarction, bilateral caudate nuclei
　　d. Perivascular lymphocytic cuffing
II.　Hippocampal maldevelopment, left

4/8/2019
**Date Signed**

ANDREA L. WIENS, DO
NEUROPATHOLOGIST

WELLS 000618

## CLINICAL HISTORY

The patient is a 40-year-old man who was reportedly tased by police and restrained in prone position while in the process of being placed into custody on February 4, 2019, suffered cardiac arrest and was resuscitated, and later died in hospital on February 6 after family elected to withdraw care.

Per available medical records, he was unresponsive at the scene and transported to hospital by emergency medical services on February 4, 2019, where he was resuscitated. CT head showed a parietal scalp hematoma, left facial contusion, and no acute intracranial hemorrhage. Urine drug screen was positive for amphetamines and ecstasy. He was admitted to the intensive care unit with diagnoses including cardiopulmonary arrest, acute encephalopathy, and multiple rib fractures. Electroencephalogram on February 5 and 6 showed multiple generalized seizures. MRI brain on February 6 showed multifocal restricted diffusion consistent with severe hypoxic-ischemic injury, slight downward displacement and swelling of cerebellar tonsils, and diffuse posterior scalp soft tissue swelling.

Review of autopsy photographs reveals abrasions of the face, purple scalp contusions and underlying hemorrhage at the vertex of the head, marked generalized brain edema with prominent cerebellar tonsils, and a grossly unremarkable spinal cord.

Specimens received for examination: brain, dura mater, spinal cord.

## NEUROPATHOLOGIC GROSS DESCRIPTION

The brain is received with a generous portion of detached dura mater. Its surfaces are unremarkable. The included venous sinuses are patent and contain only post-mortem blood clot.

The post-fixation weight of the brain is 1,491 grams. The leptomeninges over the convexities of the brain are thin and translucent and show no significant venous congestion. There is no subarachnoid hemorrhage. There are nonhemorrhagic lacerations of the bilateral cerebral convexities consistent with artifact from removal of the brain from the cranial cavity. The cerebral cortex shows the normal pattern of convolutions. There is no evident atrophy of the cerebral hemispheres. Marked generalized edema is appreciated. The uncinate processes are symmetrical. There is softening of the bilateral cerebellar tonsils without distinct notching, hemorrhage, or necrosis. The cerebellar hemispheres are symmetrical. The brainstem is of normal size and configuration. No focal lesions are seen. The vessels at the base of the brain are intact and symmetric without significant atherosclerotic changes. There is no evidence of a saccular or fusiform aneurysm. The cranial nerves are intact. The mammillary bodies are of normal bulk.

Sequential coronal sections of the cerebrum display a well-defined gray/white matter junction. Cortical thickness is appropriate, and there is no evidence of atrophy or decreased volume of gray or white matter. There is no evidence of cingulate herniation or midline shift. The centrum semiovale and corpus callosum are unremarkable. The basal ganglia show


WELLS 000619

prominent purple discoloration and softening of the bilateral caudate nuclei. The thalamus is unremarkable. Hippocampi and amygdalae are symmetric and of normal size and shape. No focal lesions are noted. The ventricular system is symmetric and not dilated. There is no evidence of intraventricular obstruction. At the level of the mammillary bodies the lateral ventricles measure 0.2 cm (left) and 0.3 cm (right), and the transverse diameter of the 3rd ventricle is 0.1 cm.

The right brainstem is notched with a scalpel along its long axis. Sequential transverse sections of the brainstem perpendicular to its long axis display a normally pigmented substantia nigra and locus ceruleus. The basis pedunculi are symmetrical. The basis pontis is unremarkable with no focal lesions seen. The medulla displays normal inferior olives and symmetrical pyramids.

Sagittal sections of the cerebellar vermis and parasagittal sections of the cerebellar hemispheres display normal folia and white matter. The dentate nucleus appears normal.

The spinal cord is received without dura mater. The cord measures 37 cm length including approximately 2 cm of cauda equina. There is mechanical disruption of 11.5 cm of the cervical and upper thoracic cord consistent with artifact from removal from the spinal column. The cervical enlargement measures approximately 1.5 cm wide, thoracic diameter 1.0 cm, and lumbar enlargement 1.1 cm wide. The anterior and posterior nerve roots are of normal caliber. Serial transverse sectioning reveals a smooth, gray/white cut surface with no focal lesions.

## NEUROPATHOLOGIC MICROSCOPIC DESCRIPTION

Neuropathologic (NP) sections submitted for microscopic examination as follows:
1) Left middle frontal gyrus
2) Right basal ganglia
3) Left basal ganglia
4) Left hippocampus
5) Right posterior cingulate gyrus and corpus callosum
6) Right occipital calcarine sulcus
7) Midbrain
8) Pons
9) Medulla
10) Right cerebellum with dentate nucleus
11) Right cerebellar tonsil
12) Cervical spinal cord
13) Thoracic spinal cord
14) Lumbar/sacral spinal cord

All histologic sections are stained with hematoxylin and eosin (H&E). Select sections are stained for iron (blocks 2 and 3); positive control stains appropriately. The meninges, choroid plexus, and ependymal lining of ventricular spaces are observed in several sections. The

WELLS 000620

leptomeninges are thin and without significant inflammation. Sections of choroid plexus demonstrate focal microcalcifications. The ependymal lining is unremarkable.

The neocortex displays normal cortical architecture with patchy vacuolization of neuropil, particularly in perivascular distribution and in deeper cortical layers, and frequent degenerating neurons with perineuronal vacuolization. The left hippocampus shows no significant cell loss within the dentate fascia or pyramidal cell layer. There is focal bilamination of the dentate gyrus. Frequent ischemic neurons are noted within the CA2 sector of Ammon's horn. No intranuclear or intracytoplasmic neuronal or glial inclusions are identified on H&E stained sections. The subiculum and entorhinal cortex are unremarkable. Scattered cortical vessels show perivascular cuffing by small lymphocytes. The corpus callosum is unremarkable without evidence of demyelination.

The putamen and globus pallidus show normal cytoarchitecture with frequent degenerating neurons and prominent vacuolization of neuropil. The caudate nucleus shows diffuse pallor, vacuolization, frequent degenerating neurons, and vascular congestion with multifocal intraparenchymal extravasation of blood. Iron stains are negative. The internal capsule is unremarkable without evidence of demyelination.

Sections of the brainstem include midbrain, pons, and medulla. The substantia nigra is normally pigmented and displays a normal complement of neurons. The red nuclei, periaqueductal gray matter, and oculomotor nuclei display normal cytoarchitecture without significant abnormalities. Within the pons, the tegmental nuclei are unremarkable. There is no evidence of demyelination or infarction within the pons. There is no neuronal cell loss or gliosis within medullary nuclei. The inferior olives have normal cytoarchitecture. No ischemic changes are identified in the brainstem sections examined.

The cerebellum shows good preservation of the molecular, Purkinje cell, and granule cell layers. There is a moderate, patchy loss of Purkinje cells within the cerebellar cortex, and frequent Purkinje cells are ischemic. The granule cell layer contains a normal complement of neurons. The dentate fascia is unremarkable. There is vacuolization of neuropil in the molecular layer of the right cerebellar tonsil.

Sections of spinal cord display a normal complement of neurons within the posterior and anterior horns. Within the white matter tracts there are scattered corpora amylacea but no evidence of demyelination or axonal loss.

### COMMENT

Neuropathologic findings in this case include hypoxic-ischemic sequelae of decreased brain perfusion secondary to cardiopulmonary arrest with resuscitation, including marked generalized brain edema with cerebellar tonsil herniation, acute neuronal degeneration throughout the cerebrum and cerebellum, and early infarction of the bilateral caudate nuclei. No appreciable intraparenchymal inflammatory infiltrates or reactive astroglial response is noted. Histopathologic features indicate a hypoxic-ischemic insult at least 6-12 hours removed and are consistent with the clinical history provided.

Page 4 of 5 

Perivascular lymphocytic cuffing is a nonspecific finding which may be seen in entities such as viral encephalitis, post-infectious viral syndrome, central nervous system lymphoma, or hypoxic-ischemic encephalopathy. There is no evidence of neuronophagia, activated microglial proliferation, intranuclear or intracytoplasmic inclusion bodies, or significant inflammation of the brain parenchyma or leptomeninges. There is no evidence of acute hemorrhage or injury, demyelination, or malignancy.

Hippocampal maldevelopment has been linked to febrile seizures and sudden unexplained death in childhood. Its clinical significance in adulthood is unknown.



WELLS 000622



**MARICOPA COUNTY**
**OFFICE OF THE MEDICAL EXAMINER**
**701 W. Jefferson Street**
**Phoenix, AZ 85007**

## ANTHROPOLOGY REPORT

**DECEDENT:** Casey Joe Wells                    **CASE:** 19-01162

**DATE OF EXAM:** 2/7/2019

**MEDICAL EXAMINER:** Kevin Horn, MD

---

### SUMMARY OF FINDINGS

    I.    Neck organs, as removed at autopsy
        a.  Hyoid bone unfused
        b.  Thyroid cartilage, mostly ossified
        c.  Cricoid and arytenoid cartilages, mostly ossified
    II.   Perimortem traumata
        a.  Fractures -right superior horn, right lamina of thyroid cartilage
        b.  Fractures – right and left inferior horns of thyroid cartilage

---

2/28/19
**Date Signed**

*Laura C. Fulginiti, Ph.D., D-ABFA*
**Laura C. Fulginiti, Ph.D., D-ABFA**
**Forensic Anthropologist**

WELLS 000623

On February 8, 2019 at approximately 1200 hours I am asked by Kevin Horn, MD, Office of the Medical Examiner, Maricopa County, Phoenix, Arizona to examine the neck organs of this decedent. The purpose of the examination is to assess osseous traumata. The specimens are transferred to anthropology and photographs are obtained. On this same date at approximately 1210 hours the maceration process begins and it concludes on February 11, 2019 at approximately 1130 hours. After maceration the specimens consist of the hyoid bone and mostly ossified thyroid, cricoid and arytenoid cartilages. The bone quality is good. Additional photographs are obtained. At the conclusion of the examination the specimens are placed into formalin. They are transferred to Histology for storage on February 28, 2019 at approximately 1045 hours.

### RESULTS OF THE EXAMINATION

**OSSEOUS TRAUMATA:** There are perimortem fractures on the submitted specimens as follows:
1) The right superior horn of the thyroid cartilage is fractured into two segments
2) The right superior lamina of the thyroid cartilage is fractured obliquely
3) The right and left inferior horns are fractured
4) There is reddish discoloration in the fractures described in #1 and #2 and in the lamina of the cricoid cartilage.

**PATHOLOGIC CONDITIONS:** The thyroid, cricoid and arytenoid cartilages are mostly ossified (bone replaces the cartilage matrix).

