SKC

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Lei Ann Stickney,

                Plaintiff,

v.

City of Phoenix, et al.,

                Defendants.

No.  CV 20-01401-PHX-SMB (DCB)

**ORDER**

      Plaintiff Lei Ann Stickney, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona law in the Maricopa County Superior Court, and Defendants removed the action to this Court.  (Doc. 1.)  Defendants the City of Phoenix ("the City") and Phoenix Police Department (PPD) Officers James Arnold, Robert Rodarme, Joseph Seaquist, Travis Funston, Frank Long, Dustin Haynes, Sean Yamane, and Kenneth Palmer ("Officer Defendants") collectively move for summary judgment. (Doc. 94.)  The Motion is fully briefed.  (Doc. 103, 108).

      The Court will grant in part and deny in part the Motion for Summary Judgment.

**I.    Background**

      Plaintiff brought this action both on behalf of herself and all statutory beneficiaries of her deceased son, Casey Wells ("Casey"), and as the personal representative of Casey's estate, alleging that Officer Defendants used excessive force against Casey on February 4, 2019, resulting in Casey's death two days later, on February 6, 2019.  In her four-count Second Amended Complaint, Plaintiff brought a state law wrongful death claim in Count

One against the City, alleging the City was vicariously liable for Officer Defendants' tortious assault on Casey and directly liable for its negligent failure to train; a Fourth Amendment excessive-use-of-force claim in Count Two against Officer Defendants; a Fourteenth Amendment loss of familial association claim in Count Three against Officer Defendants; and a *Monell* claim in Count Four against the City.  (Doc. 1-3.)  The City subsequently moved to dismiss all of Plaintiff's claims against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim (Doc. 3), and the Court granted the Motion in part and dismissed Plaintiff's state law claims against the City in Count One but denied the Motion in part as to Plaintiff's *Monell* claim against the City in Count Four.  (Doc. 37.)  The City and Officer Defendants now seek summary judgment on Plaintiff's Fourth Amendment excessive-use-of-force claim and Fourteenth Amendment loss of familial association claim against Officer Defendants in Counts Two and Three, and Plaintiff's *Monell* claim against the City in Count Four.

## II.   Legal Standards

### A.   Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### B. Video Evidence

Where video evidence is available in an excessive-use-of-force case, the Supreme Court has stated that courts "should [] view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380−81. This does not mean that courts no longer take the nonmovant's version of the facts as true where video evidence, seen in a light most favorable to the nonmoving party, leaves room for genuine dispute. Courts must still draw all reasonable inferences in the nonmovant's favor. *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)).

### C. Qualified Immunity

Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that

right was clearly established at the time of the violation.  *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Whether a right was clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation.  *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).  Thus, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted).  Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful.  *Romero*, 931 F.2d at 627.

**III.  Preliminary Issues**

When responding to Defendants' Statement of Facts, Plaintiff failed to comply with Local Rule of Civil Procedure 56.1, requiring that she set forth

> (1) for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether [she] disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting [her] position if the fact is disputed; and
>
> (2) any additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party.

LRCiv 56.1(a).

Plaintiff divided her 70-page Statement of Facts into two sections, "Response to Defendants' Statement of Facts," and "Plaintiff's Controverting Statement of Facts." (Doc. 101.)   In the first 48-page section, instead of merely admitting or disputing

Defendants' facts, as required under Local Rule 56.1(a)(1), Plaintiff frequently responded with entire paragraphs merely restating the same facts in different ways, making it difficult to identify any relevant material disputes.  She also frequently mixed substantive arguments into her Statement of Facts instead of reserving these for the Memorandum of Law. Regarding additional facts, Plaintiff additionally included 22 more pages of largely duplicative facts under the heading "Controverting Statement of Facts," covering all the same events.  Plaintiff's failure to adhere to the Local Rules resulted in an unwieldy, overlapping, redundant, and sometimes internally inconsistent presentation of the same facts, substantially increasing the amount of work required for the Court to identify and consider Plaintiff's properly supported controverting and additional facts.

In their Reply, Defendants noted these and other issues with Plaintiff's facts, including frequent internal inconsistencies between Plaintiff's admissions to Defendants' facts, simultaneous representation of the same facts, misstatements and manipulations of witness testimony, insertions of argument, reliance on hearsay and speculation, and use of expert reports that allegedly do not meet the *Daubert* standard.  (*See* Doc. 108 at 3-14.) Defendants request that the Court "disregard all additional facts, arguments and explanations asserted in [Plaintiff's Controverting Statement of Facts] and accept Defendants' Statement of Facts as admitted."  (*Id.* at 4.)

As movants, Defendants still bear the burden on summary judgment of presenting the basis of their Motion, *see* Fed. R. Civ. P. 56(a), and the Court may only consider a movant's asserted facts if they are properly supported, regardless of whether the nonmovant responds or disputes the asserted facts.  Fed. R. Civ. P. 56(c)(1)(A).  If the movant fails to meet its initial burden of production, the opposing party need not respond or produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102– 03 (9th Cir. 2000).  For this reason, the Court will not blankety accept Defendants' facts; nor will it wholly disregard Plaintiff's presentation of the facts.  The Court will, however, disregard Plaintiff's insertions of argument, misstatements of witness testimony, and failures to properly controvert Defendants' facts.

The Court will not separately address Defendants' arguments that Plaintiff's experts do not meet *Daubert* standards, which largely pertain to the weight, not the admissibility of this evidence.   The Court will instead address Defendants' arguments pertaining to Plaintiff's experts where relevant its discussion of Plaintiff's claims.

## IV.    Excessive Force Claim

### A.    Facts

#### 1.    9-1-1 Calls and Dispatch

On February 4, 2019, at 14:03 hours, Phoenix Police received a 9-1-1 call, reporting a man standing naked in a driveway who had been on his hands and knees screaming and appeared to be a danger to himself.   (Doc. 91, Defs.' Statement of Facts (DSOF) ¶ 1; Doc. 91-1, Ex. 1 (call audio).)   The caller reported that the man was about 40 to 50 years old, was about six feet tall/280 pounds, had been there for about 30 minutes, and had recently removed his clothes.   (*Id.*; Doc. 101, Pl.'s Statement of Facts (PSOF) ¶ 1.)[1]   A dispatcher entered this information into the Computer Aided Dispatch (CAD) system, and at the time, there were no units available for the call.   (DSOF ¶ 2.)

At 14:08 and 14:14, two more 9-1-1 callers reported a naked man in the street.   (*Id.* ¶¶ 3−4.)   The third caller reported that the man was in the middle of the street screaming and doing yoga poses.   (Doc. 101-1, Ex. 3 (call audio).)   This information was also relayed via CAD.   (Doc. 91-1 at 3.)   At 14:15, a repeat caller complained that "we have not had an officer here yet," and that the man was naked "in the middle of road," and the caller had been yelling at drivers to slow down.   (*Id.*)   After this, a fourth 9-1-1 caller reported that the man was a white male in his 60's with grey hair and a beard and was standing naked in the street staring up at the sky and looked like he was "communing with nature."   (Doc. 91-1, Ex. 4; Doc. 101, Ex. 4 (call audio).)   The dispatcher entered the man's description into CAD and additionally noted "appears impaired."   (Doc. 91-1 at 3.)   Another caller reported

---

[1] The caller also answered the 9-1-1 operator's query as to whether the man was armed, saying he had not seen any weapons on him, but there is no evidence the dispatcher relayed this information to officers in the field.

that the man was a white male 50−60 years old and was naked in the street and she was concerned that children would soon be getting out of school in the area.  (DSOF ¶ 6; Doc. 91-1, Ex. 5 (call audio).)

In addition to entering details from these calls into CAD, the dispatcher broadcast over the radio that "a bunch of neighbors are calling in. . . . nude male, going up and down the street, been yelling at himself for 30 minutes.  He only recently took his clothes off.  White male, 40, 6-foot, 280.  Last time they said that he's doing yoga poses out in the street at 14:15, units to follow."  (DSOF ¶ 9.)

At 14:15:33, Sgt. Rodarme radioed that he was enroute to the scene.  (*Id.* ¶ 10.)  At 14:18:02, Officer Arnold also radioed that he was enroute to the scene, and at 14:19:18, Arnold arrived.  (*Id.* ¶ 11.)

### 2.    Officer Arnold's Arrival

Upon arrival, Arnold parked his patrol vehicle 10−15 feet away from the man in the road, later identified as Casey Wells, and tried to engage him in conversation while also keeping his distance.  (*Id.* ¶ 12.)  Arnold saw Casey's clothes in a pile and told Casey they needed to get him dressed and figure out what was going on.  (*Id.*)  Considering that Casey had stripped his clothes off, Arnold thought Casey could be on drugs or have a mental condition.  (*Id.* ¶ 14; Doc. 91-1, Ex. 6, Arnold Dep. at 68:3−22.)  Arnold knew Casey was unarmed.  (PSOF ¶ 200.)

A citizen video of this encounter shows Arnold putting on gloves in the street in front of his patrol unit and walking closer to Casey, who appears with his back to the camera with both arms raised high in the air; Casey turns his head briefly to the side to face Arnold, who is then standing about three feet away, and he then turns back and shakes his head vigorously up and down while Arnold appears to attempt to engage him in conversation, although anything spoken between them is not audible on the cellphone video.  (DSOF ¶ 14; Doc. 91-1, Ex. 7 (cellphone video).)  Arnold explained in his deposition that he was attempting to verbally de-escalate Casey, and Casey responded three times but then "just kept looking up and not responding."  (Arnold Dep. at 148:2−14.)  The

first time Casey responded was when Arnold saw the pile of clothes and told Casey they needed to get his clothes on, and Casey said something to the effect that he was born naked and was going to leave the world naked or that God wanted him to leave the world naked. (*Id.* at 69:9−24.)   Arnold also told Casey he was going to have to cuff him, and the cellphone video shows Arnold holding a set of handcuffs near his waist.   (*Id.* at 72:17−18; PSOF ¶ 199.)   Casey acknowledged Arnold a second time over his shoulder and said Arnold was not going to cuff him, and Arnold asked, "Why, are you going to fight me? Are we going to have issues?" and Casey answered a third time, "You're just not going to cuff me" and then did not say anything else.   (Arnold Dep. at 72:14−25.)

After Casey said, "You're just not going to cuff me," Arnold decided "not to go hands-on with him right then" and to wait for backup from Sgt. Rodarme.   (DSOF ¶ 19; Arnold Dep. 73:5−9.)   Arnold still tried to talk to Casey, who remained calm but kept his hands raised and remained looking in the air; Arnold waited for backup because of what Casey had said about not being cuffed and because Arnold did not want to wrestle with a naked man and thought that, with more officers on the scene, Casey would be more likely to comply without a fight.   (DSOF ¶ 20; PSOF ¶ 20.)

### 3.    Sgt. Rodarme's Arrival

At approximately 14:22:14, about three minutes after Arnold's arrival, Sgt. Rodarme arrived on the scene.   (DSOF ¶ 21.)   By then, based on the 9-1-1 calls, Casey had been there for about 45 minutes.   (*Id.* ¶ 22.)   When he arrived, Rodarme observed Arnold standing off to the side talking to Casey, telling him they would get him help and get him off the street.   (*Id.* ¶ 23.)   Rodarme was aware that the area was known for meth usage, and based on his 22 years of experience, and because Casey was naked in the middle of the street, Rodarme suspected Casey was under the influence of methamphetamine.   (*Id.* ¶ 24.)[2]

---

[2] Rodarme had previously been involved in an incident in which he took a naked man into custody who was experiencing "excited delirium," which Rodarme described as "[w]hen a person is high on methamphetamines, and they start an act of aggression and fighting."   (DSOF ¶ 211; Doc. 101, Ex. 6, Rodarme Dep. at 54:1−7.)   In that incident, which occurred in 2001 or 2002, the man was naked, sweating, and fighting, and it took

Arnold told Rodarme that Casey was not going to allow the officers to cuff him and get him dressed, and Rodarme said "Okay," and positioned himself on the west side of Casey, the opposite side from Arnold. (PSOF ¶¶ 212−13.) Casey was standing with his arms held out to the side, like an airplane, with his fists clenched, and he was grunting but not speaking. (*Id.* ¶¶ 214−15; DSOF ¶ 25.) Without specifically conferring except through a possible "head nod," Arnold took hold of Casey's left arm, and Rodarme took hold of Casey's right arm, and the officers told Casey he was not under arrest, but they wanted to detain him for his own safety and wanted to help him. (DSOF ¶¶ 26−28; PSOF ¶¶ 224−35.) According to Rodarme, using the word "detain" instead of "arrest" is a way to de-escalate an encounter because when a subject hears the word "arrest," they "seem to think they're going to jail for sure." (DSOF ¶ 29.)

For the next 45 seconds to one minute, while the officers were giving Casey the opportunity to put his hands behind his back, Casey grunted, said "fuck you," and used his strength to keep from putting his hands behind his back. (*Id.* ¶¶ 27−30.) After "pleading with him to get into cuffs," Arnold told Casey, "Sir, [w]e've asked you nicely. We've told you that we're going to get you in cuffs and you're still resisting. Our next step is we're going to make you go in cuffs." (*Id.* ¶¶ 32−34; Arnold Dep. at 81:13−19.)

Casey continued to resist the officers, so Arnold gave a "verbal cue" to Rodarme that he was going to try to take Casey down, but when he attempted to do so, Casey broke free from Arnold, and Rodarme let go of Casey. (DSOF ¶ 34; Arnold Dep. at 81:20−82:5.) After breaking free, Casey briefly ran a couple of feet southbound, then turned towards Arnold, and Rodarme saw Casey flailing and punching and kicking toward Arnold and saw

---

Rodarme and his partner 10 minutes to get him into custody, and when they finally placed his arms behind his back, the man grabbed Rodarme's watch so hard it broke. (Rodarme Dep. at 54:8−13.) Then, the man's heart suddenly stopped "because of too much meth in his system." (*Id.* at 54:13−15.) According to Rodarme, "excited delirium" has since become well known, and Rodarme has watched training videos of officers fighting naked men who have what Rodarme described as "superhuman strength," requiring two or three officers to take someone in this state into custody, and a person in this state can go "from fighting like crazy to all the sudden just his heart stops or explodes or something and he passes away." (*Id.* at 55:1−20.)

him punch Arnold in the face.  (DSOF ¶ 34; PSOF ¶ 34; Rodarme Dep. at 36:10−37:8.)
According to Arnold, Casey "got into a fighting stance, balled up his fists[,] and he took a
swing at me.  He hit me right . . . in the bottom of the lip and backed off and smiled on his
face [sic] and started bouncing up and down again."  (DSOF ¶ 35; PSOF ¶ 34; Arnold Dep.
at 82:5−9.)

A neighbor, Richard Buffington, who witnessed the incident from inside his house,
later told Police Detective Michael Rudd that he saw two police officers try to take Casey
down to the ground, "and they just could not do it.  Like, he was—he's super strong."
(PSOF ¶ 34; Doc. 101-1 at 93 (Buffington Tr.).)  Buffington explained that he saw both
officers try to pull Casey's arms down while Casey was holding his arms up, but the
officers "couldn't get his arms down," and then, they were "trying to wrestle," and at one
point Casey fell to the ground on his back, and an officer "fell on top of him kind of pretty
awkward." (Doc. 101-1 at 93−94.)  Both officers then held Casey down on his back until
two more officers showed up.  (*Id.* at 94.)  Buffington did not see anybody throw any
punches or kicks, but he was talking to someone from the neighborhood outside his house
at the time, and he "didn't watch . . . the whole thing, just bits and pieces."  (*Id.*)

Another neighbor, Jeffrey Bolduc, looked out his window and saw neighbors all
looking east, so he walked across the street and saw "two police officers struggling with a
naked man" on his feet, and the officers were "trying to get him under control."  (PSOF
¶ 26; Doc. 101-1 at 102−103 (Bolduc Tr.).)  Bolduc stated that "[t]hey eventually got him
on the ground," and the whole time, he was "flailing," and the officers were having a
difficult time trying to restrain him and get him under control.  (Doc. 101-1 at 103.)  Bolduc
had no idea what led up to the struggle and did not see any punches or strikes, but he
explained that he got to the situation late.  (*Id.*)

A third witness, later interviewed on video, said he was outside his brother's house
working on a van when he saw a man arrive in a silver car and start looking up at the sky
while yelling to God, and he told his brother to call the police.  (DSOF ¶ 107; Doc. 91, Ex.
19 (Palmer Video) at 14:42−44:48.)  He later saw the man take his clothes off in the street

and an officer arrive and wait for back up.  (*Id.*)  He then saw a second, older officer arrive, and he said the two officers had the man on the ground "after a struggle," during which one of the officers got hit because the man was waiving his hands all around.  (*Id.*)  The witness described the man as flailing when he hit the officer and did not think he was punching or attacking.  (*Id.*)  He then saw one of the officers grab Casey in a hug and Casey fall to the ground where he continued kicking.  (*Id.*)

      After Casey hit Arnold in the face, Arnold turned toward Rodarme and said, "He punched me in the face," and Rodarme responded that he had seen that.  (DSOF ¶ 36.)[3] Arnold grabbed Casey in a face-to-face bear hug, and Rodarme said, "let him go," intending to tase Casey, but Arnold did not acknowledge him, so Rodarme re-holstered his Taser, and he and Arnold tried to get Casey onto the ground.  (DSOF ¶ 37.)  Rodarme pulled down on Casey' shoulders, and both Arnold and Casey fell to the ground with Casey on his back, flailing and continuing to kick and punch at the officers.  (*Id.* ¶ 38.)  During this take-down, Casey hit the back of his head on the ground.  (PSOF ¶ 231; Doc. 101-1, Ex. 6, Rodarme Dep. at 101:13−18.)