**OSSEOUS ANOMALY:** The body is not fused to the cornua of the hyoid bone.

Page **2** of **2** 

WELLS 000624



NMS Labs
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

## Toxicology Report

**Report Issued**   02/20/2019 13:05

To:   **10106**
Maricopa County Office of the Medical Examiner
Attn: Toxicology Lab
701 W. Jefferson Street
Phoenix, AZ  85007

| | |
|---|---|
| **Patient Name** | WELLS, CASEY |
| **Patient ID** | 19-01162 |
| **Chain** | NMSCP8803 |
| **Age** Not Given | **DOB** Not Given |
| **Gender** | Not Given |
| **Workorder** | 19040535 |

**Page 1 of 3**

### Positive Findings:

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| D-Amphetamine | 68 | ng/mL | 001 - Hospital Blood |
| % of D-Amphetamine | 100 | % | 001 - Hospital Blood |
| % of L-Amphetamine | 0.0 | % | 001 - Hospital Blood |
| D-Methamphetamine | 580 | ng/mL | 001 - Hospital Blood |
| % of D-Methamphetamine | 100 | % | 001 - Hospital Blood |
| % of L-Methamphetamine | 0.0 | % | 001 - Hospital Blood |
| Caffeine | Positive | mcg/mL | 001 - Hospital Blood |

See Detailed Findings section for additional information

### Testing Requested:

| Analysis Code | Description |
|---|---|
| 0329B | Amphetamines (D/L Differentiation), Blood |
| 8042B | Postmortem, Expanded w/Vitreous Alcohol Confirmation, Blood (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Pink Vial | 5.75 mL | 02/04/2019 15:16 | Hospital Blood | |
| 002 | Pink Vial | 1.25 mL | 02/04/2019 15:18 | Hospital Blood | |
| 003 | Green Vial | 1 mL | 02/04/2019 | Hospital Serum | |
| 004 | Gray Top Tube | 9 mL | 02/07/2019 09:00 | Iliac Blood | |
| 005 | Gray Top Tube | 8.75 mL | 02/07/2019 09:00 | Iliac Blood | |
| 006 | Red Top Tube | 1.75 mL | 02/07/2019 09:00 | Vitreous Fluid | |
| 007 | Gray Top Tube | 2.25 mL | 02/07/2019 09:00 | Urine | |

All sample volumes/weights are approximations.

Specimens received on 02/12/2019.

NMS v.18.0

WELLS 000625


Workorder 19040535 was electronically
signed on 02/20/2019 12:30 by:

*Michael Lamb*

Michael E. Lamb, M.S.F.S., D-ABFT-FT
Forensic Toxicologist

## Analysis Summary and Reporting Limits:

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Acode 0329B - Amphetamines (D/L Differentiation), Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| % of D-Amphetamine | N/A | D-Amphetamine | 10 ng/mL |
| % of D-Methamphetamine | N/A | D-Methamphetamine | 10 ng/mL |
| % of L-Amphetamine | N/A | L-Amphetamine | 10 ng/mL |
| % of L-Methamphetamine | N/A | L-Methamphetamine | 10 ng/mL |

Acode 52485B - Amphetamines Confirmation, Blood - Hospital Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamine | 5.0 ng/mL | Norpseudoephedrine | 5.0 ng/mL |
| Ephedrine | 5.0 ng/mL | Phentermine | 5.0 ng/mL |
| MDA | 5.0 ng/mL | Phenylpropanolamine | 5.0 ng/mL |
| MDEA | 5.0 ng/mL | Pseudoephedrine | 5.0 ng/mL |
| Methamphetamine | 5.0 ng/mL | | |

Acode 8042B - Postmortem, Expanded w/Vitreous Alcohol Confirmation, Blood (Forensic) - Hospital Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0.040 mcg/mL | Salicylates | 120 mcg/mL |
| Cannabinoids | 10 ng/mL | | |

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

-Analysis by High Performance Liquid Chromatography/Time of Flight-Mass Spectrometry (LC/TOF-MS) for: The following is a general list of compound classes included in this screen. The detection of any specific analyte is concentration-dependent. Note, not all known analytes in each specified compound class are included. Some specific analytes outside these classes are also included. For a detailed list of all analytes and reporting limits, please contact NMS Labs.

Amphetamines, Anticonvulsants, Antidepressants, Antihistamines, Antipsychotic Agents, Benzodiazepines, CNS Stimulants, Cocaine and Metabolites, Hallucinogens, Hypnosedatives, Hypoglycemics, Muscle Relaxants, Non-Steroidal Anti-Inflammatory Agents, Opiates and Opioids.

NMS v.18.0

WELLS 000626

# EXHIBIT 22



October 11, 2021

Joel Robbins
301 East Bethany Home Road, Suite B-100
Phoenix, AZ 85012

RE: *Stickney v City of Phoenix, James Arnold, Robert Rodarme, Kenneth Palmer, Joseph Seaquist, Dustin Haynes, Sean Yamane, Frank Long, and Travis Funston*

Decedent: Casey Wells
Date of Incident: February 4, 2019 (approximately 40 years old)
Date of Death: February 6, 2019

Dear Mr. Robbins,

I am in receipt of your correspondence regarding the above-named individual and the circumstances of his death. In addition to my review of these materials, I have performed an extensive literature review and research on the validity and reliability of methamphetamine intoxication as a cause of death at the levels identified in Mr. Wells, when other competing causes (*i.e.* compressive or positional asphyxia, choke hold/ strangulation, TASER shocks) are present as well.

The medical examiner who performed the autopsy on Mr. Wells, Dr. Kevin Horn (forensic pathology), concluded that the manner of Mr. Wells' death was undetermined, and the cause of death was complications of cardiac dysrhythmia and arrest in the setting of drug (methamphetamine) intoxication, acute psychosis, arteriosclerotic cardiovascular disease, and physical restraint with prone positioning and possible extrinsic chest compression.

The purpose of this report is to provide my analysis regarding the various potential causes of cardiopulmonary arrest acting on Mr. Wells at the time that he became unresponsive, and which of the potential causes were the most probable cause (or causes) of his death.

In this report I will demonstrate Dr. Horn's conclusion that the manner of Mr. Wells' death was undetermined is inaccurate, and that his death would not have occurred had he not been choked and physically restrained prior to his cardiopulmonary arrest, regardless of the other causal factors listed (*i.e.* meth and heart disease). The manner of Mr. Wells' death is most accurately categorized

WELLS 003031

as a homicide secondary to the use of aggressive restraint tactics by Phoenix law enforcement personnel, which resulted in a cardiopulmonary arrest triggered by restraint-related asphyxia, and complicated by multiple TASER shocks. There are no alternative explanations for his death that are unrelated to the actions of the City of Phoenix police personnel that are more than *slightly* probable. The Appendix of this report contains a list of the materials reviewed in reaching my opinions.

My methods and opinions in this case pertain to the fields of forensic medicine and epidemiology. Forensic medicine refers to the intersection of medicine and law, and in particular medicolegal investigation of the cause of death and injury. Epidemiology is defined as the scientific study of the cause of disease, injury, and death in populations, including prevalence, risk, and incidence in specific populations. The scientific field that dictates how probabilities may be inferred from epidemiologic data and methods and how the inferences can be used to assess the cause of injury, disease, or death in individuals in a legal setting is forensic epidemiology. Forensic epidemiology provides the scientific basis for the evaluation of specific causation, to the extent that probability or likelihood of causation may be evaluated. The methods applied in this report are consistent with those outlined in the <u>Reference Guide on Epidemiology,</u> from the <u>Reference Manual on Scientific Evidence</u>, published by the Federal Judicial Center and the National Academies of Science (3rd Edition, 2011), as well as in the text <u>Forensic Epidemiology: Principles and Practice</u>, published by Elsevier (2016).

### <u>*My qualifications to provide opinions concerning the matters herein are as follows:*</u>

I am a medicolegal consultant, and hold qualification in forensic medicine with the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (UK). I hold the following relevant academic degrees: a doctor of medicine degree (Med.Dr.) from Umeå University (Sweden), a doctor of philosophy (Ph.D.) in epidemiology from Oregon State University, a master of public health (MPH) in epidemiology and biostatistics, also from Oregon State University, a master's degree in forensic medical sciences (MScFMS) with the Academy of Forensic Medical Sciences (UK) and University of Verona (IT), and a Diploma of Legal Medicine (DLM) with the Faculty of Forensic and Legal Medicine of the Royal College of Physicians (UK), *i.a.* I have completed a 2-year post-doctoral fellowship in forensic pathology at Umeå University in Sweden, am an affiliate medical examiner with the Allegheny County Medical Examiner's office, and a fellow of the Pathology section of the American Academy of Forensic Sciences (AAFS), the Academy of Forensic Medical Sciences (UK), and the American College of Epidemiology (ACE).

I am the vice-chair of the standards board for medicolegal death investigation for the AAFS. I am also the chair of the subcommittee for research at the Faculty of Forensic and Legal Medicine of the Royal College of Physician (UK). I am a US Fulbright fellow, having held a 3-year appointment as a Fulbright Specialist in the field of Forensic Medicine with the U.S. Department of State (2017-

WELLS 003032

20).

I serve as a tenured Associate Professor of Forensic Medicine at Maastricht University, and a Joint Clinical Professor of Psychiatry and Public Health and Preventive Medicine at Oregon Health and Science University School of Medicine, where I have taught courses for the past 20 years in forensic medicine, forensic epidemiology, and medical causation. I have also held an appointment as an Adjunct Professor of Forensic Medicine and Epidemiology at the Institute of Forensic Medicine, Faculty of Health Sciences, Aarhus University, Aarhus, Denmark from 2005-2017. I am currently a visiting professor of medicine at University of Indonesia.

I serve or have served as an associate editor or editorial board member of 14 scientific peer-reviewed journals and have published approximately 220 scientific papers, abstracts, book chapters and books, including the recent text for Elsevier, <u>Forensic Epidemiology: Principles and Practice</u> (2016). My scientific publications have been cited by other authors of peer-reviewed publications approximately 2,800 times. Specific to the facts of the present investigation, I have an extensive education, practical investigational experience, and research background into restraint and in-custody deaths. Please see my CV for further details.

I have provided testimony in more than 350 civil and criminal trials in state and Federal courts throughout the United States, Canada, Australia, and Europe.

WELLS 003033

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

<u>**Background Facts;**</u>

*The following narrative is based on review of Phoenix police department records, medical records, bystander footage, the second amended complaint dated June 24, 2020, and the body camera footage of Officer Palmer, who arrived on scene shortly before Mr. Wells went into cardiopulmonary arrest. At the present time I am unaware as to whether any of the other officers had body cameras with relevant footage of the incident.*

On February 4, 2019 around 14:06 the Phoenix police department received a phone call reporting a nude white male walking down the street and yelling to himself. Over the next 15 minutes, repeated phone calls to 911 reported the same nude man praying and doing yoga in the street.

Officer Arnold arrived on scene at or around 14:19 and engaged with the man, later identified as Casey Wells. Mr. Wells was yelling at the sky, with his arms raised in the air. He was obviously unarmed. Officer Rodarme then arrived on scene at approximately 14:22. Officer Arnold called for backup.