---

[3] Plaintiff relies on the interviews with Buffington and Bolduc, who both stated they did not see any punches or kicks, and on Officer Arnold's and Sgt. Rodarme's statements that Casey was "flailing" to dispute that Casey punched Arnold.  (PSOF ¶ 36.)  Plaintiff fails to create a genuine issue of material fact regarding Arnold's and Rodarme's firsthand testimony that Casey punched Arnold in the face.  Buffington and Bolduc stated only that they did not see any punches or kicks, not that Casey had not punched anyone.  When asked about this specifically, Buffington explained that he only saw "bits and pieces" of what happened, and Bolduc stated that he had no idea what led up to the officers taking Casey to the ground and that he got to the situation late.  Unlike the deposition statements of Arnold and Rodarme, Buffington and Bolduc's statements do not demonstrate personal knowledge whether Casey punched Arnold in the face but only a lack of knowledge regarding whether this took place and therefore fail to provide evidence on this issue.  *See* Fed. R. Civ. P. 56(c)(4) (sworn statement used to support summary judgment motion must be made on personal knowledge); *cf. Bank Melli Iran v. Pahlavi*, 58 F.3d 1406, 1412−13 (9th Cir. 1995) (declaration on information and belief are entitled to no weight where declarant lacks personal knowledge).  Arnold's and Rodarme's statements that Casey was "flailing" also do not materially conflict with their testimony that Casey punched Arnold in the face and fail to create a triable issue of fact whether this occurred.

1    While the officers tried to pin Casey on the ground, Casey tried to head-butt and

2    punch the officers, then got his left arm free of Arnold's grasp and punched Rodarme in

3    the face.  (DOSF ¶ 39.)  Upon seeing this, Arnold, who was then sitting astride Casey's

4    stomach with his knees to either side of Casey's body, used his left elbow to strike Casey

5    in the nose, which momentarily enabled Arnold to regain control over Casey's left arm

6    with his own right arm and pin it down.  (*Id.*)  Casey's nose immediately began to bleed,

7    and Casey started to spit and growl.  (*Id.* ¶ 40.)  There was a large amount of blood, and

8    Casey spit blood in Rodarme's face.  (PSOF ¶ 236.)  According to Arnold, Casey was not

9    just "trying to get [the blood] out of his mouth"; he was spitting at Rodarme.  (*Id.* ¶ 237.)

10    Rodarme told Arnold, "We're going to wait here.  We're going to hold him down so we

11    can safely get him into custody and get fire to treat him."  (*Id.* ¶ 41.)

12    At approximately 14:24:58, about three minutes after Rodarme's arrival, Rodarme

13    radioed for additional units to assist.  (*Id.* ¶ 42.)  He did not request fire to respond at the

14    time.  (PSOF ¶ 239.)  Officer Seaquist heard Rodarme's request and knew the situation

15    was serious because Rodarme's voice was "jacked up."  (DSOF ¶ 45; PSOF ¶ 45.)  Officers

16    Yamane and Haynes also heard Rodarme's request for back up and drove towards the

17    scene; Yamane testified that Rodarme "sounding like he was in need of help.  Like he was

18    breathing heavily."  (DSOF ¶ 86.)  Haynes thought Rodarme "sound[ed] like he was in a

19    high stress situation."  (PSOF ¶ 86.)

20    The Lieutenant on duty at the time also radioed for other units to respond and said,

21    "it sounds like he is fighting," and the dispatcher requested an air unit.  (DSOF ¶ 43.)  At

22    14:25:29, a dispatcher noted via CAD that Rodarme was in a possible 239 (a fight).  (*Id.*

23    ¶ 44.)  Officers Long and Funston, who were on a lunch break at the police station, also

24    heard the radio transmissions, and Funston could tell that Rodarme sounded out of breath

25    and stressed.  (*Id.* ¶ 66; Doc. 91-1, Ex. 13, Funston Dep. at 39:11−40:20.)  Long and

26    Funston got into Long's patrol vehicle and began driving toward the scene.  (Funston Dep.

27    at 40:22−41:14.)

28    . . . .

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.    Officer Seaquist's Arrival

At 14:27:41, two to three minutes after Rodarme requested back up, Officer Seaquist arrived.  (*Id.* ¶ 47.)  About 10 seconds later, at 14:27:52, an unknown individual requested fire to respond.  (Doc. 91-1 at 4.)  Upon arrival, Seaquist saw that Arnold and Rodarme were struggling to control Casey—who was flailing his legs—by employing soft empty hand techniques.  (*Id.* ¶ 48.)  Based on his training in drug recognition, Seaquist thought Casey was likely on drugs, not mentally ill; Seaquist had previously seen subjects in a similar state of undress in connection with PCP and bath salt use.  (*Id.* ¶ 49.)[4]

When Seaquist saw Casey and the other two officers "fighting with him," he saw that Casey's face "was pretty much all blood.  [He] saw he had blood coming out of his nose, his mouth" and thought "he had a cut across his head."  (PSOF ¶ 243.)  At that time, Casey was lying face up on his back, and Seaquist joined the other two officers and said, "let's flip him over," thinking that having Casey on his stomach would give the officers more control over him and reduce the chance of injury to Casey and to the officers from Casey throwing punches or flailing his arms around.  (*Id.* ¶ 50; DSOF ¶ 50; Doc. 91-1, Ex. 11, Sequist Dep. at 69:25−70:6.)  Casey was still kicking and flailing his legs, but Seaquist was able to get some control over Casey's legs, and the officers worked together to roll Casey onto his stomach.  (DSOF ¶ 51; PSOF ¶ 51.)  According to Seaquist, Casey was not speaking but was "grunting and growling like a bear."  (PSOF ¶ 246.)

While turning Casey over, Rodarme had to give up Casey's right arm, and once on his stomach, Casey pinned his right arm underneath him and would not let the officers get the arm out.  (Doc. 91-1 at 44 (Arnold Dep. at 85:1−6).)  While Arnold tried to pull Casey's right arm out, Seaquist "was trying to get [Casey's] legs under control." (DSOF ¶ 52; PSOF ¶ 52.)  To prevent Casey from kicking and struggling and to try to take control of him,

---

[4] Seaquist had been trained on the effects drugs have on the human body and had had contact with people on bath salts and other synthetic drugs.  (PSOF ¶ 257.)  He was also trained to recognize the symptoms of excited delirium, such as taking one's clothes off, failure to comply with orders, being aggressive, fighting, resisting with "all of the strength you can muster," not responding to pain, yelling out loud for no reason, and talking irrationally, and he knew from his training that one of the risks of excited delirium is sudden death.  (*Id.* ¶ 258; Doc. 101, Ex. 9 (Seaquist Dep. at 86:22−87:25, 178:16−179:19).)

Seaquist employed a technique from training by grabbing Casey' ankles, crossing and pulling his ankles together, and then bending Casey's legs backwards and using all his body weight to push Casey's legs down with Casey's heels against his butt.  (DSOF ¶ 53; PSOF ¶ 53.)  Seaquist testified, "As soon as I got his ankles crossed, I just took my whole 250 pounds and laid on [Casey].  And I was laying on—basically I had his ass in my face."  (PSOF ¶ 252.)  Seaquist continued pressing down with the weight of his upper body against the backs of Casey's legs, but Casey was able to either push himself forward of push Seaquist back, causing Seaquist to lose control of Casey's legs; Casey's feet then came down and kicked against Seaquist's thighs, pushing Seaquist out of position.  (DSOF ¶ 54; PSOF ¶¶ 54, 253.)

At this point, Rodarme ordered Seaquist to tase Casey.  (DSOF ¶ 55.)  Arnold, who was still trying to get Casey's right arm out from under Casey's body, heard Seaquist state he was going to use his Taser and to stand clear.  (*Id.* ¶¶ 55−56.)  Seaquist yelled to the other two officers, "I'm deploying Taser," and he yelled to Casey "Stop resisting," but Casey kept fighting, so Seaquist deployed his Taser on Casey.  (*Id.* ¶ 56.)[5]  At the time, Arnold was on Casey's right, still trying to get control of Casey's right arm, and Rodarme was on Casey's left, still trying to get control of Casey's left arm.  (*Id.* ¶ 57; Doc. 101-1, Ex. 6, Rodarme Dep. at 76:6−23.)  According to Seaquist, Casey's whole body tensed up after being tased, but it then relaxed, and Casey "still kept into the fight."  (PSOF ¶ 57.)  Arnold saw Casey stiffen up "for a short second" in reaction each time he heard the Taser deployed.  (*Id.*; (Doc. 91-1, Ex. 6, Arnold Dep. at 85:21−86:23.)

---

[5] When a taser is fired the first time, it releases two probes that make contact with the skin, ideally in the large muscles in the back, and the Taser produces an electrical circuit between the two probes.  (Doc. 91-1, Ex. 6, Arnold Dep. at 87:1−20.)  After the probes are deployed, additional trigger pulls will activate the Taser for five seconds at a time.  (*Id.* at 86:3−23.)  The larger the spread between the two probes, the more muscles will be affected by the 5-second cycle.  (*Id.*)  Deploying a Taser from close range (within 2−3 feet) will result in a small spread between the probes and lessen the effect of the Taser cycles.  (*Id.* at 89:8−25.)

Seaquist kept yelling at Casey to stop resisting and then deployed the Taser a second time. (DSOF ¶ 59.) According to Rodarme, the first Taser deployment hit Casey in the back, but Casey was "still trying to struggle, not giving his arm up. So [it was] still . . . not working" and he "believe[s] he tased him again." (Doc. 101, Ex. 6, Rodarme Dep. at 79:15−17.) According to Seaquist, the second tasing also "basically had no effect" on Casey. (DSOF ¶ 59; Doc. 91-1, Ex. 11, Seaquist Dep. at 71:22−24.) Seaquist testified that the officers were "just getting to the point now where . . . the three of us were getting tired with this guy. He was just wearing us out. And I kept yelling at him to stop resisting. And I know I hit the trigger a third time. His body stiffened up. And once he relaxed, he – he was just – he just kept going." (Seaquist Dep. at 72:5−13.)

When he deployed the Taser a third time, Seaquist was lying on top of Casey's legs, and he saw that Casey's left arm was under his body, and Rodarme was still trying to get Casey's arm out. (*Id.* at 102:25−106:6.) Seeing that Rodarme was having difficulty gaining control of Casey's left arm, Seaquist decided to deploy the Taser a fourth time, using his right hand to reach across his body to unclip the now-holstered Taser. (*Id.* at 106:7−107:20.) After tasing Casey a fourth time, Seaquist once again saw Casey stiffen up, then relax, but then saw he "was still in it for the fight." (DSOF ¶ 62.)

Seaquist does not remember using the Taser a fifth time, but the Taser download data shows the trigger was activated five times between 14:29:11 and 14:30:46, the first three and fifth times for 5 seconds each, and the fourth time for 6 seconds, for a total of 26 seconds over a span of one minute and 35 seconds. (*Id.* ¶¶ 63, 65; Doc. 91-1 at 154.)

### 5. Officers Funston and Long's Arrival

At approximately 14:28:11, Officers Funston and Long arrived. (DSOF ¶ 69.) Funston knew the area was known for drug use, and he was EMT certified. (*Id.* ¶¶ 67−68.) Upon arrival, Funston saw that Casey was yelling and screaming, flailing and kicking his legs, with the officers giving him commands to stop, and that a Taser had been deployed because he could see taser prongs in Casey's back. (*Id.* ¶ 70.) Funston could tell that Casey was "either mentally ill or on some type of drugs." (PSOF ¶ 268; Funston Dep. at

75:10−17.)  Rodarme warned Funston and Long that Casey had struck him and spit on him.  (*Id.* ¶ 71.)  Funston also knew that a citizen had called with concerns that kids would soon be coming home from school in the area, which Funston found was also "common knowledge" for that time of day.  (*Id.* ¶ 72; Doc. 91-1, Ex. 13, Funston Dep. at 112:21−113:6.)

Upon arrival, Long immediately stepped in to help Rodarme with controlling Casey's left hand.  (DSOF ¶ 73.)  Because Long could tell that Rodarme was tired, he told Rodarme to just get out of the way.  Then, Arnold was able to bring Casey's right hand behind Casey's back, and Long took Casey's left hand and brought it around behind Casey's back, and Arnold and Long started handcuffing Casey.  (Doc. 91-1, Ex. 14, Long Dep. at 72:1−23.)  According to Long, Seaquist had been giving Casey commands between each tasing to stop resisting and was telling him, "Hey, I'm going to tase you again, stop resisting.  I'm going to tase you again, stop resisting."  (DSOF ¶ 74.)

After Arnold and Long handcuffed Casey, Funston tried to apply a RIPP restraint to Casey's ankles while Casey was still kicking and fighting with the officers.  (*Id.* ¶ 75; Doc. 91-1, Ex. 11, Funston Dep. at 49:3−18.)  Funston testified that, while he was trying to apply the RIPP restraint, Casey was "actively kicking.  And he kicked me several times during that time.  And then once I was able to get [the RIPP restraint] wrapped around his ankles[,] he was still trying to kick out of it and kick us.  It made it difficult."  (Funston Dep. at 50:12−16.)

### 6.     Officers Yamane and Haynes's Arrival

Around this time, Officers Yamane and Haynes also arrived, and Haynes saw Casey on his stomach with his hands cuffed behind his back and Funston working with the RIPP restraint.  (Doc. 91-1, Ex. 16, Haynes Dep. at 38:11−24.)  Yamane observed that Arnold and Rodarme were "on [Casey's] shoulders" and Long was "around his waist."  (PSOF ¶¶ 284−85.)  Haynes immediately went to assist Funston with the RIPP restraint because he saw that Funston was struggling with Casey's feet.  (DSOF ¶ 87.)  According to Haynes, Funston had the loop around Casey's ankles, "but he was trying to get the ankles crossed[,]

and Casey was still kicking and straightening his legs out so [Funston] could not get the ankles crossed to tie it down.  So it wasn't fully on [and] wasn't tightened and positioned properly at that moment."  (PSOF ¶ 87.)

Yamane also observed that Funston was struggling with Casey's legs, and it appeared to him that Casey was "trying to leverage himself to turn over by pressing onto the ground and spreading his feet apart."  (DSOF ¶ 88.)  After Funston had the lasso part of the RIPP restraint around Casey's ankles and was trying to attach the clasp end of the restraint to the chain between Casey's handcuffs, using only his hands, not his body weight, Casey continued to kick and try to uncross his feet.  (DSOF ¶ 76.)  A person whose ankles are in a RIPP restraint can continue to kick until the RIPP restraint is also attacked to the handcuffs.  (DSOF ¶ 82.)

According to Haynes, Funston was trying to bend Casey's legs backwards to get enough slack in the RIPP restraint to attach the clasp end to the chain between Casey's handcuffs, and Yamane was helping control Casey's legs.   (PSOF ¶ 290.)   Yamane attempted to gain control by grabbing Casey's ankles and putting his weight against Casey's legs.  (*Id.* ¶ 291.)  His goal was "just to cross his ankles and tighten the RIPP restraint, which can be done without pushing his heals toward his butt." (*Id*; Doc. 101-1, Ex. 13, Yamane Dep. at 61:1−12 at 220.)

At or around the time this was going on, Seaquist warned Casey multiple times that he was going to tase him again, and Casey continued yelling and screaming and was still resisting when Seaquist tased him a fifth time—the third Taser deployment Funston was aware of since arriving on the scene.  (PSOF ¶ 76; Doc. 91-1 at 190, Funston Dep. at 53:10−17.)  After this, Funston was able to get the RIPP restraints clipped to the handcuffs, and seconds afterwards, Casey stopped yelling and went limp. (Funston Dep. at 53:17−20.) Funston did not hear another Taser activation after the RIPP restraint was attached to the handcuffs.  (DSOF ¶ 79.)

At some point while Casey was still struggling, Arnold placed his right knee on Casey's shoulder blade in a place he did not think was a compromising spot or position to

Casey to help control him, and he placed the majority of his weight on his left leg while kneeling with his arm crossed over his left leg.  (*Id.* ¶ 80; Doc. 91-1, Ex. 5, Arnold Dep. at 112:3−114:16.)  Arnold did not target any force towards Casey's neck or apply a carotid hold.  (Arnold Dep. at 149:14−23.)  Arnold stated that, after all the other officers arrived, he stood up briefly to catch his breath and then got back down, but he does not remember if he did this before or after Casey was handcuffed.  (PSOF ¶ 80; Arnold Dep at 112:15−113:23, 143:15−25.)

### 7.    Officer Palmer's Arrival

While the officers were surrounding Casey on the ground, Officer Palmer arrived, and his bodycam recorded the final part of the struggle.  (DSOF ¶ 98.)  On the video, Casey is blocked from view by the officers kneeling around him, but audio from Palmer's bodycam as Palmer walks toward the scene captures someone yelling, "stop resisting!" (Doc. 101-1, Ex. 19, Palmer Video at 14:30:20.)  On the right side of the camera view, Arnold can be seen, facing forward, kneeling with his right knee inward, his left leg out to the side, and his left forearm bent over his left thigh, the way Arnold described his position while kneeling on Casey's right shoulder.  (*Id.* at 14:30:24−27.)[6]

While Palmer is approaching, and just after someone yells, "stop resisting," Palmer radios, "he is detained right now.  Anybody else can slow it down," and, about the same time, an officer kneeling next to Arnold furthest away from the bodycam stands up from his kneeling position and backs away.  (*Id.* at 14:30:29.)  At this time, Palmer's bodycam points away and does not capture what is happening on the ground, but the clicking sound of a Taser cycle can be heard.  (*Id.* at 14:30:31.)  Palmer explained in his deposition that, "[w]hen you pull the trigger for a Taser, it will automatically cycle for five seconds.  So [he] heard a five-second cycle."  (Doc. 101-1, Ex. 18, Palmer Dep. at 62:21−24.)

During the five-second sound of the Taser cycle, the video shows only the backs and heads of the officers surrounding Casey on the ground, and Casey is not visible.  (Palmer Video at 14:30:31−37.)  After the sound of the Taser cycle, Palmer radios, "need

---

[6] Arnold is identifiable from the earlier citizen video.

fire for a tasing." (*Id.* at 14:30:38.)  Several of the officers continue leaning over Casey, and someone can be heard asking, "is he alright?" and an officer can be seen putting on white gloves and heard saying, "he's got blood on his face." (*Id.* at 14:30:48.)  After this, the video is temporarily blacked out, but an officer can be heard on radio communications saying, "minor injuries," which the radio dispatcher repeats; after further indistinct communications, someone says, "not breathing," and the dispatcher radios back, "he's not breathing." (*Id.* at 14:30:49−14:31:30.)