Officers Arnold and Rodarme approached Mr. Wells and used physical force to attempt arrest him. When Mr. Wells responded by running in circles, Officer Arnold approached Mr. Wells from the front and wrapped his arms around his torso, while Officer Rodarme grabbed him from behind. They took Mr. Wells to the ground, lying on his back, while they continued to attempt to handcuff him.

Officer Seaquist arrived. The officers rolled Mr. Wells onto his stomach and grabbed his legs.

Officers Funston and Long arrived and joined in the attempt to restrain Mr. Wells. The five officers were using physical force to restrain Mr. Wells to the ground. Officer Seaquist then used his TASER to shock Mr. Wells for the first time for 5 seconds at 14:29.

From the initial TASER shock, over the next 1 minute and 35 seconds Officer Seaquist tased Mr. Wells for 26 seconds, a total of 5 times. A record of the times and lengths of each TASER shock is listed in the table below.[1]

---

[1] 028F, Phoenix Police department Professional Standards Bureau report

| 326 | 04 Feb 2019 14:29:11 | Trigger | C1: Deployed | 5 | | 55 |
| 327 | 04 Feb 2019 14:29:26 | Trigger | C2: Deployed | 5 | | 55 |
| 328 | 04 Feb 2019 14:29:56 | Trigger | C2: Deployed | 5 | | 55 |
| 329 | 04 Feb 2019 14:30:19 | Trigger | C2: Deployed | 6 | | 54 |
| 330 | 04 Feb 2019 14:30:46 | Trigger | C2: Deployed | 5 | | 54 |
| 331 | 04 Feb 2019 14:33:15 | Safe | C1: Deployed<br>C2: Deployed | 250 | 35 | 53 |

The audio from the final TASER shock was captured in the body camera footage of Officer Palmer, who arrived on scene at approximately 14:30, around the same time as officers Haynes and Yamane.

As indicated in the timestamp in the top left corner, the following screenshot was taken at 14:30:19, from when Officer Palmer was approaching the scene. Though Mr. Wells is not visible in the picture, at least 5 officers can be seen using force to restrain him on the ground.



WELLS 003035

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

A closer image from 17 seconds later of the restraint used on Mr. Wells is shown in the screenshot below. In this photo, 6 officers can be seen using their hands and/or knees to apply pressure to Mr. Wells' body, while one officer watched.



A RIPP restraint, a device that keeps the ankles pinned together, was applied to Mr. Wells' legs. The RIPP restraint is also designed to be used as a hobble-tie (where the arms and legs are bound separately and then tied together to restrict movement), but this feature was not used in Mr. Wells' case.

The body camera video did not capture most of what occurred at the ground level, however, it was readily apparent that multiple officers were applying weight to Mr. Wells' body while he was prone (see the screenshot above). Officer Palmer covered his body camera with either a gloved right hand or his right arm at 14:31:08 for approximately 11 seconds.

WELLS 003036

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

When Officer Palmer removed his hand/arm from obstructing his camera, the officers were no longer restraining Mr. Wells, a voice on the radio stated, "He's not breathing", and when Officer Palmer's camera turned to put Mr. Wells in view, he was turned onto his back, and an officer was performing chest compressions. See image below.



Paramedics arrived on scene at 14:39 and took over chest compressions.[2] Mr. Wells was given 3 rounds of epinephrine and oxygen. He was transported to Honor Health Medical Center, arriving at 15:04.[3]

Mr. Wells was kept on life support for 2 days but did not regain consciousness. He was declared dead on February 6, 2019 at 17:46.

---

[2] 032 - EMS records & billing, page 2
[3] 048 - Honor Health medical records, page 835

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

<u>*Autopsy report:*</u>
Dr. Kevin Horn (forensic pathology) conducted an autopsy of Mr. Wells on February 7, 2019 at 08:00.
Mr. Wells was 40 years old at the time of his death, he was 5'9" tall and weighed 227 pounds, yielding a BMI of 33.5 (classified as obese).

The external examination revealed multifocal abrasions and contusions of the face, torso, and extremities, subcutaneous hemorrhage of the central back, and puncture wounds on the back consistent with conducted electrical weapon use, which Dr. Horn attributed to the pre-mortem physical struggle.

Internal examination revealed an enlarged heart with moderate left ventricular hypertrophy, moderate to severe atherosclerotic stenosis of the proximal left anterior descending coronary artery, pulmonary edema, and mild arteriolar nephrosclerosis.

The toxicology results using blood drawn on February 4, 2019 at 15:16 (two days antemortem) revealed methamphetamine 580 μg/mL (0.58 mg/L), and amphetamine 68 μg/mL (0.068 mg/L).

In addition to these findings, an anthropological report dated February 28, 2019 by Dr. Laura Fulginiti (forensic anthropology) revealed **fractures of the right superior horn, right lamina of thyroid cartilage, as well as the right and left inferior horns of thyroid cartilage**.

Dr. Horn concluded that the manner of death was unknown, and that the cause of death was due to complications of cardiac dysrhythmia and arrest in the setting of drug (methamphetamine) intoxication, acute psychosis, arteriosclerotic cardiovascular disease, and physical restraint with prone positioning and possible extrinsic chest compression.

WELLS 003038

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

## *Analysis and opinions*

### Injury causation methods

In evaluating the most likely cause of Mr. Wells' death, the plausible causes or risk factors for sudden death can be placed in 2 categories: the risks attributable to the actions of the officers (including mechanical obstruction of respiration and the effects from multiple TASER shocks), and the risk attributable to the conditions present in Mr. Wells and unrelated to the actions of the police officers, that were described in the autopsy report (methamphetamine intoxication and heart disease). There are no other apparent causes of sudden death for Mr. Wells identified at autopsy or in any of the reviewed records.

The investigation of the cause of an injury is different than for a disease, primarily because there is typically a close temporal association between the suspected cause of death and the first signs of injury. There are systematic methods for assessing questions of injury and death causation in a medicolegal setting that have been described extensively in the peer-reviewed literature. Most simply put, an injury causation analysis for a specific individual is performed by assessing the risk of injury from a harmful event and comparing it to the probability that the injuries or conditions would have been present at the same point in time *in the individual* if the harmful event had not occurred.

The analysis is accomplished via the application of expertise and knowledge from several disciplines depending on the source and type of injury, nearly always including medicine and epidemiology.[1]

*Note: citation numbers in brackets [] refer to the bibliography at the end of this report, as opposed to the footnotes, which are superscript numbers referencing case documents.*

In a death investigation involving an autopsy, the pathologist identifies, describes, and diagnoses observed conditions, but the determination of the cause of a death in the absence of a condition that is nearly always fatal (*i.e.* gunshot wound to the head) is made via comparison of competing risks of sudden death acting on the individual at the time of the death.

The generally accepted methods for assessing injury and death causation are simply described as a 3-step process based on the Bradford-Hill criteria,[2] which has been extensively described in the peer-reviewed literature,[3] and been deemed generally accepted by US Courts, and described as part of case law in the United States.[4]

WELLS 003039

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

The three fundamental elements of an injury causation analysis in the context of a death investigation are as follows:

1) **Plausibility:** whether the injury mechanism had the potential to cause the death (general causation), and if known, the magnitude of that potential (risk of death);

2) **Temporality:** the degree of temporal proximity between the injury mechanism and the death; and

3) **Alternative explanations**: whether there is a more likely alternative explanation for the death or fatal injury occurring at the same point in time, versus the investigated cause (also known as a differential etiology). This alternative or competing cause of death or fatal injury is quantified for the individual, given their predictive characteristics and the temporal relationship quantified in step 2.

**Analysis of the most probable cause of Mr. Wells' death**

In the following section of this report is a discussion and analysis of the most probable cause of Mr. Wells' death within the context of the 3-step causal analysis process described above. This process is accomplished by first enumerating the potential causes of death acting on Mr. Wells and assessing which are *plausible* causes of death, and if so, what *risks* are associated with the plausible causes. The next step in assessing causality is temporality; for the present analysis this consists of a description of the timeframe during which the plausible risk factors for death would have acted on Mr. Wells between the initiation of the restraint by officers Arnold and Rodarme and the time of his cardiopulmonary arrest. The last step of the analysis consists of a quantitative comparison of the magnitude of the risks presented by each of the plausible causes of death (*i.e.* differential etiology).

*Step 1: Potential causes of Mr. Wells' death*

Based on the fact pattern surrounding Mr. Wells' death and Dr. Horn's autopsy findings and report, the potential causes of death for Mr. Wells are as follows:

- Restraint related
  - Asphyxia due to neck/chest/abdomen compression
  - TASER shocks
- Non-restraint related
  - Acute methamphetamine toxicity
  - Cardiovascular disease

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

The following discussion addresses the plausibility of these potential causes of Mr. Wells' death, and, when known or knowable, the risks associated with them:

### Restraint-related causes

*Asphyxia due to neck/chest/abdomen compression*

As described in the autopsy report and seen on the bystander footage and body camera of Officer Palmer, Mr. Wells was subjected to restraint with sufficient force and duration to fracture his thyroid cartilage and cause an abrasion injury to his face. As a general rule, and one that is applicable to the circumstances of Mr. Wells' death, **"*forces sufficient to cause thyroid cartilage fractures are usually sufficient to cause acute asphyxia and death*."**[5]

As seen on the video footage taken from the body camera of Officer Palmer as well as the bystander photos, Mr. Wells was subjected to full-bodied restraint, including blunt force trauma between his head and the pavement, resulting in the contusions and abrasions observed on both sides of his face and the back of his head. These are depicted in the autopsy photographs below.

 

Asphyxia is defined as a lack of oxygen (*i.e.* hypoxia) caused by an interruption in breathing, and is a well-known trigger of cardiac dysrhythmia and arrest.[6] Compression of the neck, chest, and abdomen during physical restraint is a well-recognized mechanism causing asphyxiation due to restricted inspiration.[7] Positional asphyxia, in the context of restraint, typically refers to increased

difficulty with breathing that is associated with the use of restraint (*i.e.* handcuffs, hobble restraint) that is used on a prone person, but can occur in any position in which a person is forced into a position that limits their ability to breathe. The terms compression and position are sometimes used interchangeably when referring to the circumstances of asphyxial death. Obese individuals with a protruding belly like Mr. Wells are at heightened risk of positional asphyxia when in a prone position, due to pressure against the diaphragm by the belly, thus restricting gas exchange in the lungs.[8]

When Mr. Wells was taken down and forced into a sustained prone position by Phoenix police officers a combination of factors would have presented an exceedingly high risk for positional asphyxia, including his heightened oxygen needs due to obvious delirium, activity, and struggle immediately preceding the take down, pain secondary to injury and multiple TASER shocks (further increasing his oxygen requirements), and most critically, the use of a chokehold. All of these factors combined to result in Mr. Wells cardiopulmonary arrest.