When the video is no longer blacked out, Casey appears partially visible, lying face up on the ground with one officer standing in the foreground in front of him and another officer kneeling forward on his far side, pressing gloved hands into Casey's chest. (*Id.* at 14:31:31.)

At 14:31:01, Palmer advised that the fire department could come on the scene. (DSOF ¶ 110.)  At 14:31:32, Palmer requested that fire hurry up because Casey was not breathing. (*Id.* ¶ 111.)

### 8.    Medical Response

When paramedics arrived, Casey did not have a pulse. (PSOF ¶ 309.)[7]  Casey was given CPR and was intubated during transport to HonorHealth Deer Valley, and a CT revealed "no acute body abnormality of the cervical spine." (DSOF ¶ 115.)  Within a few minutes of arrival at the hospital, Casey regained a pulse. (PSOF ¶ 310.)  An examination revealed abrasions on Casey's face and lower extremities, and Taser darts were noted in the left scapular region. (*Id.* ¶ 311.)  A CT scan of the head showed a parietal scalp hematoma and left facial contusion. (*Id.*)  A toxicology report was positive for

---

[7] Neither party provided records from the paramedics or substantive records from the hospital, so for purposes of summary judgment, the facts are taken from second-hand medical export reports.  *See Block v. City of Los Angeles*, 253 F.3d 410, 418– 19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial . . ."); *see Fraser v. Goodale*, 342 F.3d 1032, 1036– 37 (9th Cir. 2003).

methamphetamine.  (DSOF ¶ 114.)  Casey never regained consciousness and died in the hospital two days later.  (PSOF ¶ 312.)

### 9. Autopsy

At Casey's autopsy, Maricopa County Medical Examiner Horn found "no acute internal injuries of significance," only fractures of the ribs and sternum noted when Casey was brought to the hospital, which were "likely inflicted during cardiopulmonary resuscitation with chest compressions" as well as "[o]ld rib fractures" identified post-mortem.  (DSOF ¶ 119; Doc. 91-2 at 149.)  The post-mortem internal exam revealed significant cardiovascular disease, small vessel disease, and scarring (fibrosis) in the heart associated with chronic cardiovascular disease.  (Doc. 91-2 at 149.)

Dr. Horn's findings included (1) abrasions and contusions of the head, scalp, face, torso, and extremities, (2) intrascapular hemorrhages, (3) superficial puncture wounds consistent with Taser darts, (4) subcutaneous hemorrhage of the central back, (4)  cerebral edema consistent with perimortem anoxic encephalopathy, (5) conjunctival edema with petechial hemorrhages of the left eye sclera and upper eyelid conjunctiva, and (6) half-inch submucosal contusion of the esophagus adjacent to the thyroid cartilage.  (*Id.* ¶ 314.)  Examination of the neck organs showed hyoid bone unfused, thyroid cartilage, mostly ossified, perimortem fractures of the right superior horn and right lamina of thyroid cartilage, and fractures of the left inferior horns of the thyroid cartilage.  (*Id.* ¶ 315; Doc. 101-1 at 388.)

Dr. Horn did not include Taser use as a cause or contributor to Casey's death, stating,

> [e]xamination of the back revealed two apparent shallow puncture wounds likely corresponding to sites of dart implantation from the CEW in the skin of his back, with at least one puncture wound able to be delineated and measured to a depth of approximately 1 cm within the fat and soft tissue of the back, associated with a small amount of surrounding hemorrhage. As the CEW darts were only superficially penetrating into the skin and subcutaneous tissues, were not placed over or in proximity to the heart, and had no apparent

immediate effects upon his consciousness or cardiac function at the time the CEW was deployed (as he had continued to physically struggle after the last CEW deployment), the CEW is not considered a potential cause or contributing cause of death in this case.

(DSOF ¶ 119; Doc. 91-2 at 149.)[8]

The autopsy report listed Casey's cause of death as "complications of cardiac dysrhythmia and arrest in setting of drug (methamphetamine) intoxication, acute psychosis, arteriosclerotic cardiovascular disease, and physical restraint with prone positioning and possible extrinsic chest compression." (PSOF ¶ 316; Doc. 101-1 at 368.) The manner of death was listed as "undetermined." (*Id.*)

### 10. Medical Expert Reports

According to defense expert Dr. Vilke, a board-certified emergency department physician with experience in cardiac arrest and sudden death, Casey's autopsy report does not show any evidence of a crushed airway or damage to the neck that could cause death. (DSOF ¶ 116; Doc. 91-2 at 6.) Dr. Vilke opines that, "even though there are injuries noted to the thyroid cartilage on autopsy, these are not specific to a neck hold. They are indicative of neck trauma having occurred, but do[] not define exactly when or how the trauma occurred." (Doc. 91-2 at 31.)

Dr. Vilke also opines that any weight placed on the shoulder of a prone subject "would not significantly limit ventilations enough to cause asphyxiation," and that weight on the legs "would have no limiting effect on ventilation or breathing." (*Id.* at 24.) Dr. Vilke concluded as to possible asphyxiation,

---

[8] Dr. Horn's findings that the darts were only superficially penetrating the skin and subcutaneous tissues and were not placed over or in proximity to the heart are admissible for the truth of the matter asserted because they are based on Dr. Horn's personal knowledge and direct observations. The statement that Casey continued to struggle after the last Taser deployment is not admissible for the truth of the matter asserted because it is not based on Dr. Horn's personal knowledge or direct evidence. *See* Fed. R. Civ. P. 56(c)(4). Moreover, there is a genuine issue of material fact whether Casey was struggling at all at the time of the last Taser deployment.  .

[i]f the officers' application of weight had impacted Mr. Wells' ability to ventilate to the point of causing a cardiac arrest and sudden death by asphyxiation, the ventilations would have had to be restricted long enough to where blood oxygen levels would drop because there was not enough oxygen getting into Mr. Wells' lungs. When this occurs, the low blood oxygen levels will cause the heart to become irritable and eventually slow and then stop causing the subject to go into cardiac arrest. This takes time and essentially a complete blockage of air movement in and out of the lungs. There was no evidence that the short period during which some weight applied to Mr. Wells to get him restrained caused the cascade of physiologic changes resulting in a cardiac arrest due to asphyxia. In summary, the evidence supports that neither position, restraint or body weight caused asphyxia or contributed to Mr. Wells' cardiac arrest and death.

(*Id.* at 24.) Dr. Vilke also opines that Taser use did not cause or contribute to Casey's death because, to cause cardiac arrest, the Taser probes would have to penetrate deep into the chest, directly over the heart; the subject would have to have a thin chest wall; and he would have to be standing and leaning forward at the time for the heart to be close to the chest wall. (DSOF ¶ 118; Doc. 91-2 at 26−27.)

Additional defense expert Dr. Michel Levine, an attending emergency department physician and associate professor of emergency medicine and toxicology at the UCLA Medical Center, opines that Casey's methamphetamine level of 580 ng/mL "is clearly in the range where toxicity and death can occur." (DSOF ¶ 120; Doc. 91-2 at 151−53.)

Plaintiff relies on the medical expert report of Dr. Daniel J. Spitz, who opines that

[m]ultiple fractures involving the thyroid cartilage supports the conclusion that Casey Wells was subjected to applied force to his neck consistent with a neck restraint such as a choke hold. The finding of petechial hemorrhages involving the left sclera and left palpebral conjunctiva, while non-specific, are commonly observed in association with neck compression. Such a compressive force would affect Mr. Well's ability to breathe and limit blood flow to and from the brain.

(PSOF ¶ 116; Doc. 101-1 at 238.) Dr. Spitz also opines that Casey's death resulted from multiple factors, "the most significant factor being restraint asphyxiation due to forced

prone restraint with extrinsic compression of his torso likely in combination with neck compression."   (PSOF ¶ 117; Doc. 101-1 at 239.)   "Methamphetamine intoxication, arteriosclerotic and hypertensive heart disease and use of a conducted electrical weapon (Taser) [] can be considered contributory conditions."  (*Id.*)

Cardiologist Dr. Daniel Wohlgelernter opines that Casey's death was due to cardiac arrest brought on by "restraint/compressive asphyxia" caused by "compressive force applied to his torso by the police officers" and respiratory compromise resulting from the Taser shocks to Casey's back.  (PSOF ¶ 320; Doc. 101-1 at 357−58.) Dr. Wohlgelernter rejected methamphetamine intoxication and cardiac pathology as major contributing factors in Casey's cardiac arrest, opining that methamphetamine, even at high levels, does not cause PEA (pulseless electrical activity), and there was no evidence of prior acute myocardial infarction or acute myocardial infarction at the time of Casey's death sufficient to cause sudden cardiac arrest.  (Doc. 101-1 at 359.)

Dr. Michael Freeman, a medical doctor with a Ph.D. in epidemiology and a master's degree in forensic medical sciences, assessed both possible restraint related and non-restraint related causes of death, including asphyxia due to neck/chest/abdomen compression, taser shock, acute methamphetamine toxicity, and cardiovascular disease. (PSOF ¶¶ 324; Doc. 101-1 at 402.)  Dr. Freeman opines that the finding of fractured thyroid cartilage "is a nearly certain indication" that Casey had "an improperly performed chokehold applied to his neck."  (Doc. 101-1 at 406.)  He concludes that this and other restraints applied when Casey was prone and handcuffed were a "highly likely cause of cardiopulmonary arrest," resulting in Casey's death.  (*Id.*)  Dr. Freeman also opined that the use of a Taser five times when Casey was "in a highly agitated state" served to increase Casey's need for oxygen and, together with the positional asphyxia factors discussed, the repeated tasing was also a "plausible contributing factor" in Casey's cardiac arrest and death.  (*Id.* at 406−407.)

As to the possible non-restraint related causes, Dr. Freeman opines that Casey's methamphetamine levels were not high enough to cause methamphetamine toxicity, and

methamphetamine toxicity alone was highly unlikely to have caused death "in the absence of the restraint-related death risk." (*Id.* at 407−408.) Similarly, he opines that Casey's cardiac pathology "was not an independent risk factor for his sudden death, in the absence of the restraint-related death risk." (*Id.* at 408.)

### B. Legal Standards

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The reasonableness inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.*

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis, assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing a non-exhaustive list of factors including the severity of the crime, the threat posed by the suspect, and whether the suspect was resisting arrest ("*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396−97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396−97.

"[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham*, the reasonableness of the force employed." *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001). Accordingly, "[i]n the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." *Id.* at 1284. But there is no "per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals." Courts must still make allowances for an officer's need to make "split-second judgements" in "tense, uncertain, and rapidly evolving" circumstances. *Id.* (quoting *Graham,* 490 U.S. at 396–97).

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether or not an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott*, 550 U.S. at 381 n.8. But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Because the excessive force balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

## C. Discussion

The Officer Defendants' use of force in this action can be broken into three stages over a roughly eight-minute encounter. During the first stage, Arnold and Rodarme grabbed Casey's arms and attempted to pull them together for handcuffing, forcibly took Casey to ground, and Arnold elbow-struck Casey in the nose; then the officers held Casey

down on his back and waited for more backup to arrive.  During the second stage, Seaquist arrived and found Arnold and Rodarme using "soft, empty hand techniques" to try to control Casey on the ground.  Seaquist joined Arnold and Rodarme in attempting to control Casey on the ground, and he tased Casey four times.  Also during this time, Arnold, Rodarme, and Long got control of Casey's arms, placed Casey in handcuffs, and continued to hold Casey down.  During the third stage, Funsten, Yamane, and Haynes applied a RIPP restraint to Casey's legs while Arnold, Rodarme, and Long continued to hold Casey down, and Seaquist tased Casey a fifth time.

To assess whether the uses of force during each of these phases were reasonably related to the need for force, the Court must consider when each of these actions occurred and the circumstances known to the officers at the time.[9]

### 1. Initial Encounter

When Arnold arrived on the scene, he first tried to talk to Casey to get him to put his clothes on and to try to find out what was going on and did not use any physical force, though he warned Casey he would have to handcuff him.  After Rodarme arrived, Arnold and Rodarme progressed to using a modest level of physical force to attempt to place Casey in handcuffs, with each of them simultaneously grabbing and pulling on Casey's arms

---

[9] The parties fail to provide any coherent analysis addressing the different forms of force used under *Graham*.  Defendants scatter parts of their analysis under numerous different headings, leaving it to the Court to try to locate and piece together Defendants' relevant facts and arguments as to each use of force.  Plaintiff does not address each use of force *vis a' vis* the relevant legal standards or address any more than a compressed version of events, limiting her entire discussion of the need for force to the circumstances at the start of the encounter, while at the same time, lumping together every subsequent use of force into a single quantum of force, which Plaintiff argues was "extremely severe." (*See* Doc. 103 at 16−20.)  Plaintiff argues that the quantum of force must be considered as a whole because the officers' actions occurred over just a few minutes, and many actions took place simultaneously.  (*Id.* at 20.)

Whether actions occurred simultaneously or in quick succession is relevant to the totality of the circumstances informing the reasonableness of each officers' actions, but it is not a reason to forgo an accurate or coherent analysis into each materially distinct use of force and what prompted that use of force.

while Casey used his strength to resist their attempts to pull his hands together.  (DSOF ¶¶ 26−30; PSOF ¶¶ 224−35.)

Whether this initial modest use of force was reasonable depends on the governmental interests at stake at the time, which requires analyzing such things as the severity of Casey's suspected crimes, the threat Casey posed to himself or others, and whether Casey was resisting arrest.  *Espinosa*, 598 F.3d at 537; *Graham*, 490 U.S. at 396−97.  These factors are not exclusive.  "Rather, we examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case."  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (internal quotations and citations omitted).

As to the severity of the crimes known to Arnold and Rodarme at the time, radio and CAD transmissions had alerted the officers that Casey had been standing or walking naked in a neighborhood driveway and/or the street for at least 30 minutes while acting "impaired" and had variously been getting down on his hands and knees, screaming, staring up at the sky, and doing yoga poses in the street.  Casey's known or suspected crimes therefore minimally included indecent exposure, a nonviolent class 1 misdemeanor under Arizona law.  *See* Ariz. Rev. Stat. § 13-1402.  By ignoring or refusing Arnold's attempts to engage in conversation, failing to get dressed, and saying he was born naked, would leave the world naked, and would not be handcuffed, Casey was also passively resisting arrest, a class 1 misdemeanor.  *See* Ariz. Rev. Stat. § 13-2508(A)(3).[10]  Additionally, based on Casey's nudity and bizarre behavior and the fact that the area was known to officers for methamphetamine use, a reasonable officer could have believed, as various responding officers testified to believing, that Casey was intoxicated with methamphetamine, a class 4 felony.  *See* Ariz. Rev. Stat. § 13-3407.  (*See* DSOF ¶¶ 14, 24, 49, 67−68, 114; PSOF

---

[10] "[P]assive resistance" is defined as "a nonviolent physical act or failure to act that is intended to impede, hinder or delay the effecting of an arrest."  Ariz. Rev. Stat. § 13-2508(C).

¶ 268.)  Taken together, Casey's known or reasonably suspected crimes at the start of the encounter consisted of nonviolent misdemeanors and a felony drug offense.

A reasonable officer in Arnold and Rodarme's position could also have reasonably believed Casey posed a modest threat to himself or others.  Plaintiff argues that Casey did not pose a threat at any time because he was unarmed, never reached for any officers' weapons, and, prior to Arnold and Rodarme going "hands on" with him, "was being calm, standing still, had not threatened or attempted to harm them, and simply appeared to be not responding to them." (Doc. 103 at 16.)  Although Casey was unarmed and did not threaten Arnold when Arnold first approached him, this does not mean he posed no threat or that there was no governmental interest at stake in arresting him.  Numerous 9-1-1 callers from the neighborhood had already expressed concerns about Casey's behavior, including that Casey had been screaming, could be a danger to himself, and was causing a potential traffic hazard, with at least one caller worried that children in the neighborhood would soon be getting out of school.  These concerns were either relayed to the responding officers via police radio and CAD, or such threats, including potential exposure to children coming home from school, would have been readily apparent to a reasonable officer encountering Casey naked in the street and finding him verbally unresponsive or noncompliant with initial efforts to talk to him and get him clothed.  Taken together with Casey's suspected crimes and resistance to Officer's Arnold's commands, there was at least a modest governmental interest at stake in arresting Casey.

The next factor considers whether the modest level of physical force Arnold and Rodarme used to attempt to handcuff Casey after Casey failed to respond to verbal instructions was reasonably related to the governmental interests at stake.    Plaintiff argues that seizing Casey's outstretched arms and attempting to pull them together was excessive because the officers knew or should have known that Casey was mentally or emotionally disturbed, and they did not warn Casey before doing so or consider the availability of other reasonable measures.  (Doc. 103 at 18.)  The Ninth Circuit has recognized that, when considering the reasonableness of a use of force, "[o]ther relevant

factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington Cnty*., 673 F.3d 864, 872 (9th Cir. 2011). Based on these factors, Plaintiff argues that "Officer Arnold and Sgt. Rodarme could easily have spent more time talking to Casey, remaining calm, and waiting for [additional] backup or paramedics" and they should have considered Casey's mental state prior to going "hands on" with him. (*Id*. at 19.)

Plaintiff does not dispute, though, that prior to Rodarme's arrival, Arnold had already tried less intrusive alternatives by calmly approaching and talking to Casey to try to sort out what was going on and to try to get Casey clothed and out of the street. Arnold then progressed to warning Casey that he was going to have to handcuff him if he did not comply. Even when Casey protested that he would not be handcuffed, Arnold waited for backup to arrive before resorting to any use of physical force, hoping that the arrival of other officers would make Casey more likely to comply without a fight. (*See* DSOF ¶ 20; PSOF ¶ 20.)