Despite the lack of video footage depicting all of the potential sources of positional asphyxia, there is highly reliable physical evidence indicating that a chokehold was applied to Mr. Wells during the course of his restraint. At autopsy Dr. Horn noted and documented petechiae (hemorrhages/capillary dilation) in the white (sclera) and conjunctiva of Mr. Wells' left eye and eyelid (see images below). These findings indicate mechanical obstruction of respiration and venous return from the head, and are closely associated with strangulation.



The finding that demonstrates that strangulation was a likely source of the petechiae was the finding fractured thyroid cartilage, identified by Dr. Fulginiti. The thyroid cartilage is part of a constellation of structures in the larynx which is in the neck, designed to protect the esophagus and the vocal cords. Because it is in a relatively protected part of the body (*i.e.* the face and chest protrude beyond

WELLS 003042

the neck organs), thyroid cartilage fracture is highly unusual injury, occurring less than 1 in 30,000 patients admitted to trauma centers.[9]

Such fractures have a very specific injury mechanism: the most common cause of a laryngeal fracture is high-speed traffic crashes, followed by penetrating trauma from assault or suicide attempt. Specifically, fracture of the superior horn of the thyroid cartilage has been shown to be highly associated with direct intentional neck trauma, such as from manual strangulation and chokeholds.[10]

The finding of fractured thyroid cartilage is a nearly certain indication that Mr. Wells had an improperly performed chokehold applied to his neck. The correct form of this restraint (when it is allowed; the Phoenix PD banned the use of chokeholds in 2020) applies pressure to the sides of the neck in an attempt to produce unconsciousness via stimulation of the carotid sinuses and associated sudden drop in blood pressure, rather than upon the anterior neck structures, which can compress the airway. See the illustration below:[4]



**Carotid restraint**
In the carotid restraint, officers use their arms to apply pressure to the sides of a person's neck, which – if applied correctly – cuts off blood flow and can render someone unconscious quickly.

**Chokehold**
A chokehold, which is banned by the department, puts pressure on the front of the neck and throat, cutting off air.

Based on the preceding discussion and analysis, the restraint applied to Mr. Wells while he was prone and handcuffed was the only apparent cause of the asphyxial signs observed at autopsy, and serve as not only a plausible, but highly likely cause of the cardiopulmonary arrest that resulted in Mr. Wells' death.

---

[4] https://www.sandiegouniontribune.com/news/public-safety/story/2019-05-19/san-diego-police-leaders-defend-use-controversial-neck-restraint-despite-calls-for-ban

WELLS 003043

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

<u>*Electrical shock from electronic control device (TASER)*</u>
While in a prone position and still capable of struggling, Mr. Wells was tased 5 times, amounting to 26 seconds of tasing over 100 seconds. All of the TASER shocks were issued while Mr. Wells was prone on the ground with an officer or officers using force to pin him down.

Electronic control devices, most commonly called TASERs, are designed to incapacitate an individual using an electric shock or shocks. The models used by law enforcement personnel typically have projectiles, connected to the device via thin wires, so that the electric shock can be administered at a distance. The introduction of an electrical current into the human body is a highly plausible and well-established mechanism for producing dysrhythmias, and thus it is unsurprising that law enforcement use of TASER has been associated with over 630 deaths between 2001-2014.[11]

While some studies have reported that TASER use has little or no impact on cardiac or respiratory function, virtually all of these papers were funded by the company that makes and sells TASER devices. This issue was highlighted in a 2011 paper in which researchers found that papers funded by TASER were 18 times more likely to conclude that the devices are "safe" as compared with studies that were not funded by the company.[11] In contrast, studies that have not been funded by TASER have reported a number of adverse effects from TASER deployment, including dysrhythmias and associated cardiac arrest.[12]

While some volunteer studies have concluded that TASER use is generally, if not universally safe restraint technique, none have accurately recreated the events that lead to TASER shocks in the real world. Individuals who are tased often have mental illness or drug associated psychosis and delirium, as well as concurrent restraint effects (*i.e.* prone position, multiple officers' bodyweight, handcuffs), *multiple* TASER shocks, all occurring in the context of vigorous struggle and resisting of arrest.[13], [14]

In a study of TASER shocks in real-life circumstances, study authors Strote et al. found that less than 5% of all TASER encounters include shocking a subject more than 5 times.[15] The fact that Mr. Wells was tased 5 times places him in the extreme fringes of ordinary TASER use, and at substantially increased risk category for TASER-related injury.

Ordinarily, a TASER shock carries a very low risk of cardiac arrest when used by law enforcement, but this was not the case for Mr. Wells, however. At the time the TASER was used on Mr. Wells he was in a delirious and highly excited state; he was screaming, hyperventilating, and confused. In addition to the potential for dysrhythmia (particularly when deployed on the torso and near the

WELLS 003044

heart), the use of a TASER causes excruciating pain (which is the intent of the use of the device), which in turn serves to increase the need for oxygen in a tased individual.[16] Combined with the positional asphyxia factors described above, the use of the TASER is a plausible contributing cause of Mr. Wells' cardiopulmonary arrest and death.


### *Non-restraint-related causes*


*Acute methamphetamine toxicity*

Mr. Wells was found to have an antemortem blood concentration of methamphetamine of 580 ng/mL or 0.58 mg/L. Methamphetamine is a stimulant that is primarily consumed illegally as "crystal meth," or simply "meth," in a powder form that can be smoked, injected, or ingested orally. Use of the drug is highly prevalent; there were 42 tons of crystal meth consumed in the US in 2010, and in 2013 1.2 million Americans used the drug.[17]

In contrast with opiates, however, crystal meth has a relatively low hospitalization and death rate; there were 103,000 emergency room visits associated with meth use in 2011, and in the same year there were ~2,700 deaths attributed, at least in part, to meth exposure, resulting in a death rate of 1 in 444, relative to the number of people taking the drug annually (the deaths were not all necessarily due to methamphetamine toxicity, however). As the typical dose of meth ranges from 10 to 40 mg, this means that there are at least 11,340 doses available per pound of meth, (assuming a 40 mg dose), 22.7 million doses per ton of meth, and thus a total of 953 million doses of meth consumed in the US in 2010 alone.[18] A comparison of the number of doses to the number of deaths each year yields a risk of 1 death per 353,000 doses of methamphetamine.[19] While no illicit drug use is considered "safe" (and thus any level in the body is considered toxic), the risk of death from a single dose of methamphetamine is exceedingly small.

There is no evidence that supports the implication that the very small amount of methamphetamine in Mr. Wells' blood (0.58 mg/L) was even a *plausible* cause of his death in the absence of the violent restraint. The level of methamphetamine assayed in Mr. Wells' antemortem blood sample is less than what is commonly found in recreational users, a fact that is established in a publication by the National Highway Traffic Safety Administration.[18] Other studies have described non-lethal blood concentrations in recreational methamphetamine users of as high as 9.3 mg/L (+16 times greater than the level found in Mr. Wells' blood).[20] While methamphetamine deaths have been recorded with blood levels as low as 0.05 mg/L this information is essentially useless in the present investigation. There is extensive overlap between what are only *possibly* fatal levels and common recreational blood concentrations of methamphetamine.

WELLS 003045

Given the exceedingly low per-dose risk of death associated with methamphetamine use, there is no reason to believe that simply because Mr. Wells had methamphetamine in his blood that *might possibly* be fatal, that the cause of his death was related to methamphetamine toxicity. Methamphetamine isn't like cyanide or some other poison, which is invariably the cause of death when it is found in a decedent. Like alcohol, most of the time that amphetamine is present in a decedent it is *not* the cause of death. Thus, at the levels found in Mr. Wells blood two days before he died, methamphetamine toxicity was a highly unlikely cause of his death, in the absence of the restraint-related death risk.

<u>Cardiovascular disease</u>
The post-mortem examination of Mr. Wells' heart revealed cardiomegaly and moderate-to-severe arteriosclerotic heart disease. While these conditions are a common cause of increased morbidity and even premature death in the general population, the changes in Mr. Wells' heart are associated with increased disease risk occurring over decades, rather than any significant increased risk of sudden cardiac death.

As an illustration of how remote Mr. Wells' risk of sudden cardiac death was at the time of his assault, epidemiologic study indicates that the risk of sudden cardiac death in the general population of adult men aged 35-44 is 0.2 per 100,000 per year,[5] or 1 in 500,000. Even if I assume that Mr. Wells was in the least healthy 1% of his population with regard to cardiac health (an overestimation of the impact of his cardiac pathology relative to the general population his age), this would make his annual risk of sudden cardiac death, 1 in 5,000.

Applying this annual risk to the approximately 12 minutes between when Mr. Wells was at risk of death due to positional asphyxia results in a risk of sudden cardiac death of approximately 1 in 219 million.

Based on the previous discussion, it can be concluded that Mr. Wells' cardiac pathology was not an independent risk factor for his sudden death, in the absence of the restraint-related death risk.

---

[5] Centers for Disease Control and Prevention, National Center for Health Statistics. Multiple cause of death, 1999-2019. CDC Wonder online database. Released December 2017. Atlanta, GA. Accessed May 1, 2021. Retrieved from http://wonder.cdc.gov/mcd-icd10.html

WELLS 003046

**Step 2: The timing of events leading to Mr. Wells' death**

Temporality typically involves multiple axes, including sequence, proximity, and latency of time between cause and first observed effect, as well as duration of exposure to the cause. The sequence of the plausible causes of Mr. Wells' cardiac arrest are appropriate; all of his restraint/assault-related injuries and the effects of the TASER electrical shocks occurred prior to his arrest. The temporal proximity is close; Mr. Wells' went into cardiac arrest while 6 officers were forcefully restraining him, prone on the ground, which was approximately 12 minutes after initial contact with officers Arnold and Rodarme, and less than 1 minute after the fifth and final 5-second TASER shock.

Latency, typically referring to whether there is sufficient time between the suspected cause and observed effect for the effect to have developed (*i.e.* smoking cannot cause lung cancer after 1 month) is not an issue in the investigation of Mr. Wells' death. There is no minimal amount of time required for a cardiac arrest to follow blunt trauma or asphyxia. The duration of potential asphyxial risk was lengthy, around 12 minutes.

Mr. Wells' actions before his interaction with the Phenix police were unusual and apparently delusional, but not indicative of a methamphetamine *overdose*. He was doing yoga in the street and praying, according to a neighbor, "Like Muslim people do,"[6] by which the neighbor likely meant kneeling and bowing. There was no indication that he was experiencing a potentially fatal methamphetamine overdose (*i.e.* elevated heart rate, hyperaggressive behavior, intense stomach pain, seizure).[21]

The timing between the application of restraint related asphyxia and Mr. Wells' alteration in breathing and loss of consciousness is appropriate in sequence and proximate.

**Step 3: Alternative causes/ differential etiology of the most probable cause of Mr. Wells' death**

Based on the discussion under Step 1 above, of the potential causes of Mr. Wells' death, only the police actions of positional/compressive asphyxia and TASER use, and the non-police-related conditions of acute methamphetamine toxicity and cardiovascular disease are plausible competing risks for his death.