Although the officers could have and did infer from Casey's behavior that Casey was emotionally disturbed or under the influence of drugs, this does not make their use of modest physical force to try to detain him unreasonable after Arnold's non-physical attempts to do so proved ineffective. Because Casey had either ignored or refused to comply with Arnold's verbal commands, a reasonable officer confronted with these facts could have inferred that any additional warnings or attempts to reason with Casey would also be ineffective and that some degree of physical force was required to get him to comply. Moreover, Plaintiff merely speculates in hindsight that continuing to try to talk to Casey—after he had already rebuffed the officers' verbal attempts to get him clothed and out of the street—or summoning the paramedics and/or even more officers to the scene would have caused Casey to comply and resulted in less need for force. This after-the-fact conjecture does not make the modest amount of force Arnold and Rodarme used to try to handcuff Casey under the circumstances unreasonable. *See Forrester v. City of San Diego*,

25 F.3d 804, 807–08 (9th Cir. 1994) (police officers are "not required to use the least intrusive degree of force possible . . . the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene."); *see also Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment . . . [and] would inevitably induce tentativeness by officers, and thus deter police from protecting the public and themselves . . . [when acting] under stress and subject to the exigencies of the moment.").

To the extent Plaintiff relies on *Deorle*, which also involved a police encounter with a mentally disturbed individual, to suggest that grabbing Casey's arms without warning was unreasonable, the failure to warn in *Deorle* related to a potentially deadly use of force and does not support that failure to warn prior to using modest force, as Arnold and Rodarme initially used to take hold of Casey's arms, was unreasonable.  In *Deorle*, the Ninth Circuit found it was unreasonable for a police officer not to warn or command Deorle to stop approaching the officer before the officer shot Deorle with a "less lethal" bean bag munition capable of causing serious bodily injury or death.[11]  *Id.* at 1282.  The court noted that Doerle had not harmed or threatened to harm anyone, officers were already stationed at roadblocks to keep him from leaving the immediate area, and the officer who shot him with a bean bag was aware that deputies trained in crisis intervention were on the way.  *Id.* at 1281−82.  The court concluded that "[c]onsidering all the circumstances, at the time Rutherford fired, the governmental interest in using force capable of causing serious injury was clearly not substantial."  *Id.* at 1282.

Here, unlike in *Deorle*, only two officers were on the scene, their interactions with Casey had been relatively subdued, and their only use of physical force at this juncture was minor and did not lead to any discernable physical injury.  Under the totality of the

---

[11] "Less lethal" weapons are those that can inflict serious bodily injury, sometimes resulting in death, but are generally considered less lethal than deadly force.

circumstances confronting Arnold and Rodarme at the time, including that Arnold's prior, verbal attempts to get Casey to comply with orders were ineffective, it was objectively reasonable for Arnold and Rodarme to take hold of Casey's arms to attempt to place Casey in handcuffs. Plaintiff therefore fails to show there is a genuine issue of material fact for trial as to Arnold's and Rodarme's initial use of force in grabbing Casey's arms, and the Court will grant summary judgment to Defendants Arnold and Rodarme as to this portion of Plaintiff's excessive force claim.

### 2. Takedown and Elbow Strike

In the moments after Arnold and Rodarme tried unsuccessfully to pull Casey's arms together for handcuffing, the officers increased their level of force, including by taking Casey to the ground, and, once on the ground, Arnold elbow-struck Casey in the nose, drawing a large amount of blood. (DSOF ¶¶ 27–34.)

The Ninth Circuit has described the use of a leg-sweep maneuver to trip and guide a resistant subject to the ground a "modest deployment of force." *O'Doan v. Sanford*, 991 F.3d 1027, 1037 (9th Cir. 2021) ("The reverse reap throw maneuver that Officer Sanford used—a tripping technique that knocked O'Doan off balance and allowed Sanford to bring O'Doan to the ground—[] involved a modest deployment of force."). Here, the takedown was not well-orchestrated or controlled. Instead, Arnold grabbed Casey in a bearhug from the front while Rodarme pulled down on Casey's shoulders from behind, resulting in Arnold falling on top of Casey and Casey falling backward and hitting his head on the ground. Construing the facts in Plaintiff's favor, this takedown was more intrusive than the controlled maneuver discussed in *O'Doan* and entailed modest to intermediate force.

Arnold's elbow strike to Casey's nose, causing substantial bleeding, constituted a similar degree of force. Impact blows by punching or kicking are generally considered intermediate force. *Steinmeier v. Cty. of San Diego*, No. 18CV1603 JM (WVG), 2020 WL 377052, at *6 (S.D. Cal. Jan. 23, 2020) ("punching, kicking, and/or hitting with a flashlight are intermediate levels of force that significantly intrude on Fourth Amendment rights").

As already discussed regarding the governmental interests at stake, Casey's known or suspected crimes initially consisted of indecent exposure and passively resisting arrest, both non-violent class 1 misdemeanors, and methamphetamine use, a non-violent, class 4 drug felony.  Casey also passively resisted arrest, and a reasonable officer could have determined he posed a modest threat to himself and the community.

Prior to the officers initiating a takedown, however, these factors had changed. After Arnold and Rodarme tried for 45 seconds to one minute to pull Casey's arms together to place Casey in handcuffs, and Arnold warned Casey they would have to force him into handcuffs if he did not cooperate, Casey went on to engage in various actions that a reasonable officer could have perceived as actively resisting arrest and aggravated assault, both violent felonies.  These actions consisted of breaking away from Arnold; turning around and flailing, kicking, and punching toward Arnold, hitting Arnold in the lower lip; and, once on the ground, attempting to headbutt and punch the officers and striking and spitting blood on Rodarme.[12]  (*See* DSOF ¶¶ 34−35, 39−40; PSOF ¶¶ 34, 236.)

Plaintiff argues that the facts about what the officers and Casey did are materially disputed and that the officers' "self-serving statements that Casey struck or kicked them should not be believed" because bystanders stated in police interviews that Casey never tried to strike the officers or flee from them.  (Doc. 103 at 13.)  Plaintiff relies in part on

---

[12] Resisting arrest is defined under Arizona law as

> intentionally preventing or attempting to prevent a person reasonably known to him to be a peace officer . . . from effecting an arrest by:
>
> 1. Using or threatening to use physical force against the peace officer or another.
>
> 2. Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

Ariz. Rev. Stat. § 13-2508(A)(1)-(2).  Aggravated assault is defined as assault on an individual while "knowing or having reason to know that the victim is . . . [a] peace officer or a person summoned and directed by the officer" and is a class five felony.  Ariz. Rev. Stat. § 13-1204(F).

select statements from the police interview with bystander Buffington, who, when asked if he saw "anybody throw any punches or kicks or anything like that," answered, "I couldn't really see that" and went on to explain that he was talking to someone at the time and only saw "bits and pieces" of what happened. (PSOF ¶ 219.) Plaintiff also relies on select testimony of bystander Bolduc who similarly answered the same query by saying, "I didn't see any of that, but like I said, I kinda got to the situation . . . late." (*Id.*)

As previously noted, these witnesses' testimony does not demonstrate personal knowledge whether Casey ever tried to kick, punch, or hit the officers and is insufficient to create a genuine issue of material fact as to the officers' sworn deposition testimony that Casey did so. Plaintiff also leaves out Buffington and Bolduc's descriptions of the officers having a hard time getting Casey under control, including Buffington saying the officers were trying to take Casey down and "they just could not do it. Like, he was—he's super strong," and Bolduc saying "[t]hey eventually got him on the ground. He was—the whole time he was flailing. These two police officers were having a difficult time restraining him. And they kind of had his upper body held down, but his legs and the lower portion of his body were . . . swinging back and forth." (Doc. 101-1 at 93, 95, 103.) A third bystander who testified that he saw Casey hit Arnold in the face also described Casey as "flailing" and waiving his hands around at the time, and when asked specifically whether Casey was fighting, answered that he did not think Casey was punching or attacking. (DSOF ¶ 107; Doc. 91-1, Ex. 19, Palmer Video at 14:42−44:48.)

These accounts do not directly controvert Arnold's statements that Casey "got into a fighting stance, balled up his fists[,] and he took a swing at me. He hit me right . . . in the bottom of the lip and backed off and smiled on his face [sic] and started bouncing up and down again." (Arnold Dep. at 82:5−9.) *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 708 (9th Cir. 2017) ("When a suspect is killed and cannot himself provide an account of what took place, we must examine "whether the officers' accounts are 'consistent with other known facts.'"); At most, there is a triable question of fact whether Casey intentionally hit Arnold. A reasonable jury could conclude from the third witness' account

that, although it is undisputed Casey struck Arnold in the face, he only did so accidentally while flailing his arms and not as an intentional act of aggression.

Resolving this question in Plaintiff's favor does not change the reasonableness analysis, however, because Casey did not have to intend to strike Arnold in the face for a reasonable officer in Arnold's and Rodarme's positions to have concluded, at a minimum, that Casey was intentionally resisting arrest when he broke away, spun around, and started failing, and, more importantly, that he posed a danger to the officers or others if he was not physically restrained.  *See Graham*, 490 U.S. at 396; *Mattos* 661 F.3d at 441.

Considering the totality of the circumstances, the government interest at stake in detaining Casey, which started out as modest, heightened when Casey failed to comply with Arnold's verbal requests and Arnold's subsequent warnings that the officers would have to force him into handcuffs if he did not comply.  Arnold and Rodarme were then justified in initiating a takedown maneuver because their efforts using lesser force had proved ineffective.  *See O'Doan*, 991 F.3d at 1037 (takedown maneuver not excessive when it was not clear that any "less intrusive alternatives would have sufficed to bring O'Doan under control, especially when he had refused to heed several warnings to stop") (internal quotation marks omitted); *see also Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (officer does not violate any clearly established right "when he progressively increases his use of force from verbal commands to an arm grab, and then a leg sweep maneuver, when a misdemeanant refuses to comply with the officer's orders . . . in a challenging environment").

As noted, the takedown in this instance amounted to a more substantial intrusion than a controlled leg sweep maneuver, resulting in Arnold falling on top of Casey, and Casey striking the back of his head on the ground.  But this does not make the takedown unreasonable where, under the circumstances confronting the officers at the time, a more controlled leg sweep maneuver was no longer reasonably possible.  After Arnold gave a verbal cue to Rodarme that he was going to take Casey to the ground, but before he was able to do so, it is undisputed that Casey broke away from the officers, was kicking and

flailing his arms, and had already struck Arnold in the face.  (DSOF ¶¶ 34−35; PSOF ¶ 34.) Under these circumstances, the need for force became more acute, and Casey's own actions of breaking away, kicking, and flailing his arms resulted in a more awkward takedown. The amount of forced used, though more than a controlled leg-sweep maneuver, was therefore reasonably balanced against the growing need for force at the time.

Arnold's elbow-strike to Casey's nose was likewise reasonably related to the need for force.  Although Casey was then on the ground with Arnold sitting astride his waist, Casey was still resisting by flailing and trying to headbutt the officers, and he had pulled his left arm free from Arnold's grasp and had also landed a punch on Rodarme's face. (DSOF ¶ 39.)  Elbow striking Casey in the nose allowed Arnold to regain control of Casey's left arm and pin it down, at which point, Rodarme stated, "We're going to wait here.  We're going to hold him down so we can safely get him into custody and get fire to treat him." (*Id.* ¶ 40−41.)  This strike was therefore reasonably related to the need for force to take control of Casey's arm and help hold Casey down while awaiting backup.  *See Garcia v. City of Santa Clara*, 772 F. App'x 470, 472 (9th Cir. 2019) (unreported) ("The relatively mild force that was used by law enforcement, which included a leg sweep, control holds, and a punch to the face, was reasonable" to control an arrestee "who attempted to punch and kick the officers while the officers were trying to subdue him.").

In summary, Plaintiff fails to show there is a genuine issue of material fact for trial as to Arnold and Rodarme's take down of Casey and Arnold's elbow strike to Casey's nose, and the Court will grant summary judgment to Defendants Arnold and Rodarme on this portion of Plaintiff's excessive force claim.

### 3.    Taser Deployments

Ninth Circuit case law discussing the use of Tasers explains that Tasers can be used in "dart-mode" or "drive-stun mode," with dart-mode delivering a 1,200-volt electrical charge that "instantly overrides the victim's central nervous system, paralyzing the muscles throughout the body and leaving the target limp and helpless."  *Mattos*, 661 F.3d at 443, quoting *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010).  Drive-stun applications,

by contrast, involve pressing electrodes directly against the victim, delivering an electrical shock, which can be "extremely painful" but does not override the central nervous system. *Id.* The Ninth Circuit has found that, in dart-mode, Tasers "constitute an intermediate, significant level of force." *Bryan*, 630 F.3d at 826.

Here, the medical examiner's report stated that

> Examination of the back revealed two apparent shallow puncture wounds likely corresponding to sites of dart implantation from the CEW in the skin of his back, with at least one puncture wound able to be delineated and measured to a depth of approximately 1 cm within the fat and soft tissue of the back, associated with a small amount of surrounding hemorrhage. . . . darts were only superficially penetrating into the skin and subcutaneous tissues, [and] were not placed over or in proximity to the heart.

(Doc. 91-2 at 149.) The Taser download data shows the Taser was deployed five times for a maximum of 6 seconds each time, for a total of 26 seconds over a span of one minute, 35 seconds. (Doc. 91-1 at 154.) Based on Palmer's bodycam video, Casey was "detained," just before the sound of the fifth Taser cycle. Because there is no evidence of a continued struggle after this, all five tasings occurred in the final one minute, 35 seconds of the use-of-force encounter.

The first Taser deployment was reasonably related to the governmental interests at stake. Seaquist arrived roughly three minutes after Rodarme requested back up while sounding "jacked up" and breathing heavily as he and Arnold were attempting to control Casey on the ground. Upon arrival, Seaquist saw Arnold and Rodarme employing soft empty hand techniques to attempt to control Casey, while Casey was on his back, still flailing and kicking his legs. (DSOF ¶¶ 45−51, 86.) Seaquist did not immediately tase Casey but first assisted the other two officers in turning Casey onto his stomach to try to better control him and lessen the risk to the officers; he then tried to control Casey's legs by bending them backwards and using his body weight to try push them back, but he was pushed out of position. (DSOF ¶¶ 53−54; PSOF ¶¶ 53−54, 253.) This is when Rodarme ordered Seaquist to tase Casey, and after warning the other officers that he was going to

deploy the Taser and yelling to Casey to stop resisting, Seaquist deployed his Taser the first time.  (DSOF ¶¶ 55−56.)  This use of intermediate force, particularly where all three officers had already tried lesser uses of force to detain Casey, was objectively reasonable. *See Lindsay v. Kiernan*, 378 F. App'x 606, 609 (9th Cir. 2010) ("Given the volatile situation, Lindsay's refusal to comply with any of the officer's verbal commands, and his physical resistance despite the presence of multiple officers, Officer Kiernan could have reasonably believed that deploying his taser after a warning would be the least intrusive method of subduing Lindsay").

The next three Taser deployments were also reasonably related to the governmental interests at stake because Casey continued to struggle, even after being tased, refusing to give up his arms and kicking his legs.  According to Seaquist, after being tased once, Casey's whole body tensed up but then relaxed, and Casey "still kept into the fight." (PSOF ¶ 57.)  When Casey still would not give up his hands to Arnold and Rodarme, Seaquist deployed the Taser a second time, which also "basically had no effect." (DSOF ¶ 59; Doc. 91-1, Ex. 11 (Seaquist Dep. at 71:22−24).)  Seaquist testified that the three officers were "just getting to the point now where . . . the three of us were getting tired with this guy.  He was just wearing us out.  And I kept yelling at him to stop resisting.  And I know I hit the trigger a third time.  His body stiffened up.  And once he relaxed, he—he was just—he just kept going." (Seaquist Dep. at 72:5−13.)  Similarly, when Seaquist saw that Rodarme was still struggling to gain control of Casey's arm, he tased Casey a fourth time, and he once again saw Casey stiffen up, then relax, and saw that Casey "was still in it for the fight." (DSOF ¶ 62.)  Under these circumstances, the intermediate, substantial use of force inflicted by the first four tasings was reasonably related to the government interests at stake at the time and were not excessive in relation to the need for force to take control of Casey.

Plaintiff argues she is entitled to the inference that Casey was not resisting or fighting the officers during this time and that "any movements Casey made during the restraint were involuntary byproducts of the pain of the Taser, the weight of the Officers,

and his inability to breathe." (Doc. 103 at 17.)  Although the Court must construe the facts in Plaintiff's favor, the operative question for Fourth Amendment purposes is still what a reasonable officer would have perceived at the time.  Here, each time Casey was tased, Seaquist saw Casey's body momentarily stiffen up, but that effect did not last, and when Casey's body relaxed, Casey continued to fight.  These facts do not support the inference that Casey's movements were merely involuntary reactions to being tased; rather, Casey continued to kick and struggle only when the momentary stunning effects of the taser wore off.  *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1175 (9th Cir. 2012) (rejecting argument that "any apparent resistance was, in fact, involuntary muscle spasms caused by the [taser]" where the plaintiff "offered no proof" of this theory, and the officers "consistently testified that Ronald was actively struggling, pushing his knees into his body so that he could use his feet both to lever himself off the bed and to kick the officers.").

*Mattos*, upon which Plaintiff relies to argue that Seaquist is not entitled to qualified immunity, also does not support that Seaquist's first four tasings were unreasonable and would not have placed a reasonable officer on notice that four separate tasings, where a subject continues to struggle and resist arrest, were unreasonable under the circumstances. In *Mattos*, an officer applied a taser in drive stun mode three times over a span of one minute to a pregnant woman's arm, thigh, and neck, causing her to cry out in pain, while the woman was not posing a threat and was merely refusing to sign a traffic citation and would not exit her car.  661 F.3d at 437.  The court found that a reasonable jury could find this use of force unreasonable under the circumstances, reasoning that "[t]hree tasings in such rapid succession provided no time for Brooks to recover from the extreme pain she experienced, gather herself, and reconsider her refusal to comply." *Id.* at 446.  The facts in *Mattos* are materially different from the facts presented here and do not clearly establish that four tasings accompanied by warnings within a span of one minute is unreasonable where a subject is actively resisting, lesser uses of force have proven ineffective, and the subject momentarily stops resisting each time he is tased but then continues to fight. Plaintiff also does not cite to any other cases that would have put a reasonable officer in

Officer Seaquist's position on notice that this use of force was unreasonable under the circumstances confronting the officers at the time.  Therefore, even if a reasonable jury could find that the first four tasings constituted excessive force, Seaquist is entitled to qualified immunity for these uses of force.