As described above under Step 1, the risk of sudden death associated with the 2 non-police causes is less than trivial; the presence of methamphetamine in Mr. Wells' blood represented a <1 in

---

[6] Body camera footage, timestamp 14:34:24

350,000 risk, and the cardiovascular disease risk was likely <1 in 219 million during the period of restraint.

In comparison, the risk of death from the police actions was exceedingly high; the evidence of trauma to Mr. Wells' head, and the petechiae and fractured thyroid cartilage in particular, is highly associated with acute manual pressure to the neck, which carries with it an exceptionally high risk of asphyxia. The addition of the multiple officers' pressure to his entire body as he lay prone on the ground, and the 5 TASER shocks issued within 100 seconds only served to increase his need for oxygen, and risk of asphyxia. Relative to all other competing explanations for Mr. Wells' death, the injuries and effects of the actions of the police account for more than 99% of the explanation for his death, versus the non-police related conditions.

Another way to analyze the cause of Mr. Wells' death is to take the competing factors into account in a decedent who is only found after death (*i.e.* with no pre-mortem history). If a 40 year-old man was found deceased and with no sign of injury, and at autopsy was found to have low blood levels of methamphetamine and heart disease, his death would be likely ruled an accident, with the causes given as methamphetamine toxicity and heart disease.

If the same man was found with multiple abrasions, scleral petechiae and fractured thyroid cartilage, his death would be ruled a homicide, and the cause of death would be asphyxia. The heart disease and presence of the drug would be only remote secondary considerations in assessing the cause of death.

Thus, if, instead of police officers, the body cam video had captured 6 strangers beating, strangling, kneeling on, restraining with hand and ankle cuffs, and tasing Mr. Wells 5 times prior to his death, they would have been charged with murder or manslaughter.


## <u>Conclusions:</u>

Based on the preceding analysis, it is my opinion that Mr. Wells' death was solely a result of the use of excessive force by the Phoenix Police Department personnel, resulting in his death by cardiopulmonary arrest triggered by asphyxia. Because Mr. Wells' death was due to the intentional actions of others, his manner of death was a homicide, rather than undetermined.

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

The preceding opinions were given as reasonable medical and scientific probabilities. I reserve the right to amend any of my opinions should new information come to light.

Very truly yours,

Michael D. Freeman, MedDr, PhD, MScFMS, MPH, DLM, MFFLM, FAAFS, FACE
Associate Professor of Forensic Medicine
University of Maastricht Medical Center
Faculty of Health, Medicine, and Life Sciences
Maastricht University, Maastricht, Netherlands

Member, Faculty of Forensic and Legal Medicine, Royal College of Physicians (UK)
Fellow, American College of Epidemiology
Fellow, American Academy of Forensic Sciences
Fellow, Academy of Forensic Medical Sciences (UK)

### *References:*

[1]     P. D. I. Meilia, M. D. Freeman, Herkutanto, and M. P. Zeegers, "A review of causal inference in forensic medicine.," *Forensic Sci. Med. Pathol.*, Mar. 2020.

[2]     "Reference Manual on Scientific Evidence, Third Edition | Federal Judicial Center." .

[3]     P. D. Meilia, M. P. Zeegers, Herkutanto, and M. Freeman, "INFERENCE: An Evidence-Based Approach for Medicolegal Causal Analyses," *International Journal of Environmental Research and Public Health* , vol. 17, no. 22. 2020.

[4]     *Etherton v. Owner Insurance Company. U.S. District Court of Appeals, 10th Circuit. Case No. 14-1164*. 2016.

[5]     R. B. Stanley and D. G. Hanson, "Manual Strangulation Injuries of the Larynx," *Arch. Otolaryngol.*, vol. 109, no. 5, pp. 344–347, 1983.

[6]     R. E. Clark, I. Christlier, M. Sanmarco, R. Diaz-Perez, and J. F. Dammann, "Relationship of Hypoxia to Arrhythmia and Cardiac Conduction Hemorrhage: Experimental Study," *Circulation*, vol. 27, pp. 742–7, 1963.

[7]     B. Colville-Ebeling, M. Freeman, J. Banner, and N. Lynnerup, "Autopsy practice in forensic pathology - Evidence-based or experience-based? A review of autopsies performed on victims of traumatic asphyxia in a mass disaster," *J. Forensic Leg. Med.*, vol. 22, pp. 33–36, 2014.

[8]     R. W. Byard, "The relationship between positional asphyxia and increasing body mass index," *Leg. Med.*, vol. 43, no. January, p. 101678, 2020.

[9]     J. P. Kim, S. J. Cho, H. Y. Son, J. J. Park, and S. H. Woo, "Analysis of clinical feature and management of laryngeal fracture: Recent 22 case review," *Yonsei Med. J.*, vol. 53, no. 5, pp. 992–998, 2012.

[10]    H. M. de Bakker, M. V. Warmbrunn, P. van den Biggelaar, V. Soerdjbalie-Maikoe, and B. S. de Bakker, "Fracture patterns of the hyoid-larynx complex after fatal trauma of the neck: retrospective radiological postmortem analysis of 284 cases," *Int. J. Legal Med.*, vol. 134, pp. 1465–73, 2020.

[11]    "634 Taser-Related Deaths in the United States Since 2001," *Electronic Village*, 2014. .

[12]    D. P. Zipes, "TASER Electronic Control Devices Can Cause Cardiac Arrest in Humans," *Circulation*, vol. 129, no. 1, pp. 101–111, 2014.

[13]    J. Strote and H. R. Hutson, "Taser use in restraint-related deaths," *Prehospital Emerg. Care*, vol. 10, no. 4, pp. 447–450, 2006.

[14]    J. Strote and H. R. Hutson, "TASER study results do not reflect real-life restraint situations," *Am. J. Emerg. Med.*, vol. 27, no. 6, p. 747, 2009.

[15]    J. Strote, M. Walsh, M. Angelidis, A. Basta, and H. R. Hutson, "Conducted Electrical Weapon Use by Law Enforcement: An Evaluation of Safety and Injury," *J. Trauma Inj. Infect. Crit. Care*, vol. 68, no. 5, pp. 1239–1246, 2010.

[16]    J. R. Jauchem, R. L. Seaman, and C. M. Klages, "Physiological effects of the TASER® C2 conducted energy weapon," *Forensic Sci. Med. Pathol.*, vol. 5, no. 4, p. 330, 2009.

[17]    E. Patterson, "Methamphetamine history and statistics," *American Addiction Centers*, 2018.

[18]    F. Couper and B. Logan, "Human Performance Drug Fact Sheets - NHTSA," p. 102, 2004.

[19]    E. M. F. Strömmer, W. Leith, M. P. Zeegers, and M. D. Freeman, "The role of restraint in fatal excited delirium: a research synthesis and pooled analysis," *Forensic Sci. Med. Pathol.*, vol. 16, no. 4, pp. 680–692, 2020.

[20]    B. K. Logan, C. L. Flinger, and T. Haddix, "Cause and manner of death in fatalities involving methamphetamine," *J Forensic Sci*, vol. 43, no. 1, pp. 28–34, 1998.

[21]    W. connect to care Staff, "Meth overdose: signs, symptoms, and what you should do," *WebMD*, 2021.

WELLS 003050

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

### Appendix (materials provided, reviewed, or considered)

- Plaintiff's Second Amended Complaint (prior to removal to district court)
- Plaintiff's Response to Defendant Arnold's First Requests for Production of Documents
- Plaintiff's Response to Defendant Arnold's First Non-Uniform Interrogatories
- Responses to Plaintiff's First Set of Discovery to City of Phoenix and Officer Defendants
- Plaintiff's Tenth Supplemental Disclosure Statement and the following disclosure exhibits:

1. PPD Report Nos. 201900000221119 and 201900000203420 (redacted) (WELLS 000001-000004)
   a. PPD Report No. 201900000203420 (redacted) (COP-STICKNEY000001-000128)
   b. PPD Report No. 201900000221119 (redacted) (COP-STICKNEY000443-000447)
2. PPD investigative photographs (redacted) (WELLS 000122-000424)
   a. PPD investigative photographs (COP-STICKNEY000129-000442)
3. CD containing 9-1-1 audio recordings (redacted) (WELLS 000425)
   a. PPD radio dispatch call labeled 201900203420_02042019_1415_1447 dated 2-4-2019 (COP-STICKNEY000471)
   b. PPD radio dispatch call labeled 201900203420_02042019_1447_1540 dated 2-4-2019 (COP-STICKNEY000472)
   c. PPD radio dispatch call labeled 201900203420_02042019_1556_1629 dated 2-4-2019 (COP-STICKNEY000473)
   d. PPD radio dispatch call labeled 201900203420_02042019_1617_1708 dated 2-4-2019 (COP-STICKNEY000474)
   e. PPD radio dispatch call labeled 201900203420_02042019_1744_1745 dated 2-4-2019 (COP-STICKNEY000475)
   f. PPD radio dispatch call labeled 201900203420_02042019_1812_1813 dated 2-4-2019 (COP-STICKNEY000476)
   g. PPD radio dispatch call labeled 201900203420_02042019_1909_1918 dated 2-4-2019 (COP-STICKNEY000477)
   h. PPD radio dispatch call labeled 201900203420_02042019_2057_2058 dated 2-4-2019 (COP-STICKNEY000478)
   i. PPD radio dispatch call labeled 201900203420_02042019_2124_2145 dated 2-4-2019 (COP-STICKNEY000479)
   j. PPD 911 call labeled 201900203420_02042019_1403 (COP-STICKNEY000480)
   k. PPD 911 call labeled 201900203427_02042019_1406 (COP-STICKNEY000481)
   l. PPD 911 call labeled 201900203437_02042019_1406 (COP-STICKNEY000482)
   m. PPD 911 call labeled 201900203474_02042019_1413 (COP-STICKNEY000482)
   n. PPD 911 call labeled 201900203476_02042019_1413 (COP-STICKNEY000484)
   o. PPD 911 call labeled 201900203487_02042019_1416 (COP-STICKNEY000485)
   p. PPD 911 call labeled 201900203506_02042019_1420 (COP-STICKNEY000486)

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

        q.    PPD 911 call labeled 201900203666_02042019_1445 (COP-STICKNEY000487)

        r.    PPD 911 call labeled 201900221119_02072019_1336 (COP-STICKNEY000488)