Genuine issues of material fact prevent the Court from reaching this same conclusion as to the fifth taser deployment.  Defendants present deposition testimony that the fifth tasing occurred while Casey was handcuffed behind his back but was still yelling and screaming, actively resisting having his legs restrained, and kicking and uncrossing his legs while Funston was still trying to apply a RIPP restraint to Casey's ankles.  (DSOF ¶¶ 76, 79, 87−88.)  Audio from Palmer's bodycam confirms that an officer yelled "stop resisting" as Palmer approached, suggesting that, even though Casey cannot be seen on video at the time, the officers were still struggling to control Casey.  But just after someone yelled "stop resisting!" Palmer, who was by then only a few feet away from the crouched officers, radioed "he is detained right now.  [S]low it down."  (Palmer Video at 14:30:29.)  And it is only after Palmer said this that the clicking sound of the fifth taser begins, and Palmer then radios "need fire for tasing."  (*Id.* at 14:30:31−38.)

Defendants have presented no evidence that the taser probes had become dislodged from Casey's skin or did not deliver a full electrical charge to Casey's back at that time.  It is also clear from the bodycam evidence that this tasing occurred while several officers were surrounding Casey as he lay prone on the ground, and there are no audible or visible signs of an ongoing struggle on the video.  Based on these facts, a reasonable jury could conclude there was no need for any additional force at the time, much less substantial, intermediate force, and the fifth tasing was objectively unreasonable.  *See Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130–31 (9th Cir. 2017) ("By the time Jones was prone and surrounded by multiple officers, there would have been no continuing justification for using intermediate force: Jones was on the ground after his body 'locked up' as a result of repeated taser shocks; he had no weapon and was making no threatening sounds or gestures").

Defendants argue that Officer Seaquist is entitled to qualified immunity because "Ninth Circuit precedent does not clearly establish that every police officer would have known that using a Taser to restrain a suspect who just committed aggravated assault on a peace officer, aggressively and actively resisted arrest, and was warned that the Taser would be used if he did not stop resisting, was clearly unlawful." (Doc. 94 at 43.)  In making this argument, Defendants fail to account for the genuine issue of material fact whether Casey was resisting at all when Seaquist tased him a fifth time.  Construing the facts in Plaintiff's favor, Casey had by then completely stopped struggling and was, in Officer Palmer's words, "detained." (Palmer Video at 14:30:29.)

As of 2017, the Ninth Circuit's ruling in *Jones*, which involved an officer's continued use of a taser on a non-resistant subject being held on the ground, would have placed the unconstitutionality of the fifth Taser deployment beyond dispute.  In *Jones*, the police altercation began as a routine traffic stop, but Jones fled, prompting the arresting officer to call for backup and pursue Jones, who had not threatened the officer and did not appear to have a weapon.  873 F.3d at 1127.  While in pursuit, the officer fired his taser in dart mode at Jones twice, "causing Jones's body to 'lock up' and fall to the ground face down with his hands underneath him"; the officer then knelt on Jones' back to attempt to handcuff him, but he kept his taser pressed to Jones' thigh and repeatedly pulled the trigger. *Id.*  The officer continued to pull the trigger and tase Jones for more than 90 seconds, even after four other officers arrived, one of whom also tased Jones, and the officers had handcuffed Jones and were holding his feet.  *Id.*  When a fifth backup officer arrived, that officer ordered the tasings to stop because he observed that Jones was not resisting and there were enough officers surrounding him to take Jones into custody.  *Id.*

In evaluating this use of force, the Ninth Circuit found that "[u]sing a taser to stop Jones and place him under arrest was reasonable under the circumstances," but that, "[b]y the time Jones was prone and surrounded by multiple officers, there would have been no continuing justification for using intermediate force."  *Id.* at 1130−31.  The Court also denied qualified immunity to the officers, finding that "continuous, repeated and

simultaneous tasings are different from isolated shocks," and that "[a]ny reasonable officer would have known that such use can only be justified by an immediate or significant risk of serious injury or death to officers or the public." *Id.* at 1131−32.

Defendants attempt to distinguish *Jones* from the facts presented here, arguing that, unlike Jones, who merely fled the scene of a traffic stop, Casey had committed serious crimes, including indecent exposure, resisting arrest, and aggravated assault. (Doc. 94 at 28.) Defendants also argue that Officer Seaquist only deployed the taser after he found he could not control Casey's legs and was kicked, and he only did so five separate times, for a total of 26 seconds, with the longest time lasting six seconds, not continuously over 90 seconds or simultaneously with other tasings. (*Id.*)

Defendants are correct that Casey's active resistance and assaults on the officers both before and after he was taken to the ground created a greater threat to the officers here than in *Jones* and a greater need for force, which did not abate during the first four taser deployments. As discussed, the most important consideration in the use-of-force analysis is whether the subject "posed an immediate threat to the safety of the officers or others," *Mattos*, 661 F.3d at 441. Additionally, the near-continuous and duplicative 90 seconds of tasing in *Jones* was more extreme than the five separate 5−6-second tasings of Casey over roughly the same amount of time in this action. As in *Jones*, however, there was no evident need force after Casey ceased resisting, was surrounded on the ground by multiple officers, and was, in Officer Palmer's words, "detained."

Concerning the fifth and final tasing, then, the right at issue for qualified immunity purposes is the right of a previously resistant subject to be free from continued tasing after he is prone on the ground, is no longer struggling or posing a threat, and is surrounded by multiple officers. Even though the circumstances leading up to the uses of force here differ from those in *Jones*, and the amount of force from a single additional tasing in dart mode was arguably less severe than the near-continuous and simultaneous tasings in that case, a reasonable officer would have been on notice from *Jones* that using a taser on a non-resistant subject lying prone on the ground, detained by multiple officers was a

constitutional violation.  873 F.3d at 1130–31 (finding "no continuing justification for using intermediate force once Jones was on the ground and was making no threatening sounds or gestures"); *see Ashcroft v. al-Kidd*, 563 U.S. 731, 741, (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate"); *see also Mendoza*, 27 F.3d at 1361 ("the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right").

Because there are triable issues of fact whether Casey was still resisting or had been fully restrained by several officers on the ground at the time Officer Seaquist tased him a fifth time, the Court cannot determine as a matter of law that Seaquist is entitled to qualified immunity as to this use of force.  The Court will therefore deny summary judgment to Defendant Sequist as to the fifth taser deployment.

### 4.     Knee Pin and Other Prone Restraints

The Ninth Circuit has found that force employed by officers continually pressing their weight on a prone subject's neck and torso while the subject "lay handcuffed on the ground and begged for air" to be "severe" and "capable of causing death or serious injury." *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003).

Based on available deposition and video evidence, the amount of force Arnold used while kneeling with his right knee on Casey's shoulder blade was much less severe than the life-threatening force used in *Drummond*.  (DSOF ¶ 80.)  In his deposition, Arnold testified, "I placed the majority of my weight on my left leg . . . I knelt down and I had my arm on my left leg leaning over on it[, and] I just placed my right knee in his right shoulder blade."  (Arnold Dep. at 114:1−10.)  Consistent with this testimony, Palmer's bodycam video shows Arnold kneeling alongside Casey's upper back with his right knee leaning into Casey, his left leg out to side, and his left arm bent across his own left thigh.  (Ex. 19 at 14:30:28.)

Plaintiff argues that Arnold likely knelt on Casey's upper back for about three minutes (Doc. 103 at 26), but she does not cite to any evidence for this estimate, and the facts in the record do not support this conclusion.  The relevant sequence of events—from the time Seaquist tased Casey a fourth time, while Arnold and Rodarme were still struggling to get control of Casey's arms and apply handcuffs,[13] until Seaquist deployed the taser a fifth and final time, after which Casey was rolled over onto his back—lasted 26 seconds.  (*See* Doc. 91-1 at 154 (fourth tasing at 14:30:19; fifth tasing at 14:30:46)).  Adding up to 19 seconds to account for the gap in time before Palmer's bodycam swings back and clearly shows Arnold on his feet, Casey was pinned down in handcuffs in a prone position for no more than 45 seconds.[14]

For part of this time, Yamane, who had arrived with Haynes just after Long and Funston had also arrived, observed that Arnold and Rodarme were "on [Casey's] shoulders" and Long was "around his waist."  (PSOF ¶¶ 284−85.)  Construing these facts in Plaintiff's favor, at one point, all three officers who were struggling to control Casey on the ground were simultaneously applying at least some of their body weight to Casey's shoulders and/or waist.   The Officer Defendants' testimony and witness interviews indicate, however, that Casey continued to kick and flail his legs the whole time, and unlike in *Drummond*, there is no evidence he appeared unable to breathe or begged for air from which to infer that the amount of force Arnold, Rodarme, and Long used to hold him down

---

[13] Seaquist testified that prior to deploying his taser a fourth time, he was lying on top of Casey's legs, and he saw that Casey's left arm was under his body, and Rodarme was still trying to get Casey's arm out.  (Seaquist Dep. at 102:25−106:6.)

[14] The timestamp of 14:30:46 for the fifth tasing, as stated in the Taser report, does not correlate with the timestamp on the bodycam during the time that Taser deployment is audible, from 14:30:30 and 14:30:36, meaning the timing on these devices were not synchronized.  Regardless, going by the timestamps on the bodycam footage alone, 19 seconds pass between 14:30:28, when Palmer says, "he is detained right now," until at 14:30:47, when the bodycam pivots and clearly shows Casey has been turned onto his back and officers are noting blood on his face.  Because the bodycam view shifts around during this time, it is not possible to tell exactly when Arnold stood up and the officers turned Casey over.

in a prone position was extreme or life threatening.  Nonetheless, because Casey is unable to testify on his own behalf, the Court must consider whether the above facts conflict with other known facts, including circumstantial evidence.  *Longoria*, 873 F.3d at 708 (quoting *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014) (other facts and circumstantial evidence "could give a reasonable jury pause" regarding an officer's version of what took place).

Plaintiff argues that the evidence in Casey's autopsy report contradicts Officer Defendants' version of events, including Officer Arnold's testimony that he only applied pressure to the back of Casey's right shoulder.  (Doc. 103 at 12.)  Plaintiff argues that Casey's documented injuries, including a large, deep contusion between Casey's shoulder blades "shows that Officer Arnold kneeled on and applied his weight to Casey's back." (*Id.*)  Plaintiff also argues that Casey's thyroid fractures, a contusion near his esophagus, and petechial hemorrhages in Casey's left eye indicate that Casey was either struck in the neck or placed in a chokehold so forcefully that his thyroid cartilage was fractured" at some point during the encounter, possibly by Arnold or Rodarme, sometime after these officers took Casey to the ground. (*Id.* at 12, 20−21.)

Relevant to whether any Officer Defendants applied a significant amount of body weight to Casey's back, the autopsy report shows that Casey had a "subcutaneous hemorrhage" in the central back between the shoulder blades.  (Doc. 101-1 at 369.)  The "Evidence of Trauma" section of the report describes the injury in more detail:

> The skin is dissected away from the entirety of the back revealing a 4 x 1 inch elongated area of subcutaneous ecchymosis between the shoulder blades. There is an adjacent smaller 3/4 inch area of subcutaneous hemorrhage inferior and lateral to this larger area of hemorrhage on the right side. Dissection of the soft tissue and musculature of the upper back reveals a larger area of hemorrhage extending to involve the paraspinal muscles measuring up to 6 inches in greatest vertical dimension.

(*Id.* at 377.)

Plaintiff's medical expert Dr. Spitz opines that the hemorrhages of the mid-back are evidence "that Casey was subjected to forced prone restraint with weight force being applied to the central region of his back and posterior neck while he was actively being restrained in a prone position" and that "the presence of such trauma indicates that at some point during the physical restraint one or more of the involved police officers compressed Mr. Wells against the pavement by applying weight force to these areas." (*Id.* at 238.)

Relevant to whether any Officer Defendants applied weight to Casey's neck, the autopsy report states that "there is a focal 1/2 inch submucosal contusion of the anterior upper right aspect of the esophagus adjacent to the thyroid cartilage" and that "[f]orensic anthropologic evaluation of the hyoid bone and cartilaginous structures of the airway revealed focal fractures of right sided airway." (*Id.* at 376.)  Additionally, examination of Casey's eyes revealed "conjunctival edema with focal sparse petechial hemorrhages involving the left eye sclera and left upper eyelid conjunctiva." (*Id.* at 375.)  Dr. Spitz opines that the fractures of the thyroid cartilage "supports the conclusion that Casey Wells was subjected to applied force to his neck consistent with a neck restraint such as a choke hold" and that the "hemorrhages involving the left sclera and left palpebral conjunctiva, while non-specific are commonly observed in association with neck compression." (*Id.* at 238.)

Defendants argue that Dr. Spitz's report should be excluded because it contains "no information from which it could be determined that [Dr. Spitz] has qualifications to address the topics in his report." (Doc. 108 at 9.)  Defendants also argue that Dr. Spitz ignored other facts, including that the CT of the cervical spine and neck performed in the hospital showed "no acute bony abnormality," and that no neck injury was diagnosed or treated in the hospital, which they argue undermine Spitz's conclusions. (Doc. 108 at 9.) Defendants are correct that Dr. Spitz's report lacks a detailed account of Dr. Spitz's medical qualifications and experience.  Dr. Spitz identifies himself only in the heading of his report as a medical doctor (M.D.) in "forensic pathology and toxicology"; his report does not include a curriculum vitae or any other facts regarding his education, experience, areas of

medical specialty, or expertise.  (*See* Doc. 101-1, Ex, 14.)  This failure to document his expert qualifications beyond being a medical doctor in forensic pathology and toxicology does not, however, make Dr. Spitz's opinions as a medical doctor regarding the possible causes of Casey's documented injuries irrelevant or inadmissible.  Defendants are free to question Dr. Spitz about his education, experience, and expertise at trial.  The CT finding of no "acute bony abnormalities" of Casey's neck or spine and the absence of any noted internal neck injuries during Casey's two-day stay in the hospital, if relevant, also merely go to the weight, not the admissibility of Dr. Spitz's opinions.

In addition to Dr. Spitz, Plaintiff relies on the expert opinion of Dr. Freeman, who opined that thyroid cartilage fracture is a "highly unusual injury, occurring less than 1 in 30,000 patients admitted to trauma centers," and that, taken in conjunction with the signs of hemorrhaging in Casey's left eye, this injury "is a nearly certain indication" that Casey had "an improperly performed chokehold applied to his neck" that cut off his breathing. (Doc. 101-1 at 404−405.)  Unlike Dr. Spitz, Dr. Freeman set forth his medical qualifications, specifically in investigating causes of death, in detail in his report (*see id.* at 394−395), and Defendants do not object that Dr. Freeman does not have sufficient expertise to opine on the cause of Casey's neck and eye injuries.  (Doc. 108 at 10.)  As with Dr. Spitz, Defendants argue that Dr. Freeman "ignored hospital imaging documenting no injuries to the neck structures and failed to address live saving [sic] measures—CPR and use of the Lucas device—as alternative causes of injury such as petechiae in the eyes." (*Id.*)  These arguments are speculative and unsupported; moreover, whether these alleged oversights or deficiencies undermine Dr. Spitz's or Dr. Freeman's conclusions is a credibility issue for a jury to decide.

Taken together with the autopsy report, the medical expert opinions of Dr. Spitz and Dr. Freeman regarding the likely causes of Casey's back, neck, and eye injuries are sufficient to create a question of fact whether Arnold, Rodarme, and/or Long placed sufficient weight on Casey's back and/or neck while Casey was in a prone position to leave bruising between Casey's shoulder blades, fracture his thyroid cartilage, and cut off his

breathing.  A reasonable jury could also find that such uses of force while Casey was already prone on the ground and surrounded by multiple officers helping to hold him down and control his legs was unreasonable in relation to the need for force.  There is therefore a question of fact whether Arnold, Rodarme, and Long committed a constitutional violation.[15]

These officers may yet be entitled to qualified immunity for their use of such positional restraints if their conduct did not violate clearly established rights of which a reasonable officer would have known.  *Harlow*, 457 U.S. at 818.

Plaintiff relies on *Drummond* and other cases that have cited *Drummond* to argue that "use of body compression to restrain a prone and bound suspect, who was in no position to offer any meaningful resistance" violates the Fourth Amendment.  (Doc. 103 at 25 (quoting *Abston v. City of Merced*, 506 Fed. Appx. 650, 653 (9th Cir. 2013).)

In *Drummond*, police officers responded to a call regarding a mentally disturbed individual in a 7-Eleven parking lot, and when they arrived, they found Drummond, unarmed, agitated, and hallucinating.  343 F.3d at 1054.  Without warning, the officers knocked Drummond to the ground and handcuffed him behind his back, and even though Drummond did not resist, one officer put both his knees and body weight against Drummond's back, and another officer placed one knee on Drummond's back and the other knee on Drummond's neck.  *Id.*  The officers then "continued to press their weight on [Drummond's] neck and torso as he lay handcuffed on the ground and begged for air," and a witness said the officers were laughing even though it was obvious Drummond was having trouble breathing.  *Id.* at 1056.  After approximately 20 minutes of being held down this way while the officers awaited backup to provide a hobble restraint, Drummond lost

---

[15] It does not matter that Plaintiff cannot identify which of these three officers who had contact with Plaintiff on the ground employed these uses of force.  The Ninth Circuit has held that a plaintiff did not need to identify "precisely which officer delivered which alleged blow or use of force" because the plaintiff had "developed and presented sufficient evidence from which a jury could infer that the individual officers who had physical contact with Lolli participated in the alleged beating." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003).

consciousness and was later revived through CPR but suffered permanent brain damage. *Id.* at 1055. Under these circumstances, the Ninth Circuit determined that "[t]he officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." *Id.* at 1056.