4.    Audio interview of Connie Brenton (redacted) (WELLS 000426)

5.    Audio interview of Douglas Texel (redacted) (WELLS 000427)

6.    Audio interview of Elisabeth Johnson (redacted) (WELLS 000428)

7.    Audio interview of Holly Boston (redacted) (WELLS 000429)

8.    Audio interview of Jeffrey Bolduc (redacted) (WELLS 000430)

9.    Audio interview of Jenevette Tate (redacted) (WELLS 000431)

10.    Audio interview of John Antoniades (redacted) (WELLS 000432)

11.    Audio interview of Kyle O'Hare (redacted) (WELLS 000433)

12.    Audio interview of Lei Ann Stickney (redacted) (WELLS 000434)

13.    Audio interview of Naida Tedquist (redacted) (WELLS 000435)

14.    Audio interview of Frank Long (redacted) (WELLS 000436)

15.    Audio interview of James Arnold (redacted) (WELLS 000437)

16.    Audio interview of Joseph Seaquist (redacted) (WELLS 000438)

17.    Audio interview of Travis Funston (redacted) (WELLS 000439)

18.    Audio interview of Peter Chambers (redacted) (WELLS 000440)

19.    Audio interview of Richard Buffington (redacted) (WELLS 000441)

20.    Audio interview of Robert Rodarme (redacted) (WELLS 000442)

21.    Audio interview of Shelly Aldridge (redacted) (WELLS 000443)

22.    Audio interview of Vickki Zachariah (redacted) (WELLS 000444)

23.    Audio interview of Wanda Cleveland and Brittany Walls (redacted) (WELLS 000445)

24.    Axon video footage of incident (WELLS 000446)

25.    Axon video footage following incident (WELLS 000447)

26.    Cellphone video footage by Richard Buffington (redacted) (WELLS 000448)

27.    Photographs taken by Jeffrey Bolduc (WELLS 000449-000452)

28.    PPD PSB19-0022 investigation (redacted) (WELLS 000453-000601)

        a.    PPD PSB19-002 Report re 19-022 (Cover Pages) (COP-STICKNEY000567-000569)

        b.    PPD PSB19-002 Report dated 11-8-2019 (Internal Investigation) (COP-STICKNEY000570-579)

        c.    PPD PSB re 19-0022 (Administrative Paperwork) (COP-STICKNEY000580-000619)

        d.    PPD PSB re 19-0022 (Involved Employees) (COP-STICKNEY000620-000628)

        e.    PPD PSB re 19-0022 (Civilian Suspect) (redacted) (COP-STICKNEY000629-000640)

        f.    PPD PSB re 19-0022 (Attachments) (redacted) (COP-STICKNEY000641-000666)

        g.    PPD Review Board UOF Incident Review Memo re PSB 19-0022 dated 2-18-2020 (COP-STICKNEY000667)

        h.    PPD PSB Investigation Summary re PSB 19-0022 (redacted) (COP-STICKNEY000668-000676)

    i.      Audio Interview of John Antoniades dated 2-4-2019 re PPD PSB 19-0022 (COP-STICKNEY000677)

    j.      Audio Interview of James Arnold dated 2-15-2019 re PPD PSB 19-0022 (COP-STICKNEY000678)

    k.     Audio Interview of Jeffrey Bolduc dated 2-4-2019 re PPD PSB 19-0022 (COP-STICKNEY 000679)

    l.      Audio Interview of Holly Boston dated 2-4-2019 re PPD PSB 19-0022 (COP-STICKNEY000680)

    m.    Audio Interview of Richard Buffington dated 2-4-2019 re PPD PSB 19-0022 (COP-STICKNEY000681)

    n.     Audio Interview of Peter Chambers dated 2-4-2019 re PPD PSB 19-0022 (COP-STICKNEY000682)

    o.     Audio Interview of Travis Funston dated 2-11-2019 re PPD PSB 19-0022 (COP-STICKNEY000683)

    p.     Audio Interview of Dustin Haynes dated 2-11-2019 re PPD PSB 19-0022 (COP-STICKNEY000684)

    q.     Audio Interview of Frank Long dated 2-22-2019 re PPD PSB 19-0022 (COP-STICKNEY000685)

    r.      Audio Interview of Kenneth Palmer dated 2-8-2019 re PPD PSB 19-0022 (COP-STICKNEY000686)

    s.      Audio Interview of Robert Rodarme dated 2-8-2019 re PPD PSB 19-0022 (COP-STICKNEY000687)

    t.      Audio Interview of Joseph Seaquist dated 2-15-2019 re PPD PSB 19-0022 (COP-STICKNEY000688)

    u.     Audio Interview of Jenevette Tate dated 2-5-2019 re PPD PSB 19-0022 (COP-STICKNEY000689)

    v.     Audio Interview of Douglas Texel dated 2-6-2019 re PPD PSB 19-0022 (COP-STICKNEY000690)

    w.    Audio Interview of Sean Yamane dated 2-22-2019 re PPD PSB 19-0022 (COP-STICKNEY000691)

    x.     Audio Interview of Vickki Zachariah (undated) re PPD PSB 19-0022 (COP-STICKNEY000692)

29.  Maricopa County Medical Examiner's file re Casey Wells (redacted) (WELLS 000602-000686)

30.  Maricopa County Medical Examiner's photographs re Casey Wells (WELLS 000687-000867)

31.  Maricopa County Medical Examiner's imaging studies re Casey Wells (WELLS 000868)

32.  Phoenix Fire Department EMS and billing records (redacted) (WELLS 000869-000871)

35.  Photographs of Casey Wells in hospital (WELLS 000875-000888)

45.  Chief Jeri Williams' comments regarding George Floyd (WELLS 000932)

46.     PPD EIIP/IAPro notifications and alerts since 2010 (WELLS 000933-001012)
48.     HonorHealth Deer Valley Medical Center medical records (redacted) (WELLS 001021-001886)
50.     PPD CAD Log (COP-STICKNEY000450-000470)
51.     PPD Taser Report prepared by Mark Veres (COP-STICKNEY000489-000500)
52.     PPD Use of Force Report re Incident 201900000203420 (COP-STICKNEY000522-000541)
53.     Video of Casey Wells naked at bus stop (WELLS 001908)
54.     Taser Pulse Chart labeled 142911 cartridge 1 (Seaquist) (COP-STICKNEY000696)
55.     Taser Pulse Chart labeled 142926 cartridge 2 (Seaquist) (COP-STICKNEY000697)
56.     Taser Pulse Chart labeled 142956 cartridge 2 (Seaquist) (COP-STICKNEY000698)
57.     Taser Pulse Chart labeled 143019 cartridge 2 (Seaquist) (COP-STICKNEY000699)
58.     Taser Pulse Chart labeled 143046 cartridge 2 (Seaquist) (COP-STICKNEY000700)
59.     Phoenix Fire Department EMS Incident Report re: 19-045650 (COP-STICKNEY000701)
60.     Phoenix Fire Department Incident History Report (RMS Live System) re: Incident 19-045650 (COP-STICKNEY000703-000704)
62.     Jewish Family & Children's Services medical records (redacted) (WELLS 001911-001917)
63.     Recovery Innovations medical records (redacted) (WELLS 001918-002170)
162.    PPD Training materials re: Course #1453 Non- credit video training Restraint/Refusal, (COP-STICKNEY003390-3393)
163.    PPD Training materials re: Course #08159 Taser Operations M26 X26 (COP-STICKNEY003394-3418)
164.    PPD Training re: Course #08487 Ground Fighting (COP-STICKNEY003419-3429)
165.    PPD Training re: Course #09367 Excited Delirium (COP-STICKNEY003430-3438)
166.    PPD Training re: Course #10186 Taser X26 Recertification (COP-STICKNEY003439-3450)
167.    PPD Training re: Course #10378 Urban and Open Area Engagements (COP-STICKNEY003451-3466)
168.    PPD Training re: Course #10597 UOF Review (COP-STICKNEY003467-3474)
169.    PPD Training re: Course #10597 UOF Review (COP-STICKNEY003475-3485)
170.    PPD Training re: Course #9783 Crisis Communications for First Responders (COP-STICKNEY003486-3500)
171.    PPD Training re: Course #10610 Taser X26 Recertification (Revised 9/2009) (COP-STICKNEY003501-3512)
172.    PPD Training re: Course #11132 Taser X2 Operator (COP-STICKNEY003513-3532)
173.    PPD Training re: Course #10868 Advanced Officer Training 2011 (COP-STICKNEY003533-3549)
174.    PPD Training re: Course #11362 UOF review (Revised 6/2012) (COP-STICKNEY003550-3560)
175.    PPD Training re: Course #11630 Advanced Officer Training 2013 (COP-STICKNEY003561-3589)
176.    PPD Training re: Course #11364 Arrest Team Tactics (COP-STICKNEY003590-3597)
177.    PPD Training re: Lesson Plan - Dealing with the Mentally Ill (Revised 1/2008) (COP-STICKNEY003598-3607)

178. PPD Training re: Lesson Plan #12199 - 2015 Module Mental Illness (11/2014) (COP-STICKNEY003608-3627)
179. PPD Training re: Lesson Plan #12267 - 2015 Module UOF Review (03/2015) (COP-STICKNEY003628-3638)
180. PPD Training re: Lesson Plan #10610 Taser Recertification 2010 Power Point Presentation (COP-STICKNEY003639-3663)
181. PPD Training re: Lesson Plan #08159 Taser M26/X26 Advanced Taser (COP-STICKNEY003664)
182. PPD Training re: Lesson Plan #10186 Taser X26 Recertification (COP-STICKNEY003665)
183. PPD Training re: CALEA Video – Mental Illness (COP-STICKNEY003666)
184. PPD UOF Report for IR 201900000203420 (COP-STICKNEY003702-3721)
185. Chicanos Por La Causa, Corazon Residential Treatment Center medical records (redacted) (WELLS 002172-002243)
186. Danica Oparnica, ANP medical records (redacted) (WELLS 002244-002261)
187. Ferguson Family Medicine medical records (redacted) (WELLS 002262-002267)
188. Transcript of audio interview of Joseph Seaquist dated 2-4-2019 (WELLS 002268-002284)
189. Transcript of audio PSB interview of Joseph Seaquist dated 2-15-2019 (WELLS 002285-002304)
190. Transcript of audio interview of James Arnold dated 2-4-2019 (WELLS 002305-002327)
191. Transcript of audio PSB interview of James Arnold dated 2-15-2019 (WELLS 002328-002348)
192. Transcript of audio interview of Robert Rodarme dated 2-4-2019 (WELLS 002349-002360)
193. Transcript of audio PSB interview of Robert Rodarme dated 2-8-2019 (WELLS 002361-002392)
194. Transcript of audio interview of Travis Funston dated 2-4-2019 (WELLS 002393-002400)
195. Transcript of audio PSB interview of Travis Funston dated 2-11-2019 (WELLS 002401-002416)
196. Transcript of audio interview of Frank Long dated 2-4-2019 (WELLS 002417-002430)
197. Transcript of audio PSB interview of Frank Long dated 2-22-2019 (WELLS 002431-002453)
198. Transcript of audio PSB interview of Sean Yamane dated 2-22-2019 (WELLS 002454-002468)
199. Transcript of audio PSB interview of Dustin Haynes dated 2-11-2019 (WELLS 002469-002481)
200. Transcript of audio PSB interview of Kenneth Palmer dated 2-8-2019 (WELLS 002482-002498)
204. Phoenix Police Department Ops Order 1-05 Use of Force (Eff. 2018) (COP-STICKNEY003722-3743)
243. Officer Dustin Haynes' E-Learning Training Log (redacted) (COP-STICKNEY004452-4454)
244. Officer Frank Long's E-Learning Training Log (redacted) (COP-STICKNEY004455-4457)
245. Officer James Arnold's E-Learning Training Log (redacted) (COP-STICKNEY004458-4460)
246. Officer Joseph Seaquist's E-Learning Training Log (redacted) (COP-STICKNEY004461-4462)
247. Officer Kenneth Palmer's E-Learning Training Log (redacted) (COP-STICKNEY004463-4465)
248. Sergeant Robert Rodarme's E-Learning Training Log (redacted) (COP-STICKNEY004466-4469)
249. Officer Sean Yamane's E-Learning Training Log (redacted) (COP-STICKNEY004470-4472)
250. Officer Travis Funston's E-Learning Training Log (redacted) (COP-STICKNEY004473-4475)
275. TASER Handheld CEW Warnings, Instructions, and Information: Law Enforcement, dated 10-30-2018 (WELLS 002616-002623)