Here, unlike in *Drummond*, there is no genuine dispute of material fact that Casey continued to kick and resist during the final approximately one- and one-half minutes of the use-of-force encounter when Officer Arnold, Sgt. Rodarme, and Officer Long were trying to get control of Casey's arms to apply handcuffs and then continued to hold Casey down. The testimony of bystanders once again does not materially controvert multiple officers' deposition testimony that Casey continued to resist. According to bystander Buffington, after Casey was on the ground and two more officers arrived, Buffington heard the Taser go off at least twice and then thought Casey gave up, "[b]ut then, he started fighting again," which Buffington described as "[p]ulling his arms away. And he was kicking them, you know, trying to kick them away from him." (Doc. 101-1 at 95.) Buffington never saw Casey stop fighting for any length of time before he saw the officers trying to resuscitate him. (*Id.*)

Bystander Bulduc also described seeing Casey on the ground while officers had his upper body held down, and he stated that, during this time, "his legs and the lower portion of his body were . . . swinging back and forth." (*Id.* at 104.) He reported that he and other bystanders heard the popping sound of a Taser, and "shortly after that we saw a police officer giving chest compressions." *Id.* at 103−104. Even though, as previously noted, both Buffington and Buldoc admitted they did not see everything that happened, no other witnesses claimed to see any significant gap between when Casey stopped resisting and the officers turned him over and tried to resuscitate him that would create a genuine issue of material fact as to Officer Defendants accounts that he continued to kick and resist.

Based on the above, *Drummond* would not have put a reasonable officer in Arnold, Rodarme, and Long's position on notice that applying significant body weight to Casey's

back for one- and one-half minutes while Casey was prone, but continued to kick and resist, was objectively unreasonable. *Abston*, an unreported case upon which Plaintiff also relies, is similarly distinguishable.  In *Abston*, video evidence showed Abston was face-down, handcuffed, and ankle-shackled while officers applied pressure to his back for one minute, seven seconds, but due to obstructions on the video, the Ninth Circuit found there were questions of fact "whether Abston continued to resist during this period and, if so, whether his resistance was anything more than minimal."  506 Fed. Appx. at 652.

As discussed, no such genuine issues of material fact about whether Casey continued to actively resist are present here.  Therefore, to the extent Arnold, Rodarme, and Long used excessive force when they applied weight to Casey's back to hold Casey down in a prone position while he continued to resist, these officers are entitled to qualified immunity on the ground that the right of an actively resistant subject to be free from such positional restraints was not clearly established. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (an officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.") (internal quotation marks and citations omitted).

The same cannot be said when such force is applied to a resisting subject's neck sufficient to break cartilage and cut off breathing where the subject, though resisting, is not posing a threat of serious bodily injury or death to the officers.  Based on the autopsy evidence of fractured cartilage in Casey's neck and hemorrhaging in Casey's eye, coupled with the medical opinions Plaintiff has proffered in this action, a reasonable jury could conclude that, at some point during this encounter, Officer Arnold, Sgt. Rodarme, or Officer Long either applied enough pressure to the back of Casey's neck to break cartilage and completely cut off Casey's airways or did so by placing Casey in what Dr. Freeman described as an "improper chokehold."

Although Plaintiffs do not cite, and the Court was unable to locate, a case directly on point with these facts, the reasonable inference is that such injuries are consistent with

deadly force, which is only justified when "it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (internal quotation marks and citation omitted).  Although it is undisputed that Casey continued to kick and resist arrest, even while being held down on the ground, there is no evidence he "pose[d] a significant threat of death or serious physical injury to the officer or others," that would have justified the use deadly force.  Even without a case directly on point, under these circumstances, every reasonable officer would have known that Casey's actions did not warrant applying enough pressure to Casey's neck to break cartilage and cut off Casey's air supply.  For purposes of qualified immunity, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question even though the very action in question has [not] previously been held unlawful."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (internal quotation marks and citations omitted).

For the above reasons, Arnold, Rodarme, and Long are not entitled to qualified immunity for the use of force applied to Casey's neck.  Accordingly, the Court will deny summary judgment to these Defendants as to this use of force.

### 5.    Handcuffing and RIPP Restraint

After Arnold, Long, and Rodarme were able to handcuff Casey and continued to hold him prone on the ground, Funston wrapped a RIPP restraint around Casey's ankles. (DSOF ¶ 74).  Once Funston had the lasso end of the RIPP restraint around Casey's ankles, he used his hands, not his body weight, to try to push Casey's legs far enough backwards to attach the other end of the restraint to the handcuffs behind Casey's back.  Yamane assisted in this effort by pushing his body weight against Casey's legs, and when there was enough slack to do so, Haynes also assisted in clipping the RIPP restraint to the chain between Casey's handcuffs.[16]

---

[16] Minutes prior to these officers' arrival, Seaquist had also momentarily pressed his 250-pound body weight against the backs of Casey's legs while trying to press Casey's

Defendants claim the amount of force these officers employed was minimal, arguing that "the only force used by Officers Yamane, Haynes, Funston, and Long was hands-on attempts to apply handcuffs and a RIPP restraint." (Doc. 20.) Defendants' general characterization of the nature of the force used to employ both handcuffs and leg restraints misstates the facts regarding the nature of the force employed by the officers attempting to secure the RIPP restraint to Casey's handcuffs. As noted, while Funston used only his hands to apply the RIPP restraint to Casey's ankles and to attempt to clip the other end to Casey's handcuffs, Yamane pushed his own body weight against Casey's legs.

Plaintiff argues that the officers "knew that Casey could be potentially experiencing excited delirium and was, therefore, having a medical emergency, and they knew they were restraining him in a way that posed a significant risk of death by positional asphyxia." (Doc. 99 at 21.) Like Defendants, Plaintiff also misconstrues the facts because there is no evidence Casey could not breathe while he was kicking and uncrossing his legs or that the officers were aware he was having a "medical emergency," as Plaintiff claims, until Casey stopped struggling and was turned over onto his back. Nonetheless, construing the facts in Plaintiff's favor, a reasonable officer would have known that forcibly compressing the body of a highly agitated individual who was likely high on methamphetamine, had just engaged in a protracted and aggressive struggle with officers, and was already handcuffed and being held prone on the ground posed a significant risk of positional asphyxia. Under these circumstances, there are questions of fact whether these officers used excessive force in attempting to apply this type of restraint. By failing to address all the relevant facts, Defendants have also not met their initial burden of showing that the force Officers Yamane, Haynes, and Funston used when applying the RIPP restraint was not excessive in relation to the governmental interests at stake at the time.

---

legs against his back, but Casey's kicking and flailing pushed Seaquist out of position, and there is no evidence this momentary compression of Casey's body had any effect on Casey's resistance or substantially compromised his ability to breathe at that time.

These officers are nonetheless entitled to qualified immunity if their actions did not violate clearly established law of which a reasonable officer would have known. Defendants liken the facts in this case to those in *Gregory v. County. of Maui*, 523 F.3d 1103 (9th Cir. 2008), in which the Ninth Circuit held that officers did not use excessive force on a subject who died from a sudden heart attack following an aggressive struggle on the ground with police.  (Doc. 94 at 24−26.)  In *Gregory*, the subject, Richard Gregory, who was later determined to be high on marijuana at the time of the police encounter, was behaving in a bizarre manner, had just assaulted someone, and was noncompliant with police requests to drop a pen.  523 F.3d at 1105.  During a struggle on the ground, two officers held Gregory down around his head and neck while Gregory  repeatedly shouted he could not breathe.  *Id.*[17]  When the officers were finally able to handcuff Gregory, they sat him up and discovered he had stopped breathing.  *Id.*  As here, the plaintiff in *Gregory* argued that the officers should have recognized that Gregory was in a state of excited delirium, making the force the officers used to restrain him unreasonable.  *Id.* at 1106.  The Ninth Circuit rejected this reasoning, ruling that "even accepting that Gregory was in such a state and that the officers should have recognized it, the officers' response to the threat Gregory posed—first confronting him verbally, and only then attempting to disarm and to restrain him—still was objectively reasonable."  *Id.* at 1108.  The Court went on to distinguish the holding in *Drummond* on several grounds, including that, unlike in *Drummond*, "Gregory posed a threat to [the officers] because he refused their requests, acted in an aggressive manner, [] had already assaulted Finazzo," and "resisted the officers throughout the encounter."  *Id.* at 1109.

Plaintiff again relies on *Drummond* to show that the restraint techniques used

---

[17]  During this time, the officers told Gregory it was impossible that he could not breathe because he could talk.  *Gregory*, 523 F.3d at 1105.  The doctor who conducted Gregory's autopsy "noted that a sensation of shortness of breath is a common symptom of a heart attack" but also "confirmed that Gregory was breathing during the struggle since he was able to talk," and the plaintiffs presented no evidence to rebut this finding.  *Id.* at 1105, 1007 n.4.

against Casey, including the officers' attempts to attach a RIPP restraint while Casey was already prone and handcuffed on the ground and being held down by multiple officers violated clearly established law of which a reasonable officer would have known.  (Doc. 99 at 25−27.)  As in *Gregory*, however, the facts confronting the officers in this action are distinguishable from those in *Drummond*.  Most relevantly, there is no material dispute that Casey continued to kick and resist the Officer Defendants' attempts to control him, even while he was handcuffed and prone on the ground.  Because of this, *Drummond*, in which the subject never offered any resistance, does not place the constitutionality of the force Officers Yamane, Haynes, and Funston used to apply a RIPP restraint to restrain Casey while Casey was still kicking and resisting beyond dispute.

Plaintiff has not pointed to any other cases that squarely govern the facts presented here or that firmly establish that attempting to attach a RIPP restraint from a prone subject's ankles to his handcuffs while the subject continues to resist violates clearly established law.  Therefore, even if a reasonable jury could find that Yamane, Haynes, and Funston used excessive force, these Officers are entitled to qualified immunity.  The Court will therefore grant summary judgment to these officers based on their use of the RIPP restraint.

### 6.    Failure to Intervene

Plaintiff claims that "Officer Defendants violated Casey Wells' Fourth Amendment rights when they failed to de-escalate or disengage the other officers from their use of unreasonable and excessive force." (Doc. 1-3 ¶ 137.)[18]  The failure to intervene can support an excessive-use-of-force claim where a bystander-officer has a realistic opportunity to intervene but fails to do so.  *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003); *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000) (police officers can be liable for failing to intercede "when their fellow officers violate the constitutional rights of a suspect or other citizen," but only if they had an opportunity to intercede) (internal citation and quotation omitted); *see Garlick v. Kern*, 167 F.Supp.3d 1117, 1161 (E.D. Cal. 2016)

---

[18] Although Defendants did not address this allegation as a distinct claim in their Motion for Summary Judgment, Plaintiff argues in her Response that all Officer Defendants violated a clearly established duty to intervene.  (Doc. 103 at 28.)

("If an officer fails to intervene when fellow officers use excessive force, despite not acting to apply the force, he would be responsible for violating the Fourth Amendment" if the officer had a "realistic opportunity to intercede") (internal citations omitted).

Plaintiff generally argues that "[e]ach of the Officer Defendants who arrived after Officer Arnold had a realistic opportunity to intercede, de-escalate the situation, and prevent or stop the use of excessive force against Casey." (Doc. 103 at 27.)  More specifically, she argues that Rodarme failed to formulate a tactical plan when he arrived; instead, he escalated the situation by using physical force while Casey was simply standing still with his arms out like an airplane, and he "failed to ensure that the other Officers did not hogtie or deploy the Taser against Casey." (*Id.*)  She also argues that Palmer never instructed the other officers to roll Casey into a recovery position or remove their weight from Casey's body, even though Palmer's bodycam video shows that, as Palmer approached, seven officers were restraining Casey, who was silent and motionless and facedown on the ground, and Arnold was still kneeling on Casey's back. (*Id.* at 28.)  Defendants argue that there is no evidence that any officers observed any unconstitutional force while they were focused on their own areas of control or that they had a realistic opportunity to intervene in any other officers' actions.  (Doc. 108 at 20.)

As noted, to maintain a claim for failure to intervene, an officer must have a realistic opportunity to intercede.  By the time Casey broke away from Arnold and Rodarme, however, both officers were immediately involved in efforts to detain Casey, including by taking him down to the ground, where Casey continued to struggle and hit Rodarme in the face.  There is no evidence that, even if one of these officers used unconstitutional force in their efforts to control Casey at the time, the other had any realistic opportunity to evaluate and respond to those actions.  Likewise, the remaining officers all arrived after Rodarme had already made an urgent call for backup, and when they came on the scene, they immediately engaged in various uses of force to attempt to gain control of Casey in what had become a tense, rapidly evolving situation.  Plaintiff has not pointed to any facts from which to conclude that any officer had a reasonable opportunity to observe and intervene

in any unconstitutional uses of force under these circumstances.  Moreover, apart from Seaquist's fifth taser deployment, the Court has already found that the actions of Officer Defendants, including those of Arnold and Rodarme when they first took hold of Casey's arms, either did not amount to a constitutional violation or did not violate any clearly established law of which a reasonable officer would have known.  This conclusion alone precludes finding that any Officer Defendants violated clearly established law by failing to intervene.

Concerning Seaquist's final taser deployment, there is also no evidence that any officer, including Palmer, knew Seaquist was about to fire his taser and had a realistic opportunity to stop him from doing so.  *See Ting v. United States*, 927 F.2d 1504, 1511 (9th Cir. 1991) ("Assuming Ting was in custody at that point, there is no evidence that the four non-shooting agents knew that Burns would hurt or shoot Ting").  Plaintiff appears to argue that Palmer failed to respond to the tasing after the fact, when she argues, he "did nothing" in response.  (Doc. 103 at 28.)  But failure to act after the fact does not constitute a failure to intervene in the use of force.  Moreover, Palmer did not do nothing; he immediately requested a fire department response.  (PSOF ¶ 303.)

Finally, to the extent Plaintiff argues that Rodarme "failed to formulate a tactical plan upon his arrival," not formulating a plan at the outset of an encounter with a mentally impaired individual, even if misguided, is not the same as failing to intervene in known constitutional violations as they are taking place; nor has Plaintiff shown that Rodarme's alleged failure to formulate a plan before attempting to arrest Casey constitutes a separate constitutional violation or violated any clearly established law.

In summary, Plaintiff fails to present a triable dispute of fact that any officer failed to intervene, and the Court will grant summary judgment to Defendants on this claim.

### 7.   Conclusion

In summary, there is a triable issue of fact whether Casey was no longer resisting when Seaquist tased Casey a fifth time.  The Court will therefore deny summary judgment to Seaquist regarding this use of force.  There are also questions of fact whether Arnold,

Rodarme, or Long applied sufficient pressure to Casey's neck to amount to deadly force, and these Officers are not entitled to qualified immunity as to this use of force. The Court will therefore deny summary judgment to Arnold, Rodarme, and Long based on the amount of force applied to Casey's neck. All Officer Defendants are entitled to summary judgment on the remaining uses of force on the grounds that their actions either did not constitute excessive use of force under the circumstances or did not violate any clearly established rights of which a reasonable officer in their positions would have known.

## V. Familial Association Claim

### A. Legal Standard

"The substantive due process right to family or to familial association is well established," and the state's interference with this liberty interest without due process of law is remediable under § 1983. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) (citation omitted). "To amount to a violation of substantive due process, however, the harmful conduct must shock [ ] the conscience' or 'offend the community's sense of fair play and decency.'" *Rochin v. California,* 342 U.S. 165, 172–73 (1952). The "shocks-the-conscience" standard is, depending on the circumstances, met either by showing that a defendant (1) acted with "deliberate indifference*"* or (2) with a "purpose to harm*"* for reasons unrelated to legitimate law enforcement objectives. *Porter v. Osborn*, 546 F.3d 1132, 1137 (9th Cir. 2008) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Under the first situation, if a defendant is in a position "'[w]here actual deliberation is practical," then his deliberate indifference to the harm he caused may be sufficient to "'shock the conscience.'" *Gantt v. City of Los Angeles*, 717 F.3d 702, 707-08 (9th Cir. 2013) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). "'On the other hand, when an officer makes a snap judgment because of an escalating situation,'" then the courts apply the "purpose-to-harm" standard. *Id.* (quoting *Wilkinson*, 610 F.3d at 554).

Under Supreme Court precedent, conduct that "shocks the conscience" includes conduct that violates the "decencies of civilized conduct," that is "brutal" or "offensive" or

1   "arbitrary." *Cnty. of Sacramento*, 523 U.S. at 846-47 (citations omitted).  Negligence,

2   however, "is categorically beneath the threshold of constitutional due process." *Id.* at 849.

3   Whether conduct such as recklessness or gross negligence shocks the conscience "is a

4   matter for closer calls." *Id.* at 849 (noting that rules of due process are not "subject to

5   mechanical application" and depend on the particular facts in a case).

6   **B.    Discussion**

7   Defendants argue that Plaintiff's Fourteenth Amendment claim fails because "there

8   are no facts establishing that the officers acted with a 'purpose to harm' that was unrelated

9   to legitimate law enforcement objectives." (Doc. 94 at 29.)  Instead, the officers responded

10   to legitimate reports of a naked man in the street, and only when verbal persuasion and

11   command presence failed did the officers attempt any intermediate uses of force.  (*Id.* at

12   29−30.)   At this point, Defendants argue, the officers "were doing nothing other than

13   attempting to place Wells in custody for the safety of the community, Wells, and the

14   officers." (*Id.* at 30.)

15   Plaintiff does not argue that the Officer Defendants' actions meet the "purpose-to-

16   harm" standard, and therefore concedes that their actions do not demonstrate a purpose to

17   harm Casey for reasons unrelated to legitimate law enforcement objectives.   Plaintiff

18   argues instead that the officers' actions are governed by the deliberate indifference standard

19   because "Officer Arnold and Sgt. Rodarme had the time and ability to deliberate about how

20   to safely take Casey into custody while Casey was calm, standing still, and had allegedly

21   verbally refused to be handcuffed." (Doc. 103 at 30.)  Plaintiff also argues that the other

22   officers acted with deliberate indifference because, when they arrived on the scene, they

23   rapidly increased the force applied to Casey and did not pause to deliberate even though

24   Casey was restrained on the ground the entire time.  (*Id.*)

25   As to Arnold and Rodarme's initial use of force, the evidence supports that these

26   officers had a realistic opportunity to deliberate before they took hold of Casey's arms.