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

276. Transcript re: PSB19-0022 Audio File of Officer James Arnold Interview dated 2-15-19 (COP-STICKNEY004663-004694)
277. Transcript re: PSB19-0022 Audio File of Officer Travis Funston Interview dated 2-11-19 (COP-STICKNEY004695-004716)
278. Transcript re: PSB19-0022 Audio File of Officer Kenneth Palmer Interview dated 2-8-19 (COP-STICKNEY004717-004738)
279. Transcript re: PSB19-0022 Audio File of Sgt Robert Rodarme Interview dated 2-11-19 (COP-STICKNEY004739-004772)
280. Transcript re: Kyle Walls Audio Interview dated 2-4-2019 (COP-STICKNEY004773-004785)
281. Transcript re: Wanda Cleveland and Brittany Walls Audio Interview dated 2-4-2019 (COP-STICKNEY004786-004809)
282. Officer Robert Rodarme's Supervisor Notes (redacted) (COP-STICKNEY004810-004833)
283. Documents received from Glendale Police Department in response to public record request (redacted) (COP-STICKNEY004834-004857)
284. Elisabeth Johnson Interview Transcript dated 2-4-2019 (WELLS 002624-002634)
285. Holly Boston Interview Transcript dated 2-4-2019 (WELLS 002635-002648)
286. Jeffery Bolduc Interview Transcript dated 2-4-2019 (WELLS 002649-002657)
287. Jenevette Tate Interview Transcript dated 2-5-2019 (WELLS 002658-002676)
288. Kyle O'Hare Interview Transcript dated 2-6-2019 (WELLS 002677-002687)
289. Lei Ann Stickney Interview Transcript dated 2-4-2019 (WELLS 002688-002704)
290. Naida Tedquist Interview Transcript dated 2-16-2019 (WELLS 002705-002714)
291. Peter Chambers Interview Transcript dated 2-4-2019 (WELLS 002715-002726)
292. Richard Buffington Interview Transcript dated 2-4-2019 (WELLS 002727-002737)
293. Shelly Aldridge Interview Transcript dated 2-4-2019 (WELLS 002738-002750)
294. Vickki Zachariah Interview Transcript dated 2-4-2019 (WELLS 002751-002771)
295. Wanda Cleveland Interview Transcript dated 2-4-2019 (WELLS 002772-002790)
296. PPD Operations Order 7.1 – Prisoners (COP-STICKNEY004902-4910)
297. PPD Lesson Plan re: Course #8422 – Emotional Survival for the New Officer (COP-STICKNEY004911-4913)
298. PPD Lesson Plan re: Course #8440 – Enlightened Leadership (Post Academy) (COP-STICKNEY004914-4917)
299. PPD Lesson Plan re: Course #8903 – Career Survival (COP-STICKNEY004918-4926)
300. PPD Lesson Plan re: Course #10511 – RIPP Restraint ((COP-STICKNEY004927-4933)
301. PPD Lesson Plan re: Course #10596 – Use of Force Refresher (COP-STICKNEY004934-4944)
302. PPD Lesson Plan re: Course #10597 – Use of Force Review (COP-STICKNEY004945-4952)
303. PPD Lesson Plan re: Course #11233 – Interpersonal Communication (COP-STICKNEY004953-4965)
304. PPD Lesson Plan re: Course #11247 – Ethics in Law Enforcement (COP-STICKNEY004966-4977)

305.     PPD Lesson Plan re: Course #11364 – Arrest Team Tactics (COP-STICKNEY004978-4985)
306.     PPD Lesson Plan re: Course #11887 –Taser X2 Operator (COP-STICKNEY004986-5008)
307.     PPD Lesson Plan re: Course #12416 – Module re: PTSD Dealing with Trauma, 2015 (COP-STICKNEY005009-5013)
308.     PPD Lesson Plan re: Course #12474 – Emotional Survival for New Officers (COP-STICKNEY005014-5022)
309.     PPD Lesson Plan re: Course #1785 – Officer Survival Skills (COP-STICKNEY005023-5040)
310.     PPD Lesson Plan re: Course #12929 – Post Academy PSB Presentation (COP-STICKNEY005041-5045)
311.     PPD Lesson Plan re: Course #13329 –Controlling & Handcuffing Suspects (COP-STICKNEY005046-5052)
312.     PPD Lesson Plan re: Course #13445 – Tactical Negotiations (COP-STICKNEY005053-5057)
313.     PPD Lesson Plan re: Course #12266 – Module Crisis Communications for First Responders, 2015 (COP-STICKNEY005058-5077)
314.     PPD Lesson Plan re: Course #12530 – Decision Making Matrix De-Escalation Techniques (COP-STICKNEY005078-5086)
315.     AZPOST PPD Training Academy Course "Sudden in Custody Death Syndrome (Positional Asphyxia) (COP-STICKNEY005087-5100)
316.     AZPOST Model Lesson Plan Course "Managing In-Custody Death 8.5.5, June 2014 (Positional Asphyxia) (COP-STICKNEY005101-5110)
317.     AZPOST Protocol re: Excited Delirium Response (COP-STICKNEY005111)
318.     AZPOST Curriculum Lesson Plan 3.4 – Mental Illness, July 2006 (COP-STICKNEY005112-5125)
319.     AZPOST Curriculum Lesson Plan 5.10 – Narcotics and Dangerous Drugs, July 2006 (COP-STICKNEY005126-5175)
320.     AZPOST Curriculum Lesson Plan 8.5 – Techniques and Procedure Selection, August 2006 (COP-STICKNEY005176-5180)
321.     AZPOST Curriculum Lesson Plan 8.5.3 and 8.5.4 – Use of Force, August 2006 (COP-STICKNEY005181-5212)
322.     AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics Handout (COP-STICKNEY005213-5214)
323.     AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics, August 2006 (COP-STICKNEY005215-5228)
324.     AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques, August 2006 (COP-STICKNEY005229-5246)
325.     AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques Handout, 2004 (COP-STICKNEY005247-5248)
326.     AZPOST Curriculum Lesson Plan 8.5.9, 8.8.10 and 8.5.11 – Personal Defense Techniques, August 2006 (COP-STICKNEY005249-5268)

327. AZPOST Curriculum Lesson Plan 8.5.9 - 8.5.11 – Personal Defense Techniques Handout, 2004 (COP-STICKNEY005269-5270)

328. AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques (PPCT) Handout (COP-STICKNEY005271-5279)

329. AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques, August 2006 (COP-STICKNEY005280-5295)

330. AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 – Handcuffing Handout (COP-STICKNEY005296-5313)

331. AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 – Handcuffing August 2006 (COP-STICKNEY005314-5330)

332. AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival Handout (COP-STICKNEY005331-5333)

333. AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival, Revised: April, 2007 (COP-STICKNEY005334-5348)

334. AZPOST Curriculum Lesson Plan 3.4 – Mental Illness, March 2010 (COP-STICKNEY005349-5363)

335. AZPOST Curriculum Lesson Plan 5.10 – Narcotics and Dangerous Drugs, November 2009 (COP-STICKNEY005364-5413)

336. AZPOST Curriculum Lesson Plan 8.5 – Techniques and Procedure Selection, January 2010 (COP-STICKNEY005414-5418)

337. AZPOST Curriculum Lesson Plan 8.5.3 and 8.5.4 – Use of Force, January 2010 (COP-STICKNEY005419-5448)

338. AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics Handout, 2010 (COP-STICKNEY005449-5450)

339. AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques, April 2010 (COP-STICKNEY005451-5467)

340. AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques Handout, 2010 (COP-STICKNEY005468-5469)

341. AZPOST Curriculum Lesson Plan 8.5.9 - 8.5.11 – Personal Defense Techniques Handout, 2010 (COP-STICKNEY005470-5471)

342. AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques (OCCS) Handout, 2010 (COP-STICKNEY005472-5485)

343. AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques (PPCT) Handout, 2010 (COP-STICKNEY005486-5494)

344. AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 - Handcuffing Handout, 2010 (COP-STICKNEY005495-5512)

345. AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival Handout, 2010 (COP-STICKNEY005513-5515)

346.  AZPOST Curriculum Lesson Plan 3.4 – Mental Illness, November 2012 (COP-STICKNEY005516-5530)

347.  AZPOST Curriculum Lesson Plan 8.5 – Techniques and Procedure Selection, June 2014 (COP-STICKNEY005531-5535)

348.  AZPOST Curriculum Lesson Plan 8.5.3 and 8.5.4 – Use of Force, June 2014 (COP-STICKNEY005536-5565)

349.  AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics Handout, revised June 2014 (COP-STICKNEY005566-5567)

350.  AZPOST Curriculum Lesson Plan 8.5.6 – Defensive Body Mechanics, June 2014 (COP-STICKNEY005568-5581)

351.  AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques, June 2014 (COP-STICKNEY005582-5598)

352.  AZPOST Curriculum Lesson Plan 8.5.7 and 8.5.8 – Force Delivery Techniques Handout, Re-Reviewed 2014 (COP-STICKNEY005599-5600)

353.  AZPOST Curriculum Lesson Plan 8.5.9 - 8.5.11 – Personal Defense Techniques Handout, Reviewed June 2014 (COP-STICKNEY005601-5602)

354.  AZPOST Curriculum Lesson Plan 8.5.9, 8.8.10 and 8.5.11 – Personal Defense Techniques, August 2017 (COP-STICKNEY005603-5625)

355.  AZPOST Curriculum Lesson Plan 8.5.13 – Control Techniques, Instructor/Basic, April 2017 (COP-STICKNEY005626-5639)

356.  AZPOST OCCS Handout, June 2014 (COP-STICKNEY005640-5653)

357.  AZPOST Curriculum Lesson Plan 8.5.14 and 8.5.15 – Handcuffing, June 2016 (COP-STICKNEY005654-5664)

358.  AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival, June 2017 (COP-STICKNEY005665-5679)

359.  AZPOST Curriculum Lesson Plan 8.5.24 – Ground Defense and Survival Handout, Reviewed June 2014 (COP-STICKNEY005680-5682)