27   Casey was not physically threatening anyone at the time and had only refused to comply

28   with the officers' verbal attempts to get him clothed and out of the street.  Under these

circumstances, the "shocks-the-conscience" standard can be met with a showing of deliberate indifference.  As already discussed, however, using modest force to take hold of Casey's arms when Casey refused to be handcuffed was objectively reasonable, given that verbal attempts to gain Casey's compliance had already failed.  These actions were also not physically injurious or even enough to pull Casey's hands together for handcuffing, such that a reasonable jury could find that Arnold and Rodarme acted with deliberate indifference to causing Casey harm.  Plaintiff argues, without offering any alternative, that Arnold and Rodarme could have come up with another way "to safely take Casey into custody."  (*Id.*)  But mere speculation after the fact that a different approach would have been more effective in gaining Casey's compliance does not make Arnold's and Rodarme's initial modest use of force in taking hold of Casey's arms deliberately indifferent and does not "shock the conscience" for purposes of Plaintiff's Fourteenth Amendment claim.

As to the remaining uses of force, Plaintiff argues that, when other officers arrived on the scene, "none of them paused to deliberate," implying that they each had a practical opportunity to do so, such that the "deliberate indifference" standard rather than the "purpose to harm" standard also applies to all the Officer Defendants' actions, not just Arnold and Rodarme's initial choice to go "hands on" with Casey.  (Doc. 103 at 30.) Plaintiff appears to suggest that, despite Casey breaking away from and resisting Arnold's and Rodarme's initial attempts to take control of him, striking Arnold, spitting at Rodarme, and despite Rodarme's urgent call for back up and Casey's continued kicking and flailing even while multiple officers struggled to get him into handcuffs and restrain his legs, the officers had time to deliberate and were not required to make snap judgments in a rapidly escalating situation.  This characterization of events ignores the testimony of the Officer Defendants and bystanders alike that Casey continued to kick and fight against the officers' attempts to control him.  Under these circumstances, the "purpose to harm," not the "deliberate inference" standard applies.  Plaintiff does not argue that the officers who responded within quick succession during the struggle with Casey on the ground acted with a "purpose to harm*"* for reasons unrelated to legitimate law enforcement objectives.

*Porter*, 546 F.3d 1137.   Plaintiff's Fourteenth Amendment claim for loss of familiar association therefore fails as a matter of law for any uses of force these officers employed during this time, and the Court will grant summary judgment to Arnold, Rodarme, Funston, Long, Haynes, Yamane, and Palmer on Plaintiff's Fourteenth Amendment claim.

After Palmer arrived on the scene and observed that Casey was "detained," there is a genuine issue of material fact that Seaquist tased Casey when there was time for deliberation and no legitimate law enforcement reason to do so.   Construing the facts in Plaintiff's favor, a reasonable jury could find that tasing Casey at this juncture was deliberately indifferent to the potential harm to Casey.   The Court will therefore deny summary judgment to Seaquist on Plaintiff's Fourteenth Amendment claim.

## VI.   *Monell* Claim

### A.   Facts

#### 1.   Phoenix Police Department Policy and Training

The Phoenix Police Department's use-of-force guidelines appear in Operations Order 1.5, which recognizes the Department's respect for the dignity of all life.  (DSOF ¶ 126.)  Operations Order 1.5(3)(B) states that "[i]t is the policy of the Department to use a reasonable amount of force to conduct lawful public safety activities" and that the proper use of force must take into account the "totality of circumstances," including (1) the severity of the crime, (2) whether the subject poses an immediate threat to the safety of officers and others, and (3) whether the subject is actively resisting arrest or attempting to evade arrest by flight.  (*Id.* ¶ 127.)  The policy defines "reasonable belief," "excessive force," and "types of resistance" and gives force options, which are to be based on the totality of the circumstances.  (*Id.* ¶ 128.)

Under *Elements of Force*, the policy requires employees to consider whether a subject has (1) the ability to carry out the act, (2) a reasonable opportunity to do so, and (3) creates jeopardy to the officer or others; employees must also reasonably consider other alternatives to force based on the totality of the circumstances.  (*Id.* ¶ 129; PSOF ¶ 129.)  Under *Escalation/Use of Force*, the policy states that "[w]hen use of force is needed,

employees will assess each incident to determine, based on policy, training, and experience, which use of force option will de-escalate the situation and bring it under control." (DSOF ¶ 130.) Officers are taught to intervene when they know or should know that another employee is using unreasonable force, if a reasonable opportunity exists to do so, and they must immediately report excessive force to a supervisor. (*Id.* ¶ 131.)

### a. De-Escalation

The City provides training on de-escalation and "verbal judo," which emphasizes that the overall goal is preservation of life and is "designed to help the officers stay focused and calm during crisis situations and bring chaotic moments to as peaceful a resolution as the suspect(s) will afford." (DSOF ¶ 172.) This training includes the concept "ask, tell, make," meaning first, "ask−be courteous, be professional," second, "tell−be courteous, be professional," third, if the subject does not follow an order, assess whether you have the resources to make the subject follow it, and, if not, start the resources your way or wait for the resources to become available, and fourth, "make−affect the arrest or detention" using the least amount of force objectively reasonable. (*Id.*) The City's training on verbal de-escalation reviews the *Graham* factors and encourages officers to continually evaluate their approach to taking someone into custody, considering the subject's potential mental states and objectives. (*Id.* ¶ 174.) Officers are also trained in how to interact with the mentally ill, including using scenarios to apply listening skills and crisis intervention techniques. (*Id.* ¶ 176.)

### b. Restraining Devices

Operations Order 1.5(C) governs soft empty hand techniques and restraining devices that "have a minimal chance of injury," including wrist locks, joint locks, pressure points, handcuffing, and restraining devices, such as RIPP restraints. (*Id.* ¶ 131.) The policy states that "[e]mployees ***will not*** restrain subjects with their legs behind their back (hog-tying). (*Id.* (emphasis in original).)

### (i) RIPP Restraints

Officers are trained in how to properly apply a RIPP restraint.  (DSOF ¶ 166.)  During RIPP restraint training, the instructors "show [the officers] exactly what is not authorized [and explain that] when a RIPP restraint is placed around someone's ankles, you cannot shorten the length . . . because it would create what could be construed as hogtying and would lead to other issues with position[al] asphyxia and stuff like that."  (*Id.*)

According to PPD trainer Joshua Calle, Phoenix police officers are taught that "you can't hogtie individuals, meaning you can't tighten up their restraint where their ankles and hands would be in a really tight position and leave them, [which] has the potential of creating serious risk of injury or death, so [the instructors] train them not to do that.  We don't necessarily refer to it as it's deadly force."  (DSOF ¶¶ 163, 164.)  This is because whether a type of restraint amounts to deadly force is not a "yes or no" question; there are many factors at play, including physical issues and drug use, that may not be known to the officers at the time.  (*Id.*)

For prone, handcuffed individuals, the lesson plan for applying RIPP restraints covers the following guidelines: (1) the steps should be completed by 2 to 3 officers, (2) control the subject's body and legs by crossing the ankles, (3) open the hobble wide enough to loop it around the ankles, then cinch it snugly around the ankles, (4) bring the subject's ankles towards the buttocks by pulling the strap towards the handcuffs, and attach the brass clip to the middle of the handcuffs or the hinge on the cuffs, (5) do not shorten the strap or wrap it around the subject's ankles, (6) be mindful of body positions that impair the ability to breathe normally, (7) immediately roll the subject into a seated position, and (8) facedown exposure should be limited to the time necessary to apply the hobble and custody is maintained.  (Doc. 91-4 at 86–87.)  Once the RIPP restraint is properly placed, officers are trained to get the subject out of the prone position as quickly as practically possible.  (DSOF ¶ 166.)

Operations Order 7.1(1)(B)(1) further instructs that the only leg restraints that are authorized are Department-issued RIPP straps and modified leg irons.  (*Id.* ¶ 158.)  Section 7.1(B)(2), *Guidelines for Use*, provides the following:

a. Leg-restraint straps may be used to secure combative or violent subjects to prevent injury to the subject, officers, and others and to minimize the opportunity for escape.

b. If either of the restraints is applied, officers will minimize the facedown exposure of the prisoner.

c. If the opportunity presents itself, officers should place prisoners in an upright position on their side or back.

(*Id.* ¶ 159.)   Section 7.1(B)(4) states that "subjects displaying difficulty breathing or loss of consciousness will be removed from restraints at the earliest opportunity" and "first-aid and/or live saving measures will be initiated, including a request for the Fire Department." (*Id.* ¶ 160.)

### (ii)   Handcuffs

Operations Order 7.1, which sets forth Department guidelines for restraining prisoners, addresses handcuffing, and section (3)(d) provides that an officer may refrain from using handcuffs on "subjects apparently under the influence of drugs, subjects who are obese, subjects who are known to have cardiovascular disorders, and subjects who have injuries preventing handcuffing to the rear."  (*Id.* ¶ 158.)   Section 7.1(A)(3) states that "[t]hese conditions may increase the risk of injury or death by positional asphyxiation when a suspect is kept face down for a prolonged period."  (*Id.*)

### (iii)   Face-Down Restraint

Officers are taught that there could be a risk of physical harm from being restrained face down, and the policy reiterates that officers are to minimize the amount of time a subject is kept in a facedown position.  (*Id.* ¶¶ 161, 162.)  Outside of the use of a firearm, whether a particular restraint or type of force constitutes deadly force under PPD policy is based on the totality of the circumstances.  (*Id.* ¶ 162; PSOF ¶ 162.)

Officers are trained that placing body weight on the back of a handcuffed prone person is a factor that could cause death, but "depending on the situation, [officers] still have to be able to detain and control the subject.  So[,] if and when there are mitigating factors similar to excited delirium or positional asphyxia, the training is consistent with

getting control and getting that subject into a recovery position and requesting fire or EMS." (*Id.* ¶ 165; PSOF ¶ 165.)

Phoenix Police officers receive Arizona Peace Officers Standards and Training Board (AZPOST) training before they become officers, and they receive City of Phoenix training related to positional asphyxia and excited delirium, including that excited delirium is a medical emergency. (*Id.* ¶ 167.)

### c.      Tasers

Operations Order 1.5(C) governs the use of Electronic Control Devices (ECDs), including Tasers, which are considered a non-deadly use of force. (*Id.* ¶ 134.) The policy includes an explanation of how these devices work, their effect in temporarily incapacitating a suspect, and factors that determine when they should and should not be used, as follows:

> ECDs, such as the Taser, use compressed nitrogen gas to propel probes and wires that conduct electrical energy which overrides a subject's central nervous system, attempting to temporarily stop the subject's actions.
>
> ECDs may be used when it is objectively reasonable based on the totality of the circumstances, on subjects who are displaying active aggression, or who are placing an officer or a third party in reasonable apprehension of imminent physical injury, or to prevent a subject from harming him/herself.
>
> The following circumstances should be considered prior to use:
>
> > *Is the suspect posing an imminent threat to the safety of officers, a third party, or him/herself?
> >
> > *What is the severity and violence level of the crime?
> >
> > *Do the suspects have a history of violent behavior?
> >
> > *If a[n] arrest team is not available, is it feasible to delay deployment to wait for one?
>
> When the circumstances justifying the use of an ECD no longer exist, the ECD will immediately be discontinued.

\* Employees may still use reasonable force to maintain control and to protect themselves or others from danger when such force can be justified through the totality of the circumstances.

ECDs will not be used for any of the following:

• Coercion of any type

• Against subjects solely for running from the officer

• Against a subject who would be in danger of falling from a significant height

• When subjects are near flammable liquids and gases

• Intimidation by reckless display

• Escorting or prodding individuals

• Waking unconscious or intoxicated individuals

• Individuals operating a motor vehicle

• Individuals holding a firearm when their finger is on the trigger

• Handcuffed prisoner's resisting/refusing to enter a police vehicle, holding room, or hanging onto a railing or other item, etc.

(*Id.*)

Operations Order 1.5(4)(E) further advises officers to avoid using Tasers against certain categories of persons (known or visibly pregnant women, elderly persons, young children, and handcuffed prisoners) unless the officers can articulate that other reasonable force options have been tried or were unlikely to succeed.  (*Id.* ¶ 135.)

Tactical considerations for Taser deployment include

• Announcing deployment,

• Communication with other employees upon arriving at the scene,

• When practical, having an arrest team available,

• Consideration of other options when dealing with mental health or excited delirium subjects,

- When practical, giving verbal warnings, including brief use of the warning Arc function to give the subject adequate time to comply prior to applying force,
- If within nine feet, deploy in two authorized parts of the body far enough away from each other to create neuromuscular incapacitation, then use the Arc button to activate all deployed probes,
- If outside nine feet, may deploy one 5-second cycle, evaluate the response, and, when feasible, allow the arrest team to control the subject,
- Subsequent deployment may be administered if control over the subject is not achieved,
- If the ECD is ineffective or inoperable, consider another force option,
- When determining an extended cycle is necessary to control a combative subject, explain the circumstances surrounding the decision in the incident report,
- Only apply the number of cycles reasonably necessary to safely approach and restrain a subject (no specific limit to the number of cycles that may be administered to a subject has been determined).

(*Id.*)  Operations Order 1.5(4)(E) provides that the primary target for Taser probes should be "[c]enter mass of the subject's back."  (*Id.* ¶ 138.)

Officers receive training that, if a subject is lying down in handcuffs and RIPP restraints and is no longer acting aggressively or in a way that is a danger to self or others, the expectation is to roll them over from a prone position to a recovery position.  (*Id.* ¶ 137.) They are also trained that it may be appropriate to use a Taser on a handcuffed person who is prone on the ground "if they're still displaying actions of active aggression or dangers to self or others."  (PSOF ¶ 137.)

When using a Taser, officers are taught to target the back of the subject to minimize potential exposure to the chest and darts near the heart.  (DSOF ¶ 139.)  They are also taught that Tasers in stun mode may not be effective with focused aggressors or people under the influence of drugs and they should only apply the number of cycles reasonably necessary to allow safe restraint of the subject and, if ineffective, to avoid repeat cycles

and use another force option.  (*Id.* ¶ 140; PSOF ¶ 140.)  They are also taught that using a Taser improperly, such as letting it run for an extended period, can cause serious injury or death.  (DSOF ¶ 141.)

Officers are not trained that using a Taser on physically compromised people can cause death, but they are trained that certain people, including physically compromised people are not good candidates for a Taser.  (DSOF ¶ 141; PSOF ¶ 141.)  Officers are taught how a Taser works, circumstances when it should not be used, that numerous or prolonged exposures are "frowned upon," and that officers are "expected to think through problems and identify times when certain levels of force should or should not be used." (DSOF ¶ 142.)  As a general rule, officers are taught not to use a Taser on a handcuffed subject but that, under the totality of the circumstances, there may be instances when a Taser could be used this way, including when a handcuffed person is prone on the ground and displaying "active aggression" or is presenting a danger to himself or others.  (PSOF ¶ 142.)

### d. Intermediate Control Techniques

Operations Order 1.5(4)(F) governs intermediate control techniques, including closed fist strikes, hammer fist strikes, palm-heel strikes, impact pushes, kicks, knee strikes and elbow strikes.  (DSOF ¶ 144.)  This section sets forth the following guidelines:

- Areas to avoid are the neck, back, sternum, kidneys, and groin.
- Hard empty hand techniques may be used when facing the active aggression level of resistance.
- Although these techniques may be used in some situations when facing passive resistance, officers will first attempt verbal persuasion and soft empty hand techniques when practical.
- Closed fist, palm-heel, and elbow strikes are the only techniques that may be used to strike the face and head, and then only when reasonably necessary as a means to overcome a violent attack.

(*Id.*)

Officers are trained not to strike individuals in the throat or to target the throat.  (*Id.* ¶ 145.)  They are also trained not to use a knee as force on a person who is not fighting or resisting and are expected to remove the pressure as soon as it is safe to do so.  (*Id.* ¶ 168.)

### e.   Deadly Force

Operations Order 1.5(4)(H) covers the use of deadly force, with specific guidelines for the use of firearms and vehicles.  (*Id.* ¶ 146.)  This policy states that deadly force "is utilized as a last resort when other measures are not practical under the existing circumstances," and requires that "[w]hen the circumstances justifying the use of deadly force no longer exist, deadly force will immediately be discontinued."  (*Id.*)  Officers are trained that any tool or technique that is used in a way that creates a substantial risk of causing death or serious physical injury could be considered deadly force.  (*Id.* ¶ 147.)

### f.   Reporting and Review

Operations Order 1.5(6) sets forth reporting requirements for each use of force and requires critical use-of-force incidents to be submitted to the Tactical Review Committee (TRC) for review and identification of any related training needs.  (*Id.* ¶¶ 152−53, 156.)  Operations Order 1.5(8)(E) states that the Training Bureau is responsible for designing and delivering training based on the review and recommendations of the TRC.  (*Id.* ¶ 156.)

The TRC is also responsible for providing a semi-annual report of lethal force activity to the executive staff, to include (1) the number and type of lethal force incidents reviewed, (2) any training given in relation to each incident and how the training was delivered, and (3) any trends identified in lethal force incidents and any policy revisions made as a result of the TRC review process.  (*Id.*)

Operations Order 1.5(7)(B) requires all use-of-force incidents that result in serious injury or death to be investigated concurrently by the Professional Standards Bureau (PSB), the officer's supervisor, the Violent Crimes Bureau/Homicide Unit, and the Incident Review Unit. (*Id.* ¶ 154.)  Operations Order 1.5(9) provides that the physical and emotional well-being of the officer is of primary concern following any use of force incident and sets forth guidelines for counselling and other assistance, including reassignment if necessary.

### 2.    Training Requirements

Operations Order 1.5(5) requires all employees to receive annul training on the use of force options and policy by authorized instructors who are AZPOST certified.  (*Id.* ¶ 148.)  The City provides annual training on Operations Order 1.5, RIPP restraint, sudden in-custody death/positional asphyxia, excited delirium, mental illness, effective crisis communication, and de-escalation.  (*Id.* ¶ 148.)

In addition to attending multiple training modules on mental illness and crisis communications that all officers receive, Officer Long attended a 35-hour block of Crisis Intervention Training (CIT), and Officer Seaquist received training as a drug recognition officer.  (*Id.* ¶¶ 150−51.)

In addition to classroom training, officers receive (1) field training for several months to obtain hands-on training on all aspects of police work, including a debrief as to all incidents and how they could be effectively resolved, and (2) daily briefings on incidents that have occurred and the tactics that may or may not be appropriate under the circumstances.  (*Id.* ¶ 169.)