360.  AZPOST Curriculum Lesson Plan 8.5.25 – Choke Defense Technique, June 2017 (COP-STICKNEY005683-5689)

361.  Office of Community Oriented Policing Services ("COPS") Publication "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice" (COP-STICKNEY005744-5823)

362.  PPD Uniform Crime Reporting ("UCR") Annual Comparison, 2010 - 2020 (COP-STICKNEY005824)

363.  Presentation - "Estimation of TASER Current Flow and Effects on Human Body", D. Panescu, 2008 (COP-STICKNEY005825-5859)

364.  Presentation - TASER Risk Management Stats Public Summary presented June 10, 2014 (COP-STICKNEY005860-5935)

WELLS 003059

365. Presentation - TASER Risk Management Stats Public Summary presented October 15, 2013 (COP-STICKNEY005936-5993)

366. TASER Email re: Training Bulletin, September 18, 2014 (COP_003058)

367. PPD PSB investigation materials re: CI20-0075 – Officer Arnold (COP-STICKNEY006207-6212)

368. PPD PSB investigation materials re: INQ16-0401– Officer Arnold (COP-STICKNEY006213-6217)

369. Audio – Recorded Interview #1 with Complainant (labeled 801_0333) PPD PSB investigation materials re: INQ16-0401– Officer Arnold (COP-STICKNEY006218)

370. Audio – Recorded Interview #2 with Complainant (labeled B--S) PPD PSB investigation materials re: INQ16-0401– Officer Arnold (Redacted) (COP-STICKNEY006219)

371. PPD PSB investigation materials re: INQ17-0264– Officer Arnold (COP-STICKNEY006220-6224)

372. PPD PSB investigation materials re: INQ18-0955 – Officer Arnold (Redacted) (COP-STICKNEY006225-6229)

373. PPD PSB investigation materials re: PHN16-0058 – Officer Arnold (Redacted) (COP-STICKNEY006230-6235)

374. Audio – Recorded Interview (labeled Ms Jeffries Call) PPD PSB investigation materials re: PHN16-0058– Officer Arnold (COP-STICKNEY006236)

375. PPD PSB investigation materials re: CI18-0113 – Officer Funston (Redacted) (COP-STICKNEY006237-6241)

376. PPD PSB investigation materials re: INQ19- 0631 – Officer Funston (Redacted) (COP-STICKNEY006242-6266)

377. PPD PSB investigation materials re: PPI19- 0101 - Officer Funston (Redacted) (COP-STICKNEY006267-6271)

378. PPD PSB investigation materials re: INQ17-0915 - Officer Haynes (Redacted) (COP-STICKNEY006272-6280)

379. PPD PSB investigation materials re: PPI14-0373 - Officer Haynes (Redacted) (COP-STICKNEY006281-6285)

380. PPD PSB investigation materials re: CI16-0073 - Officer Long (Redacted) (COP-STICKNEY006286-6292)

381. PPD PSB investigation materials re: CI16-0188 - Officer Long (Redacted) (COP-STICKNEY006293-6299)

382. PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (Redacted) (COP-STICKNEY006300-6376)

383. Audio – Recorded Interview (labeled DCS K Miller) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (COP-STICKNEY006377)

384. Audio – Recorded Interview (labeled Det. Gonzalez (2)) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (COP-STICKNEY006378)

385. Audio – Recorded Interview (labeled Det Gonzalez Intro) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (COP-STICKNEY006379)

386. Audio – Recorded Interview (labeled Det Nichols) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (COP-STICKNEY006380)

387. Audio – Recorded Interview (labeled Palmer Interview) PPD PSB investigation materials re: PSB16-0038 - Officer Palmer (COP-STICKNEY006381)

388. PPD PSB investigation materials re: TRF10-0625 - Officer Palmer (Redacted) (COP-STICKNEY006382-6383)

389. PPD PSB investigation materials re: TRF10-0702 - Officer Palmer (Redacted) (COP-STICKNEY006384-6385)

390. PPD PSB investigation materials re: TRF10-1100 - Officer Palmer (Redacted) (COP-STICKNEY006386-6387)

391. PPD PSB investigation materials re: TRF10-1101 - Officer Palmer (COP-STICKNEY006388-6389)

392. PPD PSB investigation materials re: TRF10-1340 - Officer Palmer (COP-STICKNEY006390-6397)

393. PPD PSB investigation materials re: TRF10-1341 - Officer Palmer (COP-STICKNEY006398-6406)

394. PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (Redacted) (COP-STICKNEY006407-6414)

395. Audio – recorded Interview (labeled message left 111219) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006415)

396. Audio – recorded Interview (labeled Ms Dileo Msg for PSB) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006416)

397. Audio – recorded Interview (labeled Ms Dileo PSB Interview) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006417)

398. Audio – recorded Interview (labeled Phone Conversation 111219) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006418)

399. Audio – recorded Interview (labeled Phone Discussion 111019) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006419)

400. Audio – recorded Interview (labeled Phone Conversation 112519) PPD PSB investigation materials re: INQ19-0919 - Officer Rodarme (COP-STICKNEY006420)

401. PPD PSB investigation materials re: PIC14-0023 - Officer Rodarme (COP-STICKNEY006421-6432)

402. PPD PSB investigation materials re: SI19-0077 - Officer Rodarme (Redacted) (COP-STICKNEY006433-6437)

403. PPD PSB investigation materials re: INQ14-0011- Officer Seaquist (Redacted) (COP-STICKNEY006438-6441)

404. PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006442-6447)

405. Audio – recorded Interview (labeled Dawson msg) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006448)

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

406. Audio – recorded Interview (labeled Dawson, Marisa) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006449)

407. Audio – recorded Interview (labeled Marisa Dawson) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006450)

408. Audio – recorded Interview (labeled Ms Marisa Dawson) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006451)

409. Audio – recorded Interview (labeled Recorded Interview w Marisa Dawson) PPD PSB investigation materials re: INQ19-0200 - Officer Seaquist (Redacted) (COP-STICKNEY006452)

410. PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (Redacted) (COP-STICKNEY006453-6459)

411. Audio – recorded Interview (labeled Ofc audio recording at 918T part 1) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006460)

412. Audio – recorded Interview (labeled Ofc audio recording at 918T part 2) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006461)

413. Audio – recorded Interview (labeled PSB call to Ms Craig) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006462)

414. Audio – recorded Interview (labeled PSB Interview with Officer) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006463)

415. Audio – recorded Interview (labeled PSB Interview with Officer Seaquist) PPD PSB investigation materials re: INQ19-0407 - Officer Seaquist (COP-STICKNEY006464)

416. PPD PSB investigation materials re: INQ19-0581 - Officer Seaquist (Redacted) (COP-STICKNEY006465-6466)

417. Audio – recorded Interview (labeled Terry 8-7-19) PPD PSB investigation materials re: INQ19-0581 - Officer Seaquist (COP-STICKNEY006467)

418. Audio – recorded Interview (labeled Terry 8-19-19) PPD PSB investigation materials re: INQ19-0581 - Officer Seaquist (COP-STICKNEY006468)

419. PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (Redacted) (COP-STICKNEY006469-6471)

420. Audio – recorded Interview (labeled Voice Mail for Ms Cindy Franks) PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (COP-STICKNEY006472)

421. Audio – recorded Interview (labeled PSB Interview Ms Cindy Franks) PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (COP-STICKNEY006473)

422. Audio – recorded Interview (labeled PSB Interview Cindy Franks2) PPD PSB investigation materials re: PHN20-0123 - Officer Seaquist (COP-STICKNEY006474)

423. PPD In-Custody Deaths, 2014-2019 (COP-STICKNEY006592)

424. U.S. Department of Justice, National Law Enforcement Technology Center, Positional Asphyxia - Sudden Death June 1995 (WELLS 002791-002794)

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

425. Memorandum re Positional Asphyxia, Chris Krall, CIRSA Assistant Director, June 10, 1996 (WELLS 002795-002798)
426. Community Health Services records (redacted) (WELLS 002799-002871)
427. Banner Thunderbird Medical Center medical records (redacted) (6-24-2007) (WELLS 002872-002901)
428. Banner Thunderbird Medical Center medical records (redacted) (11-24-2016) (WELLS 002902-002996)
429. Banner Estrella Medical Center medical records (12-8-2016) (redacted) (WELLS 002997-003030)

Defense exhibits not disclosed by Plaintiff:

- Article re: Compression Asphyxia Biomechanical Model by Kroll, et al. 2017 (COP-STICKNEY003667-3674)
- Research Article "The Speed of a Prone Subject" by William J. Lewinski, Ph.D., et al., Force Science Institute (COP-STICKNEY004858-4871)
- Research Article "Prone Positioning in Awake, Nonintubated Patients with COVID-19 Hypoxemic Respiratory Failure," JAMA Internal Medicine, November 2020 (COP-STICKNEY004873-4876)
- Research Abstract "Prone Positioning Improves Oxygenation in Spontaneously Breathing Nonintubated Patients with Hypoxemic Acute Respiratory Failure: A Retrospective Study," Journal of Critical Care, December 2015 (COP-STICKNEY004877-4878)
- Research Article "Assessment of Stress Markers in Restrained Individuals Following Physical Stress with and without Sham CED Activation", Journal of Forensic and Legal Medicine, Volume 74, 2020 (COP-STICKNEY004879-4884)
- Research Article: "Police Restraint – Causes of Death", Medicine Science and the Law, Meng Aw-Yong, 2020 (COP-STICKNEY005690-5696)
- Research Article: "LAW Enforcement Use of Force "Standards" Degrees of Certainties, and Scientific Reliabilities", For the Defense, Michael Brave, June 2020 (COP-STICKNEY005697-5703)
- Research Article "The Relationship Between Positional Asphyxia and Increasing Body Mass Index", Legal Medicine, Roger W. Byard, January 2020 (COP-STICKNEY005704-5706)
- Research Article "Sudden Death During Physical Restraint by the Dutch Police", Journal of Forensic and Legal Medicine, L.G.M. Dijkhuizen, April 2020 (COP-STICKNEY005707-5715)
- Research Article "Investigation of Deaths Temporally Associated with Law Enforcement Apprehension", AFP, M. Graham, M.D., Vol 4, issue 3 (COP-STICKNEY005716-5738)
- Research Article "Electrical Weapons, Hematocytes, and Ischemic Cardiovascular Accidents", Journal of Forensic and Legal Medicine, M. Kroll, et al., May 2020 (COP-STICKNEY005739-5743)

Joel Robbins, Esq.

RE: *Stickney v City of Phoenix, et al.*

October 11, 2021

<u>Deposition Transcripts</u>:

- Arnold, James 2021-04-06
- Funston, Travis 2021-04-15
- Haynes, Dustin 2021-03-29
- Long, Frank 2021-03-30
- Palmer, Kenneth 2021-05-03
- Rodarme, Robert 2021-03-23
- Seaquist, Joseph 2021-03-22
- Yamane, Sean 2021-03-26

WELLS 003064