### 3.    Officer Defendants

When questioned during their depositions, Officers Haynes, Yamane, Long, Seaquist, and Funsten all testified that they had received training on positional asphyxia and demonstrated knowledge of what it entails.  (*Id.* ¶ 171.)  Officer Funston also testified that hog-tying is prohibited, that a properly applied RIPP restraint does not result in hog-tying, and to roll a restrained person into a recovery position as soon as possible.  (*Id.*)  Officer Arnold did not recall receiving training on positional asphyxia or excited delirium.  (*Id.*)  Sgt. Rodarme had heard of positional asphyxia but did not recall if he was trained in a class and could not say at the time what positional asphyxia meant.  (*Id.*)

### 4.    In-Custody Death Investigations

The Phoenix Police Department has a Professional Standards Bureau (PSB) that investigates in-custody deaths; the investigation includes multiple levels of review by a board with three civilian members, an assistant chief, a commander, and a peer officer.  (*Id.*

¶ 177.)  PSB investigators provide facts for the review, and the chief makes the final review decision.  (*Id.* ¶ 178.)  PSB investigators and review board members are not provided with any information regarding an officer's past use-of-force history and have no way of determining if a particular officer has a history of using force more often than other officers. (PSOF ¶ 341.)

The length of time it takes to complete the review depends on the length of time the Maricopa County Attorney's Office conducts its independent review to decide whether or not to press criminal charges because the City cannot move forward with its review until the criminal investigation is complete.  (*Id.* ¶ 179.)

Since 2009, the PSB has never found an in-custody death out of policy.  (DSOF ¶ 339.)  The Department tracks the Use of Force Board's recommendations and uses of force that are reportable but does not specifically track in-custody death in which prone restraint occurred.  (*Id.* ¶ 340.)

### 5. Officer Use-of-Force Records

Prior to 2015, Officer uses of force were documented in the PACE database, which was subject to regular purging, and in 2015, much of the PACE information was moved into the RMS system.  (*Id.* ¶ 343.)  Whether use-of-force records are available for a particular employee depends on the purging process in use at the time the use of force was documented.  (*Id.* ¶¶ 342−43.)  Reviews of uses of force that are determined to be within policy are purged on a yearly basis.  (*Id.* ¶ 342.)

### B. Legal Standards

A municipality may not be sued under § 1983 solely because an injury was inflicted by one of its employees or agents.  *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).  Rather, the municipality is liable only when the execution of its policy or custom inflicts the constitutional injury.  *Id.*; *see also Miranda v. City of Cornelius*, 429 F.3d 858, 868 (9th Cir. 2005); *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166 (1993); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983").

To impose municipal liability under § 1983 a plaintiff must show that (1) he or she was deprived of a constitutional right; (2) the municipality had a policy; (3) this policy amounts to deliberate indifference to the plaintiff's constitutional rights; and (4) the policy was the moving force behind the constitutional violation." *Oviatt By and Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)) (internal quotation marks omitted).

A city's failure to properly train or supervise its police officers may serve as the basis for § 1983 municipal liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (citing *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (same for failure to supervise). To demonstrate deliberate indifference, a plaintiff must show that a city "disregarded the known or obvious consequence that a particular omission in [its] training program would cause [municipal] employees to violate citizens' constitutional rights." *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014) (emphasis added) (internal quotation marks and citation omitted). Where liability is premised on custom rather than an official policy, "random acts or isolated events [are] insufficient to establish custom," *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995); "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy," *Trevino*, 99 F.3d at 918, *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks and citation omitted).

1

  **C.**  **Discussion**

2  Defendants have made an initial showing that the City of Phoenix did not fail to

3 train its officers in the constitutional use of force.  The City's written policies regarding

4 proper uses of force address each type of force employed in this action, including de-

5 escalation techniques; the use of restraints, including RIPP ties; intermediate uses of force,

6 such as hand, fist, and elbow strikes; and Tasers, which are categorized as non-deadly

7 force.  The policies also address risk factors—such as positional asphyxia—when

8 employing such uses of force, including that hog-tying is not permitted; Tasers are not

9 recommended for certain classes of people—including those already handcuffed—and

10 should not be used unless the officers can articulate their reasons for doing so; and that,

11 once a subject is under control, and as soon as it is practical to do so, officers must place

12 that person in a "recovery position."

13  Regarding the trainings officers receive, the evidence also shows that Phoenix

14 Police officers, including Officer Defendants, all received AZPOST training before

15 becoming officers and all of them continued to receive on-the-job training, including

16 reviewing uses of force, and annual trainings in use of force from AZPOST instructors.

17 Nothing in the evidence presented regarding the City's use-of-force policies or trainings

18 suggests that Phoenix police officers are not properly trained in the reasonable use of force

19 or that the City "disregarded the known or obvious consequence that a particular omission

20 in [its] training program would cause [municipal] employees to violate citizens'

21 constitutional rights."  *Flores.*, 758 F.3d at 1159.

22  Defendants have also met their initial burden of showing that the City does not have

23 a regular policy, practice, or custom that is deliberately indifferent to the rights of those

24 with whom its officers come in contact.  Instead, the evidence shows that the City has

25 policies requiring the documentation of all uses of force, and critical uses of force are

26 reviewed by the TRC, which submits recommendations for revised or additional training

27 to the Training Board, which is, in turn, responsible for designing and delivering training

28 in response to issues identified by the TRC.  (DSOF ¶¶ 152−3; 156.)  The City also has a

1  Professional Standards Bureau (PSB) that investigates all use-of-force incidents that result

2  in serious injury or death, and such incidents are subject to multiple levels of review,

3  including by a board with three civilian members, an assistant chief, a commander, and a

4  peer officer.  (*Id.* ¶¶ 154, 177.)  Such review measures do not demonstrate a policy,

5  practice, or custom of deliberate indifference to the uses of force employed by Phoenix

6  Police Officers.

7  Based on these initial showings, the burden shifts to Plaintiff to show either that the

8  City (1) failed to properly train Officer Defendants out of deliberate indifference to the

9  rights of the public or (2) has a regular pattern or practice that is deliberately indifferent to

10  those rights, and (3) the City's failures to train or unconstitutional patterns and practices

11  were the "moving force" behind Officer Defendants violating Casey's constitutional rights.

12  *City of Canton*, 489 U.S. at 389.

13  **1.  Failure to Train**

14  Regarding the failure-to-train portion of her claim, Plaintiff first argues that PPD

15  policies specifically prohibit the use of Tasers against handcuffed individuals, but the

16  Department nonetheless trains its officers that it is appropriate "to use a Taser on a

17  handcuffed person who is prone, face down on the ground, if the person is displaying

18  'active aggression' or is a danger to himself or others." (Doc. 103 at 31.)  Defendant further

19  argues that "Officers are not trained that the Taser can cause serious injury or death to

20  people who are physically compromised, nor are they trained to refrain from using a Taser

21  on physically compromised individuals." (*Id.*)

22  In making these arguments, Plaintiff misstates the policies at issue.  Operations

23  Order 1.5(4)(E) forbids the use of Tasers in certain situations—such as when a subject

24  would be in danger of falling from a significant height or is near flammable liquids and

25  gasses—that are not at issue here.  (Doc. 91-2 at 292.)  The policy also states that officers

26  are to avoid using Tasers against certain categories of people, including handcuffed

27  individuals, "unless employees can articulate other reasonable force options have been

28  tried or were unlikely to succeed."  (*Id.*)  There is no inconsistency between these written

policies and the training officers receive, which permits the use of a Taser on a handcuffed person who is prone on the ground "if they're still displaying actions of active aggression or dangers to self or others." (PSOF ¶ 137.) Use-of-force policies and training that give officers discretion on when to use a Taser or other significant uses of force are consistent with the bedrock principles articulated in *Graham* that officers must consider the "totality of the circumstances" when determining whether a particular use of force is objectively reasonable, taking into consideration such factors as whether the subject is posing a threat and whether lesser uses of force are practical under the circumstances. *See Graham*, 490 U.S. at 396−97, *Espinosa*, 598 F.3d at 537, 537; *Miller*, 340 F.3d at 964.

Plaintiff's arguments regarding other purported inconsistencies in the City's use-of-force policies and trainings are equally unavailing. Plaintiff argues, for instance, that the PPD's lesson plan on positional asphyxia "provides that officers should be mindful of positions that impair the subject's ability to breathe and *immediately* roll the subject to a seated position"; whereas, in training, officers are taught there is an "expectation" that they should roll the subject into a recovery position after the officers have control. (Doc. 103 at 35.) Plaintiff once again manufactures an inconsistency where there is none. The lesson plan Plaintiff relies on pertains to RIPP restraints, and the very next teaching point in the outline from which Plaintiff cites states that "[f]acedown exposure should be limited to the time necessary to apply the hobble and custody is maintained." (Doc. 91-4 at 87.) Taken as a whole, these teaching points are consistent with the deposition testimony of PPD trainer Joshua Calle, who stated "depending on the situation, [officers] still have to be able to detain and control the subject. So[,] if and when there are mitigating factors similar to excited delirium or positional asphyxia, the training is consistent with getting control and getting that subject into a recovery position and requesting fire or EMS." (PSOF ¶ 165.) As above, this approach is also consistent with *Graham*, and Plaintiff has not pointed to any case law showing that the City's training on this issue is deliberately indifferent.

Plaintiff also points out that Operations Order 1.5 forbids "hog-tying" subjects, and she argues that, despite this written policy, this is exactly what the Officer Defendants did

1    when they "bent Casey's legs toward his buttocks, elevated his legs, and applied their

2    weight to his lower extremities." (Doc. 103 at 35.)  The Court has already found a question

3    of fact whether Funsten, Yamane, and Haynes used excessive force when they attempted

4    to apply RIPP restraints to Casey by compressing his body and putting weight on his legs

5    while he was already handcuffed and prone on the ground.  But finding that individual

6    officers may have violated a subject's constitutional rights in a particular instance is not

7    the same as finding that a municipality failed to properly train its officers in the

8    constitutional use of force or that it had a policy, practice, or custom of overlooking such

9    violations.  "In resolving the issue of a city's liability, the focus must be on adequacy of

10   the training program in relation to the tasks the particular officers must perform.  That a

11   particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on

12   the city, for the officer's shortcomings may have resulted from factors other than a faulty

13   training program." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390–91, (1989); *Connick*

14   *v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by

15   untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for

16   purposes of failure to train.")[19]

17          Plaintiff also relies on three prior cases, which she argues demonstrate that the City

18   has a pattern or practice of failing to train its officers on the proper use of force and that

19   the need for more or better training is "obvious."  (Doc. 103 at 33.)  Plaintiff does not

20   discuss the facts in each of these cases except to say that they all involved in-custody deaths

21   due to positional asphyxiation and would have put the City on notice that its training in

22   such things as Taser use and prone restraint techniques was "patently inadequate in relation

23   to the tasks that officers are expected to perform."  (*Id.*)

24

25

---

26   [19] This same reasoning applies to Officer Arnold's and Sgt. Rodarme's inabilities
     during their depositions to remember or articulate certain aspects of their use-of-force
27   trainings.  Inferring that one or two officers were inadequately trained is not enough to
     show the City has a widespread pattern or practice of failing to properly train its police
28   officers. *City of Canton,* 489 U.S. at 390–91; *Connick*, 563 U.S. at 62.

1    Plaintiff first relies on *Muhaymin v. City of Phoenix*, which she identifies only by

2    its case number, 2:17-cv-04565-DLR.  (*Id.*)  Upon review of the docket in this case, the

3    parties settled, and the only substantive order prior to settlement was an order granting in

4    part and denying in part a Motion to Dismiss filed by the City of Phoenix and various

5    Phoenix police officers.  (Doc. 53.)  The court found as to the plaintiff's excessive-use-of-

6    force claims that, "assuming the truth of Plaintiff's allegations, and viewing the allegations

7    in the light most favorable to the Plaintiff, . . . Plaintiff ha[d] stated a plausible claim for

8    excessive force, and [] dismissal of Counts I and VII is not warranted at this stage of the

9    proceedings."  *Muhaymin v. City of Phoenix*, No. CV-17-04565-PHX-SMB, 2019 WL

10   699170, at *5 (D. Ariz. Feb. 20, 2019).  The mere fact that the plaintiffs in *Muhaymin*

11   alleged sufficient facts to support an excessive use-of-force claim is not evidence that any

12   officers used excessive force, and Plaintiff does not cite to any evidence to show this

13   occurred or any facts regarding the City's response to the incidents alleged in that action.

14   Absent such facts, *Muhaymin* does not show that the City had notice that its officers

15   required additional training on Taser use or positional asphyxia and was deliberately

16   indifferent to that need.

17   Next, Plaintiff cites *Atencio v. Arpaio*, 674 F. App'x 623, 625 (9th Cir. 2016).  In

18   *Atencio*, the Ninth Circuit upheld the district court's denial of qualified immunity to several

19   officers who, based on video evidence construed in a light most favorable to the plaintiff,

20   appeared to have applied a carotid hold on a physically subdued subject and tased, struck,

21   and piled on top of the subject while he was handcuffed in a prone position outside a county

22   jail cell.  In *Atencio*, the plaintiffs sued both Maricopa County and the City of Phoenix

23   based on the alleged excessive force used by their respective officers.  There are no facts

24   showing, however, that the Ninth Circuit's findings applied to Phoenix Police officers, and

25   Defendants state they did not.  (Doc. 108 at 23.)

26   Finally, Plaintiff relies on a 2015 Maricopa County Superior Court case *Ontiveros*

27   *v. City of Phoenix, et. al*, No. CV2015-007286, which significantly predates the alleged

28

events in this action.  The Maricopa County Superior Court docket shows only that this action was dismissed following a notice of settlement in late 2018.[20]

Absent any evidence regarding the actions of Phoenix Police officers in any of these cases or any evidence regarding the City's responses, including its review of these alleged incidents and whether it implemented any new or additional trainings at the relevant times, merely referring to three cases that allegedly involved deaths caused by positional asphyxia, one of which may not even have involved Phoenix Police officers, fails to show that the City was on notice of gaps in its training and was deliberately indifferent to an obvious need for more and different training prior to the uses of force in this action.  For the above reasons, Plaintiff's *Monell* claim based on the City's alleged failure to train fails as a matter of law.

### 2.      Unconstitutional Policies, Practices, or Customs

Plaintiff may still be able to prevail on her *Monell* claim if she can show that the City has a regular policy, practice, or custom of allowing its officers to violate the rights of individuals with whom they come in contact.  Where this claim rests on unconstitutional practices or customs, Plaintiff must be able to show that these practices or customs are of "sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918.

Plaintiff points to a number of alleged deficiencies in the City's use-of-force polices that she argues show deliberate indifference, including that the City does not specifically track in-custody deaths "in which prone restraint occurred"; since 2009, the PSB has never found an in-custody death out of policy; PSB investigators and Use of Force review boards are not provided information on an officer's use-of-force history, and PPD allows officers to purge use-of-force records from their files.  (Doc. 103 at 35−37.)

Plaintiff does not dispute that Operations Order 1.5(7)(B) requires all use-of-force incidents that result in serious injury or death to be investigated concurrently by the PSB,

---

[20] www.superiorcourt.maricopa.gov/docket/Civil Court Cases/ caseInfo.asp?caseNumber=cv2015-007286 (last visited February 2, 2023).

the officer's supervisor, the Violent Crimes Bureau/Homicide Unit, and the Incident Review Unit; nor does she dispute that PPD tracks the Use of Force Board's recommendations and all uses of force that are reportable.  (DSOF ¶¶ 154, 339.)  It is therefore undisputed that the City has structures in place to investigate, track, and make recommendations regarding all significant uses of force, including all in-custody deaths, which are subject to multiple levels of review.

Plaintiff has not shown, under these facts, that the City's failure to track in-custody deaths by the specific kind of force involved is deliberately indifferent.  Nor has she shown that the entities tasked with investigating police use-of-force incidents for the purpose of issuing reports and making training recommendations must have access to the use-of-force histories of the individual officers involved.  The mere fact that the PSB has not found any in-custody deaths to have been out of policy since 2009 is also not enough, on its own, to show that the City fails to properly investigate such incidents.  Finally, Plaintiff has also not pointed to any facts showing that officers are permitted to purge their use of force records from their files or pointed to any facts showing that this is relevant to the Officer Defendants in this action.

Standing on their own, these purported deficiencies in PPD policy at most represent a difference of opinion in the best way to investigate, track, and respond to various uses of force, but Plaintiff has not presented any facts upon which a reasonable jury could find that City's policies for doing so amount to deliberate indifference to the rights of those with whom its officers come in contact.  Moreover, even if Plaintiff could make this showing, she has not shown how any of these allegedly deliberately indifferent policies relate to and were the "moving force" behind any alleged unconstitutional uses of force by Officer Defendants in this action.  Absent this showing, Plaintiff's *Monell* claim based on the City's allegedly deliberately indifferent policies, practices, or customs also fails as a matter of law.

Accordingly, The Court will grant summary judgment to Defendants on Plaintiff's *Monell* claim and dismiss the City from this action.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 94).

(2)     Defendants' Motion for Summary Judgment (Doc. 94) is **granted in part** as to Plaintiff's: (a) Fourth Amendment excessive-use-of-force and Fourteenth Amendment loss of familial association claims against Defendants Funston, Haynes, Yamane, and Palmer; and (b) *Monell* claim against the City of Phoenix.  These claims and Defendants are **dismissed** with prejudice.

(3)     The Motion for Summary Judgment (Doc. 94) is **denied in part** as to Plaintiff's (a) Fourth Amendment excessive-use-of-force and Fourteenth Amendment loss of familial association claims against Defendant Seaquist; and (b) Fourth Amendment excessive-use-of-force claim against Defendants Arnold, Rodarme, and Long.

(4)     The **remaining claims** in this action are Plaintiff's Fourth Amendment excessive-use-of-force and Fourteenth Amendment loss of familial association claims against Defendant Seaquist and Fourth Amendment excessive-use-of-force claim against Defendants Arnold, Rodarme, and Long.

(5)     This action is **referred** by random lot to Magistrate Judge Fine for the purpose of conducting a settlement conference.

(6)     The parties must jointly contact the chambers of Magistrate Judge Fine at (602) 322-7630 within **14 days** of the date of this Order to schedule a settlement conference.

Dated this 17th day of March, 2023.

Honorable Susan M. Brnovich
United States District Judge